**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 29, 2020, AT 2:30 P.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JUNE 29, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING." THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY."**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF**

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**
**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**
**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**
**3) SELECTING "JUDGES' PROCEDURES & SCHEDULES;"**
**4) SELECTING "VIEW HOME PAGE" FOR CHIEF JUDGE JONES;**
**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**
**6) SELECT CHESAPEAKE ENERGY CORPORATION, ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**
**7) COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state as follows in support of this motion:

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on June 28, 2020 (the "Petition Date").

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**The Debtors' Workforce**

5. The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees, temporary workers, and independent contractors include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

6. The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits. Consequently, the relief requested herein is necessary and appropriate.

7. The Debtors employ approximately 1,990 individuals on a full-time basis and approximately 10 individuals on a part-time basis (collectively, the "Employees"). Approximately 700 Employees are paid on an hourly basis and approximately 1,300 Employees

receive a salary. None of the Employees are represented by a union or collective bargaining unit. In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "Independent Contractors") to complete discrete projects, as well as temporary workers (the "Temporary Staff") from several staffing agencies (collectively, the "Staffing Agencies") to fulfill certain duties on a short-term basis. The Debtors currently engage approximately 80 Staffing Agencies, although the number of Independent Contractors and Temporary Staff fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

**Employee Compensation and Benefits**

8. To minimize the personal hardship the Debtors' workforce would suffer if employee related obligations are not paid when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, health and welfare benefits, and certain supplemental benefits the Debtors have historically provided the Employees, Temporary Staff, and certain non-Employees, as applicable, in the ordinary course of business (collectively, the "Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incidental to the Employee Compensation and Benefits.

9. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

10. The Debtors estimate that they owe prepetition amounts of the Employee Compensation and Benefits in approximately the following amounts:

| Relief Sought | Amount |
|---|---|
| **Compensation and Withholding Obligations** | |
| Unpaid Wages | $10,400,000 |
| Unpaid Contractor and Staffing Obligations | $28,700,000 |
| Withholding Obligations | $2,900,000 |
| Expense Reimbursements | $30,000 |
| Non-Employee Director Compensation | -- |
| **Employee Benefit Programs** | |
| Health Insurance Programs | $6,300,000 |
| Life and AD&D Insurance | $600,000 |
| Disability Benefits | $900,000 |
| Workers' Compensation Program | $4,100,000 |
| 401(k) Deductions | $1,100,000 |
| 401(k) Plan Contributions | $1,400,000 |
| COBRA Benefits Program | -- |
| Paid Leave | $16,700,000 |
| Non-Insider Severance Program | -- |
| **Supplemental Employee Benefits** | |
| Relocation Program | $480,000 |
| Childcare Program | $290,000 |
| Other Additional Benefits Programs | $110,000 |
| **Total** | **$74,010,000** |

11. The Debtors do not believe there are amounts owed to any Employee on account of the Employee Compensation and Benefits that exceed $13,650, the priority expense cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## I. Compensation and Withholding Obligations.

### A. Unpaid Wages.

12. Every two weeks, the Debtors pay Employees' wages, salaries, and other compensation that accrue on a bi-weekly basis (collectively, the "Employee Compensation"). The Debtors pay their Employees' wage and salary obligations (the "Wages") on either a salaried or hourly basis up to two weeks in arrears, and pay approximately $9 million in the aggregate each bi-weekly period. The Debtors internally process and administer their payroll and

reimbursements through one payroll system. Each two-week pay period, the Debtors calculate the Employee Compensation for each Employee and typically transfer funds sufficient to satisfy such obligations from the Debtors' bank account one to two days in advance of each applicable pay period. Employee Compensation is then distributed to the Employees on behalf of the Debtors.

13. Because Employees are paid in arrears, Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid based on overtime calculation, which, upon resolution, may reveal that additional amounts are owed to such Employees.

