## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY
## MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
## OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE
## DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
## AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
## EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
## EXISTING SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 29, 2020, AT 2:30 P.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JUNE 29, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1 (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING." THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

> **IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY."**
>
> **HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**
> **1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**
> **2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**
> **3) SELECTING "JUDGES' PROCEDURES & SCHEDULES;"**
> **4) SELECTING "VIEW HOME PAGE" FOR CHIEF JUDGE JONES;**
> **5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**
> **6) SELECT CHESAPEAKE ENERGY CORPORATION, ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**
> **7) COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**
>
> **SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion:

### Relief Requested

1.     The Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):

| DIP Facility Term | Relief Requested |
|---|---|
| **DIP Facility** | Authorizing the Borrower to enter into the DIP Facility, pursuant to the terms and conditions set forth in that certain credit agreement, attached as **Exhibit A** to the Interim Order (the "DIP Credit Agreement"), consisting of: |
| | (a)  a new money first priority revolving credit facility in an aggregate maximum principal amount of up to $925 million, including a sub-facility of up to $200 million for the issuance of letters of credit (the "DIP Revolver Facility," and the loans made thereunder, the "Revolving DIP Loans"); and |
| | (b)  a conversion of all loans outstanding under the Existing RBL Facility (as defined herein) in excess of $750 million, inclusive of loans beneficially owned by the DIP Lenders (as defined herein) and non-DIP Lenders (such conversion, the "Roll-Up," and together with the DIP Revolver Facility, the "DIP Facility," all extensions of credit, including the issuance of letters of credit, under the DIP Facility, the |

---

[2]     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on June 28, 2020 (the "Petition Date").

| | |
|---|---|
| | "DIP Facility Loans"); *provided* that the amount of the Roll-Up shall not be less than $925 million.<br><br>If approved, $325 million of the DIP Revolver Facility will be available upon entry of the Interim Order (the "Interim Commitment"). |
| **DIP Credit Documents** | Authorizing the Debtors to enter into the DIP Credit Agreement, substantially in the form annexed as **Exhibit A** to the Interim Order attached hereto and certain ancillary documentation (together with the DIP Credit Agreement, the "DIP Credit Documents") and all of the Debtors' secured obligations arising thereunder (the "DIP Obligations"). |
| **Cash Collateral** | Authorizing the Debtors to continue to use Cash Collateral, as defined by section 363(a) of the Bankruptcy Code, subject to the restrictions set forth in the DIP Credit Documents and the DIP Orders, and the granting of adequate protection to the Existing Secured Parties (as defined below). |
| **Security and Priority** | Authorizing the Debtors to grant, subject to the Carve Out, priority security interests and liens to the DIP Agent (as defined below), for itself and for the behalf of the DIP Lenders (as defined below), including:<br><br>    (a)    perfected, first-priority security interests in and liens on all of the Debtors' unencumbered assets;<br><br>    (b)    perfected, first-priority priming security interests in and liens on all of the Existing Collateral (as defined below), which shall prime all liens of the Existing Secured Parties, including any liens granted as adequate protection to the Existing Secured Parties; and<br><br>    (c)    perfected, junior-priority security interests in and liens on all of the Debtors' encumbered assets to the extent such assets are subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "DIP Liens").<br><br>Authorizing the Debtors to grant, subject to the Carve Out, joint and several superpriority administrative expense claim status in these chapter 11 cases to all DIP Obligations having priority over any and all other administrative expenses, adequate protection claims, and all other priority claims (collectively, the "DIP Super-Priority Claims"). |
| **Adequate Protection** | Authorizing the Debtors to grant adequate protection to the holders and lenders, and their respective agents,[3] under the Existing RBL Credit Agreement (the "Existing RBL Secured Parties"), the Existing FLLO Term Loan Agreement (the "Existing FLLO Secured Parties"), and the Existing Second Lien Notes Indenture (the "Existing Second Lien Notes Secured Parties," and collectively with the Existing RBL Secured Parties and the Existing FLLO Secured Parties, the "Existing Secured Parties") and all related security agreements (respectively, the "Existing RBL Credit Documents," the "Existing FLLO Loan Documents," and the "Existing Second Lien Notes Documents," and collectively, the "Existing Debt Documents") and all of the Debtors' secured obligations arising thereunder (respectively, the "Existing RBL Obligations," the "Existing FLLO Obligations," |

---

[3]    "Existing Agents" shall mean, collectively, the Existing RBL Agent, the Existing FLLO Agent, and the Existing Second Lien Notes Trustee (each as defined herein).

and the "<u>Existing Second Lien Obligations</u>" and collectively, the "<u>Existing Obligations</u>") as follows:

(a)   The Existing RBL Agent (as defined herein), for itself and for the benefit of the other Existing RBL Secured Parties, is

(i)   granted valid, enforceable, unavoidable and fully perfected replacement liens on and security interests in the DIP Collateral (as defined in the Interim Order) (the "<u>RBL Adequate Protection Liens</u>"), in each case subject and subordinate only to (A) the Carve Out, (B) the DIP Liens, including, without limitation, the liens contemplated under the Hedging Order,[4] and (C) the Permitted Priority Liens (as defined in the Interim Order);

(ii)   to the extent of any postpetition diminution in the value of the Existing RBL Secured Parties' collateral, allowed superpriority administrative expense claims in the amount equal to such diminution in value in the chapter 11 cases having priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>RBL Adequate Protection Super-Priority Claims</u>"), in each case subject only to (A) the Carve Out and (B) the DIP Super-Priority Claims, including, without limitation, the claims contemplated under the Hedging Order;

(iii)   allowed payments for the reasonable and documented out-of-pocket fees, costs and expenses incurred or accrued by the Existing RBL Agent, including the legal and financial advisors to the Existing RBL Agent and other professionals hired by or on behalf of the Existing RBL Agent;

(iv)   allowed payments for (A) all accrued and unpaid interest and fees under the Existing RBL Credit Agreement at the non-default rate of L + 3.5% (with a LIBOR floor of 0.00%) as of the closing of the DIP Facility and (B) all interest and fees accruing postpetition under the Existing RBL Credit Agreement, other than those loans included in the Roll-Up, as and when due and payable at the non-default rate of L + 3.5% (with a LIBOR floor of 0.00%); and

(v)   provided the financial and other reporting as described in the DIP Credit Agreement and the Existing RBL Credit Agreement (collectively, the "<u>RBL Adequate Protection Obligations</u>").

(b)   The Existing FLLO Agent (as defined herein), for itself and for the benefit of the other Existing FLLO Secured Parties, is

(i)   granted valid, enforceable, unavoidable and fully perfected replacement liens on and security interests in the DIP Collateral (the "<u>FLLO Adequate Protection Liens</u>"), in each case subject and subordinate only to (A) the Carve Out, (B) the DIP Liens, including, without limitation, the liens contemplated under the Hedging Order, (C) the Permitted Priority Liens, and (D) the RBL Adequate Protection Liens;

---

[4]   "<u>Hedging Order</u>" shall mean the *Order (I) Authorizing the Debtors to (A) Enter Into and Perform Under Hedge Agreements, (B) Apply Proceeds From Prepetition Hedge Agreement Unwinds to Existing Obligations, (C) Grant Superpriority Claims and (D) Modify the Automatic Stay, and (II) Granting Related Relief.*

(ii) to the extent of any postpetition diminution in the value of the Existing FLLO Secured Parties' collateral, allowed superpriority administrative expense claims in the amount equal to such diminution in value in the chapter 11 cases having priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "FLLO Adequate Protection Super-Priority Claims"), in each case subject only to (A) the Carve Out and (B) the DIP Super-Priority Claims, including, without limitation, the liens contemplated under the Hedging Order, and (C) the RBL Adequate Protection Super-Priority Claims;

(iii) allowed payments for the reasonable and documented fees and expenses of professionals for (i) the FLLO Ad Hoc Group (as defined in the Interim Order), (ii) the Existing FLLO Agent, and (iii) the collateral trustee under the Collateral Trust Agreement incurred in connection with these chapter 11 cases, so long as (1) the Restructuring Support Agreement has not been terminated as to the DIP Lenders, Required Consenting Revolving Credit Facility Lenders (as defined in the Restructuring Support Agreement) or FLLO Ad Hoc Group (as defined in the DIP Credit Agreement), or (2) an alternative restructuring support agreement or similar agreement with respect to the restructuring of the Debtors' debt and businesses remains in effect between the DIP Agent, the DIP Lenders, 66.67 percent of the Existing RBL Lenders, and the FLLO Ad Hoc Group; and

(iv) provided the financial and other reporting pursuant to the Existing FLLO Term Loan Agreement (collectively, the "FLLO Adequate Protection Obligations").

(c) The Existing Second Lien Notes Trustee (as defined herein), for itself and for the benefit of the other Existing Second Lien Secured Parties, is

(i) granted valid, enforceable, unavoidable and fully perfected replacement liens on and security interests in the DIP Collateral (the "Second Lien Adequate Protection Liens," and together with the RBL Adequate Protection Liens and the FLLO Adequate Protection Liens, the "Adequate Protection Liens"), in each case subject and subordinate only to (A) the Carve Out, (B) the DIP Liens, including, without limitation, the liens contemplated under the Hedging Order, (C) the Permitted Priority Liens, (D) the RBL Adequate Protection Liens, and (E) the FLLO Adequate Protection Liens;

(ii) to the extent of any postpetition diminution in the value of the Existing Second Lien Secured Parties' collateral, allowed superpriority administrative expense claims in the amount equal to such diminution in value in the chapter 11 cases having priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Second Lien Adequate Protection Super-Priority Claims," and together with the RBL Adequate Protection Super-Priority Claims and the FLLO Adequate Protection Super-Priority Claims, the "Adequate Protection Super-Priority Claims"), in each case subject only to (A) the Carve Out and (B) the DIP Super-Priority Claims, including, without limitation, the liens contemplated under the Hedging Order, (C) the RBL

| | |
|---|---|
| | Adequate Protection Super-Priority Claims, and (D) the FLLO Adequate Protection Super-Priority Claims; |
| | (iii) allowed payments for the reasonable and documented fees and expenses of professionals for (i) Franklin Advisors, Inc. and (ii) the Existing Second Lien Notes Trustee incurred in connection with these Chapter 11 Cases to the extent permitted in the Restructuring Support Agreement, and so long as the Restructuring Support Agreement has not been terminated as to the DIP Lenders, Required Consenting Revolving Credit Facility Lenders (as defined in the Restructuring Support Agreement), or Franklin Advisors, Inc.; and |
| | (iv) provided the financial and other reporting pursuant to the Existing FLLO Term Loan Agreement (collectively, the "Second Lien Adequate Protection Obligations," and together with the RBL Adequate Protection Obligations and the FLLO Adequate Protection Obligations, the "Adequate Protection Obligations"). |
| **Automatic Stay** | Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders. |
| **Final Hearing** | Scheduling a final hearing to consider entry of the Final Order. |

2.      In support of this motion, the Debtors respectfully submit the *Declaration of Stephen Antinelli In Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, attached hereto as **Exhibit A** (the "Antinelli Declaration") and the First Day Declaration.

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a Final Order by the Court in connection with this motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter Final Orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and rules 4002-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Preliminary Statement

6.      The Debtors' business has been burdened by an overlevered balance sheet for many years.  Although the Debtors have worked tirelessly since 2013 to reduce their outstanding funded indebtedness through a series of strategic and financial transactions, it has become abundantly clear to the Debtors over the last several months that the only lasting solution is a comprehensive deleveraging transaction to position the business for profitability in the current commodity price environment.   In order to accomplish a transformational restructuring, the Debtors require a substantial liquidity injection at the outset of these chapter 11 cases to stabilize operations and fund their restructuring efforts.

7.      To that end, the Debtors, with the assistance of their advisors, conducted a fulsome and competitive marketing process over the course of more than two months to explore financing options.  The proposed DIP Facility is the product of the extensive prepetition marketing process that launched on April 9, 2020.  As described in greater detail in the Antinelli Declaration attached hereto, the Debtors contacted multiple institutions in the Existing RBL Credit Facility and certain institutions in the Existing FLLO Term Loan Facility and the Existing Second Lien Notes.

8.      After conducting several rounds of negotiations, the Debtors, in consultation with their advisors, initially determined that moving forward with a DIP proposal led by a single lender under the Existing RBL Credit Facility (the "non-MUFG proposal") was in the best interest of the Debtors and all stakeholders.  However, the non-MUFG proposal was unable to gain the support of the majority of lenders under the Existing RBL Credit Facility (the "Required Lenders") during the syndication process, which support was required for consensual priming under the Existing RBL Credit Facility and a condition of the non-MUFG proposal.  Instead, the Required Lenders indicated they supported the DIP proposal provided by the Existing RBL Agent, MUFG Union Bank, N.A., formerly known as Union Bank, N.A. ("MUFG," and such financing proposal the "MUFG proposal").  Based on the Required Lenders support of the MUFG proposal, the Debtors focused their efforts on the DIP proposal received from MUFG.  After weeks of continued arm's length, hard-fought negotiations with the Existing RBL Lenders, the Debtors and the majority of the Existing RBL Lenders agreed to the terms of the proposed DIP Facility.

9.      The relief requested by this motion is necessary as the Debtors require immediate access to the DIP Facility and Cash Collateral to continue operating in the ordinary course of business during the early stages of these chapter 11 cases.  Absent immediate access to the DIP Facility and Cash Collateral, the Debtors would be unable to operate their business, pay employees, vendors, and other suppliers, or administer these chapter 11 cases, and their ability to successfully reorganize would be jeopardized.  Importantly, the DIP Facility is the best, and only viable, postpetition financing option available to the Debtors.

10.      For these reasons, and for the reasons set forth below, in the Antinelli Declaration, and the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreement to provide access to the DIP Facility and use of Cash Collateral will maximize the value of the

Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the

Debtors respectfully request that the Court enter the DIP Orders.

**Concise Statement Pursuant to
Bankruptcy Rule 4001 and the United States Bankruptcy
Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

11.     The following chart contains a summary of the material terms of the proposed

DIP Facility, together with references to the applicable sections of the relevant source documents,

as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case

Procedures.[5]

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Parties to the Agreement**<br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower**: Chesapeake Energy Corporation ("Chesapeake" or the "Borrower").<br><br>**Guarantors**:  Certain of the Debtors identified in the DIP Credit Documents.<br><br>**Agent for the DIP Facility**:  MUFG (in such capacity, together with its successors and permitted assigns, the "DIP Agent").<br><br>**Lenders**: The several banks and other financial institutions or entities from time to time party to the DIP Facility (in such capacities, the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties") pursuant to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Facility (the "Maturity Date") shall be the earliest of:<br><br>(a)  nine (9) months after the Petition Date;<br><br>(b)  the date of termination of the Revolving DIP Loan Commitment and/or acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default (as defined in the DIP Credit Agreement);<br><br>(c)  subject to the COVID-19 Extension (as defined below), the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto;<br><br>(d)  the conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and Majority Lenders (as defined in the DIP Credit Agreement);<br><br>(e)  the dismissal of any of these chapter 11 cases, unless otherwise consented to in writing by the DIP Agent and the Majority Lenders; |

---

[5]   The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (f)   the closing of a sale of all or substantially all of the equity or assets of the Debtors (unless done pursuant to a confirmed chapter 11 plan); <br><br> (g)   the date of repayment in cash in full by the Debtors of all DIP Obligations and termination of the Revolving DIP Loan Commitment in accordance with the terms of the DIP Facility; and <br><br> (h)   the effective date of the Approved Plan (as defined below) confirmed in these chapter 11 cases (the "<u>Effective Date</u>"). <br><br> *See* DIP Credit Agreement, Art. 1, § 1, "Termination Date". |
| **Commitments** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall consist of the following: <br><br> (a)   *DIP Revolver Facility.* A revolving loan facility in an aggregate maximum principal amount of $925 million, which shall include a sub-facility of up to $200 million of aggregate commitments of letters of credit (which shall (a) permit the issuance of letters of credit for general corporate purposes, including to replace, backstop or provide credit support for any letters of credit issued pursuant to the Exiting RBL Credit Facility (including by "grandfathering" such letters of credit into the DIP Revolver Facility) and (b) reduce availability under the DIP Facility on a dollar-for-dollar basis) (such commitments, the "<u>Revolving DIP Loan Commitment</u>"); and <br><br> (b)   *Roll-Up.* All loans outstanding under the Existing RBL Credit Facility in excess of $750 million, inclusive of loans beneficially owned by the DIP Lenders and non-DIP Lenders, shall be refinanced and rolled into the DIP Facility (such loans, the "<u>Roll-Up Loans</u>"); *provided* that the Roll-Up shall not be less than $925 million. <br><br> *See* DIP Credit Agreement, Art. 2, § 1. |
| **Conditions of Borrowing** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Credit Documents include standard and customary conditions to borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to provide the DIP Facility. <br><br> The DIP Credit Documents also include a condition precedent that provides that the Debtors shall not have executed, entered into or otherwise committed to any chapter 11 plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the DIP Agent. <br><br> *See* DIP Credit Agreement, Art. 6, §§ 1-2. |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall contain the following interest rates (the "<u>Interest Rates</u>"): <br><br> (a)   *DIP Revolver Facility.* The Revolving DIP Loans shall bear interest at LIBOR plus 6.00 percent, subject to a LIBOR floor of 1.00 percent; and <br><br> (b)   *Roll-Up.* The Roll-Up Loans shall bear interest at LIBOR plus 5.50 percent, subject to a LIBOR floor of 0.00 percent. <br><br> The default rate shall be the Interest Rates plus an additional 2.00 percent. <br><br> *See* DIP Credit Agreement, Art. 2, §§ 8-9. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Use of DIP Facility and Cash Collateral Bankruptcy Rule** 4001(b)(l)(B)(ii) | The proceeds of the DIP Facility shall be used for the payment of: <br><br> (a) postpetition working capital, capital investments as permitted under the DIP Credit Agreement, and general corporate purposes of the Debtors; <br><br> (b) current interest and fees under the DIP Facility; <br><br> (c) adequate protection payments to the Existing Secured Parties, including letter of credit and other fees payable under the Existing RBL Credit Agreement; and <br><br> (d) the allowed administrative costs and expenses of these chapter 11 cases, including the Carve Out, solely in accordance with the Approved Budget (subject to the Variance Limit (as defined in the DIP Credit Agreement)) and the DIP Orders. <br><br> *See* DIP Credit Agreement, Art. 9, § 10. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral: <br><br> (a) the DIP Secured Parties and <br><br> (b) the Existing Secured Parties. <br><br> *See* Interim Order, ¶ D(xii). |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | On a monthly basis, the Debtors shall pay, in connection with these chapter 11 cases and the arrangement, the reasonable and documented out-of-pocket fees and expenses of the DIP Agent, which shall be limited to the reasonable and documented fees and expenses of: <br><br> (a) Sidley Austin LLP, as legal counsel for the DIP Agent; <br><br> (b) Houlihan Lokey Capital, Inc., as investment banker to the DIP Agent; <br><br> (c) RPA Advisors, LLC, as financial advisor to the DIP Agent; and <br><br> (d) other professionals, hired by or on behalf of the DIP Agent with the Debtors' reasonable consent. <br><br> The DIP Facility also includes the following fees: <br><br> (a) *Upfront DIP Fee.* The Borrower shall pay a percentage of the final allocated Revolving DIP Loan Commitments, payable in full upon execution of the Fee Letters (as defined in the DIP Credit Agreement). <br><br> (b) *Unused Commitment Fee.* The Borrower shall pay an annual fee on all undrawn commitments under the DIP Facility, payable quarterly in arrears on the last business day of each fiscal quarter. <br><br> (c) *Letter of Credit Fees.* The Borrower shall pay (i) a letter of credit fee for the period from the date of issuance of such letter of credit until the termination or expiration date of such letter of credit computed at the per annum rate for each day equal to the applicable margin for LIBOR loans on the average daily stated amount of such letter of credit and (ii) a fronting fee on the undrawn amount of each letter of credit, each payable monthly in arrears on the last business day of each calendar month and on the Maturity Date. <br><br> (d) *DIP Backstop Fee.* The Borrower shall pay to each Backstop Lender a percentage of their respective Revolving DIP Loan Commitments, payable upon execution of the Fee Letters. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (e) *Non-Lender Consent Fee.*  The Borrower shall pay a consent fee to two Existing RBL Lenders unable to participate in the DIP Facility, but who are otherwise committed to the Restructuring Support Agreement. |
| | (f) *DIP Exit Fee.*  The Borrower shall pay a percentage of the final allocated Revolving DIP Loan Commitments, payable in full upon the Termination Date. |
| | *See* Fee Letters. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget (subject to the Variance Limit), attached to the Interim Order as **Exhibit B** to the Interim Order. |
| | *See* DIP Credit Agreement, Art. 9, § 1(c). |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall implement the Restructuring Transactions in accordance with the Milestones which shall include the following: |
| | (a) The Court shall have entered the Interim Order no later than five (5) days after the Petition Date; |
| | (b) The Debtors shall have filed a motion, in form and substance acceptable to the DIP Agent, seeking (i) approval of all fees to be paid with respect to the Exit Facilities (as defined in Restructuring Support Agreement) and (ii) authority to pay the upfront fees, arranger fees, and any other fees under the Exit Facilities Term Sheet (as defined in Restructuring Support Agreement) earned and payable prior to the Effective Date (the "Exit Facilities Motion"), no later than thirty (30) days after the Petition Date; |
| | (c) The Court shall have entered the Final Order no later than thirty-five (35) days after the Petition Date; |
| | (d) The Debtors shall have (i) obtained Court approval of the relief requested in the Exit Facilities Motion and (ii) paid the upfront fees, arranger fees, and all other fees then earned and payable (as described in the Exit Facilities Term Sheet), no later than sixty (60) days after the Petition Date; |
| | (e) The Court shall have entered the Backstop Commitment Agreement Approval Order (as defined in the Restructuring Term Sheet) and the Backstop Commitment Agreement shall remain effective and binding on the parties thereto, no later than ninety (90) days after the Petition Date; |
| | (f) The Debtors shall have filed a chapter 11 plan (a "Plan") and a disclosure statement for the Plan (a "Disclosure Statement") that provides for treatment acceptable to DIP Lenders (or such plan provides for the indefeasible repayment of the DIP Obligations and obligations under the Existing RBL Credit Facility in full in cash on the Effective Date and as a condition to emergence) (such Plan, an "Approved Plan" and such Disclosure Statement, an "Approved Disclosure Statement"), each no later than ninety (90) days after the Petition Date; *provided*, for so long as the Restructuring Support Agreement is in effect as (i) DIP Lenders who hold or control 100% of the DIP Claims (as defined in the Restructuring Support Agreement) and Existing RBL Lenders which hold or control at least 66.67% of the Revolving Credit Facility Claims (as defined in the Restructuring Support Agreement), that the treatment provided in the Restructuring Support Agreement is acceptable to the DIP Lenders; |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (g)  The Debtors shall have filed a motion seeking approval of the Approved Disclosure Statement no later than one hundred and twenty (120) days after the Petition Date; |
| | (h)  The Court shall have entered an order approving the Approved Disclosure Statement no later than one hundred and sixty (160) days after the Petition Date; |
| | (i)  The Court shall have entered an order confirming the Approved Plan no later than one hundred and ninety-five (195) days after the Petition Date; and |
| | (j)  The Effective Date shall have occurred no later than two hundred and twenty (220) days after the Petition Date; *provided* that this milestone shall be automatically extended to the extent necessary, but in no event longer than fifteen (15) consecutive business days, to allow for the expiration of the marketing period under the Exit Facilities Term Sheet. |

Notwithstanding the foregoing, the Milestones consisting of the entry of orders or judicial resolution by the Court shall be automatically extended (the "COVID-19 Extensions") by five (5) business days to the extent it is not reasonably feasible to hold and conclude a hearing (if necessary) prior to the applicable Milestone as a result of the closure of the Court due to the events or circumstances surrounding the virus known as COVID-19 (and the DIP Agent shall be deemed to have automatically agreed to such extension).

If the Debtors fail to satisfy clauses (e) or (f) of the above listed Milestones, then the Required Plan Sponsors, for the benefit of all Consenting FLLO Term Loan Facility Lenders and Consenting Second Lien Noteholders (each as defined in the Restructuring Support Agreement), and DIP Agent shall each have the right to appoint a board observer, effective immediately, who shall attend any board of directors meetings and management meetings concerning the restructuring (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; *provided* that if any officer attends such executive session concerning the restructuring the board observer shall also attend).  In consideration for the immediate and effective appointment of the DIP Agent's board observer, the Milestones shall be extended as follows: (a) the Debtors shall file an Approved Plan and Approved Disclosure Statement, and a motion to approve such Approved Disclosure Statement, in each case, on or before a date that is one hundred and thirty-five (135) calendar days following the Petition Date; (b) such Approved Disclosure Statement shall have been approved by Court by the date that is no later than one hundred and sixty-five (165) calendar days after the Petition Date; (c) the Court shall have entered an order confirming such Approved Plan by the date that is no later than two hundred (200) calendar days after the Petition Date; and (d) the effective date of such Approved Plan shall have occurred by the date that is no later than two hundred and twenty (220) calendar days after the Petition Date; *provided* that the milestone in clause (d) shall be automatically extended to the extent necessary, but in no event longer than fifteen (15) consecutive business days, to allow for the expiration of the marketing period under the Exit Facilities Term Sheet.

If the Debtors fail to satisfy clause (f) of the above listed Milestones on or before one hundred and thirty-five (135) calendar days following the Petition Date, then (x) at the request of the DIP Agent, the Debtors shall immediately take all actions necessary on an expedited basis to implement the appointment of a Chief Restructuring Officer ("CRO") acceptable to the DIP Agent in its sole discretion who shall (i) be vested with the executive authority to oversee the Debtors' restructuring, subject to oversight by the board of directors in accordance with applicable law, (ii) attend any board of directors meetings and management meetings concerning the restructuring (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; *provided* that if any officer attends such executive session concerning the restructuring the CRO shall also attend), (iii) report directly to the board of directors,

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | (iv) provide updates to the Court; and (v) otherwise satisfy the requirements of section 327 of the Bankruptcy Code; and (y) the Debtors' shall file a plan of reorganization on or before the date that is one hundred and eighty (180) days after the Petition Date that has been approved by the CRO.  Upon Court approval and appointment of the CRO, the Milestones shall be extended as follows: (a) the disclosure statement for the plan approved by the CRO and providing treatment acceptable to the DIP Lenders, and the motion to approve such disclosure statement, shall be filed with such plan approved by the CRO on or before the date that is one hundred and eighty (180) calendar days following the Petition Date; (b) such Approved Disclosure Statement shall have been approved by Court by the date that is no later than two hundred and ten (210) calendar days after the Petition Date; (c) the Court shall have entered an order confirming such Approved Plan by the date that is no later than two hundred and forty-five (245) calendar days after the Petition Date; and (d) the Effective Date of such Approved Plan shall have occurred by the date that is no later than two hundred and sixty (260) calendar days after the Petition Date; *provided* that the milestone in clause (d) shall be automatically extended to the extent necessary, but in no event longer than fifteen (15) consecutive business days, to allow for the expiration of the marketing period under the Exit Facilities Term Sheet; *provided, further*, that in no event shall the Plan Effective Date extend beyond the Scheduled Maturity Date.<br><br>*See* Interim Order, ¶ 31. |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i) | The liens contemplated by the DIP Credit Agreement will follow the following priority until the Maturity Date, in each case subject to the Carve Out in all respects: (a) the DIP Liens and (b) the Adequate Protection Liens (subject to the Collateral Trust Agreement and the Intercreditor Agreement (each as defined in the Interim Order)).<br><br>*See* Interim Order, ¶ 11. |
| **Carve Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The DIP Orders provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 18. |
| **Challenge Period**<br>Bankruptcy Rule<br>4001(c)(l)(B) | The Interim Order provides for a standard and customary challenge period at the earliest of:<br><br>(a)  in the case of a Committee (if any), sixty (60) calendar days from the Petition Date;<br><br>(b)  in the case of all other non-Debtor parties-in-interest, with regard to the Existing RBL Liens and the Existing RBL Obligations, forty (40) calendar days from the Petition Date; and<br><br>(c)  in the case of the Debtors and all other non-Debtor parties-in-interest, with regard to the Existing FLLO Liens, the Existing FLLO Obligations, the Existing Second Liens, and the Existing Second Lien Obligations, forty (40) calendar days from the Petition Date.<br><br>*See* Interim Order, ¶ 19. |
| **Adequate Protection**<br>Bankruptcy Rules<br>4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii) | The adequate protection provided to the Existing Secured Parties shall be in accordance with the Interim Order.<br><br>*See* Interim Order, ¶¶ 12-14. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the Variance Limit and failure to satisfy any of the Milestones.<br><br>*See* DIP Credit Agreement, Art. 11. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order, ¶ 30. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Usual and customary for financings of this type, including that the Debtors shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented out-of-pocket fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, provided that no Indemnified Party will be indemnified for exclusions of the type excluded from "Indemnified Liabilities" (as such term is defined in the Existing RBL Credit Facility. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.<br><br>*See* DIP Credit Agreement, Art. 13, § 5. |

## Statement Regarding Significant Provisions

12.     The Interim Order contains certain of the provisions (the "Significant Provisions")[6] identified in section I, paragraph 23 of the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached hereto as **Exhibit B**.

---

[6]     Significant Provisions refer to those provisions that contain: (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claims against lenders or others; (g) limitations on fees for advisors to official committees; (h) priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

13.   The Interim Order and the Final Order, as applicable:

(a) grant superpriority administrative expense claims to the DIP Secured Parties, subject only to the Carve Out;

(b) grant superpriority administrative expense claims to the Existing Agents, for themselves and for the benefit of the other Existing Secured Parties, subject only to the Carve Out and the DIP Super-Priority Claims;

(c) bind the Debtors and all parties in interest with respect to the validity, perfection, or amount of the Adequate Protection Liens, subject only to the Carve Out, the DIP Liens and any liens to which the DIP Liens are junior, (each subject to certain challenge rights);

(d) authorize the Debtors to waive (a) the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) except to the extent of the Carve Out, any right to surcharge any collateral pursuant to section 506(c) of the Bankruptcy Code; *provided* that the foregoing waivers shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order;

(e) except to the extent of the Carve Out, authorize the Debtors to waive the equitable doctrine of "marshaling" and other similar doctrines (x) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (y) with respect to any of the Existing Collateral (including the Cash Collateral) for the benefit of any party other than the Existing Secured Parties; *provided* that the foregoing waiver shall be without prejudice to any provisions of the Final Order;

(f) subject to the entry of the Final Order, grant the DIP Lenders liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code;

(g) subject to the entry of the Interim Order, authorize the Debtors to convert the Roll-Up into the DIP Facility in an amount equal to the Interim Commitment;

(h) subject to the entry of the Final Order, authorize the Debtors to convert the balance of the Roll-Up into the DIP Facility;

(i) impose deadlines for the filing of a plan or disclosure statement; and

(j) after entry of the Interim Order, grant monthly payment in cash of the reasonable and documented costs, fees and expenses of the DIP Agent and the Existing Agents (including, but not limited, to fees and expenses of their advisors), among other adequate protection and liens.

14. The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating a consensual restructuring transaction. In light of the foregoing, the Debtors submit that the Significant Provisions are necessary under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim Order and the Final Order should be approved.

**The Debtors' Prepetition Capital Structure.**

15. As of the Petition Date, the Debtors have approximately $9.169 billion in total funded debt obligations. The table below summarizes the Debtors' prepetition capital structure:

| Funded and Unfunded Debt | Maturity | Principal Amount (in USD millions) |
|---|---|---|
| Existing First Lien Obligations | | |
| *Existing RBL Credit Facility* | September 2023 | $1,929 |
| *Outstanding Letters of Credit* | | $74 |
| *Existing FLLO Term Loan Facility* | July 2024 | $1,500 |
| Existing Second Lien Obligations | | |
| *Existing 11.500% Second Lien Notes* | January 2025 | $2,330 |
| Existing Unsecured Debt Obligations | | |
| *Existing 6.625% Senior Notes* | August 2020 | $176 |
| *Existing 6.875% Senior Notes* | November 2020 | $74 |
| *Existing 6.125% Senior Notes* | February 2021 | $166 |
| *Existing 5.375% Senior Notes* | June 2021 | $127 |
| *Existing 4.875% Senior Notes* | April 2022 | $272 |
| *Existing 5.750% Senior Notes* | March 2023 | $168 |
| *Existing 7.000% Senior Notes* | October 2024 | $623 |
| *Existing 8.000% Senior Notes* | January 2025 | $246 |
| *Existing 8.000% Senior Notes* | March 2026 | $46 |
| *Existing 7.500% Senior Notes* | October 2026 | $119 |
| *Existing 8.000% Senior Notes* | June 2027 | $253 |
| *Existing 5.500% Convertible Senior Notes* | September 2026 | $1,064 |
| *Existing 6.875% BVL Senior Notes* | February 2025 | $2 |
| **Total Debt Obligations** | | **$9,169** |

I.      **Existing First Lien Obligations**

      A.      **Existing Revolving Credit Facility.**

16.      The Debtors maintain a senior secured reserve-based revolving credit facility (the "Existing RBL Credit Facility") under that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated or otherwise modified from time to time, the "Existing RBL Credit Agreement"), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, MUFG, as administrative agent (in such capacity, together with its permitted successors and assigns, the "Existing RBL Agent"), and the other lender, issuer and agent parties thereto (the "Existing RBL Lenders").  Borrowings under the Existing RBL Credit Agreement are subject to a borrowing base that is adjusted twice each year (on June 15 and October 30), and may be adjusted twice more per year during "wildcard" redeterminations based on the evaluation of the Debtors' reserve reports, hedging schedule, and other similar information subject to certain procedures set forth in the Existing RBL Credit Agreement.  As part of these regularly scheduled borrowing base redeterminations, effective as of June 15, 2020, the lenders under the Existing RBL Credit Facility elected to reduce the borrowing base from $3 billion to $2.3 billion.

17.      The Existing RBL Credit Facility includes a swingline commitment of $300 million and a letter of credit sublimit of $750 million.  Outstanding loans, swingline loans and letters of credit issued under the Existing RBL Credit Facility are capped at the lesser of the Existing RBL Credit Facility borrowing base and $2.6 billion in aggregate commitments.  As of the Petition Date, the Existing RBL Credit Facility borrowing base was $2.3 billion and the Debtors had outstanding borrowings under the Existing RBL Credit Facility of $1.929 billion, excluding outstanding letters of credit.

18.     The Existing RBL Credit Agreement has been amended three times in 2019 in connection with the acquisition of certain assets and issuance of additional indebtedness, as further discussed in the First Day Declaration.  The Debtors amended the Existing RBL Credit Agreement on February 1, 2019 in connection with the acquisition of WildHorse Resource Development Corporation, a Delaware corporation ("WildHorse") to, among other things, permit the Debtors' investment in WildHorse.  Subsequently, the Existing RBL Credit Agreement was amended on December 3, 2019 to, among other things, permit entry into the Existing FLLO Term Loan Facility, increase the amount of first lien last out indebtedness that could be incurred by the Debtors in connection with the Existing FLLO Term Loan Facility, modify certain financial performance covenants, and increase the mortgage coverage requirement under the Existing RBL Credit Agreement to not less than 90 percent of the Debtors' proved reserves.  The Existing RBL Credit Agreement was further amended on December 26, 2019 to extend borrowing base clawback relief to Existing Second Lien Notes (as defined below) issued in exchange for cash under certain circumstances.

19.     As discussed in greater detail in the First Day Declaration, the Existing RBL Credit Agreement was amended again on June 12, 2020 to waive certain defaults.  The amendment allowed the Debtors to unwind their hedge portfolio and apply the proceeds thereof to reduce the commitments under the Existing RBL Credit Facility by approximately $382 million.  The unwind of the Debtors' hedge portfolio was a required condition precedent to entering into the DIP Facility. The Debtors have no hedges outstanding as of the Petition Date.

20.     The Existing RBL Credit Facility matures on September 12, 2023, and bears interest at either the alternate base rate or LIBOR, at the Debtors' election, plus an applicable margin.  The Debtors' obligations under the Existing RBL Credit Facility are secured on a first

lien basis by substantially all of the Debtors' assets and property, whether real, personal, or mixed, including by mortgages on over 90 percent of the Debtors' proved reserves.

### B.    Existing First Lien Last Out Term Loan.

21.    On December 19, 2019, Chesapeake Energy Corporation, as borrower, entered into a certain first lien last out term loan credit agreement (as amended, restated or otherwise modified from time to time, the "Existing FLLO Term Loan Agreement") with a syndicate of lenders (in such capacities, the "Existing FLLO Lenders"), GLAS USA LLC., as administrative agent (the "Existing FLLO Agent").  The Existing FLLO Term Loan Agreement provides for borrowings under the first lien last out term loan facility (the "Existing FLLO Term Loan Facility") in the aggregate principal amount of $1.5 billion.

22.    The Existing FLLO Term Loan Facility matures on June 23, 2024, and bears interest at a rate of LIBOR plus eight percent per annum with a one percent LIBOR floor.  The Existing FLLO Term Loan Facility is subject to a make-whole premium prior to the 18-month anniversary of December 23, 2019, a premium to par equal to five percent from the 18-month anniversary until but excluding the 30-month anniversary, and a premium to par equal to 2.5 percent from the 30-month anniversary until but excluding the 42-month anniversary. Beginning on the 42-month anniversary, the Debtors may prepay the Existing FLLO Term Loan Facility at par.

23.    The Existing FLLO Term Loan Facility is secured by first priority liens on substantially all of the Debtors' assets and property, whether real, personal, or mixed (the "Existing Collateral"); *provided* that the Existing FLLO Term Loan Facility will be second in recovery behind the Existing RBL Credit Facility pursuant to that certain Collateral Trust Agreement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time

to time) by and among the Existing RBL Agent and the Existing FLLO Agent.  On June 23, 2020, the Debtors elected to skip a $22.9 million interest payment due to the Existing FLLO Lenders.

24.     The proceeds of the Existing FLLO Term Loan Facility were used to finance tender offers for the Existing 6.875% BVL Senior Notes (as defined herein) due 2025 and to repay all amounts outstanding under the revolving credit facility assumed in connection with the WildHorse acquisition.

## II.     Existing Second Lien Obligations

### A.     Existing 11.500% Second Lien Notes due 2025.

25.     On December 19, 2019, Chesapeake issued $2.2 billion in an initial aggregate principal amount of 11.500% senior secured second lien notes due 2025 pursuant to an indenture (as amended, restated or otherwise modified from time to time, the "Existing Second Lien Notes Indenture") entered into with Deutsche Bank Trust Company Americas, as trustee and collateral trustee (the "Existing Second Lien Notes Trustee") and certain noteholders party thereto (the "Existing Second Lien Notes").  Additionally, on December 19, 2019, the Debtors issued an additional $120 million of its Existing Second Lien Obligations pursuant to a private offering.

26.     The Existing Second Lien Obligations are guaranteed by certain Debtor guarantors and are secured by second priority liens on all of the Debtors' assets and property, whether real, personal, or mixed.  Interest on the Existing Second Lien Obligations are payable semi-annually in arrears on each of January 1 and July 1.  The Existing Second Lien Obligations are scheduled to mature on January 1, 2025.  As of the Petition Date, there is approximately $2.33 billion in principal amount outstanding under the Existing Second Lien Obligations.

III.     **Existing Unsecured Debt Obligations**

A.     **Existing 6.625% Senior Notes due 2020.**

27.     On August 17, 2010, Chesapeake issued $1.4 billion in aggregate principal of 6.625% senior notes due 2020 (the "Existing 6.625% Senior Notes due 2020"), pursuant to a certain second supplemental indenture to that certain indenture, dated as of August 2, 2010, entered into with The Bank of New York Trust Company, N.A., as trustee (as amended, restated or otherwise modified from time to time, the "2010 Base Indenture").

28.     The obligations under the Existing 6.625% Senior Notes due 2020 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 6.625% Senior Notes due 2020 is payable semi-annually in arrears on each of February 15 and August 15.  The Existing 6.625% Senior Notes due 2020 are scheduled to mature on August 15, 2020.  As of the Petition Date, there is approximately $176 million in principal amount outstanding under the Existing 6.625% Senior Notes due 2020.

B.     **Existing 6.875% Senior Notes due 2020.**

29.     On November 8, 2005, Chesapeake issued $500 million in aggregate principal of 6.875% senior notes due 2025 (the "Existing 6.875% Senior Notes due 2020"), pursuant to an indenture entered into with The Bank of New York Trust Company, N.A., as trustee.

30.     The obligations under the Existing 6.875% Senior Notes due 2020 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 6.875% Senior Notes due 2020 is payable semi-annually in arrears on each of May 15 and November 15.  The Existing 6.875% Senior Notes due 2020 are scheduled to mature on November 15, 2020.  As of the Petition Date, there is approximately $74 million in principal amount outstanding under the Existing 6.875% Senior Notes due 2020.

### C.     Existing 6.125% Senior Notes due 2021.

31.     On February 11, 2011, Chesapeake issued $1 billion in aggregate principal of 6.125% senior notes due 2021 (the "Existing 6.125% Senior Notes due 2021"), pursuant to a certain fifth supplemental indenture to the 2010 Base Indenture, entered into with The Bank of New York Trust Company, N.A., as trustee.

32.     The obligations under the Existing 6.125% Senior Notes due 2021 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 6.125% Senior Notes due 2021 is payable semi-annually in arrears on each of February 15 and August 15.  The Existing 6.125% Senior Notes due 2021 are scheduled to mature on February 15, 2021.  As of the Petition Date, there is approximately $166 million in principal amount outstanding under the Existing 6.125% Senior Notes due 2021.

### D.     Existing 5.375% Senior Notes due 2021.

33.     On April 1, 2013, Chesapeake issued $700 million in aggregate principal of 5.375% senior notes due 2021 (the "Existing 5.375% Senior Notes due 2021"), pursuant to a certain sixteenth supplemental indenture to the 2010 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

34.     The obligations under the Existing 5.375% Senior Notes due 2021 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 5.375% Senior Notes due 2021 is payable semi-annually in arrears on each of June 15 and December 15.  The Existing 5.375% Senior Notes due 2021 are scheduled to mature on June 15, 2021.  As of the Petition Date, there is approximately $127 million in principal amount outstanding under the Existing 5.375% Senior Notes due 2021.  On June 15, 2020, the Debtors elected to skip a $3.4 million interest payment due to holders of the Existing 5.375% Senior Notes due 2021.

**E.** **Existing 4.875% Senior Notes due 2022.**

35. On April 24, 2014, Chesapeake issued $1.5 billion in aggregate principal of 4.875% senior notes due 2022 (the "Existing 4.875% Senior Notes due 2022"), pursuant to a certain second supplemental indenture to that certain indenture, dated as of April 24, 2014, entered into with Wilmington Savings Fund Society, FSB, as successor trustee (as amended, restated or otherwise modified from time to time, the "2014 Base Indenture").

36. The obligations under the Existing 4.875% Senior Notes due 2022 are guaranteed by certain Debtor guarantors, but are unsecured. Interest on the Existing 4.875% Senior Notes due 2022 is payable semi-annually in arrears on each of April 15 and October 15. The Existing 4.875% Senior Notes due 2022 are scheduled to mature on April 15, 2022. As of the Petition Date, there is approximately $272 million in principal amount outstanding under the Existing 4.875% Senior Notes due 2022.

**F.** **Existing 5.750% Senior Notes due 2023.**

37. On April 1, 2013, Chesapeake issued $1.1 billion in aggregate principal of 5.750% senior notes due 2023 (the "Existing 5.750% Senior Notes due 2023"), pursuant to a certain seventeenth supplemental indenture to the 2010 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

38. The obligations under the Existing 5.750% Senior Notes due 2023 are guaranteed by certain Debtor guarantors, but are unsecured. Interest on the Existing 5.750% Senior Notes due 2023 is payable semi-annually in arrears on each of March 15 and September 15. The Existing 5.750% Senior Notes due 2023 are scheduled to mature on March 15, 2023. As of the Petition Date, there is approximately $168 million in principal amount outstanding under the Existing 5.750% Senior Notes due 2023.

**G.      Existing 7.000% Senior Notes due 2024.**

39.      On September 27, 2018, Chesapeake issued $850 million in aggregate principal of 7.000% senior notes due 2024 (the "Existing 7.000% Senior Notes due 2024"), pursuant to a certain eighth supplemental indenture to the 2014 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

40.      The obligations under the Existing 7.000% Senior Notes due 2024 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 7.000% Senior Notes due 2024 is payable semi-annually in arrears on each of April 1 and October 1.  The Existing 7.000% Senior Notes due 2024 are scheduled to mature on October 1, 2024.  As of the Petition Date, there is approximately $623 million in principal amount outstanding under the Existing 7.000% Senior Notes due 2024.

**H.      Existing 8.000% Senior Notes due 2025.**

41.      On December 20, 2016, Chesapeake issued $1 billion in aggregate principal of 8.000% senior notes due 2025 (the "Existing 8.000% Senior Notes due 2025"), pursuant to a certain eighth supplemental indenture to the 2014 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

42.      The obligations under the Existing 8.000% Senior Notes due 2025 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 8.000% Senior Notes due 2025 is payable semi-annually in arrears on each of January 15 and July 15.  The Existing 8.000% Senior Notes due 2025 are scheduled to mature on January 15, 2025.  As of the Petition Date, there is approximately $246 million in principal amount outstanding under the Existing 8.000% Senior Notes due 2025.

**I.     Existing 8.000% Senior Notes due 2026.**

43.     On April 3, 2019, Chesapeake issued $918.5 million in aggregate principal of 8.000% senior notes due 2026 (the "Existing 8.000% Senior Notes due 2026"), pursuant to a certain tenth supplemental indenture to the 2014 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

44.     The obligations under the Existing 8.000% Senior Notes due 2026 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 8.000% Senior Notes due 2026 is payable semi-annually in arrears on each of March 15 and September 15.  The Existing 8.000% Senior Notes due 2026 are scheduled to mature on March 15, 2026.  As of the Petition Date, there is approximately $46 million in principal amount outstanding under the Existing 8.000% Senior Notes due 2026.

**J.     Existing 7.500% Senior Notes due 2026.**

45.     On September 27, 2018, Chesapeake issued $400 million in aggregate principal of 7.500% senior notes due 2026 (the "Existing 7.500% Senior Notes due 2026"), pursuant to a certain ninth supplemental indenture to the 2014 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

46.     The obligations under the Existing 7.500% Senior Notes due 2026 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 7.500% Senior Notes due 2026 is payable semi-annually in arrears on each of April 1 and October 1.  The Existing 7.500% Senior Notes due 2026 are scheduled to mature on October 1, 2026.  As of the Petition Date, there is approximately $119 million in principal amount outstanding under the Existing 7.500% Senior Notes due 2026.

### K.     Existing 8.000% Senior Notes due 2027.

47.     On June 6, 2017, Chesapeake issued $750 million in aggregate principal of 8.000% senior notes due 2027 (the "Existing 8.000% Senior Notes due 2027," and together with the Existing 6.625% Senior Notes due 2020, the Existing 6.875% Senior Notes due 2020, the Existing 6.125% Senior Notes due 2021, the Existing 5.375% Senior Notes due 2021, the Existing 4.875% Senior Notes due 2022, the Existing 5.750% Senior Notes due 2023, the Existing 7.000% Senior Notes due 2024, the Existing 8.000% Senior Notes due 2025, the Existing 8.000% Senior Notes due 2026, and the Existing 7.500% Senior Notes due 2026, collectively, the "Existing Unsecured Senior Notes"), pursuant to a certain seventh supplemental indenture to the 2014 Base Indenture, entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

48.     The obligations under the Existing 8.000% Senior Notes due 2027 are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 8.000% Senior Notes due 2027 is payable semi-annually in arrears on each of June 15 and December 15.  The Existing 8.000% Senior Notes due 2027 are scheduled to mature on June 15, 2027.  As of the Petition Date, there is approximately $253 million in principal amount outstanding under the Existing 8.000% Senior Notes due 2027.  On June 15, 2020, the Debtors elected to skip a $10.1 million interest payment due to holders of the Existing 8.000% Senior Notes due 2027.

### L.     Existing 5.500% Convertible Senior Notes due 2026.

49.     On October 5, 2016, Chesapeake issued $1.25 billion in aggregate principal of 5.500% convertible senior notes due 2026 (the "Existing 5.500% Convertible Senior Notes"), pursuant to an indenture entered into with Wilmington Savings Fund Society, FSB, as successor trustee.

50.     The obligations under the Existing 5.500% Convertible Senior Notes are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 5.500%

Convertible Senior Notes is payable semi-annually in arrears not more than 15 days after each March 1 and September 1 of each year.  The Existing 5.500% Convertible Senior Notes are scheduled to mature on September 15, 2026.  As of the Petition Date, there is approximately $1.064 billion in principal amount outstanding under the Existing 5.500% Convertible Senior Notes.

### M.    Existing 6.875% BVL Notes due 2025.

51.    On February 1, 2017, WildHorse issued $350 million in aggregate principal of 6.875% senior notes due 2025 (the "Existing 6.875% BVL Senior Notes"), pursuant to an indenture entered into with U.S. Bank National Association, as trustee.  Chesapeake assumed the Existing 6.875% BVL Senior Notes on February 1, 2019.

52.    The obligations under the Existing 6.875% BVL Senior Notes are guaranteed by certain Debtor guarantors, but are unsecured.  Interest on the Existing 6.875% BVL Senior Notes is payable semi-annually in arrears on each of February 1 and August 1.  The Existing 6.875% BVL Senior Notes are scheduled to mature on February 1, 2025.  As of the Petition Date, there is approximately $2 million in principal amount outstanding under the Existing 6.875% BVL Senior Notes.

## IV.    Equity Obligations

### A.    Preferred Equity.

53.    Chesapeake's certificate of incorporation authorizes the Board of Directors (the "Board") to establish one or more series of preferred stock.  As of the Petition Date, there were four series of preferred stock outstanding: (i) 5.75% Cumulative Non-Voting Convertible Preferred Stock (Series A) (the "5.75% Series A Preferred Stock"), (ii) 5.75% Cumulative Non-Voting Convertible Preferred Stock (the "5.75% Preferred Stock"), (iii) 4.50% Cumulative Convertible Preferred Stock (the "4.50% Preferred Stock"), and (iv) 5.00% Cumulative

Convertible Preferred Stock (Series 2005B) (the "5.00% Preferred Stock," and together with the 5.75% Series A Preferred Stock, the 5.75% Preferred Stock, and the 4.50% Preferred Stock, collectively, the "Preferred Stock").  Outstanding shares under each series of Preferred Stock are summarized as follows:

- *5.75% Series A Preferred Stock.*  Approximately 423,363 shares of 5.75% Series A Preferred Stock are outstanding as of the Petition Date.  Holders of 5.75% Series A Preferred Stock are entitled to receive, when, as, and if declared by the Board, cumulative dividends at the rate of 5.75% per annum per share on the $1,000.00 liquidation preference per share of the 5.75% Series A Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year.  Dividends on the 5.75% Series A Preferred Stock must be paid in cash.  As of the Petition Date, the 5.75% Series A Preferred Stock are convertible, at the holder's option at any time, at a conversion rate of 0.1918 and at a conversion price of $5,215.02 per share of 5.75% Series A Preferred Stock.

- *5.75% Preferred Stock.*  Approximately 770,528 shares of 5.75% Preferred Stock are outstanding as of the Petition Date.  Holders of 5.75% Preferred Stock are entitled to receive, when, as, and if declared by the Board, cumulative dividends at the rate of 5.75% per annum per share on the $1,000.00 liquidation preference per share of the 5.75% Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year.  Dividends on the 5.75% Preferred Stock must be paid in cash.  As of the Petition Date, the 5.75% Preferred Stock are convertible, at the holder's option at any time, at a conversion rate of 0.1984 and at a conversion price of $5,039.59 per share of 5.75% Preferred Stock.

- *4.50% Preferred Stock.*  Approximately 2,558,900 shares of 4.50% Preferred Stock are outstanding as of the Petition Date.  Holders of 4.50% Preferred Stock are entitled to receive, when, as, and if declared by the Board, cumulative dividends at the rate of 4.50% per annum per share on the $100.00 liquidation preference per share of the 4.50% Preferred Stock, payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year.  Dividends on the 4.50% Preferred Stock may be paid in cash or, subject to certain limitations, in common stock, or a combination thereof.  As of the Petition Date, the 4.50% Preferred Stock are convertible, at the holder's option at any time, at a conversion rate of 0.0123 and at a conversion price of $8,142.99 per share of 4.50% Preferred Stock.

- *5.00% Preferred Stock.*  Approximately 1,810,667 shares of 5.00% Preferred Stock are outstanding as of the Petition Date.  Holders of 5.00% Preferred Stock are entitled to receive, when, as, and if declared by the Board, cumulative dividends at the rate of 5.00% per annum per share on the $100.00 liquidation

preference per share of the 5.00% Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year. Dividends on the 5.00% Preferred Stock may be paid in cash or, subject to certain limitations, in common stock, or a combination thereof. As of the Petition Date, the 5.00% Preferred Stock are convertible, at the holder's option at any time, at a conversion rate of 0.0139 and at a conversion price of $7,208.51 per share of 5.00% Preferred Stock.

54.     In January 2016, Chesapeake suspended dividend payments on each series of Preferred Stock to provide additional liquidity in the depressed commodity price environment. In the first quarter of 2017, Chesapeake reinstated the payment of dividends on each series of Preferred Stock and paid all past-due dividends in arrears. During 2018 and 2019, Chesapeake paid dividends of $92 million and $91 million, respectively, to holders of each series of Preferred Stock. On April 17, 2020, Chesapeake again suspended payment of dividends on each series of Preferred Stock. The suspension of the Preferred Stock dividends did not constitute an event of default under any of the Debtors' debt instruments.

**B.      Common Stock.**

55.     The Debtors' common stock has traded on the NYSE since 1993 under ticker symbol "CHK." As of the Petition Date, there were approximately 9.784 million shares of common stock, par value $0.01, issued and the common stock traded at $11.85 per share, implying a market capitalization of approximately $115.9 million. The Board is authorized to issue 22,500,000 shares of common stock. On April 13, 2020, following a shareholder vote, the Board approved a 1-for-200 reverse stock split in order to, among other things, increase the per share trading price of Chesapeake's common stock to satisfy the $1.00 minimum bid price requirement for continued listing on the NYSE. Chesapeake has not paid dividends to holders of common

stock since 2015 when the Board decided to eliminate quarterly cash dividends to the holders of common stock.

### The Debtors Have a Need for
### Debtor-in-Possession Financing and Use of Cash Collateral.

56.     The Debtors require immediate access to the DIP Facility in addition to continued use of the Cash Collateral to operate their business postpetition and to preserve the Debtors' estates as going concerns.  *See* Antinelli Decl. ¶ 11.  If the Debtors cannot quickly access the DIP Facility and Cash Collateral, the Debtors will not be able to operate their business in the ordinary course. *See id.* ¶ 12.  In turn, this would negatively affect the Debtors' revenues, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders.  *See id.*

57.     Recent events have underscored the Debtors' need to access the proceeds of the DIP Facility and Cash Collateral.  Specifically, extreme commodity pricing volatility combined with the impact of the COVID-19 pandemic have exacerbated the significant pressure already facing the Debtors' balance sheet.  *See* First Day Decl. ¶¶ 85–89.  As discussed in greater detail in the First Day Declaration, this additional economic pressure comes at a time when the Debtors are already operating under the overhang of significant funded debt obligations.  *See id.*  As a result of these and other demands, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these chapter 11 cases.  *See* First Day Decl. ¶ 110.

58.     Absent the funds available from the DIP Facility and access to Cash Collateral, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' business depends.  *See* First Day Decl. ¶ 110.  This, in turn, would hinder the Debtors' ability to maximize the value of their estates and would force

the Debtors to curtail their operations significantly to the detriment of the Debtors, their estates, and their creditors.  *See id.*

59.     A significant portion of the Debtors' prepetition collateral includes oil and gas properties and related assets on which the secured parties have liens, including the oil and gas extracted by the Debtors from those properties and the proceeds generated from sales thereof.  *See* First Day Decl. ¶ 110.  The Debtors' business model is predicated upon their ability to maximize the value of their oil and gas assets through extraction, bring the extracted hydrocarbons to market, and utilize the proceeds of such hydrocarbon sales to fund their business operations.  *See id.*  The continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the prepetition oil and gas collateral into cash collateral and use the cash in their operations.  *See id.*

60.     The Debtors also rely on the Cash Collateral generated from their operations to fund working capital, capital expenditures, development efforts, and for other general corporate purposes.  *See* First Day Decl. ¶ 111.  Access to postpetition Cash Collateral and the proposed DIP Facility is essential to enable the Debtors to ultimately consummate their restructuring, all while continuing to operate their business by satisfying payroll obligations, pay suppliers, cover overhead costs, paying expenses pursuant to joint operating agreements for properties operated by the Debtors, satisfying joint interest billings for properties where the Debtors are non-operating working interest owners, and satisfying any other payments that are essential for the continued management, operation, and preservation of the Debtors' assets.  *See id.*

61.     Accordingly, the Debtors' access to the proposed DIP Facility will enable the Debtors to stabilize their cash flows, continue operating in the ordinary course, and fulfill their

commitment to key stakeholders, including their vendors, customers, joint-venture partners, royalty interest owners, and employees through the chapter 11 process.  *See* First Day Decl. ¶ 112.

**Alternative Sources of Financing Are Not Available on Better Terms.**

62.     The Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. The Debtors, with the assistance of their advisors, ran a robust marketing process for postpetition financing and received multiple competitive proposals.  *See* Antinelli Decl. ¶ 18.  The Debtors believe that the proposed DIP Facility represents the only viable financing option available under the circumstances.  *See* Antinelli Decl. ¶ 31.

63.     The process began on April 9, 2020, when the Debtors' investment banker, Rothschild & Co. US Inc. ("Rothschild & Co."), reached out to nine financial institutions to gauge their interest in providing debtor-in-possession financing to the Debtors.  *See* Antinelli Decl. ¶ 15. Rothschild & Co. contacted six large financial institutions, five of which were already lenders under the Debtors' existing revolving credit agreement, as well as three non-traditional financial institutions who did not have debt holdings within the Debtors' capital structure.  *See id*. Rothschild & Co. also initiated dialogue with certain of the Debtors' creditor groups to gauge their interest in providing debtor-in-possession financing.  *See id*.

64.     Following the initial outreach, Rothschild & Co. engaged in a series of conferences and presentations with the various potential lenders, as well as provided access to the Debtors' diligence materials—including a preliminary business plan, a DIP financing sizing analysis, and a 13-week cash flow analysis.  *See* Antinelli Decl. ¶ 16.  The Debtors, Rothschild & Co., and the Debtors' other advisors subsequently provided the various potential lenders with access to a heavily populated virtual data room and responded to numerous follow-up diligence requests. *See id*.

65.     Although Rothschild & Co. contacted these potential DIP lenders, including traditional and alternative lending sources, the sources for funding were limited given the amount of debtor-in-possession financing required and the number of traditional financial institutions that were already lenders under the Existing RBL Credit Facility.  *See* Antinelli Decl. ¶ 17.  Several of the parties Rothschild & Co. contacted, including potential lenders outside of the Existing RBL Credit Facility, reported that they were unwilling to extend financing to the Debtors for various reasons, including the inability to obtain commitments for a financing of this size, the challenges facing the oil and gas sector and their unwillingness to participate in a non-consensual priming financing process.  *See id*.

66.     The Debtors ultimately received initial indications of interest from four lenders or groups of lenders within the Debtors' Existing RBL Credit Facility between April 16 and April 24, including three leading financial institutions and the steering committee of the Existing RBL Lenders led by MUFG.  *See* Antinelli Decl. ¶ 18.  The proposed new money DIP facility included in the various proposals ranged from $700 million to $1.35 billion.  *See id*.  The proposals also varied in the range of facility tenors, the inclusion of an exit facility structure, the ratio of new money to the roll-up of the Existing RBL Obligations, the inclusion and amount of certain fees, the treatment of prepetition and postpetition hedges, and various other covenants and milestones. *See id*.  Following receipt of the proposals, the Debtors, with the assistance of their advisors, continued to hold conferences with, and provide additional diligence to, the proposed DIP lenders to provide feedback on the proposals and to negotiate reasonable and appropriate terms and conditions that would allow the Debtors to meet their immediate cash needs and provide the Debtors with the runway necessary to carry out a successful reorganization.  *See id*.

67.     By early May 2020, the Debtors were negotiating two competing proposals:  a $1.35 billion new money DIP facility with $2.5 billion in exit financing led by a prominent financial institution and jointly underwritten by two other prominent financial institutions that was conditioned on gaining the support of a majority of the Existing RBL Lenders, and a $925 million new money DIP facility led by MUFG that had the support of a majority of the Existing RBL Lenders.  *See* Antinelli Decl. ¶ 19.  The Debtors initially pursued the non-MUFG proposal, but were unable to secure the requisite level of support from the Existing RBL Lenders.  *See id.*

68.     Despite the lack of support for the non-MUFG proposal, the Debtors continued to engage in further negotiations with both the lead proponent of the non-MUFG proposal and MUFG.  *See* Antinelli Decl. ¶ 20.  As part of those efforts, the Debtors and the proponent of the non-MUFG proposal negotiated a "middle ground" DIP financing proposal that bridged the two previous DIP financing proposals under consideration into one, cohesive proposal.  *See id.*  This "middle ground" DIP financing proposal included (a) a $1.15 billion new money DIP facility, (b) a roll up of a portion of the Existing Obligations on a dollar-for-dollar basis, and (c) a path to emerge from bankruptcy in the form of a $2.5 billion exit facility.  *See id.*  The proponent of the non-MUFG proposal and the Debtors and their advisors attempted to secure support for the "middle ground" DIP financing proposal, but after significant discussions with both prospective DIP lenders and direct dialogue with multiple Existing RBL Lenders, a majority of the Existing RBL Lenders continued to support the MUFG proposal.  *See id.*

69.     As a result, the Debtors and their advisors focused their efforts on negotiating the MUFG proposal, which included:  (a) multiple conferences with the Debtors' management and advisors; (b) the exchange of multiple iterations of term sheet proposals and related documents reflecting the proposed debtor-in-possession financing terms; and (c) circulation of the proposed

budget and other due diligence materials to potential lenders.  *See* Antinelli Decl. ¶ 21.  These efforts bore fruit after almost six weeks of hard fought, arm's-length negotiations, as the Debtors, MUFG, and all of the Existing RBL Lenders agreed on the terms of a $925 million new money DIP facility.  *See id.*

70.     Concurrent with the DIP financing process, the Debtors and their advisors engaged in lengthy negotiations with certain major creditor constituencies regarding the terms of a comprehensive deleveraging transaction.  *See* Antinelli Decl.  ¶ 22.  These negotiations successfully resulted in agreed-upon terms of a comprehensive restructuring, including a fully backstopped equity investment in an amount of $600 million.  *See id.*  As the primary terms of the DIP financing neared conclusion, the Existing RBL Lenders were included as part of the restructuring support agreement negotiations, particularly in light of the desire to de-risk the Debtors' contemplated restructuring through committed exit financing.  *See id.*  The Existing RBL Lenders and certain of the Existing FLLO Lenders engaged directly on the terms of a global deal, culminating in the terms set forth in the restructuring support agreement (the "Restructuring Support Agreement") entered into by the Debtors, the Existing RBL Lenders, certain of the Existing FLLO Lenders, and Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts.  *See id.*

71.     The DIP Facility and the Restructuring Support Agreement, including the significant equity commitments and exit facilities commitments contained therein, demonstrate the Existing RBL Lenders' support and commitment to the Debtors and belief in the strength of the Debtors' asset base and future earnings potential.  *See* Antinelli Decl. ¶ 23.  The DIP Facility will provide the Debtors with immediate access to liquidity and provide the Debtors with access to the use of the Cash Collateral on a consensual basis.  *See id.*  The Debtors believe that the proposed

DIP Facility, which is the result of a comprehensive marketing and negotiation process, represents the best available terms for the Debtors' debtor-in-possession financing.  *See id.*

## The Terms of the DIP Facility Should Be Approved

72.     The DIP Facility includes $925 million in new money obligations, including a $200 million letter of credit sub-facility, a roll-up of the Existing RBL Obligations in excess of $750 million, inclusive of loans beneficially owned by the DIP Lenders and non-DIP Lenders, and a 9-month maturity period.  *See* Antinelli Decl. ¶ 24.  The DIP Facility provides adequate protection for the Existing RBL Lenders in the form of (a) adequate protection liens, (b) superpriority claims, (c) fees and expenses, (d) interest, and (e) financial reporting; as well as adequate protection for the Existing FLLO Lenders and Existing Second Lien Notes in the form of (a) adequate protection liens, (b)  superpriority claims, (c) fees and expenses (subject to certain conditions), and (d) financial reporting.  *See id.* ¶ 26.  Given the priming nature of the DIP Facility and the potential for diminution of value of the Existing Secured Parties' respective interests in the Existing Collateral, the adequate protection provided is appropriate.  *See id.*

73.     The Roll-Up is a material component of the consideration required by the DIP Lenders and certain non-DIP Lenders as part of their commitment to provide post-petition financing or agreement to be consensually primed by the post-petition financing, respectively.  *See* Antinelli Decl. ¶ 27.  Notably, all of the DIP financing proposals provided to the Debtors included a roll-up of a material portion of the Existing RBL Obligations.  *See id.*  Given these circumstances described herein and as set forth in the Antinelli Declaration, the Roll-Up is appropriate under the circumstances.  *See id.* ¶ 28.  In addition to the Roll-Up, the DIP Facility contains various fees expressly required by the DIP Lenders as a condition to providing financing that are integral to the financing package.  *See* Antinelli Decl. ¶ 29.  Each of the fees was the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is

an integral component of the overall terms of the DIP Facility, and is required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing. *See id.* ¶ 30. Given the circumstances described herein and the lack of available alternatives, the fees are appropriate under the circumstances. *See id.*

74.     For these reasons, the Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal represents the only viable postpetition financing option available to the Debtors. *See* Antinelli Decl. ¶ 31. The DIP Facility is the product of extensive good-faith, arm's-length negotiations and is necessary for the Debtors to complete a successful restructuring. The DIP Facility provides the Debtors and their creditor constituencies with market-tested postpetition financing on the best available terms. *See id.* Accordingly, approval of the DIP Facility is in the best interest of the Debtors' estates and the Debtors respectfully request entry of the DIP Orders approving the DIP Facility.

## Basis for Relief

I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Credit Documents.**

A.     **Entering into the DIP Credit Documents Is an Exercise of the Debtors' Sound Business Judgment.**

75.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Credit Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business

judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

76.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

77.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

78.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of alternatives given the timing of the Debtors' liquidity crisis.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their chapter 11 cases and their ongoing operations. *See* Antinelli Decl. ¶ 32.

The Debtors conducted a robust marketing process that resulted in multiple competitive DIP proposals and negotiated the proposals in good faith, at arm's length, and with the assistance of their advisors. As a result, the Debtors believe that they have obtained the best financing available. *See id.* ¶ 34. Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Documents as a reasonable exercise of the Debtors' business judgment.

### B. The Roll-Up of the Existing RBL Obligations Is Appropriate.

79. The proposed refinancing of a portion of the Existing RBL Obligations with the proceeds of the DIP Facility is an exercise of the Debtors' sound business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of Existing RBL Obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

80. Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See e.g.*, *In re McDermott International, Inc.*,

No. 20-30336 (DRJ) (Bankr. S.D. Tex. January 23, 2020) (authorizing approximately $2.81 billion in DIP financing that included repayment of approximately $1 billion of prepetition debt); *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (authorizing approximately $100 million in DIP financing that included repayment of approximately $50 million of prepetition debt); *In re Sanchez Energy Corporation*, No. 19-34508 (MI) (Bankr. S.D. Tex. August 15, 2019) (authorizing approximately $350 million in DIP financing that included repayment of approximately $175 million of prepetition debt); *In re Legacy Reserves Inc.*, No. 19-33396 (MI) (Bankr. S.D. Tex. June 20, 2019) (authorizing approximately $350 million in DIP financing that included repayment of approximately $87.5 million of prepetition debt, pursuant to the interim DIP order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (authorizing approximately $130 million in DIP financing that included repayment of approximately $65 million in prepetition debt).[7]

81.    Where, as here, the Existing RBL Lenders are likely oversecured, repaying creditors that stand to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  Rather, the DIP Facility's proposed Roll-Up feature merely affects the timing, not the amount, of the Existing RBL Lenders' recovery.  Further, the Roll-Up of the Existing RBL Obligations is a material component of the consideration required by the DIP Lenders as part of their commitment to provide postpetition financing.  *See* Antinelli Decl. ¶ 27.  Finally, refinancing the Existing RBL Obligations will not prejudice any party's right to challenge the amount, validity, perfection, enforceability, priority or extent of the Existing RBL

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Obligations or the liens thereto.  Pursuant to the procedures set forth in the Interim Order, (a) any official committee of unsecured creditors, within sixty (60) calendar days of the Petition Date, (b) all other non-Debtor parties in interest with regard to the Existing RBL Liens and the Existing RBL Obligations, within forty (40) calendar days from the Petition Date, and (c) the Debtors and all other non-Debtor parties in interest with regard to the Existing FLLO Liens, the Existing FLLO Obligations, the Existing Second Liens, and the Existing Second Lien Obligations, within forty (40) calendar days of the Petition Date, may bring a challenge proceeding the validity, extent, priority, perfection and enforceability of the Existing Obligations.  These procedures were developed to ensure that no non-Debtor party in interest would be prejudiced by the relief requested herein.  *See* Interim Order ¶ 19.

82.     Finally, the DIP Facility would not be available absent the Roll-Up.  Without access to the DIP Facility, the Debtors' would be unable to continue as a going concern and bridge to the comprehensive restructuring contemplated by the Restructuring Support Agreement.  Given these circumstances, the Roll-Up is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**C.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

83.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including previously unencumbered property and "priming" liens on all of the Existing Collateral, except for the Excluded Assets.

84.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit

allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section

364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind
> specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing,

upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test

to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy

Code.  Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section
> 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender
> only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of
> the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and
> adequate, given the circumstances of the debtor-borrower
> and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary*

*Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

85.     No party that Rothschild & Co. contacted as part of the above-described process

was interested in providing, or willing to provide, postpetition financing to the Debtors on an

unsecured basis.  Indeed, no constituency was willing to provide postpetition financing on anything

other than a superpriority or priming basis with respect to all of the Debtors' assets.  Put simply,

the DIP Lenders were not willing to provide the DIP Facility on any other terms, and no other

existing stakeholder or third-party has presented a proposal without such priming liens.  Further, the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-possession financing to fund a non-consensual chapter 11 case.  Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

86.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Existing Secured Parties have consented or (b) the Existing Secured Parties' interests in collateral are adequately protected.

87.    Here, substantially all of the Existing RBL Lenders have consented to, and are participating in, the DIP Facility.  *See* Antinelli Decl. ¶ 32.  In short, the Debtors and their advisors realized that proceeding with any DIP financing over the objection of the majority of the Existing RBL Lenders would entail complicated, costly, and time-consuming litigation and that litigation of this kind would be inherently risky and likely not in the best interests of the Debtors' estates. *See id.* ¶ 31.  Further, the Existing Secured Parties will receive adequate protection of the Existing Collateral under the DIP Orders in the form of the Adequate Protection Liens and the Adequate Protection Super-Priority Claims.

88.    Accordingly, the Debtors submit that relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**D.      No Comparable Alternative to the DIP Facility Is Reasonably Available.**

89.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that the refusal of two national banks to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

90.      Here, the Debtors conducted a fulsome and competitive marketing process over the course of more than two months to explore financing options.  *See* Antinelli Decl. ¶ 14.  As described in greater detail in the Antinelli Declaration, the Debtors contacted multiple institutions in the Existing RBL Credit Facility and certain institutions in the Existing FLLO Term Loan Facility and Existing Second Lien Notes.  *See id.*  This lengthy marketing process culminated in four financing proposals.  *See* Antinelli Decl. ¶ 18.  All of the financing proposals received by the Debtors requested similar protections and sought priming liens as a condition to lending.  *See id.*  No DIP alternatives were available without the support of a majority of the Existing RBL Lenders.  Following arm's-length negotiations, the Debtors determined that the DIP Facility is the best available alternative under the circumstances to fund these chapter 11 cases.

**II.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.**

91.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[8] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

92.     Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its

---

[8]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

collateral during the reorganization process") (citation omitted); *see also In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993).

93.     The Existing Secured Parties will inherently benefit from the Debtors' proposed use of property of their estates, including the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders. Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes. *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

94.     The Debtors believe that the proposed adequate protection in the proposed Interim Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.  The importance of adequate protection packages in DIP facilities has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2020) (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments, and fees and expenses on an interim

basis to the applicable prepetition secured creditors); *In re Sheridan Holding Company II, LLC*,

No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019) (same); *In re Vanguard Natural Resources,*

*Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 4, 2019) (same); *In re Gastar Exploration, Inc.*,

No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) (same); *In re iHeartMedia, Inc.*,

No. 18-31274 (MI) (Bankr. S.D. Tex. Mar. 15, 2018) (granting adequate protection payments on

account of prepetition debt).[9]

### III.   The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Credit Documents.

95.     Under the DIP Credit Documents, the Debtors have agreed, subject to Court

approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders.  In particular, the

Debtors have agreed to pay:

a.   ***Interest Rates***.  The Borrower shall pay (i) LIBOR plus 6.00 percent, subject to a LIBOR floor of 1.00 percent, on the Revolving DIP Loans and (ii) LIBOR plus 5.50 percent, subject to a LIBOR floor of 0.00 percent, on the Roll-Up Loans.  The default rate shall be the Interest Rates plus an additional 2.00 percent.

b.   ***Upfront DIP Fee***.  The Borrower shall pay a percentage of the final allocated Revolving DIP Loan Commitments, payable in full upon execution of the Fee Letters.

c.   ***Unused Commitment Fee.***  The Borrower shall pay an annual fee on all undrawn commitments under the DIP Facility, payable quarterly in arrears on the last business day of each fiscal quarter.

d.   ***Letter of Credit Fees.***  The Borrower shall pay (i) a letter of credit fee for the period from the date of issuance of such letter of credit until the termination or expiration date of such letter of credit computed at the per annum rate for each day equal to the applicable margin for LIBOR loans on the average daily stated amount of such letter of credit and (ii) a fronting fee on the undrawn amount of each letter of credit, each payable monthly in arrears on the last business day of each calendar month and on the Maturity Date.

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

e.   ***DIP Backstop Fee***.  The Borrower shall pay to each Backstop Lender a percentage of their respective Revolving DIP Loan Commitments, payable upon execution of the Fee Letters.

f.   ***Non-Lender Consent Fee***.  The Borrower shall pay a consent fee to two Existing RBL Lenders unable to participate in the DIP Facility, but who are otherwise committed to the Restructuring Support Agreement.

g.   ***DIP Exit Fee***.  The Borrower shall pay a percentage of the final allocated Revolving DIP Loan Commitments, payable in full upon the Termination Date.

96.   As set forth in the Antinelli Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility are necessary in light of the circumstances of these chapter 11 cases and the robust marketing process undertaken, and represent the most favorable terms available to the Debtors.  *See* Antinelli Decl. ¶ 30.  The Debtors considered the fees described above when determining in their business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Credit Documents in connection with the DIP Facility.

## IV.   The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

97.   Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such

authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

98.     As detailed in the Antinelli Declaration, the DIP Facility is the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Secured Parties.  *See* Antinelli Decl. ¶ 31.  The Debtors submit the terms and conditions of the DIP Facility are appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  *See* Antinelli Decl. ¶ 32.  Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available and was the only viable financing proposal supported by a majority of the Existing RBL Lenders.  *See id.*  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

99.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders. *See* Interim Order ¶ 30.  The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order. *See id.*  Finally, the proposed Interim Order provides that the automatic stay shall be vacated and

modified, subject to certain limitations, to the extent necessary to permit the DIP Agent and DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Credit Documents.  *See id.*

100.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2020) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019) (same); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 4, 2019) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

101.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n

motion by the debtor(s), a hearing . . . will routinely be conducted within three business days to consider . . . cash collateral use[.]"  Complex Case Procedures, § I, ¶ 18.

102.    The Debtors require an immediate capital infusion to operate their business postpetition and to preserve the Debtors' estates as going concerns.  *See* Antinelli Decl. ¶ 11.  If the Debtors cannot quickly access the DIP Facility and Cash Collateral, the Debtors will not be able to operate their business in the ordinary course, which would negatively affect the Debtors' revenues, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders.  *See id.* ¶ 12.

103.    Prior to the Petition Date, the Debtors, in consultation with their advisors, evaluated the Debtors' liquidity position and developed projections (as updated from time to time in accordance with the terms of the DIP Facility, the "Approved Budget")[10] of postpetition cash needs for the Debtors' businesses in the initial 13 weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with the longer term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.  *See* First Day Decl. ¶ 113.  The Approved Budget and projections provide an accurate reflection of the Debtors' likely funding requirements over the identified period, respectively, and are appropriate under the circumstances. *See id.*  The Approved Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Approved Budget.  *See id.*

104.    The Debtors are seeking limited relief to, among other things, satisfy payroll obligations, pay suppliers, cover overhead costs, pay expenses and billings related to the Debtors'

---

[10]    A copy of the Approved Budget is attached to the Interim Order as **Exhibit B**.

oil and gas properties, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. *See* Antinelli Decl. ¶ 11. The ability to satisfy these expenses when due is essential to the continued operation of the Debtors' business during the pendency of these cases. *See id.*

105.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this motion, and enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facility and use the Cash Collateral.

## Request for Final Hearing

106.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Emergency Consideration

107.    Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule

6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

<strong><u>Waiver of Bankruptcy Rule 6004(a) and 6004(h)</u></strong>

108.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

<strong><u>Reservation of Rights</u></strong>

109.    Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants

54

the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

110.     The Debtors will provide notice of this motion to:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' proposed debtor-in-possession credit facility and counsel thereto; (d) the administrative agent under the Debtors' prepetition revolving credit facility and counsel thereto; (e) the administrative agent for the Debtors' prepetition term loan facility and counsel thereto; (f) the indenture trustee for the Debtors' senior secured second lien notes; (g) the indenture trustees for the Debtors' unsecured notes; (h) counsel to the ad hoc group of term loan lenders; (i) counsel to certain affiliates of Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (n) the state attorneys general for states in which the Debtors conduct business.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 28, 2020

/s/ Matthew D. Cavenaugh
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         mcavenaugh@jw.com
               jwertz@jw.com
               kpeguero@jw.com
               vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Marc Kieselstein, P.C. (*pro hac vice* pending)
Alexandra Schwarzman (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               marc.kieselstein@kirkland.com
               alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Certificate of Service

I certify that on June 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## __Exhibit A__

**Antinelli Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
|  | § |  |
| Debtors. | § | (Joint Administration Requested) |
|  | § |  |

**DECLARATION OF STEPHEN J.**
**ANTINELLI IN SUPPORT OF THE DEBTORS'**
**EMERGENCY MOTION FOR ENTRY OF INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO**
**OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE**
**DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS**
**AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE**
**EXISTING SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY,**
**(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Stephen J. Antinelli, hereby declare under penalty of perjury as follows:

1.     I am a Co-Head of Restructuring, North America, at Rothschild & Co. US Inc.

("Rothschild & Co."), a global financial advisory services and investment banking firm, which has

its principal office in North America at 1251 Avenue of the Americas, New York, New York

10020.  Rothschild & Co. has been engaged as a financial advisor to the above-captioned debtors

and debtors in possession (collectively, the "Debtors")[2] since December 2019.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on June 28, 2020 (the "Petition Date").

2.      I am generally familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.  I submit this declaration  (this "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Motion"), [3] which seeks approval of a debtor in possession, superpriority, senior secured credit facility comprising a revolving loan facility in the aggregate maximum principal amount of up to $925 million (the "DIP Facility"), including a sub-facility of up to $200 million for the issuance of letters of credit, and the consensual use of Cash Collateral.  I understand that, in accordance with and subject to the terms of Interim Order, $325 million of the DIP Facility will be made available upon entry of the Interim Order,[4] with the remaining balance available upon entry of the Final Order.[5]

3.      Except where specifically noted, the statements in this Declaration are based on (a) my personal knowledge, belief, or opinion; (b) information I have received from the Debtors' employees or advisors and/or employees of Rothschild & Co. working directly with me or under

---

[3]      Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

[4]      *See Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Interim Order"), filed contemporaneously with the Motion.

[5]      The material terms of the DIP Facility are set forth in detail in the Motion.  For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Credit Documents (as defined in the Motion).

my supervision, direction, or control; or (c) the Debtors' records maintained in the ordinary course of their business.  I am authorized by the Debtors to submit this Declaration and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

### Qualifications

4.      Rothschild & Co. is a member of one of the world's leading independent investment banking groups, with over fifty offices in more than forty countries.  Rothschild & Co. has expertise in domestic and cross-border restructurings, mergers and acquisitions, new capital raises, debt advisory, and other financial advisory and investment banking services.  Rothschild & Co. has extensive experience representing the interests of debtors, creditors, and institutional investors in business and sovereign restructurings and workouts both in and out of chapter 11, and in representing clients in a wide range of industries.  Rothschild & Co. is both a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.      Over the last 24 years, my transaction experience has ranged from out-of-court restructurings to in-court bankruptcies across a variety of industries in the United States, Europe, Canada, and Mexico.  Additionally, my merger and acquisition experience includes healthy and troubled company buy-side and sell-side assignments, as well as special committee representations.  My expertise includes, but is not limited to, assisting companies in raising various forms of debt and equity financing.  I have also represented creditor constituencies in various restructuring transactions and chapter 11 cases.

6.      Prior to joining Rothschild & Co. in 2009, I was a Managing Director and assisted in the founding of Conway, Del Genio, Gries & Co., LLC.  Previously, I was a senior manager in Ernst & Young LLP, specializing in both healthy and distressed mergers and acquisitions.

7.    Prior to my career in finance, I was a Captain in the United States Air Force specializing in contract negotiation.  I hold a BS degree in Mathematics and Economics from the University of Notre Dame and an MBA from Boston College.

**Preliminary Statement**

8.    Rothschild & Co. and Intrepid Partners, LLC ("Intrepid"), acting with Rothschild & Co. as co-financial advisor to the Debtors, have rendered investment banking services to the Debtors in connection with liability management initiatives since December 2019.  On March 1, 2020, Rothschild & Co. and Intrepid entered into a new engagement letter with the Debtors regarding the formulation, analysis and implementation of various options for a restructuring, reorganization or other similar strategic alternative relating to the Debtors.  Additionally, Rothschild & Co. has worked closely with the Debtors' management and retained professionals, including Kirkland & Ellis LLP, Intrepid, and Alvarez & Marsal North America, LLC, to evaluate the Debtors' cash requirements for their business.

9.    By working with the Debtors to evaluate their financing and strategic alternatives, Rothschild & Co. and the Debtors' other restructuring advisors have become sufficiently knowledgeable about the Debtors' business, finances, operations, and systems to evaluate their liquidity and cash needs.  The Debtors' business will benefit materially from approval of the DIP Facility.  Access to incremental liquidity in the form of postpetition financing is critical to provide the necessary liquidity to fund these chapter 11 cases, facilitate a transformational restructuring, and maximize the likelihood of the Debtors' ability to execute their business plan. The DIP Facility provides the Debtors with the liquidity necessary to fund operations during the chapter 11 cases.  Additionally, the financing will signal to the Debtors' customers, vendors, and employees that operations can and will continue in the ordinary course during the reorganization process.  This financing should assist in the prompt stabilization of the Debtors' operations and

4

mitigate any uncertainty these chapter 11 cases may otherwise cause.

### The Debtors' Immediate Liquidity Needs

10.     In conjunction with the Debtors' other advisors, Rothschild & Co. assisted the Debtors' management in determining the Debtors' postpetition cash requirements for their business.  As part of Rothschild & Co.'s evaluation of the Debtors' liquidity position, Rothschild & Co. reviewed and analyzed the 13-week and long-term cash flow forecasts and the Approved Budget.  These forecasts, prepared by management of the Debtors and certain of their advisors, take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business, required operation payments, fees and interest expense associated with the DIP Facility, and professional fees.

11.     Based on Rothschild & Co.'s review and evaluation of the Debtors' financial forecasts and the Approved Budget, the Debtors require an immediate capital infusion in the form of the DIP Facility and access to Cash Collateral in order to operate their business postpetition and to preserve the Debtors' estates as going concerns.  The recent, extreme commodity price volatility combined with the impact of the COVID-19 pandemic have exacerbated the significant pressure already facing the Debtors' balance sheet.  As the Debtors' financial forecasts and the Approved Budget reveal, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these chapter 11 cases.  The Debtors need the DIP Facility and Cash Collateral to fund working capital, capital expenditures, and development efforts, as well as to satisfy payroll obligations, pay suppliers, cover overhead costs, pay expenses and billings related to the Debtors' oil and gas properties, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  The ability to satisfy these expenses when

5

due is essential to the continued operation of the Debtors' business during the pendency of these cases.

12.     If the Debtors cannot quickly access the DIP Facility and Cash Collateral, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course.  In turn, this would negatively affect the Debtors' revenues, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders.  Based on the Debtors' financial forecasts and the Approved Budget, the incremental liquidity provided by the DIP Facility will allow the Debtors to implement their business plan and weather industry headwinds related to commodity price volatility and macroeconomic uncertainty associated with the global COVID-19 pandemic and the current challenges facing the oil and gas industry.

**Prepetition Marketing Processes**

13.     Beginning in March 2020, the Debtors, with the assistance of their advisors, reached out to their major creditor constituencies to commence negotiations on a comprehensive balance sheet restructuring transaction.  Simultaneously, the Debtors and their advisors worked diligently to evaluate options for debtor-in-possession financing to fund their restructuring efforts.

14.     Rothschild & Co. launched a formal marketing process on behalf of the Debtors designed to canvas the market and identify the best possible solution to the Debtors' particular financing needs.  The marketing process, including the significant negotiations between the Debtors and the parties that submitted formal DIP financing proposals, lasted over two months.  Attached hereto as **Exhibit 1** is a timeline of the efforts to obtain DIP financing.

15.     The process began on April 9, 2020, when Rothschild & Co. reached out to nine financial institutions to gauge their interest in providing debtor-in-possession financing to the Debtors.  Specifically, Rothschild & Co. contacted six large financial institutions, five of which

6

were already lenders under the Debtors' existing revolving credit agreement, as well as three non-traditional financial institutions who I understood did not have debt holdings within the Debtors' capital structure. Rothschild & Co. also initiated dialogue with certain of the Debtors' creditor groups to gauge their interest in providing debtor-in-possession financing.

16. Following the initial outreach, Rothschild & Co. engaged in a series of conferences and presentations with the various potential lenders, as well as provided access to the Debtors' diligence materials—including a preliminary business plan, a DIP financing sizing analysis, and a 13-week cash flow analysis. The Debtors, Rothschild & Co., and the Debtors' other advisors subsequently provided the various potential lenders with access to a heavily populated virtual data room and responded to numerous follow-up diligence requests.

17. Although Rothschild & Co. contacted these potential DIP lenders, including traditional and alternative lending sources, the sources for funding were limited given the amount of debtor-in-possession financing required and the number of traditional financial institutions that were already lenders under the Existing RBL Credit Facility. Several of the parties Rothschild & Co. contacted, including potential lenders outside of the Existing RBL Credit Facility, reported that they were unwilling to extend financing to the Debtors for various reasons, including the inability to obtain commitments for a financing of this size, the challenges facing the oil and gas sector and their unwillingness to participate in a non-consensual priming financing process.

18. The Debtors ultimately received initial indications of interest from four lenders or groups of lenders within the Debtors' Existing RBL Credit Facility between April 16 and April 24, including three leading financial institutions and the steering committee of the Existing RBL Lenders led by MUFG Union Bank, N.A. ("MUFG"). The proposed new money DIP facility included in the various proposals ranged from $700 million to $1.35 billion. The proposals also

varied in the range of facility tenors, the inclusion of an exit facility structure, the ratio of new money to the roll-up of the Existing RBL Obligations, the inclusion and amount of certain fees, the treatment of prepetition and postpetition hedges, and various other covenants and milestones. Following receipt of the proposals, the Debtors, with the assistance of their advisors, continued to hold conferences with, and provide additional diligence to, the proposed DIP lenders to provide feedback on the proposals and to negotiate reasonable and appropriate terms and conditions that would allow the Debtors to meet their immediate cash needs and provide the Debtors with the runway necessary to carry out a successful reorganization.

19.     By early May 2020, the Debtors were negotiating two competing proposals:  a $1.35 billion new money DIP facility with $2.5 billion in exit financing led by a prominent financial institution and jointly underwritten by two other prominent financial institutions (the "non-MUFG proposal") that was conditioned on gaining the support of a majority of the Existing RBL Lenders, and a $925 million new money DIP facility led by MUFG that had the support of a majority of the Existing RBL Lenders (the "MUFG proposal").  The Debtors initially pursued the non-MUFG proposal, but were unable to secure the requisite level of support from the Existing RBL Lenders.

20.     Despite the lack of support for the non-MUFG proposal, the Debtors continued to engage in further negotiations with both the lead proponent of the non-MUFG proposal and MUFG.  As part of those efforts, the Debtors and the proponent of the non-MUFG proposal negotiated a "middle ground" DIP financing proposal that bridged the two previous DIP financing proposals under consideration into one, cohesive proposal.  This "middle ground" DIP financing proposal included (a) a $1.15 billion new money DIP facility, (b) a roll up of a portion of the Existing Obligations on a dollar-for-dollar basis, and (c) a path to emerge from bankruptcy in the

8

form of a $2.5 billion exit facility.  The proponent of the non-MUFG proposal and the Debtors and their advisors attempted to secure support for the "middle ground" DIP financing proposal, but after significant discussions with both prospective DIP lenders and direct dialogue with multiple Existing RBL Lenders, a majority of the Existing RBL Lenders continued to support the MUFG proposal.

21.     As a result, the Debtors and their advisors focused their efforts on negotiating the MUFG proposal, which included:  (a) multiple conferences with the Debtors' management and advisors; (b) the exchange of multiple iterations of term sheet proposals and related documents reflecting the proposed debtor-in-possession financing terms; and (c) circulation of the proposed budget and other due diligence materials to potential lenders.  These efforts bore fruit after almost six weeks of hard fought, arm's-length negotiations, as the Debtors, MUFG, and all of the Existing RBL Lenders agreed on the terms of a $925 million new money DIP facility.

22.     Concurrent with the DIP financing process, the Debtors and their advisors engaged in lengthy negotiations with certain major creditor constituencies regarding the terms of a comprehensive deleveraging transaction.  These negotiations successfully resulted in agreed-upon terms of a comprehensive restructuring, including a fully backstopped equity investment in an amount of $600 million.  As the primary terms of the DIP financing neared conclusion, the Existing RBL Lenders were included as part of the restructuring support agreement negotiations, particularly in light of the desire to de-risk the Debtors' contemplated restructuring through committed exit financing.  The Existing RBL Lenders and certain of the Existing FLLO Lenders engaged directly on the terms of a global deal, culminating in the terms set forth in the restructuring support agreement (the "Restructuring Support Agreement") entered into by the Debtors, the Existing RBL Lenders, certain of the Existing FLLO Lenders, and Franklin Advisers, Inc., as

9

investment manager on behalf of certain funds and accounts.

23.     The DIP Facility and the Restructuring Support Agreement, including the significant equity commitments and exit facilities commitments contained therein, demonstrate the Existing RBL Lenders' support and commitment to the Debtors and belief in the strength of the Debtors' asset base and future earnings potential.  The DIP Facility will provide the Debtors with immediate access to liquidity and provide the Debtors with access to the use of the Cash Collateral on a consensual basis.  The proposed DIP Facility, which is the result of a comprehensive marketing and negotiation process, represents the best available terms for the Debtors' debtor-in-possession financing.

## The Terms of the DIP Facility Should Be Approved

### A.     The DIP Facility Size and Budget

24.     The DIP Facility includes $925 million in new money obligations, including a $200 million letter of credit sub-facility, a roll-up of the Existing RBL Obligations in excess of $750 million, inclusive of loans beneficially owned by the DIP Lenders and non-DIP Lenders, and a 9-month maturity period.  Based on my knowledge and extensive discussions with the Debtors' management team and advisors and Rothschild & Co.'s review and evaluation of the Debtors' financial forecasts and the Approved Budget, the liquidity provided under the DIP Facility will allow the Debtors to provide necessary assurances to their employees, vendors, suppliers, mineral interest owners, and other key stakeholders that the Debtors are well funded to continue their operations, satisfy postpetition liabilities in accordance with the first day orders, and fund the administration of these chapter 11 cases as the Debtors seek to implement a successful restructuring.

25.     The DIP Facility also provides the Debtors with flexibility with respect to the Approved Budget and contains reasonable and customary reporting, testing and financial

covenants.  The financial covenants, including the aggregate disbursements covenant with respect to the Approved Budget, are customary and, barring any unforeseen events, will provide the Debtors with the necessary liquidity to operate their business during the pendency of these chapter 11 cases.

### B.       Adequate Protection for the Existing Secured Parties

26.       The DIP Facility provides adequate protection for the Existing RBL Lenders in the form of (a) adequate protection liens, (b) superpriority claims, (c) fees and expenses, (d) interest, and (e) financial reporting; as well as adequate protection for the Existing FLLO Lenders and Existing Second Lien Notes in the form of (a) adequate protection liens, (b)  superpriority claims, (c) fees and expenses (subject to certain conditions), and (d) financial reporting.  Given the priming nature of the DIP Facility, the potential for diminution of value of the Existing Secured Parties' respective interests in the Existing Collateral, and based on my experience and knowledge of the market for DIP financing, the adequate protection provided to the Existing Secured Parties is appropriate.

### C.       The Roll-Up of the Existing RBL Obligations

27.       The DIP Facility contemplates a "roll-up" of all loans outstanding under the Existing RBL Credit Facility in excess of $750 million that are beneficially owned by the DIP Lenders.  The Roll-Up of the Existing RBL Obligations is a material component of the consideration required by the DIP Lenders and certain non-DIP Lenders as part of their commitment to provide postpetition financing or agreement to be consensually primed by the postpetition financing, respectively.  Notably, all of the DIP financing proposals provided to the Debtors included a roll-up of a material portion of the Existing RBL Obligations.

28.       Further, the Existing RBL Lenders, with approximately $2 billion of first lien, first priority claims, are oversecured.  The DIP Facility's proposed repayment feature therefore affects

the timing, but not the amount, of the Existing RBL Lenders' recovery. Given these circumstances, the repayment of the Existing RBL Obligations by the Debtors is appropriate.

### D.     The DIP Facility Fees

29.     The DIP Facility contains various fees expressly required by the DIP Lenders as a condition to providing financing that are integral to the financing package. In particular, the Debtors have agreed to pay:

a.  ***Interest Rates***. The Borrower shall pay (i) LIBOR plus 6.00 percent, subject to a LIBOR floor of 1.00 percent, on the Revolving DIP Loans and (ii) LIBOR plus 5.50 percent, subject to a LIBOR floor of 0.00 percent, on the Roll-Up Loans. The default rate shall be the Interest Rates plus an additional 2.00 percent.

b.  ***Upfront DIP Fee***. The Borrower shall pay a percentage of the final allocated Revolving DIP Loan Commitments, payable in full upon execution of the Fee Letter.

c.  ***Unused Commitment Fee.*** The Borrower shall pay an annual fee on all undrawn commitments under the DIP Facility, payable quarterly in arrears on the last business day of each fiscal quarter.

d.  ***Letter of Credit Fees.*** The Borrower shall pay (i) a letter of credit fee for the period from the date of issuance of such letter of credit until the termination or expiration date of such letter of credit computed at the per annum rate for each day equal to the applicable margin for LIBOR loans on the average daily stated amount of such letter of credit and (ii) a fronting fee on the undrawn amount of each Letter of Credit, each payable monthly in arrears on the last business day of each calendar month and on the Maturity Date.

e.  ***DIP Backstop Fee***. The Borrower shall pay to each Backstop Lender a percentage of their respective Revolving DIP Loan Commitments, payable upon execution of the Fee Letter.

f.  ***Non-Lender Consent Fee***. The Borrower shall pay a consent fee to two Existing RBL Lenders unable to participate in the DIP Facility, but who are otherwise committed to the Restructuring Support Agreement.

g.  ***DIP Exit Fee***. The Borrower shall pay a percentage of the final allocated Revolving DIP Loan Commitments, payable in full upon the Termination Date.

30.     Each of the fees was the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facility, and is required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing.  Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these chapter 11 cases, the lack of viable alternatives, and based on my experience and knowledge of the market for DIP financing, the fees are appropriate under the circumstances.

## The DIP Facility Should Be Approved

31.     Based on the foregoing, it is my belief that the DIP Facility addresses the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Facility are appropriate under the circumstances.  The negotiation process was full and fair, was comprehensive, and produced the only viable financing option available under the circumstances.  The Debtors heavily negotiated all aspects of the DIP financing, including, the interest rate, roll-up, fees, and milestones.  They ultimately determined that they could not secure DIP financing and the related access to the liquidity necessary to preserve the value of their business on better terms other than those contemplated by the DIP Facility.  Further, the other DIP alternatives were unavailable without the support of a majority of the Existing RBL Lenders, may have resulted in complicated, costly, and time-consuming litigation with a subset of Existing RBL Lenders, and would have risked the Debtors' ability to effectuate the Restructuring Support Agreement.

32.     For these reasons, the Debtors, in consultation with their advisors, determined that the proposed DIP Facility is the best available postpetition financing option—and is the only financing option supported by all of the Existing RBL Lenders.  Here, substantially all of the Existing RBL Lenders have consented to, and are participating in, the DIP Facility.  The DIP Facility provides the Debtors with necessary liquidity to both fund operations and send a

positive signal to the Debtors' customers, vendors, and employees that operations can and will continue in the ordinary course during the reorganization process. Accordingly, and based on my experience with similar DIP financing packages and my review of the Debtors' financial position, the DIP Facility is the product of good-faith, arm's-length negotiations and is a critical component of the Debtors' chapter 11 strategy.

33. Upon entry of the Interim Order, the DIP Facility gives the Debtors immediate access to $325 million of the DIP Facility Loans. The DIP Facility will also give the Debtors consensual access to the Cash Collateral and will allow the Debtors to fund their business in the ordinary course.

34. Given the circumstances, the process to obtain debtor-in-possession financing produced the best financing option available to the Debtors and the terms of the DIP Facility are appropriate. Also, based on the Debtors' financial forecasts and the Approved Budget, the proposed DIP Facility will provide the Debtors with the necessary liquidity to effectively manage their chapter 11 process.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 28, 2020                          Respectfully submitted,

                                              */s/ Stephen J. Antinelli*

                                              Stephen J. Antinelli
                                              Co-Head of Restructuring in North America
                                              Rothschild & Co.

**<u>Exhibit 1</u>**

**Prepetition DIP Marketing Process**

# Timeline for Chesapeake DIP marketing process



**Summary of key process milestones**



**April 17**
Deadline for initial indications
- 4 proposals received from banks by or after deadline

**May 4**
Proponent of non-MUFG proposal launches DIP-to-Exit syndication process

**May 10**
Syndication process deemed unsuccessful as required lenders do not support

**May 21**
MUFG-led Steering Committee confirms that they do not support revised DIP and Exit Proposal

**May 22**
Syndication process deemed unsuccessful
- Company continues negotiating MUFG-led DIP and Exit financing proposal

The Company, MUFG and key junior creditors negotiate terms of DIP and RSA (May 22 – June 27)

| Month: | April | May | June |
|---|---|---|---|

| Week ended: | April 11 | April 18 | April 25 | May 2 | May 9 | May 16 | May 23 | May 30 | June 6 | June 13 | June 20 | June 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Company responds to most competitive initial indications (April 17 – April 30)

**April 9**
Formal process initiated
- 9 parties contacted
  - 6 banks (4 inside the bank group and 2 non-participants)
  - 3 leading alternative asset managers
- Creditor constituencies contacted

**May 1**
Company pursues non-MUFG DIP proposal, which required support of majority of lenders and included DIP-to-Exit financing structure

**May 18**
Agreement-in-principle reached with key junior creditors on terms of balance sheet restructuring

**May 19**
Non-MUFG DIP and Exit syndication re-launched on improved terms
- Full bank group call with Company and supporting junior creditors

**June 28**
Chapter 11 filing

Rothschild & Co | INTREPID

## Exhibit B

**Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**ATTORNEY CHECKLIST CONCERNING MOTIONS**
**AND ORDERS PERTAINING TO USE OF CASH COLLATERAL AND**
**POST-PETITION FINANCING (WHICH ARE IN EXCESS OF TEN (10) PAGES)**

Motions and orders pertaining to cash collateral and post-petition financing matters tend to be lengthy and complicated. Although the Court intends to read such motions and orders carefully, it will assist the Court if counsel will complete and file this checklist. All references are to the Bankruptcy Code (§) or Rules (R).

**PLEASE NOTE:**

"*" Means generally not favored by Bankruptcy Courts in this District.

"**" Means generally not favored by Bankruptcy Courts in this District without a reason and a time period for objections.

If your motion or order makes provision for any of the following, so indicate in the space provided:

**CERTIFICATE BY COUNSEL**

This is to certify that the following checklist fully responds to the Court's inquiry concerning material terms of the motion and/or proposed order:

Yes, at Page/Exhibit
Y means yes; N means no
N/A means not applicable
(Page Listing Optional)

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

1.  Identification of Proceedings:

   (a)  Preliminary or final motion/order (circle one)................................. N/A

   (b)  Continuing use of cash collateral (§ 363) ..................................... Y

   (c)  New financing (§ 364) ................................................................ Y

   (d)  Combination of §§ 363 and 364 financing .................................. Y

   (e)  Emergency hearing (immediate and irreparable harm) ................. Y

2.  Stipulations:

   (a)  Brief history of debtor's businesses and status of debtor's prior
       relationships with lender........................................................... Y

   (b)  Brief statement of purpose and necessity of financing. .................. Y

   (c)  Brief statement of type of financing (i.e., accounts receivable, inventory).... Y

   (d)  Are lender's pre-petition security interest(s) and liens deemed valid, fully
       perfected and non-avoidable........................................................ Y

       *(i)*  Are there provisions to allow for objections to above? ........... Y

   (e)  Is there a post-petition financing agreement between lender and
       debtor? ...................................................................................... Y

       *(i)*  If so, is agreement attached?..................................................... Y

   (f)  Is there is an agreement that lender's post-petition security interests and
       liens deemed valid, fully perfected and non-avoidable? ................. Y

   (g)  Is lender undersecured or oversecured (circle one) ........................ N/A

   (h)  Has lender's non-cash collateral been appraised? .......................... N

       *(i)*  Insert date of latest appraisal ................................................. N/A

   (i)  Is debtor's proposed budget attached?........................................... Y

   (j)  Are all pre-petition loan documents identified? ............................. Y

   (k)  Are pre-petition liens on single or multiple assets? (circle one) ................... N/A

   (l)  Are there pre-petition guaranties of debt? ...................................... Y

       *(i)*  Limited or unlimited? (circle one)............................................ N/A

3.  Grant of Liens:

   (a)  Do post-petition liens secure pre-petition debts?........................... Y

   (b)  Is there cross-collateralization? ................................................... N

   (c)  Is the priority of post-petition liens equal to or higher than existing liens? ... Y

   (d)  Do post-petition liens have retroactive effect? .............................. N

   (e)  Are there restrictions on granting further liens or liens of equal or higher
       priority?..................................................................................... Y

   (f)  Is lender given liens on claims under §§ 506(c), 544-50 and §§ 522? ........... N

       *(i)*  Are lender's attorneys fees to be paid?.................................... Y

*(ii)* Are debtor's attorneys fees excepted from § 506(c)?..............................Y

(g)  Is lender given liens upon proceeds of causes of action under §§ 544, 547 and 548?.....................................................................................................Y

**4.**  Administrative Priority Claims:

(a)  Is lender given an administrative priority? .....................................................Y

(b)  Is administrative priority higher than § 507(a)? .............................................Y

(c)  Is there a conversion of pre-petition secured claim to post-petition administrative claim by virtue of use of existing collateral?..........................Y

**5.**  Adequate Protection (§361):

(a)  Is there post-petition debt service? ...............................................................Y

(b)  Is there a replacement/addition 361(/) lien? (circle one or both)...................N/A

(c)  Is the lender's claim given super-priority? (§ 364(c) or (d)) [designate] ...........................................................................

Y - Both

(d)  Are there guaranties? .....................................................................................Y

(e)  Is there adequate Insurance coverage? ........................................................Y

(f)  Other? ...........................................................................................................Y

**Debtors' comment**:  Adequate protection includes (i) payment of certain reasonable and documented out-of-pocket professional fees and expenses, (ii) payment of certain postpetition interest and fees at the default rate, and (iii) financial reporting obligations.

**6.**  Waiver/Release Claims v. Lender:

(a)  Debtor waives or release claims against lender, including, but not limited to, claims under §§ 506(c), 544-550, 552, and 553 of the Code?..................Y

(b)  Does the debtor waive defenses to claim or liens of lender?.........................Y

**7.**  Source of Post-Petition Financing (§ 364 Financing):

(a)  Is the proposed lender also the pre-petition lender? ......................................Y

(b)  New post-petition lender?...............................................................................N

(c)  Is the lender an insider? ................................................................................N

8.     Modification of Stay:

    (a)   Is any modified lift of stay allowed? ............................................................ Y     

    (b)   Will the automatic stay be lifted to permit lender to exercise self-help upon default without further order? ........................................................................ N     

    (c)   Are there any other remedies exercisable without further order of court? ..... Y     

    (d)   Is there a provision that any future modification of order shall not affect status of debtor's post-petition obligations to lender? ................................... Y     

9.     Creditors' Committee:

    (a)   Has creditors' committee been appointed? .................................................... N     

    (b)   Does creditors' committee approve of proposed financing? ......................... N/A     

10.     Restrictions on Parties in Interest:

    (a)   Is a plan proponent restricted in any manner, concerning modification of lender's rights, liens and/or causes? ............................................................... Y     

    (b)   Is the debtor prohibited from seeking to enjoin the lender in pursuit of rights? ........................................................................................................... Y     

    (c)   Is any party in interest prohibited from seeking to modify this order? .......... Y     

    (d)   Is the entry of any order conditioned upon payment of debt to lender? ......... N     

    (e)   Is the order binding on subsequent trustee on conversion? ........................... Y     

11.     Nunc Pro Tunc:

    (a)   Does any provision have retroactive effect? ................................................. Y     

12.     Notice and Other Procedures:

    (a)   Is shortened notice requested? ...................................................................... Y     

    (b)   Is notice requested to shortened list? ............................................................ N     

    (c)   Is time to respond to be shortened? .............................................................. N     

    (d)   If final order sought, have 15 days elapsed since service of motion pursuant to Rule 4001(b)(2)? ..................................................... N/A     

    (e)   If preliminary order sought, is cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing? ......... Y     

    (f)   Is a Certificate of Conference included? ...................................................... N     

    (g)   Is a Certificate of Service included? ............................................................. Y     

    (h)   Is there verification of transmittal to U.S. Trustee included pursuant to Rule 9034? ................................................................................ N     

    (i)   Has an agreement been reached subsequent to filing motion? ...................... N/A     

        *(i)*   If so, has notice of the agreement been served pursuant to Rule 4001(d)(4)? .............................................................................. N/A     

*(ii)* Is the agreement in settlement of motion pursuant to Rule 4001(d)(4)? .. N/A

*(iii)* Does the motion afford reasonable notice of material provisions of agreement pursuant to Rule 4001(d)(4)? ................................................. N/A

*(iv)* Does the motion provide for opportunity for hearing pursuant to Rule 9014? ....................................................................................................... N/A

Houston, Texas
June 28, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                 jwertz@jw.com
                 kpeguero@jw.com
                 vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Marc Kieselstein, P.C. (*pro hac vice* pending)
Alexandra Schwarzman (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                 marc.kieselstein@kirkland.com
                 alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*