**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | |
| | § | |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adv. Pro. No. 20-____ |
| | § | |
| v. | § | |
| | § | |
| FEDERAL ENERGY REGULATORY | § | |
| COMMISSION, | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT FOR DECLARATORY JUDGMENT, *EX PARTE* TEMPORARY**
**RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTION**

Chesapeake Energy Corporation ("Chesapeake" or "Plaintiff"), a debtor in the

above-captioned chapter 11 case (together with its affiliated debtors, the "Debtors"), alleges for its

Complaint against defendant the Federal Energy Regulatory Commission

("FERC" or "Defendant"), upon knowledge of its own acts and upon information and belief as to

all other matters, as follows:

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake
Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is
6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

## Brief Statement of the Case

1.     This is an adversary proceeding brought pursuant to 28 U.S.C. § 2201, sections 105, 106(a), 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 7001(7), (9) and 7065, for declaratory judgment, a temporary restraining order, and preliminary and permanent injunctive relief.  In a separate matter in Chesapeake's plenary bankruptcy case, Chesapeake has filed a motion to reject certain negotiated rate firm natural gas transportation service agreements, attached hereto as **Exhibit A** (the "Rejection Motion"), including the ETC Tiger Agreement and the Gulf South Agreements (each as defined below and together, the "Firm Transportation Agreements") with ETC Tiger Pipeline, LLC ("Tiger") and Gulf South Pipeline Company, LP, pursuant to section 365 of the Bankruptcy Code and *In re Mirant Corp.* 378 F.3d 511, 522 (5th Cir. 2004) ("A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection.  Further, there is nothing within the Bankruptcy Code itself that limits a [debtor's] ability to choose to reject an executory contract subject to FERC regulation as part of its reorganization process.").

2.     The Firm Transportation Agreements epitomize the sort of obligation from which the Bankruptcy Code is designed to provide relief.  Since February 2009, the Debtors have paid approximately $890 million for transportation use under the Firm Transportation Agreements.  But the pricing environment for oil and gas production and the Debtors' financial condition when the Firm Transportation Agreements were executed were materially different than they are today.  Due to the well-documented decline in commodity pricing for oil and gas, it is no longer economic to maintain the Firm Transportation Agreements, which obligate the Debtors to pay approximately

$311 million in aggregate gross costs through their remaining terms for capacity that is not necessary to the Debtors' operations.

3.       Notwithstanding this clear and controlling law and plainly applicable facts, Tiger and Gulf South have taken steps that threaten to jeopardize this Court's jurisdiction over the Rejection Motion and, in turn, Chesapeake's prospects for reorganization.

4.       On May 19, 2020—without advanced notice to the Debtors—Tiger filed a Petition for Declaratory Order and Request for Expedited Action with FERC, requesting a declaratory judgment that "[the Debtors] must petition [FERC] for approval to abrogate, modify, or amend" the ETC Tiger Agreement.[2]  More generally, Tiger requested that FERC clarify its "unsettled role"[3] and find that "if a party to a [FERC]-jurisdictional contract under the [Natural Gas Act] seeks to reject such an agreement in bankruptcy court, the party must receive [Natural Gas Act] Section 5 approval before a bankruptcy court can determine whether to reject the agreement."[4]

5.       On May 22, 2020—also without advanced notice to the Debtors—Gulf South filed a Petition for Declaratory Order and Motion for Shortened Answer Period with FERC, requesting a declaratory judgment that "Chesapeake is required to seek [FERC] approval in order to modify or abrogate the [Gulf South Agreements] regardless of whether it seeks to reject the contracts in bankruptcy."[5]

---

[2]   Petition for Declaratory Order and Request for Expedited Action of ETC Tiger Pipeline, LLC, dated May 19, 2020, FERC Docket No. RP20-881-000 (the "Tiger Petition"), attached to the Rejection Motion as Exhibit B, at 17.

[3]   *Id.* at 14.

[4]   *Id.* at 3.

[5]   Petition for Declaratory Order and Motion for Shortened Answer Period, dated May 22, 2020, FERC Docket No. RP20-884-000 (the "Gulf South Petition"), attached to the Rejection Motion as Exhibit C, at 3.

6.     Although not subject to the Rejection Motion, Stagecoach Pipeline & Storage Company LLC ("Stagecoach" together with Tiger and Gulf South, the "FERC Contract Counterparties"), has similarly challenged this Court's jurisdiction over the rejection of its firm transportation agreements (the "Stagecoach Agreements," and, together with the Firm Transportation Agreements, the "Agreements").  On June 9, 2020, Stagecoach filed a Petition for Declaratory Order and Motion for Shortened Comment Period and Request for Expedited Action with FERC requesting a declaratory judgment that "Chesapeake must seek Commission approval in order to abrogate or modify the regulatory obligations inherent in the [Stagecoach Agreement]."⁶

7.     The FERC Contract Counterparties have requested *expedited* action from FERC, citing its anticipation that Chesapeake would file for bankruptcy protection and its expectation that Chesapeake would move the Court for approval to reject the Agreements.  In response, FERC issued notices (the "FERC Notices") establishing June 18, 2020, June 25, 2020, and July 9, 2020 as the comment due dates with respect to the Tiger Petition, the Gulf South Petition, and the Stagecoach Petition, respectively.

8.     On June 18, CEML filed the Protest and Answer of Chesapeake Energy Marketing, L.L.C. in Opposition to Petition for Declaratory Order⁷ asserting, among other things, that the Tiger Petition improperly required FERC to speculate about facts not yet existing as the Debtors

---

⁶     Petition for Declaratory Order and Motion for Shortened Comment Period, and Request for Expedited Action of Stagecoach Pipeline & Storage Company LLC dated June 9, 2020, FERC Docket No. RP20-952-000 (the "Stagecoach Petition" and together with the Tiger Petition and Gulf South Petition, the "Petitions"), attached hereto as **Exhibit B**, at 3.

⁷     Protest and Answer of Chesapeake Energy Marketing L.L.C. in Opposition to Petition for Declaratory Order, dated June 19, 2020, FERC Docket No. RP20-881-000, at 4.

had not filed these chapter 11 cases or sought to reject the Tiger Agreement at that time.[8]  On June 22, 2020, FERC issued an order granting the Tiger Petition and finding "[w]here a party to a [FERC]-jurisdictional agreement under the NGA seeks to reject the agreement in bankruptcy, that party must obtain approval from both [FERC] and the bankruptcy court to modify the filed rate and reject the contract, respectively."[9]  On June 25, CEML filed the Protest and Answer of Chesapeake Energy Marketing, L.L.C. in Opposition to Petition for Declaratory Order[10] also asserting that the Gulf South Petition improperly was procedurally improper as the Debtors had not filed these chapter 11 cases and that the Gulf South Petition sought to elevate FERC's jurisdiction over the jurisdiction of the bankruptcy courts to determine whether a contract should be rejected.

9.      Were FERC to issue a ruling requiring Chesapeake to obtain FERC's approval—in addition to this Court's approval—to reject the Agreements, the procedural delay alone would threaten irreparable harm to the estate.  Were FERC to go further, and issue an order providing that Chesapeake must *assume* the Agreements, Chesapeake could be forced to challenge any such order exclusively in a Court of Appeals (under the statutory framework of the Natural Gas Act (15 U.S.C. § 717, the "NGA")).  This sort of jurisdictional confusion and resulting delay threatens per se and de facto irreparable harm.

---

[8]    The Tiger Petition, for instance, asked FERC to speculate about rejection of the Interruptible Service Agreement, which is not one of the contracts the Debtors propose by the Rejection Motion to reject.  *See* Tiger Petition at 4.

[9]    Order on Petition for Declaratory Order, dated June 22, 2020, FERC Docket No. RP20-881-000, at 10 (the "FERC Order"), attached to the Rejection Motion as Exhibit D.

[10]   Protest and Answer of Chesapeake Energy Marketing L.L.C. in Opposition to Petition for Declaratory Order, dated June 25, 2020, FERC Docket No. RP20-884-000.

10.     In light of the foregoing, Chesapeake seeks a declaratory judgment confirming this Court's exclusive jurisdiction to determine the Debtors' right to reject the Agreements under section 365 of the Bankruptcy Code—which FERC cannot preempt or veto.  Chesapeake also seeks to enjoin FERC from issuing any order that might interfere with this Court's exclusive jurisdiction to decide the Rejection Motion or hinder its ability to administer the reorganization of the Debtors' estates.  Any loss of jurisdiction, or competing and confusing rulings from FERC, would irreparably harm Chesapeake's prospects for reorganization and, derivatively, threaten injury upon all of Chesapeake's stakeholders, including its creditors, employees, and business counterparties.  Chesapeake thus requests a ruling on its requested injunctive relief as soon as this Court's schedule will allow.

**Parties and Jurisdiction**

11.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The plaintiff in this adversary proceeding is Chesapeake, one of the above-captioned Debtors in the underlying bankruptcy case filed concurrently with this Complaint. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No statutory committees have been appointed.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

14.     The Defendant in the proceeding is FERC.

6

15.     The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Action to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1947 (2015).

**Facts**

16.     The Debtors are an Oklahoma City, Oklahoma-based oil and gas company engaged in exploration and production activities in onshore U.S. oil and natural gas properties with a focus on shale and resource plays.

**I.     Agreements.**

  **A.     ETC Tiger Agreement.**

17.     Tiger transports natural gas on the ETC Tiger Pipeline (the "Tiger Pipeline"), a natural gas pipeline stretching from the Haynesville Shale play in East Texas to near Delhi, Louisiana.  Tiger is majority owned by midstream energy company Energy Transfer Company LP ("Energy Transfer"), "one of the largest and most diversified investment-grade master limited partnerships in the United States."[11]  Debtor Chesapeake Energy Marketing, L.L.C. is one of Tiger's foundational shippers and, as such, has provided significant returns on investment to Tiger and Energy Transfer.

18.     On April 1, 2016, the Debtors and Tiger entered into a restated firm transportation natural gas agreement pursuant to the Rate Schedule FTS (the "ETC Tiger Agreement") with an effective maximum daily quantity of natural gas ("MDQ") of 500,000 Dekatherms ("Dth") per

---

[11]   *See* About Energy Transfer, https://www.energytransfer.com/about/.

day. In return, the Debtors agreed to pay a fixed monthly reservation charge of $9.5813/Dth for the term beginning April 1, 2016 and ending December 31, 2025, and $3.0417/Dth for the term beginning January 1, 2026 and ending December 31, 2030, in addition to certain other fees and expenses. To date, the Debtors have paid Tiger approximately $870 million in gross costs on account of the ETC Tiger Agreement.

19.     As is typical in a firm transportation agreement, there are no provisions in the ETC Tiger Agreement requiring or compelling the Debtors to actually use the capacity reservation to ship natural gas on the Tiger Pipeline or dedicating the Debtors' reserves or production to the ETC Tiger Agreement or the Tiger Pipeline. However, the ETC Tiger Agreement obligates the Debtors to pay for the 500,000 Dth per day reservation through the end of 2030, regardless of whether the Debtors utilize any of their capacity on the Tiger Pipeline. Absent rejection, the Debtors estimate they will pay approximately $28 million in gross costs ($20 million in net costs) per year over the remaining life of the ETC Tiger Agreement or approximately $293 million in gross costs ($211 million in net costs) in the aggregate for capacity the Debtors deem unnecessary to their business.

**B.     Gulf South Agreements.**

20.     Gulf South transports natural gas on the Gulf South Pipeline, a natural gas pipeline stretching from south and east Texas through Louisiana, Mississippi, southern Alabama, and western Florida.

21.     On February 1, 2009 and April 1, 2009, the Debtors and Gulf South entered into certain firm transportation natural gas agreements providing for a MDQ of 10,000 Dth per day through December 31, 2031 and 9,000 Dth per day through March 31, 2034 (together, the "Gulf

South Agreements").[12]  In return, the Debtors agreed to pay a fixed monthly reservation charge of $.3380/Dth for the applicable contract terms, in addition to certain other fees and expenses.  To date, the Debtors have paid Gulf South approximately $18 million in gross costs on account of the Gulf South Agreements.  Absent rejection, the Debtors estimate they will pay approximately $1.3 million in gross costs ($900,000 in net costs) per year over the remaining life of the Gulf Transportation Agreements or approximately $18 million in gross costs ($12 million in net costs) in the aggregate for capacity the Debtors deem unnecessary to their business.

        **C.**    **Stagecoach Agreements.**

        22.    Stagecoach operates an interstate natural gas pipeline transmission and storage system that in New York and Pennsylvania.  On December 16, 2011, January 25, 2019, and February 25, 2020, the Debtors and Stagecoach entered into the Stagecoach Agreements, which provide for a MDQ of 186,000 Dth per day through November 30, 2022, 100,000 Dth per day through March 31, 2021, and an additional 50,000 Dth per day through March 31, 2021.  The Stagecoach Agreements are subject to the rate schedules under a FERC Gas Tariff.

**II.**    **The Debtors' Decision to Reject the Firm Transportation Agreements.**

        23.    In the period leading up to the Petition Date, the Debtors analyzed their executory contracts and unexpired leases, including the Agreements.  As a result of this analysis, the Debtors have determined that, in their business judgment, the Firm Transportation Agreements are

---

[12]    The Gulf South Agreements were amended on April 23, 2015 to adjust a point of receipt.

unnecessary and burdensome to the Debtors' estates, and it is in the best interests of their estates to reject the Firm Transportation Agreements effective as of July 1, 2020.

24.     The Firm Transportation Agreements are exactly the sort of burdensome obligations that sections 365 and 1141(d) of the Bankruptcy Code are designed to address.  Since February 2009, the Debtors have paid approximately $890 million for transportation use under the Firm Transportation Agreements.  But the pricing environment for oil and gas production and the Debtors' financial condition when the Firm Transportation Agreements were executed were materially different than they are today.  Due to the well-documented decline in commodity pricing for oil and gas, it is no longer economic to maintain the Firm Transportation Agreements, which obligate the Debtors to pay approximately $311 million in aggregate gross costs through the their remaining terms for capacity that is not necessary to the Debtors' operations.

25.     The Debtors have the ability to ship natural gas on the Tiger Pipeline, when capacity is available, absent the Firm Transportation Agreements.  The Debtors and Tiger are parties to an interruptible transportation agreement, dated April 16, 2016, which provides for a MDQ of 500,000 Dth per day on the Tiger Pipeline, at a discounted rate of $.10/Dth for the term beginning April 1, 2016 and ending December 31, 2025 (the "Interruptible Service Agreement").  The Interruptible Service Agreement only requires the Debtors to pay for the capacity they use on the Tiger Pipeline, saving the Debtors substantial costs as compared to the Firm Transportation Agreements that require full payment regardless of capacity used.  Additionally, the Debtors have the ability to sell their natural gas production in the Hayneville basin via the Tiger Pipeline or the

Line CP pipeline absent the Gulf South Agreements.  Rejecting the Gulf South Agreements and selling in-basin will also provide the Debtors with significant cost savings.

26.     As discussed above, the Debtors do not intend to reject the Stagecoach Agreements at this time.  However, the Debtors reserve the right to seek rejection of the Stagecoach Agreements at a later date should they determine that such agreements are no longer necessary and are burdensome to their estates.

## The Necessity of this Adversary Proceeding

27.     The authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."  *Mirant*, 378 F. 3d at 517 (brackets and internal quotations omitted).  The Bankruptcy Code provides a debtor the right to make assumption and rejection decisions "at any time before the confirmation of a plan."  11 U.S.C. § 365(d)(2).  Due to the economic burden the Firm Transportation Agreements impose on Chesapeake, Chesapeake's rejection under section 365 will play a vital role in the reorganized Debtors' post-emergence financial and operational condition.  As such, the Court's consideration of the Rejection Motion is vital to the Debtors' successful reorganization.

28.     The Petitions, which request that FERC issue orders providing that it has concurrent jurisdiction with the U.S. Bankruptcy Court with respect to the Agreements, is an attempt to impair this Court's jurisdiction to decide the Rejection Motion and any rejection motion the Debtors may file with the Court.  Absent the relief sought herein, an order by FERC could very well deprive Chesapeake of its right to avail itself of the relief provided under the Bankruptcy Code, including

11

its statutory right to seek to reject the Agreements after evaluation in the context of their ongoing

business operations, as contemplated by section 365 of the Bankruptcy Code.

<u>**Basis for Relief**</u>

**I.      The Court Should Enjoin FERC From Preempting or Negating the Court's Exclusive
         Jurisdiction Over the Rejection Motion Under Section 105 of the Bankruptcy Code**

        29.      This Court should enjoin FERC under Section 105 of the Bankruptcy Code from

any attempt to preempt, prevent, negate, or otherwise interfere with the Court's decision on the

Rejection Motion or any other motion by the Debtors seeking to reject one or more of their

FERC-governed executory contracts.  Section 105 allows the Court to issue any order "that is

necessary or appropriate to carry out the provisions" of the Bankruptcy Code—including section

365.  *Mirant*, 378 F.3d at 523 ("[A] bankruptcy court can clearly grant injunctive relief [pursuant

to section 105] to prohibit FERC from negating [debtor's] rejection by requiring continued

performance at the pre-rejection filed rate."); *In re Diaz*, 526 B.R. 685, 694 (Bankr. S.D. Tex.

2015) (Isgur, J.) ("The Fifth Circuit has recognized that § 105(a) grants bankruptcy courts the

authority to grant injunctive relief.").  Bankruptcy courts have broad authority and considerable

discretion under this provision.  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007).

        30.      Bankruptcy courts can stay actions under section 105 where a stay is necessary to

prevent "an impermissible dilution of federal bankruptcy policy."  *Penn Terra Ltd. v. Dep't of

Envtl. Res.*, 733 F.2d 267, 274 (3d Cir. 1984).  Numerous courts have enjoined federal and state

regulatory actions where those actions threatened to disrupt the reorganization process.  *See, e.g.*,

*N.L.R.B. v. Superior Forwarding, Inc.,* 762 F.2d 695, 699 (8th Cir. 1985) (affirming issuance of

section 105 injunction against National Labor Relations Board); *Global Land, Inc. v. Mayor (In re

Karta Corp.)*, 296 B.R. 305 (S.D.N.Y. 2003) (enjoining local municipality); *Gumport v. Interstate*

*Com. Comm'n (In re Transcon Lines)*, 147 B.R. 770 (Bankr. C.D. Cal. 1992) (enjoining Interstate Commerce Commission).

31.     Injunctive relief "granted pursuant to section 105 must be tested against the standards of Rule 65 [of the] Federal Rules of Civil Procedure, which is made expressly applicable to the bankruptcy proceedings via Rule 7065 of the Bankruptcy Rules." *In re Tribeca Lofts LP*, 2011 WL 3878369, at \*2 (Bankr. S.D. Tex. Aug. 30, 2011) (quoting *Continental Air Lines v. Hillblom*, 61 B.R. 758, 781 (S.D.Tex.1986)).  In order to issue an injunction, the bankruptcy court must find "[1] irreparable injury would result to the movant in its absence, [2] that the threatened injury to the movant outweighs the harm that the injunction may cause to the nonmovant, [3] that there is a likelihood of success on the merits, and [4] that the public interest would not be adversely affected by the injunction . . . ." *Id*. at \*2 (quoting *Holland America Ins. Co. v. Roy,* 777 F.2d 992, 997 (5th Cir.1985)).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 491 (5th Cir. 2014) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

32.     Consistent with *Mirant's* endorsement of bankruptcy court injunctions narrowly tailored to "protect[] [a debtor's] right to reject executory contracts," 378 F.3d at 524, courts elsewhere have "established a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process *or which would impair the court's jurisdiction with respect to a case before it*."  *Alert Holdings, Inc. v. Interstate Protective Servs. Inc.*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992) (emphasis added); *see also In re Chateaugay Corp.*, 93 B.R. 26, 29 (S.D.N.Y. 1988) ("The usual grounds for injunctive relief such as irreparable injury need not be

shown in a proceeding for an injunction under section 105(a)," when the parallel proceeding "would defeat or impair [the bankruptcy court's] jurisdiction with respect to a case before it."); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987).

### A. Chesapeake Has A Strong Likelihood Of Success On The Merits.

33.     Chesapeake has a remarkably strong likelihood of success on its claims for declaratory and injunctive relief against FERC.  Indeed, the Fifth Circuit has already resolved this issue, holding that this Court's jurisdiction over the putative rejection of executory contracts is unimpaired by FERC's regulatory powers to modify or abrogate contracts.  *Mirant*, 378 F.3d at 522 ("The FPA does not preempt a district court's jurisdiction to authorize the rejection of an executory contract subject to FERC regulation as part of a bankruptcy proceeding."); *see also In re FirstEnergy Sols. Corp.*, 945 F.3d 431, 446 (6th Cir. 2019) (bankruptcy court jurisdiction to reject executory contract "is primary or superior to FERC's position . . . and FERC cannot independently prevent it."); *In re PG&E Corp.*, 603 B.R. 471, 486 (Bankr. N.D. Cal. 2019) ("The rejection of an executory contract is solely within the power of the bankruptcy court, a core matter exclusively this court's responsibility."); *In re Ultra Petroleum Corp.*, No. 20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020) (asserting that "proceeding with the petition before FERC…or FERC's ruling on the petition…would violate the automatic stay arising under Section 362(a) of the Bankruptcy Code").

34.     In *Mirant*, the debtor-power producer sought to reject a power abr agreement, a FERC-regulated contract governed by the FPA.  While the rejection motion was pending, the bankruptcy court entered two injunctions enjoining FERC from taking any action to require the debtor to continue performing under the agreement or any of the debtor's other agreements. *Mirant*, 378 F.3d at 516; *see also In re Mirant Corp.*, 299 B.R. 152, 170 (Bankr. N.D. Tex. 2003).

The district court withdrew the reference, vacated the bankruptcy court's injunctions, and denied the debtor's motion to reject, holding that such motion was a prohibited "attempt to avoid [its]…obligations… at the filed rates FERC has found to be just and reasonable." *In re Mirant Corp.*, 303 B.R. 304, 314 (N.D. Tex. 2003). The Fifth Circuit reversed and remanded. *Mirant*, 378 F.3d at 526.

35. The Fifth Circuit "conclude[d] that the FPA does not preempt Mirant's rejection." *Id.* at 519-20. The court further opined that "a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate." *Id.* at 523 ("The concern that the bankruptcy court expressed—that FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract—is certainly a legitimate basis for injunctive relief."). In sum, the District (or Bankruptcy) Court is the sole arbiter of rejection under section 365 of the Bankruptcy Code.

36. In so holding, the Fifth Circuit did no violence to FERC's jurisdiction, acknowledging that "FERC has the exclusive authority to determine the reasonableness of wholesale electricity rates under the FPA," and that under the filed rate doctrine, "the reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts." *Id.* at 518 (quoting *Miss. Power & Light Co. v. Miss. Ex rel. Moore*, 487 U.S. 354, 371, 375 (1988).

37. Nevertheless, the notion that FERC has jurisdiction over the Rejection Motion is unsustainable. *Mirant* distinguished the concepts of (i) breach, and (ii) rate modification/challenge, noting that, outside of bankruptcy, FERC's jurisdiction over the former is not exclusive. *Id.* at 519-20 (*citing Gulf States Utilities. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1472 (5th Cir. 1987)

15

(district court permitted to grant relief on FERC governed contracts where breach caused an increase in quantity purchased at the filed rate, and permitted to set aside energy contract altogether, even though this remedy would affect the filed rate by eliminating it entirely, so long as damages are calculated using the filed rate, noting that Congress did not mean for the FPA "to preempt such indirect effects" on filed rates)).   FERC has acknowledged its jurisdictional limitations outside of bankruptcy.[13]

38.     With respect to the injunction, the Fifth Circuit held that it was "needed to protect the reorganization process because any regulatory action FERC took with regard to a particular contract would divest the court of its jurisdiction over the contract." *Mirant*, 378 F.3d at 516.  The court also noted the bankruptcy court's worry that "FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract[] *is certainly a legitimate basis for injunctive relief.*" *Id*. at 523 (emphasis added).

39.     Similarly, in *FirstEnergy*, the Sixth Circuit was faced with the question whether FERC could compel the debtor to assume FERC-regulated electricity-purchase contracts in chapter 11.  945 F.3d at 443.  The court concluded that the bankruptcy court's jurisdiction was "primary or superior to FERC's position." *Id.* at 446.  Moreover, the Sixth Circuit held that the debtor could "*reject the contracts subject to proper bankruptcy court approval and FERC cannot independently prevent it*." *Id.* (emphasis added).

---

[13]  "[B]reach of contract issues … are matters better dealt with by courts of competent jurisdiction rather than through Commission review." *Southern Co. Energy Mktg. L.P.*, 86 FERC ¶ 61,131 at 61,459 (1999); *see also Nevada Power Co.*, 111 FERC ¶ 61,111, at ¶ 15 (2005) (breach of a FERC-regulated service contract is a "straightforward matter of contract interpretation" that "is not important in relation to the regulatory responsibilities of the Commission" and is "better left to a court").

40.     Further, in *In re PG&E Corp.*, the bankruptcy court held that "FERC has no jurisdiction over the rejection of contracts." 603 B.R. at 486-487 ("[I]f an executory contract does not fall into the exceptions set forth by Congress in the Bankruptcy Code, only the Bankruptcy Court can issue a ruling on rejection."). Like *Mirant*, the court accepted the premise that FERC has broad statutory jurisdiction over rates, terms, and conditions of wholesale electricity sales and power contracts, including changes to those contracts and that, under the filed rate doctrine, a party may claim no rate as a legal right other than the filed rate. *Id.* at 484. However, "[t]he issue here is Section 365 and not any of the permutations and applications of the filed rate doctrine." *Id.* at 486. Simply put, "[t]he rejection of an executory contract is solely within the power of the bankruptcy court, a core matter exclusively [the] court's responsibility." *Id.* The court stated:

> FERC must be stopped and the division and balance of power and authority of the two branches of government restored. Accordingly, and for the reasons that follow, the court declares FERC's decision announcing its concurrent jurisdiction unenforceable in bankruptcy and of no force and effect on the parties before it. If necessary in the future it will enjoin FERC from perpetuating its attempt to exercise power it wholly lacks.

*Id*. at 476.

41.     In the most recent decision on the issue, bankruptcy court for the Southern District of Texas reaffirmed its jurisdiction to authorize the rejection of a firm transportation agreement without FERC action despite assertions to the contrary. In *In re Ultra*, a natural gas pipeline filed a petition with FERC, substantially similar to the Petitions filed by the FERC Contract Counterparties, seeking to upend the bankruptcy court's jurisdiction under section 365 of the Bankruptcy Code by requesting substantially the same relief requested in the Petitions.[14]   No.

---

[14]   Petition for Declaratory Order and Requested Expedited Action, dated April 29, 2020, FERC Docket No. RP20-822-000 at 26; *see also* Tiger Petition at 3; Gulf South Petition at 14, 19.

20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020).   The bankruptcy court held that "proceeding with the petition before FERC…or FERC's ruling on the petition…would violate the automatic stay arising under Section 362(a) of the Bankruptcy Code" [15] and any ruling by FERC during the chapter 11 cases would be void.[16]   After the contract-counterparty submitted a draft amended petition for the court's consideration, which draft amended petition would have sought an order from FERC that the public interest would be harmed by rejection of the relevant contract,[17] the court again ruled that issues related to rejection are properly litigated in the bankruptcy court and any FERC proceeding "is doomed to be either a failure or unhelpful" to the rejection process.[18]   There was "just far too much in the request made to FERC [in the draft amended petition] that plainly usurps the Court's exclusive determination as to whether to approve a rejection."[19]   Further, after FERC filed an emergency motion to reconsider the ruling, the bankruptcy court entered an order denying FERC's emergency motion stating that FERC's arguments "fundamentally miscomprehend[]"the court's statements.[20]

42.     These holdings are unsurprising.  After all, rejection is merely a breach of contract. *See Mission Product Holdings, Inc. v. Tempnology*, 139 S.Ct. 1652, 1661-62 (2019) ("[A] rejection is a breach" and is "neither a defined nor a specialized bankruptcy term.  It means in the Code what it means in contract law outside bankruptcy.").  Neither FERC nor the FERC Contract

---

[15]   *In re Ultra*, Hr'g Tr. 53: 25–54: 4 (Bankr. S.D. Tex. May 29, 2020).

[16]   *Id.* at 55: 6–7.

[17]   *See In re Ultra,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 8, 2020) [Docket No. 232].

[18]   *In re Ultra*, Hr'g Tr. 13:19–20 (Bankr. S.D. Tex. June 15, 2020).

[19]   *Id.* at 13: 21–24.

[20]   *See In re Ultra*, No. 20-32631 (MI) (Bank. S.D. Tex. June 25, 2020) [Docket No. 318].

Counterparties contests that "[o]utside of the bankruptcy context…[nothing] provide[s] FERC with exclusive jurisdiction over the breach of a FERC approved contract." *Mirant*, 378 F.3d at 519.  Thus, there is no justification to arrive at a different answer in bankruptcy where the term rejection stands in for breach.

43.     Additionally, 28 U.S.C. § 1334(a) provides this Court with exclusive jurisdiction over bankruptcy cases and 28 U.S.C. § 1334(e) provides that the Court "shall have exclusive jurisdiction [] of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."  In addition, section 365(a) applies to "any" executory contract.  11 U.S.C. §365(a); *see also Mission Product*, 139 S.Ct. at 1662 ("Sections 365(a) and (g) speak broadly to any executory contracts.") (internal quotations omitted); *Dep't of Housing and Urban Development v. Rucker*, 535 U.S. 125, 131 (2002) ("As we have explained, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (some internal quotation marks omitted); *In re Hydro-Action, Inc*., 266 B.R. 638, 645 (Bankr. E.D. Tex. 2001) ("'Any' means any.").

44.     A debtor's contract rights are of course property of the estate.  *See In re Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993).  And a motion to reject under section 365 falls squarely within a bankruptcy court's core jurisdiction.  28 U.S.C. § 157(b)(2).  Therefore, a debtor's ability to assume or reject an executory contract is a "fundamental right authorized within the original *and exclusive* jurisdiction conferred upon the district courts."  *In re Texaco, Inc.*, 77 B.R. 433, 438 (Bankr. S.D.N.Y. 1987) (emphasis added);  *see also In re Corp. de Servicios Medicos Hosp*., 805 F.2d 440, 444 n. 3 (1st Cir. 1986) (Commonwealth of Puerto Rico "could not obtain subject matter jurisdiction" to terminate debtor's contract); *In re Webster Place Athletic Club, LLC*, 605 B.R. 526, 531 (Bankr. N.D. Ill. 2019) ("lease assumption issues can only arise in the context of

bankruptcy cases"); *In re Transcolor Corp.*, 258 B.R. 149 (Bankr. D. Md. 2001) ("propriety of [debtor's] rejection of its executory lease" is a "core matter[] firmly 'within the original and exclusive jurisdiction' of the bankruptcy court"); *In re Owen-Johnson*, 115 B.R. 254, 257 (Bankr. S.D. Cal. 1990) ("The issue of whether a contract is executory, and whether it may be assumed or rejected by the debtor, is a matter of bankruptcy law over which the state court has no power to rule."); *see also In re Sandridge Energy, Inc.*, 2016 Bankr. LEXIS 4622, at *28 (Bankr. S.D. Tex. Sep. 20, 2016) ("The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed and to enter a final order with respect thereto.").

45.     An alternative basis upon which to rest an injunction exists—to ensure that Chesapeake's rights under section 108(b) of the Bankruptcy Code are protected.  Section 108(b) provides for the extension of statutory and contractual time periods "for the purpose of preserving assets for the benefit of the bankruptcy estate."  *In re Frazer*, 377 B.R. 621, 631 (B.A.P. 9th Cir. 2007).  Specifically, it provides that "if applicable nonbankruptcy law . . . fixes a period within which the debtor may file any pleading . . . or perform any other similar act, and such period has not expired before the date of the filing of the [debtor's] petition, the [debtor] may only file[ ] or perform, as the case may be, before the later of: (1) the end of such period, including any suspension of such period occurring on or after the commencement of the [bankruptcy] case; or 2) 60 days after the [commencement of the debtor's bankruptcy case]."  11 U.S.C. §§ 108(b), 301.  Here, the FERC Notices fixing Chesapeake's due date to respond to the Petitions is "nonbankruptcy law" triggering section 108(b)'s application.  *See In re Ludlow Hosp. Soc., Inc.*, 124 F.3d 22, 30 (1st Cir. 1997) ("Regulatory deadlines are clearly embraced by section 108(b)'s reference to 'applicable nonbankruptcy law . . . .'"); *In re Pacific Gas & Electric Co.*, 273 B.R.

795, 798 (Bankr. N.D. Cal. 2002) (noting that "the court's reference [in the opinion] to nonbankruptcy 'law(s)' will include statutes, regulations, [FERC] decisions, [FERC] rules, [FERC] resolutions . . . .").

46.     In fact, FERC has recently stipulated that section 108(b) applies to extend a debtor's time to file a pleading in FERC proceedings.  *See* Stipulation and Agreement For Order Regarding Extension of Time Granted by 11 U.S.C. § 108(b) for Debtors to Seek Rehearing of FERC Orders, *In re PG&E Corp.*, Adv. Pro. No. 19-03003 (Bankr. N.D. Cal. Feb. 6, 2019), attached hereto as **Exhibit C**.  Pursuant to the Bankruptcy Code, Chesapeake is allowed until August 27, 2020, *i.e.*, 60 days after it filed its chapter 11 petition, to file its responsive pleading to the Petitions. Preventing FERC from violating or undermining Chesapeake's rights to an extension under section 108(b) provides an alternative basis to enjoin FERC from issuing an order in connection with the Petitions.

47.     Based on the unambiguous decisions holding that FERC cannot impair, interfere, prevent, or challenge this Court's jurisdiction to decide rejection motions, the statutory and equitable powers granted to this Court, and the rights afforded to Chesapeake under the Bankruptcy Code, Chesapeake's likelihood of success on the merits of its claims for relief is a near certainty.

**B.     Absent An Injunction, Chesapeake Will Suffer Irreparable Harm**

48.     If FERC is allowed to decide whether Chesapeake can reject the Agreements, Chesapeake's ability to reorganize as allowed by the Bankruptcy Code will be threatened.  Losing the ability to effectively reorganize would obviously cause irreparable harm to the Debtors and their stakeholders.  In the Rejection Motion, through the careful exercise of informed business judgment, Chesapeake has identified the Firm Transportation Agreements as unnecessary to its business and as highly burdensome to its estate.  Indeed, the Debtors stand to lose $311 million

over the life of the Firm Transportation Agreements, and rejection is clearly necessary for the Debtors' successful reorganization.

49.     As discussed above, the ability to reject an executory contract "is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Mirant*, 378 F. 3d at 517. Rejection is "vital" because in many cases, the debtor could not emerge from bankruptcy as a going concern, if it were forced to specifically perform under burdensome executory contracts. *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n*, 826 F.2d 434, 436 (6th Cir. 1987) ("Rejection denies the right of the contracting creditor to require the bankrupt estate to specifically perform the then executory portions of the contract.").

50.     Indeed, the Fifth Circuit has already concluded that the prospect of FERC seizing control over contracts clearly constitutes irreparable harm under the Bankruptcy Code:

> The concern that the bankruptcy court expressed—that FERC could negate Mirant's rejection of an executory power contract . . . is certainly a legitimate basis for injunctive relief.  For example, a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate.

*Mirant*, 378 F.3d at 523.

51.     Without an injunction, Chesapeake could be required to sit and await FERC's opinion "on the merits" of rejection or assumption, a process that would take place outside the bankruptcy court, that would certainly give rise to competing (and at a minimum, confusing) jurisdictional issues, and on a timetable wholly divorced from these bankruptcy cases.  To be clear, the Petitions do not present the merits of rejection to FERC; rather, they seek rulings focused on jurisdictional issues.

52.     Moreover, once FERC did ultimately rule "on the merits' of rejection, an adverse ruling from FERC (at some unknown time in the future) could leave Chesapeake forced to appeal to a federal Court of Appeals for relief—a process that could take several years to complete.  15 U.S.C § 717r ("Any party to a [FERC] proceeding…aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States."); *see also, e.g., Atlanta Gas Light Co. v. FPC*, 476 F.2d 142, 150 (5th Cir. 1973) (affirming district court dismissal of declaratory action because, under the NGA, "[FERC] and, on review, the court of appeals were the proper forums"); *see also Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010) ("Exclusive means exclusive, and the [NGA] nowhere permits an aggrieved party otherwise to pursue collateral review of a FERC certificate in state court or federal district court."); *Hunter v. FERC*, 348 Fed.Appx. 592, 593 (D.C. Cir. 2009) ("Congress has vested exclusive jurisdiction in the courts of appeals to review FERC's orders, pursuant to section 19(b) of the Natural Gas Act.") (citation omitted).

53.     That is the sort of harm suffered by the debtors in *NRG Energy*.  There, before any injunction was issued, FERC compelled the debtor's performance under an executory power agreement the debtor sought to reject.  *In re NRG Energy, Inc.*, 2003 WL 21507685, at *3-5 (S.D.N.Y. June 30, 2003).  Even after the bankruptcy court granted the debtor's motion to reject the contract, FERC entered a second order requiring the debtor to perform under the *rejected* contract, effectively disregarding the bankruptcy court's order.  *Id.* at *2.  The plaintiff sought an injunction from the district court, but the district court held that "were the issues before the Court not to affect FERC's regulatory authority, the Court would properly possess jurisdiction," but because FERC acted first "within its legal authority . . . when it ordered Plaintiff to continue to comply with its obligations under the Agreement," plaintiff's only "appropriate remedy [is] [to]

seek review of FERC's order by a federal court of appeals. This Court, however, is not the proper forum for Plaintiff to challenge FERC's regulatory action." *Id*. at *4.

54.     Seeking relief from a federal court of appeals could mean that Chesapeake would have to continue performing under the burdensome requirements of the Firm Transportation Agreements.  As a result, the estate's assets could be dissipated at an annual rate of approximately $29.3 million to the detriment of the reorganization process and the Debtors' creditors.  The reorganization process would likely be delayed for a significant time as no plan could be finalized until the Debtors and their creditors awaited the outcome of an appeal.

55.     Finally, in view of the threat to defeat or impair this Court's exercise of jurisdiction, as set forth above, Chesapeake need not establish further irreparable harm in any event.

**C.     Injunctive Relief Would Harm Neither FERC Nor FERC Contract Counterparties.**

56.     As an initial matter, neither FERC nor FERC Contract Counterparties would be harmed by an injunction premised on *Mirant*.  That decision has been issued, outstanding, and binding on district and bankruptcy courts in the 5th Circuit since 2004.  There is no harm in ordering an injunction premised on the "law of the land."

57.     Additionally, an injunction would leave FERC unharmed because its exclusive authority to regulate the natural gas market would be left fully intact.  Specifically, FERC's power to regulate filed rates for the transportation of natural gas—which has been FERC's basis in the past for claiming jurisdiction over the rejection of contracts—will be unaffected by an injunction. Indeed, the court in *Mirant* found that rejection of a filed rate contract was *not* a collateral attack on the filed rate.  *Mirant*, 378 F.3d at 522 ("A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given *full effect* when determining the breach of contract damages resulting from the rejection.")).  Rather, any rejection

of FERC-regulated contracts would actually vindicate the FERC-approved rates set forth in the Agreements by allowing damages *at* those filed rates through the claims process.

58.     Nor would an injunction harm the FERC Contract Counterparties.   The FERC Contract Counterparties will be allowed to oppose the Rejection Motion or any other rejection motion filed with the Court, and they will be entitled to assert a proof of claim based on applicable breach of contract damages.  *Id.*  This will leave the FERC Contract Counterparties in the same position as all of the Debtors' other unsecured creditors, as contemplated under the Bankruptcy Code.  *Id.*

### D.     Public Policy Favors Issuing the Injunction

59.     In bankruptcy, public policy favors "an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate."  *In re OGA Charters, LLC*, 554 B.R. 415, 426 (Bankr. S.D. Tex. 2016) (citing *In re T–H New Orleans Ltd. P'ship,* 188 B.R. 799, 807 (E.D.La. 1995), *aff'd,* 116 F.3d 790 (5th Cir.1997)); *see also In re PTI Holding Corp.*, 346 B.R. 820, 832 (Bankr. D. Nev. 2006) ("The public interest in successful reorganizations is significant.").

60.     Here, preventing FERC from interfering with the bankruptcy court's exclusive rejection powers will serve that interest by ensuring that FERC does not have the ability to prioritize certain claimants, such as the FERC Contract Counterparties, over those that are similarly situated.  *See Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (citing legislative history stating that the bankruptcy code's "preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor").  Moreover, an injunction in this case would not interfere with FERC's ability to regulate the natural gas market.  Even if this Court later grants

the Rejection Motion, rejection will not cause any disruption in the supply of natural gas to consumers but merely constitute nonpayment of money to the FERC Contract Counterparties.

## II.    This Court Can Also Enjoin FERC Under Section 362.

61.    This Court has authority to enjoin FERC pursuant to the automatic stay provision under section 362 of the Bankruptcy Code, which prohibits "all entities," including FERC, from taking any "act" to "exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The automatic stay provided by section 362 "is in the nature of an automatic injunction."  *Matter of Sullivan Cent. Plaza, I, Ltd.*, 914 F.2d 731, 733 (5th Cir. 1990), *on reh'g sub nom. Matter of Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723 (5th Cir. 1991); *cf. In re Colonial Realty Co.*, 980 F.2d 125, 132, 137 (2d Cir. 1992) (confirming automatic stay applies to FDIC-Receiver attempt to recover fraudulent transfer "automatically . . . without any need for the intervention of any court or ruling").

62.    Thus, when the debtor seeks injunctive relief to enforce the automatic stay, it "need not comply with traditional requirements of Rule 65."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 436 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014).

63.    The debtor need only "show what property of the estate is implicated and that some entity . . . is attempting to . . . exercise control over [that] property . . . ."  *Golden Distribs. Ltd. v. Reiss (In re Golden Distribs. Ltd.)*, 122 B.R. 15, 19 (Bankr. S.D.N.Y. 1990); *see also Turbowind Inc. v. Post St. Mgmt. Inc. (In re Turbowind, Inc.)*, 42 B.R. 579, 586-87 (Bankr. S.D. Cal. 1984). By definition, any FERC effort to force Chesapeake to perform under the Agreements would be an exercise of "control" over the property of the estate.  *See Edgeworth*, 993 F.2d at 55; *In re*

*Morrison*, 409 B.R. 384, 393 (S.D. Tex. 2009) ("A debtor's legal claims constitute property of the estate . . . .").

64.     The automatic stay guarantees debtors "a breathing spell from [their] creditors" and centralizes all "disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990). Indeed, Congress recognized the importance of a broad reading of the stay in codifying sections 361 and 362(a):

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy . . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

S. Rep. No. 95-989, at 5835, 5840-41 (1978).

65.     While there are exceptions to the automatic stay, none apply here. Section 362(b)(4) provides that the automatic stay shall not apply to actions "by a governmental unit . . . to enforce such government unit's . . . police or regulatory power, including the enforcement of a judgment other than a money judgment . . . ." 11 U.S.C. § 362(b)(4); *see Mirant*, 378 F.3d at 523.[21] This is a "limited exception" intended for regulatory actions that are needed for the government "to prevent or stop violation of fraud, environmental protection, consumer protection,

---

[21] The question of whether the exception to the 362 automatic stay applied to FERC proceedings was not directly addressed in *Mirant*. Only in dicta, in a summary of the lower courts' proceedings, the court stated that the bankruptcy court relied upon section 105 to enjoin FERC because "FERC is exempt from the Bankruptcy Code's automatic stay provision."

safety, or similar police or regulatory laws" while the bankruptcy is ongoing. *S.E.C. v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (quoting legislative history).  The exception to the stay helps to "ensure that debtors do not use a declaration of bankruptcy to avoid the consequences of their actions that threaten the public interest." *In re Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir. 2012); *see Brennan,* 230 F.3d at 71 (stating that the purpose of the exception is to "prevent a debtor from frustrating necessary governmental functions by seeking refuge in bankruptcy court.").

66.     Indeed, this Court has recently held that FERC's proceeding with a petition seeking a declaratory order that it has concurrent jurisdiction with the bankruptcy court with respect to the rejection of a FERC-regulated firm transportation services agreement would violate the automatic stay under section 362(a) of the Bankruptcy Code, without noting any exceptions, and that any ruling by FERC during the bankruptcy would be void.  *In re Ultra Petroleum Corp.*, No. 20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020).

67.     Accordingly, section 362 should stay any FERC proceedings adjudicating rejection of the Agreements.

## PLAINTIFF'S FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

68.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

69.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  Bankruptcy courts, as units of the district court, have the authority to issue declaratory judgments to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting violation of rights or disturbance of relationships.

70.     Courts possess jurisdiction to issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

71.     Given the Petitions, there is a substantial controversy between Chesapeake and FERC of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

72.     It is necessary and appropriate for this Court to issue a declaratory judgment that (i) the Court has exclusive jurisdiction—which FERC cannot preempt or negate—over the Debtors' right to reject the Agreements under section 365 of the Bankruptcy Code; and (ii) the Debtors do not need FERC's approval to reject the Agreements.

**PLAINTIFF'S SECOND CLAIM FOR RELIEF**
**(Section 105 Preliminary and Permanent Injunction)**

73.     The Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

74.     This Court has the power under Bankruptcy Code section 105 to enjoin FERC from interfering with the Debtors' rights to reject the Agreements pursuant to Bankruptcy Code section 365.  Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

75.     Action taken by FERC requiring Chesapeake to seek its approval to reject the Agreements or to perform under the Agreements would violate this Court's jurisdiction over the Debtors' estates, as well as the integrity of the Debtors' reorganization process, and otherwise burden the Debtors.

76.     It is necessary and appropriate that FERC be preliminarily and permanently enjoined from interfering with this Court's exclusive jurisdiction to decide the Rejection Motion or otherwise hindering the Court's ability to administer the reorganization of the Debtors' estates.

### PLAINTIFF'S THIRD CLAIM FOR RELIEF
### (Section 105 and 108(b) Preliminary and Permanent Injunction)

77.     The Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

78.     Under section 108(b) of the Bankruptcy Code, "if applicable nonbankruptcy law . . . fixes a period within which the debtor . . . may file any pleading, demand, [or] notice . . . or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of: (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or 2) 60 days after the order for relief."  11 U.S.C. § 108(b).

79.     FERC issued notices pursuant to nonbankruptcy law fixing June 18, 2020, June 25, 2020, and July 9, 2020 as the deadlines for Chesapeake to respond to the Petitions.

80.     The extended deadline for Chesapeake to file a responsive pleading to the FERC Notices is August 27, 2020.

81.     The Court should enjoin FERC under section 105 from issuing any order that would contravene Chesapeake's rights under section 108(b) to an extended deadline to respond to the

Petitions or otherwise hindering the Court's ability to administer the reorganization of the Debtors' estates.

**PLAINTIFF'S FOURTH CLAIM FOR RELIEF**
**(Section 362 Automatic Stay Preliminary and Permanent Injunction)**

82.     The Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

83.     The automatic stay prohibits "all entities" from taking any "act" to "exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

84.     Under the Bankruptcy Code, executory contracts automatically become part of the bankruptcy estate once the bankruptcy is filed.  There is no question that any effort by FERC to force Chesapeake to perform under the Agreements, or to convene or continue a hearing to address the Plaintiff's rights and obligations respecting the contract, would clearly constitute an exercise of "control" over this property of the bankruptcy estates, and therefore, a violation of the automatic stay.

85.     The Court should enforce the automatic stay by issuing a preliminary and permanent injunction preventing FERC from interfering with this Court's exclusive jurisdiction to decide the Rejection Motion or otherwise hindering the Court's ability to administer the reorganization of the Debtors' estates.

WHEREFORE, the Plaintiff respectfully requests relief as follows:

A.     That this Court issue a declaratory judgment that the Court has exclusive jurisdiction—which FERC cannot preempt or negate—over the Debtors' right to reject the Agreements under section 365 of the Bankruptcy Code;

B.     That this Court, pursuant to section 105 of the Bankruptcy Code, issue a preliminary and permanent injunction preventing FERC from interfering with this Court's jurisdiction to decide the Rejection Motion or otherwise hindering the Court's ability to administer the reorganization of the Debtors' estates;

31

C.  Alternatively, that this Court, pursuant to sections 105 and 108(b) of the Bankruptcy Code, issue a preliminary and permanent injunction preventing FERC from issuing any order in response to the Petitions until August 27, 2020, the date by which Chesapeake may respond to the Petition; and

D.  Alternatively, that this Court, pursuant to section 362 of the Bankruptcy Code, issue a preliminary and permanent injunction preventing FERC from interfering with this Court's jurisdiction to decide the Rejection Motion or otherwise hindering the Court' ability to administer the reorganization of the Debtors' estates.

*[Remainder of page intentionally left blank]*

Houston, Texas
June 28, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:            mcavenaugh@jw.com
                  jwertz@jw.com
                  kpeguero@jw.com
                  vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Marc Kieselstein, P.C. (*pro hac vice* pending)
Alexandra Schwarzman (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:            patrick.nash@kirkland.com
                  marc.kieselstein@kirkland.com
                  alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on June 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

## Exhibit A

**Rejection Motion**

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

## MOTION OF CHESAPEAKE ENERGY CORPORATION FOR ENTRY OF AN ORDER (I) AUTHORIZING REJECTION OF THE NEGOTIATED RATE FIRM TRANSPORTATION AGREEMENTS AND RELATED CONTRACTS EFFECTIVE AS OF JULY 1, 2020 AND (II) GRANTING RELATED RELIEF

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832)-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

KE 69004510

> **IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**
>
> **HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**
> **1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**
> **2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**
> **3) SELECTING "JUDGES' PROCEDURES & SCHEDULES;"**
> **4) SELECTING "VIEW HOME PAGE" FOR CHIEF JUDGE DAVID R. JONES;**
> **5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**
> **6) SELECT CHESAPEAKE ENERGY CORPORATION, ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**
> **7) COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**
> **SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion:

### Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order") (a) authorizing the Debtors to (i) reject certain executory contracts identified on **Exhibit A** attached hereto (collectively, the "Contracts") effective as of July 1, 2020 or, in the alternative, (ii) abandon their contractual rights under the Contracts and (b) granting related relief.

### Jurisdiction, Venue, and Authority

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. *See In re Mirant Corp.*, 378 F.3d 511, 518-520 (5th Cir. 2004) (federal courts overseeing cases arising under the Bankruptcy Code possess jurisdiction to authorize rejection of executory contracts

---

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on June 28, 2020 (the "Petition Date").

notwithstanding the Federal Energy Regulatory Commission's regulatory authority over rates and other terms therein).

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 365, and 554 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rule 6006, and rules 1075-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

## Contracts to Be Rejected

### I.      Firm Transportation Agreements.

6.      The Debtors are parties to certain negotiated rate firm natural gas transportation service agreements, including the ETC Tiger Agreement and the Gulf South Agreements (each as defined below and together, the "Firm Transportation Agreements") with ETC Tiger Pipeline, LLC ("Tiger") and Gulf South Pipeline Company, LP ("Gulf South," and together with Tiger, the "FERC Contract Counterparties"), respectively, the rates and terms and conditions of which are subject to a Federal Energy Regulatory Commission ("FERC") Gas Tariff (the "Tariff").

### A.      ETC Tiger Agreement.

7.      Tiger transports natural gas on the ETC Tiger Pipeline (the "Tiger Pipeline"), a natural gas pipeline stretching from the Haynesville Shale play in East Texas to near Delhi,

Louisiana. Tiger is majority owned by midstream energy company Energy Transfer Company LP ("Energy Transfer"), "one of the largest and most diversified investment-grade master limited partnerships in the United States."[3] Debtor Chesapeake Energy Marketing, L.L.C. ("CEML") is one of Tiger's foundational shippers and, as such, has provided significant returns on investment to Tiger and Energy Transfer.

8. On April 1, 2016, the Debtors and Tiger entered into a restated firm transportation natural gas agreement pursuant to the Rate Schedule FTS (the "ETC Tiger Agreement") with an effective maximum daily quantity of natural gas ("MDQ") of 500,000 Dekatherms ("Dth") per day. In return, the Debtors agreed to pay a fixed monthly reservation charge of $9.5813/Dth for the term beginning April 1, 2016 and ending December 31, 2025, and $3.0417/Dth for the term beginning January 1, 2026 and ending December 31, 2030, in addition to certain other fees and expenses. To date, the Debtors have paid Tiger approximately $870 million in gross costs on account of the ETC Tiger Agreement.

9. As is typical in a firm transportation service agreement, there are no provisions in the ETC Tiger Agreement requiring or compelling the Debtors to actually use the capacity reservation to ship natural gas on the Tiger Pipeline or dedicating the Debtors' reserves or production to the ETC Tiger Agreement or the Tiger Pipeline. However, the ETC Tiger Agreement obligates the Debtors to pay for the 500,000 Dth per day reservation through the end of 2030, regardless of whether the Debtors utilize any of their capacity on the Tiger Pipeline. Absent rejection, the Debtors estimate they will pay approximately $28 million in gross costs ($20 million in net costs) per year over the remaining life of the ETC Tiger Agreement or

---

[3] *See* About Energy Transfer, https://www.energytransfer.com/about/.

approximately $293 million in gross costs ($211 million in net costs) in the aggregate for capacity the Debtors deem unnecessary to their business.

### B. Gulf South Agreements.

10.     Gulf South transports natural gas on the Gulf South Pipeline, a natural gas pipeline stretching from south and east Texas through Louisiana, Mississippi, southern Alabama, and western Florida.

11.     On February 1, 2009 and April 1, 2009, the Debtors and Gulf South entered into certain firm transportation natural gas agreements providing for a MDQ of 10,000 Dth per day through December 31, 2031 and 9,000 Dth per day through March 31, 2034 (together, the "Gulf South Agreements").[4]  In return, the Debtors agreed to pay a fixed monthly reservation charge of $.3380/Dth for the applicable contract terms, in addition to certain other fees and expenses.  To date, the Debtors have paid Gulf South approximately $18 million in gross costs on account of the Gulf South Agreements.  Absent rejection, the Debtors estimate they will pay approximately $1.3 million in gross costs ($900,000 in net costs) per year over the remaining life of the Gulf Transportation Agreements or approximately $18 million in gross costs ($12 million in net costs) in the aggregate for capacity that the Debtors deem unnecessary to their business.

## II.     Debtors' Decision to Reject the Contracts.

12.     In the period leading up to the Petition Date, the Debtors analyzed their executory contracts and unexpired leases, including the Firm Transportation Agreements.  As a result of this analysis, the Debtors have determined that, in their business judgment, the Firm Transportation

---

[4]     The Gulf South Agreements were amended on April 23, 2015 to adjust a point of receipt.

Agreements are unnecessary and burdensome to the Debtors' estates, and it is in the best interests of their estates to reject the Firm Transportation Agreements effective as of July 1, 2020.

13.     The Firm Transportation Agreements are exactly the sort of burdensome obligations that sections 365 and 1141(d) of the Bankruptcy Code are designed to address.  Since February 2009, the Debtors have paid approximately $890 million for transportation use under the Firm Transportation Agreements.  But the pricing environment for oil and gas production and the Debtors' financial condition when the Firm Transportation Agreements were executed were materially different than they are today.  Due to the well-documented decline in commodity pricing for oil and gas, it is no longer economic to maintain the Firm Transportation Agreements, which obligate the Debtors to pay approximately $311 million in aggregate gross costs through their remaining terms for capacity that is not necessary to the Debtors' operations.

14.     The Debtors have the ability to ship natural gas on the Tiger Pipeline, when capacity is available, absent the ETC Tiger Agreement.  The Debtors and Tiger are parties to an interruptible transportation agreement, dated April 16, 2016, which provides for a MDQ of 500,000 Dth per day on the Tiger Pipeline, at a discounted rate of $.10/Dth for the term beginning April 1, 2016 and ending December 31, 2025 (the "Interruptible Service Agreement").  The Interruptible Service Agreement only requires the Debtors to pay for the capacity they use on the Tiger Pipeline, saving the Debtors substantial costs as compared to the ETC Tiger Agreement that requires full payment regardless of capacity used.  Additionally, the Debtors have the ability to sell their natural gas production in the Hayneville basin via the Tiger Pipeline or the Line CP pipeline absent the Gulf

South Agreements. Rejecting the Gulf South Agreements and selling in-basin will also provide the Debtors with significant cost savings.

### FERC Petitions.

15.     On May 19, 2020—without advanced notice to the Debtors—Tiger filed a Petition for Declaratory Order and Request for Expedited Action with FERC, requesting a declaratory judgment that "[the Debtors] must petition [FERC] for approval to abrogate, modify, or amend" the ETC Tiger Agreement.[5]  More generally, Tiger requested that FERC clarify its "unsettled role"[6] and find that "if a party to a [FERC]-jurisdictional contract under the [Natural Gas Act] seeks to reject such an agreement in bankruptcy court, the party must receive [Natural Gas Act] Section 5 approval before a bankruptcy court can determine whether to reject the agreement."[7]

16.     On May 22, 2020—also without advanced notice to the Debtors—Gulf South filed a Petition for Declaratory Order and Motion for Shortened Answer Period with FERC, requesting a declaratory judgment that "Chesapeake is required to seek [FERC] approval in order to modify or abrogate the [Gulf South Agreements] regardless of whether it seeks to reject the contracts in bankruptcy."[8]

17.     The FERC Contract Counterparties each requested expedited action from FERC, citing anticipation that the Debtors would file for bankruptcy protection and their expectation that

---

[5]     Petition for Declaratory Order and Request for Expedited Action of ETC Tiger Pipeline, LLC, dated May 19, 2020, FERC Docket No. RP20-881-000 (the "Tiger PDO"), attached hereto as **Exhibit B**, at 17.

[6]     *Id.* at 14.

[7]     *Id.* at 3.

[8]     Petition for Declaratory Order and Motion for Shortened Answer Period, dated May 22, 2020, FERC Docket No. RP20-884-000 (the "Gulf South PDO," and together with the Tiger PDO, the "PDOs"), attached hereto as **Exhibit C**, at 3.

the Debtors would move the bankruptcy court for approval to reject the Firm Transportation Agreements.[9]  Despite Tiger's request for an expedited comment period ending on May 29, 2020, FERC issued a notice establishing June 18, 2020 as the comment due date.[10]  On June 18, CEML filed the Protest and Answer of Chesapeake Energy Marketing, L.L.C. in Opposition to Petition for Declaratory Order[11] asserting, among other things, that the Tiger PDO improperly required FERC to speculate about facts not yet existing as the Debtors had not filed these chapter 11 cases or filed a motion to reject the Tiger Agreement at that time.[12]  On June 22, 2020, FERC issued an order granting the Tiger PDO and finding "[w]here a party to a [FERC]-jurisdictional agreement under the NGA seeks to reject the agreement in bankruptcy, that party must obtain approval from both [FERC] and the bankruptcy court to modify the filed rate and reject the contract, respectively."[13]

18.     Gulf South also requested an expedited comment period ending on June 8, 2020, however FERC established June 25, 2020 as the comment due date.  On June 25, CEML filed the Protest and Answer of Chesapeake Energy Marketing, L.L.C. in Opposition to Petition for Declaratory Order[14] also asserting that the Gulf South PDO was procedurally improper as the

---

[9]    Tiger PDO at 5; Gulf South PDO at 4.

[10]   To the extent that the PDO proceedings are not stayed pursuant to Bankruptcy Code section 362 or otherwise, Bankruptcy Code section 108(b) extends the Debtors' respective comment due dates until 60 days after the Petition Date (*i.e.*, August 27, 2020).

[11]   Protest and Answer of Chesapeake Energy Marketing L.L.C. in Opposition to Petition for Declaratory Order, dated June 19, 2020, FERC Docket No. RP20-881-000, at 4.

[12]   The Tiger PDO, for instance, asked FERC to speculate about rejection of the Interruptible Service Agreement, which is not one of the Contracts the Debtors propose by this motion to reject.  *See* Tiger PDO at 4.

[13]   Order on Petition for Declaratory Order, dated June 22, 2020, FERC Docket No. RP20-881-000, at 10 (the "Tiger Order") attached hereto as **Exhibit D**.

[14]   Protest and Answer of Chesapeake Energy Marketing L.L.C. in Opposition to Petition for Declaratory Order, dated June 25, 2020, FERC Docket No. RP20-884-000.

Debtors had not yet filed these chapter 11 cases and that the Gulf South PDO sought to elevate FERC's jurisdiction over the jurisdiction of the bankruptcy courts to determine whether a contract should be rejected.

19.     The FERC Contract Counterparties and FERC fail to recognize the numerous recent cases where bankruptcy courts have authorized the rejection of FERC-regulated firm transportation agreements without involvement or authorization from FERC.  *See, e.g.*, *In re Vanguard Natural Resources, LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. Mar. 1, 2017) (natural gas pipeline companies did not object to debtor's rejection of their respective firm transportation agreements; no FERC involvement); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jun. 27, 2016) (several counterparties did not object to debtors' rejection of their transportation service agreements; no FERC involvement); *In re Edgemarc Holdings, LLC*, No. 19-11104 (Bankr. D. Del. Jun. 25, 2019) (counterparty expressly did not object to the debtors' rejection of firm transportation service agreements; no FERC involvement); *In re Bonanza Creek Energy, Inc.*, Case No. 17-10015 (Bankr. D. Del. Apr. 7, 2017) (neither counterparty nor FERC objected to rejection effectuated through plan of reorganization); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Aug. 14, 2003) (neither counterparty nor FERC objected to debtors' rejection of firm natural gas transportation agreement).  Moreover, where pipeline transportation service agreements have been terminated or rejected in the bankruptcy process, FERC also has not injected itself into the bankruptcy claims allowance or discharge process.  *See, e.g.*, *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jun. 27, 2016) (FERC did not object or otherwise involve itself in debtor's rejection, or the claims allowance process relating to the rejection, of transportation service agreement, which automatically terminated a month before court ruled on debtor's rejection motion); *USGen New Eng., Inc.*, 118 FERC ¶ 61172 (F.E.R.C. Mar. 2, 2007)

(FERC declined to involve itself in the determination of damages relating to debtor's rejection of firm transportation service agreements governed by Natural Gas Act).

20.     Indeed, the bankruptcy court for the Southern District of Texas recently reaffirmed its jurisdiction to authorize the rejection of a firm transportation agreement without FERC action despite assertions to the contrary.[15]  In *Ultra*, a natural gas pipeline filed a petition with FERC, substantially similar to the PDOs filed by the FERC Contract Counterparties, seeking to upend the bankruptcy court's jurisdiction under section 365 of the Bankruptcy Code by requesting substantially the same relief requested in the Tiger PDO and the Gulf South PDO.[16]  The bankruptcy court held that "proceeding with the petition before FERC…or FERC's ruling on the petition…would violate the automatic stay arising under Section 362(a) of the Bankruptcy Code"[17] and any ruling by FERC during the chapter 11 cases would be void.[18]  After the contract-counterparty submitted a draft amended petition for the court's consideration, which draft amended petition would have sought an order from FERC that the public interest would be harmed by rejection of the relevant contract,[19] the court again ruled that issues related to rejection are properly litigated in the bankruptcy court and any FERC proceeding "is doomed to be either a failure or unhelpful" to the rejection process.[20]  There was "just far too much in the request made to FERC [in the draft amended petition] that plainly usurps the Court's exclusive determination as

---

[15]     *See In re Ultra Petroleum Corp.*, No. 20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020).

[16]     Petition for Declaratory Order and Requested Expedited Action, dated April 29, 2020, FERC Docket No. RP20-822-000 at 26; *see also* Tiger PDO at 3; Gulf South PDO at 14, 19.

[17]     *In re Ultra*, Hr'g Tr. 53: 25–54: 4 (Bankr. S.D. Tex. May 29, 2020).

[18]     *Id.* at 55: 6–7.

[19]     *See In re Ultra,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 8, 2020) [Docket No. 232].

[20]     *In re Ultra*, Hr'g Tr. 13:19–20 (Bankr. S.D. Tex. June 15, 2020).

to whether to approve a rejection."[21]  Further, after FERC filed an emergency motion to reconsider the ruling, the bankruptcy court entered an order denying FERC's emergency motion stating that FERC's arguments "fundamentally miscomprehend[]" the court's prior statements.[22]

21.     Contemporaneously herewith, the Debtors filed the *Complaint for Declaratory Judgment,* Ex Parte *Temporary Restraining Order, and Preliminary and Permanent Injunction* (the "Complaint") seeking a declaratory judgment confirming this Court's exclusive jurisdiction to determine the Debtors' right to reject the Firm Transportation Agreements under section 365 of the Bankruptcy Code—which FERC cannot preempt or veto.  Pursuant to the Complaint, the Debtors also seek to enjoin FERC from issuing any further orders that might interfere with this Court's exclusive jurisdiction to decide this motion or hinder its ability to administer the reorganization of the Debtors' estates.

## **Basis for Relief**

## I.     **The Court Has Authority to Reject the Firm Transportation Agreements.**

22.     The Fifth Circuit has held that the Bankruptcy Code does not limit the bankruptcy court's authority to reject contracts that are subject to FERC regulation.  *In re Mirant Corp.*, 378 F.3d 511, 518-520 (5th Cir. 2004).  In *Mirant*, the debtor power producer sought to reject a power purchase agreement (also a FERC-governed contract) that was simply unnecessary to its business. While the rejection motion was pending, the bankruptcy court entered two section 105 injunctions enjoining FERC from taking any action to require the debtor to continue performing under the agreement or any of the debtor's other agreements.  *Id.* at 516; *see also In re Mirant Corp.*, 299 B.R. 152, 170 (Bankr. N.D. Tex. 2003).  The district court, after withdrawing the reference, held

---

[21]   *Id.* at 13: 21–24.

[22]   *See In re Ultra,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 25, 2020) [Docket No. 318].

that FERC had exclusive jurisdiction over the power purchase agreement, vacated the injunctions, and denied the rejection motion in relevant part. *See In re Mirant Corp.*, 303 B.R. 304, 307 & 318 (N.D. Tex. 2003). The Fifth Circuit reversed the district court and remanded. *Mirant*, 378 F.3d at 526.

23. Specifically, the Fifth Circuit held that while FERC had exclusive authority under the Federal Power Act to determine wholesale power rates, the Federal Power Act does not preempt breach of contract claims where there is no challenge to the FERC-approved rate (*i.e.*, the "filed rate"). *Id.* at 522. Indeed, as FERC has recognized, "breach of contract issues … are matters better dealt with by courts of competent jurisdiction rather than through Commission review." *Southern Co. Energy Mktg, L.P.*, 86 FERC ¶ 61,131 at 61,459 (1999); *see also Nevada Power Co*., 111 FERC ¶ 61,111, at ¶ 15 (2005) (breach of a FERC-regulated service contract is a "straightforward matter of contract interpretation" that "is not important in relation to the regulatory responsibilities of the Commission" and is "better left to a court").

24. The Fifth Circuit further held that a simple rejection of a power purchase agreement in bankruptcy is merely a breach of the agreement, giving rise to a rejection damages claim calculated based on the actual filed rate, and therefore is not a challenge to the filed rate. *Mirant*, 378 F.3d at 526. The Fifth Circuit also held that the structure of the Bankruptcy Code illustrates that Congress did not intend to limit the ability of a debtor to reject the subject agreement, as the Bankruptcy Code contains many limitations and exceptions to the section 365 general rejection authority, but did not create such an exception for contracts subject to FERC regulation. *Id.* at 521-22.

25. Turning to the question of the section 105 injunctions, the Fifth Circuit held that it was appropriate for the bankruptcy court to protect the debtor's right to reject its contracts by, for

example, enjoining FERC from negating the debtor's rejection by ordering the debtor to continue performing under the terms of a rejected contract. (In *Mirant*, the bankruptcy court's order went further, by prohibiting *any* FERC action with respect to the debtor's FERC-governed contracts). Therefore, the Court has authority to reject the Firm Transportation Agreements and issue related injunctive relief.

## II.    The Court Should Apply the Business Judgment Rejection Standard Here.

26.    A debtor's rejection of an executory contract or unexpired lease is ordinarily governed by the "business judgment" standard. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that 'the question whether a lease should be rejected . . . is one of business judgment.'") (quoting *Grp. of Institutional Inv'rs v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 550 (1943)); *see also In re Texas Sheet Metals, Inc.*, 90 B.R. 260, 264 (Bankr. S.D. Tex. 1988) ("The traditional business judgment standard governs the rejection of ordinary executory contracts."). The business judgment standard requires a court to approve a debtor's business decision unless that decision is the product of "bad faith, or whim, or caprice." *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (citing *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

27.    The Fifth Circuit in *Mirant* suggested that a more rigorous standard may be applicable to determining the rejection of the debtor's power purchase agreements, but did not reject the use of the business judgment standard in all cases involving the rejection of FERC-regulated contracts. *See Mirant*, 378 F.3d at 525. According to the *Mirant* court, the court applying such a rigorous standard might consider allowing rejection of a power purchase agreement if the debtor can show that it burdens the estate, that after careful scrutiny, the equities balance in favor of rejection, and that the rejection would further the chapter 11 goal of permitting

13

the successful rehabilitation of the debtors.  *Id.*  Under such a standard, courts would carefully scrutinize the impact of rejection on the public interest and, *inter alia*, ensure that rejection does not cause any disruption in the supply of electricity to other utilities or consumers.

28.     *Mirant* did not determine or mandate that a heightened standard was applicable.  *Id.* ("*If* the district court decides that a more rigorous standard is required, then *it might* adopt a standard by which it would authorize rejection of an executory power contract….") (internal quotation marks omitted) (emphasis added).[23]  Indeed, section 365(a), which provides that a debtor in possession may reject an executory contract, and section 365(g), which provides that rejection constitutes a breach deemed to have occurred immediately before the filing of the petition, "speak broadly to *any* executory contracts."  *See Mission Product Holdings, Inc. v. Tempnology*, 139 S.Ct. 1652, 1662 (2019) (internal quotation marks omitted).  These Bankruptcy Code sections reflect no Congressional intent to apply differing standards to different executory contracts.  *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240-42 (1989) ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.").

29.     In contrast, where Congress did intend to deviate from default principles, it has clearly provided so.  *See, e.g.*, 11 U.S.C. §§365(n) (intellectual property rights); 365(h) & (i) (real property leases and timeshare interests); 365(o) (obligations for maintenance of capital requirements of a Federal insured depository); 1113 (specifying requirements for the rejection of collective bargaining agreements); 1169 & 1170 (debtor-railroad cannot reject railway lease and abandon operation to lessor if contrary to the public interest, and cannot abandon those lines unless

---

[23]     *See In re Villarreal*, 413 B.R. 633, 641 (Bankr. S.D. Tex. 2009) (following the "majority of courts that have considered the issue [and] have concluded that stare decisis does not apply to the decisions of the district court").

consistent with the public interest). Thus, the Bankruptcy Code indicates where Congress elected to establish special rules for specific types of contracts, and there is certainly no evidence of special rules applicable to natural gas pipeline transportation service agreements.[24] And even though certain cases, including *Mirant*, have suggested that the courts may consider factors beyond simple business judgment in deciding whether to authorize a rejection of power purchase agreements governed by the Federal Power Act, none have done so, nor has FERC previously advocated for them to do so, in the context of firm pipeline transportation service agreements governed by the Natural Gas Act, given the different policies and lack of impact in this context on consumers.

30. Simply put, rejection in bankruptcy is no different than a material breach outside of bankruptcy. *See Mission Product*, 139 S.Ct. at 1661 ("[A] rejection is a breach …. neither a defined nor a specialized bankruptcy term. It means in the Code what it means in contract law outside bankruptcy."). If the Debtors could breach the Firm Transportation Agreements outside of bankruptcy (subject to ordinary, monetary damages for breach of contract)—an action governed by commercial relationships and state law contracts—there is no good justification to subject the Debtors, now as debtors in possession, to broader scrutiny with respect to their rational business judgment to reject the Firm Transportation Agreements in bankruptcy. *See In re Ultra*, Hr'g Tr. 38: 22 – 38:1 ("[T]he debtor pre-petition had the right not to pay [the FERC-governed contract counterparty], and you had the right to get a judgment, and that judgment could have been dealt with in the bankruptcy case. I don't see the difference between that and the economic

---

[24] Moreover, the Natural Gas Act and the "filed rate" doctrine existed long before the Bankruptcy Code. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 – 78 (1981) (doctrine has origins before 1978). "Congress must be presumed to have knowledge of its previous legislation when making new laws." *US v. Zavala-Sustaita*, 214 F.3d 601, 606 n. 8 (5th Cir. 2000).

consequences of a breach."). Accordingly, the business judgment standard should apply to determine whether the Firm Transportation Agreements can be rejected.

## III. Rejection of the Contracts Constitutes a Sound Exercise of the Debtors' Reasonable Business Judgment.

31. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may . . . reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). "This provision allows a [debtor in possession] to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (quoting *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)). The ability to reject an executory contract is "vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Century Indemnity Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).

32. Rejection of an executory contract is appropriate where such rejection would benefit the estate. *See In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (stating that section 365 of the Bankruptcy Code permits a debtor in possession, subject to court approval, to decide which executory contracts would be beneficial to reject). Upon finding that a debtor exercised its sound business judgment in determining that rejection of certain contracts is in the best interests of its estate, a court should approve the rejection. *See Summit Land Co. v. Allen (In re Summit Land*

16

*Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

33.     Here, the rejection of the Firm Transportation Agreements is the product of the sound exercise of the Debtors' business judgment and is in the best interests of their estates.  As discussed above, the Debtors analyzed the value of the Firm Transportation Agreements to their estates and that "value" does not outweigh their costs.  Absent rejection, the Firm Transportation Agreements impose current, ongoing obligations on the Debtors' estates that are an unnecessary drain on its resources compared to any (theoretical) future benefits.

34.     Specifically, the Debtors are obligated to pay approximately $293 million in gross costs through the remaining term of the ETC Tiger Agreement and approximately $18 million in gross costs through the remaining term of the Gulf South Agreements.  Additionally, the Debtors have either identified alternative sources of transportation services comparable to those provided under the Firm Transportation Agreements at significantly lower costs or determined that such alternatives are not necessary at this time given operational changes since the Firm Transportation Agreements were executed.

35.     The Debtors respectfully submit that rejecting the Contracts is appropriate under the circumstances and reflects the Debtors' sound business judgment.

## IV.     Rejection of the Firm Transportation Agreements Is Also Appropriate Under the Rigorous Standard.

36.     Even if the Court decides to apply the more rigorous rejection factors outlines in *Mirant*, those factors still weigh strongly in favor of rejection.

37. **First**, there is no question that the Firm Transportation Agreements burden the estate. It costs the Debtors a significant amount of money per year, and if needed, there are viable alternatives that provide the Debtors with any needed capacity at more economic rates.

38. **Second**, the equities balance in favor of rejection. The Debtors' restructuring transactions outlined in the restructuring support agreement entered into prior to the filing of these chapter 11 cases, while in the best interests of the Debtors' stakeholders, contemplate meaningful impairment of their unsecured creditors and the cancellation of existing equity. There is shared (and deeply felt) pain across the capital structure. Rejection would undoubtedly further the Debtors' efforts to rehabilitate their business and facilitate some small, but fair, recovery to creditors. Absent rejection, the Debtors will be required to pay approximately $311 million over the course of the next 14 years to the detriment of the going concern and creditor recoveries.

39. Meanwhile, upon rejection, the FERC Contract Counterparties will each receive an unsecured claim for the damages caused by the rejection, and thereby will be treated similarly and ratably with the Debtors' other unsecured creditors, including unsecured funded debt creditors and other counterparties to rejected executory contracts. Additionally, the Debtors' equity holders already fully absorbed the costs of the burdensome Firm Transportation Agreements (among other burdens) through the diminution in the value, and the imminent cancellation of their equity in the Debtors, as will the equity owners of the Debtors' other creditors absorb similar losses. "While [an individual counterparty] may understandably chafe at being required to accept less than it was otherwise entitled to receive under the Agreement, the short—and conclusive—answer is that this is not injustice, it is bankruptcy." *In re First Central Financial Corp.*, 377 F.3d 209, 216 (2d Cir. 2004) ("We concede that FCIC, like many other creditors, will not, in all probability, be made whole in the proceedings; but that does not mean its remedy is legally inadequate, simply that it is

imperfect."). Meanwhile, the FERC Contract Counterparties are in receipt of the approximately $890 million paid by the Debtors since their entry into the Firm Transportation Agreements, indirectly providing the FERC Contract Counterparties and their equity owners a return on their investment.

40. **Third**, rejection would further the chapter 11 goal of permitting the successful rehabilitation of the Debtors. Again, absent rejection, the Debtors will be burdened by the costly, unnecessary Contracts.

41. **Fourth**, to the extent relevant, the public interest is in no way negatively impacted by the Debtors rejection of the Firm Transportation Agreements. Indeed, the paramount public interest concern cited by the Fifth Circuit in *Mirant* was the prospect of "disruption in the supply" of public utilities to consumers or to other public utilities, which concern is not implicated here. 378 F.3d at 525. The FERC Contract Counterparties do not assert that rejection would threaten their ability to continue operating. Rather, Gulf South has argued to FERC that, as a result of abrogation or modification, "Gulf South would be harmed because it would be forced to remarket the capacity under the [Gulf South Agreements] in a market that is more competitive than when Chesapeake entered into the [Gulf South Agreements]."[25] Similarly, Tiger merely makes a general assertion that the "abrogation affects the term and the rate received by the pipeline."[26]

42. Importantly, the Debtors do not seek to modify the rates or terms and conditions of any contracts pursuant to this motion. Rather, the Debtors seek Court approval of their rejection (*i.e.*, breach) of the Firm Transportation Agreements as of July 1, 2020. There is no cognizable public interest raised merely because the "returns" to a public utility are, arguably, implicated.

---

[25] Gulf South PDO at 16.

[26] Tiger PDO at 14.

*Mirant*, 378 F. 3d at 518 ("FERC may not change a filed rate solely because the rate affords a public utility 'less than a fair return' because 'the purpose of the power given to the Commission…is the protection of the public interest, as distinguished from the private interests of the utilities…'") (quoting *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 76 S.Ct. 368, 100 L.Ed. 388 (1956)); *see also In re Ultra*, Hr'g Tr. 34: 22 – 35: 1 ("If FERC were to determine that nonpayment of money by a debtor hurts the parties that don't get the money, or even collaterally hurts others, I don't think that goes to the type of public interest that the Fifth Circuit has told me about.  It's simply a payment of money.").  Thus, rejection is appropriate even under the more rigorous rejection standard suggested in *Mirant*.

## V.  In the Alternative, the Debtors Seek Court Approval to Abandon All Obligations that the FERC Contract Counterparties Owe to the Debtors' Estates.

43.     Pursuant to section 554 of the Bankruptcy Code, the Debtors may seek to relinquish all obligations that the FERC Contract Counterparties may continue to owe to the Debtors under the Contracts.  *See In re Morrison*, 419 B.R. 314, 322 (Bankr. S.D. Tex. 2009) (section 554 provides for relinquishment of "any interest held by the estate" against a counterparty).  The only material obligations that the FERC Contract Counterparties owe the Debtors under the Contracts are reservation and capacity management obligations, which, as described *supra*, are of little value to the Debtors' estates.

44.     To the extent the Court declines to reject the Contracts, the Debtors seek to abandon their contractual rights under the Contracts (or repudiate the Contracts), leaving the FERC Contract Counterparties with mere damages claims.  "A contract where the only thing left to do is payment of money is not an executory contract."  *See In re Particle Drilling Technologies, Inc.*, Case No. 09-33744 (Bankr. S.D. Tex. July 30, 2009) ("PSI failed to produce any evidence of significant obligations [debtor] owed to PSI other than payment of royalties. It is true that [debtor] has

20

obligations that arise from the unrecorded lien, but those obligations are debtor-creditor obligations and not of the type contained in an executory contract.  Nor does it appear that PSI owes any continuing obligations to [debtor], other than those related to the payment of money.  Accordingly, the Court finds that the Royalty Agreements are not executory with respect to PSI. This is merely a case of Particle Drilling breaching its contract. The breach of contract will give rise to a damages claim.").  With respect to any such breach of contract claims, the Debtors reserve all defenses.

## VI.   FERC Can Participate in the Proceedings.

45.     To the extent that FERC wishes to have a role in the Court's consideration of rejection of the Firm Transportation Agreements, the Fifth Circuit has suggested that the court may allow FERC to participate:  "The bankruptcy court has already indicated that it would include FERC as a party in interest for all purposes in this case under 11 U.S.C. § 1109(b) and Fed. R. Bankr. P. 2018. We presume that the district court would also welcome FERC's participation…. Therefore, FERC will be able to assist the court in balancing these equities." *Mirant*, 378 F.3d at 526.   Indeed, this Court recently issued an order inviting FERC's participation in a contract rejection proceeding to "argue and comment on whether the rejection…would harm the public interest."[27]

46.     The Debtors do not contest that *Mirant* applies here and that the court may afford FERC an opportunity to be heard on the question of contract rejection, should FERC so desire.[28] But time is also of the essence here, as the Debtors are losing money under the Firm Transportation

---

[27]  *See In re Ultra Petroleum Corp.*, No. 20-32638 (MI) (S.D. Tex. June 15, 2020) [Docket No. 274].

[28]  The Fifth Circuit and the *Ultra* case, however, are clear that the proper forum for FERC to participate is *before this Court* because federal courts overseeing cases arising under the Bankruptcy Code possess jurisdiction to authorize rejection of executory contracts notwithstanding FERC's regulatory authority over rates and other terms therein  *See Mirant*, 378 F.3d at 518-520; *In re Ultra Petroleum Corp.*, No. 20-32638 (MI) (S.D. Tex. June 15, 2020) [Docket No. 274].  To the extent that the Tiger Order may be interpreted to require that any further proceeding before FERC is required, Debtors disagree.

Agreements every day until they are rejected. In this regard, the Debtors propose that this Court immediately set a briefing schedule on the motion, and provide FERC a short, reasonable opportunity to provide its views—should it chose to do so—on the question of whether rejection of the Firm Transportation Agreements will cause any disruption in the transportation of natural gas to public utilities or consumers. While FERC recently argued in *Ultra* that it could not participate in a contract rejection proceeding because of FERC's statutory framework as a multi-member independent agency,[29] the bankruptcy court found that its invitation for FERC to participate was "not intended to alter FERC's procedures or operations."[30] Moreover, Debtors note that FERC's actions in *Ultra* and elsewhere belie this contention; not only has FERC submitted briefs in the *Ultra* case, but FERC also has repeatedly participated by invitation or on its own initiative in matters before the courts.[31] There is no reason why FERC cannot do the same with respect to this motion—if it so chooses.[32]

---

[29] *See In re Ultra,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 25, 2020) [Docket No. 315] ("The Commission cannot participate in the proceedings in the way envisioned by the Court because the Department of Energy Organization Act, 42 U.S.C. § 7171(b), the Government in the Sunshine Act, 5 U.S.C. § 552b, and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. require that FERC conduct business through orders voted out by a majority of a quorum that must include at least three Commissioners.").

[30] *See In re Ultra,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 25, 2020) [Docket No. 318].

[31] *See, e.g., Electric Power Supply Ass'n v. Sta*r, 904 F.3d 518, 522 (7th Cir. 2018) ("…we decided to ask [FERC] to give us its views as an *amicus curiae*. The Commission and the United States then filed a joint brief concluding that Illinois' program does not interfere with interstate auctions and is not otherwise preempted, arguing federal law didn't preempt state emissions scheme."); *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 249 (3d Cir. 2014) ("At the Court's invitation, the United States and FERC, acting amicus curiae, also briefed the preemption questions in support of the appellees."); *Allco Renewable Energy Ltd. v. MA ELEC. CO*., 208 F. Supp. 3d 390, 392 n.1 (D. Mass. 2016) (relying "extensively on the Brief of Amicus Curiae Federal Energy Regulatory Commission[]").

[32] And, as the *Ultra* bankruptcy court stated that "FERC may not decline to participate…and then complain of the outcome." *See In re Ultra,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 25, 2020) [Docket No. 318].

## VII.    Deeming Rejection of the Contracts Effective as of July 1, 2020 Is Appropriate.

47.    To avoid incurring unnecessary administrative expenses with respect to the Contracts, the Debtors seek to reject them effective as of July 1, 2020.  Under sections 105(a) and 365(a) of the Bankruptcy Code, bankruptcy courts may grant retroactive rejection of an executory contract or unexpired lease based on a balancing of the equities of the case.  *See, e.g.*, *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 394 (Bankr. N.D. Tex. 2003) (granting retroactive relief for contract rejection where debtors were "receiving no benefit" from the lease and the contract counterparties "had unequivocal notice of Debtors' intent to reject prior to the filing of the Motions"); *In re O'Neil Theatres, Inc.*, 257 B.R. 806, 808 (Bankr. E.D. La. 2000) (granting retroactive relief based on the circumstances of the case); *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) (finding that "nothing precludes a bankruptcy court, based on the equities of the case, from approving" retroactive rejection); *see also In re Joseph C. Spiess Co.*, 145 B.R. 597, 606 (Bankr. N.D. Ill. 1992) ("[A] trustee's rejection of a lease should be retroactive to the date that the trustee takes affirmative steps to reject said lease[.]").

48.    The balance of equities favors retroactive relief.  Without a retroactive date of rejection, the Debtors might be forced to incur unnecessary administrative expenses for the Contracts—executory contracts that provide no comparable benefit to the Debtors' estates. Although unlikely, such a result would be inequitable.   *In re 47 Hops, LLC*, Case No. 17-02440-WLH11, ECF No. 1172 at 5 (Bankr. E.D. Wash. May 13, 2020) (discussing "Congress's deliberate balancing of how best to allocate an insolvent debtor's losses among its stakeholders; limiting the rights of contract counterparties equitably situates their sacrifices among those of most other creditors in the bankruptcy process" *citing Grp. of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co*., 318 U.S. 523, 554 – 55 (1943) (Douglas, J.)).

49.     Moreover, the FERC Contract Counterparties, who are on notice of this issue, will not be unduly prejudiced if the rejection is deemed effective as of July 1, 2020.  On May 19, 2020 and May 22, 2020, the FERC Contract Counterparties filed the respective PDOs with FERC, claiming that as a result of reading the Debtors' 10-Q on May 11, the FERC Contract Counterparties anticipate the Debtors' bankruptcy filing and potential rejection of the Firm Transportation Agreements.[33]  Additionally, contemporaneously with the filing of this motion, the Debtors will cause notice of this motion to be served on the FERC Contract Counterparties (and FERC), thereby providing the parties sufficient opportunity to respond accordingly.  The Debtors have sought the relief requested at the earliest practicable moment in these chapter 11 cases and do not seek to reject the Contracts effective as of July 1, 2020 due to any delay on their own part.  Based on this factual record, no party can assert that the Debtors seek to write any "revisionist history." *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020) ("Federal courts may issue *nunc pro tunc* orders, or 'now for then' orders [] to reflect the reality of what has already occurred [but not as a] vehicle for … creating 'facts' that never occurred….") (internal citation omitted).

50.     Accordingly, the Debtors respectfully submits that it is fair and equitable for the Court to authorize rejection of the Contracts effective as of July 1, 2020.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

51.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

---

[33]     *See* Tiger PDO at 45; *see also* Gulf South PDO at 4.

that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

52.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

53.     The Debtors will provide notice of this motion to:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the

Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' proposed debtor-in-possession credit facility and counsel thereto; (d) the administrative agent under the Debtors' prepetition revolving credit facility and counsel thereto; (e) the administrative agent for the Debtors' prepetition term loan facility and counsel thereto; (f) the indenture trustee for the Debtors' senior secured second lien notes and counsel thereto; (g) the indenture trustees for the Debtors' unsecured notes; (h) counsel to the ad hoc group of term loan lenders; (i) counsel to Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) the state attorneys general for states in which the Debtors conduct business; (o) the FERC Contract Counterparties; (p) FERC; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

26

WHEREFORE, the Debtors request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 28, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Marc Kieselstein, P.C. (*pro hac vice* pending)
Alexandra Schwarzman (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                marc.kieselstein@kirkland.com
                alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## Certificate of Service

I certify that on June 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

## Schedule of Rejected Contracts

| Counterparty | Debtor | Contract(s) and Contract Description(s) (each Contract as may have been amended, modified, or supplemented) [1] |
|---|---|---|
| **Firm Transportation Agreements** | | |
| **Gulf South Transportation Agreements** | | |
| Gulf South Pipeline Company, LP | Chesapeake Energy Marketing, L.L.C | Firm gas transportation service agreement (Lonewa), dated February 1, 2009 |
| | | Amendment to the firm gas transportation service agreement (Lonewa), dated April 23, 2015 |
| Gulf South Pipeline Company, LP | Chesapeake Energy Marketing, L.L.C | Firm gas transportation service agreement (Henry Hub), dated April 1, 2009 |
| | | Amendment to the firm gas transportation service agreement (Henry Hub), dated April 23, 2015 |
| **ETC Tiger Agreement** | | |
| ETC Tiger Pipeline, LLC | Chesapeake Energy Marketing, L.L.C | Amended and restated firm transportation service rate schedule agreement, dated April 1, 2016 |

---

[1]   For the avoidance of doubt, each of the contracts and agreements identified in the motion as related related to the Contracts are incorporated in this **Exhibit A** by reference.

**<u>Exhibit B</u>**

**Tiger PDO**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| ETC Tiger Pipeline, LLC | ) | Docket No. RP20-___-000 |

## PETITION FOR DECLARATORY ORDER
## AND REQUEST FOR EXPEDITED ACTION
## OF ETC TIGER PIPELINE, LLC

Pursuant to Rule 207 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission"),[1] ETC Tiger Pipeline, LLC ("Tiger") hereby files this petition for a declaratory order ("Petition") respectfully requesting that the Commission issue a declaratory order to remove the uncertainty as to whether a counterparty to its transportation agreements must receive the Commission's approval under Section 5 of the Natural Gas Act ("NGA")[2] in order to reject such Commission-jurisdictional agreements, as more specifically set forth herein. Tiger respectfully requests expedited action. Specifically, Tiger respectfully requests that the Commission issue a shortened comment period of ten days, with comments due by May 29, 2020, and that the Commission grant this Petition by June 15, 2020.

In support hereof, Tiger states as follows:

### I.      Correspondence and Communication

The names, titles, and mailing addresses of people to be served with communications regarding this matter are:[3]

---

[1] 18 C.F.R. § 385.207(a)(2)(2019). In addition, pursuant to Rule 381.302(a), Tiger is electronically submitting the amount of $30,060.00 for the filing fee. 18 C.F.R. § 381.302(a).

[2] 15 U.S.C. § 717 *et seq.* (2019).

[3] Tiger respectfully requests waiver of Rule 203(b)(3) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.203(b)(3), to the extent necessary to permit the designation of more than two persons for service on behalf of Tiger in this proceeding.

1

Kevin Erwin  
Associate General Counsel  
ETC Tiger Pipeline, LLC  
1300 Main Street  
Houston, TX 77002  
Kevin.Erwin@energytransfer.com  
(713) 989-2745  

Shemin V. Proctor  
Gia V. Cribbs  
Hunton Andrews Kurth LLP  
2200 Pennsylvania Avenue, NW  
Washington, DC 20037  
SProctor@HuntonAK.com  
GiaCribbs@HuntonAK.com  
(202) 662-3052  

## II.   Executive Summary

### A.   The Commission Should Grant the Declaratory Order to Remove Uncertainty Related to Commission-Jurisdictional Agreements Under the NGA

The Commission has found that to give effect to both the Federal Power Act ("FPA") and the Bankruptcy Code, a party to a Commission-jurisdictional wholesale power purchase agreement must obtain approval from both the Commission and the bankruptcy court to modify the filed rate and reject the contract, respectively.[4] Tiger respectfully submits that this finding applies equally to Commission-jurisdictional transportation agreements under the NGA and respectfully requests that the Commission issue a declaratory order including the three requested rulings set forth herein. Although the issue of jurisdiction between the Commission and bankruptcy courts has been accurately described by the Commission as "unsettled," it is clear that, at a minimum, the Commission has such concurrent jurisdiction. The Commission should grant this Petition to clarify that there is no basis to distinguish between Commission-jurisdictional agreements under the NGA versus the FPA. Further, this Petition is proper because the counterparty to agreements with Tiger has publicly indicated its intention to explore

---

[4] *NextEra Energy, Inc. v. Pacific Gas & Electric Co.*, 166 FERC ¶ 61,049 (2019) ("*NextEra*"); *Exelon Corp. v. Pacific Gas & Electric Co.*, 166 FERC ¶ 61,053 (2019) ("*Exelon*"). Notably, each of these orders was issued after *In re FirstEnergy Solutions Corp.*, Case No. 18–50757, 2018 WL 2315916 (Bankr. N.D. Ohio May 18, 2018) (issuing an injunction enjoining the Commission from continuing to perform under certain wholesale power contracts that FirstEnergy sought to reject through bankruptcy) ("*FirstEnergy Bankruptcy Order*"), and prior to *In re FirstEnergy Solutions Corp.*, 945 F.3d 431 (6ᵗʰ Cir. 2019) (reversing injunction, reversing rejection of certain wholesale power contracts, and remanding to bankruptcy court) ("*FirstEnergy*"). The Commission may be even more inclined now to, at a minimum, assert its rights to concurrent jurisdiction.

and potentially file for bankruptcy.   Granting the requested declaratory order will remove uncertainty with respect to Tiger's counterparty's ability to reject the Commission-jurisdictional agreements, as well as inform industry pipelines and shippers of the necessity to present any transportation contract rejection request involving an interstate natural gas pipeline to the Commission for resolution prior to any bankruptcy decision on rejection.   Given the current economic environment and a potential rash of producer-related bankruptcy filings, it is important for the Commission to address this critical issue with substantive certainty.   For these reasons, Tiger respectfully requests that the Commission grant this Petition no later than June 15, 2020.

**B.    Rulings Requested**

1.  The natural gas firm transportation agreement dated April 1, 2016, and the natural gas interruptible transportation agreement dated April 1, 2016, entered into between Tiger and Chesapeake Energy Marketing, L.L.C. ("Chesapeake") are Commission-jurisdictional agreements reflecting filed rates approved by the Commission pursuant to its exclusive jurisdiction under the NGA; and

2.  If Chesapeake seeks to reject such Commission-jurisdictional agreements in bankruptcy court, Chesapeake must petition this Commission for approval to abrogate, modify, or amend the filed rate pursuant to Section 5 of the NGA and show that such abrogation, modification, or amendment is in the public interest.

3.  If a party to a Commission-jurisdictional contract under the NGA seeks to reject such agreement in bankruptcy court, that party must receive NGA Section 5 approval before a bankruptcy court can determine whether to reject the agreement.

**III.   Background**

Tiger is a subsidiary of Energy Transfer LP.  Tiger is a natural gas company as defined in the NGA.   Tiger's pipeline was constructed pursuant to Section 7 of the NGA, and Tiger provides interstate natural gas transportation pursuant to Section 4 of the NGA and the Commission's regulations.  The pipeline is a 197-mile bidirectional pipeline with a capacity of 2.4 Bcf/d that extends through the Haynesville Shale and ends near Delhi, Louisiana, where it interconnects with multiple interstate pipelines.    In 2016, Tiger renegotiated the firm

3

transportation natural gas agreement pursuant to Rate Schedule FTS with one of its foundation shippers, Chesapeake.  On March 31, 2016, in Docket No. RP16-788, pursuant to Section 4 of the NGA and Part 154 of the Commission's regulations, Tiger filed for approval of the renegotiated firm transportation agreement which included both non-conforming provisions as well as a negotiated rate.  Pursuant to the Commission's regulations and its Negotiated Rate Policy,[5] Tiger filed the agreement in its entirety.  The term of the agreement is April 1, 2016 through December 31, 2030.  The currently effective maximum daily quantity ("MDQ") is 500,000 Dth/d and the fixed negotiated monthly reservation rate is $9.5813/Dth.  By letter order issued on April 27, 2016, the Commission accepted the tariff filing and permitted the tariff records to become effective April 1, 2016 as Tiger proposed.[6]  Tiger and Chesapeake also entered into a transportation agreement pursuant to Rate Schedule ITS dated April 1, 2016.  That interruptible transportation agreement also has an MDQ of 500,000 Dth/d, at a discounted rate.  The term is April 1, 2016 through December 31, 2025.  Thus, Tiger has been providing service to Chesapeake under these NGA Section 4 transportation agreements since April 1, 2016.

On May 11, 2020, Chesapeake filed its 10-Q with the Securities and Exchange Commission in which it states, as pertinent here:

> As a result of the impacts to the Company's financial position resulting from declining industry conditions and in consideration of the substantial amount of long-term debt outstanding, the Company has engaged advisors to assist with the evaluation of strategic alternatives, which may include, but not be limited to, seeking a restructuring, amendment or refinancing of existing debt through a private restructuring or reorganization under Chapter 11 of the Bankruptcy Code. However, there can be no assurances that the Company will be able to successfully restructure its indebtedness, improve its financial position or

---

[5] 18 C.F.R. § 154.1(d); *Modification of Negotiated Rate Policy*, 104 FERC ¶ 61,134 (2003), *on reh'g*, 114 FERC ¶ 61,042 (2006); *Alternatives to Traditional Cost of Service Ratemaking for Natural Gas Pipelines and Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076, *reh'g and clarification denied*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066 (1996), *petition for review denied*, *Burlington Resources Oil & Gas Co. v. FERC*, Nos. 96-1160 (D.C. Cir. 1998).

[6] *ETC Tiger Pipeline, LLC*, 155 FERC ¶ 61,100 (2016).

4

complete any strategic transactions. As a result of these uncertainties and the likelihood of a restructuring or reorganization, management has concluded that there is substantial doubt about the Company's ability to continue as a going concern.

Based on these statements, Tiger must prepare for the imminent possibility that Chesapeake may file for bankruptcy under Chapter 11 of the Bankruptcy Code and move to reject its Commission-jurisdictional transportation agreements with Tiger. Accordingly, Tiger has a sound basis upon which to file this Petition.

## IV. Discussion

### A. The Commission Should Rule on the Petition Prior to any Anticipated Bankruptcy Filing

The Commission should rule on the Petition before Chesapeake makes a bankruptcy filing. In *NextEra*, NextEra filed a petition for declaratory order requesting that the Commission find that, if Pacific Gas and Electric Company ("PG&E") files for bankruptcy, PG&E may not abrogate, amend, or reject in the bankruptcy proceeding any rates, terms and conditions of its wholesale power purchase agreements subject to the Commission's FPA jurisdiction without first obtaining approval from the Commission.[7] In response to PG&E's arguments that the petition was filed prematurely, the Commission held that the petition was not without merit because it was filed in advance of PG&E's anticipated bankruptcy and that an order addressing the petition would not violate the FPA or the Bankruptcy Code given that the law was unsettled regarding the Commission's jurisdiction in such circumstances.[8] Similarly, the law is unsettled regarding the Commission's position with regard to bankruptcy filings that seek to reject agreements subject to the Commission's jurisdiction under the NGA. Granting this Petition prior

---

[7] *NextEra*, 166 FERC ¶ 61,049 at P 1; *see also Exelon*, 166 FERC ¶ 61,053 at P 1 (making similar request regarding PG&E's potential bankruptcy).

[8] *Id.* at P 30; *see also Exelon*, 166 FERC ¶ 61,053 at P 27 (making similar findings).

123142.0000001 EMF_US 80402748v1

to an anticipated bankruptcy filing is consistent with these Commission orders and would not violate the NGA or the Bankruptcy Code.

### B. The Commission's Recent Orders Related to Commission-Jurisdictional Agreements Under the FPA Clearly Find that the Commission Has Concurrent Jurisdiction with the Bankruptcy Courts

In response to two petitions for declaratory order and complaints filed by NextEra and Exelon prior to PG&E's bankruptcy filing, on January 25 and January 29, 2019, respectively, the Commission issued *NextEra* and *Exelon*, each of which finds that "it and bankruptcy courts have concurrent jurisdiction to review and address the disposition of wholesale power contracts sought to be rejected through bankruptcy."[9]  In these orders, the Commission found that "to give effect to both the FPA and the Bankruptcy Code, a party to a Commission-jurisdictional wholesale power contract must obtain approval from both the bankruptcy court and the Commission to reject a contract and modify the filed rate, respectively.[10]   In its Rehearing Order, the Commission denied rehearing and, relying on both precedent under the FPA and the NGA, found: (1) bankruptcy courts and the Commission have distinct and vitally important roles; (2) wholesale power contracts implicate the public interest and as filed rates have the force of law; (3) concurrent jurisdiction with the bankruptcy courts does not create a conflict with the Bankruptcy Code; (4) it "would eviscerate the Commission's exclusive jurisdiction under the FPA to hold that rejection of a wholesale power contract permits the unilateral termination of a

---

[9] *NextEra*, 166 FERC ¶ 61,049 and *Exelon*, 166 FERC ¶ 61,053, *order denying reh'g*, *NextEra, Inc. v. Pacific Gas & Electric Co.*, 167 FERC ¶ 61,096, at P 1 (2019) ("Rehearing Order").  At the request of the petitioners, the Commission issued *NextEra* and *Exelon* prior January 29, 2019, the expected date on which PG&E announced it would make its bankruptcy filing.
[10] Rehearing Order at P 3.

regulatory obligation by the debtor;" and (5) even under *Mirant*,[11] a bankruptcy court cannot reject a Commission-jurisdictional contract under the business judgment rule.[12]

The Commission's findings are entirely consistent with the Commission's exclusive jurisdiction under both the FPA and the NGA as well as the majority of bankruptcy courts that have addressed the issue.  Tiger submits that each of the foregoing findings is equally applicable to the Commission-jurisdictional transportation agreements under the NGA.

### C.    The Majority of Courts that have Addressed the Issue Have Found the Commission Has At Least Concurrent Jurisdiction and Reasonable Opportunity to Provide Opinion on Public Interest

The Rehearing Order was issued in the shadow of the bankruptcy court's ruling in the *FirstEnergy Bankruptcy Order*.[13]  Since that time, the Sixth Circuit has reversed the bankruptcy court's rulings.[14]  Specifically, the Sixth Circuit held:

> when a Chapter 11 debtor moves the bankruptcy court for permission to reject a filed energy contract that is otherwise governed by FERC, via the FPA, the bankruptcy court must consider the public interest and ensure that the equities balance in favor of rejecting the contract, and it must invite FERC to participate and provide an opinion in accordance with the ordinary FPA approach.[15]

However, the majority of courts that have addressed the issue of the Commission's and bankruptcy court's jurisdictions over a debtor moving to reject a Commission-jurisdictional agreement have found that the bankruptcy courts and the Commission have concurrent jurisdiction.[16]  Such courts have not followed the *Mirant* decision in which the bankruptcy court, rather than the Commission, applied the higher standard of assessing the impact of contract rejection on the public interest and instead have acknowledged the Commission's exclusive

---

[11] *In the Matter of Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004) ("*Mirant*").

[12] Rehearing Order at PP 12-14, 21, 29-30.

[13] *FirstEnergy Bankruptcy Order*, 2018 WL 2315916.

[14] *FirstEnergy*, 945 F.3d 431.

[15] *FirstEnergy*, 945 F.3d at 454.

[16] As noted in *FirstEnergy*, the 1st, 2nd, 7th, 8th and 9th Circuits have found concurrent jurisdiction is appropriate. *FirstEnergy*, 945 F.3d at 458.

jurisdiction and its proper role in determining the public-interest implications prior to permitting a debtor to reject a Commission-jurisdictional agreement.[17]   In *In re Calpine Corp.*, where a Chapter 11 debtor moved to reject an energy contract under the FPA pursuant to the business-judgment rule, the court held that because "the Bankruptcy Code does not expressly limit FERC's jurisdiction, and [instead] contemplates agency action during the pendency of a reorganization," "FERC's vast authority over filed rate energy contracts" is superior to the bankruptcy court's jurisdiction.[18]   The court's test was "whether rejection of the [contract] . . . constitutes a collateral attack of the filed rate."[19]

The Sixth Circuit found that the Commission and the bankruptcy courts have concurrent jurisdiction, although the bankruptcy court's is "superior."[20]   Nonetheless, the Sixth Circuit reversed and remanded the Ohio bankruptcy court's orders and now, as a consequence of the Sixth Circuit's opinion, the Commission has established a hearing in *Energy Harbor LLC*, Docket No. EL20-35, pursuant to Section 206 of the FPA, in order to consider Energy Harbor's proposed rejection in bankruptcy court of certain contracts that are subject to the Commission's jurisdiction.[21]

---

[17] As the court in *FirstEnergy* observed, even in *Mirant*, the Fifth Circuit refused to apply only the business-judgment rule and instead added that the bankruptcy court must "'carefully scrutinize the impact of rejection upon the public interest'" and allow the debtor to reject the energy contract "*only if*" the debtor showed "'the equities balance in favor of rejecting'" the contract. *FirstEnergy*, 945 F.3d at 441-42 (*quoting Mirant*, 378 F.3d at 525) (emphasis in original).

[18] *In re Calpine Corp.*, 337 B.R. 27, 33, 35 (Bankr. S.D.N.Y. 2006).

[19] *Id.* at 35-36.

[20] *FirstEnergy*, 945 F.3d at 445-46.  As noted in the concurrence, the Majority Opinion offers little support for its conclusion that the public necessity of bankruptcy relief is generally superior to the necessity of the Commission having exclusive jurisdiction.  As the term suggests, "concurrent" means occurring or existing at the same time. Indeed, faced with this issue in *In re Boston Generating, LLC*, the court reached the same conclusion.  *In re Boston Generating, LLC*, No. 10 Civ. 6528(DLC), 2010 WL 4616243, *3 (S.D.N.Y. Nov. 12, 2010) ("*Boston Generating*"). There is no legitimate basis to elevate a bankruptcy court's jurisdiction over the Commission's jurisdiction.  The Supreme Court has found the Commission's exclusive jurisdiction is *vis-à-vis* state and federal courts.  *Mirant*, 378 F.3d at 518 (citations omitted).  The bankruptcy court is below the district court.  The purported basis for elevating the bankruptcy court is based on a conflation of the contract and filed rate doctrine, as discussed in the *FirstEnergy* concurrence.

[21] *Energy Harbor LLC,* 170 FERC ¶ 61,278 (2020).

The majority of the court opinions address the issue with respect to wholesale power agreements. However, as discussed more fully below, in *Boston Generating* the court addressed the issue with respect to agreements under the NGA.[22]  Therefore, the Commission has judicial precedent upon which it can rely in addition to its large body of precedent to grant the requested rulings.  The parallels between the NGA and FPA are numerous and as Judge Griffin found in his concurrence in *FirstEnergy*,[23] the two statutes are regularly referred to interchangeably with respect to the issues relevant to this Petition, such as exclusive jurisdiction, public interest, the filed rate doctrine, and *Mobile-Sierra*.

### D.    The Commission's Concurrent Jurisdiction with the Bankruptcy Court Under the FPA Applies Equally Under the NGA

The Commission's concurrent jurisdiction as to whether a contract can be rejected in bankruptcy as recognized by the precedent discussed above applies equally regardless of whether the Commission has jurisdiction over the Commission-jurisdictional agreement at issue under the FPA or the NGA.

The NGA has long been recognized as a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce'"[24] which "confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale."[25]  It originated as part of the Public Utility Act of 1935 and was intended to regulate interstate sales of natural gas for resale in much the same way as the FPA regulates interstate sales of power.[26] The NGA was clearly patterned after the FPA and the legislative history shows that Congress

---

[22] *Boston Generating,* 2010 WL 4616243.

[23] *FirstEnergy*, 945 F.3d at 457 (*quoting Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) ("*Arkla*")).

[24] *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (*quoting Northern Natural Gas Co. v. State Corp. Comm'n of Kansas,* 372 U.S. 84, 91 (1963)).

[25] *Id*. at 300-01 (citation omitted).

[26] *See* 81 Cong. Rec. 6724 & 6726 (1937) (comments of Reps. Cole and Kenney, respectively).

intended to establish largely parallel rate-making and regulatory regimes for interstate sales of natural gas similar to the FPA.[27]  In fact, the relevant ratemaking provisions of the FPA and the NGA "'are in all material respects substantially identical.'"[28]  For example, the language used in the NGA regarding the requirement to file rates[29] and the Commission's power to fix unjust and unreasonable rates[30] is almost an exact replica of the language used in the FPA.

Because of the similarities between the FPA and the NGA, the Supreme Court has a longstanding and "established practice of citing interchangeably decisions interpreting the

---

[27] Congress was told repeatedly during the Congressional debates "that the Natural Gas Act merely contained the standard provisions which had been incorporated into other regulatory legislation, including the Federal Power Act." *City of Gainesville v. Florida Power & Light Co.*, 488 F. Supp. 1258, 1277 (S.D. Fla. 1980).

[28] *Arkla*, 453 U.S. at 577 n.7 (*quoting FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 353 (1956)).

[29] The text of the two provisions is set forth below.  For comparison purposes, the linguistic differences between the two have been highlighted.  FPA Section 205(c), 16 U.S.C. § 824d(c), reads in part:

> Under such rules and regulations as the Commission may prescribe, every **public utility** shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission . . . .

NGA Section 4(c), 15 U.S.C. § 717c(c), reads in part:

> Under such rules and regulations as the Commission may prescribe, every **natural-gas company** shall file with the Commission, within such time **(not less than sixty days from June 21, 1938)** and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission . . . .

[30] The text of the two provisions is set forth below.  For comparison purposes, the linguistic differences between the two have been highlighted.  FPA Section 206(a), 16 U.S.C. § 824e(a), reads:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any **public utility for any transmission or sale** subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

NGA Section 5(a), 15 U.S.C. §717d(a), reads in part:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint **of any State, municipality, State commission, or gas distributing company**, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any **natural-gas company in connection with any transportation or sale of natural gas**, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order . . . .

10

pertinent sections of the two statutes."[31]   Therefore, the bases discussed in the precedent above for determining that the Commission has exclusive, or at a very minimum, concurrent, jurisdiction over whether the rejection of a jurisdictional contract or filed rate under the FPA is in the public interest is interchangeable with and equally applies to a determination that the Commission also has such jurisdiction over whether the rejection of a jurisdictional contract or filed rate under the NGA is in the public interest.

This parity between the FPA and the NGA extends to the Commission's application of the filed-rate doctrine, which applies equally under both statutes.[32]   Under the filed-rate doctrine, rates must be filed with the Commission, the rates filed for sale and transportation are lawful only if they are "just and reasonable," and the Commission "'alone is empowered to make that judgment [of reasonableness], and until it has done so, no rate other than the one on file may be charged.'"[33]   "Once filed with FERC, a 'filed rate' becomes an obligation external to the contract, with the independent force of law."[34]   Similarly, the *Mobile-Sierra* public interest presumption applies equally to jurisdictional contracts under both the FPA and NGA.[35]   The *Mobile-Sierra* doctrine "holds that the rate set out in a freely negotiated contract presumptively meets the 'just and reasonable' requirement imposed by FPA statute unless FERC concludes that

---

[31] *Arkla*, 453 U.S. at 576 n.7 (*citing Permian Basin Area Rate Cases,* 390 U.S. 747, 820–821 (1968)).

[32] *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1041 (9th Cir. 2007) (noting that the FPA and NGA are "'substantially identical'" and often cited interchangeably, and finding that filed-rate doctrine analysis under the FPA is also applicable under the NGA).

[33] *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 964 (1986) (*quoting Arkla*, 453 U.S. at 581) ("*Nantahala*").

[34] *FirstEnergy*, 945 F.3d at 456-57 (*citing Penn. Water & Power Co. v. FPC*, 343 U.S. 414 (1952)).

[35] *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956) (holding that under the NGA, natural gas companies cannot unilaterally change contract rates) ("*Mobile*"); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956) (holding that under the FPA, the Commission had no power to change a contract rate without first finding the existing rate unjust, unreasonable, unduly discriminatory, or preferential) ("*Sierra*").

the result will 'seriously harm the public interest.'"[36]  Both the FPA and the NGA require just and reasonable rates,[37] thus, the *Mobile-Sierra* public interest presumption applies equally under each statute.  As the Commission explained in *NextEra* with respect to wholesale power purchase agreements, "[w]hile the circumstances of individual contracts, may vary—for example, to the extent *Mobile-Sierra* protections may or may not apply—the Commission's jurisdictional position is the same with regard to" other jurisdictional contracts a public utility "may seek to terminate or modify through bankruptcy."[38]  Because of the parity between the FPA and NGA, this principle, that the Commission's jurisdictional position remains the same regardless of the type of jurisdictional contract sought to be terminated or modified through bankruptcy, should apply to jurisdictional contracts under the NGA as well.  Therefore, the logical conclusion is that a pipeline shipper may not reject a Commission-jurisdictional agreement under the NGA in bankruptcy without a Commission order that the rejection is in the public interest. More specifically, the pipeline shipper must receive the Commission's approval to abrogate, modify, or amend the filed rate pursuant to Section 5 of the NGA by showing such action is in the public interest.

In addition to some courts recognizing that the Commission has a role in determining whether a jurisdictional contract under the NGA can be rejected in bankruptcy, the Commission has a long-standing practice of considering the public interest regarding NGA-jurisdictional contracts of pipelines in bankruptcy proceedings.  In *Columbia Gas Transmission Corp.*, the Commission established a technical conference to address eligibility issues of costs included in a filing to implement a transportation costs rate adjustment and recover stranded upstream capacity

---

[36] *FirstEnergy*, 945 F.3d at 444 (*quoting NRG Power Mktg., LLC v. Maine Pub. Util. Comm'n,* 558 U.S. 165, 167 (2010) (quotation marks omitted); *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1,* 554 U.S. 527, 530 (2008)).

[37] *See* 16 U.S.C. § 824d(a) and 15 U.S.C. § 717c(a), respectively.

[38] *NextEra*, 166 FERC ¶ 61,049 at P 29 n.58.

123142.0000001 EMF_US 80402748v1

costs that was made while Columbia Gas was in bankruptcy proceedings.[39]   While the Commission recognized that Columbia's rejection of its contracts with upstream suppliers in the bankruptcy proceeding was governed by the provisions of the Bankruptcy Code and, thus, had to be decided in the bankruptcy court, the Commission also found that Columbia's contracts with its upstream pipeline suppliers were fully subject to the Commission's NGA jurisdiction, and that "it has always been within the Commission's authority under NGA sections 5 and 7 to modify or terminate those contracts if they are contrary to the public interest, taking into account the interests of both interstate pipelines and both sets of customers."[40]   Therefore, the Commission held that the focus of the prudence hearing "should be Columbia's actions with respect to matters that are within the Commission's jurisdiction."[41]   Similarly, the focus of the Commission's role in relation to the potential rejection of jurisdictional contracts under the NGA in a bankruptcy proceeding should be the matters that are within the Commission's jurisdiction, *i.e.*, whether such rejection is in the public interest.

More recently, in *Boston Generating* the parties agreed that debtors should seek Commission approval of the gas transportation contract at issue, but disagreed over whether the bankruptcy court or the Commission could consider the rejection motion concurrently or the bankruptcy court must wait until the Commission had ruled.[42]   The court concluded that the issue was irrelevant because regardless of the order, "[i]f either the bankruptcy court or FERC does not approve the Debtors' rejection of the [agreement], the Debtors may not reject the contract."[43]   Thus, the court held that in order to reject the contract, the debtors had to obtain a determination

---

[39] *Columbia Gas Transmission Corp.*, 66 FERC ¶ 61,374, at 62,245 (1994).

[40] *Id.* at 62,248.

[41] *Id.*

[42] *Boston Generating*, 2010 WL 4616243 at *3.

[43] *Id.*

from the Commission pursuant to the NGA that abrogation of the contract did not contravene the public interest.[44]

The court's holding requiring a determination from the Commission before the gas transportation contract at issue could be rejected in the bankruptcy proceedings was recognized without apparent comment or disagreement by both the bankruptcy court at issue in the *Boston Generating* proceedings[45] and the Commission.[46] However, as discussed above, in *FirstEnergy*, the Sixth Circuit stated that the bankruptcy court's position within any concurrent jurisdiction is superior to the Commission's role.[47] This unsettled role that has been carved out for the Commission means that it is necessary for the Commission to hold that it has concurrent jurisdiction over jurisdictional contracts under the NGA and if a debtor seeks to reject such a contract in bankruptcy proceedings, the debtor must obtain a determination from the Commission pursuant to the NGA that abrogation of the contract does not contravene the public interest.

### E. The Issue of a Debtor Potentially Rejecting a Commission-Jurisdictional Agreement Under the NGA Clearly Raises a Public Policy Issue

The courts in *FirstEnergy* and in *Mirant* erred by failing to fully consider and appreciate the scope of the filed rate doctrine. The filed rate doctrine applies not only to the rate, but to the terms and conditions of service, including the term of the agreement.[48] By definition, an abrogation affects the term and the rate received by the pipeline. As noted above, Commission-jurisdictional agreements are not private contracts but have the force of law and the equivalent of

---

[44] *Id.* at *1, 3.

[45] *In re Boston Generating, LLC*, 440 B.R. 302, 314 (Bankr. S.D.N.Y. 2010) (discussing the ruling requiring Commission approval).

[46] *NextEra*, 166 FERC ¶ 61,049 at P 26 (discussing precedent regarding the interplay between Commission and bankruptcy court jurisdiction to review and address the disposition of contracts sought to be rejected through bankruptcy); *Exelon*, 166 FERC ¶ 61,053 at P 23 (same).

[47] *FirstEnergy*, 945 F.3d at 446.

[48] *Nantahala*, 476 U.S. at 966 (citation omitted).

14

federal regulation.  The Commission's exclusive jurisdiction affords only the Commission the right to determine whether the abrogation, modification, or amendment of a filed rate harms the public interest.  The Commission should eliminate uncertainty by granting this Petition and again asserting its exclusive jurisdiction to ensure that any move to reject Commission-jurisdictional agreements would not harm the public interest.

**F.     Although the Commission's Regulatory Powers Permit it to Act After a Bankruptcy Filing Has Been Made, Granting the Petition Expeditiously and Prior to a Bankruptcy Filing Will Eliminate Unnecessary Uncertainty**

The Fifth Circuit in *Mirant* unequivocally found that the Commission is exempt from the Bankruptcy Code's automatic stay provision.[49]  As the Sixth Circuit noted in *FirstEnergy*, whether a Commission proceeding falls outside the scope of the automatic stay is based on whether the proceeding adjudicates only private rights or whether the proceeding effectuates public policy, the former falling within the automatic stay of the bankruptcy proceeding and the latter falling outside of the stay.[50]  This proceeding, as well as any proceeding in which the Commission determines whether the filed rate may be abrogated, modified, or amended clearly effectuate a public policy rather than an adjudication of private rights.  By this Petition, Tiger is seeking the Commission's determination of concurrent jurisdiction with respect to Commission-jurisdictional agreements under the NGA and the appropriate procedures related thereto. Tiger is not seeking to adjudicate private rights.  Similarly, in any future proceeding in which Chesapeake may file a complaint to seek Commission approval to abrogate the filed rate, that would still be a proceeding that effectuates public policy because the issue is whether abrogation of a filed rate is in the public interest.  This is true as a general matter, but is particularly so under the current oil and gas industry conditions.  As the Commission is well aware, these industries

---

[49] *Mirant*, 378 F.3d at 523.
[50] *FirstEnergy*, 945 F.3d at 446-47 (citation omitted).

are under considerable stress and there are significant ramifications for the industry with respect to this and similar proceedings.  Thus, the Commission is acting within its regulatory power and should not be bound by any automatic stay in a bankruptcy proceeding.  However, the uncertainty surrounding these issues requires the Commission to address this Petition expeditiously.  Therefore, Tiger respectfully requests that the Commission grant this Petition by no later than June 15, 2020.  As noted above, Chesapeake is considering filing for bankruptcy and this could occur imminently.

## V.    Request for Expedited Action

Tiger respectfully requests that the Commission take expedited action on this Petition. Expedited action is needed here because, as noted above, there is an imminent possibility that Chesapeake could file for bankruptcy and a declaratory order from the Commission would provide the necessary guidance to ensure that Chesapeake initiates a NGA Section 5 proceeding to obtain a public interest review before it may abrogate, modify, or amend the relevant agreements.  Accordingly, Tiger respectfully requests a shortened comment period of ten days, with comments due by May 29, 2020, and Commission action granting this Petition by June 15, 2020.

## VI.    Conclusion

WHEREFORE, for the foregoing reasons, Tiger respectfully requests that the Commission grant this Petition.

123142.0000001 EMF_US 80402748v1

Respectfully submitted,

Kevin Erwin
ETC Tiger Pipeline, LLC
1300 Main Street
Houston, TX  77002
(713) 989-2745

/s/ Shemin V. Proctor
Shemin V. Proctor
Gia V. Cribbs
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 662-3052

**Attorneys for ETC Tiger Pipeline, LLC**

Date: May 19, 2020

17

**Exhibit C**

**Gulf South PDO**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| Gulf South Pipeline Company, LLC | ) ) ) | Docket No. RP20-___-000 |

**PETITION FOR DECLARATORY ORDER,**
**MOTION FOR SHORTENED COMMENT PERIOD,**
**AND REQUEST FOR EXPEDITED ACTION**
**OF GULF SOUTH PIPELINE COMPANY, LLC**

Pursuant to Rule 207(a)(2) of the Rules of Practice and Procedure of the Federal

Energy Regulatory Commission ("FERC" or the "Commission"), 18 C.F.R.

§ 385.207(a)(2) (2020), Gulf South Pipeline Company, LLC ("Gulf South") petitions for

a declaratory order holding that sections 4 and 5 of the Natural Gas Act ("NGA")  and

Part 154 of the Commission's regulations provide the Commission concurrent jurisdiction

with United States Bankruptcy Courts with respect to Gulf South's firm transportation

service agreements ("FTSA") with Chesapeake Energy Marketing, L.L.C.

("Chesapeake") (the "Chesapeake FTSAs") that are subject to the Commission's NGA

jurisdiction.

Gulf South specifically requests that the Commission find that in order to give

effect to both the NGA and the Bankruptcy Code, a party to a Commission-jurisdictional

natural gas transportation contract seeking to reject the contract in bankruptcy must

obtain approval from both the bankruptcy court (to reject the contract) and the

Commission (to abrogate or modify the contract).  The Commission has made such a

declaration with respect to wholesale power contracts subject to its jurisdiction under the

Federal Power Act ("FPA").[1]  The Commission's reasoning in those orders compels that the Commission issue a similar declaration here with respect to natural gas transportation contracts under the NGA.

Gulf South requests expedited action so that the Commission may issue a ruling as soon as possible.  Based on publicly-available information, Gulf South understands that Chesapeake's parent company may file for bankruptcy protection imminently.  Should Chesapeake do so, it may seek approval from the bankruptcy court to reject the Chesapeake FTSAs as executory contracts, and may also seek to enjoin the Commission from acting.  Gulf South requests that the Commission act to clearly state that Chesapeake is required to seek Commission approval in order to abrogate or modify the Chesapeake FTSAs in connection with the bankruptcy proceeding.  Gulf South requests that the Commission act expeditiously so that the Commission's authority is clarified prior to any bankruptcy proceeding.  To enable the Commission to act expeditiously, Gulf South moves pursuant to 18 C.F.R. § 385.212 (2020) that the Commission shorten the period for responses to this petition to 15 days, so that responses will be due on June 8, 2020.

---

[1] *NextEra Energy, Inc. v. Pac. Gas and Elec. Co.*, 166 FERC ¶ 61,049 at P 28 (2019) ("*NextEra*"), *reh'g denied*, 167 FERC ¶ 61,096 (2019) ("*NextEra/Exelon Rehearing Order*"); *Exelon Corp. v. Pac. Gas and Elec. Co.*, 166 FERC ¶ 61,053 at P 25 (2019) ("*PG&E*"), *reh'g denied*, *NextEra/Exelon Rehearing Order* (collectively "*NextEra* and *Exelon*"), *petition for review pending Pac. Gas and Elec. Co. v. FERC*, Case No. 19-71615 (9th Cir.).

## I.   COMMUNICATIONS AND CORRESPONDENCE

Pursuant to Rule 2010 of the Commission's Rules of Practice and Procedure, the names and mailing addresses of the persons designated to receive service and to whom correspondence and communications concerning this proceeding should be addressed are as follows:

| | |
|---|---|
| A. Gregory Junge | Michael E. McMahon |
| Hogan Lovells US LLP | Senior Vice President and General Counsel |
| 555 Thirteenth Street, N.W | Adina Owen |
| Washington, D.C.  20004 | Senior Counsel |
| 202-637-5600 | Gulf South Pipeline Company, LLC |
| greg.junge@hoganlovells.com | 9 Greenway Plaza, Suite 2800 |
| | Houston, Texas 77046 |
| | 713-479-8059 |
| | 713-479-8030 |
| | Mike.McMahon@bwpipelines.com* |
| | Adina.Owen@bwpipelines.com* |

* - Designated for service pursuant to 18 C.F.R. § 385.2010.

## II.   BACKGROUND

Gulf South is a natural gas company within the meaning of the NGA.  It currently owns and operates approximately 7,200 miles of pipelines extending from south and east Texas through Louisiana, Mississippi, southern Alabama, and western Florida.  Gulf South has numerous interconnects with other interstate and intrastate natural gas facilities, which allow it to serve various on-system and off-system markets.  Gulf South is an open-access natural gas company that provides transportation and storage services pursuant to Part 284 of the Commission's regulations.[2]

Gulf South provides firm transportation service to Chesapeake pursuant to two long-term FTSAs under Gulf South's Rate Schedule FTS: (i) Contract No. 36376, dated

---

[2] 18 C.F.R. Pt 284.

February 1, 2009, as amended effective May 1, 2015, provides for the transportation of a maximum daily quantity ("MDQ") of 10,000 Dekatherms per day ("Dth/d") through December 31, 2031;[3] and (ii) Contract No. 36402, dated April 1, 2009, as amended effective May 1, 2015, provides for the transportation of an MDQ of 9,000 Dth/d through March 31, 2034.[4]

Both Chesapeake FTSAs were executed on the then-current "form of service agreement"[5] for Rate Schedule FTS included in Gulf South's FERC NGA Gas Tariff ("Tariff"). The form of service agreement is included in the Tariff as required by Section 154.110 of the Commission's regulations.[6]  Because the Chesapeake FTSA's were executed on the form of service agreement, they were not individually filed with the Commission.  Section 154.1(d) of the Commission's regulations provides that "any contract that conforms to the form of service agreement that is part of the pipeline's tariff pursuant to § 154.110 does not have to be filed."[7]  The Commission explained in Order No. 582 that "a contract that conforms to a pro forma service agreement need not be filed with the Commission because the Commission has already considered and determined that the pro forma service agreement is just and reasonable."[8]  Contracts that conform to

---

[3] Contract No. 36376 is attached hereto as Exhibit A.

[4] Contract No. 36402 is attached hereto as Exhibit B.

[5] The Commission's regulations define "form of service agreement" as "an unexecuted agreement for service included as an example in the [pipeline's] tariff." 18 C.F.R. § 154.2(c).

[6] 18 C.F.R. § 154.110 ("The tariff must contain an unexecuted pro forma copy of each form of service agreement. The form for each service must refer to the service to be rendered and the applicable rate schedule of the tariff; and, provide spaces for insertion of the name of the customer, effective date, expiration date, and term. Spaces may be provided for the insertion of receipt and delivery points, contract quantity, and other specifics of each transaction as appropriate."). *See also* 18 C.F.R. § 154.103(a) ("The tariff *must contain* sections, in the following order: A table of contents, a preliminary statement, a uniform resource locator for the Internet address of a map of the system, currently effective rates, composition of rate schedules, general terms and conditions, *form of service agreement*, and an index of customers.") (emphasis added).

[7] 18 C.F.R. § 154.1(d).

[8] *Filing and Reporting Requirements for Interstate Natural Gas Company Rate Schedules and Tariffs*, Order No. 582, 60 Fed. Reg. 52,960-01 at 52,965 (Oct. 11, 1995) ("Order No. 582").

the form of service agreement, although not individually filed with the Commission, are the "filed rate" within the meaning of NGA sections 4(c) and (d), such that they may not be changed without the approval of the Commission.[9]

Chesapeake is a subsidiary of Chesapeake Energy Corporation ("CEC").[10]  On May 11, 2020, CEC filed a Form 10-Q quarterly report with the Securities and Exchange Commission, stating that it was considering "seeking a restructuring, amendment or refinancing of existing debt through a private restructuring or reorganization under Chapter 11 of the Bankruptcy Code."[11]

If CEC files a petition for bankruptcy, CEC may request that the bankruptcy court allow CEC to reject the Chesapeake FTSAs as executory contracts.  The Commission has previously noted that bankruptcy courts have issued preliminary injunctions enjoining the Commission from requiring the debtor to continue performing under Commission-jurisdictional service agreements that the debtor sought to reject through bankruptcy.[12]  Gulf South's instant petition requests the Commission to declare that Chesapeake must obtain the Commission's approval if it seeks to unilaterally abrogate or modify the Chesapeake FTSAs in bankruptcy proceedings.

---

[9] *See generally Natural Gas Pipeline Company of America,* 82 FERC ¶ 61,298 at 62,179 (1998) ("*Natural*") (explaining that the use of separately executed, but unfiled, agreements to supplement the terms and conditions embodied in the pipeline's tariff and pro forma service agreement is contrary to the filed rate doctrine embodied in the NGA, and the Commission's filing requirements promulgated in Order No. 582).

[10] Chesapeake Energy Corporation, United Stated Securities and Exchange Commission Form 10-Q at 58 (published May 11, 2020) available at http://investors.chk.com/sec-filings ("CEC May 2020 Form 10-Q").

[11] CEC May 2020 Form 10-Q at 11.

[12] *See NextEra* at P 27.

## III.   PETITION

**A.   Summary of the Commission's Holdings in *NextEra* and *Exelon***

In two recent proceedings under the FPA,[13] the Commission issued declaratory orders concluding that, in order to give effect to both the FPA and the Bankruptcy Code, a party to a Commission-jurisdictional wholesale power contract seeking to reject the contract in bankruptcy must obtain approval from both the bankruptcy court (to reject the contract) and the Commission (to abrogate or modify the contract).[14]   The Commission explained that "[i]t would eviscerate the Commission's exclusive jurisdiction under the FPA to hold that rejection of a wholesale power contract permits the unilateral termination of a regulatory obligation by the debtor."[15]   The Commission held that "a bankruptcy court's authorization to reject a contract subject to this Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes," and that *"[p]erformance under such contracts remains subject to this Commission's review* to determine whether any cessation or modification of performance is just and reasonable, and not unduly discriminatory or preferential under the FPA."[16]

The Commission has defended the basis for the declaratory orders in briefs submitted to the Ninth Circuit.[17]   The Commission should issue a declaratory order in the

---

[13] 16 U.S.C. §§ 824 *et seq.*

[14] *NextEra Energy, Inc. v. Pac. Gas and Elec. Co.*, 166 FERC ¶ 61,049 at P 28 (2019) ("*NextEra*"), *reh'g denied*, 167 FERC ¶ 61,096 (2019) ("*NextEra/Exelon Rehearing Order*"); *Exelon Corp. v. Pac. Gas and Elec. Co.*, 166 FERC ¶ 61,053 at P 25 (2019) ("*PG&E*"), *reh'g denied, NextEra/Exelon Rehearing Order.*

[15] *NextEra/Exelon Rehearing Order* at P 21.

[16] *NextEra/Exelon Rehearing Order* at P 16 (emphasis added).

[17] *Pac. Gas & Elec. Co. v. FERC*, 9th Cir. Case Nos. 19-16833, *et al.*, Brief for Appellant Federal Energy Regulatory Commission (filed Nov. 20, 2019) ("FERC Ninth Circuit Brief"); Reply Brief for Appellant Federal Energy Regulatory Commission (filed Jan. 17, 2020) ("FERC Ninth Circuit Reply Brief"). Following the Commission's issuance of *NextEra* and *Exelon*, the United States Bankruptcy Court for the Northern District of California entered a declaratory judgment that FERC's orders in *NextEra* and *Exelon* are of "no force and effect" and are "not binding" on the debtor in the bankruptcy proceedings.  See FERC Ninth Circuit Brief at 15.  FERC appealed the bankruptcy court's determination to the Ninth Circuit, and that appeal remains pending.

instant proceeding applying its holdings in *NextEra* and *Exelon* to natural gas transportation contracts entered into pursuant to the NGA.[18]  The requested declaration will ensure that the Commission is able to exercise its statutory authority so that a party cannot unilaterally abrogate or modify a natural gas transportation agreement without authorization from the Commission regardless of whether the party is seeking to reject the contract in a bankruptcy proceeding.

### B. The Commission's Analysis of the FPA in *NextEra* and *Exelon* Applies Equally to the NGA.

The Commission relied heavily on precedent construing the NGA in both *NextEra* and *Exelon*.[19]  The Commission explained to the Ninth Circuit that "FERC's regulatory authority under the Natural Gas Act is 'in all material respects substantially identical' to the FPA" and that "'[c]ourts thus 'cit[e] interchangeably decisions interpreting the pertinent sections of the two statutes.'"[20]  In *Kentucky Utils. Co. v. FERC*, the D.C. Circuit further recognized that the courts and the Commission cite "interchangeably decisions interpreting the pertinent sections of the two statutes," and explained that it is long established that parallel provisions of the NGA and the FPA are to be construed *in pari materia*.[21]  The Commission's holdings in *NextEra* and *Exelon* are specifically grounded in its analysis of FPA section 205.[22]  In *Arkla*, the Supreme Court specifically

---

[18] 15 U.S.C. §§ 717 *et seq.*

[19] *See, e.g., NextEra/Exelon Rehearing Order* at P 12 & n 16 (explaining that the FPA is designed to protect consumers and noting that the Supreme Court "has also held that the protection of consumers is the purpose of the similarly structured Natural Gas Act.") (quoting *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 388 (1959); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944) ("*Hope*"). *See also NextEra/Exelon Rehearing Order* at P 12 & n 16 (citing *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) ("*Arkla*").

[20] FERC Ninth Circuit Reply Brief at 8 n.1 (citing *Arkla*, 453 U.S. 571, 577 n.7) (internal citations omitted).

[21] *Kentucky Utils. Co. v. FERC*, 760 F.2d 1321, 1325 n.6 (D.C. Cir. 1985) (citing *Union Elec. Co. v. FERC*, 668 F.2d 389, 392 n.1 (8th Cir. 1981)). *See also Municipal Light Bds. of Reading and Wakefield v. FPC*, 450 F.2d 1341, 1347 (D.C. Cir. 1971).

[22] *See* FERC Ninth Circuit Brief at 6-8.

recognized that the ratemaking provisions set forth in NGA section 4 are "substantially identical" to those contained in section 205 of the FPA and cited precedent interpreting those provisions "interchangeably".[23]  The Commission should conclude that its analysis of the FPA's ratemaking provisions in *NextEra* and *Exelon* also applies to the NGA's ratemaking provisions and declare that a party to a Commission-jurisdictional natural gas transportation contract cannot modify or abrogate the contract without obtaining the Commission's approval.

### C. A Party to a Commission-Jurisdictional Natural Gas Transportation Contract Must Obtain the Commission's Authorization to Abrogate or Modify the Contract Regardless of Whether the Party Seeks to Reject the Contract in Bankruptcy.

The Commission determined in *NextEra* and *Exelon* that a party to a Commission-jurisdictional wholesale power contract seeking to reject the contract in bankruptcy must obtain the Commission's authorization to abrogate or modify the contract.  The Commission found that "[w]holesale power contracts are not simple run-of-the-mill contracts between two private parties; rather, these contracts, while privately negotiated, implicate the public's interest in the orderly production of plentiful supplies of electricity at just and reasonable rates and, as filed rates, carry the force of law binding sellers and purchasers alike."[24]  The Commission explained that "[w]hether a wholesale rate is just and reasonable – and whether the abrogation or modification of a wholesale power contract is necessary to protect the public interest – is a question that the Commission is statutorily obligated—and exclusively authorized—to consider.[25]  The Commission further reasoned that, "[g]iven the Commission's exclusive authority to

---

[23] *Arkla*, 453 U.S at 577 n.7 (1981).  Consistent with the precedent established by the Commission and courts, Gulf South cites to the relevant precedent regarding the FPA and NGA interchangeably.
[24] *NextEra/Exelon Rehearing Order* at P 13 (footnotes omitted)..
[25] *Id.*

make such determinations, as codified by Congress in the FPA and affirmed by Supreme Court and other judicial precedent, we conclude that the Commission's unique role neither subsumes nor is subsumed by the Bankruptcy Code."[26]

Based on this analysis, the Commission determined that "[t]he fact that a contract party has sought bankruptcy protection does not transform Commission-jurisdictional contracts into non-jurisdictional ones; it does not strip the public of the protection afforded to it under the FPA; and it does not divest the Commission of its statutory mandate to protect the public interest by examining the ramifications of unilateral changes to wholesale power contracts, a highly-technical analysis that the bankruptcy process is not designed to consider."[27]

Each of the factors in the Commission's analysis of wholesale power contracts subject to the Commission's FPA jurisdiction in *NextEra* and *Exelon* apply equally to natural gas transportation contracts subject to the Commission's NGA jurisdiction.  The Commission should hold that this same analysis requires the similar conclusion that a party to a Commission-jurisdictional natural gas transportation contract seeking to reject the contract in bankruptcy must obtain the Commission's authorization to abrogate or modify the contract.

### 1. The Same Public Interest Factors Apply Under Both the FPA and NGA.

The Commission should find that natural gas transportation contracts, like wholesale power contracts, "are not simple run-of-the-mill contracts between two private parties" but instead implicate the public's interest in the orderly production of plentiful

---

[26] *Id.*
[27] *Id.*

supplies of electricity at just and reasonable rates.[28]   Congress enacted the NGA based upon the determination that "[t]he business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest."[29]   The public interest considerations in the NGA are identical to those in the FPA.   The Supreme Court has explained that "in order to give content and meaning to the words 'public interest' as used in the [FPA] and [NGA], it is necessary to look to the purposes for which the Acts were adopted," and that, "[i]n the case of the [FPA] and [NGA] it is clear that the principal purpose of those Acts was to encourage the orderly development of plentiful supplies of electricity and natural gas at reasonable prices."[30]   The Commission should find, consistent with the Supreme Court's description, that natural gas transportation agreements are "not simple run of the mill contracts" but instead implicate the public interest.   That authority supports the conclusion that Commission authorization is required to abrogate or modify the contract by a party seeking to reject the contract in a bankruptcy proceeding.

### 2. Natural Gas Transportation Contracts, Like Wholesale Power Contracts, Are "Filed Rates" That Carry the Force of Law.

The Commission should find that natural gas transportation contracts, like wholesale power contracts, are "filed rates" that carry the force of law such that they may only be abrogated or changed with the Commission's authorization.   As noted above, Congress enacted the NGA based upon the determination that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest.   The Supreme Court has held that "[t]he NGA long has been recognized as a

---

[28] *NextEra/Exelon Rehearing Order* at P 13 (footnotes omitted)..
[29] 15 U.S.C. § 717.
[30] *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976) ("*NAACP*").

comprehensive scheme of federal regulation" and that "[t]he NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale."[31]

Under this "comprehensive regulatory framework," natural gas transportation contracts, like wholesale power contracts, must be filed with the Commission to be lawful.[32]  The Supreme Court has explained that "by requiring contracts to be filed with the Commission, the [NGA] expressly recognizes that rates to particular customers may be set by individual contracts."[33]  Once filed, the pipeline transportation contracts are included in the pipeline's tariff.[34]  As with wholesale power contracts under the FPA, the filed tariff "binds the seller and the purchaser" as "though it were a statute,"[35] or "federal regulation[.]"[36]  The "filed rate doctrine" prevents a pipeline "from charging rates higher than those filed with [the Commission] pursuant to the [NGA]."[37]  This is true whether the filed rate originates from a unilateral rate schedule, a bilateral contract, or a contract that conforms to the form of service agreement that is included in a pipeline's filed

---

[31] *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988)

[32] *See* 15 U.S.C. § 717c(c)-(d); 16 U.S.C. § 824d(c)-(d).

[33] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp*., 350 U.S. 332, 339 (1956) ("*Mobile*")

[34] *See* 18 C.F.R. § 154.102.

[35] *Nw. Pub. Serv. Co. v. Montana-Dakota Utils. Co.*, 181 F.2d 19, 22 (8th Cir. 1950), *aff'd*, 341 U.S. 246 (1951).

[36] *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir.) ("*Lockyer*"), *amended by* 387 F.3d 966 (9th Cir. 2004).  *See also Arkla*, 453 U.S. at 572 (holding that the "Commission alone is empowered" to approve a change in rate and that "the Supremacy Clause will not permit" a court to "usurp[] a function that Congress has assigned" to the Commission).

[37] *Arkla*, 453 U.S. at 573.

tariff.[38]  The filed rate doctrine is not limited to rates alone,[39] but encompasses all terms and conditions of interstate pipeline service.[40]

The NGA provides procedures for modifying a filed contract, subject to Commission review and approval pursuant to sections 4 and 5,[41] but apart from these statutory mechanisms, regulated entities may not "deviat[e] from" the tariff's terms "upon any pretext."[42]  The Supreme Court has stated that "[n]o court may substitute its own judgment on reasonableness for the judgment of the Commission," and that "the authority to decide whether the rates are reasonable is vested by § 4 of the [NGA] solely in the Commission."[43]  The Commission should conclude, as it did in *NextEra* and *Exelon*, that natural gas transportation contracts are not like other contracts that a debtor may seek to abrogate through bankruptcy but are "filed rates" that may not be modified or abrogated without the Commission's authorization.

### 3. The Commission Is Statutorily Obligated, and Exclusively Authorized, To Consider Whether the Abrogation or Modification of a Natural Gas Transportation Contract Is Necessary To Avoid Serious Harm to the Public Interest.

Under the *Mobile-Sierra* doctrine,[44] the Supreme Court has held that parties "may not unilaterally abrogate or modify their voluntarily negotiated, arms'-length contracts subject to the Commission's jurisdiction unless the Commission first 'concludes that the

---

[38] *Natural*, 82 FERC 61,298 at 62,179.  *See also ANR Pipeline Co.*, 89 FERC 61,244 at 61,273 (1999) ("The filed rate doctrine forbids a regulated entity from charging a rate different from the one on file with the Commission for a particular good or service.").

[39] *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) ("*Nantahala*") (citing *Northern Nat. Gas Co. v. Kansas Corp. Comm'n*, 372 U.S. 84, 90-92 (1963)).

[40] *Lockyer*, 375 F.3d at 851, 853.  *See also Natural*, 82 FERC 61,298 at 62,179 (explaining that "the use of separately executed, but *unfiled, agreements to supplement the terms and conditions embodied in the pipeline's tariff and pro forma service agreement is contrary to the filed rate doctrine* embodied in . . . the NGA, and the Commission's filing requirements promulgated in Order No. 582.") (emphasis added).

[41] 15 U.S.C. §§ 717c(d)-(e), 717d(a).  *See also Mobile*, 350 U.S. at 342-43.

[42] *California ex rel. Lockyer v. Dynegy, Inc.*, 383 F.3d 1006, 1012 (9th Cir. 2004).

[43] *Arkla* 453 U.S. at 577 (internal citations omitted).  *See also Nantahala*, 476 U.S. at 963.

[44] *See Mobile*, 350 U.S. at 343-44 (1956) (construing the NGA); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956) ("*Sierra*") (construing the FPA).

contract seriously harms the public interest.'"[45]  The "public interest" standard creates a high bar such that parties seeking to avoid their contractual obligations may do so only upon a Commission "finding of 'unequivocal public necessity' or 'extraordinary circumstances'" where "the public interest will be severely harmed."[46]

The requirements of the Commission's *Mobile-Sierra* "public interest" review continue to apply in the context of termination of a contract via rejection in bankruptcy. As the Commission has recognized, ceasing performance under a contract has the "exact same effect" as abrogation of the contract.[47]  The Commission should hold, as it did in *NextEra* and *Exelon*, that "[i]t would eviscerate the Commission's exclusive jurisdiction" under the NGA if a debtor's rejection of a pipeline transportation contract in a bankruptcy proceeding also permitted the unilateral termination of the debtor's regulatory obligation without any requirement for Commission approval.[48]

### 4. The Commission's Unique Role to Authorize the Modification or Abrogation of Natural Gas Transportation Contracts Neither Subsumes or Is Subsumed by the Bankruptcy Code.

The Commission should determine that its unique role to authorize the abrogation or modification of natural gas transportation contracts pursuant to the NGA "neither subsumes nor is subsumed by the Bankruptcy Code."[49]  The Commission found in *NextEra* and *Exelon* that "the roles of the bankruptcy court and the Commission are

---

[45] *NextEra/Exelon Rehearing Order* at P 23 (quoting *Morgan Stanley Capital Grp., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 530 (2008) ("*Morgan Stanley*")).  *See also Morgan Stanley* at 545-46  ("Therefore, only when the mutually agreed-upon contract rate seriously harms the consuming public may the Commission declare it not to be just and reasonable.").

[46] *Morgan Stanley* at 550, 551.

[47] *Blumenthal v. NRG Power Mktg., Inc.*, 104 FERC ¶ 61,211 at 61,743 (2003); *see also Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d 797, 800 (D.C. Cir. 2007) ("*SMUD*").

[48] *NextEra/Exelon Rehearing Order* at P 21.

[49] *See id.* (making the requested determination with respect to wholesale power contracts pursuant to the FPA).

different[.]"[50]   The Commission explained that the FPA "is designed to protect consumers," and that Commission's role in evaluating jurisdictional contracts is "to protect the public interest."[51]   The Commission explained that the bankruptcy court's role under the Bankruptcy Code "is to provide a path to rehabilitate bankrupt debtors."[52]   The Commission found that it is "necessary to give effect" to both of these "distinct, yet vitally important, roles[.]"[53]   The Commission held that "a party to a Commission-jurisdictional wholesale power contract must obtain approval from both the bankruptcy court and the Commission to reject a contract and modify the filed rate, respectively."[54]

Identical considerations apply under the NGA.   In *NextEra* and *Exelon* the Commission expressly relied upon the Supreme Court's holdings that "the protection of consumers is the purpose of the similarly structured Natural Gas Act."[55]   The Supreme Court has further explained that "the words 'public interest' in the [NGA] . . .  is a charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates."[56]   The Commission should conclude that it is necessary to give effect to both the Commission unique role under the NGA to protect consumers and the public interest as well as the bankruptcy court's role under the Bankruptcy Code to provide a pathway to rehabilitate debtors.   The Commission's should hold that it retains the jurisdiction to review and address the disposition of NGA-jurisdictional natural gas contracts that a debtor seeks to reject in bankruptcy so that the debtor must obtain the Commission's approval to modify or abrogate the contract.

---

[50] *Id.* at P 14.
[51] *Id.* at P 12.
[52] *Id.*
[53] *Id.*
[54] *Id.* at P 3.
[55] *Id.* at P 12 n.16 (citing *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 388 (1959); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591,  610 (1994)).
[56] *NAACP*, 425 U.S. 662 at 670.

### 5. Rejection of Contracts in Bankruptcy Does Not Alter Regulatory Obligations Subject to the Commission's Jurisdiction.

In *NextEra* and *Exelon,* the Commission concluded that a bankruptcy court's authorization to reject a contract subject to this Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes, and that "[p]erformance under such contracts remains subject to this Commission's review to determine whether any cessation or modification of performance is just and reasonable, and not unduly discriminatory or preferential under the FPA."[57]

The same conclusion applies to the Commission's concurrent jurisdiction to review and address the disposition of NGA-jurisdictional natural gas contracts that a debtor seeks to reject in bankruptcy. As with wholesale power contracts, the duty to perform under a natural gas transportation contract may be required not only from the private law of contracts but also pursuant to the NGA and by the Commission as the agency granted exclusive authority to implement the NGA.[58] The Supreme Court has explained that the ability of a debtor to reject a contract in bankruptcy does not relieve the debtor from burdens imposed by generally applicable law,[59] which must include obligations imposed under natural gas transportation contracts authorized by the Commission pursuant to the NGA. The Commission should hold that, "a bankruptcy court's authorization to reject a [natural gas transportation] contract does not relieve a debtor of its separate regulatory obligations under the [NGA]."[60]

---

[57] *NextEra/Exelon Rehearing Order* at P 16.
[58] *Id*. at P 21 (citing *Calpine Corp.*, 337 B.R. 27, 33 (S.D.N.Y. 2006); *Pa. Water & Power Co. v. FPC*, 343 U.S. 414, 422 (1952)).
[59] *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1665-66 (2019).
[60] *NextEra/Exelon Rehearing Order* at P 16. Also, "a bankruptcy court's authorization to reject a contract subject to the Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes." *Id*.

**D. The Commission Should Ensure That It Retains the Authority to Evaluate the Public Interest Related to a Potential Abrogation of the Chesapeake FTSAs.**

Gulf South is not requesting that the Commission pre-determine in this proceeding how it would address a request by Chesapeake to abrogate or modify the Chesapeake FTSAs. Gulf South notes that the *Mobile-Sierra* doctrine would require the Commission to determine that the Chesapeake FTSAs "seriously harm[ ]" the public interest before allowing Chesapeake to modify or abrogate the contract.[61]

Chesapeake would be unlikely to demonstrate such harm. The Chesapeake FTSAs are generic firm transportation service agreements that conform to the form of agreement for Gulf South's Rate Schedule FTS. The form of service agreement was filed with and accepted by the Commission for inclusion in Gulf South's Tariff pursuant to NGA Section 4 and the Commission's regulations. The Chesapeake FTSAs provide service pursuant to the same terms and conditions that Gulf South makes available to all shippers. The Chesapeake FTSAs also provide service at the recourse rate (*i.e.*, the maximum applicable rates) for Rate Schedule FTS set forth in Gulf South's Tariff. The Rate Schedule FTS recourse rates were established through a settlement agreement entered into between Gulf South and its shippers, including Chesapeake.[62] It is unlikely that Chesapeake could demonstrate that the Chesapeake FTSAs seriously harm the public interest given the generic nature of these contracts.

Abrogation or modification of the Chesapeake FTSAs would instead likely harm the public interest by negatively impacting both Gulf South and Gulf South's other

---

[61] *NextEra/Exelon Rehearing Order* at P 23 (quoting *Morgan Stanley*, 554 U.S. at 530).

[62] Gulf South Pipeline Company, LP, Rate Case Offer of Settlement, Docket No. RP15-65-000 (filed Sept. 25, 2015) ("2015 Settlement") (listing Chesapeake as a "Settling Party" on Appendix A), *accepted, Gulf South Pipeline Company, LP*, 153 FERC ¶ 61,326 (2015).

shippers. Gulf South would be harmed because it would be forced to remarket the capacity under the Chesapeake FTSAs in a market that is more competitive than when Chesapeake entered into the FTSAs. Gulf South would likely have to agree to provide the new shippers with discounts in order to subscribe the Chesapeake FTSA capacity given the competitive pipeline alternatives likely available to the potential new shippers. This would reduce Gulf South's revenues during a period when it is unable to adjust its rates due to a rate settlement to which Chesapeake was a settling party.[63]

Gulf South's shippers would also face harm if Gulf South were forced by market conditions to remarket the Chesapeake FTSA capacity at a discount. Commission policy encourages pipelines to contract for capacity at a discount rather than leave the capacity unsubscribed.[64] Under the Commission's policy, a pipeline that offers a discount to meet competition may be allowed a "discount adjustment," which operates as follows: "if pipeline grants a discount in order to meet competition, the pipeline is not required in its next rate case to design its rates based on the assumption that the discounted volumes would flow at the maximum rate, but may reduce the discounted volumes so that the pipeline will be able to recover its cost of service."[65] As a result of the discount adjustment, the pipeline's other shippers would pay a higher rate than they would have paid if the capacity had continued to be subscribed at the maximum applicable rates.[66]

---

[63] 2015 Settlement at Article VII.1 (providing, subject to limited exceptions not related to the Chesapeake FTSAs, that Gulf South may not propose to modify its settled-upon rates to be effective before May 1, 2023).

[64] *See, e.g., Policy for Selective Discounting By Natural Gas Pipelines*, 113 FERC ¶ 61,173 at P 9 (2005) (explaining that certain discounts "can increase throughput and thus benefit captive customers").

[65] *Id.* at 4

[66] Under the discount adjustment, however, the other shippers' rates would not increase as high as if the capacity went entirely unsubscribed because the pipeline was unable to sell the capacity at the maximum applicable rate. *See id.* at P 47 ("Discouraging the pipeline with the higher maximum rate from discounting in that situation would only harm that pipeline's captive customers, since it would lose throughput over which it could otherwise spread its fixed costs.").

If Chesapeake were permitted to abrogate the Chesapeake FTSAs, this could potentially harm Gulf South's other shippers who could be forced in the future to pay higher rates than they would have paid absent Chesapeake's abrogation.  Such a result would be contrary to the NGA's objective of protecting natural gas consumers and would be harmful to the public interest.  The Commission should declare that Chesapeake must obtain authorization from the Commission in order to modify or abrogate the Chesapeake FTSAs regardless of whether it seeks to reject the contracts in bankruptcy.  The requested declaration will ensure that the Commission is able to exercise its statutory authority so that Chesapeake cannot unilaterally abrogate or modify the FTSAs without the opportunity for the Commission to consider the public interest.

## IV.    REQUEST FOR EXPEDITED ACTION

Gulf South requests that the Commission take expedited action on this petition.  Expedited action is needed in order to foreclose the possibility that Chesapeake could seek to enjoin or otherwise prevent the Commission from exercising its NGA jurisdiction to review Chesapeake's potential rejection of the Chesapeake FTSAs.  A declaratory order from the Commission would provide the necessary guidance to ensure that Chesapeake seeks the Commission's authorization before it modifies or abrogates the Chesapeake FTSAs.

## V.    CONCLUSION

For the reasons stated above, and for the reasons stated by the Commission in *NextEra* and *Exelon*, the Commission has concurrent jurisdiction with a bankruptcy court with respect to Commission-jurisdictional contracts that a debtor seeks to reject in bankruptcy. Only the Commission may conduct the public interest review mandated by the NGA in order to abrogate or modify the terms of a natural gas transportation contract. To give effect to both the NGA and the Bankruptcy Code, a party to a Commission-jurisdictional natural gas transportation contract seeking to reject the contract in bankruptcy must also obtain authorization from the Commission in order to modify or abrogate the contract.

**WHEREFORE**, Gulf South requests that the Commission issue an order declaring that Chesapeake must obtain authorization from the Commission in order to modify or abrogate the Chesapeake FTSAs regardless of whether its seeks to reject the contracts in bankruptcy. To allow the Commission to act expeditiously, Gulf South further requests that the Commission shorten the period for the submission of responses to 15 days, or until June 8, 2020.

Respectfully submitted,

/s/ *Michael E. McMahon*

_____

A. Gregory Junge                             Michael E. McMahon
Hogan Lovells US LLP                      Senior Vice President and General Counsel
555 Thirteenth Street, N.W.              Gulf South Pipeline Company, LLC
Washington, D.C.  20004                  9 Greenway Plaza, Suite 2800
202-637-5600                                   Houston, Texas 77046
                                                         713-479-8059

**ATTORNEYS FOR GULF SOUTH PIPELINE COMPANY, LLC**

May 22, 2020

**EXHIBIT A**

**CONTRACT NO. 36376**

FIRM GAS TRANSPORTATION SERVICE AGREEMENT
PURSUANT TO SECTION 284, SUBPART "G" or "B"
between GULF SOUTH PIPELINE COMPANY, LP, as GULF SOUTH, and
CHESAPEAKE ENERGY MARKETING, INC., as CUSTOMER

Rate Schedule FTS
SCO Option: No

RECEIVED DEC 01 2008

| | | |
|---|---|---|
| Reference No.: | Contract No.: 36376 | Contract Date: February 01, 2009 |

| | | |
|---|---|---|
| CUSTOMER Correspondence: | CUSTOMER Billing: | Primary Term: 275 Month(s) |
| CHESAPEAKE ENERGY MARKETING, INC. | CHESAPEAKE ENERGY MARKETING, INC. | Beginning 9:00 A.M. on February 01, 2009 |
| 6100 N. WESTERN AVE | 6100 N. WESTERN AVE | Thru Gas Day Dated |
| OKLAHOMA CITY, OK 73118 | OKLAHOMA CITY, OK 73118 | December 31, 2031 * |
| Attn: Richard Easterly | Attn: Bridgette Hall | Contract Maximum Daily Quantity (MDQ) Dekatherm 10,000 |
| Telephone No. 405-810-2605 | Telephone No. 405-767-4626 | |
| Fax No. 405-879-9575 | Fax No. 405-879-9575 | |

| | | |
|---|---|---|
| GULF SOUTH's Customer Service Dept. Derryl Morgan | Telephone No. (713) 479-8049 | Fax No. (713) 479-1749 |
| CUSTOMER'S Dispatcher: Marc Fergason | Telephone No. 405-810-2777 | Fax No. 405-879-9575 |

Primary Point Pairs for this Service Agreement are described on Exhibit A, attached hereto.
(All points are available as supplemental receipt and delivery points up to the Contract MDQ)

Special Provisions:    Service hereunder is provided pursuant to Section 284 either Subpart G or B.
Please indicate below as appropriate:

Subpart G    [X]    Service hereunder is subject to Section 284.223, Title 18, of the Code of
Federal Regulations or

Subpart B    [ ]    Service hereunder is subject to Section 284.101, Title 18, of the Code of Federal
Regulations, and CUSTOMER must execute Exhibit C and the affidavits attached
thereto, all of which are hereby incorporated by reference and made a part of
this Agreement.

* Additional contractual right-of-first-refusal or evergreen provisions may apply as set forth in a
letter agreement.

Services provided under this Service Agreement are subject to and governed by the applicable rate
schedule and the General Terms and Conditions of Gulf South's current FERC Gas Tariff.  IF YOU ARE
IN AGREEMENT WITH THE FOREGOING, PLEASE INDICATE IN THE SPACE PROVIDED BELOW.

| | | |
|---|---|---|
| GULF SOUTH | Signature: RAWS Ø BAC | 12/3/08 |
| | Name: Rolf Gafvert    Title: President | Date: |

| | | |
|---|---|---|
| CUSTOMER | Signature: | |
| | Name:    Title: President | Date: 11/25/08 |

Contract Number: 36376
Amendment No: 0

PAGE 1 OF 1

EXHIBIT A

EFFECTIVE February 01, 2009 THROUGH December 31, 2031

FIRM TRANSPORTATION SERVICE AGREEMENT

BETWEEN

GULF SOUTH PIPELINE COMPANY, LP

AND

CHESAPEAKE ENERGY MARKETING, INC.

DATED February 01, 2009

PRIMARY POINT PAIRS

| RECEIPT METER LOCATION | RECEIPT METER DESCRIPTION | GATHERING | DELIVERY METER LOCATION | DELIVERY METER DESCRIPTION | MAXIMUM DAILY QUANTITY |
|---|---|---|---|---|---|
| 009755 | SLIGO FIELD C.P. - CHESAPEAKE ENERG | N | 003362 | LONEWA (TO TEXAS GAS) | 10,000 |
| | CONTRACT TOTAL : | | | 10,000 | |
| | | | | TOTAL: | 10,000 |

This Exhibit does not reflect capacity released on a temporary basis.  It is expressly agreed and understood that the releasing customer remains liable for such released capacity under the terms of this contract.



April 23, 2015

CHESAPEAKE ENERGY MARKETING, L.L.C.
6100 N. WESTERN AVE
OKLAHOMA CITY,OK 73118

Attention: Richard Easterly

> RE:    Amendment Number : 20, effective May 01, 2015, to the
>        Firm Transportation Service Agreement
>        between GULF SOUTH PIPELINE COMPANY, LP and
>        CHESAPEAKE ENERGY MARKETING, L.L.C.
>        dated February 01, 2009
>        Master Contract Number: 36376
>        Termination Date: December 31, 2031

Reference is made to that certain Firm Transportation Service Agreement dated February 01, 2009, as amended, between GULF SOUTH PIPELINE COMPANY, LP (GULF SOUTH) and CHESAPEAKE ENERGY MARKETING, L.L.C. (CHESAPEAKE ENERGY MARKETING, L.L.C.) which sets forth the terms governing the firm transportation of natural gas (Agreement).

GULF SOUTH and CHESAPEAKE ENERGY MARKETING, L.L.C. desire to amend the Agreement only as follows:

1.    To increase and decrease the Receipt Point MDQ of certain Receipt Point(s) set forth in your Service Request Form(s) received on March 30, 2015.

In addition, the parties amend the Agreement by deleting the effective Exhibit(s) A and/or B in their entirety and substituting the attached Exhibit(s) A and/or B.

This amendment shall be effective as of May 01, 2015. If you agree to the foregoing, please so indicate by executing in the space provided below and returning to GULF SOUTH for execution, after which a fully executed copy will be returned to you.

Except as amended, all other terms and provisions of the Agreement shall remain in full force and effect as written.

Sincerely,

GULF SOUTH PIPELINE COMPANY, LP
By: Gulf South Pipeline Company, LP
Its General Partner

Name:    Doug Ray
Title:    VP Marketing & Optimization
Date:

CHESAPEAKE ENERGY MARKETING, L.L.C.

Name: W. 6. _____, Jr.
Title: VP - Business Development
Date:    04/29/2015

Master Contract Number: 36376

# Firm Transportation Service Agreement

Between GULF SOUTH PIPELINE COMPANY, LP and CHESAPEAKE ENERGY MARKETING, L.L.C.

Rate Schedule: FTS

Amendment No: 20

Page 1 of 1

Agreement/Contract No.: 36376

Dated February 01, 2009

## EXHIBIT A
### Primary Point Pair(s)
Effective May 01, 2015 through December 31, 2031

| Receipt SLN | Receipt Point Name | Delivery SLN | Delivery Point Name | Volume (Dth) |
|---|---|---|---|---|
| 022653 | DESOTO PARISH (REGENCY FIELD SERVICES) | 003362 | LONEWA (TO TEXAS GAS) | 10,000 |
| | | | **CONTRACT TOTAL:** | **10,000** |

**EXHIBIT B**

**CONTRACT NO. 36402**

FIRM GAS TRANSPORTATION SERVICE AGREEMENT
PURSUANT TO SECTION 284, SUBPART "G" or "B"
between GULF SOUTH PIPELINE COMPANY, LP, as GULF SOUTH, and
CHESAPEAKE ENERGY MARKETING, INC., as CUSTOMER

Rate Schedule FTS

SCO Option: No

REC'D APR 2 1 2009

| Reference No.: | Contract No.: 36402 | Contract Date: April 01, 2009 |
|---|---|---|

| CUSTOMER Correspondence: | CUSTOMER Billing: | Primary Term: 300 Month(s) |
|---|---|---|
| CHESAPEAKE ENERGY MARKETING, INC. 6100 N. WESTERN AVE OKLAHOMA CITY, OK 73118 | CHESAPEAKE ENERGY MARKETING, INC. 6100 N. WESTERN AVE OKLAHOMA CITY, OK 73118 | Beginning 9:00 A.M. on April 01, 2009 Thru Gas Day Dated March 31, 2034 * |

| Attn: Richard Easterly | Attn: Bridgette Hall | Contract Maximum Daily Quantity (MDQ) |
|---|---|---|
| Telephone No. 405-810-2605 | Telephone No. 405-767-4626 | Dekatherm 9,000 |
| Fax No. 405-879-9575 | Fax No. 405-879-9575 | |

| GULF SOUTH's Customer Service Dept. Derryl Morgan | Telephone No. (713) 479-8049 | Fax No. (713) 479-1749 |
|---|---|---|
| CUSTOMER'S Dispatcher: Marc Fergason | Telephone No. 405-810-2777 | Fax No. 405-879-9575 |

Primary Point Pairs for this Service Agreement are described on Exhibit A, attached hereto.
(All points are available as supplemental receipt and delivery points up to the Contract MDQ)

Special Provisions:   Service hereunder is provided pursuant to Section 284 either Subpart G or B.
Please indicate below as appropriate:

Subpart G    [X]    Service hereunder is subject to Section 284.223, Title 18, of the Code of Federal Regulations or

Subpart B    [ ]    Service hereunder is subject to Section 284.101, Title 18, of the Code of Federal Regulations, and CUSTOMER must execute Exhibit C and the affidavits attached thereto, all of which are hereby incorporated by reference and made a part of this Agreement.

* Additional contractual right-of-first-refusal or evergreen provisions may apply as set forth in a letter agreement.

Services provided under this Service Agreement are subject to and governed by the applicable rate schedule and the General Terms and Conditions of Gulf South's current FERC Gas Tariff.  IF YOU ARE IN AGREEMENT WITH THE FOREGOING, PLEASE INDICATE IN THE SPACE PROVIDED BELOW.

GULF SOUTH    Signature:

Name: Rolf Gafvert        Title: President            Date: 4/27/09

CUSTOMER    Signature:

Name:                  Title: President            Date: 12/24/08

EXHIBIT A

Contract Number: 36402
Amendment No: 0
PAGE 1 OF 1

EFFECTIVE April 01, 2009 THROUGH March 31, 2034
FIRM TRANSPORTATION SERVICE AGREEMENT

BETWEEN

GULF SOUTH PIPELINE COMPANY, LP

AND

CHESAPEAKE ENERGY MARKETING, INC.

DATED April 01, 2009

PRIMARY POINT PAIRS

| RECEIPT METER LOCATION | RECEIPT METER DESCRIPTION | GATHERING | DELIVERY METER LOCATION | DELIVERY METER DESCRIPTION | MAXIMUM DAILY QUANTITY |
|---|---|---|---|---|---|
| 009755 | SLIGO FIELD C.P. - CHESAPEAKE ENERG | N | 010506 | HENRY HUB (TO SABINE) | 9,000 |
| | CONTRACT TOTAL : | | | 9,000 | |
| | | | | TOTAL: | 9,000 |

This Exhibit does not reflect capacity released on a temporary basis. It is expressly agreed and understood that the releasing customer remains liable for such released capacity under the terms of this contract.



April 23, 2015

CHESAPEAKE ENERGY MARKETING, L.L.C.
6100 N. WESTERN AVE
OKLAHOMA CITY,OK 73118

Attention: Richard Easterly

          RE:     Amendment Number : 13, effective May 01, 2015, to the
                  Firm Transportation Service Agreement
                  between GULF SOUTH PIPELINE COMPANY, LP and
                  CHESAPEAKE ENERGY MARKETING, L.L.C.
                  dated April 01, 2009
                  Master Contract Number: 36402
                  Termination Date: March 31, 2034

          Reference is made to that certain Firm Transportation Service Agreement dated April 01, 2009, as amended, between GULF SOUTH PIPELINE COMPANY, LP (GULF SOUTH) and CHESAPEAKE ENERGY MARKETING, L.L.C. (CHESAPEAKE ENERGY MARKETING, L.L.C.) which sets forth the terms governing the firm transportation of natural gas (Agreement).

          GULF SOUTH and CHESAPEAKE ENERGY MARKETING, L.L.C. desire to amend the Agreement only as follows:
              I.    To increase and decrease the Receipt Point MDQ of certain Receipt Point(s) set forth in your Service Request Form(s) received on March 30, 2015.

          In addition, the parties amend the Agreement by deleting the effective Exhibit(s) A and/or B in their entirety and substituting the attached Exhibit(s) A and/or B.

          This amendment shall be effective as of May 01, 2015. If you agree to the foregoing, please so indicate by executing in the space provided below and returning to GULF SOUTH for execution, after which a fully executed copy will be returned to you.

Except as amended, all other terms and provisions of the Agreement shall remain in full force and effect as written.

Sincerely,

GULF SOUTH PIPELINE COMPANY, LP
By: Gulf South Pipeline Company, LP
Its General Partner

Name:     Doug Ray
Title:      VP Marketing & Optimization
Date:

CHESAPEAKE ENERGY MARKETING, L.L.C.

Name: W. C. Winos, Jr.
Title: VP - Business Development
Date:   04/12/2015
Master Contract Number: 36402

**Firm Transportation Service Agreement**

Between GULF SOUTH PIPELINE COMPANY, LP and CHESAPEAKE ENERGY MARKETING, L.L.C.

Rate Schedule: FTS

Amendment No: 13

Page 1 of 1

Agreement/Contract No.: 36402

Dated April 01, 2009

**EXHIBIT A**
Primary Point Pair(s)
Effective May 01, 2015 through March 31, 2034

| Receipt SLN | Receipt Point Name | Delivery SLN | Delivery Point Name | Volume (Dth) |
|---|---|---|---|---|
| 022653 | DESOTO PARISH (REGENCY FIELD SERVICES) | 010506 | HENRY HUB (TO SABINE) | 9,000 |
| | | | **CONTRACT TOTAL:** | **9,000** |

**Exhibit D**

**Tiger Order**

171 FERC ¶ 61,248

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
                        Richard Glick, Bernard L. McNamee,
                        and James P. Danly.

ETC Tiger Pipeline, LLC                         Docket No.  RP20-881-000

ORDER ON PETITION FOR DECLARATORY ORDER

(Issued June 22, 2020)

1.      On May 19, 2020, ETC Tiger Pipeline, LLC (ETC Tiger or Petitioners) filed, pursuant to Rule 207 of the Commission's Rules of Practice and Procedure,[1] a petition for declaratory order (Petition) requesting a finding that the Commission has concurrent jurisdiction with United States Bankruptcy Courts under sections 4 and 5 of the Natural Gas Act (NGA)[2] with respect to ETC Tiger's transportation agreements with Chesapeake Energy Marketing, L.L.C. (Chesapeake) and that Commission approval of any abrogation or modification of these agreements is statutorily required.  In this order, we grant the Petition in part and deny it in part.

## I.    **Background**

2.      ETC Tiger states that it is a subsidiary of Energy Transfer LP and a natural gas company as defined in the NGA.  ETC Tiger states that it owns a 197-mile bidirectional pipeline, which was constructed pursuant to section 7 of the NGA, with a capacity of 2.4 billion cubic feet per day that extends through the Haynesville Shale and ends near Delhi, Louisiana, where it interconnects with multiple interstate pipelines.  ETC Tiger states that it has been providing service to Chesapeake since 2016 under two transportation agreements:  (1) a firm transportation agreement, with a term of April 1, 2016 through December 31, 2030, providing for a maximum daily quantity of 500,000 dekatherms (Dth) per day at the fixed negotiated monthly reservation rate of $9.5813 per Dth; and (2) an interruptible transportation agreement, with a term of April 1, 2016 through

---

[1] 18 C.F.R. § 385.207(a)(2) (2019).

[2] 15 U.S.C. §§ 717c and 717d (2018).

December 31, 2025, providing for a maximum daily quantity of 500,000 Dth per day
at a discounted rate.  Based on Chesapeake's May 11, 2020 10-Q filing with the Securities
and Exchange Commission, ETC Tiger states that it believes it must prepare for the
imminent possibility that Chesapeake may file for bankruptcy under Chapter 11 of the
United States Bankruptcy Code and move to reject its Commission-jurisdictional
transportation agreements with ETC Tiger.[3]

## II.  **Petition**

3.     ETC Tiger seeks three specific Commission declarations:  (1) the above-
referenced natural gas firm transportation agreements entered into between ETC Tiger
and Chesapeake are Commission-jurisdictional agreements reflecting filed rates approved
by the Commission pursuant to its exclusive jurisdiction under the NGA; (2) if
Chesapeake seeks to reject such Commission-jurisdictional agreements in bankruptcy
court, Chesapeake must petition this Commission for approval to abrogate, modify, or
amend the filed rate pursuant to Section 5 of the NGA and show that such abrogation,
modification, or amendment is in the public interest; and (3) if a party to a Commission-
jurisdictional contract under the NGA seeks to reject such agreement in bankruptcy court,
that party must receive NGA Section 5 approval before a bankruptcy court can determine
whether to reject the agreement.[4]  ETC Tiger's arguments in support follow.

4.     ETC Tiger states that the Commission has recently affirmed that it has concurrent
jurisdiction with the bankruptcy courts in connection with the disposition of
Commission-jurisdictional wholesale power contracts,[5] finding that "to give effect to
both the [Federal Power Act (FPA)] and the Bankruptcy Code, a party to a Commission-
jurisdictional wholesale power contract must obtain approval from both the bankruptcy
court and the Commission to reject the contract and modify the filed rate, respectively."[6]
ETC Tiger asserts that the Commission's findings in those orders are equally applicable
to Commission-jurisdictional transportation agreements under the NGA.[7]

---

[3] Petition at 3-5.

[4] *Id.* at 3.

[5] *Id.* at 6-7 (citing *NextEra Energy, Inc. v. Pac. Gas & Elec. Co.*, 166 FERC ¶ 61,049
(2019) (*NextEra*) and *Exelon Corp. v. Pac. Gas & Elec. Co.*, 166 FERC ¶ 61,053 (2019)
(*Exelon*), *order on reh'g, NextEra, Inc. v. Pac. Gas & Elec. Co.*, 167 FERC ¶ 61,096 (2019)
(Rehearing Order)).

[6] Rehearing Order, 167 FERC ¶ 61,096 at P 3.

[7] Petition at 7.

5.     ETC Tiger also argues that the majority of courts that have addressed this issue have found that the Commission has at least concurrent jurisdiction and reasonable opportunity to provide an opinion on whether rejection of the contracts at issue is in the public interest, and have acknowledged the Commission's exclusive jurisdiction and proper role in determining the public-interest implications prior to permitting a debtor to reject a Commission-jurisdictional agreement.  In particular, ETC Tiger highlights *In re Calpine Corp.*,[8] in which the court held that "the Bankruptcy Code does not expressly limit FERC's jurisdiction and [instead] contemplates agency action during the pendency of a reorganization," and that "FERC's vast authority over filed rate energy contracts" is superior to the bankruptcy court's jurisdiction.[9]  ETC Tiger notes that the United States Court of Appeals for the Sixth Circuit (Sixth Circuit) also recently found that the Commission and the bankruptcy courts have concurrent jurisdiction but that the bankruptcy court's jurisdiction is superior.[10]  Further, ETC Tiger contends that *Boston Generating*[11] addressed the question of the Commission's jurisdiction in bankruptcy proceedings with respect to agreements under the NGA.  According to ETC Tiger, *Boston Generating* provides judicial precedent upon which the Commission can rely, in addition to its numerous rulings with respect to contracts under the FPA, to grant the Petition.[12]

6.     ETC Tiger asserts that the rationale discussed in the Commission's orders finding that the Commission has exclusive, or at least concurrent, jurisdiction over whether the rejection of a jurisdictional contract or filed rate under the FPA is in the public interest is interchangeable with, and applies equally to, such a determination under the NGA.  ETC Tiger contends that the NGA was intended to regulate interstate sales of natural gas for resale in much the same way as the FPA regulates interstate sales of power.  For example, ETC Tiger states that the language used in the NGA regarding the requirement to file rates and the Commission's power to fix unjust and unreasonable rates is almost an exact replica of the language used in the FPA.  Thus, ETC Tiger argues that the parity between the FPA and NGA extends to the Commission's application of the filed-rate doctrine, which means that rates must be filed with the Commission and the rates filed for sale and transportation are lawful only if they are just and reasonable and the Commission "alone is empowered to make that judgment [of reasonableness], and until it has done so, no

---

[8] *In re Calpine Corp.*, 337 B.R. 27, 33, 35 (Bankr. S.D.N.Y 2006) (*Calpine*).

[9] *Id.* at 35-36.

[10] Petition at 8 (citing *FirstEnergy Sols. Corp.*, 945 F.3d 431, 445-46 (6th Cir. 2019) (*FirstEnergy*)).

[11] *Boston Generating*, 2010 WL 4616243 (S.D.N.Y. 2010).

[12] Petition at 7-9.

other rate other than the one on file may be charged."[13]  Further, ETC Tiger asserts that "[o]nce filed with FERC, a 'filed rate' becomes an obligation external to the contract, with the independent force of law."[14]

7.      ETC Tiger also argues that the *Mobile-Sierra* public interest presumption[15] applies equally to jurisdictional contracts under both the NGA and FPA.  ETC Tiger asserts that the *Mobile-Sierra* doctrine "holds that the rate set out in a freely negotiated contract presumptively meets the 'just and reasonable' requirement imposed by the FPA statute unless FERC concludes that the rate will 'seriously harm the public interest.'"[16]  Because both the FPA and NGA require just and reasonable rates, ETC Tiger contends that the *Mobile-Sierra* presumption applies equally under both statutes.  ETC Tiger asserts that the logical conclusion to the application of the presumption to natural gas contracts is that a pipeline shipper must receive the Commission's approval to abrogate, modify, or amend the filed rate pursuant to section 5 of the NGA by seeking to terminate a contract through bankruptcy by showing that such action is in the public interest.[17]

8.      ETC Tiger argues that, in addition to some courts recognizing that the Commission has a role in determining whether a contract under the FPA or NGA can be rejected in bankruptcy, the Commission has a long-standing practice of considering the public interest regarding NGA-jurisdictional contracts of pipelines in bankruptcy proceedings.  ETC Tiger states that in *Columbia Gas Transmission Corp.*,[18] the

---

[13] *Id.* at 11 (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 964 (1952)).

[14] Petition at 11 (quoting *FirstEnergy*, 945 F.3d at 456-57).

[15] *United Gas Pipeline Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) (holding that under the NGA, natural gas companies cannot unilaterally change contract rates) (*Mobile*); *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (holding that under the FPA, the Commission had no power to change a contract rate without first finding the existing rate unjust, unreasonable, unduly discriminatory, or preferential) (*Sierra*).

[16] Petition at 11-12 (quoting *FirstEnergy*, 945 F.3d at 444 (quoting *NRG Power Mktg., LLC v. Me. Pub. Util. Comm'n,* 558 U.S. 165, 167 (2010) (quotation marks omitted); *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008)).

[17] *Id.* at 12.

[18] *Columbia Gas Transmission Corp.*, 66 FERC ¶ 61,374 (1994) (*Columbia Gas*), *reh'g denied*, 67 FERC ¶ 61,269 (1994).

Commission recognized that Columbia's rejection of its contracts with upstream suppliers in a bankruptcy proceeding was governed by the provisions of the Bankruptcy Code and, thus, had to be decided in bankruptcy court, but also found that these contracts were fully subject to the Commission's jurisdiction under the NGA and therefore within the Commission's authority to modify or terminate those contracts if they were contrary to the public interest. ETC Tiger also asserts that, more recently, in *Boston Generating*, the parties agreed that the debtors should seek Commission approval of the gas transportation contracts at issue, but disagreed over whether the bankruptcy court and Commission should consider the rejection motion concurrently or whether the bankruptcy court must wait until the Commission had ruled.[19] ETC Tiger states that the court found the question was irrelevant because "[i]f either the bankruptcy court or FERC does not approve the Debtor's rejection of the [agreement], the Debtors may not reject the contract."[20]

9.      Finally, ETC Tiger argues that the issue of a debtor rejecting a Commission-jurisdictional agreement in bankruptcy raises a public policy issue. ETC Tiger asserts that the filed rate doctrine applies not only to the rate, but to the terms and conditions of service, including the term of the agreement. ETC Tiger contends that the abrogation of a contract, by definition, affects the term of the contract and the rate received by the pipeline. Further, ETC Tiger reiterates that, pursuant to the filed rate doctrine, a Commission-jurisdictional agreement is not a private contract but has the force of law and only the Commission has the right to determine whether the abrogation, modification, or amendment of a filed rate harms the public interest. Thus, ETC Tiger argues that the Commission should grant this Petition and assert its exclusive jurisdiction to ensure that any move to reject a Commission-jurisdictional agreement would not harm the public interest.[21]

## III.   Notice and Responsive Pleadings

10.     Notice of the Petition was published in the *Federal Register*, 85 Fed. Reg. 32,378 (2020), with interventions and protests due on or before June 18, 2020. Timely motions to intervene were filed by Enbridge (U.S.) Inc. and American Public Gas Association. Stagecoach Pipeline & Storage Company LLC and Arlington Storage Company, LLC (collectively, Stagecoach and Arlington) jointly filed a timely motion to intervene and comments in support of ETC Tiger's Petition. Chesapeake filed a timely motion to intervene and protest.

---

[19] Petition at 13 (citing *Boston Generating*, 2010 WL 4616243 at *3).

[20] *Id.*

[21] *Id.* at 14-15.

11. Stagecoach and Arlington argue that a debtor's motion to reject a Commission-jurisdictional contract in bankruptcy directly implicates the filed rate doctrine because the debtor is seeking to substitute its judgment on filed rates for that of the Commission. Stagecoach and Arlington assert that the Commission alone, consistent with the filed rate doctrine under both the NGA and FPA, has the authority to determine whether a debtor's proposed rejection of a Commission-jurisdictional contract is just and reasonable.[22]

12. Chesapeake argues that the Commission should deny the Petition. Chesapeake asserts that ETC Tiger erroneously seeks (1) a remedy for a situation that has not occurred, (2) to elevate the Commission's jurisdiction over the filed rate above the jurisdiction of the bankruptcy courts to determine whether a contract should be rejected, and (3) to reverse the Commission's policies with respect to natural gas transportation contracts.[23]

13. Chesapeake contends that the NGA and the Commission's regulations treat natural gas companies differently from shippers on the natural gas pipelines. According to Chesapeake, the Commission has not, nor should it, infer from the NGA any duty to perform for shippers such as Chesapeake. Chesapeake asserts that, unlike certified interstate natural gas pipelines, shippers on natural gas pipelines do not need to request abandonment authority from the Commission under section 7(b) of the NGA[24] in order to stop performing under a transportation service agreement. Further, Chesapeake argues that Congress expressly limited the scope of section 7(b) abandonment authority to the provision of certificated services by interstate pipelines by removing producers from the definition of "natural gas company" in the Wellhead Decontrol Act of 1989.[25] Thus, given that Congress has imposed specific limits on the scope of section 7(b) of the NGA, Chesapeake contends that the Commission should deny ETC Tiger's attempts to evade those limits by requiring the Commission to infer a duty to perform under the NGA where none exists.[26]

14. Chesapeake also argues that the bankruptcy courts have primary and exclusive jurisdiction over the rejection of contracts. Chesapeake highlights the court's finding in *FirstEnergy*, where the Sixth Circuit held that the bankruptcy court's jurisdiction, although concurrent with the Commission's jurisdiction, is "nonetheless primary or

---

[22] Stagecoach and Arlington Comments at 3-5.

[23] Chesapeake Protest at 1.

[24] 15 U.S.C. §717f(b) (2018).

[25] Pub. L. No. 101-60 (1989); 15 U.S.C. § 3431(b)(1).

[26] Chesapeake Protest at 4-8.

superior to FERC's position,"[27] and that the debtor-in-possession can reject the contracts subject to proper bankruptcy court approval and the Commission "cannot independently prevent it."[28] Further, Chesapeake asserts that the United States Court of Appeals for the Fifth Circuit has determined that the rejection of an executory contract allows for the non-breaching party to receive an unsecured claim against the bankruptcy estate for an amount equal to the damages from the breach, which are calculated based upon the filed rate.[29] Chesapeake contends that bankruptcy courts have also determined that they hold exclusive jurisdiction over rejection of executory contracts, including Commission-jurisdictional ones,[30] and that the Commission has consistently deferred to the bankruptcy courts where natural gas pipeline transportation agreements are at issue.[31] Chesapeake also notes that another pipeline company, Rockies Express LLC (Rockies Express), filed a petition for declaratory order with the Commission seeking similar relief but withdrew the petition after a hearing before the bankruptcy court. Chesapeake states that, in that case, the bankruptcy court held that "proceeding with the petition before FERC . . . or FERC's ruling on the petition . . . would violate the automatic stay under section 362(a) of the Bankruptcy Code"[32] and any ruling by the Commission during the chapter 11 case would be void because it would violate the automatic stay.[33]

---

[27] Chesapeake Protest at 9 (quoting *FirstEnergy*, 945 F.3d at 446).

[28] *Id.* at 10 (quoting *FirstEnergy*, 945 F.3d at 446).

[29] *Id.* (citing *In re Mirant Corp.*, 378 F.3d 511, 520 (5th Cir. 2004) (*Mirant*)).

[30] *Id.* (citing *In re PG&E Corp.*, No. 19-30088-DM (Bankr. N.D. Cal. 2019) (appeal pending in the Ninth Circuit)).

[31] *Id.* at 11 (citing *In re Vanguard Natural Resources, LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. Mar. 1, 2017) (natural gas pipeline companies did not object to debtor's rejection of their respective firm transportation agreements; no FERC involvement); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jun. 27, 2016) (several counterparties did not object to debtors' rejection of their transportation service agreements; no FERC involvement); *In re Edgemarc Holdings, LLC*, No. 19-11104 (Bankr. D. Del. Jun. 25, 2019) (counterparty expressly did not object to the debtors' rejection of firm transportation service agreements; no FERC involvement); *In re Bonanza Creek Energy, Inc.*, No. 17-10015 (Bankr. D. Del. Apr. 7, 2017) (neither counterparty nor FERC objected to rejection effectuated through plan of reorganization); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Aug. 14, 2003) (neither counterparty nor FERC objected to debtors' rejection of firm natural gas transportation agreement)).

[32] Chesapeake Protest at 12-13 (citing *In re Ultra Petroleum Corp.*, Hr'g Tr. 53:

15.     Chesapeake asserts that while bankruptcy courts have exclusive jurisdiction regarding the rejection of contracts, the Commission may play a role in the process by providing advice and guidance to the bankruptcy courts regarding whether rejection would harm the public interest.  Further, Chesapeake contends that bankruptcy courts may consider, in accordance with the business judgment rule, whether there is a public interest that should be taken into account in considering rejection of an executory contract.  However, Chesapeake maintains that with or without Commission participation, the bankruptcy courts retain the jurisdiction to consider whether to authorize rejection of a natural gas transportation contract through a shipper in chapter 11 bankruptcy.  In contrast, Chesapeake claims that the Petitioners would have the Commission create exclusive Commission jurisdiction to make this determination without any input from the bankruptcy courts.  Chesapeake argues that such an outcome would render the Bankruptcy Code meaningless and would place the Commission's jurisdiction over and above any jurisdiction the bankruptcy courts might have.[34]

16.     Chesapeake argues that the Commission has already articulated a public policy determination regarding its position on contract defaults by shippers in its 2005 Creditworthiness Policy Statement.[35]  According to Chesapeake, the Creditworthiness Policy Statement determined that, in the event of a shipper default, the risk of loss belongs with the natural gas pipeline, and found that the compensation for this risk is factored into determining the pipeline's return on equity when it seeks approval for new jurisdictional service rates and also allows for pipelines to request up to three months of reservation charges from existing shippers as collateral for a non-creditworthy shipper as a means of mitigating risk.[36]  Chesapeake also asserts that the Creditworthiness Policy Statement addresses the process pipelines can use for suspending or terminating service in response to a shipper's deteriorating creditworthiness.[37]  Further, Chesapeake claims that, in the Creditworthiness Policy Statement, the Commission cited favorably to

---

25-54: 4 (Bankr. S.D. Tex. May 29, 2020)).

    [33] *Id.* (citing *In re Ultra Petroleum Corp.*, Hr'g Tr. 55: 6-7 (Bankr. S.D. Tex. May 29, 2020)).

    [34] *Id.* at 13-14.

    [35] *Creditworthiness Standards for Interstate Natural Gas Pipelines*, 111 FERC ¶ 61,412 (2005) (Creditworthiness Policy Statement).

    [36] Chesapeake Protest at 15 (citing Creditworthiness Policy Statement, 111 FERC ¶ 61,412 at PP 11, 14).

    [37] Chesapeake Protest at 16 (citing Creditworthiness Policy Statement, 111 FERC ¶ 61,412 at PP 32-35).

previous decisions where the Commission acknowledged the primacy of bankruptcy court jurisdiction.  Thus, Chesapeake contends that the Creditworthiness Policy Statement demonstrates the Commission's understanding that rejection under the Bankruptcy Code would be available to a shipper in bankruptcy without Commission involvement.[38]

17.      In addition, Chesapeake asserts that the Petitioners would have the Commission apply the wrong standard for contract rejection in bankruptcy.  Chesapeake argues that the *Mobile-Sierra* doctrine only applies where a party is attempting to unilaterally modify a contract rate.  However, Chesapeake asserts that contract rejection is a breach of contract that does terminate or rescind the contract such that the filed rate remains intact.[39]

18.      Finally, Chesapeake argues that the Petitioners seek to have the Commission take action that would be inconsistent with the requirements of ETC Tiger's tariff.  Chesapeake states that ETC Tiger's tariff provides that ETC Tiger may unilaterally suspend and terminate a shipper's contract where the shipper has failed to pay an invoice on a timely basis and/or where the shipper fails to maintain creditworthiness.  Thus, Chesapeake contends that it strains credulity for ETC Tiger to argue that a shipper breach of contract through the bankruptcy process would require a *Mobile-Sierra* finding by the Commission when ETC Tiger's decision to terminate a contract due to the shipper's bankruptcy would not.  Moreover, Chesapeake claims that ETC Tiger's tariff contains several references to bankruptcy courts and recognizes the primacy of those courts' jurisdiction in certain situations.  For example, Chesapeake cites two provisions of the ETC Tiger tariff that prohibit ETC Tiger from taking any actions that conflict with any order of a bankruptcy court.[40]  Thus, Chesapeake asserts that, if the bankruptcy court were to authorize rejection of one or both of the contracts between Chesapeake and ETC Tiger, ETC Tiger must comply with those orders and may not take any actions that would conflict with those orders, such as requesting a contrary determination from the Commission.[41]

---

[38] *Id.* at 16-17.

[39] *Id.* at 17.

[40] *Id.* at 18-19 (citing ETC Tiger, FERC Gas Tariff, §§ 2.8, 12.1).

[41] Chesapeake Protest at 19.

## IV.     Commission Determination

### A.     Procedural Matters

19.     Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2019), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

### B.     Substantive Matters

20.     We grant the Petition and find that the principles the Commission articulated in *NextEra* and *Exelon* with respect to the FPA apply with equal force under the NGA. Where a party to a Commission-jurisdictional agreement under the NGA seeks to reject the agreement in bankruptcy, that party must obtain approval from both the Commission and the bankruptcy court to modify the filed rate and reject the contract, respectively.[42]

21.     As a threshold matter, the filed rate doctrine and the *Mobile-Sierra* presumption apply equally to contracts regulated under sections 4 and 5 of the NGA and contracts regulated under sections 205 and 206 of the FPA.[43]  As noted by ETC Tiger,[44] the language used in the NGA regarding the requirement to file rates and the Commission's power to remedy unjust and unreasonable rates "'are in all material respects substantially identical.'"[45]  Courts have held that the parity between the FPA and NGA extends to the Commission's application of the filed rate doctrine.  Indeed, due to the similarities between the two statutory schemes, the Supreme Court has a longstanding and

---

[42] *NextEra*, 166 FERC ¶ 61,049 at P 28; *Exelon*, 166 FERC ¶ 61,053 at P 25.  The Commission's initial orders and its consolidated rehearing order are currently pending on judicial review before the Ninth Circuit.

[43] Indeed, the *Mobile-Sierra* doctrine is derived from the Supreme Court's twin decisions issued the same day under the NGA, and the FPA.  *See supra* note 14 (citing *Mobile* and *Sierra*); *see also, e.g.*, *Morgan Stanley*, 554 U.S. at 544-45 (applying the *Mobile-Sierra* doctrine to rates under the FPA); *Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968) (applying the *Mobile-Sierra* doctrine to rates under the NGA).

[44] Petition at 11.

[45] *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7. (1981) (*Arkla Gas*) (quoting *Sierra,* 350 U.S. at 353).

"established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes."[46]

22.     Consistent with the foregoing precedent, we find that the Bankruptcy Code does not displace the Commission's jurisdiction over filed rate contracts under the NGA.  As filed rates, such contracts are not typical commercial contracts but rather establish public obligations that carry the force of law.[47]  As the Supreme Court explained with specific regard to Commission-jurisdictional contracts, filed rate obligations exist independently of private contractual duties and continue to bind the counterparties, regardless of one party's breach of contract, or even a determination that a contract may not be enforced at all.[48]  More recently, the Supreme Court held in *Mission Product Holdings, Inc. v. Tempnology*[49] that a debtor cannot grant itself an exemption from "all the burdens that generally applicable law . . . imposes" by breaching a contract through the bankruptcy process.  *Mission Product* supports the principle that a debtor does not extinguish its filed rate obligations under the NGA by rejecting a contract in bankruptcy.

23.     As the Commission stated in *Exelon*, "the Commission determines the filed rate and 'except for review of the Commission's orders, the courts can assume no right to a different one.'"[50]  Rejection of a Commission-jurisdictional contract in a bankruptcy court alters the essential terms and conditions of a contract that is also a filed rate; therefore, the Commission's approval is required to modify or abrogate the filed rate.[51]

24.     Bearing in mind the foregoing principles, we turn to ETC Tiger's requested declarations.  In response to the first and second questions posed by ETC Tiger, whether the above-referenced agreements constitute filed rates and whether Chesapeake must petition this Commission for approval to abrogate, modify, or amend the filed rate, the

---

[46] *Arkla Gas*, 453 U.S. at 577 n.7.

[47] *See, e.g.*, *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004) (filed rates "are considered to be 'the law'") (citation omitted).

[48] *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 422 (1952) (power company's duty to comply with filed rate "springs from the Commission's authority, not from the law of private contracts").

[49] 139 S. Ct. 1652, 1665 (2019) (*Mission Product*).

[50] *Exelon*, 166 FERC ¶ 61,053 at 26 (quoting *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. at 252).

[51] *NextEra*, 166 FERC ¶ 61,049 at P 29; *Exelon*, 166 FERC ¶ 61,053 at P 26.

Commission's answer is yes.[52]  The natural gas transportation agreements at issue here, like the wholesale power purchase agreements at issue in *NextEra* and *Exelon*, constitute filed rates.  As such, in order to give effect to both the NGA and the Bankruptcy Code, Chesapeake may not modify the rates, terms, or conditions of its transportation agreements with ETC Tiger by rejecting those contracts in bankruptcy; Chesapeake must obtain approval from the Commission to do so.

25.     In response to the third question posed by ETC Tiger, whether a party to a Commission-jurisdictional contract under the NGA must receive Commission approval *before* a bankruptcy court can determine whether to reject the agreement, our answer is no, at least to the extent ETC Tiger appears to suggest that a shipper cannot move to reject a contract in bankruptcy court without the Commission's approval.  As the Commission has previously explained, "the Commission neither presumes to sit in judgment of rejection motions nor seeks to arrogate the role of adjudicating bankruptcy proceedings.  The Commission recognizes that rendering a determination on rejection motions is solely within the province of the bankruptcy court."[53]  However, as we have also explained, a bankruptcy court's decision to approve rejection of a FERC-jurisdictional contract cannot modify the filed rate or excuse a violation of the filed rate; only the Commission has the authority to modify the public law duties set forth in the filed rate.[54]  Moreover, a reorganization plan that purports to authorize the modification or abrogation of a FERC-jurisdictional filed rate cannot be confirmed unless the Commission agrees to any rate change provided in the reorganization plan or confirmation is made contingent on the Commission's approval.[55]  Such an agreement from the Commission can only occur via a Commission order.

26.     We find that Chesapeake's reliance on section 7(b) of the NGA is misplaced.  As Chesapeake states, section 7(b) of the NGA pertains to the requirements for an interstate natural gas pipeline company to abandon jurisdictional service authorized by the Commission.  This case does not implicate the obligations arising under section 7(b) of the NGA, but instead raises questions about the rights and obligations of parties to

---

[52] Based upon the record in this proceeding, we do not opine on whether the *Mobile-Sierra* presumption applies to the agreements at issue.

[53] Rehearing Order, 167 FERC ¶ 61,096 at P 16.

[54] *See id.*

[55] Specifically, the Bankruptcy Code provides that "[t]he court shall confirm a plan only if all of the following requirements are met: . . . Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6) (2018).

Commission-jurisdictional contracts under sections 4 and 5 of the NGA.  Thus, by granting the relief requested by ETC Tiger, the Commission is not inferring a shipper's duty to perform under section 7(b) of the NGA.  Rather, the Commission is giving proper effect to the filed rate doctrine, which unquestionably applies to the contracts at issue here.

27.     Although Chesapeake cites instances where courts have taken a position contrary to our finding here,[56] the law is unsettled in this area.[57]  And, as noted, the Supreme Court's recent decision in *Mission Product* supports our position.  Further, contrary to Chesapeake's assertions, the Commission's inaction in other bankruptcy cases involving natural gas shippers[58] is inapposite to the question of jurisdiction.  That the Commission did not act in certain cases does not imply the absence of jurisdiction, and Chesapeake points to no precedent to support such a proposition.

28.     Chesapeake's reference to the Rockies Express matter also is misplaced because the factual circumstances presented in that case are distinguishable from those presented here.  There, unlike here, the relevant debtor had filed for bankruptcy, triggering the automatic stay provision in the Bankruptcy Code.  Assuming *arguendo* that the automatic stay would have prevented the Commission from acting on the Rockies Express petition before the Commission,[59] which we do not concede, here, Chesapeake has not filed a

---

[56] Chesapeake Protest at 9-10 (citing *FirstEnergy*, 945 F.3d at 446; *Mirant*, 378 F.3d at 520).

[57] Federal courts have come to varying conclusions regarding the interaction between the Bankruptcy Code and either the FPA or NGA.  *Compare FirstEnergy*, 945 F.3d 431 (6th Cir. 2019) (district court and Commission share concurrent jurisdiction but district court jurisdiction is superior and district court must consider Commission's views in considering rejection motion) *and Mirant*, 378 F.3d 511 (FPA does not preempt the bankruptcy court's jurisdiction to authorize rejection of an executory contract because rejection of wholesale power purchase agreement would only have an indirect effect upon the filed rate) *and In re PG&E Corp.*, 603 B.R. 471 (Bankr. N.D. Cal. 2019) (debtor need not obtain Commission approval or input to authorize rejection of Commission-regulated contract) *with Calpine Corp.*, 337 B.R. 27 (owing to Commission's exclusive jurisdiction under FPA, bankruptcy court may not authorize rejection of Commission-regulated contract) *and Boston Generating, LLC*, No. 10 Civ. 6258, 2010 WL 4616243 (recognizing parties' agreement that debtor must obtain approval from both bankruptcy court and Commission to reject Commission-regulated agreement).

[58] *See supra* note 30.

[59] Docket No. RP20-822-000.

bankruptcy petition.  Thus, the automatic stay provision of the Bankruptcy Code is inapplicable.

29.    We find that Chesapeake's claim that the Petitioners seek to create exclusive Commission jurisdiction to make this determination without any input from the bankruptcy courts mischaracterizes the Commission's interpretation of its jurisdiction. The Commission has consistently emphasized that its jurisdiction is concurrent with, not superior to, that of the bankruptcy courts.[60]  The Commission has held that, "to give effect to *both* the FPA and the Bankruptcy Code,"[61] a party to a Commission-jurisdictional contract must obtain approval from the bankruptcy court to reject the contract in bankruptcy and must also obtain approval from the Commission to modify or abrogate the filed rate.

30.    The application of a separate legal standard by the Commission does not elevate the Commission's jurisdiction to a superior position in relation to the bankruptcy court and does not render the Bankruptcy Code meaningless.

31.    We find no merit in Chesapeake's assertions regarding the Creditworthiness Policy Statement.  The Creditworthiness Policy Statement addresses different issues than those raised in this context.  In the Creditworthiness Policy Statement, the Commission addressed the types of credit a pipeline may require of a non-creditworthy shipper and the ability of a pipeline to terminate a pipeline-shipper relationship, in part to hedge against the risk that the shipper might file for bankruptcy.[62]  In this case, ETC Tiger is not attempting to require Chesapeake to provide additional collateral or security or to terminate the pipeline-shipper relationship.  Thus, the Creditworthiness Policy Statement is inapplicable here.

32.    Chesapeake's assertion that the Petitioners seek to have the Commission apply the wrong standard for contract rejection in bankruptcy court is likewise without merit. Chesapeake's argument on this point conflates the roles of the Commission and the bankruptcy court.

33.    Finally, we find that granting the relief requested here does not conflict with any provision of ETC Tiger's tariff.  The fact that ETC Tiger's tariff provides that ETC Tiger may unilaterally suspend and terminate a shipper's contract under certain circumstances is not relevant to the question of whether Chesapeake may unilaterally modify or

---

[60] *E.g.*, *Exelon*, 166 FERC ¶ 61,053 at P 25.

[61] *NextEra*, 166 FERC ¶ 61,049 at P 28; *Exelon*, 166 FERC ¶ 61,053 at P 25 (emphasis added).

[62] *See generally* Creditworthiness Policy Statement, 111 FERC ¶ 61,412.

abrogate the rates, terms, or conditions of its natural gas transportation agreements with ETC Tiger.  Aside from obtaining approval from the bankruptcy court to reject its contracts with ETC Tiger, Chesapeake must seek a determination from the Commission as to whether a filed rate may be modified or abrogated under the NGA.  Chesapeake's remaining arguments about the restrictions in ETC Tiger's tariff are inapplicable here because the bankruptcy court has not issued any orders on the matter; therefore, ETC Tiger's Petition cannot, by definition, conflict with any order of the bankruptcy court.

<u>The Commission orders</u>:

        We conclude that this Commission and the bankruptcy courts have concurrent jurisdiction to review and address the disposition of the natural gas transportation agreements sought to be rejected through bankruptcy, as discussed in the body of this order.

By the Commission.

( S E A L )

                                        Kimberly D. Bose,
                                        Secretary.

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
|  | § |  |
| Debtors. | § | (Joint Administration Requested) |
|  | § |  |

## ORDER (I) AUTHORIZING THE
## REJECTION OF THE NEGOTIATED RATE FIRM
## TRANSPORTATION AGREEMENTS AND RELATED CONTRACTS
## EFFECTIVE AS OF JULY 1, 2020 AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) granting the Debtors authority to reject the Contracts, effective as of the Petition Date, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Contracts set forth on **Exhibit A** attached to the Motion are hereby rejected effective as of July 1, 2020.

3.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

4.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

5.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2020

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Stagecoach Petition**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | ) | |
|---|---|---|
| **Stagecoach Pipeline & Storage** | ) | **Docket No. RP20-____-000** |
| **Company LLC** | ) | |
| | ) | |

**PETITION FOR DECLARATORY ORDER, MOTION FOR SHORTENED**
**COMMENT PERIOD, AND REQUEST FOR EXPEDITED ACTION OF**
**STAGECOACH PIPELINE & STORAGE COMPANY LLC**

Pursuant to Rule 207(a)(2) of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("FERC" or the "Commission"),[1] Stagecoach Pipeline & Storage Company LLC ("Stagecoach") hereby files this petition for a declaratory order ("Petition") requesting the Commission issue a declaratory order to remove uncertainty as to whether sections 4 and 5 of the Natural Gas Act ("NGA") and Part 154 of the Commission's regulations provide the Commission concurrent jurisdiction with United States Bankruptcy Courts with respect to Stagecoach's firm transportation service agreements with Chesapeake Energy Marketing, L.L.C. f/k/a Chesapeake Energy Marketing, Inc. ("Chesapeake") (collectively, the "Chesapeake FTSAs") that are subject to the Commission's NGA jurisdiction.

Stagecoach requests expedited action so that the Commission's authority is clarified prior to, or as soon as possible after the filing of, any bankruptcy proceeding. Based on publicly available information, Stagecoach understands that Chesapeake's parent company may file for bankruptcy protection imminently. Should Chesapeake do so, it may seek approval from the bankruptcy court to reject the Chesapeake FTSAs as executory contracts, and may also seek to enjoin the Commission from exercising its

---

[1] 18 C.F.R. § 385.207(a)(2) (2020). Pursuant to Rule 381.302(a), Stagecoach is electronically submitting the amount of $30,060.00 for the filing fee. 18 C.F.R. § 381.302(a).

jurisdiction under the NGA.  Stagecoach requests the Commission declare Chesapeake must seek Commission approval in order to abrogate or modify the regulatory obligations inherent in the Chesapeake FTSAs.  Stagecoach further moves pursuant to Rule 212 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.212, requesting the Commission shorten the period for responses to this Petition so that responses will be due on June 15, 2020.

In support hereof, Stagecoach states as follows:

## I.
## COMMUNICATIONS AND CORRESPONDENCE

Pursuant to Rule 2010 of the Commission's Rules of Practice and Procedure, the names and mailing addresses of the persons designated to receive service and to whom correspondence and communications concerning this proceeding should be addressed are as follows:

*James Johnston
Senior Vice President, General Counsel
Stagecoach Pipeline & Storage
    Company LLC
811 Main Street, Suite 3400
Houston, Texas 77002
(832) 519-2206
James.Johnston@crestwoodlp.com

*John E. Griffin
Assistant General Counsel
Stagecoach Pipeline & Storage
    Company LLC
811 Main Street, Suite 3400
Houston, Texas 77002
(832) 519-2281
John.Griffin@crestwoodlp.com

*Paul Korman
*Michael R. Pincus
Van Ness Feldman, LLP
1050 Thomas Jefferson St., NW
Seventh Floor
Washington, DC 20007
(202) 298-1800
pik@vnf.com
mrp@vnf.com

*Designated for service pursuant to 18 C.F.R. § 385.2010.  Stagecoach respectfully requests that the Commission waive Rule 203(b)(3), 18 C.F.R. § 385.203(b)(3), in order to allow Stagecoach to include the four representatives designated above on the official service list for this proceeding.

2

## II.
## BACKGROUND

### A.      About Stagecoach.

Stagecoach is a "natural gas company" as that term is defined in the NGA, and is engaged in the interstate transportation of natural gas subject to the Commission's jurisdiction.   Stagecoach operates an interstate natural gas pipeline transmission and storage system located in New York and Pennsylvania that is generally comprised of the following facilities:

- A depleted reservoir natural gas storage facility located in Owego, New York, with approximately 31.9 Bcf of storage capacity and withdrawal and injection capabilities of approximately 500 MMcf/day and 250 MMcf/day respectively (the "Storage Facility");

- A 23.7-mile, 30-inch diameter pipeline extending northward from an interconnection with Tennessee Gas Pipeline Company, L.L.C.'s ("TGP") 300 Line in Wyalusing, Bradford County, Pennsylvania to the Storage Facility (the "South Lateral");

- A 9.3-mile, 20-inch pipeline extending from the Storage Facility to an interconnection with the Millennium Pipeline near the town of Owego, New York (the "North Lateral"); and

- A 39-mile, 30-inch pipeline extending from the southern end of the South Lateral in Bradford County, Pennsylvania, to an interconnection with Transcontinental Gas Pipe Line Company ("Transco") in Lycoming County, Pennsylvania (the "MARC I Lateral").

B.        **Stagecoach's Firm Transportation Service to Chesapeake.**

Stagecoach has interconnects with four other interstate systems: TGP, Millennium, Transco, and UGI Sunbury Pipeline LLC.  Stagecoach is an open-access natural gas company that provides transportation and storage services pursuant to Part 284 of the Commission's regulations.[2]

Stagecoach provides firm transportation service to Chesapeake pursuant to the following three firm transportation service agreements:

(i)      Service Agreement #FTS-CHK-0004 under Rate Schedule MARC I FTS of Stagecoach's FERC NGA Gas Tariff ("Tariff"), dated December 16, 2011, with a primary term of ten years expiring on November 30, 2022, and with a Maximum Daily Firm TQ of 186,000 Dth per day.[3]

(ii)     Service Agreement #FT2-CHK-0001 under Rate Schedule FTS-2 of Stagecoach's Tariff, dated January 25, 2019, with a primary term of two years expiring on March 31, 2021, and with a Maximum Daily Firm TQ of 100,000 Dth per day.  This is a discounted rate agreement, pursuant to Stagecoach's Tariff on file with the Commission, that was posted to Stagecoach's Electronic Bulletin Board consistent with the Commission's regulations.[4]

(iii)    Service Agreement #FT2-CHK-0003 under Rate Schedule FTS-2 of Stagecoach's Tariff, dated February 25, 2020, with a primary term of one

---

[2] 18 C.F.R. Pt. 284.  Stagecoach is authorized to provide storage service at market-based rates; Chesapeake does not have any market-based rate storage contracts.

[3] Service Agreement #FTS-CHK-0004 is attached hereto as Exhibit A.  Chesapeake has since released a portion of the capacity originally contracted for in Service Agreement #FTS-CHK-0004.

[4] Service Agreement #FT2-CHK-0001 is attached hereto as Exhibit B.

year expiring on March 31, 2021, and with a Maximum Daily Firm TQ of 50,000 Dth per day.[5]

Two of the three Chesapeake FTSAs—Service Agreement #FTS-CHK-0004 and Service Agreement #FT2-CHK-0003—are negotiated rate agreements on file with the Commission. Service Agreement #FTS-CHK-0004 is a negotiated rate anchor shipper agreement, still in its primary term, that underpinned the construction of Stagecoach's MARC I Lateral[6] filed with the Commission in Docket No. RP13-173-000. Service Agreement #FT2-CHK-0003 is also a negotiated rate agreement that was filed with the Commission in Docket No. RP20-651-000.

Service Agreement #FT2-CHK-0001 contains a discounted rate, executed on the then-current "form of service agreement"[7] for Rate Schedule FTS-2 included in Stagecoach's FERC Tariff. The form of service agreement is included in the Tariff as required by Section 154.110 of the Commission's regulations.[8] Section 154.1(d) of the Commission's regulations provides that "any contract that conforms to the form of service agreement that is part of the pipeline's tariff pursuant to § 154.110 does not have to be filed."[9] The Commission explained in Order No. 582 that "a contract that conforms to a pro forma service agreement need not be filed with the Commission because the

---

[5] Service Agreement #FT2-CHK-0003 is attached hereto as Exhibit C.

[6] *See Cent. N.Y. Oil & Gas Co.*, 137 FERC ¶ 61,121 (2011), *order on reh'g, clarification, and stay*, 138 FERC ¶ 61,104 (2012).

[7] The Commission's regulations define "form of service agreement" as "an unexecuted agreement for service included as an example in the [pipeline's] tariff." 18 C.F.R. § 154.2(c).

[8] 18 C.F.R. § 154.110 ("The tariff must contain an unexecuted pro forma copy of each form of service agreement. The form for each service must refer to the service to be rendered and the applicable rate schedule of the tariff; and, provide spaces for insertion of the name of the customer, effective date, expiration date, and term. Spaces may be provided for the insertion of receipt and delivery points, contract quantity, and other specifics of each transaction as appropriate."). *See also id.* § 154.103(a) ("The tariff must contain sections, in the following order: A table of contents, a preliminary statement, a uniform resource locator for the Internet address of a map of the system, currently effective rates, composition of rate schedules, general terms and conditions, *form of service agreement*, and an index of customers.") (emphasis added).

[9] *Id.* § 154.1(d).

Commission has already considered and determined that the pro forma service agreement is just and reasonable."[10]   Contracts that conform to the form of service agreement, although not individually filed with the Commission, are the "filed rate" within the meaning of NGA Sections 4(c) and (d), such that they may not be changed without the approval of the Commission.[11]

### C.   Chesapeake's Potential Bankruptcy Filing.

Chesapeake is a subsidiary of Chesapeake Energy Corporation ("CEC").[12]   On May 11, 2020, CEC filed a Form 10-Q quarterly report with the Securities and Exchange Commission, stating that it was considering "seeking a restructuring, amendment or refinancing of existing debt through a private restructuring or reorganization under Chapter 11 of the Bankruptcy Code."[13]

If CEC files a petition for bankruptcy, CEC may request that the bankruptcy court allow CEC to reject the Chesapeake FTSAs as executory contracts.   The Commission is aware that bankruptcy courts have issued preliminary injunctions enjoining the Commission from requiring the debtor to continue performing under FERC-jurisdictional service agreements that the debtor sought to reject through bankruptcy.[14]   Stagecoach

---

[10] *Filing and Reporting Requirements for Interstate Natural Gas Company Rate Schedules and Tariffs*, Order No. 582, 1991–1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,025 at p. 31,385 (1995), *order on reh'g*, Order No. 582-A, 1991–1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,034, *order on clarification*, 1991–1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,037 (1996).

[11] *See generally Nat. Gas Pipeline Co. of Am.*, 82 FERC ¶ 61,298, at p. 62,179 (1998) (explaining that the use of separately executed, but unfiled, agreements to supplement the terms and conditions embodied in the pipeline's tariff and pro forma service agreement is contrary to the filed rate doctrine embodied in the NGA, and the Commission's filing requirements promulgated in Order No. 582).

[12] Chesapeake Energy Corporation, United Stated Securities and Exchange Commission Form 10-Q at 58 (published May 11, 2020), http://investors.chk.com/sec-filings ("CEC May 2020 Form 10-Q").

[13] *Id.* at 11.

[14] *See NextEra Energy, Inc. v. Pac. Gas & Elec. Co.*, 166 FERC ¶ 61,049, at P 27 (2019) ("*NextEra*"), *reh'g denied*, 167 FERC ¶ 61,096 ("*NextEra/Exelon Rehearing Order*"), *reh'g dismissed*, 167 FERC ¶ 61,227 (2019); *Exelon Corp. v. Pac. Gas & Elec. Co.*, 166 FERC ¶ 61,053, at P 25 (2019) ("*PG&E*"), *reh'g denied*, *NextEra/Exelon Rehearing Order* (collectively "*NextEra* and *Exelon*"), *pet. for review pending Pac. Gas & Elec. Co. v. FERC*, Case No. 19-71615 (9th Cir. June 26, 2019).

requests the Commission to declare Chesapeake must obtain the Commission's approval to modify or abrogate the Chesapeake FTSAs, inclusive of the regulatory obligations therein,  regardless of  whether Chesapeake seeks to reject the Chesapeake FTSAs in any bankruptcy proceeding..

## III.
## PETITION

### A.    Relief Requested.

Stagecoach requests the Commission make the following rulings and determinations, consistent with the NGA and the Commission's regulations:

1.    The Chesapeake FTSAs are governed by the NGA and are subject to the Commission's authority under the filed-rate doctrine with respect to the rates, terms and conditions of service in those agreements.

2.    Pursuant to its regulatory obligations under the NGA, Chesapeake must comply with the rates, terms and conditions of the Chesapeake FTSAs unless and until the Commission determines that terminating the Chesapeake FTSAs would not seriously harm the public interest.  *See, e.g.*, *Blumenthal v. NRG Power Mktg., Inc.*, 103 FERC ¶ 61,344, at P 68 (2003) ("Until the Commission reaches a final determination on the merits of the 'public interest' issue, we require [respondent] to comply with the rates, terms, and conditions of the [respondent's] Agreement."); *see also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) (FERC's regulatory authority under the NGA is "'in all material respects substantially identical'" to the FPA).

3.    The NGA and Commission regulations provide procedures for modifying or abrogating a contract through the filing of a complaint, subject to Commission review and approval.  15 U.S.C. § 717d and 18 C.F.R 385.206.   To the extent Chesapeake seeks to modify or abrogate the Chesapeake FTSAs, and regardless of whether it seeks to reject the contracts in bankruptcy, Chesapeake must initiate a complaint proceeding with the Commission and bear the burden of proving under Section 5 of the NGA both (1) that the Chesapeake FTSAs seriously harm the public interest under the *Mobile-Sierra* doctrine and (2) that its proposed relief— including modification or abrogation of the Chesapeake FTSAs—is just and reasonable.  *See Morgan Stanley Capital Grp., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 530, 550, 551 (2008); *see also United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332

(1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

4.    In the event that Chesapeake files for bankruptcy and seeks to reject the Chesapeake FTSAs, the Commission and the Bankruptcy Court will share concurrent jurisdiction.  While the Bankruptcy Court has the authority to authorize the rejection of executory contracts, the Bankruptcy Court's authority cannot be exercised in a manner that interferes with the exclusive statutory authority granted to the Commission under the NGA, which requires Commission authorization to abrogate or modify the regulatory obligations that are "spring" from a Commission-jurisdictional contract.  *See Pa. Water & Power Co. v. FPC*, 343 U.S. 414, 422 (1952) ("*Penn Water*").

**B.    Discussion.**

**1.    The Commission Has Concurrent Jurisdiction With Bankruptcy Courts Over Commission-Jurisdictional Agreements.**

The Commission has recently and unambiguously reaffirmed that it has concurrent jurisdiction to evaluate changes to the filed rate in FERC-jurisdictional wholesale power contracts under the Federal Power Act ("FPA").  In *NextEra* and *Exelon*, the Commission issued declaratory orders concluding that, in order to give effect to both the FPA and the Bankruptcy Code, a party to a FERC-jurisdictional wholesale power contract seeking to reject the contract in bankruptcy must obtain approval from both the bankruptcy court (to reject the contract) and the Commission (to abrogate or modify the contract).[15]

On rehearing, the Commission explained that "[i]t would eviscerate the Commission's exclusive jurisdiction under the FPA to hold that rejection of a wholesale power contract permits the unilateral termination of a regulatory obligation by the debtor."[16]  Noting these are not ordinary "run-of-the-mill" contracts, the Commission explained, these agreements "implicate the public's interest in the orderly production of

---

[15] *NextEra*, 166 FERC ¶ 61,049 at P 28, *reh'g denied, NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 (2019); *PG&E*, 166 FERC ¶ 61,053 at P 25, *reh'g denied, NextEra/Exelon Rehearing Order*.
[16] *NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 21.

plentiful supplies of electricity at just and reasonable rates and, as filed rates, carry the force of law binding sellers and purchasers alike."[17]   The Commission further stated that "[w]hether a wholesale rate is just and reasonable—and whether the abrogation or modification of a wholesale power contract is necessary to protect the public interest—is a question that the Commission is statutorily obligated—and exclusively authorized—to consider."[18]   The Commission held that "a bankruptcy court's authorization to reject a contract subject to this Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes," and that "*[p]erformance under such contracts remains subject to this Commission's review* to determine whether any cessation or modification of performance is just and reasonable, and not unduly discriminatory or preferential under the FPA."[19]

> **2.**     **Courts Have Agreed That Commission Has Concurrent Jurisdiction Role Under the FPA In Bankruptcy Proceedings.**

Prior to *NextEra* and *Exelon*, courts have addressed a debtor's ability to reject a FERC-jurisdictional contract.   Sixteen years ago, *In the Matter of Mirant Corp*, 378 F.3d 511, 516 (5th Cir. 2004) ("*Mirant*"), the U.S. Court of Appeals for the Fifth Circuit addressed the tension between the Bankruptcy Code and the FPA.   The court found that the FPA does not preempt a district court's jurisdiction to authorize the rejection of an executory contract subject to Commission regulation, although the court recognized because the contract at issue involved the interstate sale of electricity, the court instructed

---

[17] *Id*. at P 13 (citations omitted).
[18] *Id*.
[19] *Id*. at P 16 (emphasis added).

the District Court for the Northern District of Texas to consider the application of a more rigorous standard to the rejection of that contract and seeking FERC's views.[20]

On remand, the District Court for the Northern District of Texas ruled that to "be entitled to an order authorizing rejection of the [FERC-jurisdictional] Back–to–Back Agreement, Debtors must prove that it burdens the bankrupt estates, *that, after careful scrutiny and giving significant weight to comments and findings of the FERC relative to the effect such a rejection would have on the public interest inherent in the transmission and sale of electricity in interstate commerce*, the equities balance in favor of rejecting the Back–to–Back Agreement . . . ."[21]   The District Court further ruled that "[i]f rejection would compromise the public interest in any respect, it would not be authorized unless Debtors show that they cannot reorganize without rejection."[22]

Since then, however, there have been substantial developments regarding the ability of debtors to reject FERC-regulated contracts.  The Supreme Court reaffirmed the strength of the *Mobile-Sierra* doctrine, which prohibits one party to a FERC-regulated contract, such as the Chesapeake FTSAs, from unilaterally changing the mutually agreed-upon contract rate without a finding from FERC that the rate "seriously harms the consuming public."[23]

In *In re FirstEnergy Solutions Corp.*, the U.S. Court of Appeals for the Sixth Circuit held that the bankruptcy court and the Commission share concurrent jurisdiction,

---

[20] *Mirant*, 378 F.3d at 522.

[21] *In re Mirant*, 318 B.R. 100, 108 (N.D. Tex. 2004) (emphasis added), *aff'd*, 197 F. App'x 285 (5th Cir. 2006).

[22] 318 B.R. at 108.

[23] *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 545 (2008); *NRG Power Mktg. LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 174 (2010); *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) (natural gas companies cannot unilaterally change contract rates) ("*Mobile*"); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (Commission has no power to change contract rate without first finding existing rate unjust, unreasonable, unduly discriminatory, or preferential) ("*Sierra*") (*Mobile* and *Sierra* formed the basis for the so-called "*Mobile-Sierra* doctrine").

although the bankruptcy court's is "superior."[24]  The court also required that a bankruptcy court must invite the Commission to participate and provide an opinion on the impact of the rejection of FERC-jurisdictional contracts on the public interest.[25]

Other courts have taken the Commission's role further.  In *In re Calpine Corp.*, where a debtor moved to reject an energy contract under the FPA, the court held that because "the Bankruptcy Code does not expressly limit FERC's jurisdiction, and [instead] contemplates agency action during the pendency of a reorganization," "FERC's vast authority over filed rate energy contracts" is superior to the bankruptcy court's jurisdiction.[26]  In *In re Boston Generating, LLC*, No. 10 Civ. 6258, 2010 WL 4616243 (S.D.N.Y. Nov. 12, 2010), the court recognized the parties' agreement that the debtor must obtain approval from both the bankruptcy court and the Commission to reject a FERC-regulated agreement.  Most notably, the FERC-jurisdictional contract at issue in *Boston Generating* was a gas supply contract regulated by the Commission under the NGA.

While the courts have all used somewhat different language, they all recognize that contracts subject to FERC regulation are not ordinary executory contracts.  Each court has expressed the view that the Commission has a role to play.  Stagecoach's request is consistent with the views of the courts and Commission precedent under the FPA.

### 3. The Commission's Analysis of the FPA in *NextEra* and *Exelon* Applies Equally to the NGA.

The Supreme Court has repeatedly stated that the relevant substantive provisions

---

[24] 945 F.3d 431, 455-46 (6th Cir. 2019).
[25] *Id.* at 454.
[26] *In re Calpine Corp.*, 337 B.R. 27, 33, 35 (S.D.N.Y. 2006).

of the FPA (*i.e.*, Sections 205 and 206) are "substantially identical" to the equivalent provisions of the NGA (*i.e.*, Sections 4 and 5).[27]  In *Arkla*, the Supreme Court specifically recognized that the ratemaking provisions set forth in NGA Section 4 are "substantially identical" to those contained in Section 205 of the FPA and cited precedent interpreting those provisions "interchangeably."[28]   Other courts have elaborated.   In *Kentucky Utilities Co. v. FERC*, the U.S. Court of Appeals for the District of Columbia Circuit further recognized that the courts and the Commission cite interchangeably decisions interpreting the pertinent sections of the two statutes, and explained that it is long established that parallel provisions of the NGA and the FPA are to be construed *in pari materia.*[29]

Consistent with this, the Commission relied heavily on precedent construing the NGA in both *NextEra* and *Exelon*.[30]   Therefore, because the Commission's holdings in *NextEra* and *Exelon* are specifically grounded in its analysis of the FPA's ratemaking provisions, the Commission should conclude that its analysis in *NextEra* and *Exelon* also applies to the NGA's "substantively identical" ratemaking provisions and declare that a party to a FERC-jurisdictional natural gas transportation contract cannot modify or abrogate the contract without obtaining the Commission's approval.

---

[27] *See, e.g.*, *Arkla*, 453 U.S. 571, 577 n.7 (1981) (citing *Sierra*, 350 U.S. at 353).  *Compare, e.g.*, 16 U.S.C. §§ 824d, 824e *with* 15 U.S.C. §§ 717c, 717d.

[28] *Arkla*, 453 U.S. at 577 n.7.  Consistent with the precedent established by the Commission and courts, Stagecoach cites to the relevant precedent regarding the FPA and NGA interchangeably.

[29] *Kentucky Utils. Co. v. FERC*, 760 F.2d 1321, 1325 n.6 (D.C. Cir. 1985) (citing *Union Elec. Co. v. FERC*, 668 F.2d 389, 392 n.1 (8th Cir. 1981)).  *See also Mun. Light Bds. v. FPC*, 450 F.2d 1341, 1346-47 (D.C. Cir. 1971).

[30] *See, e.g.*, *NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 12 & n.16 (explaining that the FPA is designed to protect consumers and noting that the Supreme Court "has also held that the protection of consumers is the purpose of the similarly structured Natural Gas Act.") (quoting *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 388 (1959); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944)).  *See also id.* at P 12 & n 16 (citing *Arkla*, 453 U.S. at 577).

4.       **The Commission's Concurrent Jurisdiction With the Bankruptcy Court Under the FPA Applies Equally Under the NGA.**

The NGA declares that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."[31]  The Commission is vested with exclusive authority to regulate rates for the interstate transportation and sale of natural gas, and it is authorized by Congress to establish rules and regulations governing such rates.[32]  The NGA promotes the stability of supply and consumer benefits by allowing "contractual agreements voluntarily devised by the regulated companies" to carry forth the public interest, and which agreements are contemplated to be fully performed except "in circumstances of unequivocal public necessity."[33]

The Commission oversees the NGA's core mandate that all rates and charges for or in connection with interstate transportation and sale of natural gas must be "just and reasonable" and not "unduly discriminatory or preferential."[34]  To safeguard the public interest, the NGA grants FERC "an opportunity in every case to judge the reasonableness of the rate."[35]  This exclusive authority extends to the rates, terms, and conditions set through transportation service agreements.[36]

FERC's plenary authority under the NGA is embodied, in part, in the "filed rate"

---

[31] 15 U.S.C. § 717.

[32] *See id.* §§ 717, 717c, 717d.

[33] *Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968) (citing *Mobile*, 350 U.S. 332).

[34] 15 U.S.C. §§ 717c(a), 717c(b), 717d(a).

[35] *Arkla*, 453 U.S. at 582.

[36] *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966-67 (1986) (finding that FERC's jurisdiction is not limited to rates *per se*, but extends to the terms and conditions that directly affect wholesale rates).

doctrine.[37]   As the Supreme Court has articulated, under the filed-rate doctrine, a party "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms."[38]   The filed-rate doctrine recognizes that "[FERC] alone is empowered to make that judgment [of reasonableness], and until it has done so, no rate other than the one on file may be charged."[39]   Under the NGA, the Commission determines the filed rate and, "except for review of the Commission's orders, the courts can assume no right to a different one."[40]

Moreover, unlike typical executory contracts, FTSAs give rise to distinct regulatory obligations under the NGA that only FERC has the authority to modify. Those regulatory obligations derive from the filed rate, which are the "equivalent of a federal regulation."[41]   They are "to be treated as though [the obligations] were a statute, binding upon the seller and purchaser alike."[42]   These binding regulatory obligations "spring[] from the Commission's authority, not from the law of private contracts,"[43] and they include the full panoply of terms in the underlying wholesale power contract, including the continuing duty to perform.[44]   Because FERC-jurisdictional contracts are different from typical executory contracts, it is necessary for the Commission to exercise its concurrent jurisdiction over any attempt to abrogate or modify an FTSA.

---

[37] *See Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246 (1951).

[38] *Id.* at 251 (discussing the filed-rate doctrine within the context of the FPA).

[39] *Nantahala*, 476 U.S. at 964 (quoting *Arkla*, 453 U.S. at 581-82).

[40] *Montana-Dakota*, 341 U.S. at 252; *see also Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 375 (1988) ("The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts.").

[41] *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004) (citation omitted).

[42] *Nw. Pub. Serv. Co. v. Montana-Dakota Utils. Co.*, 181 F.2d 19, 22 (8th Cir. 1950), *aff'd*, 341 U.S. 246 (1951).

[43] *Penn Water*, 343 U.S. at 422.

[44] *See In re Calpine Corp.*, 337 B.R. at 32-33; *see also Miss. Power & Light*, 487 U.S. at 371; *Nantahala*, 476 U.S. at 966-67.

As the Commission explained when discussing wholesale power contracts in *NextEra*, the contracts "are not simple run-of-the-mill contracts between two private parties; rather, these contracts, while privately negotiated, implicate the public's interest in the orderly production of plentiful supplies of electricity at just and reasonable rates and, as filed rates, carry the force of law binding sellers and purchasers alike."[45]   The Commission further explained that "[w]hether a wholesale rate is just and reasonable— and whether the abrogation or modification of a wholesale power contract is necessary to protect the public interest—is a question that the Commission is statutorily obligated— and exclusively authorized—to consider."[46]   The Commission further reasoned that, "[g]iven the Commission's exclusive authority to make such determinations, as codified by Congress in the FPA and affirmed by Supreme Court and other judicial precedent, we conclude that the Commission's unique role neither subsumes nor is subsumed by the Bankruptcy Code."[47]   The same is true of FERC-jurisdictional contracts under the indistinguishable provisions of the NGA.

Similarly, the *Mobile-Sierra* public interest presumption applies equally to jurisdictional contracts under both the FPA and NGA.[48]   Both the FPA and the NGA require just and reasonable rates,[49] thus, the *Mobile-Sierra* public interest presumption applies equally under each statute.   As the Commission explained in *NextEra*, "[w]hile the circumstances of individual contracts, may vary—for example, to the extent *Mobile-*

---

[45] *NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 13 (footnotes omitted).
[46] *Id.*
[47] *Id.* (internal citation omitted).
[48] The doctrine originated in two cases decided simultaneously, *Mobile* under the NGA and *Sierra* under the FPA.
[49] *See* 16 U.S.C. § 824d(a) and 15 U.S.C. § 717c(a), respectively.

*Sierra* protections may or may not apply—the Commission's jurisdictional position is the same."[50]  Again, the same is true for FERC-jurisdictional contracts under the NGA.

Therefore, a pipeline shipper party to a FERC-jurisdictional transportation agreement under the NGA must meet the burdens imposed by Section 5 of the NGA concurrently with its actions in Bankruptcy Court.

**5.**      **A Party to a FERC-Jurisdictional Natural Gas Transportation Contract Must Obtain the Commission's Authorization to Modify or Abrogate the Rate, Terms and Conditions of the FTSA Regardless of Whether the Party Seeks to Reject the Contract in Bankruptcy.**

The Commission determined in *NextEra* and *Exelon* that a party to a FERC-jurisdictional wholesale power contract seeking to reject or abrogate the contract in bankruptcy must also obtain the Commission's authorization to abrogate or modify the independent regulatory obligations inherent in those contracts.

The Commission determined that "[t]he fact that a contract party has sought bankruptcy protection does not transform Commission-jurisdictional contracts into non-jurisdictional ones; it does not strip the public of the protection afforded to it under the FPA; and it does not divest the Commission of its statutory mandate to protect the public interest by examining the ramifications of unilateral changes to wholesale power contracts, a highly-technical analysis that the bankruptcy process is not designed to consider."[51]

Each of the factors in the Commission's analysis of wholesale power contracts subject to the Commission's FPA jurisdiction in *NextEra* and *Exelon* apply equally to natural gas transportation contracts subject to the Commission's jurisdiction.  The analysis requires the conclusion that a party to a FERC-jurisdictional natural gas

---

[50] *NextEra*, 166 FERC ¶ 61,049 at P 29 n.58.
[51] *NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 13.

transportation contract seeking to reject the contract in bankruptcy must obtain the Commission's authorization to abandon or modify the contract.   In that case, the Commission was dealing with the rate regulation provisions of the statute.   The Commission's conclusions are even more appropriate under the NGA, which provides an additional basis for that conclusion:   the requirement to obtain FERC authority to abandon jurisdictional service.

The NGA has specific provisions addressing abandonment.   Section 7(b) of the NGA requires Commission authorization and a finding "that the present or future public convenience or necessity permit such abandonment" before a pipeline company may abandon transportation service.[52]   Under the Commission's regulations abandonment is pregranted "upon *termination* of each individual transportation agreement."[53]   However, it is well settled that a rejection in bankruptcy is not a termination.   "A rejection does not terminate the contract.   When it occurs, the debtor and counterparty do not go back to their pre-contract positions.   Instead, the counterparty retains the rights it has received under the agreement.   As after a breach, so too after a rejection, those rights survive."[54] The Commission's abandonment regulations are generally understood to impose a requirement on the regulated pipeline to file an application for abandonment with the Commission.   Here Stagecoach has not filed such an application and the contract, even if rejected, is not terminated and does not qualify for pregranted abandonment.   Therefore, Commission jurisdiction remains.

---

[52] 15 U.S.C. § 717f(b).
[53] 18 C.F.R. § 284.221(d)(1) (emphasis added).
[54] *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, ___ U.S. ___, 139 S. Ct. 1652, 1662, 203 L. Ed. 2d 876 (2019).

The Commission should determine that its unique role to authorize the abrogation or modification of the regulatory obligations inherent in natural gas transportation contracts and the abandonment of that service pursuant to the NGA "neither subsumes nor is subsumed by the Bankruptcy Code."[55]   The Commission found in *NextEra* and *Exelon* that "the roles of the bankruptcy court and the Commission are different."[56]   The Commission explained that the FPA "is designed to protect consumers," and that the Commission's role in evaluating jurisdictional contracts is "to protect the public interest."[57]   The Commission concluded that the bankruptcy court's role under the Bankruptcy Code "is to provide a path to rehabilitate bankrupt debtors."[58]   The Commission found that it is "necessary to give effect" to both of these "distinct, yet vitally important, roles."[59]   The Commission held that "a party to a Commission-jurisdictional wholesale power contract must obtain approval from both the bankruptcy court and the Commission to reject a contract and modify the filed rate, respectively."[60]

Identical considerations apply under the NGA, but with more force.   In *NextEra* and *Exelon* the Commission expressly relied upon the Supreme Court's holdings that "the protection of consumers is the purpose of the similarly structured Natural Gas Act."[61]   The Supreme Court has further explained that "the words 'public interest' in the [NGA] . . . is a charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates."[62]   The Commission should conclude

---

[55] *See NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 13 (making the requested determination with respect to wholesale power contracts pursuant to the FPA).

[56] *Id.* at P 14.

[57] *Id.* at P 12.

[58] *Id.*

[59] *Id.*

[60] *Id.* at P 3.

[61] *Id.* at P 12 n.16 (citing *Atl. Ref.*, 360 U.S. at 388; *Hope*, 320 U.S. at 610).

[62] *NAACP v. FPC*, 425 U.S. 662, 670 (1976).

that it is necessary to give effect to both the Commission unique role under the NGA to protect consumers and the public interest as well as the bankruptcy court's role under the Bankruptcy Code to provide a pathway to rehabilitate debtors.  The Commission should hold that it retains the jurisdiction to review and address the disposition of NGA-jurisdictional natural gas contracts that a debtor seeks to reject in bankruptcy so that the debtor must obtain the Commission's approval to modify or abrogate the contract, especially since it is not subject to the pregranted abandonment provisions of the Commission's regulations.

### 6.    Rejection of Contracts in Bankruptcy Does Not Alter Regulatory Obligations Subject to the Commission's Jurisdiction.

In NextEra and Exelon, the Commission concluded that a bankruptcy court's authorization to reject a contract subject to the Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes, and that "[p]erformance under such contracts remains subject to this Commission's review to determine whether any cessation or modification of performance is just and reasonable, and not unduly discriminatory or preferential under the FPA."[63]

The same conclusion applies to the Commission's concurrent jurisdiction to review and address the disposition of NGA-jurisdictional natural gas contracts that a debtor seeks to reject in bankruptcy.  As with wholesale power contracts, the duty to perform under a natural gas transportation contract may be required not only from the private law of contracts, but also pursuant to the NGA and by the Commission as the agency granted exclusive authority to implement the NGA.[64]   The Supreme Court has

---

[63] *NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 16.
[64] *Id*. (citing *In re Calpine Corp.*, 337 B.R. at 33; *Penn. Water*, 343 U.S. at 422).  *See also California v. Southland Royalty Co.*, 436 U.S. 519, 537 (1978) (finding that a producer's statutory obligation under the

explained that the ability of a debtor to reject a contract in bankruptcy does not relieve the debtor from burdens imposed by generally applicable law,[65] which must include obligations imposed under natural gas transportation contracts authorized by the Commission pursuant to the NGA and the obligation to seek appropriate abandonment authority from the Commission.  The Commission should hold that, "a bankruptcy court's authorization to reject a [natural gas transportation] contract does not relieve a debtor of its separate regulatory obligations under the [NGA]."[66]

> 7.   **The Commission Should Act to Retain Its Authority to Evaluate the Public Interest Related to a Potential Request to Abrogate or Modify the Chesapeake FTSAs.**

Stagecoach is not requesting that the Commission pre-determine in this proceeding how it would address a request by Chesapeake to abrogate or modify the Chesapeake FTSAs.  Rather, the Commission need only declare that it has a role in any determination on whether Chesapeake should be permitted to modify or abrogate the Chesapeake FTSAs regardless of whether it seeks to reject the contracts in bankruptcy. The requested declaration will ensure that the Commission is able to exercise its statutory authority so that Chesapeake cannot unilaterally abrogate or modify the FTSAs without the opportunity for the Commission to consider the public interest.

## IV.
## REQUEST FOR EXPEDITED ACTION

Stagecoach requests that the Commission take expedited action on this petition. Expedited action is needed in order to foreclose the possibility that Chesapeake could

---

NGA was not limited to the contractual commitment it had voluntarily assumed, but rather was an obligation imposed by the NGA, not by the contract).

[65] *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, ___ U.S. ___, 139 S. Ct. 1652, 1665-66, 203 L. Ed. 2d 876 (2019).

[66] *NextEra/Exelon Rehearing Order*, 167 FERC ¶ 61,096 at P 16.  Also, "a bankruptcy court's authorization to reject a contract subject to the Commission's jurisdiction is not a license to cease or modify performance in whatever manner the debtor wishes."  *Id.*

seek to enjoin or otherwise prevent the Commission from exercising its NGA jurisdiction over the Chesapeake FTSAs.  A declaratory order from the Commission would remove potential uncertainty and provide the necessary process guidance so that Chesapeake seeks the Commission's authorization before it modifies or abrogates the Chesapeake FTSAs.

**V.**
**CONCLUSION**

WHEREFORE, for the foregoing reasons, Stagecoach respectfully requests that the Commission grant this Petition.

Respectfully submitted,

STAGECOACH PIPELINE & STORAGE COMPANY LLC

*/s/ John E. Griffin*
John E. Griffin
Assistant General Counsel
Crestwood Equity Partners LP
811 Main Street, Suite 3400
Houston, Texas 77002
(832) 519-2281
John.Griffin@crestwoodlp.com

James Johnston
Senior Vice President, General Counsel
John E. Griffin
Assistant General Counsel
Crestwood Equity Partners LP
811 Main Street, Suite 3400
Houston, Texas 77002
(832) 519-2281
James.Johnston@crestwoodlp.com

Paul Korman
Michael R. Pincus
Van Ness Feldman LLP
1050 Thomas Jefferson St. NW
Seventh Floor
Washington, DC 20007
(202) 298-1800
pik@vnf.com
June 9, 2020                       mrp@vnf.com

**Exhibit A**

**Service Agreement #FTS-CHK-0004**

## MARC I FTS SERVICE AGREEMENT

THIS AGREEMENT entered into as of the 16ᵗʰ day of December 2011, by and between Central New York Oil And Gas Company, L.L.C., a New York limited liability company, hereinafter referred to as "Seller," and Chesapeake Energy Marketing, Inc., hereinafter referred to as "Customer."

### WITNESSETH

WHEREAS, Customer has requested Seller to provide Firm Transportation Service on Seller's MARC I Facilities ("MARC I FTS") on Customer's behalf; and

WHEREAS, Seller has sufficient capacity available on Seller's MARC I Facilities to provide Firm Transportation Service for Customer on the terms specified herein;

NOW, THEREFORE, Seller and Customer agree as follows:

### ARTICLE I
### TRANSPORTATION SERVICE

1.    Seller's service hereunder shall be subject to receipt of all requisite regulatory authorizations from the Federal Energy Regulatory Commission ("Commission"), or any successor regulatory authority, and any other necessary governmental authorizations, in a manner and form acceptable to Seller.

2.    Subject to the terms and provisions of this Agreement, Customer may on any Gas Day cause Gas to be Tendered to Seller at the Receipt Point up to the Customer's Maximum Daily  Firm Transportation Quantity ("MDFTQ") plus Seller's Transportation Use, and Seller agrees to Tender Equivalent Quantities of Gas to or for the account of Customer, on a firm basis, at the Delivery Point.

3.    If requested by Customer, Seller may provide Transportation Service for daily quantities in excess of the Customer's Maximum Daily Firm Transportation Quantity if Seller can do so without adverse effect on operation of Seller's MARC I Facilities or Seller's ability to meet all higher priority obligations.

### ARTICLE II
### POINTS OF RECEIPT/DELIVERY

1.    Customer shall deliver or cause to be delivered Gas nominated hereunder plus Seller's Transportation Use as applicable, at the Point of Receipt.  Seller agrees to accept on a firm basis the quantity nominated by Customer at the Point of Receipt up to Customer's Maximum Daily Firm Transportation Quantity, plus Seller's Transportation Use quantity.

2.    Seller shall transport Customer's nominated quantity of Gas on a firm basis from the Point of Receipt to the Point of Delivery.

3.   Seller shall Tender to or for the account of Customer, on a firm basis at the Point of Delivery, Equivalent Quantities of Gas to the quantity nominated by Customer at the Point of Receipt.

4.   The Point(s) of Receipt and Point(s) of Delivery are identified in Exhibit A.


ARTICLE III
TERM OF AGREEMENT

1.   This Agreement shall be effective as of the date first above written and shall remain in effect for a Primary Term of ten (10) years, commencing on the In-Service Date, which shall be the first day of the month following Seller's notification, with at least thirty (30) days prior notice, that Seller's MARC I Facilities required to provide Firm Transportation Service are completed and in service; provided, absent the written consent of Customer, the Primary Term shall not commence prior to July 1, 2012.

2.   Seller shall provide Customer with notice no more than sixteen (16) months and no less than fourteen (14) months prior to the expiration of the Primary Term and each rollover period (the "Expiration Notice").  Customer shall have a one-time unilateral right, exercisable by notice to Seller at any time not less than twelve (12) months before the end of the Primary Term, to extend the term of this Agreement, including the rates assessed hereunder, with respect to all or any portion of the MDFTQ, for an initial rollover period of five (5) years commencing on the first day immediately following the expiration of the Primary Term.  Provided Customer has extended this Agreement pursuant to said rollover right, this Agreement shall thereafter remain in effect for additional five (5) year periods, which shall commence on the first day immediately following the expiration of the preceding five (5) year period, at the lower of Customer's negotiated rate in effect during the Primary Term or at a negotiated rate equal to the recourse rate in effect on the first day of such period.  Customer may terminate this Agreement by giving notice to Seller at any time not less than twelve (12) months before the end of the rollover period then in effect.  Customer's time period for (a) extending the term of this Agreement at the end of the Primary Term, or (b) terminating this Agreement at the end of any rollover period, shall be extended, on a day-for-day basis, if Seller fails to provide the Expiration Notice on a timely basis.


ARTICLE IV
RATE SCHEDULE AND CHARGES

1.   Each Month, Customer shall pay Seller for the service hereunder, an amount determined in accordance with Seller's Rate Schedule MARC I FTS and the applicable provisions of the General Terms and Conditions of Seller's FERC Gas Tariff, Original Volume No. 1, as filed with the Commission.  Sections IV & V of Exhibit A hereto set forth the applicable information as follows, which shall be utilized for transactions hereunder:

(a)   Rates and Charges

(b)   Additional charges which are applicable.



When the level of any additional charges is changed pursuant to Commission authorization or direction, Seller may unilaterally effect an amendment to Exhibit A to reflect such change(s) by so specifying in a written communication to Customer.

2.      It is further agreed that Seller may seek authorization from the Commission and/or other appropriate regulatory body for such changes to any rates, terms and conditions set forth herein, in Rate Schedule MARC I FTS or in the General Terms and Conditions of Seller's FERC Gas Tariff, as may be found necessary to assure Seller just and reasonable rates. Nothing herein contained shall be construed to deny Customer any rights it may have under the Natural Gas Act, as amended, including the right to participate fully in rate proceedings by intervention or otherwise to contest Seller's filing in whole or in part.

3.      Further Agreement:

Customer agrees to pay and/or provide fuel, lost and unaccounted for gas, and electric power charges ("Seller's Transportation Use")

(1)      in the amounts specified in Exhibit A hereto for the first sixty (60) months of the Primary Term (the "Initial Transportation Use Rate"); and

(2)      thereafter, the Initial Transportation Use Rate, except during periods in which Seller has received FERC approval to implement either –

(A)      a fully reconciling tracker (*i.e.*, reconciling for both over- and under-collections) for the determination of Seller's Transportation Use, or

(B)      fixed rates for Seller's Transportation Use which are based on Seller's actual requirements, as determined based on Seller's actual or projected experience, for a period commencing no earlier than after the first forty-eight (48) months of the Primary Term; provided, that neither Party shall have any right to recover any over- or under-collections that may result under the Initial Transportation Use Rate during any period in which the Initial Transportation Use Rate is in effect; provided, in the event that Seller installs incremental compression beyond the compression specified in the Certificate Application ("Incremental Compression"), then the rates for Seller's Transportation Use for any periods during the Primary Term in which the Initial Transportation Use Rate is no longer in effect shall not exceed 1.4 times the Initial Transportation Use Rate.

ARTICLE V
NOTICE

1.      Except as may be otherwise provided, any notice, request, demand, statement or bill provided for in this Agreement or any notice which a party may desire to give the other shall be in writing delivered personally, sent by facsimile (with transmission confirmation by sender's machine), sent by reliable delivery service (*e.g.*, FedEx, UPS), or mailed by regular mail, effective as of the postmark date, to the post office address of the party intended to receive the same, as the case may be, as follows:



Seller:        Central New York Oil And Gas Company, LLC
Two Brush Creek Blvd., Suite 200
Kansas City, MO 64112

Attention: Commercial Operations
Facsimile: 402-619-5228

Customer:    Chesapeake Energy Marketing, Inc.
6100 N Western Ave.
Oklahoma City, OK 73118

Attention: Bill Wince, Vice President
Facsimile: (405) 849-4210

## ARTICLE VI
### INCORPORATION BY REFERENCE

The provisions of Rate Schedule MARC I FTS and the General Terms and Conditions
(GT&C) of Seller's FERC Gas Tariff, Original Volume No. 1, are specifically
incorporated herein by reference and made a part hereof. Terms defined in Rate
Schedule MARC I FTS or in the GT&C and used in this Agreement shall be given the
meaning given such terms in Rate Schedule MARC I FTS and the GT&C.

## ARTICLE VII
### MISCELLANEOUS

1.     This Agreement supersedes and cancels the following contract between the parties hereto
effective _____: None

2.     Replacement Customer. [If Customer is a Replacement Customer, state identity of
Releasing Customer and Contract Number under which capacity is released. The offer of
release issued by the Releasing Customer is incorporated herein by reference.]
        Releasing Customer: N/A
        Released Contract No.: N/A

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective Officers or Representatives thereunto duly authorized.

**Central New York Oil And Gas Company, L.L.C.**

By _Jim E Hanagh_

Its _Vice President, Commercial Operations_

**Chesapeake Energy Marketing, Inc.**

By _N.C.E_

Its _VP Transportation + Business Dev._

- 5 -

EXHIBIT "A"

to

FT Service Agreement between

Central New York Oil And Gas Company, L.L.C. (Seller)

and

Chesapeake Energy Marketing, Inc. (Customer)

Dated December 16, 2011

I.  MAXIMUM DAILY FIRM TRANSPORTATION QUANTITY:   186,000 dth

II.  POINT OF RECEIPT
     ALL                                         186,000 dth
        Includes:

            (a)        Tennessee Gas Pipeline (TGP)
            (b)        Stagecoach Gas Storage – South Lateral
            (c)        Transco
            (d)        Any Points of Receipt on the MARC I
                          Hub Line between Transco and TGP

        Customer has up to 186,000 dth of Primary Receipt Point
        Capacity at each Point of Receipt.

III.  POINT OF DELIVERY
     ALL                                         186,000 dth
        Includes:

            (a)        Tennessee Gas Pipeline (TGP)
             (b)        Stagecoach Gas Storage – South Lateral
             (c)        Transco

        Customer has up to 186,000 dth of Primary Delivery Point
        Capacity at each Point of Delivery.

        In addition, Customer has secondary point capacity rights
        to any Points of Delivery added to the MARC I Hub Line
        between Transco and TGP at the rates specified herein.

IV.  RATES AND CHARGES

        MARC I Monthly Firm Transportation Reservation Rate
            Negotiated Rate:                   $5.844/dth of MDFTQ per Month
        MARC I Firm Transportation Commodity Rate
            Negotiated Rate:                   $0.00/dth
        MARC I Firm Transportation Overrun Commodity Rate
            Negotiated Rate:                   $0.192/dth

Seller's Transportation Use
    Negotiated Rate:                          $0.035/dth and 0.10%

The rates specified do not cover compression for any receipt of natural gas into the MARC I Hub Line other than at the Tennessee Gas Pipeline, Stagecoach Gas Storage – South Lateral, and Transco Points of Receipt.

V.      ADDITIONAL CHARGES - pursuant to Section 5 of Rate Schedule MARC I FTS

        Annual Charge Adjustment (ACA) – Per tariff rate

Any surcharge of general applicability that Seller has implemented as a result of a requirement to implement a surcharge imposed by the FERC or another duly authorized governmental body, in which event Seller shall discount such surcharge to Customer to the maximum extent allowed by the FERC or such other duly authorized governmental body; provided any such discount shall not be required if Seller would remain responsible for payment to FERC or such other duly authorized governmental body of any discounted portion of the surcharge.

All applicable governmental taxes set forth in either the General Terms and Conditions of Seller's FERC Gas Tariff or in this Agreement.

Except for the foregoing charges, taxes and surcharges, Customer shall not be subject to any other charges, taxes or surcharges in connection with MARC I FTS.

The rates specified in this Agreement shall apply to (a) secondary receipt and delivery points, (b) changed primary receipt and primary delivery points, and (c) any segmented capacity, provided that Customer's throughput in any segment does not exceed its Maximum Daily Firm Transportation Quantity other than at the point of segmentation or at a meter.

VI.     ADDITIONAL PROVISIONS AUTHORIZED BY SELLER'S FERC TARIFF:

1.     If, prior to and up to five years after the In-Service Date of the MARC I Hub Line, Seller enters into an FTSA (excluding Interim FTS Service authorized under Seller's Tariff) with any other FTS shipper –

        (a)     for a Maximum Daily Firm Transportation Quantity ("MDFTQ") of Firm Transportation Service equal to or less than Customer's MDFTQ, or

        (b)     for a term equal to or less than the term of Customer's FTS Agreement,

at a Reservation rate less than Customer's Reservation rate, Seller shall notify Customer within five (5) Business Days, and, unless Customer notifies Seller within five (5) Business Days that Customer does not want to revise its rates or terms and conditions of service, then Seller will revise Customer's FTS Agreement to reduce Customer's Reservation rate to equal such lower Reservation rate effective as of the date of such FTS Agreement with such other FTS shipper.



# CNYOG

## Central New York Oil And Gas Company, L.L.C.

800 ROBINSON ROAD ● OWEGO, NEW YORK 13827
(607) 689-0956 PHONE ● (607) 689-0385 FAX

October 16, 2012

Chesapeake Energy Marketing, Inc.
Attention:  Bill Wince, Vice President
6100 N Western Ave.
Oklahoma City, OK 73118

Re:     Waiver and Amendment;
        MARC I Precedent Agreement/Interim Firm Transportation Service Agreement

Gentlemen:

The purpose of this letter agreement is to memorialize the terms and conditions upon which Shipper and Seller/Service Provider have agreed to certain amendments and waivers related to the Precedent Agreement (MARC I – Firm Transportation Service) between Seller and Shipper dated July 1, 2010 (as amended from time to time prior to the date hereof, the "Precedent Agreement") and the MARC I FTS Agreement between Seller and Shipper dated as of December 16, 2011 (as amended from time to time prior to the date hereof, the "FTSA"). Unless otherwise provided, capitalized terms not defined herein have the meanings set forth in the Precedent Agreement or the FTSA.

Notwithstanding any provision of the Precedent Agreement or the FTSA to the contrary, Shipper and Seller hereby agree upon the following:

(1)     The MDFTQ of each MARC I Firm Shipper on the MARC I Hub Line under such Shipper's respective Precedent Agreement ("PA") and FTSA is hereby proportionately reduced in accordance with the following schedule:

| Shipper | PA MDFTQ | % | Reduction | Reduced MDFTQ |
|---------|----------|---|-----------|---------------|
| MMGS, Inc. | 89,375 | 16.250% | 16,250 | 73,125 |
| Anadarko Energy Services Co. | 185,625 | 33.750% | 33,750 | 151,875 |
| Chesapeake Energy Marketing | 186,000 | 33.818% | 33,818 | 152,182 |
| Statoil Natural Gas LLC | 89,000 | 16.182% | 16,182 | 72,818 |
| Total | 550,000 | 100.000% | 100,000 | 450,000 |

Exhibit A of the Precedent Agreement and Exhibit A of the FTSA are amended to substitute the Reduced MDFTQ set forth above; the amended Exhibit A of the FTSA is attached as Exhibit A-1 hereto.



(2)    The Most-Favored Nation's clause set forth in Section 5(e) of Appendix A of the Precedent Agreement and in Paragraph 1 of Section VI of the FTSA shall not apply to the 100,000 Dth/Day of reduced Firm Transportation capacity on the MARC I Hub Line made available for sale by Seller/Service Provider under the preceding Paragraph, but otherwise shall remain applicable.

(3)    Section 26 of the Precedent Agreement, as previously amended, is deleted in its entirety. In consideration of the waivers, agreements and amendments set forth herein, Shipper hereby forever waives and releases Seller from any and all Liquidated Damages claims that Shipper has or may have, and Shipper covenants not to pursue any Liquidated Damages remedies available to Shipper under the Precedent Agreement (other than to enforce the provisions of this letter agreement).

(4)    Section 8(a)(5) of the Precedent Agreement (relating to Shipper's termination rights) is deleted and the following is substituted in lieu thereof:

> "(5)    The In-Service Date does not occur on or before January 1, 2013; or".

(5)    Section 6(g) of the Precedent Agreement is deleted and the following is substituted in lieu thereof:

> "(g)  the MARC I Hub Line will be designed such that receipts from any Points of Receipt, located at least fourteen (14) miles from TGP and Transco, (i) during the first twenty-four (24) months of operations following the In-Service Date, will experience an inlet pressure of 1,000 psi or less under design conditions, and (ii) thereafter, except as provided herein, will experience an inlet pressure of 1,200 psi or less under design conditions.".

(6)    Section 3(b) of the Precedent Agreement (relating to "Interim FTS") is deleted and the following is substituted in lieu thereof:

> "(b)  Not less than thirty (30) days prior to the In-Service Date of the MARC I Hub Line, Service Provider shall provide notice to Shipper of the scheduled In-Service Date; provided, if the In-Service Date occurs between October 1, 2012 and January 1, 2013, Shipper and Service Provider shall enter into an FTSA for Interim FTS which shall include (i) the MDFTQ set forth in Exhibit A hereto, and (ii) the following negotiated transportation rates:
>     (A)    Zero Demand Charge;
>     (B)    Commodity only rate of $0.096/Dth;
>     (C)    Overrun commodity rate of $0.096/Dth; and
>     (D)    Seller's Transportation Use of $0.0175/Dth and 0.05%.



> Seller hereby forever waives and releases Shipper from any and all claims that Seller has or may have, and Seller covenants not to pursue any remedies available to Seller under the Precedent Agreement (other than to enforce the provisions of this letter agreement), for any demand or reservation rate charge relating to or arising or resulting from Interim FTS.".

(7)    The Parties agree to execute the attached Interim FTS Agreement implementing the terms of Section 3(b) of the Precedent Agreement (as amended hereby) providing Interim FTS at the rates set forth therein.

(8)    Except as expressly amended hereby or waived herein, the terms and conditions of the Precedent Agreement and the FTSA shall remain in full force and effect.

If you agree with the foregoing, please countersign this letter agreement where indicated below, retain a copy for your files, and return the countersigned original to me.    When countersigned by you, this letter agreement will constitute an amendment to the Precedent Agreement.

Your prompt attention to this matter is requested.  Thank you.

Sincerely,

CENTRAL NEW YORK OIL AND GAS COMPANY, L.L.C.

Ron E. Happach
Vice President – Commercial Operations

ACCEPTED AND AGREED TO:

CHESAPEAKE ENERGY MARKETING, INC.

By: _____
Name:  JAMES C. JOHNSON
Title:  President
Date:  10/18/12

EXHIBIT A-1

EXHIBIT "A"

to

FT Service Agreement between

Central New York Oil And Gas Company, L.L.C. (Seller)

and

Chesapeake Energy Marketing, Inc. (Customer)

Dated December 16, 2011

I.     MAXIMUM DAILY FIRM TRANSPORTATION QUANTITY:   152,182 dth

II.    POINT OF RECEIPT
        ALL                                 152,182 dth
           Includes:

              (a)     Tennessee Gas Pipeline (TGP)
              (b)     Stagecoach Gas Storage – South Lateral
              (c)     Transco
              (d)     Any Points of Receipt on the MARC I
                           Hub Line between Transco and TGP

        Customer has up to 152,182 dth of Primary Receipt Point
        Capacity at each Point of Receipt.

III.    POINT OF DELIVERY
        ALL                                 152,182 dth
           Includes:

              (a)     Tennessee Gas Pipeline (TGP)
               (b)     Stagecoach Gas Storage – South Lateral
               (c)     Transco

        Customer has up to 152,182 dth of Primary Delivery Point
        Capacity at each Point of Delivery.

        In addition, Customer has secondary point capacity rights
        to any Points of Delivery added to the MARC I Hub Line
        between Transco and TGP at the rates specified herein.

IV.    RATES AND CHARGES

        MARC I Monthly Firm Transportation Reservation Rate
           Negotiated Rate:                $5.844/dth of MDFTQ per Month
        MARC I Firm Transportation Commodity Rate
           Negotiated Rate:                $0.00/dth
        MARC I Firm Transportation Overrun Commodity Rate
           Negotiated Rate:                $0.192/dth



Seller's Transportation Use
    Negotiated Rate:                         $0.035/dth and 0.10%

The rates specified do not cover compression for any receipt of natural gas into the MARC I Hub Line other than at the Tennessee Gas Pipeline, Stagecoach Gas Storage – South Lateral, and Transco Points of Receipt.

V.    ADDITIONAL CHARGES - pursuant to Section 5 of Rate Schedule MARC I FTS

Annual Charge Adjustment (ACA) – Per tariff rate

Any surcharge of general applicability that Seller has implemented as a result of a requirement to implement a surcharge imposed by the FERC or another duly authorized governmental body, in which event Seller shall discount such surcharge to Customer to the maximum extent allowed by the FERC or such other duly authorized governmental body; provided any such discount shall not be required if Seller would remain responsible for payment to FERC or such other duly authorized governmental body of any discounted portion of the surcharge.

All applicable governmental taxes set forth in either the General Terms and Conditions of Seller's FERC Gas Tariff or in this Agreement.

Except for the foregoing charges, taxes and surcharges, Customer shall not be subject to any other charges, taxes or surcharges in connection with MARC I FTS.

The rates specified in this Agreement shall apply to (a) secondary receipt and delivery points, (b) changed primary receipt and primary delivery points, and (c) any segmented capacity, provided that Customer's throughput in any segment does not exceed its Maximum Daily Firm Transportation Quantity other than at the point of segmentation or at a meter.

VI.    ADDITIONAL PROVISIONS AUTHORIZED BY SELLER'S FERC TARIFF:

1.    If, prior to and up to five years after the In-Service Date of the MARC I Hub Line, Seller enters into an FTSA (excluding Interim FTS Service authorized under Seller's Tariff) with any other FTS shipper –

(a)    for a Maximum Daily Firm Transportation Quantity ("MDFTQ") of Firm Transportation Service equal to or less than Customer's MDFTQ, or

(b)    for a term equal to or less than the term of Customer's FTS Agreement,

at a Reservation rate less than Customer's Reservation rate, Seller shall notify Customer within five (5) Business Days, and, unless Customer notifies Seller within five (5) Business Days that Customer does not want to revise its rates or terms and conditions of service, then Seller will revise Customer's FTS Agreement to reduce Customer's Reservation rate to equal such lower Reservation rate effective as of the date of such FTS Agreement with such other FTS shipper. This paragraph shall not apply to the first 100,000 Dth/Day of firm transportation capacity sold by Seller on the MARC I Hub Line.

- ii -



**Exhibit B**

**Service Agreement #FT2-CHK-0001**

DocuSign Envelope ID: AE7DCBFD-992B-4CC3-ADD5-CF66FD7A8641

FIRM TRANSPORTATION SERVICE AGREEMENT

(For Use Under Seller's Rate Schedule FTS-2)

THIS AGREEMENT entered into as of the 25th day of January, 2019, by and between Stagecoach Pipeline & Storage Company LLC, a New York limited liability company, hereinafter referred to as "Seller," and Chesapeake Energy Marketing, LLC, hereinafter referred to as "Customer."

W I T N E S S E T H

WHEREAS, Customer has requested Seller to provide Firm Transportation Service on Seller's MARC I facilities and/or North/South Laterals ("FTS-2") on Customer's behalf; and

WHEREAS, Seller has sufficient capacity available on Seller's MARC I Facilities and/or North/South laterals to provide Firm Transportation Service for Customer on the terms specified herein;

NOW, THEREFORE, Seller and Customer agree as follows:

## ARTICLE I
## TRANSPORTATION SERVICE

1.   Seller's service hereunder shall be subject to receipt of all requisite regulatory authorizations from the Federal Energy Regulatory Commission ("Commission"), or any successor regulatory authority, and any other necessary governmental authorizations, in a manner and form acceptable to Seller.

2.   Subject to the terms and provisions of this Agreement, Customer may on any Gas Day cause Gas to be tendered to Seller at the Receipt Point(s) up to the Customer's Maximum Daily Firm Transportation Quantity ("MDFTQ") plus Seller's Transportation Use, and Seller agrees to tender Equivalent Quantities of Gas to or for the account of Customer, on a firm basis, at the Delivery Point(s).

3.   If requested by Customer, Seller may provide Transportation Service for daily quantities in excess of the Customer's Maximum Daily Firm Transportation Quantity if Seller can do so without adverse effect on the operation of Seller's MARC I Facilities and/or North/South Laterals or Seller's ability to meet all existing obligations.

## ARTICLE II
## POINTS OF RECEIPT/DELIVERY

1.   Customer shall deliver or cause to be delivered Gas nominated hereunder plus Seller's Transportation Use as applicable, at the Point(s) of Receipt. Seller agrees to accept on a firm basis the quantity nominated by Customer at the Point(s) of Receipt up to Customer's Maximum Daily Firm Transportation Quantity, plus Seller's Transportation Use quantity.

2.   Seller shall transport Customer's nominated quantity of Gas on a firm basis from the Point(s) of Receipt to the Point(s) of Delivery.

3.   Seller shall tender to or for the account of Customer, on a firm basis at the Point(s) of Delivery, Equivalent Quantities of Gas to the quantity nominated by Customer at the Point(s) of Receipt.

4.  The Point(s) of Receipt and Point(s) of Delivery are identified in Exhibit A.

## ARTICLE III
## TERM OF AGREEMENT

This Agreement shall be effective as of the date first above written and shall remain in effect for a Primary Term commencing April 1, 2019 and ending March 31, 2021.

## ARTICLE IV
## RATE SCHEDULE AND CHARGES

1.  Each Month, Customer shall pay Seller for the service hereunder, an amount determined in accordance with Seller's Rate Schedule FTS-2 and the applicable provisions of the General Terms and Conditions of Seller's FERC Gas Tariff, as filed with the Commission. Sections IV & V of Exhibit A hereto set forth the applicable information as follows, which shall be utilized for transactions hereunder:

    (a)  Rates and Charges

    (b)  Additional charges which are applicable.

    When the level of any additional charges is changed pursuant to Commission authorization or direction, Seller may unilaterally effect an amendment to Exhibit A to reflect such change(s) by so specifying in a written communication to Customer.

2.  It is further agreed that Seller may seek authorization from the Commission and/or other appropriate regulatory body for such changes to any rates, terms and conditions set forth herein, in Rate Schedule FTS-2 or in the General Terms and Conditions of Seller's FERC Gas Tariff, as may be necessary to assure Seller just and reasonable rates. Nothing herein contained shall be construed to deny Customer any rights it may have under the Natural Gas Act, as amended, including the right to participate fully in rate proceedings by intervention or otherwise to contest Seller's filing in whole or in part.

3.  Further Agreement: None.

## ARTICLE V
## NOTICE

Except as may be otherwise provided, any notice, request, demand, statement or bill provided for in this Agreement or any notice which a party may desire to give the other shall be in writing delivered personally, sent by facsimile (with transmission confirmation by sender's machine), sent by reliable delivery service (e.g., FedEx, UPS), sent by electronic mail, or mailed by regular mail, effective as of the postmark date, to the post office address of the party intended to receive the same, as the case may be, as follows:

Seller:     Stagecoach Pipeline & Storage Company LLC
            811 Main Street, Suite 3400
            Houston, TX 77002
            Attention: Commercial-Natural Gas
            Facsimile: 832-519-2250

Customer:   Chesapeake Energy Marketing, LLC
            6100 N. Western Avenue
            Oklahoma City, Oklahoma 73118
            Attention: Contract Administration
            Facsimile: _____

## ARTICLE VI
## INCORPORATION BY REFERENCE

The provisions of Rate Schedule FTS-2 and the General Terms and Conditions (GT&C) of Seller's FERC Gas Tariff are specifically incorporated herein by reference and made a part hereof. Terms defined in Rate Schedule FTS-2 or in the GT&C and used in this Agreement shall be given the meaning given such terms in Rate Schedule FTS-2 and the GT&C.

## ARTICLE VII
## MISCELLANEOUS

1. This Agreement supersedes and cancels the following contract between the parties hereto effective: N/A.

2. Replacement Customer: N/A.

The offer of release issued by the Releasing Customer is incorporated herein by reference.

        Releasing Customer: N/A.

        Released Contract No.: N/A.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective Officers or Representatives thereunto duly authorized.

Stagecoach Pipeline & Storage Company LLC

By: _____
Name: Wes Deskin
Title:    Senior Director

Chesapeake Energy Marketing, LLC

By: Sarika Agarwala
Name: Sarika Agarwala
Title:    Vice President, Marketing

SB    JM    TH

EXHIBIT "A"
to
Firm Transportation Service Agreement between
Stagecoach Pipeline & Storage Company LLC (Seller)
and
Chesapeake Energy Marketing, LLC

Dated: January 25, 2019

I. MAXIMUM DAILY FIRM TRANSPORTATION QUANTITY:         100,000 dth

II. PRIMARY POINT(S) OF RECEIPT

                Millennium                          100,000 dth MDRQ

III. PRIMARY POINT(S) OF DELIVERY

                Transco                            100,000 dth MDDQ

IV. RATES AND CHARGES

Seller's maximum recourse rates specified in the Currently Effective Rates section of Seller's FERC Gas Tariff, including Seller's Transportation Use, as such rates may change with FERC approval from time to time, shall apply to this Agreement unless Seller and Customer agree below to negotiated or discounted rates.

Discounted Rate __X___;   Negotiated Rate _____

_____ Right of First Refusal is applicable to discounted or negotiated rate agreement.

Monthly FTS-2 Reservation Rate

| | | |
|---|---|---|
| MARC I Facilities (only) | _____ | $/dth of MDFTQ |
| North/South Laterals (only) | _____ | $/dth of MDFTQ |
| MARC I & N/S Laterals | $2.589 | $/dth of MDFTQ |

FTS-2 Commodity Rate

MARC I Facilities (only)                                            _____ $/dth

North/South Laterals (only)                                        _____ $/dth

MARC I & N/S Laterals                                  Tariff Rate    $/dth


FTS-2 Overrun Commodity Rate

MARC I Facilities (only)                                            _____ $/dth

North/South Laterals (only)                                        _____ $/dth

MARC I & N/S Laterals                                  Tariff Rate    $/dth


V. ADDITIONAL CHARGES - pursuant to Section 5 of Rate Schedule FTS-2

Annual Charge Adjustment (ACA) – Per tariff rate

Any surcharge of general applicability that Seller has implemented as a result of a requirement to implement a surcharge imposed by the FERC or another duly authorized governmental body, in which event Seller shall discount such surcharge to Customer to the maximum extent allowed by the FERC or such other duly authorized governmental body; provided any such discount shall not be required if Seller would remain responsible for payment to FERC or such other duly authorized governmental body of any discounted portion of the surcharge.

All applicable governmental taxes set forth in either the General Terms and Conditions of Seller's FERC Gas Tariff or in this Agreement.

Except for the foregoing charges, taxes and surcharges, Customer shall not be subject to any other charges, taxes or surcharges in connection with firm transportation service under this Agreement.

Unless agreed otherwise below, the rates specified in this Agreement shall apply to (a) secondary receipt and delivery points, (b) changed primary receipt and primary delivery points, and (c) any segmented capacity, provided that Customer's throughput in any segment does not exceed its Maximum Daily Firm Transportation Quantity other than at the point of segmentation or at a meter.

VI. ADDITIONAL PROVISIONS AUTHORIZED BY SELLER'S FERC TARIFF:      NONE

**FIRST AMENDMENT TO**
**FIRM TRANSPORTATION SERVICE AGREEMENT #FT2-CHK-0001**
**Under Rate Schedule FTS-2**

This First Amendment to the Firm Transportation Service Agreement ("Amendment") is made and entered into to be effective as of October 1, 2019 (the "Effective Date"), by and between Stagecoach Pipeline & Storage Company LLC ("Stagecoach" or "Seller") and Chesapeake Energy Marketing, LLC ("Customer"). Stagecoach and Customer are parties to that certain Firm Transportation Service Agreement **#FT2-CHK-0001** under Rate Schedule FTS-2 dated January 25, 2019 (the "Agreement"). For purposes of this Amendment, Stagecoach and Customer may be referred to collectively as the "Parties" or individually as a "Party."

WHEREAS, there exists the above-referenced Agreement between the Parties, pursuant to which Stagecoach provides firm transportation service to Customer for certain volumes of natural gas at a discounted reservation rate; and,

WHEREAS, on December 6, 2018, in compliance with Order No. 849 and Section 260.402 of the Federal Energy Regulatory Commission's ("FERC") Regulations, Stagecoach filed its FERC Form No. 501-G in FERC Docket No. RP19-439;

WHEREAS, on March 20, 2019, the Commission issued an order instituting an investigation pursuant to Section 5 of the Natural Gas Act to determine whether Stagecoach's currently-effective rates remain just and reasonable;

WHEREAS, in an effort to achieve a negotiated resolution of the issues set for hearing by the FERC in Docket No. RP19-439, the docket participants exchanged several settlement offers and counteroffers. As a result of these efforts, the docket participates were able to reach a settlement, the terms of which were filed for final FERC approval on August 30, 2019, in Docket No. RP19-439-004 (the "Settlement");

WHEREAS, as part of the Settlement, Stagecoach agreed to provide each of its customers under existing discounted rate agreements an additional 4.5% reduction to such customer's currently effective reservation rate; and

WHEREAS, pursuant to the terms of the Settlement, but subject to final approval of the Settlement, the Parties now wish to amend the Agreement to reduce Customer's currently effective reservation rate under the Agreement by 4.5%.

**NOW THEREFORE**, in consideration of the mutual benefits to be obtained herefrom, the rights and duties assessed herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.   Subject to Paragraph 2 of this Amendment, effective as of the Effective Date, the monthly FTS-2 Reservation Rate applicable to transportation on the MARC I & North/South Laterals shall be reduced from $2.589000 per dth of MDFTQ to $2.472495 per dth of MDFTQ.

2.   In the event that the Settlement is not approved as filed, is withdrawn for any reason, or is contested by Customer, this Amendment shall be deemed null and void and the monthly FTS-2 Reservation Rate under the Agreement existing in effect immediately prior to the execution of this Amendment shall be billed retroactively back to October 1, 2019.

DocuSign Envelope ID: B20B6E4C-067A-489E-B6A6-0D80A0A6A97F

3.      This Amendment may be signed in counterparts, each of which shall constitute an original
        and together which shall constitute one and the same agreement.

4.      Except as modified herein, all other terms and conditions of the Agreement shall remain
        unchanged and in full force and effect.


        **IN WITNESS WHEREOF**, the parties signify their agreement by signature below.

**AGREED AND ACCEPTED:**


**STAGECOACH PIPELINE &**                       **CHESAPEAKE ENERGY**
**STORAGE COMPANY LLC**                         **MARKETING, LLC**

By: _____                    By: _____
                                                    Sarika Agarwala

Name: _Mark Mitchell_____                     Name: Sarika Agarwala
                                                    034697BD883840B...

Title: _SVP_____                     Title: V.P. Marketing

Date: _9/17/19_____                      Date: September 13, 2019 | 10:12 CDT

**Exhibit C**

**Service Agreement #FT2-CHK-0003**

DocuSign Envelope ID: FC8342B4-2EE1-4B2F-8C3A-01F901350F0D

FT2-CHK-0003

FIRM TRANSPORTATION SERVICE AGREEMENT

(For Use Under Seller's Rate Schedule FTS-2)

THIS AGREEMENT entered into as of the 25th day of February, 2020, by and between Stagecoach Pipeline & Storage Company LLC, a New York limited liability company, hereinafter referred to as "Seller," and Chesapeake Energy Marketing, L.L.C., an Oklahoma limited liability company, hereinafter referred to as "Customer."

W I T N E S S E T H

WHEREAS, Customer has requested Seller to provide Firm Transportation Service on Seller's MARC I facilities and/or North/South Laterals ("FTS-2") on Customer's behalf; and

WHEREAS, Seller has sufficient capacity available on Seller's MARC I Facilities and/or North/South laterals to provide Firm Transportation Service for Customer on the terms specified herein;

NOW, THEREFORE, Seller and Customer agree as follows:

ARTICLE I
TRANSPORTATION SERVICE

1.  Seller's service hereunder shall be subject to receipt of all requisite regulatory authorizations from the Federal Energy Regulatory Commission ("Commission"), or any successor regulatory authority, and any other necessary governmental authorizations, in a manner and form acceptable to Seller.

2.  Subject to the terms and provisions of this Agreement, Customer may on any Gas Day cause Gas to be tendered to Seller at the Receipt Point(s) up to the Customer's Maximum Daily Firm Transportation Quantity ("MDFTQ") plus Seller's Transportation Use, and Seller agrees to tender Equivalent Quantities of Gas to or for the account of Customer, on a firm basis, at the Delivery Point(s).

3.  If requested by Customer, Seller may provide Transportation Service for daily quantities in excess of the Customer's Maximum Daily Firm Transportation Quantity if Seller can do so without adverse effect on the operation of Seller's MARC I Facilities and/or North/South Laterals or Seller's ability to meet all existing obligations.

ARTICLE II
POINTS OF RECEIPT/DELIVERY

1.  Customer shall deliver or cause to be delivered Gas nominated hereunder plus Seller's Transportation Use as applicable, at the Point(s) of Receipt. Seller agrees to accept on a firm basis the quantity nominated by Customer at the Point(s) of Receipt up to Customer's Maximum Daily Firm Transportation Quantity, plus Seller's Transportation Use quantity.

2.  Seller shall transport Customer's nominated quantity of Gas on a firm basis from the Point(s) of Receipt to the Point(s) of Delivery.

3.  Seller shall tender to or for the account of Customer, on a firm basis at the Point(s) of Delivery, Equivalent Quantities of Gas to the quantity nominated by Customer at the Point(s) of Receipt.

DocuSign Envelope ID: FC8342B4-2EE1-4B2F-8C3A-01F901350F0D

FT2-CHK-0003

4.   The Point(s) of Receipt and Point(s) of Delivery are identified in Exhibit A.

ARTICLE III
TERM OF AGREEMENT

This Agreement shall be effective as of the date first above written and shall remain in effect for a Primary Term commencing April 1, 2020 and ending March 31, 2021.

ARTICLE IV
RATE SCHEDULE AND CHARGES

1.   Each Month, Customer shall pay Seller for the service hereunder, an amount determined in accordance with Seller's Rate Schedule FTS-2 and the applicable provisions of the General Terms and Conditions of Seller's FERC Gas Tariff, as filed with the Commission. Sections IV & V of Exhibit A hereto set forth the applicable information as follows, which shall be utilized for transactions hereunder:

  (a)     Rates and Charges

  (b)     Additional charges which are applicable.

  When the level of any additional charges is changed pursuant to Commission authorization or direction, Seller may unilaterally effect an amendment to Exhibit A to reflect such change(s) by so specifying in a written communication to Customer.

2.   It is further agreed that Seller may seek authorization from the Commission and/or other appropriate regulatory body for such changes to any rates, terms and conditions set forth herein, in Rate Schedule FTS-2 or in the General Terms and Conditions of Seller's FERC Gas Tariff, as may be necessary to assure Seller just and reasonable rates. Nothing herein contained shall be construed to deny Customer any rights it may have under the Natural Gas Act, as amended, including the right to participate fully in rate proceedings by intervention or otherwise to contest Seller's filing in whole or in part.

3.   Further Agreement: None.

ARTICLE V
NOTICE

Except as may be otherwise provided, any notice, request, demand, statement or bill provided for in this Agreement or any notice which a party may desire to give the other shall be in writing delivered personally, sent by facsimile (with transmission confirmation by sender's machine), sent by reliable delivery service (e.g., FedEx, UPS), sent by electronic mail, or mailed by regular mail, effective as of the postmark date, to the post office address of the party intended to receive the same, as the case may be, as follows:

DocuSign Envelope ID: FC8342B4-2EE1-4B2F-8C3A-01F901350F0D

FT2-CHK-0003

Seller:    Stagecoach Pipeline & Storage Company LLC
           811 Main Street, Suite 3400
           Houston, Texas 77002
           Attention:  Commercial-Natural Gas (Wes Deskin)
           Email: wes.deskin@crestwoodlp.com

Customer:  Chesapeake Energy Marketing, L.L.C.
           6100 N. Western Avenue
           Oklahoma City, Oklahoma 73118
           Attention:  Contract Administration
           Email:  ContractAdmin@chk.com

### ARTICLE VI
### INCORPORATION BY REFERENCE

The provisions of Rate Schedule FTS-2 and the General Terms and Conditions (GT&C) of Seller's FERC Gas Tariff are specifically incorporated herein by reference and made a part hereof. Terms defined in Rate Schedule FTS-2 or in the GT&C and used in this Agreement shall be given the meaning given such terms in Rate Schedule FTS-2 and the GT&C.

### ARTICLE VII
### MISCELLANEOUS

1. This Agreement supersedes and cancels the following contract between the parties hereto effective: N/A.

2. Replacement Customer: N/A.

The offer of release issued by the Releasing Customer is incorporated herein by reference.

Releasing Customer: N/A.

Released Contract No.: N/A.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective Officers or Representatives thereunto duly authorized.

Stagecoach Pipeline & Storage Company LLC

By: _____
Name:  Wes Deskin
Title:  Senior Director

Chesapeake Energy Marketing, L.L.C.

By: _____
    David Lynch
Name: David Lynch
Title:  Manager-Transportation

DocuSign Envelope ID: FC8342B4-2EE1-4B2F-8C3A-01F901350F0D

FT2-CHK-0003

EXHIBIT "A"
to
Firm Transportation Service Agreement between
Stagecoach Pipeline & Storage Company LLC (Seller)
and
Chesapeake Energy Marketing, L.L.C. (Customer)

Dated February 25, 2020


I. MAXIMUM DAILY FIRM TRANSPORTATION QUANTITY:     50,000  dth

II. PRIMARY POINT(S) OF RECEIPT

                              Tennessee     50,211  dth MDRQ


III. PRIMARY POINT(S) OF DELIVERY

                              Transco Leidy     50,000  dth MDDQ


IV. RATES AND CHARGES

Seller's maximum recourse rates specified in the Currently Effective Rates section of Seller's FERC Gas Tariff, including Seller's Transportation Use, as such rates may change with FERC approval from time to time, shall apply to this Agreement unless Seller and Customer agree below to negotiated or discounted rates.

Discounted Rate: __N/A____; Negotiated Rate:    ____X_____

Right of First Refusal is applicable to discounted or negotiated rate agreement:  N/A


Monthly FTS-2 Reservation Rate

| | | |
|---|---|---|
| MARC I Facilities (only) | $1.2167 | $/dth of MDFTQ |
| North/South Laterals (only) | _____ | $/dth of MDFTQ |
| MARC I & N/S Laterals | _____ | $/dth of MDFTQ |

DocuSign Envelope ID: FC8342B4-2EE1-4B2F-8C3A-01F901350F0D

FT2-CHK-0003

FTS-2 Commodity Rate

MARC I Facilities (only)                                    Tariff Rate   $/dth

North/South Laterals (only)                              _____  $/dth

MARC I & N/S Laterals                                    _____  $/dth


FTS-2 Overrun Commodity Rate

MARC I Facilities (only)                                    Tariff Rate   $/dth

North/South Laterals (only)                              _____  $/dth

MARC I & N/S Laterals                                    _____  $/dth


Seller's Transportation Use - Negotiated Rate Agreements Only.  **See Marc I below.**

For North/South Laterals (if applicable), Seller will bill Customer each Month for Seller's Use: (i) for electric power used in Seller's operations a rate of $_____/dth of Gas scheduled for service during the preceding month; plus (ii) for Gas lost or unaccounted for in Seller's operations at a rate of _____ percent (_____%) of the Gas scheduled for service during the preceding Month.  **(Not Applicable)**

For MARC I Facilities (if applicable), Seller will bill Customer each Month for Seller's Transportation Use: (i) for electric power used in Seller's operations, a rate of $.026/dth of Gas scheduled for firm transportation service on Customer's behalf during the preceding Month; plus (ii) for Gas used in Seller's operations, a rate of .32% of Gas scheduled for firm transportation service on Customer's behalf during the preceding Month; plus (iii) for Gas lost or unaccounted for in Seller's operations, a rate of .10% of the Gas scheduled for firm transportation service on Customer's behalf during the preceding Month.

Note: The preceding two paragraphs may be replaced if Seller and Customer agree to a different rate mechanism for Seller's Transportation Use.

The rates specified do not cover compression for any receipt of natural gas into the MARC I Facilities or North/South Laterals other than at the Tennessee Gas Pipeline, Stagecoach Gas Storage – South Lateral, and Transco Points of Receipt.

DocuSign Envelope ID: FC8342B4-2EE1-4B2F-8C3A-01F901350F0D

FT2-CHK-0003

V. ADDITIONAL CHARGES - pursuant to Section 5 of Rate Schedule FTS-2

Annual Charge Adjustment (ACA) – Per tariff rate

Any surcharge of general applicability that Seller has implemented as a result of a requirement to implement a surcharge imposed by the FERC or another duly authorized governmental body, in which event Seller shall discount such surcharge to Customer to the maximum extent allowed by the FERC or such other duly authorized governmental body; provided any such discount shall not be required if Seller would remain responsible for payment to FERC or such other duly authorized governmental body of any discounted portion of the surcharge.

All applicable governmental taxes set forth in either the General Terms and Conditions of Seller's FERC Gas Tariff or in this Agreement.

Except for the foregoing charges, taxes and surcharges, Customer shall not be subject to any other charges, taxes or surcharges in connection with firm transportation service under this Agreement.

Unless agreed otherwise below, the rates specified in this Agreement shall apply to (a) secondary receipt and delivery points, (b) changed primary receipt and primary delivery points, and (c) any segmented capacity, provided that Customer's throughput in any segment does not exceed its Maximum Daily Firm Transportation Quantity other than at the point of segmentation or at a meter.

VI.    ADDITIONAL PROVISIONS AUTHORIZED BY SELLER'S FERC TARIFF:

A.    Negotiated Transportation Use and Commodity Charges

For each Dth of Gas received from Customer at any Point(s) of Receipt on the MARC I Facilities and delivered to the M1–CNYOG Point of Delivery, notwithstanding anything else to the contrary herein, Customer shall be entitled to the following rate reductions:

(i)    Transportation Use—Customer's Transportation Use Charge shall be reduced to: (a) $0.00/dth for electric power used in Seller's operations, (b) 0.00% for Gas used in Seller's operations, and (c) 0.00% for Gas lost or unaccounted for in Seller's operations.

(ii)    Commodity Charge—Customer's Commodity Charge shall be reduced to $0.00 per Dth.

**Exhibit C**

**PG&E Stipulation and Agreement For Order Regarding Extension of Time**

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Theodore Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Peter J. Benvenutti (#60566)
pbenvenutti@kellerbenvenutti.com
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Plaintiffs (Debtors and Debtors in Possession)*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br><br><br>**PACIFIC GAS AND ELECTRIC COMPANY**<br><br>**Debtors.** | Case Nos. 19-30088 (DM)<br>19-30089 (DM)<br><br>Adv. Pro. No. 19-03003 (DM)<br><br>Chapter 11 |
| **PG&E CORPORATION,**<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**FEDERAL ENERGY REGULATORY COMMISSION**<br><br>**Defendant.** | **STIPULATION AND AGREEMENT FOR ORDER REGARDING EXTENSION OF TIME GRANTED BY 11 U.S.C. § 108(b) FOR DEBTORS TO SEEK REHEARING OF FERC ORDERS** |

This stipulation and agreement for order ("**Stipulation and Agreement for Order**") is entered into by Plaintiffs PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**"), on the one hand, and the Federal Energy Regulatory Commission ("**FERC**"), on the other hand.   The Debtors and FERC are referred to in this Stipulation and Agreement for Order collectively as the "**Parties**," and each as a "**Party**."  The Parties hereby stipulate and agree as follows:

## RECITALS

A.    On January 25, 2019, in response to the *Petition for Declaratory Order and Complaint of NextEra Energy Inc. and NextEra Energy Partners, L.P. Against Pacific Gas and Electric Co. and Request for Expedited Action*, FERC issued an *Order on Petition for Declaratory Order and Complaint* (the "**NextEra Order**"), attached hereto as **Exhibit 1**.

B.    On January 28, 2019, in response to the *Petition for Declaratory Order and Complaint of Exelon Corporation Against Pacific Gas and Electric Co. and Request for Expedited Action*, FERC issued an *Order on Petition for Declaratory Order and Complaint* (the "**Exelon Order**", collectively with the NextEra Order, the "**FERC Orders**"), attached hereto as **Exhibit 2**.

C.    Pursuant to the Federal Power Act, 16 U.S.C. § 791a *et seq.*, entities that are "aggrieved by an order issued by [FERC] in a proceeding" to which such entity is a party "may apply for a rehearing within thirty days after the issuance of an order." 16 U.S.C. § 825l(a).

D.    On January 29, 2019 (the "**Petition Date**"), PG&E Corp. and the Utility each commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

E.    Pursuant to the Bankruptcy Code, "if applicable nonbankruptcy law . . . fixes a period within which the debtor . . . may file any pleading, demand, notice . . . or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of: (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

(2) 60 days after the order for relief." 11 U.S.C. § 108(b). The filing of a petition for bankruptcy is an "order for relief" within the meaning of section 108(b). 11 U.S.C. § 301(b).

F.    The Debtors and FERC agree that, consistent with the "extension of time" granted by section 108(b) of the Bankruptcy Code, FERC will not treat as untimely applications for rehearing of the FERC Orders filed under 16 U.S.C. § 825l(a) by the Utility if filed before 60 days after the Petition Date.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT HEREBY IS STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, THROUGH THE UNDERSIGNED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

1.    Section 108(b) of the Bankruptcy Code extends the time for the Utility to submit applications for rehearing of the FERC Orders filed under 16 U.S.C. § 825l(a) to sixty (60) days after the Petition Date.

2.    Neither the Debtors nor FERC will rely upon or introduce as evidence this Stipulation and Agreement for Order or the entered Order Pursuant to Stipulation and Agreement for Order in this Adversary Proceeding (No. 19-03003) or in any other proceeding in this or any other forum, except that this restriction will not apply in any rehearing proceeding on one or more of the FERC Orders before FERC, nor in any other proceeding specifically considering the timeliness of the Utility's applications for rehearing of the FERC Orders filed under 16 U.S.C. § 825l(a). This Stipulation and Agreement for Order and the entered Order Pursuant to Stipulation and Agreement for Order are limited in scope to section 108(b)'s extension of time and are without prejudice to anyone's substantive legal arguments in any forum regarding the Federal Power Act and/or the Bankruptcy Code.

3.    This Stipulation and Agreement for Order shall constitute the entire agreement and understanding of the Parties relating to the subject matter hereof and supersedes any prior agreements and understandings relating to the subject matter hereof.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1    4.    Each of the undersigned who executes this Stipulation and Agreement for Order

2    by or on behalf of a Party represents and warrants that he or she has been duly authorized and

3    empowered to execute and deliver this Stipulation and Agreement for Order on behalf of such Party.

4    5.    This Stipulation and Agreement for Order shall not be modified, altered,

5    amended, or vacated without the written consent of all Parties hereto or further order of this Court.

6    6.    This Stipulation and Agreement for Order shall be governed by, and construed

7    in accordance with, applicable state and federal law.

8    7.    This Court shall retain jurisdiction to resolve any disputes or controversies

9    arising from this Stipulation and Agreement for Order.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

STIPULATION AND AGREEMENT FOR ORDER    4    ADV. PRO. NO. 19-03003

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1

Dated: February 6, 2019

Dated: February 6, 2019

2

KELLER & BENVENUTTI LLP

U.S. DEPARTMENT OF JUSTICE

3

4

/s/ *Peter J. Benvenutti*
Peter J. Benvenutti, Esq.

/s/ *Danielle A. Pham*
Danielle A. Pham, Esq.

5

650 California Street, Suite 1900
San Francisco, CA  94108
(415) 496 6723

1100 L St., NW
Washington, D.C.  20005
(202) 514-7451

6

7

*Attorneys for Debtors
and Debtors in Possession*

*Attorneys for Federal Energy Regulatory
Commission*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28