

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
07/31/2020

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § § § | Case No. 20-33233 (DRJ) |
| Debtors. | § § § | (Jointly Administered) |
|  | § § | **Re: Docket Nos. 22, 128, 325, 340, 341, 344, 345, 517, 519, 551, 552** |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE EXISTING SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Chesapeake Energy Corporation ("Chesapeake" or "Borrower") and each of its affiliates that are debtors and as debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") for entry of a final order (this "Final Order"), pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Texas

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2] All defined terms shall have the meaning ascribed to them in the Motion or DIP Credit Agreement (as defined below) unless otherwise defined herein.

and the Southern District of Texas Complex Chapter 11 Case Procedures (together, the "<u>Local Rules</u>"), seeking, among other things:

(1)    authorization for the Borrower, to obtain priming, senior secured, superpriority, debtor-in-possession postpetition financing and for the remaining Debtors (each, a "<u>Guarantor</u>," and collectively, the "<u>Guarantors</u>") to unconditionally guarantee the Borrower's obligations under such financing facility, which facility shall consist of (a) a revolving loan facility (the "<u>DIP Revolver Facility</u>," the loans made thereunder, the "<u>Revolving DIP Loans</u>," and such lenders that elect to participate in such DIP Revolver Facility, the "<u>New Money DIP Lenders</u>") in the aggregate maximum principal amount of up to $925 million (the "<u>Revolving DIP Loan Commitment</u>"), which shall include a sub-facility of up to $200 million for the issuance of letters of credit, which shall (i) permit the issuance of letters of credit on the Closing Date (as defined below) for general corporate purposes, including to replace, backstop or provide credit support for any letters of credit issued pursuant to the Existing RBL Credit Facility (as defined below) (including by "grandfathering" such letters of credit into the DIP Revolver Facility) and (ii) reduce availability under the DIP Facility (defined below) on a dollar-for-dollar basis (the "<u>DIP LC Sub-Facility</u>"), and (b) a conversion of all of the Existing RBL Loans (defined below) outstanding under the Existing RBL Credit Agreement (as defined below) on the date the DIP Revolver Facility becomes effective (the "<u>Closing Date</u>") in excess of $750 million to the Revolving DIP Loans under the DIP Facility (such conversion, the "<u>Roll-Up</u>," such converted loans, the "<u>Roll-Up Loans</u>" and, together with the DIP Revolver Facility and DIP LC Sub-Facility, the "<u>DIP Facility</u>," and the loans made thereunder (including the Revolving DIP Loans and the Roll-Up Loans), the "<u>DIP Facility Loans</u>"), with MUFG Union Bank, N.A., formerly known as Union Bank, N.A. ("<u>MUFG</u>"), as administrative agent and collateral agent (in such capacity, the "<u>DIP Agent</u>") for

itself and the DIP Lenders (as defined below), subject and pursuant to the terms of this Final Order, that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement by and among the Borrower, the Guarantors, the DIP Agent, and the lenders party thereto (the "DIP Lenders"), which shall be in form and substance acceptable to the Borrower, the DIP Agent, and the New Money DIP Lenders and substantially similar to the form attached hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement"), and any related documents and instruments delivered pursuant to or in connection therewith (collectively, and together with the DIP Credit Agreement, the "DIP Credit Documents").

(2)      authorization for the Debtors to (i) execute and enter into the DIP Credit Documents, (ii) pay fees and reimburse expenses under the DIP Credit Documents, as and in the amounts described in the DIP Credit Documents, and (iii) perform such other and further acts as may be required in connection with the DIP Credit Documents;

(3)      authorization for the Debtors to grant (i) valid, enforceable, nonavoidable and fully perfected security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and consensual priming liens pursuant to section 364(d) of the Bankruptcy Code on all collateral securing the Existing RBL Obligations, the Existing FLLO Obligations, and the Existing Second Lien Obligations (each as defined below)) to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (collectively, the "DIP Secured Parties") on all DIP Collateral (as defined below) to secure all obligations of the Debtors under and with respect to the DIP Facility, including the Revolving DIP Loans made under the DIP Revolver Facility and all interest accrued and accruing thereon and all other amounts owing by the respective Debtors in respect thereof (the "DIP Revolving Obligations") and the Roll-Up Loans and all interest accrued

3

and accruing thereon and all other amounts owing by the respective Debtors in respect thereof (the "Roll-Up Obligations" and, with the DIP Revolving Obligations, the "DIP Obligations"), subject and subordinate only to Permitted Priority Liens (as defined below) and the Carve Out (as defined below) and (ii) subject only to the Carve Out, super-priority claims (including a super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Secured Parties, having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but including all proceeds of, recoveries related to, and property received or recovered on account of the Avoidance Actions (the "Avoidance Actions Proceeds");

(4)     authorization for the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), solely in accordance with the Approved Budget (as defined below) then in effect (the initial version of which is attached hereto as **Exhibit B**), subject to the Variance Limit, in each case pursuant to the terms and conditions set forth in this Final Order and the DIP Credit Agreement;

(5)     authorization to provide adequate protection of the liens and security interests (i) granted by Chesapeake and the Guarantors (in such capacities, the "Existing RBL Obligors") for the benefit of the prepetition secured lenders holding loans (such lenders in such capacities, the "Existing RBL Lenders") under that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Existing RBL Credit Agreement," and the credit facility evidenced thereby, the "Existing RBL Credit Facility") among Chesapeake,

4

as borrower, the Existing RBL Lenders, as lenders, MUFG as administrative agent (in such capacity, the "Existing RBL Agent," and together with the Existing RBL Lenders, the "Existing RBL Secured Parties"), swingline lender, and letter of credit issuer, and certain other parties as co-syndication agents, swingline lenders, and letter of credit issuers, and (ii) securing the obligations of the Existing RBL Obligors under the Existing RBL Credit Agreement, the Existing RBL Security Documents (as defined below), and all collateral and ancillary documents executed or delivered in connection therewith, including without limitation the Security Agreement and the Guarantee (each as defined in the Existing RBL Credit Agreement) (the "Existing RBL Credit Documents"), as more fully set forth in this Final Order;

(6)     authorization to provide adequate protection of the liens and security interests (i) granted by Chesapeake and certain Guarantors (in such capacities, the "Existing FLLO Obligors") for the benefit of the prepetition secured lenders holding loans (such lenders in such capacities, the "Existing FLLO Lenders") under that certain Term Loan Agreement, dated as of December 19, 2019 (as from time to time amended and restated, the "Existing FLLO Term Loan Agreement," the credit facility evidenced thereby, the "Existing FLLO Term Loan Facility" and the Obligations (as defined in the Existing FLLO Term Loan Agreement), the "Existing FLLO Obligations"), among Chesapeake, as borrower, the Existing FLLO Lenders, as lenders, and GLAS USA, LLC (the "Existing FLLO Agent," and collectively with the Existing FLLO Lenders, the "Existing FLLO Secured Parties"), and (ii) securing the obligations of the Existing FLLO Obligors under the Existing FLLO Term Loan Agreement and all collateral and ancillary documents executed or delivered in connection therewith (the "Existing FLLO Loan Documents" and the liens granted thereunder, the "Existing FLLO Liens"), as more fully set forth in this Final Order;

5

(7)      authorization to provide adequate protection of the liens and security interests (i) granted by Chesapeake and certain Guarantors (in such capacities, the "Existing Second Lien Obligors") for the benefit of the holders the 11.500% Senior Secured Second Lien Notes due 2025 (the "Existing Second Lien Notes") pursuant to that certain Indenture dated as of December 19, 2019 (the "Existing Second Lien Notes Indenture") among Chesapeake, as issuer, certain of Chesapeake's subsidiaries, as guarantors, and Deutsche Bank Trust Company Americas, as trustee and collateral trustee (the "Existing Second Lien Notes Trustee," and together with the holders of the Existing Second Lien Notes, the "Existing Second Lien Secured Parties," and collectively with the Existing RBL Secured Parties and the Existing FLLO Secured Parties, the "Existing Secured Parties"), and (ii) securing the obligations of the Existing Second Lien Obligors under the Existing Second Lien Notes Indenture and all collateral and ancillary documents executed or delivered in connection therewith (the "Existing Second Lien Notes Documents" and the liens granted thereunder, the "Existing Second Liens," and together with the Existing RBL Liens (as defined below) and the Existing FLLO Liens, the "Existing Liens"), as more fully set forth in this Final Order;

(8)      authorization for the Debtors to waive (a) the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) except to the extent of the Carve Out, any right to surcharge any collateral pursuant to section 506(c) of the Bankruptcy Code;

(9)      authorization for (i) Chesapeake to obtain from the New Money DIP Lenders under the DIP Facility up to $925 million of Revolving DIP Loans under the DIP Revolver Facility and DIP LC Sub-Facility, subject to the terms of the DIP Credit Documents and this Final Order; (ii) the Debtors to use Cash Collateral solely in accordance with the Approved Budget, subject to the Variance Limit, and pursuant to the terms herein; (iii) the Roll-Up in an amount

6

equal to $1.179 billion, which shall consist of (a) $925 million in New Money Roll-Up Loans (of which $325 million in New Money Roll-Up Loans was authorized pursuant to the Interim Order) and (b) $254 million in Incremental Roll-Up Loans; (iv) the Debtors to grant adequate protection in the relative priorities set forth herein; and (v) the Debtors to grant the super-priority administrative claims as described herein;

(10)    modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Agent, the DIP Lenders, and the Existing RBL Secured Parties to implement and effectuate the terms of this Final Order and the DIP Credit Documents; and

(11)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Final Order.

The initial hearing (the "Interim Hearing") on the Motion having been held by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (this "Court") on June 29, 2020 and the final hearing (the "Final Hearing") on the Motion having been held by the Court on July 31, 2020; and this Court having found that, under the circumstances, due and sufficient notice of the Motion, the Interim Hearing and the Final Hearing was provided by the Debtors in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Local Rules, and as set forth in Paragraph C of the Interim Order and Paragraph C of this Final Order; and this Court having entered an order approving the Motion on an interim basis [Docket No. 128] (the "Interim Order") on June 29, 2020; and this Court having considered all the pleadings, declarations, and other evidence filed with this Court; and this Court having heard and resolved or overruled all unresolved objections to the relief granted in this Final Order; and upon the record made by the Debtors at the Interim Hearing and Final Hearing; and it appearing that the

relief requested in the Motion is in the best interests of the Debtors and their estates; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED ON THE FOREGOING AND THE RECORD ESTABLISHED AT THE INTERIM HEARING AND FINAL HEARING AND PURSUANT TO PAPERS FILED IN THESE CHAPTER 11 CASES, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.     **Petition Date**. On June 28, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of the Bankruptcy Code with this Court commencing the Chapter 11 Cases.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On July 9, 2020, an official committee of unsecured creditors (the "Creditors' Committee") was appointed in these Chapter 11 Cases.  On July 24, 2020 the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed a committee of royalty owners (the "Royalty Committee").  No trustee or examiner has been appointed in these Chapter 11 Cases.

B.     **Jurisdiction; Venue**.  This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Notice**.  Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors to:  (i) the U.S. Trustee, (ii) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis), (iii) MUFG, as DIP Agent and

---

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

Existing RBL Agent, (iv) Sidley Austin LLP ("Sidley"), as counsel to MUFG, (v) the Existing FLLO Agent, (vi) Arnold & Porter Kaye Scholer LLP, as counsel to the Existing FLLO Agent, (vii) the Existing Second Lien Notes Trustee, (viii) Morgan, Lewis & Bockius LLP, as counsel to the Existing Second Lien Notes Trustee, (ix) the indenture trustees for the Debtors' unsecured notes, (x) Davis Polk & Wardwell LLP and Vinson & Elkins LLP, as co-counsel to the ad hoc group of term loan lenders (such group, the "FLLO Ad Hoc Group"), (xi) Akin Gump Strauss Hauer & Feld LLP, as counsel to Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts ("Franklin"), (xii) the Internal Revenue Service, (xiii) the United States Securities and Exchange Commission, (xiv) the United States Attorney for the Southern District of Texas, (xv) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business, (xvi) the state attorneys general for states in which the Debtors conduct business, and (xvii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the Motion, the relief requested therein and the Final Hearing complies with Bankruptcy Rule 4001(b), (c), and (d) and the Local Rules, and no other or further notice of the relief sought at the Final Hearing shall be required.

       D.      **Debtors' Stipulations With Respect to Interim DIP Obligations**.
Pursuant to the Interim Order, the Court authorized, among other things, (i) the Debtors to borrow Revolving DIP Loans under the DIP Facility in an aggregate outstanding principal amount, when taken together with the aggregate face amount of the letters of credit outstanding under the DIP LC Sub-Facility, up to $325 million, (ii) the Debtors to convert to DIP Obligations under the DIP Credit Documents, $325 million of the outstanding principal amount of the Existing RBL Loans (as defined below) held by the New Money DIP Lenders as part of the Roll-Up, (iii) the DIP Guarantors to unconditionally guaranty such obligations jointly and severally, and (iv) the granting

of the DIP Super-Priority Claims and DIP Liens on DIP Collateral on account of such obligations authorized pursuant to the Interim Order.  Pursuant to the Interim Order, the Court authorized and empowered the Debtors to execute and deliver the DIP Credit Documents and incur and perform all of the DIP Obligations in accordance with, and subject to, the terms of the Interim Order and the DIP Credit Documents.  On July 1, 2020, the DIP Credit Agreement was executed, and the Debtors were authorized to borrow on the terms and conditions set forth in the DIP Credit Documents and the Interim Order.

     E.     **Debtors' Stipulations With Respect to Existing Obligations**.  Subject to the limitations described in Paragraphs 19 and 34 of this Final Order, the Debtors hereby admit, acknowledge, agree and stipulate that:

     (i)     *Existing RBL Credit Facility.*  As of the Petition Date, the Existing RBL Obligors were truly and justly indebted to the Existing RBL Secured Parties, without defense, challenge, objection, claim counterclaim or offset of any kind, pursuant to the Existing RBL Credit Documents, in the aggregate principal amount of $1.929 billion in respect of the loans made under the Existing RBL Credit Facility (the "Existing RBL Loans"), *plus* accrued and unpaid interest with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Existing RBL Credit Documents) now or hereafter due under the Existing RBL Credit Agreement and the other Existing RBL Credit Documents (collectively, together with all other obligations of the Existing RBL Obligors arising under the Existing RBL Credit Documents (including, without limitation, the Obligations (as defined in the Existing RBL Credit Agreement)), the "Existing RBL Obligations");

(ii)     pursuant to certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Existing RBL Security Documents") and the other Existing RBL Credit Documents, the Existing RBL Obligors granted to and/or for the benefit of the Existing RBL Secured Parties first priority (subject only to Permitted Priority Liens), valid, perfected and enforceable security interests and liens (the "Existing RBL Liens") in and on (a) substantially all of the Existing RBL Obligors' personal property, both tangible and intangible, including *inter alia*, all Accounts, Chattel Paper, Contracts, Deposit Accounts, Documents (other than title documents), Equipment, Fixtures, General Intangibles (including, without limitation, rights in and under any Payment Intangible or any Hedge Agreements), Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Commercial Tort Claims, Securities Accounts, and Securities Entitlements (each, as defined in the Existing RBL Security Documents), certain books and records, and the proceeds of and recoveries received on account of the foregoing, and (b) certain real property, including the Borrowing Base Properties (as defined in the Existing RBL Credit Agreement), all as more particularly described in the Existing RBL Security Documents and other Existing RBL Credit Documents (the "Existing RBL Collateral");

(iii)     (a) the Existing RBL Obligations constitute legal, valid, binding and non-avoidable Obligations (as defined in the Existing RBL Credit Agreement) of the Existing RBL Obligors; (b) no offsets, defenses, objections or counterclaims to the Existing

11

RBL Obligations exist; (c) no portion of the Existing RBL Obligations is subject to avoidance, disallowance, reduction, recharacterization, subordination, or other challenge of any nature pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Existing RBL Credit Documents are valid and enforceable by the Existing RBL Agent for the benefit of the Existing RBL Secured Parties against each of the Debtors; (e) the liens and security interests of the Existing RBL Secured Parties constitute valid, binding, enforceable and perfected security interests in and continuing liens on and to the Existing RBL Collateral, having the priority set forth in the Existing RBL Credit Documents and subject and subordinate only to (after giving effect to any applicable intercreditor or subordination agreement) Permitted Priority Liens,[4] which liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or other claim under the Bankruptcy Code or non-bankruptcy law, except as agreed to in writing by the Existing RBL Agent; (f) the Existing RBL Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no other claims, challenges, offsets, defenses, objections, or causes of action of any nature held by the Debtors exists against any of the Existing RBL Secured Parties, or any of their respective current or former affiliates, agents, subsidiaries, partners, controlling persons, attorneys, advisors, professionals, officers, directors and employees (collectively and in such capacities, "Representatives"), whether arising under applicable state or federal

---

[4]  Nothing shall prejudice the rights of any party-in-interest including, but not limited to, the Debtors and the Existing RBL Secured Parties, the Existing FLLO Secured Parties, or the Existing Second Lien Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Priority Liens and/or similar security interests.

law (including, without limitation, any recharacterization, subordination, avoidance or other claims or equitable relief arising under or pursuant to sections 105, 502(d), 510 or 542 through 553 or 724(a) of the Bankruptcy Code), or whether arising under or in connection with any of the Existing RBL Credit Documents (or the transactions contemplated thereunder), the Existing RBL Obligations, or the Existing RBL Liens, including without limitation, any right to assert any disgorgement or recovery;

(iv)     *Existing FLLO Term Loan Facility.*   As of the Petition Date, the Existing FLLO Obligors were truly and justly indebted to the Existing FLLO Secured Parties, without defense, counterclaim or offset of any kind, pursuant to the Existing FLLO Loan Documents, in the aggregate principal amount of $1.5 billion in respect of the loans made under the Existing FLLO Term Loan Facility (the "Existing FLLO Loans"), plus accrued and unpaid interest with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Existing FLLO Loan Documents) now or hereafter due under the Existing FLLO Term Loan Agreement and the other Existing FLLO Loan Documents;

(v)     pursuant to certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Existing FLLO Security Documents") and the other Existing FLLO Loan Documents, the Existing FLLO Obligors granted to and/or for the benefit of the Existing FLLO Secured

Parties first priority, in accordance with the Collateral Trust Agreement (as defined below) (subject only to Permitted Priority Liens), valid, perfected and enforceable security interests and Existing FLLO Liens in and on (a) substantially all of the Existing FLLO Obligors' personal property, both tangible and intangible, including *inter alia*, all Accounts, Chattel Paper, Contracts, Deposit Accounts, Documents (other than title documents), Equipment, Fixtures, General Intangibles (including, without limitation, rights in and under any Payment Intangible or any Hedge Agreements), Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Commercial Tort Claims, Securities Accounts, and Securities Entitlements (each, as defined in the Existing FLLO Security Documents), certain books and records, and the proceeds received on account of the foregoing, and (b) certain real property, all as more particularly described in the Existing FLLO Security Documents and other Existing FLLO Loan Documents (the "Existing FLLO Collateral");

(vi)    (a) the Existing FLLO Obligations constitute legal, valid, binding and non-avoidable Obligations (as defined in the Existing FLLO Term Loan Agreement) of the Existing FLLO Obligors; (b) no offsets, defenses, objections or counterclaims to the Existing FLLO Obligations exist; (c) no portion of the Existing FLLO Obligations is subject to avoidance, disallowance, reduction, recharacterization, subordination, or other challenge of any nature pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Existing FLLO Term Loan Agreement are valid and enforceable by the Existing FLLO Agent for the benefit of the Existing FLLO Secured Parties against each of the Debtors; (e) the liens and security interests of the Existing FLLO Secured Parties constitute valid, binding, enforceable perfected security interests in and continuing liens

14

on and to the Existing FLLO Collateral, having the priority set forth in the Existing FLLO Loan Documents and subject and subordinate only to (after giving effect to any applicable intercreditor or subordination agreement) the Existing RBL Liens and Permitted Priority Liens, which liens are not subject to avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or other claim under the Bankruptcy Code or non-bankruptcy law, except as agreed to in writing by the Existing FLLO Agent; (f) the Existing FLLO Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no other claims, challenges, offsets, defenses, objections, or causes of action of any nature held by the Debtors exists against any of the Existing FLLO Secured Parties, or any of their Representatives, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 502(d), 510 or 542 through 553 or 724(a) of the Bankruptcy Code), or whether arising under or in connection with any of the Existing FLLO Credit Documents (or the transactions contemplated thereunder), the Existing FLLO Obligations, or the Existing FLLO Liens, including without limitation, any right to assert any disgorgement or recovery;

(vii)    *Existing Second Lien Notes Indenture*.  As of the Petition Date, the Existing Second Lien Obligors were truly and justly indebted to the Existing Second Lien Secured Parties, without defense, counterclaim or offset of any kind, pursuant to the Note Documents (as defined in the Existing Second Lien Notes Indenture) and the other Existing Second Lien Notes Documents, in the aggregate principal amount of $2.33 billion in respect of the Existing Second Lien Notes, plus accrued and unpaid interest with respect

15

thereto, any premium (including the Make-Whole Premium (as defined in the Existing Second Lien Notes Indenture)), and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Existing Second Lien Notes Documents) now or hereafter due under the Existing Second Lien Notes Indenture and the other Existing Second Lien Notes Documents (collectively, together with all other obligations of Chesapeake and the Existing Second Lien Obligors arising under the Existing Second Lien Notes Documents (including, without limitation, the Obligations (as defined in the Existing Second Lien Notes Indenture)), the "Existing Second Lien Obligations");

(viii)    pursuant to certain security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Existing Second Lien Security Documents") and the other Existing Second Lien Notes Documents, the Existing Second Lien Obligors granted to and/or for the benefit of the Existing Second Lien Secured Parties second priority (subject only to the Existing RBL Liens, the Existing FLLO Liens and the Permitted Priority Liens), valid, perfected and enforceable security interests and liens in and on (a) substantially all of the Existing Second Lien Obligors' personal property, both tangible and intangible, including inter alia, all Accounts, Chattel Paper, Contracts, Deposit Accounts, Documents (other than title documents), Equipment, Fixtures, General Intangibles (including, without limitation, rights in and under any Payment Intangible or any Hedge Agreements), Goods,

Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Commercial Tort Claims, Securities Accounts, and Securities Entitlements (each, as defined in the Existing Second Lien Security Documents), certain books and records, and the proceeds received on account of the foregoing, and (b) certain real property, including the Borrowing Base Properties (as defined in the Existing Second Lien Notes Indenture), all as more particularly described in the Existing Second Lien Security Documents and other Existing Second Lien Notes Documents (the "Existing Second Lien Collateral," and together with the Existing RBL Collateral and the Existing FLLO Collateral, the "Existing Collateral");

(ix)    (a) the Existing Second Lien Obligations constitute legal, valid, binding and non-avoidable Obligations (as defined in the Existing Second Lien Notes Indenture) of the Existing Second Lien Obligors; (b) no offsets, defenses, objections or counterclaims to the Existing Second Lien Obligations exist; (c) no portion of the Existing Second Lien Obligations is subject to avoidance, disallowance, reduction, recharacterization, or subordination or other challenge of any nature pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Existing Second Lien Notes Documents are valid and enforceable by the Existing Second Lien Notes Trustee for the benefit of the Existing Second Lien Secured Parties against each of the Debtors; (e) the liens and security interests of the Existing Second Lien Secured Parties constitute valid, binding, enforceable perfected security interests in and continuing liens on and to the Existing Second Lien Collateral, having the priority set forth in the Existing Second Lien Notes Documents and subject and subordinate only to (after giving effect to any applicable intercreditor or subordination agreement) the Existing RBL Liens, the Existing FLLO Liens and Permitted Priority Liens which liens are not subject to avoidance,

17

recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or other claim under the Bankruptcy Code or non-bankruptcy law, except as agreed to in writing by the Existing Second Lien Notes Trustee; (f) the Existing Second Lien Obligations constitute allowed secured claims against the applicable Debtors' estates; and (g) no other claims, challenges, offsets, defenses, objections, or causes of action of any nature held by the Debtors exists against any of the Existing Second Lien Secured Parties, or any of their respective Representatives, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 502(d) 510 or 542 through 553 or 724(a) of the Bankruptcy Code), or whether arising under or in connection with any of the Existing Second Lien Notes Documents (or the transactions contemplated thereunder), the Existing Second Lien Obligations, or the Existing Second Liens, including without limitation, any right to assert any disgorgement or recovery; and

(x)       all of the Debtors' cash, including any cash in all deposit accounts and collection accounts, wherever located, comprising proceeds of or otherwise arising from or relating to the Existing RBL Collateral, the Existing FLLO Collateral and the Existing Second Lien Collateral, constitutes Cash Collateral of the Existing RBL Secured Parties, Existing FLLO Secured Parties and the Existing Second Lien Secured Parties.

F.       **Collateral Trust Agreement**.   That certain Collateral Trust Agreement dated as of December 19, 2019 between MUFG, as collateral trustee and revolver agent, and the Existing FLLO Agent, as original term loan agent, and acknowledged and agreed to by Chesapeake and certain of its subsidiaries (as amended, restated, supplemented, or otherwise modified in

18

accordance with its terms, the "Collateral Trust Agreement"), sets forth subordination and other provisions governing the relative priorities and rights of the Existing RBL Secured Parties and their respective Existing RBL Obligations and Existing RBL Liens, on the one hand, and Existing FLLO Secured Parties and their respective Existing FLLO Obligations and the Existing FLLO Liens, on the other hand.  Pursuant to section 510 of the Bankruptcy Code, such Collateral Trust Agreement and any other such collateral trust or intercreditor agreement between and/or among any of (1) the Existing RBL Agent, (2) Existing FLLO Agent, (3) any Existing RBL Secured Party, (4) any Existing FLLO Secured Party, (5) any Debtor, or (6) any affiliate thereof, and any other applicable collateral trust or intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture, or related document, (a) shall remain in full force and effect, (b) shall continue to govern the relative priorities, rights, and remedies of the Existing RBL Secured Parties and the Existing FLLO Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the replacement liens, administrative expense claims, and super-priority administrative expense claims granted, or amounts payable, by the Debtors under this Final Order or otherwise and the modification of the automatic stay), and (c) shall not be amended, altered or modified by the terms of this Final Order or the DIP Credit Documents, and for avoidance of doubt, any acts or omissions by any Existing RBL Secured Party or Existing FLLO Secured Party in connection with any chapter 11 plan of reorganization or liquidation in these Chapter 11 Cases (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code), and except as provided in the Restructuring Support Agreement (for so long as the Restructuring Support Agreement has not been terminated as to the Consenting Revolving Credit Facility Lenders or the Consenting FLLO Term Loan Facility Lenders (each as defined in the Restructuring Support Agreement)), any distributions on account of, or other treatment of, any Existing RBL

Obligations or Existing FLLO Obligations pursuant to any such plan, shall remain subject to the Collateral Trust Agreement (including its turnover provisions) or any other applicable intercreditor or subordination provisions, in each case to the extent provided therein; provided, however, that the foregoing shall not prejudice the rights of any party to the Collateral Trust Agreement to assert that taking any action or not taking any action is permitted by or prohibited by, as the case may be, the Collateral Trust Agreement, and all parties' rights with respect to such assertions are reserved.

       G.    **Second Lien Intercreditor Agreement**.   That certain Intercreditor Agreement dated as of December 19, 2019 between MUFG, as priority lien agent (in such capacity, the "Existing First Lien Agent"), and Existing Second Lien Notes Trustee, as the collateral trustee under the Existing Second Lien Notes Indenture, and acknowledged and agreed to by Chesapeake and certain of its subsidiaries (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Second Lien Intercreditor Agreement" and, together with the Collateral Trust Agreement, the "Intercreditor Agreements"), sets forth subordination and other provisions governing the relative priorities and rights of the Existing RBL Secured Parties and Existing FLLO Secured Parties (collectively, the "Existing First Lien Secured Parties"), their respective Existing RBL Obligations and Existing FLLO Obligations (collectively, the "Existing First Lien Obligations") and Existing RBL Liens and Existing FLLO Liens (collectively, the "Existing First Liens"), on the one hand, and the Existing Second Lien Secured Parties and their respective Existing Second Lien Obligations and Existing Second Liens, on the other hand. Pursuant to section 510 of the Bankruptcy Code, such Second Lien Intercreditor Agreement and any other such intercreditor agreement between and/or among any of (1) the Existing First Lien Agent, (2) Existing Second Lien Notes Trustee, (3) any Existing First Lien Secured Party, (4) any

Existing Second Lien Secured Party, (5) any Debtor, or (6) any affiliate thereof, and any other applicable collateral trust or intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture, or related document, (a) shall remain in full force and effect, (b) shall continue to govern the relative priorities, rights, and remedies of the Existing First Lien Secured Parties and the Existing Second Lien Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the replacement liens, administrative expense claims, and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Final Order or otherwise and the modification of the automatic stay), and (c) shall not be amended, altered or modified by the terms of this Final Order or the DIP Credit Documents, and for avoidance of doubt, any acts or omissions by any Existing First Lien Secured Party or Existing Second Lien Secured Party in connection with any chapter 11 plan of reorganization or liquidation in these Chapter 11 Cases (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code), and except as provided in the Restructuring Support Agreement (for so long as the Restructuring Support Agreement has not been terminated as to the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, or the Consenting Second Lien Noteholders (each as defined in the Restructuring Support Agreement)), any distributions on account of, or other treatment of, any Existing Second Lien Secured Party or Existing Second Lien Obligations pursuant to any such plan, shall remain subject to the Second Lien Intercreditor Agreement (including its turnover provisions) or any other applicable intercreditor or subordination provisions, in each case to the extent provided therein; provided, however, that the foregoing shall not prejudice the rights of any party to the Second Lien Intercreditor Agreement to assert that taking any action or not taking any action is permitted by or

prohibited by, as the case may be, the Second Lien Intercreditor Agreement, and all parties' rights with respect to such assertions are reserved.

H.      **Budget for DIP Facility**.  The initial Approved Budget was attached to the Interim Order as <u>Exhibit B</u>, and a revised Initial Approved Budget is attached hereto as **<u>Exhibit B</u>** (as revised, the "<u>Initial Approved Budget</u>").  The Debtors shall, in a manner consistent with the DIP Credit Agreement, propose Proposed Budgets which shall become Approved Budgets as specified in and in accordance with the DIP Credit Agreement (each, an "<u>Approved Budget</u>").  The Initial Approved Budget shall be the Approved Budget until a Proposed Budget becomes an Approved Budget in accordance with the terms of the DIP Credit Agreement.  The Initial Approved Budget is an integral part of this Final Order and has been relied upon by the DIP Secured Parties to provide the DIP Facility and consent to this Final Order and by the Existing RBL Secured Parties to permit the use of the Cash Collateral and consent to this Final Order.  The Debtors represent that the Initial Approved Budget is reasonable under the facts and circumstances.  The Debtors believe that the Initial Approved Budget is achievable and will allow the Debtors to operate in the Chapter 11 Cases and pay postpetition obligations as they come due.  Pursuant to the terms of the DIP Credit Agreement, the Debtors shall provide a Weekly Variance Report and a Monthly Variance Report, and with respect to the Monthly Variance Report, shall be in compliance with a Variance Limit on the terms and in accordance with the DIP Credit Agreement.  Additional variances, if any, shall be subject to the approval of the DIP Agent as specified in the DIP Credit Agreement.  For the avoidance of doubt, the professional fees and expenses of the Creditors' Committee and Royalty Committee shall not be greater than 110% of the estimated disbursement for such items in the Approved Budget, and the amounts of the professional fees and expenses of the Creditors' Committee or Royalty Committee included in any Approved Budget shall not be

subject to reduction without consultation with such committee, as applicable. The Debtors shall operate solely in accordance with the Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget, subject to the Variance Limit.

I. **Immediate Need for Funding**.  The Debtors have an immediate and critical need to obtain the DIP Facility and to use Cash Collateral in order to, among other things, (i) permit the orderly continuation of the operation of the Debtors' business, (ii) maintain business relationships with customers, vendors, and suppliers, (iii) make payroll, (iv) make capital expenditures, (v) satisfy other working capital and operational needs, and (vi) fund expenses of these Chapter 11 Cases.  In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm, including, without limitation, a cessation of substantially all of their operations.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, the incurrence of new indebtedness under the DIP Credit Documents, and the other financial accommodations provided under the DIP Credit Documents is necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

J. **No Credit on More Favorable Terms**.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the New Money DIP Lenders on terms more favorable than under the DIP Facility and the DIP Credit Documents (including the Roll-Up), and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Credit Agreement without the Debtors (i) providing the Roll-Up, (ii) granting to

the DIP Agent and the DIP Lenders, subject to the Carve Out, (a) the DIP Super-Priority Claims (as defined below) and (b) the DIP Liens (as defined below) in the DIP Collateral (as defined below), in each case under the terms and conditions set forth in this Final Order and the DIP Credit Documents, and (iii) providing the Existing Secured Parties the adequate protection as provided herein.

K.      **Reasonable; Good Faith**.  The New Money DIP Lenders have indicated a willingness to provide post-petition secured financing to the Debtors, but solely on the terms and conditions set forth in this Final Order and the DIP Credit Documents.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Facility to be provided by the DIP Lenders, including the Roll-Up, and the authorization to use the Cash Collateral to be provided by the Existing RBL Agent, on behalf of the Existing RBL Lenders, represents the best financing presently available to the Debtors.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility, including the Roll-Up, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility, including the Roll-Up, and the use of Cash Collateral has been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties and the Existing RBL Secured Parties, and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lenders, including the Roll-Up, have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) and 363(m) of the Bankruptcy Code and this Final Order.

L.   **Consent by Existing Secured Parties**.  The Existing Secured Parties have consented, or are deemed to have consented, pursuant to the Intercreditor Agreements, as applicable, to (i) the financing arrangements contemplated by this Final Order and the DIP Credit Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Final Order, and such consent is binding on all Existing Secured Parties.

M.   **Adequate Protection**.  The adequate protection provided to (i) the Existing RBL Secured Parties on account of the use of the Existing RBL Secured Parties' Cash Collateral and any diminution in the value of such parties' respective interests in the Existing RBL Collateral from and after the Petition Date, (ii) the Existing FLLO Secured Parties on account of any diminution of the value of such parties' respective interests in the Existing FLLO Collateral from and after the Petition Date, and (iii) the Existing Second Lien Secured Parties on account of any diminution of the value of such parties' respective interests in the Existing Second Lien Collateral from and after the Petition Date, in each case including, without limitation, resulting from the DIP Facility, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Existing Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code.  The consent of the Existing RBL Secured Parties to the use of Cash Collateral and the consent of the Existing Secured Parties to priming of their liens by the DIP Liens (1) does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Existing Secured Parties that their respective interests in the Existing Collateral are adequately protected pursuant to this Final Order or otherwise, and (2) is conditioned upon entry of this Final Order and does not and shall not be deemed to constitute consent other than pursuant to this Final Order and the terms set forth herein.  The adequate protection provided herein and other benefits and privileges contained herein are necessary (i) in order to protect the

Existing Secured Parties from the diminution in value of their Existing Collateral and (ii) to obtain the foregoing consents and agreements. Nothing herein shall prevent the Existing Secured Parties from seeking additional adequate protection to the extent permitted by law or to the extent permitted in the Intercreditor Agreements, as applicable.

N. **Good Cause Shown; Best Interest**. Absent entry of this Final Order, the Debtors' business, properties, and estates will be immediately and irreparably harmed. This Court concludes that good cause has been shown and that entry of this Final Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

O. **No Liability to Third Parties**. The Debtors stipulate and this Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Initial Approved Budget or any future Approved Budget or in taking any other actions permitted by this Final Order or the DIP Credit Documents, none of the DIP Secured Parties or Existing RBL Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

P. **Section 552**. In light of the subordination of their liens and super-priority administrative claims (i) in the case of the DIP Secured Parties, to the Carve Out and the Permitted Priority Liens and (ii) in the case of the Existing Secured Parties to the Carve Out and the DIP Liens, each of the DIP Secured Parties and the Existing Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply to any of the DIP Secured Parties or the Existing Secured Parties with

respect to the proceeds, products, rents, issues or profits of any of the DIP Collateral or the Existing Collateral, and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or the Existing Collateral under section 552(b) of the Bankruptcy Code.  The Debtors shall be deemed to have irrevocably waived, and to have agreed not to assert, any claim or right under section 552 of the Bankruptcy Code seeking to avoid the imposition of the DIP Liens, Existing Liens or the Adequate Protection Liens (as defined below) on any property acquired by any of the Debtors or any of their estates or, subject to the Carve Out, seeking to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Secured Parties or the Existing Secured Parties upon the DIP Collateral or the Existing Collateral, as applicable.

Q.      **Findings Regarding Corporate Authority**.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Credit Documents to which it is a party and to perform its obligations thereunder.

R.      **Immediate Entry**.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based on the foregoing, and upon the record made before this Court at the Interim Hearing and Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      **Motion Granted**.  The Motion is granted on the terms and conditions set forth in this Final Order and the DIP Credit Documents.  Any objections to the relief granted in this Final Order that have not previously been withdrawn, waived, settled, or resolved are hereby

denied and overruled on the merits. This Final Order shall become effective immediately upon its entry.

2. **Approval of DIP Credit Documents; Authority Thereunder**. The Debtors are hereby authorized to enter into the DIP Credit Documents, including the DIP Credit Agreement, and such additional documents, instruments, and agreements as may be required or reasonably requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Final Order. The Debtors are authorized to comply with and perform all of the terms and conditions contained in the DIP Credit Documents, and directed to repay amounts borrowed, together with interest and fees thereon (including, without limitation, the fees in sections 4.1, 6.1(h) and 7.4 of the DIP Credit Agreement), as well as any other outstanding DIP Obligations to the DIP Lenders in accordance with and subject to the terms and conditions set forth in the DIP Credit Documents and this Final Order.

3. **Authorization to Borrow DIP Facility Loans and Use Cash Collateral**. The Borrower is immediately authorized to borrow from the New Money DIP Lenders, and the Guarantors are immediately authorized to guaranty, borrowings under the DIP Facility of up to an aggregate principal amount of $925 million of the Revolving DIP Loans under the DIP Revolver Facility and the DIP LC Sub-Facility, subject to and in accordance with the terms of this Final Order and the DIP Credit Agreement. The Debtors are authorized to use the proceeds of the DIP Facility Loans and the Cash Collateral only for the purposes described in Paragraph 9 of this Final Order. The DIP Facility and authorization to use the proceeds of the DIP Facility Loans and the Cash Collateral will terminate upon the date (the "Termination Date") of the earliest to occur of (a) the Scheduled Maturity Date; (b) the date of termination of the Revolving DIP Loan Commitment and/or acceleration of any outstanding borrowings under the DIP Facility pursuant

to an Event of Default; (c) the occurrence of an RBL Cash Collateral Event of Default (as defined below); (d) subject to the COVID-19 Extension (as defined below), the first business day on which the Interim Order expires by its terms or is terminated, unless this Final Order has been entered and become effective prior thereto; (e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the Majority Lenders; (f) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Agent and the Majority Lenders; (g) the closing of a sale of all or substantially all of the equity or assets of the Debtors (unless done pursuant to the Plan (as defined below)); (h) the date of repayment in cash in full by the Debtors of all DIP Obligations and termination of the Revolving DIP Loan Commitments in accordance with the terms of the DIP Facility; and (i) the Effective Date (as defined below) unless extended, as to the DIP Facility, in the case of clause (a) with the prior written consent of the DIP Agent and the New Money DIP Lenders and in the case of clauses (b) – (i), with the prior written consent of the DIP Agent and Majority Lenders, and, as to the use of Cash Collateral, with the prior written consent of the Existing RBL Agent and the Majority Lenders (as defined in the Existing RBL Credit Agreement).  The full amount of the DIP Obligations will be required to be repaid in cash on the Termination Date, except that the DIP Agent and the New Money DIP Lenders may elect to allow the DIP Obligations to be treated in any other manner acceptable to them in accordance with the DIP Credit Agreement.

4.     The DIP Secured Parties and Existing RBL Secured Parties each have no obligation to extend credit under the DIP Revolver Facility or permit the use of any DIP Collateral or Existing RBL Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the interim period unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral, Existing RBL Collateral, or proceeds thereof under the DIP Credit

Documents and this Final Order have been satisfied in full or waived in writing by the DIP Secured Parties and the Existing RBL Agent.

5.     **Roll-Up.** The Roll-Up Loans shall be calculated as set forth in the DIP Credit Agreement and include (i) Roll-Up Loans consisting of $925 million of Existing RBL Loans held by the New Money DIP Lenders converted to loans under the DIP Facility (the "New Money Roll-Up Loans") and (ii) Roll-Up Loans consisting of (a) the amount of Existing RBL Loans on the Closing Date in excess of $750 million, *less* $925 million (the "Incremental Roll-Up Loans"). Pursuant to this Final Order, New Money Roll-Up Loans in the aggregate amount of $600 million and the Incremental Roll-Up Loans shall be immediately, automatically, and irrevocably deemed to have been converted under the DIP Facility as set forth in the DIP Credit Agreement, and the conversion of the New Money Roll-Up Loans in the aggregate amount of $325 million pursuant to the Interim Order is hereby ratified.  Except as otherwise provided in this Final Order and the DIP Credit Documents, the Roll-Up Loans shall be entitled to all of the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under this Final Order and the Credit Documents. The conversion of the Roll-Up Loans shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the New Money DIP Lenders to consent to and fund amounts under the DIP Revolver Facility and DIP LC Sub-Facility and not as payments under, adequate protection for, or otherwise on account of any Existing RBL Obligations.  The Existing RBL Lenders would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens and the DIP Agent and the New Money DIP Lenders would not be willing to provide the DIP Revolver Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up within the DIP Facility.

6.     **Collections and Disbursements.** Subject to the Carve Out, from the Petition Date until the DIP Obligations have been paid in full in cash, all cash receipts, Cash Collateral, and all proceeds from the sale or other disposition of, or other revenue of any kind attributable to, any DIP Collateral that is now in, or shall hereafter come into, the possession or control of any of the Debtors, or to which any of the Debtors is now or shall hereafter become entitled (i) shall be subject to the DIP Liens and the Adequate Protection Liens (and shall be treated in accordance with this Final Order and the DIP Credit Agreement) and (ii) shall be, to the extent related to or arising from or in connection with Existing RBL Collateral, promptly deposited only into accounts of the Debtors upon which the Existing RBL Agent has perfected Existing RBL Liens.  All such amounts arising from or in connection with the Existing RBL Collateral shall be used for the purposes described in section 9.10 of the DIP Credit Agreement or applied to the payment of outstanding DIP Obligations in accordance with the DIP Credit Agreement (subject to any Permitted Priority Liens on such Existing RBL Collateral).

7.     **Perfection in Cash.** Subject to the Carve Out and other provisions of this Final Order and the DIP Credit Agreement, all financial institutions with which the Debtors maintain accounts containing Cash Collateral are authorized to comply with any request of the DIP Agent to turn over to the DIP Agent all Cash Collateral therein without offset or deduction of any kind.  The DIP Agent shall enjoy the benefit of (i) all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which the Existing RBL Agent is a party and (ii) subject and subordinate to the rights of the holders of any Permitted Priority Liens, all other deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any Debtor is a party.  Notwithstanding and without minimizing the force of

the foregoing, the Debtors are authorized to enter into, and cause the financial institutions servicing the Debtors' deposit accounts to enter into, such deposit account control agreements and other collateral agreements with the DIP Agent and such financial institutions as the DIP Agent may reasonably require, or alternatively, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Debtor is a party, as set forth above, without the need to enter into any such new agreements.

    8.  **Payment of DIP Fees and Expenses**. Subject to the Carve Out, the Debtors are authorized and directed to pay (i) all fees when due under the DIP Credit Agreement (including, without limitation, any fees provided for under section 4.1, 6.1(h), and 7.4 of the DIP Credit Agreement) in the amounts set forth in the DIP Credit Agreement and (ii) reasonable, documented out-of-pocket fees, costs, and expenses incurred by the DIP Agent (the foregoing to include all unpaid prepetition fees, costs and expenses incurred by the DIP Agent in connection with the DIP Facility) in connection with any and all aspects of the Chapter 11 Cases (the "DIP Agent Fees and Expenses"), including, without limitation, the reasonable and documented out-of-pocket fees and expenses of the DIP Agent's legal counsel (Sidley), banker (Houlihan Lokey Capital, Inc.), and financial advisor (RPA Advisors, LLC) and other professionals, hired by or on behalf of the DIP Agent with the Debtors' reasonable consent (the "DIP Agent Professionals"), subject to the review procedures set forth in Paragraph 22 of this Final Order. In addition, the Debtors are hereby authorized and directed to indemnify the DIP Agent and the other DIP Secured Parties (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any liability arising in connection with the DIP Credit Documents, to the extent set forth in the DIP Credit Documents. All such unpaid fees, costs, expenses and indemnities of the DIP Agent and the DIP Lenders shall (i) constitute DIP

Obligations, (ii) be secured by the DIP Collateral, and (iii) be afforded all of the priorities and protections afforded to other DIP Obligations under this Final Order and the DIP Credit Documents.

9.    **Validity of DIP Credit Documents**.  Upon execution and delivery of the DIP Credit Documents, the DIP Credit Documents shall constitute, and are hereby deemed to be, legal, valid and binding obligations of the Debtors, enforceable against each Debtor in accordance with the terms thereof for all purposes during the Chapter 11 Cases, in any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code, or after dismissal of any of the Chapter 11 Cases.  Any DIP Facility Loans advanced under the DIP Credit Agreement pursuant to this Final Order shall be used solely for (i) post-petition working capital, capital investments as permitted under the DIP Credit Agreement, and general corporate purposes of the Debtors, (ii)  the payment of current interest and fees under the DIP Facility, (iii) the payment of adequate protection payments to the Existing RBL Secured Parties, including letter of credit and other fees payable under the Existing RBL Credit Agreement, (iv) the payment of fees and expenses of the FLLO Professionals (as defined below); (v) the payment of fees and expenses of the Second Lien Professionals (as defined below) to the extent provided in the Restructuring Support Agreement; and (vi) payment of allowed administrative costs and expenses of these Chapter 11 Cases, in each case, solely in accordance with the Approved Budget (subject to the Variance Limit) and this Final Order.  No obligation, payment, transfer or grant of security under the DIP Credit Documents or this Final Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

10.     **DIP Super-Priority Claims**.  In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute superpriority administrative expense claims (the "DIP Super-Priority Claims") against each of the Debtors with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims, prepetition unsecured claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any prepetition claims and adequate protection claims of the Existing Secured Parties, any adequate protection claims granted in favor of any other parties, and any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; provided, however, that the DIP Super-Priority Claims shall be subject to the Carve Out.  The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof, including the Avoidance Actions Proceeds; provided that (i) the DIP Super-Priority Claims granted to the DIP Lenders on account of the Roll-Up Loans shall be immediately junior in payment priority and subject to the DIP Super-Priority Claims granted to the New Money DIP Lenders on account of the DIP Revolving Obligations and the DIP Hedges (as defined below) and (ii) the DIP Super-

Priority Claims granted to the DIP Lenders on account of the Incremental Roll-Up Loans shall be immediately junior in payment priority to the New Money Roll-Up Loans.

11.    **DIP Liens**.  As security for the DIP Obligations and any DIP Hedges, the DIP Agent, on behalf and for the benefit of the DIP Secured Parties, is hereby granted (effective upon the date of the Interim Order, without any further action by the DIP Secured Parties, including the execution by the Debtors or the filing or recordation of security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise) valid, enforceable, binding, and fully perfected security interests in and liens upon (the "DIP Liens") all present and after-acquired property of the Debtors of any nature whatsoever (including without limitation "Collateral"), and all cash and cash equivalents contained in any account maintained by any of the Debtors, and all Avoidance Actions Proceeds of the Debtors or their estates (collectively with all rents, issues, products, offspring, proceeds and profits of any or all of the foregoing, and including property acquired pursuant to land or acreage swap transactions, but excluding "Excluded Property" as defined in the DIP Credit Agreement, the "DIP Collateral"), subject only to the payment of the Carve Out, which DIP Liens shall consist of:

(a)    First Priority Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority, fully-perfected lien and security interest upon all of the Debtors' right, title and interest in, to, and under all DIP Collateral that was not encumbered by a validly perfected, enforceable, and nonavoidable security interest or lien as of the Petition Date or a valid security interest or lien perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property").  For the avoidance of doubt, Unencumbered Property shall include the Avoidance Actions Proceeds.

(b)  <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a junior priority, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under all DIP Collateral (other than the DIP Collateral described in Subparagraphs (a) or (c) of this Paragraph 11, as to which the liens and security interests in favor of the DIP Agent will be as described in such Subparagraphs), whether now existing or hereafter acquired, that is subject to any Permitted Priority Lien that was validly perfected prior to the Petition Date, or is validly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, and is not subject to section 552(a) of the Bankruptcy Code.

(c)  <u>Liens Priming Existing Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, binding, continuing, enforceable, fully perfected, first priority senior priming liens upon and security interest in all of the Debtors' right, title and interest in, to, and under all DIP Collateral that is subject to the Existing Liens; <u>provided</u>, <u>however</u>, that the liens granted by this subparagraph shall in each case be subject and subordinate to liens on the Existing RBL Collateral (other than the Existing RBL Liens) that (a) are valid, perfected, enforceable and nonavoidable as of the Petition Date or validly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, (b) under applicable law, are senior to, and have not been subordinated to, the Existing RBL Liens, and (c) are not subject to avoidance, reduction, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (each, a "<u>Permitted Priority Lien</u>"), including the Permitted Priority Liens scheduled on Schedule 10.2(d) to the DIP Credit Agreement.

(d)      Liens Senior to Certain Other Liens.  The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date, including without limitation any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board, or court for any liability of the Debtors, or (iii) any intercompany or affiliate liens of the Debtors.

(e)      DIP Liens *Pari Passu*.  For the avoidance of doubt, the DIP Liens granted to the DIP Lenders with respect to the Roll-Up Obligations will be *pari passu* (on a pro rata basis) to the DIP Liens granted to the DIP Lenders with respect to the DIP Revolving Obligations and the DIP Hedges; provided, however, that (i) the DIP Revolving Obligations and the DIP Hedges shall have payment priority over the Roll-Up Loans and (ii) the New Money Roll-Up Loans shall have payment priority over the Incremental Roll-Up Loans, each as set forth in the DIP Credit Agreement.

Notwithstanding anything to the contrary in this Final Order or the DIP Credit Documents, the rights, claims and defenses of CNOOC Energy U.S.A. LLC f/k/a OOGC America, Inc. ("CNOOC") are preserved, including but not limited to, CNOOC's right to request adequate protection for any funds advanced to the Debtors.

12.      **Existing RBL Secured Parties' Adequate Protection**.   Until the indefeasible repayment in full in cash of the Existing RBL Obligations, the Existing RBL Secured Parties are entitled to adequate protection of their interests in the Existing RBL Collateral on account of the diminution in the value thereof as a result of (a) the provisions of this Final Order granting priming liens on such Existing RBL Collateral to the DIP Agent for the benefit of the DIP

Secured Parties; (b) the authorization of the use of Cash Collateral and other Existing RBL Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; and/or (d) otherwise (the "Diminution in Existing RBL Collateral Value"), pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code.  For the avoidance of doubt, the rights of the Existing Secured Parties, Debtors, the Creditors' Committee and all other parties in interest in respect of whether any Diminution in Existing RBL Collateral Value has occurred and the extent of any such diminution in value are reserved.  The Existing RBL Agent, on behalf and for the benefit of the Existing RBL Lenders, is hereby granted the following (collectively, the "RBL Adequate Protection Obligations"):

(a)  RBL Adequate Protection Super-Priority Claims.  The Existing RBL Agent, on behalf and for the benefit of the Existing RBL Secured Parties, is hereby granted super-priority administrative expense claims (the "RBL Adequate Protection Super-Priority Claims") under section 507(b) of the Bankruptcy Code against the Debtors' estates, including Avoidance Actions Proceeds, to the extent of any Diminution in Existing RBL Collateral Value, which RBL Adequate Protection Super-Priority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that at all times while such claim is in full force and effect pursuant to this Final Order, the RBL Adequate Protection Super-Priority Claims shall be junior in all respects to the DIP

Super-Priority Claims (including the super-priority claims in respect of the DIP Hedges) and subject to the Carve Out.

(b)      RBL Adequate Protection Liens.  Valid, enforceable, unavoidable and fully perfected replacement liens and security interests in all DIP Collateral (the "RBL Adequate Protection Liens") to the extent of any Diminution in Existing RBL Collateral Value, which shall be (i) junior only to the DIP Liens and the Permitted Priority Liens and (ii) subject to the Carve Out.  The RBL Adequate Protection Liens shall be deemed to be legal, valid, binding, enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in the Chapter 11 Cases.  Except as otherwise set forth in this Paragraph 12 or otherwise in this Final Order, the RBL Adequate Protection Liens shall not be subordinated to or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.  The RBL Adequate Protection Liens shall be deemed to be perfected automatically upon the entry of the Interim Order, without the need for (x) filing any UCC-1 financing statement, state or federal notice, or other similar instrument or document in any state or public record or office, (y) taking possession or control of any collateral, or (z) further action of any kind (including entry into any security agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, or similar agreements).  Without limiting the foregoing, but subject and subordinate to the rights of the DIP Secured Parties and the holders of any Permitted Priority Liens, in respect of the RBL Adequate Protection Liens, the Existing RBL Agent shall enjoy the benefit of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any Debtor is a party.

(c)    <u>Adequate Protection Payments</u>.   As further adequate protection, and in consideration, and as a requirement, for obtaining the consent of the Existing RBL Secured Parties to the entry of this Final Order and the Debtors' consensual use of Cash Collateral as provided herein:

(i) The Debtors shall, subject to the Carve Out, pay the reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the Existing RBL Agent (the foregoing to include all unpaid prepetition fees, costs and expenses) in connection with any and all aspects of the Chapter 11 Cases (the "<u>Existing RBL Agent Fees and Expenses</u>"), including the reasonable and documented out-of-pocket fees and expenses of the legal and financial advisors and investment bankers to the Existing RBL Agent and other professionals, hired by or on behalf of the Existing RBL Agent (the "<u>Existing RBL Agent Professionals</u>") and the reasonable, documented out-of-pocket fees, costs and expenses of MUFG as collateral trustee (the "<u>Collateral Trustee</u>") under the Collateral Trust Agreement, including the reasonable, documented out-of-pocket fees, costs and expenses of the legal advisors and other professionals of the Collateral Trustee (the "<u>Collateral Trustee Professionals</u>").   The payment of the Existing RBL Agent Fees and Expenses and the fees and expenses of the Collateral Trustee shall be subject to the review procedures set forth in Paragraph 22 of this Final Order.   To the extent the DIP Agent and the Existing RBL Agent are the same and have a single set of advisors, such advisors may submit a single combined invoice for their aggregated services.

(ii) On the Closing Date, the Debtors shall pay to the Existing RBL Agent all accrued and unpaid interest at the non-default rate and fees then owing under the Existing RBL Credit Agreement.

(iii) To the extent the Existing RBL Loans shall not have become Roll-Up Loans, the Debtors shall, as and when due pursuant to the Existing RBL Credit Documents, pay to the Existing RBL Secured Parties all post-petition interest at the non-default rate specified in such Existing RBL Credit Documents and (subject to paragraph (iv) below) fees accruing under the Existing RBL Credit Documents (the payments described in (i) – (iii), the "Existing RBL Adequate Protection Payments").

(iv) Notwithstanding paragraph (iii) above, no Letter of Credit Fees (as defined in the Existing RBL Credit Agreement) or fronting fees shall accrue post-petition under the Existing RBL Credit Agreement with respect to any letters of credit originally issued under the Existing RBL Credit Agreement that is "grandfathered" into the DIP Revolver Facility or cash-collateralized or backstopped by a letter of credit issued under the Existing RBL Credit Agreement, it being understood that any fees in respect of any such "grandfathered" letter of credit will be only those fees otherwise payable in respect of such letters of credit under the DIP Credit Agreement.

(v) The Existing RBL Adequate Protection Payments in clauses (ii) and (iii) above may be subject to disgorgement or recharacterization as principal repayment to the extent of a successful final and non-appealable Challenge (as defined below), to the extent ordered by the Court.

(d)     <u>Financial Reporting</u>.  The Debtors shall provide the Existing RBL Agent with the financial and other reporting as described in the DIP Credit Agreement and this Final Order.  Without limiting the rights of access and information afforded the Existing RBL Secured Parties under the DIP Credit Agreement and Existing RBL Credit Documents, the Debtors are hereby authorized to afford the representatives, agents, employees, attorneys, financial advisors, and investment bankers of the Existing RBL Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the Existing RBL Credit Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may reasonably be requested; <u>provided</u>, <u>however</u>, other than any such visits and inspections during the continuation of an Event of Default, only the Existing RBL Agent on behalf of the Exiting RBL Secured Parties may exercise the rights of the Existing RBL Secured Parties under this Paragraph 12(d).

(e)     <u>Right to Seek Additional Adequate Protection</u>.  This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Existing RBL Agent or the other Existing RBL Secured Parties to seek additional forms of adequate protection at any time.

(f)     <u>Noninterference with DIP Obligations</u>.  For the avoidance of doubt, nothing in this Paragraph 12 shall affect or limit the obligation of the Debtors to pay the fees, costs and expenses incurred by the DIP Secured Parties as provided in the DIP Credit Documents.

13.     **Existing FLLO Secured Parties' Adequate Protection**.  Until the indefeasible repayment in full in cash of the Existing FLLO Obligations, the Existing FLLO

Secured Parties are entitled to adequate protection of their interests in the Existing FLLO Collateral on account of the diminution in the value thereof as a result of (a) the provisions of this Final Order granting priming liens on such Existing FLLO Collateral to the DIP Agent for the benefit of the DIP Secured Parties; (b) the authorization of the use of Cash Collateral and other Existing FLLO Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; and/or (d) otherwise (the "Diminution in Existing FLLO Collateral Value"), pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code.  For the avoidance of doubt, the rights of the Existing Secured Parties, Debtors, the Creditors' Committee and all other parties in interest in respect of whether any Diminution in Existing FLLO Collateral Value has occurred and the extent of any such diminution in value are reserved.  The Existing FLLO Agent, on behalf and for the benefit of the Existing FLLO Lenders, is hereby granted the following (collectively, the "FLLO Adequate Protection Obligations"):

> (a)     FLLO Adequate Protection Super-Priority Claims.  The Existing FLLO Agent, on behalf and for the benefit of the Existing FLLO Secured Parties, is hereby granted super-priority administrative expense claims (the "FLLO Adequate Protection Super-Priority Claims") under section 507(b) of the Bankruptcy Code against the Debtors' estates, including Avoidance Actions Proceeds, to the extent of any Diminution in Existing FLLO Collateral Value, which FLLO Adequate Protection Super-Priority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided,

however, that at all times while such claims are in full force and effect pursuant to this Final Order, the FLLO Adequate Protection Super-Priority Claims shall be junior in all respects to the DIP Super-Priority Claims and RBL Adequate Protection Super-Priority Claims, and in all cases subject to the Carve Out.

(b)    FLLO Adequate Protection Liens.   Valid, enforceable, unavoidable and fully perfected replacement liens and security interests in all DIP Collateral (the "FLLO Adequate Protection Liens") to the extent of any Diminution in Existing FLLO Collateral Value, which shall be (i) junior only to the DIP Liens, the Permitted Priority Liens, the Existing RBL Liens, and the RBL Adequate Protection Liens, (ii) senior to all prepetition liens other than the Permitted Priority Liens and the Existing RBL Liens, and (iii) subject to the Carve Out.  The FLLO Adequate Protection Liens shall be deemed to be legal, valid, binding, enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in the Chapter 11 Cases.  Except as otherwise set forth in this Paragraph 13 or otherwise in this Final Order, the FLLO Adequate Protection Liens shall not be subordinated to or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.  The FLLO Adequate Protection Liens shall be deemed to be perfected automatically upon the entry of the Interim Order, without the need for (x) filing any UCC-1 financing statement, state or federal notice, or other similar instrument or document in any state or public record or office, (y) taking possession or control of any collateral, or (z) further action of any kind (including entry into any security agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, or similar agreements).

(c)     <u>Financial Reporting; Rights of Access and Information</u>.  The Debtors shall provide the Existing FLLO Agent and the advisors to the FLLO Ad Hoc Group with the financial and other reporting required to be provided to the DIP Agent pursuant to the DIP Credit Documents and this Final Order.   Without limiting the rights of access and information afforded the Existing FLLO Secured Parties under the Existing FLLO Loan Documents, the Debtors are hereby authorized to afford the representatives, agents, employees, attorneys, financial advisors, and investment bankers of the Existing FLLO Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the Existing FLLO Loan Documents and the Existing FLLO Security Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may reasonably be requested.

(d)     <u>Payment of Fees and Expenses of FLLO Ad Hoc Group and FLLO Secured Parties</u>.  The Debtors shall pay the reasonable and documented fees and expenses of professionals for (i) the FLLO Ad Hoc Group (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP including, for the avoidance of doubt, the financing fee and completion fee payable in accordance with the terms of the Perella Weinberg Partners Engagement Letter), and (ii) GLAS USA, LLC as the Existing FLLO Agent (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction) (collectively, the "<u>FLLO Professionals</u>") incurred in connection with these Chapter 11 Cases for so long as (1) the Restructuring Support Agreement has not been terminated as to the DIP Lenders, Required Consenting Revolving Credit Facility Lenders (as defined in the Restructuring Support Agreement), or FLLO Ad Hoc Group, or (2) an alternative

45

restructuring support agreement or similar agreement with respect to the restructuring of the Debtors' debt and businesses remains in effect between the DIP Agent, the DIP Lenders, 66.67% of the Existing RBL Lenders, and the FLLO Ad Hoc Group, in each case, at such time when neither of the conditions in (1) or (2) are occurring, such adequate protection shall terminate, provided that in the event such adequate protection payments terminate pursuant to the forgoing, (x) notwithstanding Paragraphs 29 and 30 of this Final Order, all parties shall retain all rights pursuant to the Collateral Trust Agreement, which rights are fully reserved, including, without limitation, the rights, if any, of the Existing FLLO Agent or Existing FLLO Lenders to seek different or additional adequate protection in accordance with section 6.02(f) of the Collateral Trust Agreement and (y) the Debtors shall pay all fees and expenses of the FLLO Professionals incurred prior to the termination of the Restructuring Support Agreement. The payment of the fees and expenses of the FLLO Professionals shall be subject to the review procedures set forth in Paragraph 22 of this Final Order. The payment of the fees and expenses of the FLLO Professionals is without prejudice to the right of the Committee to seek recharacterization of such fees as principal repayment in the event and to the extent that the Existing FLLO Obligations are determined to be undersecured, upon a motion filed with the Court.

(e)     Right to Seek Additional Adequate Protection. This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Existing FLLO Agent or the Existing FLLO Secured Parties to seek additional forms of adequate protection; provided, however, that this Final Order does not override the Collateral Trust Agreement or any of the provisions therein, including that the Existing

FLLO Agent and the Existing FLLO Secured Parties shall not seek, or be granted, any form of adequate protection except as permitted by the Collateral Trust Agreement.

14.   **Existing Second Lien Secured Parties' Adequate Protection**.  Until the indefeasible repayment in full in cash of the Existing Second Lien Obligations, the Existing Second Lien Secured Parties are entitled to adequate protection of their interests in the Existing Second Lien Collateral on account of the diminution in the value thereof as a result of (a) the provisions of this Final Order granting priming liens on such Existing Second Lien Collateral to the DIP Agent for the benefit of the DIP Secured Parties; (b) the authorization of the use of Cash Collateral and other Existing Second Lien Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; and/or (d) otherwise (the "Diminution in Existing Second Lien Collateral Value"), pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code. For the avoidance of doubt, the rights of the Existing Secured Parties, Debtors, the Creditors' Committee and all other parties in interest in respect of whether any Diminution in Existing Second Lien Collateral Value has occurred and the extent of any such diminution in value are reserved. The Existing Second Lien Notes Trustee, on behalf and for the benefit of the holders of the Existing Second Lien Notes, is hereby granted the following (collectively, the "Second Lien Adequate Protection Obligations" and, together with the RBL Adequate Protection Obligations and the FLLO Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)   Second Lien Adequate Protection Super-Priority Claims.  The Existing Second Lien Notes Trustee, on behalf and for the benefit of the holders of the Existing Second Lien Notes, is hereby granted super-priority administrative expense claims (the "Second Lien Adequate Protection Super-Priority Claims" and, together with the RBL Adequate Protection Super-Priority Claims, and the FLLO Adequate Protection Super-

47

Priority Claims, the "Adequate Protection Super-Priority Claims") under section 507(b) of the Bankruptcy Code against the Debtors' estates, including Avoidance Actions Proceeds, to the extent of any Diminution in Existing Second Lien Collateral Value, which Second Lien Adequate Protection Super-Priority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that at all times while such claims are in full force and effect pursuant to this Final Order, the Second Lien Adequate Protection Super-Priority Claims shall be junior in all respects to the DIP Super-Priority Claims, the RBL Adequate Protection Super-Priority Claims, and the FLLO Adequate Protection Super-Priority Claims, and in all cases subject to the Carve Out.

(b)     Second Lien Adequate Protection Liens.  Valid, enforceable, unavoidable and fully perfected replacement liens and security interests in all DIP Collateral (the "Second Lien Adequate Protection Liens," and together with the RBL Adequate Protection Liens and the FLLO Adequate Protection Liens, the "Adequate Protection Liens") to the extent of any Diminution in Existing Second Lien Collateral Value, which shall be (i) junior to the DIP Liens, the Permitted Priority Liens, the Existing RBL Liens, the RBL Adequate Protection Liens, the Existing FLLO Liens, and the FLLO Adequate Protection Liens, (ii) senior to all prepetition liens other than the Permitted Priority Liens, the Existing RBL Liens, and the Existing FLLO Liens, and (iii) in all cases subject to the Carve Out. The Second Lien Adequate Protection Liens shall be deemed to be legal, valid, binding,

48

enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in the Chapter 11 Cases. Except as otherwise set forth in this Paragraph 14 or otherwise in this Final Order, the Second Lien Adequate Protection Liens shall not be subordinated to or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise. The Second Lien Adequate Protection Liens shall be deemed to be perfected automatically upon the entry of the Interim Order, without the need for (x) filing any UCC-1 financing statement, state or federal notice, or other similar instrument or document in any state or public record or office, (y) taking possession or control of any collateral, or (z) further action of any kind (including entry into any security agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, or similar agreements).

(c)     Financial Reporting; Rights of Access and Information. The Debtors shall provide the Existing Second Lien Notes Trustee and the advisors Franklin with the financial and other reporting required to be provided to the DIP Agent pursuant to the DIP Credit Documents and this Final Order. Without limiting the rights of access and information afforded the Existing Second Lien Secured Parties under the Existing Second Lien Notes Documents, the Debtors are hereby authorized to afford the representatives, agents, employees, attorneys, financial advisors, and investment bankers of the Existing Second Lien Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the Existing Second Lien Notes Documents and the Existing Second Lien Security Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may reasonably be requested.

(d)     Payment of Fees and Expenses of Franklin and Existing Second Lien Secured Parties.   The Debtors shall pay (i) the reasonable and documented fees and expenses of the professionals for Franklin (including Akin Gump Strauss Hauer & Feld LLP, one local counsel in each other relevant local jurisdiction, FTI Consulting, Inc., and Moelis & Company LLC, including, for the avoidance of doubt, the restructuring fee payable in accordance with the terms of the Moelis & Company LLC Engagement Letter) and (ii)(a) the reasonable and documented fees and expenses incurred or accrued by Deutsche Bank Trust Company Americas, as the Existing Second Lien Notes Trustee and any other role(s) under the Second Lien Documents (the foregoing to include all unpaid prepetition fees, costs and expenses) (the "Existing Second Lien Notes Trustee Fees and Expenses"), (b) including the reasonable and documented fees and expenses of the professionals for Deutsche Bank Trust Company Americas, as the Existing Second Lien Notes Trustee (including Morgan, Lewis & Bockius LLP and one local counsel in each other relevant local jurisdiction) ((i) and (ii)(b), the "Second Lien Professionals") incurred in connection with these Chapter 11 Cases, for so long as the Restructuring Support Agreement has not been terminated as to the Debtors, DIP Lenders, Required Consenting Revolving Credit Facility Lenders (as defined in the Restructuring Support Agreement), or Franklin (at which time such adequate protection shall terminate), provided that in the event such adequate protection payments terminate pursuant to the foregoing, (x) all parties shall retain all rights pursuant to the Intercreditor Agreement, including, without limitation, the rights, if any, of such parties to seek different or additional adequate protection in accordance with section 4.02(f) of the Intercreditor Agreement and (y) the Debtors shall pay all fees and expenses of the Second Lien Professionals incurred prior to the termination

of adequate protection as described herein. The payment of the Second Lien Professionals and the Existing Second Lien Notes Trustee Fees and Expenses shall be subject to the review procedures set forth in Paragraph 22 of this Final Order.  The payment of the Existing Second Lien Notes Trustee Fees and Expenses and the fees and expenses of the Second Lien Professionals is without prejudice to the right of the Committee to seek recharacterization of such fees as principal repayment in the event and to the extent that the Existing Second Lien Obligations are determined to be undersecured, upon a motion filed with the Court; provided, however, that in the case of fees and expenses incurred by Akin Gump Strauss Hauer & Feld LLP, FTI Consulting, Inc., and Moelis & Company LLC, such fees and expenses are only subject to recharacterization as principal repayment in the event that both the Existing FLLO Obligations and the Existing Second Lien Obligations are determined to be undersecured, both upon a motion filed with the Court.

(e)     Right to Seek Additional Adequate Protection.  This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Existing Second Lien Notes Trustee to seek additional forms of adequate protection; provided, however, that the Existing Second Lien Notes Trustee and the Existing Second Lien Secured Parties shall not seek, or be granted, any form of adequate protection except as permitted by the Second Lien Intercreditor Agreement.

15.     **No Waiver of Secured Parties.**  The failure of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the DIP Credit Documents, or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Final Order (including the authorization of the use of any Cash Collateral) shall impair or modify any

rights, claims or defenses available in law or equity to any DIP Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law.  Except as prohibited by this Final Order, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) following a Termination Event or Event of Default under the DIP Credit Agreement, request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee or examiner in the Chapter 11 Cases, or to oppose the use of Cash Collateral on terms other than those set forth in this Final Order, (ii) following a Termination Event or Event of Default under the DIP Credit Agreement, propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly set forth herein, exercise any of the rights, claims or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties, respectively, under the DIP Credit Documents, the Bankruptcy Code, or otherwise.

16.     **No Waiver of Existing RBL Credit Agreement Provisions; Reservation of Rights**.  Except as otherwise specifically provided in this Final Order, nothing contained in this Final Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Existing RBL Credit Agreement by the Existing RBL Secured Parties, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors.

17.     **Rights of Access and Information**.  Without limiting the rights of access and information afforded the DIP Secured Parties under the DIP Credit Documents, the Debtors are hereby authorized to afford the representatives, agents, employees, attorneys, financial advisors, and investment bankers of the DIP Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Credit Documents, as applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may reasonably be requested.  The DIP Secured Parties may participate in any such visit or inspection at the expense of the Debtors as set forth in the DIP Credit Documents; provided, however, other than any such visits and inspections during the continuation of an Event of Default, only the DIP Agent on behalf of the Majority Lenders may exercise the rights of the DIP Secured Parties under this Paragraph 17.  In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and provide to the DIP Secured Parties all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors. The Debtors are further authorized to afford the representatives, agents, attorneys, financial advisors, and investment bankers of the Creditors' Committee reasonable access to the Debtors' premises, and the Creditors' Committee's professionals shall receive copies of all financial information and financial reports which are provided to the DIP Secured Parties pursuant to this Final Order or the DIP Credit Agreement, subject to any non-disclosure agreement between the Debtors and the Creditors' Committee.

18.     **Carve Out**.  As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to

the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee and Royalty Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Creditors' Committee Professionals" and the "Royalty Committee Professionals," as applicable and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, subject to and in accordance with the Approved Budget; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $7.5 million incurred after the first business day following delivery by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee and Royalty Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

        (a)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee

and Royalty Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for Revolving DIP Loans under the Revolving DIP Loan Commitment (on a pro rata basis based on the then outstanding Revolving DIP Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Revolving DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for Revolving DIP Loans under the Revolving DIP Loan Commitment (on a pro rata basis based on the then outstanding Revolving DIP Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolving DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  On

the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Revolving DIP Loans under the DIP Revolver Facility, any termination of the Revolving DIP Loan Commitments following an Event of Default, or the occurrence of the Scheduled Maturity Date, each New Money DIP Lender with an outstanding Revolving DIP Loan Commitment (on a pro rata basis based on the then outstanding Revolving DIP Loan Commitments) shall make available to the DIP Agent such New Money DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Revolver Facility; provided that the New Money DIP Lenders shall have no requirement to fund the Carve Out Reserves in excess of any remaining borrowing availability under the DIP Credit Documents. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Revolving DIP Loan Commitments have been terminated, in which case any such excess shall be paid to the Existing RBL Agent for the benefit of the Existing RBL Secured Parties in accordance with their rights and priorities as of the Petition Date and pursuant to the Intercreditor Agreements. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above

(the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Revolving DIP Loan Commitments have been terminated, in which case any such excess shall be paid to the Existing RBL Agent for the benefit of the Existing RBL Secured Parties in accordance with their rights and priorities as of the Petition Date and pursuant to the Intercreditor Agreements. Notwithstanding anything to the contrary in the DIP Credit Documents, or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 18, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 18, prior to making any payments to the DIP Agent or the Existing RBL Agent, as applicable. Notwithstanding anything to the contrary in the DIP Credit Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Existing RBL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Credit Documents. Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Revolving DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no

way shall the Initial Approved Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in the Existing RBL Credit Documents, the Existing FLLO Loan Documents, or the Existing Second Lien Notes, the Carve Out shall be senior to all liens and claims securing the DIP Obligations, the DIP Hedges, the Adequate Protection Obligations, and any and all other forms of adequate protection, liens, or claims securing the DIP Facility, the Existing RBL Credit Facility, the Existing FLLO Term Loan Facility, and the Existing Second Lien Notes.

(b)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(c)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Secured Parties or Existing RBL Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Secured Parties or the Existing RBL Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)      <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Credit Documents, the Bankruptcy Code, and applicable law.

19.      **Investigation Rights**.   (a) The Creditors' Committee and Royalty Committee shall have until eighty-five (85) calendar days from the date the Creditors' Committee selected counsel, and (b) (i) with regard to the Existing RBL Liens and the Existing RBL Obligations, all other non-Debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as defined below), and (ii) with regard to the Existing FLLO Liens, the Existing FLLO Obligations, the Existing Second Liens, and the Existing Second Lien Obligations, the Debtors and all other non-Debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date) shall have seventy-five (75) calendar days from the date of entry of the Interim Order (each, as applicable, the "<u>Investigation Termination Date</u>") to investigate the validity, extent, priority, perfection and enforceability of: (i) the Existing RBL Liens and the Existing RBL Obligations; (ii) the Existing FLLO Liens and the Existing FLLO Obligations; or (iii) the Existing Second Liens and the Existing Second Lien Obligations, and (in addition to obtaining the requisite standing) to assert any other claims or causes of action against each of the Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties; <u>provided</u>, <u>however</u>, that such Investigation Termination Date shall be extended (i) as ordered by the Court for cause prior to the expiration of

the deadline to commence a Challenge or (ii) as agreed to by the Debtors, the Existing Lenders

and the Creditors' Committee without further order of the Court.  If (1) the Creditors' Committee,

Royalty Committee, or any non-Debtor party-in-interest determines that there may be a challenge

to the Existing RBL Liens or the Existing RBL Obligations or (2) the Creditors' Committee, the

Royalty Committee, the Debtors, or any non-Debtor party-in-interest determines that there may be

a challenge to the Existing FLLO Liens, the Existing FLLO Obligations, the Existing Second

Liens, or the Existing Second Lien Obligations and is granted authority and standing by this Court

by the Investigation Termination Date, then such Creditors' Committee, Royalty Committee,

Debtor, or other non-Debtor party-in-interest, as applicable, shall be permitted to file and prosecute

an objection or claim related thereto (each, a "Challenge"), and shall have only until the applicable

Investigation Termination Date to file such objection or claim (or otherwise initiate an appropriate

action on behalf of the Debtors' estates) setting forth the basis of any such challenge, claim or

cause of action; provided, however, that nothing contained in the DIP Credit Documents or this

Final Order shall be deemed to confer standing on the Creditors' Committee or any other non-

Debtor party-in-interest to commence a Challenge, and such Creditors' Committee or other non-

Debtor party-in-interest shall be required to move for standing and satisfy the applicable standard

for obtaining standing to pursue estate causes of action.  With respect to the Creditors' Committee

only, the filing by the Creditors' Committee of a standing motion or other application (a "Standing

Motion") for authority and/or standing commence a Challenge accompanied with a copy of the

proposed complaint (the "Proposed Complaint") which details the alleged Challenge which the

Creditors' Committee seeks to pursue shall automatically extend the Investigation Termination

Date for the Creditors' Committee only (provided such Standing Motion and Proposed Complaint

are filed on or before the initial Investigation Termination Date for the Creditors' Committee)

solely with respect to the Challenges subject to such Standing Motion and Proposed Complaint. The timely filing by the Creditors' Committee of a Standing Motion and Proposed Complaint before the expiration of the Investigation Termination Date extends the Investigation Termination Date for the Creditors' Committee solely for Challenges raised in the Proposed Complaint until the date that is the third business day after the Court issues a ruling on such Standing Motion. The Creditors' Committee agrees that any hearing on the Standing Motion shall be held within fourteen (14) days of filing of the Standing Motion unless otherwise agreed in writing by the Debtors and the DIP Agent, otherwise the Investigation Termination Date expires.  If a Challenge is not filed on or before the Investigation Termination Date, then, without further action by any party or any further order of this Court: (a) the agreements, acknowledgements, stipulations and releases contained in Paragraph D of this Final Order and its subparagraphs, shall be deemed to be immediately and irrevocably binding on the Debtors, and the Debtors' estates, the Creditors' Committee, and all parties-in-interest and any and all successors-in-interest thereto shall thereafter be forever barred from bringing any Challenge; (b) the liens and security interests of each of the Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (c) each of the Existing RBL Obligations, the Existing FLLO Obligations, and the Existing Second Lien Obligations shall be deemed to be finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraph D of this Final Order and its subparagraphs and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise (which claims, with respect to the Existing RBL Obligations, shall have been deemed satisfied to the extent the Existing RBL

Obligations are converted into Roll-Up Obligations as provided herein). Each of the Existing RBL Agent, the Existing FLLO Agent and the Existing Second Lien Notes Trustee shall cooperate in all reasonable requests for information in order to assist the Creditors' Committee in its investigation under this Paragraph 19. Notwithstanding anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations contained in Paragraph D of this Final Order and its subparagraphs shall nonetheless remain binding on all parties-in-interest and preclusive except with respect to the party asserting the Challenge and to the extent that such stipulations are expressly and successfully challenged in such Challenge and (b) the Existing Secured Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, any trustee appointed or elected in these cases shall, until the Investigation Termination Date (and thereafter, if a Challenge is commenced on or prior to the Investigation Termination Date) and for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph with respect to a Challenge (whether commenced by such trustee or commenced by any other non-Debtor party-in-interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Final Order.

20. **Restriction on Use of DIP Lenders' Funds and Cash Collateral.** The proceeds of the DIP Facility and the Cash Collateral shall be used exclusively for the purposes described in Paragraph 9 of this Final Order, subject to and solely in accordance with the Approved Budget (subject to the Variance Limit). Except as expressly set forth herein, (i) none of Carve Out, DIP Facility Loans, DIP Collateral, or any Cash Collateral may be used (a) for the payment of interest and principal with respect to any indebtedness that is subordinate to the DIP Facility

(including the Adequate Protection Obligations) except as expressly set forth herein and in the DIP Credit Agreement and pursuant to the Approved Budget, or (b) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent and except as permitted in the Approved Budget, and (ii) none of the Carve Out, DIP Facility Loans, DIP Collateral, Existing RBL Collateral, Cash Collateral, or any Cash Collateral of the Existing RBL Lenders may be used directly or indirectly by any of the Debtors, any Creditors' Committee or Royalty Committee or any other person or entity (a) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion, other litigation, claim, objection, challenge, examination or investigation of any type relating to or in connection with the DIP Credit Documents, Existing RBL Credit Documents, Existing FLLO Loan Documents, or Existing Second Lien Notes Documents, including, without limitation, any challenges to the DIP Obligations or Existing Obligations, or the validity, perfection, priority, or enforceability of any DIP Lien or Existing Lien securing such claims or any payment made thereunder, or (b) to finance in any way any action, suit, arbitration, proceeding, application, motion, other litigation, claim, objection, challenge, examination, or investigation of any type adverse to the interests of the DIP Secured Parties or Existing Secured Parties or their respective rights and remedies under the DIP Credit Documents, Existing RBL Credit Documents, Existing FLLO Loan Documents, Existing Second Lien Notes Documents, the Interim Order or this Final Order without the prior written consent of the DIP Agent or Existing RBL Agent, as applicable; provided, however, that up to $400,000 shall be made available to the Creditors' Committee prior to the Investigation Termination Date for lien investigation costs in respect of the Debtors' stipulations with respect to the Existing Obligations and the Existing Liens set forth in Paragraph D of this Final Order and as permitted in Paragraph 19 of this Final Order and the

Creditors' Committee may be paid in accordance with the terms hereof and the order regarding the payment of interim compensation for investigation costs related to potential Challenges other than the lien investigation.

21. **Estate Professional Fees**. Nothing in this Final Order shall be construed as consent to the allowance of any fees, expenses, reimbursement or compensation sought by any Professional Person, or shall affect the right of any party in interest, including any DIP Secured Party or any Existing Secured Party, to object to the allowance and payment of any such fees, expenses, reimbursement or compensation.

22. **Payment of Certain Fees and Expenses.** Subject to the review procedures set forth in this Paragraph 22, payment of all DIP Agent Fees and Expenses, Existing RBL Agent Fees and Expenses, and the fees and expenses of the Collateral Trustee, FLLO Professionals and Second Lien Professionals shall not be subject to Court approval or the U.S. Trustee fee guidelines, and none of the DIP Agent Professionals, Existing RBL Agent Professionals, Collateral Trustee Professionals, FLLO Professionals or Second Lien Professionals shall be required to file with respect thereto any interim or final fee application with this Court. The DIP Agent, the Existing RBL Agent, the Collateral Trustee, the Existing FLLO Agent, the FLLO Ad Hoc Group, the Existing Second Lien Notes Trustee and Franklin shall provide copies of the summary invoices of such professionals (which shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses, but shall not be required to contain time entries, and which may be modified to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of the summary invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee, the DIP

Agent, the Existing RBL Agent, the Existing FLLO Agent, the FLLO Ad Hoc Group, the Existing Second Lien Notes Trustee, Franklin and counsel to the Creditors' Committee and Royalty Committee (together, the "Review Parties").  If any Review Party objects to the reasonableness of the fees and expenses of the DIP Agent Professionals, Existing RBL Agent Professionals, Collateral Trustee Professionals, FLLO Professionals or Second Lien Professionals and cannot resolve such objection within ten (10) business days of receipt of such invoices (the "Review Period"), then such party shall file with this Court and serve on such professional an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within the Review Period shall constitute a waiver of any right of such party to object to the applicable invoice.  The Debtors shall timely pay in accordance with the terms and conditions of this Final Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs, and expenses on any invoice in which no Fee Objection has been timely filed.

23.    **Protection of DIP Secured Parties' and Existing RBL Secured Parties' Rights**.  The DIP Secured Parties' and Existing RBL Secured Parties' rights shall be protected as follows:

(a)    So long as there are any DIP Facility Loans or DIP Obligations outstanding or the New Money DIP Lenders have any outstanding commitments under the DIP Credit Agreement, the Existing Secured Parties (i) shall not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Final Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized herein or by any other order of this Court, (ii) shall be deemed to have consented to any release of DIP Collateral authorized under

the DIP Credit Documents, (iii) shall not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) not seek to terminate or modify the use of Cash Collateral, except as provided in Paragraph 29 of this Final Order.

(b)     So long as there are any Existing RBL Loans or Existing RBL Obligations outstanding or the Existing RBL Secured Parties have any outstanding commitments under the Existing RBL Credit Facility, the Existing FLLO Secured Parties and Existing Second Lien Secured Parties (i) shall not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Final Order, or otherwise exercise remedies against any Existing RBL Collateral, except to the extent authorized herein or by any other order of this Court, (ii) shall be deemed to have consented to any release of Existing RBL Collateral authorized under the Existing RBL Credit Documents, (iii) shall not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the Existing RBL Collateral unless, solely as to this clause (iii), the DIP Agent and Existing RBL Agent, in each case if applicable, files financing statements or other documents to perfect the liens granted pursuant to this Final Order, or as may be

required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) not seek to terminate or modify the use of Cash Collateral.

(c)     For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order or the DIP Credit Agreement, in the event of any payment or disbursement made by Credit Agricole Corporate and Investment Bank ("CACIB") as a Letter of Credit Issuer under any Letter of Credit issued by it (each as defined in the Existing RBL Credit Agreement), the Debtors are authorized to and shall pay the Letter of Credit Issuer the Unpaid Drawing (as defined in the Existing RBL Credit Agreement) pursuant to section 3.4(a) of the Existing RBL Credit Agreement.

24.     **Further Assurances**.  The Debtors shall execute all such agreements, financing statements, instruments and other documents, and take all such further actions (including the filing and recording of financing statements and other documents) that may be required under any applicable requirements of law, or that the DIP Secured Parties or the Existing RBL Secured Parties may reasonably request in order to grant, preserve, protect, or perfect the DIP Liens or the Adequate Protection Liens granted pursuant hereto.  Further, the Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, mortgages, financing statements collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, and other collateral documents and agreements), and to pay all fees and expenses that may be required or necessary for the Debtors' performance under the DIP Credit Documents, including, without limitation, (i) the

67

execution of the DIP Credit Documents and (ii) the payment of the fees, costs and other expenses described in the DIP Credit Documents as and when such become due.

25.     **506(c) Waiver**.  Except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Existing RBL Agent, the Existing FLLO Agent, and the Existing Second Lien Notes Trustee, no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties, the Existing RBL Secured Parties, the Existing FLLO Secured Parties or the Existing Second Lien Secured Parties; <u>provided</u> that the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this Paragraph 25, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties, the Existing RBL Secured Parties, the Existing FLLO Secured Parties, or the Existing Second Lien Secured Parties upon the DIP Collateral, the Existing RBL Collateral, or the Existing FLLO Collateral or the Existing Second Lien Collateral (as applicable).

26.     **Waiver of Marshaling**.  Except to the extent of the Carve Out, in connection with any disposition of or exercise of rights and remedies with respect to the DIP Collateral, the DIP Agent may use commercially reasonable efforts to first apply proceeds of the DIP Collateral that is not Existing Collateral to satisfy the DIP Obligations before applying proceeds of DIP Collateral that is Existing Collateral to satisfy the DIP Obligations and in no event shall any of the DIP Secured Parties or, any of the Existing RBL Secured Parties, the Existing

68

FLLO Secured Parties, or the Existing Second Lien Secured Parties, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the collateral securing the DIP Obligations, the RBL Adequate Protection Obligations, the Existing RBL Obligations, the FLLO Adequate Protection Obligations, the Existing FLLO Obligations, the Second Lien Adequate Protection Obligations, or the Existing Second Lien Obligations; provided, however, that the DIP Secured Parties shall use commercially reasonable efforts to first use all DIP Collateral other than Avoidance Actions Proceeds to repay the DIP Obligations.

27.     **Restrictions on Granting Post-Petition Liens**.  Other than the Carve Out, or as otherwise provided in this Final Order or the DIP Credit Agreement, no claim having a priority superior or *pari passu* with those granted by the Interim Order or this Final Order to the DIP Secured Parties, Existing RBL Secured Parties, and Existing FLLO Secured Parties shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any portion of the DIP Facility (or refinancing thereof), any DIP Facility Loan, or any other DIP Obligations are outstanding or (ii) the New Money DIP Lenders have any outstanding Revolving DIP Loan Commitments under the DIP Credit Agreement.  Except as expressly permitted by the DIP Credit Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

28.     **Automatic Effectiveness of Liens**.  The DIP Liens and the Adequate Protection Liens automatically shall be deemed to be valid, perfected, enforceable, non-avoidable and effective by operation of law, and not subject to challenge as of the Petition Date, without the need for (x) filing any UCC-1 financing statements, security agreements, vehicle lien applications, filings with the U.S. Patent and Trademark Office, the United States Copyright Office, or the

Library of Congress, state or federal notice, or any other similar instrument or document in any state or public record or office, (y) taking possession or control of any collateral, or (z) further action of any kind (including execution of any security agreements, mortgages, financing statements, collateral agreements, collateral trust agreements, deposit account control agreements, blocked account control agreements, securities account control agreements, or other collateral documents and agreements). All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except the Permitted Priority Liens, Adequate Protection Liens, the Existing Liens, and any other liens expressly permitted under the Existing RBL Credit Agreement. If the DIP Agent, the Existing RBL Agent, the Existing FLLO Agent, or Existing Second Lien Notes Trustee hereafter reasonably requests that the Debtors execute and deliver to the DIP Agent, the Existing RBL Agent, the Existing FLLO Agent, or Existing Second Lien Notes Trustee financing statements, security agreements, collateral assignments, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, as applicable, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, collateral assignments, instruments, and documents, and the DIP Agent or the Existing RBL Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order; provided that all financing statements, notices of liens or similar instruments filed by the Existing FLLO Agent shall conspicuously state that the FLLO Adequate Protection Liens are junior and subordinated to the DIP Liens, RBL Adequate Protection Liens, and Existing RBL Liens; provided, further, that all financing statements, notices of liens or similar instruments filed by the

Existing Second Lien Notes Trustee shall conspicuously state that the Second Lien Adequate Protection Liens are junior and subordinated to the DIP Liens, RBL Adequate Protection Liens, Existing RBL Liens, FLLO Adequate Protection Liens, and Existing FLLO Liens.

29.   **Events of Default and Enforcement of Remedies**.   Upon the occurrence and during the continuation of any Event of Default, the DIP Secured Parties shall have the rights and remedies set forth in the DIP Credit Agreement and in this Final Order.  In the event the Debtors file, solicit or take any affirmative action supporting a plan of reorganization that does not propose to pay all claims on account of the Existing RBL Obligations, including the RBL Adequate Protection Super-Priority Claims, indefeasibly in full in cash or with such other consideration acceptable to the Existing RBL Secured Parties, or fail to object to such a plan, such event shall terminate the Existing Secured Parties' consent to the Debtors' use of Cash Collateral and shall be an event of default under this Final Order (the "RBL Cash Collateral Event of Default"), subject to the provisions and procedures described in Paragraph 30 of this Final Order.

30.   **Modification of Automatic Stay**.  As provided herein, subject only to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit: (i) the DIP Agent to, upon the occurrence and during the continuance of any Event of Default and upon the direction of the Majority Lenders, (a) deliver a notice to the Borrower of the Event of Default, (b) declare the termination, reduction, or restriction of the Revolving DIP Loan Commitments, and thereupon the Revolving DIP Loan Commitments shall be terminated, reduced, or restricted immediately unless and until the Majority Lenders and the DIP Agent shall reinstate the same in writing, (c) declare the DIP Facility Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due

and payable may thereafter be declared due and payable), and thereupon the principal of the DIP Facility Loans so declared to be due and payable, together with accrued interest thereon and all fees and other DIP Obligations, shall become due and payable immediately, in each case, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, which is waived by the Debtors pursuant to the DIP Credit Agreement, (d) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, (e) terminate the DIP Facility, (f) charge the Default Rate under the DIP Facility, and (g) exercise any right or remedy with respect to the DIP Collateral or DIP Liens, or take any other action or exercise any other right or remedy permitted under the DIP Credit Documents or applicable law; (ii) the Existing RBL Agent to, upon the occurrence of the RBL Cash Collateral Event of Default, declare a termination of the ability of the Debtors to use any Cash Collateral; and (iii) any of the parties to the Restructuring Support Agreement to send a notice of termination as permitted under the Restructuring Support Agreement; provided, however, that in the case of the enforcement of liens or other remedies with respect to DIP Collateral pursuant to clauses (i) and (ii) above, the DIP Agent or Existing RBL Agent shall provide the Debtors (with a copy to counsel for the Creditors' Committee and Royalty Committee, the U.S. Trustee, the FLLO Professionals and the Second Lien Professionals) with notice, file such notice on the docket in the Chapter 11 Cases (using the CM/ECF code for emergency), and request an emergency hearing with respect to the same (the "Stay Relief Hearing").  The Court shall conduct the Stay Relief Hearing upon five (5) business days' notice to determine whether an Event of Default has occurred; provided, further, that at the Stay Relief Hearing, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Agent or Existing RBL Agent shall be whether, in fact, an Event of Default has occurred and is continuing.  Prior to the Stay Relief

Hearing, the Debtors are permitted to use Cash Collateral solely in accordance with the Approved Budget.  Upon the Court's determination that an Event of Default occurred, the DIP Agent or Existing RBL Agent shall be entitled to exercise all rights and remedies with respect to the DIP Collateral provided for in the DIP Credit Agreement or this Final Order, including the right to foreclose on, or otherwise exercise its rights with respect to all or any portion of the DIP Collateral, including by applying the proceeds thereof to the DIP Obligations.  Without limiting the foregoing, upon a determination by the Court that an Event of Default occurred, each DIP Lender (and its respective affiliates, including its various branches and offices) shall have the authority, subject to obtaining the prior written consent of the DIP Agent and to the fullest extent permitted by applicable law, to set off and apply any and all deposits (of whatever type and in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such DIP Lender (or its affiliate) to or for the credit or account of the Borrower against any and all of the DIP Obligations of the Borrower to such DIP Lender, subject to the terms of the DIP Credit Agreement.  The foregoing right of setoff shall apply irrespective of whether such DIP Lender has made any demand under the DIP Credit Documents and even if the DIP Obligations of the Borrower are contingent or unmatured.  The rights and remedies of the DIP Agent and DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Secured Parties may have under the DIP Credit Documents or otherwise.  The Debtors shall cooperate fully with the DIP Agent and the DIP Secured Parties in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Paragraph 30 and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

31. **Milestones**.  It is a condition to the DIP Facility that the Debtors shall comply with the following deadlines (each of which may be waived, amended, modified or extended upon the prior written consent of the DIP Agent and the Majority Lenders without further order of this Court) (the "Milestones").  The failure to satisfy the following Milestones shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement and this Final Order:

(a)    The Court shall have entered the Interim Order no later than five (5) days after the Petition Date.

(b)    No later than the date that is thirty (30) days after the Petition Date, the Debtors shall have filed a motion that is acceptable to the DIP Agent seeking approval of the fees to be paid with respect to the exit financing facilities described in the Restructuring Support Agreement and authority to pay the upfront fees, arranger fees, and all other fees earned and payable as of the approval of such motion (as described in the term sheet describing the exit financing facilities attached to the Restructuring Support Agreement).

(c)    The Court shall have entered this Final Order no later than thirty-five (35) days after the Petition Date.

(d)    No later than the date that is sixty (60) days after the Petition Date, the Debtors shall have (i) obtained Court approval of the fees to be paid with respect to the Exit Facilities and (ii) paid the upfront fees, arranger fees, and all other fees then earned and payable (as described in the term sheet describing the exit financing facilities attached to the Restructuring Support Agreement).

(e)     No later than the date that is ninety (90) calendar days after the Petition Date, the Court shall have entered an order approving the Backstop Commitment Agreement (as defined in the Restructuring Support Agreement) and the Backstop Commitment Agreement shall remain effective and binding on the parties thereto.

(f)     No later than the date that is ninety (90) calendar days after the Petition Date, the Debtors shall file (i) a chapter 11 plan (a "Plan") and a disclosure statement for the Plan (a "Disclosure Statement") that provides for treatment acceptable to the DIP Lenders (or such plan provides for the indefeasible repayment of the DIP Obligations and remaining Existing RBL Obligations in full in cash on the Effective Date and as a condition to emergence) (such Plan, an "Approved Plan," and such Disclosure Statement, an "Approved Disclosure Statement," and together with an Approved Plan, collectively, an "Approved Plan and Disclosure Statement"); provided, for so long as the Restructuring Support Agreement is in effect as (i) DIP Lenders who hold or control 100% of the DIP Claims (as defined in the Restructuring Support Agreement) and Existing RBL Lenders which hold or control at least 66.67% of the Revolving Credit Facility Claims (as defined in the Restructuring Support Agreement), that the treatment provided in the Restructuring Support Agreement is acceptable to the DIP Lenders.

(g)     No later than the date that is one-hundred and twenty (120) calendar days after the Petition Date, the Debtors shall have filed a motion seeking approval of the Approved Disclosure Statement.

(h)     No later than the date that is one-hundred and sixty (160) calendar days after the Petition Date, the Approved Disclosure Statement shall have been approved by the Court.

(i)      No later than the date that is one-hundred and ninety-five (195) calendar days after the Petition Date, the Court shall have entered an order confirming the Approved Plan.

(j)      No later than the date that is two-hundred and twenty (220) calendar days after the Petition Date, the effective date of the Approved Plan (the "Effective Date") shall have occurred; provided that this milestone shall be automatically extended to the extent necessary, but in no event longer than fifteen (15) consecutive business days to allow for the expiration of the marketing period under the Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement).

(i)    If the Debtors fail to satisfy clause (e) or (f) above, then the Required Plan Sponsors, for the benefit of all Consenting FLLO Term Loan Facility Lenders and Consenting Second Lien Noteholders (each as defined in the Restructuring Support Agreement) and the DIP Agent shall each have the right to appoint a board observer, effective immediately, who shall attend any board of directors meetings and management meetings concerning the restructuring (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; provided that if any officer attends such executive session concerning the restructuring the board observer shall also attend).  In consideration for the immediate and effective appointment of the DIP Agent's board observer, the Milestones shall be extended as follows (and there shall not be an Event of Default under the DIP Credit Agreement as a result of the Debtors' failure to satisfy clause (e) or (f) above):  (1) the Debtors shall file an Approved Plan and Disclosure Statement, and a motion to approve such Approved Disclosure Statement on or before a date that is 135 days following the Petition Date; (2) such Approved Disclosure Statement shall have been approved by the Court by the date that is no later than 165 days after the Petition Date; (3) the

Court shall have entered an order confirming such Approved Plan by the date that is no later than 200 days after the Petition Date; and (4) the effective date of such Approved Plan shall have occurred by the date that is no later than 220 days after the Petition Date; provided that the milestone in clause (4) shall be automatically extended to the extent necessary, but in no event longer than fifteen (15) consecutive business days to allow for the expiration of the marketing period under the Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement). (ii)   If the Debtors fail to satisfy clause (f) above on or before the date that is 135 days following the Petition Date, then (x) at the request of the DIP Agent, the Debtors shall immediately take all actions necessary on an expedited basis (including by filing a motion and notice of hearing) to implement the appointment of a Chief Restructuring Officer ("CRO") acceptable to the DIP Agent who shall (i) be vested with the executive authority to oversee the Debtors' restructuring, subject to oversight by the board of directors in accordance with applicable law, (ii) attend any board of directors meetings and management meetings concerning the restructuring (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; provided that if any officer attends such executive session concerning the restructuring the CRO shall also attend), (iii) report directly to the board of directors, (iv) provide updates to the Court, and (v) otherwise satisfy the requirements of 11 U.S.C. §327; and (y) the Debtors' shall file an Approved Plan on or before the date that is one-hundred and eighty (180) days after the Petition Date that has been approved by the CRO.  For the avoidance of doubt, all rights of the Creditors' Committee, Royalty Committee, and all other parties in interest to object to the proposed CRO are reserved.  Upon Court approval and appointment of the CRO, the Milestones shall be extended as follows (and there shall not be an Event of Default under the DIP Credit Agreement as a result of the Debtors' failure to satisfy clause (f) above on or before the date that is 135 days following the

Petition Date):  (1) an Approved Disclosure Statement for the Approved Plan approved by the CRO, and the motion to approve such Approved Disclosure Statement, shall be filed with such Approved Plan on or before the date that is one-hundred and eighty (180) days following the Petition Date; (2) such Approved Disclosure Statement shall have been approved by the Court by the date that is no later than two-hundred and ten (210) days after the Petition Date; (3) the Court shall have entered an order confirming such Approved Plan by the date that is no later than two-hundred and forty-five (245) days after the Petition Date; and (4) the effective date of such Approved Plan shall have occurred by the date that is no later than two-hundred and sixty (260) days after the Petition Date; provided that the milestone in clause (4) shall be automatically extended to the extent necessary, but in no event longer than fifteen (15) consecutive business days to allow for the expiration of the marketing period under the Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement); provided, further, that in no event shall the Plan Effective Date extend beyond the Scheduled Maturity Date.

(iii)   The Milestones consisting of the entry of orders or judicial resolution by the Court shall be automatically extended by five (5) business days to the extent it is not reasonably feasible to hold and conclude a hearing (if necessary) prior to the applicable Milestone as a result of the closure of the Court due to the events or circumstances surrounding the virus known as COVID-19 (the "COVID-19 Extension"), and the DIP Agent shall be deemed to have automatically agreed to such extension.

32.   **Credit Bid**.

(a)      The DIP Agent, at the direction of the Majority Lenders, shall have the unqualified right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a

plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

(b)     The Existing RBL Agent, at the direction of the Required Lenders (as defined in the Existing RBL Credit Agreement), shall have the right to credit bid up to the full amount of any remaining Existing RBL Obligations in any sale of DIP Collateral or Existing RBL Collateral, as applicable, as provided for in section 363(k) of the Bankruptcy Code, subject to the satisfaction of all DIP Obligations and all obligations secured by Permitted Priority Liens, or as otherwise consented to by the New Money DIP Lenders or such other holder of a Permitted Priority Lien, as applicable, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

(c)     The Existing FLLO Agent and Existing Second Lien Notes Trustee shall have the right to credit bid the Existing FLLO Obligations and Existing Second Lien Obligations, respectively, pursuant to section 363(k) of the Bankruptcy Code solely to the extent permitted in the Intercreditor Agreements.

33.     **Post-Petition Hedging Agreements**. The Debtors may enter into commodity hedge transactions with New Money DIP Lenders or their affiliates (the "<u>DIP Hedges</u>") subject to the terms set forth in the DIP Credit Agreement and pursuant to the order of the Court authorizing the Debtors to continue prepetition hedging arrangements and to enter into postpetition hedging arrangements (Docket No. 135, the "<u>Hedging Order</u>").  Subject to the Carve Out, and consistent with the Hedging Order, the obligations of the Debtors pursuant to the DIP

Hedges shall be allowed superpriority claims pursuant to section 364(c)(1) (the "Superpriority Hedge Claims"). Such Superpriority Hedge Claims shall have *pari passu* priority to the DIP Revolving Obligations (and, for the avoidance of doubt, priority over the Roll-Up Loans) and priority over all other claims (including claims otherwise having priority under section 507 of the Bankruptcy Code or otherwise).

34.    **Binding Effect**.  Subject to Paragraph 19 of this Final Order, the provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Existing Secured Parties, the Debtors, the Creditors' Committee, the Royalty Committee, any other committee appointed in these Chapter 11 Cases, and each of their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Final Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Final Order.

35.    **Survival**.  The provisions of this Final Order and the DIP Credit Documents, any actions taken pursuant hereto or thereto, and all of the protections, rights, remedies, liens, priorities, privileges, and benefits granted to any or all of the DIP Secured Parties, Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties hereunder or thereunder, as applicable, shall survive and continue in full force and effect, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, converting any of the

Chapter 11 Cases to a chapter 7 case, dismissing any of the Chapter 11 Cases, withdrawing of the reference of any of these Chapter 11 Cases or providing for abstention from handling or retaining of jurisdiction of any of these Chapter 11 Cases in this Court, or terminating the joint administration of these Chapter 11 Cases or by any other act or omission.  The terms and provisions of this Final Order, including the DIP Super-Priority Claims, and the DIP Liens in the DIP Collateral, and all other protections, rights, remedies, liens, priorities, privileges, and benefits granted to any or all of the DIP Secured Parties, Existing RBL Secured Parties, Existing FLLO Secured Parties, and Existing Second Lien Secured Parties, respectively, shall continue in full force and effect in these proceedings and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Final Order, the DIP Credit Documents, and the Existing RBL Credit Documents, the Existing FLLO Loan Documents, the Existing Second Notes Lien Documents and to the maximum extent permitted by law, until all of the DIP Obligations, Existing RBL Obligations, the Existing FLLO Obligations, and the Existing Second Lien Obligations, as applicable are indefeasibly paid in full in cash and discharged.  The DIP Obligations shall not be discharged by the entry of any order confirming any such chapter 11 plan, each of the Debtors having hereby waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  In no event shall any plan of reorganization or liquidation be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Credit Documents without the express written consent of the DIP Agent and the New Money DIP Lenders.

36.    **Modifications of DIP Credit Documents.**  The Debtors and the DIP Secured Parties are hereby authorized to implement, in accordance with the terms of the DIP Credit Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders) of the DIP Credit Documents without further order of

81

this Court; provided, however, that notice of any non-material modification or amendment to the DIP Credit Documents shall be provided to counsel to the Creditors' Committee and Royalty Committee, to the U.S. Trustee, the Existing RBL Agent, the Existing FLLO Agent, the FLLO Ad Hoc Group, the Existing Second Lien Notes Trustee, and Franklin, each of whom shall have three (3) business days from the date of such notice within which to object in writing to such modification or amendment.  If any such party timely objects to any non-material modification or amendment to the DIP Credit Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

37.    **Limits on Lender Liability; No Third Party Rights**.  Nothing in this Final Order, any of the DIP Credit Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Existing Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases.  The DIP Secured Parties shall not, solely by reason of having made loans under the DIP Facility, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Final Order or the DIP Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or any of the Existing Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.  Except as explicitly provided for herein or in any credit document, this Final Order does not create any rights for the benefit of any third party, creditor,

equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Credit Documents, the DIP Secured Parties and the Existing Secured Parties shall not owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

38.     **Insurance Policies**.  The DIP Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained now or in the future by any of the Debtors which in any way relates to the DIP Collateral; provided, however, that nothing in this Final Order, the Interim Order, or the DIP Credit Agreement shall modify the terms and conditions of any insurance policies or related agreements issued to the Debtors by ACE American Insurance Company, Federal Insurance Company, and/or any of their respective affiliates or successors unless agreed to or acknowledged by ACE American Insurance Company, Federal Insurance Company or their respective affiliates, as applicable.  Notwithstanding the foregoing, the Debtors are authorized and directed to take any actions that the DIP Agent shall request, in its sole and absolute discretion, to have the DIP Agent, on behalf of the DIP Secured Parties, added as an additional insured and loss payee on each insurance policy.

39.     **Release of Claims and Defenses**.  Each Debtor, on its own behalf and on behalf of its estate, hereby absolutely, irrevocably, and unconditionally releases and forever discharges and acquits each of the DIP Secured Parties and the Existing Secured Parties (solely in their capacity as such) together with their Representatives (collectively, the "Released Parties"), of and from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, controversies, disputes, obligations, counterclaims, offsets, defenses,

demands, debts, damages, expenses, losses, liens, accounts, contracts, liabilities, actions, causes

of action and any other rights of disgorgement or recovery of any kind, nature or description,

whether known or unknown, foreseen or unforeseen, matured or unmatured, accrued or unaccrued,

suspected or unsuspected, or liquidated or unliquidated, pending or threatened, arising in law or

equity or upon contract or tort or under any state or federal law or otherwise, arising out of, based

upon or related to, in whole or in part, any of the DIP Credit Documents, the Existing RBL Credit

Agreement, the Existing FLLO Term Loan Agreement, the Existing Second Lien Notes Indenture,

or any loans under the DIP Facility, any aspect of the relationship between the Debtors, on the one

hand, and any or all of the Released Parties, on the other hand, relating to any of DIP Credit

Documents, the Existing RBL Credit Agreement, the Existing FLLO Term Loan Agreement, the

Existing Second Lien Notes Indenture, or any transaction contemplated thereby or any other acts

or omissions by any or all of the Released Parties in connection with the DIP Facility, the Existing

RBL Facility, the Existing FLLO Facility, the issuance of the Second Lien Notes or any of the DIP

Credit Documents, the Existing RBL Credit Agreement, the Existing FLLO Term Loan

Agreement, the Existing Second Lien Notes Indenture, or their prepetition relationship with such

Debtor or any affiliate thereof relating to any of the DIP Credit Documents the Existing RBL

Credit Agreement, the Existing FLLO Term Loan Agreement, the Existing Second Lien Notes

Indenture, or any transaction contemplated thereby, including, without limitation, any so-called

"lender liability" claims or defenses or claims or defenses under chapter 5 of the Bankruptcy Code

or any other causes of action, in each case that any Debtor at any time had, now has or may have,

or that its successors or assigns hereafter can or may have against any of the Released Parties for

or by any reason of any act, omission, matter, cause or thing whatsoever arising at any time on or

prior to the date of this Final Order; <u>provided</u> that the releases set forth in this section shall not

release any claims against a Released Party or liabilities that a court of competent jurisdiction determines results from the bad faith, fraud, gross negligence or willful misconduct of such Released Party; provided, further, that nothing herein shall relieve the DIP Secured Parties from fulfilling their commitments under the DIP Facility.

40. **Protection Under Section 364(e)**. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the validity or enforceability of any DIP Obligation, DIP Lien, Adequate Protection Super-Priority Claim, or Adequate Protection Lien, or any other claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Credit Documents or Adequate Protection Obligations incurred prior to the actual receipt by the DIP Agent or the Existing RBL Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations by the Debtors prior to the actual receipt by the DIP Agent or the Existing RBL Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Final Order, and the DIP Secured Parties and Existing RBL Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under the Bankruptcy Code, including section 364(e) of the Bankruptcy Code, this Final Order, and the DIP Credit Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations.

41. **Effect of Dismissal of Chapter 11 Cases**. If the Chapter 11 Cases are dismissed, converted or substantively consolidated, then neither the entry of this Final Order nor the dismissal, conversion or substantive consolidation of these Chapter 11 Cases shall affect the

rights of the DIP Secured Parties or Existing Secured Parties under their respective DIP Credit Documents,  Existing RBL Credit Documents, the Existing FLLO Loan Documents, the Existing Second Lien Notes Documents, or this Final Order, and all of the respective rights and remedies thereunder of the DIP Secured Parties and the Existing Secured Parties shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Liens and DIP Super-Priority Claims granted to and conferred upon the DIP Agent and the DIP Secured Parties and the protections afforded to the DIP Agent and the DIP Secured Parties pursuant to this Final Order and the DIP Credit Documents shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Super-Priority Claims, and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (b) those Existing RBL Liens, RBL Adequate Protection Liens and RBL Adequate Protection Super-Priority Claims granted to and conferred upon the Existing RBL Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Existing RBL Obligations shall have been paid and satisfied in full (and that such RBL Adequate Protection Liens, RBL Adequate Protection Super-Priority Claims, and other adequate protection granted to or conferred on the Existing RBL Secured Parties shall, notwithstanding such dismissal, remain binding on all interested parties); and (c) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the Existing RBL Liens, the Adequate Protection Liens, the DIP Super-Priority Claims and the Adequate Protection Super-Priority Claims referred to herein.

42.     **Discharge**.  The DIP Obligations and the Adequate Protection Obligations provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such confirmed plan, unless each of the DIP Secured Parties and the Existing RBL Secured Parties, as applicable, has agreed in writing in accordance with section 13.1 of the DIP Credit Agreement, as applicable.

43.     **Proofs of Claim.**  The Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases for any claim allowed herein.  The stipulations in Paragraph D of this Final Order shall be deemed to constitute a timely-filed proof of claim for the Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties in respect of the Existing RBL Obligations, the Existing FLLO Obligations, and the Existing Second Lien Obligations.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Existing RBL Agent, the Existing FLLO Agent, and the Existing Second Lien Notes Trustee is authorized to file in the Debtors' lead Chapter 11 Case Chesapeake Energy Corporation, Case No. 20-33233 (DRJ), a master proof of claim on behalf of the Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties on account of any and all of their respective claims arising under the applicable security documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim by each of the Existing RBL Agent, the Existing FLLO Agent and the Existing Second

Lien Notes Trustee, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable security documents, and the claim of each Existing RBL Secured Party, Existing FLLO Secured Party, and Existing Second Lien Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  In addition, the Existing RBL Secured Parties and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Final Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Existing RBL Obligations constituting administrative expenses or any DIP Obligations, as applicable.

44.     **Reservation of Rights of the United States and other Governmental Units**.  Notwithstanding anything to the contrary in the Interim Order, this Final Order, or the DIP Credit Documents, nothing in the Interim Order, this Final Order, or the DIP Credit Documents shall: (i) impair or adversely affect the United States' rights, claims, and defenses under applicable law of set-off and recoupment, or those of any governmental unit as defined under 11 U.S.C. § 101(27) ("governmental unit"), and all such rights, claims and defenses (the "Setoff/Recoupment Rights") shall be preserved in their entirety, provided, however, that the exercise of any such Setoff/Recoupment Rights must be in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules; provided further, however, that (a) exercise of such Setoff/Recoupment Rights shall not impair or adversely affect the rights of the DIP Secured Parties to assert remedies (if any) with respect to any Event of Default in the event any governmental unit exercises any such Setoff/Recoupment Rights, (b) nothing in this paragraph shall limit the right of any party in interest to challenge the Setoff/Recoupment Rights of any such governmental unit, and (c) nothing in the

Interim Order, this Final Order, or the DIP Credit Documents shall modify or determine the rights or priority of any governmental unit's Setoff/Recoupment Rights vis-à-vis the rights and liens of the DIP Secured Parties, and all rights of the governmental units and the DIP Secured Parties with respect to the determination of such rights or priority (to the extent such priority is a disputed issue) are preserved; (ii) impair or adversely affect any right under applicable law of any governmental unit with respect to any financial assurance, letter of credit, trust, surety bond, or insurance proceeds; (iii) waive, impair, or adversely affect any governmental unit's rights (if any) under applicable law to refuse to provide its consent to the proposed assumption and/or assignment of any lease or executory contract; (iv) limit any governmental unit in the exercise of its police powers in accordance with 11 U.S.C. § 362(b)(4); (v) impair or adversely affect the right of any governmental unit to object to the terms of any credit bid for cause; or (vi) relieve the Debtors of any obligations under police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors rights to assert any defenses under applicable law, and nothing herein shall create new defenses to obligations under such police or regulatory laws or 28 U.S.C. § 959(b). With respect to environmental liabilities owed to any governmental unit, to the extent that the actions of the DIP Secured Parties or Existing Secured Parties (i) constitute, within the meaning of 42 U.S.C. § 9601(F) and (G), actual participation in the management or operational functions of a vessel or facility owned or operated by the Debtors, or (ii) otherwise cause lender liability to arise or the status of control, responsible person, owner or operator to exist under applicable law, the rights of such governmental unit under such applicable laws are preserved, and all rights of the DIP Secured Parties or Existing Secured Parties to contest such liability or status under applicable law are preserved.

45.   **Reservation of Rights of Royalty Committee**.  Notwithstanding anything to the contrary in the DIP Motion, the DIP Credit Documents, the Interim Order, or this Final DIP Order:

(A) The DIP Liens shall not prime or be senior to the liens or security interests of any Royalty Owners in any DIP Collateral, whether such liens or security interests arise by title, contract, under statute, by operation of law, or otherwise, to the extent such Royalty Owner's lien or security interest constitutes a valid, perfected non-avoidable lien senior to the Existing RBL Liens as of the Petition Date; provided, however, nothing in the DIP Motion, DIP Credit Documents, Interim Order or Final DIP Order shall be deemed to be an adjudication of, or have any preclusive effect, as to the validity, priority or extent of the liens or security interests of any Royalty Owners;

(B)  Nothing  in the DIP Motion, the DIP Credit Documents, the Interim Order, this Final Order shall be deemed to be an adjudication of, or have a preclusive effect as to (i) the extent of the Debtors' ownership of oil and gas minerals under an oil and gas lease with any Royalty Owners, or (ii) whether any such ownership has or has not terminated, or any such acreage has been deemed released to any Royalty Owner lessors, or is subject to judicial order of release to any Royalty Owner lessors, and the rights of all parties with respect to any challenge respecting the extent of the Debtors' ownership of any oil and gas minerals under any oil and gas leases are hereby preserved;

(C)  The DIP Liens shall be coextensive with the Debtors' rights, title and interest in, to and under any DIP Collateral, and all parties reserve all rights regarding ownership of any property alleged to be held in trust;

(D)  Solely with regard to the mineral acreage for which there is a dispute as to whether such mineral acreage terminated or has been released by any of the Debtors to any Royalty Owners, nothing in the DIP Motion, the DIP Credit Documents, the Interim Order, this Final Order shall (i) be deemed an admission or waiver of any dispute on any prepetition Royalty Owner claim, or (ii) limit or prejudice any Royalty Owner from challenging the validity, extent, priority, perfection, or enforceability of any liens or security interests asserted by the Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties in any mineral acreage subject to their respective oil and gas leases solely on the basis of the Debtors' disputed interest.

(E) All parties rights are reserved with regard to the priority of any recorded lis pendens as of the Petition Date.

46.  **Reservation of Rights of Petty Entities**.  Notwithstanding anything in this Final Order, the Interim Order, or the DIP Credit Documents, the DIP Liens and the Adequate Protection Liens shall not prime or be senior to the liens or interests of Petty Business Enterprises, LP, Petty Energy L.P, Petty Grandchildren's Trust, Susan Petty Arnim Trust, Scott James Petty Trust, Joan L. Petty Trust, Scott James Petty, Joan L. Petty, Susan Petty Arnim, Petty Group LLP, Ferncliff Investments, L.P., Scott Jr. and Eleanor Petty, Susan and Thomas Arnim,  Eleanor O. Petty, and The Petty Family Limited Partnership, LLP (each a "Petty Entity") under any oil and gas lease between a Petty Entity as lessor and Chesapeake Exploration L.L.C. as lessee and any operating agreement between Chesapeake Exploration L.L.C. as operator and Petty Energy L.P. as non-operator, in each case to the extent such lien or interest of the Petty Entity constitutes a valid, perfected non-avoidable lien senior to the Existing RBL Liens as of the Petition Date.

47. <u>**Reservation of Rights of Plaintiffs in Texas MDL Litigation**</u>.
Notwithstanding anything to the contrary in the DIP Motion, in the DIP Credit Documents, in the
Interim Order (for the removal of doubt, including without limitation part D thereof sub-headed
"Debtors' Stipulations with Respect to Existing Obligations" and including without limitation,
paragraphs 19 and 34 thereof) or in this Final DIP Order:

(A)  nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP
Credit Documents shall be deemed to be an adjudication of, or have a preclusive effect as to (i)
the extent of the Debtors' ownership of oil and gas minerals and the originally-leased acreage
subject to the claims of the plaintiff-lessors in the multi-district litigation currently pending in
Texas (the "<u>Texas MDL Litigation</u>"),[5] or (ii) whether any such ownership has or has not
terminated, or any such acreage has been deemed released to plaintiff-lessors or is subject to
judicial order of release to plaintiff-lessors, and all rights of the parties in the Texas MDL
Litigation are hereby preserved;

(B) the DIP Liens shall not attach to the property interests of the plaintiffs in the
Texas MDL Litigation in which the Debtors' do not hold an interest;

(C) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the
DIP Credit Documents (including, for the removal of doubt, the "Challenge" and "shall be required
to move for standing" provisions set forth in Paragraph 19 of the Interim Order and Paragraph 34
of the Interim Order)  shall limit in any manner the plaintiffs in the Texas MDL Litigation from

---

[5]   The Texas MDL Litigation consists of all claims and suits consolidated in the Texas Multi-District Litigation
proceeding styled *In re Chesapeake Eagle Ford Royalty Litigation*, Cause No. 2016C122093, pending in the
224th District Court in Bexar County, Texas; as well as the claims of the La Salle Trial Group One Plaintiffs from
the case styled *7K Investments, Ltd., et al. v. Chesapeake En. Corp., et al.*, No. 16-03-0030-CVL, tried in the
218th Judicial District Court of La Salle County, Texas, which was remanded by the pretrial court in Cause No.
2016C122093.

challenging the validity, extent, priority, perfection, or enforceability of any purported interest—solely with respect to the property that is the subject of the Texas MDL Litigation—asserted by the Existing RBL Secured Parties, the Existing FLLO Secured Parties, or the Existing Second Lien Secured Parties solely on the basis of the Debtors' disputed interests in such property; and

(D) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents shall limit in any manner the rights of any parties in the Texas MDL Litigation under any recorded lis pendens.

48. **Reservation of Rights of Delasandro Litigation**. Notwithstanding anything to the contrary in the DIP Motion, in the DIP Credit Documents, in the Interim Order (for the removal of doubt, including without limitation part D thereof subheaded "Debtors' Stipulations with Respect to Existing Obligations" and including without limitation, Paragraphs 19 and 34 thereof) or in this Final DIP Order:

(A) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents shall be deemed to be an adjudication of, or have a preclusive effect as to (i) the extent of the Debtors' ownership of oil and gas minerals and the originally-leased acreage subject to the claims of the plaintiff-lessor in the litigation captioned *Stefanie Delasandro v. Esquisto Resources II, LLC, et al.*, currently pending in the 272nd Judicial District Court in Brazos County, Texas under Cause No. 18-002976-CV-272 (the "Delasandro Litigation" ), or (ii) whether any such ownership has or has not terminated, or any such acreage has been deemed released to plaintiff-lessors or is subject to judicial order of release to plaintiff-lessor, and all rights of the parties in the Delasandro Litigation are hereby preserved;

(B) the DIP Liens shall not attach to the property interests of the plaintiff in the Delasandro Litigation in which the Debtors' do not hold an interest;

93

(C) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents (including, for the removal of doubt, the "Challenge" and "shall be required to move for standing" provisions set forth in Paragraph 19 of the Interim Order and Paragraph 34 of the Interim Order) shall limit in any manner the plaintiff in the Delasandro Litigation from challenging the validity, extent, priority, perfection, or enforceability of any purported interest—solely with respect to the property that is the subject of the Delasandro Litigation—asserted by the Existing RBL Secured Parties, the Existing FLLO Secured Parties, or the Existing Second Lien Secured Parties solely on the basis of the Debtors' disputed interests in such property; and

(D) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents shall limit in any manner the rights of any parties in the Delasandro Litigation under any recorded lis pendens.

49.      **Reservation of Rights of Tributary Litigation**.  Notwithstanding anything to the contrary in the DIP Motion, in the DIP Credit Documents, in the Interim Order (for the removal of doubt, including without limitation part D thereof sub-headed "Debtors' Stipulations with Respect to Existing Obligations" and including without limitation, paragraphs 19 and 34 thereof) or in this Final DIP Order:

(A)  nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents shall be deemed to be an adjudication of, or have a preclusive effect as to the extent of the Debtors' ownership of oil and gas minerals and the originally-leased acreage subject to the claims of Tributary Resources LLC ("Tributary") relating to the (i) claims asserted in Case No. CV-2017-140 pending in the District Court of Kingfisher County, State of Oklahoma (the "Tributary Litigation") or (ii) any defenses the Debtors may have, and all rights of the parties in the Tributary Litigation are hereby preserved;

(B) the DIP Liens shall not attach to the property interests of the plaintiffs in the Tributary Litigation in which the Debtors' do not hold an interest;

(C) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents (including, for the removal of doubt, the "Challenge" and "shall be required to move for standing" provisions set forth in Paragraph 19 of the Interim Order and Paragraph 34 of the Interim Order)  shall limit in any manner the plaintiffs in the Tributary Litigation from challenging the validity, extent, priority, perfection, or enforceability of any purported interest— solely with respect to the property that is the subject of the Tributary Litigation—asserted by  the Existing RBL Secured Parties, the Existing FLLO Secured Parties, or the Existing Second Lien Secured Parties solely on the basis of the Debtors' disputed interests in such property; and

(D) nothing in the DIP Motion, in the Interim Order, in this Final Order, or in the DIP Credit Documents shall limit in any manner the rights of any parties in the Tributary Litigation under any recorded lis pendens.

50.    **Reservation of Rights of Plaintiffs in Louisiana Cases**. The DIP Liens shall attach to the property interests that are subject to litigation currently pending in Louisiana (collectively, the "Louisiana Cases," and the plaintiffs in the Louisiana Cases, the "Louisiana Unleased Plaintiffs")[6] solely to the extent of the Debtors' interest in such property but not to | or identifiable proceeds therefrom
Louisiana Unleased Plaintiffs' interest in such property.  Nothing in the Interim Order, this Final Order, or the DIP Credit Documents shall (i) be deemed to be an adjudication of the underlying

---

[6] The Louisiana Cases are limited to (i) the following cases pending in the United States District Court for the Western District of Louisiana:  *Allen Johnson and Linda Johnson et al v. Chesapeake Louisiana, LP and Chesapeake Operating, L.L.C.*, 5:16-cv-01543-SMH-MLH; *Rodney Hudson et al v. Chesapeake Operating, L.L.C.*, 5:19-cv-00862-SMH-MLH; and *Saundra Louise Woods Nelson v. Chesapeake Louisiana, LP*, 5:19-cv-00533-SMH-MLH and (ii) *Ruth Elizabeth Middleton, et al v. EP Energy E&P Company, LP, et al*, No. 74,521, pending in the 42nd Judicial Court, DeSoto Parish, Louisiana.

matters asserted in the Louisiana Cases, and all rights of the parties to the Louisiana Cases are preserved, or (ii) preclude the plaintiffs in the Louisiana Cases from seeking adequate protection or other relief in accordance with the Bankruptcy Code, and all parties' rights to object to such relief are reserved. Nothing herein shall affect the Louisiana Unleased Plaintiffs' property.

51.     **Reservation of Rights of the PMBG Parties**.  Notwithstanding anything in this Final Order, the Interim Order, or the DIP Credit Documents, the DIP Liens shall not prime or be senior to the liens or interests of the PMBG Parties[7] in the DIP Collateral to the extent such lien or interest of the PMBG Party constitutes a valid, perfected non-avoidable lien senior to the Existing RBL Liens as of the Petition Date, whether those liens arise by contract, under statute, by operation of law, or otherwise. The DIP Liens shall attach to the property interests that are subject to the mineral and other interests held by the PMBG Parties only to the extent of the Debtors' interest in such property (and including all proceeds from the Debtors' interest in such property), and, with respect to amounts presently or hereafter being held in escrow pending resolution of any disputes between the Debtors and the PMBG Parties, the DIP Liens shall attach to such amounts solely to the extent of the Debtors' interests in such amounts. Nothing in the Interim Order, this

---

[7] "PMBG Parties" are the following parties asserting mineral and other interests: (i) Kelly Vesper, individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased; (ii) Gates Mineral Company, Ltd., Gates Production Company EF, LLC, Donald G. Elliott, Jannifer M. Elliott, David B. Elliott, Richard J. Gates, Linda A. Pederson, Louise G. Davis, Thomas A. Gates, Alonzo E. Gates, II, Laura I. Gates, Terri Street Gates Life Estate, and Alonzo E. Gates II Testamentary Trust, Argent Trust as Trustee; (iii) Leojua Ltd.; (iv) Blackstone Dilworth, Paul Dirks, Executor of the Estate of Frances Dilworth, deceased, Joya Minerals, LP, Frances Diane Dilworth Gates, Thomas A. Gates, Jr., Anthony Aguilar, David Ortiz, Horacio Saenz, Louise Dilworth Davis, Trustee of the Louise Dilworth Davis 2006 Trust, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Eric Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Daniel Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Serena Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Michelle Davis; (v) MBF Holdings La Salle LP, formerly MBF Partnership; (vi) Dan W. Kinsel III, individually, and as Trustee of the 2009 Dan and Leslie Kinsel Children's Trust and Karl Gene Kinsel, Individually, and as Trustee of the 2009 Karl Gene Kinsel Child's Trust; and (vii) Leighton Arthur Wier, Ronald Hargis Wier, Vicki Grace Gilbert, Max Harris Wier III, Leonard H. Sims III, Elizabeth Sims Hufft, Terry Lewis, Executor of the Estate of Diana Rose Sims Lewis, deceased, James Edward Sheldon, Executor of the Estate of Catherine Lilley Sheldon, deceased, and James Edward Sheldon, or their successors or assigns.

Final Order, or the DIP Credit Documents shall be deemed to be an adjudication of, or have a preclusive effect as to the extent of the Debtors' ownership of oil and gas minerals on the leased acreage subject to the mineral and other interests held by the PMBG Parties, and all rights of the Debtors and the PMBG Parties are preserved; provided, however, that any interest of the Debtors in such property is subject to the DIP Liens, the DIP Credit Documents, the Interim Order and this Final Order.

52.     **Tax Liens**. Notwithstanding any other provisions included in the Interim Order or this Final Order, or any agreements approved thereby or hereby, any statutory liens on account of ad valorem property taxes (collectively, the "Tax Liens") of Dimmit County, Borden County Appraisal District, Crosby Independent School District, Dawson County Central Appraisal District, Martin County Appraisal District, Crockett County Tax Office, Howard County Tax Office, Midland County, Upton County Appraisal District, Gray County Tax Office, Hansford County Tax Office, Sheldon ISD, Austin ISD, Houston County, Nacogdoches County et al., Panola County, Burleson County, Fayette County, Karnes County, Gause Independent School District, Young County, Wilbarger County, Brazos County, Bastrop County, Cherokee County, Cherokee County Central Appraisal District, Pine Tree ISD, the City of Gladewater, Grimes Central Appraisal District, Harrison Central Appraisal District, Harrison County, Irion County, Leon Independent School District, Midland Central Appraisal District, Milam County, Reeves County Tax District, Stephens County, Atascosa County, Bexar County, Cotulla ISD, Culberson Co – Allamoore ISD, DeWitt County, Dilley ISD, Frio Hospital District, Goliad County, Gregg County, Harris County, Jasper County, Jim Wells CAD, Karnes City ISD, La Salle County, Lee County, McMullen County, Montgomery County, Nueces County, Orange County, Parker CAD, Pearsall ISD, Polk County, Reeves County, Robertson County, San Augustine County, Tarrant County,

Washington County, Webb CISD, Zapata County, Zavala CAD, and other similarly situated taxing entities (the "Texas Taxing Jurisdictions"), shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount and extent of the claims and liens asserted by the Texas Taxing Jurisdictions are fully preserved. In the event of a sale of the Debtors' assets subject to such Tax Liens, the rights of the Texas Taxing Jurisdictions to request that proceeds of such sale be segregated are preserved.

53.     **Reservation of Rights of Energy Transfer**.  The DIP Liens shall not prime or be senior to the liens or security interests (if any) of ETC Texas Pipeline, Ltd., Energy Transfer Fuel, LP, ETC Katy Pipeline, LLC, Houston Pipe Line Company LP, Oasis Pipeline, LP, Sunoco Pipeline L.P. and Trade Star, LLC (collectively, "Energy Transfer,") in the DIP Collateral to the extent such lien or interest of Energy Transfer constitutes a valid, perfected and non-avoidable lien senior to the Existing RBL Liens as of the Petition Date and to the extent such lien or interest has not been released or relinquished during the Chapter 11 Cases.  Nothing in the Interim Order, this Final Order, or the DIP Credit Documents shall preclude Energy Transfer from seeking adequate protection or other relief in accordance with the Bankruptcy Code, and all parties' rights to object to such relief are reserved.

54.     **Findings of Fact and Conclusions of Law**.  This Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

55.     **Jurisdiction**.  This Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or the DIP Credit Documents.

56.     **Authorized Signatories**.  The signature of any Authorized Officer (as defined in the Debtors' corporate resolutions filed with the Petitions) or Debtors' attorneys, appearing on any one or more of the DIP Credit Documents shall be sufficient to bind the Debtors. No board of directors or other approval shall be necessary.

57.     **Order Effective**.  This Final Order shall be effective as of the date of the signature by the Court.

58.     **No Requirement to Accept Title to Collateral**.  The DIP Secured Parties, the Existing RBL Secured Parties, the Existing FLLO Secured Parties and the Existing Second Lien Secured Parties shall not be obligated to accept title to any portion of the respective DIP Collateral, Existing RBL Collateral, the Existing FLLO Collateral or the Existing Second Lien Collateral in payment of the indebtedness owed to such parties by the Debtors, in lieu of payment in cash or cash equivalents, nor shall any of the DIP Secured Parties, Existing RBL Secured Parties, Existing FLLO Secured Parties or Existing Second Lien Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the DIP Secured Parties, Existing RBL Secured Parties, Existing FLLO Secured Parties, or Existing Second Lien Secured Parties, as applicable.

59.     **Controlling Effect of Final Order**.  To the extent any provision of this Final Order conflicts or is inconsistent with any provision of the Motion, any prepetition agreement or any DIP Credit Document, the provisions of this Final Order shall control.

60.     **Interim Order**.  Except as specifically amended, supplemented, or otherwise modified hereby, all of the provisions of the Interim Order shall remain in effect and are hereby ratified by this Final Order.  In the event of any inconsistency between the terms of this Final Order and the terms of the Interim Order, the terms of this Final Order shall govern.

61.   **Headings**.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Final Order.

**Signed:  July 31, 2020.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

100

**Exhibit A to Final Order**

**DIP Credit Agreement**

**Execution Version (Conformed to Final Order)**

## SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION
## CREDIT AGREEMENT

DATED AS OF JULY 1, 2020

AMONG

CHESAPEAKE ENERGY CORPORATION,
AS A DEBTOR AND DEBTOR-IN-POSSESSION,
AS THE BORROWER,

THE OTHER DEBTORS PARTY HERETO FROM TIME TO TIME,
AS DEBTORS AND DEBTORS-IN-POSSESSION,
AS GUARANTORS,

MUFG UNION BANK, N.A.,
AS THE AGENT,

AND

THE SEVERAL LENDERS
FROM TIME TO TIME PARTIES HERETO

---

MUFG UNION BANK, N.A.,
BANK OF AMERICA, N.A.; BMO CAPITAL MARKETS CORP.;
MORGAN STANLEY SENIOR FUNDING, INC.; WELLS FARGO SECURITIES, LLC;
DNB MARKETS, INC.; MIZUHO BANK, LTD.; CITIBANK, N.A.;
AND GOLDMAN SACHS LENDING PARTNERS LLC,
AS JOINT LEAD ARRANGERS AND JOINT BOOKRUNNERS

## Table of Contents

**Page**

ARTICLE I DEFINITIONS ....................................................................................2
  1.1    Defined Terms .........................................................................................2
  1.2    Other Interpretive Provisions ................................................................38
  1.3    Accounting Terms .................................................................................39
  1.4    Rounding ...............................................................................................39
  1.5    References to Agreements, Laws, Etc ...................................................39
  1.6    Times of Day .........................................................................................39
  1.7    Timing of Payment or Performance ......................................................39
  1.8    Classification of Loans and Borrowings ...............................................40
  1.9    Rates .....................................................................................................40

ARTICLE II AMOUNT AND TERMS OF CREDIT ...........................................40
  2.1    Commitments .........................................................................................40
  2.2    Minimum Amount of Each Borrowing; Maximum Number of Borrowings..............41
  2.3    Notice of Borrowing .............................................................................42
  2.4    Disbursement of Funds .........................................................................42
  2.5    Repayment of Loans; Evidence of Debt ...............................................43
  2.6    Conversions and Continuations ............................................................44
  2.7    Pro Rata Borrowings .............................................................................45
  2.8    Interest ...................................................................................................45
  2.9    Interest Periods .....................................................................................46
  2.10  Increased Costs, Illegality, Etc .............................................................46
  2.11  Compensation .......................................................................................49
  2.12  Change of Lending Office .....................................................................49
  2.13  Notice of Certain Costs ........................................................................50
  2.14  [Reserved] .............................................................................................50
  2.15  Defaulting Lenders ...............................................................................50
  2.16  Collateral; Guarantees ..........................................................................52

ARTICLE III LETTERS OF CREDIT ..................................................................55
  3.1    Letters of Credit ....................................................................................55
  3.2    Letter of Credit Requests ......................................................................56
  3.3    Letter of Credit Participations ...............................................................57
  3.4    Agreement to Repay Letter of Credit Drawings ...................................59
  3.5    Increased Costs .....................................................................................60
  3.6    New or Successor Letter of Credit Issuers ............................................61
  3.7    Role of Letter of Credit Issuer .............................................................62
  3.8    Cash Collateral .....................................................................................62
  3.9    Applicability of ISP and UCP ..............................................................63
  3.10  Conflict with Issuer Documents ...........................................................63
  3.11  Letters of Credit Issued for Subsidiaries ..............................................63

i

ARTICLE IV FEES; COMMITMENTS .................................................................63
   4.1    Fees .................................................................................................63
   4.2    Termination or Reduction of Commitments .................................64

ARTICLE V PAYMENTS ....................................................................................65
   5.1    Voluntary Prepayments..................................................................65
   5.2    Mandatory Prepayments ................................................................66
   5.3    Method and Place of Payment .......................................................66
   5.4    Net Payments .................................................................................67
   5.5    Computations of Interest and Fees ................................................71
   5.6    Limit on Rate of Interest ...............................................................71

ARTICLE VI CONDITIONS PRECEDENT TO INTERIM FACILITY AND FINAL
           FACILITY ....................................................................................72
   6.1    Interim Facility Effective Date ......................................................72
   6.2    Final Facility Effective Date ..........................................................75

ARTICLE VII CONDITIONS PRECEDENT TO ALL CREDIT EVENTS.............75
   7.1    No Default; Representations and Warranties.................................75
   7.2    Notice of Borrowing .....................................................................76
   7.3    DIP Orders ....................................................................................76
   7.4    Fees ...............................................................................................76

ARTICLE VIII REPRESENTATIONS AND WARRANTIES.................................77
   8.1    Corporate Status ...........................................................................77
   8.2    Corporate Power and Authority; Enforceability ...........................77
   8.3    No Violation...................................................................................77
   8.4    Litigation.......................................................................................78
   8.5    Margin Regulations .......................................................................78
   8.6    Governmental Approvals ...............................................................78
   8.7    Investment Company Act ...............................................................78
   8.8    True and Complete Disclosure.......................................................78
   8.9    Financial Condition; Financial Statements ...................................79
   8.10   Tax Matters ...................................................................................79
   8.11   Compliance with ERISA...............................................................79
   8.12   Subsidiaries...................................................................................79
   8.13   Environmental Laws ......................................................................79
   8.14   Properties ......................................................................................80
   8.15   [Reserved] .....................................................................................80
   8.16   Hedge Agreements ........................................................................80
   8.17   No Default......................................................................................80
   8.18   Anti-Corruption Laws and Sanctions............................................80
   8.19   *Pari Passu* or Priority Status........................................................81
   8.20   No Material Adverse Effect ...........................................................81
   8.21   Beneficial Ownership Certification ...............................................81
   8.22   Security Documents.......................................................................81

| | | |
|---|---|---|
| 8.23 | DIP Orders | 81 |
| 8.24 | Budget | 81 |

**ARTICLE IX AFFIRMATIVE COVENANTS** .............81

| | | |
|---|---|---|
| 9.1 | Information Covenants | 82 |
| 9.2 | Books, Records and Inspections | 86 |
| 9.3 | Maintenance of Insurance | 87 |
| 9.4 | Payment of Taxes | 88 |
| 9.5 | Existence | 88 |
| 9.6 | Compliance with Statutes, Regulations, Etc. | 88 |
| 9.7 | Maintenance of Properties | 88 |
| 9.8 | Delivery of Proposed DIP Orders | 89 |
| 9.9 | Additional Guarantors, Grantors and Collateral | 89 |
| 9.10 | Use of Proceeds | 89 |
| 9.11 | Further Assurances | 91 |
| 9.12 | Reserve Reports and Hedge Schedules | 91 |
| 9.13 | Cash Management | 92 |

**ARTICLE X NEGATIVE COVENANTS** .............92

| | | |
|---|---|---|
| 10.1 | Limitation on Indebtedness | 92 |
| 10.2 | Limitation on Liens | 93 |
| 10.3 | Limitation on Fundamental Changes | 95 |
| 10.4 | Limitation on Sale of Assets | 95 |
| 10.5 | Limitation on Investments | 96 |
| 10.6 | Limitation on Restricted Payments | 97 |
| 10.7 | [Reserved] | 97 |
| 10.8 | Negative Pledge Agreements | 97 |
| 10.9 | Marketing Activities | 97 |
| 10.10 | Hedge Agreements | 97 |
| 10.11 | Financial Performance Covenants | 98 |
| 10.12 | Transactions with Affiliates | 98 |
| 10.13 | Change in Business | 98 |
| 10.14 | Use of Proceeds | 99 |
| 10.15 | Sanctions; Anti-Corruption Use of Proceeds | 99 |
| 10.16 | Accounting Changes | 99 |
| 10.17 | Key Employee Plans | 99 |
| 10.18 | Super-Priority Claims | 99 |
| 10.19 | Bankruptcy Orders | 99 |
| 10.20 | New Accounts | 99 |

**ARTICLE XI EVENTS OF DEFAULT** .............100

| | | |
|---|---|---|
| 11.1 | Payments | 100 |
| 11.2 | Representations, Etc. | 100 |
| 11.3 | Covenants | 100 |
| 11.4 | Default Under Other Agreements | 100 |
| 11.5 | Bankruptcy Cases, Etc. | 100 |

ACTIVE 260175030

11.6   ERISA ................................................................................................... 103
11.7   Guarantee ............................................................................................... 104
11.8   Credit Documents ................................................................................... 104
11.9   Judgments ............................................................................................... 104
11.10  Change of Control .................................................................................. 104

ARTICLE XII THE AGENT ................................................................................. 106
12.1   Appointment ........................................................................................... 106
12.2   Delegation of Duties ............................................................................... 106
12.3   Exculpatory Provisions ........................................................................... 106
12.4   Reliance ................................................................................................... 107
12.5   Notice of Default ..................................................................................... 107
12.6   Non-Reliance on Agent and Other Lenders ............................................ 107
12.7   [Reserved] ............................................................................................... 108
12.8   Indemnification ....................................................................................... 108
12.9   Agent in Its Individual Capacity ............................................................ 109
12.10  Successor Agent ...................................................................................... 109
12.11  Withholding Tax ..................................................................................... 110
12.12  Security Documents and Guarantee ........................................................ 110
12.13  Right to Realize on Collateral and Enforce Guarantee ........................... 111
12.14  Agent May File Proofs of Claim ............................................................ 111

ARTICLE XIII MISCELLANEOUS ..................................................................... 112
13.1   Amendments, Waivers and Releases ...................................................... 112
13.2   Notices .................................................................................................... 114
13.3   No Waiver; Cumulative Remedies .......................................................... 114
13.4   Survival of Representations and Warranties ............................................ 114
13.5   Payment of Expenses; Indemnification ................................................... 114
13.6   Successors and Assigns; Participations and Assignments ...................... 116
13.7   Replacement of Lenders under Certain Circumstances ........................... 120
13.8   Adjustments; Set-off ............................................................................... 121
13.9   Counterparts ............................................................................................ 122
13.10  Severability ............................................................................................. 122
13.11  Integration ............................................................................................... 123
13.12  GOVERNING LAW ............................................................................... 123
13.13  Submission to Jurisdiction; Waivers ...................................................... 123
13.14  Acknowledgments ................................................................................... 124
13.15  WAIVERS OF JURY TRIAL ................................................................. 125
13.16  Confidentiality ........................................................................................ 125
13.17  Release of Collateral and Guarantee Obligations; Disavowal of Liens .. 126
13.18  USA PATRIOT Act ................................................................................ 127
13.19  Payments Set Aside ................................................................................ 127
13.20  Reinstatement .......................................................................................... 127
13.21  Disposition of Proceeds .......................................................................... 127
13.22  Collateral Matters; Hedge Agreements ................................................... 128
13.23  Consent to Bail-In of Affected Financial Institutions ............................ 128

iv

13.24   Joinder of Subsidiaries ............................................................128
13.25   Acknowledgment Regarding Any Supported QFCs...................................129

ARTICLE XIV OBLIGATIONS GUARANTEE ......................................................130
14.1    Guarantee ...................................................................130
14.2    Guarantee of Payment.........................................................130
14.3    No Discharge or Diminishment of Obligations Guarantee.........................130
14.4    Defenses Waived .............................................................131
14.5    Rights of Subrogation .......................................................132
14.6    Reinstatement; Stay of Acceleration..........................................132
14.7    Information .................................................................132
14.8    [Reserved] ..................................................................132
14.9    Maximum Liability ...........................................................132
14.10   Contribution ................................................................133
14.11   Representations and Warranties...............................................133
14.12   Subordination of Indebtedness................................................134
14.13   Other Terms .................................................................135

Schedules and Exhibits

Schedule 1.1            Commitments
Schedule 1.1A           Existing Letters of Credit
Schedule 2.1(b)         Roll-Up
Schedule 3.1(a)         Letter of Credit Issuance Limit
Schedule 8.4            Litigation
Schedule 8.12           Subsidiaries
Schedule 10.1(e)        Existing Capital Leases
Schedule 10.1(f)        Existing Performance Indebtedness
Schedule 10.1(h)        Existing Indebtedness for Borrowed Money
Schedule 10.2(d)        Existing Liens
Schedule 10.5(a)        Existing Investments
Schedule 10.6           Restricted Payments
Schedule 13.2           Notice Addresses
Schedule 14.11          Guarantors' Legal Name, Location of Jurisdiction of Organization, Organizational Identification Number, Taxpayer Identification Number and Chief Executive Office
Exhibit A               Form of Notice of Borrowing
Exhibit B               Form of Letter of Credit Request
Exhibit C               Form of Closing Certificate
Exhibit D               Form of Assignment and Acceptance
Exhibit E               Form of Promissory Note
Exhibit F               Form of Interim Order
Exhibit G               Initial Budget
Exhibit H               Form of Production and Sales Report

ACTIVE 260175030

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of July 1, 2020, is among CHESAPEAKE ENERGY CORPORATION, as a debtor and debtor-in-possession, an Oklahoma corporation (together with its permitted successors, the "Borrower"), the Guarantors party hereto from time to time, the Lenders party hereto from time to time, and MUFG UNION BANK, N.A., as administrative agent and collateral agent for the Lenders (in such capacity, together with its successors in such capacity, the "Agent").

WHEREAS, on June 28, 2020 (the "Petition Date"), the Borrower and the Initial Guarantors (as defined below) (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, the Borrower has requested that the Lenders provide the Borrower with a debtor-in-possession, super-priority, senior secured revolving loan credit facility in an aggregate principal amount of up to $2,103,977,189.56 (the "DIP Facility") in Commitments and Loans from the Lenders, which shall consist of (x) a new money revolving loan facility ("New Money Facility") in the aggregate principal amount of up to $925,000,000, which shall include a sub-facility of up to $200,000,000 for the issuance of Letters of Credit and (y) a $1,178,977,189.56 term loan to reflect the roll-up of a portion of outstanding Existing Loans made by the Lenders under the Existing RBL Credit Agreement consisting of two Classes of term loans: (i) a $925,000,000 term loan reflecting the roll-up of a portion of outstanding Existing Loans made by the New Money Lenders under the Existing RBL Credit Agreement (the "New Money Roll-Up Loans") and (ii) a $253,977,189.56 term loan reflecting the roll-up of a portion of outstanding Existing Loans made by the Lenders under the Existing RBL Credit Agreement (the "Incremental Roll-Up Loans"), in each case to be afforded the liens and priority set forth in the DIP Orders and as set forth in the other Credit Documents and to be used during the Bankruptcy Cases for the purposes set forth in Section 9.10;

WHEREAS the New Money Facility shall be available for borrowings and other extensions of credit as of the Interim Facility Effective Date, subject in all respects to the terms, conditions and limitations set forth herein and in the other Credit Documents;

WHEREAS, by execution and delivery of this Agreement and the other Credit Documents and entry of the applicable DIP Order, the Guarantors, as applicable, agree to guarantee the Obligations, and the Borrower and each Guarantor agrees to secure all of the Obligations by granting to the Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, substantially all of each Debtor's respective assets, on and subject to the terms and priorities set forth in the DIP Orders and the other Credit Documents; and

WHEREAS, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

# ARTICLE I
# DEFINITIONS

1.1     <u>Defined Terms</u>.

(a)     Terms defined in the preamble have the meaning ascribed to them in the preamble.

(b)     As used herein, the following terms shall have the meanings specified in this <u>Section 1.1</u> unless the context otherwise requires (it being understood that defined terms in this Agreement shall include in the singular number the plural and in the plural the singular):

"<u>ABR</u>" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Agent as its "prime rate" and (c) LIBOR for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) *plus* 1.0%; <u>but</u>, for the avoidance of doubt, for purposes of calculating LIBOR pursuant to <u>clause (c)</u> above, LIBOR for any day shall be based on the rate per annum determined by the Agent at approximately 11:00 a.m. (London time) on such day by reference to the rate appearing on the Reuters Screen LIBOR01 Page (or any successor page or any successor service, or any substitute page or substitute for such service, providing rate quotations comparable to the Reuters Screen LIBOR01 Page, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) for a period equal to one-month and such rate shall in no event be less than zero for the purposes of this Agreement.  The "prime rate" is a rate set by the Agent based upon various factors, including the Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in the ABR due to a change in such rate announced by the Agent, in the Federal Funds Effective Rate or in the one-month LIBOR shall take effect at the opening of business on the day specified in the public announcement of such change.  If the ABR is being used as an alternate rate of interest pursuant to <u>Section 2.10</u> hereof, then the ABR shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"<u>ABR Loan</u>" means each Loan bearing interest based on the ABR.

"<u>Adequate Protection Liens</u>" shall have the meaning assigned such term in the DIP Orders.

"<u>Adjusted Total Commitment</u>" means, with respect to the New Money Lenders, at any time, the Total Commitment less the aggregate amount of Commitments of all Defaulting Lenders.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person,

2

whether through the ownership of voting securities, by contract or otherwise. "Controlling" ("controlling") and "controlled" shall have meanings correlative thereto.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Agent may from time to time notify in writing to the Borrower and the Lenders.

"Agent Questionnaire" means, for each Lender, an administrative questionnaire in a form approved by the Agent.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Anti-Corruption Laws" means all Laws applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery, money laundering or corruption.

"Applicable Margin" means with respect to (a) any New Money Loan that is a LIBOR Loan, 6.00% per annum, (b) any New Money Loan that is an ABR Loan, 5.00% per annum, (c) any Roll-Up Loan that is a LIBOR Loan, 5.50% per annum and (d) any Roll-Up Loan that is an ABR Loan, 4.50% per annum.

"Approved Budget" means the Initial Budget, as amended, modified, supplemented or replaced from time to time in accordance with Section 9.1(c).

"Approved Petroleum Engineers" means LaRoche Petroleum Consultants, Ltd. or any independent petroleum engineer chosen by the Borrower and reasonably acceptable to the Agent.

"Approved Plan of Reorganization" means the "Plan" as defined in the DIP Order.

"Asset Coverage Ratio" means as of any date of determination, the ratio (expressed as a percentage) of (a) the sum of PV-10 *plus* the Hedge Value to (b) the sum of (i) the aggregate principal amount of Loans outstanding under this Agreement, *plus* (ii) the aggregate principal amount of Existing Loans *plus* (iii) the total Letter of Credit Exposure of all New Money Lenders *plus* (iv) the undrawn face amount of letters of credit issued under the Existing RBL Credit Agreement, in each case outstanding as of such date.

"Assignment and Acceptance" means an assignment and acceptance substantially in the form of Exhibit D or such other form as may be approved by the Agent.

"Authorized Officer" means as to any Person the President, the Chief Executive Officer, the Chief Financial Officer, the Treasurer, the Assistant Treasurer, the General Counsel, any Senior Vice President or any Executive Vice President of such Person (or, in the case of any limited partnership without its own officers, any of the foregoing of the general partner of such limited partnership). Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of any Debtor and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

3

"<u>Automatic Stay</u>" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"<u>Availability Period</u>" means the period from the Interim Facility Effective Date, to, but excluding, the Termination Date.

"<u>Available Commitments</u>" means, at any time, (a) the Loan Limit at such time *minus* (b) the Total Exposure at such time.

"<u>Avoidance Action Proceeds</u>" means any and all proceeds of any Avoidance Action.

"<u>Avoidance Actions</u>" means all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation, or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Cases</u>" means the cases of the Debtors filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court from and after the Petition Date including any and all proceedings arising in or related to such cases.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas.

"<u>Benchmark Replacement</u>" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to LIBOR for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; <u>provided</u>, notwithstanding anything herein to the contrary, the parties hereto shall use their commercially reasonable efforts to cause any alternate benchmark rate to constitute a "qualified rate" within the meaning of Proposed Treasury Regulations § 1.1001-6(b), <u>provided</u> further that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

4

"Benchmark Replacement Adjustment" means, with respect to any replacement of LIBOR with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement for U.S. dollar- denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to LIBOR:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of LIBOR permanently or indefinitely ceases to provide LIBOR; or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to LIBOR:

(a)      a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR;

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will

5

cease to provide LIBOR permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; or

(c)       a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Agent or the Required Lenders, as applicable, by notice to the Borrower, the Agent (in the case of such notice by the Required Lenders) and the Lenders.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBOR and solely to the extent that LIBOR has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced LIBOR for all purposes hereunder in accordance with Section 2.10 and (y) ending at the time that a Benchmark Replacement has replaced LIBOR for all purposes hereunder pursuant to Section 2.10.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefited Lender" shall have the meaning provided in Section 13.8.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning provided in the introductory paragraph hereto.

"Borrowing" means the incurrence of one Type of Loan on a given date (or resulting from conversions on a given date) having, in the case of LIBOR Loans, the same Interest Period (but ABR Loans incurred pursuant to Section 2.10(b) shall be considered part of any related Borrowing of LIBOR Loans).

"Budget" means a detailed 13-week rolling cash forecast, containing line items of sufficient detail to reflect the Debtors' projected receipts and disbursements for the applicable period, in substantially the same form as the Initial Budget.

"Business Day" means any day excluding Saturday, Sunday and any other day on which banking institutions in New York City, New York are authorized by Law to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"Capital Expenditure Report" shall have the meaning assigned to such term in Section 9.1(d)(ii).

"Capital Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Credit Parties during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Credit Parties.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person.

"Capital Lease Obligations" means, as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Carve-Out" shall have the meaning assigned to such term in the DIP Order.

"Cash Collateralize" shall have the meaning provided in Section 3.8(c) (and "Cash Collateral" means cash that has been Cash Collateralized). "Cash Collateralization" shall have a correlative meaning.

"Cash Management Order" means one or more orders of the Bankruptcy Court, including any interim and/or final orders, entered in the Bankruptcy Cases, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Agent, which, among other matters, authorizes the Borrower and the Guarantors to maintain their existing cash management system.

"Cash Management Services" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), (c) any other demand deposit or operating account relationships and (d) other cash management services.

"Casualty Event" means, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of any Law, (b) any change in any Law or (c) compliance by any Lender or the Letter of Credit Issuer (or, for purposes of clauses (a)(ii) or (c) of Section 2.10, by any lending office of such Lender or by such Lender's or the Letter of Credit Issuer's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; but notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means and be deemed to have occurred if:

(a)      any "person" or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such "person" or "group" and their respective Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), shall at any time have acquired direct or indirect "beneficial ownership" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of the outstanding common Stock of the Borrower having more than 35% of the ordinary voting power for the election of directors of the Borrower; or

(b)      occupation of a majority of the seats (other than vacant seats) on the Board of Directors of the Borrower by individuals who were neither (1) nominated or approved by the Board of Directors of the Borrower nor (2) appointed by directors so nominated.

"Chapter 11 Milestones" means the "Milestones" as defined in the DIP Orders.

"Class" means (a) when used with respect to Lenders, refers to whether such Lenders are New Money Lenders or Roll-Up Lenders and (b) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are New Money Loans, Roll-Up Loans, New Money Roll-Up Loans or Incremental Roll-Up Loans, as applicable.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all assets and property of any kind (including all assets pledged under, and the "Collateral" as defined in, the Existing Security Documents) that is subject to a Lien in favor of the Agent to secure the Obligations or which under the terms of any Credit Document is purported to be subject to such Lien, which includes, for the avoidance of doubt, all existing (whether pre- or post-petition) and after-acquired or arising, tangible and intangible, personal and real property and assets of each of the Debtors and any and all rents, issues, products, offspring, proceeds and profits thereof and, subject to approval by the Bankruptcy Court pursuant to the Final Order, any Avoidance Action Proceeds; provided, that notwithstanding anything in this Agreement

8

or any other Credit Document to the contrary, the Collateral does not include any Excluded Property.

"Collateral Trust Agreement" means that certain Collateral Trust Agreement, dated December 19, 2019, by and between MUFG Union Bank, N.A., as Collateral Trustee and Revolver Agent, and GLAS USA LLC, as Original Term Loan Agent, and as acknowledged and agreed by certain of the Debtors.

"Commitment" means, with respect to each New Money Lender, the commitment of such New Money Lender to make New Money Loans and to acquire participations in Letters of Credit hereunder in an aggregate principal amount at any time outstanding not to exceed (a) in the case of a New Money Lender that is a New Money Lender as of the Interim Facility Effective Date, the amount set forth opposite such Lender's name on Schedule 1.1 as such Lender's "Commitment" (as such Schedule 1.1 may be amended or modified from time to time in connection with any reduction or modification to any Commitment or to the Total Commitments in accordance with this Agreement) and (b) in the case of any New Money Lender that becomes a New Money Lender after the Interim Facility Effective Date, the amount specified as such New Money Lender's "Commitment" in the Assignment and Acceptance (or other applicable document) pursuant to which such Lender became a Lender hereunder, in each case as the same may be changed from time to time pursuant to terms of this Agreement.

"Commitment Fee" shall have the meaning provided in Section 4.1(a).

"Commitment Fee Rate" means, for any day, with respect to the Available Commitment on any day, 0.50% per annum.

"Commitment Percentage" means, at any time, for each New Money Lender, the percentage obtained by dividing (a) such New Money Lender's Commitment at such time by (b) the amount of the Total Commitment at such time; but at any time when the Total Commitment shall have been terminated, each New Money Lender's Commitment Percentage shall be the percentage obtained by dividing (i) such Lender's Exposure at such time by (ii) the Total Exposure at such time.

"Committee" means the statutory official committee of unsecured creditors appointed in the Bankruptcy Cases.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"Confidential Information" shall have the meaning provided in Section 13.16.

"Confirmation Order" means an order of the Bankruptcy Court confirming the Approved Plan of Reorganization, which order shall be in form and substance acceptable to the Agent.

"Connection Income Taxes" means, Taxes imposed on or measured by a Lender's overall net income or branch profits (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision

9

of state, local or foreign law), and franchise (and similar) Taxes imposed on such Lender (in lieu of net income Taxes), in each case as a result of any present or former connection with the jurisdiction imposing such Taxes (other than any such connection arising solely from any Credit Document or any Transaction).

"Contractual Requirement" shall have the meaning provided in Section 8.3.

"COVID-19 Extension" shall have the meaning provided in the DIP Order.

"Credit Documents" means this Agreement, each Letter of Credit, any promissory notes issued by the Borrower under this Agreement, the Security Documents, the Fee Letters and all other agreements, instruments, consents and certificates heretofore and hereafter executed and delivered by the Borrower, any other Credit Party and any of their respective Affiliates in connection with this Agreement.

"Credit Event" means and include the making (but not the conversion or continuation) of a Loan and the issuance of a Letter of Credit.

"Credit Party" means each of the Borrower and the Guarantors.

"Creditors' Committee" shall have the meaning assigned to such term in Section 11.5(r).

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors" shall have the meaning provided in the recitals hereto.

"Default" means any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" shall have the meaning provided in Section 2.8(d).

"Defaulting Lender" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default."

"DIP Order" or "DIP Orders" means the Interim Order and the Final Order, as applicable.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof, including any Casualty Event, and the issuance of any Stock or Stock Equivalents by a Subsidiary of the Borrower.  The terms "Dispose" and "Disposed" shall have correlative meanings.

"Disqualified Stock" means, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other

ACTIVE 260175030

than as a result of a change of control or asset sale, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control or asset sale to the extent the terms of such Stock or Stock Equivalents provide that such Stock or Stock Equivalents shall not be required to be repurchased or redeemed until the Scheduled Maturity Date has occurred or such repurchase or redemption is otherwise permitted by this Agreement (including as a result of a waiver hereunder)), in whole or in part, in each case before the date that is 91 days after the Scheduled Maturity Date hereunder; but if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; provided, further, that any Stock or Stock Equivalents held by any future, present or former employee, director, manager or consultant of the Borrower, any Subsidiary or any of its direct or indirect parent companies or any other entity in which any Credit Party has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower, in each case pursuant to any equity holders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by any Credit Party.

"Dollars" and "$" means dollars in lawful currency of the United States of America.

"Drawing" shall have the meaning provided in Section 3.4(b).

"Early Opt-in Election" means the occurrence of:

(a)     (i) a determination by the Agent or (ii) a notification by the Required Lenders to the Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.10, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR, and

(b)     (i) the election by the Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Agent.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

ACTIVE 260175030

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Law" means any applicable Federal, state, or local statute, law (including common law), rule, regulation, ordinance, or code of any Governmental Authority now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or human health or workplace safety (to the extent relating to human exposure to Hazardous Materials), or the release or threatened release of Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Interim Facility Effective Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means each person (as defined in Section 3(9) of ERISA) that together with any Debtor would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) the failure by any Debtor or any ERISA Affiliate to meet the minimum funding standard of Section 412 of the Code, other than a failure to which a waiver of such minimum funding standard applies; (c) the incurrence by any Debtor or any ERISA Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA; (d) a complete or partial withdrawal by any Debtor or any ERISA Affiliate from a Multiemployer Plan if there is potential liability therefor or notification that a Multiemployer Plan is in endangered or critical status or is insolvent (within the meaning of Title IV of ERISA); (e) the filing of a notice of intent to terminate a Plan in a distress termination under, or the treatment of a Plan amendment as a distress termination under, Section 4041(c) of ERISA; (f) receipt from the Internal Revenue Service of notice of the failure of a Plan to qualify under Section 401(a) of the Code; (g) the engagement by any Debtor or any ERISA Affiliate in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; (h) the imposition of a Lien upon any Debtor pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; (i) the making of an amendment to a Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code; or (j) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA upon any Debtor or any ERISA Affiliate.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Article XI.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Deposit Account" means (1) the Utility Deposit Account and (2) deposit accounts (within the meaning of the Uniform Commercial Code) the balance of which consists exclusively of (a) withheld income taxes and federal, state or local employment taxes required to be paid to the IRS or state or local government agencies with respect to employees of the Borrower or any Guarantor, (b) amounts required to be paid over to an employee benefit plan on behalf of or for the benefit of employees of the Borrower or any Guarantor, (c) amounts set aside for payroll and the payment of accrued employee benefits, medical, dental and employee benefits claims to employees of the Borrower or any Guarantor, (d) amounts held in escrow or in trust pending litigation or other settlement claims, and (e) amounts held in trust or as fiduciaries for third parties in respect of such third party's ratable share of the revenues of Oil and Gas Properties.

"Excluded Hedge Obligation" means, with respect to any Credit Party, any Swap Obligation if, and to the extent that, all or a portion of the liability of such Credit Party with respect to, or the grant by such Credit Party of a security interest to secure, such Swap Obligation (or any Obligations Guarantee thereof or other agreement or undertaking agreeing to guarantee, repay, indemnify or otherwise be liable therefor) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (a) by virtue of such Credit Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee obligation or other liability of such Credit Party or the grant of such security interest becomes or would become effective with respect to such Swap Obligation or (b) in the case of a Swap Obligation subject to a clearing requirement pursuant to Section 2(h) of the Commodity Exchange Act (or any successor provision thereto), because such Credit Party is a "financial entity," as defined in Section 2(h)(7)(C)(i) of the Commodity Exchange Act (or any successor provision thereto), at the time the guarantee obligation or other liability of such Credit Party becomes or would become effective with respect to such related Swap Obligation.  If a Swap Obligation arises under a Master Agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee obligation or other liability or security interest is or becomes illegal.

"Excluded Property" means (a) any property to the extent the grant of a Lien on such property (i) is prohibited by any Requirement of Law (ii) requires a consent not obtained of any Governmental Authority pursuant to applicable law or (iii) is prohibited by, or requires consent not obtained under any Contractual Requirements, except to the extent that such Contractual Requirement (not entered into in contemplation of this Agreement) providing for such prohibition or requiring such consent is ineffective under applicable law (including pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code); (b) Avoidance Actions and (c) the Excluded Deposit Accounts; provided, however, that subject to entry of the Final Order, "Excluded Property" shall not include any Avoidance Action Proceeds.

"Excluded Taxes" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party under any Credit Document, (i) Taxes imposed on or measured by its overall net income or branch profits (however

denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision of state, local or foreign law), and franchise (and similar) Taxes imposed on it (in lieu of net income Taxes), in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from any Credit Documents or any Transaction), (ii) any United States federal withholding Tax imposed on any payment by or on account of any obligation of any Credit Party under any Credit Document that is required to be imposed on amounts payable to such Lender pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately before the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to Section 5.4 or (iii) Taxes attributable to such recipient's failure to comply with Section 5.4(d), Section 5.4(e), Section 5.4(h), or Section 5.4(i) or (iv) any withholding Tax imposed under FATCA.

"Existing Agent" means MUFG Union Bank, N.A., in its capacity as administrative under the Existing RBL Credit Agreement.

"Existing Commitment Percentage" means the "Commitment Percentage" as defined in the Existing RBL Credit Agreement.

"Existing Credit Documents" means the "Credit Documents" as defined in the Existing RBL Credit Agreement.

"Existing FLLO Loan Documents" means the "Additional Priority Lien Documents" as defined in the Existing Intercreditor Agreement.

"Existing FLLO Obligations" means the "Additional Priority Lien Obligations" as defined in the Existing Intercreditor Agreement.

"Existing Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of December 19, 2019, by and between MUFG Union Bank, N.A., as Priority Lien Agent, and Deutsche Bank Trust Company Americas, as Second Lien Collateral Trustee ("Second Lien Collateral Trustee"), and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

"Existing Letters of Credit" means the letters of credit issued and outstanding as of the date hereof under the Existing RBL Credit Agreement and set forth on Schedule 1.1A.

"Existing Loans" means the Loans (as defined in the Existing RBL Credit Agreement) held by the Existing RBL Lenders on the Interim Facility Effective Date.

"Existing Obligations" means the "Obligations" as defined in the Existing RBL Credit Agreement.

14

"Existing RBL Credit Agreement" means the Amended and Restated Credit Agreement, dated as of September 12, 2018, among the Borrower, the Existing RBL Lenders and the Existing Agent, as amended by the First Amendment to Amended and Restated Credit Agreement, dated as of February 1, 2019, the Second Amendment to Amended and Restated Credit Agreement, dated as of December 3, 2019, and the Third Amendment to Amended and Restated Credit Agreement, dated as of December 26, 2019 and the Fourth Amendment and Waiver to Amended and Restated Credit Agreement, dated as of June 12, 2020 (the "Existing RBL Fourth Amendment"), as further amended, supplemented, or otherwise modified prior to the Petition Date, and including all exhibits and other ancillary documentation in respect thereof.

"Existing RBL Fourth Amendment" shall have the meaning provided in the definition of "Existing RBL Credit Agreement".

"Existing RBL Guarantee" means the "Guarantee" as defined in the Existing RBL Credit Agreement.

"Existing RBL Guarantors" means the "Guarantors" as defined in the Existing RBL Credit Agreement.

"Existing RBL Lenders" means those lenders who are parties to the Existing RBL Credit Agreement as of the Petition Date.

"Existing Second Lien Loan Documents" means the "Second Lien Documents" as defined in the Existing Intercreditor Agreement.

"Existing Second Lien Obligations" means the "Second Lien Obligations" as defined in the Existing Intercreditor Agreement.

"Existing Security Documents" means the "Security Documents" as defined in the Existing RBL Credit Agreement.

"Exposure" means, with respect to any New Money Lender at any time, the sum of (a) the aggregate principal amount of the New Money Loans of such New Money Lender then outstanding and (b) such New Money Lender's Letter of Credit Exposure at such time.

"Facility Termination" means the first (1st) Business Day when (a) all Obligations (other than (i) indemnification and other contingent obligations for which no claim has been asserted at the relevant time of determination and (ii) Lender Hedging Obligations as to which arrangements satisfactory to the applicable Hedge Bank in its sole discretion have been made) have been paid in full, (b) all Commitments have terminated or expired,  (c) no Letter of Credit shall be outstanding that is not Cash Collateralized or otherwise back-stopped or replaced pursuant arrangements satisfactory to the applicable Letter of Credit Issuer and the Agent and (d) termination of all Hedge Agreements the obligations under which constitute Lender Hedging Obligations other than such Hedge Agreements as to which arrangements satisfactory to the applicable Hedge Bank in its sole discretion have been made; provided that the continuation of Hedge Agreements under any exit credit facility contemplated by the applicable Hedge Agreement shall be deemed satisfactory for purposes of clause (a)(ii) and (d)).

15

"<u>Fair Market Value</u>" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing such Sections of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average of the per annum rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York or, if such rate is not so published for any date that is a Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day for such transactions received by the Agent from three Federal Funds brokers of recognized standing selected by it.

"<u>Federal Reserve Bank of New York's Website</u>" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"<u>Fee Letters</u>" means (a) that certain Lead Arranger Fee Letter, dated as of June 28, 2020, by and among the Agent and the Borrower and (b) that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Fee Letter, dated as of June 28, 2020, by and among the Agent and the Borrower.

"<u>Final Facility Effective Date</u>" shall have the meaning provided in <u>Section 6.2</u>.

"<u>Final Facility Roll-Up Loans</u>" shall have the meaning provided in <u>Section 2.1(b)</u>.

"<u>Final Order</u>" means a Final Order entered by the Bankruptcy Court (i) authorizing the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and (b) use cash collateral during the pendency of the Bankruptcy Cases, and (ii) granting certain related relief on a final basis, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agent (and if such amendment, modification or supplement is materially adverse to the Lenders, the Majority Lenders) and the Borrower.

"<u>Final Period</u>" means the period from and including the Final Facility Effective Date to but excluding the Termination Date.

"<u>Financial Performance Covenants</u>" means the covenants of the Debtors set forth in <u>Section 10.11</u>.

16

"FLLO Ad Hoc Group" has the meaning ascribed to such term in the Restructuring Support Agreement.

"FLLO Agent" means GLAS USA LLC, in its capacity as administrative agent under the FLLO Term Loan.

"FLLO Professionals" shall have the meaning provided in Section 9.10(a).

"FLLO Term Loan" means that certain Term Loan Agreement, dated as of December 19, 2019, among the Borrower, the FLLO Agent and the lenders from time to time parties thereto.

"Franklin" means Franklin Advisers Inc.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" means United States generally accepted accounting principles, as in effect from time to time.

"Governmental Authority" means any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange and any supra-national bodies such as the European Union or the European Central Bank.

"Guaranteed Obligations" shall have the meaning set forth in Section 14.1.

"Guarantors" means (a) the Initial Guarantors and (b) each Subsidiary that is joined as a party to this Agreement and/or guarantees the Obligations pursuant to Section 9.9 and Article XIV.

"Guarantor Claims" shall have the meaning set forth in Section 14.12.

"Hazardous Materials" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any applicable Environmental Law.

"Hedge Agreements" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency

17

options, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.  Notwithstanding the foregoing, agreements or obligations entered into in the ordinary course of business to physically buy or sell any commodity produced from the Borrower's and its Subsidiaries' Oil and Gas Properties or electricity generation facilities under an agreement that has a tenor under ninety (90) days shall not be considered Hedge Agreements.

"<u>Hedge Bank</u>" means any Person (other than the Borrower or any Subsidiary) that (a) at the time it enters into a Hedge Agreement is a New Money Lender, the Agent or an Affiliate of a New Money Lender or the Agent or (b) at any time after it enters into a Hedge Agreement, it becomes a New Money Lender, the Agent or an Affiliate of a New Money Lender or the Agent.

"<u>Hedge Schedule</u>" means any report, in form and substance reasonably satisfactory to the Agent, setting forth, as of the end of each calendar month, as applicable, the terms, value, and counterparty of all Hedge Agreements of the Credit Parties with a Hedge Bank on such date.

"<u>Hedge Termination Value</u>" means, in respect of any one or more Hedge Agreements, after taking into account the effect of any netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreement has been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date before the date referenced in <u>clause (a)</u>, the amount(s) determined as the mark-to-market value(s) for such Hedge Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreement (including any Lender or any Affiliate of a Lender).

"<u>Hedge Value</u>" means, as of any date of determination and with respect to each Hedge Agreement, the product of (a) the positive difference (if any) of the prices to be received by a Debtor thereunder during its remaining life *minus* the corresponding Strip Pricing *times* (b) the volumes hedged thereunder. The Hedge Value of any Hedge Agreement shall be as set forth in the most recent Hedge Schedule delivered by the Borrower to the Agent.

"<u>Hedging Order</u>" means the interim or final (as applicable) order of the Bankruptcy Court (a) authorizing the Credit Parties to (i) continue prepetition hedging arrangements or enter into and perform under new hedging arrangements with certain of the Hedge Banks, (ii) honor, pay or otherwise satisfy all obligations, liabilities, and indebtedness of the Credit Parties arising under such hedging arrangements, (iii) pledge and transfer collateral in the form of Liens and (iv) grant Super-Priority Claims, and (b) granting certain related relief, which such order shall be in form and substance reasonably satisfactory to the Agent and the Majority Lenders.

18

"Historical Financial Statements" means (a) the audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of December 31, 2018 and December 31, 2019, and the related audited consolidated statements of income and comprehensive income, statements of stockholders' equity and statements of cash flows for each of the fiscal years in the two-year period ended December 31, 2019 and (b) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of March 31, 2020, and the related unaudited consolidated statements of income and comprehensive income and statements of cash flows for the six-month period ended March 31, 2020.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Incremental Roll-Up Loans" shall have the meaning provided in the recitals.

"Indebtedness" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business and other obligations to the extent such obligations may be satisfied at such Person's sole discretion by the issuance of Stock of such Person), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of banker's acceptances, letters of credit, or similar arrangements, (g) all Guaranteed Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (f) above, (h) all obligations of the kind referred to in clauses (a) through (f) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person (including accounts and contract rights, but excluding any Stock in joint ventures to the extent the Liens on such Stock secures Indebtedness of such joint venture that is nonrecourse to any Credit Party), whether or not such Person has assumed or become liable for the payment of such obligation, but the amount of Indebtedness for purposes of this clause (h) shall be an amount equal to the lesser of the unpaid amount of such Indebtedness and the Fair Market Value of the property subject to such Lien, (i) liabilities with respect to payments received in consideration of oil, gas, or other minerals yet to be acquired or produced at the time of payment other than in respect of a Qualifying VPP (including obligations under "take-or-pay" contracts to deliver gas in return for payments already received and the undischarged balance of any production payment (other than a Qualifying VPP) created by such Person or for the creation of which such Person directly or indirectly received payment), and (j) for the purposes of Sections 10.1, 10.2 and 11.4

19

only, all net obligations of such Person in respect of Hedge Agreements (and any reference to the "principal amount" of obligations, or Indebtedness, in respect of any Hedge Agreement shall be the Hedge Termination Value at the relevant time of determination).  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.  Notwithstanding the foregoing, (i) any Indebtedness that has been defeased in accordance with GAAP or defeased pursuant to the deposit of cash or cash equivalents (in an amount sufficient to satisfy all such obligations relating to such Indebtedness at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such Indebtedness, and subject to no other Liens, and the other applicable terms of the instrument governing such Indebtedness, shall not constitute or be deemed Indebtedness, if such defeasance has been made in a manner not prohibited by this Agreement, (ii) for purposes of Section 10.1, a Qualifying VPP shall not be treated as Indebtedness, and (iii) Indebtedness shall not include endorsements of checks, bills of exchange and other instruments for deposit or collection in the ordinary course of business.

"Indemnified Liabilities" shall have the meaning provided in Section 13.5(d).

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to or measured by, any payment by or on account of any obligation of any Debtor under any Credit Document, and (b) to the extent not otherwise described in clause (a), Other Taxes, in each case excluding any interest, penalties or expenses caused by the Agent's or Lender's gross negligence or willful misconduct (as determined in a final and non-appealable judgment by a court of competent jurisdiction).

"Indentures" means each indenture (including any supplemental indenture) governing any outstanding senior, public, unsecured, long-term notes of the Borrower issued before the Interim Facility Effective Date as permitted under Section 10.1.

"Industry Investment" shall mean Investments and/or expenditures made in the ordinary course of, and of a nature that is or shall have become customary in, the oil and gas business as a means of actively engaging therein through agreements, transactions, interests or arrangements that permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of oil and gas business jointly with third parties, including (a) ownership interests in oil and gas properties or gathering, transportation, processing, or related systems and (b) Investments and/or expenditures in the form of or pursuant to operating agreements, processing agreements, farm-in agreements, farm-out agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling arrangements, service contracts and other similar agreements with third parties.

"Ineligible Person" means, on any date, (a) a natural person (or a company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), (b) a Defaulting Lender or any parent entity thereof or (c) the Borrower or any Subsidiary or Affiliate of the Borrower.

"Initial Budget" shall have the meaning provided in Section 6.1(l)(iv).

"Initial Guarantors" means the entities listed as "Initial Guarantors" on Schedule 8.12 hereto as of the Interim Facility Effective Date, who shall be all of the Debtors other than the Borrower.

"Initial Reserve Report" means the most recent Reserve Report delivered to the Agent before the Interim Facility Effective Date and identified by the Borrower as the "Initial Reserve Report".

"Intercreditor Agreements" means (a) the Existing Intercreditor Agreement and (b) the Collateral Trust Agreement.

"Interest Period" means, with respect to any Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"Interim Facility Cap" means, as of any date of determination, $325,000,000; provided that, if as of any such date of determination during the Interim Period, the Commitments are less than $325,000,000, the "Interim Facility Cap" in effect on such date shall equal the amount of the Commitments in effect on such date.

"Interim Facility Effective Date" shall have the meaning assigned to such term in Article VI.

"Interim Facility Roll-Up Loans" shall have the meaning provided in Section 2.1(b).

"Interim Order" means the interim order entered by the Bankruptcy Court (i) authorizing the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and (b) use cash collateral during the pendency of the Bankruptcy Cases, and (ii) granting certain related relief on an interim basis substantially in the form of Exhibit F, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agent, (and if such amendment, modification or supplement is materially adverse to the Lenders, the Majority Lenders) and the Borrower.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on (but excluding) the earlier to occur of (a) the Final Facility Effective Date and (b) the Termination Date.

"Internal Reserve Report" shall have the meaning provided in Section 9.12(a).

"Investment" means, for any Person: (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale), (b) the making of any deposit with, or advance, loan or other extension of credit to, assumption of Indebtedness of, or capital contribution to, or purchase or other acquisition of an equity participation in, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property

21

to such Person) (including any partnership or joint venture), (c) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness or (d) the purchase or other acquisition (in one transaction or a series of transactions) of (i) all or substantially all of the property and assets or business of another Person or (ii) assets constituting a business unit, line of business or division of such Person; but in the event that any Investment is made by any Debtor in any Person through substantially concurrent interim transfers of any amount through one or more other Debtors, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 10.5.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means, with respect to any Letter of Credit, the Letter of Credit Request, and any other document, agreement and instrument entered into by the Letter of Credit Issuer and the Borrower (or any Credit Party) or in favor of the Letter of Credit Issuer and relating to such Letter of Credit.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Maturity Date" means the date that is five (5) Business Days before the Scheduled Maturity Date.

"L/C Obligations" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit *plus* the aggregate of all Unpaid Drawings.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"L/C Participant" shall have the meaning provided in Section 3.3(a).

"L/C Participation" shall have the meaning provided in Section 3.3(a).

"Lenders" means, collectively, the New Money Lenders and the Roll-Up Lenders. Unless the context otherwise requires, the term "Lenders" includes each Letter of Credit Issuer.

"Lender Default" means (a) the refusal or failure of any Lender to make available its portion of any incurrence of Loans or participations in Letters of Credit, which refusal or failure is not cured within two (2) Business Days after the date of such refusal or failure, unless such Lender notifies the Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which

22

conditions precedent, together with any applicable Default, shall be specifically identified in such writing) has not been satisfied; (b) the failure of any Lender to pay over to the Agent, any Letter of Credit Issuer, or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless the subject of a good faith dispute; (c) a Lender has notified the Borrower or the Agent in writing that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under the DIP Facility (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default, shall be specifically identified in such writing or public statement) cannot be satisfied); (d) the failure, within three (3) Business Days after a written request by the Agent or the Borrower, by a Lender to confirm in writing to the Agent and the Borrower that it will comply with its obligations under the DIP Facility (but such Lender shall cease to be a Defaulting Lender pursuant to this clause (d) upon receipt of such written confirmation by the Agent and the Borrower), (e) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event or (f) a Lender has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.

"Lender Hedging Obligations" means obligations under any Hedge Agreement between a Debtor and a Hedge Bank that (i) is authorized by the Hedge Order and (ii) specifies that such obligations are secured by the Security Documents.

"Lender-Related Distress Event" means, with respect to any Lender, that such Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, (a) is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, (b) such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, (c) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt or (d) becomes the subject of a Bail-In Action; but a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Letter of Credit" means the Existing Letters of Credit and any letter of credit issued pursuant to this Agreement.

"Letter of Credit Commitment" means $200,000,000, as the same may be reduced from time to time pursuant to Section 3.1, but no Letter of Credit Issuer shall be obligated to issue Letters of Credit in an aggregate face amount in excess of its Letter of Credit Issuance Limit.

23

"Letter of Credit Exposure" means, with respect to any New Money Lender, at any time, (a) the principal amount of any Unpaid Drawings in respect of which such New Money Lender has made (or is required to have made) payments to the Letter of Credit Issuer pursuant to Section 3.4(a) at such time *plus* (b) such New Money Lender's Commitment Percentage of the Letters of Credit Outstanding at such time (excluding the portion thereof consisting of Unpaid Drawings in respect of which the New Money Lenders have made (or are required to have made) payments to the Letter of Credit Issuer pursuant to Section 3.4(a)) *minus* (c) such New Money Lender's Commitment Percentage of the amount of cash or deposit account balances held by the Agent to Cash Collateralize outstanding Letters of Credit and Unpaid Drawings under Section 3.8.

"Letter of Credit Fee" shall have the meaning provided in Section 4.1(b).

"Letter of Credit Issuance Limit" means, with respect to each Letter of Credit Issuer, the amount set forth on Schedule 3.1(a) opposite such Letter of Credit Issuer's name, or in the case of any New Money Lender that becomes a Letter of Credit Issuer after the Interim Facility Effective Date, the amount set forth in the agreement pursuant to which such New Money Lender becomes a Letter of Credit Issuer pursuant to Section 3.6(a).

"Letter of Credit Issuer" means (a) as to the Existing Letters of Credit, the issuing lender thereof on the Petition Date, provided such issuing lender is a New Money Lender hereunder, and (b) each other New Money Lender appointed as a Letter of Credit Issuer pursuant to Section 3.6, including in each case, any of their respective Affiliates or any replacement or successor appointed pursuant to Section 3.6.  References in any Credit Document to the Letter of Credit Issuer shall be deemed to refer to the Letter of Credit Issuer in respect of the applicable Letter of Credit or to all Letter of Credit Issuers, as the context requires.

"Letter of Credit Request" shall have the meaning provided in Section 3.2(a).

"Letters of Credit Outstanding" means, at any time, without duplication, (a) the aggregate Stated Amount of all outstanding Letters of Credit *plus* (b) the aggregate principal amount of all Unpaid Drawings in respect of all Letters of Credit.

"LIBOR" means, for any Interest Period for each LIBOR Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion; in each case the "LIBOR Screen Rate") at approximately 11:00 a.m. (London time) two (2) Business Days before the first day of such Interest Period; but if (i) the LIBOR Screen Rate shall be less than 1.00%, such rate shall be deemed to be 1.00% with respect to any New Money Loans and (ii) the LIBOR Screen Rate shall be less than 0.00%, such rate shall be deemed to be 0.00% with respect to any Roll-Up Loans, in each case for the purposes of this Agreement.

24

"LIBOR Loan" means any Loan bearing interest at a rate determined by reference to LIBOR (other than an ABR Loan bearing interest by reference to LIBOR by virtue of clause (c) of the definition of ABR).

"LIBOR Screen Rate" shall have the meaning provided in the definition of "LIBOR."

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement or a financing lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties; but in no event shall an operating lease be deemed to be a Lien.

"Loan" means, collectively, the New Money Loans and the Roll-Up Loans.

"Loan Limit" means (a) during the Interim Period, the Interim Facility Cap and (b) during the Final Period, the Total Commitments.

"Majority Lenders" means, at any date, Non-Defaulting Lenders having or holding more than 50% of the sum of (a) the unused Adjusted Total Commitment at such date, and (b) the Total Exposure (excluding the Exposure of Defaulting Lenders) at such date.

"Material Adverse Effect" means a circumstance or condition affecting the business, assets, operations, properties or financial condition of the Borrower and the Guarantors on a consolidated basis, that would, individually or in the aggregate, materially adversely affect (a) the ability of the Credit Parties, taken as a whole, to perform their obligations under any Credit Document (including, without limitation, payment and performance of the Obligations) or (b) the rights and remedies of, or benefits available to, the Agent and the Lenders under any Credit Document.

"Maximum Liability" shall have the meaning provided in Section 14.9.

"Monthly Variance Report" shall have the meaning provided in Section 9.1(c)(iii)9.1(c)(ii).

"Monthly Variance Testing Date" shall have the meaning provided in Section 9.1(c)(iii).

"Monthly Variance Testing Period" shall have the meaning provided in Section 9.1(c)(iii).

"Moody's" means Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA and is or was within any of the last preceding six years contributed to by the Borrower or an ERISA Affiliate.

"New Money Facility" shall have the meaning provided in the recitals hereto.

"New Money Lender" means the Persons listed on Schedule 1.1 that has a Commitment and any Person that becomes a party hereto pursuant to an Assignment and Acceptance (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance) with respect to a New Money Loan or Commitments and includes their respective successors and permitted assigns.

"New Money Loans" means the Loans made pursuant to Section 2.1(a)

"New Money Roll-Up Loans" shall have the meaning provided in the recitals hereto.

"Non-Debtor Subsidiaries" means the entities listed as "Other Subsidiaries" on Schedule 8.12 hereto as of the Interim Facility Effective Date.

"Non-Defaulting Lender" means and include each Lender other than a Defaulting Lender.

"Non-Participating Lenders" shall have the meaning provided in Section 2.1(b).

"Non-U.S. Lender" means any Lender that is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"Notice of Borrowing" shall have the meaning provided in Section 2.3(a) and, if in writing, shall be substantially in the form of Exhibit A or such other form as shall be approved by the Agent (acting reasonably).

"Notice of Conversion or Continuation" shall have the meaning provided in Section 2.6(a).

"Obligated Party" shall have the meaning provided in Section 14.2.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, the Borrower or any other Debtor arising under any Credit Document or otherwise with respect to any Loan or any Letter of Credit (including any Unpaid Drawings), in each case, entered into with any Debtor, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Debtor or any Affiliate thereof in any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) the Lender Hedging Obligations.  Without limiting the generality of the foregoing, the Obligations of the Debtors under the Credit Documents include the obligation (including Guaranteed Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Debtor under any Credit Document. Notwithstanding the foregoing, (a) the obligations of any Debtor under any Hedge Agreement giving rise to Lender Hedging Obligations shall be secured and guaranteed pursuant to the Security Documents and the Obligations Guarantee only to the extent that, and for so long as, the other Obligations are so secured and guaranteed, (b) any release of Collateral or Guarantors effected in the manner permitted by the Credit Documents shall not require the consent of the holders of Lender Hedging Obligations unless otherwise specifically set forth herein and (c) solely with respect to any Debtor that is not an "eligible contract participant" under the Commodity Exchange

26

Act, Excluded Hedge Obligations of such Debtor shall in any event be excluded from "Obligations" owing by such Debtor.

"Obligations Guarantee" means Article XIV of this Agreement.

"Oil and Gas Properties" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems, power and cogeneration facilities and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Ordinary Course Settlement Payments" means all regularly scheduled and other payments due or received under any Hedge Agreement from time to time, including any cash deposit or credit support required to be posted by a Debtor under any Hedge Agreement, calculated in accordance with the terms of such Hedge Agreement, but excluding any Termination Payments due and payable under such Hedge Agreement.

"Other Taxes" means any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar taxes (including interest, fines, penalties, additions to tax and related, reasonable, out-of-pocket expenses with regard thereto) arising from any payment made under any Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, any Credit Document; but such term shall not include any of the foregoing Taxes that result from an assignment, grant of a participation pursuant to Section 13.6(c) or transfer or assignment to or designation of a new lending office or other office for receiving payments under any Credit Document ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor/participating Lender and/or the assignee/Participant and the

27

taxing jurisdiction (other than a connection arising solely from any Credit Documents or any Transaction), except to the extent that any such action described in this proviso is requested or required by the Borrower.

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Agent or the Letter of Credit Issuer, as the case may be, in accordance with banking industry rules on interbank compensation.

"Participant" shall have the meaning provided in Section 13.6(c)(i).

"Participant Register" shall have the meaning provided in Section 13.6(c)(ii).

"PATRIOT Act" shall have the meaning provided in Section 13.18.

"Paying Guarantor" shall have the meaning set forth in Section 14.10.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Investments" means any of the following types of Investments, to the extent owned by any Debtor:

(i)      Dollars;

(ii)      securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of the U.S. government, in each case with maturities of twenty-four (24) months or less from the date of acquisition;

(iii)      certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic commercial bank having capital and surplus of not less than $500,000,000 or any foreign commercial bank having capital and surplus of not less than $100,000,000 (or the Dollar equivalent as of the date of determination);

(iv)      repurchase obligations for underlying securities of the types described in clauses (ii), (iii) and (vii) entered into with any financial institution meeting the qualifications specified in clause (iii) above;

(v)      commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and in each case maturing within twenty-four (24) months after the date of creation thereof and Indebtedness or preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition;

(vi)      marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's

28

nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within twenty-four (24) months after the date of creation or acquisition thereof;

(vii)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating of Baa3 or higher from Moody's or BBB- or higher from S&P with maturities of twenty-four (24) months or less from the date of acquisition;

(viii)    Investments with average maturities of twenty-four (24) months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's; and

(ix)     investment funds investing 90.00% of their assets in securities of the types described in clauses (i) through (viii) above.

"Permitted Liens" means:

(a)     Liens for taxes, assessments or governmental charges or claims (i) which are not yet overdue for a period of more than thirty (30) days, (ii) the nonpayment of which is permitted or required by the Bankruptcy Code, or (iii) that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP, or for property taxes on property that the Borrower or one of its Subsidiaries has determined to abandon if the sole recourse for such tax, assessment, charge or claim is to such property, or attributable to Taxes (the nonpayment of which is permitted or required pursuant to the Bankruptcy Code);

(b)     Liens in respect of property or assets of any Debtor imposed by law, such as landlords', vendors', operators', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business or incident to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens incurred, or pledges or deposits made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar legislation and deposits securing liabilities to insurance carriers under insurance or self-insurance arrangements in respect of such obligations, or to secure the performance of tenders, statutory and regulatory obligations, plugging and abandonment obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of business or otherwise constituting Investments permitted hereunder;

(d)     ground leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by any Debtor are located;

29

(e)      easements, rights-of-way, licenses, restrictions (including zoning restrictions), title defects, exceptions, reservations, deficiencies or irregularities in title, encroachments, protrusions, servitudes, rights, eminent domain or condemnation rights, permits, conditions and covenants and other similar charges or encumbrances (including in any rights of way or other property of any Debtor for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of real estate, rights of way, facilities and equipment), in each case, incurred in the ordinary course of business, which do not interfere in any material respect with the business of the Debtors, taken as a whole;

(f)      any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense permitted by this Agreement;

(g)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(h)      Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or bankers' acceptance issued for the account of any Debtor, if such Lien secures only the obligations of such Debtor in respect of such letter of credit or bankers' acceptance to the extent permitted under Section 10.1;

(i)      leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Debtors, taken as a whole;

(j)      Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by any Debtor;

(k)      Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Debtors held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(l)      Liens which arise in the ordinary course of business under operating agreements (including preferential purchase rights, consents to assignment and other restrains on alienation), joint operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, farm-in agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty and royalty agreements, reversionary interests, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual and customary in the oil and gas business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP, if any such Lien referred to in this clause does not in the aggregate have a Material Adverse Effect;

(m)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Debtors, taken as a whole; and

(n)     Liens arising under statutory provisions of applicable law with respect to production purchased from others.

The parties acknowledge and agree that (i) no intention to subordinate the priority afforded any Lien granted in favor of the Agent, for the benefit of the Secured Parties under the Security Documents is to be hereby implied or expressed by the permitted existence of such Permitted Liens and (ii) the term "Permitted Liens" shall not include any Lien securing any Indebtedness for borrowed money other than the Obligations.

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"Petition Date" shall have the meaning provided in the recitals to this Agreement.

"Petroleum Industry Standards" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" means any single-employer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, that is or was within any of the preceding six years maintained or contributed to (or to which there is or was an obligation to contribute or to make payments to) by any Debtor or an ERISA Affiliate.

"Professional Fees" means the fees of restructuring professionals.

"Proposed Budget" shall have the meaning provided in Section 9.1(c)(i).

"Proved Developed Producing Reserves" means Proved Reserves that, in accordance with Petroleum Industry Standards are classified as "Developed Producing Reserves."

"Proved Developed Reserves" means (a) Proved Developed Producing Reserves and (b) Proved Reserves that, in accordance with Petroleum Industry Standards, are classified as "Developed Non-Producing Reserves"; and Proved Developed Reserves in the aggregate comprise Proved Reserves that are Proved Developed Producing Reserves and "Developed Non-Producing Reserves."

"Proved Non-Producing Reserves" means Proved Reserves that, in accordance with Petroleum Industry Standards, are classified as "Developed Non-Producing Reserves."

"Proved Reserves" means oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves," (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves"; and "Proved Reserves" in the aggregate comprise Proved Reserves that are "Developed Producing Reserves," "Developed Non-Producing Reserves" and "Undeveloped Reserves."

31

"Proved Undeveloped Reserves" means Proved Reserves that, in accordance with Petroleum Industry Standards, are classified as "Undeveloped Reserves."

"PV-10" means, as of any date of determination, with respect to any Proved Developed Producing Reserves expected to be produced from any Oil and Gas Properties evaluated in a Reserve Report, the net present value (calculated before federal and state income Taxes (but not other Taxes customarily included in such calculation, including sales, ad valorem and severance Taxes)), discounted at 10% per annum, of the future net revenues expected to accrue to the Debtors' collective interests in such reserves during the remaining expected economic lives of such reserves, calculated in a manner consistent with past practice and using Strip Pricing. The PV-10 of any Oil and Gas Property shall be as set forth in the most recent Reserve Report delivered by the Borrower to the Agent in accordance with Section 9.12.

"Qualifying VPP" means each VPP existing on the Interim Facility Effective Date.

"Register" shall have the meaning provided in Section 13.6(b)(iv).

"Regulation T" means Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation U" means Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation X" means Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Reimbursement Date" shall have the meaning provided in Section 3.4(a).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents and members of such Person or such Person's Affiliates.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reporting Date" shall have the meaning provided in Section 9.1(c)(i).

"Required Consenting Revolving Credit Facility Lenders" has the meaning ascribed to such term in the Restructuring Support Agreement.

"Required Lenders" means, at any date, Non-Defaulting Lenders having or holding at least 66.67% of the sum of (a) the Total Exposure (excluding the Exposure of Defaulting Lenders) at such date plus (b) the unused Total Commitments at such date.

ACTIVE 260175030

"<u>Requirement of Law</u>" means, as to any Person, any law, treaty, rule, regulation statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"<u>Reserve Report</u>" means any report, in form and substance reasonably satisfactory to the Agent, setting forth, as of the applicable dates set forth in <u>Section 9.12(a)</u> (or another date in the event of the Initial Reserve Report), the Proved Reserves, the Proved Developed Reserves, the Proved Non-Producing Reserve and Proved Undeveloped Reserves attributable to the Oil and Gas Properties of the Debtors, together with a projection of the rate of production and future net income, taxes, operating expenses and Capital Expenditures with respect thereto as of such date, based upon the most recent Strip Pricing and a certification of an Authorized Officer of the Borrower certifying as to the calculations required to establish whether the Debtors were in compliance with the Financial Performance Covenant in <u>Section 10.11(b)</u> as of the date of such Reserve Report; <u>provided</u>, that for purposes of any Reserve Report and the certifications of an Authorized Officer of the Borrower delivered in connection with such Reserve Report, the Strip Pricing may be calculated as of any day in the preceding two week period from the date of such Reserve Report.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Restricted Payments</u>" shall have the meaning provided in <u>Section 10.6</u>.

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement, dated June 28, 2020, by and among the Debtors, the Lenders, certain holders of FLLO Term Loans and certain holders of Existing Second Lien Obligations.

"<u>Revolving Credit Facility Lenders</u>" has the meaning ascribed to such term in the Restructuring Support Agreement.

"<u>Roll-Up Lenders</u>" means the Persons listed on <u>Schedule 2.1(b)</u> (as updated by the Agent from time to time on or prior to the Final Facility Effective Date in accordance with <u>Section 2.1(b)</u>) and any Person that becomes a party hereto pursuant to an Assignment and Acceptance agreement (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance agreement) with respect to a Roll-Up Loan and includes their respective successors and permitted assigns.

"<u>Roll-Up Loan</u>" shall have the meaning provided in <u>Section 2.1(b)</u>.

"<u>Roll-Up Loan Amount</u>" means, as to each Roll-Up Lender, the amounts set forth opposite such Roll-Up Lender's name on <u>Schedule 2.1(b)</u> under the captions "Interim Facility Roll-Up Loan Amount" and "Final Facility Roll-Up Loan Amount".

"<u>Royalty Committee</u>" means the committee of royalty owners appointed by the United States Trustee on July 24, 2020 in connection with the Bankruptcy Cases.

33

"Royalty Trust" means a statutory trust, business trust, limited liability company, partnership or other form of legal entity to which the Borrower or one or more of its Subsidiaries grants or conveys any term or perpetual overriding royalty interests, net profits interests or other similar interests in Oil and Gas Properties in exchange for units of beneficial interest or ownership interest in such trust or other entity, or for cash.

"S&P" means Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, including Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the Government of Canada, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the Government of Canada, the European Union or Her Majesty's Treasury of the United Kingdom.

"Scheduled Maturity Date" means the date that is the nine (9) month anniversary of the Petition Date.

"SEC" means the Securities and Exchange Commission or any successor thereto.

"Second Lien Collateral Trustee" shall have the meaning provided in the definition of "Existing Intercreditor Agreement"

"Second Lien Professionals" shall have the meaning provided in Section 9.10(a).

"Secured Parties" means, collectively, (a) the Agent, (b) the Letter of Credit Issuers, (c) each Lender, (d) each Hedge Bank with respect to their respective Lender Hedging Obligations, and (e) any other Person holding Obligations secured by the Liens granted under any Credit Document, including pursuant to the DIP Orders.

"Security Documents" means, collectively, each security agreement, the DIP Orders and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any other Credit Party to secure or perfect the security interest in, or otherwise relating to, any or all of the Collateral securing the Obligations.

"SFAS" means Statement of Financial Accounting Standard No. 133 or No. 143 as promulgated by the Financial Accounting Standards Board.

34

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"Stated Amount" of any Letter of Credit, at any time, means the maximum amount available to be drawn thereunder at such time, determined without regard to whether any conditions to drawing could then be met.

"Stay Relief Hearing" shall have the meaning given such term in Article XI XI.

"Stock" means any and all shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"Strip Pricing" means four (4) year NYMEX strip pricing adjusted for applicable differentials and Hedge Agreements and held flat after such four (4) year period at the average of the 37th month through the 48th month's price.

"Subsidiary" means as to any Person, a corporation, partnership, limited liability company or other entity of which shares of Stock or other ownership interests having ordinary voting power (other than Stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise expressly provided, all references herein to a "Subsidiary" means a Subsidiary of the Borrower.  A Royalty Trust shall not constitute a "Subsidiary" of the Borrower or its Subsidiaries.

"Super-Priority Claims" shall have the meaning provided in Section 8.23.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

ACTIVE 260175030

"Termination Date" means the earliest to occur of: (a) the Scheduled Maturity Date, (b) the date of the termination of the Commitments and/or the acceleration of all of the Obligations under this Agreement and the other Credit Documents following the occurrence and continuance of an Event of Default in accordance with Article XI, (c) subject to the COVID-19 Extension, the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (d) the conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Agent and the Majority Lenders, (e) the dismissal of any of the Bankruptcy Cases, unless otherwise consented to in writing by the Agent and the Majority Lenders, (f) the closing of a sale of all or substantially all of the equity or assets of the Debtors (unless effected pursuant to an Approved Plan of Reorganization), (g) the date of payment in full in cash of all Obligations (other than any contingent Obligations that survive the expiration or termination of this Agreement) and termination of all of the Commitments pursuant to the terms herein, and (h) the effective date of any Debtor's Approved Plan of Reorganization.

"Termination Declaration" shall have the meaning given such term in Article XI XI.

"Termination Payment" means the termination payment, if any, payable by a Debtor in connection with an early termination or other close out (whether as a result of the occurrence of an event of default or other termination event) of any Hedge Agreement in accordance with the terms thereof.

"Total Commitment" means, as of any date of determination, the aggregate amount of the Commitments of all New Money Lenders.  The Total Commitment as of the Interim Facility Effective Date is $925,000,000.

"Total Exposure" means the sum of the Exposures of the New Money Lenders.

"Transaction Expenses" means any fees or expenses incurred or paid by any Debtor or any of their Affiliates in connection with the Transactions and the Credit Documents.

"Transactions" means, collectively, the execution, delivery and performance of the Credit Documents, the borrowing of Loans, the use of the proceeds thereof, the issuance of Letters of Credit hereunder, the payment of Transaction Expenses on the Interim Facility Effective Date and the other transactions contemplated by the Credit Documents.

"Transferee" shall have the meaning provided in Section 13.6(e).

"Type" means, as to any Loan, its nature as an ABR Loan or a LIBOR Loan.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

36

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"<u>Uniform Commercial Code</u>" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"<u>United States Trustee</u>" means the Office of the United States Trustee for the Southern District of Texas.

"<u>Unpaid Drawing</u>" shall have the meaning provided in <u>Section 3.4(a)</u>.

"<u>U.S. Lender</u>" shall have the meaning provided in <u>Section 5.4(h)</u>.

"<u>U.S. Tax Compliance Certificate</u>" shall have the meaning provided in <u>Section 5.4(e)(iii)</u>.

"<u>Utility Deposit Account</u>" means a deposit account (within the meaning of the Uniform Commercial Code) the balance of which consists exclusively of utility adequate assurance deposits; <u>provided</u>, that, for the avoidance of doubt, if at any time such deposit account ceases to satisfy the requirement of this definition, such deposit account shall cease to be a Utility Deposit Account.

"<u>Variance Limit</u>" shall have the meaning provided in <u>Section 10.11(a)</u>.

"<u>VPP</u>" means the sale of limited-term overriding royalty interests in natural gas and/or oil reserves that (a) entitle the purchaser to receive scheduled production volumes over a period of time from specific lease interests; (b) are free and clear of all associated future production costs and capital expenditures; (c) are nonrecourse to the seller (i.e., the purchaser's only recourse is to the reserves acquired); (d) transfer title of the reserves to the purchaser; and (e) allow the seller to retain all production beyond the specified volumes, if any, after the scheduled production volumes have been delivered.

"<u>Weekly Variance Report</u>" shall have the meaning provided in <u>Section 9.1(c)(ii)</u>.

"<u>Weekly Variance Testing Date</u>" shall have the meaning provided in <u>Section 9.1(c)(ii)</u>.

"<u>Write-Down and Conversion Powers</u>" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to

37

suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

      1.2   <u>Other Interpretive Provisions</u>.  With reference to each Credit Document, unless otherwise specified therein:

      (a)   The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

      (b)   The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

      (c)   Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

      (d)   The term "including" is by way of example and not limitation.

      (e)   The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

      (f)   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

      (g)   Section headings in the Credit Documents are included for convenience of reference only and shall not affect the interpretation of any Credit Document.

      (h)   Any reference to any Person shall be constructed to include such Person's successors or assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

      (i)   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

      (j)   The word "will" shall be construed to have the same meaning as the word "shall".

      (k)   The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

      (l)   Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, (each, a "<u>Transformation</u>") shall be deemed to apply to a division of or by a limited liability company, limited partnership or trust (each, a "<u>Divisible Entity</u>") into - or an allocation of assets to - a series of a Divisible Entity

38

(or the unwinding of such a division or allocation), as if it were a Transformation to, of or with a separate Person.  Any division of a Divisible Entity shall be considered a separate Person for all purposes hereunder.

1.3     Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a consistent manner; but if the Borrower notifies the Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Interim Facility Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Agent notifies the Borrower that all Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding anything to the contrary in any Credit Document, for purposes of calculations made pursuant to the terms of any Credit Document, GAAP will be deemed to treat leases that would have been classified as operating leases in accordance with GAAP as in effect on the Interim Facility Effective Date in a manner consistent with the treatment of such leases under GAAP as in effect on the Interim Facility Effective Date, notwithstanding any modifications or interpretive changes to GAAP that may occur thereafter.

1.4     Rounding.  Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5     References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document and (b) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

1.6     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight or standard, as applicable) time.

1.7     Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a

day which is not a Business Day, the date of such payment (other than as described in <u>Section 2.9</u>) or performance shall extend to the immediately succeeding Business Day.

       1.8   <u>Classification of Loans and Borrowings</u>.  For purposes of this Agreement, Loans may be classified and referred to by Type and/or by Class (e.g., a "LIBOR Loan" or a "LIBOR New Money Roll-Up Loan").

       1.9   <u>Rates</u>.  The Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to rates in the definition of "LIBOR."

**ARTICLE II**
**AMOUNT AND TERMS OF CREDIT**

       2.1   <u>Commitments</u>.

       (a)   (1) Subject to and upon the terms and conditions and relying upon the representations and warranties herein set forth, each New Money Lender severally, but not jointly, agrees to make New Money Loans denominated in Dollars to the Borrower, which New Money Loans (a) shall be made at any time and from time to time during the Availability Period, (b) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; but all New Money Loans made by each of the New Money Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Loans of the same Type, (c) may be repaid and reborrowed in accordance with the provisions hereof, (d) shall not, for any New Money Lender at any time, after giving effect thereto and to the application of the proceeds thereof, result in such New Money Lender's Exposure at such time exceeding such New Money Lender's Commitment Percentage at such time of the applicable Loan Limit and (e) shall not, after giving effect thereto and to the application of the proceeds thereof, result in the Total Exposure exceeding the applicable Loan Limit at such time.

       (b)   On (i) the Interim Facility Effective Date, each Roll-Up Lender shall become entitled to roll up an aggregate principal amount of Existing Loans held by such Lender equal to such Roll-Up Lender's Interim Facility Roll-Up Loan Amount as set forth opposite such Roll-Up Lender's name on <u>Schedule 2.1(b)</u> under "Interim Facility Roll-Up Loan Amount" into roll-up loans hereunder (the "<u>Interim Facility Roll-Up Loans</u>") and (ii) in addition to the Interim Facility Roll-Up Loans, on the Final Facility Effective Date, each Roll-Up Lender shall become entitled to roll up an aggregate principal amount of Existing Loans held by such Lender equal to such Roll-Up Lender's Final Facility Roll-Up Loan Amount as set forth opposite such Roll-Up Lender's name on <u>Schedule 2.1(b)</u> under "<u>Final Facility Roll-Up Loan Amount</u>" into roll-up loans hereunder (the "<u>Final Facility Roll-Up Loans</u>"; and, together with the Interim Facility Roll-Up Loans, collectively, the "<u>Roll-Up Loans</u>").  As set forth on <u>Schedule 2.1(b)</u>, the Roll-Up Loans shall consist of New Money Roll-Up Loans and Incremental Roll-Up Loans.  The Incremental Roll-Up Loans shall be allocated to New Money Lenders and Existing RBL Lenders that are not providing Commitments hereunder (the "<u>Non-Participating Lenders</u>"), based on (i) with respect to the Non-Participating Lenders, their respective Existing Commitment Percentage and (ii) with respect to the New Money Lenders, their respective Commitment Percentage hereunder, and each such allocation shall be reflected on <u>Schedule 2.1(b)</u>.  Subject to the terms and conditions set forth

40

herein and without any further action by any party to this Agreement, each Roll-Up Lender's (x) Interim Facility Roll-Up Loans shall, from and after the Interim Facility Effective Date, be designated as Roll-Up Loans and administered hereunder and (y) Final Facility Roll-Up Loans shall, from and after the Final Facility Effective Date, be designated as Roll-Up Loans and administered hereunder; provided that, for the avoidance of doubt, until any the Existing Loan has been designated as a Roll-Up Loan hereunder and approved by the applicable DIP Order, the Roll-Up Loans shall continue to be guaranteed by the Existing RBL Guarantors under the Existing RBL Guarantee and secured by and entitled to the benefits of all Liens and security interests created and arising under the Existing Security Documents, which Liens and security interests shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority (until such Existing Loan has been designated as a Roll-Up Loan hereunder and approved by the applicable DIP Order). Each such designation shall be applied on a *pro rata* basis to the Existing Loans held by such Roll-Up Lender under the Existing RBL Credit Agreement to the extent rolled up under this Agreement as set forth on Schedule 2.1(b). For the avoidance of doubt, each Roll-Up Lender acknowledges and agrees that, by accepting the benefits of this Agreement, on the Interim Facility Effective Date, each such Lender, in its capacity as an Existing RBL Lender rolling up loans under this Agreement shall become a party to this Agreement as a Roll-Up Lender hereunder by executing and delivering a counterpart to this Agreement. Amounts rolled up under this Section 2.1(b) and repaid or prepaid may not be reborrowed. Upon the entry of the Interim Order, the conversion of New Money Roll-Up Loans shall be in an amount equal to the Interim Facility Cap approved by the Bankruptcy Court, with the balance of the New Money Roll-Up Loans and the Incremental Roll-Up Loans converting upon entry of the Final Order. The Agent shall update Schedule 2.1(b) on the Interim Facility Effective Date (and, with respect to the Final Facility Roll-Up Loan Amounts only, on the Final Facility Effective Date) to reflect each Roll-Up Lender's Roll-Up Loan Amount (which Roll-Up Loan Amounts listed on Schedule 2.1(b) shall be conclusive absent manifest error) and deliver such updated Schedule 2.1(b) to the Borrower and the Roll-Up Lenders, whereupon such updated Schedule 2.1(b) shall constitute Schedule 2.1(b) for all purposes hereunder. Subject to the terms and conditions hereof, each Roll-Up Loan may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; but all Roll-Up Loans shall, unless otherwise specifically provided herein, consist entirely of Loans of the same Type.

(c)     Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan, but (A) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (B) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.10 shall apply).

2.2     Minimum Amount of Each Borrowing; Maximum Number of Borrowings. The aggregate principal amount of each Borrowing of New Money Loans shall be in a minimum amount of at least $1,000,000 and in a multiple of $1,000,000 in excess thereof (except for any Borrowing of New Money Loans in an aggregate amount that is equal to the entire unused balance of aggregate Commitments), but New Money Loans made to reimburse the Letter of Credit Issuer

with respect to any Unpaid Drawing shall be made in the amounts required by Section 3.3 or 3.4, as applicable.  More than one Borrowing may be incurred on any date; but at no time shall there be outstanding more than nine (9) Borrowings of LIBOR Loans under this Agreement (for the avoidance of doubt, in addition to any Roll-Up Loans that are rolled-over in accordance with Section 2.1(b)).

2.3     Notice of Borrowing.

(a)     Whenever the Borrower desires to incur New Money Loans (other than Borrowings to repay Unpaid Drawings), the Borrower shall give the Agent at the Agent's Office, (i) before 1:00 p.m. at least three (3) Business Days' (or such shorter time period as agreed to by the Agent) prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of New Money Loans if such New Money Loans are to be initially LIBOR Loans (or before 1:00 p.m. two (2) Business Days' prior notice in the case of a Borrowing of New Money Loans to be made on the Interim Facility Effective Date initially as LIBOR Loans) and (ii) written notice (or telephonic notice promptly confirmed in writing) before 1:00 p.m. on the Business Day before the date of each Borrowing of New Money Loans that are to be ABR Loans.  Such notice (a "Notice of Borrowing") shall specify (A) the aggregate principal amount of the New Money Loans to be made pursuant to such Borrowing, (B) the date of the Borrowing (which shall be a Business Day) and (C) whether the respective Borrowing shall consist of ABR Loans and/or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto.  The Agent shall promptly give each New Money Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of New Money Loans, of such New Money Lender's Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

(b)     Borrowings to reimburse Unpaid Drawings shall be made upon the notice specified in Section 3.4(a).

(c)     Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Agent may act before receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Agent in good faith to be from an Authorized Officer of the Borrower or other representative of the Borrower duly authorized by an Authorized Officer.

2.4     Disbursement of Funds.

(a)     No later than 1:00 p.m. on the date specified in each Notice of Borrowing, each New Money Lender will make available its *pro rata* portion of each Borrowing requested to be made on such date in the manner provided below; but on the Interim Facility Effective Date, such funds shall be made available by 10:00 a.m. or such earlier time as may be agreed among the New Money Lenders, the Borrower and the Agent for the purpose of consummating the Transactions.

(b)     Each New Money Lender shall make available all amounts it is to fund to the Borrower under any Borrowing in immediately available funds to the Agent at the Agent's Office in Dollars, and the Agent will (except in the case of Borrowings to repay Unpaid Drawings)

make available to the Borrower, by depositing or wiring to an account as designated by the Borrower in the Notice of Borrowing to the Agent the aggregate of the amounts so made available in Dollars.  Unless the Agent shall have been notified by any New Money Lender before the date of any such Borrowing that such New Money Lender does not intend to make available to the Agent its portion of the Borrowing or Borrowings to be made on such date, the Agent may assume that such New Money Lender has made such amount available to the Agent on such date of Borrowing, and the Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Agent by such New Money Lender and the Agent has made available such amount to the Borrower, the Agent shall be entitled to recover such corresponding amount from such New Money Lender.  If such New Money Lender does not pay such corresponding amount forthwith upon the Agent's demand therefor the Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Agent in Dollars.  The Agent shall also be entitled to recover from such New Money Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Agent to the Borrower to the date such corresponding amount is recovered by the Agent, at a rate per annum equal to (i) if paid by such New Money Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the respective New Money Loans.

(c)     Nothing in this Section 2.4 shall be deemed to relieve any New Money Lender from its obligation to fulfill its Commitment or to prejudice any rights that the Borrower may have against any New Money Lender as a result of any default by such New Money Lender hereunder (it being understood, however, that no New Money Lender shall be responsible for the failure of any other New Money Lender to fulfill its Commitment).

2.5     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby promises to pay to the Agent, for the benefit of the applicable Lenders, on the Scheduled Maturity Date, the then-outstanding principal amount of all Loans.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office from time to time, including the amounts of principal and interest payable and paid to such lending office from time to time under this Agreement.

(c)     The Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, the Type and Class of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Agent hereunder from the Borrower and each Lender's share thereof.

43

(d)     The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (b) and (c) of this Section 2.5 shall, to the extent permitted by applicable Requirements of Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; but the failure of any Lender or the Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note substantially in the form of Exhibit E hereto.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 13.6) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

2.6     Conversions and Continuations.

(a)     Subject to the penultimate sentence of this clause (a), (i) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least $1,000,000 (and in multiples of $100,000 in excess thereof) of the outstanding principal amount of Loans of one Type into a Borrowing or Borrowings of another Type of the same Class and (ii) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period of one month; but (A) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than $1,000,000, (B) ABR Loans may not be converted into LIBOR Loans if an Event of Default is in existence on the date of the conversion and the Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such conversion, (C) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if an Event of Default is in existence on the date of the proposed continuation and the Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, and (D) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2.  Each such conversion or continuation shall be effected by the Borrower by giving the Agent at the Agent's Office before 1:00 p.m. at least (1) three (3) Business Days', in the case of a continuation of or conversion to LIBOR Loans or (2) the date of conversion, in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "Notice of Conversion or Continuation") specifying the Loans to be so converted or continued, the Type and Class of Loans to be converted into or continued and, if such Loans are to be converted into or continued as LIBOR Loans, the Interest Period to be initially applicable thereto.  The Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b)     If any Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans.  If upon the

44

expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in clause (a) above, the Borrower shall be deemed to have elected to convert such Borrowing of LIBOR Loans into a Borrowing of ABR Loans, effective as of the expiration date of such current Interest Period.

2.7     Pro Rata Borrowings.  Each Borrowing of Loans of a particular Class under this Agreement shall be made by the Lenders of such Class (a) in the case of the New Money Lenders, *pro rata* on the basis of their then applicable Commitment Percentages and (b) in the case of the Roll-up Lenders as set forth in Section 2.1(b).  It is understood that (a) no New Money Lender shall be responsible for any default by any other Lender in its obligation to make New Money Loans hereunder and that each New Money Lender severally but not jointly shall be obligated to make the New Money Loans provided to be made by it hereunder, regardless of the failure of any other New Money Lender to fulfill its Commitment and (b) failure by a Lender to perform any obligation under any Credit Document shall not release any Person from performance of its obligation under any Credit Document.

2.8     Interest.

(a)     The unpaid principal amount of each ABR Loan shall bear interest at a rate per annum that shall at all times be the Applicable Margin *plus* the ABR, in each case, in effect from time to time.

(b)     The unpaid principal amount of each LIBOR Loan shall bear interest at a rate per annum that shall at all times be the Applicable Margin *plus* the relevant LIBOR, in each case, in effect from time to time.

(c)     [Reserved].

(d)     (I) If an Event of Default has occurred and is continuing, then, at the election of the Majority Lenders, all Loans and such fees or other amounts due hereunder shall bear interest at a rate per annum that is (the "Default Rate") (1) in the case of principal, the rate that would otherwise be applicable thereto *plus* 2% or (2) in the case of any other amount, to the extent permitted by applicable Requirements of Law, the rate described in Section 2.8(a) *plus* 2% from the date of such Event of Default to the earlier of (A) the date on which such amount is paid in full (after as well as before judgment) and (B) the date on which such Event of Default has been waived or otherwise cured; and (II) without duplication of clause (I) above, if all or a portion of the principal of or interest on any Loan or any fee or other amount payable by the Borrower or Guarantor hereunder or under any other Credit Document is not paid when due (whether at stated maturity, by acceleration, or otherwise), all overdue Loans and such fees or other amounts due hereunder shall automatically bear interest at the Default Rate.

(e)     Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; but any Loan that is repaid on the same date on which it is made shall bear interest for one day.  Except as provided below, interest shall be payable (i) in respect of each ABR Loan, on the last Business Day of each calendar month (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto, and (iii) in respect of each Loan, (A) on any prepayment (on the amount

45

prepaid), (B) on the Termination Date (whether by acceleration or otherwise) and (C) after the Termination Date, on demand.

(f)        All computations of interest hereunder shall be made in accordance with Section 5.5.

(g)        The Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders of the applicable Class thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

2.9        Interest Periods.  At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall be a period of one month.

Notwithstanding anything to the contrary contained above:

(a)        the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)        if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)        if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; but if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day, but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)        the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the Scheduled Maturity Date.

2.10        Increased Costs, Illegality, Etc..

(a)        In the event that (x) in the case of clause (i) below (but subject to Section 2.10(d)), the Majority Lenders or (y) in the case of clauses (ii) and (iii) below, any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)        on any date for determining LIBOR for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Borrowing are not generally available in the relevant market, (B) by reason of any changes

46

arising on or after the Interim Facility Effective Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR, or (C) LIBOR for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; or

(ii)      that, due to a Change in Law occurring at any time or after the Interim Facility Effective Date, which Change in Law shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender to any Tax with respect to any Credit Document or any LIBOR Loan made by it (other than (i) Taxes indemnifiable under Section 5.4, (ii) Taxes described in clauses (ii), (iii) and (iv) of the definition of "Excluded Taxes" or (iii) Connection Income Taxes), or (C) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Loans made by such Lender, which results in the cost to such Lender of making, converting into, continuing or maintaining LIBOR Loans or participating in Letters of Credit (in each case hereunder) increasing by an amount which such Lender reasonably deems material or the amounts received or receivable by such Lender hereunder with respect to the foregoing shall be reduced; or

(iii)      at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Agent, in the case of clause (i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Agent of such determination (which notice the Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Agent no longer exist (which notice the Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender, promptly (but no later than fifteen (15) Business Days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b)     At any time that any LIBOR Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.10(a)(iii) shall) either (i) if the affected LIBOR Loan has been requested but not yet made, cancel such Borrowing request by giving the Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.10(a)(ii) or (iii) or (ii) if the affected LIBOR Loan is then outstanding, upon at least three (3) Business Days' notice to the Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; but if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c)     If, after the Interim Facility Effective Date, any Change in Law relating to capital adequacy or liquidity requirements of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity requirements occurring after the Interim Facility Effective Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's Commitment or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy or liquidity requirements), then from time to time, promptly (but in any event no later than fifteen (15) Business Days) after written demand by such Lender (with a copy to the Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Interim Facility Effective Date (except as otherwise set forth in the definition of Change in Law).  Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

(d)     Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Agent and the Borrower may amend this Agreement to replace LIBOR with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Agent written notice that such Required Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 2.10(d) will occur prior to the applicable Benchmark Transition Start Date.

(e)     In connection with the implementation of a Benchmark Replacement, the Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any

amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(f)     The Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Agent or Lenders pursuant to this Section 2.10(f), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.10(f).

(g)     Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a LIBOR Loan of, conversion to or continuation of LIBOR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period, the component of ABR based upon LIBOR will not be used in any determination of ABR.

2.11    Compensation.  If (a) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to Section 2.5, 2.6, 2.10, 5.1, 5.2 or 13.7, as a result of acceleration of the maturity of the Loans pursuant to Article XI or for any other reason, (b) any Borrowing of LIBOR Loans is not made on the date specified in a Notice of Borrowing, (c) any ABR Loan is not converted into a LIBOR Loan on the date specified in a Notice of Conversion or Continuation, (d) any LIBOR Loan is not continued as a LIBOR Loan on the date specified in a Notice of Conversion or Continuation or (e) any prepayment of principal of any LIBOR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or 5.2, the Borrower shall after the Borrower's receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount and shall be conclusive and binding in the absence of manifest error), pay to the Agent (within fifteen (15) Business Days) for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

2.12    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), 2.10(a)(iii), 2.10(c), 3.5 or 5.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, if such designation is made on such terms that such Lender and its lending office

49

suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  Nothing in this Section shall affect or postpone any Obligation or the right of any Lender provided in Section 2.10, 3.5 or 5.4.

2.13    Notice of Certain Costs.    Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11, 3.5 or 5.4 is given by any Lender, any Letter of Credit Issuer or any L/C Participant, as the case may be, more than one hundred-eighty (180) days after such Person has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Person shall not be entitled to compensation under Section 2.10, 2.11, 3.5 or 5.4, as the case may be, for any such amounts incurred or accruing before the one-hundred-eighty-first (181st) day before the giving of such notice to the Borrower; but if the circumstance giving rise to such claim is retroactive, then such one hundred-eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

2.14    [Reserved].

2.15    Defaulting Lenders.    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Commitment Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.1(a);

(b)    The Commitment and the Exposure of such Defaulting Lender shall not be included in determining whether all Lenders, the Required Lenders or the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 13.1); but any waiver, amendment or modification requiring the consent of all Lenders pursuant to Section 13.1 (other than Section 13.1(b)(x)) or requiring the consent of each affected Lender pursuant to Section 13.1(b)(i) or, shall require the consent of such Defaulting Lender (which for the avoidance of doubt would include any change to the Scheduled Maturity Date applicable to such Defaulting Lender, decreasing or forgiving any principal or interest due to such Defaulting Lender, any decrease of any interest rate applicable to Loans made by such Defaulting Lender (other than the waiving of post-default interest rates) and any increase in such Defaulting Lender's Commitment);

(c)    If any Letter of Credit Exposure exists at the time a New Money Lender becomes a Defaulting Lender, then (i) all or any part of such Letter of Credit Exposure of such Defaulting Lender will, subject to the limitation in the first proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders that are New Money Lenders *pro rata* in accordance with their respective Commitment Percentages; but (A) each Non-Defaulting Lender's Exposure may not in any event exceed the Commitment Percentage of the Loan Limit of such Non-Defaulting Lender as in effect at the time of such reallocation and (B) subject to Section 13.23, neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Agent, the Letter of Credit Issuers or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender, (ii) to the

50

extent that all or any portion of the Defaulting Lender's Letter of Credit Exposure cannot, or can only partially, be so reallocated to Non-Defaulting Lenders, whether by reason of the first proviso in Section 2.15(c)(i) or otherwise, the Borrower shall within two (2) Business Days following notice by the Agent or the applicable Letter of Credit Issuer, Cash Collateralize for the benefit of the applicable Letter of Credit Issuer only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above), in accordance with the procedures set forth in Section 3.8 for so long as such Letter of Credit Exposure is outstanding, (iii) if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.15(c), the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Letter of Credit Exposure is Cash Collateralized, (iv) if the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.15(c), then the Letter of Credit Fees payable for the account of the Lenders pursuant to Section 4.1(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Commitment Percentages and the Borrower shall not be required to pay any Letter of Credit Fees to the Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period that such Defaulting Lender's Letter of Credit Exposure is reallocated, or (v) if any Defaulting Lender's Letter of Credit Exposure is neither Cash Collateralized nor reallocated pursuant to this Section 2.15(c), then, without prejudice to any rights or remedies of the Letter of Credit Issuer or any Lender hereunder, all Letter of Credit Fees payable under Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to the Letter of Credit Issuer until such Letter of Credit Exposure is Cash Collateralized and/or reallocated;

(d)     So long as any New Money Lender is a Defaulting Lender, no Letter of Credit Issuer will be required to issue any new Letter of Credit or amend any outstanding Letter of Credit to increase the Stated Amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless (i) in the case of any Letter of Credit Issuer, such Letter of Credit Issuer is reasonably satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated or fully covered by the Commitments of the Non-Defaulting Lenders that are New Money Lenders or by Cash Collateralization or a combination thereof in accordance with clause (c) above or otherwise in a manner reasonably satisfactory to the Letter of Credit Issuer, and (ii) in the case of any Letter of Credit Issuer, it is reasonably satisfied that participating interests in any such newly issued or increased Letter of Credit, as applicable, shall be allocated among Non-Defaulting Lenders that are New Money Lenders in a manner consistent with Section 2.15(c) (and Defaulting Lenders shall not participate therein); and

(e)     If the Borrower, the Agent and each Letter of Credit Issuer agree in writing in their discretion that a New Money Lender that is a Defaulting Lender is no longer a Defaulting Lender, the Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding New Money Loans of the other Lenders or take such other actions as the Agent may determine to be necessary to cause the New Money Loans and funded and unfunded participations in Letters of Credit to be held *pro rata* by the New Money Lenders in accordance with the Commitments (without giving effect to Section 2.15(c)), whereupon such Lender will cease to be a Defaulting Lender; but no adjustments will be made retroactively with respect to fees

51

accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; provided, further, that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

(f)     Any payment of principal, interest, fees or other amounts received by the Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article XI or otherwise, and including any amounts made available to the Agent by that Defaulting Lender pursuant to Section 13.8), shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Agent hereunder; second, to the payment on a *pro rata* basis of any amounts owing by that Defaulting Lender (if such Defaulting Lender is a New Money Lender) to each Letter of Credit Issuer hereunder; third, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent; fourth, if so determined by the Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender (if such Defaulting Lender is a New Money Lender) to fund New Money Loans under this Agreement; fifth, to the payment of any amounts owing to the Lenders, the Letter of Credit Issuers as a result of any judgment of a court of competent jurisdiction obtained by any Lender, such Letter of Credit Issuer against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; sixth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and seventh, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; but if such payment is a payment of the principal amount of any Loans or Unpaid Drawings, such payment shall be applied solely to pay the relevant Loans of, and Unpaid Drawings owed to, the relevant non-Defaulting Lenders on a *pro rata* basis before being applied in the manner set forth in this Section 2.15(f). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to Section 3.8 shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

2.16     Collateral; Guarantees.

(a)     Priority and Liens. The parties hereto acknowledge and agree that, upon entry of the Interim Order and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the super-priority claims and Liens as set forth in, the DIP Orders and herein.

(b)     Payment of Obligations. On the Termination Date, the Lenders shall be entitled to immediate payment of all Obligations without further application to, or order of, the Bankruptcy Court.

(c)     No Discharge; Survival of Claims. Each Debtor agrees that (a) any Confirmation Order entered in the Bankruptcy Cases shall not discharge or otherwise affect in any

52

way any of the Obligations, other than after or upon the payment in full in cash to the Secured Parties of all Obligations (and the Cash Collateralization of all outstanding Letters of Credit in amount and subject to documentation satisfactory to the Letter of Credit Issuer) and termination of the Commitments on or before the effective date of an Approved Plan of Reorganization and (b) to the extent the Obligations are not satisfied in full, (i) the Obligations shall not be discharged by the entry of a Confirmation Order (and each Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Super-Priority Claim granted to the Agent, the Lenders, the Hedge Banks and the providers of Cash Management Services pursuant to the DIP Order and the Liens granted to the Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a Confirmation Order.

(d)     Perfection and Protection of Security Interests and Liens. The Debtors will from time to time deliver to the Agent all financing statements, amendments, assignments and continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by each Debtor, as applicable, in form and substance reasonably satisfactory to the Agent, in each case, which the Agent requests for the purpose of confirming or protecting its lien and security interest in Collateral for the purpose of securing the Obligations. Each Credit Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral shall be created and perfected, to the maximum extent permitted by law, without the execution or the recordation or filing in any land records or filing offices of, any assignment, security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Agent of, or over, any Collateral, as set forth in the Interim Order (and, when entered, the Final Order).

(e)     Offset. Subject to the terms and conditions set forth in the applicable DIP Order, in addition to any other rights and remedies of the Lenders upon the occurrence and during the continuation of any Events of Default and subject to Article XI, each Lender is authorized to set-off and apply, without notice to any Debtor (other than as required in the applicable DIP Order) (i) any and all monies, securities or other property (and the proceeds therefrom) of the Debtors now or hereafter held or received by or in transit to such Lender from or for the account of any Debtor, whether for safekeeping, custody, pledge, transmission, collection or otherwise, any and all deposits (general or special, time or demand, provisional or final) of any Debtor with such Lender, and (ii) any other credits and claims of any Debtor at any time existing against the such Lender, including claims under certificates of deposit. During the existence of any Event of Default, but subject to Article XI, the Agent or any Lender is hereby authorized to foreclose upon, offset, appropriate, and apply, at any time and from time to time, without notice to any Debtor, any and all items hereinabove referred to against the Obligations then due and payable. For the avoidance of doubt, the parties to this agreement agree and acknowledge that this Section 2.16(e) shall not apply to Excluded Deposit Accounts of any Debtors and that any recoveries received by any Lender pursuant to this Section 2.16(e) are subject to Section 13.8.

(f)     Value. The direct or indirect value of the consideration received and to be received by such Guarantor in connection herewith is reasonably worth at least as much as the liability and obligations of each Guarantor hereunder and under the other Credit Documents, and

53

the incurrence of such liability and obligations in return for such consideration may reasonably be expected to benefit each Guarantor, directly or indirectly.

(g)      Collateral. Upon the entry of, and subject to, the Interim Order (and, when entered, the Final Order), all Obligations of the Debtors to the Lenders under the Credit Documents, including all Loans made under the DIP Facility, shall, subject to the Carve-Out, at all times:

(i)      pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several Super-Priority Claim status in the Bankruptcy Case; provided that (x) the Super-Priority Claim in respect of the Roll-Up Loans shall be immediately junior in payment and priority to the Super-Priority Claim in respect of the New Money Loans and Lender Hedging Obligations, (y) the Super-Priority Claim in respect of the Incremental Roll-Up Loans shall be immediately junior in payment and priority to the Super-Priority Claim in respect of the New Money Roll-Up Loans and Lender Hedging Obligations and (z) the Super-Priority Claims in respect of the New Money Loans, Lender Hedging Obligations and Roll-Up Loans shall be senior in priority and payment to the obligations under the Existing RBL Credit Agreement;

(ii)      pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority Lien on the Collateral to the extent that such Collateral is not subject to valid, perfected and non-avoidable Liens as of the Petition Date or Liens that were in existence immediately prior to the Petition Date that become perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, including, subject to the entry of the Final Order, the Avoidance Action Proceeds;

(iii)      pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on all assets of the Debtors, to the extent that such assets are subject to a valid, perfected and non-avoidable Liens as of the Petition Date or Liens that were in existence immediately prior to the Petition Date that are perfected as permitted by Section 546(b) of the Bankruptcy Code (in each case, other than (x) Liens securing Indebtedness permitted by Section 10.1(g) and (y) Excluded Property); and

(iv)      pursuant to Bankruptcy Code section 364(d), be secured by a perfected super-priority priming Lien on all Collateral to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties as of the commencement of the Bankruptcy Case, including, all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors, whether now existing or hereafter acquired or arising, that secure Indebtedness permitted by Section 10.1(g).

provided that, notwithstanding anything to the contrary in this Section 2.16, the Liens securing the Obligations in favor of the Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral shall not be subject or subordinate to (i) subject to entry of the Final Order only, any

54

Lien that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code, (ii) any Liens arising after the Petition Date including, without limitation, any Liens granted in favor of any Governmental Authority for any liability of the Debtors, or (iii) any intercompany or Affiliate Liens of the Debtors.

## ARTICLE III
## LETTERS OF CREDIT

3.1     <u>Letters of Credit</u>.

(a)     Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the Interim Facility Effective Date and during the Availability Period, the Letter of Credit Issuer agrees, in reliance upon the agreements of the New Money Lenders set forth in this Article, to issue upon the request of the Borrower and for the direct or indirect benefit of the Debtors, a letter of credit or letters of credit (the "<u>Letters of Credit</u>" and each, a "<u>Letter of Credit</u>") in such form and with such Issuer Documents as may be approved by the Letter of Credit Issuer in its reasonable discretion; <u>but</u> the Borrower shall be a co-applicant of, and jointly and severally liable with respect to, each Letter of Credit issued for the account of a Guarantor.  The Existing Letters of Credit shall be deemed to have been issued pursuant hereto (but shall not be considered newly issued on the Interim Facility Effective Date for purposes of <u>Section 4.1(d)</u>), and from and after the Interim Facility Effective Date shall be subject to and governed by the terms and conditions hereof.

(b)     Notwithstanding the foregoing, (i) no Letter of Credit shall be issued the Stated Amount of which, (A) when added to the Letters of Credit Outstanding at such time, would exceed the Letter of Credit Commitment then in effect and/or (B) when added to the Letters of Credit issued by and outstanding at such time for any Letter of Credit Issuer, would exceed the Letter of Credit Issuance Limit for such Letter of Credit Issuer, (ii) no Letter of Credit shall be issued the Stated Amount of which would cause the Total Exposure at such time to exceed the applicable Loan Limit then in effect, (iii) each Letter of Credit shall have an expiration date occurring no later than the L/C Maturity Date, unless otherwise agreed upon by the Letter of Credit Issuer; <u>but</u> any Letter of Credit may provide for automatic renewal thereof to a date no later than the L/C Maturity Date or such longer period of time as may be agreed by the applicable Letter of Credit Issuer; <u>provided</u>, <u>further</u>, that in no event shall such expiration date occur later than the L/C Maturity Date unless arrangements, which are reasonably satisfactory to the Letter of Credit Issuer to Cash Collateralize (or backstop, convert, or roll-over) such Letter of Credit, have been made (<u>but</u> no Lender shall be obligated to fund participations in respect of any Letter of Credit after the L/C Maturity Date), (iv) each Letter of Credit shall be denominated in Dollars, (v) no Letter of Credit shall be issued if it would be illegal under any applicable Requirement of Law for the beneficiary of the Letter of Credit to have a Letter of Credit issued in its favor, (vi) no Letter of Credit shall be issued by a Letter of Credit Issuer (but another Letter of Credit Issuer, not subject to the constraints of this <u>Section 3.1(b)(vi)</u>, may issue such Letter of Credit) if (A) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Letter of Credit Issuer from issuing the Letter of Credit, or any Law applicable to such Letter of Credit Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Letter of Credit Issuer shall prohibit, or request that such Letter of Credit Issuer refrain from, the issuance of letters of credit generally

55

or the Letter of Credit in particular or shall impose upon such Letter of Credit Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which such Letter of Credit Issuer is not otherwise compensated hereunder) not in effect on the Interim Facility Effective Date, or shall impose upon such Letter of Credit Issuer any unreimbursed loss, cost or expense which was not applicable on the Interim Facility Effective Date and which such Letter of Credit Issuer in good faith deems material to it or (B) the issuance of the Letter of Credit would violate one or more policies of such Letter of Credit Issuer generally, and (vii) no Letter of Credit shall be issued by a Letter of Credit Issuer after it has received a notice from any Debtor or the Agent or the Majority Lenders stating that a Default or Event of Default has occurred and is continuing until such time as the Letter of Credit Issuer shall have received a notice (A) of rescission of such notice from the party or parties originally delivering such notice, (B) of the waiver of such Default or Event of Default in accordance with the provisions of <u>Section 13.1</u> or (C) that such Default or Event of Default is no longer continuing.

(c)     Upon at least one (1) Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Agent and the Letter of Credit Issuer (which notice the Agent shall promptly transmit to each of the applicable Lenders), the Borrower shall have the right, on any day, permanently to terminate or reduce the Letter of Credit Commitment in whole or in part; but, after giving effect to such termination or reduction, the Letters of Credit Outstanding shall not exceed the Letter of Credit Commitment.

3.2     <u>Letter of Credit Requests</u>.

(a)     Whenever the Borrower desires that a Letter of Credit be issued, the Borrower shall give the Agent and the Letter of Credit Issuer a Letter of Credit Request by no later than 1:00 p.m. at least two (2) (or such lesser number as may be agreed upon by the Agent and the Letter of Credit Issuer) Business Days before the proposed date of issuance.  Each notice shall be executed by the Borrower and shall be in the form of <u>Exhibit B</u> or such other form (including by electronic or fax transmission) as reasonably agreed between the Borrower, the Agent and the Letter of Credit Issuer (each a "<u>Letter of Credit Request</u>").  No Letter of Credit Issuer shall issue any Letters of Credit unless such Letter of Credit Issuer shall have received notice from the Agent that the conditions to such issuance have been met, which notice shall be deemed given (i) if the Letter of Credit Issuer has not received notice from the Agent that the conditions to such issuance have been met within two (2) Business Days after the date of the applicable Letter of Credit Request or (ii) if the aggregate amount of Letters of Credit Outstanding issued by such Letter of Credit Issuer then outstanding does not exceed the amount theretofore agreed to by the Borrower, the Agent and such Letter of Credit Issuer, and the Agent has not otherwise notified such Letter of Credit Issuer that it may no longer rely on this <u>clause (ii)</u>.

(b)     Each Letter of Credit Issuer (other than the Agent or any of its Affiliates) shall, at least once each week, provide the Agent with a list of all Letters of Credit issued by it that are outstanding at such time; but, upon written request from the Agent, such Letter of Credit Issuer shall thereafter notify the Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Letter of Credit Issuer.

56

(c)     The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower that the Letter of Credit may be issued in accordance with, and will not violate the requirements of, <u>Section 3.1(b)</u>.

3.3     <u>Letter of Credit Participations</u>.

(a)     Immediately upon the issuance by any Letter of Credit Issuer of any Letter of Credit, such Letter of Credit Issuer shall be deemed to have sold and transferred to each New Money Lender (each such New Money Lender, in its capacity under this <u>Section 3.3</u>, an "<u>L/C Participant</u>"), and each such L/C Participant shall be deemed irrevocably and unconditionally to have purchased and received from such Letter of Credit Issuer, without recourse or warranty, an undivided interest and participation (each an "<u>L/C Participation</u>"), to the extent of such L/C Participant's Commitment Percentage, in each Letter of Credit, each substitute therefor, each Drawing thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.

(b)     In determining whether to pay under any Letter of Credit, the relevant Letter of Credit Issuer shall have no obligation relative to the L/C Participants other than to confirm that (i) any documents required to be delivered under such Letter of Credit have been delivered, (ii) the Letter of Credit Issuer has examined the documents with reasonable care and (iii) the documents appear to comply on their face with the requirements of such Letter of Credit.  Any action taken or omitted to be taken by the relevant Letter of Credit Issuer under or in connection with any Letter of Credit issued by it, if taken or omitted in the absence of gross negligence or willful misconduct, shall not create for the Letter of Credit Issuer any resulting liability to the L/C Participants.

(c)     In the event that any Letter of Credit Issuer makes any payment under any Letter of Credit issued by it and the Borrower shall not have repaid such amount in full to the respective Letter of Credit Issuer pursuant to <u>Section 3.4(a)</u>, or if any reimbursement payment is required to be refunded to the Borrower, such Letter of Credit Issuer shall promptly notify the Agent of such failure, and each such L/C Participant shall promptly and unconditionally pay to the Agent for the account of such Letter of Credit Issuer, the amount of such L/C Participant's Commitment Percentage of such unreimbursed payment in Dollars and in immediately available funds; but no L/C Participant shall be obligated to pay to the Agent for the account of such Letter of Credit Issuer its Commitment Percentage of such unreimbursed amount arising from any wrongful payment made by the Letter of Credit Issuer under any such Letter of Credit as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Letter of Credit Issuer (as determined in a final and non-appealable judgment by a court of competent jurisdiction).  Each L/C Participant shall make available to the Agent for the account of the Letter of Credit Issuer such L/C Participant's Commitment Percentage of the amount of such payment no later than 1:00 p.m. on the first Business Day after the date notified by such Letter of Credit Issuer in immediately available funds.  If and to the extent such L/C Participant shall not have so made its Commitment Percentage of the amount of such payment available to the Agent for the account of the applicable Letter of Credit Issuer, such L/C Participant agrees to pay to the Agent for the account of such Letter of Credit Issuer, forthwith on demand, such amount, together with interest thereon for each day from such date until the date such amount is paid to the Agent for the account of such Letter of Credit Issuer at a rate per annum equal to the Overnight Rate from time

57

to time then in effect, plus any administrative, processing or similar fees customarily charged by such Letter of Credit Issuer in connection with the foregoing.  The failure of any L/C Participant to make available to the Agent for the account of the applicable Letter of Credit Issuer its Commitment Percentage of any payment under any Letter of Credit shall not relieve any other L/C Participant of its obligation hereunder to make available to the Agent for the account of such Letter of Credit Issuer its Commitment Percentage of any payment under such Letter of Credit on the date required, as specified above, but no L/C Participant shall be responsible for the failure of any other L/C Participant to make available to the Agent such other L/C Participant's Commitment Percentage of any such payment.

(d)     Whenever any Letter of Credit Issuer receives a payment in respect of an unpaid reimbursement obligation as to which the Agent has received for the account of such Letter of Credit Issuer any payments from the L/C Participants pursuant to clause (c) above, such Letter of Credit Issuer shall pay to the Agent and the Agent shall promptly pay to each L/C Participant that has paid its Commitment Percentage of such reimbursement obligation, in Dollars and in immediately available funds, an amount equal to such L/C Participant's share (based upon the proportionate aggregate amount originally funded by such L/C Participant to the aggregate amount funded by all L/C Participants) of the principal amount so paid in respect of such reimbursement obligation and interest thereon accruing after the purchase of the respective L/C Participations at the Overnight Rate.

(e)     The obligations of the L/C Participants to make payments to the Agent for the account of a Letter of Credit Issuer with respect to Letters of Credit shall be irrevocable and not subject to counterclaim, set-off or other defense or any other qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including under any of the following circumstances:

(i)     any lack of validity or enforceability of any Credit Document;

(ii)     the existence of any claim, set-off, defense or other right that the Borrower may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Agent, the Letter of Credit Issuer, any Lender or other Person, whether in connection with this Agreement, any Letter of Credit, the Transactions or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any term of any Credit Document; or

(v)     the occurrence of any Default or Event of Default;

but no L/C Participant shall be obligated to pay to the Agent for the account of any Letter of Credit Issuer its Commitment Percentage of any unreimbursed amount arising from any wrongful

58

payment made by such Letter of Credit Issuer under a Letter of Credit as a result of acts or omissions constituting willful misconduct, bad faith or gross negligence on the part of the Letter of Credit Issuer (as determined in a final and non-appealable judgment by a court of competent jurisdiction).

3.4     Agreement to Repay Letter of Credit Drawings.

(a)     The Borrower hereby agrees to reimburse each Letter of Credit Issuer by making payment in Dollars to the Agent for the account of such Letter of Credit Issuer in immediately available funds, for any payment or disbursement made by such Letter of Credit Issuer under any Letter of Credit issued by it (each such amount so paid until reimbursed, an "Unpaid Drawing") (i) within one (1) Business Day of the date of such payment or disbursement if such Letter of Credit Issuer provides notice to the Borrower of such payment or disbursement before 11:00 a.m. on such next succeeding Business Day (from the date of such payment or disbursement) or (ii) if such notice is received after such time, on the next Business Day following the date of receipt of such notice (such required date for reimbursement under clause (i) or (ii), as applicable, on such Business Day (the "Reimbursement Date")), with interest on the amount so paid or disbursed by such Letter of Credit Issuer, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the per annum rate for each day equal to the rate described in Section 2.8(a); but, notwithstanding anything contained in this Agreement to the contrary, with respect to any Letter of Credit, (i) unless the Borrower shall have notified the Agent and the applicable Letter of Credit Issuer before 11:00 a.m. on the Reimbursement Date that the Borrower intends to reimburse such Letter of Credit Issuer for the amount of such Drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that the New Money Lenders make New Money Loans (which shall be ABR Loans) on the Reimbursement Date in an amount equal to the amount of the Unpaid Drawing, and (ii) the Agent shall promptly notify each New Money Lender of such Drawing and the amount of its New Money Loan to be made in respect thereof, and each New Money Lender shall be irrevocably obligated to make a New Money Loan to the Borrower in the manner deemed to have been requested in the amount of its Commitment Percentage of the applicable Unpaid Drawing by 12:00 noon on such Reimbursement Date by making the amount of such New Money Loan available to the Agent.  Such New Money Loans made in respect of such Unpaid Drawing on such Reimbursement Date shall be made without regard to the limits of Section 2.2 and without regard to the satisfaction of the conditions set forth in Article VII.  The Agent shall use the proceeds of such New Money Loans solely for purpose of reimbursing the applicable Letter of Credit Issuer for the related Unpaid Drawing (and upon the application of the proceeds of such New Money Loans to such Unpaid Drawing, the Borrower's obligations with respect to such Unpaid Drawing shall be satisfied in full and replaced with an obligation to repay such Loans in accordance with the terms of this Agreement).  In the event that the Borrower fails to Cash Collateralize any Letter of Credit that is outstanding on the Termination Date (or make other arrangements with respect thereto satisfactory to the applicable Letter of Credit Issuer and the Agent), the full amount of the Letter of Exposure in respect of such Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.4 except that such Letter of Credit Issuer shall hold the proceeds received from the New Money Lenders as contemplated above as Cash Collateral for such Letter of Credit to reimburse any Drawing under such Letter of Credit and shall use such proceeds first, to reimburse itself for any Drawings made in respect of such Letter of Credit following the L/C Maturity Date, second, to the extent such Letter of Credit expires or is returned

59

undrawn while any such Cash Collateral remains, to the repayment of obligations in respect of any Loans that have not paid at such time and third, to the Borrower or as otherwise directed by a court of competent jurisdiction.  Nothing in this Section 3.4(a) shall affect the Borrower's obligation to repay all outstanding Loans when due in accordance with the terms of this Agreement.

(b)     The obligations of the Borrower under this section to reimburse each Letter of Credit Issuer with respect to Unpaid Drawings (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against such Letter of Credit Issuer, the Agent or any Lender (including in its capacity as an L/C Participant), including any defense based upon the failure of any drawing under a Letter of Credit (each a "Drawing") to conform to the terms of the Letter of Credit or any non-application or misapplication by the beneficiary of the proceeds of such Drawing; but the Borrower shall not be obligated to reimburse any Letter of Credit Issuer for any wrongful payment made by such Letter of Credit Issuer under the Letter of Credit issued by it as a result of acts or omissions constituting willful misconduct, bad faith or gross negligence on the part of such Letter of Credit Issuer (as determined in a final and non-appealable judgment by a court of competent jurisdiction).

3.5     Increased Costs.  If, after the Interim Facility Effective Date, the adoption of any Change in Law shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy, liquidity or similar requirement against Letters of Credit issued by any Letter of Credit Issuer, or any L/C Participant's L/C Participation therein, or (b) impose on any Letter of Credit Issuer or any L/C Participant any other conditions, costs or expenses affecting its obligations under this Agreement in respect of Letters of Credit or L/C Participations therein or any Letter of Credit or such L/C Participant's L/C Participation therein, and the result of any of the foregoing is to increase the cost to such Letter of Credit Issuer or such L/C Participant of issuing, maintaining or participating in any Letter of Credit, as applicable, or to reduce the amount of any sum received or receivable by such Letter of Credit Issuer or such L/C Participant hereunder (other than (i) Taxes indemnifiable under Section 5.4, (ii) Taxes described in clauses (ii), (iii) and (iv) of the definition of "Excluded Taxes" or (iii) Connection Income Taxes) in respect of Letters of Credit or L/C Participations therein, then, promptly (and in any event no later than fifteen (15) Business Days) after receipt of written demand to the Borrower by such Letter of Credit Issuer or such L/C Participant, as the case may be (a copy of which notice shall be sent by such Letter of Credit Issuer or such L/C Participant to the Agent), the Borrower shall pay to such Letter of Credit Issuer or such L/C Participant such additional amount or amounts as will compensate such Letter of Credit Issuer or such L/C Participant for such increased cost or reduction, it being understood and agreed, however, that such Letter of Credit Issuer or an L/C Participant shall not be entitled to such compensation as a result of such Person's compliance with, or pursuant to any request or directive to comply with, any such Requirement of Law as in effect on the Interim Facility Effective Date (except as otherwise set forth in the definition of Change in Law).  A certificate submitted to the Borrower by the relevant Letter of Credit Issuer or an L/C Participant, as the case may be (a copy of which certificate shall be sent by such Letter of Credit Issuer or such L/C Participant to the Agent), setting forth in reasonable detail the basis for the determination of such additional amount

60

or amounts necessary to compensate such Letter of Credit Issuer or such L/C Participant as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.

3.6     New or Successor Letter of Credit Issuers.

(a)     Any Letter of Credit Issuer may resign as a Letter of Credit Issuer upon thirty (30) days' prior notice to the Agent, the Lenders and the Borrower.  The Borrower may replace any Letter of Credit Issuer for any reason upon notice to such Letter of Credit Issuer and the Agent and may add Letter of Credit Issuers at any time upon notice to the Agent.  If any Letter of Credit Issuer shall resign or be replaced, or if the Borrower shall decide to add a new Letter of Credit Issuer under this Agreement, then the Borrower may appoint from among the Lenders a successor issuer of Letters of Credit or a new Letter of Credit Issuer, as the case may be, or, with the consent of the Agent (such consent not to be unreasonably withheld) and such new Letter of Credit Issuer, another successor or new issuer of Letters of Credit, whereupon such successor issuer shall succeed to the rights, powers and duties of the replaced or resigning Letter of Credit Issuer under the Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of a Letter of Credit Issuer hereunder, and the term "Letter of Credit Issuer" means such successor or such new issuer of Letters of Credit effective upon such appointment.  The acceptance of any appointment as a Letter of Credit Issuer hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form reasonably satisfactory to the Borrower and the Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become a "Letter of Credit Issuer" hereunder.  After the resignation or replacement of a Letter of Credit Issuer hereunder, the resigning or replaced Letter of Credit Issuer shall remain a party hereto and shall continue to have all the rights and obligations of a Letter of Credit Issuer under the Credit Documents with respect to Letters of Credit issued by it before such resignation or replacement, but shall not be required to issue additional Letters of Credit.  In connection with any resignation or replacement pursuant to this clause (a) (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Letter of Credit Issuer and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Letter of Credit Issuer replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) the Borrower shall cause the successor issuer of Letters of Credit, if such successor issuer is reasonably satisfactory to the replaced or resigning Letter of Credit Issuer, to issue "back-stop" Letters of Credit naming the resigning or replaced Letter of Credit Issuer as beneficiary for each outstanding Letter of Credit issued by the resigning or replaced Letter of Credit Issuer, which new Letters of Credit shall have a Stated Amount equal to the Letters of Credit being back-stopped and the sole requirement for drawing on such new Letters of Credit shall be a drawing on the corresponding back-stopped Letters of Credit.  After any resigning or replaced Letter of Credit Issuer's resignation or replacement as Letter of Credit Issuer, the provisions of this Agreement relating to a Letter of Credit Issuer shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was a Letter of Credit Issuer under this Agreement or (B) at any time with respect to Letters of Credit issued by such Letter of Credit Issuer.

(b)     To the extent that there are, at the time of any resignation or replacement as set forth in clause (a) above, any outstanding Letters of Credit, nothing herein shall be deemed to

61

impact or impair any rights and obligations of any party hereto with respect to such outstanding Letters of Credit (including any obligations related to the payment of fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Letter of Credit Issuer and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in clause (a) above.

3.7     Role of Letter of Credit Issuer.  Each Lender and the Borrower agree that, in paying any Drawing, no Letter of Credit Issuer shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the Letter of Credit Issuers, the Agent, any of their respective Affiliates nor any correspondent, participant or assignee of any Letter of Credit Issuer shall be liable to any Lender for (a) any action taken or omitted in connection herewith at the request or with the approval of the Majority Lenders, (b) any action taken or omitted in the absence of gross negligence or willful misconduct or (c) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; but this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Letter of Credit Issuers, the Agent, any of their respective Affiliates nor any correspondent, participant or assignee of any Letter of Credit Issuer shall be liable or responsible for any matter described in Section 3.3(e); but anything in such Section to the contrary notwithstanding, the Borrower may have a claim against the Letter of Credit Issuer, and the Letter of Credit Issuer may be liable to the Borrower in accordance with Section 3.4(b) and, to the extent, but only to the extent, of any direct, as opposed to special, indirect, consequential, exemplary or punitive, damages suffered by the Borrower as a result of such Letter of Credit Issuer's willful misconduct, bad faith or gross negligence (as determined in a final and non-appealable judgment by a court of competent jurisdiction) or such Letter of Credit Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, each Letter of Credit Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Letter of Credit Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

3.8     Cash Collateral.

(a)     If, as of the L/C Maturity Date, there are any Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize such Letters of Credit Outstanding; provided that, the Borrower shall not be required to Cash Collateralize such Letters of Credit Outstanding if arrangements to backstop, convert or roll-over such Letters of Credit have been made to the satisfaction of such applicable Letter of Credit Issuer (it being understood and agreed that, notwithstanding anything herein to the contrary, no Lender shall be under any obligation to fund participations in respect of any Letter of Credit after the L/C Maturity Date).

62

(b)     If any Event of Default shall occur and be continuing, the Majority Lenders may direct the Borrower to Cash Collateralize the L/C Obligations and, within one (1) Business Day of the Borrower's receipt of such direction, the Borrower shall Cash Collateralize such L/C Obligations.

(c)     For purposes of this Agreement, "Cash Collateralize" means to pledge (as a security interest with the priority set forth in the DIP Order) and deposit with or deliver to the Agent, for the benefit of the Letter of Credit Issuer and the New Money Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 103% of the amount of the applicable Letters of Credit Outstanding required or permitted to be Cash Collateralized pursuant to documentation in form and substance reasonably satisfactory to the Agent and the Letter of Credit Issuers (which documents are hereby consented to by the Lenders).  Derivatives of such term have corresponding meanings.  The Borrower hereby grants to the Agent, for the benefit of the Letter of Credit Issuers and the L/C Participants, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Such Cash Collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Borrower, but under the "control" (as defined in Section 9-104 of the Uniform Commercial Code) of the Agent.

3.9     <u>Applicability of ISP and UCP</u>.  Unless otherwise expressly agreed by the Letter of Credit Issuer and the Borrower when a Letter of Credit is issued, (a) the rules of the ISP shall apply to each standby Letter of Credit and (b) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit.

3.10     <u>Conflict with Issuer Documents</u>.  In the event of any conflict or inconsistency between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

3.11     <u>Letters of Credit Issued for Subsidiaries</u>.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Guarantor, the Borrower shall be obligated to reimburse the applicable Letter of Credit Issuer hereunder for any and all Drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of its Subsidiaries.

## ARTICLE IV
## FEES; COMMITMENTS

4.1     <u>Fees</u>.

(a)     The Borrower agrees to pay to the Agent in Dollars, for the account of each New Money Lender (in each case *pro rata* according to the respective Commitment Percentages of the New Money Lenders), a commitment fee (the "<u>Commitment Fee</u>") for each day from the Interim Facility Effective Date until but excluding the Termination Date.  Each Commitment Fee shall be payable by the Borrower (i) monthly in arrears on the last Business Day of each month (for the one-month period (or portion thereof) ended on such day for which no payment has been

received) and (ii) on the Termination Date (for the period ended on such date for which no payment has been received pursuant to clause (i) above) and shall accrue for each day during such period at a rate per annum equal to the Commitment Fee Rate in effect on such day on the average daily amount of Available Commitment.

(b)     The Borrower agrees to pay to the Agent in Dollars for the account of the New Money Lenders *pro rata* on the basis of their respective Letter of Credit Exposure, a fee in respect of each Letter of Credit (the "Letter of Credit Fee"), for the period from the date of issuance of such Letter of Credit until the termination or expiration date of such Letter of Credit computed at the per annum rate for each day equal to the Applicable Margin for LIBOR Loans on the average daily Stated Amount of such Letter of Credit.  Such Letter of Credit Fees shall be due and payable (i) monthly in arrears on the last Business Day of each calendar month and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (i) above).

(c)     The Borrower agrees to pay to each Letter of Credit Issuer a fronting fee in respect of each Letter of Credit issued by it, for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% per annum (or such other amount a may be agreed in a separate writing between the Borrower and any Letter of Credit Issuer) on the average daily Stated Amount of such Letter of Credit (or at such other rate per annum as agreed in writing between the Borrower and the Letter of Credit Issuer).  Such fronting fees shall be due and payable by the Borrower (i) monthly in arrears on the last Business Day of each calendar month and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (i) above).

(d)     The Borrower agrees to pay directly to each Letter of Credit Issuer upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as such Letter of Credit Issuer and the Borrower shall have agreed upon for issuances of, Drawings under or amendments of, Letters of Credit issued by it.

(e)     The Borrower agrees to pay to the Agent the fees in the amounts and on the dates as set forth in the Fee Letters, and as otherwise set forth in writing from time to time between the Agent and the Borrower.

4.2     Termination or Reduction of Commitments.

(a)     Upon at least two (2) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Agent at the Agent's Office (which notice the Agent shall promptly transmit to each of the New Money Lenders), the Borrower shall have the right, without premium or penalty, on any day, to permanently terminate or reduce the Commitments, as determined by the Borrower, in whole or in part; but (i) any such termination or reduction shall apply ratably to reduce each New Money Lender's Commitment, (ii) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least $10,000,000 and in an integral multiple of $2,500,000 in excess thereof and (iii) after giving effect to such termination or reduction and to any prepayments of New Money Loans and to the cancellation or Cash Collateralization of Letters of Credit (or other arrangements with respect thereto satisfactory to the applicable Letter of Credit Issuer and the Agent) made on the date thereof in accordance with this Agreement, the Total Exposure shall not exceed the Loan Limit in effect at such date.

64

(b)      The Borrower may terminate the unused amount of the Commitment of a Defaulting Lender upon not less than two (2) Business Days' prior notice to the Agent (which will promptly notify the New Money Lenders thereof), and in such event the provisions of Section 2.15(f) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), but such termination will not be deemed to be a waiver or release of any claim the Borrower, the Agent, any Letter of Credit Issuer or any Lender may have against such Defaulting Lender.

(c)      Unless previously terminated, the Commitments shall terminate on the Termination Date.

## ARTICLE V
## PAYMENTS

5.1   <u>Voluntary Prepayments</u>.  The Borrower shall have the right to prepay Loans, in each case, without premium or penalty, in whole or in part from time to time, subject to the following terms and conditions:

(a)      the Borrower shall give the Agent at the Agent's Office written notice (or telephonic notice promptly confirmed in writing) of (1) the Borrower's intent to make such prepayment, (2) the amount of such prepayment, (3) the Type and Class of Loans to be prepaid and (4) in the case of LIBOR Loans, the specific Borrowing(s) being prepaid, which notice shall be given by the Borrower no later than (i) in the case of LIBOR Loans, 1:00 p.m. three (3) Business Days before the date of such prepayment and (ii) in the case of ABR Loans, 1:00 p.m. on the date of such prepayment, and in each case, shall promptly be transmitted by the Agent to each of the Lenders of the applicable Class;

(b)      each partial prepayment of (i) LIBOR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof, and (ii) any ABR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof; but no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than $1,000,000 for such LIBOR Loans;

(c)      any prepayment of LIBOR Loans pursuant to this Section 5.1 on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11; and

(d)      notwithstanding the foregoing, no prepayment (whether voluntary or otherwise) of Roll-Up Loans may be made until all New Money Loans and all other Obligations in respect thereof have been paid in full in cash and all Commitments have been terminated and no prepayment (whether voluntary or otherwise) of Incremental Roll-Up Loans may be made until all New Money Roll-Up Loans have been paid in full in cash.

With respect to each prepayment of Loans elected under this Section 5.1, the Borrower may designate (i) the Types and Class of Loans that are to be prepaid and the specific Borrowing(s) being repaid and (ii) the Loans to be prepaid; but (A) each prepayment of any Loans made pursuant

to a Borrowing shall be applied *pro rata* among such Loans of the same Class and (B) notwithstanding the provisions of the preceding clause (A), no prepayment of Loans shall be applied to the Loans of any Defaulting Lender unless otherwise agreed in writing by the Borrower. In the absence of a designation by the Borrower under Section 5.2(b), the Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

5.2     Mandatory Prepayments.

(a)     Repayment of Loans Following Excess Exposure.  If at any time, including as a result of giving effect to any termination or reduction of the Commitments pursuant to Section 4.2(a) or for any other reason, the Total Exposure exceeds the Loan Limit, then the Borrower shall on the same Business Day (i) prepay the New Money Loans on the date such excess has occurred in an aggregate principal amount equal to such excess and (ii) if any excess remains after prepaying all of the New Money Loans as a result of any Letter of Credit Exposure, pay to the Agent on behalf of the Letter of Credit Issuers and the L/C Participants an amount in cash equal to such excess to be held as Cash Collateral as provided in Section 3.8.

(b)     LIBOR Interest Periods.  In lieu of making any payment pursuant to this Section 5.2 in respect of any LIBOR Loan, other than on the last day of the Interest Period therefor so long as no Event of Default shall have occurred and be continuing, the Borrower at its option may deposit, on behalf of the Borrower, with the Agent an amount equal to the amount of LIBOR Loan to be prepaid and such LIBOR Loan shall be repaid on the last day of the Interest Period therefor in the required amount.  Such deposit shall be held by the Agent in a corporate time deposit account established on terms reasonably satisfactory to the Agent, earning interest at the then-customary rate for accounts of such type.  Such deposit shall constitute Cash Collateral for LIBOR Loans to be so prepaid; but the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 5.2.

5.3     Method and Place of Payment.

(a)     Except as otherwise specifically provided herein and in the other Credit Documents, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Agent for the ratable  account of the Lenders of the Class entitled thereto or the Letter of Credit Issuer entitled thereto, as the case may be, not later than 2:00 p.m., in each case, on the date when due and shall be made in immediately available funds at the Agent's Office or at such other office as the Agent shall specify for such purpose by notice to the Borrower; it being understood that written or facsimile notice by the Borrower to the Agent to make a payment from the funds in the Borrower's account at the Agent's Office shall constitute the making of such payment to the extent of such funds held in such account.  All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars.  The Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Agent before 2:00 p.m. or, if payment was not actually so received by the Agent by such time, on the next Business Day in the sole discretion of the Agent), like funds relating to the payment of principal or interest or fees ratably to the Lenders and/or the Letter of Credit Issuers, as applicable, entitled thereto.

66

(b)     For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. in respect of Loans shall be deemed to have been made on the next succeeding Business Day in the sole discretion of the Agent.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately before such extension.

5.4     <u>Net Payments</u>.

(a)     Any and all payments made by or on behalf of any Debtor under any Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Indemnified Taxes; <u>but if</u> the Borrower or any Guarantor or the Agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the Borrower or such Guarantor or the Agent shall make such deductions or withholdings as are reasonably determined by the Borrower, such Guarantor or the Agent to be required by any applicable Requirement of Law, (ii) the Borrower, such Guarantor or the Agent, as applicable, shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that, after making all required deductions and withholdings (including deductions or withholdings applicable to additional sums payable under this <u>Section 5.4</u>), the Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings on account of Indemnified Taxes been made.  Whenever any Indemnified Taxes are payable by the Borrower or such Guarantor, as promptly as possible thereafter, the Borrower or Guarantor shall send to the Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an official receipt (or other evidence acceptable to such Lender, acting reasonably) received by the Borrower or such Guarantor showing payment thereof.  After any payment of Taxes by any Debtor or the Agent to a Governmental Authority as provided in this <u>Section 5.4</u>, the Borrower shall deliver to the Agent or the Agent shall deliver to the Borrower, as the case may be, a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Agent, as the case may be.

(b)     The Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)     The Borrower shall indemnify and hold harmless the Agent and each Lender within fifteen (15) Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Agent or such Lender or required to be deducted or withheld from a payment to the Agent or such Lender, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 5.4</u>), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; but no indemnification payment shall be due under this <u>Section 5.4</u> to the extent such payment is duplicative of any payment made by a Debtor under any other provision of this Agreement or

67

under any other Credit Document.  A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent) or the Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)     Each Lender shall deliver to the Borrower and the Agent, at such time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law and such other reasonably requested information as will permit the Borrower or the Agent, as the case may be, to determine (A) whether or not any payments made under any Credit Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Debtor pursuant to any Credit Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  In addition, any Lender, if requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than the documentation set forth in Section 5.4(e), (h) and (i)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(e)     Without limiting the generality of Section 5.4(d), any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the Borrower or the Agent) on or before the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(i)     in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed originals of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, Internal Revenue Service Form W-8BEN or W-8BEN-E (or any applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)    executed originals of IRS Form W-8ECI (or any applicable successor form);

(iii)   in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate

68

to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any applicable successor form); or

(iv)    to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of Internal Revenue Service Form W-8IMY (or any applicable successor form), accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or W-8BEN-E (or any applicable successor form), a U.S. Tax Compliance Certificate, Internal Revenue Service Form W-9 (or any applicable successor form), and/or other certification documents from each beneficial owner, as applicable; but if the Non-U.S. Lender is a partnership and one (1) or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner; and

(v)    two (2) further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete, inaccurate or invalid, after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower, and from time to time thereafter if reasonably requested by the Borrower and the Agent; unless in any such case any Change in Law has occurred before the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Lender from duly completing and delivering any such form with respect to it and such Non-U.S. Lender promptly so advises the Borrower and the Agent.  Each Person that shall become a Participant pursuant to Section 13.6 or a Lender pursuant to Section 13.6 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 5.4(e); but in the case of a Participant, such Participant shall furnish all such required forms and statements to the Lender from which the related participation shall have been purchased.

(f)    If any Lender or the Agent, as applicable, determines, in its sole discretion, that it had received and retained a refund (or the monetary benefit of a credit in lieu of a refund) of an Indemnified Tax for which a payment has been made by the Borrower or any Guarantor pursuant to any Credit Document, which refund (or credit) in the good faith judgment of such Lender or the Agent, as the case may be, is attributable to such payment made by the Borrower or any Guarantor, then such Lender or the Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (net of all out-of-pocket expenses of such Lender or the Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund (or credit)) as such Lender or the Agent, as the case may be, determines in its sole discretion to be the proportion of the refund (or credit) as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any taxes imposed on the refund (or credit)) than it would have been in if the payment had not been required; but the Borrower or such Guarantor, upon the request of such Lender or the Agent,

69

agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Lender or the Agent in the event such Lender or the Agent is required to repay such refund (or credit) to such Governmental Authority.  In such event, such Lender or the Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund (or credit) received from the relevant Governmental Authority (but such Lender or the Agent may delete any information therein that it deems confidential).  Each Lender and the Agent shall claim any refund (or credit) that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim.  No Lender nor the Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Debtor in connection with this clause (f) or any other provision of this Section 5.4.

(g)     If the Borrower determines that a reasonable basis exists for contesting a Tax, each Lender or the Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax.  The Borrower shall indemnify and hold each Lender and the Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 5.4(g).  Nothing in this Section 5.4(g) shall obligate any Lender or the Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(h)     The Agent, and each Lender that is a United States person under Section 7701(a)(30) of the Code (each such Lender, a "U.S. Lender"), shall deliver to the Borrower and, as applicable, to the Agent, two (2) Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Person is exempt from United States federal backup withholding (i) on or before the Interim Facility Effective Date (or on or before the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete, inaccurate or invalid, (iii) after the occurrence of a change in such Person's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and, as applicable, to the Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or, as applicable, the Agent.

(i)     If a payment made to any Lender or the Agent under any Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Person were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Person shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA, to determine that such Person has or has not complied with such Person's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 5.4(i), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

70

(j)     For the avoidance of doubt, for purposes of this <u>Section 5.4</u>, the term "Lender" includes any Letter of Credit Issuer.

(k)     The agreements in this <u>Section 5.4</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender and the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(l)     For purposes of this <u>Section 5.4</u>, the term "Requirement of Law" includes FATCA.

5.5     <u>Computations of Interest and Fees</u>.

(a)     Except as provided in the next succeeding sentence, interest on Loans shall be calculated on the basis of a three hundred sixty (360) day year for the actual days elapsed, <u>but</u> interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Agent's prime rate and interest on overdue interest shall be calculated on the basis of a three hundred sixty five (365) - (or three hundred sixty six (366), as the case may be) day year for the actual days elapsed.

(b)     Fees and the average daily Stated Amount of Letters of Credit shall be calculated on the basis of a three hundred sixty (360) day year for the actual days elapsed.

5.6     <u>Limit on Rate of Interest</u>.

(a)     <u>No Payment Shall Exceed Lawful Rate</u>.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect to any Obligation in excess of the amount or rate permitted under or consistent with any applicable Requirement of Law.

(b)     <u>Payment at Highest Lawful Rate</u>.  If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of <u>Section 5.6(a)</u>, the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable Requirement of Law.

(c)     <u>Adjustment if Any Payment Exceeds Lawful Rate</u>.  If any provision of any Credit Document would obligate any Debtor to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any applicable Requirement of Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Requirements of Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under <u>Section 2.8</u>.

(d)     <u>Rebate of Excess Interest</u>.  Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable Requirement of Law, then the Borrower shall be entitled, by notice in writing to the Agent to obtain reimbursement from

71

that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

## ARTICLE VI
## CONDITIONS PRECEDENT TO INTERIM FACILITY AND FINAL FACILITY

6.1     <u>Interim Facility Effective Date</u>.  The obligation of each Lender to enter into and execute this Agreement and make Loans and the obligations of the Letter of Credit Issuers to issue the Letters of Credit hereunder, in each case, during the Interim Period, shall commence on the first (1st) Business Day when each of the following conditions precedent shall have been satisfied (or waived in writing (including by email) by the Agent and the New Money Lenders) in a manner satisfactory to the Agent (the "<u>Interim Facility Effective Date</u>"):

(a)     <u>Executed Credit Agreement</u>.  The Agent shall have received (including by facsimile or other electronic means) this Agreement, executed and delivered by a duly Authorized Officer of the Borrower.

(b)     <u>Secretary's Certificates</u>.  The Agent shall have received, in form and substance reasonably satisfactory to the Agent, certificates of the secretary or an assistant secretary of each Debtor containing specimen signatures of the Persons authorized to execute Credit Documents to which such Debtor is a party, together with (a) a copy of the resolutions, in form and substance reasonably satisfactory to the Agent, of the Board of Directors or a duly authorized committee thereto (or other equivalent governing body) of such Debtor authorizing the execution, delivery and performance of the Credit Documents to which it is a party and (b) true and complete copies of each of the organizational documents of such Debtor as of the Interim Facility Effective Date.

(c)     <u>Good Standing Certificate of the Debtors</u>.  The Agent shall have received a certificate of good standing (or the equivalent) from the appropriate governing agency of each Debtor's jurisdiction of organization (to the extent good standing (or the equivalent) has meaning in such jurisdiction).

(d)     <u>Certain Credit Documents</u>.  The Agent shall have received:

(i)     Counterparts (in such numbers as may be requested by the Agent) of each other Credit Document to be executed and delivered by a duly Authorized Officer of each Guarantor as of the Interim Facility Effective Date;

(ii)     a promissory note executed by the Borrower in favor of each New Money Lender that has requested a promissory note; and

(iii)     evidence reasonably satisfactory to the Agent that all Obligations shall be secured by a perfected lien and security interest on all Collateral of the Debtors pursuant to, and such Lien and security interest shall have the priorities set forth in, the Interim Order, subject only to the Liens permitted by <u>Section 10.2</u> and all filing and recording fees and taxes with respect to such Liens and security interests that are due and payable as of the Interim Facility Effective Date shall have been duly paid.

72

(e)    <u>Legal Opinions</u>. The Agent shall have received the executed legal opinion of Kirkland & Ellis LLP, counsel to the Borrower, in form and substance reasonably satisfactory to the Agent and the executed legal opinion of Derrick & Briggs, LLP, Oklahoma counsel to the Borrower in form and substance reasonably satisfactory to the Agent. The Credit Parties and the Agent hereby instruct such counsel to deliver such legal opinion.

(f)    <u>Closing Certificate</u>.  The Agent shall have received a certificate of the Borrower, dated the Interim Facility Effective Date, substantially in the form of <u>Exhibit C</u>.

(g)    <u>Existing Obligations</u>.  All proceeds of the termination, offset, modification or other unwind or monetization of prepetition Hedge Agreements received by any Debtor prior to the Interim Facility Effective Date shall have been applied to repay the Existing Obligations on a *pro rata* basis and, after giving effect to such application and other payments of the Existing Loans prior to the Petition Date, (i) the "Total Exposure" (under and as defined in the Existing Credit Agreement) as of the Petition Date shall not be more than $2,005,000,000 and (ii) the "Swingline Exposure" (under and as defined in the Existing Credit Agreement) shall be zero.

(h)    <u>Fees</u>.  Subject to the applicable DIP Order, all reasonable and documented pre- and post-petition fees, charges and expenses including, without limitation, (i) the fees, charges and expenses of Sidley Austin LLP, RPA Advisors, LLC, Houlihan Lokey Capital, Inc., and one local counsel to the Agent in each applicable jurisdiction, in each case pursuant to invoices delivered to the Borrower at least three (3) Business Days before the Interim Facility Effective Date, (ii) the fees agreed to in the Fee Letters and (iii) all other amounts due and payable pursuant to invoices delivered to the Borrower at least three (3) Business Days before the Interim Facility Effective Date (or such later date as reasonably agreed by the Borrower), in each case as required to be paid to the Agent on or before the Interim Facility Effective Date, shall have been paid.

(i)    <u>KYC Information</u>.  The Agent shall have received (for distribution to the Lenders) all documentation and other information (including Beneficial Ownership Certifications) about the Borrower and the Guarantors as shall have been reasonably requested in writing by the Agent at least three (3) Business Days prior to the Interim Facility Effective Date and as is mutually agreed to be required by U.S. regulatory authorities under applicable "know your customer," beneficial ownership and anti-money laundering rules and regulations, including the Patriot Act and Beneficial Ownership Regulation, and if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in respect of the Borrower, in each case, that has been requested in writing by the Agent or any New Money Lender not less than three (3) Business Days before the Interim Facility Effective Date.

(j)    <u>Insurance</u>.  The Agent shall have received copies of insurance certificates evidencing the insurance required to be maintained by the Debtors pursuant to <u>Section 9.3</u>.

(k)    <u>Notice of Borrowing</u>.  The Agent shall have received a Notice of Borrowing in accordance with <u>Section 2.3</u>, which shall include a certification from an Authorized Officer of the Borrower that such proceeds will be used in accordance with the Initial Budget.

(l)    <u>Bankruptcy Cases</u>.

(i)    The Petition Date shall have occurred;

73

(ii)     The Bankruptcy Court shall have entered the Interim Order within five (5) days following the Petition Date, which Interim Order (i) shall have been entered on the docket of the Bankruptcy Court, (ii) shall be in full force and effect, (i) shall not have been vacated, stayed, reversed, appealed, modified or amended in any respect without the prior written consent of the Agent; provided that amendments or modifications that are materially adverse to the Lenders shall require the approval of the Majority Lenders and (iii) the Debtors shall be in compliance with the terms of the Interim Order in all respects;

(iii)    the Bankruptcy Court shall have entered orders approving all "first day" motions filed by the Debtors (including any motions related to cash management or any critical vendor or supplier motions), which motions and orders that affect the rights or duties of the Agent or the Lenders, including the Cash Management Order and Hedging Order, shall be in form and substance reasonably satisfactory to the Agent (it being understood and agreed that drafts approved by counsel to the Agent prior to the Petition Date are satisfactory to the Agent);

(iv)    (A) No later than two (2) days prior to the Petition Date, the Agent shall have received a detailed rolling cash forecast, containing line items of sufficient detail to reflect the Debtors' projected receipts and disbursements for the period from the Petition Date through the Scheduled Maturity Date, in form and substance acceptable to the Agent and the New Money Lenders and which shall be attached hereto as Exhibit G (the "Initial Budget") and (B) the Agent shall have received a certificate of the Borrower stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower to be reasonable at the time made and from the best information then available to the Borrower;

(v)     The Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a chapter 11 plan or other exit strategy without the consent of the Agent;

(vi)    The entry of the Interim Order shall have occurred no earlier than three (3) Business Days prior to the Interim Facility Effective Date; and

(vii)   The Debtors shall have obtained documentation evidencing a $600,000,000 equity commitment and/or a committed backstopped equity rights offering reasonably acceptable to the Agent and the Majority Lenders, subject only to Bankruptcy Court approval, it being understood that the draft of the Backstop Commitment Agreement attached to the Restructuring Support Agreement is satisfactory to the Agent and the Majority Lenders.

(m)     Restructuring Support Agreement.  The Restructuring Support Agreement shall have been executed, entered into and effective.

74

For purposes of determining compliance with the conditions specified in this Section 6.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Interim Facility Effective Date specifying the basis upon which the condition precedent has not been met.

6.2     Final Facility Effective Date.  The obligation of each New Money Lender to make its New Money Loans hereunder and the obligation of the Letter of Credit Issuers to issue their Letters of Credit hereunder, in each case, during the Final Period, shall commence as of the first (1st) Business Day when each of the following conditions precedent shall have been satisfied (or waived in accordance with Section 13.1) in a manner satisfactory to the Agent (the "Final Facility Effective Date"):

(a)     the Bankruptcy Court shall have entered the Final Order within thirty-five (35) days (or such later date consented to by the Agent and the Majority Lenders) following the entry of the Interim Order, which Final Order shall (i) be in substantially the form contemplated by the Interim Order, with only such modifications thereto as are satisfactory in form and substance to the Agent, (ii) have been entered on the docket of the Bankruptcy Court and (iii) be in full force and effect and shall not have been vacated, stayed, reversed, appealed (and for which the appeal period has expired or has been waived), modified or amended in any respect without the prior written consent of the Agent (and, if the amendment or modification is materially adverse to the Lenders, the Majority Lenders); and

(b)     the Debtors shall be in compliance in all respects with (i) the DIP Orders and (ii) subject to application of the Variance Limit, with the Approved Budget.

## ARTICLE VII
## CONDITIONS PRECEDENT TO ALL CREDIT EVENTS

The agreement of each New Money Lender to make any New Money Loan requested to be made by it on any date (excluding Loans required to be made by the Lenders in respect of Unpaid Drawings pursuant to Section 3.4) and the obligation of each Letter of Credit Issuer to issue, extend, or renew Letters of Credit on any date, is subject to the satisfaction (or waiver in writing (including by email) of the Agent and the Majority Lenders) of the following conditions:

7.1     No Default; Representations and Warranties.  At the time of each Credit Event and also immediately after giving effect thereto (a) no Default or Event of Default shall have occurred and be continuing, (b) all representations and warranties made by any Debtor contained in the Credit Documents shall be, to the knowledge of an Authorized Officer of the Borrower, true and correct in all material respects (unless such representations and warranties are already qualified by materiality or Material Adverse Effect, in which case they are true and correct in all respects) with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (unless such representations and warranties are already qualified by materiality or Material Adverse Effect, in which case they are true and correct in all respects) as

75

of such earlier date) and (c) to the knowledge of an Authorized Officer of the Borrower, except as disclosed to the Agent and the Lenders in writing, no Material Adverse Effect has occurred since June 28, 2020.

7.2     Notice of Borrowing.

(a)     Before the making of each New Money Loan (other than any Loan made pursuant to Section 3.4(a)), the Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of Section 2.3(a), which shall include a certification from an Authorized Officer of the Borrower that such proceeds shall be used in accordance with the Approved Budget (subject to the Variance Limit).

(b)     Before the issuance of each Letter of Credit, the Agent and the applicable Letter of Credit Issuer shall have received a Letter of Credit Request meeting the requirements of Section 3.2(a).

7.3     DIP Orders.

(a)     Prior to the entry of the Final Order, the Interim Order (A) shall be in full force and effect and shall not have been (a) vacated, stayed reversed, or modified or amended without the written consent of the Agent (and, if the amendment or modification is materially adverse to the Lenders, the Majority Lenders) and (B) shall, without limitation, approve the Interim Facility Roll-Up Loans.

(b)     After the entry of the Final Order, the Final Order (A) shall be in full force and effect and shall not have been (a) vacated, stayed, reversed, or modified or amended without the written consent of the Agent (and, if the amendment or modification is materially adverse to the Lenders, the Majority Lenders), and (B) shall, without limitation, approve the Final Facility Roll-Up Loans.

(c)     The Debtors shall be in compliance with the applicable DIP Order.

(d)     No trustee or examiner (other than a fee examiner) shall have been appointed with respect to the Debtors or their property.

7.4     Fees. Subject to the procedures described in any order of the Bankruptcy Court regarding payments for professional fees and expenses, if any, all reasonable and documented fees, charges and expenses (including, without limitation, the fees, charges and out-of-pocket expenses of Sidley Austin LLP, RPA Advisors, LLC, Houlihan Lokey Capital, Inc., one local counsel to the Agent in each applicable jurisdiction and any other professional advisor, as applicable), in each case pursuant to invoices delivered to the Borrower at least three (3) Business Days before the date of such Credit Event, and all other amounts due and payable on or prior to the date of such Credit Event, required to be paid to the Agent and Lenders on or before the date of such Credit Event shall have been paid (or will be paid with the proceeds of the New Money Loans authorized under the Interim Order or the Final Order, as applicable).

76

The acceptance of the benefits of each Credit Event shall constitute a representation and warranty by each Credit Party to each of the New Money Lenders that all the applicable conditions specified in Section 7.1, 7.3, and 7.4 above have been satisfied as of that time.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement, to make the Loans and issue or participate in Letters of Credit as provided for herein, the Debtors make, on the Interim Facility Effective Date, the Final Facility Effective Date and on each other date as required by this Agreement, the following representations and warranties to the Lenders:

8.1    Corporate Status.  Subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code and entry of the DIP Orders, each Debtor (a) is a duly organized and validly existing corporation or other entity in good standing under the laws of the jurisdiction of its organization, (b) has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged, and (c) has duly qualified and is authorized to do business and is in good standing in all jurisdictions where it is required to be so qualified, except in each case referred to in clauses (b) and (c), where the failure to have such power and authority or be so qualified would not reasonably be expected to result in a Material Adverse Effect.

8.2    Corporate Power and Authority; Enforceability.  Subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, each Debtor has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.  Each Debtor has duly executed and delivered each Credit Document to which it is a party and each such Credit Document, upon entry of the Interim Order or the Final Order, as applicable, constitutes the legal, valid and binding obligation of such Debtor enforceable in accordance with its terms, subject to entry of each DIP Order, and further subject to other bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

8.3    No Violation.  Subject to the entry of the DIP Order, none of the execution, delivery or performance by any Debtor of the Credit Documents to which it is a party or the compliance with the terms and provisions thereof will (a) contravene any material applicable provision of any material Requirement of Law, (b) result in any breach of any terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any property or assets of such Debtor (other than Liens and security interests in favor of the Agent (or any designee) created under the Credit Documents) pursuant to the terms of any indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other instrument to which such Debtor is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "Contractual Requirement") except to the extent such breach, default or Lien that would not reasonably be

77

expected to result in a Material Adverse Effect or (c) violate any provision of the certificate of incorporation, by-laws or other organizational documents of such Debtor.

8.4    <u>Litigation</u>.  Except as set forth on <u>Schedule 8.4</u>, and other than the Bankruptcy Cases, there are no actions, suits or proceedings pending or, to the knowledge of an Authorized Officer of the Borrower, threatened in writing with respect to any Debtor or any of their respective properties, that would reasonably be expected to result in a Material Adverse Effect and is not otherwise subject to the Automatic Stay as a result of the Bankruptcy Cases.

8.5    <u>Margin Regulations</u>.  The proceeds of the Loans or Letters of Credit will not be used by any Debtor in violation of the provisions of Regulation T, Regulation U or Regulation X of the Board.  No Debtor is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying margin stock.

8.6    <u>Governmental Approvals</u>.  Subject to the entry of the DIP Order, the execution, delivery and performance of each Credit Document do not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (a) such as have been obtained or made and are in full force and effect, (b) any reports required to be filed by the Borrower with the SEC pursuant to the Exchange Act, (c) those that may be required from time to time in the ordinary course of business that may be required to comply with certain covenants contained in the Credit Documents, and (d) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

8.7    <u>Investment Company Act</u>.  No Debtor is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8.8    <u>True and Complete Disclosure</u>.

(a)    None of the written factual information and written data (taken as a whole) furnished by or on behalf of any Debtor or any of their respective authorized representatives to the Agent and/or any Lender (including all such information and data contained in the Credit Documents) for purposes of or in connection with this Agreement or any Transaction (other than information of a general industry nature or constituting projections, projected financial information, forward looking information or prospect information) contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time (after giving effect to all supplements so furnished before such time) in light of the circumstances under which such information or data was furnished; it being understood and agreed that for purposes of this <u>Section 8.8(a)</u>, such factual information and data shall not include pro forma financial information, projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

(b)    The projections (including financial estimates, forecasts and other forward-looking information) contained in the information and data referred to in <u>Section 8.8(a)</u> were based on good faith estimates and assumptions believed by the Borrower to be reasonable at the time made; it being recognized by the Agent and the Lenders that such projections are as to future events

78

and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

8.9     Financial Condition; Financial Statements.

(a)     The Historical Financial Statements present fairly in all material respects the consolidated financial position of the Borrower and the consolidated Subsidiaries at the dates of such information and for the period covered thereby and have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes thereto, if any, subject, in the case of the unaudited financial information, to changes resulting from audit, normal year end audit adjustments and to the absence of footnotes.

(b)     No Debtor has any material Indebtedness (including Disqualified Stock), off balance sheet liabilities, partnership liabilities for taxes or unusual forward or long-term commitments that, in each case, are not reflected or provided for in the Historical Financial Statements, except as would not reasonably be expected to have a Material Adverse Effect.

8.10     Tax Matters.  Except where the failure of which would not be reasonably expected to have a Material Adverse Effect, each of the Debtor has filed all U.S. federal income tax returns and all other tax returns, domestic and foreign, required to be filed by it and has paid or caused to be paid all material taxes payable by it that have become due, other than those (i) not yet delinquent, (ii) the nonpayment of which is excused, permitted, or required by the Bankruptcy Code or (iii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP.

8.11     Compliance with ERISA.  Except to the extent excused by the Bankruptcy Court or as a result of the filing of the Bankruptcy Cases, no ERISA Event has occurred or is reasonably expected to occur that would reasonably be expected to result in a Material Adverse Effect.  Each Plan is in compliance with applicable provisions of ERISA, the Code and other applicable laws except to the extent failure to comply would not reasonably be expected to result in a Material Adverse Effect.

8.12     Subsidiaries.  Schedule 8.12 lists each Subsidiary existing on the Interim Facility Effective Date.

8.13     Environmental Laws.

(a)     Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Debtor and all Oil and Gas Properties are in compliance with all applicable Environmental Laws; (ii) no Debtor has received written notice of any liability under any applicable Environmental Law; (iii) no Debtor is conducting any investigation, removal, remedial or other corrective action pursuant to any applicable Environmental Law at any location; and (iv) there has been no release or, to the knowledge of any Authorized Officer of the Borrower, threatened release of any Hazardous Materials at, on or under any Oil and Gas Properties currently owned or leased by any Debtor.

79

(b)      Except as would not reasonably be expected to have a Material Adverse Effect, no Debtor has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or formerly owned or leased Oil and Gas Properties or facility in a manner that would reasonably be expected to give rise to liability of any Debtor under any applicable Environmental Law.

8.14      <u>Properties</u>.  Except as a result of the filing of the Bankruptcy Cases, each Debtor has good and defensible title to all of its material properties and assets, free and clear of all Liens other than Liens permitted under <u>Section 10.2</u> and of all impediments to the use of such properties and assets in such Debtor's business, except that no representation or warranty is made with respect to any oil, gas or mineral property or interest to which no proved oil or gas reserves are properly attributed.  As of the date of delivery of each Reserve Report pursuant to <u>Section 9.12</u>, except for Liens permitted under <u>Section 10.2</u>, each Debtor will respectively own in the aggregate, in all material respects, the net interests in production attributable to all material wells and units owned by the Debtor.  The ownership of such properties shall not in the aggregate in any material respect obligate such Debtor to bear the costs and expenses relating to the maintenance, development and operations of such properties in an amount materially in excess of the working interest of such properties.  Each Debtor has paid in all material respects all royalties payable under the oil and gas leases to which it is operator, except those contested in accordance with the terms of the applicable joint operating agreement or otherwise contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of such Debtor.

8.15      [Reserved].

8.16      <u>Hedge Agreements</u>.  The Hedge Agreements of the Debtors are in compliance with the Hedging Order and <u>Section 10.10</u>.

8.17      <u>No Default</u>. No Credit Party is in default under or with respect to any Contractual Requirement arising after the Petition Date (i) that would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) for which exercise of remedies would not be stayed by section 362 of the Bankruptcy Code. No Default has occurred and is continuing or would result from the consummation of the Transactions.

8.18      <u>Anti-Corruption Laws and Sanctions</u>.  Each Debtor has implemented and maintains in effect policies and procedures designed to ensure compliance by such Debtor and its respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Debtors and their respective officers and employees and, to the knowledge of the Authorized Officers of the Borrower, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower being designated as a Sanctioned Person.  None of (a) any Debtor or, to the knowledge of the Authorized Officers of the Borrower, any of their respective directors, officers or employees, or (b) to the knowledge of the Authorized Officers of the Borrower, any agent of any Debtor that will act in any capacity in connection with or benefit from the DIP Facility, is a Sanctioned Person.  No Borrowing or Letter

of Credit, use of proceeds or other Transactions will violate Anti-Corruption Laws or applicable Sanctions.

8.19     *Pari Passu* or Priority Status.  No Debtor has taken any action which would cause the claims of unsecured creditors of any Debtor (other than claims of such creditors to the extent that they are statutorily preferred or Permitted Liens) to have priority over the claims of the Agent and the Secured Parties against the Debtors under the Credit Documents.

8.20     No Material Adverse Effect.  No Material Adverse Effect has occurred since the Petition Date.

8.21     Beneficial Ownership Certification.  As of the Interim Facility Effective Date, the information in the Beneficial Ownership Certifications delivered to the Agent is true and correct in all material respects.

8.22     Security Documents.  Subject to the entry of the DIP Orders, every Security Document is effective to create in favor of the Agent, for its benefit and the benefit of the other Secured Parties, a legal, valid and enforceable Lien in all Collateral (with such exceptions as may be agreed to by the Agent) described therein owned by the Debtors and with the priority set forth in the DIP Orders.

8.23     DIP Orders.  After the entry of the DIP Orders, the applicable DIP Order is in full force and effect and has not been vacated, stayed, reversed, modified or amended without the prior written consent of the Agent.  After the entry of the Interim Order, pursuant to and to the extent permitted in such DIP Order, (i) in respect of each of the Debtors, the Obligations will constitute allowed joint and several superpriority administrative expense claims in each of the Bankruptcy Cases pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority over any and all other administrative expenses and claims of any kind or nature whatsoever, specified in or ordered pursuant to Section 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code (but which shall be *pari passu* with the administrative expenses contemplated under the Hedging Order) and having full recourse against all assets of the Debtors, including, subject to the Final Order, Avoidance Action Proceeds, subject only to the Carve-Out (the "Super-Priority Claims") and (ii) in respect of any property owned by a Debtor other than Excluded Property, to the maximum extent permitted by law, the Obligations will be secured by a valid, binding, continuing, enforceable, fully-perfected Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d), subject only to the Carve-Out.

8.24     Budget.  The Debtors have not failed to disclose any material assumptions with respect to the Initial Budget and, as of the Interim Facility Effective Date, affirm the reasonableness of the assumptions in the Initial Budget in all material respects.

## ARTICLE IX
## AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees with the Lenders from and after the Interim Facility Effective Date until Facility Termination, as follows:

81

9.1     <u>Information Covenants</u>.  The Borrower will furnish to the Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     <u>Annual Financial Statements</u>.  As soon as available and in any event within five Business Days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is ninety-five (95) days after the end of each such fiscal year), the audited consolidated balance sheet of the Borrower and its Subsidiaries  as at the end of such fiscal year and the related consolidated statements of operations, shareholders' equity and cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal years, all in reasonable detail and prepared in accordance with GAAP and certified by independent certified public accountants of recognized national standing.

(b)     <u>Quarterly Financial Statements</u>.  As soon as available and in any event within five (5) Business Days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is sixty (60) days after the end of each such quarterly accounting period), the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year, all of which shall be certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

(c)     <u>Budget</u>.

(i)     On July 30, 2020 (the "<u>Initial Reporting Date</u>") and on each Thursday thereafter that is the four (4) week anniversary of the Initial Reporting Date (the Initial Reporting Date, together which each such four (4) week anniversary thereof, each, a "<u>Reporting Date</u>"), the Debtors shall deliver to the Agent an updated Budget (each, a "<u>Proposed Budget</u>"), together with a reconciliation for the periods included in the prior Approved Budget which such updated Budget shall be in form and substance reasonably satisfactory to the Agent and the Majority Lenders; <u>provided</u> that the Agent and the Majority Lenders shall have five (5) Business Days to approve any revised Proposed Budget; <u>provided</u>, <u>further</u>, that if the Agent and Majority Lenders do not approve any updated Proposed Budget by the sixth (6th) Business Day following receipt thereof, the previous Approved Budget shall remain in effect.  Upon the Debtors' receipt of the Agent's and Majority Lenders' consent to a Proposed Budget, such Proposed Budget shall become an Approved Budget and shall replace the then-operative Approved Budget for all purposes.  The Initial Budget shall be the Approved

82

Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved.  The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Variance Limit).  The Debtors may submit additional Proposed Budgets to the Agent and the Lenders, but until the Agent and the Majority Lenders consent to such Proposed Budget in their reasonable discretion, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.

(ii)      Beginning on July 9, 2020, and on the Thursday of each calendar week thereafter (each such date, a "Weekly Variance Testing Date" and each such week, a "Weekly Testing Period"), the Debtors shall deliver to the Agent, in a form consistent with the form of the Approved Budget, a variance report comparing the Debtors' actual receipts and disbursements by line item for the prior calendar week and the prior four calendar weeks (on a cumulative basis) with the projected receipts and disbursements for such week and the prior four calendar weeks (on a cumulative basis) as reflected in the applicable Approved Budget for such weeks, which variance report shall include a report from an Authorized Officer of the Borrower identifying and addressing any variance of actual performance to projected performance for such prior weekly periods (such report, the "Weekly Variance Report").

(iii)      No later than 4:00 p.m. Central Time on the Initial Reporting Date and on each Thursday thereafter that is the four (4)week anniversary of the Initial Reporting Date (each such date, the "Monthly Variance Testing Date" and each such four (4)-week period the "Monthly Variance Testing Period"), the Debtors shall deliver to the Agent a variance report detailing (A) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Monthly Variance Testing Period for (1) lease operating expenses and capital expenditures on a combined basis, (2) all other operating disbursements (excluding lease operating expenses and capital expenditures), and (3) the Professional Fees of the Debtors, the Committee and the Royalty Committee; and (B) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Monthly Variance Testing Period by the Debtors against the aggregate disbursements for the Monthly Variance Testing Period, as set forth in the applicable Approved Budget (a "Monthly Variance Report").

(d)      Monthly Financials; Capital Expenditures.

(i)      As soon as available and in any event within thirty (30) days after the end of each month, the consolidated balance sheet of the Debtors as at the end of such monthly period and the related consolidated statements of operations, for such monthly accounting period and for the elapsed portion of the fiscal year ended with the last day of such month, all of which shall be certified by an Authorized Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, of the Debtors in accordance with GAAP, subject

to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

(ii)     As soon as available and in any event within fifteen (15) Business Days after the end of each month, a detailed forward-looking rolling three-month forecast of Capital Expenditures by basin and category and in form and substance reasonably acceptable to the Agent (the "Capital Expenditure Report"), and, commencing with the second Capital Expenditure Report delivered hereunder, together with a report from an Authorized Officer of the Borrower comparing the Capital Expenditures on an accrual basis for the current month to the same period in the immediately prior Capital Expenditure Report and addressing any variance of actual performance to such Capital Expenditure Report for the prior month.

(e)     Other Information.

(i)     Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by any Debtor (other than amendments to any registration statement, exhibits to any registration statement and, if applicable, any registration statements on Form S-8), (A) copies of all financial statements, proxy statements, notices and reports that any Debtor shall send to the holders of any publicly issued debt of any Debtor, in each case in their capacity as such holders, lenders or agents (in each case to the extent not theretofore delivered to the Agent pursuant to this Agreement) and (B) with reasonable promptness, but subject to the limitations set forth in the last sentences of Section 9.2(a) and Section 13.16, such other information (financial or otherwise) as the Agent on its own behalf or on behalf of any Lender (acting through the Agent) may reasonably request in writing from time to time.

(ii)     Subject to any applicable limitations set forth in the Credit Documents, the Debtors will deliver to the Agent for filing, registration or recording all documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements reasonably requested by the Agent to be filed, registered or recorded to create or continue, as applicable, the Liens intended to be created by any Security Document (including the DIP Orders) and to further evidence the perfection of such Liens provided by the DIP Orders to the extent required by, and with the priority required by, such Security Document (including the DIP Orders) to the Agent and none of the Collateral shall be subject to any other pledges, security interests or mortgages, except for Liens permitted under Section 10.2.

(iii)     On or prior to the twentieth (20th) day after the end of each calendar month, the Borrower shall deliver to the Agent, a report setting forth, for each calendar month during the then-current fiscal year to date, the volume of production for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses

84

attributable thereto and incurred for each such calendar month, substantially in the form attached as Exhibit H hereto.

(iv)     Promptly following any request therefor, (i) such other information regarding the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of any Debtor, or compliance with the terms of the Credit Documents, as the Agent or any Lender (through the Agent) may from time to time reasonably request in writing or (ii) information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws.

(v)     The Debtors will provide written notice to the Agent and the Existing Agent if any of the Debtors (a) intend to provide information with respect to the Existing Credit Documents to a party in interest in the Bankruptcy Cases or (b) is compelled to provide such information by order of the Bankruptcy Court.

Documents required to be delivered pursuant to Sections 9.1(a), (b), (c), (d) and (e) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which the Debtors post such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 13.2, (ii) on which such documents are transmitted by electronic mail to the Agent or (iii) on which such documents are filed of record with the SEC. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of such documents from the Agent and maintaining its copies of such documents.

(f)     Officer's Certificates.

(i)     At the time of the delivery of the financial statements provided for in Sections 9.1(a) and (b), a certificate of an Authorized Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof

(ii)     At the time of delivery of each Reserve Report delivered pursuant to Section 9.12, a certificate of an Authorized Officer of the Borrower demonstrating compliance with the Financial Performance Covenant, which certificate shall set forth the calculations required to establish whether the Debtors were in compliance with the Financial Performance Covenant specified in Section 10.11(b) as of such date.

(g)     Notice of Material Events. (A) Promptly after an Authorized Officer of the Borrower obtains actual knowledge thereof, notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (ii) other than the Bankruptcy Cases, any litigation or governmental proceeding pending against any Debtor for which it would reasonably be expected that an adverse determination is probable, and that such determination would result in a Material Adverse Effect (and not subject to the Automatic Stay in

85

the Bankruptcy Cases), (B) at least two (2) Business Days prior to filing (or, if not practicable, as soon as reasonably practicable), the Borrower shall provide the Agent copies of all pleadings and motions (other than "first day" motions and proposed orders, but including the Approved Plan of Reorganization and any disclosure statement related thereto (which shall be provided as soon as practicable in advance of filing)) to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Bankruptcy Cases, which such pleadings shall include the Agent as a notice party, and (C) on a timely basis as specified in any DIP Order, the Borrower shall provide the Agent with copies of all notices required to be given to all parties specified in such DIP Order, in the manner specified therefor therein.

(h)     Environmental Matters.   Promptly after an Authorized Officer of the Borrower obtains written notice from any Governmental Authority of any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)     any condition or occurrence on any Oil and Gas Properties of any Debtor that would reasonably be expected to result in noncompliance by any Debtor with any applicable Environmental Law;

(ii)     any condition or occurrence on any Oil and Gas Properties that would reasonably be anticipated to cause such Oil and Gas Properties to be subject to any restrictions on the ownership, occupancy, use or transferability of such Oil and Gas Properties under any Environmental Law; and

(iii)     the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, release or threatened release of any Hazardous Material on, at, under or from any Oil and Gas Properties.

All such notices delivered under this Section 9.1(g) shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the response thereto.

(i)     Change in Beneficial Ownership Certification.  The Borrower will promptly notify the Agent of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

9.2     Books, Records and Inspections.

(a)     Each Debtor will permit officers and designated representatives of the Agent or the Majority Lenders (as accompanied by the Agent) to visit and inspect any property or asset of such Debtor in whosoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of such Debtor and discuss the affairs, finances and accounts of such Debtor with, and be advised as to the same by, its and their officers and independent accountants, upon reasonable advance notice to the Borrower, all at such reasonable times and

86

intervals during normal business hours and to such reasonable extent as the Agent or the Majority Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); but, excluding any such visit and inspections during the continuation of an Event of Default, only the Agent on behalf of the Majority Lenders may exercise rights of the Agent and the Lenders under this section; provided, further, that when an Event of Default exists, the Agent (or any of its representatives or independent contractors) or any representative of the Majority Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary contained herein, no Debtor will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     Each Debtor will maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the such Debtor, as the case may be.

9.3     <u>Maintenance of Insurance</u>.

(a)     Each Debtor will at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that such Debtor believes (in the good faith judgment of the management of such Debtor) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which such Debtor believes (in the good faith judgment of management of such Debtor) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as such Debtor believes (in the good faith judgment of management of such Debtor) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Agent, upon written request from the Agent, information presented in reasonable detail as to the insurance so carried.

(b)     The Secured Parties shall be the additional insureds on any such liability insurance as their interests may appear and, if property insurance is obtained, the Agent shall be the additional loss payee under any such property insurance; <u>but</u>, so long as no Event of Default has occurred and is then continuing, the Secured Parties will provide any proceeds of such property insurance to the Borrower to the extent that the Borrower undertakes to apply such proceeds to the reconstruction, replacement or repair of the property insured thereby.  The Debtors shall use commercially reasonable efforts to ensure that all policies of insurance required by the terms of this Agreement or any Security Document shall provide that each insurer shall endeavor to give at least thirty (30) days' prior written notice to the Agent of any cancellation of such insurance (or at least ten (10) days' prior written notice in the case of cancellation of such insurance due to non-payment of premiums).

87

9.4     Payment of Taxes.   Subject to any necessary order or authorization of the Bankruptcy Court and to the extent provided in the Approved Budget (subject to the Variance Limit), the Debtors will pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, before the date on which material penalties attach thereto, and all lawful material claims in respect of any Taxes imposed, assessed or levied that, if unpaid, would reasonably be expected to become a material Lien upon any properties of any Debtor; but no Debtor shall be required to pay or discharge any such tax, assessment, charge, levy or claim (i) that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of such Debtor) with respect thereto to the extent required by, and in accordance with, GAAP, (ii) the failure to pay or discharge would not reasonably be expected to result in a Material Adverse Effect or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code.

9.5     Existence.  Subject to any necessary order or authorization of the Bankruptcy Court approved by the Agent, each Debtor will do all things necessary to preserve and keep in full force and effect its legal existence, corporate (or equivalent) rights and authority, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.6     Compliance with Statutes, Regulations, Etc..  Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor will comply with all Requirements of Law applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Each Debtor will maintain in effect and enforce policies and procedures designed to ensure compliance by the Debtors and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

9.7     Maintenance of Properties.  Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor will, except in each case where the failure to so comply would not reasonably be expected to result in a Material Adverse Effect:

(a)     operate its Oil and Gas Properties and other material properties or cause such Oil and Gas Properties and other material properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable Contractual Requirements and all applicable Requirements of Law, including applicable proration requirements and applicable Environmental Laws, and all applicable Requirements of Law of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b)     keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material properties, including all equipment, machinery and facilities; and

(c)      to the extent a Debtor is not the operator of any property, each Debtor shall use reasonable efforts to cause the operator to comply with this Section.

9.8      <u>Delivery of Proposed DIP Orders</u>.  The Borrower will deliver to the Agent, as soon as practicable in advance of filing with the Bankruptcy Court, (a) the pleadings in respect of this DIP Facility, including the motion, any declarations, any responsive pleadings, and the proposed DIP Orders (which must be in form and substance satisfactory to the Agent) and (b) the Approved Plan of Reorganization and the proposed disclosure statement related to such Approved Plan of Reorganization.

9.9      <u>Additional Guarantors, Grantors and Collateral</u>.

(a)      Each Guarantor shall guarantee the Obligations pursuant to the Obligations Guarantee.  In connection with any such guarantee, each Guarantor shall promptly, (A) execute and deliver this Agreement or a joinder to this Agreement, in form and substance reasonably acceptable to the Agent (the "<u>Joinder Agreement</u>"), and any other Credit Document reasonably requested by the Agent, and (B) pledge all of the Stock of such Debtor pursuant to a Security Document or other Credit Document (including, without limitation, delivery of original stock certificates, if any, evidencing the Stock of such Debtor, together with appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents and certificates as shall reasonably be requested by the Agent.

(b)      Notwithstanding the restrictions in <u>Section 10.13</u>, each Subsidiary (other than a Non-Debtor Subsidiary) of a Debtor now existing or created, acquired or coming into existence after the date hereof, other than the Guarantors party hereto, shall promptly execute and deliver to the Agent a Joinder Agreement and any Security Document or other Credit Document (or joinder thereto) as may be required by the Agent. Such Subsidiary shall, and the Borrower shall cause such Subsidiary to, deliver to the Agent, simultaneously with its delivery of such Joinder Agreement and any such Security Document or other Credit Document (or joinder), (x) written evidence reasonably satisfactory to the Agent that such Subsidiary has taken all organizational action necessary to duly approve and authorize its execution, delivery and performance of such Joinder Agreement (including under the Obligations Guarantee), any such Security Document and any other documents which it is required to execute, and (y) such additional closing documents and certificates as the Agent shall reasonably require.

9.10     <u>Use of Proceeds</u>.

(a)      The proceeds of the Loans and Letters of Credit shall be used solely (i) for post-petition working capital, capital investments permitted hereunder, and general corporate purposes of the Debtors, (ii) for the payment of current interest and fees with respect to the Loans and other Obligations hereunder, (iii) the payment of adequate protection payments to the Existing Agent and the Existing RBL Lenders, including interest and letter of credit and other fees payable under the Existing RBL Credit Agreement, (iv) expenses and professional fees for (A) the collateral trustee under the Collateral Trust Agreement (including Paul Hastings LLP), (B) the FLLO Agent (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction), (C) the FLLO Ad Hoc Group (including Davis Polk & Wardwell LLP, Vinson &

89

Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP) ((B)-(C), collectively the "FLLO Professionals"), (D) Deutsche Bank Trust Company Americas, as the Second Lien Collateral Trustee (including Morgan, Lewis & Bockius LLP and one local counsel in the relevant jurisdiction) and (E) Franklin (including Akin Gump Strauss Hauer & Feld LLP, Moelis & Company LLC, one local counsel in each other relevant local jurisdiction, and FTI Consulting, Inc.) ((D)-(E), collectively, the "Second Lien Professionals"); provided, however, (x) that the payment of the fees and expenses of the FLLO Professionals and the FLLO Ad Hoc Group shall only be payable as a form of adequate protection for so long as (1) the Restructuring Support Agreement has not been terminated as to the DIP Lenders, Required Consenting Revolving Credit Facility Lenders, or the FLLO Ad Hoc Group or (2) an alternative restructuring support agreement or similar agreement with respect to the restructuring of the Debtors' debt and businesses remains in effect between the Agent, the Lenders, 66.67% of the Revolving Credit Facility Lenders, and the FLLO Ad Hoc Group, in each case, at which time such adequate protection shall terminate; provided, further, that in the event such adequate protection payments terminate pursuant to the foregoing, (a) all parties shall retain all rights pursuant to the Collateral Trust Agreement, which rights are fully reserved, including, without limitation, the rights, if any, of the FLLO Agent or lenders under the FLLO Term Loan to seek different or additional adequate protection in accordance with section 6.02(f) of the Collateral Trust Agreement and (b) the Debtors shall pay all fees and expenses of the FLLO Professionals incurred prior to termination of the payment of the fees and expenses of the FLLO Professionals as a form of adequate protection as described herein and (y) the payment of fees and expenses of the Second Lien Professionals (shall only be payable as a form of adequate protection for so long as the Restructuring Support Agreement has not been terminated as to the Debtors, DIP Lenders, Required Consenting Revolving Credit Facility Lenders or Franklin (at which time such adequate protection shall terminate); provided, further, that in the event such adequate protection payments terminate pursuant to the foregoing, (1) all parties shall retain all rights pursuant to the Intercreditor Agreement, including, without limitation, the rights, if any, of such parties to seek different or additional adequate protection in accordance with section 4.02(f) of the Intercreditor Agreement and (2) the Debtors shall pay all fees and expenses of the Second Lien Professionals incurred prior to termination of the payment of fees and expenses of the Second Lien Professionals as a form of adequate protection as described herein, and (v) for payment of allowed administrative costs and expenses of the Bankruptcy Cases, in each case, solely in accordance with the Approved Budget (subject to the Variance Limit) and the applicable DIP Order.  Subject to compliance with the Variance Limit, the Borrower shall not make disbursements or permit any other Debtor to make disbursements in excess of the amounts set forth in the Approved Budget for any period.

(b)     Except pursuant to any DIP Order, the Debtors shall not request any Borrowing or Letter of Credit, and the Debtors shall not use, and their respective directors, officers, employees and agents shall not use the proceeds of any Borrowing or Letter of Credit (i) in furtherance of an offer, a payment, a promise to pay, or an authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, in violation of applicable Sanctions or (iii) in any manner that would result in the violation of any applicable Sanctions by any Debtor.

ACTIVE 260175030

9.11    Further Assurances.

(a)    Subject to the applicable limitations set forth in Section 9.9 and the Security Documents, each Debtor will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents) that may be required under any applicable Requirements of Law, or that the Agent or the Majority Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Debtors.

(b)    Notwithstanding anything herein to the contrary, if the Agent and the Borrower reasonably determine in writing that the cost of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Lenders thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents.

9.12    Reserve Reports and Hedge Schedules.

(a)    The Borrower shall furnish to the Agent (1) on or before January 1st, April 1st, July 1st and October 1st of each year, beginning with July 1, 2020, a Reserve Report evaluating, (i) in the case of each January 1st Reserve Report, as of the immediately preceding September 30th, (ii) in the case of each April 1st Reserve Report, as of the immediately preceding December 31st, (iii) in the case of each July 1st Reserve Report, as of the immediately preceding March 31st, and (iv) in the case of each October 1st Reserve Report, as of the immediately preceding June 30th, the Proved Reserves of the Debtors located within the geographic boundaries of the United States of America (or the Outer Continental Shelf adjacent to the United States of America) and (2) within twenty days of the end of the prior calendar month, a Hedge Schedule with the Hedge Agreements of the Credit Parties as of the end of such monthly accounting period of the Debtors.  Each April 1st Reserve Report will be prepared by an Approved Petroleum Engineer with respect to at least 70% of the aggregate volumes of the Proved Reserves. Each other Reserve Report will be prepared by or under the supervision of the Borrower's chief engineer, certified by an Authorized Officer of the Borrower as to the accuracy and completeness thereof (each an "Internal Reserve Report").

(b)    On or before the delivery to the Agent of each Reserve Report required by Section 9.12 (commencing with the October 1, 2020 Reserve Report), to the extent requested by the Agent with sufficient prior notice in connection with the Agent's review of each such Reserve Report, the Borrower will deliver to the Agent title information consistent with usual and customary standards for the geographic regions in which the Oil and Gas Properties evaluated in such Reserve Report are located covering not less than 80% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(c)    Beginning on the date that is thirty (30) days after the Petition Date, which date may be extended in the Agent's sole discretion (with respect to the July 1, 2020 Reserve Report) and thereafter contemporaneously with the delivery of each subsequent Reserve Report, the Borrower and/or other Credit Parties shall have entered into (and shall thereafter maintain at all times), in each case in compliance with the Hedging Order, Hedge Agreements with Hedge Banks in respect of Hydrocarbons entered into not for speculative purposes and in the form of

91

commodity Hedge Agreements, the notional volumes for which (when aggregated with other commodity Hedge Agreements then in effect in the form of calls, swaps, costless collars or other commodity Hedge Agreements) are no less than, as of the date the Reserve Report is required to be delivered pursuant to <u>Section 9.12</u>, for the two year period that follows such date of delivery, 50% of the reasonably anticipated projected monthly production from Debtors' total Proved Developed Producing Reserves (as based on such Reserve Report) in respect of (i) crude oil and (ii) natural gas and natural gas liquids (for purposes of this clause (ii) only, taken together), and calculated separately in the case of clauses (i) and (ii); <u>provided</u>, <u>however</u>, that if the Borrower reasonably determines that the Lenders (and their respective Affiliates) have insufficient aggregate capacity or are unwilling or otherwise fail or refuse to enter into Hedge Agreements with one or more Credit Parties on commercially reasonable terms consistent with terms available to other similarly situated borrowers, then the requirements of this <u>Section 9.12</u> shall be reduced solely to the extent necessary to reflect the maximum volumes for which the Lenders (and their respective Affiliates) have insufficient aggregate capacity, willingness or otherwise fail or refuse to enter in such Hedge Agreements.

9.13    <u>Cash Management</u>.  Each Debtor shall maintain their cash management system as it existed prior to the Petition Date for the benefit of the Lenders, with any changes made in accordance with the Cash Management Order with the prior written consent of the Agent.

## ARTICLE X
## NEGATIVE COVENANTS

Each Debtor hereby covenants and agrees with the Lenders from and after the Interim Facility Effective Date until Facility Termination, as follows:

10.1    <u>Limitation on Indebtedness</u>.  No Debtor will create, incur, assume or suffer to exist any Indebtedness other than the following:

(a)      the Obligations;

(b)      unsecured intercompany loans and advances made between Debtors so long as such Indebtedness is subject to subordination terms acceptable to the Agent, to the extent permitted by Requirements of Law and not giving rise to material adverse tax consequences;

(c)      Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(d)      guarantee obligations incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors, licensees or sublicensees;

(e)      Indebtedness of the Debtors under Capital Leases entered into prior to the Petition Date and set forth on <u>Schedule 10.1(e)</u> hereto and Capital Leases entered into after the Petition Date in an aggregate principal amount not to exceed $6,000,000 at any time outstanding;

(f)      to the extent set forth on <u>Schedule 10.1(f)</u>, Indebtedness of the Debtors in existence on the Petition Date in respect of performance, bid, surety or similar bonds or surety obligations for the account of the Debtors, in each case, to the extent required by any Requirements of Law applicable to the Debtors and otherwise in connection with the operation of the Oil and Gas Properties of the Debtors, together with all replacements, extensions and renewals thereof made in the ordinary course of business;

(g)      the Existing Obligations, the Existing FLLO Obligations and the Existing Second Lien Obligations;

(h)      (i) Indebtedness outstanding on the Petition Date and set forth on <u>Schedule 10.1(h)</u> hereto and (ii) other immaterial Indebtedness (other than Indebtedness for borrowed money) outstanding on the Petition Date, whether or not scheduled;

(i)      obligations in respect of Cash Management Services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business;

(j)      Indebtedness incurred in the ordinary course of business in respect of obligations of Debtors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(k)      Indebtedness arising from agreements of any Debtor providing for indemnification or customary and ordinary course adjustments of purchase price, in each case, entered into in connection with any acquisition or Disposition permitted hereunder;

(l)      Indebtedness of the Debtors consisting of (i) obligations to pay insurance premiums or (ii) obligations contained in firm transportation or supply agreements or other take or pay contracts, in each case arising in the ordinary course of business;

(m)      Indebtedness associated with bonds or surety obligations required by Requirements of Law or by Governmental Authorities in connection with the operation of Oil and Gas Properties in the ordinary course of business;

(n)      Indebtedness under Hedge Agreements permitted by <u>Section 10.10</u>; and

(o)      Indebtedness other than Indebtedness for borrowed money not included under clauses (a) through (n) of this Section 10.1 in an aggregate principal amount not to exceed $2,500,000 at any one time outstanding.

10.2      <u>Limitation on Liens</u>.  No Debtor will create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of any Debtor, whether now owned or hereafter acquired, except:

(a)      Liens arising under the Credit Documents to secure the Obligations (including Liens contemplated by <u>Section 3.8</u>);

93

(b)     Permitted Liens;

(c)     Liens on any property of the Debtors securing Indebtedness arising in respect of Capital Leases so long as such Indebtedness is permitted under Section 10.1(e); provided that such Liens attach only to the assets acquired with the proceeds of such Indebtedness and do not cover any Hydrocarbon Interests or Stock in Persons owning direct or indirect interests in Hydrocarbon Interests;

(d)     Liens on any property of the Debtors existing on the Petition Date and set forth on Schedule 10.2(d); provided that (i) no such Lien shall at any time be extended to cover any additional property not subject thereto on the Petition Date and (ii) the principal amount of the Indebtedness secured by such Liens shall not be extended, renewed, refunded or refinanced;

(e)     Liens securing Indebtedness or other obligations of a Credit Party in favor of another Credit Party;

(f)     Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off);

(g)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business;

(h)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance or incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Debtors to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Debtors or (iii) relating to purchase orders and other agreements entered into with customers of Debtors in the ordinary course of business;

(i)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(j)     Liens in respect of any Qualifying VPP entered into prior to the Interim Facility Effective Date;

(k)     Liens securing Indebtedness permitted by Section 10.1(g); provided that such Liens are subject to the terms and conditions of the DIP Order;

(l)     Liens in existence as of the Petition Date on Stock in a joint venture that does not constitute a Guarantor securing obligations of such joint venture so long as the assets of such joint venture do not constitute Collateral;

(m)     Adequate Protection Liens;

94

(n)      Liens arising from judgments or decrees in circumstances not constituting an Event of Default under <u>Section 11.9</u>;

(o)      other Liens securing amounts in an aggregate amount outstanding not to exceed $2,500,000 at any time outstanding; and

(p)      Liens on cash collateral securing obligations of the Debtors in respect of Cash Management Services in an aggregate amount at any time outstanding not to exceed $5,000,000.

10.3    <u>Limitation on Fundamental Changes</u>.  No Debtor will enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, all or substantially all its assets.

10.4    <u>Limitation on Sale of Assets</u>.  No Debtor will, (x) make any voluntary Disposition of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (y) sell to any Person (other than any Debtor) any shares owned by it of any Subsidiary's Stock and Stock Equivalents, except that:

(a)      the Debtors may Dispose of (A) inventory and other goods held for sale in the ordinary course of business, including Hydrocarbons, obsolete, worn out, used or surplus equipment, vehicles and other assets (other than accounts receivable) in the ordinary course of business (including equipment that is no longer necessary for the business of the Debtors or is replaced by equipment of at least comparable value and use) and (B) Permitted Investments;

(b)      the Debtors may affect any transaction permitted by <u>Sections 10.3</u>, <u>10.5</u> or <u>10.6</u>, and any Debtor may Dispose of any property to another Debtor;

(c)      the Debtors may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any intellectual property) real, personal or intellectual property in the ordinary course of business;

(d)      the unwinding, terminating and/or offsetting of any Hedge Agreement will be permitted with at least one (1) Business Day's prior written notice to the Agent;

(e)      transfers of property will be permitted if such transfer is subject to a Casualty Event or in connection with any condemnation proceeding with respect to Collateral;

(f)      if no Event of Default then exists or would result as a result thereof, sales and other Dispositions of property not otherwise permitted pursuant to this <u>Section 10.4</u> (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363); <u>provided</u> that the Debtors will not be permitted to enter into sales or other Dispositions pursuant to this clause (f) to the extent the net cash proceeds of which, in the aggregate with all other Dispositions effected under this clause (f), would reasonably be expected to exceed $5,000,000 in the aggregate for each fiscal year; and

(g)      Dispositions of any property of any Debtor pursuant to an order of the Bankruptcy Court (including any Dispositions contemplated by the procedures for de minimis

95

asset transactions authorized and approved by the Bankruptcy Court); <u>provided</u> that the Bankruptcy Court order authorizing and approving such Dispositions shall be subject to the prior consent of the Agent and the Majority Lenders.

      10.5   <u>Limitation on Investments</u>.  No Debtor will make any Investment except:

      (a)   Investments in the Debtors in existence on the Interim Facility Effective Date and set forth in <u>Schedule 10.5(a)</u>;

      (b)   extensions of trade credit and purchases of assets and services (including purchases of inventory, supplies and materials) in the ordinary course of business;

      (c)   Investments in assets that constituted Permitted Investments at the time such Investments were made;

      (d)   Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business or upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

      (e)   Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

      (f)   Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

      (g)   advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

      (h)   guarantee obligations of any Debtor of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

      (i)   Industry Investments, Investments in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto and Investments related to farm-out, farm-in, joint operating, joint venture, joint development or other area of mutual interest agreements, other similar industry investments, gathering systems, pipelines or other similar oil and gas exploration and production business arrangements, in each case excluding ownership in any Person other than a Debtor;

      (j)   Investments in Hedge Agreements permitted by <u>Section 10.1</u> and <u>Section 10.10</u>;

(k)　　Investments consisting of Indebtedness, Dispositions and Restricted Payments permitted under Sections 10.1, 10.3, 10.4 and 10.6;

(l)　　Investments by any Debtor in or to any other Debtor;

(m)　　Investments consisting of licensing of intellectual property pursuant to joint marketing arrangements with other Persons in the ordinary course of business;

(n)　　Investments (other than Investments in Non-Debtor Subsidiaries) in accordance with (and as specifically identified in) the Approved Budget; and

(o)　　prepayments made in accordance with the Approved Budget (subject to the Variance Limit).

10.6　　Limitation on Restricted Payments.  The Debtors will not declare or make or agree to pay or make, directly or indirectly, any dividends, return any capital to its stockholders or make any other  distribution, payment or delivery of property or cash to its equity holders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents now or hereafter outstanding, or set aside any funds for any of the foregoing purposes (all of the foregoing, "Restricted Payments"), except the Debtors (other than Borrower) may declare and pay dividends or distributions directly or indirectly to the Borrower or any other Debtor or ratably with respect to their equity interests (including dividends or distributions in respect of consolidated, combined or similar income or franchise taxes), and the Borrower may make payments to Affiliates in connection with transactions entered into prior to the Petition Date that are set forth on Schedule 10.6.

10.7　　[Reserved].

10.8　　Negative Pledge Agreements.  No Debtor will enter into or permit to exist any Contractual Requirement (other than this Agreement, the other Credit Documents or any Existing Credit Document or in any document in respect of secured Indebtedness otherwise permitted hereunder) that limits the ability of any Debtor to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Credit Documents; but the foregoing shall not apply to (i) Contractual Requirements that exist on the Petition Date, (ii) restrictions that are imposed by any Requirement of Law or, (iii) restrictions arising under leases, subleases, licenses or sublicenses in the ordinary course of business to the extent relating to the property subject thereto.

10.9　　Marketing Activities.  No Debtor will engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than such marketing activities materially consistent with those described in the Form 10-K filing of the Borrower for the fiscal year ended December 31, 2019.

10.10　　Hedge Agreements.  Subject to the Hedging Order, no Debtor will enter into any Hedge Agreements other than (a) Hedge Agreements with Hedge Banks not for speculative purposes entered into to hedge or mitigate risks to which any Debtor has or may have exposure (including with respect to commodity prices) and (b) Hedge Agreements with Hedge Banks not for speculative purposes entered into in order to effectively cap, collar or exchange interest rates

97

(from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Debtor; provided that notwithstanding the foregoing, no Debtor will be permitted to enter into any Hedge Agreement to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production of the Debtors if, at the time such Hedge Agreement is entered into, (1) the term of such Hedge Agreement exceeds 60 months or (2) the notional volumes of Hydrocarbons subject to such Hedge Agreement (when aggregated with other commodity Hedge Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) exceed (x) for the 24-month period from the date such Hedge Agreement is executed, 90% of the reasonably anticipated projected monthly production from Oil and Gas Properties which are classified as Proved Developed Producing Reserves or (y) for the 24-month period ending immediately after the 24-month period described in the foregoing clause (x), 80% of the reasonably anticipated projected monthly production from Oil and Gas Properties which are classified as Proved Developed Producing Reserves (in the case of each of clause (x) and (y), calculated separately for (i) crude oil and (ii) natural gas and natural gas liquids, taken together, and in the case of clauses (i) and (ii), based on the most recent Reserve Report delivered by the Borrower to the Agent in accordance with Section 9.12).

10.11    Financial Performance Covenants.

(a)    Variance Test. As of any Monthly Variance Testing Date, for the Monthly Variance Testing Period ending on the Sunday preceding such Monthly Variance Testing Date, the Debtors shall not allow: (i) lease operating expenses and Capital Expenditures on a combined basis to be greater than 110% of the estimated disbursement for such items in the Approved Budget; (ii) all other operating disbursements (excluding lease operating expenses and Capital Expenditures) to be greater than 115% of the estimated disbursement for such items in the Approved Budget and (iii) the Professional Fees of the Debtors, the Committee and Royalty Committee to be greater than 110% of the estimated disbursement for such items in the Approved Budget, each for such Monthly Variance Testing Period (collectively, the "Variance Limit"). Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the Agent's reasonable approval (which, for avoidance of doubt may be granted by electronic transmission).

(b)    Asset Coverage Ratio. The Debtors will not permit, as of the date of delivery of each Reserve Report delivered pursuant to Section 9.12 (beginning with the Reserve Report delivered as of July 1, 2020), the Asset Coverage Ratio, to be less than 1.25:1:00.

10.12    Transactions with Affiliates. No Debtor will enter into any transaction, including, without limitation, any purchase, sale, or lease or exchange of property, with any non-Debtor Affiliate (including any Non-Debtor Subsidiary), other than (a) transactions or arrangements in place as of the Petition Date (including contractual obligations in place at such time); or (b) as approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the Agent and the Majority Lenders.

10.13    Change in Business. Subject to any restrictions arising on account of the Debtors' status as a "debtor" under the Bankruptcy Code and entry of the DIP Orders, no Debtor will allow any material change to be made (i) in the character of their business, taken as a whole, from the

98

business conducted by the Debtors on the date hereof and other business activities incidental or reasonably related thereto or (ii) in the Debtors' identities or corporate structure, the jurisdiction in which such Person is incorporated or formed, or any organizational documents of such Debtors, except, in each case, (x) as required by the Bankruptcy Code or (y) to the extent any such changes are not otherwise materially adverse to the interests of the Lenders.

10.14   Use of Proceeds.  No Debtor will use the proceeds of any Loans or Letter of Credit in violation of the provisions of Regulation T, Regulation U or Regulation X of the Board.

10.15   Sanctions; Anti-Corruption Use of Proceeds.  No Debtor will knowingly, directly or indirectly, use the proceeds of the Loans or use the Letters of Credit, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Law, or (ii) (A) to fund, in violation of applicable Sanctions, any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (B) in any other manner that would result in a violation of applicable Sanctions by any Person (including any Person participating in the Loans or Letters of Credit), whether as Agent, Lender, underwriter, advisor, investor, or otherwise.

10.16   Accounting Changes.  No Debtor will (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (ii) change the fiscal year of any Debtor.

10.17   Key Employee Plans.  No Debtor shall (a) enter into any key employee retention plan and incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any existing key employee retention plan and incentive plan, unless such plan, amendment or modification, as applicable, is satisfactory to the Agent and Majority Lenders (it being agreed and understood that the key employee retention plan of the Borrower effective as of May 1, 2020 shall be permitted, to the extent approved by the Bankruptcy Court).

10.18   Super-Priority Claims.  No Debtor will create or permit to exist any Super-Priority Claim that is *pari passu* with or senior to the Super-Priority Claims of the Lenders other than in respect of Lender Hedging Obligations.

10.19   Bankruptcy Orders.  No Debtor will (a) obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the Agent's or any Lender's remedies hereunder or under any other Credit Document, except as specifically provided in the DIP Order, or (b) seek to change or otherwise modify any DIP Order or other order in the Bankruptcy Court with respect to the DIP Facility without the prior written approval of the Agent and, with respect to any modification of any DIP Order that would reasonably be expected to be materially adverse to the interests of the Lenders, the Majority Lenders.

10.20   New Accounts.  No Debtor will open or otherwise establish, or deposit, credit or otherwise transfer any cash, cash receipts, securities, financial assets or any other property into a deposit account or securities account other than (a) any deposit account or securities account

established with the prior consent of the Agent and in which the Agent has been granted a first-priority perfected lien pursuant to the applicable DIP Order or (b) any Excluded Deposit Account.

## ARTICLE XI
## EVENTS OF DEFAULT

Upon the occurrence of any of the following specified events (each an "Event of Default"):

11.1    Payments.  The Borrower shall (i) default in the payment when due of any principal of the Loans or Unpaid Drawings or (ii) default in the payment when due of (x) any interest on the Loans or any Unpaid Drawings, (y) fees or (z) any other amounts owing under any Credit Document and such default shall continue for five (5) or more days.

11.2    Representations, Etc..  Any representation, warranty or statement made or deemed made by any Debtor in any Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue or misleading in any material respect on the date as of which made or deemed made.

11.3    Covenants.  Any Debtor shall:

(a)    default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.1(c), 9.1(d), 9.1(e)(iii), 9.1(f), 9.1(g), 9.5, 9.10 or Article X; or

(b)    default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 11.1, 11.2 or 11.3(a)) contained in this Agreement or any Security Document and such default shall continue unremedied for a period of at least 30 days after receipt of notice thereof by the Borrower from the Agent.

11.4    Default Under Other Agreements.  (i) Any Debtor shall default in any payment with respect to any Indebtedness (other than Indebtedness described in Section 11.1) or any Indebtedness in respect of any Hedge Agreement in excess of $7,500,000, beyond the grace period, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) any such Indebtedness shall be declared to be due and payable, or shall be required to be prepaid, defeased or redeemed before the stated maturity thereof, other than (A) as a result of a regularly scheduled required prepayment or as a mandatory prepayment, (B) in the case of any Indebtedness in respect of any Hedge Agreement, as a result of termination event or equivalent event under such Hedge Agreement and (C) secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement, in the case of each of clause (i) and (ii), which is not stayed by the filing of the voluntary petition to commence the Bankruptcy Cases or is otherwise permitted to be paid under this Agreement and by the DIP Orders.

11.5    Bankruptcy Cases, Etc..  The occurrence of any of the following:

(a)    the Credit Documents shall not have been executed and delivered by the Debtors, the Agent and the Lenders party thereto within three (3) days after the date of entry of the Interim Order (or shall not have been filed with, and approved by, the Bankruptcy Court within the times specified and otherwise in accordance with the Interim Order);

(b)      the Interim Order at any time ceases to be in full force and effect, or shall be vacated, reversed, stayed, modified or amended without the prior written consent of the Agent and, if such modification or amendment would reasonably be expected to be materially adverse to the interests of the Lenders, the Majority Lenders;

(c)      the Final Order (i) at any time ceases to be in full force and effect, (ii) shall be vacated, reversed, stayed, modified or amended without the prior written consent of the Agent and, if such modification or amendment would reasonably be expected to be materially adverse to the interests of the Lenders, the Majority Lenders, or (iii) shall not have been entered by the Bankruptcy Court within thirty-five (35) days after the entry of the Interim Order (subject to any COVID-19 Extensions); provided that such time period in clause (iii) may be extended by mutual agreement among the Borrower and Agent;

(d)      failure to satisfy any of the Chapter 11 Milestones in accordance with the terms in the DIP Orders relating to such Chapter 11 Milestone (subject to any COVID-19 Extensions);

(e)      dismissal of the Bankruptcy Cases or conversion of the Bankruptcy Cases to a Chapter 7 case (or the filing of any pleading by a Debtor seeking, consenting to or otherwise supporting such action);

(f)      appointment of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor in the Bankruptcy Case (or the filing of any pleading by a Debtor seeking, consenting to or otherwise supporting such action);

(g)      subject to the Carve-Out, the Bankruptcy Court's granting of any Super-Priority Claim (other than in respect of Lender Hedging Obligations) or Lien on the Collateral which is *pari passu* with or senior to the Super-Priority Claims or Liens of the Lenders in the Bankruptcy Case (or the filing of any pleading by a Debtor seeking, consenting to or otherwise supporting such action);

(h)      the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates for any reason;

(i)      other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (i) in respect of accrued payroll and related expenses as of the commencement of the Bankruptcy Cases, (ii) in respect of adequate protection payments set forth in the DIP Orders and consented to by the Agent, or otherwise permitted under the terms of the Collateral Trust Agreement or the Existing Intercreditor Agreement, as applicable, and (iii) in respect of certain critical vendors and other creditors, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the Agent, any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables (including without limitation, reclamation claims);

(j)        the Bankruptcy Court shall enter one or more orders during the pendency of the Bankruptcy Cases granting relief from the Automatic Stay to the holder or holders of any Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on assets of any Debtor or Debtors that have an aggregate value in excess of $7,500,000 without the prior written consent of the Agent;

(k)        the Termination Date shall have occurred;

(l)        any Debtor petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the Liens securing the Loans without the consent of the Agent (other than the Carve-Out or as contemplated under the Hedging Order);

(m)        (A) the Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the Credit Documents, the Existing Credit Documents or the Liens on or security interest in the assets of the Debtors securing the Obligations or the Existing Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the such indebtedness or (B) the Debtors engage in or support any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the Agent, any Lender, the Existing Agent or any Existing RBL Lender or Letter of Credit Issuer contesting the validity or enforceability of any Credit Document or denying that it has any further liability thereunder; provided, however, that it shall not constitute an Event of Default if any of the Debtors provides information with respect to the Existing RBL Credit Agreement, the Existing FLLO Loan Documents and the Existing Second Lien Loan Documents to a party in interest or is compelled to provide information by an order of the Bankruptcy Court;

(n)        after entry of the Final Order, the entry of any final order in the Bankruptcy Case charging any of the Collateral, including under Section 506(c), which is adverse to the Lenders or their rights and remedies under the DIP Facility in the Bankruptcy Case;

(o)        any Debtor shall consummate or seek to obtain Bankruptcy Court approval of any sale or other Disposition of all or a material portion of the Collateral securing the Loans pursuant to Section 363 of the Bankruptcy Code (other than in ordinary course of business that is contemplated by the Approved Budget) without the advance written consent of the Agent and the Majority Lenders, whether as a part of or outside of a plan of reorganization, in each case if such sale or other transaction does not contemplate indefeasibly satisfying the Obligations in full in cash at the consummation of such transactions, or any Credit Party proposes, supports or fails to contest in good faith the entry of such an order;

(p)        any Person shall obtain a judgment or similar determination under Section 506(a) of the Bankruptcy Code with respect to the Existing Obligations;

(q)        the confirmation of a plan of reorganization or liquidation that does not provide for treatment acceptable to the Lenders, or any Debtor proposes or supports, or fails to contest in good faith, the entry of such a plan of reorganization or liquidation, unless such plan contemplates indefeasibly paying the Obligations and the Existing Obligations in full, in cash on the effective date of such plan;

(r)      the entry of an order by the Bankruptcy Court in favor of the statutory committee of unsecured creditors (the "Creditors' Committee"), if any, appointed in the Bankruptcy Cases, any ad hoc committee, or any other party in interest, (i) sustaining an objection to claims of the Agent or any of the Lenders, (ii) avoiding any liens held by the Agent or any of the Lenders, (iii) sustaining an objection to claims of the Existing Agent or any of the Existing RBL Lenders, or (iv) avoiding any liens held by the Existing Agent or any of the Existing RBL Lenders except as otherwise agreed by the Existing Agent in writing;

(s)      if (i) the Existing Intercreditor Agreement shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with its terms against the Borrower, any party thereto or any holder of the liens subordinated thereby, or shall be repudiated by any of them, or be amended, modified or supplemented to cause the liens securing the obligations of the Existing Second Lien Credit Agreement to be senior or *pari passu* in priority to the liens securing the obligations under the Existing RBL Credit Agreement, (ii) the Borrower takes any action inconsistent with the terms of the Existing Intercreditor Agreement (other than in connection with an Approved Plan of Reorganization), (iii) any Person bound by the Existing Intercreditor Agreement takes any action inconsistent with the terms thereof and the Borrower shall fail to promptly take all commercially reasonable actions necessary to oppose such action or (iv) any order of any court of competent jurisdiction is granted which is materially inconsistent with the terms of the Existing Intercreditor Agreement and would reasonably be expected to be adverse to the interests of the Existing RBL Lenders;

(t)      reversal or modification of the Roll-Up Loans provided for hereunder by the Bankruptcy Court without Agent consent;

(u)      the failure of any Debtor to comply with the terms of the applicable DIP Order;

(v)      any Debtor shall (i) contest the validity or enforceability of the Orders or any Credit Document or deny that it has further liability thereunder or (ii) contest the validity or perfection of the liens and security interests securing the Loans;

(w)      any Debtor shall attempt to invalidate or otherwise impair the Loans or the liens granted to the Lenders under the Credit Documents;

(x)      the consensual use of prepetition cash collateral is terminated; or

(y)      entry of a final order by the Bankruptcy Court terminating the use of cash collateral.

11.6    ERISA.

(a)      Any ERISA Event shall occur or any Plan shall fail to satisfy the minimum funding standards under Section 412 of the Code required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; any Plan or Multiemployer Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof);

an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); any Debtor or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan or a Multiemployer Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 or of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof);

> (b)     there results from any event or events set forth in <u>clause (a)</u> of this section the imposition of a Lien or a liability; and

> (c)     such Lien or liability would be reasonably likely to have a Material Adverse Effect.

11.7    <u>Guarantee</u>.  The Obligations Guarantee or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Debtor shall deny or disaffirm in writing any such Guarantor's obligations under the Obligations Guarantee.

11.8    <u>Credit Documents</u>.  Any Credit Document shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Debtor shall deny or disaffirm in writing any grantor's obligations under any Credit Document.

11.9    <u>Judgments</u>.  One or more monetary judgments or decrees of a court of competent jurisdiction shall be entered against any Debtor involving a liability of $50,000,000 or more in the aggregate for all such judgments and decrees for the Debtors (to the extent not paid or covered by insurance provided by a carrier not disputing coverage) and any such judgments or decrees shall not have been satisfied, vacated, discharged or stayed or bonded pending appeal within sixty (60) days after the entry thereof.

11.10    <u>Change of Control</u>.  A Change of Control shall occur.

Upon the occurrence of and continuance of an Event of Default, subject in all respects to the Carve-Out, (i) the Agent may, and at the request of the Majority Lenders, shall (A) deliver a notice to the Borrower of the Event of Default, (B) declare the termination, reduction, or restriction of the Commitments, and thereupon the Commitments shall be terminated, reduced, or restricted immediately unless and until the Majority Lenders and the Agent shall reinstate the same in writing, (C) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, shall become due and payable immediately, in each case, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Credit Party, (D) declare a termination, reduction or restriction on the ability of the Credit Parties to use any cash collateral, (E) terminate the DIP Facility, (F) charge the Default Rate under the DIP Facility and (G) exercise any right or remedy with respect to the Collateral or the Liens in favor of the Agent on behalf of the Lenders, or take any other action or exercise any other right or remedy permitted under the Credit Documents or applicable law, in each case without first obtaining relief

104

from the Automatic Stay under Section 362 of the Bankruptcy Code (any such declaration, a "Termination Declaration"); provided, however, that in the case of the enforcement of Liens or other remedies with respect to the Collateral pursuant this paragraph, the Agent shall provide the Debtors (with a copy to counsel for the Committee and Royalty Committee, to the United States Trustee, the FLLO Professionals and the Second Lien Professionals) with notice, file such notice on the docket in the Bankruptcy Cases (using the CM/ECF code for emergency), and request an emergency hearing with respect to the same (the "Stay Relief Hearing"). The Bankruptcy Court shall conduct the Stay Relief Hearing upon five (5) Business Days' notice to determine whether an Event of Default has occurred; provided, further, that in any such Stay Relief Hearing, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the Agent shall be whether, in fact, an Event of Default has occurred and is continuing. Prior to the Stay Relief Hearing, the Debtors are permitted to use cash collateral solely in accordance with the Approved Budget. Upon the Bankruptcy Court's determination that an Event of Default has occurred, the Agent shall be entitled to exercise all rights and remedies with respect to the Collateral provided for in the Credit Documents, including the right to foreclose on, or otherwise exercise its rights with respect to all or any portion of the Collateral, including by applying the proceeds thereof to the Obligations

Any amount received by the Agent from any Debtor (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement shall be applied:

(i)     first, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Agent (including fees, expenses and disbursement of counsel and financial advisors to the Agent);

(ii)     second, to the payment of all fees, indemnities, expenses and other amounts (other than principal and interest, Ordinary Course Settlement Payments and Termination Payments) payable to the Secured Parties (including fees, expenses, and disbursements of counsel to Lenders) ratably among them in proportion to the respective amounts described in this clause second payable to them;

(iii)     third, to accrued and unpaid interest on the Loans and Ordinary Course Settlement Payments owed to the relevant Secured Parties on the Obligations, ratably among such Secured Parties in proportion to the respective amounts described in this clause third payable to them;

(iv)     fourth, to unpaid principal of the New Money Loans, to any obligation to provide cash collateral in respect of undrawn Letters of Credit and to any Termination Payments owed to Secured Parties in respect of Lender Hedging Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause fourth payable to them;

(v)     fifth, to unpaid principal of the New Money Roll-Up Loans, ratably among the New Money Lenders in proportion to the respective amounts described in this clause fifth payable to them;

105

(vi)     <u>sixth</u>, to unpaid principal of the Incremental Roll-Up Loans, ratably among the New Money Lenders and Non-Participating Lenders in proportion to the respective amounts described in this clause fifth payable to them; and

(vii)     <u>seventh</u>, to any surplus then remaining, after all of the Obligations then due shall have been paid in full in cash, shall be paid to the Borrower or its successors or assigns or to whomever may be lawfully entitled to receive the same or as the Bankruptcy Court or a court of competent jurisdiction may award.

## ARTICLE XII
## THE AGENT

12.1     <u>Appointment</u>. Each Lender (which, for the purposes of this Article includes each Letter of Credit Issuer) hereby irrevocably designates and appoints the Agent as the agent of such Lender under the Credit Documents and irrevocably authorizes the Agent, in such capacity, to take such action on its behalf under the provisions of the Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of the Credit Documents, together with such other powers as are reasonably incidental thereto.  The provisions of this Article (other than <u>Sections 12.10</u>, <u>12.12</u> and <u>12.13</u> with respect to the Borrower) are solely for the benefit of the Agent and the Lenders, and the Borrower shall not have rights as third party beneficiary of any such provision.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth in the Credit Documents, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into any Credit Document or otherwise exist against the Agent.

12.2     <u>Delegation of Duties</u>.  The Agent may execute any of its duties under the Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3     <u>Exculpatory Provisions</u>.  Neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with any Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth in any Credit Document) (IT BEING THE INTENTION OF THE PARTIES HERETO THAT THE AGENT AND ANY RELATED PARTIES SHALL, IN ALL CASES, BE INDEMNIFIED FOR ITS ORDINARY, COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE) or (ii) responsible in any manner to any Lender or any Participant for any recitals, statements, representations or warranties made by any Debtor or any officer thereof contained in any Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, any Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of any Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the

106

Security Documents, or for any failure of any Debtor to perform its obligations hereunder or thereunder.  The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, any Credit Document, or to inspect the properties, books or records of any Debtor or any Affiliate thereof.  The Agent shall not be under any obligation to any Lender or any Letter of Credit Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, any Credit Document, or to inspect the properties, books or records of any Debtor.

      12.4   <u>Reliance</u>.  The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agent.  The Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a notice of assignment, negotiation or transfer thereof shall have been filed with the Agent.  The Agent shall be fully justified in failing or refusing to take any action under any Credit Document unless it shall first receive such advice or concurrence of the Majority Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under the Credit Documents in accordance with a request of the Majority Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; but the Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or applicable Requirements of Law.  For purposes of determining compliance with the conditions specified in <u>Article VI</u> and <u>Article VII</u> on the Interim Facility Effective Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender before the proposed Interim Facility Effective Date specifying its objection thereto.

      12.5   <u>Notice of Default</u>.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Agent receives such a notice, it shall give notice thereof to the Lenders.  The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority Lenders in accordance with the terms hereof; but unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

      12.6   <u>Non-Reliance on Agent and Other Lenders</u>.  Each Lender expressly acknowledges that neither the Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Agent

107

hereinafter taken, including any review of the affairs of any Debtor, shall be deemed to constitute any representation or warranty by the Agent to any Lender or any Letter of Credit Issuer. Each Lender and each Letter of Credit Issuer acknowledges to the Agent that it has, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of each Debtor and made its own decision to make its credit extensions hereunder and enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of any Debtor. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent hereunder, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of any Debtor that may come into the possession of the Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.7    [Reserved].

12.8    Indemnification. The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Debtors and without limiting the obligation of the Debtors to do so), ratably according to their respective portions of the Commitments or Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Exposure in effect immediately before such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of the Commitments, any Credit Document or any documents contemplated by or referred to herein or therein or the Transactions or any action taken or omitted by the Agent under or in connection with any of the foregoing; but no Lender shall be liable to the Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction (IT BEING THE INTENTION OF THE PARTIES HERETO THAT THE AGENT AND ANY RELATED PARTIES SHALL, IN ALL CASES, BE INDEMNIFIED FOR ITS ORDINARY, COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE); provided, further, that no action taken in accordance with the directions of the Majority Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, bad faith or willful misconduct for purposes of this section. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this section applies whether any such investigation, litigation or proceeding is brought by any

108

Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by the Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, any Credit Document, or any document contemplated by or referred to herein, to the extent that the Agent is not reimbursed for such expenses by or on behalf of the Borrower; but such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to the Agent for any purpose shall, in the opinion of the Agent, be insufficient or become impaired, the Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; but in no event shall this sentence require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and provided, further, this sentence shall not be deemed to require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from the Agent gross negligence, bad faith or willful misconduct.  The agreements in this section shall survive the payment of the Loans and all other amounts payable hereunder.

12.9    <u>Agent in Its Individual Capacity</u>.  The Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the any Debtor as though the Agent were not the Agent under the Credit Documents.  With respect to the Loans made by it, the Agent shall have the same rights and powers under the Credit Documents as any Lender and may exercise the same as though it were not the Agent, and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

12.10    <u>Successor Agent</u>.  The Agent may at any time give notice of its resignation to the Lenders, the Letter of Credit Issuers and the Borrower.  If the Agent becomes a Defaulting Lender, then such Agent may be removed as the Agent at the reasonable request of the Borrower and the Majority Lenders.  Upon receipt of any such notice of resignation or removal, as the case may be, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Event of Default under <u>Section 11.1</u> is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States but shall not, in any case, be a Defaulting Lender or an Affiliate of a Defaulting Lender.  If, in the case of the resignation of the Agent, no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the Agent gives notice of its resignation, then the Agent may on behalf of the Lenders and the Letter of Credit Issuers, appoint a successor Agent meeting the qualifications set forth above.  Upon the acceptance of a successor's appointment as the Agent hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Majority Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents (if any), such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations under the Credit Documents (if not already discharged therefrom as provided above in this section).  The fees payable by the Borrower (following the effectiveness of such appointment) to the successor Agent

shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation under the Credit Documents, the provisions of this Article (including <u>Section 12.8</u>) and <u>Section 13.5</u> shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as the Agent.

Any resignation of any Person as Agent pursuant to this section shall also constitute its resignation as Letter of Credit Issuer (if applicable).  Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Letter of Credit Issuer, (b) the retiring Letter of Credit Issuer shall be discharged from all of their respective duties and obligations under the Credit Documents, and (c) the successor Letter of Credit Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Letter of Credit Issuer to effectively assume the obligations of the retiring Letter of Credit Issuer with respect to such Letters of Credit.

12.11   <u>Withholding Tax</u>.  To the extent required by any applicable Requirement of Law, the Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Agent (to the extent that the Agent has not already been reimbursed by any applicable Debtor and without limiting the obligation of any applicable Debtor to do so) fully for all amounts paid, directly or indirectly, by the Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.  Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document against any amount due to the Agent under this section.  For the avoidance of doubt, for purposes of this section, the term "Lender" includes any Letter of Credit Issuer.

12.12   <u>Security Documents and Guarantee</u>.  Each Secured Party hereby further authorizes the Agent, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents.  Subject to <u>Section 13.1</u>, without further written consent or authorization from any Secured Party, the Agent may (a) execute any documents or instruments necessary in connection with a Disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is the subject of such Disposition of assets or with respect to which Majority Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.1</u>) have otherwise consented or (c) release any Guarantor from the Guarantee with respect to which Majority Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.1</u>) have otherwise consented (and, in the case of any automatic release of a Guarantor in accordance with

110

Section 13.17, execute any documents or instruments that may be necessary or advisable to evidence such release).

12.13    Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any Credit Document to the contrary notwithstanding, the Borrower, the Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any Collateral or to enforce the Obligations Guarantee; it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents and the Obligations Guarantee may be exercised solely by the Agent, and (b) in the event of a foreclosure by the Agent on any Collateral pursuant to a public or private sale or other Disposition, the Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such Disposition and the Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Majority Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any Obligation as a credit on account of the purchase price for any Collateral payable by the Agent at such Disposition.

12.14    Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law relative to any Debtor, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel, to the extent due under Section 13.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, to the extent due under Section 13.5.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

ACTIVE 260175030

## ARTICLE XIII
## MISCELLANEOUS

13.1    <u>Amendments, Waivers and Releases</u>.  Except as expressly set forth in the applicable Credit Document, no Credit Document, nor any terms thereof, may be amended, supplemented or modified except in accordance with the provisions of this section.  The Majority Lenders may, or, with the written consent of the Majority Lenders, the Agent shall, from time to time, (a) enter into with the relevant Debtor or Debtors written amendments, supplements or modifications to the Credit Documents or (b) waive in writing, on such terms and conditions as the Majority Lenders or the Agent, as the case may be, may specify in such instrument, any requirement of any Credit Document or any Default or Event of Default and its consequences; but each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>further</u>, that no such waiver and no such amendment, supplement or modification shall:

(i)    forgive or reduce any portion, or extend the date for the payment, of any Loan or reduce the stated rate (subject to <u>Section 2.10(d)</u> and it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend <u>Section 2.8(d)</u>), or forgive any portion, or extend the date for the payment, of any interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Commitment or increase the amount of the Commitment of any Lender, or make any Loan, interest, fee or other amount payable in any currency other than Dollars, in each case without the written consent of each Lender, directly and adversely affected thereby; <u>provided</u> that only consent of the Agent and the Majority Lenders shall be necessary to extend the Termination Date (other than with respect to the Scheduled Maturity Date, which shall require consent of the Agent and the New Money Lenders);

(ii)    amend, modify or waive any provision of this section, or amend or modify any provision of <u>Section 5.1(d)(A)</u>, <u>Section 5.3</u> or <u>Section 13.8(a)</u> to the extent it would alter the ratable allocation of payments thereunder, or reduce the percentages specified in the definitions of the terms "Majority Lenders" or "Required Lenders" consent to the assignment or transfer by the Borrower of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to <u>Section 10.3</u>) or alter the order of application set forth in the final paragraph of <u>Article XI</u> or modify any definition used in such final paragraph if the effect thereof would be to alter the order of payment specified therein, in each case without the written consent of each Lender that is either (i) directly and adversely affected thereby or (ii) an Affiliate of a Hedge Bank directly and adversely affected thereby;

(iii)    amend, modify or waive any provision of <u>Article XII</u> without the written consent of the then-current Agent, as applicable, or any other former Agent to whom <u>Article XII</u> then applies in a manner that directly and adversely affects such Person,

112

(iv)   amend, modify or waive any provision of <u>Article III</u> with respect to any Letter of Credit without the written consent of each Letter of Credit Issuer to whom <u>Article III</u> then applies in a manner that directly and adversely affects such Person;

(v)   [Reserved];

(vi)   release all or substantially all of the value of the Obligations Guarantee (except as expressly permitted by the Obligations Guarantee or this Agreement) without the prior written consent of each Lender (other than any Non-Participating Lender);

(vii)   release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement) without the prior written consent of each Lender (other than any Non-Participating Lender);

(viii)   amend <u>Section 2.9</u> so as to permit Interest Period intervals greater than six months without regard to availability to Lenders, without the written consent of each Lender (other than any Non-Participating Lender) directly and adversely affected thereby;

(ix)   [Reserved];

(x)   affect the rights or duties of, or any fees or other amounts payable to the Agent under any Credit Document without the prior written consent of the Agent;

(xi)   amend, modify or waive any provision of <u>Article VII</u> without the written consent of the Majority Lenders;

<u>provided</u>, <u>further</u>, that any provision of any Credit Document may be amended by an agreement in writing entered into by the Borrower and the Agent to cure any ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five (5) Business Days' prior notice thereof and the Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a notice from the Majority Lenders stating that the Majority Lenders object to such amendment.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon the Borrower, such Lenders, the Agent and all future holders of the affected Loans.  In the case of any waiver, the Borrower, the Lenders and the Agent shall be restored to their former positions and rights under the Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

13.2     Notices.   Unless otherwise expressly provided herein, all notices and other communications provided for under any Credit Document shall be in writing (including by facsimile or email transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to the Borrower, the Agent or any Letter of Credit Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Agent Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Agent and the Letter of Credit Issuers.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii)(A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone); and (D) if delivered by electronic mail, when delivered; but notices and other communications to the Agent or the Lenders pursuant to Sections 2.3, 2.6, 2.9, 4.2 and 5.1 shall not be effective until received.

13.3     No Waiver; Cumulative Remedies.   No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power or privilege under the Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Requirements of Law.

13.4     Survival of Representations and Warranties.   All representations and warranties made in the Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

13.5     Payment of Expenses; Indemnification.   The Borrower agrees:

(a)     to pay or reimburse (or to cause the Debtors to pay or reimburse) the Agent for all of its reasonable and documented out-of-pocket costs and expenses (with respect to legal expenses, limited to reasonable fees, disbursements and other charges of one primary outside counsel to the Agent (which is Sidley Austin LLP as of the Interim Facility Effective Date), additional specialist counsel as applicable (limited to one firm of specialist counsel to the Agent per specialty), and one outside counsel in each appropriate local jurisdiction), including the fees of RPA Advisors, LLC and Houlihan Lokey Capital, Inc. incurred in connection with the

114

preparation and execution and delivery of, and any amendment, waiver, supplement or modification to, the Credit Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the Transactions, including all restructuring matters related to the Debtors,

(b)     to pay or reimburse the Agent and each Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under the Credit Documents and any such other documents, including in the course of any work-out or restructuring the Loans (with respect to attorney costs, limited to the reasonable and documented fees, disbursements and other charges of one primary outside counsel for all such Persons, taken as a whole, and, if necessary, of a single firm of local outside counsel in each material jurisdiction for all Persons, taken as a whole (unless there is an actual or perceived conflict of interest in which case each such Person with such conflict may retain its own outside counsel upon written notice to the Borrower and the Agent) and additional specialist counsel as applicable (limited to one firm of specialist counsel for all such Persons, taken as a whole, per specialty), and one outside counsel in each appropriate local jurisdiction), including the fees and expenses of a financial advisor, limited to reasonable and documented fees, disbursements and other charges of one financial advisor to the Agent,

(c)     to pay, indemnify, and hold harmless each Lender, Letter of Credit Issuer and the Agent from, any and all recording and filing fees, and

(d)     to pay (or to cause the Debtors to pay), indemnify, and hold harmless each Lender, Letter of Credit Issuer and the Agent and their respective Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, whether or not such proceedings are brought by the Borrower, any of its Related Parties or any other third Person (with respect to attorney costs, limited to the reasonable and documented fees, disbursements and other charges of one primary outside counsel for all such Persons, taken as a whole, and, if necessary, of a single firm of local outside counsel in each appropriate jurisdiction for all such Persons, taken as a whole (unless there is an actual or perceived conflict of interest in which case each such Person may retain its own outside counsel)), with respect to the execution, delivery, enforcement, performance and administration of the Credit Documents and any such other documents, including any of the foregoing relating to the violation of, noncompliance with or liability under, any applicable Environmental Law (other than by such indemnified Person or any of its Related Parties (other than any trustee or advisor)) or to any actual or alleged presence, release or threatened release of Hazardous Materials involving or attributable to the operations of the Borrower, any Subsidiary or any Oil and Gas Property (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"); but the Borrower shall have no obligation hereunder to the Agent, any Letter of Credit Issuer or any Lender or any of their respective Related Parties with respect to Indemnified Liabilities to the extent it has been determined by a final non-appealable judgment of a court of competent jurisdiction to have resulted from (i) the gross negligence, bad faith or willful misconduct of the party to be indemnified or any of its Related Parties (IT BEING THE INTENTION OF THE PARTIES HERETO THAT EACH LENDER, LETTER OF CREDIT ISSUER AND THE AGENT AND THEIR RESPECTIVE RELATED PARTIES SHALL, IN ALL CASES, BE INDEMNIFIED FOR ITS ORDINARY COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE), (ii) any material breach of any

115

Credit Document by the party to be indemnified or (iii) disputes, claims, demands, actions, judgments or suits not arising from any act or omission by the Borrower or its Affiliates, brought by an indemnified Person against any other indemnified Person (other than disputes, claims, demands, actions, judgments or suits involving claims against the Agent in its capacity as such). NO PERSON ENTITLED TO INDEMNIFICATION UNDER <u>CLAUSE (D)</u> OF THIS SECTION SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY UNINTENDED RECIPIENTS OF ANY INFORMATION OR OTHER MATERIALS DISTRIBUTED BY IT THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THE CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THE TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS USED BY THE AGENT IS PROVIDED "AS IS" AND "AS AVAILABLE." NONE OF THE AGENT OR ANY OF ITS RELATED PARTIES WARRANTS THE ADEQUACY OF SUCH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH ANY COMMUNICATIONS OR ANY TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS. No Person entitled to indemnification under <u>clause (d)</u> of this section, nor the Borrower or any Subsidiary, shall have any liability for any special, punitive, indirect, exemplary or consequential damages (including any loss of profits, business or anticipated savings) relating to any Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Interim Facility Effective Date); <u>but</u> the foregoing shall not negate the Borrower's obligations with respect to Indemnified Liabilities. All amounts payable under this section shall be paid within fifteen (15) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail. The agreements in this section shall survive repayment of the Loans and all other amounts payable hereunder. Other than with respect to Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim, this section shall not apply with respect to any claims for Taxes which shall be governed exclusively by <u>Section 5.4</u> and, to the extent set forth therein, <u>Sections 2.10</u> and <u>3.5</u>. For the avoidance of doubt, the Borrower shall not be obligated under this section with respect to any allocated costs of in-house counsel.

13.6    <u>Successors and Assigns; Participations and Assignments</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Letter of Credit Issuer that issues any Letter of Credit and any Affiliate of any Lender that makes a Loan), except that (i) no Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section; <u>provided</u> that any such assignment must comply with any restrictions on assignments pursuant to the Restructuring Support Agreement. Nothing in this

116

Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Letter of Credit Issuer that issues any Letter of Credit and any Affiliate of any Lender that makes a Loan), Participants (to the extent provided in Section 13.6(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent, the Letter of Credit Issuer and the Lenders and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      (i) Subject to the conditions set forth in clause (b)(ii) below, any Lender may at any time assign to one or more assignees (other than an assignee that is not a bank, investment bank, insurance company, mutual fund or other institutional lender, as such terms are used in the Indentures) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including participations in L/C Obligations) at the time owing to it, it being understood that any New Money Lender may assign any of its New Money Loans, New Money Roll-Up Loans or Incremental Roll-Up Loans independently of all other Classes of Loans hereunder) with the prior written consent of:

(A)      the Borrower (such consent not to be unreasonably withheld, conditioned or delayed); but no consent of the Borrower shall be required if (x) an Event of Default has occurred and is continuing or (y) such assignments are to the other Lenders or Affiliates with respect to a Lender;

(B)      the Agent and, in the case of an assignment of New Money Loans or Commitments, each Letter of Credit Issuer (such consent not to be unreasonably withheld, conditioned or delayed); but no consent of the Agent or a Letter of Credit Issuer shall be required if such assignment is to a Person that is a Lender or an Affiliate of a Lender.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or Class of Loans, (1) the amount of the Commitment or Class of Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Agent) shall not be less than $5,000,000 and increments of $1,000,000 in excess thereof and (2) after giving effect to such assignment, the amount of the remaining Commitment or Class of Loans of the assigning Lender (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Agent) shall not be less than $5,000,000, in each case unless each of the Borrower, each Letter of Credit Issuer (in the case of New Money Loans), and the Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); but no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Lenders shall be

117

aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; but the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)      the assignee, if it shall not be a Lender, shall deliver to the Agent an Agent Questionnaire.

(iii)      Subject to acceptance and recording thereof pursuant to Section 13.6(b)(iv), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 3.5, 5.4 and 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.6(c).

(iv)      The Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest amounts) of the Loans and L/C Obligations and any payment made by the Letter of Credit Issuers under any Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Further, the Register shall contain the name and address of the Agent, the Lenders and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agent, the Letter of Credit Issuers and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Letter of Credit Issuers and, solely with respect to itself, each other Lender, at any reasonable time and from time to time upon reasonable prior notice.

118

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Agent Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in <u>Section 13.6(b)</u> (unless waived) and any written consent to such assignment required by <u>Section 13.6(b)</u>, the Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  The parties hereto agree and intend that the obligations under this Agreement shall be treated as being in "registered form" for the purposes of the Code (including Code Sections 163(f), 871(h)(2) and 881(c)(2)), and the Register and the Participant Register shall be maintained in accordance with such intention.

(c)

(i)     Any Lender may, without the consent of the Borrower, the Agent or any Letter of Credit Issuer, sell participations to one or more banks or other entities other than an Ineligible Person (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); <u>but</u> (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrower, the Agent, the Letter of Credit Issuer and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (D) any such participation must comply with any restrictions on participations pursuant to the Restructuring Support Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of any Credit Document; <u>but</u> such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (i) or (ii) of the proviso to <u>Section 13.1</u> that affects such Participant; <u>but</u> the Participant shall have no right to consent to any modification to the percentages specified in the definitions of the terms "Majority Lenders" or "Required Lenders". Subject to <u>Section 13.6(c)(ii)</u>, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.10</u>, <u>2.11</u>, <u>3.5</u> and <u>5.4</u> to the same extent as if it were a Lender (subject to the limitations and requirements of those Sections as though it were a Lender and had acquired its interest by assignment pursuant to <u>Section 13.6(b)</u>, including the requirements of <u>clauses (e)</u>, <u>(f)</u> and <u>(i)</u> of <u>Section 5.4</u>).  To the extent permitted by Requirements of Law, each Participant also shall be entitled to the benefits of <u>Section 13.8(a)</u> as though it were a Lender if such Participant agrees to be subject to <u>Section 13.8(a)</u> as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under <u>Section 2.10</u>, <u>2.11</u>, <u>3.5</u> or <u>5.4</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior

written consent (which consent shall not be unreasonably withheld); <u>but</u> the Participant shall be subject to the provisions in <u>Section 2.12</u> as if it were an assignee under <u>clauses (a)</u> and <u>(b)</u> of this section.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "<u>Participant Register</u>"). The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other Obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other Obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(d)     Any Lender may, without the consent of the Borrower, the Agent or the Letter of Credit Issuers at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender to a Federal Reserve Bank or any central bank having jurisdiction over such Lender, and this section shall not apply to any such pledge or assignment of a security interest; but no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Subject to <u>Section 13.16</u>, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "<u>Transferee</u>") and any prospective Transferee any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates before becoming a party to this Agreement.

(f)     The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

13.7     <u>Replacement of Lenders under Certain Circumstances</u>.

(a)     The Borrower shall be permitted to replace any Lender that (i) requests reimbursement for amounts owing pursuant to <u>Section 2.10</u>, <u>3.5</u> or <u>5.4</u>, (ii) is affected in the manner

120

described in Section 2.10(a)(iii). and as a result thereof any of the actions described in such Section is required to be taken, (iii) becomes a Defaulting Lender, (iv) does not consent to any waiver or amendment desired by the Borrower requiring the consent of all Lenders, all Lenders directly affected thereby or the Required Lenders (so long as the Majority Lenders have consented thereto), or (v) has failed to fund Loans, participations in Letters of Credit or has made a notification or public statement that it does not intend or expect to comply with its funding obligations hereunder, in each case as a result of its determination that a condition precedent to funding has not or cannot be satisfied pursuant to the definition of "Lender Default", in each case, with a replacement bank, lending institution or other financial institution, if (A) such replacement does not conflict with any Requirement of Law, (B) no Event of Default under Section 11.1 shall have occurred and be continuing at the time of such replacement, (C) the replacement bank or institution shall purchase, at par, all Loans and the Borrower shall pay all other amounts (other than any disputed amounts), pursuant to Section 2.10, 3.5 or 5.4, as the case may be owing to such replaced Lender before the date of replacement, (D) the replacement bank or institution shall be subject to the consent of the Agent, and the Letter of Credit Issuers (to the extent the consent of such Person would be required if an assignment were being made to such replacement bank or institution under Section 13.6(b)), (E) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6(b) (but the Borrower shall be obligated to pay the registration and processing fee referred to therein), and (F) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Agent or any other Lender shall have against the replaced Lender.

(b)    Notwithstanding anything herein to the contrary, each party hereto agrees that any assignment pursuant to the terms of this Section 13.7 may be effected pursuant to an Assignment and Acceptance executed by the Borrower, the Agent and the assignee and that the Lender making such assignment need not be a party thereto.

13.8    Adjustments; Set-off.

(a)    If any Lender (a "Benefited Lender") shall at any time receive any payment in respect of any principal of or interest on all or part of the Loans made by it, or the participations in Letters of Credit held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 11.5, or otherwise), in a greater proportion than such Benefited Lender is entitled to pursuant to the Credit Documents (pursuant to the payment priorities set forth in the last paragraph of Article XI) with respect to any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall (i) notify the Agent of such fact, and (ii) purchase for cash at face value from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably in accordance with the aggregate principal of and accrued interest on their respective Loans and other amounts owing them; but (A) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (B) the provisions of this paragraph shall not be construed to apply to (1) any payment made by any Debtor pursuant to and in accordance with the express terms of the Credit Documents, (2) any payment obtained by a

121

Lender as consideration for the assignment of or sale of a participation in any of its Loans, Commitments or participations in Drawings to any assignee or Participant or (3) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Margin in respect of Loans or Commitments of Lenders that have consented to any such extension.  Each Debtor consents to the foregoing and agrees, to the extent it may effectively do so under Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Debtor rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Debtor in the amount of such participation.

(b)     After the occurrence and during the continuance of an Event of Default, but subject to Article XI, in addition to any rights and remedies of the Lenders provided by Requirements of Law, each Lender, and each Affiliate of such Lender, shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Requirements of Law, upon any amount becoming due and payable by the Borrower under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, or such Affiliate of such Lender, or any branch or agency thereof to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower (and the Debtors, if applicable) and the Agent after any such set-off and application made by such Lender or such Affiliate of such Lender; but the failure to give such notice shall not affect the validity of such set-off and application.

13.9     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission, i.e.  a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Agent. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any  document to be signed in connection with this Agreement, any other Credit Document and the Transactions contemplated hereby shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that, in respect of documents to be signed by entities established within the European Union, the Electronic Signature qualifies as a "qualified electronic signature" within the meaning of the Regulation (EU) n°910/2014 of the European parliament and of the Council of 23 July 2014 on electronic identification and trust services for electronic transaction in the internal market as amended from time to time.

13.10     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or

ACTIVE 260175030

unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11    Integration.  The Credit Documents represent the agreement of the Debtors, the Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Debtors, the Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to in the Credit Documents.

13.12    GOVERNING LAW.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

13.13    Submission to Jurisdiction; Waivers.  Each party hereto hereby irrevocably and unconditionally:

(a)    AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE AGENT, ANY LENDER, THE LETTER OF CREDIT ISSUER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE BANKRUPTCY COURT AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF TEXAS SITTING IN HOUSTON, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT THE AGENT, ANY LENDER OR THE LETTER OF CREDIT ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST THE BORROWER OR ANY OTHER DEBTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION;

(b)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 at such other address of which the Agent shall have been notified pursuant to Section 13.2;

(c)　　agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Requirements of Law or shall limit the right to sue in any other jurisdiction;

(d)　　waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this section any special, exemplary, punitive or consequential damages; and

(e)　　agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.14　<u>Acknowledgments</u>.  Each Debtor hereby acknowledges that:

(a)　　it has been advised by counsel in the negotiation, execution and delivery of the Credit Documents;

(b)　　(i) the DIP Facility and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification of any Credit Document) are an arm's-length commercial transaction between the Debtors, on the one hand, and the Agent and the Lenders, on the other hand, and the Debtors are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the Transactions (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to any Transaction, each of the Agent and the Lenders is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any Debtor or any of their respective Affiliates, equity holders, creditors or employees or any other Person; (iii) neither the Agent nor any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of any Debtor with respect to any Transaction or the process leading thereto, including with respect to any amendment, waiver or other modification of any Credit Document (irrespective of whether the Agent or any Lender has advised or is currently advising any Debtor or their respective Affiliates on other matters) and none of the Agent or any Lender has any obligation to any Debtor or their respective Affiliates with respect to the Transactions, in each case, except those obligations expressly set forth in the Credit Documents; (iv) the Debtors and their respective Affiliates will not assert any claim based on alleged breach of fiduciary duty; (v) the Agent and its Affiliates and each Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and none of the Agent or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (vi) neither the Agent nor any Lender has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any Transaction (including any amendment, waiver or other modification of any Credit Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c)      no joint venture is created by the Credit Documents or otherwise exists by virtue of the Transactions among the Lenders or among the Borrower, on the one hand, and any Lender, on the other hand.

13.15  <u>WAIVERS OF JURY TRIAL</u>.   THE BORROWER, THE AGENT, EACH LETTER OF CREDIT ISSUER AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO ANY CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16  <u>Confidentiality</u>.  The Agent and each Lender shall hold all information furnished by or on behalf of the Borrower or any Subsidiary other than any such information that is available to such Person on a nonconfidential basis before disclosure by the Borrower or any such Subsidiary ("<u>Confidential Information</u>"), confidential in accordance with its customary procedure for handling confidential information of this nature and in any event may make disclosure (a) to such Person's Affiliates and the directors, officers, employees, attorneys, professional advisors, independent auditors, trustees and agents of such Person or such Person's Affiliates, in each case who need to know such information in connection with the administration of the Credit Documents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information, are instructed to keep such Confidential Information confidential and agree to keep such Confidential Information confidential on the same terms as provided herein), (b) as required or requested by any Governmental Authority, self-regulatory agency or representative thereof purporting (on a reasonable basis, as determined by such Person) to have jurisdiction over such Person or pursuant to legal process or applicable Requirements of Law, (c) to any other party hereto, (d) in connection with the exercise of any remedies under any Credit Document or any action or proceeding relating to any Credit Document or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (y) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder or to any credit insurance provider related to the Borrower and its Obligations, (f) with the consent of the Borrower, and (g) to the extent such Confidential Information (x) becomes publicly available other than as a result of a breach of this section, or (y) becomes available to any Lender, the Agent or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower or any Subsidiary thereof (unless such Lender, such Agent or such Affiliate has actual knowledge that such source owes an obligation of confidence to the Borrower or any Subsidiary thereof with respect to such Confidential Information); but unless specifically prohibited by applicable Requirements of Law, each Lender and the Agent shall notify the Borrower (without any liability for a failure to so notify the Borrower) of any request made to such Person for Confidential Information by any Governmental Authority, self-regulatory agency or representative thereof or pursuant to legal process or applicable Requirements of Law (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency) before disclosure of such Confidential Information; <u>provided</u>, <u>further</u>, that in no event shall any Lender or the Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary; <u>provided</u>, <u>further</u>, that, at any time after the Borrower has filed this Agreement with

125

the SEC, the Agent and the Lenders may disclose the existence of this Agreement and information about the terms of this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agent and the Lenders in connection with the administration of the Credit Documents and the Commitments.

13.17   <u>Release of Collateral and Guarantee Obligations; Disavowal of Liens</u>.

(a)     The Secured Parties hereby irrevocably agree that the Liens granted to the Agent by the Debtors on any Collateral shall be automatically released (i) in full, as set forth in <u>clauses (b)</u> or <u>(c)</u> below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than another Debtor, to the extent such Disposition is made in compliance with the terms of this Agreement (and the Agent may rely conclusively on a certificate to that effect provided to it by any Debtor upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Debtor, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Majority Lenders (or such other percentage of the Lenders whose consent may be required in accordance with <u>Section 13.1</u>), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Obligations Guarantee and (vi) as required by the Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Agent pursuant to the Security Documents.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Debtors in respect of) all interests retained by the Debtors, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral to the extent required by the applicable Credit Documents, except to the extent otherwise released in accordance with the provisions of the Credit Documents.  Additionally, the Secured Parties hereby irrevocably agree that any Guarantor shall be automatically released from the Obligations Guarantee in respect of the DIP Facility upon consummation of any transaction permitted hereunder resulting in such Guarantor no longer being a Subsidiary of the Borrower. Upon any such release, any representation, warranty or covenant contained in any Credit Document relating to any such Collateral or Guarantor shall no longer be deemed to be repeated.

(b)     Notwithstanding anything to the contrary contained in any Credit Document, upon the Facility Termination, all security interests and Liens in all Collateral and all obligations under all the Credit Documents shall be automatically released and discharged as contemplated by the Intercreditor Agreement, and the Agent shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required, advisable or reasonably requested by the Borrower to evidence or otherwise more fully effect the foregoing, <u>but</u> such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)     If any Lender determines, acting reasonably, that any applicable law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such

126

Lender to hold or benefit from a Lien over real property pursuant to any law of the United States or any State thereof, such Lender may notify the Agent and disclaim any benefit of such security interest to the extent of such illegality; but such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other Lender.

13.18   <u>USA PATRIOT Act</u>.  The Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L.  107-56 (signed into law October 26, 2001)) (the "<u>PATRIOT Act</u>"), it is required to obtain, verify and record information that identifies each Debtor, which information includes the name and address of each Debtor and other information that will allow the Agent and such Lender to identify each Debtor in accordance with the PATRIOT Act.

13.19   <u>Payments Set Aside</u>.  To the extent that any payment made by or on behalf of the Borrower is made to the Agent or any Lender, or the Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its applicable share of any amount so recovered from or repaid by the Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20   <u>Reinstatement</u>.  This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any monetary Obligation is rescinded or must otherwise be restored or returned by the Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

13.21   <u>Disposition of Proceeds</u>.  If executed and delivered, any Security Document may contain an assignment by the applicable Debtor unto and in favor of the Agent for the benefit of the Secured Parties of all of such Debtor's interest in and to its as-extracted collateral in the form of production and all proceeds attributable thereto which may be produced from or allocated to the Collateral covered thereby.  If executed and delivered, the Security Documents may further provide in general for the application of such proceeds to the satisfaction of the Obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Documents, unless an Event of Default is continuing, (a) the Agent and the Secured Parties agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Agent or any other Secured Party, and all such proceeds shall be permitted to be paid to the Borrower and its Subsidiaries, and (b) the Secured

127

Parties hereby authorize the Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

13.22    Collateral Matters; Hedge Agreements.  The benefit of the Security Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available on a *pro rata* basis to  any Hedge Bank under any Hedge Agreement giving rise to Lender Hedging Obligations, in each case, after giving effect to all netting arrangements relating to such Hedge Agreements; but, with respect to any Hedge Agreement that remains secured after the Hedge Bank thereto is no longer a Lender or an Affiliate of a Lender, the provisions of Article XII shall also continue to apply to such Hedge Bank in consideration of its benefits hereunder and each such Hedge Bank shall, if requested by the Agent, promptly execute and deliver to the Agent all such other documents, agreements and instruments reasonably requested by the Agent to evidence the continued applicability of the provisions of Article XII. No Person shall have any voting rights under any Credit Document solely as a result of the existence of Lender Hedging Obligations.

13.23    Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

13.24    Joinder of Subsidiaries.  Upon the execution and delivery by a Subsidiary and the Agent of a Joinder Agreement, and delivery to the Agent of such other security agreements, documents and opinions with respect to such Subsidiary as may reasonably be requested by the Agent, such Subsidiary shall become a Guarantor hereunder, with the same force and effect as if originally named as such herein, and without the consent of any other party hereto.  The rights and

128

obligations of each Credit Party hereunder and under the other Credit Documents shall remain in full force and effect notwithstanding the addition of any Subsidiary as a party to this Agreement.

13.25   <u>Acknowledgment Regarding Any Supported QFCs</u>.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for any Hedge Agreement or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)   In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)   As used in this <u>Section 13.25</u>, the following terms have the following meanings:

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"<u>Covered Entity</u>" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Default Right</u>" shall have the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" shall have the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

# ARTICLE XIV
## OBLIGATIONS GUARANTEE

14.1    Guarantee.  Each Guarantor hereby agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to the Agent, the Lenders, the Letter of Credit Issuers and the other Secured Parties, the prompt payment and performance when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all reasonable and documented costs and expenses including, without limitation, all court costs and out-of-pocket attorneys' and paralegals' fees and expenses paid or incurred by the Agent, the Letter of Credit Issuers and the Lenders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, being collectively called the "Guaranteed Obligations"); provided, that the guarantee of any Guarantor will not apply to any Lender Hedging Obligation if and to the extent that it would be unlawful for such Guarantor to guarantee such Lender Hedging Obligation under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason (and after giving effect to the guarantees by the other Guarantors of the Obligations of such Guarantor) to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor becomes effective with respect to such Lender Hedging Obligation.  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Obligations Guarantee apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

14.2    Guarantee of Payment.  This Obligations Guarantee is a guarantee of payment and not of collection.  Each Guarantor waives any right to require the Agent, any Letter of Credit Issuer, any Lender or any other Secured Party to sue the Borrower, any other Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or to enforce its rights against any collateral securing all or any part of the Guaranteed Obligations.

14.3    No Discharge or Diminishment of Obligations Guarantee.

(a)    Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or its assets

130

or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other right which any Guarantor may have at any time against any Obligated Party, the Agent, any Letter of Credit Issuer, any Lender, or any other Person, whether in connection herewith or in any unrelated transaction.

(b)     The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Agent, any Letter of Credit Issuer, any Lender or any other Secured Party to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Agent, any Letter of Credit Issuer, any Lender or any other Secured Party with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

14.4     <u>Defenses Waived</u>.   To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any other Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any other Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person.  Each Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Obligations Guarantee except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law,

131

to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

14.5    Rights of Subrogation.  No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any Collateral, until the Borrower and the Guarantors have fully performed all their obligations to the Agent, the Letter of Credit Issuers, the Lenders and the other Secured Parties.

14.6    Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Obligations Guarantee with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Agent, the Letter of Credit Issuers, the Lenders or the other Secured Parties are in possession of this Obligations Guarantee.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Agent.

14.7    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Obligations Guarantee, and agrees that none of the Agent, any Letter of Credit Issuer or any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

14.8    [Reserved].

14.9    Maximum Liability.  The provisions of this Obligations Guarantee are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Obligations Guarantee would otherwise be held or determined to be avoidable, invalid or unenforceable on account of such Guarantor's liability under this Obligations Guarantee, then, notwithstanding any other provision of this Obligations Guarantee to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability").  This Section with respect to the Maximum Liability of Guarantor is intended solely to preserve the rights of the Lenders to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other Person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Obligations Guarantee or affecting the rights and remedies

132

of the Lenders hereunder; <u>provided</u> that nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

14.10   <u>Contribution</u>.  In the event any Guarantor (a "<u>Paying Guarantor</u>") shall make any payment or payments under this Obligations Guarantee or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Obligations Guarantee, each other Guarantor (each a "<u>Non-Paying Guarantor</u>") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's Applicable Share of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Section, each Non-Paying Guarantor's "<u>Applicable Share</u>" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (a) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrower after the Interim Facility Effective Date (whether by loan, capital infusion or by other means) to (b) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the Interim Facility Effective Date (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Obligations Guarantee from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of the Agent, the Letter of Credit Issuers, the Lenders and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

14.11   <u>Representations and Warranties</u>.  Each Guarantor hereby represents and warrants to the Agent and each Lender that:

(a)   the representations and warranties set forth in <u>Article VIII</u> as they relate to such Guarantor or to the Credit Documents to which such Guarantor is a party are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects after giving effect to such qualification), *provided* that each reference in each such representation and warranty to the Borrower's knowledge shall, for the purposes of this clause, be deemed to be a reference to such Guarantor's knowledge.

(b)   on the date hereof, the correct legal name of such Guarantor, all names and trade names that such Guarantor has used in the last five (5) years, such Guarantor's jurisdiction of organization and each jurisdiction of organization of such Guarantor over the last five (5) years, organizational number, tax payor identification number, and the location(s) of such Guarantor's chief executive office or sole place of business over the last five years are specified on <u>Schedule 14.11</u>.

133

(c)     the Borrower is a member of an affiliated group of companies that includes each Guarantor, and the Borrower and the other Guarantors are engaged in related businesses. Each Guarantor agrees that it shall benefit, directly or indirectly, from the transactions contemplated by this Agreement; and it has determined that this Obligations Guarantee is necessary and convenient to the conduct, promotion and attainment of the business of such Guarantor and the Borrower.

14.12   Subordination of Indebtedness.

(a)     Subordination of All Guarantor Claims. As used herein, the term "Guarantor Claims" shall mean all debts and obligations of the Borrower or any other Guarantor to the Borrower or any other Guarantor, whether such debts and obligations now exist or are hereafter incurred or arise, or whether the obligation of the debtor thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or obligations be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or obligations may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by. After and during the continuation of an Event of Default, no Guarantor shall receive or collect, directly or indirectly, from any other obligor in respect thereof any amount upon the Guarantor Claims.

(b)     Claims in Bankruptcy. In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving any Guarantor, the Agent on behalf of the Agent and the Secured Parties shall have the right to prove their claim in any proceeding, so as to establish their rights hereunder and receive directly from the receiver, trustee or other court custodian, dividends and payments which would otherwise be payable upon Guarantor Claims. Each Guarantor hereby assigns such dividends and payments to the Agent for the benefit of the Agent and the Secured Parties for application against the Obligations as provided under Article XI hereof. Should any Agent or Secured Party receive, for application upon the Guaranteed Obligations, any such dividend or payment which is otherwise payable to any Guarantor, and which, as between such Guarantors, shall constitute a credit upon the Guarantor Claims, then upon payment in full in cash of the Obligations, the expiration of all Letters of Credit outstanding under the Credit Agreement and the termination of all of the Commitments, the intended recipient shall become subrogated to the rights of the Agent and the Secured Parties to the extent that such payments to the Agent and the Secured Parties on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if the Agent and the Secured Parties had not received dividends or payments upon the Guarantor Claims.

(c)     Payments Held in Trust.  In the event that, notwithstanding clauses (a) and (b) above, any Guarantor should receive any funds, payments, claims or distributions which is prohibited by such clauses, then it agrees: (i) to hold in trust for the Agent and the Secured Parties an amount equal to the amount of all funds, payments, claims or distributions so received, and (ii) that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions except to pay them promptly to the Agent, for the benefit of the Secured Parties; and each Guarantor covenants promptly to pay the same to the Agent.

(d)     Liens Subordinate. Each Guarantor agrees that, until the Obligations are paid in full in cash, no Letter of Credit shall be outstanding and the termination of all of the Commitments, any Liens securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any Liens securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of such Guarantor, the Agent or any Secured Party presently exist or are hereafter created or attach.  Without the prior written consent of the Agent, no Guarantor, during the period in which any of the Obligations are outstanding or the Commitments are in effect, shall (i) exercise or enforce any creditor's right it may have against any debtor in respect of the Guarantor Claims, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceeding (judicial or otherwise, including without limitation the commencement of or joinder in any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any Lien securing payment of the Guarantor Claims held by it.

(e)     Notation of Records.  Upon the reasonable request of the Agent, all promissory notes and all accounts receivable ledgers or other evidence of the Guarantor Claims accepted by or held by any Guarantor shall contain a specific written notice thereon that the indebtedness evidenced thereby is subordinated under the terms of this Obligations Guarantee.

14.13   Other Terms.

(a)     Notices. All notices and other communications to any Guarantor shall be given in the manner and subject to the terms of Section 13.2; provided that each Guarantor acknowledges and agrees that any such notice, request or demand to or upon any Guarantor by the Agent, the Lenders or any other Secured Party may be addressed to the Borrower and any notice provided to the Borrower hereunder shall constitute notice to each Guarantor on the date received by the Borrower in accordance with Section 13.2.

(b)     Indemnities, Etc.

(i)      [Reserved].

(ii)     Each Guarantor agrees to pay, and to save the Agent and the Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Obligations Guarantee to the extent the Borrower would be required to do so pursuant to Section 13.5 hereof. Notwithstanding the foregoing, the preceding sentence shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Acknowledgments. Each Guarantor hereby acknowledges that:

(i)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement, including the Obligations Guarantee and the other Credit Documents to which it is a party;

135

(ii)      neither the Agent nor any Secured Party has any fiduciary relationship with or duty to any Guarantor arising out of or in connection with this Agreement or any of the other Credit Documents, and the relationship between the Guarantors, on the one hand, and the Agent and Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(iii)      no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Guarantors and the Secured Parties.

(iv)      each Guarantor specifically agrees that it has a duty to read this Agreement, the Security Documents and the other Credit Documents and agrees that it is charged with notice and knowledge of the terms of this Agreement, the Security Documents and the other Credit Documents; that it has in fact read this Agreement, the Security Documents and the other Credit Documents and is fully informed and has full notice and knowledge of the terms, conditions and effects thereof; that it has been represented by independent legal counsel of its choice throughout the negotiations preceding its entry of this Agreement and the Security Documents; and has received the advice of its attorney in entering into this Agreement and the Security Documents; and that it recognizes that certain of the terms of this Agreement and the Security Documents result in one party assuming the liability inherent in some aspects of the transaction and relieving the other party of its responsibility for such liability. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE SECURITY DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

**[SIGNATURES BEGIN NEXT PAGE]**

ACTIVE 260175030

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER**:

**CHESAPEAKE ENERGY CORPORATION**,
as a debtor and debtor-in-possession

By: _____
Name: Domenic J. Dell'Osso, Jr.
Title:   Executive Vice President and Chief Financial Officer

[Signature Page to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement]

**GUARANTORS**:

**CHESAPEAKE AEZ EXPLORATION, L.L.C.**
**CHESAPEAKE APPALACHIA, L.L.C.**
**CHESAPEAKE E&P HOLDING, L.L.C.**
**CHESAPEAKE ENERGY LOUISIANA, LLC**
**CHESAPEAKE ENERGY MARKETING, L.L.C.**
**CHESAPEAKE EXPLORATION, L.L.C.**
**CHESAPEAKE LAND DEVELOPMENT COMPANY, L.L.C.**
**CHESAPEAKE MIDSTREAM DEVELOPMENT, L.L.C.**
**CHESAPEAKE NG VENTURES CORPORATION**
**CHESAPEAKE OPERATING, L.L.C.,** on behalf of itself and as general partner of
       **CHESAPEAKE LOUISIANA, L.P.**
**CHESAPEAKE PLAINS, LLC**
**CHESAPEAKE ROYALTY, L.L.C.**
**CHESAPEAKE VRT, L.L.C.**
**CHESAPEAKE-CLEMENTS ACQUISITION, L.L.C.**
**CHK ENERGY HOLDINGS, INC.**
**CHK NGV LEASING COMPANY, L.L.C.**
**CHK UTICA, L.L.C.**
**COMPASS MANUFACTURING, L.L.C.**
**EMLP, L.L.C.,** on behalf of itself and as the general partner of
       **EMPRESS LOUISIANA PROPERTIES, L.P.**
**EMPRESS, L.L.C.**
**GSF, L.L.C.**
**MC LOUISIANA MINERALS, L.L.C.**
**MC MINERAL COMPANY, L.L.C.**
**MIDCON COMPRESSION, L.L.C.**
**NOMAC SERVICES, L.L.C.**
**NORTHERN MICHIGAN EXPLORATION COMPANY, L.L.C.**
**SPARKS DRIVE SWD, INC.**
**WINTER MOON ENERGY CORPORATION**
**BRAZOS VALLEY LONGHORN FINANCE CORP.**
**BRAZOS VALLEY LONGHORN, L.L.C.**
**BURLESON SAND LLC**
**BURLESON WATER RESOURCES, LLC**
**ESQUISTO RESOURCES II, LLC**
**PETROMAX E&P BURLESON, LLC**
**WHE ACQCO., LLC**
**WHR EAGLE FORD LLC**
**WILDHORSE RESOURCES II, LLC**
**WILDHORSE RESOURCES MANAGEMENT COMPANY, LLC,** each as a debtor and debtor-in-possession

By:
Name: Domenic J. Dell'Osso, Jr.
Title:   Executive Vice President and Chief Financial Officer

[Signature Page to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement]

**MUFG UNION BANK, NA.**,
as Agent, New Money Lender and Roll-Up Lender


By: _____
   Name:
   Title:

**[OTHERS]**,
as Lender


By: _____
   Name:
   Title:

[Signature Page to Senior Secured Super-Priority Debtor-in-Possession Credit Agreement]

**Exhibit B to Final Order**

**Revised Initial Approved Budget**

**CHESAPEAKE ENERGY CORPORATION**
**DIP Budget as of June 28, 2020**

($ in millions)

| Week Number: | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Weeks 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Week Ended: | | 7/3/2020 | 7/10/2020 | 7/17/2020 | 7/24/2020 | 7/31/2020 | 8/7/2020 | 8/14/2020 | 8/21/2020 | 8/28/2020 | 9/4/2020 | 9/11/2020 | 9/18/2020 | 9/25/2020 | Total |
| Total Receipts | $ | 19.7 $ | 33.3 $ | 5.9 $ | 105.9 $ | 118.7 $ | 29.4 $ | 5.0 $ | 163.9 $ | 146.1 $ | 20.7 $ | 31.6 $ | 137.2 $ | 185.9 | $ 1,003.3 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| LOE & Capital Expenditures | $ | (55.0) $ | (53.9) $ | (48.0) $ | (41.8) $ | (42.4) $ | (32.1) $ | (32.0) $ | (39.6) $ | (20.6) $ | (20.5) $ | (26.7) $ | (26.7) $ | (26.7) | $ (466.0) |
| Other Operating Disbursements | | (56.6) | (80.3) | (50.5) | (59.1) | (72.8) | (35.5) | (69.8) | (50.6) | (62.6) | (50.6) | (20.9) | (80.1) | (50.4) | (739.6) |
| Total Operating Disbursements | $ | (111.6) $ | (134.1) $ | (98.4) $ | (100.9) $ | (115.2) $ | (67.6) $ | (101.7) $ | (90.2) $ | (83.1) $ | (71.1) $ | (47.6) $ | (106.8) $ | (77.2) | $ (1,205.6) |
| **Operating Cash Flow** | $ | (91.9) $ | (100.8) $ | (92.5) $ | 5.0 $ | 3.5 $ | (38.2) $ | (96.8) $ | 73.7 $ | 62.9 $ | (50.4) $ | (16.0) $ | 30.3 $ | 108.7 | $ (202.3) |
| **Restructuring Related Disbursements** | | | | | | | | | | | | | | | |
| Debtors' Restructuring Professional Fees | $ | (0.3) $ | (0.5) $ | (6.2) $ | - $ | - $ | (0.4) $ | (1.6) $ | - $ | - $ | (0.3) $ | (0.7) $ | (4.7) $ | - | $ (14.6) |
| Non-Debtors' Restructuring Professional Fees | | - | - | (1.2) | - | (0.5) | - | (4.4) | - | - | - | - | (5.7) | - | (11.8) |
| Other Restructuring Disbursements | | (10.0) | (2.0) | - | - | (7.9) | (10.4) | - | - | (47.5) | (10.6) | - | - | - | (88.4) |
| Total Restructuring Disbursements | $ | (10.3) $ | (2.5) $ | (7.4) $ | - $ | (8.4) $ | (10.8) $ | (6.0) $ | - $ | (47.5) $ | (10.8) $ | (0.7) $ | (10.4) $ | - | $ (114.8) |
| **NET CASH FLOW** | $ | (102.2) $ | (103.3) $ | (100.0) $ | 5.0 $ | (4.9) $ | (49.0) $ | (102.7) $ | 73.7 $ | 15.4 $ | (61.2) $ | (16.7) $ | 19.9 $ | 108.7 | $ (317.1) |
| **Cash Balance** | | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | $ | 20.0 $ | 10.9 $ | 10.6 $ | 10.6 $ | 10.7 $ | 10.8 $ | 10.8 $ | 10.1 $ | 10.8 $ | 10.2 $ | 10.0 $ | 10.3 $ | 10.3 | $ 20.0 |
| Net Cash Flow | | (102.2) | (103.3) | (100.0) | 5.0 | (4.9) | (49.0) | (102.7) | 73.7 | 15.4 | (61.2) | (16.7) | 19.9 | 108.7 | (317.1) |
| DIP Draw / (Paydown) | | 93.0 | 103.0 | 100.0 | (5.0) | 5.0 | 49.0 | 102.0 | (73.0) | (16.0) | 61.0 | 17.0 | (20.0) | (108.0) | 308.0 |
| **Ending Cash Balance** | $ | 10.9 $ | 10.6 $ | 10.6 $ | 10.7 $ | 10.8 $ | 10.8 $ | 10.1 $ | 10.8 $ | 10.2 $ | 10.0 $ | 10.3 $ | 10.3 $ | 11.0 | $ 11.0 |
| **DIP Financing** | | | | | | | | | | | | | | | |
| **Beginning Revolving DIP Balance** | $ | - $ | 93.0 $ | 196.0 $ | 296.0 $ | 291.0 $ | 296.0 $ | 345.0 $ | 447.0 $ | 374.0 $ | 358.0 $ | 419.0 $ | 436.0 $ | 416.0 | $ - |
| DIP Draw / (Paydown) | | 93.0 | 103.0 | 100.0 | (5.0) | 5.0 | 49.0 | 102.0 | (73.0) | (16.0) | 61.0 | 17.0 | (20.0) | (108.0) | 308.0 |
| **Ending Revolving DIP Balance** | $ | 93.0 $ | 196.0 $ | 296.0 $ | 291.0 $ | 296.0 $ | 345.0 $ | 447.0 $ | 374.0 $ | 358.0 $ | 419.0 $ | 436.0 $ | 416.0 $ | 308.0 | $ 308.0 |
| LCs Issued Against the DIP Commitment | | 36.2 | 36.4 | 36.6 | 36.6 | 37.7 | 37.9 | 38.7 | 38.9 | 38.9 | 39.0 | 39.1 | 39.2 | 39.8 | 39.8 |
| Roll-Up DIP Balance | | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 | 1,179.0 |
| **Total DIP Facility Balance** | $ | 1,308.2 $ | 1,411.4 $ | 1,511.5 $ | 1,506.6 $ | 1,512.7 $ | 1,561.9 $ | 1,664.7 $ | 1,591.9 $ | 1,575.9 $ | 1,637.0 $ | 1,654.1 $ | 1,634.2 $ | 1,526.8 | $ 1,526.8 |
| DIP Availability | | 795.8 | 692.6 | 592.4 | 597.4 | 591.3 | 542.1 | 439.3 | 512.1 | 528.1 | 467.0 | 449.9 | 469.8 | 577.2 | 577.2 |
| **Total Liquidity** | $ | 806.6 $ | 703.2 $ | 603.1 $ | 608.1 $ | 602.1 $ | 552.9 $ | 449.4 $ | 522.9 $ | 538.3 $ | 477.0 $ | 460.2 $ | 480.0 $ | 588.1 | $ 588.1 |