**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case no. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION BY THE OFFICIAL COMMITTEE OF ROYALTY OWNERS TO**
**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER DISBANDING**
**THE ROYALTY COMMITTEE**

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE.

COMES NOW the Official Committee of Royalty Owners (the "Royalty Committee")

which files this Objection (the "Objection") opposing the relief requested by the debtors,

Chesapeake Energy Corporation and its affiliated debtors (collectively "Chesapeake" or the

"Debtors"), in the *Debtors' Emergency Motion for an Entry of an Order Disbanding the Royalty*

*Committee* [Docket No. 567] (the "Motion").

## I.   Executive Summary

1.      The United States Trustee ("U.S. Trustee") is granted the authority in section

1102(a)(1) to appoint additional committees if the U.S. Trustee deems this to be appropriate.

Judicial review of such decisions is very narrow in scope and the judgment of the U.S. Trustee

in appointing an additional committee (like the Royalty Committee) may only be set aside based

on a showing that the appointment of the Royalty Committee was an arbitrary and capricious

exercise of the judgment of the U.S. Trustee.  As demonstrated below, the royalty owners

(collectively, the "Royalty Owners") hold interests both distinct from, and in many cases adverse

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake
Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100
North Western Avenue, Oklahoma City, Oklahoma 73118.

to, Chesapeake's unsecured creditors.  As a result, the Royalty Owners' interests are not adequately represented by the official committee of unsecured creditors (the "Creditors Committee").  Instead, the Royalty Committee is necessary to ensure that Chesapeake's hundreds of thousands of Royalty Owners receive proper notice of the bankruptcy proceedings and have a meaningful opportunity to participate to preserve their rights.  In this regard, the Royalty Committee intends to participate on behalf of Royalty Owners in the plan process in an effort to help efficiently deal with Royalty Claims, preserve Royalty Owners' lien rights and administrative claims, and/or negotiate with the Debtors for a claims resolution process to more efficiently deal with Royalty Owner claims to minimize cost to Royalty Owners and the Estates. Under the facts and circumstances of this case, the action of the U.S. Trustee in creating the Royalty Committee was well within the U.S. Trustee's judgment and was not arbitrary and capricious in any way.

2.      For example, at the Debtors' meeting of creditors pursuant to section 341 of the Bankruptcy Code, a number of Royalty Owners asked questions showing confusion with the bankruptcy process.  Several stated they had not received any notice of the bankruptcy case from the Debtors and only learned of the proceedings from others.  After the United States Trustee asked questions, individual Royalty Owners' asked questions of the Debtors. The Debtors and their representatives never mentioned to the Royalty Owners that an Official Committee of Royalty Owners had been appointed, but instead initially referred them to a phone line to call. After being informed by some Royalty Owners that they could not get information from that line, the Debtors' counsel provided a phone number and e-mail for counsel.  At one point, a Royalty Owner asked if Royalty Owners needed to file a proof of claim and someone from the Debtors responded "No."  When proposed Counsel for the Royalty Committee had an opportunity to speak, she informed the Royalty Owners of the existence of the Royalty Committee and advised that whether they needed to file a proof of claim would depend upon their individual circumstances.  The Debtors' 341 meeting illustrates the need for a Royalty

Committee to ensure Royalty Owners receive proper notice and correct information regarding the steps they need to take to protect their rights in the Debtors' bankruptcy cases.

3.      The Southern District of Texas has been home to numerous sophisticated oil and gas company bankruptcies in the last few years. Yet, Chesapeake is the only on in which the U.S. Trustee appointed a Royalty Committee. The reason is explained by Chesapeake's pervasive, decades-long practice of underpaying and ill-treating its massive number of Royalty Owners. These harmful activities alleged against Chesapeake do not exist at to the other oil companies and demonstrates the diligence and care taken by the US Trustee's office in appointing this Royalty Committee.

## II.      Preliminary Statement

4.      The largest asset of the Debtors' bankruptcy estate (by far) is the proved developed and proved undeveloped acreage leased to Chesapeake by Royalty Owners throughout the country.  This includes substantial acreage in Texas, Oklahoma, Wyoming, Louisiana and Pennsylvania.  These Royalty Owners include large financial institutions, sophisticated family trusts, large and small ranch or farm families, churches, non-profit organizations, and thousands of smaller lessors with mineral acreage leased to Chesapeake. The Royalty Committee was formed by the U.S. Trustee to protect the interests of all Royalty Owners in Chesapeake's bankruptcy proceedings.

5.      In addition to the Royalty Owners' interest in receiving accurate and ongoing royalty payments pursuant to the terms of their respective oil and gas leases with Chesapeake, a large number of Royalty Owners assert prepetition claims against Chesapeake based on its decades-long business practices involving the failure to properly pay the royalties due to Royalty Owners and failure to fully and continuously develop their oil and gas leases as required by the terms of their leases or applicable state law.  Indeed, the numerous lawsuits resulting from Chesapeake's widespread underpayment and nonpayment of its Royalty Owners were material enough to be included in its filings with the Securities and Exchange Commission.

Excerpts from Chesapeake's Form 10-K for 2019 and Chesapeake's 10-Q for the first quarter of 2020 discussing these lawsuits are included in the attached **Exhibit A**.

6.      The following sentence, which appears in substantially the same form in both the 2019 10-K and the 10-Q for the first quarter of 2020, concisely summarizes the wrongful business practices which form the general basis of the underpayment and nonpayment claims by the Royalty Owners against Chesapeake:

> The lawsuits against us allege, among other things, that we used below-market prices, made improper deductions, used improper measurement techniques, entered into arrangements with affiliates that resulted in underpayment of royalties in connection with the production and sale of natural gas and NGL and similar theories.

7.      As indicated by Chesapeake's SEC filings, there are numerous lawsuits pending against Chesapeake which involve thousands of Royalty Owners seeking hundreds of millions of dollars in damages based on the underpayment of royalties and, in some instances, asserting claims that the mineral acreage under the leases should have been released by Chesapeake. A list of the known lawsuits is attached as **Exhibit B** which reflects lawsuits pending in Texas, Oklahoma, Wyoming, Ohio and Pennsylvania.  This reflects 20 lawsuits including over 1,000 individual plaintiffs in addition to four (4) class actions.  In addition, the Commonwealth of Pennsylvania has commenced an enforcement action against Chesapeake based on alleged deceptive leasing practices and underpayment of royalties.

8.      The Royalty Owners had no opportunity to participate in the formation of the Creditors Committee as none were included in Chesapeake's list of the 50 largest creditors. The list includes, as number 46, a creditor with a claim of $745,482.  Although many of the Royalty Owners assert much larger claims than this, they were not included in the list.  The last four (4) creditors reflected on the 50 largest list all hold disputed and unliquidated claims, so that was no bar to including Royalty Owners on the list.  Indeed, based on Chesapeake's list of the largest 50 creditors, when the U.S. Trustee's counsel was contacted regarding the formation of

a committee of royalty owners, he had no knowledge that the Royalty Owners even existed as a constituency in these bankruptcy cases.

9.      In the Motion, Chesapeake seeks the extraordinary relief of an order disbanding the Royalty Committee, leaving the interests of hundreds of thousands of Royalty Owners without any representation in this case.  Chesapeake asserts several reasons why it believes its Royalty Owners should not be entitled to a separate Royalty Committee, none of which have merit.  For example, Chesapeake erroneously contends that the interests of Royalty Owners are adequately represented by the Creditors Committee.  As will be discussed in greater detail below, the Royalty Owners have interests distinct from, and in many ways adverse to, the unsecured creditors represented by the Creditors Committee.  However, the Motion misses the mark as it fails to offer any reason why the U.S. Trustee's decision should be considered arbitrary and capricious.

### III.      <u>The Applicable Legal Standard to Disband the Royalty Committee</u>

**A.      Standard of Review**

10.      Disbanding a committee appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code is an extraordinary form of relief.  Under section 1102(a)(1), the U.S. Trustee may appoint such additional committees of creditors "as the United States trustee deems appropriate."  Not surprisingly, great deference is given to the U.S. Trustee's decision that it is appropriate under the circumstances to form an additional committee.  Chesapeake must demonstrate that the U.S. Trustee's decision to appoint the Royalty Committee was arbitrary and capricious.

11.      There is no controlling Fifth Circuit precedent on the standard for judicial review of a U.S. Trustee's decision to appoint a committee under section 1102(a)(1) of the Bankruptcy Code.  A number of courts in other circuits have held that a bankruptcy court may review such a decision for abuse of discretion, and the court will uphold the U.S. Trustee's decision regarding committee appointment unless the court concludes that the decision was "arbitrary and

capricious." *See, e.g., Bodenstein v. Lentz (In re Mercury Fin. Co.)*, 240 B.R. 270, 275 (N.D. Ill.

1999); *In re JNL Funding Corp.*, 438 B.R. 356, 360 (Bankr. E.D.N.Y. 2010); *In re Barney's, Inc.*,

197 B.R. 431, 439 (Bankr. S.D.N.Y. 1996); *see also In re Columbia Gas Sys.*, 133 B.R. 174,

175 (Bankr. D. Del. 1991) ("[A] U.S. Trustee's refusal to appoint a creditor [to a committee is]

subject to the deferential abuse of discretion standard") (citing *In re Gates Eng'g Co.*, 104 B.R.

653, 655 (Bankr. D. Del. 1989)). The authority to review such a decision derives from the court's

inherent power and from section 105(a) of the Bankruptcy Code. *JNL*, 438 B.R. at 360.[2]

12.     In 1986, Congress amended section 1102 of the Bankruptcy Code and

established the current division of responsibilities between the U.S. Trustee and the bankruptcy

court regarding appointment of committees. The amendments, which established the U.S.

Trustee system on a permanent, nationwide basis (except for North Carolina and Alabama),

reflected Congress's desire to separate the judicial and administrative functions and to screen

courts from administrative functions that could raise conflict-of-interest issues. *See In re Victory

Markets, Inc.*, 196 B.R. 1, 3-4 (Bankr. N.D.N.Y. 1995); *see also In re ShoreBank Corp.*, 467 B.R.

156, 160 (Bankr. N.D. Ill. 2012) (discussing the historical development of the role of bankruptcy

courts and U.S. Trustees regarding committee membership). "[T]he purpose of amending §

1102 was 'to transfer the authority to appoint the chapter 11 committee of unsecured creditors

from the court to the United States trustee as it is an administrative task.'" *Barney's*, 197 B.R. at

439 (quoting H.R. Rep. No. 99-764, 99th Cong., 2d Sess. 28 (1986), *reprinted in* 1986

U.S.C.C.A.N. 5227, 5241).

13.     Given Congress's clear intent to vest administrative authority in the U.S. Trustee

to appoint committees in a chapter 11 case, the relationship between the U.S. Trustee and the

---

[2] Other courts have held that a bankruptcy court has no authority, under any standard, to disband a committee appointed by the U.S. Trustee. *See In re Caesars Entm't, Operating Co.*, 526 B.R. 265, 269 (Bankr. N.D. Ill. 2015); *In re New Life Fellowship*, 202 B.R. 994, 997 (Bankr. W.D. Okla. 1996). This Court need not reach the issue of whether it has such authority, however, because the Debtors cannot carry their burden of showing that the U.S. Trustee's appointment of the Royalty Committee was arbitrary or capricious, and the Motion should be denied in any event.

bankruptcy court, in regard to a committee decision, is akin to the relationship between an administrative agency and a reviewing court. The "arbitrary and capricious" standard is commonly used in judicial review of administrative acts. *See* 5 U.S.C. § 706(2)(A) (under Administrative Procedures Act, reviewing court will set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). For this reason, cases explicating the "arbitrary and capricious" standard in the context of administrative review are instructive here.

14.     These cases show that anytime the "arbitrary and capricious" standard governs, three bedrock principles apply. **First, the action under review is *"entitled to a presumption of regularity."* Hayward v. U.S. Dep't of Labor**, 536 F.3d 376, 379 (5th Cir. 2008) (emphasis added); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983); *Gouger v. U.S. Army Corps of Eng'rs*, 779 F. Supp. 2d 588, 602 (S.D. Tex. 2011). **Second, "a court is *not to substitute its judgment for that of the agency.*"** *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added); *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995); *In re Bell Petroleum Servs.*, 3 F.3d 889, 905 (5th Cir. 1993). **Third, the action will be overturned only if the reviewing court "can conclude with *'definite and firm conviction' that a clear error of judgment or a mistake has been committed.*"** *President & Fellows of Harvard Coll. v. Lee*, 589 Fed. App'x 982, 986 (Fed. Cir. 2014) (emphasis added) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed. Cir. 2004)); *Deloach v. Nicholson*, 2007 U.S. App. Vet. Claims LEXIS 693, at *9 (Vet. App. Apr. 25, 2007); *United States v. Akzo Coatings of Am.*, 949 F.2d 1409, 1429 (6th Cir. 1991).

**B.     Burden of Proof**

15.     Chesapeake bears the burden of proof to establish by "substantial evidence" that the U.S. Trustee's appointment of the Royalty Committee was "arbitrary and capricious." *Barney's*, 197 B.R. at 439; *see also In re Dewey & LeBoeuf LLP*, 2012 Bankr. LEXIS 5534, at

*15 (Bankr. S.D.N.Y. Nov. 29, 2012) ("[I]f the authority exists for the court to order an additional

committee disbanded, the burden must rest on the parties moving for that relief").

**C.      The Standard to Appoint additional Committees under section 1102(a)(1) is whether the U.S. Trustee deems the appointment appropriate.**

16.      Much of Chesapeake's legal argument is based on the false premise that the

Royalty Committee is not necessary to assure adequate representation of the Royalty Owners

(*See* Motion, pp. 10-16, 19).  However, this misstates the legal standard applicable to the

appointment of an additional committee pursuant to section 1102(a)(1) which states that the

U.S. Trustee "may appoint [such] additional committees of creditors … as the United States

trustee may deem appropriate."  If the U.S. Trustee declines to appoint an additional committee

and a party in interest moves for the bankruptcy court to order such an appointment, the party

must prove that the additional committee is "necessary to assure adequate representation."

Thus, sections 1102(a)(1) and (a)(2) apply different standards applicable in different situations:

The U.S. Trustee may appoint an additional committee if deemed to be appropriate by the U.S.

Trustee, but can only be required to appoint an additional committee based on a court order if

the additional committee is necessary to insure adequate representation.

17.      Chesapeake's argument improperly conflates the two (2) standards to suggest

that the appointment of the Royalty Committee must be premised on the fact that an additional

committee was necessary to insure the adequate representation of Royalty Owners.  However,

under section 1102(a)(1), all that is necessary is for the U.S. Trustee to conclude that the

appointment of the Royalty Committee is appropriate.  The cases on which Chesapeake bases

its necessity argument are inapposite because they are section 1102(a)(2) cases seeking an

order by the court to compel appointment of an additional committee.[3]  The legal standard

---

[3] *See Exide Techs. v. Wis. Inv. Bd.,* Nos. 02-1572-SLR, 02-11125-KJC, 02-1610-SLR, 2002 U.S. Dist. LEXIS 27210, at *3-4 (D. Del. Dec. 23, 2002); *In re New Century TRS Holdings, Inc.,* No. 07-10416 (KJC), 2013 Bankr. LEXIS 4021, at *9 (Bankr. D. Del. Sep. 26, 2013); *In re Residential Capital, LLC,* 480 B.R. 550, 557-58 (Bankr. S.D.N.Y. 2012); *In re Spansion, Inc.,* 421 B.R. 151, 155-56 (Bankr. D. Del. 2009); *In re Dana Corp.,* 344 B.R. 35, 37-38 (Bankr. S.D.N.Y. 2006); *In re Sharon Steel Corp.,* 100 B.R. 767, 776 (Bankr. W.D. Pa. 1989).

applied in section 1102(a)(2) cases does not apply here.  Instead, the U.S. Trustee could

appoint the Royalty Committee if he deemed the appointment appropriate, and such a decision

can only be set aside if arbitrary and capricious.

**D.     The U.S. Trustee's formation of the Royalty Committee was not arbitrary and capricious**

18.     A decision is arbitrary and capricious if it is "based on an erroneous conclusion of

law, a record devoid of evidence on which the decision maker could rationally have based its

decision, or otherwise potentially unreasonable, arbitrary or fanciful."  *In re Barney's Inc.*, 197

B.R. at 439.  To meet this exceptionally high standard, Chesapeake must present substantial

evidence that the U.S. Trustee acted arbitrarily and capriciously.  *Id.*

19.     Here, the U.S. Trustee clearly had a proper legal basis to form the Royalty

Committee based on section 1102(a)(1), which allows the appointment of an additional

committee if deemed appropriate by the U.S. Trustee.  The Motion offers no allegations of any

facts or circumstances to establish that the U.S. Trustee's decision to form a Royalty Committee

was based on a lack of a proper record to form the basis for a reasonable decision or any

indication that the decision was patently unreasonable, arbitrary or fanciful.  Instead, what the

Motion indicates is that Chesapeake disagrees with the decision based on its own self-serving

conclusions that the Royalty Owners' interests are adequately represented by the Creditors

Committee.  The fact that Chesapeake disagrees with the decision, and would prefer another

course, does not even arguably raise any issue that the U.S. Trustee acted arbitrarily and

capriciously.

**IV.     The Interests of Royalty Owners are Distinct from the Interests of
Unsecured Creditors Represented by the Creditor's Committee**

**A.     Royalty Owners Have Distinct Interests Which Often Conflict with the Interests of
the Unsecured Creditors Represented by the Creditors Committee**

20.     The interests of Royalty Owners are distinct from those of unsecured creditors

represented by the Creditors Committee.  Indeed, in many cases, the distinct interests of the

Royalty Owners are inconsistent with the interests of those unsecured creditors.  The interests of the Royalty Owners differ from the interests of general unsecured creditors in many material ways, including the following:

a.      Secured Claims.  Royalty Owners may hold secured claims against Chesapeake under applicable state law.  Examples of this are Tex. Bus & Com. Code, §§ 9.319 and 9.343, Okla. Stat. Am. Title 52, §§ 548 et seq., and Wyo. Stat. § 34.1-9-319, all of which grant Royalty Owners potential secured claims against Chesapeake.  Other states in which Chesapeake holds oil and gas interests may also provide similar protections to Royalty Owners.  Obviously, the unsecured creditors represented by the Creditors Committee enjoy no such rights.

b.      Trust Fund Claims.  There is substantial authority that some of the royalty proceeds received by Chesapeake are not even Chesapeake's money and does not constitute property of the estate.  *Dahlberg v. ConocoPhillips Co.* (*In re Reichmann Petroleum Corp.*), 434 B.R. 790, 797 (Bankr. S.D. Tex. 2010) (Revenue attributable to working interest owners was property of the working interest owners and not property of the estate); *Vess Oil Corp. v. SemCrude, L.P.* (*In re SemCrude, L.P.*), 418 B.R. 98, 106 (Bankr. Del. 2009) (Production proceeds held in trust by the debtor for the benefit of third parties were not property of the estate). "Where [a] Debtor merely holds legal title to property as an agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner."  *MCZ Indus. v. Andrus Res. Inc.* (*In re MCZ, Inc.*), 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987).  Consequently, the Royalty Owners have claims that Chesapeake holds the underpaid royalties in trust for the benefit of the Royalty Owners, and that these funds were never the property of Chesapeake and did not become property of any bankruptcy estate. Indeed, the Royalty Owners may have broad claims to Chesapeake's cash as the remnants of these trust funds or rights to an accounting and restitution of the trust funds wrongfully misappropriated by Chesapeake.  The unsecured creditors have no such claims or rights.

c.      Filing Proofs of Claim.  The Royalty Owners should be granted an appropriate period to file proofs of claim and to receive meaningful notice of their rights to file claims for past royalty underpayments.  There should also be some meaningful resource to answer the Royalty Owners' questions regarding this process, which will be alien to the great majority of them.  As was illustrated at the 341 meeting, a great deal of confusion exists among Royalty Owners regarding the steps they need to take to protect their rights in the bankruptcy case.  The letter purportedly sent by the Debtors to Royalty Owners gave the impression that they did not need to file a claim in the bankruptcy case.  Further, at the 341 meeting, a representative of the Debtors told them that they did not need to file proofs of claim and that they should contact the Debtors' customer service hotline number on their royalty checks if they had any questions.  The Debtors' June 28 Letter to Royalty Owners adds to the confusion. The letter did not sufficiently apprise Royalty Owners of their rights and is likely to promote minimal participation in the bankruptcy cases by the Royalty Owners, many of whom likely lack legal representation or whose interests are too small to justify seeking legal representation.  The Royalty Committee would like to have a letter from the Royalty Committee sent with the package on proofs of claims to provide (i) notice regarding the U.S. Trustee's appointment of the Royalty Committee, and (ii) clarification on the claims process in layperson terms to make sure they are properly informed given the June 28 Letter.

d.      Class of Proofs of Claim.  There are thousands of Royalty Owners who may hold relatively small claims against Chesapeake based on the same or similar practices regarding the systematic underpayment of royalties nationwide over a period of years.  Indeed, **Exhibit A** reflects four (4) class action lawsuits pending against Chesapeake.  Class action claims pursuant to Fed. R. Civ. Pr. 23 provide an excellent tool to protect the rights of these small Royalty Owner claimants.  *See, e.g., Judgment, In re Sheridan Holding Company I, LLC*, No. 20-31884 (DRJ) (Bankr. S.D. Tx. July 13.2020) (approving class action settlement of royalty underpayment claims as part of Debtors' restructuring).

e.      <u>Release of Acreage</u>.  Some Royalty Owners may have Chesapeake leases which were arguably terminated and that leased acreage should have been released by Chesapeake under the terms of the lease document or applicable law.  These claimants should also have their rights to pursue such claims preserved and a Royalty Committee can assist to that end and in helping work towards an orderly procedure for the manner of handling such claimants.  These release of acreage claims are likewise inconsistent with the interests of the unsecured creditors represented by the Creditors Committee.

f.      <u>Executory Contracts</u>.  There will be issues as to whether the oil and gas leases in some states constitute executory contracts.  This will likely give rise to significant issues regarding what cure payments Chesapeake is required to make to assume these leases. The Royalty Committee will act to ensure that the interests of these Royalty Owners, especially the smaller ones, are protected in this bankruptcy case through a procedure that fully and fairly provides such claimants' notice and transparency of their  rights related to assumption or rejection of such leases.  For example, a shortened notice period of a cure amount will likely result in the great majority of such lessor counterparties failing to timely object.  Once again, on this issue, the Royalty Owners' rights conflict with the general unsecured creditors.

g.      <u>Potential Administrative Claims</u>. The Royalty Owners hold both pre-petition and post-petition claims against Chesapeake.  If Chesapeake fails to properly pay post-petition royalties, the Royalty Owners will hold administrative claims.  By contrast, the Creditors Committee, by definition, represents only pre-petition creditors who hold no administrative claims.  This is another issue where the Royalty Owners and Creditors Committee have divergent interests.

h.      <u>Right to Jury Trial</u>.  Many Royalty Owners have already filed suit in state courts and will likely seek relief from the stay to pursue their termination claims under state law property rights and/or liquidate their damages through jury trials in state court.  These are

interests which will likely conflict with the interests of the unsecured creditors represented by the Creditors Committee.

       i.     **Different Plan Treatment**.  In the term sheet reflected in Chesapeake's first day pleadings, the holders of general unsecured claims are treated differently from the holders of the unsecured notes.  The Debtors' appear to take the position that all Royalty Owners' pre-petition claims are a homogenous group of unsecured claims without addressing the applicable State law property rights vary greatly from State to State. The Royalty Owners are also entitled to a separate voice on through the Royalty Committee.

       j.     **Separate Class**.  Based on the above, the Royalty Owners may be better addressed in any proposed Plan of Reorganization as a separate class or classes.  In addition, there may be an opportunity to resolve some pre-petition litigation claims of Royalty Owners' via settlement(s) in the Plan of Reorganization. Further, given their distinct set of rights, the liquidation analysis as to Royalty Owners may be also much different from the unsecured creditors represented by the Creditors Committee.  The Royalty Owners are entitled to a separate voice to advance these issues at confirmation.

<h3 style="text-align:center">V.    <u>Chesapeake's Arguments in the Motion</u>[4]</h3>

**A.    The Creditors Committee Cannot Adequately Represent the Royalty Owners Interests**

21.    Chesapeake asserts that the interests of the Royalty Owners are adequately represented by the Creditors Committee, and that the Royalty Owners interests may be appropriately protected by appointing Royalty Owners to the Creditors Committee.  This argument misses the mark on several points.

22.    As demonstrated above, applying the correct legal standard, section 1102(a)(1) of the Bankruptcy Code vests the U.S. Trustee with the power to create such additional committees as the U.S. Trustee deems appropriate.  Through the Motion, Chesapeake is, in

---

[4] The Royalty Committee's admissions and denials pertaining to the Motion are attached hereto as **Exhibit C**.

effect, asking the Court to second guess the judgment of the U.S. Trustee that the appointment of the Royalty Committee was appropriate based on Chesapeake's conclusion that the interests in the Royalty Owners are adequately protected by the Creditors Committee.  Chesapeake's history with its Royalty Owners, which is arguably more contentious than any other big oil and gas company, makes it a very dubious sheriff to evaluate whether the Royalty Owners' interests are adequately protected in these bankruptcy cases.  However, Chesapeake's opinion that the Royalty Committee is unnecessary is not a basis to establish that the U.S. Trustee acted arbitrarily or capriciously.  Indeed, the Motion alleges no facts or circumstances which in any way tend to establish that the U.S. Trustee acted arbitrarily or capriciously.

23.     The Royalty Owners have several distinct interests which needed protection, including the assertion that the DIP Motion could not affect claims regarding the termination of leases or the release of acreage and to preserve the Royalty Owners' lien rights and trust fund claims. The DIP Order reflects that Royalty Owners who retained counsel each requested more protective language than was proposed by the Debtors'. It was left to the Royalty Committee to seek similar protections for all the other Royalty Owners and, absent the Royalty Committee, the other Royalty Owners would have been deprived of the benefit of this protective language.

24.     Second, the appointment of Royalty Owners as minority members of the Creditors Committee will not adequately protect the interests of the Royalty Owners.  By definition, the representation by the Creditors Committee of the Royalty Owners' interests should be limited to their unsecured claims and would not encompass the other rights unique to Royalty Owners.  Moreover, nothing in section 1102(a)(1) supports such a position.  As demonstrated above, many of the interests of the Royalty Owners are inconsistent with those of the unsecured creditors represented by the Creditors Committee.  Chesapeake should not be seeking to substitute its judgment for the U.S. Trustee's judgment that a separate Royalty Committee was appropriate.  Chesapeake has failed to show the U.S. Trustee's decision was arbitrary and capricious.

**B.      The Payment of Undisputed Royalties Does Not Negate the Need for the Royalty Committee.**

25.      The fact that the Debtors have obtained approval from the Bankruptcy Court to pay all *undisputed* pre- and post-petition royalties does not negate the need for a Royalty Committee in this case. The Schedules and Statement of Financial Affairs are not due to be filed until August 26, 2020.  As such, there is currently no visibility on what royalties the Debtors claim will be paid, have been paid, are currently owed and/or are disputed.  Thousands of Royalty Owners possess prepetition claims against the Debtors which collectively could exceed hundreds of millions of dollars in unpaid past royalties.  Moreover, the Royalty Owners have an interest in ensuring that their post-petition royalties are administered, calculated and timely paid. Given Chesapeake's belabored past with its Royalty Owners, in the long run, it is very likely that there will be benefit the Debtors' Estates and the Royalty Owners to have an official committee charged with the duty of trying to make the bankruptcy process more efficient for Royalty Owners, which would facilitate the administrative efficiency of the bankruptcy estates.

26.      Moreover, as noted above, these interests cannot, by definition, be protected by a committee protecting the rights of pre-petition general unsecured creditors.

**C.      The Absence of Royalty Committees in Other Cases**.

27.      The fact that royalty owner committees have not been appointed in other cases does not mean that a Royalty Committee is not appropriate in this case or that the U.S. Trustee acted arbitrarily and capricious in appointing the Royalty Committee.  This is a unique case wherein there are claim that, for many years, Chesapeake consistently underpaid Royalty Owners in Texas, Oklahoma, Wyoming, Pennsylvania and Ohio.  In most cases, a royalty owner committee may not be appropriate; but this is not most cases.  Chesapeake's business practices allegedly involved using below market prices, making improper deductions, using improper measurement techniques, and entering into agreements with affiliates that result in substantial underpayment of royalties over the years.  Chesapeake has been sued for hundreds

of millions of dollars by many thousands of claimants for the underpayment or royalties and related relief.  To protect the interests of all Royalty Owners, the continuation of the Royalty Committee in this case is not only appropriate, but essential.  Contrast Chesapeake's position in silencing the Royalty Owners' voices with that of Sheridan in its recent restructuring where this Court approved a classwide settlement of royalty underpayment claims within Sheridan's Plan of Reorganization. *See, e.g., Judgment, In re Sheridan Holding Company I, LLC*, No. 20-31884 (DRJ) (Bankr. S.D. Tx. July 13.2020) (approving class action settlement of royalty underpayment claims as part of Debtors' restructuring).

28.     Over the past several years, numerous exploration and production (E&P) companies have filed for bankruptcy in the Southern District of Texas.  None of those cases appear to have the same type of egregious conduct that has been alleged against Chesapeake. The lawsuits against Chesapeake over the years, including litigation pending at the time of the bankruptcy, allege Chesapeake engaged in a pervasive, nationwide practice for many years of underpaying the Royalty Owners.  The absence of similar committees of royalty owners in other E&P cases simply confirms that the underpayment of royalties was either not a material issue or was fairly addressed in the E&P companies plan of reorganization.  The background and facts unique to Chesapeake are what is relevant in determining whether a Royalty Committee was necessary. The Debtors' seem to be concerned with the precedent that appointing a Royalty Committee sets for other cases. It does not set any precedent whatsoever, but merely reflects that, in this case, it was deemed appropriate.  The lack of royalty committees in other cases casts no doubt on the judgement of the U.S. Trustee in this case.

**D.     The Motion provides no basis to deem the U.S. Trustee's appointment of the Royalty Committee as arbitrary and capricious.**

29.     The Motion alleges no facts or circumstances to establish that the U.S. Trustee's decision was "unreasonable, arbitrary or fanciful," *In re Barney's, Inc.*, 197 B.R. at 439, and which would leave the Court with a "definite and firm conviction" that the U.S. Trustee made a

"clear error of judgment or a mistake" in appointing the Royalty Committee. *Cf. President & Fellows of Harvard Coll. v. Lee*, 589 Fed. App'x at 986.  Chesapeake merely disagrees with the United States Trustee.

30.     The very few cases in which a court has ordered an existing committee disbanded demonstrate the extreme circumstances necessary to warrant granting this extraordinary relief, none of which are even remotely like the present facts. In three (3) cases, a committee was disbanded on the grounds that appointment of the committee violated the Bankruptcy Code. *See In re Coalinga Reg. Med. Ctr.*, 608 B.R. 746, 756 (Bankr. E.D. Cal. 2019) (§ 1102 does not apply in chapter 9 case); *In re City of Detroit*, 519 B.R. 673, 678 (Bankr. E.D. Mich. 2014) (§ 1102 does not apply in chapter 9 case); *In re Mercury Fin. Co.*, 224 B.R. 380, 386 (Bankr. N.D. Ill. 1998) (single committee included both unsecured creditors and equity security holders in violation of § 1102(a)(1)), aff'd, 240 B.R. 270 (N.D. Ill. 1999). Chesapeake does not and cannot assert that the U.S. Trustee's appointment of the Royalty Committee violated the Bankruptcy Code in any way.

31.     In another case, a court ordered the unsecured creditors' committee disbanded a year and half into the reorganization because (i) the committee had been ineffective and had run up excessive legal fees on the lender's cash collateral; (ii) a chapter 11 trustee had been appointed, who would represent the interests of creditors; and (iii) the only financially disinterested party, the Bankruptcy Administrator, supported disbanding the committee. *In re Pac. Ave., LLC*, 467 B.R. 868, 870-71 (Bankr. W.D.N.C. 2012). The facts of the present cases, of course, are completely different. Thus, *Pacific Avenue* is not persuasive authority here.

32.     Chesapeake identifies no fact or circumstance which establishes that the U.S. Trustee's decision to appoint the Royalty Committee was arbitrary and capricious. Chesapeake's arguments boil down to self-serving opinions that the Royalty Committee is unnecessary.

**E.      Members Can Serve on the Royalty Committee in a Representative Capacity**

33.      Chesapeake also contends that the U.S. Trustee's action in forming the Royalty Committee was arbitrary and capricious because three (3) of the committee members (Aaron D. Hovan, Michael D. Donovan, and Charles E. Schaffer) purportedly are not creditors and, instead, serve as counsel to Royalty Owners in three different class action lawsuits against Chesapeake.

34.      As an initial matter, Mr. Hovan is a Chesapeake Royalty Owner.  Mr. Hovan is listed among the Royalty Owners on Chesapeake's Affidavit of Service reflecting service of a "Royalty Owner Letter" dated June 28, 2020 to Royalty Owners.  See, Docket No. 375 at p. 1503.

35.      Regardless, Chesapeake's contention that parties cannot serve on a committee in a representative capacity is simply incorrect.  Individuals frequently serve on committees in a representative capacity for one or more creditors, including indenture trustees, union representatives, and corporate designees.  Paradoxically, the Debtors have not accused the U.S. Trustee of being arbitrary and capricious in the formation of the Creditors Committee, which includes two indenture trustees serving in a representative capacity for the Debtors' prepetition bondholders.  See, Motion at ¶ 15.

36.      In any event, Chesapeake's arguments that only a creditor, and not the legal representative of a class of creditors, can serve on a creditors' committee was expressly rejected by the district court in *In re Dow Corning Corp.*, 212 B.R. 258 (E.D. Mich. 1997).  In that case, the district court reversed the decision of the bankruptcy court to remove several class action attorneys from an official tort claimants committee.  *In re Dow Corning Corp.*, 212 B.R. at 264.  The court found that, although section 1102(b)(1) gives the U.S. Trustee a "guide" to the type of persons the that "ordinarily" may be appointed on committees, where a matter is not an ordinary case (such as a mass tort case), the U.S. Trustee may appoint members who are not the largest creditors.  *Id.*  In addition, although section 1102(a)(1) provides that the U.S. Trustee

may appoint an additional committee of creditors, section 1102(b) describes the types of "persons" to be appointed solely as "persons, willing to serve." 11 U.S.C. § 1102(b). Presumably, if only "creditors" could serve as committee members, the statute would expressly so provide. To the contrary, "[n]owhere in Section 1102 does it indicate that a person must be an actual creditor to be appointed by the United States Trustee to a committee of creditors." *Id.*

37.    Likewise, the court in *Dow Corning* considered and rejected the argument that attorneys for class claimants have a conflict of interest that precludes them from acting as a committee member because, regardless of whether a committee member is an actual creditor or an attorney representing a creditor, either person would have a self-interest in the outcome of the bankruptcy. *Id.* at 261 and 264. The law, however, requires that "a committee member place the collective interest of the class above its personal stake in the bankruptcy case." *Id.* at 261. Further, unlike other provisions, section 1102(b) of the Bankruptcy Code does not prohibit a person from serving on a committee because of a lack of disinterestedness. Consequently, despite their competing interests, the court in *Dow Corning* found that the class attorneys' duties owed to their class claimants separate from their duties to the tort claimants committee in the bankruptcy case did not preclude them from serving on the committee. *Id.* at 264.

38.    Such is the case here. The Chesapeake bankruptcy case is not an ordinary case. Most debtors do not have numerous class action lawsuits by royalty owners filed against them across the country. As was the case in *Dow Corning*, where class attorneys representing thousands of breast implant and other silicone injured claimants were allowed to serve on the tort claimants committee, the attorneys representing the more than 10,000 Royalty Owners, who are parties to more than 12,000 leases, seeking tens of millions of dollars in class actions in Pennsylvania can aggregate the experiences of those Royalty Owners and thereby enhance the Royalty Committee's contribution to the bankruptcy case. Likewise, the Debtors have not alleged that the attorney members on the Royalty Committee have not or cannot act in a manner consistent with their fiduciary duties to all Royalty Owners and the Royalty Committee.

Regardless, any argument regarding the membership of the Royalty Committee is not a basis to disband the committee. At most, it is a challenge to the U.S. Trustee's appointment of the class attorneys to the Royalty Committee which should be directed, in the first instance, to the U.S. Trustee, who is responsible for appointing or removing the members of the Committee. *Id.* at 264.

39.     Finally, the Debtors' argument that "the purpose of the [Royalty Committee] was to benefit the lawyers – not the royalty owners" in paragraph 39 of the Motion defies credulity. Chesapeake has hundreds of thousands of Royalty Owners who need representation in its bankruptcy case to (i) ensure all Royalty Owners receive proper notice, (ii) ensure fair procedures are in place so the Royalty Owners can preserve their pre- and post-petition royalty claims, including secured claims, trust fund claims, and/or release of mineral acreage claims, and (iii) give Royalty Owners a voice in the reorganization process. Absent the Royalty Committee, Chesapeake's hundreds of thousands of Royalty Owners, who are counterparties to the oil and gas leases constituting Chesapeake's most valuable assets, will have no one advocating for their rights because the overwhelming majority of Royalty Owners likely lack the financial resources needed to retain counsel in order to protect their individual interests.

**F.     Chesapeake's Request to Limit the Scope of the Royalty Committee's Responsibilities and the Amount of its Fees Should Be Denied.**

40.     Given the number of matters pertaining to Royalty Owners that need to be addressed by the Royalty Committee, Chesapeake's attempt to limit the scope of the Royalty Committee's responsibilities and the amount of its professional fees is improper and should be denied.

41.     As outlined above, the Royalty Committee does not intend to duplicate any work being performed by the Creditors Committee. Instead, the Royalty Committee intends to limit its involvement in the case to matters that relate in a material manner to the Royalty Owners' interests. For example, the Royalty Committee filed a limited objection to the Debtors' motion to

set a bar date for the filing of proofs of claim requesting a number of procedures intended to help preserve Royalty Owner claims [see Dkt. No. 650] and extending the time for the Bar Date for Royalty Owners to file claims.  Here, the Debtors propose to substantially shorten the bar date from the normal 90 days from the first 341 Meeting as provided for in the Complex Procedure Rules, which would be November 2, 2020.

42.     The Debtors seek to limit the Royalty Committee's fees while proposing to pay millions in fees for the Debtors' counsel and Creditors' Committees' counsel.  This appears to be an attempt to minimize the ability of the Royalty Committee, if it is disbanded, to be effective in this case.  All fees incurred by the Royalty Committee will be subject to review and approval by this Court, which is capable of assessing their reasonableness.  Also, the Court has approved procedures for the interim compensation of professionals [Dkt. No. 656].  The Debtors and all other parties in interest will have transparency into the work being performed by the Royalty Committee and can object to any fees they believe are unreasonable.

43.     Finally, the Motion was filed on July 30, 2020, a mere six (6) days after the Royalty Committee was formed.  Given the large constituency of Royalty Owners, it is extremely unfair for the Debtors to attempt to limit the scope of the Royalty Committee's responsibilities and fees at this early stage. The Royalty Committee remains open to discussions to resolve the Motion with the Debtors, including agreeing to a reasonable cap on legal fees on a prospective basis with all expenses to be reimbursable at actual cost.

## PRAYER FOR RELIEF

WHEREFORE, the Royalty Committee prays that the Court enter an order sustaining this Objection, denying the relief requested in the Motion, and granting the Royalty Committee all such relief as the Court may deem just and proper.

DATED: August 10, 2020

Respectfully submitted,

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
jprostok@forsheyprostok.com
srosen@forsheyprostok.com

Deirdre Carey Brown
State Bar No. 24049116
FORSHEY PROSTOK, LLP
1990 Post Oak Blvd., Suite 2400
Houston, TX 77056
Telephone: (832) 536-6910
Facsimile:  (832) 310-1172
dbrown@forsheyprostok.com

PROPOSED COUNSEL FOR THE
OFFICIAL COMMITTEE OF ROYALTY
OWNERS

## CERTIFICATE OF CONFERENCE

On August 4, 2020, I spoke with counsel for the Debtors, Patrick Nash, and had a productive conversation on ways to resolve the Motion to Disband. Mr. Nash was to confer with his client further. I followed up again on August 5, 2020 and on August 6, 2020 Mr. Nash informed me that the Debtors' were not agreeable to a resolution.  On August 8, 2020, myself and others with my firm conferred with Mr. Duran and informed Mr. Duran that the Royalty Committee had already attempted to work out a resolution and were willing to reach out to the Debtors again to discuss a resolution after further consultation with the Royalty Committee.  We had a second conference with Mr. Nash, Ms. Shwarzman, and Mr. Duran on August 9, 2020; however, an agreement as to the resolution of the Motion could not be reached.

/s/Jeffrey Prostok

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing objection and all exhibits have been served upon the parties receiving electronic notice via the Court's CM/ECF system on August 10, 2020.

/s/ Suzanne K. Rosen
Suzanne K. Rosen

L:\BFORSHEY\Chesapeake (RO Committee-CrR) #6092\Pleadings 20-33233 txsb\ROC Objection to Debtors' Motion to Disband ROC 8.10.2020.docx

# Exhibit A

**[Excerpts from Chesapeake's 2019 10-K and 1st Quarter 2020 10-Q]**

## Exhibit "A"

***We are defending against claims by royalty owners alleging, among other things, that we used below-market prices, made improper deductions, used improper measurement techniques, entered into arrangements with affiliates that resulted in underpayment of royalties in connection with the production and sales of natural gas and NGL and similar theories. Numerous cases are pending. The resolution of disputes regarding past payments could cause our future obligations to royalty owners to increase and would negatively impact our future results of operations.***

In addition, there are ongoing governmental regulatory investigations and inquiries into various matters such as our royalty practices. ***The outcome of any pending or future litigation or governmental regulatory matter is uncertain and may adversely affect our results of operations.*** In addition, we have incurred substantial legal expenses in the past three years, and such expenses may continue to be significant in the future. Further, attention to these matters by members of our senior management has been required, reducing the time they have available to devote to managing our business.

*See* Chesapeake Form 10-K at page 26 for the year ending December 31, 2019.

We and other natural gas producers have been named in various lawsuits alleging underpayment of royalties and other shares of the proceeds of production. ***The lawsuits against us allege, among other things, that we used below-market prices, made improper deductions, utilized improper measurement techniques, entered into arrangements with affiliates that resulted in underpayment of amounts owed in connection with the production and sale of natural gas and NGL, or similar theories.*** These lawsuits include cases filed by individual royalty owners and putative class actions, some of which seek to certify a statewide class. The lawsuits seek compensatory, consequential, treble, and punitive damages, restitution and disgorgement of profits, declaratory and injunctive relief regarding our payment practices, pre-and post-judgment interest, and attorney's fees and costs. Royalty plaintiffs have varying provisions in their respective leases, oil and gas law varies from state to state, and royalty owners and producers differ in their interpretation of the legal effect of lease provisions governing royalty calculations. We have resolved a number of these claims through negotiated settlements of past and future royalty obligations and have prevailed in various other lawsuits. We are currently defending numerous lawsuits seeking damages with respect to underpayment of royalties or other shares of the proceeds of production in multiple states where we have
operated, including those discussed below.

\* \* \*

***We believe losses are reasonably possible in certain of the pending royalty cases for which we have not accrued a loss contingency, but we are currently unable to estimate an amount or range of loss or the impact the actions could have on our future results of operations or cash flows.*** Uncertainties in pending royalty cases generally include the complex nature of

the claims and defenses, the potential size of the class in class actions, the scope and types of the properties and agreements involved, and the applicable production years.

*See* Chesapeake Form 10-Q at page 14 for the quarter ending March 31, 2020.

# **Exhibit B**

**[Known Pending and Settled Cases against Chesapeake]**

**Exhibit B**
**Known Chesapeake Lawsuits (Pending)**

| Court | Case Number | Case Title | Status/Type of Case | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|
| Tarrant County District Court | 048-000000-15 096-000003-15 | IN RE: CHESAPEAKE BARNETT ROYALTY LITIGATION #2 | Barnett Shale Royalty case. | 24 | Multiple leases |
| Bexar County District Court | 2016ci22093 | In Re: Chesapeake Eagle Ford Royalty Litigation | Eagle Ford Royatly case. | 170 | Multiple leases |
| Bexar County District Court | 2020CI07957 | Petty Business Enterprises, L.P. et al. v. Chesapeake Exploration, LLC et al. | Eagle Ford Shale Royalty case | 30 | Multiple leases |
| Middle District of Pennsylvania | 3:2015cv00340 | A & B Campbell Family et al v. Chesakpeake Energy Corporation  et al | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | 87 | Multiple leases |
| Ohio Northern District Court | 4:2013cv00391 | Ritteger et al v. Chesapeake Exploration et al | This case was remanded back to state court | | |
| Ohio Northern District Court 6th USCOA | 5:2017cv01695 0:2020cv03043 | Bounty Minerals, LLC v. Chesapeake Exploration, L.L.C. et al | This is royalty suit in which Ds MSJ was granted which resulted in the case being appealed. | 1 | Multiple leases |
| Ohio Northern District Court 6th USCOA | 4:15cv02449 | Zehentbauer Family Land LP et. al. v. Chesapeake Exploration, L.L.C. et.al. | This is royalty suit in which Ds MSJ was granted which resulted in the case being appealed. | 1 | Multiple leases |
| Ohio Northern District Court 6th USCOA | 4:2015cv02591 0:2019cv03942 | Henceroth et al v Chesapeake Exploration, LLC | USCOA-6th Circuit - on appeal from Northern District of Ohio at Youngstown. This is a royalty suit. | 2 | No information on the lease or acreage involved |
| Oklahoma Western District Court | 5:2018cv01242 | CTF LTD et al v. Chesapeake Exploration LLC et al | Action was removed to Beaver County, OK. Case No. CJ-2018-26. Royalty suit. | 8 | Multiple leases |
| Wyoming District Court | 1:2020cv00029 | Wellstar Corporation et al v. Chesapeake Operating LLC, Chesapeake Exploration LLC, and CNOOC Energy USA LLC | Complaint filed - Breach of Contract, Violation of WY Royalty Payment Act, Conversion, Declaratory Relief | 2 | Multiple leases |
| Middle District of Pennsylvania | 4:16cv01343 | Patricia L. Abrams, et al., v. Chesapeake Energy Corp., et al. | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | 352 | Multiple leases |
| Middle District of Pennsylvania | 4:16cv01345 | Paul H. Arnold, et al., v. Chesapeake Energy Corp., et al. | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | 213 | Multiple leases |

**Exhibit B**
**Known Chesapeake Lawsuits (Pending)**

| Court | Case Number | Case Title | Status/Type of Case | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|
| Middle District of Pennsylvania | 4:16cv01346 | Robert C. Abrams, Jr., et al., v. Chesapeake Energy Corp., et al. | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | 76 | Multiple leases |
| Middle District of Pennsylvania | 4:16cv01347 | Kylie E. Ahern, et al., v. Chesapeake Energy Corp., et al. | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | 32 | Multiple leases |
| Middle District of Pennsylvania | 3:16cv00456 | Timothy Tyler, et al., v. Chesapeake Energy Corp., et al. | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | 6 | Multiple leases |
| Middle District of Pennsylvania | 3:13cv02289 | Demchak Partners Limited Partnership, v. Chesapeake Energy Corp., et al. | Royalty case. Case is stayed pending issues to be addressed by the Pennsylvania Supreme Court. | Class | Multiple leases |
| Middle District of Pennsylvania | 3:14-cv-00591 | James L. Brown, v. Chesapeake Energy Corp., et al. | Royalty case that was shown to be settled August 9, 2018 with the Suessenbach case but matter is still pending even though nothing has been filed related to the case settlement since Nov 2018. | Class | Multiple leases |
| Middle District of Pennsylvania | 3:14-cv-01197 | Suessenbach v. Chesapeake Energy Corp., et al. | Royalty case that was shown to be settled August 9, 2018 with the Brown case but matter is still pending even though nothing has been filed related to the case settlement since Nov 2018. | Class | Multiple leases |
| Western District of Oklahoma | 5:18-cv-00565 | Dennis R Taylor, et al., v. Chesapeake Energy Corp., et al. | Jury Trial set for January 12, 2021. | 5 | Multiple leases |
| Western District of Oklahoma | 5:16-cv-00776 | CEOG, LLC, et al. v. Chesapeake Operating, LLC, et al. | Order Granting Class Action Settlement filed May 26, 2020. | Class | Multiple leases |

**Exhibit B**
**Known Chesapeake Cases (Settled)**

| Court | Case Number | Case Title | dateFiled | dateTermed | Settlement Amount (if public) | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|---|---|
| Tarrant County District Court | 348-000000-15 | IN RE: CHESAPEAKE BARNETT ROYALTY LITIGATION #1 | 4/28/2015 | 10/12/2017 | **$52.5 million** | 13,000+ | Multiple leases |
| 5th USCOA | 0:2015pcd10955 | Arbuckle Mountain Ranch of TX v. Chesapeake Energy Corp., et al | 10/2/2015 | 3/22/2020 | **$3.2 million** | 3983 Class Members | Tarrant and Johnson County Units |
| Beaver County OK | 2010-000038 | Fitzgerald v. Chesapeake | | | **$119 million** | 15000 class members | Statewide Oklahoma |
| Tarrant County District Court | | DFW Airport v. Chesapeake, et al. | | | **$8.2 million** | 1 | 2,000 acres of DFW Airport property |
| Tarrant County District Court | | City of Fort Worth v. Chesapeake, et al. | | | **$15 million** | 1 | 5000 Acres |
| Tarrant County District Court | | Fort Worth School District vs. Chesapeake, et al. | | | **$1 million** | 1 | 250 acres owned by FWISD |
| AR Western District Court | 2:2015cv02108 | Looney v. Chesapeake Energy Corporation et al | 6/3/2015 | 1/13/2017 | Order of Final Approval and Judgment incorporating and approving Class Settlement Agreement; all Settled Claims are dismissed with prejudice and all claims that are not Settled Claims are dismissed without prejudice; approving The Plan of Administration and Distribution; awarding Class Counsel $1,035,729.79 in attorneys' fees and $142,810.64 in expenses and costs; directing $5,000.00 incentive award be paid to Class Representatives Billy C. Looney, Goodwin & Herman Associates, LLC, and Siloam Minerals, LLC from the Settlement Fund. | 2 with Class | No information on the lease or acreage involved |
| Oklahoma Western District Court | 5:2016cv00209 | Thieme et al v. Chesapeake Energy Corporation et al | 3/3/2016 | 4/23/2020 | Administrative Closing Order was filed April 17, 2018 but documents continued to be filed advising class settlement. Order granting Plaintiffs Motion to Approve Distributions from Settlement Fund filed April 23, 2020. | Class | Multiple leases |
| Texas Northern District Court | 3:2013cv01812 | Ballard et al v. Chesapeake Operating Inc et al | 5/14/2013 | 5/29/2014 | Settled Confidentially | | |
| Texas Northern District Court | 4:2015cv00315 | Barfield Family Private Foundation v. Chesapeake Exploration LLC | 4/27/2015 | 8/25/2015 | Settled Confidentially | | |
| Texas Eastern District Court | 9:2016cv00089 | Bayou Bleu Farm, L.P. et al v. Chesapeake Exploration, L.L.C. | 6/14/2016 | 5/1/2017 | Settled Confidentially | 11 | Multiple leases |

**Exhibit B**
**Known Chesapeake Cases (Settled)**

| Court | Case Number | Case Title | dateFiled | dateTermed | Settlement Amount (if public) | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|---|---|
| West Virginia Northern District Court | 5:2014cv00097 | Bird et al v. Turner et al | 7/25/2014 | 2/23/2017 | Settled Confidentially | 2 | 3.4 acres |
| Wyoming District Court | 1:2018cv00143 | Box Creek Mineral Limited Partnership v. Chesapeake Exploration LLC et al | 8/27/2018 | 1/17/2019 | Settled Confidentially | 1 | 26588.035 acres |
| Ohio Northern District Court | 5:2016cv02023 | Everett et al v. EnerVest Operating, L.L.C. et al | 8/12/2016 | 8/20/2018 | Settled Confidentially | 3 | 85.7100 and 11.4450 acres |
| Texas Southern District Court | 5:2018cv00098 | Kirkwood v. Chesapeake Operating, L.L.C. | 7/6/2018 | 12/12/2018 | Settled Confidentially | 1 | 1299.28 acres |
| Oklahoma Western District Court | 5:2016cv00301 | Powers et al v. Chesapeake Energy Corporation et al | 3/31/2016 | 4/15/2016 | Settled Confidentially | | |
| Oklahoma Western District Court | 5:2016cv00293 | Ruby L Stucky Trust The v. Chesapeake Energy Corporation et al | 3/29/2016 | 4/15/2016 | Settled Confidentially | | |
| Ohio Southern District Court | 2:2014cv02650 | Texas Eastern Transmission, LP v. 3.2 ACRES PERMANENT EASEMENT, AND 4.2 ACRES TEMPORARY EASEMENT OF LAND IN COLERAIN TOWNSHIP, BELMONT COUNTY, OHIO et al | 12/16/2014 | 7/7/2016 | Settled Confidentially | | |
| Texas Northern District Court | 3:2013cv01082 | Trinity Valley School et al v. Chesapeake Operating Inc et al | 3/13/2013 | 9/8/2015 | Settled Confidentially | | |
| Oklahoma Western District Court | 5:2016cv00403 | Van Meter et al v. Chesapeake Energy Corp et al | 4/20/2016 | 5/19/2016 | Settled Confidentially | | |
| Oklahoma Western District Court | 5:2016cv00351 | White v. Chesapeake Energy Corp et al | 4/12/2016 | 4/15/2016 | Settled Confidentially | | |
| 6th USCOA | 0:2013cv04345 | Willard Liggett, et al v. Chesapeake Energy Corporation, et al | 11/14/2013 | 10/24/2014 | Settled Confidentially | | |
| Wyoming District Court | 1:2019cv00208 | Jonah Gas Company LLC et al v. Chesapeake Exploration LLC et al | 10/9/2019 | 4/7/2020 | Royalty case. Agreed dismissal | 3 | Unable to read lease to determine acreage involed |
| Wyoming District Court | 2:2019cv00180 | LeBar Ranch Minerals LLC v. Chesapeake Operating LLC et al | 9/3/2019 | 3/11/2020 | Royalty case. Settled March 2020. No information given. | 1 | No information on the lease or acreage involved |
| Texas Northern District Court | 4:2017cv00273 | Fleet Oil and Gas Ltd. et al v. Chesapeake Energy Corporation et al | 3/30/2017 | 6/13/2017 | Royalty claim involving the Barnett Shale. Joint Stipulation of Voluntary Dismissal with Prejudice filed without explanation as to why. | 9 | No information on the lease or acreage involved |

**Exhibit B**
## Known Chesapeake Cases (Settled)

| Court | Case Number | Case Title | dateFiled | dateTermed | Settlement Amount (if public) | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|---|---|
| Texas Southern District Court | 5:2017cv00139 | Peacock, Sr. et al v. Chesapeake  Energy Corporation  et al | 7/7/2017 | 5/7/2019 | Royalty suit originating from LaSalle County that was moved to Federal Count b/c of Subject Matter. Joint Stipulation to Dismiss was filed. | 10 | No information on the lease or acreage involved |
| Texas Southern District Court | 4:2017cv01584 | Carrizo (Eagle Ford) LLC v. Chesapeake Exploration, L.L.C. | 5/24/2017 | 9/26/2017 | Stipulation of dismissal filed without explanation as to why. | 1 | No information on the lease or acreage involved |
| Texas Northern District Court | 3:2015cv00222 | Flanagan et al v. Chesapeake Exploration, LLC et al | 1/21/2015 | 1/16/2017 | Stipulation of dismissal filed without explanation as to why. | 2 | No information on the lease or acreage involved |
| Ohio Northern District Court | 4:2018cv02217 | Hale et al v. Chesapeake Exploration L.L.C. et al | 9/26/2018 | 12/20/2018 | Arbitration award confirmed. | 2 | No information on the lease or acreage involved |
| Texas Southern District Court | 2:2014cv00331 | Texas Lone Star Petroleum Corporation v. Chesapeake Operating Inc et al | 8/8/2014 | 1/4/2017 | Bench Trial. Judgment for CHK. Lone Star appealed. | 2 | No information on the lease or acreage involved |
| Texas Northern District Court | 4:2013cv00844 | Calkins fka Katherine Gray v. JPMorgan Chase Bank, NA | 10/15/2013 | 3/10/2014 | Case is about a home in which JP Morgan is the mortgage holder | | |
| Texas Northern District Court | 4:2017cv00786 | Flanagan v. Access Midstream Partners, L.P. et al | 10/2/2017 | 10/3/2017 | Case originated in Oklahoma Northern District. It was transferred to Texas and the next day, Plaintiff filed for Dismissal. | 1 | No information on the lease or acreage involved |
| Ohio Northern District Court 6th USCOA | 4:2015cv02449 0:2018cv04139 | Zehentbauer Family Land LP et al v. Chesapeake Exploration, L.L.C. et al | 11/30/2015 | 3/30/2020 | Judge issued a Memo and Order granting MSJ in favor of CHK. Final Judgment entered in favor of Defendants. This case Royalty suit. Demand was $30M. It is not on appeal. | 3 with Class | Multiple leases |
| Ohio Southern District Court | 2:2013cv00280 | Benzel  et al v. Chesapeake Exploration, L.L.C. et al | 3/25/2013 | 9/30/2014 | ORDER denying (38) Motion for Summary Judgment; granting (39) Motion for Summary Judgment in case 2:13-cv-00280-ALM-EPD. 2:13cv280 is here by dismissed. | | |
| Ohio Southern District Court | 2:2013cv00296 | Batalo et al v. Chesapeake Exploration, L.L.C. et al | 3/28/2013 | 8/29/2014 | ORDER denying (38) Motion for Summary Judgment; granting (39) Motion for Summary Judgment in case 2:13-cv-00280-ALM-EPD. 2:13cv296 is here by dismissed. Signed by Judge Algenon L. Marbley on 9/30/2014. Associated Cases: 2:13-cv-00280-ALM-EPD, 2:13-cv-00296-ALM-EPD | | |
| Oklahoma Western District Court | 5:2016cv00238 | Beadles et al v. Chesapeake Energy Corporation et al | 3/10/2016 | 4/15/2016 | Order granting plaintiffs' Agreed Motion to Consolidate and ADMINISTRATIVE CLOSING ORDER | | |
| Oklahoma Western District Court | 5:2016cv00320 | Behrenbrinker et al v. Chesapeake Energy Corp et al | 4/5/2016 | 4/15/2016 | Order granting plaintiffs' Agreed Motion to Consolidate and ADMINISTRATIVE CLOSING ORDER | | |

**Exhibit B**
**Known Chesapeake Cases (Settled)**

| Court | Case Number | Case Title | dateFiled | dateTermed | Settlement Amount (if public) | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|---|---|
| Oklahoma Western District Court | 5:2016cv00306 | Crandall et al v. Chesapeake Energy Corporation et al | 4/1/2016 | 4/15/2016 | Order granting plaintiffs' Agreed Motion to Consolidate and ADMINISTRATIVE CLOSING ORDER | | |
| Oklahoma Western District Court | 5:2016cv00297 | Garvin Holdings LLC v. Chesapeake Energy Corporation et al | 3/29/2016 | 4/15/2016 | Order granting plaintiffs' Agreed Motion to Consolidate and ADMINISTRATIVE CLOSING ORDER | | |
| Oklahoma Western District Court | 5:2016cv00325 | Herzog et al v. Chesapeake Energy Corporation et al | 4/6/2016 | 4/15/2016 | Order granting plaintiffs' Agreed Motion to Consolidate and ADMINISTRATIVE CLOSING ORDER | | |
| Ohio Southern District Court | 2:2013cv00460 | Cesario et al v. Chesapeake Appalachia, L.L.C. et al | 5/13/2013 | 2/6/2014 | Settled Confidentially | | |
| 6th USCOA | 0:2013cv03021 | Charles Cain, et al v. Chesapeake Exploration. L.L.C. | 1/9/2013 | 10/30/2013 | Settled Confidentially | | |
| 5th USCOA | 0:2013pcd10619 | Charles Warren, et al v. Chesapeake Exploration, L.L.C., et al | 6/14/2013 | 7/16/2014 | Settled Confidentially | | |
| Ohio Southern District Court | 2:2013cv00246 | Corban v. Chesapeake Exploration, L.L.C. et al | 3/15/2013 | 1/26/2016 | Settled Confidentially | | |
| Texas Northern District Court | 4:2015cv00120 | Crowley Independent School District v. Chesapeake Operating LLC | 2/16/2015 | 1/21/2016 | Settled Confidentially | | |
| Texas Northern District Court | 3:2013cv02594 | Duggins et al v. Chesapeake Exploration LLC et al | 7/5/2013 | 6/12/2014 | Settled Confidentially | | |
| Wyoming District Court | 1:2015cv00102 | Ellbogen Property Management LTD and UBM Properties LLC v. Chesapeake Exploration LLC et al | 7/2/2015 | 7/23/2015 | Settled Confidentially | | |
| Oklahoma Western District Court | 5:2013cv00757 | FM Erikson Revocable Trust et al v. Chesapeake Operating Inc et al | 7/22/2013 | 10/10/2013 | Settled Confidentially | | |
| Texas Northern District Court | 3:2014cv03871 | Fort Worth 4th Street Partners LP et al v. Chesapeake Energy Corp et al | 10/30/2014 | 11/28/2016 | Settled Confidentially | | |
| 5th USCOA | 0:2017pcd10040 | | | | | | |
| 6th USCOA | 0:2015cv04044 | Frank Coniglio, Jr., et al v. Chesapeake Exploration, L.L.C., et al | 9/24/2015 | 5/12/2016 | Settled Confidentially | | |
| 6th USCOA | 0:2013cv03379 | Fritz Dairy Farm LLC, et al v. Chesapeake Exploration. L.L.C., et al | 4/3/2013 | 6/3/2014 | Settled Confidentially | | |
| 5th USCOA | 0:2013pcd10601 | Gordon Potts, et al v. Chesapeake Exploration, L.L.C. | 6/10/2013 | 7/29/2014 | Settled Confidentially | | |
| Texas Western District Court | 5:2014cv01020 | Gray v. Chesapeake Exploration, LLC | 11/14/2014 | 10/22/2015 | Settled Confidentially | | |
| Kansas District Court | 2:2016cv02753 | Graybill et al v. Chesapeake Operating, L.L.C. et al | 11/3/2016 | 11/15/2016 | Settled Confidentially | | |

**Exhibit B**
**Known Chesapeake Cases (Settled)**

| Court | Case Number | Case Title | dateFiled | dateTermed | Settlement Amount (if public) | Number of Plaintiffs | Acreage/Amounts Involved |
|---|---|---|---|---|---|---|---|
| Ohio Northern District Court | 5:2013cv00368 | Green et al v. Chesapeake Exploration, L.L.C.  et al | 2/20/2013 | 4/19/2013 | Settled Confidentially | | |
| Ohio Northern District Court | 4:2013cv01545 | Griebenow v. Chesapeake Exploration, LLC et al | 7/17/2013 | 7/22/2013 | Settled Confidentially | | |
| Ohio Southern District Court | 2:2014cv02337 | Jewett Sportsmen and Farmers Club, Inc. v. Chesapeake Exploration, LLC et al | 11/20/2014 | 11/14/2016 | Settled Confidentially | | |
| 6th USCOA | 0:2013cv04274 | Kenneth Wiley, et al v. Triad Hunter Gathering LLC, et al | 10/30/2013 | 3/5/2014 | Settled Confidentially | | |
| Oklahoma Western District Court | 5:2016cv00427 | Koppitz et al v. Chesapeake Energy Corporation et al | 4/26/2016 | 4/27/2016 | Settled Confidentially | | |
| Texas Northern District Court | 4:2014cv00082 | Laguna Point, Ltd. v. Chesapeake Operating, Inc. et al | 2/5/2014 | 8/20/2014 | Settled Confidentially | | |
| Texas Northern District Court | 3:2014cv01863 | Lowe et al v. Chesapeake Operating Inc et al | 5/21/2014 | 3/17/2015 | Settled Confidentially | | |
| Oklahoma Western District Court | 5:2016cv00284 | Lowry v. Chesapeake Energy Corporation et al | 3/24/2016 | 4/15/2016 | Settled Confidentially | | |
| Texas Southern District Court | 5:2013cv00169 | Maltsberger/Storey Ranch, LLC et al v. Rene R. Barrientos, Ltd. et al | 10/10/2013 | 7/9/2014 | Settled Confidentially | | |
| Wyoming District Court | 2:2014cv00146 | Moore Mineral Trust v. Chesapeake Exploration LLC et al | 7/18/2014 | 10/24/2014 | Settled Confidentially | | |
| Texas Western District Court | 5:2014cv00834 | Petty Business Enterprises, L.P., et al v. Chesapeake Exploration, LLC | 9/19/2014 | 1/7/2016 | Settled Confidentially | | |
| Texas Eastern District Court | 4:2015cv00506 | PMC Funding Corp v. Chesapeake Operating LLC et al | 7/24/2015 | 5/6/2016 | Settled Confidentially | | |
| Texas Southern District Court | 5:2014cv00167 | Rockwood et al v. Chesapeake Exploration Limited Partnership et al | 10/9/2014 | 5/6/2016 | Settled Confidentially | | |
| Ohio Southern District Court | 2:2015cv00626 | Ware et al v. Chesapeake Exploration, L.L.C. et al | 2/17/2015 | 10/3/2016 | Settled Confidentially | | |

# Exhibit C

**[Royalty Committee's Admissions and Denials]**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) ) | Case no. 20-33233 (DRJ) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## OFFICIAL COMMITTEE OF ROYALTY OWNERS' ADMISSIONS AND DENIALS IN SUPPORT OF RESPONSE TO EMERGENCY MOTION FOR ENTRY OF <u>AN ORDER DISBANDING THE ROYALTY COMMITTEE</u>

1. The allegations of Paragraph 1 are legal argument which does not need to be admitted or denied.  However, the allegations that the Royalty Committee is a second committee of unsecured creditors is denied. The allegation that the Unsecured Creditors Committee is already representing the interests of the Royalty Committee is denied. The allegations that royalty owners are being paid is yet to be determined, although it is admitted that a motion to approve payment to royalty owners was filed by the Debtors' and approved by the Court. The fact that the Debtors view the Royalty Owners as merely unsecured creditors is support for U.S. Trustee appointing the Royalty Committee.

2. The allegations of Paragraph 2 are denied, except to admit that many letters including the letter marked Exhibit A were submitted to the U.S. Trustee.

3. The allegations of Paragraph 3 are denied.

4. The allegations of Paragraph 4 are denied.

5. The allegations of Paragraph 5 are denied and, in further answering, royalty owners with litigation claims have filed their own objections and motions in this case.

6. The allegations of Paragraph 6 are denied. The Bankruptcy Code provides the ability of the U.S. Trustee to appoint creditor committees and the U.S. Trustee has

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

appointed committees other than unsecured creditors committees in numerous cases.

7. Paragraph 7 of the Motion need not be admitted or denied as it is the relief requested by the Debtors. In an abundance of caution, the Royalty Committee denies the allegations.

8. Paragraphs 8 through 10 are legal argument for jurisdiction and venue which need not be admitted or denied. The Royalty Committee consents to jurisdiction of the Court and the entry of a final order on the Motion to Disband.

9. Paragraph 11 is admitted.

10. Paragraph 12 is denied. Forshey Prostok, L.L.P. was not counsel to any parties in pending litigation prior to the Bankruptcy.

11. Paragraph 13 is admitted to the extent that a motion was filed and approved. However, the motion was to pay undisputed amounts and did not provide anything to show who was being paid what or what amounts were claimed by the Debtor to be currently owing but instead stated an estimated total amount of what was owed while there are pending disputes over the allocation of costs which are unresolved. As such, the Debtor filed a motion to allow payment of amounts it unilaterally determined to be owing and which were undisputed.

12. The Royalty Committee lacks sufficient information to admit or deny Paragraph 14 because it is uncertain if the Debtors are paying the proper amount owing to royalty owners and assessing costs correctly under applicable leases and state law.

13. The allegations of Paragraph 15 are admitted.

14. The allegations of Paragraph 16 are denied as written.

15. The Royalty Committee lack sufficient information to admit or deny the allegations of Paragraph 17.

16. The allegations of Paragraph 18 are admitted.

17. The allegations of Paragraph 19 are admitted, in part, but denied to the extent it is alleged that there were settlements. The Court is required to approve any settlement and no settlements were approved by the Court. In at least one case, the Commonwealth of Pennsylvania objected to the proposed settlements.

18. The allegations of Paragraph 20 are admitted to the extent a joinder was filed to the UCC's Objection as some Royalty Owners would also be unsecured creditors, but the Royalty Committee's Objection to the DIP Motion was centered on

protecting the rights of the Royalty Owners and the Royalty Committee worked out agreed language with the Debtors' in the DIP Order distinct from any language suggested by the Unsecured Creditors Committee.

19. Paragraphs 21 through 44 are legal argument and need not be admitted or denied.