# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' MID-CON ASSETS, (II) APPROVING BID PROTECTIONS, (III) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (B) AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO A DEFINITIVE PURCHASE AGREEMENT

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON OCTOBER 6, 2020, AT 10:30 A.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AUDIO/VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEJONES" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE JONES' HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE JONES. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state the following in support of this motion:[2]

## Introduction

1.      In the years prior to commencing these chapter 11 cases, the Debtors entered into a series of transactions to maximize operational efficiencies and divest certain non-core assets, including in Oklahoma and Hemphill County, Texas (the "<u>Mid-Con</u>").  In 2018, the Debtors sold certain acreage, producing properties, and other related property and equipment in the Mid-Con, including all of the Debtors' Mississippian Lime assets.  In September 2019, the Debtors began a marketing process for a final divestiture of Mid-Con assets, however that process was put on hold in May 2020.  Following the Petition Date, the Debtors, in consultation with the Consenting Stakeholders, continued to evaluate the potential sale of their remaining oil and gas properties and related infrastructure in the Mid-Con (the "<u>Mid-Con Assets</u>").  On August 3, 2020, the Debtors, with the assistance of Intrepid Partners, LLC ("<u>Intrepid</u>"), relaunched the Mid-Con marketing process. To date the Debtors have contacted approximately 85 parties and executed confidentiality agreements with approximately 58 potential purchasers, each of which has been granted access to a data room that contains, among other things, a form purchase and sale agreement and procedures

---

[2]      Capitalized terms used but not otherwise defined in this motion shall have the meanings given to them in the Bidding Procedures (as defined herein) or the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 37], as applicable.

for submitting proposals to be considered as a stalking horse bidder.  As of the date of this motion, the marketing process remains ongoing.

2.      The marketing process and the Bidding Procedures proposed herein provide sufficient time for the Debtors to finish marketing the Mid-Con Assets, receive and evaluate bids, execute a stalking horse agreement if doing so will maximize the value received for the Mid-Con Assets, and hold an Auction (if necessary) to determine the highest or otherwise best bid.  The Debtors intend to use the proceeds of any Mid-Con Asset sale to fund the Debtors' working capital needs and distributions under the Debtors' plan of reorganization.  The marketing process and the Bidding Procedures will result in the highest or otherwise best available offer for the Mid-Con Assets.  To the extent the Debtors move forward with a sale transaction for the Mid-Con Assets, the Debtors submit that such transaction will be in the best interest of the Debtors' estates and their stakeholders.

3.      Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## **Relief Requested**

4.      The Debtors hereby seek entry of an order, substantially in the form attached hereto (the "Bidding Procedures Order"):

   a.      authorizing and approving bidding procedures, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale of the Debtors' Mid-Con Assets, potentially at an auction if needed;

   b.      establishing the following dates and deadlines in connection with the Bidding Procedures:

   • Bid Deadline: October 15, 2020, at 12:00 p.m. prevailing Central Time, as the deadline by which all binding bids must be actually received by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline"); and

- Auction: October 27, 2020, at 10:00 a.m. prevailing Central Time, as the date by which the Debtors will conduct an Auction;

c.    authorizing the Debtors in their discretion and with the consent of the Consenting Stakeholders to (i) select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder") and enter into a purchase agreement with such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in connection with any Stalking Horse Agreement, (A) provide a break-up fee of up to 2% of the purchase price contemplated by the Stalking Horse Agreement (the "Break-up Fee"), (B) agree to reimburse reasonable and documented out-of-pocket fees and expenses of the Stalking Horse Bidder up to 1% of the purchase price contemplated by the Stalking Horse Agreement (the "Expense Reimbursement"), and/or (C) provide other appropriate and customary protections approved by the Court (together with the Break-up Fee and the Expense Reimbursement, the "Bid Protections") to the extent the Debtors determine that provision of such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates;

d.    approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Mid-Con Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice");

e.    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), and approving the form and manner of the notice thereof, attached as Exhibit 3 to the Bidding Procedures Order (the "Cure Notice"); and

f.    granting related relief.

5.    The Debtors also seek entry of an order (the "Sale Order") approving the Debtors' entry into a definitive purchase agreement substantially in the form that shall be attached to the Sale Order (the "Definitive Purchase Agreement"). The Debtors will file a proposed form of Sale Order and Definitive Purchase Agreement in advance of the hearing to consider the Sale Order.

## Jurisdiction and Venue

6.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant

to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Bankruptcy Rules 2002, 6004, 6006(a), 9007, and 9014.

<b><u>Proposed Sale Process and Selection of Stalking Horse</u></b>

9.      The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to consummate a sale of the Mid-Con assets prior to or contemporaneously with confirmation of a plan of reorganization.  The current marketing process for the Mid-Con assets launched on August 3, 2020.  At this time, approximately 58 parties have executed confidentiality agreements with the Debtors and currently have access to a virtual data room.  The Bidding Procedures contemplate that those parties, and any others that execute confidentiality agreements in accordance with the Bidding Procedures, will continue to have access to the data room throughout the sale process.  The timeline set forth in the Bidding Procedures was calculated to balance the need for adequate notice to parties in interest and potential bidders with the need to run a fulsome, expeditious, and efficient sale process.  Specifically, the Debtors propose the following timeline for the Sale:

| Event or Deadline | Date and Time |
|---|---|
| Deadline to Designate a Stalking Horse Bidder (if any) | October 8, 2020 |
| Qualified Bid Deadline | October 15, 2020, at 12:00 p.m. (prevailing Central Time) |
| Cure Objection Deadline | October 23, 2020, at 4:00 p.m. (prevailing Central Time) |
| Sale Objection Deadline | October 23, 2020 at 4:00 p.m. (prevailing Central Time); *provided, however,* that any objections to the manner in which the Auction was conducted and the identity of the Successful Bidder or Backup Bidder may be filed up to 24 hours prior to the Sale Hearing |
| Auction (if applicable) | An Auction will be held on October 27, 2020 at 10:00 a.m. (prevailing Central Time) via remote video |
| Sale Hearing | October 30, 2020, at 9:30 a.m. (prevailing Central Time) |

10.     If the Debtors, with the consent of the Consenting Stakeholders, select a Stalking Horse Bidder, and if the Break-Up Fee and Expense Reimbursement, if any, contemplated by the Stalking Horse Agreement are less than or equal to 2% and 1%, respectively, of the purchase price contemplated by the Stalking Horse Agreement, the Debtors will file with the Court and cause to be published on the case website a notice that contains information about the Stalking Horse Bidder, including the identity of the Stalking Horse Bidder, key terms of the Stalking Horse Bidder's bid, and the proposed Stalking Horse Agreement (the "Stalking Horse Selection Notice").

11.     Having the flexibility to designate a Stalking Horse Bidder and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Mid-Con Assets. Given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer Bid Protections to such bidder (although the Debtors ultimately may, in the exercise of their business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

### The Bidding Procedures

12.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order.

13.     Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully herein.  Generally speaking, however, the Bidding Procedures establish, among other things:[3]

- the process by which the Debtors will provide the Bidding Procedures Order, the Bidding Procedures, the Sale Notice, and the Cure Notice to interested parties as soon as practicable after entry of the Bidding Procedures Order;

- the requirements that Potential Bidders must satisfy to participate in the bidding process and become Qualified Bidders;

- the availability of and access to due diligence by Potential Bidders;

- the deadlines and requirements for submitting bids and the method and criteria by which such bids are deemed to be Qualified Bids sufficient to trigger the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any bidder (other than a Stalking Horse Bidder) to be considered a Qualified Bidder, which shall be determined by the Debtors;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid for the Auction;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the Successful Bidder will be selected by the Debtors; and

- various other matters relating to the sale process generally, including the designation of the Backup Bid, return of any good faith deposits, and certain reservations of rights.

---

[3]     The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.

14. Importantly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and, as noted, they preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate, in consultation with the Consenting Stakeholders, to maximize value for the Debtors' estates. As such, the Bidding Procedures uphold and comply with the Debtors' fiduciary obligations to maximize sale value.

15. Following conclusion of the Auction, if any, and the selection of a Successful Bidder, the Debtors shall present the results of the Auction at the Sale Hearing and shall seek entry of the Sale Order. The Sale Order shall authorize the Debtors to enter into and perform under the Definitive Purchase Agreement and deem the Debtors' selection of the Successful Bid final. Subject to the designation of any Backup Bid, the Debtors shall not solicit and/or accept any further bids or offers to submit a bid after such selection.

**I.    Form and Manner of Sale Notice**.

16. The Auction, if any, shall take place at 10:00 a.m. (prevailing Central Time) on October 27, 2020, via remote video, or such later date and time as selected by the Debtors.

17. As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known (collectively, the "Notice Parties"): (a) the United States Trustee for the Southern District of Texas; (b) counsel to the official committee of unsecured creditors; (c) counsel to the official committee of royalty owners; (d) the DIP Agent; (e) the administrative agent under the Debtors' prepetition revolving credit facility and counsel thereto; (f) the administrative agent for the Debtors' prepetition term loan facility and counsel thereto; (g) the indenture trustee for the Debtors' senior secured second lien notes and counsel thereto; (h) the indenture trustees for the Debtors' unsecured notes; (i) counsel to the ad hoc group of term loan lenders; (j) counsel to Franklin Advisers, Inc., as

investment manager on behalf of certain funds and accounts; (k) the United States Attorney's Office for the Southern District of Texas; (l) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; (n) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (o) the state attorneys general for states in which the Debtors conduct business; (p) all parties who have expressed a written interest in the Mid-Con Assets; (q) all known holders of liens, encumbrances, and other claims secured by the Mid-Con Assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (s) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

18. In addition, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in the *New York Times*, the *Oklahoman*, and the *Houston Chronicle*, the *Billings Gazette*, the *Philadelphia Inquirer*, the *Casper Star-Tribune*, the *Canton Repository*, and *The Advocate* to provide notice to any other potential interested parties.

19. The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Auction be required.

## II. Summary of the Assumption and Assignment Procedures.

20. The Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption, assumption and

assignment, or rejection of certain of the Debtors' Contracts in connection with the Sale. The proposed Assumption and Assignment Procedures are as follows:

a. **Cure Notice**. As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as <u>Exhibit 3</u> to the proposed Bidding Procedures Order, on certain non-Debtor Contract counterparties (collectively, the "<u>Contract Counterparties</u>," and each, a "<u>Contract Counterparty</u>"), and post the Cure Notice to the case website (https://dm.epiq11.com/chesapeake).

b. **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale (the "<u>Assigned Contracts</u>," each individually, an "<u>Assigned Contract</u>"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "<u>Cure Objection</u>"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c. **Cure Objections**. Objections, if any, to a Cure Notice (each, a "<u>Cure Objection</u>") must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Local Rules</u>"), and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **October 23, 2020 at 4:00 p.m. (prevailing Central Time)**; *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

d. **Effects of Filing a Cure Objection**. A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the motion.

e.    **Dispute Resolution**.  Any Cure Objection to the proposed assumption and assignment of an Assigned Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

f.    **Supplemental Cure Notice**.    If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice").

g.    **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs, if any.  All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h.    **Dispute Resolution of Supplemental Cure Objection**.  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice.

i.    **No Cure Objections**.  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file a Cure Objection or

a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

## Basis for Relief

**I.** **The Bidding Procedures Are Fair, Designed To Maximize the Value Received For the Mid-Con Assets, and Consistent With the Debtors' Reasonable Business Judgment**.

21.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

22.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

23.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

24.     Here, the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for the Mid-Con Assets. The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from the Sale. In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

25.     Moreover, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's

length fair value transaction"). This is especially true here, where the sale of the Mid-Con Assets and related transactions have been subjected to an extensive marketing process and intensively scrutinized by the Debtors and their retained advisors. Moreover, having the option to enter into a Stalking Horse Agreement with a Stalking Horse Bidder ensures that the Debtors retain flexibility to set a minimum purchase price for the Mid-Con Assets that will be tested by the marketplace. As such, the Debtors and their creditors can be assured that, taking into account the financial condition of the market and the economy, the consideration obtained will be fair and reasonable and at or above market.

26.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accordingly, the Court should enter an order approving the Bidding Procedures.

## II.     The Bid Protections Have a Sound Business Purpose and Should Be Approved.

27.     The Debtors are also seeking authority to designate one or more Stalking Horse Bidders and offer Bid Protections to each such Stalking Horse Bidder. The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, 2011 WL 2671254 at *1 n. 1. As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase

agreement." *Id*. (citation omitted).  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

28.     Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11:  "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . .  In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis in original).  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

29.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").  The allowance of Bid Protections, in the event that the Debtors execute a Stalking Horse Agreement, is in the best interests of the Debtors' estates and their creditors, as any Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Mid-Con Assets, which will inure to the benefit of the Debtors' estates.

30.     Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established in this district that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount

of the incentive is unreasonable relative to the proposed purchase price.  *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule).

31.     Here, the flexibility to offer Bid Protections is a critical component of the Debtors' ability to obtain the commitment of a Stalking Horse Bidder.  To qualify as a Stalking Horse Bidder, a bidder will need to have expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties.  Any Bid Protections offered to a Stalking Horse Bidder will have been negotiated in good faith and at arm's length and with significant give-and-take with respect to such Bid Protections.  As a result, by preserving the flexibility to offer Bid Protections, the Debtors ensure that their estates can realize the benefit of a transaction with a Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

32.     The Bid Protections provided to any Stalking Horse Bidder, (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed Sale, the commitments that have been made, and the efforts that have been and will be expended by any Stalking Horse Bidder.  The Bid Protections are necessary to induce a Stalking Horse Bidder to pursue the Sale and enter into a Stalking Horse Agreement.

33.     If the Court does not approve Bid Protections, the Debtors may not be able to induce one or more bidders to serve as a Stalking Horse Bidder, to the detriment of the Debtors' estates. Further, if the Debtors enter into a Stalking Horse Agreement with Bid Protections that were ultimately to be paid, it will be because the Debtors have received higher or otherwise superior offers for the Mid-Con Assets.  In short, the proposed Bid Protections are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

34.     The Bid Protections are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders.  Accordingly, the Court should approve Bid Protections.

### III.    The Court Should Approve the Debtors' Entry Into the Definitive Purchase Agreement Because the Sale Is a Sound Exercise of Business Judgment.

35.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."  *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

36.     As noted above, the business judgment rule shields a debtor's management's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not

17

entertain objections to the debtor's conduct after a reasonable basis is set forth).  Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).   The business judgment rule protects certain debtor decisions—such as the Debtors' entry into the Definitive Purchase Agreement—from reevaluation by a court with the benefit of hindsight.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

37.     Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

### A.      A Sound Business Purpose Exists For the Sale.

38.     The Debtors have a sound business justification for selling the Mid-Con Assets. The Mid-Con Assets are not core to the Debtors' business operations. Indeed, the Debtors have previously sold substantial assets in the Mid-Con area with the goal of ultimately divesting the entirety of their Mid-Con portfolio.

39.     Additionally, any Stalking Horse Bidder and Stalking Horse Agreement (if any) will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Mid-Con Assets.  Consequently, the ultimately successful bid, after being subject to a further "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Mid-Con Assets and will provide a

greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

40.     Thus, the Definitive Purchase Agreement of the Successful Bidder, will constitute the highest or otherwise best offer for the Mid-Con Assets, which are not required for the Debtors' go-forward business plan, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Mid-Con Assets through an Auction process and to enter into the Definitive Purchase Agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court authorize the proposed Sale as a proper exercise of the Debtors' business judgment.

**B.     The Sale Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

41.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

42.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Mid-Con Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may

be assumed Encumbrances under Definitive Purchase Agreement of the Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

43.     Any Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Mid-Con Assets to the Successful Bidder free and clear of all Encumbrances including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**IV.     The Form And Manner of the Sale Notice Should Be Approved**.

44.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction.  Notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**V.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

   **A.     The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment.**

45.     To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Assigned Contracts to the Successful Bidder to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

46.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

47.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. *First*, the Assigned Contracts are essential to the value of the Mid-Con Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Mid-Con Assets.  *Second*, it is unlikely that any purchaser would want to acquire the Mid-Con Assets unless a significant number

of the contracts and leases needed to conduct business and manage day-to-day operations of the Mid-Con Assets were included in the transaction. **Third,** the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

48.     Accordingly, the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

**B.      Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale.**

49.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

50.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

**C.      Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

51.      Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

52.      The Debtors will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court

therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Definitive Purchase Agreement of the Successful Bidder.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

53.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

54.     The Debtors will provide notice of this motion to: (a) the United States Trustee for the Southern District of Texas; (b) counsel to the official committee of unsecured creditors; (c) counsel to the official committee of royalty owners; (d) the DIP Agent; (e) the administrative agent under the Debtors' prepetition revolving credit facility and counsel thereto; (f) the administrative agent for the Debtors' prepetition term loan facility and counsel thereto; (g) the indenture trustee for the Debtors' senior secured second lien notes and counsel thereto; (h) the indenture trustees for the Debtors' unsecured notes; (i) counsel to the ad hoc group of term loan lenders; (j) counsel to Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts; (k) the United States Attorney's Office for the Southern District of Texas; (l) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; (n) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (o) the state attorneys general for states in which the Debtors conduct business; (p) all parties who have expressed a written interest in some or all of the Mid-Con Assets; (q) all known holders of liens, encumbrances, and other claims secured by the Mid-Con Assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (s) all known creditors of the Debtors; and (t) all parties that

have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
September 11, 2020

*/s/ Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jennifer F. Wertz (TX Bar No. 24072822) | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* ) |
| Kristhy M. Peguero (TX Bar No. 24102776) | Marc Kieselstein, P.C. (admitted *pro hac vice* ) |
| Veronica A. Polnick (TX Bar No. 24079148) | Alexandra Schwarzman (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | 300 North LaSalle Street |
| Houston, Texas 77010 | Chicago, Illinois 60654 |

JACKSON WALKER L.L.P.
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:        mcavenaugh@jw.com
        jwertz@jw.com
        kpeguero@jw.com
        vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* )
Marc Kieselstein, P.C. (admitted *pro hac vice* )
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        patrick.nash@kirkland.com
        marc.kieselstein@kirkland.com
        alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on September 11, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh