**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**DISCLOSURE STATEMENT FOR THE JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF**
**CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com  jwertz@jw.com
     kpeguero@jw.com
     vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     patrick.nash@kirkland.com
     marc.kieselstein@kirkland.com
     alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: [●]

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

<u>**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**</u>

**The Debtors are providing the information in this Disclosure Statement to holders of Claims for purposes of soliciting votes to accept or reject the *Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (the "Plan").[2] Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan, each holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Article VIII herein.**

**<u>Subject to the foregoing, the Plan is supported by the Debtors and holders of 100 percent of loans under the Revolving Credit Facility, holders of approximately 92 percent of FLLO Term Loan Facility Claims, holders of approximately 63 percent of Second Lien Notes, and holders of approximately 32 percent of Unsecured Notes. The Debtors urge holders of Claims whose votes are being solicited to accept the Plan.</u>**

**The Debtors urge each holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.**

**This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.**

**In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records and various assumptions regarding the Debtors' business. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business or their future results or operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.**

**The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted, and there is no assurance that the statements contained herein will be correct at any time after such date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right, with prior notice to and reasonable consent of the Required Plan Sponsors and Consenting DIP Lenders, to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.**

**The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any**

---

[2]    Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Article I.A of the Plan.

representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims and Interests (including those holders of Claims who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VIII, entitled "Risk Factors," which begins on page 52, before submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

The information contained in this Disclosure Statement is included for purposes of soliciting votes for, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code to the extent permitted under applicable law. Other Securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- **business strategy;**

- **acquisition or disposition of assets, including strategy, amount, timing, and ability to effectuate any such transaction;**

- **financial strategy;**

- **risks associated with the Chapter 11 process, including the Debtors' ability to develop, confirm, and consummate a plan under Chapter 11 or an alternative restructuring transaction;**

- **inability to maintain relationships with suppliers, employees, and other third parties as a result of the Chapter 11 filing or other failure of such parties to comply with their contractual obligations;**

- **failure to satisfy the Debtors' short- or long-term liquidity needs, including its inability to generate sufficient Cash flow from operations or to obtain adequate financing to fund its capital expenditures and meet working capital needs and its ability to continue as a going concern;**

- **legal proceedings and the effects thereof;**

- **drilling locations;**

- **oil and natural gas reserves;**

- **realized oil and natural gas prices;**

- **production volumes;**

- **capital expenditures;**

- **economic and competitive advantages;**

- **credit and capital market conditions;**

- **regulatory changes;**

- **lease operating expenses, general and administrative expenses and development costs;**

- **future operating results, including results of acquired properties;**

- **plans, objectives, expectations and intentions; and**

- **integration and the resulting benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' Cash position and levels of indebtedness.**

**Statements concerning these and other matters are not guarantees of the Debtors and the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors and the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' business during the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; the Debtors' ability to access financing necessary to consummate the Plan; general economic, business, and market conditions; commodity price fluctuations; currency fluctuations; interest rate**

**fluctuations; price increases; changes in estimates of oil and natural gas reserves; marketing of oil and natural gas; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing business; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; natural disasters; geopolitical instability; the effects of COVID-19 on the Debtors' business; and the effects of governmental regulation on the Debtors' business.**

*[Remainder of page intentionally left blank.]*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION...................................................................................................................1

II.     PRELIMINARY STATEMENT ...........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN .....................................................................................................................................2

        A.      What is chapter 11?...................................................................................................2
        B.      Why are the Debtors sending me this Disclosure Statement? ..................................2
        C.      Am I entitled to vote on the Plan?............................................................................3
        D.      What will I receive from the Debtors if the Plan is consummated?..........................3
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
                Claim, a Professional Claim, or a Priority Tax Claim?............................................6
        F.      Are any regulatory approvals required to consummate the Plan?.............................8
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ....................8
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan
                goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?"......................................................................................................9
        I.      What are the sources of Cash and other consideration required to fund the Plan?..........................9
        J.      Are there risks to owning the New Common Stock or New Warrants upon emergence from
                chapter 11?................................................................................................................9
        K.      Is there potential litigation related to the Plan? ......................................................9
        L.      Will Royalty and Working Interests be affected by the Plan? ................................9
        M.      What is the Management Incentive Plan and how will it affect the distribution I receive
                under the Plan?........................................................................................................10
        N.      Will the final amount of Allowed General Unsecured Claims affect the recovery of holders
                of Allowed General Unsecured Claims under the Plan? ........................................10
        O.      How will the preservation of the Causes of Action impact my recovery under the Plan? ...............10
        P.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............11
        Q.      What is the deadline to vote on the Plan? ..............................................................15
        R.      How do I vote for or against the Plan?...................................................................15
        S.      Why is the Bankruptcy Court holding a Confirmation Hearing?...........................15
        T.      When is the Confirmation Hearing set to occur? ...................................................15
        U.      What is the purpose of the Confirmation Hearing?................................................15
        V.      What is the effect of the Plan on the Debtors' ongoing business? .........................15
        W.      Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors?.......................................................................................16
        X.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? .............................................................................................................16
        Y.      Do the Debtors recommend voting in favor of the Plan?.......................................16
        Z.      Who supports the Plan?...........................................................................................17

IV.     THE DEBTORS' PLAN .......................................................................................................17

        A.      General Settlement of Claims and Interests ...........................................................17
        B.      Restructuring Transactions.....................................................................................17
        C.      Midstream Savings Requirements...........................................................................18
        D.      Reorganized Debtors...............................................................................................18
        E.      Sources of Consideration for Plan Distributions ...................................................18
        F.      Corporate Existence ................................................................................................20
        G.      Vesting of Assets in the Reorganized Debtors .......................................................21
        H.      Cancellation of Existing Securities and Agreements ..............................................21
        I.      Corporate Action.....................................................................................................22
        J.      New Organizational Documents ..............................................................................22

| | K. | Indemnification Obligations | 23 |
| | L. | Directors and Officers of the Reorganized Debtors | 23 |
| | M. | Effectuating Documents; Further Transactions | 23 |
| | N. | Section 1146 Exemption | 24 |
| | O. | Director and Officer Liability Insurance | 24 |
| | P. | Management Incentive Plan | 24 |
| | Q. | Employee Benefits | 24 |
| | R. | Preservation of Causes of Action | 25 |
| | S. | Preservation of Royalty and Working Interests | 26 |
| | T. | Payment of Certain Fees | 26 |
| **V.** | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** | | **26** |
| | A. | Chesapeake's Corporate History | 26 |
| | B. | The Debtors' Key Assets and Operations | 27 |
| | C. | The Debtor's Prepetition Capital Structure | 29 |
| | D. | Pending Material Litigation | 36 |
| **VI.** | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** | | **37** |
| | A. | Recent Market Volatility and Oil Market Crash | 37 |
| | B. | Operational Responses | 38 |
| | C. | Financial Responses | 39 |
| | D. | Retention of Advisors | 41 |
| | E. | Hedging Portfolio Unwind | 41 |
| | F. | Negotiations with Key Stakeholders and Entry into DIP Facility and Restructuring Support Agreement | 41 |
| **VII.** | **MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES** | | **42** |
| | A. | First Day Relief | 42 |
| | B. | Other Procedural and Administrative Motions | 45 |
| | C. | Retention of Professionals | 47 |
| | D. | Enforcement of the Automatic Stay | 47 |
| | E. | Contract and Lease Rejection | 48 |
| | 1. | ETC Texas Contract Rejection Motion | 48 |
| | 2. | FERC Contract Rejection Motion | 49 |
| | 3. | Sand Mine Contract Rejection Motion | 50 |
| | 4. | IT Agreements and Non-Residential Real Property Leases Rejection Motion | 50 |
| | F. | Exit Financing and Backstop Commitment Agreement | 51 |
| | G. | Mid-Continent Asset Sale | 51 |
| | H. | Appointment of Creditors' Committees | 51 |
| **VIII.** | **RISK FACTORS** | | **52** |
| | A. | Bankruptcy Law Considerations | 52 |
| | B. | Risks Related to Recoveries under the Plan | 56 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Business | 58 |
| **IX.** | **SOLICITATION, VOTING, AND NEW COMMON STOCK ELECTION PROCEDURES** | | **66** |
| | A. | Holders of Claims Entitled to Vote on the Plan | 66 |
| | B. | Solicitation Packages | 67 |
| | C. | Voting Record Date | 67 |
| | D. | Voting on the Plan | 67 |

**X.       CONFIRMATION OF THE PLAN**........................................................................................**68**

    A.     Requirements for Confirmation of the Plan ...................................................68
    B.     Best Interests of Creditors/Liquidation Analysis ........................................68
    C.     Feasibility ........................................................................................................68
    D.     Acceptance by Impaired Classes ...................................................................69
    E.     Confirmation Without Acceptance by All Impaired Classes .......................69
    F.     Valuation of the Debtors ................................................................................70

**XI.      CERTAIN SECURITIES LAW MATTERS** ...................................................................**70**

    A.     Issuance of Securities under the Plan ...........................................................70
    B.     Subsequent Transfers .....................................................................................71
    C.     New Common Stock & Management Incentive Plan ....................................73
    D.     Shares issuable pursuant to the Rights Offering ..........................................73

**XII.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.................................**73**

    A.     Introduction ....................................................................................................73
    B.     Certain U.S. Federal Tax Consequences to the Debtors and the Reorganized
           Debtors ............................................................................................................74
    C.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims Entitled
           to Vote .............................................................................................................76
    D.     Certain United States Federal Income Tax Consequences to U.S. Holders of Owning and
           Disposing of Consideration Received Under the Plan ..................................82
    E.     Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain
           Allowed Claims ..............................................................................................84
    F.     FATCA ............................................................................................................88
    G.     Information Reporting and Backup Withholding...........................................88

**XIII.    RECOMMENDATION** .........................................................................................................**90**

## **EXHIBITS**[3]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Corporate Organization Chart

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

---

[3]    Each Exhibit is incorporated herein by reference.

## I.   INTRODUCTION

Chesapeake Energy Corporation ("Chesapeake") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and, together with Chesapeake's direct and indirect non-Debtor subsidiaries and affiliates, the "Company"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan, dated September 11, 2020.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.

**THE DEBTORS AND CERTAIN STAKEHOLDERS, INCLUDING HOLDERS OF 100 PERCENT OF LOANS UNDER THE REVOLVING CREDIT FACILITY, HOLDERS OF APPROXIMATELY 92 PERCENT OF FLLO TERM LOAN FACILITY CLAIMS, HOLDERS OF APPROXIMATELY 63 PERCENT OF SECOND LIEN NOTES, AND HOLDERS OF APPROXIMATELY 32 PERCENT OF UNSECURED NOTES, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.   PRELIMINARY STATEMENT

The Debtors are an Oklahoma City, Oklahoma-based oil and gas company engaged in exploration and production activities in onshore U.S. oil and natural gas properties with a focus on shale and resource plays.  As of the date of this Disclosure Statement, the Company operates in approximately five states and has approximately 2,000 employees and independent contractors.  As of March 31, 2020, the Debtors held (i) interests in approximately 13,700 gross wells, a substantial majority of which are Debtor-operated, (ii) approximately 5,193,000 gross acres[2] of developed leasehold, undeveloped leasehold, and fee minerals, in the aggregate, and (iii) estimated proved reserves of approximately 988 million barrels of oil equivalent, in the aggregate, of oil, natural gas and natural gas liquids based on Securities & Exchange Commission parameters.  As of the Petition Date, the Debtors had approximately $9.169 billion in total funded debt obligations.

The difficulties faced by the Debtors are consistent with those faced industry-wide.  Low oil and natural gas prices and the volatile market have challenged oil and gas companies for years.  From January 1, 2012 until the Petition Date, West Texas Intermediate ("WTI") crude oil prices ranged from a high of $107.26 per barrel to a low of -$37.63 per barrel; during that same period Henry Hub natural gas prices ranged from a high of $6.15 per one million British Thermal Units ("mmbtu") to a low of $1.55 per mmbtu.  Further, in 2020 the COVID-19 pandemic and the oil price war between the Kingdom of Saudi Arabia and Russia have exacerbated such hardships.

The Debtors have undertaken significant efforts since 2013 to address their leverage and profitability— including rationalizing capital expenditures, reducing operating and general administrative expenses, executing over $11 billion in strategic oil and gas divestitures, reducing off balance sheet liabilities and consummating multiple refinancing transactions, including as recently as December 2019.  Despite these efforts, the recent and dramatic drop in commodity prices and resulting tightening of the credit markets have frustrated the Debtors' ability to further deleverage absent a chapter 11 proceeding. As a result, in early 2020, the Company engaged financial and legal advisors to explore strategic alternatives to enhance the Debtors' liquidity, evaluate strategic merger and acquisition opportunities, and address their capital structure.

Following the retention of financial and legal advisors, the Debtors commenced comprehensive restructuring negotiations with their major creditor constituencies, including MUFG Union Bank, N.A., in its capacity as the administrative agent for the Revolving Credit Facility ("MUFG"), an ad hoc group of lenders under the FLLO Term

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings given to them in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

[2]   Gross acres represent the total surface area covered by Chesapeake's leased acreage, without taking into account the fact that Chesapeake may not bear 100% of costs associated with such acreage.  Similarly, gross producing wells reflect the number of wells that Chesapeake owns an interest in which are currently producing oil or natural gas.

Loan Facility (the "FLLO Ad Hoc Group"), and Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts ("Franklin"). The Debtors provided these creditors and their advisors with substantial diligence regarding the Debtors' operations, held multiple telephonic conferences to discuss the Debtors' business plan and potential estate causes of action, and worked cooperatively with these stakeholders regarding a mortgage analysis related to oil and gas assets securing the Debtors' prepetition secured debt.

The Debtors focused their conversations with Revolving Credit Facility Lenders on the terms of a potential debtor-in-possession financing facility and potential exit financing and their conversations with the FLLO Ad Hoc Group and Franklin on all aspects of a comprehensive restructuring, including the terms of a new money investment. The Debtors were able to reach an agreement with the FLLO Ad Hoc Group members and Franklin on the parameters of a restructuring transaction that included a $600 million fully backstopped rights offering within approximately three weeks from the start of negotiations. Over the course of the next month while the Debtors continued to negotiate the DIP Facility, the Debtors, the FLLO Ad Hoc Group, and Franklin continued to refine the terms of the rights offering and other restructuring transactions in mid-May 2020.

As the primary terms of the debtor-in-possession financing neared conclusion, the Revolving Credit Facility lenders were included as part of the restructuring support agreement negotiations, particularly in light of the desire to de-risk the Debtors' contemplated restructuring through committed exit financing. The Revolving Credit Facility Lenders and the FLLO Ad Hoc Group engaged directly on the terms of a global deal, including the terms of proposed exit financing. On June 18, 2020, the Revolving Credit Facility Lenders, the FLLO Ad Hoc Group, and Franklin reached agreement in principle on a global deal, which included $2.5 billion of exit facilities, comprised of a $1.75 billion revolving facility and a $750 million first lien last out term loan facility. The terms of the global agreement are documented in the Restructuring Support Agreement executed on June 28, 2020, with holders of 100 percent of the loans under the Revolving Credit Facility, holders of approximately 90 percent of FLLO Term Loan Facility Claims, holders of approximately 63 percent of the Second Lien Notes, and holders of approximately 32 percent of the Unsecured Notes. Since the execution of the Restructuring Support Agreement, support for the Restructuring Transactions contemplated by the Plan has grown to holders of approximately 92 percent of the FLLO Term Loan Facility Claims. The Restructuring Support Agreement, and the Plan contemplated thereby, represents a significant achievement for the Debtors and is a testament to the strength and potential of the Debtors and their asset base.

The Plan contemplated by the Restructuring Support Agreement delivers significant value to stakeholders in the form of a deleveraged balance sheet and a significant new money investment that together will provide a path to exit in a volatile and challenging commodity price environment.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing

adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as defined herein).  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3]      The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims (in millions) | Projected Recovery Under the Plan |
| Class 1 | Other Secured Claims | On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | [●] | [●] |
| Class 2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | [●] | [●] |
| Class 3 | Revolving Credit Facility Claims | On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility. On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive, in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full in Cash as set forth in Section II.A.1 of the Plan. | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Allowed Claims (in millions)** | **Projected Recovery Under the Plan** |
| **Class 4** | **FLLO Term Loan Facility Claims** | On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility.  On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights. | [●] | [●] |
| **Class 5** | **Second Lien Notes Claims** | On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest.  Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C  Warrants. | [●] | [●] |
| **Class 6** | **Unsecured Notes Claims** | On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of (i) the Unsecured Claims Recovery and (ii) 50 percent of the New Class C Warrants. | [●] | [●] |
| **Class 7** | **General Unsecured Claims** | On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Unsecured Claims Recovery. | [●] | [●] |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims (in millions) | Projected Recovery Under the Plan |
| Class 8 | Intercompany Claims | On the Effective Date, unless otherwise provided under the Restructuring Transactions Memorandum, each holder of an Allowed Intercompany Claim shall have its Claim (i) Reinstated or (ii) distributed, contributed, set off, settled, canceled, and released or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distributions shall be made on account of any such Intercompany Claims. | [●] | [●] |
| Class 9 | Intercompany Interests | On the Effective Date, each holder of Intercompany Interests shall have such Interest (i) Reinstated or (ii) cancelled, released, and extinguished and without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders. | [●] | [●] |
| Class 10 | Existing Equity Interests | On the Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and extinguished without any distribution. | [●] | [●] |

E.   **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, a Professional Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

1.   **General Administrative Claims**

Administrative Claims other than DIP Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.  Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Agent under the Collateral Trust Agreement shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments. The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

## 2. DIP Claims

DIP Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein. Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (1) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (2) the proceeds of the Rights Offering; and (3) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims. For the avoidance of doubt, the Debtors shall indefeasibly pay in Cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order. The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with Article II.B of the Plan, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## 3. Professional Compensation

Professional Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.

### (a) Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

**(b)**     **Professional Fee Escrow Account**

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

**(c)**     **Professional Fee Amount**

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

**(d)**     **Post-Confirmation Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**4.**     **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**5.**     **Statutory Fees**

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee. Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

**F.**     **Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.**     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide holders of Claims with less than

they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article I.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 68, and the Liquidation Analysis attached hereto as **Exhibit C**.

**H.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 68, for a discussion of the conditions precedent to consummation of the Plan.

**I.**     **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the distributions under the Exit Facilities, as applicable.

**J.**     **Are there risks to owning the New Common Stock or New Warrants upon emergence from chapter 11?**

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 52.

**K.**     **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  *See* Article VIII.22 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 66.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 69.

**L.**     **Will Royalty and Working Interests be affected by the Plan?**

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan.  For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any right to payment arising from a Royalty and Working Interest, if any, shall be treated as a General Unsecured Claim under the Plan and shall be subject to any discharge and/or release provided thereunder.

**M.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On the Effective Date, the Reorganized Debtors will implement the Management Incentive Plan (as described more fully in Article IV.P of this Disclosure Statement).  The New Common Stock being provided in connection with the Management Incentive Plan will dilute all of the New Common Stock equally.

As is typical for many of the Debtors' peer companies, to be a competitive employer and to maximize the value of the Debtors' estates, the Debtors have requested a management incentive plan that the New Board can use to attract, incentivize, and retain talented key employees (including officers) after the Effective Date.  After the Effective Date, the New Board in its sole discretion will implement the allocation, timing, and the form and structure of options, warrants, and/or equity compensation to be provided pursuant to the Management Incentive Plan.

**N.      Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?**

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information as of the date hereof, the amount of potential Allowed General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material and could materially affect Class 6 and Class 7 recoveries.  The projected amount of General Unsecured Claims set forth herein is subject to change.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses, and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigants, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change and materially affect Class 6 and Class 7 recoveries.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. Finally, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change, and could materially affect Class 6 and Class 7 recoveries.

**O.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized**

10

**Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for 30 days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

> **P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes. The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Stakeholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT VALIDLY OPT OUT OR FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

> **1.      Release of Liens**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages,**

deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

2.      Releases by the Debtors

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in-or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary

12

in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

        3.        **Releases by Holders of Claims and Interests**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the

third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

4.      Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

14

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**Q.    What is the deadline to vote on the Plan?**

The Voting Deadline is [November 23], 2020, at 11:59 p.m. (prevailing Central Time).

**R.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is actually received by the Debtors' Claims and Balloting Agent, Epiq Corporate Restructuring, LLC ("Epiq"), on or before the Voting Deadline, *i.e.* [November 23], 2020, at 11:59 p.m., prevailing Central Time. See Article IX of this Disclosure Statement, entitled "Solicitation, Voting, and New Common Stock Election Procedures," which begins on page 66 for more information.

**S.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.    When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for [December 7], at [●], prevailing Central Time, or such other time as may be scheduled by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time without further notice. Objections to Confirmation must be Filed with the Bankruptcy Court, by no later than [November 23], at 5:00 p.m., prevailing Central Time, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order incorporated herein by reference.

**U.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**V.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire, or

dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**W.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire, and the new directors and officers of each of the Reorganized Debtors shall be appointed in accordance with the terms of the Governance Term Sheet, attached as <u>Exhibit 6</u> to the Restructuring Term Sheet. The New Board shall consist of those individuals that are appointed in accordance with Article IV.L of the Plan.

Assuming that the Effective Date occurs, holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Common Stock, may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**X.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Balloting Agent, Epiq, via one of the following methods:

> *By regular mail at:*
> Chesapeake Energy Corporation
> Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4419
> Beaverton, OR 97076-4419
>
> *By hand delivery or overnight mail at:*
> Chesapeake Energy Corporation
> Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.
> Beaverton, OR 97005
>
> *By electronic mail at:*
> chesapeake@epiqglobal.com
>
> *By telephone at:*
> (855) 907-2082 (toll free) or +1 (503) 520-4448 (toll)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Balloting Agent at https://dm.epiq11.com/chesapeake (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

**Y.     Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**Z.      Who supports the Plan?**

The Plan is supported by the Debtors and certain stakeholders, including holders of 100 percent in principal amount of the Revolving Credit Facility Claims, holders of approximately 92 percent in principal amount of the FLLO Term Loan Facility Claims, holders of approximately 63 percent in principal amount of the Second Lien Notes, and holders of approximately 32 percent of Unsecured Notes.

## IV.      THE DEBTORS' PLAN

The Plan contemplates the following key terms, among others described herein and therein:

**A.      General Settlement of Claims and Interests**

As discussed in detail in this Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions").  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders. The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights

Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

### C.    Midstream Savings Requirements

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

### D.    Reorganized Debtors

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### E.    Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D of the Plan.

### 1.    Rights Offering

The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights;

(b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights. Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount. Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order.

All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law. The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith). On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

## 2.    Rights and New Common Stock

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B of the Plan. Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents. Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock. All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

       **3.**       **New Warrants**

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B of the Plan. Issuances of the New Warrants shall be governed by the terms and conditions set forth in the Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

       **4.**       **Exit Facilities**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents. The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to File with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**F.**       **Corporate Existence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such

documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### G.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### H.    Cancellation of Existing Securities and Agreements

On the Effective Date, except as otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan or the Confirmation Order.

Notwithstanding anything to the contrary in the Plan, to the extent cancelled pursuant to the Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; and (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable.

Except as provided in the Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable. To the extent cancelled in accordance with the Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to extend any further or future credit or financial

accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

**I.        Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article VI.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**J.        New Organizational Documents**

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state.  The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan.  The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock

in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents.

### K.      Indemnification Obligations

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

### L.      Directors and Officers of the Reorganized Debtors

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing.  Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents.  The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

### M.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      **Section 1146 Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      **Director and Officer Liability Insurance**

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth in the Plan, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.      **Management Incentive Plan**

On the Plan Effective Date, the Reorganized Debtors shall adopt the Management Incentive Plan.  All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

Q.      **Employee Benefits**

Unless otherwise provided in the Plan, and subject to Article V of the Plan, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.  On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to

the Debtor and such employee.    Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

R.    **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

S.      **Preservation of Royalty and Working Interests**

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan.  For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any right to payment arising from a Royalty and Working Interest asserted by a non-Debtor, if any, shall be treated as a General Unsecured Claim under the Plan and shall be subject to any discharge and/or release provided hereunder.

T.      **Payment of Certain Fees**

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in Article IV.T of the Plan.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

V.      **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

A.      **Chesapeake's Corporate History**

Chesapeake is a publicly-traded oil and natural gas company headquartered in Oklahoma City, Oklahoma. Founded in 1989, Chesapeake grew from its initial $50,000 investment and first well spud in Grady County, Oklahoma to become one of the largest oil and gas exploration and production companies in the United States.  In its early years, Chesapeake's growth was primarily attributable to its strategy of drilling horizontal natural gas wells in unconventional reservoirs and the early adoption of hydraulic fracturing techniques in Southern Oklahoma and Fayette County, Texas.  In 1993, Chesapeake went public through an initial public offering that raised approximately $25 million.  With the newly raised capital, Chesapeake made its first big lease play in the Austin Chalk formation.  By 1996, Chesapeake began focusing on opportunistic acquisitions, joint ventures, and unconventional drilling in carbonates, tight sandstones, and shales particularly in the Barnett Shale, Fayetteville Shale, and Marcellus Shale, and in 2008, Chesapeake discovered the Haynesville Shale in East Texas/Northwestern Louisiana.  From 2009 to 2013, Chesapeake's natural gas production continued to grow from 2.3 billion to nearly 3.0 billion cubic feet per day.  During this same time, the Debtors also began to build substantial acreage positions in basins which produce a significant amount of crude oil and natural gas liquids ("NGLs"), along with natural gas, including the Eagle Ford Shale in South Texas, the Utica Shale in Ohio, and the Powder River Basin in Wyoming.  Recently, the Debtors acquired additional

exposure to crude oil acreage and production in the Brazos Valley of the Eagle Ford Shale in Southeastern Texas with the acquisition of WildHorse Resource Development Corporation ("WildHorse") in February 2019.

Chesapeake's growth required extensive capital support, and by the time the current management team, led by Chief Executive Officer Robert D. Lawler, took over in 2013, Chesapeake had been saddled with significant funded debt obligations and other legacy commitments equating to over $20 billion in total leverage. This left Chesapeake in a tenuous position when the oil and natural gas markets began to falter in 2014. Prior to the collapse in oil and natural gas prices, the new management team had already undertaken immense efforts to streamline its business operations, reduce its obligations, and divest non-core assets, and these activities have continued until today. Ultimately, and in light of recent world events, Chesapeake determined to commence these chapter 11 cases in order to permanently restructure its balance sheet and position Chesapeake for long-term sustainable profitability.

**B.      The Debtors' Key Assets and Operations**

**1.      The Debtors' Assets and Locations**

The Debtors have a gas-centric asset portfolio with significant, high-quality drilling inventory.[4] The Debtors hold substantial positions in the liquids-rich resource plays of the Eagle Ford Shale in South Texas—including the Brazos Valley, the stacked play in the Powder River Basin in Wyoming, and the Anadarko Basin in Northwestern Oklahoma. The Debtors' natural gas resource plays are the Marcellus Shale in the Northern Appalachian Basin in Pennsylvania, and the Haynesville/Bossier Shales in Northwestern Louisiana. The following is an overview of each of the Debtors' six geographic operating areas, including acreage held as of December 31, 2019 and production volumes as of March 31, 2020:

- ***Marcellus Shale:*** Chesapeake holds a significant natural gas position in the Marcellus Shale in the Northern Appalachian Basin in Pennsylvania, holding approximately 538,000 net acres[5] and producing an average of 163,000 barrels of oil equivalent per day.

- ***Haynesville/Bossier Shale:*** Chesapeake discovered and holds a large position in the Haynesville/Bossier Shale in the Northwestern Louisiana region. Chesapeake began developing natural gas in the area in 2008. Chesapeake holds approximately 293,000 net acres and produces approximately 93,000 barrels of oil equivalent per day.

- ***Eagle Ford Shale of South Texas:*** Chesapeake holds approximately 232,000 net acres in South Texas and produces approximately 108,000 barrels of oil equivalent per day, the majority of which is crude oil.

- ***Brazos Valley:*** Chesapeake obtained their Brazos Valley position in Southeastern Texas through an acquisition of WildHorse in 2019. Chesapeake holds approximately 477,000 net acres in the Brazos Valley—primarily targeting the Eagle Ford Shale oil formation—and produces approximately 61,000 barrels of oil equivalent per day.

- ***Powder River Basin:*** Chesapeake holds approximately 206,000 net acres in Wyoming's Powder River Basin and produces approximately 38,000 barrels of oil equivalent per day, the majority of which is composed of crude oil and NGLs.

---

[4]   As of March 31, 2020, Chesapeake's portfolio contains 4,186 billion cubic feet of proved gas reserves, 213 million barrels of proved oil reserves, and 78 million barrels of oil equivalent of proved NGLs reserves, in each case, based on Securities & Exchange Commission parameters.

[5]   As opposed to a gross acre, a net acre reduces an oil and gas company's ownership to reflect its true working interest, or cost-bearing interest, in a lease. Net acres are calculated by multiplying the gross acres covered by a lease by Chesapeake's working interest in such lease. For example, if Chesapeake bears 50% of the costs associated with a 10,000 acre lease, and another company bears the remaining 50%, Chesapeake has 5,000 net acres in such lease.

- *Mid-Continent - Anadarko Basin:*  Chesapeake holds a position in the Mid-Continent located in Northwestern Oklahoma, holding approximately 736,000 net acres and producing approximately 16,000 barrels of oil equivalent per day.



### 2.     The Debtors' Industry and Operations

The majority of the Debtors' assets are in the upstream sector of the oil and gas industry, which is comprised of exploration and production ("E&P") activities that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons from under the ground.  Common upstream assets include wells and simple well pad equipment. The Debtors focus on the acquisition, exploration, development, and production of crude oil, natural gas liquids, and natural gas.  Although the Debtors also engage in certain functions such as gathering, processing, and marketing—which are typically characterized as mid-stream or downstream activities—the Debtors consider such functions to be ancillary to their upstream E&P activities.

As of March 31, 2020, the Debtors held (i) interests in approximately 13,700 gross wells, a substantial majority of which are Debtor-operated, (ii) approximately 5,193,000 gross acres[6] of developed leasehold, undeveloped leasehold, and fee minerals, in the aggregate, and (iii) estimated proved reserves of approximately 988 million barrels of oil equivalent, in the aggregate, of oil, natural gas, and NGLs based on Securities & Exchange Commission parameters.  For the three months ending March 31, 2020, the Debtors' exploration and production activities yielded a total production of approximately 479,000 barrels of oil equivalent per day.

The Debtors, through Debtor Chesapeake Energy Marketing, LLC ("CEML"), also provide oil, natural gas and NGL marketing services, including commodity price structuring; securing and negotiating gathering, hauling,

---

[6]     Gross acres represent the total surface area covered by Chesapeake's leased acreage, without taking into account the fact that Chesapeake may not bear 100% of costs associated with such acreage.  Similarly, gross producing wells reflect the number of wells that Chesapeake owns an interest in which are currently producing oil or natural gas.

processing, and transportation services; contract administration; and nomination services for both the Debtor and non-Debtor interest owners in Debtor-operated wells.  CEML also provides services to enhance the value of the Debtors' oil and natural gas production by aggregating volumes sold to various intermediary markets, end markets, and pipelines.  This aggregation enables the Debtors to attract larger, more creditworthy customers, which assists in maximizing the prices the Debtors receive.

The Debtors' oil typically is sold under market-sensitive, short-term or spot price contracts, while natural gas and NGL production usually is sold to purchasers under percentage-of-proceeds contracts, percentage-of-index contracts, or spot price contracts.[7]  Under the percentage-of-proceeds contracts, the Debtors receive a percentage of the resale price received from the ultimate purchaser.  Under the percentage-of-index contracts, the price the Debtors receive is tied to published indices.  From time to time, the Debtors also enter into long-term gathering, processing, and transportation contracts that require the Debtors to deliver fixed, determinable quantities of production over a specified period of time or, in the event the Debtors are unable to deliver or transport the committed volumes, pay shortfall payments.

## C.    The Debtor's Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $9.169 billion in aggregate outstanding principal amount of funded and unfunded debt obligations.

| Debt | Maturity | Principal Amount (in USD millions) |
|---|---|---|
| Revolving Credit Facility | September 12, 2023 | $1,929 |
| Letters of Credit outstanding under RCF | | $74 |
| First Lien Last Out Term Loan Facility | July 1, 2024 | $1,500 |
| **Total Senior Secured Debt** | | **$3,503** |
| 11.500% 2nd Lien Notes | January 1, 2025 | $2,330 |
| **Total Secured Debt** | | **$5,833** |
| 6.625% Notes Due 2020 | August 15, 2020 | $176 |
| 6.875% Notes Due 2020 | November 15, 2020 | $74 |
| 6.125% Notes Due 2021 | February 15, 2021 | $166 |
| 5.375% Notes Due 2021 | June 15, 2021 | $127 |
| 4.875% Notes Due 2022 | April 15, 2022 | $272 |
| 5.750% Notes Due 2023 | March 15, 2023 | $168 |
| 7.000% Notes Due 2024 | October 1, 2024 | $623 |
| 8.000% Notes Due 2025 | January 15, 2025 | $246 |
| 8.000% Notes Due 2026 | March 15, 2026 | $46 |
| 7.500% Notes Due 2026 | October 1, 2026 | $119 |
| 8.000% Notes Due 2027 | June 15, 2027 | $253 |
| 5.500% Convertible Notes Due 2026 | September 15, 2026 | $1,064 |
| 6.875% BVL Notes Due 2025 | February 1, 2025 | $2 |
| **Total Unsecured Debt** | | **$3,336** |
| **Total Funded Debt** | | **$9,169** |

---

[7]    For any given moment, the spot price for a commodity represents the then-current price at which that commodity could be bought or sold for immediate delivery.

| Preferred Equity | Shares | Approximate Liquidation Preference |
|---|---|---|
| 5.75% Cumulative Non-Voting Convertible Preferred Stock (Series A) | 423,363 | $423.4 million |
| 5.75% Cumulative Non-Voting Convertible Preferred Stock | 770,528 | $770.5 million |
| 4.50% Cumulative Convertible Preferred Stock | 2,558,900 | $255.9 million |
| 5.00% Cumulative Convertible Preferred Stock (Series 2005B) | 1,810,667 | $181.1 million |

1.      **Revolving Credit Facility**

The Debtors maintain a senior secured reserve-based revolving credit facility (the "Revolving Credit Facility") under that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated or otherwise modified from time to time, the "Revolving Credit Facility Credit Agreement"), by and among Chesapeake as borrower, the Debtor guarantors party thereto, MUFG, as administrative agent (in such capacity, together with its permitted successors and assigns, the "Revolving Credit Facility Administrative Agent"), and the other lender, issuer, and agent parties thereto. Borrowings under the Revolving Credit Facility Credit Agreement are subject to a borrowing base that is adjusted twice each year (on June 15 and October 30), and may be adjusted twice more per year during "wildcard" redeterminations based on the evaluation of the Debtors' reserve reports, hedging schedule, and other similar information subject to certain procedures set forth in the Revolving Credit Facility Credit Agreement. As part of these regularly scheduled borrowing base redeterminations, effective as of June 15, 2020, the lenders under the Revolving Credit Facility elected to reduce the borrowing base from $3 billion to $2.3 billion.

The Revolving Credit Facility includes a swingline commitment of $300 million and a letter of credit sublimit of $750 million. Outstanding loans, swingline loans, and letters of credit issued under the Revolving Credit Facility are capped at the lesser of the Revolving Credit Facility borrowing base and $2.6 billion in aggregate commitments. As of the Petition Date, the Revolving Credit Facility borrowing base was $2.3 billion and the Debtors had outstanding borrowings under the Revolving Credit Facility of approximately $1.929 billion, excluding outstanding letters of credit.

The Revolving Credit Facility Credit Agreement was amended three times in 2019 in connection with the acquisition of certain assets and issuance of additional indebtedness:

- **February 1, 2019:**  amended in connection with the WildHorse acquisition to, among other things, permit the Debtors' investment in WildHorse;

- **December 3, 2019:**  amended to, among other things, permit the issuance of the Second Lien Notes and entry into the FLLO Term Loan Facility without associated reductions in the borrowing base, increase the amount of first lien last out indebtedness that could be incurred by the Debtors in connection with the FLLO Term Loan Facility, modify certain financial performance covenants, and increase the mortgage coverage requirement under the Revolving Credit Facility Credit Agreement to not less than 90 percent of the Debtors' proved reserves; and

- **December 26, 2019:**  amended to extend borrowing base clawback relief to Second Lien Notes issued in exchange for cash under certain circumstances.

The Revolving Credit Facility was amended again in June 2020 to allow for the hedge portfolio unwind (discussed in greater detail herein), the Roll-Up, and the waiver of certain events of default.

The Revolving Credit Facility matures on September 12, 2023, and bears interest at either the alternate base rate or LIBOR, at the Debtors' election, plus an applicable margin. The Debtors' obligations under the Revolving Credit Facility are required to be secured on a first lien basis by substantially all of the Debtors' assets and property, whether real, personal, or mixed, including by mortgages on the Debtors' oil and gas properties representing not less

than 90 percent of the net present value (discounted at nine percent per annum) of the Debtors' proved reserves included in their most recently delivered reserve report, as discounted.

## 2. FLLO Term Loan Facility

As of the Petition Date, the Debtors had approximately $1.5 billion in principal outstanding under the first lien last out term loan facility (the "FLLO Term Loan Facility") incurred under that certain term loan agreement (the "FLLO Term Loan Facility Credit Agreement"), dated as of December 19, 2019, as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, GLAS USA LLC., as administrative agent (the "FLLO Term Loan Facility Administrative Agent"), and the lender parties thereto, and as further amended, restated or otherwise modified from time to time, by and among Chesapeake, as borrower, the Debtor guarantors party thereto, FLLO Term Loan Facility Administrative Agent, and the lender parties thereto.

The FLLO Term Loan Facility matures on June 23, 2024, and bears interest at a rate of LIBOR plus eight percent per annum with a one percent LIBOR floor. The FLLO Term Loan Facility is subject to a make-whole premium prior to the 18-month anniversary of December 23, 2019, a premium to par equal to 5 percent from the 18-month anniversary until but excluding the 30-month anniversary, and a premium to par equal to 2.5 percent from the 30-month anniversary until but excluding the 42-month anniversary. Beginning on the 42-month anniversary, the Debtors may prepay the FLLO Term Loan Facility at par. The FLLO Term Loan Facility is required to be secured by first priority liens on substantially all of the Debtors' assets and property, whether real, personal, or mixed, provided that the FLLO Term Loan Facility will be second in recovery behind the Revolving Credit Facility pursuant to that certain First Lien Collateral Trust Agreement. On June 23, 2020, the Debtors elected to skip a $22.9 million interest payment due to FLLO Term Loan Facility lenders.

The proceeds of the FLLO Term Loan Facility were used to finance tender offers for the BVL Senior Notes due 2025 and to repay all amounts outstanding under the revolving credit facility assumed in connection with the WildHorse acquisition (the "BVL Revolving Facility").

### 3. 11.500% Senior Secured Lien Notes due 2025

In connection with entry into that certain Indenture, dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtor guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee and collateral trustee (the "Second Lien Notes Indenture"), the Debtors issued a series of 11.500% Senior Secured Second Lien Notes due 2025 (the "Second Lien Notes") in an initial aggregate principal amount of approximately $2.3 billion in exchange for approximately $3.2 billion in carrying value of then existing unsecured notes. Also on December 19, 2019, the Debtors issued an additional $120 million of Second Lien Notes pursuant to a private offering.

The Second Lien Notes are subject to a make-while premium prior to the 24-month anniversary of January 1, 2022. Beginning on the 24-month anniversary, the Debtors may prepay the Second Lien Notes at par. The Second Lien Notes are required to be secured by second priority liens on substantially all of the Debtors' assets and property, whether real, personal, or mixed. The Second Lien Notes bear interest at a rate of 11.500% per annum, with interest payable on January 1 and July 1 of each year, beginning on July 1, 2020. The Second Lien Notes mature on January 1, 2025. As of the Petition Date, approximately $2.33 billion in principal was outstanding under the Second Lien Notes.

### 4. Unsecured Notes

#### (a) 6.625% Senior Notes due 2020

In connection with entry into that certain Second Supplemental Indenture, dated as of August 17, 2010, to that certain Indenture, dated as of August 2, 2010 (the "2010 Base Indenture"), by and among Chesapeake, as issuer, certain Debtor guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, the Debtors issued a series of 6.625% senior notes due 2020 (the "6.625% Senior Notes due 2020") in an aggregate principal amount of $1.4 billion.

The 6.625% Senior Notes due 2020 bear interest at a rate of 6.625% per annum, with interest payable on February 15 and August 15 of each year, beginning on February 15, 2011.  The 6.625% Senior Notes due 2020 mature on August 15, 2020.  As of the Petition Date, approximately $176 million in principal was outstanding under the 6.625% Senior Notes due 2020.

###### (b)      6.875% Senior Notes due 2020

In connection with entry into that certain Indenture, dated as of November 8, 2005, by and among Chesapeake as issuer, certain Debtor guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, the Debtors issued a series of 6.875% senior notes due 2020 (the "6.875% Senior Notes due 2020") in an aggregate principal amount of $500 million.

The 6.875% Senior Notes due 2020 bear interest at a rate of 6.875% per annum, with interest payable on May 15 and November 15 of each year, beginning on May 15, 2006.  The 6.875% Senior Notes due 2020 mature on November 15, 2020.  As of the Petition Date, approximately $74 million in principal was outstanding under the 6.875% Senior Notes due 2020.

###### (c)      6.125% Senior Notes due 2021

In connection with entry into that certain Fifth Supplemental Indenture, dated as of February 11, 2011, to the 2010 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, the Debtors issued a series of 6.125% senior notes due 2021 (the "6.125% Senior Notes due 2021") in an aggregate principal amount of $1 billion.

The 6.125% Senior Notes due 2021 bear interest at a rate of 6.125% per annum, with interest payable on February 15 and August 15 of each year, beginning on August 15, 2011.  The 6.125% Senior Notes due 2021 mature on February 15, 2021.  As of the Petition Date, approximately $166 million in principal was outstanding under the 6.125% Senior Notes due 2021.

###### (d)      5.375% Senior Notes due 2021

In connection with entry into that certain Sixteenth Supplemental Indenture, dated as of April 1, 2013, to the 2010 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 5.375% senior notes due 2021 (the "5.375% Senior Notes due 2021") in an aggregate principal amount of $700 million.

The 5.375% Senior Notes due 2021 bear interest at a rate of 5.375% per annum, with interest payable on June 15 and December 15 of each year, beginning on December 15, 2013.  The 5.375% Senior Notes due 2021 mature on June 15, 2021.  As of the Petition Date, approximately $127 million in principal was outstanding under the 5.375% Senior Notes due 2021.  On June 15, 2020, the Debtors elected to skip a $3.4 million interest payment due to holders of the 5.375% Senior Notes due 2021.

###### (e)      4.875% Senior Notes due 2022

In connection with entry into that certain Second Supplemental Indenture, dated as of April 24, 2014, to that certain Indenture, dated as of April 24, 2014 (the "2014 Base Indenture"), by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 4.875% senior notes due 2022 (the "4.875% Senior Notes due 2022") in an aggregate principal amount of $1.5 billion.

The 4.875% Senior Notes due 2022 bear interest at a rate of 4.875% per annum, with interest payable on April 15 and October 15 of each year, beginning on October 15, 2014.  The 4.875% Senior Notes due 2022 mature on April 15, 2022.  As of the Petition Date, approximately $272 million in principal was outstanding under the 4.875% Senior Notes due 2022.

(f)        **5.750% Senior Notes due 2023**

In connection with entry into that certain seventeenth supplemental indenture, dated as of April 1, 2013, to the 2010 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 5.750% senior notes due 2023 (the "5.750% Senior Notes due 2023") in an aggregate principal amount of $1.1 billion.

The 5.750% Senior Notes due 2023 bear interest at a rate of 5.750% per annum, with interest payable on March 15 and September 15 of each year, beginning on September 15, 2013.  The 5.750% Senior Notes due 2023 mature on March 15, 2023.  As of the Petition Date, approximately $168 million in principal was outstanding under the 5.750% Senior Notes due 2023.

(g)        **7.000% Senior Notes due 2024**

In connection with entry into that certain Eighth Supplemental Indenture, dated as of September 27, 2018, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 7.000% senior notes due 2024 (the "7.000% Senior Notes due 2024") in an aggregate principal amount of $850 million.

The 7.000% Senior Notes due 2024 bear interest at a rate of 7.000% per annum, with interest payable on April 1 and October 1 of each year, beginning on April 1, 2019.  The 7.000% Senior Notes due 2024 mature on October 1, 2024.  As of the Petition Date, approximately $623 million in principal was outstanding under the 7.000% Senior Notes due 2024.

(h)        **8.000% Senior Notes due 2025**

In connection with entry into that certain Sixth Supplemental Indenture, dated as of December 20, 2016, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 8.000% senior notes due 2025 (the "8.000% Senior Notes due 2025") in an aggregate principal amount of $1 billion.

The 8.000% Senior Notes due 2025 bear interest at a rate of 8.000% per annum, with interest payable on January 15 and July 15 of each year, beginning on July 15, 2017.  The 8.000% Senior Notes due 2025 mature on January 15, 2025.  As of the Petition Date, approximately $246 million in principal was outstanding under the 8.000% Senior Notes due 2025.  On June 15, 2020, the Debtors elected to skip the interest payment due to holders of the 8.000% Senior Notes due 2027.

(i)        **8.000% Senior Notes due 2026**

In connection with entry into that certain Tenth Supplemental Indenture, dated as of April 3, 2019, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 8.000% senior notes due 2026 (the "8.000% Senior Notes due 2026") in an aggregate principal amount of approximately $918.5 million.

The 8.000% Senior Notes due 2026 bear interest at a rate of 8.000% per annum, with interest payable on March 15 and September 15 of each year, beginning on September 15, 2019. The 8.000% Senior Notes due 2026 mature on March 15, 2026. As of the Petition Date, approximately $46 million in principal was outstanding under the 8.000% Senior Notes due 2026.

(j)        **7.500% Senior Notes due 2026**

In connection with entry into that certain Ninth Supplemental Indenture, dated as of September 27, 2018, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 7.500% senior notes due 2026 (the "7.500% Senior Notes due 2026") in an aggregate principal amount of $400 million.

The 7.500% Senior Notes due 2026 bear interest at a rate of 7.500% per annum, with interest payable on April 1 and October 1 of each year, beginning on April 1, 2019.  The 7.500% Senior Notes due 2026 mature on October 1, 2026.  As of the Petition Date, approximately $119 million in principal was outstanding under the 7.500% Senior Notes due 2026.

**(k)     8.000% Senior Notes due 2027**

In connection with entry into that certain Seventh Supplemental Indenture, dated as of June 6, 2017, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 8.000% senior notes due 2027 (the "8.000% Senior Notes due 2027") in an aggregate principal amount of $750 million.

The 8.000% Senior Notes due 2027 bear interest at a rate of 8.000% per annum, with interest payable on June 15 and December 15 of each year, beginning on December 15, 2017.  The 8.000% Senior Notes due 2027 mature on June 15, 2027.  As of the Petition Date, approximately $253 million in principal was outstanding under the 8.000% Senior Notes due 2027. On June 15, 2020, the Debtors elected to skip a $10.1 million interest payment due to holders of the 8.000% Senior Notes due 2027.

**(l)     5.500% Convertible Senior Notes due 2026**

In connection with entry into that certain Indenture, dated as of October 5, 2016, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 5.500% convertible senior notes due 2026 (the "Convertible Notes") in an aggregate principal amount of approximately $1.25 billion.

The Convertible Notes bear interest at a rate of 5.500% per annum, with interest payable not more than 15 days after each March 1 and September 1 of each year, beginning on March 15, 2017.  The Convertible Notes mature on September 15, 2026.  As of the Petition Date, approximately $1.064 billion in principal was outstanding under the Convertible Notes.

**(m)     6.875% BVL Senior Notes due 2025**

In connection with entry into that certain Indenture, dated as of February 1, 2017, by and among WildHorse, certain Debtor guarantors party thereto, and U.S. Bank National Association, as trustee, WildHorse issued a series of 6.875% senior notes due 2025 (the "BVL Senior Notes") in an aggregate principal amount of approximately $350 million.  Chesapeake assumed the BVL Senior Notes on February 1, 2019.

The BVL Senior Notes bear interest at a rate of 6.875% per annum, with interest payable on February 1 and August 1 of each year, beginning on August 1, 2017.  The BVL Senior Notes mature on February 1, 2025.  As of the Petition Date, approximately $2 million in principal was outstanding under the BVL Senior Notes.

**5.     Intercreditor Agreement**

MUFG, as priority lien agent on behalf of the Revolving Credit Facility secured parties and FLLO Term Loan Facility secured parties, and the Second Lien Collateral Trustee (as such term is defined in the Intercreditor Agreement) are parties to that certain Intercreditor Agreement, dated as of December 19, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).  The Intercreditor Agreement governs certain rights and remedies as among the secured parties under the Revolving Credit Facility, the FLLO Term Loan Facility, and the Second Lien Notes, relative priority of claims, and certain other matters, including the exercise of remedies and permitted actions in the event of the Debtors' chapter 11 proceedings.

**6.     First Lien Collateral Trust Agreement**

The Revolving Credit Facility Administrative Agent and FLLO Term Loan Facility Administrative Agent are parties to that certain Collateral Trust Agreement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time, the "First Lien Collateral Trust Agreement"), pursuant to which the Revolving Credit Facility Administrative Agent, as first lien collateral trustee, will receive, hold, administer, maintain, enforce,

and distribute the proceeds of all of its liens upon the collateral for the benefit of the secured parties under the Revolving Credit Facility and the secured parties under the FLLO Term Loan Facility Credit Agreement. The First Lien Collateral Trust Agreement governs certain rights and remedies as among the secured parties under the Revolving Credit Facility and the FLLO Term Loan Facility, relative priority of claims and certain other matters, including the exercise of remedies and permitted actions in the event of the Debtors' chapter 11 proceedings.

### 7. Preferred Equity

Chesapeake's certificate of incorporation (the "Certificate") authorizes the board of directors of Chesapeake to establish one or more series of preferred stock. There are four series of preferred stock outstanding: (i) 5.75% Cumulative Non-Voting Convertible Preferred Stock (Series A) (the "5.75% Series A Preferred Stock"), (ii) 5.75% Cumulative Non-Voting Convertible Preferred Stock (the "5.75% Preferred Stock"), (iii) 4.50% Cumulative Convertible Preferred Stock (the "4.50% Preferred Stock") and (iv) 5.00% Cumulative Convertible Preferred Stock (Series 2005B) (the "5.00% Preferred Stock" and together with the 5.75% Series A Preferred Stock, the 5.75% Preferred Stock, and the 4.50% Preferred Stock, collectively, the "Preferred Stock").

In January 2016, Chesapeake suspended dividend payments on each series of Preferred Stock to provide additional liquidity in the depressed commodity price environment. In the first quarter of 2017, Chesapeake reinstated the payment of dividends on each series of Preferred Stock and paid all past-due dividends in arrears. During 2018 and 2019, Chesapeake paid dividends of $92 million and $91 million, respectively, to holders of each series of Preferred Stock. On April 17, 2020, the board of directors of Chesapeake suspended payment of dividends on each series of Preferred Stock. The suspension of the Preferred Stock dividends did not constitute an event of default under any of the Debtors' debt instruments.

- **5.75% Series A Preferred Stock:** There were approximately 423,363 shares of 5.75% Series A Preferred Stock outstanding as of the Petition Date. Holders of 5.75% Series A Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 5.75% per annum per share on the $1,000.00 liquidation preference per share of the 5.75% Series A Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year. Dividends on the 5.75% Series A Preferred Stock must be paid in cash. As of the Petition Date, the 5.75% Series A Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.1918 and at a conversion price of $5,215.02 per share of 5.75% Series A Preferred Stock. The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

- **5.75% Preferred Stock:** There were approximately 770,528 shares of 5.75% Preferred Stock outstanding as of the Petition Date. Holders of 5.75% Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 5.75% per annum per share on the $1,000.00 liquidation preference per share of the 5.75% Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year. Dividends on the 5.75% Preferred Stock must be paid in cash. As of the Petition Date, the 5.75% Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.1984 and at a conversion price of $5,039.59 per share of 5.75% Preferred Stock. The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

- **4.50% Preferred Stock:** There were approximately 2,558,900 shares of 4.50% Preferred Stock outstanding as of the Petition Date. Holders of 4.50% Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 4.50% per annum per share on the $100.00 liquidation preference per share of the 4.50% Preferred Stock, payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year. Dividends on the 4.50% Preferred Stock may be paid in cash or, subject to certain limitations, in common stock, or a combination thereof. As of the Petition Date, the 4.50% Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.0123 and at a conversion price of $8,142.99 per share of 4.50% Preferred Stock. The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

- ***5.00% Preferred Stock***:  There were approximately 1,810,667 shares of 5.00% Preferred Stock outstanding as of the Petition Date.  Holders of 5.00% Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 5.00% per annum per share on the $100.00 liquidation preference per share of the 5.00% Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year.  Dividends on the 5.00% Preferred Stock may be paid in cash or, subject to certain limitations, in common stock, or a combination thereof.  As of the Petition Date, the 5.00% Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.0139 and at a conversion price of $7,208.51 per share of 5.00% Preferred Stock.  The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

### 8.    Common Equity

Since an initial public offering of equity in 1993, the Debtors' common stock has traded on the New York Stock Exchange ("NYSE") under ticker symbol "CHK."  On April 13, 2020, following a shareholder vote, the board of directors of Chesapeake approved a 1-for-200 reverse stock split (the "Reverse Stock Split") in order to, among other things, increase the per share trading price of Chesapeake's common stock to satisfy the $1.00 minimum bid price requirement for continued listing on the NYSE.  As of the Petition Date, there were approximately 9.784 million shares of common stock, par value $0.01, issued and the common stock was trading at $11.85 per share, implying a market capitalization of approximately $115.9 million.  The board of directors of Chesapeake is authorized to issue 22,500,000 shares of common stock.  The Debtors have not issued cash dividends to holders of common stock since 2015, when the board of directors of Chesapeake decided to eliminate quarterly cash dividends to the holders of common stock.  Since 2014, the trading price of Chesapeake's common stock has faced downward pressures proportionate with downturns in commodity markets.

### D.    Pending Material Litigation

The Debtors are involved in a number of litigation and regulatory proceedings incidental to their business operations, including certain pending material litigation described below.  The Debtors dispute the alleged liability in each of these cases and intend to vigorously defend the claims against them.

### 1.    Pennsylvania Royalty Litigation

On August 30, 2013, a group of Pennsylvania lessors Filed royalty underpayment claims in the U.S. District Court for the Middle District of Pennsylvania on behalf of a putative class of lessors with interests in Pennsylvania oil and gas leases ("Demchak").[8]  At the same time the Demchak action was proceeding in federal court, another group of Pennsylvania lessors initiated a putative class arbitration against the Debtors alleging similar royalty underpayment claims ("Burkett").

On September 12, 2013, the Burkett plaintiffs moved to intervene in the Demchak federal court action, and on December 18, 2014, the Demchak and Burkett plaintiffs Filed a motion for preliminary approval of a classwide settlement covering all Pennsylvania lessors with interests in leases containing a particular provision known as a "market enhancement clause" (the "Demchak/Burkett Class Settlement").  The Demchak/Burkett Class Settlement provided both a lump-sum initial settlement payment in excess of $17 million and a revised royalty formula going forward.  On October 2, 2015, the Demchak court certified the settlement class and granted preliminary approval of the Demchak/Burkett Class Settlement.

In March and June 2014, two groups of Pennsylvania lessors initiated putative class actions in the U.S. District Court for the Middle District of Pennsylvania, also alleging that the Debtors underpaid royalties owed under oil and gas leases ("Brown"[9] and "Suessenbach"[10]).  The cases were later consolidated for discovery, and in August 2018, the Debtors reached a tentative classwide settlement ("Brown/Suessenbach Class Settlement").  The Brown/Suessenbach Class Settlement provided for a $7.75 million settlement fund and a revised royalty formula going

[8]   *Demchak Partners Limited Partnership v. Chesapeake Appalachia, L.L.C.*, No. 3:13-cv-02289-MEM (M.D. Pa.)

[9]   *Brown v. Access Midstream Partners, L.P., et al.*, No. 3:14-cv-00597-MEM (M.D. Pa.)

[10]   *Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P.*, No. 3:14-cv-001197-MEM (M.D. Pa.)

forward.  On August 9, 2018, the plaintiffs Filed a motion for preliminary approval of the Brown/Suessenbach Class Settlement, which remains pending.

On December 9, 2015, the Attorney General of the Commonwealth of Pennsylvania (the "PA AG") Filed a lawsuit in the Pennsylvania state court, alleging that the Debtors violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL") by making improper deductions from royalties and entering into arrangements with affiliates that resulted in underpayment of royalties.  The PA AG seeks civil penalties, permanent injunctive relief, and restitution on behalf of lessors in Pennsylvania.  On December 11, 2015, the PA AG Filed an objection to the Demchack/Burkett Class Settlement.  The *Demchak* court has stayed final approval of Demchak/Burkett Class Settlement pending resolution of the PA AG action.  This matter is currently pending.

### 2. HOOPP Arbitration

In July 2018, Healthcare of Ontario Pension Plan ("HOOPP") Filed a demand for arbitration regarding HOOPP's purchase of the Debtors' interest in Chaparral Energy, Inc. stock in January 2014 for $215 million.  HOOPP claims that the Debtors engaged in material misrepresentations, and fraud, and that the Debtors violated both the Exchange Act and the Oklahoma Uniform Securities Act.  HOOPP seeks either rescission or $215 million monetary damages, together with interest, attorneys' fees, disgorgements, and punitive damages.  The arbitration remains pending before the American Arbitration Association.

### 3. Personal Injury Litigation

On January 29, 2020, one of the wells operated by the Debtors—the Wendland 1H Well in Burleson County, Texas— experienced a loss of control while certain third-party vendors were conducting workover operations.[11]  The incident resulted in three contractor fatalities and one contractor injury.  Ten lawsuits relating to the incident are currently pending against the Debtors and the third-party vendors described above.

### 4. Environmental Proceedings

The Debtors are defendants in numerous mass tort actions Filed in Oklahoma alleging that the Debtors (and other companies) have operated wastewater disposal wells in a manner that has caused earthquakes.  The lawsuits seek compensation for injury to real and personal property, diminution of property value, and economic losses due to business interruption, among other claims.  The lawsuits also seek reimbursement of insurance premiums and the award of punitive damages and attorneys' fees.

## VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. Recent Market Volatility and Oil Market Crash

The Debtors have undertaken significant efforts since 2013 to address their leverage and profitability— including rationalizing capital expenditures, reducing operating and general administrative expenses, executing over $11 billion in strategic oil and gas divestitures, reducing off balance sheet liabilities and consummating multiple refinancing transactions, including as recently as December 2019.  Despite these efforts, the recent and dramatic drop in commodity prices and resulting tightening of the credit markets have frustrated the Debtors' ability to further deleverage absent a chapter 11 proceeding.

Indeed, the Debtors have struggled under the weight of their funded debt obligations for years, and, despite their significant efforts undertaken the past several years to address their leverage and profitability and survive the challenging commodity market, as more fully described below, the exacerbation of the industry's problems in recent months finally made such efforts incapable of solving the Debtors' capital structure issues without a chapter 11 proceeding.

In addition to long term negative pricing declines, prices dropped precipitously in recent months as a result of the onset of the COVID-19 pandemic and the recent price war between Russia and the Kingdom of Saudi Arabia. The initial spread of COVID-19 caused decreased factory output and transportation demand, resulting in a decline in

---

[11]   A "workover" means the process of performing major maintenance or remedial treatments on an oil or gas well.

energy prices.  To address this, OPEC, led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia.  However, those initial efforts faltered, and the parties failed to reach an agreement as to production levels.  Instead, both the Kingdom of Saudi Arabia and Russia announced that they would *increase*, rather than decrease, production, resulting in surplus supply amidst already decreasing demand for energy.  Meanwhile, the COVID-19 pandemic continued to spread, causing governments across the world to institute strict public health and safety measures including quarantine orders, stay-at-home orders, and social distancing guidelines that have further decreased energy demand.  On April 12, 2020, in an effort to relieve some of the negative impacts on the industry, 23 countries agreed to commit to withholding 9.7 million barrels of oil per day from the global markets.

The corresponding effects on energy markets have been stark.  On March 9, 2020, the WTI index declined 24.59 percent in a single day.  Major oil indexes and U.S. indexes then continued to hover around $20.00 per barrel, until prices plummeted to a level never before seen on April 20, 2020, when WTI crude oil for May delivery settled at negative $37.63 per barrel, a record low and drop of roughly 306 percent in a single day.

The current volatility in commodity markets and uncertain future in light of the COVID-19 pandemic has made it especially challenging for companies to execute out-of-court restructuring alternatives.  In 2020, at least ten large E&P companies and related services providers have Filed for chapter 11, including  Kingfisher Midstream, LLC on January 13, 2020, McDermott International, Inc. on January 21, 2020, Southland Royalty Company, LLC on January 27, 2020, Pioneer Energy Services Corporation on March 1, 2020, Foresight Energy LP on March 10, 2020, Whiting Petroleum on April 1, 2020, Diamond Offshore Drilling Inc. on April 26, 2020, Ultra Petroleum Corp. on May 14, 2020, Hornbeck Offshore Services, Inc. on May 19, 2020, Extraction Oil and Gas, Inc. on June 14, 2020, Sable Permian Resources, LLC on June 25, 2020, California Resources Corporation on July 15, 2020, Noble Corporation on July 31, 2020, Denbury Resources Inc. on July 30, 2020, Fieldwood Energy LLC on August 3 and August 4, 2020, Bruin E&P Partners on August 26, 2020, and Valaris plc on August 19, 2020.

B.      **Operational Responses**

The Debtors implemented a proactive approach to address their balance sheet beginning in 2013, following the appointment of Doug Lawler as Chief Executive Officer.  Mr. Lawler and the new management team initiated a shift across all aspects of the Debtors' business centered on four strategic pillars:  financial discipline; profitable and efficient growth from captured resources; exploration; and business development.  Underpinning the management team's efforts was a transformation from Chesapeake's culture of "grow at any cost" to a culture that is laser-focused on cost leadership and increased competitiveness relative to its peers.  With this approach, as of December 31, 2019, Chesapeake was able to achieve, among other accomplishments, the following results:

- reduction in total leverage by over $10 billion since 2012;

- elimination of more than $10 billion in midstream and operating commitments since 2012;

- increase of oil mix by over 80 percent since 2012;

- growth of Adjusted EBITDAX margins per barrel of oil equivalent by 50 percent since 2015;

- removal of approximately $1.7 billion in total cash costs since 2014; and

- improvement of all aspects of health, safety, environmental, and regulatory performance.

One component of the Debtors' liability management efforts was executing a series of transactions to divest certain non-core assets and maximize operational efficiencies.  In 2014, the Debtors sold certain acreage and producing properties targeting the Marcellus and Utica Shale formations located in Southern Pennsylvania and Northern West Virginia, respectively, for $4.975 billion.  In 2017, the Debtors sold certain acreage and producing properties in the Haynesville Shale area of Northern Louisiana for $915 million, recognizing a gain of approximately $326 million.  The Debtors continued their divestiture efforts in 2018, selling (a) all of their acreage in Ohio (approximately 1,500,000 gross (900,000 net) acres) for approximately $1.868 billion, and (b) certain acreage, producing properties, and other related property and equipment in the Mid-Continent, including all of the Debtors' Mississippian Lime assets, for approximately $491 million.

The Debtors also initiated efforts to reduce their workforce to promote operational efficiencies and improve their cash flow. Since 2015, the Debtors' employee count has been reduced by more than 50 percent, with corresponding reductions in compensation of approximately 43 percent and gross overhead of approximately 38 percent.

These strategic divestitures, along with the Debtors' relentless focus on reducing their cash operating costs, have resulted in meaningful reductions in their operating cost structure. In 2019 alone, the Debtors improved their cost structure by approximately $0.79 per barrel of oil equivalent by reducing production, gathering, processing, transportation, and general and administrative expenses which amounted to $290 million (approximately 13 percent) in savings in 2019 compared to 2018.

The Debtors also executed certain strategic acquisitions, including the February 2019 acquisition of WildHorse for approximately $4 billion in the aggregate, consisting of 717.4 million shares of common stock and approximately $381 million in cash, less $28 million of cash held by WildHorse as of the acquisition date, and the assumption of WildHorse's $1.4 billion of debt. The WildHorse acquisition enabled the Debtors to strengthen their presence in the Eagle Ford Shale and Austin Chalk formations in Texas and significantly increase their oil production, while simultaneously reducing operational costs through operational and capital efficiencies as a result of the Debtors' significant expertise with unconventional assets and technical and operational excellence. The WildHorse transaction generated approximately $250 million in cost savings in 2019, with additional savings anticipated over the coming years.

## C.      Financial Responses

### 1.      Transactions

The Debtors have taken numerous efforts to manage their balance sheet in the last half decade. In 2015, the Debtors completed a private exchange of their 8.00% Senior Secured Second Lien Notes due 2022 (the "2022 Second Lien Notes") for certain senior unsecured notes and contingent convertible notes (the "Existing Notes"). Approximately $3.9 billion of the Existing Notes were exchanged for approximately $2.4 billion aggregate principal amount of the 2022 Second Lien Notes.

The Debtors continued their efforts in 2016 and early 2017 with a series of preferred stock exchanges and conversions, including the following.

- **January 2016**: The Debtors suspended dividend payments on their convertible preferred stock to increase liquidity; the suspension lasted throughout 2016. On February 15, 2017, the Debtors reinstated dividend payments, and paid the past-due dividends in arrears.

- **February and March 2016**: Certain preferred shareholders converted (i) 24,601 shares of 5.75% Preferred Stock and (ii) 1,201 shares of 5.75% Series A Preferred Stock into an aggregate of approximately 1 million shares of the Debtors' common stock. The converted preferred stock represented approximately $26 million of liquidation value.

- **October and November 2016**: The Debtors completed a private exchange of an aggregate of approximately 119.2 million shares of their common stock for (i) 134,000 shares of 5.00% Preferred Stock, (ii) 629,271 shares of 5.75% Preferred Stock, and (iii) 622,936 shares of 5.75% Series Preferred Stock. The exchanged preferred stock represented approximately $1.3 billion of liquidation value.

- **January 2017**: The Debtors completed exchanges of an aggregate of approximately 10 million shares of their common stock for (i) 150,948 shares of 5.00% Preferred Stock, (ii) 72,600 shares of 5.75% Preferred Stock, and (iii) 5.75% Series A Preferred Stock. The exchanged preferred stock represented approximately $100 million of liquidation value.

In total, the preferred stock exchanges and conversions completed in 2016 and 2017 eliminated approximately $80 million of annual dividend obligations.

Also from 2015 to 2017, the Debtors completed several open market repurchases and redemptions, including the: (a) purchase of approximately $119 million aggregate principal amount of their 3.25% Senior Notes due 2016 for cash in 2015; (b) repurchase in 2015 of approximately $60 million of their outstanding 2.5% Contingent Convertible Notes due 2037 for $32 million, $122 million of their 3.25% Senior Notes due 2016 for $115 million, and $2 million of their 6.5% Senior Notes due 2017 for $1 million; and (c) retirement of $643 million aggregate principal amount of their outstanding senior notes and contingent convertible senior notes in 2017.

The Debtors also made efforts to right size their balance sheet through debt repurchases. In 2015, the Debtors used $508 million of cash to repurchase $513 million principal amount of debt. In 2016, the Debtors used $2.734 billion of cash to repurchase $2.884 billion principal amount of debt. And, in 2017, the Debtors used $2.592 billion of cash to repurchase $2.389 billion principal amount of debt.

In 2018, the Debtors' liability management strategy continued, including additional transactions intended to reduce cash interest payments and overall leverage. For example, the Debtors completed public notes offerings through which they raised approximately $1.24 billion. As part of the offerings, the Debtors issued at par $850 million of 7.000% Senior Notes due 2024 and $400 million of 7.500% Senior Notes due 2026. The Debtors used the proceeds of these notes offerings, plus cash on hand and borrowings under the Revolving Credit Facility to pay approximately $1.23 billion outstanding under their then existing secured term loan. Also in 2018, the Debtors redeemed the $1.42 billion aggregate principal amount outstanding of their 8.00% senior secured second lien notes due 2022 for $1.48 billion in an all cash transaction using proceeds from the sale of their Utica assets in Ohio.

In 2019, the Debtors (a) repurchased $698 million principal amount of the BVL Senior Notes for $693 million and (b) privately negotiated exchanges of certain of their Unsecured Notes and Convertible Notes for common stock. Approximately $507 million of the principal amount outstanding on certain Unsecured Notes was exchanged for 235,563,519 shares of common stock, and approximately $186 million principal amount outstanding on the Convertible Notes was exchanged for 73,389,094 shares of common stock. As a result of these exchange transactions, the Debtors recorded an aggregate net gain of approximately $64 million.

In December 2019, the Debtors (a) entered into the $1.5 billion FLLO Term Loan Facility, the proceeds of which were used to finance tender offers for the Debtors' unsecured BVL Senior Notes and to pay amounts outstanding under the revolving credit facility for Debtor Brazos Valley Longhorn, L.L.C., (b) completed private offers to exchange approximately $3.2 billion in carrying value of unsecured notes for approximately $2.3 billion of Second Lien Notes, and (c) issued an additional $120 million of Second Lien Notes pursuant to a private offering at 89.75 percent of par. Additionally, the Debtors amended the existing Revolving Credit Facility to allow for the foregoing transactions. In the first quarter of 2020, the Debtors repurchased approximately $156 million in principal amount of Unsecured Notes, at a discount, for $93 million.

## 2. Reverse Stock Split

In the weeks leading up to the Petition Date, Chesapeake approved and effected the Reverse Stock Split. In December 2019, the NYSE alerted Chesapeake that its stock risked delisting under the NYSE rules because it traded below $1.00, and Chesapeake had six months to correct course before delisting would occur. In April 2020, Chesapeake's stock continued to trade below $1.00 and, with the recent market downturn, it appeared improbable that the trading price would fall back in compliance within the six-month timeframe. To avoid delisting, Chesapeake effected a 1-for-200 Reverse Stock Split with the approval of its stockholders on April 13, 2020. As of the Petition Date, Chesapeake's stock traded within the NYSE's requirements.

## 3. Section 382 Rights Agreement

On April 23, 2020, the board of directors of Chesapeake declared a dividend of one preferred share purchase right to common stockholders of record on May 4, 2020. Each right entitles the registered holder to purchase from Chesapeake one one-thousandth of a share of Series B Preferred Stock, par value $0.01 per share, of Chesapeake at a price of $90.00 subject to adjustment. In connection with the distribution of the rights, Chesapeake entered into a section 382 rights agreement with Computershare Trust Company, N.A., as rights agent. The purpose of the rights

agreement is to protect value by preserving Chesapeake's ability to use its tax attributes[12] to offset potential future income taxes for federal income tax purposes. The rights agreement is intended to reduce the likelihood of an ownership change by deterring any person or group of affiliated or associated persons from acquiring beneficial ownership of 4.9 percent or more of the outstanding shares of common stock. The rights agreement will expire on the close of business on the day following the certification of the voting results from Chesapeake's 2021 annual meeting, unless Chesapeake's shareholders ratify the rights agreement at or prior to such meeting, in which case it will continue in effect until April 22, 2023, unless terminated earlier in accordance with its terms.

### D.      Retention of Advisors

In March 2020, the Debtors retained Kirkland & Ellis LLP as legal advisor, Rothschild & Co US Inc. and Intrepid Partners, LLC as investment bankers, and Alvarez & Marsal North America, LLC as restructuring advisors, to assist the Debtors with a review of all strategic alternatives, including a comprehensive balance sheet restructuring. Additionally, Wachtell, Lipton, Rosen & Katz has been, and continues to be, counsel to the board of directors of Chesapeake.

### E.      Hedging Portfolio Unwind

In an effort to mitigate exposure to the volatile commodities market and related adverse market price changes, the Debtors historically entered into various derivative instruments. Because commodity prices had declined substantially since the Debtors entered into their hedge arrangements, their hedge portfolio held a mark-to-market value to the Debtors of approximately $405 million as of June 8, 2020. In light of the June 15 borrowing base redetermination and the Debtors' ongoing minimum liquidity covenants under the Revolving Credit Facility, the Debtors executed a consent letter with the Revolving Credit Facility Administrative Agent that allowed the Debtors to unwind their hedge portfolio and apply the proceeds thereof to reduce the commitments under the Revolving Credit Facility. The hedge unwind resulted in an approximately $382 million reduction of the Revolving Credit Facility commitments. The Debtors had no hedges outstanding as of the Petition Date.

### F.      Negotiations with Key Stakeholders and Entry into DIP Facility and Restructuring Support Agreement

In light of the current commodity price environment, the Debtors recognized that a successful restructuring likely would require both a significant deleveraging and a significant new money investment. With that in mind, beginning in late March 2020, the Debtors, with the assistance of their advisors, commenced comprehensive restructuring negotiations with their major creditor constituencies, including MUFG (the Revolving Credit Facility Administrative Agent) and the Revolving Credit Facility Lenders, the FLLO Ad Hoc Group, and Franklin. Each of these constituents retained the following restructuring advisors:

- MUFG is represented by Sidley Austin LLP, as counsel, Houlihan Lokey Capital, Inc., as investment banker, and RPA Advisors, LLC, as financial advisor;

- the FLLO Ad Hoc Group is represented by Davis Polk & Wardwell LLP, as counsel, and Perella Weinberg Partners LP and Tudor, Pickering, Holt & Co., as investment bankers; and

- Franklin is represented by Akin Gump Strauss Hauer & Feld LLP, as counsel, Moelis & Company LLC, as investment banker, and FTI Consulting, Inc., as financial advisor.

The Debtors provided these creditors and their advisors with substantial diligence regarding the Debtors' operations, held multiple telephonic conferences to discuss the Debtors' business plan and potential estate causes of action, and worked cooperatively with all stakeholders regarding a mortgage analysis related to oil and gas assets securing the Debtors' prepetition secured debt.

---

[12]      As of December 31, 2019, Chesapeake estimates it had, among certain other tax attributes, approximately $7.6 billion of federal net operating losses and $12 billion of total asset basis.

The Debtors focused their conversations with Revolving Credit Facility Lenders on the terms of a potential DIP and potential exit financing and their conversations with the FLLO Ad Hoc Group and Franklin on all aspects of a comprehensive restructuring, including the terms of a new money investment.

On April 9, 2020, the Debtors, with the assistance of their advisors, launched a DIP marketing process. The Debtors contacted five institutions within the first-tier of the Debtors' existing capital structure, as well as several financial institutions with junior secured debt holdings, to gauge their interest in providing DIP and exit financing to the Debtors. In connection with this process and as described in greater detail herein, the Debtors received initial indications of interest from four lenders or groups of lenders within the Revolving Credit Facility, including three individual Revolving Credit Facility Lenders and the steering committee of Revolving Credit Facility Lenders led by MUFG.

By early May 2020, the Debtors were negotiating two competing proposals: a $1.35 billion new money DIP facility with $2.5 billion in exit financing led by a prominent financial institution (the "non-MUFG proposal"), and a $925 million new money DIP facility led by MUFG that was supported by a majority of the Revolving Credit Facility lenders (the "MUFG proposal"). Although the Debtors initially preferred the non-MUFG proposal, the Debtors were unable to secure the requisite level of Revolving Credit Facility lender support for such proposal. As a result, the Debtors and their advisors focused their efforts on negotiating the MUFG proposal. These efforts bore fruit. After almost six weeks of hard fought, arm's-length negotiations, the Debtors, MUFG, and 100 percent of the Revolving Credit Facility lenders agreed on the terms of a $925 million new money DIP facility.

In parallel with the DIP marketing process, the Debtors engaged with advisors to each of the FLLO Ad Hoc Group and Franklin regarding the terms of a comprehensive deleveraging transaction. The Debtors highlighted in their initial conversations with the lenders' advisors that the preference period for certain liens granted in connection with the December 2019 Refinancing Transactions, including the issuance of the approximately $1.5 billion new-money FLLO Term Loan Facility and uptier of the Second Lien Notes, may expire in mid-May 2020 and that the possible expiration of the preference periods would inform the Debtors' determination of when to commence these chapter 11 cases. Specifically, the Debtors communicated that, absent agreement or significant progress toward agreement on the terms of a new money investment and deleveraging transaction, the Debtors likely would commence chapter 11 cases in advance of that date.

With the specter of potential preference litigation hanging over negotiations, the Debtors were able to reach agreement with the FLLO Ad Hoc Group members and Franklin on the parameters of a restructuring transaction that included a $600 million fully backstopped rights offering within approximately three weeks from the start of negotiations. Over the course of the next month while the Debtors continued to negotiate the DIP Facility, the Debtors, the FLLO Ad Hoc Group, and Franklin continued to refine the terms of the rights offering and other restructuring transactions in mid-May 2020.

The Restructuring Support Agreement memorialized the commitment made by the parties thereto to support the transactions described in the Restructuring Support Agreement and the Restructuring Term Sheet, and to negotiate with each other in good faith to finalize the documentation and agreements governing the Plan.

## VII.   MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES

### A.   First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the chapter 11 cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and service providers, and other third parties following the commencement of the chapter 11 cases. On June 29, 2020, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. On July 31, 2020, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

The First Day Motions and all orders for relief granted in these chapter 11 cases, can be viewed free of charge at https://dm.epiq11.com/chesapeake. A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the First Day Declaration.

1.      **DIP and Cash Collateral Motion**

On the Petition Date, the Debtors Filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 22] (the "DIP and Cash Collateral Motion"), requesting that the Bankruptcy Court approve the DIP Facility provided by the DIP Lenders, consisting of $325 million in new money loans and a conversion of $325 million in loans under the Revolving Credit Facility to loans under the DIP Facility on an interim basis and $925 million in new money loans and a conversion of $1.179 billion in loans under the Revolving Credit Facility to loans under the DIP Facility on a final basis. On June 29, 2020, the Bankruptcy Court entered an order approving the DIP Motion on interim basis [Docket No. 128]. After resolving several formal objections and informal comments to the DIP and Cash Collateral Motion, on July 31, 2020, the Debtors Filed an amended proposed order approving the DIP and Cash Collateral Motion on a final basis [Docket No. 590]. On July 31, 2020, the Bankruptcy Court entered an order approving the DIP and Cash Collateral Motion on a final basis [Docket No. 597].

2.      **Operational Motions**

The Debtors also Filed several other motions on the Petition Date seeking relief to facilitate their operation in the ordinary course, including:

- Fuel Card Motion. The *Debtors' Emergency Motion for Entry of a Limited Interim Order Authorizing the Debtors to Maintain Their Fuel Card Program in the Ordinary Course of Business* [Docket No. 5] (the "Fuel Card Motion"), seeking authorization to maintain the Debtors' fuel card program in the ordinary course of business until entry of the Interim Cash Management Order (as defined herein). On the Petition Date, the Bankruptcy Court entered the limited interim order approving the Fuel Card Motion [Docket No. 23].

- Wages Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 10] (the "Wages Motion"), seeking authorization to honor and pay the Debtors' existing employee wages and benefit programs in the ordinary course of business during the pendency of the Chapter 11 Cases. On June 29, 2020, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 131].

- Royalty Payments Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings, and (II) Granting Related Relief* [Docket No. 16] (the "Royalty Payments Motion"), seeking authorization for payment or application of funds attributable to (i) Mineral and Other Interests and Non-Op Working Interests (each as defined in the Royalty Payments Motion) and (ii) JIBs (as defined in the Royalty Payments Motion). On June 29, 2020, the Bankruptcy Court entered an order approving the Royalty Payments Motion on a final basis [Docket No. 141].

- Lienholders Motion. The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, and (D) 503(B)(9) Claims, and (II) Granting Related Relief* [Docket No. 15] (the "Lienholders Motion"), seeking authorization to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of (i) operating expenses, (ii) marketing expenses, (iii) shipping and warehousing claims, and (iv) 503(b)(9) claims. On June 29, 2020, the Bankruptcy Court entered an order approving the Lienholders Motion on a final basis [Docket No. 140].

- Taxes Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 11] (the "Taxes Motion"), seeking authorization to pay certain prepetition taxes and fees as they come due during the

pendency of the Debtors' chapter 11 cases.  On June 29, 2020, the Bankruptcy Court entered an order approving the Taxes Motion on a final basis [Docket No. 132].

- <u>Utilities Motion</u>.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 17] (the "<u>Utilities Motion</u>"), seeking approval of the Debtors' proposed adequate assurance of payment for future utility services, and prohibiting utility companies from altering, refusing, or discontinuing service, and approving the Debtors' proposed procedures for resolving additional adequate assurance requests.  On June 29, 2020, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 143].

- <u>Equity Trading Procedures Motion</u>.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 18] (the "<u>Equity Trading Procedures Motion</u>"), seeking approval of certain notification and hearing procedures (the "<u>Equity Trading Procedures</u>") related to certain transfers of Debtor Chesapeake's existing common stock and preferred stock and directing that any purchase, sale, or other transfer of common stock or preferred stock in violation of the Equity Trading Procedures be null and void *ab initio*.  On June 29, 2020, the Bankruptcy Court entered an order approving the Equity Trading Procedures Motion on a final basis [Docket No. 144].

- <u>Insurance Motion</u>.  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, Or Purchase Insurance Policies, and (II) Granting Related Relief* [Docket No. 12] (the "<u>Insurance Motion</u>"), seeking authorization to continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto, and renew, amend, supplement, extend, or purchase insurance policies in the ordinary course of business on a postpetition basis.  The Debtors Filed an amended proposed order approving the Insurance Motion on June 29, 2020 [Docket No. 110], which the Bankruptcy Court entered on a final basis on the same day [Docket No. 133].

- <u>Hedging Motion</u>. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Enter into And Perform Under Hedge Agreements, (B) Grant Liens and Superpriority Claims, and (C) Modify the Automatic Stay, and (II) Granting Related Relief* [Docket No. 19] (the "<u>Hedging Motion</u>"), seeking authorization to, among other things, enter into and perform under amended and restated hedge agreements with the parties to the remaining prepetition hedge agreements (if any) and postpetition hedge agreements with the DIP Lenders or their affiliates; apply the proceeds from unwinding any remaining prepetition hedges to prepetition Revolving Credit Facility obligations; and grant the obligations under the hedge agreement administrative claims, subject to the terms and conditions contained in the DIP Credit Agreement and the DIP Order. The Debtors Filed an amended proposed order approving the Hedging Motion on June 29, 2020 [Docket No. 98], which the Bankruptcy Court entered on a final basis on the same day [Docket No. 129].

- <u>Surety Bond Motion</u>.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief* [Docket No. 13] (the "<u>Surety Bond Motion</u>"), seeking authorization to maintain, renew, and modify their surety bond program in the ordinary course of business on a postpetition basis and to pay prepetition amounts related thereto.  On June 29, 2020, the Bankruptcy Court entered an order approving the Surety Bond Motion on a final basis [Docket No. 138].  On July 22, 2020, the Debtors Filed an amended order approving the Surety Bond Motion [Docket No. 460], which the Bankruptcy Court entered on a final basis on the same day [Docket No. 469].

- <u>Cash Management Motion</u>.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 14] (the "<u>Cash Management Motion</u>"), seeking authorization to (a) continue

to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; and (b) continue to perform intercompany transactions consistent with historical practice. On June 29, 2020, the Bankruptcy Court entered an order approving the Cash Management Motion on an interim basis [Docket No. 139]. The Debtors Filed an amended proposed order approving the Cash Management Motion on a final basis on June 29, 2020 [Docket No. 545]. On July 31, 2020, the Bankruptcy Court entered an order approving the Cash Management Motion on a final basis [Docket No. 594].

3.      **Administrative Motions**

The Debtors also Filed several other motions on the Petition Date seeking relief to efficiently administer their Chapter 11 Cases, including:

- Joint Administration Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 4] (the "Joint Administration Motion"), seeking the procedural consolidation and joint administration of the Debtors' chapter 11 cases under the case of Chesapeake Energy Corporation. On the Petition Date, the Bankruptcy Court entered an order approving the Joint Administration Motion on a final basis [Docket No. 91].

- Creditor Matrix Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information* [Docket No. 7] (the "Creditor Matrix Motion"), seeking approval to File a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, waiving the requirement to File a list of and provide notice directly to the Debtor entity Chesapeake Energy Corporation's equity security holders, and authorizing the Debtors to redact certain personal identification information. On June 29, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 137].

- SOFA Extension Motion. The *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 8] (the "SOFA Extension Motion"), seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to August 26, 2020. On the Petition Date, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 136]. On August 21, 2020, the Debtors Filed the Schedules and SOFAs [Docket Nos. 901-983].

- Claims and Balloting Agent Application. The *Debtors' Emergency Application for Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent* [Docket No. 6] (the "Claims and Balloting Agent Application"), seeking authorization to employ Epiq to act as the Claims and Balloting Agent for the Debtors. On June 29, 2020, the Bankruptcy Court entered an order approving the Claims and Balloting Agent Application on a final basis [Docket No. 109].

B.      **Other Procedural and Administrative Motions**

During the Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Sell Down Record Date Motion. The *Debtors' Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures For Trading in Certain Claims Against the Debtors Estates* [Docket No. 36], Filed on the Petition Date, seeking to establish an effective date (the "Sell Down Record Date") for notification and sell-down procedures for trading in claims against the Debtors' Estates. On

July 31, 2020, the Bankruptcy Court entered an order establishing July 31, 2020 as the Sell Down Record Date and approving certain notices related thereto [Docket No. 593].

- Non-Insider Retention Programs Motion. The *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Non-Insider Retention Programs and (II) Granting Related Relief* [Docket No. 290] (the "Non-Insider Retention Programs Motion"), Filed on the July 7, 2020, seeking authority to pay, in the ordinary course of business, retention awards to approximately 1,920 non-insider employees consistent with prepetition practice. On July 31, 2020, the Bankruptcy Court entered an order granting the Non-Insider Retention Programs Motion on a final basis [Docket No. 595].

- Ordinary Course Professionals Motion. The *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 288] (the "OCP Motion"), Filed on July 7, 2020, seeking to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their business. On July 30, 2020, the Debtors filed a certificate of counsel stating no objections to the OCP Motion had been Filed by the applicable objection deadline and asking the Bankruptcy Court enter an order granting the OCP Motion [Docket No. 544]. On August 6, 2020 the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 656]. On September 3, 2020, the Debtors Filed a notice of additional professional utilized in the ordinary course of business [Docket No. 1100].

- Interim Compensation Procedures Motion. The *Debtors' Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 289] (the "Interim Compensation Motion"), Filed on July 7, 2020, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases. On July 30, 2020, the Debtors Filed a certificate of counsel stating no objections to the OCP Motion had been Filed and asking the Bankruptcy Court enter an order granting the OCP Motion [Docket No. 544]. On August 6, 2020, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 656]

- Claims Bar Date Motion. The *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 367] (the "Bar Date Motion"), Filed on July 16, 2020, seeking approval of: (a) September 25, 2020, at 5:00 p.m. (prevailing Central Time), as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) December 28, 2020, at 5:00 p.m. (prevailing Central Time) as the deadline for all Governmental Units to File Claims in the chapter 11 cases; (c) procedures for Filing Proofs of Claims; and (d) the form and manner of notice of the bar dates. In response to objections from the RO Committee (as defined herein) and the Eagle Ford Royalty Owner Plaintiffs (as defined herein), on August 11, 2020, the Debtors Filed an amended proposed order approving the Bar Date Motion [Docket No. 737] and changing the proposed deadline for all non-Governmental Units to File Claims to October 30, 2020. On August 13, 2020 the Bankruptcy Court entered the Bar Date Order on a final basis [Docket No. 787].

- De Minimis Asset Transactions Motion. The *Debtors' Motion to Approve Procedures for De Minimis Asset Transactions* [Docket No. 287] (the "De Minimis Asset Transactions") Filed on July 7, 2020, seeking authorization to implement expedited procedures related to de minimis asset transactions. On August 11, 2020, the Debtors File an amended proposed order approving the De Minimis Asset Sales Motion [Docket No. 706], which the Bankruptcy Court entered on a final basis on August 12, 2020 [Docket No. 715].

- Removal Extension Motion. The *Debtors' Motion for Entry of an Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 1070] (the "Removal Extension Motion"), Filed on September 1, 2020, seeking entry of an order extending the period within which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and rule 9027 of the

Federal Rules of Bankruptcy Procedure by 120 days, up to an including January 24, 2021, without prejudice to the Debtors' right to seek further extensions.

### C. Retention of Professionals

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the chapter 11 cases:

- Alvarez & Marsal, as restructuring advisor [Docket Nos. 368, 719];

- Jackson Walker LLP, as restructuring co-counsel [Docket Nos. 370, 720]; and

- Kirkland & Ellis LLP, as restructuring co-counsel [Docket Nos. 372, 786].

On July 16, 2020, the Debtors Filed an application to retain Rothschild & Co US Inc. and Intrepid Partners, LLC (collectively, the "Investment Bankers"), as investment bankers to the Debtors [Docket No. 369]. The U.S. Trustee and UCC (as defined herein) each Filed a limited objection to the Debtors' retention of the Investment Bankers on July 21, 2020 and August 10, 2020, respectively [Docket Nos. 452, 692]. A hearing on the Debtors' retention of the Investment Bankers has not yet been scheduled.

### D. Enforcement of the Automatic Stay

During the course of these Chapter 11 Case, the Debtors Filed or responded to various pleadings requesting the Bankruptcy Court enforce or impose the automatic stay against certain parties in accordance section 362 of the Bankruptcy Code, including:

- Petty Automatic Stay Adversary Proceeding.  The *Debtors' Emergency Motion for Entry of an Order Enforcing the Automatic Stay Against the Petty Business Enterprises, LP and Mary Elizabeth Sheldon Wier, or, in the Alternative, Granting Declaratory Relief* [Adv. Proc. Case No. 20-03399, Docket No. 1], Ad. Proc. No. 20-03399 (the "Petty Automatic Stay Adversary Proceeding"), Filed on August 24, 2020, seeking entry of an order enforcing the automatic stay or extending or imposing the automatic stay pursuant to section 105 of the Bankruptcy Code with respect to actions by Petty Business Enterprises, LP's ("PBE") and other affiliated defendants (collectively, "Wier" and together with PBE, the "Lessors") to collect on prepetition claims arising under certain oil and gas leases governing property in Texas or terminate the Debtors' interests in such leases.  In the alternative, by the Petty Automatic Stay Adversary Proceeding, the Debtors seek declaratory judgements establishing (a) the amount of funds to be escrowed in compliance with the applicable leases and (b) with respect to PBE, for the 2018 forward period notice, and with respect to Wier, for the 2018-2019 period notice, that no escrow obligations have been validly triggered.  Following a hearing in the Bankruptcy Court on August 25, 2020, on August 28, 2020, the Bankruptcy Court entered an agreed order staying the operation of the escrow provisions under the applicable leases until September 30, 2020 at 5:00 p.m. (prevailing Central Time) [Adv. Proc. Case No. 20-03399, Docket No. 33].  A status conference on the Petty Automatic Stay Adversary Proceeding is scheduled for September 30, 2020.

- PA AG Automatic Stay Motion.  The *Debtors' Emergency Motion for Entry of an Order Enforcing the Automatic Stay Against the Office of the Attorney General of the Commonwealth of Pennsylvania* [Docket No. 323] (the "PA AG Automatic Stay Motion"), Filed on July 14, 2020, seeking entry of an order enforcing the automatic stay with respect to the actions of the Attorney General of the Commonwealth of Pennsylvania.  On July 22, 2020, the Bankruptcy Court entered an order granting the PA AG Automatic Stay Motion [Docket No. 467].

- DFW Automatic Stay Objection.  *DFW's Motion for Relief From Automatic Stay to Permit a Pending Appeal* [Docket No. 407] (the "DFW Lift Stay Motion"), Filed on July 17, 2020 by Dallas/Fort Worth International Airport Board, the City of Dallas, and the City of Fort Worth (collectively, "DFW"), seeking relief from the automatic stay to pursue an appeal regarding the severance of a "gas-lift" claim by an unrelated party pending in the Second Court of Appeals in Fort Worth, Texas.  On August 7, 2020,

the Debtors Filed an objection to the DFW Lift Stay Motion [Docket No. 665]. On August 10, 2020, DFW Filed a reply in support of the DFW Lift Stay Motion [Docket No. 694]. At a hearing on August 12, 2020, the Bankruptcy Court denied the DFW Lift Stay Motion on the record. On August 25, 2020, the Debtors and DFW Filed an agreed proposed order denying the DFW Lift Stay Motion [Docket No. 1006], which the Bankruptcy Court entered on August 26, 2020 [Docket No. 1012].

- Eagle Ford Automatic Stay Objection. The *Eagle Ford Royalty Owner Plaintiffs' Motion for Relief from the Automatic Stay as to Debtors Chesapeake Energy Corporation; Chesapeake Operating, L.L.C. F/K/A Chesapeake Operating, Inc.; Chesapeake Exploration, L.L.C. as Successor by Merger to Chesapeake Exploration, L.P.; and Chesapeake Energy Marketing, L.L.C., F/K/A Chesapeake Energy Marketing, Inc.* [Docket No. 424] (the "Eagle Ford Lift Stay Motion") Filed on July 18, 2020, by a group of 28 royalty owner litigants (the "Eagle Ford Royalty Owner Plaintiffs"), seeking to lift the automatic stay to proceed with multi-district ligation pending in Texas state court regarding unpaid royalty claims. On August 7, 2020, the Debtors Filed an objection to the Eagle Ford Lift Stay Motion. [Docket No. 666]. On August 7, 2020, CNOOC Energy U.S.A. LLC filed a notice of joinder to the Eagle Ford Lift Stay Motion [Docket No. 667]. At a hearing on August 12, 2020, the Bankruptcy Court denied the Eagle Ford Lift Stay Motion on the record. On August 25, 2020, the Debtors and the Eagle Ford Royalty Owner Plaintiffs Filed a proposed order denying the Eagle Ford Lift Stay Motion [Docket No. 1007], which the Bankruptcy Court entered on August 26, 2020 [Docket No. 1013].

- Railroad Commission Lift Stay Stipulation. The *Stipulation and Order by the Debtors Granting Relief from Automatic Stay* [Docket No. 1057] (the "Railroad Commission Stipulation") Filed on July 31, 2020, by the Debtors seeking to modify the automatic stay with respect to, and solely to issue a ruling on, the Debtors' motion to dismiss a complaint pending before the Railroad Commission of Texas (the "Railroad Commission") seeking the Railroad Commission to revoke the permit of one of the Debtors' wells. On September 2, 2020, Stefanie and Timothy Delasandro (the "Delasandros") [Docket No. 1077] Filed a limited objection to the Railroad Commission Stipulation to the extent it sought to provide the Debtors with relief from the stay while prohibiting the Delasandros from exercising their rights with respect to the proceeding before the Railroad Commission. On September 3, 2020, the Bankruptcy Court entered the Railroad Commission Stipulation [Docket No. 1091].

- CNOOC Lift Stay Stipulation. The *Stipulation and Order by and Among Debtors Granting and CNOOC Energy U.S.A. LLC Granting Relief from Automatic Stay* [Docket No. 1058] (the "CNOOC Stipulation") Filed on July 31, 2020 by and between the Debtors and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC ("CNOOC") seeking to modify the automatic stay with respect to, and solely to issue a ruling on, the Debtors' appeal of the United States District Court for the Southern District of Texas's approval of CNOOC's motion to vacate arbitration proceedings. On September 9, 2020, the Bankruptcy Court entered the CNOOC Stipulation [Docket No. 1130].

### E.       Contract and Lease Rejection

Since the Petition Date, the Debtors have Filed several motions seeking to reject unnecessary or burdensome executory contracts or unexpired leases [Docket No. 27, 35 598, 814]. The Debtors may file additional motions seeking to reject unnecessary or burdensome executory contracts or unexpired leases throughout these Chapter 11 Cases.

### 1.       ETC Texas Contract Rejection Motion

On the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* [Docket No. 27] (the "Contract Rejection Motion"), seeking authorization to reject certain executory contracts effective as of July 1, 2020. On July 24, 2020, ETC Texas Pipeline, Ltd. ("ETC Texas") Filed an objection to the Contract Rejection Motion, arguing that certain of the ETC Texas contracts subject to rejection (the "ETC Texas Agreement") contain covenants running with the land that are not rejectable [Docket No. 487]. On July 30, 2020, the Debtors filed an amended proposed order approving the Contract Rejection Motion [Docket No. 571] that, among other things, removed the ETC Texas Agreement from the schedule of contracts to be rejected. On July 31, 2020, the Bankruptcy Court entered the amended order approving the Contract Rejection Motion on a final basis [Docket No. 596]. On August 10, 2020,

the Debtors and ETC Texas Filed a stipulation and agreed scheduling order [Docket No. 697] establishing certain dates in connection with ETC Texas's objection to the Contract Rejection Motion and tolling the dates and deadlines under the ETC Texas Agreement.  On August 17, 2020, the Debtors and ETC Texas Filed their respective briefs in support of [Docket No. 825] and in opposition to [Docket No. 810] the Contract Rejection Motion as it relates to the ETC Texas Agreement.  On August 24, 2020, the Debtors and ETC Texas each filed a response to the other party's brief [Docket Nos. 999 and 1001].  On August 27, 2020, the Debtors and ETC Texas each filed a reply in support of [Docket No. 1011] and in opposition to [Docket No. 1033] the Contract Rejection Motion as it relates to the ETC Texas Agreement.  On August 28, 2020, the Debtors and ETC Texas filed joint stipulated facts in connection with the arguments on the Contract Rejection Motion as it relates to the ETC Texas Agreement [Docket No. 1038].  On August 31, 2020, the Debtors Filed an amended order authorizing rejection of the ETC Texas Agreement [Docket No. 1046].  On August 31, 2020, the Bankruptcy Court heard arguments in support and opposition of the Contract Rejection Motion.  A decision on the Contract Rejection Motion is currently pending.

## 2.       FERC Contract Rejection Motion

### (a)       FERC Petitions

The Debtors are parties to certain negotiated rate firm natural gas transportation service agreements with ETC Tiger Pipeline, LLC (such counterparty, "ETC Tiger," and such agreement, the "ETC Tiger Agreement"), Gulf South Pipeline Company, LP (such counterparty, "Gulf South," and such agreements, the "Gulf South Agreements"), and Stagecoach Pipeline & Storage Company, LLC (such counterparty, "Stagecoach," and such agreements, the "Stagecoach Agreements"), the rates and terms and conditions of which are subject to a Federal Energy Regulatory Commission ("FERC") Gas Tariff.

On May 19, 2020, anticipating these Chapter 11 Cases and expecting that the Debtors would move the Bankruptcy Court to authorize rejection of the ETC Tiger Agreement, ETC Tiger Filed a Petition for Declaratory Order and Request for Expedited Action with FERC, requesting a declaratory judgement that "[the Debtors] must petition [FERC] for approval to abrogate, modify, or amend" the ETC Tiger Agreement.[13]  More generally, ETC Tiger requested that FERC clarify its "unsettled role"[14] and find that "if a party to a [FERC]-jurisdictional contract under the [Natural Gas Act] seeks to reject such an agreement in bankruptcy court, the party must receive [Natural Gas Act] Section 5 approval before a bankruptcy court can determine whether to reject the agreement."[15]

On May 22, 2020, Gulf South Filed a Petition for Declaratory Order and Motion for Shortened Answer Period with FERC, similarly anticipating the Debtors' chapter 11 filing and requesting a declaratory judgment that "Chesapeake is required to seek [FERC] approval in order to modify or abrogate the [Gulf South Agreements] regardless of whether it seeks to reject the contracts in bankruptcy."[16]

On June 10, 2020, Stagecoach Filed a Petition for Declaratory Order and Motion for Shortened Comment Period with FERC, also anticipating the Debtors' chapter 11 filing and requesting a declaratory judgment that "Chesapeake must seek [FERC] approval in order to abrogate or modify the regulatory obligations inherent in the Chesapeake [Stagecoach Agreements]."[17]

FERC established June 18, 2020, June 25, 2020, and July 9, 2020 as the comment due dates for the Tiger Petition, Gulf South Petition, and Stagecoach Petition, respectively. The Debtors Filed their responsive comment to the Tiger Petition on June 18, 2020 and the Gulf South Petition on June 25, 2020.  On June 22, 2020, FERC issued

---

[13]     Petition for Declaratory Order and Request for Expedited Action of ETC Tiger Pipeline, LLC, dated May 19, 2020, FERC Docket No. RP20-881-000 (the "Tiger Petition").

[14]     Id. at 14.

[15]     Id. at 3.

[16]     Petition for Declaratory Order and Motion for Shortened Answer Period, dated May 22, 2020, FERC Docket No. RP20-881-000 (the "Gulf South Petition"), at 9.

[17]     Petition for Declaratory Order and Motion for Shortened Comment Period, and Request for Expedited Action dated June 9, 2020 FERC Docket No. RP20-952-000, at 2(the "Stagecoach Petition" and together with the Tiger Petition and Gulf South Agreements, the "FERC Petitions"), at 2.

the Order on Petition for Declaratory Order in connection with the Tiger Petition.[18]  In the Tiger Order, FERC stated that the Debtors may not "modify the rates, terms, or conditions of its transportation agreements with ETC Tiger by rejecting those contracts in bankruptcy" and "must obtain approval from [FERC] to do so."[19]

#### (b)     Rejection of the Gulf South Agreement and ETC Tiger Agreement

In the period leading up to the Petition Date, the Debtors analyzed their executory contracts and unexpired leases and determined that, in their business judgment, the ETC Tiger Agreement and Gulf South Agreements, which obligate the Debtors to pay approximately $311 million in aggregate gross costs through their remaining terms, are unnecessary and burdensome to the Debtors' estates.  Accordingly, on the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* [Docket No. 35] (the "FERC Contract Rejection Motion"), seeking authorization to reject certain FERC-governed executory contracts effective as of July 1, 2020.   Additionally, on the Petition Date, the Debtors commenced an adversary proceeding for, among other things, a declaratory judgement confirming the Bankruptcy Court's exclusive jurisdiction to determine the Debtors' right to reject the ETC Tiger Agreement, Gulf South Agreements, and the Stagecoach Agreement (as applicable) under section 365 of the Bankruptcy Code—which FERC cannot preempt or veto [Ad. Proc. No. 20-03231].  The adversary proceeding was resolved on July 17, 2020, when the Bankruptcy Court signed a stipulation and agreed order by and between the Debtors and FERC wherein FERC agreed not to issue any ruling in connection with the FERC Petitions during the Chapter 11 Cases.

On July 1, 2020, the Debtors and Gulf South Filed an agreed order seeking authorization to immediately reject the Gulf South Agreements [Docket No. 187] (the "Gulf South Agreed Order").  The Bankruptcy Court entered the Gulf South Agreed Order on July 1, 2020.  On July 14, 2020, FERC Filed a motion to reconsider the Gulf South Agreement Order [Docket No. 327] (the "Motion to Reconsider"), arguing the Bankruptcy Court's retention of "exclusive" jurisdiction to implement, interpret, and enforce the Gulf South Agreed Order was a fundamental error in law.  On July 28, 2020, the Bankruptcy Court granted the Motion to Reconsider, in part, and limited the Bankruptcy Court's jurisdiction with regard to the Gulf South Agreed Order to "the maximum extend allowed by law under applicable circumstances" [Docket No. 515].

On July 24, 2020, ETC Tiger Filed a motion seeking to withdraw the reference of the FERC Contract Rejection Motion to the District Court [Docket No. 491] (the "Motion to Withdraw") and an objection to the FERC Contract Rejection [Docket No. 492], along with an accompanying scheduling order [Docket No. 491].  On August 18, 2020, ETC Tiger and the Debtors commenced discovery on the FERC Contract Rejection Motion.  On August 20, 2020, the Debtors Filed an objection to the Motion to Withdraw [Docket No. 870].  On August 25, 2020, the Debtors Filed a reply in support of the FERC Contract Rejection Motion [Docket No. [1011].  On August 31, 2020, the Bankruptcy Court heard arguments in support and opposition of the Motion to Withdraw.  On September 3, 2020, the Bankruptcy Court recommended that the District Court deny the Motion to Withdraw. [Docket No. 1092].  A decision on the FERC Contract Rejection Motion is currently pending.

#### 3.     Sand Mine Contract Rejection Motion

On July 31, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Sand Mine Contracts Effective as of July 31, 2020 and (II) Granting Related Relief* [Docket No. 598] (the "Sand Mine Contract Rejection Motion"), seeking authorization to reject certain leases for equipment and machinery used in the Debtors' sand mine operations and a sand supply contract effective as of July 31, 2020.  On August 31, 2020, the Bankruptcy Court entered the order authorizing rejection of the sand mine equipment and machinery leases and the sand supply contract [Docket No. 1054].

#### 4.     IT Agreements and Non-Residential Real Property Leases Rejection Motion

On August 17, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Effective as of August 17, 2020 and (II) Granting*

---

[18]     Order on Petition for Declaratory Order, dated June 22, 2020, FERC Docket No. RP20-881-000, 171 FERC ¶ 61,248 (the "Tiger Order").

[19]     *Id*. at 24.

*Related Relief* [Docket No. 814] (the "IT Agreements and Non-Residential Real Property Leases Rejection Motion"), seeking authorization to reject certain IT agreements and leases of non-residential real property effective as of August 17, 2020. On September 11, 2020, the Debtors Filed a proposed agreed order approving the IT Agreements and Non-Residential Real Property Leases Rejection Motion [Docket No. 1146].

### F.  Exit Financing and Backstop Commitment Agreement

On July 28, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Incur and Pay the Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief* [Docket No. 523] (the "Exit Financing Motion"), seeking approval of the payment of certain expenses incurred in connection with the Exit Facilities incurred within 60 days of the Petition Date. Also on July 28, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* [Docket No. 520] (the "Backstop Commitment Agreement Motion"), seeking approval of the Debtors' entry into the Backstop Commitment Agreement and payment of related costs. On August 11, 2020, the Debtors Filed an amended proposed order approving the Backstop Commitment Agreement Motion [Docket No. 700]. On August 18, 2020, the UCC (as defined herein) Filed an omnibus objection to the Exit Financing Motion and Backstop Commitment Agreement Motion [Docket No. 836]. On August 19, 2020, the RO Committee (as defined herein) Filed a limited objection to the Exit Financing Motion and the Backstop Commitment Agreement Motion [Docket No. 853]. On August 20, 2020, the Debtors Filed amended proposed orders approving the Exit Financing Motion [Docket No. 868] and Backstop Commitment Agreement Motion [Docket No. 867]. On August 21, 2020, the RO Committee Filed an amended proposed order approving the Backstop Commitment Agreement Motion, reserving its rights with respect thereto [Docket No. 886]. On August 21, 2020, the Bankruptcy Court entered orders approving the Exit Financing Motion [Docket No. 898] and the Backstop Commitment Agreement Motion [Docket No. 899].

### G.  Mid-Continent Asset Sale

On August 3, 2020, the Debtors and their advisors commenced a marketing process to divest the Debtors' oil and gas properties and related infrastructure in the state of Oklahoma and Hemphill County in the state of Texas (collectively, the "Mid-Con Assets"). In connection with the potential sale of the Mid-Con Assets, the Debtors reached out to 85 potential purchasers and executed nondisclosure agreements with and provided data room access to 58 potential purchasers. On September 11, 2020, the Debtors Filed a motion (the "Bidding Procedures and Sale Motion") seeking the entry of an order (the "Bidding Procedures Order") approving bidding procedures in connection with the potential sale of the Mid-Con Assets and—should the marketing process and bidding procedures generate a value-maximizing bid—the entry of an order (the "Sale Order") authorizing and approving the sale of the Mid-Con Assets [Docket No. 1147]. The hearings on the Bidding Procedures and Sale Motion are currently set for October 6, 2020 with respect to the proposed Bidding Procedures Order and October 30, 2020 with respect to the proposed Sale Order.

To the extent the Debtors move forward with the sale of the non-core Mid-Con Assets, the proceeds generated from the sale will provide increased liquidity to fund distributions under the Plan and the Debtors' business following emergence from these chapter 11 cases.

### H.  Appointment of Creditors' Committees

On July 9, 2020, the U.S. Trustee appointed seven members to the Committee of Unsecured Creditors (the "UCC") [Docket No. 301]. The UCC is currently comprised of: (a) Wilmington Savings Fund Society, FSB; (b) the Bank of New York Mellon Trust Company, N.A.; (c) Energy Transfer; (d) the Williams Companies, Inc.; (e) Glass Mountain Pipeline, LLC; (f) Gulf South Pipeline Company, LLC; and (g) Halliburton Energy Services, Inc.

On August 31, 2020, the UCC Filed applications seeking to retain Brown Rudnick LLP and Norton Rose Fulbright US LLP as co-counsel [Docket No. 725, 727], which the Bankruptcy Court approved on September 10, 2020 [Docket Nos. 1131, 1132], and AlixPartners, LLP as financial advisor [Docket No. 780].

On July 24, 2020, the U.S. Trustee appointed nine members to the Committee of Royalty Owners (the "RO Committee") [Docket No. 488]. On July 30, 2020, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order Disbanding the Royalty Committee* (the "Debtors' Motion Disband RO Committee") [Docket No. 567]. On August 10, 2020, the RO Committee Filed an objection to the Debtors' Motion to Disband RO Committee [Docket

No. 681], which was joined by certain owners of mineral and other interests [Docket No. 696] and the Railroad Commission of Texas [Docket No. 705].  On August 11, 2020, the U.S. Trustee filed an objection to the Debtors' Motion to Disband RO Committee [Docket No. 699].  The RO Committee was reconstituted on August 11, 2020 to remove certain committee members who were counsel in ongoing royalty litigation matters but not themselves royalty owners [Docket No. 698].  On August 12, 2020, the Bankruptcy Court denied the Debtors' Motion to Disband the RO Committee, but ordered the U.S. Trustee to reconstitute the committee to consist of only unrepresented royalty owners with small royalty interests, as opposed to large, sophisticated royalty owners or royalty owners that are party to pending litigation with the Debtors.  On August 16, 2020, the RO Committee Filed a proposed order denying the Debtors' Motion to Disband RO Committee [Docket No. 795], which the Bankruptcy Court entered on August 18, 2020 [Docket No. 819].  On August 28, 2020, the U.S. Trustee reconstituted the RO Committee to consist of five members:  (i) Bride and Brandenburg Limited Partnership; (ii) Una Oreja LLC; (iii) Randall Harbaugh; (iv) Stephen P. Clark; and (v) Rickie Hines.

On July 30, 2020, the RO Committee Filed an application seeking to retain Forshey & Prosok, L.L.P. as counsel [Docket No. 557], which the Bankruptcy Court approved on September 3, 2020 [Docket No. 1094].

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.   There Is a Risk of Termination of the Restructuring Support Agreement

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

#### 2.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.       **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

4.       **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

5.       **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim may object to Confirmation and assert that the Plan does not satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  The Bankruptcy Court could decline to confirm the Plan if it finds statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance acceptable to the Required Consenting Stakeholders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

6.       **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.      There is Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses.  *See* Article I.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business," which begins on page 58.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 8.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan and will retain the right to object to Claims until the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such Claim.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11.     The Release, Injunction, and Exculpation Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to accept treatment of their claims that is less favorable than they could demand under the Bankruptcy Code, thereby infusing massive capital into the Debtors' estates which will be used to pay claims and delever the Debtors' balance sheets, and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### 12.     The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Plan by the Bankruptcy Court could last approximately 220 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities;

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects; and

- A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 13.    There is Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived by the Debtors and applicable stakeholders in accordance with the consent right sunder the Restructuring Support Agreement, the Effective Date will not take place; *provided* that the condition in Article IX.A.11 of the Plan may be waived only with the prior written consent of the Required Consenting Stakeholders.

### B.    Risks Related to Recoveries under the Plan

### 1.    The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2.    A Liquid Trading Market for the Shares of New Common Stock May Not Develop

Although the Debtors and the Reorganized Debtors may apply to relist the New Common Stock on a national securities exchange, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Common Stock will develop.  The liquidity of any market for shares of New Common Stock will depend upon, among other things, the number of holders of shares of New Common Stock, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

### 3.    The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to holders of certain Classes of Claims.  Following the Effective Date of the Plan, shares of New Common Stock may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, holders of Claims that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and

the volume of New Common Stock available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

### 4.      Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that shares of the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, such rights or shares of such New Common Stock will not be freely tradeable if, at the time of transfer, the holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by holders of Claims who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Common Stock to freely resell the New Common Stock. *See* Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 70.

### 5.      Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the New Common Stock. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' business, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

### 6.      There Are Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" which begins on page 73 to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

### 7.      The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time

periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' business, results of operations, and financial condition.

> **8.     Contingencies Could Affect the Final Amount of Allowed General Unsecured Claims and the Recovery to Holders of Allowed General Unsecured Claims Under the Plan**

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the amount of potential Allowed General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material and could materially affect Class 6 and Class 7 recoveries. The projected amount of Allowed General Unsecured Claims set forth herein is subject to change.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business, and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigants, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change and materially affect Class 6 and Class 7 recoveries.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. Finally, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change, and could materially affect Class 6 and Class 7 recoveries.

> **C.     Risks Related to the Debtors' and the Reorganized Debtors' Business**

> **1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facilities upon emergence.

> **2.     The Debtors Have Significant Capital Needs, and Their Ability to Access the Capital and Credit Markets to Raise Capital on Favorable Terms Is Limited by Their Debt Level and Industry Conditions**

Disruptions in the capital and credit markets, in particular with respect to the energy sector, could limit the Debtors' ability to access these markets or may significantly increase the Debtors' cost to borrow. Low commodity prices have caused and may continue to cause lenders to increase the interest rates under the Debtors' credit facilities, enact tighter lending standards, refuse to refinance existing debt around maturity on favorable terms or at all and may reduce or cease to provide funding to borrowers. If the Debtors are unable to access the capital and credit markets on favorable terms, it could have a material adverse effect on their business, financial condition, results of operations, cash flows and liquidity and their ability to repay or refinance their debt. Additionally, challenges in the economy have led and could further lead to reductions in the demand for oil and gas, or further reductions in the prices of oil and gas, or both, which could have a negative impact on the Debtors' financial position, results of operations and cash flows.

3.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

4.      **Financial Results May Be Volatile and May Not Reflect Historical Trends**

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

5.      **The Debtors' Substantial Liquidity Needs May Impact Revenue**

The Debtors operate in a capital-intensive industry.  The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and gas properties, borrowings under the revolving credit facility, term loan facility, issuances of debt securities, including the Senior Notes, and issuances of equity securities.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, the terms of the Debtors' customer contracts which dictate when operating revenues can be realized, the Debtors' ability to expend the capital necessary to complete work on any particular project or post letters of credit to support new project wins, resulting in decreased revenues over time, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage or maintain current production, resulting in decreased production and proved reserves over time, or otherwise.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The

Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and conditions of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

6. **Long-Term Liquidity Requirements and Adequacy of Capital Resources are Difficult to Predict at this Time**

The Debtors face uncertainty regarding the adequacy of liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparation for the Chapter 11 Cases and expect that they will continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot ensure that cash on hand and cash flow from operations will be sufficient to continue to fund operations and allow them to satisfy obligations related to the Chapter 11 Cases. Liquidity, including the ability to meet ongoing operational obligations, depends on, among other things: (a) the ability to comply with the terms and conditions of any order governing the use of cash collateral that may be entered by the Bankruptcy Court in connection with the Chapter 11 Cases, (b) the ability to access credit under the DIP Credit Facility, (c) the ability to maintain adequate cash on hand, (d) the ability to generate cash flow from operations, (e) the ability to consummate a plan of reorganization or other alternative restructuring transaction, and (f) the cost, duration and outcome of the Chapter 11 Cases.

7. **Delays in the Chapter 11 Cases May Increase the Risks of Inability to Reorganize and Emerge From Bankruptcy and Increase Costs Associated With the Bankruptcy Process**

There can be no assurance that a plan of reorganization will become effective in accordance with its terms on the anticipated timeline, or at all. Prolonged chapter 11 proceedings could adversely affect relationships with customers and employees, among other parties, which in turn could adversely affect the Debtors' business, competitive position, financial condition, liquidity and results of operations and the ability to continue as a going concern. A weakening of the Debtors' financial condition, liquidity and results of operations could adversely affect the ability to implement a plan of reorganization (or any other Chapter 11 plan). If the Debtors are unable to consummate a plan of reorganization, the Debtors may be forced to liquidate assets.

8. **The Debtors Are Subject to the Risks and Uncertainties Associated With the Exclusive Right to File a Plan of Reorganization**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides debtors-in-possession the exclusive right to file and solicit acceptance of a plan of reorganization for the first 120 days of the bankruptcy case, subject to extension at the discretion of the court. All other parties are prohibited from filing or soliciting a plan of reorganization during this period. If the Bankruptcy Court terminates that right or the exclusivity period expires, there could be a material adverse effect on the ability to achieve confirmation of a plan in order to achieve the Debtors' stated goals. The possible decision of creditors and/or other third parties, whose interest may be inconsistent with the Debtors' own, to file alternative plans of reorganization could further protract the Chapter 11 Cases, leading the Debtors to

continue to incur significant professional fees and costs. Because of these risks and uncertainties associated with the termination or expiration of exclusivity rights, the Debtors cannot predict or quantify the ultimate impact that events occurring during the Chapter 11 Cases may have on business, cash flows, liquidity, financial condition and results of operations, nor can the Debtors predict the ultimate impact that events occurring during the Chapter 11 Cases may have on the corporate or capital structure.

9. **Trading in Common Stock During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks**

All of the indebtedness is senior to the existing common stock in the Debtors' capital structure. The Restructuring Support Agreement contemplates that the Debtors' existing equity interests will be cancelled and discharged in connection with the Chapter 11 Cases and the holders of those equity interests, including the holders of common stock, will be entitled to no recovery. Accordingly, any trading in common stock during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of common stock.

10. **The Restructuring Support Agreement is Subject to Significant Conditions and Milestones That May be Difficult to Satisfy**

There are certain material conditions that must be satisfied under the Restructuring Support Agreement, including the timely satisfaction of milestones in the Chapter 11 Cases, which include the consummation of the financing contemplated by the Exit Facilities and other transactions contemplated by a plan of reorganization. The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.

11. **The Unaudited Condensed Consolidated Financial Statements Included in the Quarterly Report on Form 10-Q for the Period Ended June 30, 2020 Contain Disclosures that Express Substantial Doubt About the Ability to Continue as a Going Concern**

The inclusion of disclosures that express substantial doubt about the ability to continue as a going concern may negatively impact the trading price of common stock and have an adverse impact on relationships with third parties with whom the Debtors do business, including customers, subcontractors, suppliers and employees, and could have a material adverse impact on the Debtors' business, financial condition and results of operations. If the Plan is not confirmed or the Effective Date does not occur, there will continue to be substantial doubt about the Debtors' ability to continue as a going concern.

12. **Adverse Publicity in Connection With the Chapter 11 Cases or Otherwise Could Negatively Affect Business**

Adverse publicity or news coverage relating to the Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote a positive image after emergence from the Chapter 11 Cases.

13. **The Flexibility of the Management Team May be Limited**

While the Debtors operate their businesses as debtor-in-possession under supervision by the Bankruptcy Court, they are required to obtain the approval of the Bankruptcy Court, and in some cases certain lenders, prior to engaging in activities or transactions outside the ordinary course of business. Bankruptcy Court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the Bankruptcy Court, negotiation with the various creditors' committees and other parties in interest and one or more hearings. The creditors' committees and other parties in interest may be heard at any Bankruptcy Court hearing and may raise objections with respect to these motions. This process may delay major transactions and limit the ability to respond quickly to opportunities and events. Furthermore, in the event the Bankruptcy Court does not approve a proposed activity or transaction, the Debtors would be prevented from engaging in activities and transactions that would be beneficial to them.

14. **Upon Emergence from Bankruptcy, the Composition of the Board of Directors Will Change Significantly**

The composition of the board of directors is expected to change significantly following the Chapter 11 Cases. Any new directors may have different backgrounds, experiences and perspectives from those individuals who currently serve on the board of directors and, thus, may have different views on the issues that will determine the future of the Debtors' businesses. As a result, future strategy and plans may differ materially from those of the past.

15. **Oil, Natural Gas, and Natural Gas Liquids Prices Are Volatile, and Continued Low Oil, Natural Gas, or Natural Gas Liquids Prices Could Materially Adversely Affect the Debtors' Business, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy

- changes in the domestic and foreign supply of oil and natural gas and demand for oil and natural gas;

- the ability of members of the OPEC and other producing countries to agree upon production levels which has an impact on oil prices and the actions of other foreign countries;

- social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or terrorist attacks, whether or not in oil or natural gas producing regions or other political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the price and quantity of imports of foreign oil and natural gas;

- expectations about future prices;

- the cost of exploring for, producing and delivering hydrocarbons;

- the discovery rate, size and location of new hydrocarbon reserves;

- the rate of decline of existing hydrocarbon reserves;

- domestic or foreign laws and regulations related to environmental matters, including those addressing alternative energy sources and the risks of global climate change;

- the level and growth of consumer product demand;

- labor unrest in oil and natural gas producing regions;

- weather conditions, including hurricanes and other natural occurrences that affect the supply and/or demand of oil and natural gas;

- the price and availability of alternative fuels and renewable energy sources;

- the impact of the U.S. dollar exchange rates on commodity prices;

- the price of foreign imports;

- technological advances affecting energy consumption;

- worldwide economic conditions; and

- the availability of liquid natural gas imports and exports.

In early 2020, the continued spread of COVID-19 led to a decline in factory output and transportation demand, causing oil and gas prices to suffer. Subsequently, in March 2020, a breakdown in dialogue between OPEC and Russia over proposed oil production cuts in the midst of the COVID-19 pandemic caused oil and gas prices to fall to their lowest levels in nearly twenty years. It is impossible to tell with certainty how, or to what degree, production agreements between OPEC and Russia and the COVID-19 pandemic will affect the macro-economy and commodity prices in the long term.

A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' business, results of operations, and financial condition.

16. **The Debtors' Commodity Price Risk Management Activities May Limit the Benefit the Debtors Would Receive from Increases in Commodity Prices and Involve Risk That the Debtors' Counterparties May Be Unable to Satisfy Their Obligations to the Debtors**

To manage the Debtors exposure to price volatility, the Debtors enter into oil, natural gas and NGL price derivative contracts, which may limit the benefit they would receive from increases in commodity prices. The Debtors are required to hedge a certain amount of their production pursuant to the DIP Order. The fair value of the oil, natural gas and NGL derivative instruments can fluctuate significantly between periods and the Debtors may choose not to enter into derivatives if the pricing environment for certain time periods is not deemed to be favorable. The Debtors chose to liquidate existing derivative positions prior to the expiration of their contractual maturities to monetize gain positions for the purpose of funding their capital program.

Oil, natural gas and NGL derivative transactions expose the Debtors to the risk that their contract counterparties may be unable to satisfy their obligations to them. During periods of declining commodity prices, the value of the Debtors' commodity derivative asset positions increase, which increases the Debtors' counterparty exposure. Although many of the counterparties to the hedging arrangements are required to secure their obligations to the Debtors under certain scenarios, if any of the Debtors' counterparties were to default on their obligations to the Debtors under the derivative contracts or seek bankruptcy protection, it could have an adverse effect on the Debtors' ability to fund their planned activities and could result in a larger percentage of their future cash flows being exposed to commodity price changes.

17. **Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition, and Results of Operations**

The Debtors' future success will depend on, among other things, the success of their development and production activities. The Debtors must incur significant expenditures to identify and acquire properties and to drill and complete wells. The costs of drilling and completing wells are often uncertain, and drilling operations may be curtailed, delayed, or cancelled as a result of a variety of factors, including unexpected drilling conditions, pressure or irregularities in formations, equipment failures or accidents, weather conditions, and shortages or delays in the delivery of equipment. Additionally, seismic and other technology does not allow the Debtors to know conclusively prior to drilling a well that oil and natural gas is present or economically producible. The results of drilling in new or emerging formations, including the Debtors' properties in shale formations, are more uncertain initially than drilling results in areas that are developed, have established production, or where the Debtors have a longer history of operation. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical.

Further, the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment, materials, and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures, and discharges of toxic gases;

- adverse weather conditions;

- reductions in oil and natural gas prices;

- natural gas and oil property title problems; and

- market limitations for natural gas and oil.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

In addition, the Debtors' operations are subject to the risks inherent in the oil and natural gas industry, including the risks of fires, explosions, and blowouts; pipe failures; abnormally pressured formations; and environmental accidents such as oil spills, natural gas leaks, ruptures or discharges of toxic gases, brine or well fluids into the environment (including groundwater contamination).

Further, the Debtors' success depends upon their ability to find, develop or acquire additional oil and natural gas reserves that are profitable to produce. Factors that may hinder the Debtors' ability to acquire or develop additional oil and natural gas reserves include competition, access to capital, prevailing oil and natural gas prices, and the number and attractiveness of properties for sale. The Debtors' decisions to purchase, explore, develop or otherwise exploit properties or prospects will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic and other information, the results of which are often inconclusive and subject to various interpretations. These decisions could significantly reduce the Debtors' ability to generate Cash needed to service the Debtors' debt and other working capital requirements.

18.     **Contracted Revenues May Not Be Fully Realized and May Reduce Significantly in the Future, Which May Have a Material Adverse Effect on the Debtors' Financial Position, Results of Operations, or Cash Flows**

The Debtors' expected revenues under existing contracts may not be fully realized due to a number of factors, including rig or equipment downtime or suspensions of operations.  Several factors could cause downtime or a suspension of operations, many of which are beyond the Debtors' control, including:

- breakdowns of equipment or the equipment of others necessary for continuation of operations;

- work stoppages, including labor strikes;

- shortages of material and skilled labor;

- severe weather or harsh operating conditions;

- the occurrence or threat of epidemic or pandemic diseases or any government response to such occurrence or threat (including the COVID-19 pandemic);

- the early termination of contracts; or

- force majeure events.

Liquidity issues could lead the Debtors' contract counterparties to File for bankruptcy and/or could encourage the Debtors' contract counterparties to seek to repudiate, cancel, or renegotiate their contracts for various reasons. Some of the Debtors' contracts permit early termination of the contract by the customer for convenience (without cause), generally exercisable upon advance notice to the Debtors and in some cases without making an early termination payment to the Debtors.  There can be no assurance that the Debtors' customers will be able or willing to fulfill their contractual commitments.

19.     **The Debtors' Operations or Ability to Emerge from Bankruptcy May Be Impacted By the Continuing COVID-19 Pandemic**

The continued spread of COVID-19 could have a significant impact on the Debtors' business, both in the context of consumer demand and production capacity.  On a macro level, this pandemic could further dampen global growth and ultimately lead to a greater economic recession than already exists.  If this occurs, demand for oil, natural gas, or NGLs would likely decline, as would commodity prices generally (including oil and natural gas).  Such a scenario would negatively impact the Debtors' financial performance.  In addition, government lockdowns and employee infections could both inhibit the Debtors' ability to extract and transport their hydrocarbon production.  This diminished production capacity would negatively affect the Debtors' financial performance.

20.     **The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to extensive laws and regulations, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, or criminal penalties. The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Debtors may be charged with remedial costs and land owners may File claims for alternative water supplies, property damage, or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Debtors.

65

21.     **The Debtors Operate in a Highly Competitive Industry Which May Negatively Affect Ability To Conduct Operations**

The Debtors compete with both major integrated and other independent oil and natural gas companies in all aspects of their business to explore, develop and operate their properties and market their production.  Some of the Debtors' competitors may have larger financial and other resources than the Debtors.  Competitive conditions may be affected by future legislation and regulations as the United States develops new energy and climate-related policies.  In addition, some of the Debtors' competitors may have a competitive advantage when responding to factors that affect demand for oil and natural gas production, such as changing prices, domestic and foreign political conditions, weather conditions, the price and availability of alternative fuels, the proximity and capacity of natural gas pipelines and other transportation facilities and overall economic conditions. The Debtors' also face indirect competition from alternative energy sources, including wind, solar and electric power.  The competitive nature of the Debtors' industry may negatively affect the Debtors' financial performance.

22.     **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

23.     **The Loss of Employees and Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because competition for experienced personnel in the oil and natural gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' business and the results of operations.

24.     **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## IX.     SOLICITATION, VOTING, AND NEW COMMON STOCK ELECTION PROCEDURES

This Disclosure Statement is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.     Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled

to vote on the Plan?," which begins on page 3, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3, 4, 5, 6, and 7 (collectively, the "Voting Classes"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Claims or Interests in Classes 1, 2, 8, 9, and 10.

**B.      Solicitation Packages**

Contemporaneously herewith, the Debtors Filed the proposed Disclosure Statement Order. For purposes of this Article IX.B, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (in paper or electronic form) including (the "Solicitation Package"):

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan);
- the Disclosure Statement Order (without exhibits thereto);
- the Solicitation and Voting Procedures;
- the Confirmation Hearing Notice;
- an appropriate ballot with voting instructions with respect thereto, together with a pre-addressed, postage pre-paid return envelope;[20] and
- any supplemental documents the Debtors may File with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits) in electronic format (flash drive or cd-rom), and all other contents of the solicitation package, including ballots and these solicitation and voting procedures, shall be provided in paper format.

**C.      Voting Record Date**

**The Voting Record Date is [October 8], 2020** (the "Voting Record Date"). The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

**D.      Voting on the Plan**

**The Voting Deadline is [November 23] 2020, at 11:59 p.m. (prevailing Central Time)**. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Claims and Balloting Agent on or before the Voting Deadline. Ballots or master ballots returned by facsimile will not be counted.

---

[20]   The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive ballots directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of Rothschild & Co US Inc., Intrepid Partners, LLC, and Alvarez & Marsal North America, LLC, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (collectively, the "Financial Projections").  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 52, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[21]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, with the consent of the Required Plan Sponsors, to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement, including any consent rights provided thereunder.

#### 1.        No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take

---

[21]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of Rothschild & Co US Inc. and Intrepid Partners, LLC, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XI. CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Common Stock, the New Warrants, and the options or other equity awards (and any New Common Stock underlying such awards) to be issued pursuant to the Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Stock and the New Warrants by Reorganized Chesapeake pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below. The New Common Stock underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

### A. Issuance of Securities under the Plan

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law. All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property. The Debtors believe that the issuance of the 1145 Securities is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. Accordingly, no registration statement will be Filed under the Securities Act or any state securities laws.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Recipients of the New Common Stock and the New Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

### B.    Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to determine whether or not you are an "underwriter."

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock and the New Warrants who are deemed to be "underwriters" may be entitled to resell their New Common Stock and the New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock and the New Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and New Warrants and, in turn, whether any Person may freely resell New Common Stock or the New Warrants.

Unlike the securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, any shares of New Interests issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has Filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors currently expect that the Reorganized Debtors will continue to be a reporting issuer and File all such required periodic reports and that current public information will be available to allow resales by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  As noted above, the Debtors currently expect that this information requirement will be satisfied.  The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1 percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1 percent of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must File with the SEC three copies of a notice of proposed sale on Form 144.  The sale must occur within three months of filing the notice unless an amended notice is Filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold the 4(a)(2) Securities for at least six months and, thereafter, to sell the 4(a)(2) Securities only in accordance with the applicable requirements of Rule 144, unless such 4(a)(2) Securities are registered under the Securities Act or are otherwise exempt.

**ANY PERSONS RECEIVING "RESTRICTED SECURITIES" UNDER THE PLAN ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW INTERESTS ARE URGED TO CONSULT THEIR**

OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.

### C. New Common Stock & Management Incentive Plan

The Confirmation Order shall authorize the board of directors of Reorganized Chesapeake to adopt the Management Incentive Plan, which shall contain terms and conditions acceptable to the Debtors and the Required Plan Sponsors and as set forth in the Plan Supplement.  Awards issued under the Management Incentive Plan that include New Common Stock will dilute all of the New Common Stock outstanding.  The New Common Stock is also subject to dilution in connection with the conversion of the New Warrants, any other options, convertible securities or other securities that may be issued post-emergence.

### D. Shares issuable pursuant to the Rights Offering

Subscription rights to participate in the Rights Offering shall be distributed to the Backstop Parties, the holders of Allowed FLLO Term Loan Facility Claims, and the holders of Allowed Second Lien Notes Claims in accordance with the Plan and the issuance of such subscription rights will be exempt from SEC registration under applicable law. All shares of the New Common Stock, the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement and shares issuable as part of the Put Option Premium will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. All shares of New Common Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The Debtors believe that the securities issued in the Rights Offering satisfy all the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws (except with respect to an underwriter as described above).

On the Effective Date, Reorganized Chesapeake will consummate the Rights Offering.  Unless otherwise expressly allowed in the Rights Offering or Rights Offering Procedures, the right to participate in the Rights Offering may not be sold, transferred, or assigned.

## XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and certain holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS, any other taxing authority or the courts.  No assurance can be given that the IRS or any other taxing authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors

within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold consideration received under the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of tax accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors

#### 1.    Expected Transaction Structure and Consequences Thereof

As of December 31, 2019, the Debtors had approximately $7.6 billion of federal net operating losses ("NOLs") carryforwards and $12 billion of total asset basis. Additional losses and credits may be generated in 2020, which will ultimately increase the Debtors' NOLs and other tax attributes. Depending on the how the Restructuring Transactions are implemented, some NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. As discussed below, however, the Debtors' NOLs are expected to be reduced upon implementation of the Plan and could be subject to other limitations.

The Restructuring Transactions are not expected to give rise to any gain or loss to the Debtors (other than as a result of cancellation of debt income ("CODI"), as described below). The Debtors' tax attributes will, subject to the

rules discussed below regarding CODI and section 382 of the Tax Code, survive the restructuring process and potentially be usable by the Reorganized Debtors going forward.

### 2.        Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, the Debtors will realize and recognize CODI upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of any consideration (including stock of the Debtors) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not, however, be required to include any amount of CODI in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a result of such exclusion, the Debtors must reduce their tax attributes by the amount of CODI that they excluded from gross income pursuant to section 108 of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryovers; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Debtors will remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize a significant amount of CODI.  The exact amount of any CODI that will be realized by the Debtors will not be determinable until, at the earliest, the consummation of the Plan.  Because the Plan provides that certain Holders of Claims will receive non-Cash consideration, the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the fair market value of the non-Cash consideration received (or, in the case of consideration in the form of certain debt instruments, the issue price), which cannot be known with certainty at this time.

### 3.        Limitation on NOLs and Other Tax Attributes

As of December 31, 2019, the Debtors had approximately $7.6 billion of federal NOL carryovers and $12 billion of total asset basis, and additional losses and credits may be generated in 2020.  In general, NOLs may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018.  Subject to any applicable limitations, NOLs carried to taxable years before 2021 may offset 100 percent of taxable income and NOLs carried to taxable years starting with 2021 may be used to offset 80 percent of taxable income for any tax year thereafter.  Further, NOLs arising in tax years after 2017, and before 2021, may be carried back to each of the five tax years preceding the tax year of such loss.  Following the Effective Date, the Debtors anticipate that any NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors that are not reduced according to the CODI rules described above and that are allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  The rules of sections 382 and 383 of the Tax Code are complicated, but, as a general matter, the Debtors anticipate that the consummation of the Plan will result in an "ownership change" for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses and tax credits will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

Under section 382 of the Tax Code, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated

as Pre-Change Losses and similarly will be subject to the annual limitation. The Debtors currently believe that they have a net unrealized built-in loss. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 and (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 0.89 percent for September 2020). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent that the Debtors have a net unrealized built-in gain at the time of the ownership change. The Debtors do not currently believe they have a net unrealized built-in gain. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their shares and Claims, respectively, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryovers would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another "ownership change" within two years after the Effective Date, then such debtor's Pre-Change Losses thereafter would be effectively eliminated in their entirety. The Debtors currently believe that the transactions contemplated by the Plan will not qualify for the 382(l)(5) Exception.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryovers by the amount of interest deductions in the manner described above, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

### C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims Entitled to Vote

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of Chesapeake for United States federal income tax purposes. Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Holders should consult their own tax advisors regarding the status of their claims as securities.

### 1. Consequences to the Holders of Allowed Class 3 Revolving Credit Facility Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed Revolving Credit Facility Claim shall receive, in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis (for purposes of this Article XII, the "RBL Exit Facility Loans"); *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash.

If an Allowed Class 3 Claim qualifies as a "security" of Chesapeake and the relevant RBL Exit Facility Loans qualify as a "security" of Reorganized Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss. Such Holder's tax basis in the relevant RBL Exit Facility Loans received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the relevant RBL Exit Facility Loans should include the holding period for the Claim exchanged therefor.

If an Allowed Class 3 Claim does not qualify as a "security" of Chesapeake and/or if the relevant RBL Exit Facility Loans do not qualify as a "security" of Reorganized Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the issue price of the relevant RBL Exit Facility Loans received and (2) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the relevant RBL Exit Facility Loans received should equal its issue price as of the date such property is distributed to the Holder. A Holder's holding period for the relevant RBL Exit Facility Loans should begin on the day following the date it receives such property.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the relevant RBL Exit Facility Loans issued to a Holder are traded on an "established securities market" at any time during the 31-day period ending 15 days after the Effective Date. In general, a debt instrument will be treated as traded on an established securities market if (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments, (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument, or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for the debt instrument.

### 2.   Consequences to the Holders of Allowed Class 4 FLLO Term Loan Facility Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the FLLO Ad Hoc Group of an Allowed FLLO Term Facility Claim, a Holder of such Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

If an Allowed Class 4 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss. Such Holder's tax basis in the New Common Stock and FLLO Rights received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor, allocated between the New Common Stock and the FLLO Rights based upon their respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock and FLLO Rights received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 4 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock and the FLLO Rights received and (2) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder. A Holder's holding period in such property should begin on the day following the date it receives such property.

### 3.   Consequences to the Holders of Allowed Class 5 Second Lien Notes Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

If an Allowed Class 5 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss. Such Holder's tax basis in the New Common Stock, Second Lien Rights, New Class A Warrants, New Class B Warrants, and New Class C Warrants received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor, allocated between such property received based upon their respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock, Second Lien Rights, New Class A Warrants, New Class B Warrants, and New Class C Warrants received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 5 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock, Second Lien Rights, New Class A Warrants, New Class B Warrants, and New Class C Warrants received, and (2) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt

deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder.  A Holder's holding period in such property should begin on the day following the date it receives such property.

### 4.      Consequences to the Holders of Allowed Class 6 Unsecured Notes Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of (i) the Unsecured Claims Recovery and (ii) 50 percent of the New Class C Warrants.  Further, a Holder of an Allowed Class 6 Claim may receive distributions of New Common Stock made after the Effective Date from the Disputed and Contingent Claims Reserve (the "Claims Reserve").  The treatment of any such distributions made after the Effective Date is described below.

If an Allowed Class 6 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization.  Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss.  Such Holder's tax basis in the New Common Stock and New Class C Warrants received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor, allocated between such property received based upon their respective fair market values.  Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock and New Class C Warrants received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 6 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code.  In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock and New Class C Warrants received, and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder.  A Holder's holding period in such property should begin on the day following the date it receives such property.

### 5.      Consequences to the Holders of Allowed Class 7 General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed General unsecured Claim shall receive its *Pro Rata* share of the Unsecured Claims Recovery.  Further, a Holder of an Allowed Class 7 Claim may receive distributions of New Common Stock made after the Effective Date from the Claims Reserve.  The treatment of any such distributions made after the Effective Date is described below.

If an Allowed Class 7 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization.  Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss.  Such Holder's tax basis in the New Common Stock received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor.  Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 7 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code.

In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock received, and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder.  A Holder's holding period in such property should begin on the day following the date it receives such property.

### 6.      Treatment of New Warrants

A U.S. Holder that elects to exercise its New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of Cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants.  Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants.  A U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise its New Warrants and (ii) such U.S. Holder's tax basis in its New Warrants immediately before such New Warrants are exercised.  A U.S. Holder's holding period for the New Common Stock received pursuant to the exercise of its New Warrants should begin on the day following the date on which such U.S. Holder exercises its New Warrants.

A U.S. Holder that elects not to exercise the New Warrants may be entitled to claim a capital loss equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the New Warrants.

### 7.      Treatment of FLLO Rights and Second Lien Rights

A U.S. Holder that elects to exercise its FLLO Rights or its Second Lien Rights (together, the "Subscription Rights") should be treated as purchasing, in exchange for its Subscription Rights and the amount of cash paid by the U.S. Holder to exercise such Subscription Rights, New Common Stock.  Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises its Subscription Rights.  A U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise its Subscription Rights and (ii) such U.S. Holder's tax basis in its Subscription Rights immediately before such Subscription Rights are exercised.  A U.S. Holder's holding period for the New Common Stock received pursuant to such exercise on the Effective Date should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise its Subscription Rights may be entitled to claim a loss equal to the amount of tax basis allocated to such Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses.  U.S. Holders electing not to exercise their Subscription Rights should consult with their own tax advisors as to the tax consequences of such decision.

### 8.      Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a Holder pursuant to the Plan is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders

of Allowed Claims in each Class will be allocated [●]. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. It is possible that the IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest for U.S. federal income tax purposes.

In general, a U.S. Holder's tax basis in any non-Cash consideration attributable to accrued but untaxed interest should equal the fair market value of such non-Cash consideration as of the date such property is received by such U.S. Holder.  A U.S. Holder's holding period in any such non-Cash consideration should begin on the day following its receipt.

### 9.      Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). Generally, if a Claim that was acquired with market discount is exchanged in a tax-free transaction for other property, any market discount that accrued on such Claim as of the time of the exchange but that was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of such accrued but unrecognized market discount.  U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 10.     Net Investment Income Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 11.     Limitation of Use of Capital Losses

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 12.     The Disputed and Contingent Claims Reserve

The Plan provides that, among other things, on or after the Effective Date, the Claims Reserve shall be formed.  Pursuant to the Plan, upon completion of the Claims reconciliation process, certain Holders of Allowed Class 6 and Class 7 Claims may become entitled to additional New Common Stock.  The Debtors intend to, upon the completion of the Claims reconciliation process, issue and then contribute to the Claims Reserve New Common Stock in an amount necessary to satisfy any such entitlements to additional New Common Stock, which New Common Stock the Claims Reserve would immediately thereafter distribute to the applicable Holders of Allowed Class 6 and Class 7 Claims in accordance with the Plan.  Generally, such New Common Stock should be treated as received in satisfaction of such Claim as described above.  If such New Common Stock were not treated as received in satisfaction of such Holder's Claim, the U.S. federal income tax consequences to such Holder, including whether such transaction qualified as a recapitalization for U.S. federal income tax purposes, could be materially different.

Furthermore, there is a risk that the Debtors may be deemed to have issued and then contributed New Common Stock to the Claims Reserve on the Effective Date, in which case pursuant to the "disputed ownership fund" treatment described below, the Claims Reserve would have a tax liability on account of the appreciation (if any) in such New Common Stock during the period in which the Claims Reserve held such New Common Stock.  When subsequently distributed by the Claims Reserve, any such New Common Stock would not be treated as received in a recapitalization for U.S. federal income tax purposes.

Because entitlements to any assets that are treated as contributed to the Claims Reserve would be subject to potential disputed claims of ownership or uncertain distributions, the Debtors anticipate that any such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred (or deemed transferred) to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred (or deemed transferred).  Instead, generally, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.  It is possible, however, that a portion of the property received would instead be re-characterized as imputed interest for U.S. federal income tax purposes.  The U.S. Holder would be required to take into account any amounts treated as imputed interest under the U.S. Holder's regular method of accounting.

D.    **Certain United States Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Consideration Received Under the Plan**

1.    **Distributions on New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current and accumulated earnings and profits of Reorganized Chesapeake as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares (determined on a share-by-share basis).  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for a dividends-received deduction.

2.    **Sale, Redemption, or Repurchase of New Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of their New Common Stock.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held its New

82

Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

### 3.    Ownership, Exercise, and Disposition of New Warrants

A U.S. Holder that elects to exercise its New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises such New Warrants. A U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's tax basis in its New Warrants immediately before such New Warrants are exercised. A U.S. Holder's holding period in the New Common Stock received pursuant to the exercise of such New Warrants should begin on the day following the date on which such U.S. Holder exercises such New Warrants.

Under section 305 of the Tax Code, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

A U.S. Holder that elects not to exercise its New Warrants may be entitled to claim a capital loss equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the New Warrants.

In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in its New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants.

### 4.    Interest on the RBL Exit Facility Loans

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the RBL Exit Facility Loans received by U.S. Holders exceeds the "issue price" of the RBL Exit Facility Loans by an amount equal to or greater than a statutorily defined de minimis amount, the loans will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the RBL Exit Facility Loans is the total of all payments due on the RBL Exit Facility Loans other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates). The determination of the issue price for loans is discussed above. The issue price for a RBL Exit Facility Loan that is traded on an established market will equal its fair market value on the date of issuance. If such a RBL Exit Facility Loan is not traded on an established market, its issue price will generally equal its stated principal amount.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the RBL Exit Facility Loans multiplied by the number of complete years to maturity from their original issue date, or if the RBL Exit Facility Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the RBL Exit Facility Loans are issued with OID, a U.S. Holder generally (i) will be required to

include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the loans, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the loans that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on any of the RBL Exit Facility Loans is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the loans, and a pro rata amount of such de minimis OID must be included in income as principal payments are received on the loans.

        **5.**        **Sale, Redemption, or Repurchase of Interests in the Exit Facility**

Upon the sale, exchange or other taxable disposition of the RBL Exit Facility Loans, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the loan.  A U.S. Holder's adjusted tax basis in their interest in relevant RBL Exit Facility Loans will depend on whether, as described above, the loans are considered a "security" for tax purposes and whether the U.S. Holder receives the relevant RBL Exit Facility Loans as part of a transaction that is treated as a reorganization for U.S. federal income tax purposes.  A U.S. Holder's initial tax basis in the relevant RBL Exit Facility Loans will be increased by any previously accrued OID and decreased by any payments on the loans other than qualified stated interest.  Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the loans has been held for more than one year at the time of its sale, exchange or other taxable disposition.  Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains.  The deductibility of capital losses is subject to limitations as discussed above.

        **E.**        **Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of any consideration received under the Plan.

        **1.**        **Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder described above in "Certain United States Federal Income Tax Consequences of the Plan - Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote" (except that the net investment income tax would generally not apply).  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including Accrued but Untaxed Interest) and of Owning and Disposing of the RBL Exit Facility Loans**

(a)      **Payments of Interest (Including Accrued but Untaxed Interest)**

Payments made to a Non-U.S. Holder of interest income (which, for purposes of this discussion, includes payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest on a Claim) generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of, as applicable, Reorganized Chesapeake (in the case of the Exit Facility) or the Debtors (in the case of interest received pursuant to the Plan), (iii) the Non-U.S. Holder is not a controlled foreign corporation related to, as applicable, Reorganized Chesapeake (in the case of the Exit Facility) or the Debtors (in the case of interest received pursuant to the Plan), actually or constructively through the ownership rules under Section 864(d)(4) of the Tax Code, and (iv) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to such interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(b)      **Sale, Taxable Exchange, or Other Disposition of the RBL Exit Facility Loans**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of its interest in a RBL Exit Facility Loan (other than any amount representing accrued but untaxed interest on such RBL Exit Facility Loan) unless:

- the gain is effectively connected with the conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of its interest in the relevant RBL Exit Facility Loan under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest (Including Accrued But Untaxed Interest)."  To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If an individual Non-U.S. Holder falls under the second of these exceptions, the holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of disposition.

3.      **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock and New Warrants**

(a)      **Distributions on Account of the New Common Stock**

Any distributions made with respect to the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Chesapeake, as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its New Common Stock.  Any such distributions in excess of a Non-U.S. Holder's basis in its New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange, as discussed below.

Except as described below, dividends paid with respect to the New Common Stock held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (or, if income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Special certification and other requirements apply to certain Non-U.S. Holders that are pass-through entities rather than corporations or individuals.  Dividends paid with respect to the New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

To the extent the FIRPTA rules (discussed below) are applicable to any Non-U.S. Holder (and subject to the rules discussed below regarding less-than-5 percent Holders if the New Common Stock is regularly traded on an established securities market), distributions that are not taxable as dividends but, instead, are treated as a return of capital or gain may be subject to withholding at an amount equal to 15 percent of the gross amount of such distributions.  Distributions that are taxable as dividends will be subject to withholding as described above.

(b)      **Sale, Redemption, or Repurchase of New Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of its New Common Stock unless: (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (iii) the issuer of such New Common Stock is or has been, during a specified testing period, a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of its New Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable

86

to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The FIRPTA rules are discussed in greater detail below.

### (c)   Ownership, Exercise, and Disposition of New Warrants

A Non-U.S. Holder that elects to exercise its New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the Non-U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a Non-U.S. Holder (to the extent such Non-U.S. Holder is subject to U.S. federal income tax, as described above) should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises such New Warrants. A Non-U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of cash paid by the Non-U.S. Holder to exercise its New Warrants plus (ii) such Non-U.S. Holder's tax basis in its New Warrants immediately before such New Warrants are exercised.

Any deemed distribution under section 305 of the Tax Code (as discussed above), will be taxed and reported to the IRS in the same manner as an actual distribution on stock and will be subject to the rules described above with respect to such Non-U.S. Holder. As applicable, the Reorganized Debtor or an applicable withholding agent may withhold in accordance with applicable tax law any amounts required to be withheld in connection with any such deemed distribution, including from amounts received on the New Warrants or other cash or property held or received on behalf of the Non-U.S. Holder.

In the event that a Non-U.S. Holder sells its New Warrants in a taxable transaction, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition except in the same circumstances as described above under "Sale, Redemption, or Repurchase of New Common Stock." If a Non-U.S. Holder is subject to U.S. federal income tax, any such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the Non-U.S. Holder if such stock had been acquired by the Non-U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the Non-U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such Non-U.S. Holder has held its Warrants.

Under Treasury Regulations issued pursuant to section 871(m) of the Tax Code, withholding at a rate of 30 percent (subject to certain treaty considerations) would apply to certain "dividend equivalent" payments made or deemed made to Non-U.S. Holders in respect of financial instruments that reference U.S. stocks. The Treasury Regulations promulgated under section 871(m) do not apply to a payment to the extent that the payment is already treated as a deemed dividend under the rules described above, and therefore generally would not apply in respect of adjustments to the conversion rate of the New Warrants. However, because the section 871(m) rules are complex, it is possible that they will apply in certain circumstances in which the deemed dividend rules described above do not apply, in which case the section 871(m) rules might require withholding at a different time or amount than the deemed dividend. Importantly, in Notice 2020-2, the IRS extended certain transition relief that makes section 871(m) of the Tax Code inapplicable to instruments that are not so-called "delta one" instruments.

### 4.   FIRPTA

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as effectively connected income that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to the New Common Stock and New Warrants, rules with respect to U.S. real property holding corporations ("USRPHCs") may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. Although the Debtors and other relevant parties have

not performed an analysis to determine whether Reorganized Chesapeake would constitute a USRPHC, companies that are engaged in the Debtor's line of business often constitute USRPHCs and, as such, it is likely that Reorganized Chesapeake would be a USRPHC. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock or New Warrants may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. However, in the event the New Common Stock is "regularly traded on an established securities market" within the meaning of FIRPTA, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer. If determined by the Required Consenting Stakeholders, the Company is required to use commercially reasonable efforts to cause the New Common Stock to be regularly traded on an established securities market under the FIRPTA rules on the Plan Effective Date. However, whether and when the New Common Stock will be considered regularly traded on an established securities market cannot currently be determined. With respect to the New Warrants, even if the New Warrants are not traded on an established securities market, the exclusion for persons with less than 5 percent of the New Common Stock extends to Non-U.S. Holders of New Warrants so long as the Non-U.S. Holder's New Warrants were not, on a fair market value basis, worth more than 5 percent of the New Common Stock on the date the Non-U.S. Holder acquired such New Warrants and the New Common Stock is considered regularly traded on an established securities market.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

### F.     FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN.**

### G.     Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S.

Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated: [●]                                   Chesapeake Energy Corporation
                                             on behalf of itself and all other Debtors


_____

                                             Domenic J. Dell'Osso, Jr.
                                             Executive Vice President and Chief Financial Officer
                                             Chesapeake Energy Corporation

**<u>Exhibit A</u>**

**Plan of Reorganization**

[Filed separately.]

**Exhibit B**

**Corporate Organization Chart**



**<u>Exhibit C</u>**

**Liquidation Analysis**

[To come.]

**<u>Exhibit D</u>**

**Financial Projections**

[To come.]

**<u>Exhibit E</u>**

**Valuation Analysis**

[To come.]