# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **Chesapeake Energy Corporation,** *et al.* [1] | § | **Case No. 20-33233 (DRJ)** |
| | § | |
| | § | **(Jointly Administered)** |

## TRIBUTARY RESOURCES, LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO PURSUE PREPETITION QUIET TITLE ACTION

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

THIS IS AN APPLICATION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

A HEARING WILL BE CONDUCTED ON THIS MATTER ON **NOVEMBER 20 AT 2:00 P.M.**, PREVAILING CENTRAL TIME IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002

PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR BY VIDEO AT THIS HEARING.

### AUDIO COMMUNICATION

Audio communication will conducted by use of the Court's regular dial-in number: 832-917-1510. At the start of the call, the caller will be asked to enter a six-digit conference code. The six-digit conference code for this hearing is Judge Jones's conference room number: 205691. Each caller shall be responsible for its own long-distance charges. Parties are encouraged to review the Court's procedures for telephonic appearances located at        https://www.txs.uscourts.gov/sites/txs/files/Court%20Procedures%20-%202-1-2020.pdf.        Attorneys, witnesses, and parties-in-interest wishing to participate in the hearing must connect to the hearing by audio communication. Any person who wishes to attend the hearing may also dial in to the audio conference dial-in number. Each person who speaks at the electronic hearing should be prepared to restate that person's name each time that the person speaks in order to assist any transcriber of the audio recording.

### VIDEO COMMUNICATION

Parties may participate in electronic hearings by use of an internet connection. You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "judgejones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting. Any exhibit offered by the Debtors will be filed on the Court's docket. Any party may also obtain an electronic copy of the exhibits by request to counsel to the Debtors.

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;

2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;

3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;

4) SELECTING "VIEW HOME PAGE" FOR JUDGE DAVID R. JONES;

5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"

6) SELECT CHESAPEAKE ENERGY CORPORATION, ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND

7) AFTER SELECTING CHESAPEAKE ENERGY CORPORATION, ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE. SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.

**TO THE HONORABLE DAVID R. JONES, CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Tributary Resources, LLC ("**Tributary**"), a creditor and party-in-interest in these bankruptcy cases, moves for entry of an Order granting relief from the automatic stay ("**Motion for Relief**") to permit the continuation of an Oklahoma quiet title action involving Tributary and Chesapeake Exploration, LLC, *et al.* ("**Debtor**" or "**Chesapeake**"), styled *Tributary Resources,*

*LLC v. Chesapeake Exploration, LLC*, *et al.* Case No. CV-2017-140 pending in the District Court of Kingfisher County, State of Oklahoma ("**Tributary Litigation**"). In support of the Motion for Relief, Tributary respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Prior to these bankruptcy cases, Chesapeake was embroiled in a quiet-title contest with Tributary over a disputed oil and gas lease. Though Chesapeake was on notice of Tributary's claims against its oil and gas lease prior to drilling, Chesapeake nonetheless drilled four horizontal oil and gas wells under the disputed lease. Oklahoma law requires operators to hold apart production revenue from disputed acreage in such instances. However, Chesapeake ignored Oklahoma law and pocketed the proceeds from the disputed acreage for itself. Now, the automatic stay is allowing Chesapeake to continue pocketing proceeds that do not belong to it, and to which it never had any right. Contemporaneously with the filing of this Motion for Relief, Tributary files an administrative expense[2] claim relating to post-petition oil and gas proceeds from the following wells drilled under the disputed lease: (1) the Perdue 23-17-7 1H; (2) the Perdue 23-17-7 2H; (3) the Stuteville 23-17N-7W 3H; and (4) the Stuteville 23-17N-7W 4H ("**New Wells**"). To recover its pre-petition property wrongfully held by Debtors, Tributary seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

2.     In addition to its Motion for Relief, Tributary seeks adequate protection of its property rights, and prays the Court order Chesapeake to hold separate and apart from its estate

---

[2]    Many of the factual matters and legal authorities contained within this Motion for Relief are necessarily also stated in Tributary's motion for administrative expense claim, and so the Court will notice overlap. However, because the nature of bankruptcy requires Tributary to seek pre-petition and post-petition relief through different procedural tools, and though the circumstances and legal scenarios entitling Tributary to the relief it seeks may overlap, this Motion for Relief and the administrative expense application are respectively tailored to the appropriate remedies.

funds equal to 1/4th of the production revenue from the New Wells from the dates of first production, less royalties already paid and the reasonable costs of operating the New Wells.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the Southern District of Texas ("**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  This Court has constitutional authority to enter a final order regarding this matter.  *See Stern v. Marshall*, 564 U.S. 462 (2011).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The basis for the relief requested herein is §§ 105(a), 362(d) of title 11 of the United States Code ("**Bankruptcy Code**") and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas ("**Local Rules**").

## PROCEDURAL POSTURE

6.      On June 28, 2020 ("**Petition Date**"), Chesapeake Energy Corporation and forty affiliated companies filed chapter 11 petitions in the United States Bankruptcy Court for the Southern District of Texas.

7.      The Debtors continue to operate their business and manage their properties as debtors in possession, and no trustee or examiner has been appointed.

8.      On July 9, 2020, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors.

## RELIEF REQUESTED

9.      Tributary moves this Court for entry of an Order granting its Motion for Relief to permit the Tributary Litigation to move forward towards a resolution and to permit Tributary to recover against any funds held in suspense (or otherwise) by Debtors.

## BASIS FOR RELIEF REQUESTED

10.     Section 362(d)(1) of the Bankruptcy Code states:

> On request of a party in interest and after notice and a hearing, the court **shall** grant relief from the stay provided under subsection (a) of this section, as by terminating, annulling, modifying, or condition such stay . . . for cause, including lack of protection of an interest in property of such party in interest[.]

11 U.S.C. § 362(d)(1) (*emphasis added*).

11.     To fully understand the harm Tributary will suffer in the absence of relief from the stay requires a brief explanation of the Oklahoma law at issue.  The most salient legal aspects of the Tributary Litigation are:

a.      Under Oklahoma law, the secondary term of an oil and gas lease expires the moment a lease fails to produce in paying quantities for an unreasonable period of time, regardless of the date an order to that effect is entered by a court.

b.      All owners (including non-producing co-tenants) within a drilling and spacing unit established by the Oklahoma Corporation Commission are entitled to their proportionate share of the unit production and revenue from the date the unit is established.

c.      The operator of a drilling and spacing unit appointed by the Corporation Commission has (1) common-law fiduciary duties to properly account for and distribute all oil and gas revenue from the unit and (2) a statutory duty to hold proceeds from the sale of production "separate and distinct from all other funds . . . until such time as such proceeds are paid to the owners legally entitled thereto."

OKLA. STAT. tit. 52, § 570.10.

12.     Within this legal framework, Tributary alleges that Chesapeake's base lease expired prior to the dates it commenced operations to drill the four New Wells on a 640-acre drilling and spacing unit in Kingfisher County, Oklahoma.  Tributary's top leases cover 160 acres out of the 640-acre drilling and spacing unit.  When Tributary ultimately prevails in the Tributary

Litigation, it will be entitled to one-fourth of the unit revenue (i.e., production revenue from the New Wells) from the dates of first production.

13.     That production revenue should have been held separate and apart from Chesapeake's coffers until a final resolution of the Tributary Litigation.  Instead, Chesapeake pocketed the funds, and now Tributary is at risk of never recovering the funds owed to it. Only relief from the stay would prevent that from occuring.

14.     In support of its Motion for Relief, Tributary offers the expert report of Raymond B. Roush, P.E., attached hereto as **Exhibit 1**.  In further support, Tributary respectfully shows the Court:

## <u>ARGUMENT & AUTHORITIES</u>

### A.     The Quiet Title Suit, the Base Lease & the Purdue 2 Well

15.     Long before the Petition Date, Tributary and Chesapeake were engaged in a quiet title contest.  The contest is a suit to terminate an oil and gas lease covering lands in Kingfisher County, Oklahoma for failure to produce in paying quantities.  In 1958, James M. Perdue and wife Elizabeth Ann Perdue, as Lessor, executed a certain Oil and Gas Lease ("**Base Lease**")[3] covering the SE/4 of Section 23, Township 17 North, Range 7 West ("**Subject Lands**"), in favor of Calvert Drilling, Inc, as Lessee.  The Base Lease was for a term of 5 years, and as long thereafter as oil and gas "is or can be produced."  Ex. 1, ¶ 2.  Calvert Drilling, Inc. and its successors carried the Base Lease into its secondary term by drilling the "**Perdue 1**" and "**Perdue 2**" oil and gas wells. *See id*, Expert Report of Ray Roush P.E., pg. 2.

---

[3]     The Base Lease was recorded January 20, 1959 in the office of the County Clerk of Kingfisher County in Book 180, Page 463. The Base Lease is attached to the Expert Report of Ray Roush, (**Exhibit 1**), as Appendix **Exhibit 1A**.

16.      Perdue 1 was drilled in 1959 and Perdue 2 was drilled in 1960, and both were completed as producers.  As with all oil and gas wells, production from Perdue 1 and Perdue 2 gradually decreased over time.  In 1994, Perdue 1 was plugged and abandoned, leaving Perdue 2 as the only producing well under the Base Lease.

17.      Starting in November of 2015 and continuing throughout all of 2016 and 2017, Perdue 2 well operated at a net loss for more than two consecutive years, and therefore failed to produce in paying quantities for an unreasonable period of time.  Tributary alleges this resulted in termination of the Base Lease under Oklahoma law.  *See e.g.,* Ex. 1.

18.      Aside from that, however, the Base Lease terminated on other grounds.  Paragraph 13 of the Base Lease contains a 60-day "cessation of production clause." *See id.*, Ex. 1A, ¶ 13.  That clause requires that, should production in paying quantities cease for any reason, the Base Lease terminates unless the lessee "commences operations for drilling a well within sixty (60) days from such cessation[.]" *Id.*

19.      After November of 2015, Perdue 2 well ceased producing in paying quantities, and no additional drilling efforts on the Subject Lands were undertaken until August 5, 2017.  Because cessation of production in paying quantities for a period of 60 days terminates the Base Lease under its own terms in the absence of additional drilling, the Base Lease terminated in January of 2016. *See id.*, pg. 3, 5, and **Exhibit 1B** (showing profit/loss of the Perdue 2 well during the relevant time frame discussed herein and demonstrating for the period of November 2015 – July 2017 there were losses totaling $13,482.49).

20.      Moreover, Perdue 2 well suffered not just a failure to produce in paying quantities for an unreasonable period of time, but also a *total cessation* of any production whatsoever from

September 2016 through March 2017, during which time no additional drilling operations were commenced. *See id.*, *Ex. 1B*.

21.     The total cessation of production for more than 180 days—in light of the 60-day cessation of production clause in the Base Lease—conclusively shows the Base Lease terminated.

22.     Subsequently, and prior to the Petition Date, Tributary and the mineral owners of the Subject Lands (successors in interest to James M. Perdue and Elizabeth Ann Perdue), entered into certain oil and gas leases ("**Top Leases**").  True and correct copies of the Top Leases are filed in the real property records of Kingfisher County, Oklahoma, and are attached hereto as **Exhibits 2 – 4**.

23.     Notwithstanding the failure to produce in paying quantities (and the total cessation or production exceeding 60 days), Debtors and other unrelated non-debtor parties continue to claim an interest in minerals underlying the Subject Lands pursuant to the Base Lease—specifically: (1) Monty L. Hott Production Corp.; (2) Chaparral Energy, LLC;[4] (3) Kaiser-Francis Oil Company; (4) L.R. McBride, Inc. (as successor to L.R. McBride Engineering, Inc.); Be-Ja, LLC; Casa Cortez Holdings, Inc.; D&T Oil, LLC; Voortman Oil & Gas, LLC; and DeWaard Oil and Gas, LLC, all of whom (including Chesapeake) are successors in interest to Calvert Drilling, Inc., the original Lessee under the Base Lease.

24.     After obtaining the Top Leases, Tributary filed suit against the defendants in Oklahoma state court.  A copy of the petition is attached as **Exhibit 5**.

---

[4]     Though Chaparral Energy, LLC ("Chaparral") was originally named a Defendant by Tributary in the Tributary Litigation, apparently recognizing the futility of defending the Base Lease, Chaparral settled with Tributary.

25.     In connection with the Tributary Litigation, Tributary filed a *lis pendens* in the real property records of Kingfisher County, Oklahoma, thereby placing all the public on notice of its claim to the minerals underlying the Subject Lands.  A copy is attached as **Exhibit 6**.

26.     Notwithstanding the fact that the Tributary Litigation was filed November 17, 2017, and service of process was completed on Chesapeake on November 20, 2017, Chesapeake nonetheless "spud" the first of its four new horizontal oil and gas wells on December 10, 2017, and therefore knowingly drilled under the disputed Base Lease.

27.     Thereafter, Debtors drilled three more wells into the drilling and spacing unit[5] of which the Subject Lands are a part (the four horizontal oil and gas wells drilled by Chesapeake into the spacing unit which encompasses the Subject Lands are the New Wells).[6]  Despite the disputed title under which Debtors drilled and produced the New Wells, Chesapeake neglected to suspend the funds attributable to the Subject Lands, as required by Oklahoma law.

28.     The Base Lease expired well before August 5, 2017, the spud date of the first of a series of recent horizontal oil and gas wells[7] ostensibly drilled under the Base Lease, and far in advance of the November 2017 date Chesapeake spud the New Wells.  Debtors therefore have no right to that portion of revenue from the New Wells attributable to the Subject Lands.

---

[5]     By Order No. 667564 in Cause CD No. 201505428 of the Oklahoma Corporation Commission (the regulatory body for oil and gas operations in Oklahoma, similar to the Texas Railroad Commission), the Subject Lands were included in a 640-acre drilling and spacing unit made up of all of Section 23-17N-07W, Kingfisher County, Oklahoma. The "Spacing Order" is attached hereto as **Exhibit 7**.

[6]     The New Wells are the Purdue 23-17-7 1H (API No. 35073258390000), the Purdue 23-17-7 1H (API No. 35073258550000, the Stuteville 23-17-7 3H (API No. 35073260020000), and the Stuteville 23-17-7 4H (API No. 35073260030000). Copies of the Oklahoma Corporation Commission Form 1002A Completion Reports for the New Wells are attached hereto as **Exhibits 8 – 11**.

[7]     As mentioned above, the New Wells are the four horizontal oil and gas wells drilled by Chesapeake.  However, prior to Chesapeake's drilling of the New Wells, Chaparral also drilled horizontal oil and gas wells on the drilling and spacing unit encompassing the Subject Lands, the first of which was the Stay-Puft 1707 1LMH-23 ("**Stay-Puft Well**"), spud on August 5, 2017.  *See* Ex. 12, 1002A for the Stay-Puft Well.  While the Chaparral well and Chesapeake's New Wells are drilled into the same drilling and spacing unit, they targeted and produce from different oil and gas bearing formations.

**B.      Tributary's Likelihood of Success on the Merits is Strong**

29.      Oil and gas leases (including the Base Lease in this case) almost universally have (1) a primary term for a specified time frame; and (2) a secondary term that lasts for as long thereafter as oil and/or gas (or other hydrocarbon constituents) "is or can be produced." *See* Ex. 1, App. Tab B.  This language "denotes in law production in paying quantities." *Stewart v. Amerada Hess Corp.*, 604 P.2d 854, 857 (Okla. 1979).  Production in "paying quantities" is a term of art under Oklahoma law meaning "production of quantities of oil and gas sufficient to yield a profit to the lessee over operating expenses[.]"  *Hininger v. Kaiser*, 738 P.2d 137, 140 (Okla. 1987).  Commonly, when older wells approach the end of their productive lives (like Perdue 2), the wells operate at a loss, but lessees continue to hold the leases due to the high value of the underlying leasehold estate in hopes of selling it at enormous financial gain or simply drilling again later on, when it suits them.  Such "speculative purposes" are not legally justifiable.  *See Shell Oil Co. v. Howell*, 258 P.2d 661, 664 (Okla. 1953).

30.      Under Oklahoma law, an oil and gas "lease terminates for failure to produce in paying quantities under its own terms pursuant to the habendum clause." *Baytide Petroleum, Inc. v. Continental Resources, Inc*, 231 P.3d 1144, 1147 (Okla. 2010).  While "a court order may be necessary to adjudicate the rights of the parties" when leases are challenged for failure to produce in paying quantities, the lease "is not cancelled because of the entrance of the court order."  *Id.* Rather, the lease expires automatically by its own terms.  *Id.*  The Oklahoma Supreme Court's decision in *Baytide* established that oil and gas leases terminate pursuant to their own terms when they fail to produce in paying quantities.  *Id.* at 1147.

31.      As the Expert Report of Ray Roush, P.E., explains, Purdue 2 became unprofitable in November 2015, and <u>never again regained profitability</u>.  *See* Ex. 1B.  Even if Tributary were to

(generously) limit the profit/loss time frame to before August of 2017 (when Chaparral drilled the Stay-Puft Well), the Base Lease suffered <u>net losses of $13,482.49</u> during that twenty-one-month period.  *See* Ex. 1, App. Tab. I, pg.  This period of time is in excess of what appellate courts in Oklahoma found to be "unreasonable" in prior cases.  *See Hunter v. Clarkson*, 428 P.2d 210 (Okla. 1967) (six months); *Fisher v Grace*, 830 P.2d 1380 (Okla. Civ. App. 1991) (12 months); *Kerr v. Hillenberg*, 373 P.2d 66 (Okla. 1962) (six to twelve months).  Worse still, there were no sales from Chaparral's Stay-Puft 1707 or any of the New Wells until January of 2018, meaning the Base Lease simply continued in the red for the remainder of 2017.  *See e.g.,* Ex. 1.  Such a prolonged period of time is obviously "unreasonable," and means the Base Lease terminated for failure to produce in paying quantities.

32.     Although Tributary can easily demonstrate a prolonged period of unprofitable operations under the Base Lease, because of the 60-day cessation clause, Tributary's burden is limited to showing 60 days of losses to succeed in terminating the Base Lease.

33.     This principal is demonstrated by *Hoyt v. Continental*, where a 60-day cessation clause similar to the one in the Base Lease was under consideration.  606 P.2d 560 (Okla. 1980).  In that case, the Oklahoma Supreme Court considered whether a "total cessation" was required to trigger the 60-day cessation clause, or whether the 60-day clause was triggered by mere failure to produce in paying quantities.  *Id*. at 563.  The issue was dispositive in that case because the well under consideration there "did not completely cease producing hydrocarbons."  *Id*. at 562.

34.     The court reasoned that once "the primary term has expired" the 60-day cessation clause serves "to modify the habendum clause" of an oil and gas lease.  *Id*. at 563.  Therefore, when a lease in its secondary term (like the Base Lease) contains a 60-day cessation clause, "there is a cessation of production if the habendum clause requires production in paying quantities and

such requirement is not met." *Id*. It cannot be seriously contended that the habendum clause of the Base Lease does not require production in paying quantities.

35.     The *Hoyt* court went on to describe the ramifications of this, holding that because "the record clearly demonstrates production in paying quantities was not obtained for an uninterrupted period far in excess of the 60-day provision in the lease executed by the parties," the oil and gas lease had expired by its own terms and was no longer of force. *Id*. Therefore, the "trial court" below had "correctly granted partial summary judgment" that "the lease in question has terminated under the 60-day cessation of production clause." *Id*. at 565.

36.     The 60-day cessation clause in the Base Lease serves to replace the common law "reasonable time" that a lessee under an oil and gas lease usually is afforded in which to put a well back into commercial production. *Id*. at 563. And where contracting "parties have bargained for and agreed on a [reasonable] time period for a temporary cessation clause, that provision will control over the common law." *Id*.

37.     In this case, application of the 60-day cessation clause at nearly any point from and after November of 2015 commands a finding that the Base Lease terminated. *See* Ex. 1B. This is *especially* true for time frame of September 2016 through March of 2017, where no oil or gas were produced or sold at all. *Id*. Because Perdue 2 failed to produce in paying quantities for periods of time far in excess of what is allowed for under the Base Lease, the Base Lease terminated by its own terms, and Chesapeake had no right to drill—and has no rights to keep oil and gas proceeds from—the Subject Lands.

## C.     Tributary is Entitled to 1/4th of the Proceeds from the New Wells, Less Royalties Paid and Operating Costs

38.     By virtue of the spacing order, Tributary is entitled to a 1/4th share of the proceeds from all production from the drilling and spacing unit comprised of the Subject Lands, less and

except mineral owner's royalty already paid and the reasonable and necessary costs to operate the New Wells.  An Oklahoma Corporation Commission ("**Commission**") order creating a drilling and spacing unit for a common source of supply entitles all owners within the unit to share in unit production from the date the order is entered.  Much like a co-tenancy, a producing party within a spacing unit must account to non-producing parties for their rightful share of the unit production. That is because as "a matter of law," a "drilling and spacing order operate[s] to unitize or communitize the oil and gas mineral interests in the unit."  *Shearn v. Ward Petroleum Corp.*, 808 F. Supp. 1530, 1533–34 (W.D. Okla. 1992).

39.     It is a well-settled principal of Oklahoma law that "non-drilling owners" of a divided or undivided interest "in a spacing unit is [sic] entitled to share in the production from the unit well commencing on the date the Commission established the unit."  *Ward v. Corp. Commission*, 501 P.2d 503, 505 (Okla. 1972).   The rights of the non-producer to share in production is no less than a "requirement of due process."  *Ward*, 501 P.2d at 508 (emphasis added).

40.     This due process right is uniformly applied by courts in the following manner:

> an Oklahoma Corporation Commission spacing and drilling unit order establishes all interest owners in the unit as co-tenants as of the date of the order and apportions production from the unit among all owners in proportion to the surface acres that their respective tracts bear to the total unit acreage.

*Shearn*, 808 F. Supp. at 1533.

41.     As described in footnote 5, supra, the Commission entered Order No. 667564 in Cause CD 201505428 on August 29, 2017, established the Oswego formation (from which the New Wells are producing) underlying all of Section 23-17N-7W, Kingfisher County, as a single 640-acre drilling and spacing unit.   Therefore, once Tributary is able to carry the Tributary

Litigation to its ultimate conclusion, it will have established its rights to the production from the 160 acres its Top Leases cover in the proportion that the 160 acres bear to the 640-acre unit, being one-fourth.  This right exists "as of the time the unit is established" by the Commission.  *Ward*, 501 P.2d at 507.  Because the Spacing Order was entered in August of 2017 (months before the first of the New Wells was drilled), and because the Base Lease expired in January of 2016 (due to the 60-day cessation clause therein), Tributary's rights to production revenue dates back to the dates of first production from the New Wells, being January of 2018.  *See* Ex. 8, Commission Form 1002A for the Perdue 23-17-7 1H well (1st Prod Date: January 27, 2018).

42.     Tributary is aware that Debtors have regularly paid the mineral interest owners of the Subject Lands the royalty they are entitled to under the Base Lease.[8]  Tributary will, of course, account to its Top Lessor-mineral interest owners for the higher royalties they are entitled to under the Top Leases once it receives its share of the unit revenue, but Chesapeake, having already paid the lesser royalty under the Base Lease to those owners, has at least satisfied that part of the royalty obligation.  Twenty-five percent (25%) of the unit revenue (the Top Leases cover 160 acres out of a 640-acre unit), minus 15.234375% of 25% (the mineral owner royalty Chesapeake already paid), equals 21.1914% of the unit revenue (i.e., $.25 - (.25*.15234375) = .211914$).  Therefore, 21.1914% of the unit production is Tributary's due.  Aside from this, it's well-settled law in Oklahoma that an operator is entitled to deduct the reasonable, necessary costs of operating a well before it accounts to fellow owners within the unit, and Tributary does not begrudge Debtors that right, so long as those costs are actually reasonable and necessary.

---

[8]     The Base Lease provides for a unique royalty.  While it provides the traditional 1/8th royalty, it then provides for an additional 1/32nd of 7/8ths royalty.  Together, these fractions add up to a number best expressed as a decimal: 0.15234375 (i.e., $((1/8) + (1/32 * 7/8)) = 0.15234375$).  This means the mineral owner's royalty under the Base Lease is a **15.234375%** cost-free share of production, which Chesapeake has already paid.  The irregular royalty provided for on the Base Lease results on some cumbersome percentages and decimals, which normally only title attorneys must contend with.

43.     Having obtained production and revenue records, Tributary has calculated the amount of revenue to which it is entitled, and which Chesapeake wrongfully kept for itself. **Exhibit 13** attached hereto is based off true and correct copies of the production revenue statements Chesapeake provided to mineral owners of the Subject Lands through June of 2020, and shows that Chesapeake should have held in suspense and apart from its own funds the total amount of $4,472,660.19, being 21.1914% of the production from: the Perdue 23-17-7 1H ($1,552,928.19); the Perdue 23-17-1 2H ($1,591,605.33); the Stuteville 23-17-7 3H ($952,184.36); and the Stuteville 23-17-7 ($375,942.30).

44.     While Chesapeake is entitled to deduct the reasonable and necessary costs of operating the wells from these figures, only Chesapeake can provide insight on what those costs may have been.  The significant sums at stake here demonstrate the urgency of Tributary's request for relief, and further underscore the significance of Chesapeake's failure to comply with Oklahoma law to segregate those funds.

**D.     As the Commission-appointed Operator of the New Wells, Chesapeake had a Duty to Segregate and Account for Revenue Attributable to the Subject Lands**

45.     Typically, (in accordance with Oklahoma law), Oklahoma operators hold disputed revenues in suspense pending a resolution of underlying quiet title actions.  Here, however, in direct violation of duties imposed by Oklahoma law, Debtors failed to hold any revenue related to the Tributary Litigation in suspense.

46.     Debtors had a duty under Oklahoma case law and certain applicable statutes to hold production revenue separate and distinct from all other funds because of the disputed title in the Tributary Litigation.  "[A]bundant case law that holds that a unit operator stands in a fiduciary or trustee-like status as to the interest owners in a well."  *Shearn v. Ward Petroleum Corp.*, 808 F. Supp. 1530, 1532 (W.D. Okla. 1992).  For instance, in *Leck v. Continental Oil Co.* the Oklahoma

Supreme Court recognized the "existence of a fiduciary duty owed" by the operator of a unit "to the royalty owners <u>and lessees</u> who are parties to the unitization agreement or subject to the order creating the unit." 800 P.2d 224, 229 (Okla. 1989) (emphasis added). This duty arises because of "the unitization order," *id.*, and it requires the operator "to act diligently in determining and paying" revenue to proper interest owners. *Howell v. Texaco, Inc.*, 112 P.3d 1154, 1161 (Okla. 2004).

47.     Aside from these inherent duties, the Production Revenue Standards Act ("**PRSA**"), codified in Title 52, Section 570.1 *et seq.* of the Oklahoma Statutes, places explicit requirements on operators to hold revenue in trust for those legally entitled to it.  § 570.10(A). Under the statute "the operator has a duty to pay proceeds from the sale of oil or gas to the legal owner," and "to act diligently in determining the legal owners." *Goodall v. Trigg Drilling Co.*, 944 P.2d 292, 295 (Okla. 1997).  Operators are "liable for mispayments caused by failure to act diligently in determining the legal owner." *Id.*  When the rightful owner of revenue is in dispute, the operator must hold "<u>proceeds from the sale of production . . . separate and distinct from all other funds of any person</u>[.]" 52 O.S. § 570.10 (emphasis added).  The funds are held "for the benefit of owners legally entitled thereto." *Id.*  The PRSA is construed to create a cause of action for fraud against operators who ignore or fail in their statutory duties.  *See Howell*, 112 P.3d at 1161–62.  This is in addition to the various statutory consequences, including liability for the amount not paid at a punitive 12-percent interest rate.  *See* 52 O.S. § 570.10.

48.     Importantly, the PRSA also provides owners like Tributary a right to specific performance.  *See* 52 O.S. § 570.14(c) ("Any owner injured in business or property by reason of any action in violation of the provisions of the Production Revenue Standards Act shall have the right to: 1. Recover actual damages so sustained; and 2. <u>Obtain specific performance where</u>

equitable.  The prevailing party in any court proceeding brought pursuant to the Production Revenue Standards Act shall be entitled to recover the costs of the suit, including but not limited to reasonable attorney and expert witness fees.") (emphasis added).

49.    Normally, Tributary's interest in the revenue attributable to the Subject Lands would be assured by its ability to hold an operator to account for these statutory and common law duties.  But operator's duties, and the potential liability for failure to comply with them, are meaningless to Tributary in this case.  Due to the automatic stay, Tributary can only watch as the Subject Lands are depleted of their most profitable stages of oil and gas production.  Chesapeake is now constrained only by its voluntary good faith-compliance with its fiduciary and statutory duties, and has communicated to Tributary that it has no intention to comply with any such duties. Clearly relief from the stay is necessary for Tributary to protect its property rights.

50.    To protect its valuable property interests, Tributary requests relief from the stay so that it may seek to enforce its rights under Oklahoma law in Oklahoma.  Tributary has a strong likelihood of success on the merits.  Once successful, Tributary's right to 1/4th of the unit revenue will be indisputable (less applicable deductions).  Whether that right amounts to anything more than a meaningless, unenforceable judgment depends on this Court granting relief from the stay.

**E.    Relief from the Stay is Warranted Under the Bankruptcy Code**

51.    First and foremost, the Code enumerates "lack of adequate protection" as "cause" for granting relief from the automatic stay.  *See* 11 U.S.C. § 362(d)(1).  Tributary has heretofore been forced to rely on Chesapeake's voluntary compliance with state law to protect its interest in the production proceeds attributable to the Subject Lands.  That protection is clearly not adequate because Chesapeake has admitted to Tributary that it has not, and will not, segregate or suspend any of the funds attributable to the Subject Lands.  It seems doubtful whether Tributary would

have any recourse for Chesapeake's flouting of its statutory duties to segregate and hold apart those funds once it emerges from these Chapter 11 proceedings.  Therefore, relief from the stay is warranted under the Bankruptcy Code.

52.     While the trustee or debtor-in-possession is undoubtedly entitled to possession and use of all the debtor's property, what constitutes the debtor's property is a matter of state law.  *See Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."). The terms of the Base Lease and Oklahoma law (as explained above) determine the rights of Chesapeake in and to the Subject Lands and proceeds therefrom.  Regardless if Chesapeake re-emerges from these proceedings with the benefits of a discharge or assigns its rights in the Base Lease to some other party, ownership of the Subject Lands would still be subject to the terms of the Base Lease.  And the Base Lease's own terms do not constitute a "claim" by Tributary which may be discharged under the Code.  *See In re Trigg*, 630 F.2d 1370, 1375 (10th Cir. 1980) (relying on Fifth Circuit precedent and finding expiration of an oil and gas lease by its own terms was not prevented by filing a case under Chapter 11, and the "bankruptcy court was powerless to rewrite those terms for the parties.").  Allowing the stay to continue would only delay the inevitable, and that delay would harm Tributary, while providing no corresponding benefit to Chesapeake.

53.     Aside from this, there is additional cause to lift the Stay.  "Cause" to lift the stay is not defined in the Bankruptcy Code and whether it exists is determined on a "case-by-case basis*." In re Mosher*, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017) (citing *In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014)); *see also In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998).

54.     There is no set standard for finding "cause" in this Circuit, *In re Choice ATM Enters., Inc.*, No. 14-44982-DML, 2015 WL 1014617, at *5 (Bankr. N.D. Tex. Mar. 4, 2015)

(citation omitted), and bankruptcy courts therefore have flexibility and broad discretion in determining whether to lift the automatic stay. *See Bonneville Power Admin. v. Mirant Corp.* (*In re Mirant Corp.*), 440 F.3d 238, 253 (5th Cir. 2006) (quoting *Little Creek Dev. Co. v. Commonwealth Mortg. Corp.* (*In re Little Creek Dev. Co.*), 779 F.2d 1068, 1072 (5th Cir. 1986)).

55.     Although the Fifth Circuit has not imposed a firm standard for determining whether cause exists to lift the automatic stay, courts in this Circuit have relied upon a series of factors relevant to that assessment.  One popular twelve-factor test appears in *Xenon Anesthesia* and considers:

1)     whether the relief will result in a partial or complete resolution of the issues;

2)     lack of any connection or interference with the bankruptcy case;

3)     whether the other proceeding involves the debtor as a fiduciary;

4)     whether a specialized tribunal has been established to hear the particular cause of action;

5)     whether the debtor's insurer has assumed full responsibility;

6)     whether the action primarily involves third parties;

7)     whether litigation in the other forum would prejudice the interests of other creditors;

8)     whether the judgment claim arising from the other action is subject to equitable subordination;

9)     whether movant's success would result in a judicial lien avoidable by the debtor;

10)    interests of judicial economy and the expeditious and economical resolution of litigation;

11)    whether the proceedings have progressed to the point that parties are ready for trial; and

12)    impact of the stay on the parties and the balance of harm.

510 B.R. at 112 (citing, among other cases, *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990)); *see also In re Mosher*, 578 B.R. at 772.

56.     Not all of the factors will be relevant in every case, *In re Mosher*, 578 B.R. at 773, and they need not be assigned equal weight.  *In re U.S. Brass Corp.*, 176 B.R. 11, 13 (Bankr. E.D. Tex. 1994).  Furthermore, courts have found cause to lift the stay based on one factor alone.  *See, e.g., id.* ("The factor of judicial economy may be considered in deciding whether to lift the automatic stay; in fact, a decision to lift the stay may be upheld on this ground alone.") (citation omitted).  As shown below, cause exists to lift the automatic stay so that the Tributary Litigation can move forward to final resolution.

## A.     Xenon/Sonnax Factor 1: Relief will result in a complete resolution of the issues

57.     Granting relief from the automatic stay to allow the Tributary Litigation to continue through final decision and will result in a complete resolution of the dispute between the Debtors and Tributary (aside from collecting any funds owed to Tributary post-judgment).  Allowing the Tributary Litigation to move forward would result in a final adjudication of whether the Base Lease expired for failure to produce in paying quantities prior to the New Wells being drilled, and will ultimately determine Chesapeake's rights to the proceeds therefrom.

## B.     Xenon/Sonnax Factor 2, 3, 7, 10, 11, and 12: Judicial economy and the balance of harms all weigh in favor of lifting the automatic stay, and the Tributary Litigation will not interfere with the bankruptcy case or prejudice the interest of other creditors

58.     All other relevant factors[9] also support lifting the automatic stay, especially those

---

[9]     *Xenon/Sonnax* factors four, five, eight, and nine—*i.e.*, whether a special tribunal has been established, whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation, whether a judgment in the foreign action is subject to equitable subordination, and whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor respectively—are not addressed herein as they are inapplicable in this case.

that involve judicial economy and a balancing of the harms, as demonstrated below:

59.     ***Judicial economy***.   Judicial economy is the notion that courts should operate efficiently and "minimize duplication of effort . . . to avoid wasting the judiciary's time and resources." *Black's Law Dictionary* (11th ed. 2019).  This factor alone can be sufficient to lift the stay.  *In re U.S. Brass Corp.* 176 B.R. at 13.  Tributary believes this case will be ripe for summary judgment shortly after the stay is lifted, because the 60-cessation clause weighs so heavily in Tributary's favor.  Resolution of the litigation will pose only a minor cost on the Debtors in the way of attorneys' fees.  Furthermore, a determination of these state law rights is best left to the expertise of the Oklahoma state court.  *See MCZ, Inc. v. Andrus Resources, Inc.* (*In re MCZ, Inc.*), 82 B.R. 40, 43 (Bankr. S.D. Tex. 1987).

60.     ***Debtor as a Fiduciary***.   Debtor has a fiduciary obligation to segregate and hold revenues accrued to date in trust for the owners legally entitled to the funds.  Until the Tributary Litigation is resolved, Debtors cannot claim to know who is legally entitled to the funds, and Debtors have <u>not</u> heretofore abided by their obligations.

61.     ***Interference with the bankruptcy***.   Tributary contends that the Base Lease expired and is not property of the estate pursuant to 11 U.S.C. § 541(b)(2).  Since it is not property of the estate, it will not impact the Debtors' property, nor will it interfere with the bankruptcy cases.

62.     ***Whether the Tributary Litigation would prejudice the interests of other creditors***. The creditors in these cases will not be harmed because the Tributary Litigation is not seeking to collect a debt or claim against the Debtors that would diminish the bankruptcy estates.  If the Base Lease is expired as Tributary contends, it was never a part of the Debtors' estates, <u>and</u> the Debtors never had any right to the proceeds attributable to the disputed interest.

63.      ***Impact of the stay on the parties and the balance of harms.***  There is significant economic harm to Tributary's property interests if the stay is not lifted and Tributary is not permitted to enforce the Debtors' statutory obligation to hold revenues separate and apart from the bankruptcy estate.

64.      For these reasons, Tributary respectfully submits that cause exists for this Court to lift the automatics stay to allow the Tributary Litigation to continue and for such other relief as the Court deems just.

## CONCLUSION

WHEREFORE, Tributary requests entry of the attached proposed order granting the relief requested in the Application, including relief from the stay in Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure, and such other and further relief as the Court may deem appropriate.

Dated: October 19, 2020

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, P.C.**

By: /s/ Jarrod B. Martin
Jarrod B. Martin
Texas Bar No. 24070221
Tyler W. Greenwood
Florida Bar No. 1011325
SDTX Bar No. 3575083
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tyler.greenwood@chamberlainlaw.com

***Attorneys for Tributary Resources, LLC***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 19, 2020, a true and correct copy of the foregoing Notice was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

<u>*/s/ Jarrod B. Martin*</u>
Jarrod B. Martin

## <u>CERTIFICATE OF CONFERENCE UNDER LOCAL RULE 4001-1</u>

Pursuant to Local Rule 4001-1, Counsel for Tributary Resources, LLC conferred with counsel for the Debtors to resolve the stay issues contemplated herein on October 6 and October 18 and no resolution was reached.

<u>*/s/ Jarrod B. Martin*</u>
Jarrod B. Martin