**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
10/28/2020

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-33233** |
| **CHESAPEAKE ENERGY** | § | **CHAPTER 11** |
| **CORPORATION,** *et al.*, | § | **(Jointly Administered)** |
| | § | |
| Debtors. | § | **DAVID R. JONES** |

<u>**MEMORANDUM OPINION**</u>
(Docket No. 27)

    In this contested matter, the Debtors seek to reject a gas purchase agreement with ETC Texas Pipeline, Ltd. ("ETC") as an executory contract under 11 U.S.C. § 365. ETC objects to the requested relief asserting that the agreement contains a covenant running with the land and is therefore not executory. The Debtors counter that (i) the agreement fails to comply with Texas law to establish a covenant running with the land; and (ii) if the agreement does contain a covenant running with the land, it is not *per se* prohibited from rejecting the agreement.

## <u>Procedural History</u>

    The Debtors filed these jointly administered bankruptcy cases on June 28, 2020. [Docket No. 1]. The cases were designated as complex chapter 11 cases under the Procedures for Complex Cases in the Southern District of Texas. [Docket No. 82]. Chesapeake Exploration L.L.C. and Chesapeake Energy Marking, LLC (collectively "Chesapeake") are each a debtor.

    On June 28, 2020, the Debtors filed their Motion for Entry of an Order (i) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (ii) Granting Related Relief (the "Rejection Motion") [Docket No. 27]. In the Rejection Motion, the Debtors sought, in part, to reject a gas purchase agreement with ETC.[1] [Docket No. 27]. ETC filed its objection to the Rejection Motion on July 24, 2020. [Docket No. 487]. The parties filed supporting briefs on August 17, 2020. [Docket Nos. 810 and 813]. Each party filed a response brief on August 24, 2020. [Docket Nos. 999 and 1001].

    The Debtors filed their reply to ETC's objection on August 27, 2020. [Docket No. 1032]. In the reply, the Debtors asserted that (i) rejection of the ETC agreement would not impair any covenant running with the land that might exist and that ETC would receive a claim under the liquidated damages provision of the agreement; (ii) no privity exists with respect to Chesapeake's mineral estate; and (iii) the ETC agreement does not touch and concern the land as severed gas is personalty under Texas law. [Docket No. 1032 at 1–2].

---

[1]  The Rejection Motion seeks the rejection of eight separate alleged executory contracts under 11 U.S.C. § 365. Only the Debtors' request to reject the identified gas purchase agreement with ETC remains outstanding and is addressed in this memorandum opinion. All other matters were previously resolved.

On August 27, 2020, ETC filed its response to the Debtors' reply [Docket No. 1033]. In its argument, ETC relies upon the proposition that an agreement cannot be an executory contract if it contains a covenant running with the land to support its objection to the Rejection Motion. [Docket No. 1033 at 3].

The Court conducted a hearing on the Rejection Motion on August 31, 2020. [Docket No. 1056]. At the conclusion of the hearing, the Court took the matter under advisement. [Docket No. 1056].

## Jurisdiction and Authority

The Court has exclusive jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b), (e). The matter is a core proceeding under 28 U.S.C. § 157(b) as a request to reject an executory contract under § 365 can only arise in a bankruptcy case. *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." (quoting *In re Wood*, 825 F.2d 90, 97 (5th Cir.1987))). The Court has constitutional authority to enter a final order in this contested matter. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). To the extent necessary, the parties have impliedly consented to the entry of a final order by the Court. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947–48 (2015) (holding that a party impliedly consents to adjudication when the party "voluntarily appear[s] to try the case" with knowledge of the need for consent and without affirmatively refusing to it).

## Relevant Factual Background

Effective February 23, 2016, ETC and Chesapeake entered into a "Base Contract for Sale and Purchase of Natural Gas" (the "Base Contract"). [Docket No. 1035-2]. Under the Base Contract, Chesapeake agreed to sell and ETC agreed to buy certain quantities of Gas for a particular transaction. [Docket No. 1035-2]. Under Appendix 1, Special Provisions A to the Base Contract (the "Appendix"), the term "Gas" was modified from its original definition to mean "methane and other gaseous hydrocarbons, including gaseous combustible, noncombustible, and inert elements, compounds, components or mixtures thereof and liquefiable hydrocarbons in the vapor stream produced and recovered at the wellhead." (*sic*)" [Docket No. 1035-2, Appendix 1, at 13].

The parties executed a Transaction Confirmation effective February 23, 2016 (the "Confirmation Transaction") subject to the Base Contract that modified certain terms of the Base Contract and further defined the relationship between the parties. [Docket No. 1035-2, Transaction Confirmation]. Under the Confirmation Transaction, the parties agreed as follows:

> Seller shall tender all of Seller's Gas to Buyer at the Delivery Point(s) during the term of this Transaction Confirmation, up to the SRC set forth on Exhibit "E" attached hereto. On a Firm basis, Buyer shall accept and purchase at the Delivery Point(s) all Gas that Seller delivers to such Delivery Point(s), up to the MDQ for each Delivery Point as set forth on Exhibit "A" attached hereto and the SRC in total . . . .

[Docket No. 1035-2, Transaction Confirmation, at 19].  The parties further agreed that:

> [s]ubject to Seller's Reservations, **Seller dedicates for sale and delivery hereunder all of the Gas owned or controlled by Seller or an Affiliate of Seller that is produced from the oil and gas leases described in Exhibit "C"**[2] to this Transaction Confirmation (such Gas, "Seller's Gas", and such leases, the "Dedicated Leases"), up to the SRC; provided, however, such dedication does not include the Gas attributable to any non-operating working interest in a lease equal to less than thirty percent (30%). Seller shall not assign, transfer or convey any interest now owned or hereafter acquired (directly or indirectly) in the Dedicated Leases without expressly making same subject to this Transaction Confirmation and the Base Contract.  Seller's dedication hereunder is a covenant running with the land, and Buyer and Seller shall sign, and Buyer shall file in the property records of the applicable county or counties, a Memorandum of this Transaction Confirmation in the form attached hereto as Exhibit "D".

[Docket No. 1035-2, Transaction Confirmation, at 19] (emphasis added). The Seller's Reservations include:

> (a)  The right to use the Gas produced from the Dedicated Leases prior to delivery to Buyer for the following purposes:
>
> > (1)  For fuel in development and operation of the Dedicated Leases from which the Gas is produced or any leases and lands with which the leases covering the Dedicated Leases are pooled or unitized, including (but not limited to) the use of Gas for fuel, drilling (including Gas drilling), deepening, reworking, compressing, completing, Gas lifting, treating, cycling, re-pressuring or other supplemental recovery operations, provided, however, that any Gas so used but not consumed by such uses shall remain committed under this Transaction Confirmation; and
> >
> > (2)  For delivery to the lessors and other owners of interests in the Dedicated Leases if such lessors and other owners of interests are entitled to use or take such Gas in kind under the terms of the leases or other instruments creating their interests; and
> >
> > (3)  For fuel in the operation of the facilities which Seller may install in order to deliver Gas under this Transaction Confirmation.
>
> (b)  The right to pool or unitize the Dedicated Leases (or any portion thereof) with other lands and leases. In the event of pooling or unitization, this Transaction Confirmation will cover Seller's interest in the pool or unit and the Gas attributable thereto.
>
> (c)  The right to separate the Gas using only mechanical, ambient temperature equipment.

---

[2]  ETC argues and the Court notes that the language in the Recordable Agreement and Memorandum of NAESB Agreements (the "Memorandum") contains a dedication of **all Gas owned by Counterparty or an affiliate and underlying or produced from the Dedicated Leases**, up to the SRC as set forth in the Transaction Confirmation. [Docket No. 1035-4, Memorandum].  The Memorandum further states that the Transaction Confirmation will control if a conflict, ambiguity or inconsistency exists.  Memorandum at V.  While the term used in the Memorandum is "Dedicated Leases", the "thing" actually "tender[ed], committed[ed] and dedicate[ed]" is Gas.  Memorandum at IV.  The Court has applied the Transaction Confirmation accordingly.

(d) Seller shall conduct operations on the Dedicated Leases free of any control by Buyer, including without limitation the right to make farmouts of any lease subject to this Transaction Confirmation, and to abandon any well and surrender any lease when Seller, in its sole discretion, deems the same no longer capable of producing Gas in commercial quantities. Seller shall not be required to produce and/or operate any well or wells in any manner which in its sole judgment and discretion would not constitute good operating practice and/or is uneconomic, nor shall Seller be obligated to drill additional wells or to deepen, repair or rework any existing wells.

[Docket No. 1035-2, Transaction Confirmation, at 20].

In the event of a breach of the agreement, the parties agreed to the following exclusive remedy:

3.2. The **sole and exclusive remedy** of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s): or (ii) in the event of a breach by Buyer . . . . The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

[Docket No. 1035-2 at 6] (emphasis added).  The parties further agreed that:

[w]ithout limiting the applicability of any other provision of title 11 of the United States Code, 11U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code") (including without limitation Sections 362, 546, 553, 556, 560, 561 and 562 thereof and the applicable definitions in Section 101 thereof), the Parties acknowledge and agree that: (i) this Base Contract and all transactions entered into hereunder constitute "forward contracts" and/or "swap agreements" and this Agreement constitutes a "master netting agreement" as defined in section 101 of the Bankruptcy Code; (ii) each party is a "master netting agreement participant," a "forward contract merchant" and/or a "swap participant" as defined in the Bankruptcy Code; (iii) the rights of the Parties under Section 10.3 of this Base Contract constitute "contractual rights" to liquidate, terminate or accelerate, as applicable, this Agreement and the transactions entered into hereunder; (iv) any margin or collateral (including any Adequate Assurance of Performance that has been posted) provided hereunder, or under any margin, collateral, security, or similar agreement related hereto and all payment obligations of any party to the other hereunder constitute a "margin payment" or a "settlement payment" as defined in section 101 of the Bankruptcy Code; and (v) the Parties are entitled to the rights under, and protections afforded by, sections 362, 546, 553, 556, 560, 561 and 562 of the Bankruptcy Code."

[Docket No. 1035-2 at 14].  Finally, the parties agreed that Texas law applies to the parties' agreement  [Docket No. 1035-2].  Hereafter, the Base Contract, the Transaction Confirmation and the Memorandum are collectively referred to as the "ETC Purchase Agreement."

**Analysis**

Executory Contracts and Rejection under 11 U.S.C. § 365

Under 11 U.S.C. § 365(a), a debtor "may assume or reject ***any*** executory contract . . . ." 11 U.S.C. § 365(a) (emphasis added); *see also In re National Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000) (discussing the Bankruptcy Code's treatment of executory contracts). "A contract is executory 'if performance remains due to some extent on both sides.'"  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984)). Section 365 derives from § 70(b) of the Bankruptcy Act which codified the common law doctrine allowing debtors to reject contracts that were economically burdensome. *See In re Austin Dev. Co.*, 19 F.3d 1077, 1081 (5th Cir. 1994).  In simple terms, § 365(a) allows a debtor to re-evaluate the wisdom of continued performance of a particular contract based upon the circumstances faced by the debtor during the bankruptcy case.  By rejecting an executory contract, a debtor is permitted to disavow further performance of its obligations under a burdensome contract. *Tempnology*, 139 S. Ct. at 1658.  Courts evaluate a debtor's decision under the business judgment rule.  *Id.*

The rejection of an executory contract constitutes a breach by the debtor of the contract immediately before the petition date.  11 U.S.C. § 365(g)(1); *see also Wainer v. A.J. Equities, Ltd.*, 984 F.2d 679, 684 (5th Cir. 1993). In general terms, this breach results in a general unsecured claim against the bankruptcy estate for the damages caused by the debtor's future nonperformance. *See Tempnology*, 139 S. Ct. at 1658.  Thus, any allowed claim would be paid pro rata with the debtor's other unsecured creditors.  Notably, a rejection under § 365 does not terminate the underlying contract.  As the Supreme Court noted from the Bankruptcy Appellate Panel's decision in *Tempnology*:

> [T]he breach of an agreement does not eliminate rights the contract had already conferred on the non-breaching party . . . A rejection 'convert[s]' a 'debtor's unfulfilled obligations' to a pre-petition damages claim.  But it does not 'terminate the contract' or 'vaporize[ ]' (*sic*) the counterparty's rights.

*Id.* (internal citations omitted).

Covenants that Run with the Land under Texas Law

Covenants restricting the unfettered use of one's real property are generally disfavored under Texas law.  *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987).  Any ambiguity is strictly construed against the party seeking to enforce the restriction.  *Id.*  In Texas, a covenant runs with the land and is enforceable if: (i) the obligation touches and concerns the land; (ii) the obligation relates to a thing in existence, or specifically binds the parties and their assigns; (iii) the original parties intended for the obligation to run with the land; and (iv) the successor to the burden has notice of the obligation. *In re El Paso Refinery, LP*. 302 F.3d 343, 355 (5th Cir. 2002) (citing *Inwood N. Homeowners' Ass'n v. Harris,* 736 S.W.2d 632, 635 (Tex. 1987)).  In addition, there must be privity of estate or vertical privity between the parties at the time the covenant was created. *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Ehler v. B.T. Suppenas Ltd.*, 74

S.W.3d 515, 521 (Tex. App.—Amarillo 2002)).  Finally, some Texas courts also require that the covenant "must be contained in a grant or in a grant of some property interest in the land." *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. App.—Tyler 2013, no pet.) (citing *Wayne Harwell Props.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied).  This concept, known as horizontal privity, was criticized by the Fifth Circuit in *Energytec* as potentially no longer applicable, although the *Energytec* Court performed the horizontal privity test as part of its analysis.  *Energytec*, 739 F.3d at 222.

<u>Executory Contracts and Covenants that Run with the Land are not Mutually Exclusive</u>

ETC repeatedly asserts that the ETC Purchase Agreement cannot be an executory contract if it contains a covenant that runs with the land.  ETC does not cite nor is the Court able to locate any authority for such a proposition.  Likewise, § 365 of the Bankruptcy Code contains no such exclusion and no known rule or law prohibits the mutual existence of both concepts within a single document.  It does not stretch the imagination to envision a contract that both contains a covenant that runs with the land and is executory.  In such a circumstance, the appropriate analysis is what benefit was previously bestowed by the debtor on the non-rejecting party that remains post-rejection and what future performance by the debtor is excused by the rejection.  *See Tempnology*, 139 S. Ct. at 1658 (describing the attributes of an "executory" contract).  Depending on the particular language of the subject agreement, a plethora of outcomes are possible.

ETC cites several decisions holding that gathering agreements containing covenants running with the land could not be rejected.  *See generally In re Alta Mesa Res., Inc.*, 613 B.R. 90 (Bankr. S.D. Tex. 2019); *In re Badlands Energy, Inc.*, 608 B.R. 854 (Bankr. D. Colo. 2019).  ETC misses the import of those decisions.  In each case, the debtors sought to remove the entirety of the burden from their real property interests.  The Court agrees that the decisions in these two cases were proper given the relief requested, the arguments raised by the parties and addressed by the court[3] and the holding in *Tempnology*.  These decisions do not, however, result in the mutually exclusive result that ETC advocates.  Although properly raised by the Debtors in this case, further analysis is moot in light of the below analysis.

<u>Analysis of the ETC Purchase Agreement</u>

The parties do not dispute that the ETC Purchase Agreement requires ongoing future performance to some extent on both sides.  Likewise, no genuine dispute exists that the ETC Purchase Agreement relates to a thing in existence (gas) and that the agreement contains express language that specifically binds the parties and their assigns.  Finally, the requirement of successor notice is not an issue in this case as ETC and Chesapeake are the original contracting parties.  In their briefs, the parties primarily focus their arguments on whether the ETC Purchase Agreement "touches and concerns" Chesapeake's land and whether privity exists.  Limited time is spent on the presence of intent—which is where the Court will begin its analysis.

---

[3]  The Court's review of the record in the identified cases does not reflect that any party asserted that the agreement at issue could be rejected notwithstanding that a real property covenant would continue to burden the subject land post-rejection.

**Intent that the Obligation Run with the Land**

The ETC Purchase Agreement contains express language that the parties intended for the obligation to sell certain quantities of gas to run with the land.  Generally speaking, such an acknowledgement, without more, would establish the requisite intent.  *See, e.g., El Paso Refinery*, 302 F.3d at 355–56 (holding that the express intent of the parties to bind successive purchasers to an agreement demonstrated the parties had the requisite intent to create a covenant running with the land).  In this case, however, further analysis is required.  *See Billington v. Riffe*, 492 S.W.2d 343, 346 (Tex. Civ. App.—Amarillo 1973, no writ) (relying on parol evidence to determine intent of the parties despite unambiguous language within deed); *Neiman-Marcus Co. v. Hexter*, 412 S.W.2d 915, 919 (Tex. Civ. App.—Dallas 1967, writ ref'd n.r.e.) (considering a lease in its entirety, as well as other leases held by the lessor, to determine whether an unambiguous lease provision ran with the land); *see also ABS Sherman Props., Ltd. v. Sarris*, 626 S.W.2d 538, 540 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.) (determining an unambiguous lease provision ran with the land based on an examination of the entire lease).  Under the ETC Purchase Agreement, the parties agreed that the exclusive remedy for a breach of the obligation to deliver or purchase a specified quantity of gas is a formulaic monetary payment.  Specific performance, injunctive relief and other equitable remedies are excluded.  Such a remedy is inherently personal in nature and unrelated to any real property interest held by Chesapeake.  This economic provision better expresses the parties' true intent under and the personal nature of their agreement.  The damages limitation along with the acknowledgement that the ETC Purchase Agreement is a two-party forward contract as discussed below suggests that the added language that "the parties intended for the obligation to run with the land" was an ill-conceived attempt to portray the ETC Purchase Agreement as a horse of a different color.  The Court finds that the requisite intent required by Texas law is missing.

**Touch and Concern**

A covenant touches and concerns the land when the underlying obligations affect the "nature, quality or value of the thing demised, independently of collateral circumstances, or it affect[s] the mode of enjoying it." *El Paso Refinery*, 302 F.3d at 356  (citing *Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 911 (Tex. 1982)).  Recent Texas cases apply a "burden on the promisor's land" test to determine whether a covenant touches and concerns land.  *See Westland Oil,* 637 S.W.2d at 910–11; *see also Wimberly v. Lone Star Gas Co.*, 818 S.W.2d 868, 871 (Tex. App.—Fort Worth 1991, writ denied) *but see McCart v. Cain*, 416 S.W.2d 463, 465 (Tex. Civ. App.—Fort Worth 1967, writ ref'd n.r.e.) (applying a burden-and-benefit test).

ETC contends that the dedication of all oil and gas produced from the Debtors' leases touches and concerns the land.[4]  Notably, the Debtors did not assign a specific interest in the oil and gas leases themselves.  "Produced gas" necessarily means gas severed from the mineral estate and collected at the wellhead.  Under Texas law, produced gas is personal property.  *Phillips Petroleum Co. v. Adams,* 513 F.2d 355, 363 (5th Cir. 1975).  Even if the "underlying and produced from" language contained in the Memorandum governed, the result would be no different.  The thing or object of the parties' agreement is gas to be delivered to ETC's entry point if any such gas is produced, up to the agreed quantity.  ETC has no right of access to or control over Chesapeake's

---

[4]  *See supra* note 2.

use of its real property interests. Chesapeake's ability to use and enjoy its property rights is unaffected. Only after gas is produced and becomes personal property does an obligation regarding the disposition of that gas arise. Without more, the Court finds that the parties' chosen words do not create a covenant that touches and concerns Chesapeake's land.[5]

**Privity**

For a covenant to run with the land there must be privity of estate between the parties to the agreement. *Westland Oil,* 637 S.W.2d at 910. Known as vertical privity, the requirement means that "there must be a mutual or successive relationship to the same rights of property." *Id.* at 910-11. An easy example of vertical privity is the transfer of a person's fee estate to another.

In this case, ETC asserts that the dedication of Gas along with a dedication of "such property rights arising out of the Dedicated Leases necessary to burden the Dedicated Leases with [Chesapeake's] dedication of the Dedicated Leases and Gas" is sufficient to establish privity. This identified language highlights the problem. A simple translation of the foregoing is that "we dedicate whatever is necessary to make sure that the dedication is valid." The ETC Purchase Agreement contains only a specific dedication of gas. Moreover, the parties agreed that the ETC Purchase Agreement was a "forward contract" under the Bankruptcy Code. Under § 101 of the Bankruptcy Code, a forward contract means:

> [A] contract (other than a commodity contract, as defined in section 761) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase or reverse repurchase transaction (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in this section) [2] consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement . . . .

11 U.S.C. § 101(25)(A). The parties' agreement is indicative that the object of the ETC Purchase Agreement is the ongoing purchase and sale of personal property—not the burdening of a real property interest.

ETC further asserts that the existence of a monetary "fee" requirement in the ETC Purchase Agreement makes the Fifth Circuit's holding in *Energytec* applicable. ETC misreads the importance of the fee in *Energytec*. The fee was only important as it served as a toll for use of the "gas highway" and the accompanying easements and other real property interests that existed in *Energytec*. No such corollary exists in this case. ETC operates a "drainage ditch" on its adjoining property waiting for Chesapeake to fill its collection vessel with gas once, and only if, produced. The Court finds the absence of vertical privity.

---

[5] Had the agreement between the parties included a dedication of "all of the Debtors' right, title and interest in and to the leases," the Court's analysis might have been profoundly different.

Although Texas law remains unclear, the Court agrees with the Fifth Circuit's skepticism about whether a horizontal privity requirement remains. The Court declines to venture a guess whether a horizontal privity requirement remains. Such answer will ultimately be provided by the Texas Supreme Court or the Texas legislature. To the extent that horizontal privity remains a requirement, the Court finds that no simultaneous interest existed at the time of the ETC Purchase Agreement and consequently, an absence of horizontal privity. *See Energytec*, 739 F.3d at 222.

Equitable Servitude

Arguing in the alternative, ETC initially asserted that the ETC Purchase Agreement creates an equitable servitude on Chesapeake's property interests and cannot therefore be rejected. The doctrine of equitable obligation or servitude may bind a successor owner if the successor acquired its interest with notice of the restriction and the restriction concerns the use of the subject land. *Clear Lake City Water Auth. v. Clear Lake Util.,* 549 S.W.2d 385, 388 (Tex. 1977). This argument was practically abandoned by ETC during the parties' briefing. To the extent that it remains, the Court finds it inapplicable to the analysis of whether an alleged executory contract can be rejected. Such an argument, if applicable at all, would be raised in response to the Debtors' request for authority to sell its property interests under 11 U.S.C. § 363.

## **Conclusion**

Simply put, the parties' words matter. Applying Judge Isgur's analysis in *Alta Mesa* and the specific content of the ETC Purchase Agreement, the Court concludes that (i) the requisite intent is absent due to the parties' implementation of an exclusive personal remedy in the event of a breach; (ii) the ETC Purchase Agreement does not touch and concern Chesapeake's real property interests; and (iii) the agreement lacks the required privity to establish a covenant running with the land under Texas law. The ETC Purchase Agreement does not contain a covenant that runs with the land. The ETC Purchase Agreement is an executory contract subject to rejection under 11 U.S.C. § 365. The Debtors' motion is granted and the ETC Purchase Agreement is rejected. A separate order will issue.

Signed:  October 28, 2020.

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**