14. As of the Petition Date, the Debtors estimate they owe approximately $10.4 million to Employees on account of all accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time-off, and amounts related to the 401(k) plan) earned before the Petition Date (collectively, the "Unpaid Wages"). By this motion, the Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue paying Wages to their Employees on a postpetition basis in the ordinary course of the Debtors' business.

**B. Independent Contractors and Temporary Staff Compensation.**

15. As discussed, the Debtors rely on Independent Contractors and Temporary Staff in the ordinary course of their business to perform a wide range of services critical to the Debtors' operations, including, among other things, providing drilling, engineering, security, and other operational services, information technology services, human resources services, and various other administrative functions. The Debtors rely on the support of Independent Contractors and Temporary Staff to complete discrete projects in furtherance of the Debtors'

business and to fill short-term positions that are necessary to meet the Debtors' intermittent needs but are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and Temporary Staff (directly or indirectly through payments to the Staffing Agencies) is critical to minimizing disruption of the Debtors' continued business operations. On average, the Debtors spend approximately $9.2 million per month on account of Independent Contractors and Temporary Staff (the "Unpaid Contractor and Staffing Obligations").

16. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Unpaid Contractor and Staffing Obligations is approximately $28.7 million. By this motion, the Debtors seek authority to pay any prepetition Unpaid Contractor and Staffing Obligations, and to continue paying Unpaid Contractor and Staffing Obligations on a postpetition basis in the ordinary course of the Debtors' business.

**C. Withholding Obligations.**

17. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Certain of the Deductions are forwarded to various third-party recipients. The Debtors deduct approximately $700,000 in the aggregate from Employees' paychecks on account of the Deductions on a semi-monthly basis.

18. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of

gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority at approximately the same time Employees' payroll checks are disbursed. The Debtors remit approximately $2.5 million in the aggregate on account of the Payroll Taxes on a semi-monthly basis.

19. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and outstanding Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $2.9 million. The Debtors seek authority to pay any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business.

**D. Reimbursable Expenses.**

20. In the ordinary course of business, the Debtors pay or reimburse Employees for certain reasonable and customary expenses that such Employees incur in the scope of their employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties.

21. The Debtors provide certain Employees with corporate credit or prepaid debit cards, including fuel cards and purchasing cards used by Employees required to travel or work in the field to cover legitimate business travel and fuel expenses and other credit cards used by Employees in certain departments to cover miscellaneous operational expenses (collectively, the "Credit Cards").[3] Expenses incurred on the Credit Cards are billed directly to the Debtors

[3] For the avoidance of doubt, the Debtors are seeking authority to pay prepetition obligations on account of the Credit Cards and to continue providing the Credit Cards, and the intercompany transactions in connection

and do not pass through the applicable Employee's personal financial accounts. However, Expense Reimbursements primarily are incurred by Employees through the use of personal funds. In such cases, the applicable Employee may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse the Expense Reimbursements likely would impose significant hardship on Employees.

22. On average, the Debtors pay Expense Reimbursements of approximately $11,000 per month in the aggregate.[4] Due to the timing of when Employees submit Expense Reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding as of the Petition Date. Based on historical practice, however, the Debtors estimate that as of the Petition Date, the Debtors have accrued approximately $30,000 on account of Expense Reimbursements. By this motion, the Debtors seek authority to pay the Employees' unpaid prepetition Expense Reimbursements and to continue paying prepetition and postpetition Expense Reimbursements in the ordinary course of the Debtors' business on a postpetition basis.

**E. Non-Employee Director Compensation.**

23. The Debtors' board of directors consists of nine non-Employee directors (each, a "Director"). The Chairman of the board of directors receives annual cash compensation of $550,000 and each of the other Directors receive annual cash compensation of up to approximately $325,000 for his or her services as a Director, inclusive of amounts received for

---

therewith, on a postpetition basis pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief*, filed contemporaneously herewith.

[4] The monthly cost of Employee Reimbursements was calculated by using the average monthly cost of Expense Reimbursements in fiscal year 2019.

his or her service on any committees and paid in quarterly installments in advance (the "Non-Employee Director Compensation").

24. The Debtors do not believe they presently owe any prepetition amounts on account of the Non-Employee Director Compensation. As such, the Debtors seek authority to pay their Directors any Non-Employee Director Compensation in the ordinary course of business, and to continue paying Non-Employee Director Compensation to their Directors in the ordinary course of business on a postpetition basis.

## II. Employee Benefit Programs.

### A. Health and Welfare Programs.

25. The Debtors offer a comprehensive employee benefits package to all of their full-time Employees (working 30 or more hours per week) for medical, dental, and vision care coverage and certain other benefits (collectively, the "Health and Welfare Programs"), including:

- health care coverage;
- life insurance;
- liability insurance;
- disability benefits;
- workers' compensation;
- the 401(k) Plan (as defined herein); and
- the COBRA Benefits Program (as defined herein).

26. By this motion the Debtors seek authority to pay any accrued and outstanding prepetition amounts due under the Health and Welfare Programs and to continue the Health and Welfare Programs in the ordinary course of business on a postpetition basis.

**1. Health Insurance Programs.**

27. The Debtors offer their full-time Employees the opportunity to participate in a number of health benefit plans, including the Medical Plan, the FSA, the Dental Plan, the Vision Plan, and the Voluntary Health Benefits (each as defined below, and collectively, the "Health Insurance Programs").

28. The Debtors offer medical and prescription drug benefit coverage to Employees and eligible dependents (the "Medical Plan"). The Medical Plan is administered by Blue Cross Blue Shield of Texas ("BCBSTX"). Because the Medical Plan is self-insured, the Debtors are primarily responsible for Employee claims under the Medical Plan. The Debtors pay CVS Caremark a monthly administrative service fee and also pay a per-prescription administrative service fee for administration of payments and benefits under the Medical Plan. Generally, the medical and prescription drug coverage provided under the Medical Plan depends on a variety of factors, including whether the coverage is sought for an individual or a family, whether treatment is sought "in-network," meaning at a provider that contracts with BCBSTX, or whether the coverage provided is "out-of-network." Thus, monthly health care premiums per Employee may vary depending on the specific coverage under the Medical Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. Prescription coverage is provided to all Employees who enroll in the Medical Plan, although Employee out-of-pocket costs may vary depending on whether prescriptions are fulfilled through "in-network" or "out-of-network" providers. In connection with the Medical Plan, the Debtors contract with Teladoc Health, Inc. to provide participating Employees with 24/7 access to physicians via phone or video appointments for a consultation fee of $45 per appointment.

29. The Debtors pay approximately $1.7 million per month on account of the Medical Plan. The Debtors also contract for stop-loss coverage with HM Life Insurance Company under

which the Debtors pay approximately $70,000 per month to insure against Medical Plan claims that exceed $400,000 per covered individual.

30. The Debtors provide Employees the opportunity to access flexible spending accounts (the "FSAs"), administered by Alight Solutions Company ("Alight Solutions"), which set aside pre-tax dollars to cover incidental medical costs and dependent child and elderly care. Currently, approximately 190 Employees use the FSA for medical costs or dependent child and elderly care, for which the Debtors pay a monthly administration fee of approximately $20,000 (the "FSA Administration Fees"). The Debtors do not make any contributions to any Employee's FSA.

31. The Debtors also provide Employees with dental insurance (the "Dental Plan") administered by BCBSTX. The Dental Plan is self-insured, and the Debtors pay an administrative service fee of approximately $5,000 per month on account of the Dental Plan. Additionally, the Debtors provide Employees the opportunity to purchase vision insurance (the "Vision Plan"), administered by VSP Vison. The Vision Plan is self-insured, and the Debtors pay an administrative service fee of approximately $20,000 per month on account of the Vision Plan.

32. The Debtors offer Employees the opportunity to purchase certain voluntary benefits, including accident insurance, critical illness, and hospital indemnity insurance, and insurance for age-related or debilitating care needs (collectively, the "Voluntary Health Benefits"). The Debtors contract with Aflac Inc. and Transamerica Life Insurance Company to provide the Voluntary Health Benefits and pay approximately $30,000 per month in the aggregate to administer coverage thereunder. The Debtors deduct up to $11,000 a month in the

aggregate from each participating Employee's Wages on account of the Voluntary Health Benefits.

33. The Debtors pay approximately $1.9 million] per month in the aggregate on account of the Health Insurance Programs. As of the Petition Date, the Debtors estimate that approximately $6.3 million is accrued and outstanding on account of the Health Insurance Programs. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Health Insurance Programs and to continue administering the Health Insurance Programs in the ordinary course of business and consistent with past practice.

**2. Life and AD&D Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

34. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Standard Life and AD&D Insurance") to Employees through Prudential Insurance Company of America ("Prudential"), which provides maximum coverage of up to 200 percent of the applicable Employee's annual salary in the event of an Employee's death or injury, up to a maximum of $2.5 million. Employees may also purchase supplemental life insurance (the "Voluntary Life Insurance," and together with the Standard Life and AD&D Insurance, the "Life and AD&D Insurance") through Prudential, which provides maximum coverage of up to $1 million for the applicable Employee, and in other varying amounts for such Employee's spouse and children.[5] The Debtors are fully insured through the Life and AD&D Insurance and the Debtors pay approximately $200,000 per month with respect to their portion of the premiums for the Life and AD&D Insurance.

---

[5] Employees may purchase Voluntary Life Insurance for spouses and children up to 50 percent of the applicable Employee's coverage, up to $250,000 for spouses and $10,000 for children.

35. As of the Petition Date, the Debtors estimate that approximately $600,000 is accrued and outstanding on account of the Life and AD&D Insurance. By this motion, the Debtors seek authority to pay prepetition amounts due on account of the Life and AD&D Insurance and to continue administering the Life and AD&D Insurance in the ordinary course of business and consistent with past practice.

**b. Disability Benefits.**

36. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits on the first day of the first month following their date of hire. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of 100 percent of their base Wages for the first six weeks of protection[6] in the event of a qualified non-work related illness or injury (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their base Wages, up to a monthly maximum of $20,000, in the event of a qualified non-work related illness or injury (the "Long-Term Disability Benefits").

37. An Employee's Short-Term Disability Benefits begin (a) immediately after such Employee is injured or begins maternity leave or (b) five calendar days after such Employee is absent from work due to illness. The Short-Term Disability Benefits continue for a maximum of 26 weeks of any disability thereafter. The Long-Term Disability Benefits begin after an Employee is absent from work for 26 weeks due to any disability and continue until normal Social Security retirement age. The Short-Term Disability Benefits and the Long-Term

[6] If an Employee's Short-Term Disability Benefits exceed six weeks, such Employee will receive an additional 14 weeks of protection at 80 percent of his or her base Wages and then six weeks at 60 percent of his or her base Wages until transitioning into the Long-Term Disability Benefits.

Disability Benefits are fully insured through Prudential. The Debtors pay Prudential approximately $10,000 per month in premiums with respect to the Short-Term Disability Benefits and approximately $90,000 per month in premiums with respect to the Long-Term Disability Benefits.

38. 11 Employees are currently receiving Disability Benefits. As of the Petition Date, the Debtors estimate that approximately $900,000 is accrued and outstanding on account of the Disability Benefits and associated premiums. By this motion, the Debtors seek authority to pay prepetition amounts due on account of the Disability Benefits and to continue providing the Disability Benefits in the ordinary course of business and consistent with past practice.

**c. Workers' Compensation Program.**

39. The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate (the "Workers' Compensation Program"). All Employees are entitled to participate in the Workers' Compensation Program. Currently, the Debtors maintain coverage under the Workers' Compensation Program through Starr Indemnity & Liability Co. The Debtors use a guaranteed cost program with no deductible but subject to year-end adjustments. The annual cost of the Workers' Compensation Program is approximately $2 million.

40. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[7] There are currently 15 open claims under the Workers' Compensation

[7] The Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this

Program. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with such claims. This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

41. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. As of the Petition Date, the Debtors estimate that approximately $4.1 million is accrued and outstanding on account of the Workers' Compensation Program. By this motion, the Debtors request the authority to (a) pay prepetition amounts due on account of the Workers' Compensation Program, (b) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, and (c) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

**3. 401(k) Plan.**

42. The Debtors provide all Employees with the ability to participate in a 401(k) defined contribution program (the "401(k) Plan"). Employees generally are eligible to participate in the 401(k) Plan on the first day of employment. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). As of the Petition Date, the Debtors

motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

estimate that they are obligated to remit approximately $1.1 million on account of the 401(k) Deductions.

43. The Debtors match the Employees' 401(k) Plan contributions on a discretionary, dollar-for-dollar basis up to 15 percent of the Employees' compensation (collectively, the "401(k) Contributions"). The Debtors contribute approximately $3 million per month on account of the 401(k) Contributions. As of the Petition Date, approximately $1.4 million in 401(k) Contributions are accrued and outstanding.

44. The 401(k) Plan currently is administered by Fidelity Investments. All administrative costs associated with the 401(k) Plan are deducted from the assets contributed by the Employee.

45. Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions. As such, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions generally are held in trust by the Debtors and are not property of their estates. Therefore, the Debtors request the authority to continue the 401(k) Plan in the ordinary course of business on a postpetition basis, including (a) remitting the 401(k) Contributions consistent with their ordinary course practice and (b) transferring the 401(k) Deductions on a pre- or postpetition basis consistent with their ordinary course practice.

**4. COBRA Benefits.**

46. Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees (the "COBRA Participants") may continue insurance coverage under the Medical Plan, Dental Plan, and Vision Plan, and may continue participation in the FSAs following the termination of their employment with the Debtors (the "COBRA Benefits").

More specifically, COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to eighteen months, and in some instances up to thirty-six months, following termination of employment. Approximately 110 former Employees receive COBRA Benefits. COBRA Participants are responsible for paying all premium costs associated with the COBRA Benefits. To assist in the administration of the COBRA Benefits and collection of premiums costs related thereto, the Debtors use the services of Alight Solutions. Alight Solutions collects premiums costs from the COBRA Participants and remits a check to the Debtors on a monthly basis. The Debtors then remit these funds to the applicable healthcare services provider.

47. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of the COBRA Benefits. Out of an abundance of caution, by this motion, the Debtors request authorization to (a) remit all outstanding prepetition amounts incurred on account of the COBRA Benefits, (b) continue to offer the COBRA Benefits, including to those Employees who may be terminated after the Petition Date, and honor all obligations related thereto on a postpetition basis in the ordinary course of business consistent with their prepetition practices, and (c) continue to pay fees related to the COBRA Benefits on a postpetition basis in the ordinary course of business consistent with their prepetition practices.

**B. Paid Leave.**

48. The Debtors maintain certain paid leave benefit programs for Employees, providing paid leave for PTO, Holidays, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

49. In the ordinary course of business, the Debtors provide paid time off ("PTO") to the Employees as a Paid Leave benefit. PTO accrues, beginning with the first full pay period of employment, at a specified rate based on an Employee's years of experience. An Employee accrues between approximately three and nine hours of PTO each pay period. Employees may

carry over up to 120 hours of their accrued but unused PTO into the next calendar year at the end of any calendar year. Employees who are terminated or resign are entitled to a cash payment in lieu of their accrued but unused PTO, subject to deduction for any amounts owed to the Debtors. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid PTO is approximately $16.7 million. This amount is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO in the event an Employee leaves the Debtors' employment.

50. In addition, the Debtors also offer Employees 11 paid holidays throughout the year (each a "Holiday"). Generally, eligible Employees are not required to work on a designated Holiday, but to the extent they do, Employees are paid for Holiday time plus their base rate of pay.

51. The Debtors also permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Employees for certain missed work time in the ordinary course of business for bereavement, jury duty, leave provided under the Family and Medical Leave Act, short-term disability, long-term disability, voting, military leave, and all legally required leaves (collectively, the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

52. The Debtors believe that the continuation of the Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. As a result, the Debtors seek authority to allow eligible Employees to use their Paid Leave in the ordinary course of business on a postpetition basis and to pay any PTO accrued in the ordinary

course of business. To be clear, the Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**C. Non-Insider Severance Programs.**

53. In the ordinary course of business, the Debtors provide severance benefits to non-insider full-time Employees[8] in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns (the "Non-Insider Severance Program"). Under the Non-Insider Severance Program, Employees receive a lump-sum payment pursuant to one of the policies below:

- two weeks of base salary for each year of service;
- one week of base salary for every year of age over 40;
- one week base salary for every $10,000 of salary;
- payment equal to the number of severance weeks for medical and dental costs under COBRA, if enrolled in such programs at the time of termination; or
- the cost of outplacement services.

54. The Debtors believe that the Non-Insider Severance Program is critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success.

55. As a condition to receiving benefits under the Non-Insider Severance Program, the Debtors typically require that the participating Employee execute a release agreement, whereby such Employee releases any claims held against the Debtors. Severance is paid out to

---

[8] For the avoidance of doubt, the Debtors do not request authorization to continue the Non-Insider Severance Program with regard to any "insider" as the term is defined in section 101(31) of the Bankruptcy Code (each, an "Insider"). Consequently, the Debtors submit that section 503(c) of the Bankruptcy Code with respect to bonus or severance payments to insiders does not apply to the relief requested herein.

Employees in a lump-sum upon the execution of the release agreement, but no later than 45 days following the notice of termination.

56. As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations on account of the Non-Insider Severance Program. However, for the avoidance of doubt, the Debtors seek authority to continue to honor the Non-Insider Severance Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**E. Supplemental Employee Benefits.**

57. The Debtors offer supplemental employee benefits (collectively, the "Supplemental Benefits") to substantially all of their Employees, including:

- relocation assistance;
- onsite childcare services;
- Employee assistance and counseling;
- tuition reimbursement;
- advocacy services;
- adoption services; and
- military differential pay.

58. As of the Petition Date, the Debtors estimate that approximately $880,000 is accrued and outstanding on account of the Supplemental Benefits. By this motion, the Debtors request the authority to pay prepetition amounts on account of the Supplemental Benefits and continue the Supplemental Benefits in the ordinary course of business and consistent with past practice.

**1. Relocation Assistance.**

59. The Debtors pay for certain expenses to relocate or provide temporary housing for certain Employees (the "Relocation Program"). Specifically, the Relocation Program provides Employees with home sale assistance, home finding and temporary living assistance, home purchase assistance, rental assistance, moving and household transportation assistance, and employee and family transition assistance. The Debtors contract with Weichert, Realtors to administer certain aspects of the Relocation Program. The Debtors believe that maintaining the Relocation Program is important to attracting valuable talent and ensuring smooth transitions into the Debtors' business. On average, the Debtors pay approximately $150,000 per month in the aggregate on account of the Relocation Program. As of the Petition Date, the Debtors estimate that approximately $480,000 is accrued and outstanding on account of the Relocation Program. By this motion, the Debtors seek authority to continue the Relocation Program in the ordinary course of business and consistent with past practice.

**2. Childcare Program.**

60. The Debtors offer all Employees onsite childcare at a subsidized rate (the "Childcare Program"). Under the Childcare Program, the Debtors have engaged Bright Horizons Family Solutions ("Bright Horizons") to provide childcare services to Employees at certain of the Debtors' properties. In connection with the childcare services, participating Employees pay subsidized fees through deductions from the applicable Employee's Wages as such fees are incurred. The Debtors pay Bright Horizons directly for the balance of amounts owed after the Employees' payments. On average, the Debtors pay approximately $90,000 per month on account of the Childcare Program. As of the Petition Date, the Debtors estimate that approximately $290,000 is accrued and outstanding on account of the Childcare Program. By this motion, the Debtors seek authority to pay prepetition amounts due on account of the

Childcare Program and to continue providing the Childcare Program in the ordinary course of business and consistent with past practice.

**3. Other Additional Benefits Programs.**

61. The Debtors also provide their Employees the opportunity to participate in supplemental benefits funded by the Debtors, including the Employee Assistance Program, Tuition Reimbursement, Advocacy Services, Adoption Services, and Military Differential Pay (each as defined below, and collectively the "Other Additional Benefits Programs"):

- **Employee Assistance Program.** Employees are eligible to participate in an employee assistance program funded by the Debtors (the "Employee Assistance Program") offering confidential access to counseling, programs, and services needed to balance work and home life. Each participating Employee is entitled to six in-person counseling sessions in connection with the Employee Assistance Program.

- **Tuition Reimbursement.** Full-time Employees who have completed twelve months of continuous employment are eligible to be reimbursed up to $10,000 in tuition assistance for personal education development (the "Tuition Reimbursement").

- **Advocacy Services.** The Debtors have contracted with Advocacy Services to assist Employees and dependents in navigating the Health and Welfare Programs ("Advocacy Services").

- **Adoption Services.** The Debtors provide full- and part-time Employees who have completed twelve months of continuous employment and have worked at least 1,250 hours in those twelve months with adoption assistance services ("Adoption Services").

- **Military Differential Pay.** Full-time Employees who have completed twelve months of continuous employment and are called to active duty or military training for 30 or more continuous days are eligible for military differential pay ("Military Differential Pay").

62. As of the Petition Date, the Debtors estimate that approximately $110,000 is accrued and outstanding on account of the Other Additional Benefits Programs. By this motion, the Debtors seek authority to pay prepetition amounts due on account of the Other Additional

Benefits Programs and to continue providing the Other Additional Benefits Programs in the ordinary course of business and consistent with past practice.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

63. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

64. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that

governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (Bankr. S.D. Tex. 2000) (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *Matter of Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

65. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

66. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

**C. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code.**

67. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

68. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497). Under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy

Code." 11 U.S.C. § 105(a); *In re CoServ*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

69. Payment of Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees, Independent Contractors, and Temporary Staff rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees, Independent Contractors, and Temporary Staff will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

70. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee

Compensation and Benefits owed to the Employees, Independent Contractors, and Temporary Staff, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, the workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees, Independent Contractors, and Temporary Staff may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

## II. A Limited Waiver of the Automatic Stay for the Workers' Compensation Program Is Appropriate in this Case.

71. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

72. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

## III. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

73. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and postpetition financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**Emergency Consideration**

74. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days of the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm" and Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion. The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

75. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

76. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief

requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

77. The Debtors will provide notice of this motion to: (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' proposed debtor-in-possession credit facility and counsel thereto; (d) the administrative agent under the Debtors' prepetition revolving credit facility and counsel thereto; (e) the administrative agent for the Debtors' prepetition term loan facility and counsel thereto; (f) the indenture trustee for the Debtors' senior secured second lien notes and counsel thereto; (g) the indenture trustees for the Debtors' unsecured notes; (h) counsel to the ad hoc group of term loan lenders; (i) counsel to Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue

Service; (l) the United States Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (n) the state attorneys general for states in which the Debtors conduct business. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 28, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Marc Kieselstein, P.C. (*pro hac vice* pending)
Alexandra Schwarzman (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
marc.kieselstein@kirkland.com
alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**Certificate of Service**

I certify that on June 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh