**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
10/30/2020

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re:  Docket No. 1149** |

**ORDER (I) APPROVING THE ADEQUACY**
**OF THE DISCLOSURE STATEMENT, (II) APPROVING**
**THE SOLICITATION PROCEDURES WITH RESPECT TO**
**CONFIRMATION OF THE DEBTORS' PROPOSED CHAPTER 11**
**PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN**
**CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS OFFERING**
**PROCEDURES AND RELATED MATERIALS, (V) SCHEDULING CERTAIN**
**DATES WITH RESPECT THERETO, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), pursuant to sections 105, 363, 502, 1123(a), 1124, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, 3020, and 9006, and Bankruptcy Local Rules 2002-1 and 3016-1:  (a) approving the adequacy of the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates*, substantially in the form attached to this Order (the "Disclosure Statement");  (b) approving the Solicitation Procedures;  (c) approving the Ballots;  (d) approving the Solicitation Packages;  (e) approving the Cover  Letter;  (f) approving the Confirmation  Hearing Notice;  (g)  approving the Non-Voting

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Status Notices; (h) approving the Plan Supplement Notice; (i) approving the Assumption Notice and Rejection Notice; (j) approving the Rights Offering Procedures; and (k) approving certain dates and deadlines related to confirmation of the Plan; this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' Estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as provided herein.

## I.      Approval of the Disclosure Statement.

2.      The Disclosure Statement, attached hereto as **Exhibit 1**, is approved as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

3.      The Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims and Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

II.     **Approval of the Procedures, Materials, and Timeline for Soliciting Votes on and Confirming the Plan.**

      A.     **Approval of the Solicitation Procedures.**

      4.     The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures attached hereto as **Exhibit 2**, which are hereby approved in their entirety.

      B.     **Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.**

      5.     The following dates are hereby established (subject to modification as necessary with the consent of the Required Plan Sponsors and the DIP Agent) with respect to the solicitation of votes to accept the Plan, voting on the Plan, and confirming the Plan:

| Event | Date |
|---|---|
| Voting Record Date | October 19, 2020 |
| Solicitation Mailing Deadline | November 6, 2020 (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Nine (9) business days following the entry of the Order (or as soon as reasonably practicable thereafter) |
| Plan Supplement Filing Deadline | November 23, 2020 |
| Voting Deadline | December 7, 2020 at 11:59 p.m. (prevailing Central Time) |
| Confirmation Objection Deadline | December 7, 2020 at 5:00 p.m. (prevailing Central Time) |
| Deadline to File Voting Report | December 11, 2020 at 5:00 p.m. (prevailing Central Time) |
| Confirmation Hearing Date | December 15, 2020 at 12:00 p.m. (prevailing Central Time) |

      6.     The Second Lien Notes Trustee and the Unsecured Notes Trustee are directed to provide the Solicitation Agent with lists of the registered holders of Second Lien Notes and General Unsecured Notes, respectively, reflecting the principal amount of Second Lien Notes and General Unsecured Notes held as of the Voting Record Date as soon as practicable, but no later than five (5) Business Days following the Voting Record Date.

**C.     Approval of the Form and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

7.      The Solicitation Packages to be transmitted on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, to those holders of Claims entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

   a.      this Order (excluding the schedules hereto, except as set forth below);

   b.      the Disclosure Statement attached hereto as **Exhibit 1**;

   c.      the Solicitation Procedures attached hereto as **Exhibit 2**;

   d.      the applicable form of Ballot, in substantially the form of the Ballots attached hereto as **Exhibits 3A**, **3B**, **3C**, **3D**, **3E** and **3G**;

   e.      a cover letter, in substantially the form attached hereto as **Exhibit 4** describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

   f.      the Confirmation Hearing Notice in substantially the form attached hereto as **Exhibit 8**;

   g.      a pre-addressed, postage pre-paid reply envelope;[3]

   h.      with respect to Class 6 and Class 7, the solicitation letter from the Official Committee of Unsecured Creditors, substantially in the form of letter attached hereto as **Exhibit 14**; and

   i.      with respect to holders of Royalty and Working Interest Claims, the solicitation letter from the Official Committee of Royalty Owners, substantially in the form of letter attached hereto as **Exhibit 15**.

8.      The Debtors shall distribute Solicitation Packages to all holders of Claims entitled to vote on the Plan on or before the Solicitation Mailing Deadline, or as soon as reasonably

---

[3]     The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive Ballots directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

practicable thereafter.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

9.      The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to holders of Claims entitled to vote on the Plan in electronic format (*i.e.*, on a CD-ROM or flash drive) only.  Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Solicitation Agent and request paper copies of the materials previously received in electronic format (to be provided at the Debtors' expense).  ***Only*** the Ballots, the Solicitation Procedures, the Cover Letter, and the Confirmation Hearing Notice will be provided in paper form.  On or before the Solicitation Mailing Deadline, the Debtors shall provide (a) complete Solicitation Packages (other than Ballots) to the U.S. Trustee, and (b) the Order (in electronic format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

10.      The Solicitation Agent is authorized to assist the Debtors in:  (a) distributing the Solicitation Packages; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against in the Debtors; (c) responding to inquiries from holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Solicitation Packages (including the Ballots), and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan or the adequacy of the Disclosure Statement; (d) soliciting votes on the Plan; and (e) if necessary, contacting creditors or interest holders regarding the Plan and/ or the Disclosure Statement.

11.      The Solicitation Agent is also authorized to accept Ballots via electronic online transmission solely through an online balloting portal on the Debtors' case website as set forth in

the Solicitation Procedures. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

      **D.**    **Approval of the Form of Notices to Non-Voting Classes.**

    12.    Except to the extent the Debtors determine otherwise in consultation with the Required Plan Sponsors and the DIP Agent, the Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in Non-Voting Classes, as such holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, the Solicitation Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2 | Unimpaired—Deemed to Accept | Holders of Claims that are deemed to accept the Plan are not entitled to vote. As such, holders of such Claims will receive a notice, substantially in the form attached to the Order as **Exhibit 5**, in lieu of a Solicitation Package. |
| 10 | Impaired—Deemed to Reject | Holders of Interests that are deemed to reject the Plan are not entitled to vote. As such, holders of such Interests will receive a notice, substantially in the form attached to the Order as **Exhibits 6** and **6A**, **6B**, and **6C** (as applicable) in lieu of a Solicitation Package. |

| Class(es) | Status | Treatment |
|-----------|--------|-----------|
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim.  As such, holders of such Claims will receive a notice, substantially in the form attached to the Order as **Exhibit 7** (which notice shall be served together with such objection). |

13.     The Debtors are not required to mail Solicitation Packages, other solicitation materials, or a Non-Voting Status Notice to:  (a) holders of Claims that have already been paid in full during the Chapter 11 Cases; (b) any party to whom the notice of this motion was sent but was subsequently returned as undeliverable without a forwarding address; or (c) holders of Class 8 Intercompany Claims and Class 9 Intercompany Interests.

### E.     Approval of the Confirmation Hearing Notice.

14.     The Confirmation Hearing Notice, substantially in the form attached hereto as **Exhibit 8**, which shall be filed by the Debtors and served upon parties in interest in these Chapter 11 Cases by November 6, 2020 (or as soon as reasonably practicable thereafter) and published in a format modified for publication one time no later than **nine (9) business days after the entry of this Order, or as soon as reasonably practicable thereafter**, in the *New York Times*, the *Oklahoman*, the *Houston Chronicle*, the *Billings Gazette*, the *Casper Star-Tribune*, the *Philadelphia Inquirer*, *The Advocate*, and the *Canton Repository* constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan and Disclosure Statement can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

### F.     Approval of the Procedures for Filing Objections to the Plan.

15. Objections to the Plan will not be considered by the Court unless such objections are timely filed in accordance with this Order. Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court by **December 7, 2020 at 5:00 p.m.** (prevailing Central Time).

G. **Approval of Notice of Filing of the Plan Supplement.**

16. The Debtors are authorized to send notice of the filing of the Plan Supplement to parties in interest, substantially in the form attached hereto as **Exhibit 9**, within the time periods specified in the Plan. Notwithstanding the foregoing, the Debtors may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the Plan.

H. **Approval of Notices to Contract and Lease Counterparties.**

17. The Debtors are authorized to mail a notice of assumption (and any corresponding Cure Claims) or rejection of any Executory Contracts or Unexpired Leases, in the forms attached hereto as **Exhibit 10** and **Exhibit 11**, respectively, to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan, within the time periods specified in the Plan.

I. **Non-Substantive Modifications.**

18. The Debtors are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan, the Solicitation Package, and related documents without further order of the Court, including changes to correct typographical and grammatical errors, and to make conforming changes among the Disclosure Statement, the Plan, and related documents (including

the appendices thereto) where, in the Debtors' reasonable discretion, doing so would better facilitate the Plan solicitation process.  Subject to the foregoing, the Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with this Order, without further order of the Court.

### III.     Approval of the Rights Offering Procedures.

19.     The Rights Offering Procedures attached hereto as **Exhibit 12** are approved.

20.     The Subscription Forms attached hereto as **Exhibits 13A**, **13B**, and **13C** are approved.

21.     The Debtors may modify the Rights Offering Procedures or adopt any additional detailed procedures, consistent with the provisions of the Rights Offering Procedures, to effectuate the Rights Offering and to issue the Rights Offering Shares.

22.     The following dates and deadlines regarding the Rights Offering are hereby established, subject to the right of the Debtors to modify the following dates:

a.     FLLO Record Date:  **4:00 p.m. Central Time on December 7, 2020**, as the record date for determining holders of FLLO Term Loan Facility Claims entitled to participate in the applicable Rights Offering (the "FLLO Record Date");

b.     Second Lien Record Date:  **4:00 p.m. Central Time on December 7, 2020**, as the record date for determining holders of Second Lien Notes Claims entitled to participate in the applicable Rights Offering (the "Second Lien Record Date");

c.     Subscription Commencement Date:  **November 6, 2020**, as the commencement of the Rights Offering;

d.     Subscription Expiration Deadline:  **4:00 p.m. Central Time on December 7, 2020**, as the deadline for Rights Offering Participants to subscribe to the Rights Offering Shares (as defined in the Rights Offering Procedures); and

e.     Subscription Funding Deadline (only for non-Backstop Parties):  **4:00 p.m. Central Time on December 8, 2020**, as the deadline for Rights Offering

Participants that are not Backstop Parties to deliver the aggregate Purchase Price (as defined in the Rights Offering Procedures).

## IV. Miscellaneous.

23.    The Debtors' rights are reserved to modify the Plan without further order of the Court in accordance with Article X of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

24.    Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

25.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.    Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Bankruptcy Local Rules are satisfied by such notice.

27.    Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

28.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

29.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Signed:  October 30, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit 1

**Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**AMENDED DISCLOSURE STATEMENT FOR THE SECOND**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:      mcavenaugh@jw.com
                  jwertz@jw.com
                  kpeguero@jw.com
                  vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      patrick.nash@kirkland.com
                  marc.kieselstein@kirkland.com
                  alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: October 30, 2020

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

The Debtors are providing the information in this Disclosure Statement to holders of Claims for purposes of soliciting votes to accept or reject the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (the "**Plan**").[2] Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan, each holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Article VIII below.

**Subject to the foregoing, the Plan is supported by the Debtors and holders of 100 percent of loans under the Revolving Credit Facility, holders of approximately 93 percent of FLLO Term Loan Facility Claims, holders of approximately 63 percent of Second Lien Notes, and holders of approximately 36 percent of Unsecured Notes. The Debtors urge holders of Claims whose votes are being solicited to accept the Plan.**

The Debtors urge each holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records and various assumptions regarding the Debtors' business. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business or their future results or operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted, and there is no assurance that the statements contained herein will be correct at any time after such date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right, with prior notice to and reasonable consent of the Required Plan Sponsors and Consenting DIP Lenders, to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any

---

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Article I.A of the Plan.

representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims and Interests (including those holders of Claims who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VIII, entitled "Risk Factors," which begins on page 73, before submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

The information contained in this Disclosure Statement is included for purposes of soliciting votes for, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.  This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  Other Securities may be issued pursuant to other applicable exemptions under the federal securities laws.  To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward looking statements under federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements.  Forward-looking statements may include statements about the Debtors':

- **business strategy;**

- **acquisition or disposition of assets, including strategy, amount, timing, and ability to effectuate any such transaction;**

- **financial strategy;**

- **risks associated with the Chapter 11 process, including the Debtors' ability to develop, confirm, and consummate a plan under Chapter 11 or an alternative restructuring transaction;**

- **inability to maintain relationships with suppliers, employees, and other third parties as a result of the Chapter 11 filing or other failure of such parties to comply with their contractual obligations;**

- **failure to satisfy the Debtors' short- or long-term liquidity needs, including its inability to generate sufficient Cash flow from operations or to obtain adequate financing to fund its capital expenditures and meet working capital needs and its ability to continue as a going concern;**

- **legal proceedings and the effects thereof;**

- **drilling locations;**

- **oil and natural gas reserves;**

- **realized oil and natural gas prices;**

- **production volumes;**

- **capital expenditures;**

- **economic and competitive advantages;**

- **credit and capital market conditions;**

- **regulatory changes;**

- **lease operating expenses, general and administrative expenses and development costs;**

- **future operating results, including results of acquired properties;**

- **plans, objectives, expectations and intentions; and**

- **integration and the resulting benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' Cash position and levels of indebtedness.**

**Statements concerning these and other matters are not guarantees of the Debtors and the Reorganized Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Debtors and the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties, and factors may include:  the Debtors' ability to confirm and consummate the Plan; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' business during the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; the Debtors' ability to access financing necessary to consummate the Plan; general economic, business, and market conditions; commodity price fluctuations; currency fluctuations; interest rate**

iv

**fluctuations; price increases; changes in estimates of oil and natural gas reserves; marketing of oil and natural gas; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing business; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; natural disasters; geopolitical instability; the effects of COVID-19 on the Debtors' business; and the effects of governmental regulation on the Debtors' business.**

[*Remainder of page intentionally left blank.*]

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ........................................................................................................................1

II.     PRELIMINARY STATEMENT .............................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN ....................................................................................................................................2

    A.      What is chapter 11? ..............................................................................................2
    B.      Why are the Debtors sending me this Disclosure Statement? ..............................2
    C.      Am I entitled to vote on the Plan? ........................................................................3
    D.      What will I receive from the Debtors if the Plan is consummated? ......................3
    E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, a Professional Claim, or a Priority Tax Claim? .......................................6
    F.      Are any regulatory approvals required to consummate the Plan? .........................9
    G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ......9
    H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .......................................................................................9
    I.      What happens to Claims that are Disputed as of the Effective Date? ...................9
    J.      What are the sources of Cash and other consideration required to fund the Plan? .......10
    K.      Are there risks to owning the New Common Stock or New Warrants upon emergence from chapter 11? ..........................................................................................................10
    L.      Is there potential litigation related to the Plan? ....................................................10
    M.      Will Royalty and Working Interests be affected by the Plan? ..............................10
    N.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? .....................................................................................................12
    O.      Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan? ...............................12
    P.      How will the Debtor against which an Allowed General Unsecured Claim is Allowed affect the recovery of Holders of Allowed General Unsecured Claims under the Plan? ....13
    Q.      Do all holders of Allowed Claims in a given Class receive the same treatment? ...........14
    R.      Why do Allowed Unsecured Notes and Allowed General Unsecured Claims receive different treatment under the Plan? .................................................................................15
    S.      How will the preservation of the Causes of Action impact my recovery under the Plan? .......15
    T.      Will there be releases and exculpation granted to parties in interest as part of the Plan? .......16
    U.      What value did the Released Parties and Exculpated Parties contribute to the Restructuring Transactions? ....................................................................................................20
    V.      What is the deadline to vote on the Plan? .............................................................22
    W.      How do I vote for or against the Plan? ..................................................................22
    X.      Why is the Bankruptcy Court holding a Confirmation Hearing? ..........................22
    Y.      When is the Confirmation Hearing set to occur? ..................................................22
    Z.      What is the purpose of the Confirmation Hearing? ..............................................22
    AA.      What is the effect of the Plan on the Debtors' ongoing business? .........................22
    BB.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ..............................................................................23
    CC.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ...................................................................................................23
    DD.      Do the Debtors recommend voting in favor of the Plan? ......................................23
    EE.      Who supports the Plan? .........................................................................................23
    FF.      Does the UCC support the Plan? ...........................................................................24

IV.     THE DEBTORS' PLAN ...........................................................................................................24

    A.      General Settlement of Claims and Interests ..........................................................24

B.    Restructuring Transactions .......................................................................24
C.    Midstream Savings Requirements ...........................................................25
D.    Reorganized Debtors................................................................................25
E.    Sources of Consideration for Plan Distributions.....................................26
F.    General Unsecured Claims Recovery Reserve .........................................28
G.    Corporate Existence .................................................................................28
H.    Vesting of Assets in the Reorganized Debtors.........................................29
I.    Cancellation of Existing Securities and Agreements................................29
J.    Corporate Action......................................................................................30
K.    New Organizational Documents ..............................................................30
L.    Indemnification Obligations.....................................................................31
M.    Directors and Officers of the Reorganized Debtors.................................31
N.    Effectuating Documents; Further Transactions ........................................32
O.    Section 1146 Exemption ..........................................................................32
P.    Director and Officer Liability Insurance..................................................32
Q.    Management Incentive Plan......................................................................33
R.    Employee Benefits ...................................................................................33
S.    Preservation of Causes of Action ............................................................33
T.    Preservation of Royalty and Working Interests .......................................34
U.    Resolution of Pending Litigation .............................................................34
V.    Payment of Certain Fees ..........................................................................34
W.    Timing and Calculation of Amounts to Be Distributed. ..........................35
X.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ....36
Y.    Manner of Payment...................................................................................37

**V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..........37**

A.    Chesapeake's Corporate History...............................................................37
B.    The Debtors' Key Assets and Operations.................................................37
C.    The Debtor's Prepetition Capital Structure ..............................................40
D.    The Debtors' Employees...........................................................................47
E.    Pending Material Litigation......................................................................48
F.    Escrowed Funds ........................................................................................52

**VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................................52**

A.    Recent Market Volatility and Oil Market Crash.......................................52
B.    Operational Responses..............................................................................53
C.    Financial Responses..................................................................................54
D.    Retention of Advisors...............................................................................55
E.    Hedging Portfolio Unwind .......................................................................55
F.    Negotiations with Key Stakeholders and Entry into DIP Facility and Restructuring Support
        Agreement .................................................................................................56

**VII.    MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES ................57**

A.    First Day Relief.........................................................................................57
B.    Other Procedural and Administrative Motions .........................................61
C.    Retention of Professionals ........................................................................62
D.    Enforcement of the Automatic Stay .........................................................63
E.    Contract and Lease Rejection ...................................................................67
F.    Exit Financing and Backstop Commitment Agreement ............................70
G.    Mid-Continent Asset Sale ........................................................................70
H.    Appointment of Creditors' Committees....................................................71
I.    UCC Investigation.....................................................................................72

VIII.    RISK FACTORS ...............................................................................................................73

    A.    Bankruptcy Law Considerations ..................................................................73
    B.    Risks Related to Recoveries under the Plan .................................................78
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Business.........80

IX.    SOLICITATION, VOTING, AND NEW COMMON STOCK ELECTION PROCEDURES............89

    A.    Holders of Claims Entitled to Vote on the Plan .........................................89
    B.    Solicitation Packages ...................................................................................89
    C.    Voting Record Date .....................................................................................90
    D.    Voting on the Plan .......................................................................................90

X.    CONFIRMATION OF THE PLAN.................................................................................90

    A.    Requirements for Confirmation of the Plan ................................................90
    B.    Best Interests of Creditors/Liquidation Analysis .......................................90
    C.    Feasibility ....................................................................................................91
    D.    Acceptance by Impaired Classes .................................................................91
    E.    Confirmation Without Acceptance by All Impaired Classes .......................92
    F.    Valuation of the Debtors .............................................................................92

XI.    CERTAIN SECURITIES LAW MATTERS .....................................................................93

    A.    Issuance of Securities under the Plan .........................................................93
    B.    Subsequent Transfers ..................................................................................93
    C.    New Common Stock & Management Incentive Plan ...................................95
    D.    Shares issuable pursuant to the Rights Offering .........................................95

XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....................96

    A.    Introduction .................................................................................................96
    B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized
           Debtors .......................................................................................................97
    C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims Entitled
           to Vote ........................................................................................................99
    D.    Certain United States Federal Income Tax Consequences to U.S. Holders of Owning and
           Disposing of Consideration Received Under the Plan................................104
    E.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain
           Allowed Claims.........................................................................................106
    F.    FATCA.......................................................................................................110
    G.    Information Reporting and Backup Withholding .......................................110

XIII.    RECOMMENDATION ...........................................................................................112

## **EXHIBITS**[3]

EXHIBIT A       Plan of Reorganization

EXHIBIT B       Corporate Organization Chart

EXHIBIT C       Liquidation Analysis

EXHIBIT D       Financial Projections

EXHIBIT E       Valuation Analysis

---

[3]       Each Exhibit is incorporated herein by reference.

## I.       INTRODUCTION

Chesapeake Energy Corporation ("Chesapeake") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," and, together with Chesapeake's direct and indirect non-Debtor subsidiaries and affiliates, the "Company"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan, dated October 30, 2020.[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.

**THE DEBTORS AND CERTAIN STAKEHOLDERS, INCLUDING HOLDERS OF 100 PERCENT OF LOANS UNDER THE REVOLVING CREDIT FACILITY, HOLDERS OF APPROXIMATELY 93 PERCENT OF FLLO TERM LOAN FACILITY CLAIMS, HOLDERS OF APPROXIMATELY 63 PERCENT OF SECOND LIEN NOTES, AND HOLDERS OF APPROXIMATELY 36 PERCENT OF UNSECURED NOTES, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT

The Debtors are an Oklahoma City, Oklahoma-based oil and gas company engaged in exploration and production activities in onshore U.S. oil and natural gas properties with a focus on shale and resource plays.  As of the date of this Disclosure Statement, the Company operates in approximately five states and has approximately 2,000 employees and independent contractors.  As of March 31, 2020, the Debtors held (i) interests in approximately 13,700 gross wells, a substantial majority of which are Debtor-operated, (ii) approximately 5,193,000 gross acres[2] of developed leasehold, undeveloped leasehold, and fee minerals, in the aggregate, and (iii) estimated proved reserves of approximately 988 million barrels of oil equivalent, in the aggregate, of oil, natural gas and natural gas liquids based on Securities & Exchange Commission parameters.  As of the Petition Date, the Debtors had approximately $9.169 billion in total funded debt obligations.

The difficulties faced by the Debtors are consistent with those faced industry-wide.  Low oil and natural gas prices and the volatile market have challenged oil and gas companies for years.  From January 1, 2012 until the Petition Date, West Texas Intermediate ("WTI") crude oil prices ranged from a high of $107.26 per barrel to a low of -$37.63 per barrel; during that same period Henry Hub natural gas prices ranged from a high of $6.15 per one million British Thermal Units ("mmbtu") to a low of $1.55 per mmbtu.  Further, in 2020 the COVID-19 pandemic and the oil price war between the Kingdom of Saudi Arabia and Russia have exacerbated such hardships.

The Debtors have undertaken significant efforts since 2013 to address their leverage and profitability— including rationalizing capital expenditures, reducing operating and general administrative expenses, executing over $11 billion in strategic oil and gas divestitures, reducing off balance sheet liabilities and consummating multiple refinancing transactions, including as recently as December 2019.  Despite these efforts, the recent and dramatic drop in commodity prices and resulting tightening of the credit markets have frustrated the Debtors' ability to further deleverage absent a chapter 11 proceeding.  As a result, in early 2020, the Company engaged financial and legal advisors to explore strategic alternatives to enhance the Debtors' liquidity, evaluate strategic merger and acquisition opportunities, and address their capital structure.

Following the retention of financial and legal advisors, the Debtors commenced comprehensive restructuring negotiations with their major creditor constituencies, including MUFG Union Bank, N.A., in its capacity as the administrative agent for the Revolving Credit Facility ("MUFG"), an ad hoc group of lenders under the FLLO Term

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings given to them in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

[2]   Gross acres represent the total surface area covered by Chesapeake's leased acreage, without taking into account the fact that Chesapeake may not bear 100% of costs associated with such acreage.  Similarly, gross producing wells reflect the number of wells that Chesapeake owns an interest in which are currently producing oil or natural gas.

Loan Facility (the "FLLO Ad Hoc Group"), and Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts ("Franklin"). The Debtors provided these creditors and their advisors with substantial diligence regarding the Debtors' operations, held multiple telephonic conferences to discuss the Debtors' business plan and potential estate causes of action, and worked cooperatively with these stakeholders regarding a mortgage analysis related to oil and gas assets securing the Debtors' prepetition secured debt.

The Debtors focused their conversations with Revolving Credit Facility Lenders on the terms of a potential debtor-in-possession financing facility and potential exit financing and their conversations with the FLLO Ad Hoc Group and Franklin on all aspects of a comprehensive restructuring, including the terms of a new money investment. The Debtors were able to reach an agreement with the FLLO Ad Hoc Group members and Franklin on the parameters of a restructuring transaction that included a $600 million fully backstopped rights offering within approximately three weeks from the start of negotiations. Over the course of the next month while the Debtors continued to negotiate the DIP Facility, the Debtors, the FLLO Ad Hoc Group, and Franklin continued to refine the terms of the rights offering and other restructuring transactions in mid-May 2020.

As the primary terms of the debtor-in-possession financing neared conclusion, the Revolving Credit Facility lenders were included as part of the restructuring support agreement negotiations, particularly in light of the desire to de-risk the Debtors' contemplated restructuring through committed exit financing. The Revolving Credit Facility Lenders and the FLLO Ad Hoc Group engaged directly on the terms of a global deal, including the terms of proposed exit financing. On June 18, 2020, the Revolving Credit Facility Lenders, the FLLO Ad Hoc Group, and Franklin reached agreement in principle on a global deal, which included $2.5 billion of exit facilities, comprised of a $1.75 billion revolving facility and a $750 million first lien last out term loan facility. The terms of the global agreement are documented in the Restructuring Support Agreement executed on June 28, 2020, with holders of 100 percent of the loans under the Revolving Credit Facility, holders of approximately 90 percent of FLLO Term Loan Facility Claims, holders of approximately 63 percent of the Second Lien Notes, and holders of approximately 36 percent of the Unsecured Notes. Since the execution of the Restructuring Support Agreement, support for the Restructuring Transactions contemplated by the Plan has grown to holders of approximately 93 percent of the FLLO Term Loan Facility Claims. The Restructuring Support Agreement, and the Plan contemplated thereby, represents a significant achievement for the Debtors and is a testament to the strength and potential of the Debtors and their asset base.

The Plan contemplated by the Restructuring Support Agreement delivers significant value to stakeholders in the form of a deleveraged balance sheet and a significant new money investment that together will provide a path to exit in a volatile and challenging commodity price environment.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing

adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

> **C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as defined herein).  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:[3]

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

> **D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

> **THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

---

[3]      The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.

[4]      The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims (in millions)[5] | Projected Recovery Under the Plan |
| Class 1 | Other Secured Claims | On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100% |
| Class 2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | N/A | 100% |
| Class 3 | Revolving Credit Facility Claims | On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility. On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive, in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full in Cash as set forth in Section II.A.1 of the Plan. | $752 | 100% |

---

[5]    The estimated aggregate Allowed Claim amount for Revolving Credit Facility Claims includes accrued and unpaid postpetition interest as of the projected Effective Date, which postpetition interest was Allowed pursuant to the Final DIP Order. The estimated aggregate Allowed Claim amounts for the FLLO Term Loan Facility Claims, the Second Lien Notes Claims, and the Unsecured Notes Claims include prepetition accrued interest but exclude postpetition interest and any make-whole premiums. If Claims for postpetition interest or make-whole premiums are Allowed, the projected recoveries set forth in this table may be different, and such changes may be material.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims (in millions)[5] | Projected Recovery Under the Plan |
| Class 4 | FLLO Term Loan Facility Claims | On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, the make whole amount, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility.  On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights. | $1,525 | 39.3%–79.3% |
| Class 5 | Second Lien Notes Claims | On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest.  Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C  Warrants. | $2,471 | 9.0%–21.2% |
| Class 6 | Unsecured Notes Claims[6] | On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of (i) the Unsecured Notes Claims Recovery and (ii) 50 percent of the New Class C  Warrants. | $3,404 | 2.3%–4.4% |

---

[6]   In March 2020, the Debtors repurchased approximately $156 million in aggregate principal amount of certain of its senior notes for a total of $93 million.  The Debtors have since retired the repurchased senior notes.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Allowed Claims (in millions)[5]** | **Projected Recovery Under the Plan** |
| **Class 7** | **General Unsecured Claims** | On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery Amount Allocation applicable to the Debtor against whom such Claim is asserted. | $1,036 | ≥0.0% |
| **Class 8** | **Intercompany Claims** | On the Effective Date, unless otherwise provided under the Restructuring Transactions Memorandum, each holder of an Allowed Intercompany Claim shall have its Claim (i) Reinstated or (ii) distributed, contributed, set off, settled, canceled, and released or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distributions shall be made on account of any such Intercompany Claims. | $0– $102,158 | 0% or 100% |
| **Class 9** | **Intercompany Interests** | On the Effective Date, each holder of Intercompany Interests shall have such Interest (i) Reinstated or (ii) cancelled, released, and extinguished and without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders. | N/A | 0% or 100% |
| **Class 10** | **Existing Equity Interests** | On the Effective Date, each holder of an Existing Equity Interest shall have such Interest cancelled, released, and extinguished without any distribution. | N/A | 0% |

> **E.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, a Professional Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

> **1.** **General Administrative Claims**

Administrative Claims other than DIP Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.  Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following:  (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an

order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Agent under the Collateral Trust Agreement shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments. The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

## 2.   DIP Claims

For the avoidance of doubt, the DIP Claims are Allowed in full in accordance with the DIP Order.  DIP Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (a) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (b) the proceeds of the Rights Offering; and (c) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims.  For the avoidance of doubt, the Debtors shall indefeasibly pay in Cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order.  The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with Article II.B of the Plan, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## 3.   Professional Compensation

Professional Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. As of October 16, 2020, the Debtors have paid approximately $16.1 million in Professional compensation, including costs and fees incurred by the professionals for the Debtors, the DIP Agent, the Revolving Credit Facility Administrative

Agent, the FLLO Term Loan Facility Administrative Agent, the FLLO Ad Hoc Group, the Second Lien Notes Trustee, and Franklin.  Pursuant to Article II.A.2 of the Plan, the Debtors expect to pay a total of approximately $136 million in Professional compensation incurred from the Petition Date through December 31, 2020.

#### (a)      Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

#### (b)      Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed.  When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

#### (c)      Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

#### (d)      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.      Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 5.      Statutory Fees

All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all

such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee. Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

> **F.     Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

> **G.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 90, and the Liquidation Analysis attached hereto as **Exhibit C**.

> **H.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 90, for a discussion of the conditions precedent to consummation of the Plan.

> **I.     What happens to Claims that are Disputed as of the Effective Date?**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan. The Committee of Unsecured Creditors (the "UCC") asserts that the Plan should provide for an unsecured Claims administrator or similar functionary to object to General Unsecured Claims. The Debtors disagree.

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided for in the Plan shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of the Claim or Interest is Allowed.

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the General Unsecured Claims Recovery Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts set forth in the Plan (in the case of the General Unsecured Claims Recovery Reserve) or as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**J.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the distributions under the Exit Facilities, as applicable.

**K.      Are there risks to owning the New Common Stock or New Warrants upon emergence from chapter 11?**

Yes. *See* Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 73.

**L.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.22 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 88.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article X.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 92.

**M.      Will Royalty and Working Interests be affected by the Plan?**

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan; *provided however*, that any prepetition right to payment arising from a Royalty and Working Interest, if any, shall be treated by the Plan as a Claim and shall be subject to discharge and/or release and any postpetition, pre-Effective Date right to payment arising from a Royalty and Working Interest, if any, shall be treated by the Plan as an Administrative Claim in accordance with Article II.A.1 of the Plan and described in Article III.E.1 herein. Certain Royalty and Working Interest owners view the treatment of rights to payment as a Claim as impermissibly compromising such Interests and reserve their rights to object to the Plan regarding such compromise. In addition, certain Royalty and Working Interest owners assert that classifying rights to payment as Claims is ambiguous.

For the avoidance of doubt, the rights held by Royalty and Working Interest owners in minerals in the ground shall not be affected by the Plan, including the release and discharge provisions thereof; however, any prepetition right to payment asserted by a holder of a Royalty and Working Interest on account of any such interests shall be treated as a Claim under the Plan and shall be subject to any discharge and/or release provided thereunder. Certain Royalty and Working Interest owners view the treatment of rights to payment as a Claim as impermissibly compromising such Interests and reserve their rights to object to the Plan regarding such compromise. The Debtors believe that all or

substantially all prepetition rights to payment on account of Royalty and Working Interests are General Unsecured Claims. Royalty and Working Interest owners may disagree. The priority of any Allowed Royalty and Working Interest Claim shall be determined on a Claim by Claim basis in connection with the Claims resolution process. To the extent a Royalty and Working Interest Claim is Allowed as a Secured Claim, it shall receive the treatment described in Article III.B.1 of the Plan for Other Secured Claims. To the extent a Royalty and Working Interest Claim is Allowed as an Unsecured Claim, it shall receive the treatment described in Article III.B.7 of the Plan for General Unsecured Claims. The Debtors or Reorganized Debtors, as applicable, retain the right, pursuant to the Plan, to object to any Claim arising on account of a Royalty and Working Interest, including based on the validity, priority, or security asserted by such Royalty and Working Interest Claim holder. Certain Royalty and Working Interest owners assert that classifying rights to payment as Claims is ambiguous. Further, certain Royalty and Working Interest owners assert that any claims between Royalty and Working Interest holders and the Debtors shall be considered dollar-for-dollar amounts for the purposes of any right to setoff or offset. The Debtors disagree.

Petty Business Enterprises, L.P. ("Petty") and certain related parties (collectively, the "Petty Entities") dispute that its prepetition unpaid royalties should be treated as General Unsecured Claims because the Petty Entities assert they are fully secured by the underlying leases, the filing of UCC-1s in Texas, Delaware and Oklahoma, and the properties should be treated as Other Secured Claims under the Plan. Further, the Petty Entities assert that their liens are senior to all other liens including any DIP Liens granted postpetition, as well as prepetition liens granted on the underlying leases and properties. The Debtors disagree.

A group of royalty owner plaintiffs in pending Texas state court litigation alleging royalty nonpayment and release-of-acreage claims against certain of the Debtors (collectively, the "Texas MDL Plaintiffs") assert they hold Secured Claims. The Debtors disagree.

The PMBG Client Group[7] assert they hold Secured Claims. The Debtors disagree.

Allen Johnson, *et al.*[8] and Rodney Hudson, *et al.*[9] (collectively, "Johnson-Hudson Parties") and Saundra Louise Woods Nelson assert their interests should not be classified as Claims because their unleased mineral interest is an ownership in property, not a mere right to payment. The Debtors disagree.

The Debtors are managing funds related to Royalty and Working Interests in accordance with the cash management system approved by the Bankruptcy Court pursuant to the Cash Management Order (as defined herein). Certain Royalty and Working Interest holders assert that "suspense" funds, escrow funds, or funds placed in the registry of the court by the Debtors are not property of the estate and that their rights to such funds should be delineated from other Claims. The Debtors disagree. Notwithstanding the foregoing, to the extent the Debtors have placed funds in escrow or in a court registry on account of an Allowed Royalty and Working Interest Claim, such Allowed Royalty

---

[7]   The clients of Person Mohrer Morales Boddy Garcia Gutierrez PLLC are: : (i) Kelly Vesper, individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased; (ii) Gates Mineral Company, Ltd., Gates Production Company EF, LLC, Donald G. Elliott, Jannifer M. Elliott, David B. Elliott, Richard J. Gates, Linda A. Pederson, Louise G. Davis, Thomas A. Gates, Alonzo E. Gates, II, Laura I. Gates, Terri Street Gates Life Estate, and Alonzo E. Gates II Testamentary Trust, Argent Trust as Trustee; (iii) Leojua Ltd.; (iv) Blackstone Dilworth, Paul Dirks, Executor of the Estate of Frances Dilworth, deceased, Joya Minerals, LP, Frances Diane Dilworth Gates, Thomas A. Gates, Jr., Anthony Aguilar, David Ortiz, Horacio Saenz, Louise Dilworth Davis, Trustee of the Louise Dilworth Davis 2006 Trust, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Eric Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Daniel Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Serena Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Michelle Davis; (v) MBF Holdings La Salle LP, formerly MBF Partnership; (vi) Dan W. Kinsel III, individually, and as Trustee of the 2009 Dan and Leslie Kinsel Children's Trust and Karl Gene Kinsel, Individually, and as Trustee of the 2009 Karl Gene Kinsel Child's Trust; and (vii) Leighton Arthur Wier, Ronald Hargis Wier, Vicki Grace Gilbert, Max Harris Wier III, Sims Family Limited Partnership, Elizabeth Sims Hufft, Terry Lewis as Executor of the Estate of Diana Rose Sims Lewis, deceased, and James Edward Sheldon individually and as Executor of the Estate of Kay L. Sheldon (a.k.a. Catherine Lilley Sheldon), deceased, and their successors or assigns.

[8]   The "Johnson" unleased mineral owners include Allen Johnson, Linda Johnson, Donald A. Crosslin, Jr., Mary Jo Gragg, Rodney M. Hudson, Clifton Layman, Alfred R. Meshell, Sherman R. Meshell, David E. Oliver, Tracy Oliver, Laura S. Pendleton, Andrew L. Piccolo, Karla S. Piccolo, Randall S. Rodgers, Freddie P. Spohrer, Tim. G. Taylor, Charles R. Waldon, Rexford Galen White, Jerry McCune, Chalotte McCune, James Shope, and Donna Shope.

[9]   The "Hudson" unleased mineral owners include Rodney Hudson, James Garner, Jessica Garner Cox, Judy Marie Thomas Dickson, and John Samuel Mayo, Jr, individually and for those similarly situated.

and Working Interest Claim shall be satisfied, *first*, with such escrow or registry funds without regard to the Secured or Unsecured nature of such Allowed Royalty and Working Interest Claim, and, *second*, any remaining unsatisfied portion of such Allowed Royalty and Working Interest Claim shall be treated in accordance with the Plan.  Any funds remaining in such escrow or registry following the satisfaction of such Allowed Royalty and Working Interest Claim shall revert to the Debtors or Reorganized Debtors, as applicable.  Failure of a Royalty and Working Interest owner to timely file a Proof of Claim on account of any amounts held in suspense, in escrow, or in a registry, shall waive and relinquish such Royalty and Working Interest owner's rights to such funds.

Stefanie Delasandro asserts she is owed payment on account of prepetition Royalty and Working Interests, and proceeds from unleased minerals, including funds held by Debtors in suspense, and Mrs. Delasandro asserts that these prepetition amounts are Secured Claims. The Debtors disagree.

The Debtors believe that non-federal oil and gas leases related to Royalty and Working Interests are not Executory Contracts or Unexpired Leases subject to assumption or rejection under section 365 of the Bankruptcy Code.  To the extent any Royalty and Working Interest owner disagrees, he or she is entitled to File an objection in accordance with the Plan.  To the extent any oil and gas leases are determined to be Executory Contracts or Unexpired Leases, nothing herein or in the Plan shall limit the Debtors' rights to assume or reject such Executory Contracts or Unexpired Leases in accordance with Article V of the Plan and section 365 of the Bankruptcy Code.  Provisions governing the treatment of Executory Contracts and Unexpired Leases under the Plan are set forth in Article V of the Plan.  Certain Royalty and Working Interest owners believe that these interests, pursuant to Oklahoma and Texas state law, are ownership interest and are not subject to assumption or rejection under section 365 of the Bankruptcy Code and would object to any attempt by the Debtors to treat them as such.

Certain leased and unleased mineral interest owners believe any prepetition right to payment arising on account of their interest is not property of the estate.  The Debtors disagree.

Royalty interest owners may request additional information concerning the computation of their payments as provided by state law (for example, see Section 91.504 of the Texas Natural Resources Code).

### N.     What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?

On the Effective Date, the Reorganized Debtors will implement the Management Incentive Plan (as described more fully in Article IV.Q of this Disclosure Statement).  The New Common Stock being provided in connection with the Management Incentive Plan will dilute all of the New Common Stock equally.

As is typical for many of the Debtors' peer companies, to be a competitive employer and to maximize the value of the Debtors' estates, the Debtors have requested a management incentive plan that the New Board can use to attract, incentivize, and retain talented key employees (including officers) after the Effective Date.  After the Effective Date, the New Board in its sole discretion will implement the allocation, timing, and the form and structure of options, warrants, and/or equity compensation to be provided pursuant to the Management Incentive Plan.

The UCC asserts the Debtors' named executive officers are highly incentivized to support the Plan due to the Management Incentive Plan awards and assumption of their prepetition employment agreements upon the occurrence of the Effective Date.  The Debtors disagree with this postulation.  As of the date hereof, the New Board has not been formed and no determinations have been made with respect to the Management Incentive Plan, including the amount or structure of any award limits to be allocated under the Management Incentive Plan.

### O.     Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information as of the date hereof, the amount of potential Allowed General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material and could materially affect Class 7 recoveries.  The projected amount of General Unsecured Claims set forth herein is subject to change.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses, and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigants, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change and materially affect Class 7 recoveries.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. Finally, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change, and could materially affect Class 7 recoveries.

P. **How will the Debtor against which an Allowed General Unsecured Claim is Allowed affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

Holders of Allowed General Unsecured Claims will receive their *Pro Rata* share of the General Unsecured Claims Recovery Amount allocable to the Debtor against which such Claim is asserted.  As a result, the distributions to such Holders will depend on the allocation of value between the Debtors.  The table below provides the allocation of value as between the Debtors.  Holders of General Unsecured Claims are encouraged to review the table below in

detail as recoveries may be materially different among Holders of Allowed General Unsecured Claims depending on which Debtor is liable for an Allowed General Unsecured Claim.

**Class 7 Recoveries**
*($ in 000s)*

| Legal Entity | Estimated Claim $ | Recovery $ | Recovery % |
|---|---|---|---|
| CHK ENERGY CORP | $-- | $-- | --% |
| CHK EXPLORATION LLC | 77,899 | 75 | 0.1% |
| WHR EAGLE FORD LLC | 6,311 | 6 | 0.1% |
| CHK LOUISIANA LP | 1,494 | 1 | 0.1% |
| CHK APPALACHIA LLC | 11,574 | 11 | 0.1% |
| CHK LAND DEVL CO LLC | 531 | 1 | 0.1% |
| BRAZOS VALLEY PPA CO | -- | -- | --% |
| CHK ENERGY MARKETING LLC | 853,901 | 825 | 0.1% |
| CHK OPERATING LLC | 54,794 | 53 | 0.1% |
| WHR MANAGEMENT CO LLC | 3,608 | 3 | 0.1% |
| CHK AEZ EXPLORATION LLC | -- | -- | --% |
| BURLESON SAND LLC | 2,759 | 3 | 0.1% |
| CHK PLAINS LLC | -- | -- | --% |
| EMPRESS LOUISIANA PRP LP | -- | -- | --% |
| EMPRESS LLC | -- | -- | --% |
| COMPASS MANUFACTURING LLC | -- | -- | --% |
| BRAZOS VALLEY LONGHORN LLC | -- | -- | --% |
| CHK NG VENTURES CORP | -- | -- | --% |
| MC LOUISIANA MINERALS LLC | -- | -- | --% |
| MC MINERAL CO LLC | -- | -- | --% |
| CHESAPEAKE VRT, LLC | -- | -- | --% |
| CHK ROYALTY LLC | -- | -- | --% |
| CHK-CLEMENTS ACQ LLC | -- | -- | --% |
| CHK UTICA, LLC | -- | -- | --% |
| MIDCON COMPRESSION LLC | 22,733 | 22 | 0.1% |
| CHK E&P HOLDING LLC | -- | -- | --% |
| N. MICHIGAN EXPL CO LLC | -- | -- | --% |
| CHK ENERGY LOUISIANA CORP | -- | -- | --% |
| CHK ENERGY HOLDINGS INC | -- | -- | --% |
| Wild Horse Resources II LLC | -- | -- | --% |
| Nomac Services LLC | -- | -- | --% |
| WHE Acq Co LLC | -- | -- | --% |
| Esquisto Resources II LLC | -- | -- | --% |
| Burleson Water Resources LLC | -- | -- | --% |
| Petromax E&P Burleson LLC | -- | -- | --% |
| EMLP LLC | -- | -- | --% |
| SPARKS DRIVE SWD INC | -- | -- | --% |
| WINTER MOON ENERGY CORP | -- | -- | --% |
| CHK MIDSTREAM DEVL LLC | -- | -- | --% |
| CHK NGV LEASING CO LLC | -- | -- | --% |
| GSF LLC | -- | -- | --% |
| **Total** | **$1,035,605** | **$1,000** | **0.1%** |

**Q.      Do all holders of Allowed Claims in a given Class receive the same treatment?**

Yes.  Each holder of an Allowed Claim will receive the same treatment as other holders of Allowed Claims in its applicable Class, which treatment is forth in Article III of the Plan and Article III.D hereof, unless such holder of an Allowed Claim agrees to less favorable treatment than those in its Class.  For the avoidance of doubt, even if a Class votes to accept the Plan, all Holders of Allowed Claims in such Class, including those who do not vote to accept the Plan, are entitled to the same treatment on account of any interests in such Class.  Moreover, voting to accept the Plan, alone, shall not constitute an agreement to less favorable treatment than those in the given Class.

Along with its professionals, the Second Lien Notes Trustee is conducting an analysis into proposed distributions to be made on account of holdings of Second Lien Notes. If the Second Lien Notes Trustee determines that value that should be allocated to Holders of Second Lien Notes is being improperly allocated to other stakeholders, the Second Lien Notes Trustee may object to confirmation on these and other grounds.

**R.      Why do Allowed Unsecured Notes and Allowed General Unsecured Claims receive different treatment under the Plan?**

The disparate treatment of Class 6 and Class 7 is required by the differences between Class 6 and Class 7 Claims.  The Unsecured Notes were issued by Debtor Chesapeake and guaranteed by 25 other Debtors.  As a result, the Unsecured Notes are entitled to assert Claims at 26 Debtors.  In contrast, General Unsecured Claims exist at only a single Debtor.  As a result, they are only eligible to recover against the relevant Debtor.  However, to the extent a particular general unsecured creditor has a valid General Unsecured Claim at more than one Debtor, such creditor will be entitled to assert and receive distributions on account of such General Unsecured Claim against all applicable Debtors, provided recoveries cannot exceed 100 percent.

**S.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall

retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**T.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes. The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Stakeholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Plan provides for releases for (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT VALIDLY OPT OUT OR FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

In addition, the Plan provides for the exculpation of: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the DIP Lenders; (d) the Exit Facilities Lenders; (e) the Consenting Revolving Credit Facility Lenders; (f) the Consenting FLLO Term Loan Facility Lenders; (g) the Consenting Second Lien Noteholders; (h) the Consenting Unsecured Noteholders; (i) the Agents; (j) each Trustee; (k) the Backstop Parties; and (l) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, participants, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**1.      Release of Liens**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages,**

deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided further* that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

2.      Releases by the Debtors

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission,

transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

3.     Releases by Holders of Claims and Interests

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement)

executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third party releases.

4.      Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff

pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

U.    **What value did the Released Parties and Exculpated Parties contribute to the Restructuring Transactions?**

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

1.    **Releases by the Debtors**

The Debtors' releases are fair and equitable, in the best interest of the Debtors' Estates, and well within the Debtors' business judgment.

*First*, the Debtors undertook a thorough investigation of potential Estate claims and causes of action.  The probability of success in litigation with respect to causes of action the Debtors may have against the Released Parties is low, and prosecution of any potential causes of action released under the Debtor Release would be complex, time consuming, and could mire the Debtors and parties in interest in litigation rather than effectuation of a highly consensual restructuring.  In fact, many of the parties related to the Debtors, such as current and former directors, managers, officers, equity holders  (regardless of whether such interests are held directly or indirectly), and employees may have indemnification rights against the Debtors under applicable agreements for, among other things, all losses, damages claims, liabilities, or expenses, including defense costs, for claims subject to the release provisions of the Plan.  The Second Lien Notes Trustee, the Unsecured Notes Trustees, the DIP Agent, the Revolving Credit Facility Administrative Agent, and the FLLO Term Loan Facility Administrative Agent may also hold indemnification claims against the Debtors under the applicable indentures and/or credit agreements for all losses, damages, claims, liabilities, or expenses that they may incur, including defense costs for all losses, damages for claims subject to the release provisions of the Plan.  Additionally, the Debtors have agreed to indemnify the Exit Facilities Lenders and the Exit Facilities Agent.  As such, those indemnification claims could directly affect the Debtors' estates and, in the case of the Debtor Release, undermine any attempt to collect on released Causes of Action.

*Second*, the Plan, including the Debtors' releases, was vigorously negotiated prepetition by sophisticated entities that were represented by able counsel and financial advisors, including the Consenting Stakeholders.  The release provisions were a necessary element of consideration that these parties required before entering into the Restructuring Support Agreement and agreeing to support the Plan.  Notably, the Consenting FLLO Term Loan Lenders and the Consenting Second Lien Noteholders have agreed to equitize their Claims in order to significantly deleverage the Debtors' prepetition capital structure.  Further, pursuant to the Restructuring Support Agreement, the Consenting FLLO Term Loan Facility Lenders and the Consenting Second Lien Noteholders agreed to fully backstop a $600 million equity rights offering and allocate value to junior creditors beyond what they would receive in a strict priority waterfall scenario.  And if the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders do not receive the benefit of the Plan's proposed release provisions, they and their constituencies may not support Confirmation of the Plan. The RBL Lenders consented to be primed by the DIP Facility, which provided the financing necessary to fund the administration of these cases, the DIP Lenders provided a $925 million in new money DIP

20

Facility to finance these Chapter 11 Cases, and the Exit Facility Lenders and the Exit Facility Agent have agreed to provide the approximately $2.5 billion Exit Facilities, which will provide the Debtors with the liquidity needed to fund distributions under the Plan and their go-forward business. Finally, there is no question that directors, managers, officers, and employees of the Debtors provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their daily responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.

Accordingly, the Debtors submit that the Debtors' releases are consistent with applicable law, represents a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, are a valid exercise of the Debtors' business judgment, and are in the best interests of their Estates.

### 2. Third Party Release

Similarly, the third party release (the "Third Party Release") is integral to the Plan, and the value-maximizing restructuring contemplated by the Plan would not be possible absent the support of the Released Parties.

The Third Party Release complies with applicable law: *First*, the Third Party Release is sufficiently specific to put the Releasing Parties on notice of the released claims. *Second*, the Third Party Release is integral to the Plan. The Third Party Release (together with the Debtors' releases) is a key component of the Debtors' restructuring and a key inducement to bring stakeholder groups to the bargaining table. *Third*, as described more fully above, each of the Released Parties under the Third Party Release provided consideration (and are also Releasing Parties themselves, thereby making the release mutual).

Importantly, the Third Party Release is consensual because it provides Holders of Claims and Interests with the option to opt out of the Third Party Release by checking a box on the Ballot or opt out form provided by the Debtors. Each of the Disclosure Statement, Ballots, notices of non-voting status, and notice of Confirmation Hearing state in bold-faced, conspicuous text that Holders of Claims and Interests that do not opt out of the Third Party Release will be bound thereby. Accordingly, upon checking the opt-out box, such Holders of Claims or Interests do not grant the Third Party Release and no longer have a basis to argue their rights are affected thereby.

Ultimately, the restructuring contemplated by the Plan operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or costs associated with the continuation of disputes related to the Debtors' restructuring, and would not be possible absent the support of the Released Parties.

### 3. Exculpation

In addition to the Debtors' releases and Third Party Release, the exculpation clause in the Plan provides that the Exculpated Party shall be released and exculpated from any cause of action arising out of acts or omissions in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. As such, the exculpation clause is reasonable, appropriate, and vital to these Chapter 11 Cases because it provides protection to parties who served as fiduciaries to the Estates during the restructuring.

*First*, the Debtors and Reorganized Debtors are entitled to the benefits of the exculpation clause. Upon a "good faith" finding within the meaning of section 1125(e) of the Bankruptcy Code, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation clause. Further, granting such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code.

*Second*, certain other Exculpated Parties owe fiduciary duties in favor of the Debtors' Estates, permitting them to receive the benefits of the exculpation clause. The directors, officers, and professionals that have acted on behalf of the Debtors' in connection with the Chapter 11 Cases owe the Debtors fiduciary duties similar to those the debtor in possession owes to the Estates. Further, the Debtors and their fiduciaries could not possibly have developed the Plan without the support and contributions of the Exculpated Parties. Insofar as any Exculpated Parties do not, strictly speaking, owe fiduciary duties to the Debtors, they were integral participants to the settlement embodied by the Plan and are therefore properly included in the Exculpation provision.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors are prepared to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**V.      What is the deadline to vote on the Plan?**

The Voting Deadline is [December 7], 2020, at 11:59 p.m. (prevailing Central Time).

**W.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is actually received by the Debtors' Claims and Balloting Agent, Epiq Corporate Restructuring, LLC ("Epiq"), on or before the Voting Deadline, *i.e.* [December 7], 2020, at 11:59 p.m., prevailing Central Time.  See Article IX of this Disclosure Statement, entitled "Solicitation, Voting, and New Common Stock Election Procedures," which begins on page 89 for more information.

**X.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Y.      When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for [December 15], at [●], prevailing Central Time, or such other time as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.  Objections to Confirmation must be Filed with the Bankruptcy Court, by no later than [December 7], at 5:00 p.m., prevailing Central Time, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order incorporated herein by reference.

**Z.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**AA.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**BB.   Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire, and the new directors and officers of each of the Reorganized Debtors shall be appointed in accordance with the terms of the Governance Term Sheet, attached as Exhibit 6 to the Restructuring Term Sheet.  The New Board shall consist of those individuals that are appointed in accordance with Article IV.M of the Plan.

Assuming that the Effective Date occurs, holders of Allowed Claims that receive distributions representing a substantial percentage of outstanding shares of the New Common Stock, may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**CC.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Balloting Agent, Epiq, via one of the following methods:

> *By regular mail at:*
> Chesapeake Energy Corporation
> Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4419
> Beaverton, OR 97076-4419
>
> *By hand delivery or overnight mail at:*
> Chesapeake Energy Corporation
> Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.
> Beaverton, OR 97005
>
> *By electronic mail at:*
> chesapeake@epiqglobal.com
>
> *By telephone at:*
> (855) 907-2082 (toll free) or +1 (503) 520-4448 (toll)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Balloting Agent at https://dm.epiq11.com/chesapeake (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

**DD.   Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**EE.   Who supports the Plan?**

The Plan is supported by the Debtors and certain stakeholders, including holders of 100 percent in principal amount of the Revolving Credit Facility Claims, holders of approximately 93 percent in principal amount of the FLLO

Term Loan Facility Claims, holders of approximately 63 percent in principal amount of the Second Lien Notes, and holders of approximately 36 percent of Unsecured Notes.

**FF.     Does the UCC support the Plan?**

The UCC is likely to lodge an objection to confirmation of the Plan if the Debtors are unable to agree on the terms of a consensual restructuring with the UCC.

## IV.     THE DEBTORS' PLAN

The Plan contemplates the following key terms, among others described herein and therein:

**A.     General Settlement of Claims and Interests**

As discussed in detail in this Disclosure Statement and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions").  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**B.     Restructuring Transactions**

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders. The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop

Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

### C. Midstream Savings Requirements

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

The Plan Sponsors have worked in concert with the Debtors to address concerns shared by the Debtors and the Plan Sponsors regarding the Debtors' burdensome gathering, processing, transportation, and other midstream arrangements. The Plan provides that in the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  In this context, "sufficient savings" has been evaluated by the Debtors and Plan Sponsors on a basin-by-basin basis, with a particular focus on rationalizing basins that are uneconomic, meaning that they are expected over time to result in limited and/or potentially negative cash flows on a present value basis in a range of commodity pricing scenarios, and, ultimately, maximizing the value of the Debtors' business generally.

The following factors, among others, will be considered when evaluating whether sufficient savings have been achieved with respect to a particular basin:

- Basin-level cash flows;
- Fixed, variable, and capital costs in the basin, including gathering, processing, and transportation costs;
- Basin-level SG&A and other costs, including costs associated with plugging and abandoning wells;
- Potential for future development in the basin;
- Impact that future federal regulatory changes might have on federal leases; and
- Public and private investor interest in the basin and ability to raise development capital

The determination of whether sufficient midstream savings have been achieved in a particular basin, and the actions to be taken if they have not, including the decision to separate assets, will be made by the Debtors, in consultation with the Plan Sponsors (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders) prior to the Confirmation Hearing; *provided, however*, to the extent the Debtors determine to separate certain of their assets, the Debtors shall provide parties with notice of the proposed separation filed on the Bankruptcy Court's docket no less than five (5) business days prior to the Confirmation Objection Deadline.  The Debtors and Plan Sponsors consider the Appalachia assets, Haynesville assets and Brazos Valley assets to be core assets that will constitute remaining assets in all foreseeable scenarios.

### D. Reorganized Debtors

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other

agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### E.    Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D of the Plan.

### 1.    Rights Offering

The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights; (b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights.  Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount.  Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order.  For the avoidance of doubt, if the Put Option Premium is payable in Cash pursuant to the terms and conditions set forth in the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order, the Put Option Premium shall be a superpriority administrative expense with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726,

1113, and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code except it shall be unsecured and (i) be subordinated in priority to (a) the DIP Claims and (b) any adequate protection granted on account of the Revolving Credit Facility Claims (and any Claims to which such Claims in (a) or (b) are subordinate); and (ii) payable only after all such Claims set forth in clause (i) have been paid in full in Cash or provided such other treatment as is agreed to by the  requisite parties, as set forth in section 3.1 of the Backstop Commitment Agreement.

All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

2.       **Rights and New Common Stock**

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B of the Plan.  Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents.  Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock.  All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

3.       **New Warrants**

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B of the Plan.  Issuances of the New Warrants shall be governed by the terms and conditions set forth in the Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.  The New Warrants shall be entitled to the benefits set forth in section 1145 of the Bankruptcy Code.

4.      **Exit Facilities**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents.  The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to File with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

F.      **General Unsecured Claims Recovery Reserve**

On the Effective Date, the Reorganized Debtors shall establish and fund the General Unsecured Claims Recovery Reserve with Cash in an amount equal to the General Unsecured Claims Recovery Amount. The General Unsecured Claims Recovery Reserve shall be maintained in trust solely for holders of Allowed General Unsecured Claims. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  Allowed General Unsecured Claims shall be paid in accordance with Article VI.A of the Plan.

G.      **Corporate Existence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms

therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### H.        Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### I.        Cancellation of Existing Securities and Agreements

On the Effective Date, except as otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to the Plan or the Confirmation Order.

Notwithstanding anything to the contrary in the Plan, to the extent cancelled pursuant to the Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, the Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens with respect thereto; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification, contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

Except as provided in the Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable.  To the extent cancelled in accordance with the Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to extend any further or future credit or financial

29

accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

**J.**     **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article VI.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**K.**     **New Organizational Documents**

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state. The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan. The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock

in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents

In addition to any approvals required under applicable law and regulation, the New Organizational Documents shall grant the holders of a majority of the outstanding New Common Stock approval rights until such time as the New Common Stock is listed with respect to the Management Incentive Plan or any other equity incentive plan or equity compensation plan, the issuance of New Common Stock in excess of five percent of outstanding stock or preferred shares, the sale of any subsidiary, division, operation, business, line of business, assets or property, in each case, held by the Company or any of its subsidiaries with any person involving consideration in excess of $50 million per transaction or series of related transactions, or the acquisition of assets worth more than $50 million per transaction or series of related transactions. The New Organizational Documents, including any information regarding protections to minority shareholders or information rights, if applicable, will disclosed in the Plan Supplement.

## L.    Indemnification Obligations

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

## M.    Directors and Officers of the Reorganized Debtors

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents. The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

### N.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### O.      Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### P.      Director and Officer Liability Insurance

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth in the Plan, regardless of whether such directors and officers remain in such positions after the Effective Date.

### Q.    Management Incentive Plan

On the Plan Effective Date, the Reorganized Debtors shall adopt the Management Incentive Plan.  All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

### R.    Employee Benefits

Unless otherwise provided in the Plan, and subject to Article V of the Plan, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.  On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee.   Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

### S.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action

of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

The UCC asserts a litigation trust should be established to preserve Causes of Action retained by the Debtors and those causes of action identified in the Standing Motions and the Complaints. The Debtors disagree.

T.    **Preservation of Royalty and Working Interests**

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any prepetition or postpetition but pre-Effective Date right to payment arising from a Royalty and Working Interest asserted by a non-Debtor as a prepetition Claim or an Administrative Claim, respectively, if any, shall be treated as a Claim under the Plan and shall be subject to any discharge and/or release provided in the Plan without prejudice to any rights to assert a Claim or dispute which may arise post-Effective Date on account of or relating to an unexpired or unterminated Royalty and Working Interest.

Certain Royalty and Working Interest owners view the treatment of rights to payment as a Claim as impermissibly compromising such Interests and reserve their rights to object to the Plan regarding such compromise. In addition, certain Royalty and Working Interest owners assert that classifying rights to payment as Claims is ambiguous. The Debtors disagree.

U.    **Resolution of Pending Litigation**

The Debtors may remove to the Bankruptcy Court by the Removal Deadline any litigation pending as of the Petition Date that alleges claims or causes of action that, if successful, would not result in a Claim. Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; *provided* that any Claim resulting from a final judgment in such litigation shall be treated in accordance with the Plan.

V.    **Payment of Certain Fees**

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in Article IV.V of the Plan. The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the

Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens.  Notwithstanding anything in the Plan, including Article IV.I thereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

The Unsecured Notes Indentures each provide for the payment in cash of the fees and expenses of the Unsecured Notes Indenture Trustees by Debtor Chesapeake and the Debtor guarantors parties thereto.  However, the Plan does not provide for such payments.  Rather, the Plan expressly preserves the Unsecured Notes Trustees' respective charging liens against distributions to the Unsecured Noteholders. The Unsecured Notes Trustees have informed the Debtors that to the extent provision is not made in the Plan for payment of the fees and expenses of the Unsecured Notes Trustees in cash, they intend to exercise their charging liens against some or all of the distributions to the holders of the Unsecured Notes, including the distributions of New Common Stock and New Class C Warrants that would otherwise be distributed to the Unsecured Noteholders, to satisfy any outstanding and unpaid fees and expenses of the Unsecured Notes Trustees, including the fees and expenses of their respective counsel. The Unsecured Notes Trustees have further informed the Debtors that requiring them to exercise their respective charging liens against the New Common Stock and/or the New Class C Warrants could require them to hold back an indeterminate amount of such securities in order to attempt to liquidate such in an uncertain market, thereby potentially materially diluting distributions to the Unsecured Noteholders and delaying such distributions significantly beyond the Effective Date of the Plan, as well as potentially necessitating multiple bifurcated distributions.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

**W.      Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Interests in the applicable Class.

With respect to holders of Allowed General Unsecured Claims, each such holder shall receive from the General Unsecured Claims Recovery Reserve (1) an initial Cash distribution on the Effective Date or as soon as reasonably practicable thereafter (or if a General Unsecured Claim is not an Allowed General Unsecured Claim on the Effective Date, on the date that such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Cash in the General Unsecured Claims Recovery Reserve allocable to the Debtors against which such General Unsecured Claim is Allowed.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

## X.   Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### 1.   Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security or FLLO Term Loan Facility Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 2.   Delivery of Distributions in General.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, with respect to distributions on account of FLLO Term Loan Facility Claims, the Required Plan Sponsors.

### 3.   Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment therefor; *provided*, *however*, that fractional shares rounding determination with respect to the Rights Offering shall be subject to the Rights Offering Procedures.  The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

### 4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

### 5.   Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I of the Plan shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

6. **Delivery of Distributions on Second Lien Notes Claims and Unsecured Notes Claims.**

The Debtors shall make all distributions required under the Plan.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of Second Lien Notes Claims and Unsecured Notes Claims shall be made to or at the direction of each of the Trustees for distribution under the applicable indentures and bond agreements.  The Trustees may transfer or direct the transfer of such distributions directly through the facilities of the applicable securities depository and clearing house and will be entitled to recognize and deal with, for all purposes under the Plan, holders of Second Lien Notes Claims and Unsecured Notes Claims, as applicable, as is consistent with the ordinary practices of the applicable depositories.  Such distributions shall be subject to the right of each of the Trustees under the applicable indenture or bond agreements, including their rights to assert and exercise charging liens against such distributions.

Y. **Manner of Payment.**

Except as otherwise set forth herein, all distributions of Cash, the New Common Stock, the New Warrants, and the Rights, as applicable, to Holders of Allowed Claims under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable.  At the option of the Reorganized Debtors (in consultation with and subject to the reasonable consent of the Required Consenting Stakeholders), any Cash payment to be made under the Plan, if any, may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

V. **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

A. **Chesapeake's Corporate History**

Chesapeake is a publicly-traded oil and natural gas company headquartered in Oklahoma City, Oklahoma.  Founded in 1989, Chesapeake grew from its initial $50,000 investment and first well spud in Grady County, Oklahoma to become one of the largest oil and gas exploration and production companies in the United States.  In its early years, Chesapeake's growth was primarily attributable to its strategy of drilling horizontal natural gas wells in unconventional reservoirs and the early adoption of hydraulic fracturing techniques in Southern Oklahoma and Fayette County, Texas.  In 1993, Chesapeake went public through an initial public offering that raised approximately $25 million.  With the newly raised capital, Chesapeake made its first big lease play in the Austin Chalk formation.  By 1996, Chesapeake began focusing on opportunistic acquisitions, joint ventures, and unconventional drilling in carbonates, tight sandstones, and shales particularly in the Barnett Shale, Fayetteville Shale, and Marcellus Shale, and in 2008, Chesapeake discovered the Haynesville Shale in East Texas/Northwestern Louisiana.  From 2009 to 2013, Chesapeake's natural gas production continued to grow from 2.3 billion to nearly 3.0 billion cubic feet per day. During this same time, the Debtors also began to build substantial acreage positions in basins which produce a significant amount of crude oil and natural gas liquids ("NGLs"), along with natural gas, including the Eagle Ford Shale in South Texas, the Utica Shale in Ohio, and the Powder River Basin in Wyoming.  Recently, the Debtors acquired additional exposure to crude oil acreage and production in the Brazos Valley of the Eagle Ford Shale in Southeastern Texas with the acquisition of WildHorse Resource Development Corporation ("WildHorse") in February 2019.

Chesapeake's growth required extensive capital support, and by the time the current management team, led by Chief Executive Officer Robert D. Lawler, took over in 2013, Chesapeake had been saddled with significant funded debt obligations and other legacy commitments equating to over $20 billion in total leverage.  This left Chesapeake in a tenuous position when the oil and natural gas markets began to falter in 2014.  Prior to the collapse in oil and natural gas prices, the new management team had already undertaken immense efforts to streamline its business operations, reduce its obligations, and divest non-core assets, and these activities have continued until today. Ultimately, and in light of recent world events, Chesapeake determined to commence these chapter 11 cases in order to permanently restructure its balance sheet and position Chesapeake for long-term sustainable profitability.

B. **The Debtors' Key Assets and Operations**

1. **The Debtors' Assets and Locations**

The Debtors have a gas-centric asset portfolio with significant, high-quality drilling inventory.[10]   The Debtors hold substantial positions in the liquids-rich resource plays of the Eagle Ford Shale in South Texas—including the Brazos Valley, the stacked play in the Powder River Basin in Wyoming, and the Anadarko Basin in Northwestern Oklahoma.  The Debtors' natural gas resource plays are the Marcellus Shale in the Northern Appalachian Basin in Pennsylvania, and the Haynesville/Bossier Shales in Northwestern Louisiana.  The following is an overview of each of the Debtors' six geographic operating areas, including acreage held as of December 31, 2019 and production volumes as of March 31, 2020:

- *Marcellus Shale:*  Chesapeake holds a significant natural gas position in the Marcellus Shale in the Northern Appalachian Basin in Pennsylvania, holding approximately 538,000 net acres[11] and producing an average of 163,000 barrels of oil equivalent per day.

- *Haynesville/Bossier Shale:*   Chesapeake discovered and holds a large position in the Haynesville/Bossier Shale in the Northwestern Louisiana region.  Chesapeake began developing natural gas in the area in 2008.  Chesapeake holds approximately 293,000 net acres and produces approximately 93,000 barrels of oil equivalent per day.

- *Eagle Ford Shale of South Texas:*  Chesapeake holds approximately 232,000 net acres in South Texas and produces approximately 108,000 barrels of oil equivalent per day, the majority of which is crude oil.

- *Brazos Valley:*  Chesapeake obtained their Brazos Valley position in Southeastern Texas through an acquisition of WildHorse in 2019.  Chesapeake holds approximately 477,000 net acres in the Brazos Valley—primarily targeting the Eagle Ford Shale oil formation—and produces approximately 61,000 barrels of oil equivalent per day.

- *Powder River Basin:*  Chesapeake holds approximately 206,000 net acres in Wyoming's Powder River Basin and produces approximately 38,000 barrels of oil equivalent per day, the majority of which is composed of crude oil and NGLs.

- *Mid-Continent - Anadarko Basin:*   Chesapeake holds a position in the Mid-Continent located in Northwestern Oklahoma, holding approximately 736,000 net acres and producing approximately 16,000 barrels of oil equivalent per day.

---

[10]   As of March 31, 2020, Chesapeake's portfolio contains 4,186 billion cubic feet of proved gas reserves, 213 million barrels of proved oil reserves, and 78 million barrels of oil equivalent of proved NGLs reserves, in each case, based on Securities & Exchange Commission parameters.

[11]   As opposed to a gross acre, a net acre reduces an oil and gas company's ownership to reflect its true working interest, or cost-bearing interest, in a lease.  Net acres are calculated by multiplying the gross acres covered by a lease by Chesapeake's working interest in such lease.  For example, if Chesapeake bears 50% of the costs associated with a 10,000 acre lease, and another company bears the remaining 50%, Chesapeake has 5,000 net acres in such lease.



### 2. The Debtors' Industry and Operations

The majority of the Debtors' assets are in the upstream sector of the oil and gas industry, which is comprised of exploration and production ("E&P") activities that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons from under the ground. Common upstream assets include wells and simple well pad equipment. The Debtors focus on the acquisition, exploration, development, and production of crude oil, natural gas liquids, and natural gas. Although the Debtors also engage in certain functions such as gathering, processing, and marketing—which are typically characterized as mid-stream or downstream activities—the Debtors consider such functions to be ancillary to their upstream E&P activities.

As of March 31, 2020, the Debtors held (i) interests in approximately 13,700 gross wells, a substantial majority of which are Debtor-operated, (ii) approximately 5,193,000 gross acres[12] of developed leasehold, undeveloped leasehold, and fee minerals, in the aggregate, and (iii) estimated proved reserves of approximately 988 million barrels of oil equivalent, in the aggregate, of oil, natural gas, and NGLs based on Securities & Exchange Commission parameters. For the three months ending March 31, 2020, the Debtors' exploration and production activities yielded a total production of approximately 479,000 barrels of oil equivalent per day.

The Debtors, through Debtor Chesapeake Energy Marketing, LLC ("CEML"), also provide oil, natural gas and NGL marketing services, including commodity price structuring; securing and negotiating gathering, hauling, processing, and transportation services; contract administration; and nomination services for both the Debtor and non-Debtor interest owners in Debtor-operated wells. CEML also provides services to enhance the value of the Debtors' oil and natural gas production by aggregating volumes sold to various intermediary markets, end markets, and

---

[12]   Gross acres represent the total surface area covered by Chesapeake's leased acreage, without taking into account the fact that Chesapeake may not bear 100% of costs associated with such acreage. Similarly, gross producing wells reflect the number of wells that Chesapeake owns an interest in which are currently producing oil or natural gas.

pipelines. This aggregation enables the Debtors to attract larger, more creditworthy customers, which assists in maximizing the prices the Debtors receive.

The Debtors' oil typically is sold under market-sensitive, short-term or spot price contracts, while natural gas and NGL production usually is sold to purchasers under percentage-of-proceeds contracts, percentage-of-index contracts, or spot price contracts.[13] Under the percentage-of-proceeds contracts, the Debtors receive a percentage of the resale price received from the ultimate purchaser. Under the percentage-of-index contracts, the price the Debtors receive is tied to published indices. From time to time, the Debtors also enter into long-term gathering, processing, and transportation contracts that require the Debtors to deliver fixed, determinable quantities of production over a specified period of time or, in the event the Debtors are unable to deliver or transport the committed volumes, pay shortfall payments.

### C.    The Debtor's Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $9.169 billion in aggregate outstanding principal amount of funded and unfunded debt obligations.

| Debt | Maturity | Principal Amount (in USD millions) |
|------|----------|-----------------------------------|
| Revolving Credit Facility | September 12, 2023 | $1,929 |
| Letters of Credit outstanding under RCF | | $74 |
| First Lien Last Out Term Loan Facility | July 1, 2024 | $1,500 |
| **Total Senior Secured Debt** | | **$3,503** |
| 11.500% 2nd Lien Notes | January 1, 2025 | $2,330 |
| **Total Secured Debt** | | **$5,833** |
| 6.625% Notes Due 2020 | August 15, 2020 | $176 |
| 6.875% Notes Due 2020 | November 15, 2020 | $74 |
| 6.125% Notes Due 2021 | February 15, 2021 | $166 |
| 5.375% Notes Due 2021 | June 15, 2021 | $127 |
| 4.875% Notes Due 2022 | April 15, 2022 | $272 |
| 5.750% Notes Due 2023 | March 15, 2023 | $168 |
| 7.000% Notes Due 2024 | October 1, 2024 | $623 |
| 8.000% Notes Due 2025 | January 15, 2025 | $246 |
| 8.000% Notes Due 2026 | March 15, 2026 | $46 |
| 7.500% Notes Due 2026 | October 1, 2026 | $119 |
| 8.000% Notes Due 2027 | June 15, 2027 | $253 |
| 5.500% Convertible Notes Due 2026 | September 15, 2026 | $1,064 |
| 6.875% BVL Notes Due 2025 | February 1, 2025 | $2 |
| **Total Unsecured Debt** | | **$3,336** |
| **Total Funded Debt** | | **$9,169** |

---

[13]    For any given moment, the spot price for a commodity represents the then-current price at which that commodity could be bought or sold for immediate delivery.

| Preferred Equity | Shares | Approximate Liquidation Preference |
|---|---|---|
| 5.75% Cumulative Non-Voting Convertible Preferred Stock (Series A) | 423,363 | $423.4 million |
| 5.75% Cumulative Non-Voting Convertible Preferred Stock | 770,528 | $770.5 million |
| 4.50% Cumulative Convertible Preferred Stock | 2,558,900 | $255.9 million |
| 5.00% Cumulative Convertible Preferred Stock (Series 2005B) | 1,810,667 | $181.1 million |

### 1.     Revolving Credit Facility

The Debtors maintain a senior secured reserve-based revolving credit facility (the "Revolving Credit Facility") under that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated or otherwise modified from time to time, the "Revolving Credit Facility Credit Agreement"), by and among Chesapeake as borrower, the Debtor guarantors party thereto, MUFG, as administrative agent (in such capacity, together with its permitted successors and assigns, the "Revolving Credit Facility Administrative Agent"), and the other lender, issuer, and agent parties thereto.  Borrowings under the Revolving Credit Facility Credit Agreement are subject to a borrowing base that is adjusted twice each year (on June 15 and October 30), and may be adjusted twice more per year during "wildcard" redeterminations based on the evaluation of the Debtors' reserve reports, hedging schedule, and other similar information subject to certain procedures set forth in the Revolving Credit Facility Credit Agreement.  As part of these regularly scheduled borrowing base redeterminations, effective as of June 15, 2020, the lenders under the Revolving Credit Facility elected to reduce the borrowing base from $3 billion to $2.3 billion.

The Revolving Credit Facility includes a swingline commitment of $300 million and a letter of credit sublimit of $750 million.  Outstanding loans, swingline loans, and letters of credit issued under the Revolving Credit Facility are capped at the lesser of the Revolving Credit Facility borrowing base and $2.6 billion in aggregate commitments. As of the Petition Date, the Revolving Credit Facility borrowing base was $2.3 billion and the Debtors had outstanding borrowings under the Revolving Credit Facility of approximately $1.929 billion, excluding outstanding letters of credit.

The Revolving Credit Facility Credit Agreement was amended three times in 2019 in connection with the acquisition of certain assets and issuance of additional indebtedness:

- **February 1, 2019:**  amended in connection with the WildHorse acquisition to, among other things, permit the Debtors' investment in WildHorse;

- **December 3, 2019:**  amended to, among other things, permit the issuance of the Second Lien Notes and entry into the FLLO Term Loan Facility without associated reductions in the borrowing base, increase the amount of first lien last out indebtedness that could be incurred by the Debtors in connection with the FLLO Term Loan Facility, modify certain financial performance covenants, and increase the mortgage coverage requirement under the Revolving Credit Facility Credit Agreement to not less than 90 percent of the Debtors' proved reserves; and

- **December 26, 2019:**  amended to extend borrowing base clawback relief to Second Lien Notes issued in exchange for cash under certain circumstances.

The Revolving Credit Facility was amended again in June 2020 to allow for the hedge portfolio unwind (discussed in greater detail herein), the Roll-Up, and the waiver of certain events of default.

The Revolving Credit Facility matures on September 12, 2023, and bears interest at either the alternate base rate or LIBOR, at the Debtors' election, plus an applicable margin.  The Debtors' obligations under the Revolving Credit Facility are required to be secured on a first lien basis by substantially all of the Debtors' assets and property, whether real, personal, or mixed, including by mortgages on the Debtors' oil and gas properties representing not less

than 90 percent of the net present value (discounted at nine percent per annum) of the Debtors' proved reserves included in their most recently delivered reserve report, as discounted.

### 2.    FLLO Term Loan Facility

As of the Petition Date, the Debtors had approximately $1.5 billion in principal outstanding under the first lien last out term loan facility (the "FLLO Term Loan Facility") incurred under that certain term loan agreement (the "FLLO Term Loan Facility Credit Agreement"), dated as of December 19, 2019, as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, GLAS USA LLC., as administrative agent (the "FLLO Term Loan Facility Administrative Agent"), and the lender parties thereto, and as further amended, restated or otherwise modified from time to time, by and among Chesapeake, as borrower, the Debtor guarantors party thereto, FLLO Term Loan Facility Administrative Agent, and the lender parties thereto.

The FLLO Term Loan Facility matures on June 23, 2024, and bears interest at a rate of LIBOR plus eight percent per annum with a one percent LIBOR floor.  The FLLO Term Loan Facility is subject to a make-whole premium prior to the 18-month anniversary of December 23, 2019, a premium to par equal to 5 percent from the 18-month anniversary until but excluding the 30-month anniversary, and a premium to par equal to 2.5 percent from the 30-month anniversary until but excluding the 42-month anniversary.  Beginning on the 42-month anniversary, the Debtors may prepay the FLLO Term Loan Facility at par.  The FLLO Term Loan Facility is required to be secured by first priority liens on substantially all of the Debtors' assets and property, whether real, personal, or mixed, provided that the FLLO Term Loan Facility will be second in recovery behind the Revolving Credit Facility pursuant to that certain First Lien Collateral Trust Agreement.  On June 23, 2020, the Debtors elected to skip a $22.9 million interest payment due to FLLO Term Loan Facility lenders.

The proceeds of the FLLO Term Loan Facility were used to finance tender offers for the BVL Senior Notes due 2025 and to repay all amounts outstanding under the revolving credit facility assumed in connection with the WildHorse acquisition (the "BVL Revolving Facility").

### 3.    11.500% Senior Secured Lien Notes due 2025

In connection with entry into that certain Indenture, dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtor guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee and collateral trustee (the "Second Lien Notes Indenture"), the Debtors issued a series of 11.500% Senior Secured Second Lien Notes due 2025 (the "Second Lien Notes") in an initial aggregate principal amount of approximately $2.3 billion in exchange for approximately $3.2 billion in carrying value of then existing unsecured notes.  Also on December 19, 2019, the Debtors issued an additional $120 million of Second Lien Notes pursuant to a private offering.

The Second Lien Notes are subject to a make-while premium prior to the 24-month anniversary of January 1, 2022.  Beginning on the 24-month anniversary, the Debtors may prepay the Second Lien Notes at par.  The Second Lien Notes are required to be secured by second priority liens on substantially all of the Debtors' assets and property, whether real, personal, or mixed.  The Second Lien Notes bear interest at a rate of 11.500% per annum, with interest payable on January 1 and July 1 of each year, beginning on July 1, 2020.  The Second Lien Notes mature on January 1, 2025.  As of the Petition Date, approximately $2.33 billion in principal was outstanding under the Second Lien Notes.

### 4.    Unsecured Notes

#### (a)    6.625% Senior Notes due 2020

In connection with entry into that certain Second Supplemental Indenture, dated as of August 17, 2010, to that certain Indenture, dated as of August 2, 2010 (the "2010 Base Indenture"), by and among Chesapeake, as issuer, certain Debtor guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, the Debtors issued a series of 6.625% senior notes due 2020 (the "6.625% Senior Notes due 2020") in an aggregate principal amount of $1.4 billion.

The 6.625% Senior Notes due 2020 bear interest at a rate of 6.625% per annum, with interest payable on February 15 and August 15 of each year, beginning on February 15, 2011.  The 6.625% Senior Notes due 2020 mature

on August 15, 2020.  As of the Petition Date, approximately $176 million in principal was outstanding under the 6.625% Senior Notes due 2020.

**(b)      6.875% Senior Notes due 2020**

In connection with entry into that certain Indenture, dated as of November 8, 2005, by and among Chesapeake as issuer, certain Debtor guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, the Debtors issued a series of 6.875% senior notes due 2020 (the "6.875% Senior Notes due 2020") in an aggregate principal amount of $500 million.

The 6.875% Senior Notes due 2020 bear interest at a rate of 6.875% per annum, with interest payable on May 15 and November 15 of each year, beginning on May 15, 2006.  The 6.875% Senior Notes due 2020 mature on November 15, 2020.  As of the Petition Date, approximately $74 million in principal was outstanding under the 6.875% Senior Notes due 2020.

**(c)      6.125% Senior Notes due 2021**

In connection with entry into that certain Fifth Supplemental Indenture, dated as of February 11, 2011, to the 2010 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee, the Debtors issued a series of 6.125% senior notes due 2021 (the "6.125% Senior Notes due 2021") in an aggregate principal amount of $1 billion.

The 6.125% Senior Notes due 2021 bear interest at a rate of 6.125% per annum, with interest payable on February 15 and August 15 of each year, beginning on August 15, 2011.  The 6.125% Senior Notes due 2021 mature on February 15, 2021.  As of the Petition Date, approximately $166 million in principal was outstanding under the 6.125% Senior Notes due 2021.

**(d)      5.375% Senior Notes due 2021**

In connection with entry into that certain Sixteenth Supplemental Indenture, dated as of April 1, 2013, to the 2010 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 5.375% senior notes due 2021 (the "5.375% Senior Notes due 2021") in an aggregate principal amount of $700 million.

The 5.375% Senior Notes due 2021 bear interest at a rate of 5.375% per annum, with interest payable on June 15 and December 15 of each year, beginning on December 15, 2013.  The 5.375% Senior Notes due 2021 mature on June 15, 2021.  As of the Petition Date, approximately $127 million in principal was outstanding under the 5.375% Senior Notes due 2021.  On June 15, 2020, the Debtors elected to skip a $3.4 million interest payment due to holders of the 5.375% Senior Notes due 2021.

**(e)      4.875% Senior Notes due 2022**

In connection with entry into that certain Second Supplemental Indenture, dated as of April 24, 2014, to that certain Indenture, dated as of April 24, 2014 (the "2014 Base Indenture"), by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 4.875% senior notes due 2022 (the "4.875% Senior Notes due 2022") in an aggregate principal amount of $1.5 billion.

The 4.875% Senior Notes due 2022 bear interest at a rate of 4.875% per annum, with interest payable on April 15 and October 15 of each year, beginning on October 15, 2014.  The 4.875% Senior Notes due 2022 mature on April 15, 2022.  As of the Petition Date, approximately $272 million in principal was outstanding under the 4.875% Senior Notes due 2022.

**(f)      5.750% Senior Notes due 2023**

In connection with entry into that certain seventeenth supplemental indenture, dated as of April 1, 2013, to the 2010 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings

Fund Society, FSB, as successor trustee, the Debtors issued a series of 5.750% senior notes due 2023 (the "5.750% Senior Notes due 2023") in an aggregate principal amount of $1.1 billion.

The 5.750% Senior Notes due 2023 bear interest at a rate of 5.750% per annum, with interest payable on March 15 and September 15 of each year, beginning on September 15, 2013.  The 5.750% Senior Notes due 2023 mature on March 15, 2023.  As of the Petition Date, approximately $168 million in principal was outstanding under the 5.750% Senior Notes due 2023.

**(g)      7.000% Senior Notes due 2024**

In connection with entry into that certain Eighth Supplemental Indenture, dated as of September 27, 2018, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 7.000% senior notes due 2024 (the "7.000% Senior Notes due 2024") in an aggregate principal amount of $850 million.

The 7.000% Senior Notes due 2024 bear interest at a rate of 7.000% per annum, with interest payable on April 1 and October 1 of each year, beginning on April 1, 2019.  The 7.000% Senior Notes due 2024 mature on October 1, 2024.  As of the Petition Date, approximately $623 million in principal was outstanding under the 7.000% Senior Notes due 2024.

**(h)      8.000% Senior Notes due 2025**

In connection with entry into that certain Sixth Supplemental Indenture, dated as of December 20, 2016, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 8.000% senior notes due 2025 (the "8.000% Senior Notes due 2025") in an aggregate principal amount of $1 billion.

The 8.000% Senior Notes due 2025 bear interest at a rate of 8.000% per annum, with interest payable on January 15 and July 15 of each year, beginning on July 15, 2017.  The 8.000% Senior Notes due 2025 mature on January 15, 2025.  As of the Petition Date, approximately $246 million in principal was outstanding under the 8.000% Senior Notes due 2025.  On June 15, 2020, the Debtors elected to skip the interest payment due to holders of the 8.000% Senior Notes due 2027.

**(i)      8.000% Senior Notes due 2026**

In connection with entry into that certain Tenth Supplemental Indenture, dated as of April 3, 2019, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 8.000% senior notes due 2026 (the "8.000% Senior Notes due 2026") in an aggregate principal amount of approximately $918.5 million.

The 8.000% Senior Notes due 2026 bear interest at a rate of 8.000% per annum, with interest payable on March 15 and September 15 of each year, beginning on September 15, 2019. The 8.000% Senior Notes due 2026 mature on March 15, 2026. As of the Petition Date, approximately $46 million in principal was outstanding under the 8.000% Senior Notes due 2026.

**(j)      7.500% Senior Notes due 2026**

In connection with entry into that certain Ninth Supplemental Indenture, dated as of September 27, 2018, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 7.500% senior notes due 2026 (the "7.500% Senior Notes due 2026") in an aggregate principal amount of $400 million.

The 7.500% Senior Notes due 2026 bear interest at a rate of 7.500% per annum, with interest payable on April 1 and October 1 of each year, beginning on April 1, 2019.  The 7.500% Senior Notes due 2026 mature on October 1, 2026.  As of the Petition Date, approximately $119 million in principal was outstanding under the 7.500% Senior Notes due 2026.

### (k)    8.000% Senior Notes due 2027

In connection with entry into that certain Seventh Supplemental Indenture, dated as of June 6, 2017, to the 2014 Base Indenture, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 8.000% senior notes due 2027 (the "8.000% Senior Notes due 2027") in an aggregate principal amount of $750 million.

The 8.000% Senior Notes due 2027 bear interest at a rate of 8.000% per annum, with interest payable on June 15 and December 15 of each year, beginning on December 15, 2017.  The 8.000% Senior Notes due 2027 mature on June 15, 2027.  As of the Petition Date, approximately $253 million in principal was outstanding under the 8.000% Senior Notes due 2027. On June 15, 2020, the Debtors elected to skip a $10.1 million interest payment due to holders of the 8.000% Senior Notes due 2027.

### (l)    5.500% Convertible Senior Notes due 2026

In connection with entry into that certain Indenture, dated as of October 5, 2016, by and among Chesapeake, certain Debtor guarantors party thereto, and Wilmington Savings Fund Society, FSB, as successor trustee, the Debtors issued a series of 5.500% convertible senior notes due 2026 (the "Convertible Notes") in an aggregate principal amount of approximately $1.25 billion.

The Convertible Notes bear interest at a rate of 5.500% per annum, with interest payable not more than 15 days after each March 1 and September 1 of each year, beginning on March 15, 2017.  The Convertible Notes mature on September 15, 2026.  As of the Petition Date, approximately $1.064 billion in principal was outstanding under the Convertible Notes.

### (m)    6.875% BVL Senior Notes due 2025

In connection with entry into that certain Indenture, dated as of February 1, 2017, by and among WildHorse, certain Debtor guarantors party thereto, and U.S. Bank National Association, as trustee, WildHorse issued a series of 6.875% senior notes due 2025 (the "BVL Senior Notes") in an aggregate principal amount of approximately $350 million.  Chesapeake assumed the BVL Senior Notes on February 1, 2019.

The BVL Senior Notes bear interest at a rate of 6.875% per annum, with interest payable on February 1 and August 1 of each year, beginning on August 1, 2017.  The BVL Senior Notes mature on February 1, 2025.  As of the Petition Date, approximately $2 million in principal was outstanding under the BVL Senior Notes.

### 5.    Intercreditor Agreement

MUFG, as priority lien agent on behalf of the Revolving Credit Facility secured parties and FLLO Term Loan Facility secured parties, and the Second Lien Collateral Trustee (as such term is defined in the Intercreditor Agreement) are parties to that certain Intercreditor Agreement, dated as of December 19, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).  The Intercreditor Agreement governs certain rights and remedies as among the secured parties under the Revolving Credit Facility, the FLLO Term Loan Facility, and the Second Lien Notes, relative priority of claims, and certain other matters, including the exercise of remedies and permitted actions in the event of the Debtors' chapter 11 proceedings.

### 6.    First Lien Collateral Trust Agreement

The Revolving Credit Facility Administrative Agent and FLLO Term Loan Facility Administrative Agent are parties to that certain Collateral Trust Agreement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time, the "First Lien Collateral Trust Agreement"), pursuant to which the Revolving Credit Facility Administrative Agent, as first lien collateral trustee, will receive, hold, administer, maintain, enforce, and distribute the proceeds of all of its liens upon the collateral for the benefit of the secured parties under the Revolving Credit Facility Administrative Agent and the secured parties under the FLLO Term Loan Facility Credit Agreement.  The First Lien Collateral Trust Agreement governs certain rights and remedies as among the secured parties under the Revolving Credit Facility and the FLLO Term Loan Facility, relative priority of claims and certain other matters, including the exercise of remedies and permitted actions in the event of the Debtors' chapter 11 proceedings.

### 7.    Preferred Equity

Chesapeake's certificate of incorporation (the "Certificate") authorizes the board of directors of Chesapeake to establish one or more series of preferred stock.  There are four series of preferred stock outstanding: (i) 5.75% Cumulative Non-Voting Convertible Preferred Stock (Series A) (the "5.75% Series A Preferred Stock"), (ii) 5.75% Cumulative Non-Voting Convertible Preferred Stock (the "5.75% Preferred Stock"), (iii) 4.50% Cumulative Convertible Preferred Stock (the "4.50% Preferred Stock") and (iv) 5.00% Cumulative Convertible Preferred Stock (Series 2005B) (the "5.00% Preferred Stock" and together with the 5.75% Series A Preferred Stock, the 5.75% Preferred Stock, and the 4.50% Preferred Stock, collectively, the "Preferred Stock").

In January 2016, Chesapeake suspended dividend payments on each series of Preferred Stock to provide additional liquidity in the depressed commodity price environment.  In the first quarter of 2017, Chesapeake reinstated the payment of dividends on each series of Preferred Stock and paid all past-due dividends in arrears.  During 2018 and 2019, Chesapeake paid dividends of $92 million and $91 million, respectively, to holders of each series of Preferred Stock.  On April 17, 2020, the board of directors of Chesapeake suspended payment of dividends on each series of Preferred Stock.  The suspension of the Preferred Stock dividends did not constitute an event of default under any of the Debtors' debt instruments.

- **5.75% Series A Preferred Stock:**  There were approximately 423,363 shares of 5.75% Series A Preferred Stock outstanding as of the Petition Date.  Holders of 5.75% Series A Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 5.75% per annum per share on the $1,000.00 liquidation preference per share of the 5.75% Series A Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year.  Dividends on the 5.75% Series A Preferred Stock must be paid in cash.  As of the Petition Date, the 5.75% Series A Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.1918 and at a conversion price of $5,215.02 per share of 5.75% Series A Preferred Stock.  The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

- **5.75% Preferred Stock:**  There were approximately 770,528 shares of 5.75% Preferred Stock outstanding as of the Petition Date.  Holders of 5.75% Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 5.75% per annum per share on the $1,000.00 liquidation preference per share of the 5.75% Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year.  Dividends on the 5.75% Preferred Stock must be paid in cash.  As of the Petition Date, the 5.75% Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.1984 and at a conversion price of $5,039.59 per share of 5.75% Preferred Stock.  The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

- **4.50% Preferred Stock:**  There were approximately 2,558,900 shares of 4.50% Preferred Stock outstanding as of the Petition Date.  Holders of 4.50% Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 4.50% per annum per share on the $100.00 liquidation preference per share of the 4.50% Preferred Stock, payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year.  Dividends on the 4.50% Preferred Stock may be paid in cash or, subject to certain limitations, in common stock, or a combination thereof.  As of the Petition Date, the 4.50% Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.0123 and at a conversion price of $8,142.99 per share of 4.50% Preferred Stock.  The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

- **5.00% Preferred Stock:**  There were approximately 1,810,667 shares of 5.00% Preferred Stock outstanding as of the Petition Date.  Holders of 5.00% Preferred Stock are entitled to receive, when, as, and if declared by the board of directors of Chesapeake, cumulative dividends at the rate of 5.00% per annum per share on the $100.00 liquidation preference per share of the 5.00% Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15 and November 15 of each year.  Dividends on the 5.00% Preferred Stock may be paid in cash or, subject to certain limitations, in common stock, or a

combination thereof. As of the Petition Date, the 5.00% Preferred Stock were convertible, at the holder's option at any time, at a conversion rate of 0.0139 and at a conversion price of $7,208.51 per share of 5.00% Preferred Stock. The conversion rate and price were adjusted after the Reverse Stock Split to reflect a proportional decrease in the number of shares of common stock to be issuable upon conversion.

### 8.  Common Equity

Since an initial public offering of equity in 1993, the Debtors' common stock has traded on the New York Stock Exchange ("NYSE") under ticker symbol "CHK." On April 13, 2020, following a shareholder vote, the board of directors of Chesapeake approved a 1-for-200 reverse stock split (the "Reverse Stock Split") in order to, among other things, increase the per share trading price of Chesapeake's common stock to satisfy the $1.00 minimum bid price requirement for continued listing on the NYSE. As of the Petition Date, there were approximately 9.784 million shares of common stock, par value $0.01, issued and the common stock was trading at $11.85 per share, implying a market capitalization of approximately $115.9 million. The board of directors of Chesapeake is authorized to issue 22,500,000 shares of common stock. The Debtors have not issued cash dividends to holders of common stock since 2015, when the board of directors of Chesapeake decided to eliminate quarterly cash dividends to the holders of common stock. Since 2014, the trading price of Chesapeake's common stock has faced downward pressures proportionate with downturns in commodity markets.

### D.  The Debtors' Employees

The Debtors employ approximately 2,000 individuals on full- or part-time bases. These employees perform a wide variety of functions critical to the Debtors' business. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency of the Company.

As more fully specified in the Debtors' 8-K filed on or about May 8, 2020, prior to the Petition Date, the Debtors conducted a comprehensive review of its compensation program for its entire workforce to determine whether it continues to effectively incentivize and retain its employees in light of the unprecedented market volatility and historic decline in commodity prices. As a result of this review, the Debtors and Chesapeake's board of directors modified the Debtors' compensation program effective as of May 5, 2020. Under the revised program, four of the Debtors' highest paid named executive officers each agreed to the reductions of between 28 and 34 percent in their target variable compensation relative to their 2019 target variable compensation (*i.e.*, 2019 Annual Incentive Program target value and 2019 Long-Term Incentive Program aggregate grant date target value).

The board of directors and the compensation committee, with the advice of their independent compensation consultant and legal advisors, determined that the historic compensation structure and performance metrics would not be effective in motivating and incentivizing the Debtors' workforce. As a result, the board of directors and the Debtors implemented a revised compensation structure for the Debtors' senior executives and employees.

The modified structure provided that 21 senior employees would receive prepaid compensation in the amount of $25 million with an obligation to refund up to 100% of the compensation (on an after-tax basis) if certain conditions are not satisfied. The total amount paid to these 21 employees will be approximately $25 million. Named executive officers' target compensation will be earned 50% based on their continued employment for a period of up to 12 months and 50% based on achieving certain specified incentive metrics. As a condition to participating in the revised program, the Debtors' named executive officers and vice presidents were required to waive participation in the Company's 2020 annual bonus plan and waive their rights to all equity compensation awards with respect to 2020. All outstanding equity compensation awards held by named executive officers and vice presidents were cancelled. Similarly, the board of directors waived the remaining portion of the repayment requirement with respect to the certain cash retention awards granted to named executive officers, Messrs. Lawler, Dell'Osso, Patterson and Webb, on July 31, 2018.

Additionally, to maintain the stability and continuity of the Debtors' workforce and minimize distractions arising from the uncertainty associated with its compensation program, the Debtors' annual incentive plan was be converted into an opportunity for our employees to receive cash retention payments earned on a quarterly basis over a 12-month period, subject to their continued employment. The Debtors and the board of directors believe the revised compensation program's emphasis on retention was essential to keep employees engaged and focused on the tasks necessary to achieve the Debtors' short- and long-term goals.

### E.    Pending Material Litigation

The Debtors are involved in a number of litigation and regulatory proceedings incidental to their business operations, including certain pending material litigation described below.  The Debtors dispute the alleged liability in each of these cases and intend to vigorously defend the claims against them.

### 1.    Royalty and Mineral Interest Litigation

#### (a)    Pennsylvania Royalty Litigation

On August 30, 2013, a group of Pennsylvania lessors Filed royalty underpayment claims in the United States District Court for the Middle District of Pennsylvania on behalf of a putative class of lessors with interests in Pennsylvania oil and gas leases ("*Demchak*").[14]  At the same time the *Demchak* action was proceeding in federal court, another group of Pennsylvania lessors initiated a putative class arbitration against the Debtors alleging similar royalty underpayment claims ("*Burkett*").

On September 12, 2013, the *Burkett* plaintiffs moved to intervene in the *Demchak* federal court action, and on December 18, 2014, the *Demchak* and *Burkett* plaintiffs Filed a motion for preliminary approval of a classwide settlement covering all Pennsylvania lessors with interests in leases containing a particular provision known as a "market enhancement clause" (the "Demchak/Burkett Class Settlement").  The Demchak/Burkett Class Settlement provided both a lump-sum initial settlement payment in excess of $17 million and a revised royalty formula going forward.  On October 2, 2015, the *Demchak* court certified the settlement class and granted preliminary approval of the Demchak/Burkett Class Settlement.

In March and June 2014, two groups of Pennsylvania lessors initiated putative class actions in the United States District Court for the Middle District of Pennsylvania, also alleging that the Debtors underpaid royalties owed under oil and gas leases ("*Brown*"[15] and "*Suessenbach*"[16]).  The cases were later consolidated for discovery, and in August 2018, the Debtors reached a tentative classwide settlement ("Brown/Suessenbach Class Settlement").  The Brown/Suessenbach Class Settlement provided for a $7.75 million settlement fund and a revised royalty formula going forward.  On August 9, 2018, the plaintiffs Filed a motion for preliminary approval of the Brown/Suessenbach Class Settlement, which remains pending.

On December 9, 2015, the Attorney General of the Commonwealth of Pennsylvania (the "PA AG") Filed a lawsuit in the Pennsylvania state court, alleging that the Debtors violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL") by making improper deductions from royalties and entering into arrangements with affiliates that resulted in underpayment of royalties.  The PA AG seeks civil penalties, permanent injunctive relief, and restitution on behalf of lessors in Pennsylvania.  On December 11, 2015, the PA AG Filed an objection to the Demchack/Burkett Class Settlement.  The *Demchak* court has stayed final approval of Demchak/Burkett Class Settlement pending resolution of the PA AG action.  This matter is currently pending.

#### (b)    South and East Texas Royalty Litigation

The Debtors are party to several royalty lawsuits pending in south or east Texas concerning alleged underpayment of royalties, including the Eagle Ford MDL[17] and the Petty Lawsuit.[18]

---

[14]  *Demchak Partners Limited Partnership v. Chesapeake Appalachia, L.L.C.*, No. 3:13-cv-02289-MEM (M.D. Pa.)

[15]  *Brown v. Access Midstream Partners, L.P., et al.*, No. 3:14-cv-00597-MEM (M.D. Pa.)

[16]  *Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P.*, No. 3:14-cv-001197-MEM (M.D. Pa.)

[17]  *In re: Chesapeake Eagle Ford Royalty Litigation*, No. 2016CI22093 (Tex. Dist.) (the "Eagle Ford MDL").

[18]  *Petty Business Enterprises, L.P.* et al. *v. Chesapeake Exploration, L.L.C.* et al., No. 2020CI07957 (S.D. Tex) (the "Petty Lawsuit").

The Eagle Ford MDL, pending in the United States District Court in Bexar County, Texas, consists of two original lawsuits[19] plus eight cases asserting similar claims for over $160 million in gross damages, which have been consolidated for pre-trial handling.  There are approximately 150 royalty owner plaintiffs (the "Eagle Ford Royalty Owner Plaintiffs") across the cases.  The Eagle Ford Royalty Owner Plaintiffs' claims fall into two main groups: (1) royalty claims and (2) claims involving alleged breaches related to lease drilling (offset well, lease development, and retained acreage claims).  Most of the alleged damages are based on the drilling claims not the royalty claims.  The Debtors hold approximately two-thirds of the working interest in the underlying Eagle Ford MDL leases.  On September 30, 2020, the Eagle Ford MDL pre-trial judge entered an order, on motion by the Eagle Ford Royalty Owner Plaintiffs, severing the cases against the Debtors' into a separate case number.  The severed litigation against the Debtors remains stayed.

On April 30, 2020, Petty and various related parties Filed a royalty lawsuit against the Debtors in the United States District Court in Bexar County, Texas, asserting more than $40 million in unpaid royalties.  Petty and the Debtors are parties to five leases covering approximately 30,000 acres in South Texas, of which the Debtors hold approximately two-thirds of the working interest.  The Debtors answered, but the Petty Lawsuit has not otherwise progressed toward trial.  The Petty Lawsuit was removed to the United States District Court for the Western District of Texas on September 23, 2020, and transferred to the Southern District of Texas on September 25, 2020.  As discussed further herein, on September 30, 2020, the Debtors and Petty Filed a stipulation and agreed order [Adv. Proc. Case No. 20-03399, Docket No. 43] (the "Petty Stipulation"), whereby the parties agreed on a timeline to litigate the Petty Lawsuit, culminating in the commencement of a bench trial in the Southern District of Texas in February 2021.

### (c)    North Texas Barnett Shale Royalty MDL

The Debtors currently are party to ten royalty litigation cases in the United States District Court in Tarrant County, Texas (collectively, the "Barnett Shale Royalty MDL"). The Barnett Shale Royalty MDL cases generally allege that Debtors have underpaid or failed to pay royalty payments by agreeing to unreasonable and excessive gathering fees, basing royalty payments on improper prices, or deducting post-production costs from the lessors' royalties.  Certain cases also allege that the Debtors did not pay royalties on all volumes produced from the leases.  As of the date hereof, two of the Barnett Shale Royalty MDL cases are in the post-trial or final summary judgment ruling stage.

The District Court hearing the Barnett Shale Royalty MDL has stayed all of the cases, but has allowed the plaintiffs in the *Addax*[20] case to proceed against defendants other than the Debtors.  On June 30, 2016, the *Addax* plaintiffs, a group claiming to hold royalty and/or mineral interests under 19,000 oil and gas leases covering roughly 6,000 mineral acres and involving more than 960 producing gas wells located in Tarrant, Johnson and Ellis Counties, Filed suit against the Debtors. On August 31, 2016, the *Addax* plaintiffs amended their petition to add six more plaintiffs and name Dorchester Resources, L.P., Larchmont Resources, L.L.C. and Jamestown Resources, L.L.C. as defendants.  The District Court ruled that the plaintiffs' claims will be tried in separate manageable trials.

### (d)    Oklahoma CEOG Royalty Litigation

On November 7, 2014, CEOG, LLC, on behalf of a putative class of royalty and overriding royalty owners in Oklahoma wells, commenced an action in the United States District Court in Caddo County, Oklahoma, for statutory interest under the Oklahoma Production Revenue Standard Act for purported late revenue payments made by the Debtors ("CEOG").  On July 8, 2016, the *CEOG* case was removed to the United States District Court for the Western District of Oklahoma.[21]  On April 1, 2020, the *CEOG* plaintiff and the Debtors reached a settlement, which was preliminarily approved by the District Court on May 16, 2020.  Under the terms of the settlement, the Debtors agreed to pay up to approximately $6.1 million to the settlement class.  On July 27, 2020, the District Court administratively

---

[19]    *7K Investments, Ltd.,* et al*. v. Chesapeake Energy Corporation*; et al., No. 16-03-00030-CVL (Tex. Dist.) and *Stanton P. Bell, et al. v. Chesapeake Energy Corporation,* et al.; No. 16-03-12841-DCVAJA; (Tex. Dist.).

[20]    *Addax Minerals Fund, L.P.,* et al., *v. Chesapeake Operating, L.L. C. (flk/a Chesapeake Operating, Inc.), Chesapeake Exploration, LLC, Dorchester Resources L.P. (flk/a Arcadia Resources, L.P., flk/a Chesapeake Investments, L.P.), Jamestown Resources, L.L. C. and Larchmont Resources, L.L. C*., No. 096-286764-16 (Tex. Dist.) ("*Addax*").

[21]    *CEOG, LLC, vs. Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C.*, No. 16-CV-0076-HE (W.D. Okla).

closed the *CEOG* case and struck the once pending fairness hearing, originally scheduled for August 25, 2020, as moot.

> **(e)** **Louisiana Unleased Mineral Interest Litigation**

The Debtors currently are party to four cases pending in the United States District Court in the Western District of Louisiana, including *Johnson*,[22] *Hudson*,[23] *Nelson*,[24] and *Buggs DeSoto*,[25] alleging substantially the same claims related primarily to: (i) the Debtors' deduction of post-production costs from the unleased mineral owners' proceeds and (ii) the Debtors' reporting with respect to unleased mineral owners.

*Johnson* is a multi-plaintiff case with approximately 22 individual identified plaintiffs. On March 21, 2019, the District Court granted the plaintiffs' motion for summary judgment holding that post-production costs could not be deducted under the Louisiana statute. The Debtors then filed a motion for reconsideration arguing that the Louisiana Civil Code provides for the recovery of post-production costs under the doctrine of *negotiorum gestio*. Both *Hudson*, a putative class action[26] and *Nelson*, a single plaintiff case, similarly allege improper post-production costs from the unleased mineral owners' proceeds. On January 29, 2020, the District Court approved an agreement to continue all pretrial deadlines in *Johnson*, *Hudson*, and *Nelson* until the *negotiorum gestio* issue initially raised in *Johnson* was decided and finally appealed.

Like the plaintiffs in *Johnson*, *Hudson*, and *Nelson*, the *Bugg DeSoto* plaintiff's claims similarly include post-production costs, along with claims that the Debtors failed to fully, accurately, and timely report costs and charged the plaintiff for other allegedly improper categories of costs (e.g., title opinions, surveys, etc.). The *Bugg DeSoto* plaintiff also alleges unfair trade practices and civil conversion under Louisiana law. On September 13, 2019, the Debtors filed a motion for partial dismissal of the case.

The District Court was set to address the motions relating to the post-production costs issue on July 21, 2020. In light of the Chapter 11 Cases, the District Court dismissed the pending motions without prejudice. As discussed further herein, on September 28, 2020, the Johnson-Hudson Parties Filed a motion to expedite discovery related to their claims [Docket No. 1237]. On October 2, 2020, the Debtors Filed an emergency motion for a protective order limiting and setting a timeline to respond to the discovery requests in advance of the hearing on the Johnson Motions (each as defined and discussed herein) on October 22, 2020 [Docket No. 1277] (the "Motion for Protective Order"). On October 5, 2020, the Johnson-Hudson Parties Filed a response to the Motion for Protective Order [Docket No. 1294]. At a hearing on October 7, 2020, the Bankruptcy Court granted the Motion for Protective Order with respect to certain discovery requests on the record.

The Johnson-Hudson Parties believe the *Johnson* and *Hudson* litigation matters implicate the interests of in excess of 10,000 unleased mineral owners with rights dating back to 2008, that estimated property interests from these litigation matters exceed $150,000,000, and success by the unleased mineral owners in the litigation would eliminate Debtors' ability to deduct an estimated $1,300,000 per month in post-production charges going forward. The Debtors disagree and dispute the merits of these allegations.

> **(f)** **Tributary Litigation**

One or more of the Debtors are defendants in an Oklahoma state court lawsuit brought by Tributary Resources, LLC ("Tributary") as plaintiff under Case No. CV-2017-140, pending in the District Court of Kingfisher County, Oklahoma, as of the Petition Date. That lawsuit is a quiet title contest in which Tributary alleges, *inter alia*, that an oil and gas lease owned in part by the Debtors, which covers the Southeast Quarter of Section 23, Township

---

[22]   *Johnson, et al. v. Chesapeake Louisiana, L.P.,* et al., No. 5:16-CV-01543 (W.D. La) ("*Johnson*").

[23]   *Hudson, et al. v. Chesapeake Louisiana, L.P.,* et al., No. 5:19-CV-00862 (W.D. La) ("*Hudson*").

[24]   *Woods-Nelson v. Chesapeake Louisiana, L.P.,* et al., No. 5:19-CV-0053 (W.D. La) ("*Nelson*")

[25]   *Bugg DeSoto, L.L.C. v. Chesapeake Operating, L.L.C.*, No. 5:19-CV-01049 (W.D. La) ("*Buggs DeSoto*").

[26]   The Debtors have moved to dismiss the class allegations due to failure of the *Hudson* plaintiffs to timely file a motion for class certification. On October 5, 2020, Rodney Hudson and other movants related to the *Hudson* case Filed in the Bankruptcy Court a motion to certify a class of unleased mineral interested owners in Louisiana for the purposes of filing a class proof of claim [Docket No. 1295] (the "Hudson Class Certification Motion").

17 North, Range 7 West in Kingfisher County, Oklahoma, terminated pursuant the lease's own terms for failure to produce oil and gas in paying quantities and due to total cessations of production of oil and gas. Tributary contends the lease terminated prior to the date the Debtors drilled four horizontal oil and gas wells under the lease. The Debtors were served with summons and Tributary's petition in the lawsuit prior to the date the Debtors began drilling. Tributary owns competing oil and gas leases covering the same minerals, and alleges its title to the minerals, and its rights to proceeds therefrom, are superior to the Debtors'. Therefore, Tributary asserts that it is entitled to all revenues attributable to the disputed interest dating back to the respective dates of first production from the oil and gas wells the Debtors drilled and produced. In connection with the lawsuit, Tributary filed a *lis pendens* in the real property records of Kingfisher County, Oklahoma, thereby placing all the public on notice of its claim to the subject mineral interest and proceeds therefrom. Tributary has further objected (or will object) to the Debtors' sale of the Mid-Con assets, which include the interests at issue in the above-referenced lawsuit. Tributary asserts that under Oklahoma law, an oil and gas lease terminates for failure to produce in paying quantities under its own terms pursuant to the habendum clause, and for a total cessation of production longer than allowed for by an oil and gas lease's terms. The Debtors disagree and dispute the merits of the allegations in the Tributary litigation.

### 2.    HOOPP Arbitration

In July 2018, Healthcare of Ontario Pension Plan ("HOOPP") Filed a demand for arbitration regarding HOOPP's purchase of the Debtors' interest in Chaparral Energy, Inc. stock in January 2014 for $215 million. HOOPP claims that the Debtors engaged in material misrepresentations, and fraud, and that the Debtors violated both the Exchange Act and the Oklahoma Uniform Securities Act. HOOPP seeks either rescission or $215 million monetary damages, together with interest, attorneys' fees, disgorgements, and punitive damages. The arbitration remains pending before the American Arbitration Association.

### 3.    Personal Injury Litigation

On January 29, 2020, one of the wells operated by the Debtors—the Wendland 1H Well in Burleson County, Texas— experienced a loss of control while certain third party vendors were conducting workover operations.[27] The incident resulted in three contractor fatalities and one contractor injury. Ten lawsuits relating to the incident are currently pending against the Debtors and the third party vendors described above.

### 4.    Environmental Proceedings

#### (a)    Mass Tort

The Debtors are defendants in numerous mass tort actions Filed in Oklahoma alleging that the Debtors (and other companies) have operated wastewater disposal wells in a manner that has caused earthquakes. The lawsuits seek compensation for injury to real and personal property, diminution of property value, and economic losses due to business interruption, among other claims. The lawsuits also seek reimbursement of insurance premiums and the award of punitive damages and attorneys' fees.

#### (b)    Clean Water Act

Chesapeake Appalachia, LLC ("CALLC") discovered and subsequently disclosed to the Commonwealth of Pennsylvania, Department of Environmental Protection, the US Department of Justice, the US Environmental Protection Agency, and the US Army Corps of Engineers (together, "Agencies") potential violations of the permitting requirements of the federal Clean Water Act, the Pennsylvania Clean Streams Law and the Pennsylvania Dam Safety and Encroachments Act at certain sites in Pennsylvania. The potential violations involve allegedly discharging dredged or fill material, and/or controlling and directing the discharge of dredged or fill material, into waters of the United States and/or waters of the Commonwealth, and conducting unauthorized earth disturbance activities, stormwater management and constructing, operating, or maintaining encroachments and/or water obstructions, potentially without prior authorization under State and/or federal law, potentially impacting both wetlands and streams. CALLC is negotiating a resolution of these potential violations with the Agencies. Obligations associated with the resolution of the potential violations will be treated in accordance with the Plan.

---

[27]    A "workover" means the process of performing major maintenance or remedial treatments on an oil or gas well.

### F.      Escrowed Funds

As of the Petition Date, the Debtors or the registry of the court, as applicable, are holding escrowed funds due and owing to certain Royalty and Working Interest owners that are unpayable for a variety of reasons, including ongoing disputes over the underlying interest.  In particular, in connection with a demand made by Gates Mineral Company, Ltd. regarding claims for alleged unpaid royalties, the Debtors and its co-interest owners escrowed approximately $7.5 million (approximately $4.9 net to the Debtors) pursuant to applicable lease provisions. Additionally, in connection with a title dispute between royalty lessors, *Kent B. Hoffman*, et al. *v. 7PL Minerals Ltd and Peeler Family Limited Partnership,* et al., the Debtors deposited approximately $6.1 million into the registry of the state District Court in McMullen County, Texas.  The Debtors continue to make payments to the registry of the court on account of such interests.  Further, as discussed herein, the Debtors and certain other co-working interest owners placed approximately $15 million into escrow (approximately $9.8 million net to the Debtors) for prepetition Claims made in the Petty Lawsuit for the 2016–2017 time frame and will place approximately $7.5 million (approximately $4.9 million net to the Debtors) into escrow for the 2018 forward time period.

## VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.      Recent Market Volatility and Oil Market Crash

The Debtors have undertaken significant efforts since 2013 to address their leverage and profitability—including rationalizing capital expenditures, reducing operating and general administrative expenses, executing over $11 billion in strategic oil and gas divestitures, reducing off balance sheet liabilities and consummating multiple refinancing transactions, including as recently as December 2019.  Despite these efforts, the recent and dramatic drop in commodity prices and resulting tightening of the credit markets have frustrated the Debtors' ability to further deleverage absent a chapter 11 proceeding.

Indeed, the Debtors have struggled under the weight of their funded debt obligations for years, and, despite their significant efforts undertaken the past several years to address their leverage and profitability and survive the challenging commodity market, as more fully described below, the exacerbation of the industry's problems in recent months finally made such efforts incapable of solving the Debtors' capital structure issues without a chapter 11 proceeding.

In addition to long term negative pricing declines, prices dropped precipitously in recent months as a result of the onset of the COVID-19 pandemic and the recent price war between Russia and the Kingdom of Saudi Arabia. The initial spread of COVID-19 caused decreased factory output and transportation demand, resulting in a decline in energy prices.  To address this, OPEC, led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia.  However, those initial efforts faltered, and the parties failed to reach an agreement as to production levels.  Instead, both the Kingdom of Saudi Arabia and Russia announced that they would *increase*, rather than decrease, production, resulting in surplus supply amidst already decreasing demand for energy. Meanwhile, the COVID-19 pandemic continued to spread, causing governments across the world to institute strict public health and safety measures including quarantine orders, stay-at-home orders, and social distancing guidelines that have further decreased energy demand.  On April 12, 2020, in an effort to relieve some of the negative impacts on the industry, 23 countries agreed to commit to withholding 9.7 million barrels of oil per day from the global markets.

The corresponding effects on energy markets have been stark.  On March 9, 2020, the WTI index declined 24.59 percent in a single day.  Major oil indexes and U.S. indexes then continued to hover around $20.00 per barrel, until prices plummeted to a level never before seen on April 20, 2020, when WTI crude oil for May delivery settled at negative $37.63 per barrel, a record low and drop of roughly 306 percent in a single day.

The current volatility in commodity markets and uncertain future in light of the COVID-19 pandemic has made it especially challenging for companies to execute out-of-court restructuring alternatives.  In 2020, at least ten large E&P companies and related services providers have Filed for chapter 11, including  Kingfisher Midstream, LLC on January 13, 2020, McDermott International, Inc. on January 21, 2020, Southland Royalty Company, LLC on January 27, 2020, Pioneer Energy Services Corporation on March 1, 2020, Foresight Energy LP on March 10, 2020, Whiting Petroleum on April 1, 2020, Diamond Offshore Drilling Inc. on April 26, 2020, Ultra Petroleum Corp. on May 14, 2020, Hornbeck Offshore Services, Inc. on May 19, 2020, Extraction Oil and Gas, Inc. on June 14, 2020,

Sable Permian Resources, LLC on June 25, 2020, California Resources Corporation on July 15, 2020, Noble Corporation on July 31, 2020, Denbury Resources Inc. on July 30, 2020, Fieldwood Energy LLC on August 3 and August 4, 2020, Bruin E&P Partners on August 26, 2020, and Valaris plc on August 19, 2020.

**B.      Operational Responses**

The Debtors implemented a proactive approach to address their balance sheet beginning in 2013, following the appointment of Doug Lawler as Chief Executive Officer.  Mr. Lawler and the new management team initiated a shift across all aspects of the Debtors' business centered on four strategic pillars:  financial discipline; profitable and efficient growth from captured resources; exploration; and business development.  Underpinning the management team's efforts was a transformation from Chesapeake's culture of "grow at any cost" to a culture that is laser-focused on cost leadership and increased competitiveness relative to its peers.  With this approach, as of December 31, 2019, Chesapeake was able to achieve, among other accomplishments, the following results:

- reduction in total leverage by over $10 billion since 2012;

- elimination of more than $10 billion in midstream and operating commitments since 2012;

- increase of oil mix by over 80 percent since 2012;

- growth of Adjusted EBITDAX margins per barrel of oil equivalent by 50 percent since 2015;

- removal of approximately $1.7 billion in total cash costs since 2014; and

- improvement of all aspects of health, safety, environmental, and regulatory performance.

One component of the Debtors' liability management efforts was executing a series of transactions to divest certain non-core assets and maximize operational efficiencies.  In 2014, the Debtors sold certain acreage and producing properties targeting the Marcellus and Utica Shale formations located in Southern Pennsylvania and Northern West Virginia, respectively, for $4.975 billion.  In 2017, the Debtors sold certain acreage and producing properties in the Haynesville Shale area of Northern Louisiana for $915 million, recognizing a gain of approximately $326 million. The Debtors continued their divestiture efforts in 2018, selling (a) all of their acreage in Ohio (approximately 1,500,000 gross (900,000 net) acres) for approximately $1.868 billion, and (b) certain acreage, producing properties, and other related property and equipment in the Mid-Continent, including all of the Debtors' Mississippian Lime assets, for approximately $491 million.

The Debtors also initiated efforts to reduce their workforce to promote operational efficiencies and improve their cash flow.  Since 2015, the Debtors' employee count has been reduced by more than 50 percent, with corresponding reductions in compensation of approximately 43 percent and gross overhead of approximately 38 percent.

These strategic divestitures, along with the Debtors' relentless focus on reducing their cash operating costs, have resulted in meaningful reductions in their operating cost structure.  In 2019 alone, the Debtors improved their cost structure by approximately $0.79 per barrel of oil equivalent by reducing production, gathering, processing, transportation, and general and administrative expenses which amounted to $290 million (approximately 13 percent) in savings in 2019 compared to 2018.

The Debtors also executed certain strategic acquisitions, including the February 2019 acquisition of WildHorse for approximately $4 billion in the aggregate, consisting of 717.4 million shares of common stock and approximately $381 million in cash, less $28 million of cash held by WildHorse as of the acquisition date, and the assumption of WildHorse's $1.4 billion of debt.  The WildHorse acquisition enabled the Debtors to strengthen their presence in the Eagle Ford Shale and Austin Chalk formations in Texas and significantly increase their oil production, while simultaneously reducing operational costs through operational and capital efficiencies as a result of the Debtors' significant expertise with unconventional assets and technical and operational excellence.  The WildHorse transaction generated approximately $250 million in cost savings in 2019, with additional savings anticipated over the coming years.

C.    **Financial Responses**

1.    **Transactions**

The Debtors have taken numerous efforts to manage their balance sheet in the last half decade.  In 2015, the Debtors completed a private exchange of their 8.00% Senior Secured Second Lien Notes due 2022 (the "2022 Second Lien Notes") for certain senior unsecured notes and contingent convertible notes (the "Existing Notes"). Approximately $3.9 billion of the Existing Notes were exchanged for approximately $2.4 billion aggregate principal amount of the 2022 Second Lien Notes.

The Debtors continued their efforts in 2016 and early 2017 with a series of preferred stock exchanges and conversions, including the following.

- **January 2016**:  The Debtors suspended dividend payments on their convertible preferred stock to increase liquidity; the suspension lasted throughout 2016.  On February 15, 2017, the Debtors reinstated dividend payments, and paid the past-due dividends in arrears.

- **February and March 2016**:  Certain preferred shareholders converted (i) 24,601 shares of 5.75% Preferred Stock and (ii) 1,201 shares of 5.75% Series A Preferred Stock into an aggregate of approximately 1 million shares of the Debtors' common stock.  The converted preferred stock represented approximately $26 million of liquidation value.

- **October and November 2016**:  The Debtors completed a private exchange of an aggregate of approximately 119.2 million shares of their common stock for (i) 134,000 shares of 5.00% Preferred Stock, (ii) 629,271 shares of 5.75% Preferred Stock, and (iii) 622,936 shares of 5.75% Series Preferred Stock.  The exchanged preferred stock represented approximately $1.3 billion of liquidation value.

- **January 2017**:  The Debtors completed exchanges of an aggregate of approximately 10 million shares of their common stock for (i) 150,948 shares of 5.00% Preferred Stock, (ii) 72,600 shares of 5.75% Preferred Stock, and (iii) 5.75% Series A Preferred Stock.  The exchanged preferred stock represented approximately $100 million of liquidation value.

In total, the preferred stock exchanges and conversions completed in 2016 and 2017 eliminated approximately $80 million of annual dividend obligations.

Also from 2015 to 2017, the Debtors completed several open market repurchases and redemptions, including the:  (a) purchase of approximately $119 million aggregate principal amount of their 3.25% Senior Notes due 2016 for cash in 2015; (b) repurchase in 2015 of approximately $60 million of their outstanding 2.5% Contingent Convertible Notes due 2037 for $32 million, $122 million of their 3.25% Senior Notes due 2016 for $115 million, and $2 million of their 6.5% Senior Notes due 2017 for $1 million; and (c) retirement of $643 million aggregate principal amount of their outstanding senior notes and contingent convertible senior notes in 2017.

The Debtors also made efforts to right size their balance sheet through debt repurchases.  In 2015, the Debtors used $508 million of cash to repurchase $513 million principal amount of debt.  In 2016, the Debtors used $2.734 billion of cash to repurchase $2.884 billion principal amount of debt.  And, in 2017, the Debtors used $2.592 billion of cash to repurchase $2.389 billion principal amount of debt.

In 2018, the Debtors' liability management strategy continued, including additional transactions intended to reduce cash interest payments and overall leverage.  For example, the Debtors completed public notes offerings through which they raised approximately $1.24 billion.  As part of the offerings, the Debtors issued at par $850 million of 7.000% Senior Notes due 2024 and $400 million of 7.500% Senior Notes due 2026.  The Debtors used the proceeds of these notes offerings, plus cash on hand and borrowings under the Revolving Credit Facility to pay approximately $1.23 billion outstanding under their then existing secured term loan.  Also in 2018, the Debtors redeemed the $1.42 billion aggregate principal amount outstanding of their 8.00% senior secured second lien notes due 2022 for $1.48 billion in an all cash transaction using proceeds from the sale of their Utica assets in Ohio.

In 2019, the Debtors (a) repurchased $698 million principal amount of the BVL Senior Notes for $693 million and (b) privately negotiated exchanges of certain of their Unsecured Notes and Convertible Notes for common stock. Approximately $507 million of the principal amount outstanding on certain Unsecured Notes was exchanged for 235,563,519 shares of common stock, and approximately $186 million principal amount outstanding on the Convertible Notes was exchanged for 73,389,094 shares of common stock. As a result of these exchange transactions, the Debtors recorded an aggregate net gain of approximately $64 million.

In December 2019, the Debtors (a) entered into the $1.5 billion FLLO Term Loan Facility, the proceeds of which were used to finance tender offers for the Debtors' unsecured BVL Senior Notes and to pay amounts outstanding under the revolving credit facility for Debtor Brazos Valley Longhorn, L.L.C., (b) completed private offers to exchange approximately $3.2 billion in carrying value of unsecured notes for approximately $2.3 billion of Second Lien Notes, and (c) issued an additional $120 million of Second Lien Notes pursuant to a private offering at 89.75 percent of par. Additionally, the Debtors amended the existing Revolving Credit Facility to allow for the foregoing transactions. In the first quarter of 2020, the Debtors repurchased approximately $156 million in principal amount of Unsecured Notes, at a discount, for $93 million.

### 2.   Reverse Stock Split

In the weeks leading up to the Petition Date, Chesapeake approved and effected the Reverse Stock Split. In December 2019, the NYSE alerted Chesapeake that its stock risked delisting under the NYSE rules because it traded below $1.00, and Chesapeake had six months to correct course before delisting would occur. In April 2020, Chesapeake's stock continued to trade below $1.00 and, with the recent market downturn, it appeared improbable that the trading price would fall back in compliance within the six-month timeframe. To avoid delisting, Chesapeake effected a 1-for-200 Reverse Stock Split with the approval of its stockholders on April 13, 2020. As of the Petition Date, Chesapeake's stock traded within the NYSE's requirements.

### 3.   Section 382 Rights Agreement

On April 23, 2020, the board of directors of Chesapeake declared a dividend of one preferred share purchase right to common stockholders of record on May 4, 2020. Each right entitles the registered holder to purchase from Chesapeake one one-thousandth of a share of Series B Preferred Stock, par value $0.01 per share, of Chesapeake at a price of $90.00 subject to adjustment. In connection with the distribution of the rights, Chesapeake entered into a section 382 rights agreement with Computershare Trust Company, N.A., as rights agent. The purpose of the rights agreement is to protect value by preserving Chesapeake's ability to use its tax attributes[28] to offset potential future income taxes for federal income tax purposes. The rights agreement is intended to reduce the likelihood of an ownership change by deterring any person or group of affiliated or associated persons from acquiring beneficial ownership of 4.9 percent or more of the outstanding shares of common stock. The rights agreement will expire on the close of business on the day following the certification of the voting results from Chesapeake's 2021 annual meeting, unless Chesapeake's shareholders ratify the rights agreement at or prior to such meeting, in which case it will continue in effect until April 22, 2023, unless terminated earlier in accordance with its terms.

### D.   Retention of Advisors

In March 2020, the Debtors retained Kirkland & Ellis LLP as legal advisor, Rothschild & Co US Inc. and Intrepid Partners, LLC as investment bankers, and Alvarez & Marsal North America, LLC as restructuring advisors, to assist the Debtors with a review of all strategic alternatives, including a comprehensive balance sheet restructuring. Additionally, Wachtell, Lipton, Rosen & Katz has been, and continues to be, counsel to the board of directors of Chesapeake.

### E.   Hedging Portfolio Unwind

In an effort to mitigate exposure to the volatile commodities market and related adverse market price changes, the Debtors historically entered into various derivative instruments. Because commodity prices had declined substantially since the Debtors entered into their hedge arrangements, their hedge portfolio held a mark-to-market

---

[28]   As of December 31, 2019, Chesapeake estimates it had, among certain other tax attributes, approximately $7.6 billion of federal net operating losses and $12 billion of total asset basis.

value to the Debtors of approximately $405 million as of June 8, 2020.  In light of the June 15 borrowing base redetermination and the Debtors' ongoing minimum liquidity covenants under the Revolving Credit Facility, the Debtors executed a consent letter with the Revolving Credit Facility Administrative Agent that allowed the Debtors to unwind their hedge portfolio and apply the proceeds thereof to reduce the commitments under the Revolving Credit Facility.  The hedge unwind resulted in an approximately $382 million reduction of the Revolving Credit Facility commitments.  The Debtors had no hedges outstanding as of the Petition Date.

### F.     Negotiations with Key Stakeholders and Entry into DIP Facility and Restructuring Support Agreement

In light of the current commodity price environment, the Debtors recognized that a successful restructuring likely would require both a significant deleveraging and a significant new money investment. With that in mind, beginning in late March 2020, the Debtors, with the assistance of their advisors, commenced comprehensive restructuring negotiations with their major creditor constituencies, including MUFG (the Revolving Credit Facility Administrative Agent) and the Revolving Credit Facility Lenders, the FLLO Ad Hoc Group, and Franklin.  Each of these constituents retained the following restructuring advisors:

- MUFG is represented by Sidley Austin LLP, as counsel, Houlihan Lokey Capital, Inc., as investment banker, and RPA Advisors, LLC, as financial advisor;

- the FLLO Ad Hoc Group is represented by Davis Polk & Wardwell LLP, as counsel, and Perella Weinberg Partners LP and Tudor, Pickering, Holt & Co., as investment bankers; and

- Franklin is represented by Akin Gump Strauss Hauer & Feld LLP, as counsel, Moelis & Company LLC, as investment banker, and FTI Consulting, Inc., as financial advisor.

The Debtors provided these creditors and their advisors with substantial diligence regarding the Debtors' operations, held multiple telephonic conferences to discuss the Debtors' business plan and potential estate causes of action, and worked cooperatively with all stakeholders regarding a mortgage analysis related to oil and gas assets securing the Debtors' prepetition secured debt.

The Debtors focused their conversations with Revolving Credit Facility Lenders on the terms of a potential DIP and potential exit financing and their conversations with the FLLO Ad Hoc Group and Franklin on all aspects of a comprehensive restructuring, including the terms of a new money investment.

On April 9, 2020, the Debtors, with the assistance of their advisors, launched a DIP marketing process.  The Debtors contacted five institutions within the first-tier of the Debtors' existing capital structure, as well as several financial institutions with junior secured debt holdings, to gauge their interest in providing DIP and exit financing to the Debtors.  In connection with this process and as described in greater detail herein, the Debtors received initial indications of interest from four lenders or groups of lenders within the Revolving Credit Facility, including three individual Revolving Credit Facility Lenders and the steering committee of Revolving Credit Facility Lenders led by MUFG.

By early May 2020, the Debtors were negotiating two competing proposals:  a $1.35 billion new money DIP facility with $2.5 billion in exit financing led by a prominent financial institution (the "non-MUFG proposal"), and a $925 million new money DIP facility led by MUFG that was supported by a majority of the Revolving Credit Facility lenders (the "MUFG proposal").  Although the Debtors initially preferred the non-MUFG proposal, the Debtors were unable to secure the requisite level of Revolving Credit Facility lender support for such proposal.  As a result, the Debtors and their advisors focused their efforts on negotiating the MUFG proposal.  These efforts bore fruit.  After almost six weeks of hard fought, arm's-length negotiations, the Debtors, MUFG, and 100 percent of the Revolving Credit Facility lenders agreed on the terms of a $925 million new money DIP facility.

In parallel with the DIP marketing process, the Debtors engaged with advisors to each of the FLLO Ad Hoc Group and Franklin regarding the terms of a comprehensive deleveraging transaction.  The Debtors highlighted in their initial conversations with the lenders' advisors in mid- to late-April that the preference period for certain liens granted in connection with the December 2019 Refinancing Transactions, including the issuance of the approximately $1.5 billion new-money FLLO Term Loan Facility and uptier of the Second Lien Notes, may expire in mid-May 2020

and that the possible expiration of the preference periods would inform the Debtors' determination of when to commence these chapter 11 cases. Specifically, the Debtors communicated that, absent agreement or significant progress toward agreement on the terms of a new money investment and deleveraging transaction, the Debtors likely would commence chapter 11 cases in advance of that date.

On April 27, 2020, the Debtors provided an initial restructuring term sheet to the advisors to the FLLO Ad Hoc Group and Franklin. Similar to the Plan, the initial proposal contemplated a new money rights offering, backstopped by the FLLO Ad Hoc Group and Franklin. The initial proposal also contemplated a recovery scenario in which the FLLO Term Loan Lenders and holders of Second Lien Notes would settle all potential claims and causes of action against them in consideration for, among other things, providing new money investment and contributing certain value to fund distributions to unsecured creditors. Alternatively, the initial proposal contemplated a no-settlement scenario in which the New Common Stock would be placed in escrow pending resolution of all potential claims and causes of action, after which it will be distributed in accordance with the priority of Claims, as established by such litigation. The FLLO Ad Hoc Group provided a counterproposal on May 5, 2020, that contemplated a similar new money commitment and settlement structure, with certain modifications to, among other things, the terms of the backstop commitment and allocation of recoveries compared to the initial proposal. In addition, the May 5 proposal contemplated, among other terms, a junior DIP financing, which would be used, in part, to satisfy the new money commitment. On May 6, 2020, Franklin provided a counterproposal that contemplated a similar new money commitment and settlement structure as the initial proposal, also with certain modifications to, among other things, the terms of the backstop commitment and allocation of recoveries compared to the initial proposal. The Debtors, the FLLO Ad Hoc Group, and Franklin continued to exchange counterproposals on May 6, 8, 9, 10, 11, and 12, each of which modified, among other things, the terms of the new money commitment and recoveries to creditors. The Debtors, the FLLO Ad Hoc Group, and Franklin reached agreement on substantially all material terms of the restructuring term sheet by May 12, 2020.

The pace of negotiations and the Debtors' ultimate ability to secure significant concessions from the FLLO Ad Hoc Group and Franklin was due in large part to the the specter of potential preference litigation hanging over negotiations. Specifically, the Debtors were able to reach agreement with the FLLO Ad Hoc Group members and Franklin on the parameters of a restructuring transaction that included a $600 million fully backstopped rights offering within approximately three weeks from the start of negotiations. Over the course of the next month while the Debtors continued to negotiate the DIP Facility, the Debtors, the FLLO Ad Hoc Group, and Franklin continued to refine the terms of the rights offering and other restructuring transactions, ultimately executing the Restructuring Support Agreement in late June.

The Restructuring Support Agreement memorialized the commitment made by the parties thereto to support the transactions described in the Restructuring Support Agreement and the Restructuring Term Sheet, and to negotiate with each other in good faith to finalize the documentation and agreements governing the Plan. The terms of the Plan are substantially the same as the terms of the Restructuring Support Agreement. The allocation of recoveries among Classes 4, 5, and 6 has not changed, even though the total enterprise value set forth in the Valuation Analysis is greater than the settlement total enterprise value set forth in the Restructuring Term Sheet.

## VII.    MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the chapter 11 cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and service providers, and other third parties following the commencement of the chapter 11 cases. On June 29, 2020, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. On July 31, 2020, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

The First Day Motions and all orders for relief granted in these chapter 11 cases, can be viewed free of charge at https://dm.epiq11.com/chesapeake. A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the First Day Declaration.

### 1.    DIP and Cash Collateral Motion

On the Petition Date, the Debtors Filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 22] (the "DIP and Cash Collateral Motion"), requesting that the Bankruptcy Court approve the DIP Facility provided by the DIP Lenders, consisting of $325 million in new money loans and a conversion of $325 million in loans under the Revolving Credit Facility to loans under the DIP Facility on an interim basis and $925 million in new money loans and a conversion of $1.179 billion in loans under the Revolving Credit Facility to loans under the DIP Facility on a final basis.  On June 29, 2020, the Bankruptcy Court entered an order approving the DIP Motion on interim basis [Docket No. 128].  After resolving several formal objections and informal comments to the DIP and Cash Collateral Motion, on July 31, 2020, the Debtors Filed an amended proposed order approving the DIP and Cash Collateral Motion on a final basis [Docket No. 590].  On July 31, 2020, the Bankruptcy Court entered an order approving the DIP and Cash Collateral Motion on a final basis [Docket No. 597] (the "DIP Order").

### 2.    Operational Motions

The Debtors also Filed several other motions on the Petition Date seeking relief to facilitate their operation in the ordinary course, including:

- Fuel Card Motion.  The *Debtors' Emergency Motion for Entry of a Limited Interim Order Authorizing the Debtors to Maintain Their Fuel Card Program in the Ordinary Course of Business* [Docket No. 5] (the "Fuel Card Motion"), seeking authorization to maintain the Debtors' fuel card program in the ordinary course of business until entry of the Interim Cash Management Order.  On the Petition Date, the Bankruptcy Court entered the limited interim order approving the Fuel Card Motion [Docket No. 23].

- Wages Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 10] (the "Wages Motion"), seeking authorization to honor and pay the Debtors' existing employee wages and benefit programs in the ordinary course of business during the pendency of the Chapter 11 Cases.  On June 29, 2020, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 131].

- Royalty Payments Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings, and (II) Granting Related Relief* [Docket No. 16] (the "Royalty Payments Motion"), seeking authorization for payment or application of funds attributable to (i) Mineral and Other Interests and Non-Op Working Interests (each as defined in the Royalty Payments Motion) and (ii) JIBs (as defined in the Royalty Payments Motion).  On June 29, 2020, the Bankruptcy Court entered an order approving the Royalty Payments Motion on a final basis [Docket No. 141] (the "Royalty Payments Order").  The Royalty Payments Order authorized, but did not direct, the Debtors to pay prepetition amounts owed on account of Mineral and Other Interests and Non-Op Working Interests.  Under authority of the Royalty Payments Order, the Debtors paid only those prepetition amounts that they regarded as owed and undisputed.  The Debtors intend to treat any prepetition right to payment that was not paid as a Claim under the Plan.  As set forth in the Royalty Payments Motion, the Debtors hold suspense funds as of the Petition Date, which are funds due and owing to certain holders of Royalty and Working Interests that are unpayable for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interest.  Subject to applicable laws, when and to the extent the Debtors are provided evidence or sufficient notice that the issue preventing payment of the suspense funds to particular holders of Mineral and Other Interests is resolved, the Debtors may release the suspense funds in question pursuant to the authority granted in the Royalty Payments Order.

- Lienholders Motion.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, and (D) 503(B)(9) Claims, and (II) Granting Related Relief* [Docket No. 15] (the "Lienholders Motion"), seeking authorization to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of (i) operating expenses, (ii) marketing expenses, (iii) shipping and warehousing claims, and (iv) 503(b)(9) claims.  On June 29, 2020, the Bankruptcy Court entered an order approving the Lienholders Motion on a final basis [Docket No. 140].

- Taxes Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 11] (the "Taxes Motion"), seeking authorization to pay certain prepetition taxes and fees as they come due during the pendency of the Debtors' chapter 11 cases.  On June 29, 2020, the Bankruptcy Court entered an order approving the Taxes Motion on a final basis [Docket No. 132].

- Utilities Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 17] (the "Utilities Motion"), seeking approval of the Debtors' proposed adequate assurance of payment for future utility services, and prohibiting utility companies from altering, refusing, or discontinuing service, and approving the Debtors' proposed procedures for resolving additional adequate assurance requests.  On June 29, 2020, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 143].

- Equity Trading Procedures Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 18] (the "Equity Trading Procedures Motion"), seeking approval of certain notification and hearing procedures (the "Equity Trading Procedures") related to certain transfers of Debtor Chesapeake's existing common stock and preferred stock and directing that any purchase, sale, or other transfer of common stock or preferred stock in violation of the Equity Trading Procedures be null and void *ab initio*.  On June 29, 2020, the Bankruptcy Court entered an order approving the Equity Trading Procedures Motion on a final basis [Docket No. 144].

- Insurance Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, Or Purchase Insurance Policies, and (II) Granting Related Relief* [Docket No. 12] (the "Insurance Motion"), seeking authorization to continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto, and renew, amend, supplement, extend, or purchase insurance policies in the ordinary course of business on a postpetition basis.  The Debtors Filed an amended proposed order approving the Insurance Motion on June 29, 2020 [Docket No. 110], which the Bankruptcy Court entered on a final basis on the same day [Docket No. 133].

- Hedging Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Enter into And Perform Under Hedge Agreements, (B) Grant Liens and Superpriority Claims, and (C) Modify the Automatic Stay, and (II) Granting Related Relief* [Docket No. 19] (the "Hedging Motion"), seeking authorization to, among other things, enter into and perform under amended and restated hedge agreements with the parties to the remaining prepetition hedge agreements (if any) and postpetition hedge agreements with the DIP Lenders or their affiliates; apply the proceeds from unwinding any remaining prepetition hedges to prepetition Revolving Credit Facility obligations; and grant the obligations under the hedge agreement administrative claims, subject to the terms and conditions contained in the DIP Credit Agreement and the DIP Order. The Debtors Filed an amended proposed order approving the Hedging Motion on June 29, 2020 [Docket No. 98], which the Bankruptcy Court entered on a final basis on the same day [Docket No. 129].

- Surety Bond Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief* [Docket No. 13] (the "Surety

Bond Motion") seeking authorization to maintain, renew, and modify their surety bond program in the ordinary course of business on a postpetition basis and to pay prepetition amounts related thereto. On June 29, 2020, the Bankruptcy Court entered an order approving the Surety Bond Motion on a final basis [Docket No. 138]. On July 22, 2020, the Debtors Filed an amended order approving the Surety Bond Motion [Docket No. 460], which the Bankruptcy Court entered on a final basis on the same day [Docket No. 469].

- Cash Management Motion. The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 14] (the "Cash Management Motion"), seeking authorization to (a) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; and (b) continue to perform intercompany transactions consistent with historical practice. On June 29, 2020, the Bankruptcy Court entered an order approving the Cash Management Motion on an interim basis [Docket No. 139]. The Debtors Filed an amended proposed order approving the Cash Management Motion on a final basis on June 29, 2020 [Docket No. 545]. On July 31, 2020, the Bankruptcy Court entered an order approving the Cash Management Motion on a final basis [Docket No. 594].

### 3. Administrative Motions

The Debtors also Filed several other motions on the Petition Date seeking relief to efficiently administer their Chapter 11 Cases, including:

- Joint Administration Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 4] (the "Joint Administration Motion"), seeking the procedural consolidation and joint administration of the Debtors' chapter 11 cases under the case of Chesapeake Energy Corporation. On the Petition Date, the Bankruptcy Court entered an order approving the Joint Administration Motion on a final basis [Docket No. 91].

- Creditor Matrix Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information* [Docket No. 7] (the "Creditor Matrix Motion"), seeking approval to File a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, waiving the requirement to File a list of and provide notice directly to the Debtor entity Chesapeake Energy Corporation's equity security holders, and authorizing the Debtors to redact certain personal identification information. On June 29, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 137].

- SOFA Extension Motion. The *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 8] (the "SOFA Extension Motion"), seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to August 26, 2020. On the Petition Date, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 136]. On August 21, 2020, the Debtors Filed the Schedules and SOFAs [Docket Nos. 901-983].

- Claims and Balloting Agent Application. The *Debtors' Emergency Application for Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent* [Docket No. 6] (the "Claims and Balloting Agent Application"), seeking authorization to employ Epiq to act as the Claims and Balloting Agent for the Debtors. On June 29, 2020, the Bankruptcy Court entered an order approving the Claims and Balloting Agent Application on a final basis [Docket No. 109].

**B.      Other Procedural and Administrative Motions**

During the Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Sell Down Record Date Motion.  The *Debtors' Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures For Trading in Certain Claims Against the Debtors Estates* [Docket No. 36], Filed on the Petition Date, seeking to establish an effective date (the "Sell Down Record Date") for notification and sell-down procedures for trading in claims against the Debtors' Estates.  On July 31, 2020, the Bankruptcy Court entered an order establishing July 31, 2020 as the Sell Down Record Date and approving certain notices related thereto [Docket No. 593].

- Non-Insider Retention Programs Motion.  The *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Non-Insider Retention Programs and (II) Granting Related Relief* [Docket No. 290] (the "Non-Insider Retention Programs Motion"), Filed on the July 7, 2020, seeking authority to pay, in the ordinary course of business, retention awards to approximately 1,920 non-insider employees consistent with prepetition practice. On July 31, 2020, the Bankruptcy Court entered an order granting the Non-Insider Retention Programs Motion on a final basis [Docket No. 595].

- Ordinary Course Professionals Motion.  The *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 288] (the "OCP Motion"), Filed on July 7, 2020, seeking to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their business.  On July 30, 2020, the Debtors filed a certificate of counsel stating no objections to the OCP Motion had been Filed by the applicable objection deadline and asking the Bankruptcy Court enter an order granting the OCP Motion [Docket No. 544]. On August 6, 2020 the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 656].  On September 3, 2020, September 14, 2020, and October 12, 2020, the Debtors Filed notices of additional professionals utilized in the ordinary course of business [Docket Nos. 1100, 1162, 1353].

- Interim Compensation Procedures Motion.  The *Debtors' Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 289] (the "Interim Compensation Motion"), Filed on July 7, 2020, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.  On July 30, 2020, the Debtors Filed a certificate of counsel stating no objections to the OCP Motion had been Filed and asking the Bankruptcy Court enter an order granting the OCP Motion [Docket No. 544]. On August 6, 2020, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 656]

- Claims Bar Date Motion.  The *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claims, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 367] (the "Bar Date Motion"), Filed on July 16, 2020, seeking approval of:  (a) September 25, 2020, at 5:00 p.m. (prevailing Central Time), as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) December 28, 2020, at 5:00 p.m. (prevailing Central Time) as the deadline for all Governmental Units to File Claims in the chapter 11 cases; (c) procedures for Filing Proofs of Claims; and (d) the form and manner of notice of the bar dates. In response to objections from the RO Committee (as defined herein) and the Eagle Ford Royalty Owner Plaintiffs (as defined herein), on August 11, 2020, the Debtors Filed an amended proposed order approving the Bar Date Motion [Docket No. 737] (the "Bar Date Order") and changing the proposed deadline for all non-Governmental Units to File Claims to October 30, 2020.  On August 13, 2020 the Bankruptcy Court entered the Bar Date Order on a final basis [Docket No. 787].

- De Minimis Asset Transactions Motion.  The *Debtors' Motion to Approve Procedures for De Minimis Asset Transactions* [Docket No. 287] (the "De Minimis Asset Transactions") Filed on July 7, 2020,

seeking authorization to implement expedited procedures related to de minimis asset transactions. On August 11, 2020, the Debtors File an amended proposed order approving the De Minimis Asset Sales Motion [Docket No. 706], which the Bankruptcy Court entered on a final basis on August 12, 2020 [Docket No. 715].

- Removal Extension Motion. The *Debtors' Motion for Entry of an Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 1070] (the "Removal Extension Motion"), Filed on September 1, 2020, seeking entry of an order extending the period within which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and rule 9027 of the Federal Rules of Bankruptcy Procedure by 120 days, up to an including January 24, 2021, without prejudice to the Debtors' right to seek further extensions. On September 24, 2020, the Debtors Filed an amended proposed order approving the Removal Extension Motion with certain modifications, including that: (a) the Debtors, CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC ("CNOOC"), and the Eagle Ford Royalty Owner Plaintiffs (as defined herein) may remove the matter pending in the Texas multi-district litigation pre-trial court, or the litigation that may be severed therefrom, through and including November 10, 2020; and (b) CNOOC and the Debtors may seek removal from any other action through and including January 25, 2021 [Docket No. 1207]. On September 25, 2020, the Bankruptcy Court entered the amended proposed order approving the Removal Extension Motion on a final basis [Docket No. 1231] (the "Removal Extension Order").

- Assumption or Rejection Extension Motion. The *Debtors' Motion for Entry of an Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 1228] (the "Assumption or Rejection Extension Motion") Filed on September 25, 2020, seeking entry of an order extending the time within which the Debtors may assume or reject unexpired leases of nonresidential real property for an additional 90 days, through and including January 25, 2021, without prejudice to the Debtors' right to seek further extensions. On October 16, 2020, PMBG Client Group Filed an objection to the Assumption or Rejection Extension Motion seeking the Bankruptcy Court to issue a ruling declaring that section 365 of the Bankruptcy Code in its entirety does not apply to oil and gas leases in Texas [Docket No. 1431]. On October 16, 2020, the RO Committee Filed an objection to the Assumption or Rejection Extension Motion to the extent the Debtors' sought to extent the time to assume or reject non-federal royalty leases [Docket No. 1433]. On October 21, 2020, the Debtors Filed a reply in support of the Assumption or Rejection Extension Motion [Docket No. 1470]. On October 21, 2020, the Debtors Filed a proposed order approving the Assumption or Rejection Extension Motion [Docket No. 1475]. At a hearing on October 22, 2020, the Bankruptcy Court approved the Assumption or Rejection Extension Motion on the record. On October 26, 2020, the Bankruptcy Court entered an order approving the Assumption or Rejection Extension Motion [Docket No. 1532].

- Exclusivity Extension Motion. The *Debtors' Motion to Extend the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1227] (the "Exclusivity Extension Motion") Filed on September 25, 2020, seeking entry of an order extending the period during which the Debtors have exclusive right to file a chapter 11 plan and the exclusive right to solicit a chapter 11 plan through and including January 25, 2021 and March 25, 2021, respectively, without prejudice to the Debtors' right to seek further extensions. On October 26, 2020, the Bankruptcy Court entered an order approving the Exclusivity Extension Motion [Docket No. 1531].

### C.     Retention of Professionals

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the chapter 11 cases:

- Alvarez & Marsal, as restructuring advisor [Docket Nos. 368, 719];

- Jackson Walker LLP, as restructuring co-counsel [Docket Nos. 370, 720]; and

- Kirkland & Ellis LLP, as restructuring co-counsel [Docket Nos. 372, 786].

On July 16, 2020, the Debtors Filed an application to retain Rothschild & Co US Inc. and Intrepid Partners, LLC (collectively, the "Investment Bankers"), as investment bankers to the Debtors [Docket No. 369]. The U.S. Trustee and UCC (as defined herein) each Filed a limited objection to the Debtors' retention of the Investment Bankers on July 21, 2020 and August 10, 2020, respectively [Docket Nos. 452, 692].  On October 9, 2020, the Bankruptcy Court approved the application to retain the Investment Bankers [Docket No. 1350].

On September 11, 2020, the Debtors Filed an application to retain PricewaterhouseCoopers LLP as audit services and tax consulting services provider to the Debtors [Docket No. 1148].  On October 12, 2020, the Debtors filed a proposed order approving the application to retain PricewaterhouseCoopers LLP [Docket No. 1354], which the Bankruptcy Court entered on October 14, 2020 [Docket No. 1373].

On September 17, 2020, the Debtors Filed an application to retain Ernst & Young LLP as restructuring, accounting, tax, and audit service provider to the Debtors [Docket No. 1176].  On October 14, 2020, the Debtors filed a proposed order approving the application to retain Ernst & Young LLP [Docket No. 1374], which the Bankruptcy Court entered on October 19, 2020 [Docket No. 1452].

### D.      Enforcement of the Automatic Stay

During the course of these Chapter 11 Case, the Debtors Filed or responded to various pleadings requesting the Bankruptcy Court enforce or impose the automatic stay against certain parties in accordance section 362 of the Bankruptcy Code, including:

- Petty Automatic Stay Adversary Proceeding.  The *Debtors' Emergency Motion for Entry of an Order Enforcing the Automatic Stay Against the Petty Business Enterprises, LP and Mary Elizabeth Sheldon Wier, or, in the Alternative, Granting Declaratory Relief* [Adv. Proc. Case No. 20-03399, Docket No. 1], Ad. Proc. No. 20-03399 (the "Petty Automatic Stay Adversary Proceeding"), Filed on August 24, 2020, seeking entry of an order enforcing the automatic stay or extending or imposing the automatic stay pursuant to section 105 of the Bankruptcy Code with respect to actions by Petty and other defendants (collectively, "Wier") to collect on prepetition claims arising under certain oil and gas leases governing property in Texas or terminate the Debtors' interests in such leases.  In the alternative, by the Petty Automatic Stay Adversary Proceeding, the Debtors seek declaratory judgements establishing (a) the amount of funds to be escrowed in compliance with the applicable leases and (b) with respect to Petty, for the 2018 forward period notice, and with respect to Wier, for the 2018-2019 period notice, that no escrow obligations have been validly triggered.  Following a hearing in the Bankruptcy Court on August 25, 2020, on August 28, 2020, the Bankruptcy Court entered an agreed order staying the operation of the escrow provisions under the applicable leases until September 30, 2020 at 5:00 p.m. (prevailing Central Time) [Adv. Proc. Case No. 20-03399, Docket No. 33].  On September 30, 2020, Petty, the Debtors, and certain other co-interest owners Filed the Petty Stipulation, whereby the parties agreed that, upon the escrow of $7.5 million from the Debtors and the co-interest owners, the Petty leases are in full force and effect and have not been terminated, thus resolving the adversary proceeding.  Pursuant to the Petty Stipulation, the parties also agreed on a timeline to litigate the Petty Lawsuit and any issues related to Petty's Proof of Claim.  Also on September 30, 2020, the Debtors and Wier announced on the record at a hearing before the Bankruptcy Court that a settlement was reached, the terms of which will be documented by October 7, 2020 and Filed by October 12, 2020.  On October 2, 2020, the Debtors and Wier Filed a stipulation extending the deadline for filing Proofs of Claim for Wier from October 30, 2020 to November 29, 2020 [Docket No. 1265], which the Bankruptcy Court entered on October 27, 2020 [Docket No. 1556].  On October 6, 2020, the Petty Automatic Stay Adversary Proceeding was dismissed with prejudice [Adv. Proc. Case No. 20-03399, Docket No. 48].  On October 14, 2020, the Debtors Filed a motion to approve the settlement by and among the Debtors and Wier [Docket No. 1377].

- PA AG Automatic Stay Motion.  The *Debtors' Emergency Motion for Entry of an Order Enforcing the Automatic Stay Against the Office of the Attorney General of the Commonwealth of Pennsylvania* [Docket No. 323] (the "PA AG Automatic Stay Motion"), Filed on July 14, 2020, seeking entry of an order enforcing the automatic stay with respect to the actions of the PA AG.  On July 16, 2020, the PA AG Filed a response in opposition to the PA AG Automatic Stay Motion [Docket No. 362].  On July 22, 2020, the Bankruptcy Court entered an order granting the PA AG Automatic Stay Motion [Docket No. 467] (the "PA AG Automatic Stay Order").  On August 3, 2020, the PA AG Filed a notice of appeal of

the PA AG Automatic Stay to the United States District Court for the Southern District of Texas [Docket No. 609] (the "PA AG Appeal").  On September 24, 2020, the PA AG Filed a brief in support of the PA AG Appeal [No. 4:20-cv-02725, Docket No. 8].

- DFW Automatic Stay Objection.  *DFW's Motion for Relief From Automatic Stay to Permit a Pending Appeal* [Docket No. 407] (the "DFW Lift Stay Motion"), Filed on July 17, 2020 by Dallas/Fort Worth International Airport Board, the City of Dallas, and the City of Fort Worth (collectively, "DFW"), seeking relief from the automatic stay to pursue an appeal regarding the severance of a "gas-lift" claim by an unrelated party pending in the Second Court of Appeals in Fort Worth, Texas.  On August 7, 2020, the Debtors Filed an objection to the DFW Lift Stay Motion [Docket No. 665].  On August 10, 2020, DFW Filed a reply in support of the DFW Lift Stay Motion [Docket No. 694].  At a hearing on August 12, 2020, the Bankruptcy Court denied the DFW Lift Stay Motion on the record.  On August 25, 2020, the Debtors and DFW Filed an agreed proposed order denying the DFW Lift Stay Motion [Docket No. 1006], which the Bankruptcy Court entered on August 26, 2020 [Docket No. 1012].

- Eagle Ford Automatic Stay Objection.  The *Eagle Ford Royalty Owner Plaintiffs' Motion for Relief from the Automatic Stay as to Debtors Chesapeake Energy Corporation; Chesapeake Operating, L.L.C. F/K/A Chesapeake Operating, Inc.; Chesapeake Exploration, L.L.C. as Successor by Merger to Chesapeake Exploration, L.P.; and Chesapeake Energy Marketing, L.L.C., F/K/A Chesapeake Energy Marketing, Inc.* [Docket No. 424] (the "Eagle Ford Lift Stay Motion") Filed on July 18, 2020, by a group of 28 Eagle Ford Royalty Owner Plaintiffs, seeking to lift the automatic stay to proceed with the Eagle Ford MDL.  On August 7, 2020, the Debtors Filed an objection to the Eagle Ford Lift Stay Motion [Docket No. 666].  On August 7, 2020, CNOOC filed a notice of joinder to the Eagle Ford Lift Stay Motion [Docket No. 667].  At a hearing on August 12, 2020, the Bankruptcy Court denied the Eagle Ford Lift Stay Motion on the record.  On August 25, 2020, the Debtors and the Eagle Ford Royalty Owner Plaintiffs Filed a proposed order denying the Eagle Ford Lift Stay Motion [Docket No. 1007], which the Bankruptcy Court entered on August 26, 2020 [Docket No. 1013].

- Railroad Commission Lift Stay Stipulation.  The *Stipulation and Order by the Debtors Granting Relief from Automatic Stay* [Docket No. 1057] (the "Railroad Commission Stipulation") Filed on July 31, 2020, by the Debtors seeking to modify the automatic stay with respect to, and solely to issue a ruling on, the Debtors' motion to dismiss a complaint pending before the Railroad Commission of Texas (the "Railroad Commission") seeking the Railroad Commission to revoke the permit of one of the Debtors' wells.  On September 2, 2020, Stefanie and Timothy Delasandro [Docket No. 1077] Filed a limited objection to the Railroad Commission Stipulation to the extent it sought to provide the Debtors with relief from the stay while prohibiting the Delasandros from exercising their rights with respect to the proceeding before the Railroad Commission.  On September 3, 2020, the Bankruptcy Court entered the Railroad Commission Stipulation [Docket No. 1091].  On September 17, 2020, the Delasandros Filed a motion for rehearing or to alter or amend the Railroad Commission Stipulation [Docket No. 1175] (the "Delasandro Motion for Rehearing").  On October 8, 2020, the Debtors Filed an objection to the Delasandro Motion for Rehearing [Docket No. 1329].  On October 13, 2020, the Delasandros Filed a reply to the Debtors' objection to the Delasandro Motion for Rehearing [Docket No. 1361].  A hearing on the Delasandro Motion for Rehearing is currently scheduled for November 20, 2020.

- CNOOC Lift Stay Stipulation.  The *Stipulation and Order by and Among Debtors Granting and CNOOC Energy U.S.A. LLC Granting Relief from Automatic Stay* [Docket No. 1058] (the "CNOOC Stipulation") Filed on July 31, 2020 by and between the Debtors and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC ("CNOOC") seeking to modify the automatic stay with respect to, and solely to issue a ruling on, the Debtors' appeal of the United States District Court for the Southern District of Texas's approval of CNOOC's motion to vacate arbitration proceedings.  On September 9, 2020, the Bankruptcy Court entered the CNOOC Stipulation [Docket No. 1130].

- Lombrana Lift Stay Stipulation.  The *Joint Stipulation and Agreed Order by and Among Debtors and Maricela H. Lombrana, Individually and as the Representative of the Estate of Guadalupe Lombrana, Genesis Lombrana and Maricela Lombrana Granting Relief from the Automatic Stay* [Docket No. 1156] (the "Lombrana Lift Stay Stipulation") Filed on September 14, 2020 by and between the Debtors and Maricela H. Lombrana, individually and as the representative of the estate of Guadalupe Lombrana,

Genesis Lombrana and Maricela Lombrana (collectively, the "Lombranas") seeking to modify the automatic stay with respect to, and solely to issue a ruling on or settlement of certain liability insurance claims asserted in a proceeding pending in the United States District Court in Dimmit County, Texas. On October 6, 2020, the Bankruptcy Court entered the Lombrana Lift Stay Stipulation [Docket No. 1298].

- **Johnson Lift Stay Objection.** *Allen Johnson,* et al*., and Rodney Hudson,* et al*.'s Motion for Relief from Stay* [Docket No. 1200] (the "Johnson Lift Stay Motion") Filed on September 23, 2020 by the Johnson-Hudson Parties seeking to lift the automatic stay to proceed with the *Johnson* and *Hudson* cases pending in the United States District Court for the Western District of Louisiana regarding alleged deductions from oil and gas proceeds. On September 23, 2020, the Johnson-Hudson Parties Filed a motion for adequate protection requesting the Bankruptcy Court enter an order directing the Debtors to deposit the oil and gas proceeds into the Court's registry pending resolution from the Johnson Lift Stay Motion and the underlying litigation [Docket No. 1201] (the "Johnson Adequate Protection Motion," and together with the Johnson Lift Stay Motion, the "Johnson Motions"). On September 28, 2020, the Johnson-Hudson Parties Filed an emergency motion to expedite discovery related to the Johnson Motions in advance of the hearing on October 22, 2020 [Docket No. 1237]. Following a status conference on September 30, 2020, on October 2, 2020, the Debtors Filed the Motion for Protective Order limiting the Johnson-Hudson Parties' discovery requests and setting a timeline to respond to the same. On October 5, 2020, the Johnson-Hudson Parties Filed a response to the Motion for Protective Order [Docket No. 1294]. On October 5, 2020, Rodney Hudson and other movants related to the *Hudson* case Filed the Hudson Class Certification Motion. At a hearing on October 7, 2020, the Bankruptcy Court granted the Motion for Protective Order with respect to certain discovery requests on the record. On October 15, 2020, the Debtors Filed an objection to the Johnson Motions [Docket No. 1402]. On October 21, 2020, the Johnson-Hudson Parties Filed a rely in support of the Johnson Motions [Docket No. 1469]. A hearing on the Johnson Motions and the Hudson Class Certification Motion is currently scheduled for November 6, 2020.

- **Nelson Lift Stay Objection.** *Saundra Nelson's Motion for Relief from Stay* [Docket No. 1235] (the "Nelson Lift Stay Motion") Filed on September 28, 2020 by Saundra Louise Woods Nelson seeking to lift the automatic stay to proceed with the *Nelson* case pending in the United States District Court for the Western District of Louisiana regarding alleged deductions from oil and gas proceeds. On September 28, 2020, Nelson Filed a motion for adequate protection requesting the Bankruptcy Court enter an order directing the Debtors to deposit the oil and gas proceeds into the court's registry pending resolution from the Nelson Lift Stay Motion and the underlying litigation [Docket No. 1236] (the "Nelson Adequate Protection Motion"). On October 15, 2020, the Debtors Filed an objection to the Nelson Lift Stay Motion and the Nelson Adequate Protection Motion [Docket No. 1409]. A hearing on the Nelson Adequate Protection Motion is currently scheduled for October 30, 2020.

- **J. Fleet and Martin Lift Stay Objection.** *J. Fleet Oil & Gas Production Company, L.L.C. and Martin Producing, L.L.C.'s Motion for Relief from the Automatic Stay as to the Debtors Chesapeake Louisiana, L.P., Chesapeake Operating, Inc., Chesapeake Energy Corporation, and Chesapeake Energy Marketing, Inc.,* [Docket No. 1238] (the "J. Fleet Lift Stay Motion") Filed on September 28, 2020 by J. Fleet Oil & Gas Production Company, L.L.C. and Martin Producing, L.L.C. seeking to lift the automatic stay to proceed with a case pending in the United States District Court in the Western District of Louisiana, Shreveport Division regarding breach of contract and fiduciary duty claims. On October 15, 2020, the Debtors Filed an objection to the J. Fleet Lift Stay Motion [Docket No. 1410]. At a hearing on October 22, 2020, the Bankruptcy Court denied the J. Fleet Lift Stay Motion on the record. On October 26, 2020, the Debtors Filed a proposed order denying the J. Fleet Lift Stay Motion [Docket No. 1525].

- **Bedsole Lift Stay Motion.** The *Motion to Lift Automatic Stay* [Docket No. 1248] (the "Bedsole Lift Stay Motion") Filed on September 30, 2020 by John H. Bedsole and Bedsole Land Company, seeking to lift the automatic stay to proceed with a case pending in the United States District Court in DeSoto Parish, Louisiana to cancel an oil, gas and mineral lease held by the Debtors for the Debtors' alleged failure to pay royalties. A hearing on the Bedsole Lift Stay Motion is currently scheduled for November 6, 2020.

- **Byers Lift Stay Motion.** The *Motion for Partial Relief from Automatic Stay* [Docket No. 1249] (the "Byers Lift Stay Motion") Filed on September 30, 2020 by Rosa M. Byers and the State of Louisiana Company, seeking to partially lift the automatic stay to proceed with a case pending in the United States District Court in Caddo Parish, Louisiana regarding the determination of royalties payable from certain lands located in Louisiana.  Although the Debtors are a party to the pending case, the Byers and the State of Louisiana do not allege the Debtors have any interest or claim to the royalties attributable to the subject property.  A hearing on the Byers Lift Stay Motion is currently scheduled for November 6, 2020.

- **Delasandro Lift Stay Motion.** *Stefanie Delasandro's Motion for Relief from the Automatic Stay as to Esquisto Resources II, LLC, WildHorse Resources Management, LLC, WHR Eagle Ford LLC and Chesapeake Operating, LLC* [Docket No. 1293] (the "Delasandro Lift Stay Motion") Filed on October 5, 2020 by Stephanie Delasandro, seeking to lift the automatic stay to proceed with a case pending in the United States District Court in Brazos County, Texas, regarding allegations of wrongful pooling, breach of contract, trespass, and termination of oil and gas leases.  A hearing on the Delasandro Lift Stay Motion is currently scheduled for November 20, 2020.

- **Alaniz Lift Stay Stipulation.** The *Joint Stipulation and Agreed Order by and Among Debtors and Juan Carlos Alaniz Granting Relief from the Automatic Stay* [Docket No. 1308] (the "Alaniz Lift Stay Stipulation") Filed on October 6, 2020 by the Debtors and Juan Carlos Alaniz seeking to modify the automatic stay with respect to, and solely to the extent necessary to enable certain claims in a case pending in the United States District Court in Maverick, Texas to proceed to final settlement and judgment and to enable Alaniz to recover any final settlement or judgment from certain of the Debtors' insurers.  On October 27, 2020, the Bankruptcy Court entered the Alaniz Lift Stay Stipulation [Docket No. 1557].

- **Fira Lift Stay Stipulation.** The *Joint Stipulation and Agreed Order by and Among Debtors and Eloy Fira Granting Relief from the Automatic Stay* [Docket No. 1328] (the "Fira Lift Stay Stipulation") Filed on October 8, 2020 by the Debtors and Eloy Fira seeking to modify the automatic stay with respect to, and solely to the extent necessary to enable certain claims in a case pending in the United States District Court in Maverick, Texas to proceed to final settlement and judgment and to enable Fira to recover any final settlement or judgment (i) from certain of the Debtors' insurers or (ii) to the extent not satisfied from the proceeds of the applicable insurance policies, as a general unsecured prepetition claim in the Chapter 11 Cases.

- **Cobb Lift Stay Motion.** The *Motion of Justin Cobb, Kristine Cobb, and Linda Milanovich for Relief from the Automatic Stay* [Docket No. 1448] (the "Cobb Lift Stay Motion") Filed on October 19, 2020 by Justin Cobb, Kristine Cobb, and Linda Milanovich and certain related parties, seeking to lift the automatic stay to liquidate their wrongful death and personal injury claims to finality in the United States District Court in Dallas County, Texas, but not to collect on any judgment against the Debtors or their estates except through the bankruptcy process. A hearing on the Cobb Lift Stay Motion is currently scheduled for November 20, 2020.

- **Tributary Lift Stay Motion.** *Tributary Resources, LLC's Motion for Relief from the Automatic Stay to Pursue Prepetition Quiet Title Action* [Docket No. 1451] (the "Tributary Lift Stay Motion") Filed on October 19, 2020, by Tributary Resources, LLC ("Tributary") seeking to lift the automatic stay to proceed with a quiet-title action pending in the United States District Court of Kingfisher County, Oklahoma regarding a disputed oil and gas lease.  Contemporaneously with the Tributary Lift Stay Motion, Tributary also Filed a motion for an application for an administrative expense claim related to postpetition oil and gas proceeds allegedly from the wells drilled under the disputed lease [Docket No. 1451] and a motion to extend the deadline to object to the non-dischargeability deadline under section 523 of the Bankruptcy Code to November 7, 2020 [Docket No. 1449].  On October 22, 2020, Tributary withdrew its motion to extend the deadline [Docket No. 1477].  A hearing on the Tributary Lift Stay Motion is currently scheduled for November 20, 2020.

- **Hendrix Lift Stay Motion.** The *Motion of Madison Hendrix; Traci Hendrix, Individually and as Next of Kin to the Estate of Bradley Hendrix; Norma Lyn Maldonado, Individually and as Representative of the Estate of Bria Amador Maldonado; and Erika Beddingfield, Individually and as Next Friend of M.B., a*

*Minor, and as Representative of the Estate of Windell Beddingfield, Deceased for Relief from Stay to Conclude Pending Texas State Court Litigation* [Docket No. 1558] (the "Hendrix Lift Stay Motion") Filed on October 27, 2020, by Madison Hendrix, Traci Hendrix, individually and as the personal representative of the Estate of Bradley Hendrix, Norma Lyn Maldonado, individually and as representative of the Estate of Brian Amador Maldonado, and Erika Beddingfield, individually, and as next friend of M.B., a minor, and as representative of the Estate of Windell Beddingfield (collectively, the "Hendrix Parties") seeking to lift the automatic stay to proceed with lawsuits for personal injurie claims pending in the United States District Court of Dallas County, Texas.   A hearing on the Hendrix Lift Stay Motion is currently scheduled for November 20, 2020.

- Ramirez Lift Stay Motion.  The *Motion for Relief from the Automatic Stay* [Docket No. 1606] Filed on October 29, 2020, by Catherine Ramirez seeking to lift the automatic stay to pursue available insurance proceeds that would cover damages in a personal injury action against certain of the Debtors' pending in the United States District Court of Atacosa County, Texas.  A hearing on the Ramirez Lift Stay Motion is currently scheduled for December 4, 2020.

### E.        Contract and Lease Rejection

Since the Petition Date, the Debtors have Filed several motions seeking to reject unnecessary or burdensome executory contracts or unexpired leases [Docket No. 27, 35 598, 814, 1183].  The Debtors may file additional motions seeking to reject unnecessary or burdensome executory contracts or unexpired leases throughout these Chapter 11 Cases.

### 1.        ETC Texas Contract Rejection Motion

On the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* [Docket No. 27] (the "Contract Rejection Motion"), seeking authorization to reject certain executory contracts effective as of July 1, 2020.  On July 24, 2020, ETC Texas Pipeline, Ltd. ("ETC Texas") Filed an objection to the Contract Rejection Motion, arguing that certain of the ETC Texas contracts subject to rejection (the "ETC Texas Agreement") contain covenants running with the land that are not rejectable [Docket No. 487].  On July 30, 2020, the Debtors filed an amended proposed order approving the Contract Rejection Motion [Docket No. 571] that, among other things, removed the ETC Texas Agreement from the schedule of contracts to be rejected.  On July 31, 2020, the Bankruptcy Court entered the amended order approving the Contract Rejection Motion on a final basis [Docket No. 596].  On August 10, 2020, the Debtors and ETC Texas Filed a stipulation and agreed scheduling order [Docket No. 697] establishing certain dates in connection with ETC Texas's objection to the Contract Rejection Motion and tolling the dates and deadlines under the ETC Texas Agreement.  On August 17, 2020, the Debtors and ETC Texas Filed their respective briefs in support of [Docket No. 825] and in opposition to [Docket No. 810] the Contract Rejection Motion as it relates to the ETC Texas Agreement.  On August 24, 2020, the Debtors and ETC Texas each filed a response to the other party's brief [Docket Nos. 999 and 1001].  On August 27, 2020, the Debtors and ETC Texas each filed a reply in support of [Docket No. 1011] and in opposition to [Docket No. 1033] the Contract Rejection Motion as it relates to the ETC Texas Agreement. On August 28, 2020, the Debtors and ETC Texas filed joint stipulated facts in connection with the arguments on the Contract Rejection Motion as it relates to the ETC Texas Agreement [Docket No. 1038].  On August 31, 2020, the Debtors Filed an amended order authorizing rejection of the ETC Texas Agreement [Docket No. 1046]. On August 31, 2020, the Bankruptcy Court heard arguments in support and opposition of the Contract Rejection Motion.  On October 28, 2020, the Bankruptcy Court entered an order granting the Contract Rejection Motion [Docket No. 1580].

### 2.        FERC Contract Rejection Motion

#### (a)        FERC Petitions

The Debtors are parties to certain negotiated rate firm natural gas transportation service agreements with ETC Tiger Pipeline, LLC (such counterparty, "ETC Tiger," and such agreement, the "ETC Tiger Agreement"), Gulf South Pipeline Company, LP (such counterparty, "Gulf South," and such agreements, the "Gulf South Agreements"), and Stagecoach Pipeline & Storage Company, LLC (such counterparty, "Stagecoach," and such agreements, the

"Stagecoach Agreements"), the rates and terms and conditions of which are subject to a Federal Energy Regulatory Commission ("FERC") Gas Tariff.

On May 19, 2020, anticipating these Chapter 11 Cases and expecting that the Debtors would move the Bankruptcy Court to authorize rejection of the ETC Tiger Agreement, ETC Tiger Filed a Petition for Declaratory Order and Request for Expedited Action with FERC, requesting a declaratory judgement that "[the Debtors] must petition [FERC] for approval to abrogate, modify, or amend" the ETC Tiger Agreement.[29]  More generally, ETC Tiger requested that FERC clarify its "unsettled role"[30] and find that "if a party to a [FERC]-jurisdictional contract under the [Natural Gas Act] seeks to reject such an agreement in bankruptcy court, the party must receive [Natural Gas Act] Section 5 approval before a bankruptcy court can determine whether to reject the agreement."[31]

On May 22, 2020, Gulf South Filed a Petition for Declaratory Order and Motion for Shortened Answer Period with FERC, similarly anticipating the Debtors' chapter 11 filing and requesting a declaratory judgment that "Chesapeake is required to seek [FERC] approval in order to modify or abrogate the [Gulf South Agreements] regardless of whether it seeks to reject the contracts in bankruptcy."[32]

On June 10, 2020, Stagecoach Filed a Petition for Declaratory Order and Motion for Shortened Comment Period with FERC, also anticipating the Debtors' chapter 11 filing and requesting a declaratory judgment that "Chesapeake must seek [FERC] approval in order to abrogate or modify the regulatory obligations inherent in the Chesapeake [Stagecoach Agreements]."[33]

FERC established June 18, 2020, June 25, 2020, and July 9, 2020 as the comment due dates for the Tiger Petition, Gulf South Petition, and Stagecoach Petition, respectively. The Debtors Filed their responsive comment to the Tiger Petition on June 18, 2020 and the Gulf South Petition on June 25, 2020.

On June 22, 2020, FERC issued the Order on Petition for Declaratory Order in connection with the Tiger Petition.[34]  In the Tiger Order, FERC stated that the Debtors may not "modify the rates, terms, or conditions of its transportation agreements with ETC Tiger by rejecting those contracts in bankruptcy" and "must obtain approval from [FERC] to do so."[35]  On July 10, 2020, the Debtors and FERC Filed a stipulation and agreed order that provided, among other things, that FERC would not issue any ruling in connection with the FERC Petitions during the Chapter 11 Cases [Docket No. 312], which the Bankruptcy Court entered on July 17, 2020 [Docket No. 417] (the "FERC Stipulation").  On July 22, 2020, out of an abundance of caution to preserve the Debtors' right to appeal, Debtor CEML filed the rehearing request (the "Rehearing Request") with FERC on the basis that FERC erred in its June 22 order by failing to follow clear statutory language in the Bankruptcy Code, relevant court decisions, and its own precedent.[36]  On August 21, 2020, FERC issued an order denying the Rehearing Request (the "Rehearing Order"), which significantly expanded on the findings of the initial in direct contravention of the FERC Stipulation.[37]  On October 4, 2020, the Debtors Filed an emergency motion for entry of an order enforcing the FERC Stipulation and finding the Rehearing Order is void [Docket No. 1281] (the "Motion to Enforce FERC Stipulation").  On October 14, 2020, ETC Tiger and FERC each Filed a response to the Motion to Enforce FERC Stipulation [Docket Nos. 1376,

---

[29]   Petition for Declaratory Order and Request for Expedited Action of ETC Tiger Pipeline, LLC, dated May 19, 2020, FERC Docket No. RP20-881-000 (the "Tiger Petition").

[30]   *Id.* at 14.

[31]   *Id.* at 3.

[32]   Petition for Declaratory Order and Motion for Shortened Answer Period, dated May 22, 2020, FERC Docket No. RP20-881-000 (the "Gulf South Petition"), at 9.

[33]   Petition for Declaratory Order and Motion for Shortened Comment Period, and Request for Expedited Action dated June 9, 2020 FERC Docket No. RP20-952-000, at 2(the "Stagecoach Petition" and together with the Tiger Petition and Gulf South Agreements, the "FERC Petitions"), at 2.

[34]   Order on Petition for Declaratory Order, dated June 22, 2020, FERC Docket No. RP20-881-000, 171 FERC ¶ 61,248 (the "Tiger Order").

[35]   *Id.* at 24.

[36]   *Request for Rehearing of Chesapeake Energy Marketing, LLC,* dated July 22, 2020, FERC Docket No. RP20-881-00.

[37]   *Order Denying Rehearing,* dated Aug. 1, 2020, FERC Docket No. RP20-881-001.

1379].  At a hearing on October 15, 2020, the Bankruptcy Court denied the Motion to Enforce FERC Stipulation without prejudice on the record on the basis that FERC represented and agreed to be bound by the representation that the sole legal effect of the Rehearing Order was to deny the Debtors' Rehearing Request [Docket No. 1391].

### (b)   Rejection of the Gulf South Agreement and ETC Tiger Agreement

In the period leading up to the Petition Date, the Debtors analyzed their executory contracts and unexpired leases and determined that, in their business judgment, the ETC Tiger Agreement and Gulf South Agreements, which obligate the Debtors to pay approximately $311 million in aggregate gross costs through their remaining terms, are unnecessary and burdensome to the Debtors' estates.  Accordingly, on the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* [Docket No. 35] (the "FERC Contract Rejection Motion"), seeking authorization to reject certain FERC-governed executory contracts effective as of July 1, 2020.  Additionally, on the Petition Date, the Debtors commenced an adversary proceeding for, among other things, a declaratory judgement confirming the Bankruptcy Court's exclusive jurisdiction to determine the Debtors' right to reject the ETC Tiger Agreement, Gulf South Agreements, and the Stagecoach Agreement (as applicable) under section 365 of the Bankruptcy Code—which FERC cannot preempt or veto [Ad. Proc. No. 20-03231].  The adversary proceeding was resolved on July 17, 2020, when the Bankruptcy Court signed the FERC Stipulation.

On July 1, 2020, the Debtors and Gulf South Filed an agreed order seeking authorization to immediately reject the Gulf South Agreements [Docket No. 187] (the "Gulf South Agreed Order").  The Bankruptcy Court entered the Gulf South Agreed Order on July 1, 2020.  On July 14, 2020, FERC Filed a motion to reconsider the Gulf South Agreement Order [Docket No. 327] (the "Motion to Reconsider"), arguing the Bankruptcy Court's retention of "exclusive" jurisdiction to implement, interpret, and enforce the Gulf South Agreed Order was a fundamental error in law.  On July 28, 2020, the Bankruptcy Court granted the Motion to Reconsider, in part, and limited the Bankruptcy Court's jurisdiction with regard to the Gulf South Agreed Order to "the maximum extend allowed by law under applicable circumstances" [Docket No. 515].

On July 24, 2020, ETC Tiger Filed a motion seeking to withdraw the reference of the FERC Contract Rejection Motion to the District Court [Docket No. 491] (the "Motion to Withdraw") and an objection to the FERC Contract Rejection [Docket No. 492], along with an accompanying scheduling order [Docket No. 491].  On August 18, 2020, ETC Tiger and the Debtors commenced discovery on the FERC Contract Rejection Motion.  On August 20, 2020, the Debtors Filed an objection to the Motion to Withdraw [Docket No. 870].  On August 25, 2020, the Debtors Filed a reply in support of the FERC Contract Rejection Motion [Docket No. 1011].  On August 31, 2020, the Bankruptcy Court heard arguments in support and opposition of the Motion to Withdraw.  On September 3, 2020, the Bankruptcy Court recommended that the District Court deny the Motion to Withdraw. [Docket No. 1092].  A decision on the FERC Contract Rejection Motion is currently pending.

### 3.   Sand Mine Contract Rejection Motion

On July 31, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Sand Mine Contracts Effective as of July 31, 2020 and (II) Granting Related Relief* [Docket No. 598] (the "Sand Mine Contract Rejection Motion"), seeking authorization to reject certain leases for equipment and machinery used in the Debtors' sand mine operations and a sand supply contract effective as of July 31, 2020.  On August 31, 2020, the Bankruptcy Court entered the order authorizing rejection of the sand mine equipment and machinery leases and the sand supply contract [Docket No. 1054].

### 4.   IT Agreements and Non-Residential Real Property Leases Rejection Motion

On August 17, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Effective as of August 17, 2020 and (II) Granting Related Relief* [Docket No. 814] (the "IT Agreements and Non-Residential Real Property Leases Rejection Motion"), seeking authorization to reject certain IT agreements and leases of non-residential real property effective as of August 17, 2020.  On September 11, 2020, the Debtors Filed a proposed agreed order approving the IT Agreements and Non-Residential Real Property Leases Rejection Motion [Docket No. 1146].  On September 18, 2020, the Bankruptcy Court entered the order authorizing the rejection of the IT agreements and leases of non-residential real property [Docket No. 1187].

### 5.     Tower Leases Rejection Motion

On September 18, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Tower Leases Effective as of September 18, 2020 and (II) Granting Related Relief* [Docket No. 1183] (the "Tower Leases Rejection Motion") seeking authorization to reject certain license agreements for use of tower facilities.

### 6.     Houston Lease Rejection Motion

On October 20, 2020, the *Debtors Filed the Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of the Houston Lease and Sublease Effective as of October 30, 2020 and (II) Granting Related Relief* [Docket No. 1466] (the "Houston Rejection Motion") seeking authorization to reject a lease agreement for office space in Houston, Texas (the "Houston Lease"), and a sublease agreement (the "Sublease") regarding the Debtors' sublet of a portion of the Houston Lease to Gavilan Resources, LLC ("Gavilan"). Concurrently with the Houston Rejection Motion, the Debtors Filed the *Stipulation and Agreed Order By and Among the Chesapeake Debtors and the Gavilan Debtors Granting Relief from the Automatic Stay for the Exclusive Purpose of Rejecting a Lease and Sublease in Houston* [Docket No. 1465], seeking to lift the automatic stay in Gavilan's pending bankruptcy cases to reject to Sublease.

### F.     Exit Financing and Backstop Commitment Agreement

On July 28, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Incur and Pay the Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief* [Docket No. 523] (the "Exit Financing Motion"), seeking approval of the payment of certain expenses incurred in connection with the Exit Facilities incurred within 60 days of the Petition Date. Also on July 28, 2020, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* [Docket No. 520] (the "Backstop Commitment Agreement Motion"), seeking approval of the Debtors' entry into the Backstop Commitment Agreement and payment of related costs. On August 11, 2020, the Debtors Filed an amended proposed order approving the Backstop Commitment Agreement Motion [Docket No. 700]. On August 18, 2020, the UCC (as defined herein) Filed an omnibus objection to the Exit Financing Motion and Backstop Commitment Agreement Motion [Docket No. 836]. On August 19, 2020, the RO Committee (as defined herein) Filed a limited objection to the Exit Financing Motion and the Backstop Commitment Agreement Motion [Docket No. 853]. On August 20, 2020, the Debtors Filed amended proposed orders approving the Exit Financing Motion [Docket No. 868] and Backstop Commitment Agreement Motion [Docket No. 867]. On August 21, 2020, the RO Committee Filed an amended proposed order approving the Backstop Commitment Agreement Motion, reserving its rights with respect thereto [Docket No. 886]. On August 21, 2020, the Bankruptcy Court entered orders approving the Exit Financing Motion [Docket No. 898] and the Backstop Commitment Agreement Motion [Docket No. 898].

The Backstop Commitment Agreement contemplates that Rights Offering Participants may exercise their Rights to purchase New Common Stock at a 35 percent discount to the equity value implied by the settlement total enterprise value of $3.25 billion set forth in the Restructuring Support Agreement. The discount to the equity value implied by the total enterprise value as set forth in the Valuation Analysis is approximately 59 percent. The Debtors have not taken proactive steps to remarket or reprice the Backstop following entry of the Backstop Commitment Order. The Debtors also have not received any inquiries or proposals regarding alternate new money investments.

### G.     Mid-Continent Asset Sale

On August 3, 2020, the Debtors and their advisors commenced a marketing process to divest the Debtors' oil and gas properties and related infrastructure in the state of Oklahoma and Hemphill County in the state of Texas (collectively, the "Mid-Con Assets"). In connection with the potential sale of the Mid-Con Assets, the Debtors reached out to 85 potential purchasers and executed nondisclosure agreements with and provided data room access to 58 potential purchasers. On September 11, 2020, the Debtors Filed a motion (the "Bidding Procedures and Sale Motion") seeking the entry of an order (the "Bidding Procedures Order") approving bidding procedures in connection with the potential sale of the Mid-Con Assets and—should the marketing process and bidding procedures generate a value-maximizing bid—the entry of an order (the "Sale Order") authorizing and approving the sale of the Mid-Con Assets [Docket No. 1147].

On October 2, 2020, Stone Creek Operating, LLC Filed a limited objection to the Bidding Procedures and Sale Motion to the extent it purports to market, sell, or transfer certain oil and gas leasehold located in Oklahoma [Docket No. 1266] and the RO Committee Filed a limited objection to the Bidding Procedures and Sale Motion to, among other things, protect the interests of royalty owners during the sale process [Docket No. 1278]. On October 4, 2020, Tributary Resources, LLC Filed a reservation of rights with respect to the Bidding Procedures and Sale Motion [Docket No. 1280]. On October 6, 2020, the Debtors Filed an amended proposed Bidding Procedures Order, which the Bankruptcy Court entered on the same day [Docket No. 1305].

On October 9, 2020, the Debtors and Tapstone Energy, LLC ("Tapstone") executed a stalking horse purchase agreement for the sale of the Mid-Con Assets in the amount of $85 million. On October 13, 2020, the Debtors Filed and served the notice of auction for the sale of the Mid-Con Assets [Docket No. 1363]. On October 13, 2020, the Debtors Filed a notice of selection of Tapstone to act as stalking horse bidder [Docket No. 1366]. On October 13, 2020, the Debtors Filed a proposed Sale Order [Docket No. 1367]. The hearing on the Sale Order is currently scheduled for November 13, 2020.

To the extent the Debtors move forward with the sale of the non-core Mid-Con Assets, the proceeds generated from the sale will provide increased liquidity to fund distributions under the Plan and the Debtors' business following emergence from these chapter 11 cases.

### H.     Appointment of Creditors' Committees

On July 9, 2020, the U.S. Trustee appointed seven members to the UCC [Docket No. 301]. The UCC is currently comprised of: (a) Wilmington Savings Fund Society, FSB; (b) the Bank of New York Mellon Trust Company, N.A.; (c) Energy Transfer; (d) the Williams Companies, Inc.; (e) Glass Mountain Pipeline, LLC; (f) Gulf South Pipeline Company, LLC; and (g) Halliburton Energy Services, Inc.

On August 31, 2020, the UCC Filed applications seeking to retain Brown Rudnick LLP and Norton Rose Fulbright US LLP as co-counsel [Docket No. 725, 727], which the Bankruptcy Court approved on September 10, 2020 [Docket Nos. 1131, 1132], and AlixPartners, LLP as financial advisor [Docket No. 780], which the Bankruptcy Court approved on September 21, 2020 [Docket No. 1186]. On October 1, 2020, the UCC Filed an applications seeking to retain Back Bay Management Corporation and its division, The Michael-Shaked Group, as valuation consultants and Dr. Isreal Shaked as valuation witness [Docket No. 1255] and Opportune LLP as special valuation and industry advisor [Docket No. 1256], which the Bankruptcy Court approved on October 26, 2020 [Docket Nos. 1533, 1534].

On July 24, 2020, the U.S. Trustee appointed nine members to the Committee of Royalty Owners (the "RO Committee") [Docket No. 488]. On July 30, 2020, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order Disbanding the Royalty Committee* (the "Debtors' Motion Disband RO Committee") [Docket No. 567]. On August 10, 2020, the RO Committee Filed an objection to the Debtors' Motion to Disband RO Committee [Docket No. 681], which was joined by certain owners of mineral and other interests [Docket No. 696] and the Railroad Commission of Texas [Docket No. 705]. On August 11, 2020, the U.S. Trustee filed an objection to the Debtors' Motion to Disband RO Committee [Docket No. 699]. The RO Committee was reconstituted on August 11, 2020 to remove certain committee members who were counsel in ongoing royalty litigation matters but not themselves royalty owners [Docket No. 698]. On August 12, 2020, the Bankruptcy Court denied the Debtors' Motion to Disband the RO Committee, but ordered the U.S. Trustee to reconstitute the committee to consist of only unrepresented royalty owners with small royalty interests, as opposed to large, sophisticated royalty owners or royalty owners that are party to pending litigation with the Debtors. On August 16, 2020, the RO Committee Filed a proposed order denying the Debtors' Motion to Disband RO Committee [Docket No. 795], which the Bankruptcy Court entered on August 18, 2020 [Docket No. 819]. On August 28, 2020, the U.S. Trustee reconstituted the RO Committee to consist of five members: (i) Bride and Brandenburg Limited Partnership; (ii) Una Oreja LLC; (iii) Randall Harbaugh; (iv) Stephen P. Clark; and (v) Rickie Hines.

On July 30, 2020, the RO Committee Filed an application seeking to retain Forshey & Prosok, L.L.P. as counsel [Docket No. 557], which the Bankruptcy Court approved on September 3, 2020 [Docket No. 1094].

**I.       UCC Investigation**[38]

The DIP Order provides the UCC with a limited time period to investigate the validity, extent, priority, perfection and enforceability of: (i) the Existing RBL Liens and the Existing RBL Obligations; (ii) the Existing FLLO Liens and the Existing FLLO Obligations; or (iii) the Existing Second Liens and the Existing Second Lien Obligations, and (in addition to obtaining the requisite standing) to assert any other claims or causes of action against each of the Existing RBL Secured Parties, the Existing FLLO Secured Parties, and the Existing Second Lien Secured Parties.   The DIP Order further provides that If the UCC determines that there may be a challenge to the Existing RBL Liens, the Existing RBL Obligations, the Existing FLLO Liens, the Existing FLLO Obligations, the Existing Second Liens, or the Existing Second Lien Obligations, the UCC must file a motion seeking standing to pursue such claims and causes of action in advance of the termination of the investigation period (the "Investigation Termination Date").   The initial Investigation Termination Date was October 6, 2020.   On October 6, 2020, the Bankruptcy Court entered the first stipulation and agreed order by and among Debtors, the UCC, the Existing RBL Agent, the Existing RBL Lenders, FLLO Ad Hoc Group, and Franklin extending the UCC's Investigation Termination Date from October 6, 2020 to October 12, 2020 [Docket No. 1306].   On October 12, 2020, the Debtors, the UCC, the Existing RBL Agent, the Existing RBL Lenders, FLLO Ad Hoc Group, and Franklin filed a second stipulation and agreed order further extending the UCC's Investigation Termination Date from October 12, 2020 to October 26, 2020 [Docket No. 1357].

The Debtors collected, reviewed, and produced thousands of documents in response to numerous discovery and other requests from the UCC and attended and defended numerous depositions in connection with the UCC's Investigation of the claims or causes of action.

On October 26, 2020, the UCC filed two motions [Docket Nos. 1545, 1547] (the "Standing Motions") and the related affirmative claims complaint (the "Affirmative Claims Complaint") and lien perfection complaint (the "Lien Perfection Complaint," together with the Affirmative Claims Complaint, the "Complaints") seeking standing to pursue approximately 42 counts against, among others, the Existing RBL Agent and Collateral Trustee, the Existing RBL Lenders, the Existing FLLO Agent, the FLLO Ad Hoc Group, the Existing FLLO Facility Lenders, the Existing Second Lien Notes Trustee, the Existing Second Lien Noteholders, Franklin, certain other unidentified lenders, and certain current and former directors.

The majority of the claims and causes of action in the Affirmative Claims Complaint are focused on the refinancing transactions executed by the Debtors in December 2019, which transactions are described in greater detail in Article VI.C hereof.   The Affirmative Claims Complaint also contains multiple causes of action in connection the Debtors' decision not to commence these Chapter 11 Cases in advance of May 14, 2020.   The specific claims and causes of action enumerated in the Affirmative Claims Complaint include:[39]

- **Intentional and constructive fraudulent transfer claims**: intentional and/or constructive fraudulent transfer claims against the Existing FLLO Agent, Franklin, the Existing FLLO Facility Lenders, the Existing Second Lien Notes Trustee, and other lenders related to the December 2019 refinancing transactions and the Debtors' decision to allow the preference period to lapse based on allegations that (i) the Debtors were insolvent at the time of the relevant transaction or became insolvent as a result and (ii) the Debtors did not receive reasonably equivalent value in return for the relevant transaction;

- **Breach of fiduciary duty, aiding and abetting, and corporate waste claims**: breach of fiduciary duty claims and corporate waste claims against members of the Debtors' board of directors and aiding and abetting breach of fiduciary duty claims against Franklin, each related to the Debtors' decision to allow the preference period expire;

- **Unjust enrichment claims:** unjust enrichment claim against the Existing FLLO Agent, the Existing Second Lien Agent, Franklin, the FLLO Ad Hoc Group, the Existing FLLO Facility Lenders, and the Existing Second Lien Noteholders based on allegations that the value connected to allowing the preference period to lapse benefited these parties and occurred to the detriment of the Debtors' estates;

---

[38]   Capitalized terms used in this paragraph have the meanings ascribed to such terms in the DIP Order.

[39]   The Affirmative Claims Complaint and associated Standing Motion do not seek to assert any claims against the Existing RBL Agent and Collateral Trustee or the Existing RBL Lenders.  None of the Standing Motions or Complaints seeks to assert any claims against the DIP Agent or DIP Lenders in their capacities as such.

- **Equitable subordination claims**: equitable subordination claim against the Existing FLLO Agent, the Existing Second Lien Agent, Franklin the FLLO Ad Hoc Group, the Existing FLLO Facility Lenders, and the Existing Second Lien Noteholders based on allegations of misconduct in connection with the Directors' decision to allow the preference period to lapse;

- **Insider preference claims**: insider preference claims against Franklin and the Existing Second Lien Notes Trustee in connection with the liens securing their loans under the Existing FLLO Facility and their commitments pursuant to the Second Lien Notes;

- **Disallowance of original issue discount and make whole claims**: disallowance of make whole claims against the Existing FLLO Agent, the Existing Second Lien Notes Trustee, the Existing FLLO Facility Lenders, and the Existing Second Lien Noteholders and disallowance of Existing FLLO Facility Claims for original discount and allegedly unmatured interest against the Existing FLLO Agent and the Existing FLLO Facility Lenders; and

The Lien Perfection Complaint contains causes of action seeking a determination that certain property of the estate was unencumbered as of the Petition Date. The claims include declaratory judgments that certain property of the estate was unencumbered as of the Petition Date, that the Debtors' prepetition secured creditors failed to properly perfect liens on and security interests in certain of the Debtors' real and personal property, and preference claims to avoid certain liens on and security interests granted to or otherwise filed by the Debtors' secured lenders within the ninety days preceding the Petition Date. Specifically, the Lien Perfection Complaint alleges the following categories of assets of the Debtors were unencumbered as of the Petition Date:

- certain oil and gas assets that are considered Borrowing Base Properties (as defined in the Revolving Credit Facility Credit Agreement);

- certain other oil and gas real property that are not considered Borrowing Base Properties;

- certain categories of non-oil and gas real property, including Debtor Burleson Sand LLC's sand mine, the field office in Harrisburg, Pennsylvania, non-core buildings in Charleston West Virginia, the Debtors headquarters in Oklahoma City, Oklahoma, non-campus buildings and leases, and non-core land in Mansfield, Louisiana, the Louisiana field office, buildings and land, certain land in Ventura, Oklahoma, a field office leasehold in Houston, Texas, and field offices and land in Brazos Valley, Texas; and

- certain categories of personal property of the Debtors, including deposit accounts, security accounts, cash on hand, escrow funds, deposits, and prepayments, an airplane, motor vehicles, intellectual property, excluded stock, and certain non-guarantor property.

The UCC asserts the assets set forth above, which were potentially unencumbered as of the Petition Date, may have significant vale and, depending on the liquidation value of the unencumbered property, the Plan may be unable to satisfy the best interests test.

The Debtors vigorously deny the allegations in the Standing Motions and the Complaints. A hearing on the Standing Motion has not yet been scheduled. If granted, the Standing Motions may have a material negative impact on the Debtors' ability to consummate the Plan.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the

vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1.   There Is a Risk of Termination of the Restructuring Support Agreement

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 2.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3.   The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.  Notwithstanding the foregoing, if the Minimum Liquidity Condition, the Total Leverage Condition, and/or the PDP PV-10 Test Ratio Condition would not otherwise be satisfied as required by Article IX.A.11, the Required Plan Sponsors may agree, in their sole discretion, to increase the Rights Offering amount above $600 million on the same terms, including the Rights Offering Value and with an allocation consistent with the Backstop Allocations, to enable such conditions to be satisfied; *provided* that no Backstop Party's Backstop Commitment may be increased without its consent.

### 4.   The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 5.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim may object to Confirmation and assert that the Plan does not satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  The Bankruptcy Court could decline to confirm the Plan if it finds statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed

by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance acceptable to the Required Consenting Stakeholders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 6.        Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.        The Management Incentive Plan May Dilute Recoveries to Classes 4, 5, and 6

As described more fully in Articles III.N and IV.Q of this Disclosure Statement, on the Effective Date, the Reorganized Debtors will approve and implement the Management Incentive Plan. After the Effective Date, the New Board in its sole discretion will implement the allocation, timing, form, and structure of options, warrants, and/or equity compensation to be provided pursuant to the Management Incentive Plan. Because the New Board will not be established until after the Effective Date, the size and structure of the Management Incentive Program is not known.

### 8.        There is Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business," which begins on page 80. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

9. **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

10. **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan and will retain the right to object to Claims until the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

12. **The Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to accept treatment of their claims that is less favorable than they could demand under the Bankruptcy Code, thereby infusing massive capital into the Debtors' estates which will be used to pay claims and delever the Debtors' balance sheets, and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions.

The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

        **13.**     **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Plan by the Bankruptcy Court could last approximately 220 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities;

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects; and

- A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

        **14.**     **There is Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived by the Debtors and applicable stakeholders in accordance with the consent right sunder the Restructuring Support Agreement, the Effective Date will not take place; *provided* that the condition in Article IX.A.11 of the Plan may be waived only with the prior written consent of the Required Consenting Stakeholders.

B.      **Risks Related to Recoveries under the Plan**

1.      **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.      **A Liquid Trading Market for the Shares of New Common Stock May Not Develop**

Although the Debtors and the Reorganized Debtors may apply to relist the New Common Stock on a national securities exchange, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Common Stock will develop.  The liquidity of any market for shares of New Common Stock will depend upon, among other things, the number of holders of shares of New Common Stock, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

3.      **The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date**

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to holders of certain Classes of Claims.  Following the Effective Date of the Plan, shares of New Common Stock may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, holders of Claims that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Common Stock available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

4.      **Certain Holders of New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**

To the extent that shares of the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, that rights or shares of such New Common Stock will not be freely tradeable if, at the time of transfer, the holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer.  Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Resales by holders of Claims who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Common Stock to freely resell the

New Common Stock.  *See* Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 93.

5.      **Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date**

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock.  In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock.  A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' business, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' business, financial condition, and operating results.

6.      **There Are Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" which begins on page 96 to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

7.      **The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' business, results of operations, and financial condition.

8.      **Contingencies Could Affect the Final Amount of Allowed General Unsecured Claims and the Recovery to Holders of Allowed General Unsecured Claims Under the Plan**

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the amount of potential Allowed General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material and could materially affect Class 7 recoveries.  The projected amount of Allowed General Unsecured Claims set forth herein is subject to change.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business, and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigants, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change and materially affect Class 7 recoveries.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  Finally, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change, and could materially affect Class 7 recoveries.

> **9.      Contingencies Could Affect the Final Amount of Allowed General Unsecured Claims and the Recovery to Holders of Allowed General Unsecured Claims Under the Plan**

Along with its professionals, the Second Lien Notes Trustee is conducting an analysis into proposed distributions to be made to unsecured creditors, parties to the Restructuring Support Agreement, and other stakeholders.  If it is determined that value that should be allocated to Holders of Second Lien Notes is being improperly allocated to other stakeholders, the Second Lien Notes Trustee may object to confirmation on these and other grounds.  If such objection is sustained by the Bankruptcy Court, distributions to creditors under the Plan may differ materially and resolicitation may be required.

> **C.      Risks Related to the Debtors' and the Reorganized Debtors' Business**

> **1.      The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facilities upon emergence.

> **2.      The Debtors Have Significant Capital Needs, and Their Ability to Access the Capital and Credit Markets to Raise Capital on Favorable Terms Is Limited by Their Debt Level and Industry Conditions**

Disruptions in the capital and credit markets, in particular with respect to the energy sector, could limit the Debtors' ability to access these markets or may significantly increase the Debtors' cost to borrow.  Low commodity prices have caused and may continue to cause lenders to increase the interest rates under the Debtors' credit facilities, enact tighter lending standards, refuse to refinance existing debt around maturity on favorable terms or at all and may reduce or cease to provide funding to borrowers.  If the Debtors are unable to access the capital and credit markets on favorable terms, it could have a material adverse effect on their business, financial condition, results of operations, cash flows and liquidity and their ability to repay or refinance their debt.  Additionally, challenges in the economy have led and could further lead to reductions in the demand for oil and gas, or further reductions in the prices of oil and gas, or both, which could have a negative impact on the Debtors' financial position, results of operations and cash flows.

> **3.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 4.  Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 5.  The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry.  The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and gas properties, borrowings under the revolving credit facility, term loan facility, issuances of debt securities, including the Senior Notes, and issuances of equity securities.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, the terms of the Debtors' customer contracts which dictate when operating revenues can be realized, the Debtors' ability to expend the capital necessary to complete work on any particular project or post letters of credit to support new project wins, resulting in decreased revenues over time, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage or maintain current production, resulting in decreased production and proved reserves over time, or otherwise.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and conditions of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at

all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6. Long-Term Liquidity Requirements and Adequacy of Capital Resources are Difficult to Predict at this Time

The Debtors face uncertainty regarding the adequacy of liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparation for the Chapter 11 Cases and expect that they will continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot ensure that cash on hand and cash flow from operations will be sufficient to continue to fund operations and allow them to satisfy obligations related to the Chapter 11 Cases.  Liquidity, including the ability to meet ongoing operational obligations, depends on, among other things: (a) the ability to comply with the terms and conditions of any order governing the use of cash collateral that may be entered by the Bankruptcy Court in connection with the Chapter 11 Cases, (b) the ability to access credit under the DIP Credit Facility, (c) the ability to maintain adequate cash on hand, (d) the ability to generate cash flow from operations, (e) the ability to consummate a plan of reorganization or other alternative restructuring transaction, and (f) the cost, duration and outcome of the Chapter 11 Cases.

### 7. Delays in the Chapter 11 Cases May Increase the Risks of Inability to Reorganize and Emerge From Bankruptcy and Increase Costs Associated With the Bankruptcy Process

There can be no assurance that a plan of reorganization will become effective in accordance with its terms on the anticipated timeline, or at all. Prolonged chapter 11 proceedings could adversely affect relationships with customers and employees, among other parties, which in turn could adversely affect the Debtors' business, competitive position, financial condition, liquidity and results of operations and the ability to continue as a going concern. A weakening of the Debtors' financial condition, liquidity and results of operations could adversely affect the ability to implement a plan of reorganization (or any other Chapter 11 plan). If the Debtors are unable to consummate a plan of reorganization, the Debtors may be forced to liquidate assets.

### 8. The Debtors Are Subject to the Risks and Uncertainties Associated With the Exclusive Right to File a Plan of Reorganization

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides debtors-in-possession the exclusive right to file and solicit acceptance of a plan of reorganization for the first 120 days of the bankruptcy case, subject to extension at the discretion of the court. All other parties are prohibited from filing or soliciting a plan of reorganization during this period. If the Bankruptcy Court terminates that right or the exclusivity period expires, there could be a material adverse effect on the ability to achieve confirmation of a plan in order to achieve the Debtors' stated goals. The possible decision of creditors and/or other third parties, whose interest may be inconsistent with the Debtors' own, to file alternative plans of reorganization could further protract the Chapter 11 Cases, leading the Debtors to continue to incur significant professional fees and costs. Because of these risks and uncertainties associated with the termination or expiration of exclusivity rights, the Debtors cannot predict or quantify the ultimate impact that events occurring during the Chapter 11 Cases may have on business, cash flows, liquidity, financial condition and results of operations, nor can the Debtors predict the ultimate impact that events occurring during the Chapter 11 Cases may have on the corporate or capital structure.

### 9. Trading in Common Stock During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks

All of the indebtedness is senior to the existing common stock in the Debtors' capital structure. The Restructuring Support Agreement contemplates that the Debtors' existing equity interests will be cancelled and discharged in connection with the Chapter 11 Cases and the holders of those equity interests, including the holders of common stock, will be entitled to no recovery.  Accordingly, any trading in common stock during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of common stock.

10.      **The Restructuring Support Agreement is Subject to Significant Conditions and Milestones That May be Difficult to Satisfy**

There are certain material conditions that must be satisfied under the Restructuring Support Agreement, including the timely satisfaction of milestones in the Chapter 11 Cases, which include the consummation of the financing contemplated by the Exit Facilities and other transactions contemplated by a plan of reorganization. The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.

11.      **The Unaudited Condensed Consolidated Financial Statements Included in the Quarterly Report on Form 10-Q for the Period Ended June 30, 2020 Contain Disclosures that Express Substantial Doubt About the Ability to Continue as a Going Concern**

The inclusion of disclosures that express substantial doubt about the ability to continue as a going concern may negatively impact the trading price of common stock and have an adverse impact on relationships with third parties with whom the Debtors do business, including customers, subcontractors, suppliers and employees, and could have a material adverse impact on the Debtors' business, financial condition and results of operations.  If the Plan is not confirmed or the Effective Date does not occur, there will continue to be substantial doubt about the Debtors' ability to continue as a going concern.

12.      **Adverse Publicity in Connection With the Chapter 11 Cases or Otherwise Could Negatively Affect Business**

Adverse publicity or news coverage relating to the Debtors, including, but not limited to, publicity or news coverage in connection with the Chapter 11 Cases, may negatively impact the Debtors' efforts to establish and promote a positive image after emergence from the Chapter 11 Cases.

13.      **The Flexibility of the Management Team May be Limited**

While the Debtors operate their businesses as debtor-in-possession under supervision by the Bankruptcy Court, they are required to obtain the approval of the Bankruptcy Court, and in some cases certain lenders, prior to engaging in activities or transactions outside the ordinary course of business. Bankruptcy Court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the Bankruptcy Court, negotiation with the various creditors' committees and other parties in interest and one or more hearings. The creditors' committees and other parties in interest may be heard at any Bankruptcy Court hearing and may raise objections with respect to these motions. This process may delay major transactions and limit the ability to respond quickly to opportunities and events. Furthermore, in the event the Bankruptcy Court does not approve a proposed activity or transaction, the Debtors would be prevented from engaging in activities and transactions that would be beneficial to them.

14.      **Upon Emergence from Bankruptcy, the Composition of the Board of Directors Will Change Significantly**

The composition of the board of directors is expected to change significantly following the Chapter 11 Cases. Any new directors may have different backgrounds, experiences and perspectives from those individuals who currently serve on the board of directors and, thus, may have different views on the issues that will determine the future of the Debtors' businesses. As a result, future strategy and plans may differ materially from those of the past.

15.      **Oil, Natural Gas, and Natural Gas Liquids Prices Are Volatile, and Continued Low Oil, Natural Gas, or Natural Gas Liquids Prices Could Materially Adversely Affect the Debtors' Business, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends.  Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future,

especially given current economic and geopolitical conditions.  The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy

- changes in the domestic and foreign supply of oil and natural gas and demand for oil and natural gas;

- the ability of members of the OPEC and other producing countries to agree upon production levels which has an impact on oil prices and the actions of other foreign countries;

- social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or terrorist attacks, whether or not in oil or natural gas producing regions or other political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the price and quantity of imports of foreign oil and natural gas;

- expectations about future prices;

- the cost of exploring for, producing and delivering hydrocarbons;

- the discovery rate, size and location of new hydrocarbon reserves;

- the rate of decline of existing hydrocarbon reserves;

- domestic or foreign laws and regulations related to environmental matters, including those addressing alternative energy sources and the risks of global climate change;

- the level and growth of consumer product demand;

- labor unrest in oil and natural gas producing regions;

- weather conditions, including hurricanes and other natural occurrences that affect the supply and/or demand of oil and natural gas;

- the price and availability of alternative fuels and renewable energy sources;

- the impact of the U.S. dollar exchange rates on commodity prices;

- the price of foreign imports;

- technological advances affecting energy consumption;

- worldwide economic conditions; and

- the availability of liquid natural gas imports and exports.

In early 2020, the continued spread of COVID-19 led to a decline in factory output and transportation demand, causing oil and gas prices to suffer.  Subsequently, in March 2020, a breakdown in dialogue between OPEC and Russia over proposed oil production cuts in the midst of the COVID-19 pandemic caused oil and gas prices to fall to their lowest levels in nearly twenty years.  It is impossible to tell with certainty how, or to what degree, production agreements between OPEC and Russia and the COVID-19 pandemic will affect the macro-economy and commodity prices in the long term.

A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.  As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments,

or obtain additional capital, all of which could materially adversely affect the Debtors' business, results of operations, and financial condition.

16. **The Debtors' Commodity Price Risk Management Activities May Limit the Benefit the Debtors Would Receive from Increases in Commodity Prices and Involve Risk That the Debtors' Counterparties May Be Unable to Satisfy Their Obligations to the Debtors**

To manage the Debtors exposure to price volatility, the Debtors enter into oil, natural gas and NGL price derivative contracts, which may limit the benefit they would receive from increases in commodity prices. The Debtors are required to hedge a certain amount of their production pursuant to the DIP Order. The fair value of the oil, natural gas and NGL derivative instruments can fluctuate significantly between periods and the Debtors may choose not to enter into derivatives if the pricing environment for certain time periods is not deemed to be favorable. The Debtors chose to liquidate existing derivative positions prior to the expiration of their contractual maturities to monetize gain positions for the purpose of funding their capital program.

Oil, natural gas and NGL derivative transactions expose the Debtors to the risk that their contract counterparties may be unable to satisfy their obligations to them. During periods of declining commodity prices, the value of the Debtors' commodity derivative asset positions increase, which increases the Debtors' counterparty exposure. Although many of the counterparties to the hedging arrangements are required to secure their obligations to the Debtors under certain scenarios, if any of the Debtors' counterparties were to default on their obligations to the Debtors under the derivative contracts or seek bankruptcy protection, it could have an adverse effect on the Debtors' ability to fund their planned activities and could result in a larger percentage of their future cash flows being exposed to commodity price changes.

Specifically provided for by the underlying leases, the Petty Entities assert (i) they have rights to share in any benefits to Chesapeake from hedging or derivative agreements or from certain transportation or derivative or swap agreements; (ii) Chesapeake's standard of conduct or duty owed to the Petty Entities with respect to these benefits "shall be the same duty that a trustee owes to a beneficiary"; and (iii) the Petty Entities' rights to such benefits are valid and perfected secured claims and should be treated as Other Secured Claims under the Plan, just as its royalty and working interest claims should be treated. The Debtors disagree.

17. **Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition, and Results of Operations**

The Debtors' future success will depend on, among other things, the success of their development and production activities. The Debtors must incur significant expenditures to identify and acquire properties and to drill and complete wells. The costs of drilling and completing wells are often uncertain, and drilling operations may be curtailed, delayed, or cancelled as a result of a variety of factors, including unexpected drilling conditions, pressure or irregularities in formations, equipment failures or accidents, weather conditions, and shortages or delays in the delivery of equipment. Additionally, seismic and other technology does not allow the Debtors to know conclusively prior to drilling a well that oil and natural gas is present or economically producible. The results of drilling in new or emerging formations, including the Debtors' properties in shale formations, are more uncertain initially than drilling results in areas that are developed, have established production, or where the Debtors have a longer history of operation. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical.

Further, the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment, materials, and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures, and discharges of toxic gases;

- adverse weather conditions;

- reductions in oil and natural gas prices;

- natural gas and oil property title problems; and

- market limitations for natural gas and oil.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

In addition, the Debtors' operations are subject to the risks inherent in the oil and natural gas industry, including the risks of fires, explosions, and blowouts; pipe failures; abnormally pressured formations; and environmental accidents such as oil spills, natural gas leaks, ruptures or discharges of toxic gases, brine or well fluids into the environment (including groundwater contamination).

Further, the Debtors' success depends upon their ability to find, develop or acquire additional oil and natural gas reserves that are profitable to produce. Factors that may hinder the Debtors' ability to acquire or develop additional oil and natural gas reserves include competition, access to capital, prevailing oil and natural gas prices, and the number and attractiveness of properties for sale. The Debtors' decisions to purchase, explore, develop or otherwise exploit properties or prospects will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic and other information, the results of which are often inconclusive and subject to various interpretations. These decisions could significantly reduce the Debtors' ability to generate Cash needed to service the Debtors' debt and other working capital requirements.

18.     **Contracted Revenues May Not Be Fully Realized and May Reduce Significantly in the Future, Which May Have a Material Adverse Effect on the Debtors' Financial Position, Results of Operations, or Cash Flows**

The Debtors' expected revenues under existing contracts may not be fully realized due to a number of factors, including rig or equipment downtime or suspensions of operations. Several factors could cause downtime or a suspension of operations, many of which are beyond the Debtors' control, including:

- breakdowns of equipment or the equipment of others necessary for continuation of operations;

- work stoppages, including labor strikes;

- shortages of material and skilled labor;

- severe weather or harsh operating conditions;

- the occurrence or threat of epidemic or pandemic diseases or any government response to such occurrence or threat (including the COVID-19 pandemic);

- the early termination of contracts; or

- force majeure events.

Liquidity issues could lead the Debtors' contract counterparties to File for bankruptcy and/or could encourage the Debtors' contract counterparties to seek to repudiate, cancel, or renegotiate their contracts for various reasons. Some of the Debtors' contracts permit early termination of the contract by the customer for convenience (without cause), generally exercisable upon advance notice to the Debtors and in some cases without making an early termination payment to the Debtors. There can be no assurance that the Debtors' customers will be able or willing to fulfill their contractual commitments.

19.   **The Debtors' Operations or Ability to Emerge from Bankruptcy May Be Impacted By the Continuing COVID-19 Pandemic**

The continued spread of COVID-19 could have a significant impact on the Debtors' business, both in the context of consumer demand and production capacity. On a macro level, this pandemic could further dampen global growth and ultimately lead to a greater economic recession than already exists. If this occurs, demand for oil, natural gas, or NGLs would likely decline, as would commodity prices generally (including oil and natural gas). Such a scenario would negatively impact the Debtors' financial performance. In addition, government lockdowns and employee infections could both inhibit the Debtors' ability to extract and transport their hydrocarbon production. This diminished production capacity would negatively affect the Debtors' financial performance.

20.   **The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to extensive laws and regulations, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, or criminal penalties. The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Debtors may be charged with remedial costs and land owners may File claims for alternative water supplies, property damage, or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Debtors.

21.   **The Debtors Operate in a Highly Competitive Industry Which May Negatively Affect Ability To Conduct Operations**

The Debtors compete with both major integrated and other independent oil and natural gas companies in all aspects of their business to explore, develop and operate their properties and market their production. Some of the Debtors' competitors may have larger financial and other resources than the Debtors. Competitive conditions may be affected by future legislation and regulations as the United States develops new energy and climate-related policies. In addition, some of the Debtors' competitors may have a competitive advantage when responding to factors that affect demand for oil and natural gas production, such as changing prices, domestic and foreign political conditions, weather conditions, the price and availability of alternative fuels, the proximity and capacity of natural gas pipelines and other transportation facilities and overall economic conditions. The Debtors' also face indirect competition from alternative energy sources, including wind, solar and electric power. The competitive nature of the Debtors' industry may negatively affect the Debtors' financial performance.

22.   **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

23.   **The Reorganized Debtors May Be Adversely Affected by the Pending FERC Contract Rejection Motion**

As discussed in Article VII.E hereof, the Debtors are seeking to reject the ETC Tiger Agreement pursuant to the FERC Contract Rejection Motion.  Although the Bankruptcy Court has recommended the Motion to Withdraw be denied, the District Court has yet to issue a ruling on whether to withdraw the FERC Contract Rejection Motion and no hearing on the FERC Contract Rejection Motion has occurred.  To the extent the District Court or the Bankruptcy Court, as applicable, determines the Debtors are not able to reject the ETC Tiger Agreement, the ongoing obligations related thereto may adversely affect the Debtors' business and jeopardize the Debtors' ability to realize the anticipated savings associated with rejection.

24.   **Certain of the Reorganized Debtors Oil and Gas Leases May Have Terminated and Such Termination Could Adversely Affect the Debtors' Operations**

Certain parties have or may allege that certain oil and gas leases terminated due to, among other things, lack of production or non-payment or underpayment of pre- or post-petition royalties.  As of the Petition Date, the Debtors were party to certain litigation matters, including the Eagle Ford MDL, alleging that mineral acreage has been released or oil and gas leases have terminated.  Specifically, the Eagle Ford MDL plaintiffs seek a determination that over 35,000 net acres were released prior to the Petition Date.  The Debtors do not believe the release-of-acreage or lease termination alleged in the Eagle Ford MDL.  However, to the extent a declaratory order is entered granting such claims or causes of action, the Debtors' acreage in this area may be overstated and their business and operations may be negatively impacted and such impact may be material.  The Debtors also do not believe there is a material risk that a material amount of oil and gas leases have or will terminate due to non-payment or underpayment.  However, to the extent such oil and gas leases did or do terminate, such termination may negatively impact the Debtors' business and operations and such impact may be material.

For the avoidance of doubt, the Plan shall not revive leases or acreage that validly terminated or were released prepetition.  Further, the Plan will not extend the duration of any mineral leases or subleases, or, solely to the extent not barred by the automatic stay, prevent the termination of mineral leases or subleases according to their terms, and will not release or discharge any right of a Royalty and Working Interest owner to have such termination recognized by court of law.

25.   **The Reorganized Debtors May Be Adversely Affected by Pending Litigation**

The Debtors were party to numerous pending litigation matters as of the Petition Date, certain of which are set forth in greater detail in Article V.E hereof.  These pending litigation matters included putative and certified class actions, mass actions, individual royalty litigation, and other general commercial litigation.  The Debtors believe substantially all of the pending litigation will result in Claims that will be resolved in connection with the Claims resolution process in these cases.  To the extent certain pending prepetition litigation involves causes of action that do not give rise to a Claim, such litigation may be resolved in this Court or in the jurisdiction in which the litigation was pending as of the Petition Date.  While the Debtors continue to engage in settlement negotiations with certain plaintiffs in the pending litigation matters, the Debtors cannot guarantee a settlement will be reached and cannot guaranty the outcome of any such litigation.  Nevertheless, the Debtors believe substantially all pending prepetition litigation will result in General Unsecured Claims, which will be treated in accordance with the Plan and discharged thereunder.  As a result, the Debtors do not believe the pending prepetition litigation will adversely impact their ability to reorganize or adversely impact the Reorganized Debtors' business and operations.  However, there is a risk that such pending

prepetition litigation may adversely impact the Debtors' ability to reorganize and/or the Reorganized Debtors' business and operations, and such impact may be material.

26. **The Loss of Employees and Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  Because competition for experienced personnel in the oil and natural gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' business and the results of operations.

27. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## IX.   SOLICITATION, VOTING, AND NEW COMMON STOCK ELECTION PROCEDURES

This Disclosure Statement is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.   Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 3, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3, 4, 5, 6, and 7 (collectively, the "Voting Classes").  The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 8, 9, and 10.

### B.   Solicitation Packages

Contemporaneously herewith, the Debtors Filed the proposed Disclosure Statement Order.  For purposes of this Article IX.B, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  Pursuant to the Disclosure Statement Order, holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (in paper or electronic form) including (the "Solicitation Package"):

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan);
- the Disclosure Statement Order (without exhibits thereto);

- the Solicitation and Voting Procedures;
- the Confirmation Hearing Notice;
- an appropriate ballot with voting instructions with respect thereto, together with a pre-addressed, postage pre-paid return envelope;[40] and
- any supplemental documents the Debtors may File with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits) in electronic format (flash drive or cd-rom), and all other contents of the solicitation package, including ballots and these solicitation and voting procedures, shall be provided in paper format.

### C.     Voting Record Date

**The Voting Record Date is October 19, 2020** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

### D.     Voting on the Plan

**The Voting Deadline is [December 7] 2020, at 11:59 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Claims and Balloting Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

## X.     CONFIRMATION OF THE PLAN

### A.     Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.     Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan

---

[40]     The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive ballots directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

The UCC asserts the Liquidation Analysis improperly assumes that all of the Debtors' assets are encumbered by their secured lenders.  The Debtors disagree.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## C.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of Rothschild & Co US Inc., Intrepid Partners, LLC, and Alvarez & Marsal North America, LLC, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (collectively, the "Financial Projections").  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 73, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.   Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[41]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests

---

[41]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, with the consent of the Required Plan Sponsors, to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement, including any consent rights provided thereunder.

#### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of Rothschild & Co US Inc. and Intrepid Partners, LLC, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount

of its funded-debt obligations.  Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

The UCC asserts the enterprise valuation set forth in the Valuation Analysis undervalues the Debtors' assets.  The Debtors disagree.

The Second Lien Notes Trustee believes that the Valuation Analysis is incomplete and may be inaccurate, based on, among other things, variation in commodity pricing.  The Second Lien Notes Trustee is analyzing matters regarding valuation and allocation of valuation under the Plan, and may object to confirmation on these and other grounds.

## XI.    CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Common Stock, the New Warrants, and the options or other equity awards (and any New Common Stock underlying such awards) to be issued pursuant to the Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law").  The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Stock and the New Warrants by Reorganized Chesapeake pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.  The New Common Stock underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

### A.    Issuance of Securities under the Plan

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the issuance of the 1145 Securities is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities.  Accordingly, no registration statement will be Filed under the Securities Act or any state securities laws.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Recipients of the New Common Stock and the New Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

### B.    Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1)

of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to determine whether or not you are an "underwriter."

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New Common Stock and the New Warrants who are deemed to be "underwriters" may be entitled to resell their New Common Stock and the New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock and the New Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and New Warrants and, in turn, whether any Person may freely resell New Common Stock or the New Warrants.

Unlike the securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, any shares of New Common Stock issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has Filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors currently expect that the Reorganized Debtors will continue to be a reporting issuer and File

all such required periodic reports and that current public information will be available to allow resales by non-affiliates when the six-month holding period expires (approximately six months after the emergence date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  As noted above, the Debtors currently expect that this information requirement will be satisfied.  The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1 percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1 percent of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must File with the SEC three copies of a notice of proposed sale on Form 144.  The sale must occur within three months of filing the notice unless an amended notice is Filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold the 4(a)(2) Securities for at least six months and, thereafter, to sell the 4(a)(2) Securities only in accordance with the applicable requirements of Rule 144, unless such 4(a)(2) Securities are registered under the Securities Act or are otherwise exempt.

**ANY PERSONS RECEIVING "RESTRICTED SECURITIES" UNDER THE PLAN ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

C.      **New Common Stock & Management Incentive Plan**

The Confirmation Order shall authorize the board of directors of Reorganized Chesapeake to adopt the Management Incentive Plan, which shall contain terms and conditions acceptable to the Debtors and the Required Plan Sponsors and as set forth in the Plan Supplement.  Awards issued under the Management Incentive Plan that include New Common Stock will dilute all of the New Common Stock outstanding.  The New Common Stock is also subject to dilution in connection with the conversion of the New Warrants, any other options, convertible securities or other securities that may be issued post-emergence.

D.      **Shares issuable pursuant to the Rights Offering**

Subscription rights to participate in the Rights Offering shall be distributed to the Backstop Parties, the holders of Allowed FLLO Term Loan Facility Claims, and the holders of Allowed Second Lien Notes Claims in accordance with the Plan and the issuance of such subscription rights will be exempt from SEC registration under

applicable law. All shares of the New Common Stock, the Subscription Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) and shares issuable as part of the Put Option Premium will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. All shares of New Common Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The Debtors believe that the securities issued in the Rights Offering satisfy all the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws (except with respect to an underwriter as described above).

On the Effective Date, Reorganized Chesapeake will consummate the Rights Offering.  Unless otherwise expressly allowed in the Rights Offering or Rights Offering Procedures, the right to participate in the Rights Offering may not be sold, transferred, or assigned.

## XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and certain holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS, any other taxing authority or the courts.  No assurance can be given that the IRS or any other taxing authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold consideration received under the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of tax accounting, and holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors

#### 1. Expected Transaction Structure and Consequences Thereof

As of December 31, 2019, the Debtors had approximately $7.6 billion of federal net operating losses ("NOLs") carryforwards and $12 billion of total asset basis. Additional losses and credits may be generated in 2020, which will ultimately increase the Debtors' NOLs and other tax attributes. Depending on the how the Restructuring Transactions are implemented, some NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. As discussed below, however, the Debtors' NOLs are expected to be reduced upon implementation of the Plan and could be subject to other limitations.

The Restructuring Transactions are not expected to give rise to any gain or loss to the Debtors (other than as a result of cancellation of debt income ("CODI"), as described below). The Debtors' tax attributes will, subject to the rules discussed below regarding CODI and section 382 of the Tax Code, survive the restructuring process and potentially be usable by the Reorganized Debtors going forward.

#### 2. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, the Debtors will realize and recognize CODI upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of any consideration (including stock of the Debtors) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not, however, be required to include any amount of CODI in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a result of such exclusion, the Debtors must reduce their tax attributes by the amount of CODI that they excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryovers; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in

assets (but not below the amount of liabilities to which the Debtors will remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize a significant amount of CODI. The exact amount of any CODI that will be realized by the Debtors will not be determinable until, at the earliest, the consummation of the Plan. Because the Plan provides that certain Holders of Claims will receive non-Cash consideration, the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the fair market value of the non-Cash consideration received (or, in the case of consideration in the form of certain debt instruments, the issue price), which cannot be known with certainty at this time.

### 3.      Limitation on NOLs and Other Tax Attributes

As of December 31, 2019, the Debtors had approximately $7.6 billion of federal NOL carryovers and $12 billion of total asset basis, and additional losses and credits may be generated in 2020. In general, NOLs may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018. Subject to any applicable limitations, NOLs carried to taxable years before 2021 may offset 100 percent of taxable income and NOLs carried to taxable years starting with 2021 may be used to offset 80 percent of taxable income for any tax year thereafter. Further, NOLs arising in tax years after 2017, and before 2021, may be carried back to each of the five tax years preceding the tax year of such loss. Following the Effective Date, the Debtors anticipate that any NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors that are not reduced according to the CODI rules described above and that are allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of sections 382 and 383 of the Tax Code are complicated, but, as a general matter, the Debtors anticipate that the consummation of the Plan will result in an "ownership change" for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses and tax credits will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

Under section 382 of the Tax Code, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. The Debtors currently believe that they have a net unrealized built-in loss. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 and (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

#### (a)      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 0.89 percent for September 2020). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent that the Debtors have a net unrealized built-in gain at the time of the ownership change. The Debtors do not currently believe they have a net unrealized built-in gain. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below,

however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

###### (b)  Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their shares and Claims, respectively, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis but, instead, NOL carryovers would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another "ownership change" within two years after the Effective Date, then such debtor's Pre-Change Losses thereafter would be effectively eliminated in their entirety. The Debtors currently believe that the transactions contemplated by the Plan will not qualify for the 382(l)(5) Exception.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryovers by the amount of interest deductions in the manner described above, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

###### C.  Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Claims Entitled to Vote

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claim surrendered constitutes a "security" of Chesapeake for United States federal income tax purposes. Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Holders should consult their own tax advisors regarding the status of their claims as securities.

###### 1.  Consequences to the Holders of Allowed Class 3 Revolving Credit Facility Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed Revolving Credit Facility Claim shall receive, in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility

Loans, on a dollar-for-dollar basis (for purposes of this Article XII, the "RBL Exit Facility Loans"); *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash.

If an Allowed Class 3 Claim qualifies as a "security" of Chesapeake and the relevant RBL Exit Facility Loans qualify as a "security" of Reorganized Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss. Such Holder's tax basis in the relevant RBL Exit Facility Loans received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the relevant RBL Exit Facility Loans should include the holding period for the Claim exchanged therefor.

If an Allowed Class 3 Claim does not qualify as a "security" of Chesapeake and/or if the relevant RBL Exit Facility Loans do not qualify as a "security" of Reorganized Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the issue price of the relevant RBL Exit Facility Loans received and (2) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the relevant RBL Exit Facility Loans received should equal its issue price as of the date such property is distributed to the Holder. A Holder's holding period for the relevant RBL Exit Facility Loans should begin on the day following the date it receives such property.

The determination of "issue price" for purposes of this analysis will depend, in part, on whether the relevant RBL Exit Facility Loans issued to a Holder are traded on an "established securities market" at any time during the 31-day period ending 15 days after the Effective Date. In general, a debt instrument will be treated as traded on an established securities market if (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments, (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the debt instrument, or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for the debt instrument.

## 2. Consequences to the Holders of Allowed Class 4 FLLO Term Loan Facility Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the FLLO Ad Hoc Group of an Allowed FLLO Term Facility Claim, a Holder of such Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

If an Allowed Class 4 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss. Such Holder's tax basis in the New Common Stock and FLLO Rights received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor, allocated between the New Common Stock and the FLLO Rights based upon their respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock and FLLO Rights received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 4 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock and the FLLO Rights received and (2) such Holder's adjusted basis, if any,

in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder.  A Holder's holding period in such property should begin on the day following the date it receives such property.

### 3.     Consequences to the Holders of Allowed Class 5 Second Lien Notes Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

If an Allowed Class 5 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization.  Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss.  Such Holder's tax basis in the New Common Stock, Second Lien Rights, New Class A Warrants, New Class B Warrants, and New Class C Warrants received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor, allocated between such property received based upon their respective fair market values.  Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock, Second Lien Rights, New Class A Warrants, New Class B Warrants, and New Class C Warrants received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 5 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code.  In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock, Second Lien Rights, New Class A Warrants, New Class B Warrants, and New Class C Warrants received, and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder.  A Holder's holding period in such property should begin on the day following the date it receives such property.

### 4.     Consequences to the Holders of Allowed Class 6 Unsecured Notes Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of (i) the Unsecured Notes Claims Recovery and (ii) 50 percent of the New Class C Warrants.

If an Allowed Class 6 Claim qualifies as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization.  Subject to the rules regarding accrued but untaxed interest, a Holder of such claim should not recognize gain or loss.  Such Holder's tax basis in the New Common Stock and New Class C Warrants received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim exchanged therefor, allocated between such property received based upon their respective fair market values.  Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its New Common Stock and New Class C Warrants received should include the holding period for the Claim exchanged therefor.

If an Allowed Class 6 Claim does not qualify as a "security" of Chesapeake, then the Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, the Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock and New Class C Warrants received, and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the property received should equal its fair market value as of the date such property is distributed to the Holder.  A Holder's holding period in such property should begin on the day following the date it receives such property.

### 5.        Consequences to the Holders of Allowed Class 7 General Unsecured Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim, each Holder of an Allowed General unsecured Claim shall receive its *Pro Rata* share of the General Unsecured Claims Recovery Amount.  Further, a Holder of an Allowed Class 7 Claim may receive distributions of Cash made after the Effective Date from the General Unsecured Claims Recovery Reserve (the "Claims Reserve"). The treatment of any such distributions made after the Effective Date is described below.

The Holder of an Allowed Class 7 Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code.  The Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Cash received, and (2) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.

### 6.        Treatment of New Warrants

A U.S. Holder that elects to exercise its New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of Cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants.  Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the New Warrants.  A U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise its New Warrants and (ii) such U.S. Holder's tax basis in its New Warrants immediately before such New Warrants are exercised.  A U.S. Holder's holding period for the New Common Stock received pursuant to the exercise of its New Warrants should begin on the day following the date on which such U.S. Holder exercises its New Warrants.

A U.S. Holder that elects not to exercise the New Warrants may be entitled to claim a capital loss equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the New Warrants.

### 7.        Treatment of FLLO Rights and Second Lien Rights

A U.S. Holder that elects to exercise its FLLO Rights or its Second Lien Rights (together, the "Subscription Rights") should be treated as purchasing, in exchange for its Subscription Rights and the amount of cash paid by the U.S. Holder to exercise such Subscription Rights, New Common Stock.  Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises its Subscription Rights.  A U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise

its Subscription Rights and (ii) such U.S. Holder's tax basis in its Subscription Rights immediately before such Subscription Rights are exercised.  A U.S. Holder's holding period for the New Common Stock received pursuant to such exercise on the Effective Date should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise its Subscription Rights may be entitled to claim a loss equal to the amount of tax basis allocated to such Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses.  U.S. Holders electing not to exercise their Subscription Rights should consult with their own tax advisors as to the tax consequences of such decision.

### 8.    Accrued Interest

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a Holder pursuant to the Plan is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, and then, to the extent the consideration exceeds the principal amount of Allowed Claims, to the remainder of the Allowed Claims, including untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations governing the payment ordering rules generally require that interest is deemed paid prior to any principal payments. Accordingly, there is no assurance that the IRS will respect such allocations for U.S. federal income tax purposes.  Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest for U.S. federal income tax purposes.

In general, a U.S. Holder's tax basis in any non-Cash consideration attributable to accrued but untaxed interest should equal the fair market value of such non-Cash consideration as of the date such property is received by such U.S. Holder.  A U.S. Holder's holding period in any such non-Cash consideration should begin on the day following its receipt.

### 9.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). Generally, if a Claim that was acquired with market discount is exchanged in a tax-free transaction for other property, any market discount that accrued on such Claim as of the time of the exchange but that was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of such accrued but unrecognized market discount.  U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

10.     Net Investment Income Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

11.     Limitation of Use of Capital Losses

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

12.     The General Unsecured Claims Recovery Reserve

The Plan provides that, among other things, on or after the Effective Date, the Claims Reserve shall be formed and funded with Cash.

Because entitlements to any assets that are contributed to the Claims Reserve would be subject to potential disputed claims of ownership or uncertain distributions, the Debtors anticipate that any such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred (or deemed transferred).  Instead, generally, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.  It is possible, however, that a portion of the property received would instead be re-characterized as imputed interest for U.S. federal income tax purposes.  The U.S. Holder would be required to take into account any amounts treated as imputed interest under the U.S. Holder's regular method of accounting.

D.     Certain United States Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Consideration Received Under the Plan

1.     Distributions on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current and accumulated earnings and profits of Reorganized Chesapeake as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares (determined on a share-by-share basis).  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for a dividends-received deduction.

2. **Sale, Redemption, or Repurchase of New Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of their New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held its New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

3. **Ownership, Exercise, and Disposition of New Warrants**

A U.S. Holder that elects to exercise its New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises such New Warrants. A U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise its New Warrants plus (ii) such U.S. Holder's tax basis in its New Warrants immediately before such New Warrants are exercised. A U.S. Holder's holding period in the New Common Stock received pursuant to the exercise of such New Warrants should begin on the day following the date on which such U.S. Holder exercises such New Warrants.

Under section 305 of the Tax Code, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

A U.S. Holder that elects not to exercise its New Warrants may be entitled to claim a capital loss equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the New Warrants.

In the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in its New Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants.

4. **Interest on the RBL Exit Facility Loans**

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the RBL Exit Facility Loans received by U.S. Holders exceeds the "issue price" of the RBL Exit Facility Loans by an amount equal to or greater than a statutorily defined de minimis amount, the loans will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the RBL Exit Facility Loans is the total of all payments due on the RBL Exit Facility Loans other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates). The determination of the issue price for loans is discussed above. The issue price for a RBL Exit Facility Loan that is traded on an established market will equal its fair market value on the date of issuance. If such a RBL Exit Facility Loan is not traded on an established market, its issue price will generally equal its stated principal amount.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the RBL Exit Facility Loans multiplied by the number of complete years to maturity from their original issue date, or if the RBL Exit Facility Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations).  If the RBL Exit Facility Loans are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the loans, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the loans that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on any of the RBL Exit Facility Loans is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the loans, and a pro rata amount of such de minimis OID must be included in income as principal payments are received on the loans.

> ### 5.    Sale, Redemption, or Repurchase of Interests in the Exit Facility

Upon the sale, exchange or other taxable disposition of the RBL Exit Facility Loans, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the loan.  A U.S. Holder's adjusted tax basis in their interest in relevant RBL Exit Facility Loans will depend on whether, as described above, the loans are considered a "security" for tax purposes and whether the U.S. Holder receives the relevant RBL Exit Facility Loans as part of a transaction that is treated as a reorganization for U.S. federal income tax purposes.  A U.S. Holder's initial tax basis in the relevant RBL Exit Facility Loans will be increased by any previously accrued OID and decreased by any payments on the loans other than qualified stated interest.  Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the loans has been held for more than one year at the time of its sale, exchange or other taxable disposition.  Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains.  The deductibility of capital losses is subject to limitations as discussed above.

> ### E.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of any consideration received under the Plan.

> ### 1.    Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder described above in "Certain United States Federal Income Tax Consequences of the Plan - Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote" (except that the net investment income tax would generally not apply).  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form

as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including Accrued but Untaxed Interest) and of Owning and Disposing of the RBL Exit Facility Loans**

(a)    **Payments of Interest (Including Accrued but Untaxed Interest)**

Payments made to a Non-U.S. Holder of interest income (which, for purposes of this discussion, includes payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest on a Claim) generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of, as applicable, Reorganized Chesapeake (in the case of the Exit Facility) or the Debtors (in the case of interest received pursuant to the Plan), (iii) the Non-U.S. Holder is not a controlled foreign corporation related to, as applicable, Reorganized Chesapeake (in the case of the Exit Facility) or the Debtors (in the case of interest received pursuant to the Plan), actually or constructively through the ownership rules under Section 864(d)(4) of the Tax Code, and (iv) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to such interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(b)    **Sale, Taxable Exchange, or Other Disposition of the RBL Exit Facility Loans**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of its interest in a RBL Exit Facility Loan (other than any amount representing accrued but untaxed interest on such RBL Exit Facility Loan) unless:

- the gain is effectively connected with the conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of its interest in the relevant RBL Exit Facility Loan under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest (Including Accrued But Untaxed Interest)." To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a

lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of disposition.

3. **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock and New Warrants**

(a) **Distributions on Account of the New Common Stock**

Any distributions made with respect to the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Chesapeake, as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its New Common Stock. Any such distributions in excess of a Non-U.S. Holder's basis in its New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange, as discussed below.

Except as described below, dividends paid with respect to the New Common Stock held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Special certification and other requirements apply to certain Non-U.S. Holders that are pass-through entities rather than corporations or individuals. Dividends paid with respect to the New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

To the extent the FIRPTA rules (discussed below) are applicable to any Non-U.S. Holder (and subject to the rules discussed below regarding less-than-5 percent Holders if the New Common Stock is regularly traded on an established securities market), distributions that are not taxable as dividends but, instead, are treated as a return of capital or gain may be subject to withholding at an amount equal to 15 percent of the gross amount of such distributions. Distributions that are taxable as dividends will be subject to withholding as described above.

(b) **Sale, Redemption, or Repurchase of New Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of its New Common Stock unless: (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (iii) the issuer of such New Common Stock is or has been, during a specified testing period, a "U.S. real property holding corporation" (a "<u>USRPHC</u>") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of its New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder,

and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The FIRPTA rules are discussed in greater detail below.

<div style="text-align:center">

**(c)      Ownership, Exercise, and Disposition of New Warrants**

</div>

A Non-U.S. Holder that elects to exercise its New Warrants will be treated as purchasing, in exchange for its New Warrants and the amount of cash funded by the Non-U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a Non-U.S. Holder (to the extent such Non-U.S. Holder is subject to U.S. federal income tax, as described above) should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises such New Warrants. A Non-U.S. Holder's aggregate tax basis in the New Common Stock should equal the sum of (i) the amount of cash paid by the Non-U.S. Holder to exercise its New Warrants plus (ii) such Non-U.S. Holder's tax basis in its New Warrants immediately before such New Warrants are exercised.

Any deemed distribution under section 305 of the Tax Code (as discussed above), will be taxed and reported to the IRS in the same manner as an actual distribution on stock and will be subject to the rules described above with respect to such Non-U.S. Holder. As applicable, the Reorganized Debtor or an applicable withholding agent may withhold in accordance with applicable tax law any amounts required to be withheld in connection with any such deemed distribution, including from amounts received on the New Warrants or other cash or property held or received on behalf of the Non-U.S. Holder.

In the event that a Non-U.S. Holder sells its New Warrants in a taxable transaction, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition except in the same circumstances as described above under "Sale, Redemption, or Repurchase of New Common Stock." If a Non-U.S. Holder is subject to U.S. federal income tax, any such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the New Warrants relate would have had in the hands of the Non-U.S. Holder if such stock had been acquired by the Non-U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the Non-U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such Non-U.S. Holder has held its Warrants.

Under Treasury Regulations issued pursuant to section 871(m) of the Tax Code, withholding at a rate of 30 percent (subject to certain treaty considerations) would apply to certain "dividend equivalent" payments made or deemed made to Non-U.S. Holders in respect of financial instruments that reference U.S. stocks. The Treasury Regulations promulgated under section 871(m) do not apply to a payment to the extent that the payment is already treated as a deemed dividend under the rules described above, and therefore generally would not apply in respect of adjustments to the conversion rate of the New Warrants. However, because the section 871(m) rules are complex, it is possible that they will apply in certain circumstances in which the deemed dividend rules described above do not apply, in which case the section 871(m) rules might require withholding at a different time or amount than the deemed dividend. Importantly, in Notice 2020-2, the IRS extended certain transition relief that makes section 871(m) of the Tax Code inapplicable to instruments that are not so-called "delta one" instruments.

<div style="text-align:center">

**4.      FIRPTA**

</div>

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as effectively connected income that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to the New Common Stock and New Warrants, rules with respect to U.S. real property holding corporations ("USRPHCs") may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any

<div style="text-align:center">

109

</div>

time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held an interest in such corporation. Although the Debtors and other relevant parties have not performed an analysis to determine whether Reorganized Chesapeake would constitute a USRPHC, companies that are engaged in the Debtor's line of business often constitute USRPHCs and, as such, it is likely that Reorganized Chesapeake would be a USRPHC. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock or New Warrants may be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. However, in the event the New Common Stock is "regularly traded on an established securities market" within the meaning of FIRPTA, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5 percent or less of such stock (after taking into account certain attribution rules) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer. If determined by the Required Consenting Stakeholders, the Company is required to use commercially reasonable efforts to cause the New Common Stock to be regularly traded on an established securities market under the FIRPTA rules on the Plan Effective Date. However, whether and when the New Common Stock will be considered regularly traded on an established securities market cannot currently be determined. With respect to the New Warrants, even if the New Warrants are not traded on an established securities market, the exclusion for persons with less than 5 percent of the New Common Stock extends to Non-U.S. Holders of New Warrants so long as the Non-U.S. Holder's New Warrants were not, on a fair market value basis, worth more than 5 percent of the New Common Stock on the date the Non-U.S. Holder acquired such New Warrants and the New Common Stock is considered regularly traded on an established securities market.

The FIRPTA rules will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

F.      FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN.**

G.      Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the

Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated: October 30, 2020                                   Chesapeake Energy Corporation
                                                          on behalf of itself and all other Debtors


                                                          */s/ Domenic J. Dell'Osso, Jr.*
                                                          _____
                                                          Domenic J. Dell'Osso, Jr.
                                                          Executive Vice President and Chief Financial Officer
                                                          Chesapeake Energy Corporation

**<u>Exhibit A</u>**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | Case No. 20-33233 (DRJ) |
| Debtors. | (Jointly Administered) |

---

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

---

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
               jwertz@jw.com
               kpeguero@jw.com
               vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: October 30, 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
               marc.kieselstein@kirkland.com
               alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
    GOVERNING LAW ........................................................................................................1
  A.  Defined Terms. .......................................................................................................1
  B.  Rules of Interpretation. .........................................................................................16
  C.  Computation of Time. ...........................................................................................17
  D.  Governing Law. ....................................................................................................17
  E.  Reference to Monetary Figures. ...........................................................................17
  F.  Reference to the Debtors or the Reorganized Debtors. ........................................17
  G.  Controlling Document. .........................................................................................18
  H.  Consultation, Information, Notice, and Consent Rights. .......................................18

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS ....................18
  A.  Administrative Claims. .........................................................................................18
  B.  DIP Claims. ..........................................................................................................20
  C.  Priority Tax Claims. .............................................................................................20
  D.  Statutory Fees. .....................................................................................................20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................21
  A.  Classification of Claims and Interests. .................................................................21
  B.  Treatment of Claims and Interests. ......................................................................21
  C.  Special Provision Governing Unimpaired Claims. ...............................................24
  D.  Elimination of Vacant Classes. ............................................................................25
  E.  Voting Classes, Presumed Acceptance by Non-Voting Classes. ...........................25
  F.  Intercompany Interests. ........................................................................................25
  G.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................25
  H.  Controversy Concerning Impairment. ...................................................................25
  I.  Subordinated Claims and Interests. ......................................................................25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................................25
  A.  General Settlement of Claims and Interests. .........................................................25
  B.  Restructuring Transactions. ..................................................................................26
  C.  Midstream Savings Requirement. .........................................................................26
  D.  Reorganized Debtors. ...........................................................................................27
  E.  Sources of Consideration for Plan Distributions. .................................................27
  F.  General Unsecured Claims Recovery Reserve. .....................................................29
  G.  Corporate Existence. ............................................................................................29
  H.  Vesting of Assets in the Reorganized Debtors. .....................................................30
  I.  Cancellation of Existing Securities and Agreements. ............................................30
  J.  Corporate Action. .................................................................................................31
  K.  New Organizational Documents. ..........................................................................31
  L.  Indemnification Obligations. .................................................................................32
  M.  Directors and Officers of the Reorganized Debtors. .............................................32
  N.  Effectuating Documents; Further Transactions. ....................................................33
  O.  Section 1146 Exemption. ......................................................................................33
  P.  Director and Officer Liability Insurance. ..............................................................33
  Q.  Management Incentive Plan. .................................................................................34
  R.  Employee Benefits. ...............................................................................................34
  S.  Preservation of Causes of Action. ........................................................................34
  T.  Preservation of Royalty and Working Interests. ...................................................35
  U.  Resolution of Pending Litigation. .........................................................................35
  V.  Payment of Certain Fees. ......................................................................................35

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................... 36
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 36
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................... 37
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................. 37
    D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. .......... 38
    E.    Insurance Policies. ..................................................................................... 38
    F.    Reservation of Rights. ................................................................................. 38
    G.    Nonoccurrence of Effective Date. ................................................................... 38
    H.    Contracts and Leases Entered Into After the Petition Date. ..................................... 39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................................... 39
    A.    Timing and Calculation of Amounts to Be Distributed. ......................................... 39
    B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................... 39
    C.    Manner of Payment. ................................................................................... 40
    D.    Exemption from Securities Laws. ................................................................... 41
    E.    Compliance with Tax Requirements. ............................................................... 41
    F.    Allocations. ............................................................................................ 42
    G.    No Postpetition or Default Interest on Claims. .................................................. 42
    H.    Foreign Currency Exchange Rate. .................................................................. 42
    I.    Setoffs and Recoupment. ............................................................................ 42
    J.    No Double Payment of Claims. ..................................................................... 42
    K.    Claims Paid or Payable by Third Parties. ......................................................... 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
               DISPUTED CLAIMS ................................................................................ 43
    A.    Allowance of Claims. ................................................................................. 43
    B.    Claims Administration Responsibilities. ........................................................... 43
    C.    Estimation of Claims. ................................................................................. 44
    D.    Adjustment to Claims or Interests without Objection. ........................................... 44
    E.    Time to File Objections to Claims. ................................................................. 44
    F.    Disputed and Contingent Claims Reserve. ........................................................ 44
    G.    Disallowance of Claims or Interests. ............................................................... 44
    H.    No Distributions Pending Allowance. .............................................................. 45
    I.    Distributions After Allowance. ..................................................................... 45
    J.    No Interest on Disputed Claims. .................................................................... 45

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........................... 45
    A.    Discharge of Claims and Termination of Interests. .............................................. 45
    **B.**    **Release of Liens.** .................................................................................... 46
    **C.**    **Releases by the Debtors.** .......................................................................... 46
    **D.**    **Releases by Holders of Claims and Interests.** ................................................. 47
    **E.**    **Exculpation.** ........................................................................................ 48
    **F.**    **Injunction.** .......................................................................................... 48
    G.    Protections Against Discriminatory Treatment. ................................................... 49
    H.    Recoupment. ........................................................................................... 49
    I.    Document Retention. .................................................................................. 49
    J.    Reimbursement or Contribution. .................................................................... 49

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ................................... 50
    A.    Conditions Precedent to the Effective Date. ....................................................... 50
    B.    Waiver of Conditions. ................................................................................ 51
    C.    Effect of Failure of Conditions. ..................................................................... 51
    D.    Substantial Consummation .......................................................................... 52

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ................................. 52
    A.    Modification and Amendments. ..................................................................... 52

| | B. | Effect of Confirmation on Modifications. | 52 |
| | C. | Revocation or Withdrawal of Plan. | 52 |

**ARTICLE XI. RETENTION OF JURISDICTION** ......................................................................52

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...................................................................54
| | A. | Immediate Binding Effect. | 54 |
| | B. | Additional Documents. | 54 |
| | C. | Payment of Statutory Fees. | 55 |
| | D. | Statutory Committee and Cessation of Fee and Expense Payment. | 55 |
| | E. | Reservation of Rights. | 55 |
| | F. | Successors and Assigns. | 55 |
| | G. | Notices. | 55 |
| | H. | Term of Injunctions or Stays. | 56 |
| | I. | Entire Agreement. | 56 |
| | J. | Plan Supplement. | 56 |
| | K. | Nonseverability of Plan Provisions. | 56 |
| | L. | Votes Solicited in Good Faith. | 57 |
| | M. | Closing of Chapter 11 Cases. | 57 |
| | N. | Waiver or Estoppel. | 57 |
| | O. | Creditor Default. | 57 |

**INTRODUCTION**

Chesapeake Energy Corporation and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters. Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*1145 Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

2.      "*4(a)(2) Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Professional Claims; (c) DIP Claims; (d) Adequate Protection Super-Priority Claims (as defined in the Final DIP Order) (if any); (e) postpetition, pre-Effective Date rights to payment arising on account of Royalty and Working Interests; (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (g) as approved by the Backstop Commitment Agreement Approval Order, including the priority and payment subordination provisions described in paragraph 7 thereof, the Put Option Premium.

4.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

6.      "*Agent*" means any administrative agent, collateral agent, collateral trustee, or similar Entity under the Exit Facilities, the DIP Facility, the Revolving Credit Facility, the Collateral Trust Agreement, and/or the FLLO Term Loan Facility.

7.      "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture,

1

or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Reorganized Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

8.       "*Alternative Securities Exchange*" means, excluding any National Securities Exchange, any other securities exchange or over-the-counter quotation system, including, without limitation, the NYSE MKT, the Nasdaq Capital Market, any quotation or other listing service provided by the OTC Markets Group or the Financial Industry Regulatory Authority, Inc., any "pink sheet" or other alternative listing service, or any successor or substantially equivalent service to any of the foregoing.

9.       "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

10.       "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11.       "*Backstop*" means the several and not joint backstop in full of the Rights Offering by the Backstop Parties pursuant to the Backstop Commitment Agreement.

12.       "*Backstop Allocations*" has the meaning set forth in Article IV.E.1 of the Plan.

13.       "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of June 28, 2020, by and between Chesapeake and the Backstop Parties, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

14.       "*Backstop Commitment Agreement Approval Order*" means the *Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 21, 2020 at CM/ECF No. 899 in the Chapter 11 Cases.

15.       "*Backstop Parties*" means the members of the FLLO Ad Hoc Group and Franklin that are signatories to the Backstop Commitment Agreement.

16.       "*Backstop Party Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $150 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

17.       "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

18.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

20.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim or Proofs of Interest must be Filed with respect to such Claims or Interests, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim or Proofs of Interest.

21.     "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

22.     "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

23.     "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

24.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

25.     "*Chesapeake*" means Chesapeake Energy Corporation or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

26.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

27.     "*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

28.     "*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

29.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

30.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

31.     "*Collateral Trust Agreement*" means that certain Collateral Trust Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee and revolver agent, and GLAS USA LLC, as original term loan agent, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

32.     "*Conditions Precedent to the Effective Date*" means the conditions precedent to the Effective Date set forth in Article IX.A of the Plan

33.     "*Conditions Precedent to the Exit Facilities*" means the conditions precedent to the closing of the Exit Facilities identified on <u>Exhibit D</u> to the Exit Facilities Term Sheet.

34.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

35.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

36.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

37.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

38.     "*Consenting DIP Lenders*" means those certain DIP Lenders that are or have become parties to the Restructuring Support Agreement.

39.     "*Consenting FLLO Term Loan Facility Lenders*" means those certain FLLO Term Loan Facility Lenders that are or have become parties to the Restructuring Support Agreement.

40.     "*Consenting Revolving Credit Facility Lenders*" means those certain Revolving Credit Facility Lenders that are or have become parties to the Restructuring Support Agreement.

41.     "*Consenting Second Lien Noteholders*" means Second Lien Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Second Lien Noteholders that are or have become parties to the Restructuring Support Agreement.

42.     "*Consenting Stakeholders*" means collectively, the Consenting DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, and the Consenting Second Lien Noteholders.

43.     "*Consenting Unsecured Noteholders*" means Unsecured Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Unsecured Noteholders that are or have become parties to the Restructuring Support Agreement.

44.     "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

45.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

46.     "*D&O Liability Insurance Policies*" means all insurance policies issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

47.     "*Definitive Documents*" means, without limitation, the following documents: (a) the Plan and its exhibits, ballots, and solicitation procedures; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the DIP Order, DIP Credit Agreement, and any and all other DIP Documents and related documentation; (h) the Backstop Commitment Agreement, Backstop Commitment Agreement Approval Order, Rights Offering Procedures, Registration Rights Agreement and any and all documentation required to implement, issue, and distribute the New Common Stock; (i) the New Warrants Agreements; (j) the Exit Facilities Documents and related documentation; (k) the Management Incentive Plan; (l) the New Organizational Documents and all other documents or agreements for the governance of Reorganized Chesapeake, including the list of directors of Reorganized Chesapeake and any certificates of incorporation and shareholders' agreements or supplements as may be reasonably necessary or advisable to implement the Restructuring Transactions; and (m) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by the Plan.

48.     "*DIP Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

49.     "*DIP Agent Fees and Expenses*" has the meaning ascribed to such term in the DIP Order.

50.     "*DIP Claims*" means all Claims derived from, based upon, or secured pursuant to the DIP Credit Agreement or DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, transaction fees, Superpriority Hedge Claims, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Facility; *provided* that any Adequate Protection Super-Priority Claims (as defined in the Final DIP Order), including such Claims granted in respect of the Revolving Credit Facility, FLLO Term Loan Facility, or Second Lien Notes authorized in the DIP Order, shall not be DIP Claims.

51.     "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated July 1, 2020, between Chesapeake Energy Corporation, as borrower, the Debtor guarantors that are party thereto, the DIP Lenders, and the DIP Agent (as may be amended, supplemented, or otherwise modified from time to time).

52.     "*DIP Documents*" means collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the DIP Credit Agreement.

53.     "*DIP Facility*" means that certain debtor-in-possession financing facility documented pursuant to the DIP Documents and DIP Order.

54.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement.

55.     "*DIP Order*" means collectively, the Interim DIP Order and the Final DIP Order.

56.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

57.     "*Disclosure Statement Order*" means an order of the Bankruptcy Court approving the Disclosure Statement, the Solicitation Materials, and the solicitation of the Plan.

58.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

59.     "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or before the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public Securities, including the Second Lien Notes and the Unsecured Notes.

60.     "*DTC*" means the Depository Trust Company.

61.     "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all Conditions Precedent to the Effective Date have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

62.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

63.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

64.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time, and the rules and regulations promulgated thereunder.

65.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the DIP Lenders; (d) the Exit Facilities Lenders; (e) the Consenting Revolving Credit Facility Lenders; (f) the Consenting FLLO Term Loan Facility Lenders; (g) the Consenting Second Lien Noteholders; (h) the Consenting Unsecured Noteholders; (i) the Agents; (j) each Trustee; (k) the Backstop Parties; and (l) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, participants, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

66.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

67.     "*Existing Equity Interest*" means an Interest in Chesapeake Energy Corporation existing as of the Petition Date.

68.     "*Existing RBL Adequate Protection Payments*" has the meaning ascribed to such term in the DIP Order.

69.     "*Exit Facilities*" means collectively, the Exit RBL Facility and Exit FLLO Term Loan Facility.

70.     "*Exit Facilities Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Exit Facilities.

71.     "*Exit Facilities Credit Agreements*" means those certain credit agreements that will govern the Exit Facilities (as each may be amended, supplemented, or otherwise modified from time to time), in each case which shall be consistent with the Exit Facilities Term Sheet.

6

72.     "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreements, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the form and substance of which shall be consistent with the Exit Facilities Term Sheet.

73.     "*Exit Facilities Lenders*" means the lenders party to the Exit Facilities Credit Agreements.

74.     "*Exit Facilities Loans*" means collectively, the Tranche A RBL Exit Facility Loans, the Tranche B RBL Exit Facility Loans, and the Exit FLLO Term Loans.

75.     "*Exit Facilities Term Sheet*" means the term sheet setting forth the material terms of the Exit Facilities, attached as <u>Exhibit 3</u> to the Restructuring Term Sheet.

76.     "*Exit FLLO Term Loan*" means term loans made under and on the terms set forth under the Exit FLLO Term Loan Facility.

77.     "*Exit FLLO Term Loan Facility*" means the term loan facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

78.     "*Exit RBL Facility*" means the revolving credit facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

79.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

80.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

81.     "*Final DIP Order*" means the *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, And (VI) Granting Related Relief* entered by the Bankruptcy Court on July 31, 2020 at CM/ECF No. 597 in the Chapter 11 Cases.

82.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

83.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

84.     "*FLLO Ad Hoc Group*" means the ad hoc group of FLLO Term Loan Facility Lenders represented by Davis Polk & Wardwell LLP.

85.     "*FLLO Professionals*" means the FLLO Term Loan Facility Administrative Agent's professionals (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction) and the FLLO Ad Hoc Group's professionals (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP).

86.     "*FLLO Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $382.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

87.     "*FLLO Term Loan Facility*" means the facility outstanding under the FLLO Term Loan Facility Credit Agreement.

88.     "*FLLO Term Loan Facility Administrative Agent*" means GLAS USA LLC, in its capacity as administrative agent for the FLLO Term Loan Facility.

89.     "*FLLO Term Loan Facility Claim*" means any Claim on account of the FLLO Term Loan Facility.

90.     "*FLLO Term Loan Facility Credit Agreement*" means that certain Term Loan Agreement, dated as of December 19, 2019 ((i) as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lender parties thereto, and (ii) as further amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lenders party thereto.

91.     "*FLLO Term Loan Facility Lenders*" means lenders party to the FLLO Term Loan Facility Credit Agreement.

92.     "*Franklin*" means Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts.

93.     "*General Unsecured Claim*" means any Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, a Second Lien Notes Claim, an Unsecured Notes Claim, an Intercompany Claim, or a Section 510(b) Claim.

94.     "*General Unsecured Claims Recovery Amount*" means cash in the amount of $1,000,000 in the aggregate.

95.     "*General Unsecured Claims Recovery Amount Allocation*" means the *Pro Rata* share of the General Unsecured Claims Recovery Amount allocated to each Debtor for payment of General Unsecured Claims asserted against such Debtor, which allocation shall be determined by the unencumbered value (if any) of such Debtor's assets as compared to the unencumbered value of all the Debtors' assets.

96.     "*General Unsecured Claims Recovery Reserve*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the General Unsecured Claims Recovery Amount.

97.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

98.     "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

99.     "*Insurance Policies*" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

100.     "*Insurer*" means any company or other Entity that issued or entered into an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

101.     "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

102.     "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

103.     "*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of December 19, 2019 by and between MUFG Union Bank, N.A., as Priority Lien Agent, and the Second Lien Notes Trustee, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

104.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

105.     "*Interim DIP Order*" means the *Interim Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on June 29, 2020 at CM/ECF No. 128 in the Chapter 11 Cases.

106.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

107.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

108.     "*Management Incentive Plan*" has the meaning set forth in Article IV.Q of the Plan.

109.     "*Minimum Liquidity Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have minimum liquidity, including unrestricted cash on hand and availability under the Exit RBL Facility, of at least $500 million.

110.     "*National Securities Exchange*" means The New York Stock Exchange, The Nasdaq Global Select Market, or The Nasdaq Global Market.

111.     "*New Board*" means the board of directors of Reorganized Chesapeake that shall be appointed in accordance with the terms of the governance term sheet attached as <u>Exhibit 6</u> to the Restructuring Term Sheet.  The identities of directors on the New Board shall be set forth in the Plan Supplement, to the extent known.

112.     "*New Class A Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan, the New Class B Warrants, and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.0 billion.

9

113.    "*New Class B Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.5 billion.

114.    "*New Class C Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $5.0 billion.

115.    "*New Common Stock*" means the single class of common stock to be issued by Reorganized Chesapeake on the Effective Date on terms acceptable to the Required Plan Sponsors.

116.    "*New Organizational Documents*" means the amended and restated or new charters, bylaws, operating agreements, or other organizational documents of Reorganized Chesapeake and the other Reorganized Debtors, as applicable and in form and substance satisfactory to the Required Plan Sponsors.

117.    "*New Warrants*" means collectively, the New Class A Warrants, the New Class B Warrants, and the New Class C Warrants.

118.    "*New Warrants Agreements*" means the documents or agreements governing the New Warrants, Filed with the Plan Supplement, which will be consistent in all material respects with the terms of this Plan and shall at all times be in form and substance reasonably acceptable to the Required Plan Sponsors and the Consenting Second Lien Noteholders holding at least 66.67% of the aggregate outstanding principal amount of the Second Lien Notes Claims that are held by the Consenting Second Lien Noteholders.

119.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

120.    "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, or a Second Lien Notes Claim.

121.    "*PDP PV-10 Ratio*" means the ratio of (a) the total present value of the future net revenues expected with respect to the oil and gas properties of the Debtors discounted at 10% per annum, calculated in accordance with the Exit Facilities Term Sheet to (b) consolidated indebtedness under the Exit Credit Facilities and any other secured debt of Chesapeake as of the closing date of the Exit Credit Facilities.

122.    "*PDP PV-10 Test Ratio Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have a PDP PV-10 Ratio no less than 1.5x.

123.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

124.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

125.    "*Plan Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

10

126.     "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior on or before November 23, 2020, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) a summary of the material terms of the Exit Facilities, which may include the Exit Facilities Term Sheet; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) the Registration Rights Agreement.

127.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

128.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

129.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

130.     "*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

131.      "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.A.2(c) of the Plan.

132.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

133.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Administrative Claims Bar Date, as applicable.

134.     "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

135.     "*Put Option Premium*" means a nonrefundable aggregate fee of $60 million, which represents 10 percent of the Rights Offering Amount, payable to the Backstop Parties in accordance with, and subject to the terms of, the Backstop Commitment Agreement based on their respective Backstop commitment percentages at the time such payment is made.

136.     "*Registration Rights Agreement*" means the registration rights agreement pursuant to which each Backstop Party shall be entitled to registration rights with respect to its shares of New Common Stock, its New Warrants, and its shares of New Common Stock underlying its New Warrants to be entered into as of the Effective Date.  The Registration Rights Agreement will provide (among other provisions) that, after the Effective Date, at any time Reorganized Chesapeake is not required to file public reports with the SEC, Reorganized Chesapeake shall continue to file such public reports on EDGAR as a voluntary filer, unless approved by the holders of a majority of the outstanding New Common Stock.

137.      "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

138.      "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Stakeholders.

139.      "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

140.      "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

141.      "*Removal Deadline*" means the deadline by which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, as amended by the Removal Extension Order.

142.      "*Removal Extension Order*" means the *Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* entered by the Bankruptcy Court on September 25, 2020 at CM/ECF No. 1231 in the Chapter 11 Cases.

143.      "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

144.      "*Reorganized Chesapeake*" means the new entity which shall be incorporated in the State of Delaware and will be the successor or assign to Chesapeake, by merger, consolidation, or otherwise, on or after the Effective Date.

145.     "*Required Consenting DIP Lenders*" means Consenting DIP Lenders holding at least 51% of the aggregate Revolving DIP Loan Commitments under the DIP Facility that are held by Consenting DIP Lenders.

146.     "*Required Consenting Revolving Credit Facility Lenders*" means Consenting Revolving Credit Facility Lenders holding at least 51% of the aggregate outstanding principal amount of the Revolving Credit Facility Claims that are held by Consenting Revolving Credit Facility Lenders.

147.     "*Required Consenting Stakeholders*" means the Required Consenting DIP Lenders, the Required Consenting Revolving Credit Facility Lenders, and the Required Plan Sponsors.

148.     "*Required Plan Sponsors*" means the Backstop Parties holding FLLO Term Loan Facility Claims and commitments to Backstop the Rights Offering such that the Required Plan Sponsors Percentage exceeds 66 2/3 percent.

149.     "*Required Plan Sponsors Percentage*" means a fraction, expressed as a percentage, (a) the numerator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by the relevant Backstop Parties and (ii) the percentage of the Backstop ascribed to the relevant Backstop Parties (as set forth in the Backstop Commitment Agreement) multiplied by the Rights Offering Amount; and (b) the denominator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by all of the Backstop Parties and (ii) the Rights Offering Amount.

150.     "*Restructuring Expenses*" means any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by the FLLO Professionals and the Second Lien Professionals payable on the Effective Date, subject to the conditions set forth in Article IV.V of the Plan; *provided* that reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

151.     "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of June 28, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

152.     "*Restructuring Term Sheet*" means the term sheet setting forth the material terms of the Restructuring Transactions, attached as Exhibit B to the Restructuring Support Agreement.

153.     "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

154.     "*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Stakeholders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions.

155.     "*Revolving Credit Facility*" means the facility outstanding under the Revolving Credit Facility Credit Agreement.

156.     "*Revolving Credit Facility Administrative Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Revolving Credit Facility.

157.     "*Revolving Credit Facility Claim*" means any Claim on account of the Revolving Credit Facility, other than any Claims converted to Roll-Up Loans (as defined in the Final DIP Order).

158.     "*Revolving Credit Facility Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the Revolving Credit Facility Administrative Agent, and the other lender, issuer, and agent parties party thereto.

159.     "*Revolving Credit Facility Lenders*" means the lenders party to the Revolving Credit Facility Credit Agreement.

160.     "*Revolving DIP Loan Commitment*" means a commitment to provide revolving loans under the DIP Facility.

161.     "*Rights*" means collectively, the FLLO Rights, the Second Lien Rights, and the Backstop Party Rights.

162.     "*Rights Offering*" means the New Common Stock rights offering for the Rights Offering Amount to be consummated by the Debtors on the Effective Date in accordance with the Rights Offering Procedures.

163.     "*Rights Offering Amount*" means a minimum of $600 million in aggregate amount of Rights.

164.     "*Rights Offering Participants*" means (a) holders of FLLO Term Loan Facility Claims and Second Lien Notes Claims as of the Rights Offering Record Date and (b) the Backstop Parties.

165.     "*Rights Offering Procedures*" means the procedures governing the Rights Offering attached as an exhibit to the Disclosure Statement Order.

166.     "*Rights Offering Record Date*" means the record date set by the Rights Offering Procedures, as of which date an Entity must be a record holder of FLLO Term Loan Facility Claims or Second Lien Notes Claims in order to be eligible to be a Rights Offering Participant.

167.     "*Royalty and Working Interests*" means the working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests, including but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, unleased mineral interests, and production payments.

168.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

169.     "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

170.     "*SEC*" means the United States Securities and Exchange Commission.

171.     "*Second Lien Noteholders*" means holders of notes issued under the Second Lien Notes Indenture.

172.     "*Second Lien Notes*" means the 11.500% senior notes due 2025 issued by Chesapeake pursuant to the Second Lien Notes Indenture.

173.     "*Second Lien Notes Claim*" means any Claim on account of the Second Lien Notes.

174.     "*Second Lien Notes Indenture*" means that certain indenture dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtors guarantors party thereto, and the Second Lien Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

175.     "*Second Lien Notes Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee and collateral trustee for the Second Lien Notes Indenture.

176.    "*Second Lien Professionals*" means the Second Lien Collateral Trustee's professionals (including Morgan, Lewis & Bockius LLP, one local counsel in the relevant jurisdiction, and one financial advisor) and Franklin's professionals (including Akin Gump Strauss Hauer & Feld LLP, Moelis & Company LLC, one local counsel in each other relevant local jurisdiction, and FTI Consulting, Inc.).

177.    "*Second Lien Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $67.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

178.    "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

179.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

180.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

181.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

182.    "*Solicitation Materials*" means the Disclosure Statement and related documentation to be distributed to holders of Claims entitled to vote on the Plan.

183.    "*Superpriority Hedge Claims*" means superpriority claims in respect of the Debtors' Superpriority Hedge Obligations.

184.    "*Superpriority Hedge Obligations*" means all hedging obligations with respect to commodity hedge transactions that are secured under the DIP Facility.

185.    "*Total Leverage*" means the ratio of (a) consolidated indebtedness net of unrestricted Cash and Cash equivalents held in a pledged account in an amount not to exceed $100 million to (b) consolidated EBITDAX calculated in accordance with the terms set forth in the Exit Facilities Term Sheet.

186.    "*Total Leverage Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have Total Leverage no greater than 2.25:1.00.

187.    "*Tranche A RBL Exit Facility Loans*" means fully revolving loans made under and on the terms set forth under the Exit RBL Facility which will be partially funded on the Effective Date, will have a scheduled maturity of 3 years from the Effective Date, and shall at all times be repaid prior to the repayment of Tranche B Exit RBL Facility Loans.

188.    "*Tranche B RBL Exit Facility Loans*" means term loans made under and on the terms set forth under the Exit RBL Facility which will be fully funded on the Effective Date, will have a scheduled maturity of 4 years from the Effective Date, will be repaid or prepaid only after there are no Tranche A RBL Exit Facility Loans outstanding, and once so prepaid or repaid, may not be reborrowed.

189.    "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Second Lien Notes or the Unsecured Notes.

190.    "*Turnover Provisions*" has the meaning set forth in Article IV.A of the Plan.

191.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

192.     "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

193.     "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

194.     "*Unsecured Noteholders*" means holders of notes issued under the Unsecured Notes Indentures.

195.     "*Unsecured Notes*" means the 6.625% senior notes due 2020, the 6.875% senior notes due 2020, the 6.125% senior notes due 2021, the 5.375% senior notes due 2021, the 4.875% senior notes due 2022, the 5.750% senior notes due 2023, the 7.000% senior notes due 2024, the 8.000% senior notes due 2025, the 8.000% senior notes due 2026, the 7.500% senior notes due 2026, the 8.000% senior notes due 2027, the 5.500% convertible senior notes due 2026, and the 6.875% senior notes due 2025, all issued by certain Debtors pursuant to the Unsecured Notes Indentures.

196.     "*Unsecured Notes Claim*" means any Claim on account of the Unsecured Notes.

197.     "*Unsecured Notes Claims Recovery*" means 12% of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants).

198.     "*Unsecured Notes Indentures*" means those certain indentures dated as of the following dates: August 2, 2010 (6.625% senior notes due 2020); November 8, 2005 (6.875% senior notes due 2020); February 11, 2011 (6.125% senior notes due 2021); April 1, 2013 (5.375% senior notes due 2021); April 24, 2014 (4.875% senior notes due 2022); April 1, 2013 (5.750% senior notes due 2023); September 27, 2018 (7.000% senior notes due 2024); December 20, 2016 (8.000% senior notes due 2025); April 3, 2019 (8.000% senior notes due 2026); September 27, 2018 (7.500% senior notes due 2026); June 6, 2017 (8.000% senior notes due 2027); October 5, 2016 (5.500% convertible senior notes due 2026); and February 1, 2017 (6.875% senior notes due 2025), each by and among certain of the Debtors and the Unsecured Notes Trustees, as may be amended, supplemented, or otherwise modified from time to time.

199.     "*Unsecured Notes Trustees*" means the following entities, each in its capacity as trustee for the Unsecured Notes Indentures:  The Bank of New York Trust Company, N.A. (6.625% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.875% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.125% senior notes due 2021); Wilmington Savings Fund Society, FSB (5.375% senior notes due 2021); Wilmington Savings Fund Society, FSB (4.875% senior notes due 2022); Wilmington Savings Fund Society, FSB (5.750% senior notes due 2023); Wilmington Savings Fund Society, FSB (7.000% senior notes due 2024); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2025); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2026); Wilmington Savings Fund Society, FSB (7.500% senior notes due 2026); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2027); Wilmington Savings Fund Society, FSB (5.500% convertible senior notes due 2026); and U.S. Bank National Association (6.875% senior notes due 2025).

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as

applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; *provided* that nothing in this clause (2) or clause (3) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as set forth in the Restructuring Support Agreement (including the exhibits thereto), with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent, DIP Lenders, Revolving Credit Facility Administrative Agent, Revolving Credit Facility Lenders, Exit Facilities Agent, and Exit Facilities Lenders as set forth in the DIP Documents, DIP Order, and Exit Facilities Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein. Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

    1.      General Administrative Claims.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims, or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Agent under the Collateral Trust Agreement shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments. The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

2.     Professional Compensation.

(a)     Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

(b)     Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(c)     Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)    Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.    *DIP Claims.*

For the avoidance of doubt, the DIP Claims are Allowed in full in accordance with the DIP Order.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (1) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (2) the proceeds of the Rights Offering; and (3) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Allowed Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims. For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order.  The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with this Article II.B, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.    *Statutory Fees.*

All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. <u>Class 1 – Other Secured Claims</u>.

    (a)    *Classification*:  Class 1 consists of all Other Secured Claims.

    (b)    *Treatment*: On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders:

        (i)    payment in full in Cash;

        (ii)    the collateral securing its Allowed Other Secured Claim;

        (iii)    Reinstatement of its Allowed Other Secured Claim; or

        (iv)    such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 – Other Priority Claims</u>.

    (a)    *Classification*:  Class 2 consists of all Other Priority Claims.

    (b)    *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – Revolving Credit Facility Claims</u>.

    (a)    *Classification*:  Class 3 consists of all Revolving Credit Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility.  On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive,  in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash as set forth in Section II.A.1 of the Plan.

    (c)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Revolving Credit Facility Claims are entitled to vote to accept or reject the Plan.

4.   Class 4 – FLLO Term Loan Facility Claims.

    (a)    *Classification*:  Class 4 consists of all FLLO Term Loan Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, the make whole amount, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility.  On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

    (c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of FLLO Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

5.   Class 5 – Second Lien Notes Claims.

    (a)    *Classification*:  Class 5 consists of all Second Lien Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest.  Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

    (c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

6.   Class 6 – Unsecured Notes Claims.

    (a)    *Classification*:  Class 6 consists of all Unsecured Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of (i) the Unsecured Notes Claims Recovery and (ii) 50 percent of the New Class C Warrants.

    (c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

7.   Class 7 – General Unsecured Claims.

    (a)    *Classification*:  Class 7 consists of all General Unsecured Claims.

    (b)    *Treatment*:  On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the General Unsecured Claims Recovery Amount allocable to the Debtor against which such Claim is asserted.

     (c)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Intercompany Claims</u>.

     (a)     *Classification*:  Class 11 consists of all Intercompany Claims.

     (b)     *Treatment*:  On the Effective Date, unless otherwise provided for under the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall have its Claim:

         (i)     Reinstated; or

         (ii)     distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distribution shall be made on account of any such Intercompany Claims.

     (c)     *Voting*:  Class 8 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 8 is not entitled to vote to accept or reject the Plan.

9.    <u>Class 9 – Intercompany Interests</u>.

     (a)     *Classification*:  Class 9 consists of all Intercompany Interests.

     (b)     *Treatment*:  On the Effective Date, each holder of Intercompany Interests shall have such Interest:

         (i)     Reinstated; or

         (ii)     canceled, released, and extinguished without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders.

     (c)     *Voting*:  Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10.    <u>Class 10 – Existing Equity Interests</u>.

     (a)     *Classification*:  Class 10 consists of all Existing Equity Interests.

     (b)     *Treatment*:  On the Effective Date, each holder of Existing Equity Interests shall have such Interest cancelled, released, and extinguished without any distribution.

     (c)     *Voting*:  Class 10 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right, subject to the prior consent of the Required Consenting Stakeholders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving

Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions").  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Midstream Savings Requirement.*

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and

the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

D.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

E.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D below.

1.      Rights Offering.

The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures. Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights; (b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights. Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount. Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and

restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order.  For the avoidance of doubt, if the Put Option Premium is payable in Cash pursuant to the terms and conditions set forth in the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order, the Put Option Premium shall be a superpriority administrative expense with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code except it shall be unsecured and (i) be subordinated in priority to (a) the DIP Claims and (b) any adequate protection granted on account of the Revolving Credit Facility Claims (and any Claims to which such Claims in (a) or (b) are subordinate); and (ii) payable only after all such Claims set forth in clause (i) have been paid in full in Cash or provided such other treatment as is agreed to by the requisite parties, as set forth in section 3.1 of the Backstop Commitment Agreement.

All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

2.    Rights and New Common Stock.

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B.  Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents.  Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock.  All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

3.    New Warrants.

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B this Plan.  Issuances of the New Warrants shall be governed by the terms and conditions set

forth in this Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

       4.   Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents. The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

F.    *General Unsecured Claims Recovery Reserve.*

On the Effective Date, the Reorganized Debtors shall establish and fund the General Unsecured Claims Recovery Reserve with Cash in an amount equal to the General Unsecured Claims Recovery Amount. The General Unsecured Claims Recovery Reserve shall be maintained in trust solely for holders of Allowed General Unsecured Claims. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. Allowed General Unsecured Claims shall be paid in accordance with Article V1.A of the Plan.

G.    *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation,

limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise provided in this Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to this Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, to the extent cancelled pursuant to this Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, this Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification,

contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

Except as provided in this Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable. To the extent cancelled in accordance with this Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to extend any further or future credit or financial accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

J.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state. The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such

provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents. The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.      *Management Incentive Plan.*

On the Plan Effective Date, the Reorganized Debtors shall adopt a management incentive plan (the "Management Incentive Plan"). All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

R.      *Employee Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices. On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee. Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the

objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

T.      *Preservation of Royalty and Working Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any prepetition or post-petition but pre-Effective Date right to payment arising from a Royalty and Working Interest asserted by a non-Debtor as a prepetition Claim or Administrative Claim, respectively, if any, shall be treated as a Claim under this Plan and shall be subject to any discharge and/or release provided in the Plan without prejudice to any rights to assert a Claim or dispute which may arise post-Effective Date on account of or relating to an unexpired or unterminated Royalty and Working Interest.

U.      *Resolution of Pending Litigation.*

The Debtors may remove to the Bankruptcy Court by the Removal Deadline any litigation pending as of the Petition Date that alleges claims or causes of action that, if successful, would not result in a Claim. Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; *provided* that any Claim resulting from a final judgment in any such litigation shall be treated in accordance with the Plan.

V.      *Payment of Certain Fees*.

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in this Article IV.V of the Plan. The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the

Plan, whether incurred before, on, or after the Effective Date. For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens. Notwithstanding anything in the Plan, including Article IV.I hereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right, with the consent of the Required Consenting Stakeholders, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Stakeholders, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Leases Schedule in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.       *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.       *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, any Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, the Restructuring Term Sheet, any Bar Date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):

(1) on the Effective Date the Reorganized Debtors shall be deemed to have assumed all unexpired Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (2) all unexpired Insurance Policies shall re-vest in the Reorganized Debtors, unaltered, other than that on and after the Effective Date, the Reorganized Debtors shall be liable for all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) under the Insurance Policies, regardless of when such debts, obligations, and liabilities arise, without the need or requirement for any Insurer to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount, and thereafter the Reorganized Debtors may, subject to the terms of the Insurance Policies and applicable non-bankruptcy law, resolve any Claims covered by the Insurance Policies, resolve any Causes of Action, if any, in connection with the Insurance Policies, and collect any and all outstanding deposits, restricted cash, and letters of credit, if any, related thereto; (3) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Policies; and (4) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

F.       *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.       *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.     *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Interests in the applicable Class.

With respect to holders of Allowed General Unsecured Claims, each such holder shall receive from the General Unsecured Claims Recovery Reserve (1) an initial Cash distribution on the Effective Date or as soon as reasonably practicable thereafter (or if a General Unsecured Claim is not an Allowed General Unsecured Claim on the Effective Date, on the date that such General Unsecured Claim becomes an Allowed General Unsecured Claim or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Cash in the General Unsecured Claims Recovery Reserve allocable to the Debtor against which such General Unsecured Claim is Allowed.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

B.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.     Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security or FLLO Term Loan Facility Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.     Delivery of Distributions in General.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, with respect to distributions on account of FLLO Term Loan Facility Claims, the Required Plan Sponsors.

3.   Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment therefor; *provided, however*, that fractional shares rounding determination with respect to the Rights Offering shall be subject to the Rights Offering Procedures.  The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

5.   Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

6.   Delivery of Distributions on Second Lien Notes Claims and Unsecured Notes Claims.

The Debtors shall make all distributions required under the Plan.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of Second Lien Notes Claims and Unsecured Notes Claims shall be made to or at the direction of each of the Trustees for distribution under the applicable indentures and bond agreements.  The Trustees may transfer or direct the transfer of such distributions directly through the facilities of the applicable securities depository and clearing house and will be entitled to recognize and deal with, for all purposes under the Plan, holders of Second Lien Notes Claims and Unsecured Notes Claims, as applicable, as is consistent with the ordinary practices of the applicable depositories.  Such distributions shall be subject to the right of each of the Trustees under the applicable indenture or bond agreements, including their rights to assert and exercise charging liens against such distributions.

C.   *Manner of Payment.*

Except as otherwise set forth herein, all distributions of Cash, the New Common Stock, the New Warrants, and the Rights, as applicable, to Holders of Allowed Claims under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable.  At the option of the Reorganized Debtors (in consultation with and subject to the reasonable consent of the Required Consenting Stakeholders), any Cash payment to be made under the Plan, if any, may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

D.      *Exemption from Securities Laws*.

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the 1145 Securities are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  Each of the 1145 Securities (1) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (2) is freely tradable and transferable by any initial recipient thereof that at the time of transfer or as a result thereof, is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock (including any shares issuable as part of the Put Option Premium or issuable upon exercise of the Rights other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) or the New Warrants (and any Shares of the New Common Stock issuable upon the exercise of the New Warrants) through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to such treatment under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Each Backstop Party that receives Plan Securities will be entitled to registration rights and sale support rights with respect to all such Securities to be documented in the Registration Rights Agreement in form and substance satisfactory to the Required Plan Sponsors.

E.      *Compliance with Tax Requirements*.

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

F.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

G.      *No Postpetition or Default Interest on Claims.*

Notwithstanding any provision in the Plan, the Confirmation Order, or any documents that govern the Debtors' prepetition funded indebtedness or other Claims to the contrary, except as provided in the DIP Order, DIP Credit Agreement, and Articles II.B, III.B.3 and III.B.4 hereof, (a) postpetition and/or default interest shall not accrue or be paid on any Claims; and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan and the DIP Order, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.  Notwithstanding anything to the contrary herein, the Allowed DIP Claims, the Allowed Revolving Credit Facility Claims, the Allowed FLLO Term Loan Facility Claims, the Allowed Second Lien Notes Claims, or the Allowed Unsecured Notes Claims and the Plan distributions to be made on account of such Claims shall not be subject to set off and/or recoupment by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors and the Reorganized Debtors hereby waive any and all rights of set off or recoupment against such Claims.

J.      *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

K.      *Claims Paid or Payable by Third Parties.*

    1.      <u>Claims Paid by Third Parties</u>.

        The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

    2.      <u>Claims Payable by Third Parties</u>.

        No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction of such Claim, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.      <u>Applicability of Insurance Policies</u>.

        Except as otherwise provided in the Plan, payments to holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

</div>

A.      *Allowance of Claims.*

        After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities.*

        Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

<div align="center">43</div>

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) one-hundred-eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the General Unsecured Claims Recovery Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts set forth in the Plan (in the case of the General Unsecured Claims Recovery Reserve) or as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

G.      *Disallowance of Claims or Interests.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and

all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order**.

H.     *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of the Claim or Interest is Allowed.

I.     *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

J.     *No Interest on Disputed Claims.*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

**B.**     *Release of Liens.*

Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided, further,* that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

**C.**     *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan

Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

D.    *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other

related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or

may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Recoupment.*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

I.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of

the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1. the Confirmation Order shall have become a Final Order and be in form and substance acceptable to the Required Consenting Stakeholders and shall:

   (a)   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   (b)   decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   (c)   authorize the Debtors or the Reorganized Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering and Exit Facilities; (b) appoint the directors and officers for the Reorganized Debtors; (c) issue and distribute the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (d) issue and distribute the Rights and subsequently issue and distribute New Common Stock issuable upon exercise of such; (e) execute and deliver the Registration Rights Agreement; (f) execute and deliver the New Warrants Agreements and issue and distribute the New Warrants; (g) enter into the Exit Facilities Documents; (h) take all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (i) approve and adopt the New Organizational Documents; (j) adopt the Management Incentive Plan; (k)  reject, assume, or assume and assign, as applicable, Executory Contracts and Unexpired Leases; and (l) complete all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

   (d)   authorize the implementation of the Plan in accordance with its terms;

   (e)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

   (f)   contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the Plan and the applicable documents included in the Plan Supplement, including any schedules, documents, and exhibits contained therein, shall have been Filed and shall be in form and substance

reasonably acceptable to the Debtors and the Required Consenting Stakeholders in accordance with the consent rights contained in the Restructuring Support Agreement;

4. the Restructuring Support Agreement shall remain in full force and effect;

5. the Final Order approving the DIP Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

6. the Backstop Commitment Agreement Approval Order and Backstop Commitment Agreement shall have been entered and remain in full force and effect;

7. all Allowed Professional Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Claims by the Bankruptcy Court, all fees and expenses payable pursuant to Article IV.V shall have been paid in full, and all fees and expenses of the DIP Agent, Revolving Credit Facility Administrative Agent, and the Agent under the Collateral Trust Agreement payable pursuant to the DIP Order shall have been paid in full;

8. the payments required to be made pursuant to the terms of Article IV.V of the Plan shall have been paid;

9. the New Organizational Documents with respect to the Reorganized Debtors shall be in full force and effect and be in form and substance reasonably acceptable to the Required Consenting Stakeholders;

10. the Exit Facilities Documents shall be in full force and effect (with the Conditions Precedent to the Exit Facilities having been met, satisfied, or waived) and, subject to any post-closing execution and delivery requirements provided for in the Exit Facilities Documents, be in form and substance acceptable to the Required Consenting Stakeholders (such approval not to be withheld in bad faith; *provided* that the terms set forth in the Exit Facilities Term Sheet shall be deemed acceptable to the Required Consenting Stakeholders); and

11. The Minimum Liquidity Condition, the Total Leverage Condition, and the PDP PV-10 Test Ratio Condition shall have been met, satisfied, or waived.

For the avoidance of doubt, if the Minimum Liquidity Condition, the Total Leverage Condition, and/or the PDP PV-10 Test Ratio Condition would not otherwise be satisfied, the Required Plan Sponsors may agree, in their sole discretion, to increase the Rights Offering amount above $600 million on the same terms, including the Rights Offering Value and with an allocation consistent with the Backstop Allocations, in order to enable such conditions to be satisfied; *provided* that no Backstop Party's Backstop Commitment may be increased without its consent.

B. *Waiver of Conditions.*

Any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (with the exception of the condition precedent specified in Section IX.A.4, not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C. *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an

admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.       *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.       *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, upon prior notice to and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and with the consent of the Required Consenting Stakeholders, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.       *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, upon prior notice to and with the consent of the Required Consenting Stakeholders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, and including any settlement, waiver, or release of any rights of the Revolving Credit Facility Lenders under the Intercreditor Agreement or the Collateral Trust Agreement), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.       allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any

Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15.     enter an order concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the obligations or terms of the Rights Offering and the Backstop Commitment Agreement;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

23.     enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
| --- | --- |
| Chesapeake Energy Corporation<br>6100 North Western Avenue<br>Oklahoma, Oklahoma 73118<br>Attention:  James R. Webb | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Patrick J. Nash, Jr., P.C., Marc Kieselstein, P.C., and Alexandra Schwarzman<br><br>and<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention:  Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, and Veronica A. Polnick |

| United States Trustee | Counsel to the Consenting DIP Lenders |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention: Jennifer C. Hagle and Brian E. Minyard |
| **Counsel to the Consenting Revolving Credit Facility Lenders** | **Counsel to the FLLO Ad Hoc Group** |
| Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention: Jennifer C. Hagle and Brian E. Minyard | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention: Damian S. Schaible, Darren S. Klein, and Aryeh Ethan Falk |
| **Counsel to Franklin** | |
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, New York 10036<br>Attention: Michael S. Stamer, Meredith A. Lahaie, and Stephen B. Kuhn | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/chesapeake or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or

provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Chesapeake, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Chesapeake; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of Chesapeake has been closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Chesapeake in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated:  October 30, 2020

CHESAPEAKE ENERGY CORPORATION

on behalf of itself and all other Debtors



*/s/  Domenic J. Dell'Osso, Jr.*
Domenic J. Dell'Osso, Jr.
Executive Vice President and Chief Financial Officer

**Exhibit B**

**Corporate Organization Chart**



**Exhibit C**

**Liquidation Analysis**

<u>**EXHIBIT C**</u>

Liquidation Analysis

## 1) Introduction

Chesapeake Energy Corporation and certain of its affiliates (collectively, the "**Debtors**"), with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "**Plan**") and related disclosure statement (as amended, supplemented, or modified from time to time, the "**Disclosure Statement**") pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").[1]

The Liquidation Analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test. Under this test, the Bankruptcy Court must find, as a condition to confirmation of the Plan, that each holder of an impaired Claim against or Interest in the Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of their advisors, have prepared the following Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

To demonstrate satisfaction of the "best interests" test, the Debtors have:

i)  estimated the cash proceeds (the "**Liquidation Proceeds**") a chapter 7 trustee (the "**Trustee**") would generate if each Debtor's Chapter 11 Case was converted to a case under chapter 7 on the Conversion Date and the assets of such Debtor's estate were liquidated;

ii)  determined the distribution (the "**Liquidation Distribution**") each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated under chapter 7 of the Bankruptcy Code; and

iii)  compared each holder's Liquidation Distribution to such holder's distribution under the Plan if it were confirmed and consummated.

Accordingly, asset values discussed herein may be different than amounts referred to in the Plan and the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IF THE CHAPTER 11 CASES ARE CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THIS LIQUIDATION ANALYSIS.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or Plan, as applicable.

**2)  Process and Assumption Overview**

The Liquidation Analysis was prepared by legal entity and assumes that the Debtors would be liquidated on a jointly administered but nonconsolidated basis. The analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to chapter 7 cases on or about December 31, 2020 (the "**Conversion Date**"). The Debtors have assumed that the liquidation would occur over an approximately three-month time period in order sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet.  The analysis assumes the Debtors would utilize an additional three-month period to administer and wind-down the estates. Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' pro forma balance sheets as of August 31, 2020, which values are adjusted to reflect the estimated balances as of the Conversion Date or are otherwise assumed to be representative of the Debtors' assets and liabilities. Any projected balance sheet amounts presented in this Liquidation Analysis are intended to be a proxy for actual balances on the Conversion Date. In addition, this Liquidation Analysis incorporates certain adjustments to account for the effects of the chapter 7 liquidation process, including but not limited to post-conversion operating cash flow, costs of winding down the Debtors' estates, employee related costs, professional fees, and trustee fees.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint a Trustee who would sell the assets of the bankruptcy estates and distribute the Liquidation Proceeds, net of liquidation related costs, to creditors in accordance with the Bankruptcy Code. To maximize recovery in an expedited process, the Trustee's expected initial step would be to develop a liquidation plan to generate Liquidation Proceeds from the sale of the Debtors' assets for Liquidation Distributions to creditors. It is assumed the appointed Trustee will retain lawyers and other necessary advisors to assist in the liquidation.

This analysis assumes three months following a conversion to chapter 7 to allow for a reasonable but expedited amount of time to consummate a sale of the producing assets. Assets are marketed on an accelerated timeline with all asset sales contemplated to occur within the three-month period. Asset values in the liquidation process are assumed to be driven by, among other things:

- the accelerated time frame in which the assets are marketed and sold;

- the potential loss of key personnel;

- forward commodity price curves;

- current market conditions;

- negative partner and vendor reaction; and

- the general forced nature of the sale

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of claims include various potential employee claims (such as severance or WARN Act claims), new bonding or letters of credit for plugging and abandonment ("P&A") liabilities, claims resulting from the rejection of executory contracts, claims resulting from litigation, and unexpired lease rejection damages in addition to other potential claims. Claims can be material and can receive administrative or priority payment status.  This analysis does not include estimates for tax consequences, both Federal and state, that may be triggered upon the liquidation and sale of assets; tax consequences could be material, and may also be eligible to receive administrative or priority payment status. Liquidation Proceeds would be used to pay in full Priority claims and the balance would be made available to satisfy general unsecured claims.

3) **Distribution of Net Liquidation Proceeds to Claimants**

Any available net Liquidation Proceeds would be allocated to Holders of Claims in strict priority in accordance with section 726 of the Bankruptcy Code:

- <u>Structurally Senior Claims</u> - includes estimated claims from counterparties that are able to assert liens on corresponding assets, including certain trade vendors;

- <u>Superpriority Claims</u> – includes DIP Claims, along with associated professional fee carve out amounts and any out-of-the-money hedging obligations;

- <u>Administrative Claims</u> - includes Chapter 7 administrative claims such as estimated fees paid to the U.S. Trustee and Clerk of the Bankruptcy Court, professional fees and wind-down expenses, and certain Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;

- <u>Revolving Credit Facility Claims</u> - includes estimated Claims arising under the Debtors' first lien secured credit facilities;

- <u>FLLO Term Loan Facility Claims</u> – includes claims resulting under the FLLO Term Loan due 2024 claims;

- <u>Second Lien Notes Claims</u> – includes claims resulting under the Second Lien Notes due 2025 claims;

- <u>Unsecured Priority Claims</u> – includes claims with elevated priority, such as priority tax claims;

- <u>General Unsecured Claims</u> - includes claims arising from the Debtors' unsecured funded debt, estimated deficiency claims arising from the Debtors' secured funded debt, Chapter 11 prepetition unsecured trade Claims, rejection damage claims, and other types of prepetition liabilities. Deficiency claims are assumed to be asserted at each Debtor borrower and guarantor entity and are pari passu with other General Unsecured Claims;

- <u>Intercompany Claims and Equity Interests</u> - includes estimated Intercompany Claims and Equity Interests.

Under the absolute priority rule, no junior creditor would receive any Liquidation Distribution until all senior creditors are paid in full, and no equity holder would receive any Liquidation Distribution until all creditors are paid in full. The assumed Liquidation Distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule. The recoveries estimated in this analysis consider the encumbered nature of the assets that are monetized, for both oil & gas properties and other assets.

4) **Conclusion**

The determination of hypothetical Liquidation Proceeds from this liquidation is a highly uncertain process involving the extensive use of estimates and assumptions, which, while considered reasonable by the Debtors and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors.

This analysis was prepared before the deadline for filing Claims against the Debtors' estates, so the Debtors have not had an opportunity to fully evaluate potential Claims against the Debtors or to adjudicate such Claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities under chapter 11 of the Bankruptcy Code. The estimated

liquidation recoveries and proceeds waterfall are presented herein as a summary of each individual debtor with their estimated recoveries.

The Debtors determined, as summarized in the table below, upon the Effective Date, the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and thus believe the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

| Class | Name of Class Under Plan | Status | Estimated Recovery Under the Plan (Mid) | Estimated Recovery Under Hypothetical Liquidation (Low) | Estimated Recovery Under Hypothetical Liquidation (Mid) | Estimated Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| DIP Claims | DIP Facility Claims | Unimpaired | 100% | 100% | 100% | 100% |
| Class 1 | Other Secured Claims | Unimpaired | 100% | n.a. | n.a. | n.a. |
| Class 2 | Unsecured Priority Claims | Unimpaired | 100% | n.a. | n.a. | n.a. |
| Class 3 | Revolving Credit Facility Claims | Unimpaired | 100% | 29.1% | 63.2% | 100.0% |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | 59.7% | --% | --% | 7.3% |
| Class 5 | Second Lien Notes Claims | Impaired | 14.8% | --% | --% | --% |
| Class 6 | Unsecured Notes Claims | Impaired | 3.3% | --% | --% | --% |
| Class 7 | General Unsecured Claims | Impaired | >0% | --% | --% | --% |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | --% | n.a. | n.a. | n.a. |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | --% | n.a. | n.a. | n.a. |
| Class 10 | Equity Interests | Impaired | --% | n.a. | n.a. | n.a. |

**The following table summarizes the Liquidation Analysis for the Aggregated Debtor Entities. The Liquidation Analysis should be reviewed with the accompanying "Specific Notes to the Liquidation Analysis" set forth on the following pages.**

## STANDALONE DEBTOR ENTITY LIQUIDATION ANALYSIS

Aggregated Legal Entities
*$ in millions*

### Gross Liquidation Proceeds

| Liquidated Balance Sheet | Notes | 8/31/2020 | Adjustments | 12/31/2020 | Estimated Recovery - % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Low | Mid | High | Low | Mid | High |
| Cash | [A] | $207 | ($197) | $10 | 100% | 100% | 100% | $10 | $10 | $10 |
| Accounts Receivable | [B] | 728 | 105 | 833 | 80% | 85% | 91% | 669 | 712 | 755 |
|   Oil and Natural Gas Sales A/R | | 101 | 1 | 101 | 85% | 90% | 95% | 86 | 91 | 96 |
|   JIB A/R | | 81 | 98 | 178 | 80% | 85% | 90% | 143 | 152 | 161 |
|   Marketing, Gathering and Compression A/R | | 497 | 34 | 531 | 80% | 85% | 90% | 425 | 452 | 478 |
|   Other A/R | | 49 | (27) | 22 | 70% | 80% | 90% | 16 | 18 | 20 |
| Property & Equipment | | 5,671 | -- | 5,671 | 41% | 45% | 51% | 2,353 | 2,551 | 2,886 |
|   Total Oil and Gas | [C] | 4,664 | -- | 4,664 | 48% | 52% | 58% | 2,224 | 2,404 | 2,722 |
|   Total PP&E Other | [D] | 1,008 | -- | 1,008 | 13% | 15% | 16% | 129 | 147 | 164 |
| Other Assets | [D] | 289 | -- | 289 | 12% | 19% | 26% | 35 | 55 | 55 |
| **Total Liquidated Assets** | | **$6,895** | **($92)** | **$6,803** | **45%** | **49%** | **55%** | **$3,067** | **$3,328** | **$3,726** |

| | Low | Mid | High |
|---|---|---|---|
| **Gross Estimated Proceeds from Liquidation Available for Distribution** | **$3,067** | **$3,328** | **$3,726** |
| Gross Estimated Proceeds Allocable to Secured Claims | 2,675 | 2,883 | 3,136 |
| Gross Estimated Proceeds Allocable from Unencumbered Property (Incl. Avoidance Action Proceeds) | 392 | 445 | 590 |
| **Gross Estimated Proceeds from Liquidation Available for Distribution** | **$3,067** | **$3,328** | **$3,726** |

| Claims | Class | Notes | Total Estimated Claim | | | Total Recovery - % | | | Total Recovery - $ | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Structurally Senior Claims** | | [E] | | | | | | | | | |
|   Structurally Senior Claims | | | $886 | $886 | $886 | 100% | 100% | 100% | $886 | $886 | $886 |
| **Total Structurally Senior Claims** | | | **$886** | **$886** | **$886** | **100%** | **100%** | **100%** | **$886** | **$886** | **$886** |
| **Superiority Claims** | DIP Claims | [F] | | | | | | | | | |
|   DIP Claims incl. Hedging Obligations | | | 1,592 | 1,582 | 1,572 | 100% | 100% | 100% | 1,592 | 1,582 | 1,572 |
| **Total Superiority Claims** | | | **$1,592** | **$1,582** | **$1,572** | **100%** | **100%** | **100%** | **$1,592** | **$1,582** | **$1,572** |
| **Administrative Claims** | | [G] | | | | | | | | | |
|   Chapter 7 Administrative and Wind Down Costs | | | 370 | 385 | 405 | 100% | 100% | 100% | 370 | 385 | 405 |
| **Total Administrative Claims** | | | **$370** | **$385** | **$405** | **100%** | **100%** | **100%** | **$370** | **$385** | **$405** |
| **Other Secured Claims** | Class 1 | | | | | | | | | | |
|   Other Secured Claims | | | -- | -- | -- | --% | --% | --% | -- | -- | -- |
| **Total Other Secured Claims** | | | **$--** | **$--** | **$--** | **--%** | **--%** | **--%** | **$--** | **$--** | **$--** |
| **Revolving Credit Facility Claims** | Class 3 | [H] | | | | | | | | | |
|   RBL Claims | | | 752 | 752 | 752 | 29% | 63% | 100% | 219 | 475 | 752 |
| **Total Revolving Credit Facility Claims** | | | **$752** | **$752** | **$752** | **29%** | **63%** | **100%** | **$219** | **$475** | **$752** |
| **FLLO Term Loan Facility Claims** | Class 4 | [I] | | | | | | | | | |
|   Term Loan Due 2024 Claims | | | 1,525 | 1,525 | 1,525 | --% | --% | 7% | -- | -- | 111 |
| **Total FLLO Term Loan Facility Claims** | | | **$1,525** | **$1,525** | **$1,525** | **--%** | **--%** | **7%** | **$--** | **$--** | **$111** |
| **Second Lien Notes Claims** | Class 5 | [J] | | | | | | | | | |
|   11.5% Senior Secured Second Lien Notes Due 2025 Claim | | | 2,471 | 2,471 | 2,471 | --% | --% | --% | -- | -- | -- |
| **Total Second Lien Notes Claims** | | | **$2,471** | **$2,471** | **$2,471** | **--%** | **--%** | **--%** | **$--** | **$--** | **$--** |
| **Net Remaining Distributable Unencumbered Property** | | | | | | | | | **$--** | **$--** | **$--** |
| **Unsecured Priority Claims** | Class 2 | [K] | | | | | | | | | |
|   Unsecured Priority | | | -- | -- | -- | --% | --% | --% | -- | -- | -- |
| **Total Unsecured Priority Claims** | | | **$--** | **$--** | **$--** | **--%** | **--%** | **--%** | **$--** | **$--** | **$--** |
| **Net Remaining Distributable Proceeds for Unsecured Claims** | | | | | | | | | **$--** | **$--** | **$--** |
| **Unsecured Notes Claims** | | [L] | | | | | | | | | |
|   Deficiency Claims | | | $4,529 | $4,272 | $3,884 | --% | --% | --% | $-- | $-- | $-- |
|     DIP Deficiency Claims | | | -- | -- | -- | --% | --% | --% | -- | -- | -- |
|     Structurally Senior Deficiency Claims | | | -- | -- | -- | --% | --% | --% | -- | -- | -- |
|     RBL Deficiency Claims | | | 533 | 277 | -- | --% | --% | --% | -- | -- | -- |
|     Term Loan Due 2024 Deficiency Claims | | | 1,525 | 1,525 | 1,414 | --% | --% | --% | -- | -- | -- |
|     11.5% Senior Secured Second Lien Notes Due 2025 Deficiency Claims | | | 2,471 | 2,471 | 2,471 | --% | --% | --% | -- | -- | -- |
|   6.625% Senior Notes Due 2020 | Class 6 | | 181 | 181 | 181 | --% | --% | --% | -- | -- | -- |
|   6.875% Senior Notes Due 2020 | Class 6 | | 74 | 74 | 74 | --% | --% | --% | -- | -- | -- |
|   6.125% Senior Notes Due 2021 | Class 6 | | 170 | 170 | 170 | --% | --% | --% | -- | -- | -- |
|   5.375% Senior Notes Due 2021 | Class 6 | | 131 | 131 | 131 | --% | --% | --% | -- | -- | -- |
|   4.875% Senior Notes Due 2022 | Class 6 | | 274 | 274 | 274 | --% | --% | --% | -- | -- | -- |
|   5.75% Senior Notes Due 2023 | Class 6 | | 170 | 170 | 170 | --% | --% | --% | -- | -- | -- |
|   7.00% Senior Notes Due 2024 | Class 6 | | 634 | 634 | 634 | --% | --% | --% | -- | -- | -- |
|   6.875% Senior Notes Due 2025 | Class 6 | | 2 | 2 | 2 | --% | --% | --% | -- | -- | -- |
|   8.00% Senior Notes Due 2025 | Class 6 | | 255 | 255 | 255 | --% | --% | --% | -- | -- | -- |
|   5.5% Convertible Senior Notes Due 2026 | Class 6 | | 1,081 | 1,081 | 1,081 | --% | --% | --% | -- | -- | -- |
|   7.5% Senior Notes Due 2026 | Class 6 | | 121 | 121 | 121 | --% | --% | --% | -- | -- | -- |
|   8.00% Senior Notes Due 2026 | Class 6 | | 47 | 47 | 47 | --% | --% | --% | -- | -- | -- |
|   8.00% Senior Notes Due 2027 | Class 6 | | 264 | 264 | 264 | --% | --% | --% | -- | -- | -- |
|   General Unsecured Claims | Class 7 | | 1,036 | 1,036 | 1,036 | --% | --% | --% | -- | -- | -- |
|   Unsecured Intercompany Claims | Class 8 | | -- | -- | -- | --% | --% | --% | -- | -- | -- |
| **Total Unsecured Claims** | | | **$8,968** | **$8,712** | **$8,324** | **--%** | **--%** | **--%** | **$--** | **$--** | **$--** |
| **Total Claims** | | | | | | | | | **$3,067** | **$3,328** | **$3,726** |

## STANDALONE DEBTOR ENTITY LIQUIDATION ANALYSIS

### SPECIFIC NOTES TO THE LIQUIDATION ANALSIS

**Liquidation Proceeds**

*Gross Liquidation Proceeds*

A. <u>Cash & Cash Equivalents</u>: Entity cash as of August 31, 2020 is adjusted for estimated cash flow forecast through the Conversation Date. Cash activity through the sale and wind-down period are reflected in the Liquidation Proceeds and Chapter 7 administrative and wind-down costs. All projected cash and equivalents on hand are considered to be 100% recoverable.

B. <u>Accounts Receivable, Net</u>: Includes proceeds from oil and gas production, along with other net receivables related to joint interest billing partners, and miscellaneous receivables. The recovery percentage will differ among the categories of accounts receivable: Oil & Gas Sales (85% to 95%), JIB Receivables (80% to 90%), Marketing, Gathering, and Compression (80% to 90%), and Other (70% to 90%).

C. <u>Oil & Gas Properties, Net</u>: The Liquidation Analysis assumes that the Trustee sells or otherwise monetizes the reserves and associated equipment owned by the Debtors, in logical regional or geological packages, or on a piecemeal basis, with sales to buyers during a three-month period. The estimated recoveries realized for such assets reflect, among other things and the factors considered herein, the following factors:

- projected commodity prices and demand factors;

- production and operating performance for each asset;

- operating and maintenance costs for each asset;

- capital and environmental expenditure requirements; and

- market conditions at the time of the sales.

The Liquidation Proceeds attributable to the Debtors' reserves are based on reserves as of the Conversion Date, with strip pricing as of September 30, 2020. In the context of a liquidation, due to the appointment of a Trustee and the Debtors' assumed insufficient liquidity and access to capital to maintain, develop, or expand production and future reserves, Liquidation Proceeds of oil and gas assets will be depressed and would likely result in recoveries that reflect a material discount relative to "fair value." The estimated recovery is based on a discount rate applied to cash flows from proved developed producing reserves, plus acreage value. The Liquidation Analysis assumes an estimated range of gross Liquidation Proceeds from oil and gas property between approximately $2.2 billion to $2.7 billion. In total, the Liquidation Analysis assumes an overall recovery range between 48% and 58% on the book value of the Debtors' oil and gas properties.

D. <u>PP&E Other and Other Assets</u> – Includes other assets belonging to the Debtors, including but not limited to those items listed below. Recoveries are assumed to range from 12% to 26%.

- <u>Prepaid Assets</u>: Primarily includes prepayments made on account of insurance, lease deposit, utility deposits, prepaid service providers, IT maintenance, service, taxes, and license fees.

- <u>Inventory and Equipment</u>: Primarily consists of equipment installed onsite in addition to production equipment: including tubes, pumps, valves, tanks, etc. Also includes furniture, fixtures, and corporate equipment.

- <u>Vehicles</u>: Includes the Debtors' vehicles and 25% interest in aircraft.

## STANDALONE DEBTOR ENTITY LIQUIDATION ANALYSIS

- <u>Real Property</u>:  Represents buildings and real estate, notably including the Debtors' operating headquarters.

- <u>Long Term Assets</u>: Includes long-lived assets, such as intangible assets, long-term prepaid, potential refunds, other fixed assets and equipment.

### Claims & Recoveries

E.  <u>Structurally Senior Secured Claims</u>:  These claims consist of obligations incurred by the Debtors that are expected to be entitled to elevated priority.  This primarily includes vendor obligations that may be subject to mechanic's  and materialmen's and similar liens or the ability to assert such liens, or certain royalty obligations related to mineral production and sale that may be entitled to elevated priority. These claims are projected to be unimpaired.

F.  <u>DIP Claims</u>:  The Debtors' obligations pursuant to the Final DIP Order are estimated at $1.6 billion, and are projected to be unimpaired on account of liens on Oil & Gas Properties and other assets.  These claims include balances for out-of-the-money hedges and certain Chapter 11 professional fees as the Final DIP Order grants superpriority status to Chapter 11 Allowed Professional Fees incurred prior to notice of conversion to a Chapter 7 liquidation for each professional retained by the court pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

G.  <u>Administrative Claims</u>: The Liquidation Analysis includes Chapter 7 Administrative Claims:

- <u>Chapter 7 Administrative and Wind-Down Costs</u>:  includes the costs required to administer the wind-down of the cases.  Notably, these costs include personnel and overhead costs. For those employees that are retained during the liquidation process, the analysis includes estimated salary, retention, and severance expense;

- <u>Chapter 7 Professional Fees</u>: includes the estimated cost for advisors, attorneys and other professionals retained by the Chapter 7 trustee. These fees can fluctuate based on length and complexity of wind-down process and could be substantially greater than the amounts assumed herein. These fees are applied on a pro-rata basis across debtor entities based on the estimated gross Liquidation Proceeds available to each estate;

- <u>Chapter 7 Trustee Fees</u>: includes fees estimated pursuant to the fee guidelines in Section 326(a) of the Bankruptcy code. The Debtors assumed that trustee fees are 3.0% of entity gross Liquidation Proceeds, excluding cash.

H.  <u>Revolving Credit Facility Claims (Class 3)</u>:  To the extent there are excess proceeds available after satisfying the DIP Claims and Structurally Senior Secured Claims, all liquidated remaining assets are assumed to be available for the Revolving Credit Facility, consistent with the Revolving Credit Facility Indenture, except for certain unencumbered assets.

The Liquidation Analysis assumes that the Revolving Credit Facility Claims are $752 million as of the Conversion Date.  The Liquidation Distribution to Class 3 claimants would range from $219 million to $752 million which represents 29% and 100% recovery of the amount of the total Revolving Credit Facility Claims (Class 3), respectively.

I.  <u>FLLO Term Loan Facility Claims (Class 4)</u>: The Liquidation Analysis assumes that the FLLO Term Loan Facility Claims are $1.5 billion as of the Conversion Date. The Liquidation Distribution to Class 4 claimants would range from $0 to $111 million which represents 0% and 7% recovery of the amount of the total FLLO Term Loan Facility Claims (Class 4), respectively.

## STANDALONE DEBTOR ENTITY LIQUIDATION ANALYSIS

J.  <u>Second Lien Notes Claims (Class 5)</u>:  The Liquidation Analysis assumes that the Second Lien Notes Claims are $2.5 billion as of the Conversion Date. There is no Liquidation Distribution expected to Class 5 claimants.

K.  <u>Other Priority Claims (Class 2)</u>:  The Debtors assume that all Priority Claims will have been satisfied in the ordinary course of business prior to the Conversion Date.

L.  <u>Unsecured Claims</u>:  Unsecured Claims consist of two Classes.

- <u>Unsecured Notes Claims (Class 6)</u>:  The Liquidation Analysis assumes that the Unsecured Notes Claims are $3.4 billion as of the Conversion Date. There is no Liquidation Distribution expected to Class 6 claimants.

- <u>General Unsecured Claims (Class 7)</u>:  The Liquidation Analysis assumes there are General Unsecured Claims totaling at least $1.0 billion.  These claims primarily consist of prepetition unsecured trade payables and contract rejection claims, although additional claims may be asserted beyond those herein, which could materially increase the total amount of General Unsecured Claims.  There is no Liquidation Distribution expected to Class 7 claimants.

*Intercompany Claims / Equity Interests*

<u>Intercompany Claims (Class 8) and Interests (Class 9)</u>:  The Liquidation Analysis assumes Intercompany Claims and Interests are subordinated to other General Unsecured Claims.  Therefore, the Liquidation Analysis assumes that there would be no Liquidation Distribution for Intercompany Claims (Class 8) and Interests (Class 9).

<u>Equity Interests (Class 10)</u>:  Equity Interests consist of Claims by common shareholders of the Debtors. The Liquidation Analysis assumes that there would be no Liquidation Distribution on account of the Holders of Class 10 Common Equity Interests.

**<u>Exhibit D</u>**

**Financial Projections**

## FINANCIAL PROJECTIONS

The Debtors believe that the Plan[1] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or the Financial Projections to holders of Claims or Interests or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the Financial Projections for the years 2021 through 2025. The Financial Projections were prepared by Management and are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

The Debtors have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PRO FORMA BALANCE SHEET HEREIN REFLECTS A PRELIMINARY HIGH-LEVEL PRESENTAION OF WHAT A FRESH START ACCOUNTING ESTIMATE MAY LOOK LIKE, BUT IS SUBJECT TO MATERIAL CHANGE AND DOES NOT REFLECT A FULL FRESH START ACCOUNTING ANALYSIS, WHICH COULD RESULT IN MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES HEREIN.

ALTHOUGH MANAGEMENT HAS PREAPRED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE UNDERLYING ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which these Financial Projections are attached.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that such plans, intentions and expectations will be achieved. These statements are only predictions are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements are attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only to as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to: (a) fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices; (b) the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows; (c) the timing and amount of future production of oil and natural gas; (d) changes in the availability and cost of capital; (e) environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations; (f) proved and unproved drilling locations and future drilling plans; and (g) the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation. The Debtors believe, based on preliminary tax and accounting analyses, that it will not incur income taxes over the forecast horizon. To the extent it is later determined that these accounting and tax analyses are incorrect, the Reorganized Debtors projections could be materially impacted. Additional information regarding these uncertainties are described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factors or combination may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtors' future performance.

**Overview**

Actual balances may vary from those reflected in the opening balance sheet due to variances in projections. The reorganized pro forma debt capital structure for the period ending December 31, 2020 through December 31, 2025 contain certain pro forma adjustments as a result of consummation of the Plan.

**Assumptions**

**A.  Overview**

The Reorganized Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore oil and natural gas assets in the United States. The Reorganized Debtors have operations across five key regions, which are assumed to continue in the financial projections: Appalachia, Brazos Valley, Gulf Coast, South Texas, and Powder River Basin. The Mid-Continent asset is actively in a sales process and is not included in the financial projections.

**B.  Presentation**

The Projections are presented on a consolidated basis, including estimates of operating results for the Reorganized Debtor entities in the aggregate.

**C.  Plan Consummation**

The Financial Projections include projected financial statements for 2021 – 2025 and an Assumed Effective Date of January 1, 2021.

**D.  Accounting Policies**

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements.

**E.  Total Revenue**

Total revenue consists of production revenue and hedging revenue. Production revenue is generated from the exploration for and development, production, gathering, and sale of oil, natural gas, and natural gas liquids.

**F.  Commodity Pricing**

Commodity pricing is based on September 30, 2020 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil, natural gas, and NGLs. Management estimates realized pricing based on forecasted oil and gas differentials. Hedged volumes and hedged prices reflect hedge schedule as of September 9, 2020.

| WTI Oil ($/Bbl) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| Benchmark Price | $42.21 | $43.56 | $44.35 | $45.07 | $45.96 |
| Realized Price | $40.30 | $41.76 | $42.57 | $43.35 | $44.31 |
| Total Volumes Hedged (%) | 55% | 37% | -- | -- | -- |
| Average Hedged Prices | $42.10 | $42.34 | n.a. | n.a. | n.a. |

| Henry Hub Gas ($/MMBtu) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| Benchmark Price | $2.92 | $2.62 | $2.48 | $2.47 | $2.49 |
| Realized Price | $2.69 | $2.40 | $2.25 | $2.24 | $2.37 |
| Total Volumes Hedged (%) | 52% | 19% | -- | -- | -- |
| Average Hedged Prices | $2.60 | $2.47 | n.a. | n.a. | n.a. |

### G.  Operating Expenses

Operating expenses consist of lease operating expenses, production and ad valorem taxes and gathering, transportation and marketing expense. GP&T projections include savings associated with ongoing midstream contract rejections and renegotiations as part of the Reorganized Debtor's business.



### H.  Cash General and Administrative Expenses

Cash general and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory and public company requirements. The Reorganized Debtors' projected G&A expenses are based on the Debtors' current development and operational plans.



### I. Development Capex

Development Capex reflects cost incurred in connection with the Reorganized Debtors' development plan.

### J. Interest Expense

Post-emergence interest expense is forecasted based on the Reorganized Debtors' anticipated pro forma capital structure. Pro forma capital structure includes $[1.05]bn drawn on a $1.75bn Exit RBL (commitment) with an interest rate of L+3.25% − 4.25% and a $750mm Exit Term Loan with an interest rate of 10.50%.

| ($mm, unless otherwise noted) | Annual Forecast[2] | | | | |
|---|---|---|---|---|---|
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| **Income Statement** | | | | | |
| *Net Production (Mboe/d)* | *426* | *395* | *386* | *377* | *364* |
| **Total Revenue** | **$3,045** | **$2,526** | **$2,323** | **$2,240** | **$2,265** |
| Lease Operating Expenses | 330 | 296 | 285 | 279 | 267 |
| Production Tax | 64 | 49 | 45 | 43 | 44 |
| Ad Valorem Tax | 62 | 51 | 48 | 46 | 44 |
| Gathering, Processing & Transportation | 847 | 789 | 724 | 701 | 673 |
| **Asset Level Cash Flows** | **$1,742** | **$1,340** | **$1,222** | **$1,172** | **$1,237** |
| General and Administrative | 187 | 187 | 187 | 187 | 187 |
| Other | 6 | 5 | 5 | 5 | 5 |
| **Adjusted EBITDAX (Before Hedges)** | **$1,550** | **$1,148** | **$1,030** | **$980** | **$1,045** |
| Hedge Gain / (Loss) | (128) | (31) | -- | -- | -- |
| **Adjusted EBITDAX** | **$1,422** | **$1,117** | **$1,030** | **$980** | **$1,045** |
| Development Capex | 627 | 617 | 605 | 615 | 638 |
| Other Cash Expenses | 63 | 57 | 51 | 51 | 51 |
| **Unlevered Free Cash Flow** | **$732** | **$443** | **$375** | **$314** | **$357** |
| Change in Net Working Capital | (127) | (19) | 9 | (28) | 7 |
| Cash Interest | 123 | 98 | 92 | 91 | 90 |
| KEIP / KERP | 10 | -- | -- | -- | -- |
| **Levered Free Cash Flow** | **$725** | **$364** | **$274** | **$251** | **$260** |

| ($mm, unless otherwise noted) | Annual Forecast[2] | | | | |
|---|---|---|---|---|---|
| | 1/1/2021E[3] | 2021YE | 2022YE | 2023YE | 2024YE | 2025YE |
| **Balance Sheet** | | | | | | |
| Exit RBL | $1,054 | $329 | $-- | $-- | $-- | $-- |
| Exit Term Loan | 750 | 743 | 735 | 728 | 720 | 713 |
| **Total Debt** | **$1,804** | **$1,072** | **$735** | **$728** | **$720** | **$713** |
| Cash | 10 | 10 | 44 | 318 | 569 | 829 |
| **Net Debt** | **$1,794** | **$1,062** | **$691** | **$409** | **$151** | **($116)** |

---

[2] The Company has approximately $2.5 billion PV-10 of potential savings opportunities, some or all of which may or may not be achieved. Of these opportunities, approximately $1.75 billion are reflected in the business plan, of which $700 – $900 million are subject to ongoing negotiation and may or may not be achieved.

[3] Debt balances shown prior to application of cash proceeds, if any, from Mid-Con sales process.

**<u>Exhibit E</u>**

**Valuation Analysis**

**ESTIMATED ENTERPRISE VALUATION OF THE REORGANIZED DEBTORS**

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS. Solely for the purposes of the Plan and the Disclosure Statement, Intrepid Partners, LLC ("Intrepid"), as financial advisor to the Debtors, has estimated a range of the total enterprise value ("Total Enterprise Value") and implied equity value ("Plan Equity Value") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In preparing the estimates presented below, Intrepid relied upon the accuracy, completeness, and fairness of financial, reserve, and other information contained within the business plan furnished by the Debtors' management (the "Financial Projections"). Intrepid did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

As a result of the analysis described below and for purposes of the Plan, Intrepid estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $3.5 billion to $4.7 billion with a mathematical midpoint estimate of approximately $4.1 billion, as of an assumed Effective Date of December 31, 2020. Based on estimated pro forma net debt of $1.8 billion as of the Effective Date, the estimated Total Enterprise Value of the Reorganized Debtors results in a Plan Equity Value of $1.7 billion to $2.9 billion with a mathematical midpoint estimate of approximately $2.3 billion. Intrepid has assumed no changes that would materially affect estimated value occur between the date of the Disclosure Statement and the assumed Effective Date.

Intrepid's estimated Total Enterprise Value does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or under the terms and provisions of the plan. This valuation analysis is based on information as of September 30, 2020 and is based on reserve and production information, development schedules, and financial information provided by the Debtors' management, as well as the Financial Projections attached as Exhibit D of the Disclosure Statement. This valuation analysis is based on a number of assumptions, including but not limited to a successful reorganization of the Debtors' business in a timely manner, the achievement of the Financial Projections (including proposed changes to certain midstream contracts), consummation of the Exit Facility and Rights Offering, continuity of a qualified management team, and capital market conditions consistent with those that exist as of September 30, 2020.

Neither Intrepid nor the Debtors have any obligation to update, revise, or reaffirm the Valuation Analysis and do not intend to do so.

INTREPID DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS IN CONNECTION WITH THE ESTIMATES OF THE TOTAL ENTERPRISE VALUE AND PLAN EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF ESTIMATES OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE TOTAL ENTERPISE VALUE AND PLAN EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS

ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE TOTAL ENTERPRISE VALUE PREPARED BY INTREPID REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, INTREPID, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, FUNDED DEBT, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS OR SECURITIES, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO A MANAGEMENT INCENTIVE PLAN, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Intrepid assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Total Enterprise Value and Plan Equity Value ranges assume the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Total Enterprise Value and Plan Equity Value. In estimating Total Enterprise Value, Intrepid: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections; (c) reviewed and discussed with the Debtors' senior management team projected savings related to certain midstream contracts which savings are included in the Financial Projections; (d) discussed the Debtors' operations and future prospects with the Debtors' senior management team; (e) reviewed certain publicly available financial data for, and considered the market value of, public companies that Intrepid deemed generally relevant in analyzing the value of the Reorganized Debtors; (f) considered certain economic and industry information relevant to the operating businesses; and (g) conducted such other

studies, analyses, inquiries and investigations as it deemed appropriate. Intrepid assumed and relied on the accuracy and completeness of all financial and other information furnished to them by the Debtors' management as well as publicly available information. The estimated ranges of Total Enterprise Value and Plan Equity Value do not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan. Intrepid has not been asked to express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance or at any time.

In performing its analysis, Intrepid applied the following valuation methodologies as applicable to the operations of the Debtors: (a) a Risked Net Asset Value Analysis, (b) a Publicly-Traded Companies Analysis, and (c) a Sum-of-the-Parts Analysis (as described below). In addition, Intrepid considered a precedent transactions analysis, but because the precedent transactions occurred in different commodity pricing and market environments, and involved companies with differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size and other factors, Intrepid concluded that this approach was of limited applicability. However, precedent asset transactions were incorporated in evaluation of certain of the Debtor's basins as part of the Sum-of-the-Parts Analysis as described below.

## RISKED NET ASSET VALUE ANALYSIS

A Risked Net Asset Value Analysis is used to estimate the net asset value of the Reorganized Debtors' estimated proved and unproved oil and gas reserves under the Financial Projections. In utilizing this approach, Intrepid applied both the Reserve Adjustment Factor ("RAF") method and Risk-Adjusted Discount Rate ("RADR") method of estimating net asset value. Under the RAF method, the value of the proved and unproved reserves is estimated by applying various reserve adjustment factors, based on oil and gas exploration and production industry standard guidance from The Society of Petroleum Evaluation Engineers 39th Annual Survey of Parameters Used in Property Evaluation, to the pre-tax present value (utilizing a 10% discount rate) of the future cash flows generated by the Debtors' proved and unproved reserves under the Financial Projections. Under the RADR method, various discount rates, based on oil and gas exploration and production industry standard guidance from The Society of Petroleum Evaluation Engineers 39th Annual Survey of Parameters Used in Property Evaluation, are utilized to estimate the present value of the future pre-tax cash flows generated by the Debtors' proved and unproved reserves under the Financial Projections. Under each method, the Total Enterprise Value is then estimated by adjusting for other items, such as the estimated value of the Reorganized Debtors' other property and equipment and other liabilities, the estimated impact of corporate level general and administrative expense, and the present value of estimated hedge gains/losses.

## PUBLICLY-TRADED COMPANIES ANALYSIS

A selected Publicly-Traded Companies Analysis estimates the value of a company based on a comparison with certain other publicly-traded companies in lines of business and with operating characteristics similar in certain respects to the company being valued. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to certain of the Reorganized Debtors' financial metrics to imply an enterprise value for the Reorganized Debtors. Although the selected companies were compared to the Reorganized Debtors for purposes of this analysis, no entity used in this analysis is identical to the Reorganized Debtors. The selection of public entities for this purpose was based upon characteristics that were deemed relevant based on Intrepid's professional judgment. The selection of appropriate companies is a matter of judgment and subject to limitations due to sample size and the availability of meaningful market-based information. Accordingly, Intrepid's comparison of the selected companies to the Reorganized Debtors and analysis of

the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size and other factors that could affect the relative values of the selected companies and the Reorganized Debtors.

## SUM-OF-THE-PARTS ANALYSIS

The Sum-of-the-Parts Analysis considers the value of each of the Debtors' asset regions separately and sums the valuation of each region to estimate the Reorganized Debtors' Total Enterprise Value. The value of each region is based on a combination of the three methodologies described above (Risked Net Asset Value Analysis, Precedent Transactions Analysis, and Public Trading Companies Analysis). The Total Enterprise Value is then estimated by adjusting for other items, such as the estimated value of the Reorganized Debtors' other property and equipment and other liabilities, the estimated impact of corporate level general and administrative expense, and the present value of estimated hedge gains/losses.

Intrepid did not consider any one analysis or factor to the exclusion of any other analyses or factors, although Intrepid did apply more weight to the Risked Net Asset Value Analysis in determining the estimate of the Total Enterprise Value and the Plan Equity Value described above. Intrepid believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of this Valuation Analysis. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The estimated Total Enterprise Value and Plan Equity Value do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Intrepid has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance or at any other time. The estimated Total Enterprise Value and Plan Equity Value of the Reorganized Debtors set forth herein do not constitute an opinion as to fairness from a financial point of view of the consideration to be received by any person under the Plan or of the terms and provisions of the Plan.

Intrepid did not account for the impact of any income tax attributes. The impact of any income tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Intrepid's valuation analysis.

Intrepid is acting as financial advisor to the Debtors and will not be responsible for and will not provide any tax, accounting, actuarial, legal, or other specialist advice.

## PRECEDENT TRANSACTIONS ANALYSIS

A selected Precedent Transactions Analysis estimates the value of a company by examining public and private mergers and acquisitions transactions on an enterprise and asset-level basis. Under this approach, transaction values are commonly expressed as multiples of various measures of operating and asset metrics such as EBITDA, production, and proved reserves. For this analysis, Intrepid concluded that the inclusion of precedent transactions was of limited applicability (as described above). However, comparable asset transactions were incorporated in the evaluation of select basins as part of the Sum-of-the-Parts analysis (as described above) based on the geographic location, scale, reserve composition, and other characteristics deemed relevant to the Reorganized Debtors' assets in such basin. Although the selected precedent transactions were compared to the Reorganized Debtors' assets for purposes of this analysis, no transaction

used in this analysis involved entities with assets that are identical to the Reorganized Debtors' assets. The selection of precedent transactions for this purpose was based upon characteristics that were deemed

relevant based on Intrepid's professional judgment. The selection of appropriate transactions is a matter of judgment and subject to limitations due to sample size and the availability of meaningful publicly-available information.

**Exhibit 2**

**Solicitation Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[4] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**SOLICITATION PROCEDURES**

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"), (a) approving the adequacy of the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (the "Disclosure Statement"), (b) approving these solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (the "Plan"),[5] (c) approving the forms of ballots and notices in connection therewith, (d) scheduling certain dates with respect thereto, and (e) granting related relief.

A.     **The Voting Record Date**

The Court has established October 19, 2020 as the record date to determine which Claims and Interests in Classes 3, 4, 5, 6, and 7 are entitled to vote to accept or reject the Plan (the "Voting Record Date").

B.     **The Voting Deadline.**

The Court has established **December 7, 2020 at 11:59 p.m.** (prevailing Central Time) as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, with the consent of the Required Plan Sponsors and the DIP Agent, without further notice or order of the Court.  To be counted as votes to accept or reject the Plan, all ballots ("Ballots") must be properly executed, completed, and delivered pursuant those instructions set forth on the applicable Ballot so that they are ***actually received*** in any case, no later than the Voting Deadline by Epiq Corporate Restructuring, LLC (the "Solicitation Agent").  Delivery of a Ballot to the Solicitation Agent by e-mail, facsimile, or other electronic means shall not be valid with the

---

[4]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[5]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

following exceptions: (i) Ballots submitted by voters who are not Beneficial Holders of Second Lien Notes or Unsecured Notes Claims through the online balloting portal on the Debtors' case website maintained by the Solicitation Agent ("E-Ballot"),[6] and (ii) master ballots (the "Master Ballots") submitted by brokers, banks, or other nominees holding the Second Lien Notes Claims or the Unsecured Notes Claims on behalf of the underlying Beneficial Holders (the "Nominees")[7] via e-mail at tabulation@epiqglobal.com.

To have their votes to accept or reject the Plan counted, Beneficial Holders must properly submit their vote to the appropriate Nominee, in sufficient time so that such Nominee can verify, tabulate, and include such Ballots in a master ballot and timely return such master ballot, so that it is ***actually received*** no later than the Voting Deadline by the Solicitation Agent. In the case of the Beneficial Holders of the Second Lien Notes Claims or Unsecured Notes who hold their position through a Nominee, such Beneficial Holders will be instructed to comply with the return instructions provided by such Nominee.[8]

### C.    Voting For Claims Filed After the Voting Record Date.

Notwithstanding anything to the contrary herein, to the extent a holder of a Claim validly files a Proof of Claim after the Voting Record Date but on or prior to the Claims Bar Date, the Solicitation Agent shall send to such holder the appropriate Solicitation Package, including a Ballot if applicable; *provided* that the forgoing shall not extend the Voting Deadline for holders of Claims who file Proofs of Claim after the Voting Record Date. If the Solicitation Agent previously provided such holder of a Claim with a Ballot on account of a scheduled claim or previous Proof of Claim, the Solicitation Agent shall update such creditor's voting amount, but shall not be obligated to send a new Ballot.[9]

### D.    Form, Content, and Manner of Notices.

1.    The Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

a.    the Disclosure Statement Order (excluding schedules);

---

[6]    For the avoidance of doubt, votes submitted through E-Ballot and votes submitted by Nominees (as defined herein) via e-mail shall be the only electronic votes accepted by the Solicitation Agent.

[7]    The defined term "Nominee" shall include each Nominee's agents, including mailing agents.

[8]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees holding through the respective indenture trustee or transfer agent (as applicable).

[9]    For the avoidance of doubt, the provisions of this paragraph shall also apply to the extent that a holder of an Interest files a proof of such interest after the Voting Record Date but before the Voting Deadline.

b.     the approved Disclosure Statement (annexed as **Exhibit 1** to the Disclosure Statement Order) and the schedules thereto, including the Plan;

c.     these Solicitation Procedures (annexed as **Exhibit 2** to the Disclosure Statement Order);

d.     the applicable form of Ballot, in substantially the form of the Ballots annexed as **Exhibits 3A**, **3B**, **3C**, **3D**, **3E**, and **3G** to the Disclosure Statement Order;

e.     a cover letter, in substantially the form annexed as **Exhibit 4** to the Disclosure Statement Order, describing the contents of the Solicitation Package and urging the holders of Claims and Interests in each of the Voting Classes to vote to accept the Plan;

f.     the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines*, in substantially the form annexed as **Exhibit 8** to the Disclosure Statement Order (the "Confirmation Hearing Notice");

g.     a pre-addressed, postage pre-paid reply envelope;[10] and

h.     any additional documents that the Court has ordered to be made available to holders of Claims and Interests in the Voting Classes.

2.     Distribution of the Solicitation Packages.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without schedules) in electronic format (*i.e.*, CD-ROM or flash drive format), and all other contents of the Solicitation Package, including Ballots and the Solicitation Procedures, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format may contact the Solicitation Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense) by: (a) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (b) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (c) mail tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots and the Cover Letter) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 and Bankruptcy Local

---

[10]     The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive Ballots directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

Rule 2002-1 as of the Voting Record Date.  In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to all holders of Claims in the Voting Classes who are entitled to vote, as described in section D below on November 6, 2020 (or as reasonably practicable thereafter).

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that any holder of a Claim or Interest who has filed duplicative Proofs of Claim or proofs of Interest against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claims or Interest and with respect to that Class as against that Debtor.

3.    Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan.

a.    Holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive only the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as **Exhibit 5** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the third-party release provided by the Plan (the "Third-Party Release").

b.    Holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Impaired Interests Conclusively Presumed to Reject the Plan*, substantially in the form annexed as **Exhibits 6** and **6A**, **6B**, and **6C** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the Third-Party Release.[11]

---

[11]   Holders of Claims and Interests who hold such Claims and Interests directly (collectively, the "Direct Holders") will receive an *Opt-Out Form for Holders of Impaired Interests Conclusively Presumed to Reject The Plan,* substantially in the form annexed as **Exhibit 6A** to the Disclosure Statement Order.  Holders of Class 10 Existing Equity Interests who hold such Interests through a broker, bank, or other nominee (collectively, the "Beneficial Equity Holders") will receive from such broker, bank, or other nominee, or such firm's agent (each of the foregoing, an "Equity Nominee") an *Opt-Out Form for Holders of Impaired Interests Deemed To Reject The Plan*, substantially in the form annexed as **Exhibit 6B** to the Disclosure Statement Order.  The Equity Nominees for Class 10 Existing Equity Interests will receive the *Master Form for Optional Release Opt-Out for Class 10 Existing Equity Interests*, substantially in the form annexed as **Exhibit 6C** to the Disclosure Statement Order.

    c.      Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their claims and will receive the *Non-Voting Status Notice With Respect to Disputed Claims*, substantially in the form annexed as **Exhibit 7** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the Third-Party Release.

## E.    Voting and Tabulation Procedures.

    1.    <u>Holders of Claims and Interests Entitled to Vote</u>.

Only the following holders of Claims or Interests in the Voting Classes shall be entitled to vote with regard to such Claims or Interests:

    a.      Holders of Claims who, on or before the Voting Deadline, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Deadline and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed by the Debtors with the Court at least seven days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

    b.      Holders of Existing Interests as of the Voting Record Date;

    c.      Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be disallowed for voting purposes (unless the applicable Claims Bar Date has not yet expired, in which case such scheduled claims would be allowed to vote in the amount of $1.00);

    d.      Holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

    e.      Holders of any Disputed Claim or Interest that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

f.     the assignee of any Claim or Interest that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

2.     <u>Establishing Claim Amounts for Voting Purposes</u>

**Revolving Credit Facility Claims**.  The Claims amount of Revolving Credit Facility Claims for voting purposes only will be established based on the amount of the applicable positions held by such Revolving Credit Facility Claim holder, as of the Voting Record Date, as evidenced by the applicable records provided by the  Revolving Credit Facility Administrative Agent in electronic Microsoft Excel format to the Debtors or the Solicitation Agent no later than five (5) Business Days following the Voting Record Date.

**FLLO Term Loan Facility Claims**.  The Claims amount of FLLO Term Loan Facility Claims for voting purposes only will be established based on the amount of the applicable positions held by such FLLO Term Loan Facility Claim holder, as of the Voting Record Date, as evidenced by the applicable records provided by the FLLO Term Loan Facility Administrative Agent in electronic Microsoft Excel format to the Debtors or the Solicitation Agent no later than five (5) Business Days following the Voting Record Date.

**Second Lien Notes Claims**.  The Claims amounts of Second Lien Notes Claims for voting purposes only will be established by reference to (a) the Debtors' applicable books and records and (b) the list of record holders maintained by the Second Lien Notes Trustee reflected in the securities position report(s) from DTC or other applicable depository firm, dated as of the Voting Record Date, which shall be provided by the Second Lien Notes Trustee to the Debtors or the Solicitation Agent no later than five (5) Business Days following the Voting Record Date.

**Unsecured Notes Claims**.  The Claims amounts of Unsecured Notes Claims for voting purposes only will be established by reference to (a) the Debtors' applicable books and records and (b) the list of record holders maintained by the Unsecured Notes Trustee reflected in the securities position report(s) from DTC or other applicable depository firm, dated as of the Voting Record Date, which shall be provided by the Unsecured Notes Trustee to the Debtors or the Solicitation Agent no later than five (5) Business Days following the Voting Record Date.

**General Unsecured Claims**.  Each holder of a General Unsecured Claim that is not a Unsecured Notes Claim as of the Voting Record Date shall be entitled to vote the amount of its Claim established in accordance with the procedures set forth below for Filed and Scheduled Claims.

**Filed and Scheduled Claims**.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Solicitation Agent, as applicable, are not

binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.  the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court, or (iv) set forth in e-mailed instructions from the Debtors' counsel to the Solicitation Agent with the applicable voter copied;

b.  the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section C.3(d) of these Solicitation Procedures;

c.  the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that any Ballot cast by a holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Solicitation Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim will be Allowed for voting purposes only in the liquidated amount; *provided*, further, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes; *provided*, further, that any Claim filed in an amount denominated by a currency other than USD will vote at $1.00;

d.  the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided*, further, that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00;

e.  Proofs of Claim filed for $0.00 are not entitled to vote;

f.    notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims;

g.    if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Voting Record Date, the later-filed amending Claim shall be entitled to vote in a manner consistent with these Solicitation Procedures, and the earlier-filed Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended Claim.  Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Voting Record Date shall not be considered for purposes of these Solicitation Procedures; and

h.    in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

3.    <u>Resolution of Disputed Claims for Voting Purposes; Resolution Event</u>.

a.    Absent a further order of the Court, the holder of a Claim in a Voting Class that is the subject of a pending objection by the Debtors on a "reduce and allow" basis that is filed with the Court on or prior to seven days before the Voting Deadline shall be entitled to vote such Claim in the reduced amount contained in such objection.

b.    If a Claim in a Voting Class is subject to an objection by the Debtors other than a "reduce and allow" objection that is filed with the Court on or prior to seven days before the Voting Deadline: (i) the Debtors shall cause the applicable holder to be served with a Disputed Claim Notice substantially in the form annexed as <u>Exhibit 7</u> to the Disclosure Statement Order (which notice shall be served together with such objection); and (ii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined herein) occurs as provided herein.

c.    If a Claim in a Voting Class is subject to an objection by the Debtors other than a "reduce and allow" objection that is filed with the Court less than seven days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the holder of such Claim and without further order of the Court, unless the Court orders otherwise.

10

d.  A "Resolution Event" means the occurrence of one or more of the following events no later than two Business Days prior to the Voting Deadline:

i.   an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

ii.  an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii. a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

iv.  the Debtors' pending objection is voluntarily withdrawn by the objecting party.

e.  No later than two Business Days following the occurrence of a Resolution Event, the Debtors shall cause the Solicitation Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package to the relevant holder to the extent such holder has not already received a Solicitation Package containing a Ballot that reflects the outcome of the Resolution Event.

4.   Occurrence of a Terminate Date

Upon the occurrence of a Termination Date (as defined in the Restructuring Support Agreement) (other than a Termination Date as a result of the occurrence of the Plan Effective Date), any and all Ballots submitted by the Parties (as defined in the Restructuring Support Agreement) subject to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be counted in determining the acceptance or rejection of the Plan or for any other purpose, and such Parties shall have a reasonable opportunity to cast new votes to accept or reject the Plan whether or not the Voting Deadline has passed.

5.   Tabulation of Ballots.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a.  except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted and actually received by the Solicitation Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors with the consent of the Required Plan Sponsors and the DIP Agent), the Debtors shall reject

11

such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

b.      the Debtors will file with the Court, by no later than one Business Day prior to the Confirmation Hearing, a voting report (the "Voting Report"). The Voting Report shall, among other things, indicate the tabulation of acceptances and rejections of the Plan, including the tabulation of acceptances and rejections from holders of General Unsecured Claims against each Debtor entity. The Voting Report further shall delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, sent by improper means, or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c.      the method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot;

d.      an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Solicitation Agent by facsimile, or any electronic means other than as expressly approved by the Statement Order or these Solicitation Procedures will not be valid;[12]

e.      no Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), the Debtors' financial or legal advisors, and if so sent will not be counted;

f.      if multiple Ballots are received from the same holder with respect to the same Claim or Interest prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

g.      holders must vote all of their Claims or Interests within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple

---

[12]   For the avoidance of doubt, a Ballot may be submitted via the online electronic ballot portal and, solely for Nominees, via electronic mail to the Solicitation Agent at tabulation@epiqglobal.com with a reference to "Chesapeake Master Ballot" in the subject line.

Claims or Interests within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims or Interests of any particular holder within a Class for the purpose of counting votes;

h. a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims or Interests should indicate such capacity when signing;

i. the Debtors, subject to a contrary order of the Court in consultation with the Required Plan Sponsors and the DIP Agent, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

j. neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification; unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

k. any Class that contains Claims or Interests entitled to vote but for which no votes are returned shall be deemed to have accepted the Plan;

l. in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Interest will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

m. subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors in consultation with the Required Plan Sponsors and the DIP Agent, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided that any such rejections will be documented in the Voting Report;

n. if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for

voting purposes only, and not for purposes of allowance or distribution;

o.    if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

p.    the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim or Interest; (ii) any Ballot cast by any Entity that does not hold a Claim or Interest in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim or Interest shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the Solicitation Agent online balloting portal shall be deemed an original signature); (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein; and (vii) any Ballot submitted by improper means;

q.    after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors and the Required Plan Sponsors and the DIP Agent;

r.    the Debtors are authorized to enter into stipulations with the holder of any Claim or Interest agreeing to the amount of a Claim or Interest for voting purposes;

s.    where any portion of a single Claim or Interest has been transferred to a transferee, all holders of any portion of such single Claim or Interest may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such single Claim or Interest collectively to accept or reject the Plan. In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various holders of multiple portions of a single Claim or Interest partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion; and

t.    for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims or Interests held by a single

creditor in a particular Class will be aggregated and treated as if such creditor held one Claim or Interest in such Class, and all votes related to such Claim or Interest will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities, including any funds or accounts that are advised or managed by the same entity or by affiliated entities, hold Claims or Interests in a particular Class, these Claims or Interests will not be aggregated and will not be treated as if such creditor held one Claim or Interest in such Class, and the vote of each affiliated entity or managed fund or account will be counted separately as a vote to accept or reject the Plan.

6.      <u>Tabulation of Master Ballots</u>**.**

These rules will apply with respect to the tabulation of Master Ballots cast by Nominees for Beneficial Holders of certain Second Lien Notes Claims and Unsecured Notes Claims:

a. the Solicitation Agent shall distribute or cause to be distributed through a Nominee or its agent the appropriate number of copies of Ballots to each Beneficial Holder (a "<u>Beneficial Holder Ballot</u>") of a Second Lien Notes Claims and Unsecured Notes Claim as of the Voting Record Date;

b. Nominees identified by the Solicitation Agent as Entities through which Beneficial Holders hold their Claims or Interests will be provided with (i) Solicitation Packages for each Beneficial Holder represented by the Nominee as of the Voting Record Date, which will contain, among other things, a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a Master Ballot;

c. any Nominee that is a holder of record with respect to a Second Lien Notes Claim or Unsecured Notes Claim shall vote on behalf of Beneficial Holders of such Claims or Interests by: (i) immediately, and in any event within five Business Days after its receipt of the Solicitation Packages, distributing the Solicitation Packages, including Beneficial Holder Ballots, it receives from the Solicitation Agent to all such Beneficial Holders;[13] (ii) providing such Beneficial Holders with a return address or other means of returning the completed Beneficial Holder Ballots; (iii) compiling and validating the votes and other relevant information of all such

---

[13]    Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee. Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices. If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.

Beneficial Holders on the Master Ballot; and (iv) transmitting the Master Ballot to the Solicitation Agent on or before the Voting Deadline;

d. any Beneficial Holder holding a Second Lien Notes Claims or Unsecured Notes Claim as a record holder in its own name shall vote on the Plan by completing and signing a Ballot or Master Ballot and returning it directly to the Solicitation Agent on or before the Voting Deadline;

e. any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Solicitation Agent a Master Ballot that reflects the vote of such Beneficial Holders on or before the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Solicitation Agent.  Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of one year after the Effective Date of the Plan;

f. if a Beneficial Holder holds a Second Lien Notes Claim or Unsecured Notes Claim through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of Second Lien Notes Claims or Unsecured Notes Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

g. votes cast by Beneficial Holders through a Master Ballot submitted by a Nominee (or its agent) will be applied against the positions held by such Nominee in the securities as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee (or its agent) will not be counted in excess of the Record Amount of such securities held by such Nominee; *provided* that the Solicitation Agent may adjust such record amount to reflect the amount in accordance with subparagraph (d) below;

h. if conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominee;

i. if over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's

position, as of the Voting Record Date, of certain Second Lien Notes Claims or Unsecured Notes Claims;

j.   for the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such holder includes interest in the amount counted on its Ballot) to have voted only the principal amount of its position in the applicable Second Lien Notes Claims or Unsecured Notes Claims; and

k.   a single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.

**F.   Amendments to the Plan and Solicitation Procedures.**

The Debtors with the consent of the Required Plan Sponsors and the DIP Agent reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents, without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

*[Remainder of page intentionally left blank]*

**<u>Exhibit 3A</u>**

**Form of Ballot for Revolving Credit Facility Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**CLASS 3 BALLOT FOR HOLDERS OF REVOLVING CREDIT FACILITY CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 3 ballot (this "Class 3 Ballot") because you are a Holder of a Revolving Credit Facility Claim in Class 3 as of **[October 19], 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 3 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 3 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 3 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 3, Revolving Credit Facility Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 3 Claim in the following aggregate unpaid amount:[2]



**Item 2.    Vote on Plan.**

The Holder of the Class 3 Revolving Credit Facility Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
| --- | --- |

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

---

[2]    For voting purposes only, subject to tabulation rules.

<u>Item 3.</u>  **Important information regarding the Third Party Release.**[3]

**AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or**

---

[3]     Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

*        *        *

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

<u>OPTIONAL RELEASE ELECTION.</u> YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:

☐ **The Undersigned Holder of the Claim elects to <u>OPT OUT of the Third Party Release</u>**

[*Remainder of page intentionally left blank; continued next page.*]

**Item 4.**  **Certifications.**

By signing this Class 3 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a)  **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Revolving Credit Facility Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Revolving Credit Facility Claims being voted;**

(b)  **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c)  **that the Entity has cast the same vote with respect to all Revolving Credit Facility Claims in a single Class; and**

(d)  **that no other Class 3 Ballots with respect to the amount of the Revolving Credit Facility Claims identified in Item 1 have been cast or, if any other Class 3 Ballots have been cast with respect to such Revolving Credit Facility Claims, then any such earlier Class 3 Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE)** *PROMPTLY* **BY** *ONLY ONE* **OF THE FOLLOWING RETURN METHODS:**

---

If by First Class mail:

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

---

If by overnight courier or hand delivery:

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

---

By electronic, online submission:

    Please visit https://dm.epiq11.com/chesapeake. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Ballot.

    **IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

    **Unique E-Ballot ID#:** _____

    <u>"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.</u>

---

<u>Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.</u>

<u>Creditors who cast a Ballot using the Solicitation Agent's online portal should NOT also submit a paper Ballot.</u>

7

**THE VOTING DEADLINE IS [DECEMBER 7], 2020 AT 11:59 P.M., PREVAILING CENTRAL TIME**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR CLASS 3 BALLOT
ON OR BEFORE THE VOTING DEADLINE.**

[*Remainder of page intentionally left blank; continued next page.*]

| Class 3 — Revolving Credit Facility Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 3 BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 3 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 3 Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 3 Ballot is counted, you *must either*: (a) complete and submit this hard copy Class 3 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website https://dm.epiq11.com/chesapeake. **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot**. To ensure that your hard copy Class 3 Ballot is counted, you must: (a) complete your Class 3 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 3 Ballot; and (c) clearly sign and return your original Class 3 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
|---|---|
| Chesapeake Energy Corporation<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Chesapeake Energy Corporation<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

5. **Use of Online Ballot Portal**. To ensure that your electronic Class 3 Ballot is counted, please follow the instructions of the Debtors' case administration website at https://dm.epiq11.com/chesapeake. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6. Your Class 3 Ballot *must* be returned to the Solicitation Agent so as to be *actually received* by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is [December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

7. If a Class 3 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted in the discretion of the Debtors with the consent of the Required Plan Sponsors and the DIP Agent. Additionally, **the following Class 3 Ballots will *not* be counted**:

    **(a)** any Class 3 Ballot that partially rejects and partially accepts the Plan;
    **(b)** Class 3 Ballots sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;
    **(c)** Class 3 Ballots sent by facsimile or any electronic means other than via the online portal;
    **(d)** any Class 3 Ballot that is illegible or contains insufficient information to permit the

        **identification of the Holder of the Claim;**

  (e)  **any Class 3 Ballot cast by an Entity that does not hold a Claim in Class 3;**

  (f)  **any Class 3 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;**

  (g)  **any unsigned Class 3 Ballot;**

  (h)  **any Class 3 Ballot not bearing an original signature, except as provided above; and/or**

  (i)  **any Class 3 Ballot not marked to accept or reject the Plan or any Class 3 Ballot marked both to accept and reject the Plan.**

8.    The method of delivery of Class 3 Ballots to the Solicitation Agent is at the election and risk of each Holder of a Revolving Credit Facility Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent ***actually receives*** the originally executed Class 3 Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

9.    If multiple Class 3 Ballots are received from the same Holder of a Revolving Credit Facility Claim with respect to the same Revolving Credit Facility Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 3 Ballot will supersede and revoke any earlier received Class 3 Ballots.

10.   You must vote all of your Revolving Credit Facility Claims within Class 3 either to accept or reject the Plan and may **not** split your vote.  Further, if a Holder has multiple Revolving Credit Facility Claims within Class 3, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Revolving Credit Facility Claims within Class 3 for the purpose of counting votes.

11.   This Class 3 Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12.   **<u>Please be sure to sign and date your Class 3 Ballot</u>**.  If you are signing a Class 3 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 3 Ballot.

13.   If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes ***only*** your Claims indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**<u>PLEASE MAIL YOUR CLASS 3 BALLOT PROMPTLY</u>**

**<u>IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 3 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE SOLICITATION AGENT AT:
(855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL)
(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)
OR EMAIL TABULATION@EPIQGLOBAL.COM
AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.</u>**

</div>

<div align="center">

**THE VOTING DEADLINE IS [DECEMBER 7], 2020 AT 11:59 P.M., PREVAILING CENTRAL TIME**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR CLASS 3 BALLOT
ON OR BEFORE THE VOTING DEADLINE.**

</div>

**Exhibit 3B**

**Form of Ballot for FLLO Term Loan Facility Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**CLASS 4 BALLOT FOR HOLDERS OF FLLO TERM LOAN FACILITY CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED,
EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION
AGENT BY [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME (THE "VOTING
DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 4 ballot (this "Class 4 Ballot") because you are a Holder of a FLLO Term Loan Facility Claim in Class 4 as of **[October 19], 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 4 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and

---

[1]　A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 4 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 4 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 4, FLLO Term Loan Facility Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 4 Claim in the following aggregate unpaid amount:[2]



**Item 2.   Vote on Plan.**

The Holder of the Class 4 FLLO Term Loan Facility Claims against the Debtors set forth in Item 1 votes to (please check one):

☐  **ACCEPT** (vote FOR) the Plan                    ☐  **REJECT** (vote AGAINST) the Plan

        **Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

---

[2]     For voting purposes only, subject to tabulation rules.

**Item 3.** **Important information regarding the Third Party Release.³**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or

---

³   Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

\*       \*       \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

<u>OPTIONAL RELEASE ELECTION.</u> YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:

☐ **The Undersigned Holder of the Claim elects to <u>OPT OUT of the Third Party Release</u>**

[*Remainder of page intentionally left blank; continued next page.*]

4

**Item 4**.  **Certifications.**

By signing this Class 4 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the FLLO Term Loan Facility Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the FLLO Term Loan Facility Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all FLLO Term Loan Facility Claims in a single Class; and**

(d) **that no other Class 4 Ballots with respect to the amount of the FLLO Term Loan Facility Claims identified in Item 1 have been cast or, if any other Class 4 Ballots have been cast with respect to such FLLO Term Loan Facility Claims, then any such earlier Class 4 Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)
*PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

---

If by First Class mail:

        Chesapeake Energy Corporation
        Ballot Processing
        c/o Epiq Corporate Restructuring, LLC
        P.O. Box 4422
        Beaverton, OR 97076-4422

---

If by overnight courier or hand delivery:

        Chesapeake Energy Corporation
        Ballot Processing
        c/o Epiq Corporate Restructuring, LLC
        10300 SW Allen Boulevard
        Beaverton, OR 97005

---

By electronic, online submission:

        Please visit https://dm.epiq11.com/chesapeake. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Ballot.

        **IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

        **Unique E-Ballot ID#: _____**

        <u>"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.</u>

---

<u>Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot.
Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.</u>

<u>Creditors who cast a Ballot using the Solicitation Agent's online portal
should NOT also submit a paper Ballot.</u>

**THE VOTING DEADLINE IS [DECEMBER 7], 2020 AT 11:59 P.M., PREVAILING CENTRAL TIME**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR CLASS 4 BALLOT
ON OR BEFORE THE VOTING DEADLINE.**

[*Remainder of page intentionally left blank; continued next page.*]

| Class 4 — FLLO Term Loan Facility Claims |
| --- |

**INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BALLOT**

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.   Capitalized terms used in the Class 4 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 4 Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 4 Ballot is counted, you **must *either***:  (a) complete and submit this hard copy Class 4 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website https://dm.epiq11.com/chesapeake.  **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4.  **Use of Hard Copy Ballot**.  To ensure that your hard copy Class 4 Ballot is counted, you must:  (a) complete your Class 4 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 4 Ballot; and (c) clearly sign and return your original Class 4 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
| --- | --- |
| Chesapeake Energy Corporation<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Chesapeake Energy Corporation<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

5.  **Use of Online Ballot Portal**.  To ensure that your electronic Class 4 Ballot is counted, please follow the instructions of the Debtors' case administration website at https://dm.epiq11.com/chesapeake.  You will need to enter your unique E-Ballot identification number indicated above.  The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6.  Your Class 4 Ballot ***must*** be returned to the Solicitation Agent so as to be ***actually received*** by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is [December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

7.  If a Class 4 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted in the discretion of the Debtors with the consent of the Required Plan Sponsors and the DIP Agent. Additionally, **the following Class 4 Ballots will *not* be counted**:

   (a)  **any Class 4 Ballot that partially rejects and partially accepts the Plan;**
   (b)  **Class 4 Ballots sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;**
   (c)  **Class 4 Ballots sent by facsimile or any electronic means other than via the online portal;**
   (d)  **any Class 4 Ballot that is illegible or contains insufficient information to permit the**

identification of the Holder of the Claim;

(e)  **any Class 4 Ballot cast by an Entity that does not hold a Claim in Class 4;**

(f)  **any Class 4 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;**

(g)  **any unsigned Class 4 Ballot;**

(h)  **any Class 4 Ballot not bearing an original signature, except as provided above; and/or**

(i)  **any Class 4 Ballot not marked to accept or reject the Plan or any Class 4 Ballot marked both to accept and reject the Plan.**

8.   The method of delivery of Class 4 Ballots to the Solicitation Agent is at the election and risk of each Holder of a FLLO Term Loan Facility Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent *actually receives* the originally executed Class 4 Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

9.   If multiple Class 4 Ballots are received from the same Holder of a FLLO Term Loan Facility Claim with respect to the same FLLO Term Loan Facility Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 4 Ballot will supersede and revoke any earlier received Class 4 Ballots.

10.  You must vote all of your FLLO Term Loan Facility Claims within Class 4 either to accept or reject the Plan and may **not** split your vote.  Further, if a Holder has multiple FLLO Term Loan Facility Claims within Class 4, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple FLLO Term Loan Facility Claims within Class 4 for the purpose of counting votes.

11.  This Class 4 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12.  **Please be sure to sign and date your Class 4 Ballot**.  If you are signing a Class 4 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4 Ballot.

13.  If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**PLEASE MAIL YOUR CLASS 4 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4 BALLOT,**
**THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE SOLICITATION AGENT AT:**
**(855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL)**
**(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)**
**OR EMAIL TABULATION@EPIQGLOBAL.COM**
**AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.**

</div>

<div align="center">

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR CLASS 4 BALLOT**
**ON OR BEFORE THE VOTING DEADLINE.**

</div>

**<u>Exhibit 3C</u>**

**Form of Master Ballot for Second Lien Notes Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**CLASS 5 HOLDERS OF SECOND LIEN NOTES CLAIMS**

**11.500% senior notes due 2025
(CUSIP No. 165167DD6)**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY [DECEMBER 7], 2020, AT 11:59 P.M.,
PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **[●], 2020** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 5 Second Lien Notes Claims as of **[October 19], 2020** (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain**

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]     A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

Beneficial Holders' Class 5 Second Lien Notes Claims (the "<u>Class 5 Claims</u>"), to transmit to the Solicitation Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 5 Claims to accept or reject the Plan.  The CUSIP number (the "<u>CUSIP</u>") for the Class 5 Claims entitled to vote and of which you are the Nominee is 165167DD6.  This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "<u>Solicitation Package</u>") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "<u>Solicitation Agent</u>"), at no charge by: (i) accessing the Debtors' restructuring website at <u>https://dm.epiq11.com/chesapeake</u>; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at <u>http://www.txs.uscourts.gov/bankruptcy</u>.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Master Ballot in error, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR BENEFICIAL HOLDERS OF SECOND LIEN NOTES CLAIMS IN CLASS 5 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 5 CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests.  To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Solicitation Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

<u>Item 1</u>.  **Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐  Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 5 Claims listed in Item 2 below, and is the record Holder of such bonds, or

☐  Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 5 Claims listed in Item 2 below, or

☐  Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered Holder of the aggregate principal amount of Class 5 Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 5 Claims described in Item 2.

2

**Item 2.  Class 5 Claims Vote on Plan**

The undersigned transmits the following votes, and releases of Beneficial Holders of Class 5 Claims and certifies that the following Beneficial Holders of Class 5 Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's Class 5 Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

**A SEPARATE MASTER BALLOT MUST BE USED FOR EACH CUSIP.**

| CUSIP VOTED ON THIS MASTER BALLOT:   ☐ **CUSIP No. 165167DD6** | | | |
|---|---|---|---|
| **Your Customer Account Number for Each Beneficial Holder of Class 5 Claims** | **Principal Amount Held as of Voting Record Date** | **Item 2**<br><br>**Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below.** | **Item 3**<br><br>**Check the box below if the Beneficial Holder checked the box in Item 3 of their Ballot** |
| | | **Accept the Plan** / **Reject the Plan** | |
| 1 | $ | ☐          ☐ | ☐ |
| 2 | $ | ☐          ☐ | ☐ |
| 3 | $ | ☐          ☐ | ☐ |
| 4 | $ | ☐          ☐ | ☐ |
| 5 | $ | ☐          ☐ | ☐ |
| 6 | $ | ☐          ☐ | ☐ |
| **TOTALS** | $ | | |

**Item 3.**  **Important information regarding the Third Party Release.**[3]

**AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

   **Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or**

---

[3] Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), of each such Entity and its current and former Affiliates, and such Entities' and their current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

<p style="text-align:center">*     *     *</p>

<u>Item 4</u>.  **Other Class 5 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | **Account Number** | **Name of Record Holder or Nominee** | **Principal Amount of other Class 5 Second Lien Notes Claims** | **CUSIP of other Class 5 Second Lien Notes Claims Votes** |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

<u>Item 5</u>.  **Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

(a)  **it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 5 Claims listed in Item 2 above;**

(b)  **it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;**

<p style="text-align:center">5</p>

(c) **it is the registered Holder of all Class 5 Claims listed in Item 2 above being voted, or**

(d) **it has been authorized by each Beneficial Holder of Class 5 Claims listed in Item 2 above to vote on the Plan;**

(e) **no other Master Ballots with respect to the same Class 5 Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;**

(f) **it has properly disclosed:  (a) the number of Beneficial Holder of Class 5 Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Class 5 Claims owned, as the case may be, by each Beneficial Holder of Class 5 Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Class 5 Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of Class 5 Claims' certification as to other Class 5 Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of Class 5 Claims; and**

(g) **it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Class 5 Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Participant Number | |
| Name of Proxy Holder or Agent for Nominee (if applicable) | |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.  **In the envelope provided via first class mail, by overnight courier, or by hand delivery to:**

---

If by First Class mail:

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

---

If by overnight courier or hand delivery:

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

---

2.  **Via electronic mail service to:**

tabulation@epiqglobal.com
with a reference to "Chesapeake Master Ballot" in the subject line.

---

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE THE
CLASS 5 MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

*[Remainder of page intentionally left blank; continued next page.]*

| Class 5 — Second Lien Notes Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.   Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 5 Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds.  You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices.  You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a beneficial ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.  Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 5 Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Solicitation Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

4. If you are transmitting the votes of any Beneficial Holder of Class 5 Claims other than yourself, you may either:

   (a) **"Pre-validate" the individual Class 5 Second Lien Notes Claim Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 5 Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Solicitation Agent in the return envelope to be provided in the Solicitation Package.  A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 5 Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder.  The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Solicitation Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date.**

   (b) **Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 5 Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee.  In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Solicitation Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Solicitation Agent.  The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Solicitation Agent so that the Master Ballot is actually received by the Solicitation Agent on or before the Voting Deadline.**

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must:  (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the

customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Solicitation Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan.  You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

The Master Ballot **must** be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is [December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

6. If a Master Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted in the discretion of the Debtors with the consent of the Required Plan Sponsors and the DIP Agent. Additionally, **the following Master Ballots will *not* be counted**:

   (a) **any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
   (b) **any Master Ballot cast by a Party that does not hold a Claim in a Class that is entitled to vote on the Plan;**
   (c) **any Master Ballot sent by facsimile or any electronic means other than electronic mail;**
   (d) **any unsigned Master Ballot;**
   (e) **any Master Ballot that does not contain an original signature provided however, that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;**
   (f) **any Master Ballot not marked to accept or reject the Plan; and**
   (g) **any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.**

7. The method of delivery of Master Ballots to the Solicitation Agent is at the election and risk of each Nominee of Class 5 Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent **actually receives** the originally executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

8. If a Beneficial Holder or Nominee holds a Claim in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that Voting Class.

9. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

10. The Master Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

12. If you are both the Nominee and the Beneficial Holder of any of the Class 5 Claims and you wish to vote such Class 5 Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 5 Claims and you must vote all of your Class 5 Claims to either to accept or reject the Plan and may not split your vote.  Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

13. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity may be counted separately as a vote to accept or reject the Plan.

14. The following additional rules shall apply to Master Ballots:

   (a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 5 Claims as of the Record Voting Date, as evidenced by the record and depository listings.

   (b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Ballots, will not be counted in excess of the record amount of the Class 5 Claims held by such Nominee;

   (c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Beneficial Holder Ballots, the Solicitation Agent will attempt to reconcile discrepancies with the Nominee;

   (d) To the extent that over-votes on a Master Ballot or pre-validated Holder Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 5 Claims; and

   (e) For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating to its holding in that particular account, although the Solicitation Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5 BALLOT,**
**THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE SOLICITATION AGENT AT:**
**(855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL)**
**(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)**
**OR EMAIL TABULATION@EPIQGLOBAL.COM**
**AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.**

---

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE**
**THE CLASS 5 MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

**<u>Exhibit 3D</u>**

**Form of Beneficial Holder Ballot for Second Lien Notes Claims**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**BENEFICIAL BALLOT FOR VOTING TO ACCEPT OR REJECT THE**
**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**CLASS 5 BALLOT FOR BENEFICIAL HOLDERS**
**OF SECOND LIEN NOTES CLAIMS**

**11.500% senior notes due 2025**
**(CUSIP No. 165167DD6)**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THE DEADLINE FOR THE RECEIPT OF BALLOTS AND MASTER BALLOTS IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE SOLICITATION AGENT (EPIQ CORPORATE RESTRUCTURING, LLC)*, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.**

***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE*, PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.  PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2020 (the "Disclosure Statement Order").  Bankruptcy Court approval of the

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 5 ballot for Beneficial Holders[2] (the "Class 5 Beneficial Holder Ballot") because you are a Beneficial Holder of a Second Lien Notes Claim in Class 5 as of **[October 19], 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Class 5 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 5 Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 5 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 5 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 5 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 5, Second Lien Notes Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 5 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Solicitation Agent on or before the Voting Deadline, which is **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

## Item 1. Amount of Claim.

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 5 Second Lien Notes Claims in the following principal amount (insert amount in box below, unless otherwise completed by your Nominee):



$_____

---

[2]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

**Item 2.**    **Vote on Plan.**

The Beneficial Holder of the Class 5 Second Lien Notes Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

<div style="border:1px solid black; padding:10px;">

☐  **<u>ACCEPT</u>** (vote FOR) the Plan ☐  **<u>REJECT</u>** (vote AGAINST) the Plan

</div>

 

    <u>**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**</u>

*[Remainder of page intentionally left blank; continued next page.]*

<u>Item 3.</u>  **Important information regarding the Third Party Release.**[3]

**AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

> **Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or**

---

[3]     Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

\*          \*          \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

<u>OPTIONAL RELEASE ELECTION.</u> YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:

☐ **The Undersigned Holder of the Claim elects to <u>OPT OUT of the Third Party Release</u>**

<u>Item 4.  Other Class 5 Beneficial Holder Ballots Submitted.</u>  By returning this Beneficial Holder Ballot, the Holder of the Class 5 Second Lien Notes Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for Second Lien Notes Claims owned by such Holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the Holder indicate the same vote to accept or reject the Plan that the Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u>
CLASS 5 SECOND LIEN NOTES CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

| Account Number of other Class 5 Second Lien Notes Claims Voted | Name of Record Holder or Nominee | Principal Amount of other Class 5 Second Lien Notes Claims | CUSIP of Other Class 5 Second Lien Notes Claims |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

<u>Item 5</u>.  **Certifications.**

By signing this Class 5 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Class 5 Second Lien Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Note Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all Second Lien Notes Claims in a single Class; and**

(d) **that no other Class 5 Beneficial Holder Ballots with respect to the amount of the Second Lien Notes Claims identified in Item 1 have been cast or, if any other Class 5 Beneficial Holder Ballots have been cast with respect to such Second Lien Notes Claims, then any such earlier Class 5 Beneficial Holder Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

6

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

THE VOTING DEADLINE IS
**[DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

THE SOLICITATION AGENT MUST *ACTUALLY RECEIVE*
THE CLASS 5 BENEFICIAL HOLDER BALLOT REFLECTING YOUR VOTE (OR PRE-VALIDATED
BALLOT, IF APPLICABLE) ON OR BEFORE THE VOTING DEADLINE.

[*Remainder of page intentionally left blank; continued next page.*]

| Class 5 — Second Lien Notes Claims |
| --- |

### INSTRUCTIONS FOR COMPLETING THIS CLASS 5 BENEFICIAL HOLDER BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 5 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5 Beneficial Holder Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3. Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you must submit your Class 5 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Solicitation Agent by the Voting Deadline.  You may instruct your Nominee to vote on your behalf in the Master Ballot as follows:  (a) complete the Class 5 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 5 Beneficial Holder Ballot; and (c) sign and return the Class 5 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee.  The Voting Deadline for the receipt of Master Ballots by the Solicitation Agent is **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time.  Your completed Class 5 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Solicitation Agent on or before the Voting Deadline.

4. **The following Class 5 Ballots submitted to your Nominee will *not* be counted**:

   (a) **any Class 5 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;**
   (b) **Class 5 Beneficial Holder sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;**
   (c) **Class 5 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee (however, if you are directed by your Nominee to submit the Beneficial Holder Ballot to the Nominee via electronic means, such instructions to your Nominee shall have the same effect as if you had completed and returned a physical Beneficial Holder Ballot, including all certifications);**
   (d) **any Class 5 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
   (e) **any Class 5 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 5;**
   (f) **any unsigned Class 5 Beneficial Holder Ballot;**
   (g) **any Class 5 Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan.**
   (h) **any Class 5 Beneficial Holder Ballot not bearing an original signature, except as provided above; and/or**
   (i) **any Class 5 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 5 Ballot marked both to accept and reject the Plan.**

5. If your Class 5 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise.  In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 5 Beneficial Holder Ballot to your Nominee.  No Class 5 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6.  If you deliver multiple Class 5 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 5 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 5 Beneficial Holder Ballots.

7.  You must vote all of your Claims within Class 5 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple Claims within Class 5, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Claims within Class 5 for the purpose of counting votes.

8.  This Class 5 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Class 5 Beneficial Holder Ballot**.  If you are signing a Class 5 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

10. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 5 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE RETURN YOUR CLASS 5 BENEFICIAL HOLDER BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5 BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE SOLICITATION AGENT AT: (855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL) (ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP) OR EMAIL TABULATION@EPIQGLOBAL.COM AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.**

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE THE CLASS 5 BENEFICIAL HOLDER BALLOT (OR PRE-VALIDATED BALLOT, IF APPLICABLE) ON OR BEFORE THE VOTING DEADLINE.**

**<u>Exhibit 3E</u>**

**Form of Master Ballot for Unsecured Notes Claims**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT THE**
**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**CLASS 6 HOLDERS OF UNSECURED NOTES CLAIMS**

| | |
|---|---|
| **6.625% senior notes due 2020** **(CUSIP No. 165167CF2)** | **8.000% senior notes due 2025** **(CUSIP No. 165167CU9)** |
| **6.125% senior notes due 2021** **(CUSIP No. 165167CG0)** | **8.000% senior notes due 2026** **(CUSIP No. U16450AY1 )** |
| **5.375% senior notes due 2021** **(CUSIP No. 165167CK1)** | **7.500% senior notes due 2026** **(CUSIP No. 165167DB0)** |
| **4.875% senior notes due 2022** **(CUSIP No. 165167CN5)** | **8.000% senior notes due 2027** **(CUSIP No. 165167CZ8)** |
| **5.750% senior notes due 2023** **(CUSIP No. 165167CL9)** | **5.500% convertible senior notes due 2026** **(CUSIP No. 165167CY1)** |
| **7.000% senior notes due 2024** **(CUSIP No. 165167DA2)** | **6.875% senior notes due 2025** **(CUSIP No. 96812TAB8)** |

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor*

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

*Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **[●], 2020** (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[1] of Class 6 Unsecured Notes Claims as of  **[October 19], 2020** (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' Class 6 Unsecured Notes Claims (the "Class 6 Claims"), to transmit to the Solicitation Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 6 Claims to accept or reject the Plan.  The CUSIP number (the "CUSIP") for the Class 6 Claims entitled to vote and of which you are the Nominee are 165167CF2, 165167CG0, 165167CK1, 165167CN5, 165167CL9, 165167DA2, 165167CU9, U16450AY1, 165167DB0, 165167CY1, 165167CZ8, and 96812TAB8.**  This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Master Ballot in error, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR BENEFICIAL HOLDERS OF UNSECURED NOTES CLAIMS IN CLASS 6 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 6 CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests.  To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Solicitation Agent *actually receives* it on or before the Voting Deadline.

---

[1]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

2

**THE VOTING DEADLINE IS ON [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**Item 1.  Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 6 Claims listed in Item 2 below, and is the record Holder of such bonds, or

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 6 Claims listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered Holder of the aggregate principal amount of Class 6 Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 6 Claims described in Item 2.

**Item 2.  Class 6 Claims Vote on Plan**

The undersigned transmits the following votes, and releases of Beneficial Holders of Class 6 Claims and certifies that the following Beneficial Holders of Class 6 Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's Class 6 Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

**A SEPARATE MASTER BALLOT MUST BE USED FOR EACH CUSIP.**

| | | CUSIP VOTED ON THIS MASTER BALLOT: | | |
|---|---|---|---|---|

☐ **CUSIP No. 165167CF2**   ☐ **CUSIP No. 165167CU9**
☐ **CUSIP No. 165167CG0**   ☐ **CUSIP No. U16450AY1**
☐ **CUSIP No. 165167CK1**   ☐ **CUSIP No. 165167DB0**
☐ **CUSIP No. 165167CN5**   ☐ **CUSIP No. 165167CZ8**
☐ **CUSIP No. 165167CL9**   ☐ **CUSIP No. 165167CY1**
☐ **CUSIP No. 165167DA2**   ☐ **CUSIP No. 96812TAB8**

| Your Customer Account Number for Each Beneficial Holder of Class 6 Claims | Principal Amount Held as of Voting Record Date | Item 2 — Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | Item 3 — Check the box below if the Beneficial Holder checked the box in Item 3 of their Ballot |
|---|---|---|---|---|
| | | **Accept the Plan** | **Reject the Plan** | |
| 1 | $ | ☐ | ☐ | ☐ |
| 2 | $ | ☐ | ☐ | ☐ |
| 3 | $ | ☐ | ☐ | ☐ |
| 4 | $ | ☐ | ☐ | ☐ |
| 5 | $ | ☐ | ☐ | ☐ |
| 6 | $ | ☐ | ☐ | ☐ |
| **TOTALS** | $ | | | |

**Item 3.**  Important information regarding the Third Party Release.[2]

AS A "**RELEASING PARTY**" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed,

---

[2]   Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in

each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions

the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

**and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.**

<div align="center">

\*      \*      \*

</div>

**Item 4.  Other Class 6 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | Account Number | Name of Record Holder or Nominee | Principal Amount of other Class 6 Unsecured Notes Claims | CUSIP of other Class 6 Unsecured Notes Claims Votes |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

**Item 5.  Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

(a) **it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 6 Claims listed in Item 2 above;**

(b) **it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;**

(c) **it is the registered Holder of all Class 6 Claims listed in Item 2 above being voted, or**

(d) **it has been authorized by each Beneficial Holder of Class 6 Claims listed in Item 2 above to vote on the Plan;**

(e) **no other Master Ballots with respect to the same Class 6 Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;**

(f) **it has properly disclosed:  (a) the number of Beneficial Holder of Class 6 Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Class 6 Claims owned, as the case may be, by each Beneficial Holder of Class 6 Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Class 6 Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of Class 6 Claims' certification as to other Class 6 Claims voted; and (f) the**

<div align="center">6</div>

customer account or other identification number for each such Beneficial Holder of Class 6 Claims; and

(g) it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Class 6 Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Participant Number | |
| Name of Proxy Holder or Agent for Nominee (if applicable) | |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

### PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:

1. **In the envelope provided via first class mail, by overnight courier, or by hand delivery to:**

<u>If by First Class mail:</u>

Chesapeake Energy Corporation
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

<u>If by overnight courier or hand delivery:</u>

Chesapeake Energy Corporation
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

2.   **Via electronic mail service to:**

tabulation@epiqglobal.com
with a reference to "Chesapeake Master Ballot" in the subject line.

---

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE THE
CLASS 6 MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[*Remainder of page intentionally left blank; continued next page.*]

---

| **Class 6 — Unsecured Notes Claims** |
|:---:|

## **INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 6 Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a beneficial ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 6 Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Solicitation Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

4. If you are transmitting the votes of any Beneficial Holder of Class 6 Claims other than yourself, you may either:

   (a) **"Pre-validate" the individual Class 6 Unsecured Notes Claim Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 6 Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Solicitation Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 6 Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Solicitation Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date.**

   (b) **Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 6 Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Solicitation Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Solicitation Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Solicitation Agent so that the Master Ballot is actually received by the Solicitation Agent on or before the Voting Deadline.**

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the

customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Solicitation Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan.  You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

The Master Ballot **must** be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is [December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

6. If a Master Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted in the discretion of the Debtors with the consent of the Required Plan Sponsors and the DIP Agent. Additionally, **the following Master Ballots will _not_ be counted**:

   (a) **any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
   (b) **any Master Ballot cast by a Party that does not hold a Claim in a Class that is entitled to vote on the Plan;**
   (c) **any Master Ballot sent by facsimile or any electronic means other than electronic mail;**
   (d) **any unsigned Master Ballot;**
   (e) **any Master Ballot that does not contain an original signature provided however, that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;**
   (f) **any Master Ballot not marked to accept or reject the Plan; and**
   (g) **any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.**

7. The method of delivery of Master Ballots to the Solicitation Agent is at the election and risk of each Nominee of Class 6 Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent **actually receives** the originally executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

8. If a Beneficial Holder or Nominee holds a Claim in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that Voting Class.

9. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

10. The Master Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

12. If you are both the Nominee and the Beneficial Holder of any of the Class 6 Claims and you wish to vote such Class 6 Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 6 Claims and you must vote all of your Class 6 Claims to either to accept or reject the Plan and may not split your vote.  Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

13. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity may be counted separately as a vote to accept or reject the Plan.

14. The following additional rules shall apply to Master Ballots:

    (a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 6 Claims as of the Record Voting Date, as evidenced by the record and depository listings.

    (b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Ballots, will not be counted in excess of the record amount of the Class 6 Claims held by such Nominee;

    (c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Beneficial Holder Ballots, the Solicitation Agent will attempt to reconcile discrepancies with the Nominee;

    (d) To the extent that over-votes on a Master Ballot or pre-validated Holder Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 6 Claims; and

    (e) For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating to its holding in that particular account, although the Solicitation Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 6 BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE SOLICITATION AGENT AT: (855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL) (ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP) OR EMAIL TABULATION@EPIQGLOBAL.COM AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.**

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE THE CLASS 6 MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

**<u>Exhibit 3F</u>**

**Form of Beneficial Holder Ballot for Unsecured Notes Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**BENEFICIAL BALLOT FOR VOTING TO ACCEPT OR REJECT THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

<u>**CLASS 6 BALLOT FOR BENEFICIAL HOLDERS
OF UNSECURED NOTES CLAIMS**</u>

| | |
|---|---|
| **6.625% senior notes due 2020<br>(CUSIP No. 165167CF2)** | **8.000% senior notes due 2025<br>(CUSIP No. 165167CU9)** |
| **6.125% senior notes due 2021<br>(CUSIP No. 165167CG0)** | **8.000% senior notes due 2026<br>(CUSIP No. U16450AY1 )** |
| **5.375% senior notes due 2021<br>(CUSIP No. 165167CK1)** | **7.500% senior notes due 2026<br>(CUSIP No. 165167DB0)** |
| **4.875% senior notes due 2022<br>(CUSIP No. 165167CN5)** | **8.000% senior notes due 2027<br>(CUSIP No. 165167CZ8)** |
| **5.750% senior notes due 2023<br>(CUSIP No. 165167CL9)** | **5.500% convertible senior notes due 2026<br>(CUSIP No. 165167CY1)** |
| **7.000% senior notes due 2024<br>(CUSIP No. 165167DA2)** | **6.875% senior notes due 2025<br>(CUSIP No. 96812TAB8)** |

<u>**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**</u>

<u>**THE DEADLINE FOR THE RECEIPT OF BALLOTS AND MASTER BALLOTS IS [DECEMBER 7],
2020, AT 11:59 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**</u>

<u>***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE SOLICITATION AGENT (EPIQ
CORPORATE RESTRUCTURING, LLC)*, PLEASE COMPLETE THE BALLOT AND RETURN IT***</u>

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

> **PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE.**
>
> *IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE,* **PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.  PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on **[●], 2020** (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 6 ballot for Beneficial Holders[1] (the "Class 6 Beneficial Holder Ballot") because you are a Beneficial Holder of an Unsecured Notes Claim in Class 6 as of **[October 19], 2020** (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.  You can cast your vote through this Class 6 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 6 Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 6 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 6 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 6 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 6, Unsecured Lien Notes Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 6 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Solicitation Agent on or before the Voting Deadline, which is **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time.  Please allow sufficient

---

[1]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

time for your vote to be included on the Master Ballot completed by your Nominee.  If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1.    Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 6 Unsecured Notes Claims in the following principal amount (insert amount in box below, unless otherwise completed by your Nominee):



$_____

**Item 2.    Vote on Plan.**

The Beneficial Holder of the Class 6 Unsecured Notes Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

☐  **ACCEPT** (vote FOR) the Plan                        ☐  **REJECT** (vote AGAINST) the Plan

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

*[Remainder of page intentionally left blank; continued next page.]*

**Item 3.**  **Important information regarding the Third Party Release.**[2]

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or

---

[2]   Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

\*       \*       \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

☐ **The Undersigned Holder of the Claim elects to OPT OUT of the Third Party Release**

Item 4.  Other Class 6 Beneficial Holder Ballots Submitted.  By returning this Beneficial Holder Ballot, the Holder of the Class 6 Unsecured Notes Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for Notes Claims owned by such Holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the Holder indicate the same vote to accept or reject the Plan that the Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u>
CLASS 6 UNSECURED NOTES CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

| Account Number of other Class 6 Unsecured Notes Claims Voted | Name of Record Holder or Nominee | Principal Amount of other Class 6 Unsecured Notes Claims | CUSIP of Other Class 6 Unsecured Notes Claims |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

**<u>Item 5</u>.  Certifications.**

By signing this Class 6 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Class 6 Unsecured Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Note Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all Unsecured Notes Claims in a single Class; and**

(d) **that no other Class 6 Beneficial Holder Ballots with respect to the amount of the Unsecured Notes Claims identified in Item 1 have been cast or, if any other Class 6 Beneficial Holder Ballots have been cast with respect to such Unsecured Notes Claims, then any such earlier Class 6 Beneficial Holder Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

6

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

THE VOTING DEADLINE IS
**[DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

THE SOLICITATION AGENT MUST *ACTUALLY RECEIVE*
THE CLASS 6 BENEFICIAL HOLDER BALLOT REFLECTING YOUR VOTE (OR PRE-VALIDATED
BALLOT, IF APPLICABLE) ON OR BEFORE THE VOTING DEADLINE.

[*Remainder of page intentionally left blank; continued next page.*]

---

| Class 6 — Unsecured Notes Claims |
|:---:|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 6 BENEFICIAL HOLDER BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 6 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 6 Beneficial Holder Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you must submit your Class 6 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Solicitation Agent by the Voting Deadline.  You may instruct your Nominee to vote on your behalf in the Master Ballot as follows:  (a) complete the Class 6 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 6 Beneficial Holder Ballot; and (c) sign and return the Class 6 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee.  The Voting Deadline for the receipt of Master Ballots by the Solicitation Agent is **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time.  Your completed Class 6 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Solicitation Agent on or before the Voting Deadline.

4.  **The following Class 6 Ballots submitted to your Nominee will *not* be counted**:

    (a)  **any Class 6 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;**
    (b)  **Class 6 Beneficial Holder sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;**
    (c)  **Class 6 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee (however, if you are directed by your Nominee to submit the Beneficial Holder Ballot to the Nominee via electronic means, such instructions to your Nominee shall have the same effect as if you had completed and returned a physical Beneficial Holder Ballot, including all certifications);**
    (d)  **any Class 6 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
    (e)  **any Class 6 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 6;**
    (f)  **any unsigned Class 6 Beneficial Holder Ballot;**
    (g)  **any Class 6 Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan.**
    (h)  **any Class 6 Beneficial Holder Ballot not bearing an original signature, except as provided above; and/or**
    (i)  **any Class 6 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 6 Ballot marked both to accept and reject the Plan.**

5.  If your Class 6 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise.  In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 6 Beneficial Holder Ballot to your Nominee.  No Class 6 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6.  If you deliver multiple Class 6 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 6 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 6 Beneficial Holder Ballots.

7.  You must vote all of your Claims within Class 6 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple Claims within Class 6, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Claims within Class 6 for the purpose of counting votes.

8.  This Class 6 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Class 6 Beneficial Holder Ballot**.  If you are signing a Class 6 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

10. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 6 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE RETURN YOUR CLASS 6 BENEFICIAL HOLDER BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 6 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE SOLICITATION AGENT AT:
(855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL)
(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)
OR EMAIL TABULATION@EPIQGLOBAL.COM
AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.**

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE
THE CLASS 6 BENEFICIAL HOLDER BALLOT (OR PRE-VALIDATED BALLOT, IF APPLICABLE)
ON OR BEFORE THE VOTING DEADLINE.**

**Exhibit A**

*Your Nominee may have checked a box below to indicate the CUSIP to which this Beneficial Holder Ballot pertains, or otherwise provided that information to you on a label or schedule attached to the Beneficial Holder Ballot:*

| | Class 6 (Unsecured Notes Claims) | |
|---|---|---|
| ☐ | 6.625% senior notes due 2020 | CUSIP No. 165167CF2 |
| ☐ | 6.125% senior notes due 2021 | CUSIP No. 165167CG0 |
| ☐ | 5.375% senior notes due 2021 | CUSIP No. 165167CK1 |
| ☐ | 4.875% senior notes due 2022 | CUSIP No. 165167CN5 |
| ☐ | 5.750% senior notes due 2023 | CUSIP No. 165167CL9 |
| ☐ | 7.000% senior notes due 2024 | CUSIP No. 165167DA2 |
| ☐ | 8.000% senior notes due 2025 | CUSIP No. 165167CU9 |
| ☐ | 8.000% senior notes due 2026 | CUSIP No. U16450AY1 |
| ☐ | 7.500% senior notes due 2026 | CUSIP No. 165167DB0 |
| ☐ | 8.000% senior notes due 2027 | CUSIP No. 165167CZ8 |
| ☐ | 5.500% convertible senior notes due 2026 | CUSIP No. 165167CY1 |
| ☐ | 6.875% senior notes due 2025 | CUSIP No. 96812TAB8 |

## Exhibit 3G

**Form of Ballot for General Unsecured Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**CLASS 7 BALLOT FOR HOLDERS OF GENERAL UNSECURED CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE")**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 7 ballot (this "Class 7 Ballot") because you are a Holder of a General Unsecured Claim in Class 7 as of **[October 19], 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 7 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 7 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 7 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 7, General Unsecured Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1**.  **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 7 Claim in the following aggregate unpaid amount:[2]

$\$\underline{\hspace{3cm}}$

Debtor:$\underline{\hspace{4cm}}$

**Item 2**.    **Vote on Plan.**

The Holder of the Class 7 General Unsecured Claim against the Debtor set forth in Item 1 votes to (please check <u>one</u>):

| ☐  **ACCEPT** (vote FOR) the Plan | ☐  **REJECT** (vote AGAINST) the Plan |
| --- | --- |

**<u>You will receive a separate ballot for each Debtor for General Unsecured Claims.</u>**

[*Remainder of page intentionally left blank; continued next page*.]

---

[2]        For voting purposes only, subject to tabulation rules.

<u>Item 3.</u>  **Important information regarding the Third Party Release.**[3]

**AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

> **Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or**

---

[3]    Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

\*        \*        \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

☐  The Undersigned Holder of the Claim elects to
OPT OUT of the Third Party Release

Item 4.  Certifications.

By signing this Class 7 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a)  that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the General Unsecured Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the General Unsecured Claims being voted;

(b)  that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)  that the Entity has cast the same vote with respect to all General Unsecured Claims in a single Class; and

(d) **that no other Class 7 Ballots with respect to the amount of the General Unsecured Claims identified in Item 1 have been cast or, if any other Class 7 Ballots have been cast with respect to such General Unsecured Claims, then any such earlier Class 7 Ballots are hereby revoked.**

Name of Holder: _____

<div align="center">(Print or Type)</div>

_____

Signature: _____

Name of Signatory: _____

<div align="center">(If other than Holder)</div>

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

<div align="center">

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)
*PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

</div>

If by First Class mail:

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

If by overnight courier or hand delivery:

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

By electronic, online submission:

    Please visit https://dm.epiq11.com/chesapeake. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot. If you choose to submit your

Ballot via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

Unique E-Ballot ID#: _____

<u>"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.</u>

<u>Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.</u>

<u>Creditors who cast a Ballot using the Solicitation Agent's online portal should NOT also submit a paper Ballot</u>.

---

**<u>THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME</u>**

**<u>THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR CLASS 7 BALLOT ON OR BEFORE THE VOTING DEADLINE.</u>**

---

*[Remainder of page intentionally left blank; continued next page.]*

| Class 7 — General Unsecured Claims |
|:---:|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 7 BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 7 Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 7 Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 7 Ballot is counted, you *must either*:  (a) complete and submit this hard copy Class 7 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website https://dm.epiq11.com/chesapeake.  **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4.  **<u>Use of Hard Copy Ballot</u>**.  To ensure that your hard copy Class 7 Ballot is counted, you must:  (a) complete your Class 7 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 7 Ballot; and (c) clearly sign and return your original Class 7 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
|---|---|
| Chesapeake Energy Corporation<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Chesapeake Energy Corporation<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

5.  **<u>Use of Online Ballot Portal</u>**.  To ensure that your electronic Class 7 Ballot is counted, please follow the instructions of the Debtors' case administration website at https://dm.epiq11.com/chesapeake.  You will need to enter your unique E-Ballot identification number indicated above.  The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6.  Your Class 7 Ballot *must* be returned to the Solicitation Agent so as to be *actually received* by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is [December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

7.  If a Class 7 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted in the discretion of the Debtors with the consent of the Required Plan Sponsors and the DIP Agent.  Additionally, **the following Class 7 Ballots will *not* be counted**:

   **(a)  any Class 7 Ballot that partially rejects and partially accepts the Plan;**
   **(b)  Class 7 Ballots sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;**

      (c) **Class 7 Ballots sent by facsimile or any electronic means other than via the online portal;**

      (d) **any Class 7 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**

      (e) **any Class 7 Ballot cast by an Entity that does not hold a Claim in Class 7;**

      (f) **any Class 7 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;**

      (g) **any unsigned Class 7 Ballot;**

      (h) **any Class 7 Ballot not bearing an original signature, except as provided above; and/or**

      (i) **any Class 7 Ballot not marked to accept or reject the Plan or any Class 7 Ballot marked both to accept and reject the Plan.**

8. The method of delivery of Class 7 Ballots to the Solicitation Agent is at the election and risk of each Holder of a General Unsecured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent **_actually receives_** the originally executed Class 7 Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

9. If multiple Class 7 Ballots are received from the same Holder of a General Unsecured Claim with respect to the same General Unsecured Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 7 Ballot will supersede and revoke any earlier received Class 7 Ballots.

10. You must vote all of your General Unsecured Claims within Class 7 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple General Unsecured Claims within Class 7, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple General Unsecured Claims within Class 7 for the purpose of counting votes.

11. This Class 7 Ballot does **_not_** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date your Class 7 Ballot**. If you are signing a Class 7 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 7 Ballot.

13. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class. Each ballot votes **_only_** your Claims indicated on that ballot, so please complete and return each ballot that you received.

<p align="center">**PLEASE MAIL YOUR CLASS 7 BALLOT PROMPTLY**</p>

<p align="center">**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 7 BALLOT,<br>THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,<br>PLEASE CALL THE SOLICITATION AGENT AT:<br>(855) 907-2082 (TOLL FREE) OR +1 (503) 520-4448  (INTERNATIONAL)<br>(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)<br>OR EMAIL TABULATION@EPIQGLOBAL.COM<br>AND REFERENCE "CHESAPEAKE" IN THE SUBJECT LINE.**</p>

<p align="center">**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME**</p>

<p align="center">**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE YOUR CLASS 7 BALLOT<br>ON OR BEFORE THE VOTING DEADLINE.**</p>

**Exhibit 4**

**Form of Cover Letter**



_____, 2020

RE:   **In re Chesapeake Energy Corporation, _et al.,_**
      **Chapter 11 Case No. 20-33233 (DRJ) (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Chesapeake Energy Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on [●], 2020.

You have received this letter and the enclosed materials because you are entitled to vote on the _Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates_ [Docket No. [●]] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]  On [●], 2020, the Court entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) approving the adequacy of the _Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates_ [Docket No. [●]] (the "Disclosure Statement"); (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to the Plan; (c) approving the forms of ballots and notices in connection therewith; (d) scheduling certain dates with respect thereto; and (e) granting related relief.

> **YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

     a.     the Disclosure Statement Order (excluding exhibits);

     b.     the approved Disclosure Statement (annexed as **Exhibit 1** to the Disclosure Statement Order) and the exhibits thereto, including the Plan;

     c.     these Solicitation Procedures (annexed as **Exhibit 2** to the Disclosure Statement Order);

     d.     the applicable form of Ballot, in substantially the form of the Ballots annexed as **Exhibits 3A, 3B, 3C, 3D, 3E, 3F,** and **3G** the Disclosure Statement Order;

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

e.      a cover letter, in substantially the form annexed as **Exhibit 4** to the Disclosure Statement Order describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

f.      the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Procedures*, in substantially the form annexed as **Exhibit 8** to the Disclosure Statement Order (the "Confirmation Hearing Notice");

g.      a pre-addressed, postage pre-paid reply envelope;[3] and

h.      any additional documents that the Court has ordered to be made available.

Chesapeake Energy Corporation (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their Estates, holders of Claims and Interests, and all other parties in interest. Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims or Interests in the Chapter 11 Cases.

---

**THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN. BALLOTS SHOULD BE SUBMITTED IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**

**THE VOTING DEADLINE IS AT 11:59 P.M., PREVAILING CENTRAL TIME, ON [DECEMBER 7], 2020.**

---

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions, however, please feel free to contact Epiq Corporate Restructuring, LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "Solicitation Agent"), by: (a) accessing the Solicitation Agent's website at https://dm.epiq11.com/chesapeake;; (b) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) emailing tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (d) calling  (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, the solicitation materials, but may *not* advise you as to whether you should vote to accept or reject the Plan or provide any legal advice.

Sincerely,

Chesapeake Energy Corporation, on its own behalf and for each of the Debtors

_____
Domenic J. Dell'Osso, Jr.
Executive Vice President & Chief Financial Officer

---

[3]     The Debtors will provide pre-addressed, postage pre-paid reply envelopes only to those holders who receive Ballots directly from the Debtors and shall not be responsible for ensuring individual Beneficial Holders receive pre-addressed, postage pre-paid reply envelopes from their respective Nominees.

2

## Exhibit 5

**Form of Non-Impaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF
UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN**

    **PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) approving the adequacy of the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (the "Disclosure Statement"), (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (the "Plan"),[2] (c) approving the forms of ballots and notices in connection therewith, (d) scheduling certain dates with respect thereto, and (e) granting related relief.

    **PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

    **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.,** prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

    **PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **[December 7], 2020 at at 5:00 p.m.,** prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

    **PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line. You may also obtain copies

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.  PURSUANT TO THE PLAN YOU ARE DEEMED TO ACCEPT THE PLAN AND THEREFORE ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE VIII.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN USING THE ENCLOSED OPT OUT FORM OR BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OR ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

Houston, Texas
[●], 2020

/s/

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:            mcavenaugh@jw.com
                      jwertz@jw.com
                      kpeguero@jw.com
                      vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:            patrick.nash@kirkland.com
                      marc.kieselstein@kirkland.com
                      alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim that is not entitled to vote on the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article VIII.D of the Plan contains the following provision:**

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE REVOLVING CREDIT FACILITY, THE FLLO TERM LOAN FACILITY, THE SECOND LIEN NOTES, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE EXIT FACILITIES, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES THAT ARE NOT DESCRIBED IN ITEMS 1 AND 2 SET FORTH IN ARTICLE IV.A OF THE PLAN ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OTHER THAN A DEBTOR THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, EACH SOLELY TO THE EXTENT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITIES CREDIT AGREEMENTS, OR ANY OTHER FINANCING DOCUMENT UNDER AND AS DEFINED THEREIN) OR (II) ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY

PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITIES DOCUMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.

\*       \*       \*

UNDER THE PLAN, "*RELEASED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS; (D) EACH DIP LENDER; (E) EACH AGENT; (F) EACH TRUSTEE; (G) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (H) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (I) THE CONSENTING SECOND LIEN NOTEHOLDERS; (J) THE CONSENTING UNSECURED NOTEHOLDERS; (K) THE EXIT FACILITIES LENDERS; (L) THE BACKSTOP PARTIES; (M) ALL HOLDERS OF INTERESTS; AND (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), EACH OF SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH DIP LENDER; (D) EACH AGENT; (E) EACH TRUSTEE; (F) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (G) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (H) THE CONSENTING SECOND LIEN NOTEHOLDERS; (I) THE CONSENTING UNSECURED NOTEHOLDERS; (J) THE EXIT FACILITIES LENDERS; (K) THE BACKSTOP PARTIES; (L) ALL HOLDERS OF CLAIMS; (M) ALL HOLDERS OF INTERESTS; (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD

8

MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, IN EACH CASE, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH WITH RESPECT TO SUCH ENTITY AND SOLELY TO THE EXTENT SUCH ENTITY HAS THE AUTHORITY TO BIND SUCH AFFILIATE IN SUCH CAPACITY; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

Notwithstanding the foregoing, an entity **shall be** neither a Releasing Party nor a Released Party if it:  (a) validly opts out of the releases contained in Article VIII.D of the Plan or (b) timely files with the Bankruptcy Court on the docket of the Chapter 11 Ca**ses an objection to the releases contained in Article VIII** of the plan that is not resolved before confirmation.

As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article VIII.D of the Plan, as set forth above.  You may elect not to grant the releases contained in Article VIII.D of the plan ***only if*** you (a) check the box below or (b) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the released contained in Article VIII of the Plan that is not resolved before confirmation.  The election to withhold consent to grant such release is at your option.  By opting out of the releases set forth in Article VIII.D of the Plan, you will forego the benefit of obtaining the releases set forth in Article VIII of the Plan if you are a Released Party in connection therewith.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

> ☐ **The Undersigned holder of the Claim elects to OPT OUT of the Third Party Release**

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the holder of a Claim; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim;

(b)     the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims Conclusively Presumed to Accept the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class; and

(d)     no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

***IF YOU HAVE MADE THE OPTIONAL OPT OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

<u>If by First Class mail:</u>

> Chesapeake Energy Corporation
> Ballot Processing
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4422
> Beaverton, OR 97076-4422

<u>If by overnight courier or hand delivery:</u>

> Chesapeake Energy Corporation
> Ballot Processing
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Boulevard
> Beaverton, OR 97005

<u>By electronic, online submission:</u>

> Please visit https://dm.epiq11.com/chesapeake. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your Opt Out Form. If you choose to submit your Opt Out Form via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Opt Out Form.

10

"E-Balloting" is the sole manner in which Opt Out Forms will be accepted via electronic or online transmission. Opt Out Forms submitted by facsimile or email will not be counted.

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M.,** PREVAILING CENTRAL TIME. THE SOLICITATION AGENT MUST *ACTUALLY RECEIVE* YOUR OPT OUT ELECTION ON OR BEFORE THE VOTING DEADLINE.

11

**<u>Exhibit 6</u>**

**Form of Impaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | § |
| | §     Chapter 11 |
| | § |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | §     Case No. 20-33233 (DRJ) |
| | § |
| Debtors. | §     (Jointly Administered) |
| | § |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF
IMPAIRED INTERESTS CONCLUSIVELY PRESUMED TO REJECT THE PLAN**

**PLEASE TAKE NOTICE THAT** on **[●], 2020**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) approving the adequacy of the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (the "Disclosure Statement"), (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (the "Plan"),[2] (c) approving the forms of ballots and notices in connection therewith, (d) scheduling certain dates with respect thereto, and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Interest under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a holder of an Interest (as currently asserted against the Debtors) that is Impaired and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.**, prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **[December 7], 2020, at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line. You may also obtain copies

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**. YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN USING THE ENCLOSED OPT OUT FORM OR BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OR ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

Houston, Texas
[●], 2020

/s/

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:          mcavenaugh@jw.com
                 jwertz@jw.com
                 kpeguero@jw.com
                 vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:          patrick.nash@kirkland.com
                 marc.kieselstein@kirkland.com
                 alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit 6A

**Opt Out Form for Holders of Impaired Interests Deemed To Reject The Plan
(Direct Holders)**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a Holder of a Claim or Interest that is not entitled to vote on the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article VIII.D of the Plan contains the following provision:**

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE REVOLVING CREDIT FACILITY, THE FLLO TERM LOAN FACILITY, THE SECOND LIEN NOTES, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE EXIT FACILITIES, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES THAT ARE NOT DESCRIBED IN ITEMS 1 AND 2 SET FORTH IN ARTICLE IV.A OF THE PLAN ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OTHER THAN A DEBTOR THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, EACH SOLELY TO THE EXTENT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITIES CREDIT AGREEMENTS, OR ANY OTHER FINANCING DOCUMENT

UNDER AND AS DEFINED THEREIN) OR (II) ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITIES DOCUMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE:  (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.

UNDER THE PLAN, "*RELEASED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS; (D) EACH DIP LENDER; (E) EACH AGENT; (F) EACH TRUSTEE; (G) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (H) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (I) THE CONSENTING SECOND LIEN NOTEHOLDERS; (J) THE CONSENTING UNSECURED NOTEHOLDERS; (K) THE EXIT FACILITIES LENDERS; (L) THE BACKSTOP PARTIES; (M) ALL HOLDERS OF INTERESTS; AND (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), EACH OF SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH DIP LENDER; (D) EACH AGENT; (E) EACH TRUSTEE; (F) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (G) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (H) THE CONSENTING SECOND LIEN NOTEHOLDERS; (I) THE CONSENTING UNSECURED NOTEHOLDERS; (J) THE EXIT FACILITIES LENDERS; (K) THE BACKSTOP PARTIES; (L) ALL HOLDERS OF CLAIMS; (M) ALL HOLDERS OF INTERESTS; (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, IN EACH CASE, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH WITH RESPECT TO SUCH ENTITY AND SOLELY

TO THE EXTENT SUCH ENTITY HAS THE AUTHORITY TO BIND SUCH AFFILIATE IN SUCH CAPACITY; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

Notwithstanding the foregoing, an entity **shall be neither a Releasing Party nor a Released Party if it:  (a) validly opts out of the releases contained in Article VIII.D of the Plan or (b) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII of the plan that is not resolved before confirmation.**

As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article VIII.D of the Plan, as set forth above.  You may elect not to grant the releases contained in Article VIII.D of the plan ***only if*** you (a) check the box below or (b) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the released contained in Article VIII of the Plan that is not resolved before confirmation.  The election to withhold consent to grant such release is at your option.  By opting out of the releases set forth in Article VIII.D of the Plan, you will forego the benefit of obtaining the releases set forth in Article VIII of the Plan if you are a Released Party in connection therewith.

**<u>OPTIONAL RELEASE ELECTION.</u>  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:**

> ☐  **The Undersigned holder of the Claim elects to <u>OPT OUT of the Third Party Release</u>**

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the holder of Existing Equity Interests; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim;

(b)     the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Interests Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

(d)     no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

***IF YOU HAVE MADE THE OPTIONAL OPT OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

> <u>If by First Class mail:</u>
>
> Chesapeake Energy Corporation
> Ballot Processing
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4422
> Beaverton, OR 97076-4422

> <u>If by overnight courier or hand delivery:</u>
>
> Chesapeake Energy Corporation
> Ballot Processing
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Boulevard
> Beaverton, OR 97005

> <u>By electronic, online submission:</u>
>
> Please visit https://dm.epiq11.com/chesapeake. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your Opt Out Form. If you choose to submit your Opt Out Form via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Opt Out Form.

4

"E-Balloting" is the sole manner in which Opt Out Forms will be accepted via electronic or online transmission. Opt Out Forms submitted by facsimile or email will not be counted.

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M.,** PREVAILING CENTRAL TIME. THE SOLICITATION AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT OUT ELECTION ON OR BEFORE THE VOTING DEADLINE.

5

**Exhibit 6B**

**Opt Out Form for Holders of Impaired Interests Deemed To Reject The Plan
(Beneficial Equity Holders)**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Class 10 Existing Equity Interests that is not entitled to vote on the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article VIII.D of the Plan contains the following provision:**

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE REVOLVING CREDIT FACILITY, THE FLLO TERM LOAN FACILITY, THE SECOND LIEN NOTES, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE EXIT FACILITIES, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES THAT ARE NOT DESCRIBED IN ITEMS 1 AND 2 SET FORTH IN ARTICLE IV.A OF THE PLAN ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OTHER THAN A DEBTOR THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, EACH SOLELY TO THE EXTENT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITIES CREDIT AGREEMENTS, OR ANY OTHER FINANCING DOCUMENT

UNDER AND AS DEFINED THEREIN) OR (II) ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITIES DOCUMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.

UNDER THE PLAN, "*RELEASED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS; (D) EACH DIP LENDER; (E) EACH AGENT; (F) EACH TRUSTEE; (G) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (H) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (I) THE CONSENTING SECOND LIEN NOTEHOLDERS; (J) THE CONSENTING UNSECURED NOTEHOLDERS; (K) THE EXIT FACILITIES LENDERS; (L) THE BACKSTOP PARTIES; (M) ALL HOLDERS OF INTERESTS; AND (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), EACH OF SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH DIP LENDER; (D) EACH AGENT; (E) EACH TRUSTEE; (F) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (G) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (H) THE CONSENTING SECOND LIEN NOTEHOLDERS; (I) THE CONSENTING UNSECURED NOTEHOLDERS; (J) THE EXIT FACILITIES LENDERS; (K) THE BACKSTOP PARTIES; (L) ALL HOLDERS OF CLAIMS; (M) ALL HOLDERS OF INTERESTS; (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, IN EACH CASE, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH WITH RESPECT TO SUCH ENTITY AND SOLELY

TO THE EXTENT SUCH ENTITY HAS THE AUTHORITY TO BIND SUCH AFFILIATE IN SUCH CAPACITY; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

Notwithstanding the foregoing, an entity **shall be neither a Releasing Party nor a Released Party if it: (a) validly opts out of the releases contained in Article VIII.D of the Plan or (b) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII of the plan that is not resolved before confirmation.**

As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article VIII.D of the Plan, as set forth above.  You may elect not to grant the releases contained in Article VIII.D of the plan ***only if*** you (a) check the box below or (b) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the released contained in Article VIII of the Plan that is not resolved before confirmation.  The election to withhold consent to grant such release is at your option.  By opting out of the releases set forth in Article VIII.D of the Plan, you will forego the benefit of obtaining the releases set forth in Article VIII of the Plan if you are a Released Party in connection therewith.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

> ☐ **The Undersigned holder of the Claim elects to OPT OUT of the Third Party Release**

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the holder of Existing Equity Interests; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim;

(b)     the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Interests Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

(d)     no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

3

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory | |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

***IF YOU HAVE MADE THE OPTIONAL OPT OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.  PLEASE ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO PROCESS YOUR OPT OUT FORM AND SUBMIT YOUR ELECTION SO THAT IT IS RECEIVED BY SOLICITATION AGENT BY THE VOTING DEADLINE.**

| |
|---|
| **THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M.,** PREVAILING CENTRAL TIME. THE SOLICITATION AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT OUT ELECTION ON OR BEFORE THE VOTING DEADLINE. |

**<u>Exhibit 6C</u>**

**Opt Out Form for Holders of Impaired Interests Deemed To Reject The Plan
(Equity Nominees)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**MASTER FORM FOR OPTIONAL RELEASE**
**OPT OUT FOR CLASS 10 EXISTING EQUITY INTERESTS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS FORM**

**THIS MASTER FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE**
***ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY [DECEMBER 7], 2020, AT 11:59**
**P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

Beneficial Holders of Existing Equity Interests deemed to reject the Plan received a Notice of Non-Voting Status and an Optional Release Opt Out Form.

You are receiving this master form (the "Master Opt Out Form") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 10 Existing Equity Interests as of **[October 19], 2020** (the "Voting Record Date").

**This Master Opt Out Form is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' Class 10 Existing Equity Interests (the "Class 10 Interests"), to transmit to the Solicitation Agent (as defined below) the optional elections of such Beneficial Holders in respect of their Class 10 Interests to opt out of the Releases. The CUSIP number (the "CUSIP") for the Class 10 Interests entitled to make the optional opt out elections and of which you are the Nominee is 165167107. This Master Opt Out Form may not be used for any purpose other than for submitting optional opt out elections with respect to the Plan.**

If you desire copies, of the Disclosure Statement and Plan, you may obtain them from (a) Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (ii) writing to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (iv) mail tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

This Master Opt Out Form may not be used for any purpose other than transmitting elections to opt out of the releases. If you believe you have received this form in error, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You are authorized to collect elections to opt out of the releases from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Release Opt Out Form, and collecting elections from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

To have valid opt out elections of your Beneficial Holders, you must complete and return this Master Opt Out Form so that the Solicitation Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON [DECEMBER 7], 2020, AT 11:59 P.M., PREVAILING CENTRAL TIME.**

<u>Item 1</u>.  **Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the Class 10 Interests listed in Item 2 below, and is the record Holder of such bonds, or

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the of Class 10 Interests listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered Holder of the of Class 10 Interests listed in Item 2 below,

and accordingly, has full power and authority to transmit the optional opt out release elections on behalf of the Beneficial Holders of the Class 10 Interests.

<u>Item 2</u>.  **Class 10 Interests Opting Out of the Releases.**

The undersigned transmits the following releases of Beneficial Holders of Class 10 Interests and certifies that the following Beneficial Holders of Class 10 Interests, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Interests as of the Voting Record Date and have delivered to the undersigned, as Nominee, Optional Release Opt Out Form with such election.

Indicate in the appropriate column below the aggregate number of shares held for each account or attach such information to this Master Opt Out Form in the form of the following table.  Please note that each Holder must elect all such Beneficial Holder's Class 10 Interests to opt out of the releases and may not split such election.  Any Beneficial Holder Optional Release Opt Out Form executed by the Beneficial Holder that does not indicate an election to opt out of the releases will not be counted.

3

**Item 3.** **Important information regarding the Third Party Release.**[3]

**AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

**Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or**

---

[3]     Under the Plan, "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), of each such Entity and its current and former Affiliates, and such Entities' and their current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

*       *       *

HOLDERS THAT ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF THEY ARE A RELEASED PARTY IN CONNECTION THEREWITH.

[*Remainder of page intentionally left blank; continued next page.*]

| Your Customer Account Number for Each Beneficial Holder of Class 10 Interests | Number of Shares Held as of Voting Record Date | Holder Elected to Opt Out of the Third Party Release |
|---|---|---|
| 1 | | ☐ |
| 2 | | ☐ |
| 3 | | ☐ |
| 4 | | ☐ |
| 5 | | ☐ |
| 6 | | ☐ |
| **TOTALS** | | |

**Item 4.  Certifications.**

Upon execution of this Master Opt Out Form, the undersigned certifies that:

(a) **it has received a copy of the Notice of Non-Voting Status to Holders of Impaired Interests Conclusively Presumed to Reject the Plan and has delivered the same to the Beneficial Holders of the Class 10 Interests listed in Item 2 above;**

(b) **it has received a completed and signed Release Opt Out Form from each Beneficial Holder listed in Item 2 of this Master Opt Out Form;**

(c) **it is the record Holder of all Class 10 Interests listed in Item 2 above, or**

(d) **it has been authorized by each Beneficial Holder of Class 10 Interests listed in Item 2 above to transmit an Optional Release Election on such Beneficial Holders behalf;**

(e) **no other Master Opt Out Forms with respect to the same Class 10 Interests identified in Item 2 have been cast or, if any other Master Opt Out Forms have been submitted with respect to such Interests, then any such earlier Master Opt Out Forms are hereby revoked;**

(f) **it has properly disclosed:  (a) the Beneficial Holder of Class 10 Interests who completed the Release Opt Out Form; (b) the respective number of the Class 10 Interests owned, as the case may be, by each Beneficial Holder of Class 10 Interests who completed a Release Opt Out Form; and (c) the customer account or other identification number for each such Beneficial Holder of Class 10 Interests; and**

(g) **it will maintain the Release Opt Out Forms and evidence of separate transactions returned by Beneficial Holder of Class 10 Interests (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.**

6

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Participant Number | |
| Name of Proxy Holder or Agent for Nominee (if applicable) | |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER OPT OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

**In the envelope provided via first class mail, by overnight courier, or by hand delivery to:**

<u>If by First Class mail:</u>

Chesapeake Energy Corporation
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

<u>If by overnight courier or hand delivery:</u>

Chesapeake Energy Corporation
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

**Via electronic mail service to:**

tabulation@epiqglobal.com
with a reference to "Chesapeake Master Ballot" in the subject line.

7

**THE VOTING DEADLINE IS [DECEMBER 7], 2020 AT 11:59 P.M., PREVAILING CENTRAL TIME.**

**THE SOLICITATION AGENT MUST ACTUALLY RECEIVE THE**
**CLASS 10 MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE.**

## **Exhibit 7**

**Form of Disputed Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS**

   **PLEASE TAKE NOTICE THAT** on **[●], 2020**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) approving the adequacy of the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (the "Disclosure Statement"), (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (the "Plan"),[2] (c) approving the forms of ballots and notices in connection therewith, (d) scheduling certain dates with respect thereto, and (e) granting related relief.

   **PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the holder of a Claim or Interest that is subject to a pending objection by the Debtors. ***You are not entitled to vote any disputed portion of your Claim unless one or more of the following events has taken place before [December 3], 2020 (the date that is two Business Days before the Voting Deadline)*** (each, a "Resolution Event"):

    1. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

    2. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

    3. a stipulation or other agreement is executed between the holder of such Claim and the Debtors temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

    4. the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.,** prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may:  (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call  (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

**PLEASE TAKE FURTHER NOTICE THAT** if a timely Resolution Event occurs, then no later than one business day thereafter, the Solicitation Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Solicitation Agent no later than the Voting Deadline, which is on **[December 7], 2020, at 11:59 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Solicitation Agent in accordance with the instructions provided above.

---

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN USING THE ENCLOSED OPT OUT FORM OR BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OR ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

---

Houston, Texas
[●], 2020

/s/

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:      mcavenaugh@jw.com
              jwertz@jw.com
              kpeguero@jw.com
              vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      patrick.nash@kirkland.com
              marc.kieselstein@kirkland.com
              alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim that is not entitled to vote on the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article VIII.D of the Plan contains the following provision:**

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY IS, AND IS DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE CAPITAL STRUCTURE, MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE REVOLVING CREDIT FACILITY, THE FLLO TERM LOAN FACILITY, THE SECOND LIEN NOTES, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE EXIT FACILITIES, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, BEFORE OR DURING THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES THAT ARE NOT DESCRIBED IN ITEMS 1 AND 2 SET FORTH IN ARTICLE IV.A OF THE PLAN ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OTHER THAN A DEBTOR THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, EACH SOLELY TO THE EXTENT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (I) ANY PARTY OF ANY OBLIGATIONS RELATED TO CUSTOMARY BANKING PRODUCTS, BANKING SERVICES OR OTHER FINANCIAL ACCOMMODATIONS (EXCEPT AS MAY BE EXPRESSLY AMENDED OR MODIFIED BY THE PLAN AND THE EXIT FACILITIES CREDIT AGREEMENTS, OR ANY OTHER FINANCING DOCUMENT UNDER AND AS DEFINED THEREIN) OR (II) ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY

PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITIES DOCUMENTS, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASES ARE: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.

UNDER THE PLAN, "*RELEASED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS; (D) EACH DIP LENDER; (E) EACH AGENT; (F) EACH TRUSTEE; (G) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (H) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (I) THE CONSENTING SECOND LIEN NOTEHOLDERS; (J) THE CONSENTING UNSECURED NOTEHOLDERS; (K) THE EXIT FACILITIES LENDERS; (L) THE BACKSTOP PARTIES; (M) ALL HOLDERS OF INTERESTS; AND (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), EACH OF SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH DIP LENDER; (D) EACH AGENT; (E) EACH TRUSTEE; (F) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (G) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (H) THE CONSENTING SECOND LIEN NOTEHOLDERS; (I) THE CONSENTING UNSECURED NOTEHOLDERS; (J) THE EXIT FACILITIES LENDERS; (K) THE BACKSTOP PARTIES; (L) ALL HOLDERS OF CLAIMS; (M) ALL HOLDERS OF INTERESTS; (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, IN EACH CASE,

SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH WITH RESPECT TO SUCH ENTITY AND SOLELY TO THE EXTENT SUCH ENTITY HAS THE AUTHORITY TO BIND SUCH AFFILIATE IN SUCH CAPACITY; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

Notwithstanding the foregoing, an entity **shall be neither a Releasing Party nor a Released Party if it:  (a) validly opts out of the releases contained in Article VIII.D of the Plan or (b) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII of the plan that is not resolved before confirmation.**

As a "Releasing Party" under the Plan, you are deemed to provide the releases contained in Article VIII.D of the Plan, as set forth above.  You may elect not to grant the releases contained in Article VIII.D of the plan ***only if*** you (a) check the box below or (b) timely file with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the released contained in Article VIII of the Plan that is not resolved before confirmation.  The election to withhold consent to grant such release is at your option.  By opting out of the releases set forth in Article VIII.D of the Plan, you will forego the benefit of obtaining the releases set forth in Article VIII of the Plan if you are a Released Party in connection therewith.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:**

---

☐  **The Undersigned holder of the Claim elects to <u>OPT OUT OF</u> the Third Party Release**

---

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)      as of the Voting Record Date, either:  (i) the Entity is the holder of a Claim; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim;

(b)      the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Interests Conclusively Presumed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)      the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class; and

(d)     no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

***IF YOU HAVE MADE THE OPTIONAL OPT OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

<u>If by First Class mail:</u>

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

<u>If by overnight courier or hand delivery:</u>

    Chesapeake Energy Corporation
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

<u>By electronic, online submission:</u>

    Please visit https://dm.epiq11.com/chesapeake. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your Opt Out Form.  If you choose to submit

7

your Opt Out Form via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Opt Out Form.

"E-Balloting" is the sole manner in which Opt Out Forms will be accepted via electronic or online transmission.  Opt Out Forms submitted by facsimile or email will not be counted.

---

**THE VOTING DEADLINE IS [DECEMBER 7], 2020, AT 11:59 P.M.,** PREVAILING CENTRAL TIME. THE SOLICITATION AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT OUT ELECTION ON OR BEFORE THE VOTING DEADLINE.

**<u>Exhibit 8</u>**

**Form of Confirmation Hearing Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

NOTICE OF HEARING TO CONSIDER
CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY
THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (a) approved the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtors and debtors in possession (the "Debtors") to solicit acceptances for the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.,** prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

---

**PLEASE BE ADVISED:  THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.**

---

CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **[October 19], 2020**, which is the date for determining which holders of Claims in Classes 3, 4, 5, 6 and 7 are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is **[December 7], 2020, at 11:59 p.m.,** prevailing Central Time (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

that it is *actually received* by the Debtors' solicitation agent, Epiq Corporate Restructuring, LLC (the "Solicitation Agent") on or before the Voting Deadline. *A failure to follow such instructions may disqualify your vote*.

**Confirmation Objection Deadline**. The deadline for filing objections to the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, is **[December 7], 2020, at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing *must*: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the **Confirmation Objection Deadline**.

<u>**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**</u>

---

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D** CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

---

**Please be advised that Article VIII of the Plan contains the following release, exculpation, and injunction provisions:**

<u>**RELEASES BY THE DEBTORS.**</u>

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission,**

transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

<u>RELEASES BY THE RELEASING PARTIES.</u>

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective

Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

UNDER THE PLAN, "*RELEASED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH OF THE DEBTORS' CURRENT AND FORMER DIRECTORS AND OFFICERS; (D) EACH DIP LENDER; (E) EACH AGENT; (F) EACH TRUSTEE; (G) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (H) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (I) THE CONSENTING SECOND LIEN NOTEHOLDERS; (J) THE CONSENTING UNSECURED NOTEHOLDERS; (K) THE EXIT FACILITIES LENDERS; (L) THE BACKSTOP PARTIES; (M) ALL HOLDERS OF INTERESTS; AND (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), EACH OF SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) EACH DEBTOR; (B) EACH REORGANIZED DEBTOR; (C) EACH DIP LENDER; (D) EACH AGENT; (E) EACH TRUSTEE; (F) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (G) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (H) THE CONSENTING SECOND LIEN NOTEHOLDERS; (I) THE CONSENTING UNSECURED NOTEHOLDERS; (J) THE EXIT FACILITIES LENDERS; (K) THE BACKSTOP PARTIES; (L) ALL HOLDERS OF CLAIMS; (M) ALL HOLDERS OF INTERESTS; (N) WITH RESPECT TO EACH OF THE FOREGOING (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER MEMBERS, DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, PARTICIPANTS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, IN EACH CASE, SOLELY IN THEIR RESPECTIVE CAPACITIES AS SUCH WITH RESPECT TO SUCH ENTITY AND SOLELY TO THE EXTENT SUCH ENTITY HAS THE AUTHORITY TO BIND SUCH AFFILIATE IN SUCH CAPACITY; *PROVIDED* THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE

BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

**EXCULPATION.**

**Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**UNDER THE PLAN, "*EXCULPATED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) ANY OFFICIAL COMMITTEES APPOINTED IN THE CHAPTER 11 CASES AND EACH OF THEIR RESPECTIVE MEMBERS; (C) THE DIP LENDERS; (D) THE EXIT FACILITIES LENDERS; (E) THE CONSENTING REVOLVING CREDIT FACILITY LENDERS; (F) THE CONSENTING FLLO TERM LOAN FACILITY LENDERS; (G) THE CONSENTING SECOND LIEN NOTEHOLDERS; (H) THE CONSENTING UNSECURED NOTEHOLDERS; (I) THE AGENTS; (J) EACH TRUSTEE; (K) THE BACKSTOP PARTIES; AND (L) WITH RESPECT TO EACH OF THE FOREGOING, SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES, AND SUCH ENTITY'S AND ITS CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.**

**INJUNCTION.**

**Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any**

kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may:  (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.  Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan or provide legal advice.

**The Plan Supplement**.  The Debtors will file the Plan Supplement (as defined in the Plan) on or before **[November 23], 2020**, and will serve notice on parties in interest, which will:  (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

## BINDING NATURE OF THE PLAN

IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

---

Houston, Texas
[●], 2020

/s/
_____

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:       (713) 752-4221
Email:           mcavenaugh@jw.com
                 jwertz@jw.com
                 kpeguero@jw.com
                 vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:           patrick.nash@kirkland.com
                 marc.kieselstein@kirkland.com
                 alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit 9

**Form of Plan Supplement Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on **[●], 2020**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (a) approved the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtors and debtors in possession (the "Debtors") to solicit acceptances for the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Court on **[●], 2020** [Docket No. [●]]. The Plan Supplement is comprised of the following:  (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) a summary of the material terms of the Exit Facilities, which may include the Exit Facilities Term Sheet; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) the Registration Rights Agreement.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in the Plan and in accordance with the Restructuring Support Agreement and Restructuring Term Sheet (and subject to the applicable consent rights thereunder).

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.,** prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]     Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is **[December 7], 2020 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  Any objection to the Plan *must*: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the Confirmation Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may:  (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Houston, Texas
[●], 2020

/s/
_____

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                marc.kieselstein@kirkland.com
                alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit 10

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTORS PURSUANT TO THE PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (a) approved the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtors and debtors in possession (the "Debtors") to solicit acceptances for the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Assumed Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on [●], 2020, as contemplated under the Plan. The Debtors' determination to assume the agreements identified on the Assumption Schedule is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.,** prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumption Schedule. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan, including the Assumption Schedule.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) listed in **Schedule A** attached hereto to which you are a party.[3]

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption.  Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto.  Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter.  In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is **[December 7], 2020, at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  Any objection to the Plan *must*:  (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the **Confirmation Objection Deadline**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO THE PROPOSED ASSUMPTION OR CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o

---

enforceable agreement.  Further, the Debtors expressly reserve the right to:  (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until and including 45 days after the Effective Date; and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

      **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Houston, Texas
[●], 2020

/s/

| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jennifer F. Wertz (TX Bar No. 24072822) | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| Kristhy M. Peguero (TX Bar No. 24102776) | Marc Kieselstein, P.C. (admitted *pro hac vice*) |
| Veronica A. Polnick (TX Bar No. 24079148) | Alexandra Schwarzman (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | 300 North LaSalle Street |
| Houston, Texas 77010 | Chicago, Illinois 60654 |

JACKSON WALKER L.L.P.
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                marc.kieselstein@kirkland.com
                alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

2

**Schedule A**

**Schedule of Assumed Contracts and Leases and Proposed Cure Cost**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|--------|--------------|--------------------------------------------|-----------|
|        |              |                                            |           |

## Exhibit 11

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE REGARDING EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN**

**PLEASE TAKE NOTICE THAT** on **[●], 2020**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (a) approved the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtors and debtors in possession (the "Debtors") to solicit acceptances for the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Rejected Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on **[●], 2020**, as contemplated under the Plan.  The Debtors' determination to reject the agreements identified on the Rejection Schedule is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan and related voting and objection procedures (the "Confirmation Hearing") will commence on **[December 15], 2020 at [●] a/p.m.,** prevailing Central Time, before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN, SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE BEING LISTED IN <u>SCHEDULE A</u> ATTACHED HERETO. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

---

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. Further, the Debtors expressly reserve the right to: (a) remove any Executory Contract or Unexpired Lease from the Rejection Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until and including

**PLEASE TAKE FURTHER NOTICE THAT** all Proofs of Claim with respect to Claims arising from the rejection of the Executory Contract(s) or Unexpired Leases identified on **Schedule A** attached hereto, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any rejection of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is **[December 7], 2020 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  Any objection to the Plan *must*: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the **Confirmation Objection Deadline**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may:  (a) access the Debtors' restructuring website at https://dm.epiq11.com/chesapeake; (b) write to Chesapeake Energy Corporation c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) call (855) 907-2082 (toll free) or +1 (503) 520-4448 (international) and requesting to speak with a member of the Solicitation Group; or (d) email tabulation@epiqglobal.com and referencing "Chesapeake" in the subject line.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  http://www.txs.uscourts.gov/bankruptcy.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

45 days after the Effective Date; and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

Houston, Texas
[●], 2020

/s/

| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
|---|---|
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         mcavenaugh@jw.com
               jwertz@jw.com
               kpeguero@jw.com
               vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C.(admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               marc.kieselstein@kirkland.com
               alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Schedule A

**Schedule of Rejected Contracts and Leases**

| Debtor | Counterparty | Description of Rejected Contracts or Leases |
|--------|--------------|---------------------------------------------|
|        |              |                                             |

**Exhibit 12**

**Rights Offering Procedures**

**CHESAPEAKE ENERGY CORPORATION (THE "<u>COMPANY</u>")**

**RIGHTS OFFERING PROCEDURES**

**Each Rights Offering Share (as defined below) is being distributed and issued by the Debtors without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>")[1], in reliance upon the exemption provided in Section 1145 of the Bankruptcy Code. None of the rights to subscribe (the "<u>Subscription Rights</u>") to the Rights Offerings (as defined below) or the Rights Offering Shares issuable upon exercise of such Subscription Rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security.**

**The Subscription Rights are not transferable separate from the FLLO Term Loan Facility Loans and Second Lien Notes. Any FLLO Term Loan Facility Loans or Second Lien Notes traded after the Subscription Expiration Time will not be traded with the Subscription Rights attached.**

**The Disclosure Statement (as defined below) has previously been distributed in connection with the Debtors' solicitation of votes to accept or reject the Plan (as defined below) and that document sets forth important information, including risk factors, that should be carefully read and considered by each Eligible Holder (as defined below) prior to making a decision to participate in the Rights Offerings (as defined below). Additional copies of the Disclosure Statement are available upon request from the Subscription Agent. The Disclosure Statement is also available on the case website at: https://dm.epiq11.com/case/chesapeake/documents.**

**Each Eligible Holder exercising the Subscription Rights acknowledges and agrees that by exercising such Subscription Rights, such Eligible Holder also agrees to vote in favor of the Plan.**

**The Rights Offerings are being conducted by the Company in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

---

[1] **Terms used and not defined herein shall have the meaning assigned to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time, the "<u>Plan</u>").**

Eligible Holders should note the following times relating to the Rights Offerings:

| Date | Calendar Date | Event |
|---|---|---|
| FLLO Record Date................... | Subscription Expiration Date | The date and time fixed by the Company for the determination of the Eligible Holders of Allowed FLLO Term Loan Facility Claims to participate in the Rights Offerings. |
| Second Lien Record Date......... | Subscription Expiration Date | The date and time fixed by the Company for the determination of the Eligible Holders of Allowed Second Lien Notes Claims to participate in the Rights Offerings. |
| Subscription Commencement Date ......................................... | [November 6], 2020 | Commencement of the Rights Offerings. |
| Subscription Expiration Date ... | 4:00 p.m. Central Time on [December 7], 2020 | The deadline for Eligible Holders to subscribe for Rights Offering Shares in accordance with the directions in the relevant Subscription Form. |
| Subscription Funding Deadline (only for Non-Backstop Parties) | 4:00 p.m. Central Time on [December 8], 2020 | Eligible Holders that are not Backstop Parties must deliver the aggregate Purchase Price (as defined below) by the Subscription Funding Deadline. Eligible Holders that are Backstop Parties must deliver the aggregate Purchase Price no later than the applicable Backstop Funding Deadline (as defined below) in accordance with the terms of the Backstop Commitment Agreement. |

To Eligible Holders and Nominees of Eligible Holders:

On [●], 2020, the Debtors filed the Plan with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, and the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates (*as may be amended from time to time in accordance with its terms, the "Disclosure Statement"). Pursuant to the Plan, each holder of an Allowed FLLO Term Loan Facility Claim as of the FLLO Record Date (each such holder, an "Eligible FLLO Holder") has a right to participate in the FLLO Rights Offering (as defined below), and each holder of an Allowed Second Lien Notes Claim (each such holder, an "Eligible Second Lien Holder" and, together with the Eligible FLLO Holders, "Eligible Holders") has a right to participate in the Second Lien Rights Offering (as defined below), in each case, in accordance with the terms and conditions of these Rights Offering Procedures. The FLLO Rights Offering and the Second Lien Rights Offering are collectively referred to herein as the "Rights Offerings."

Pursuant to the Plan, each **Eligible FLLO Holder** will receive rights to subscribe for its *pro rata* portion of a rights offering of New Common Stock in an aggregate amount of $382,500,000 (the "FLLO Rights Offering," and such shares, the "FLLO Rights Offering Shares"), provided that such Eligible FLLO Holder timely and properly executes and delivers its applicable FLLO Rights Offering Subscription Form(s) ("FLLO Subscription Forms") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent in advance of the Subscription Expiration Date and, unless a Backstop Party, delivers the aggregate Purchase Price to the Subscription Agent by the Subscription Funding Deadline.

Pursuant to the Plan, each **Eligible Second Lien Holder** will receive rights to subscribe for its *pro rata* portion of a rights offering of New Common Stock in an aggregate amount of $67,500,000 (the "Second Lien Rights Offering," and such shares, the "Second Lien Rights Offering Shares" and, together with the FLLO Rights Offering Shares, the "Rights Offering Shares"), provided that such Eligible Second Lien Holder that is not a Backstop Party timely and properly arranges for its nominee, broker or other DTC participant (each, a "Nominee") to tender the relevant portion of such holder's Second Lien Notes via the Automated Tender Offer Program ("ATOP") of The Depository Trust Company ("DTC"). In order to validly exercise its Subscription Rights, each Eligible Holder that is not a Backstop Party must return a duly completed and executed Second Lien Subscription Form ("Second Lien Subscription Form") to its Nominee (or otherwise follow the directions of its Nominee), so that such Eligible Holder's subscription instructions may be effected by the Nominee by delivering the applicable Second Lien Notes via DTC's ATOP system prior to the Subscription Expiration Date. Delivery of Second Lien Notes via ATOP shall be the sole means for an Eligible Second Lien Holder that is not a Backstop Party to exercise the Subscription Rights associated with such Second Lien Notes.

Pursuant to the Plan, each **Backstop Party** will receive rights to subscribe for its *pro rata* portion of the Rights Offering Shares in accordance with the Backstop Commitment Agreement, provided that such Backstop Party timely and properly executes and delivers its Backstop Subscription Form ("Backstop Subscription Form") to the Subscription Agent in advance of the Subscription Expiration Date.

Backstop Parties must provide the applicable aggregate Purchase Price in the manner and by the deadlines (the "Backstop Funding Deadline") specified in the Backstop Commitment Agreement (if the undersigned is a registered investment company under the Investment Company Act of 1940, as amended, it must provide funds no later than the Effective Date, in accordance with the Backstop Commitment Agreement).

The amount of time necessary for a Nominee to process and deliver underlying Second Lien Notes via ATOP is variable, and Eligible Holders are urged to consult with their Nominees to determine the necessary deadline to return their Beneficial Holder Subscription instructions. Failure to submit such Beneficial Holder Subscription instructions on a timely basis will result in forfeiture of an Eligible Holder's rights to participate in the Rights Offerings. None of the Company, the Subscription Agent or any of the Backstop Parties will have any liability for any such failure.

No Eligible Holder that is not a Backstop Party shall be entitled to participate in the Rights Offerings unless the aggregate Purchase Price (as defined below) for the Rights Offering Shares it subscribes for is received by the Subscription Agent by the Subscription Funding Deadline. No interest is payable on any advanced funding of the Purchase Price. If the Rights Offerings are terminated for any reason, the aggregate Purchase Price previously received by the Subscription Agent will be returned to Eligible Holders as provided in Section 6 hereof. No interest will be paid on any returned Purchase Price.

Any Eligible Holder that is not a Backstop Party submitting payment must coordinate such payment in sufficient time to forward such payment to the Subscription Agent by the Subscription Funding Deadline.

**In order to participate in the Rights Offerings, an Eligible Holder must complete all of the steps outlined below. If all of the steps outlined below are not completed by the relevant deadline as applicable, an Eligible Holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offerings.**

**Each Eligible Holder exercising the Subscription Rights acknowledges and agrees that by exercising such Subscription Rights, such Eligible Holder also agrees to vote in favor of the Plan.**

1.      **Rights Offerings**

Eligible FLLO Holders have the right, but not the obligation, to participate in the FLLO Rights Offering, and Eligible Second Lien Holders have the right, but not the obligation, to participate in the Second Lien Rights Offering.

Eligible FLLO Holders shall receive rights to subscribe for their *pro rata* portion of the FLLO Rights Offering Shares, and Eligible Second Lien Holders shall receive rights to subscribe for their pro rata portion of the Second Lien Rights Offering Shares.

Subject to the terms and conditions set forth in the Plan and these Rights Offering Procedures, each Eligible FLLO Holder is entitled to subscribe for up to [•] FLLO Rights Offering Shares per $1,000 of Principal Amount of the FLLO Term Loan Facility, in each case at a purchase price of $[•] per share (the "Purchase Price").

Subject to the terms and conditions set forth in the Plan and these Rights Offering Procedures, each Eligible Second Lien Holder is entitled to subscribe for up to [•] Second Lien Rights Offering Shares per $1,000 of Principal Amount of the Company's 11.500% Senior Notes due 2025 at the Purchase Price.

There will be no over-subscription privilege in the Rights Offerings. Any Rights Offering Shares that are unsubscribed by the Eligible Holders entitled thereto will not be offered to other Eligible Holders but will be purchased by the applicable Backstop Parties in accordance with the Backstop Commitment Agreement. Subject to the terms and conditions of the Backstop Commitment Agreement, each Backstop Party is obligated to purchase its pro rata portion of the applicable Rights Offering Shares.

Any Eligible Holder that subscribes for Rights Offering Shares and is deemed to be an "underwriter" under Section 1145(b) of the Bankruptcy Code will be subject to restrictions under the Securities Act on its ability to resell those securities. Resale restrictions are discussed in more detail in Article XI of the Disclosure Statement, entitled "Certain Securities Law Matters."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE RIGHTS OFFERING PROCEDURES AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY BACKSTOP PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE APPLICABLE SUBSCRIPTION FORM(S) ARE IRREVOCABLE.**

## 2.    Subscription Period for Non-Backstop Parties

The Rights Offerings will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Date. Each Eligible Holder intending to purchase Rights Offering Shares in any Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the applicable Subscription Form by the Subscription Expiration Date.

Any exercise of Subscription Rights by an Eligible Holder after the Subscription Expiration Date will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the prior written consent of the Required Backstop Parties in their sole discretion, to allow any exercise of subscription rights after the Subscription Expiration Date.

The Subscription Expiration Date may be extended by the Company with the prior written consent of the Required Backstop Parties or as required by law.

### 3.    Delivery of Subscription Documents

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Subscription Rights, but subject to the terms and conditions contained herein. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the applicable Subscription Form and these Rights Offering Procedures will be sent to Eligible Holders at that time, together with appropriate instructions for the proper completion, due execution and timely delivery of the executed Subscription Form and the payment of the applicable aggregate Purchase Price for its Rights Offering Shares.

### 4.    Exercise of Subscription Rights – *Eligible FLLO Holders*

(a)    In order to validly exercise its Subscription Rights, each Eligible FLLO Holder that is <u>not</u> a Backstop Party must:

i.    return duly completed and executed FLLO Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent so that such documents are actually received by the Subscription Agent by the Subscription Expiration Date; and

ii.    at the same time it returns its FLLO Subscription Form(s) to the Subscription Agent, but in no event later than the Subscription Funding Deadline, pay, or arrange for the payment of the Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the applicable FLLO Subscription Form(s).

(b)    In order to validly exercise its Subscription Rights, each FLLO Eligible Holder that is a Backstop Party must:

i.    return duly completed and executed Backstop Subscription Form(s) (provided to the Backstop Parties through their counsel) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent so that such documents are actually received by the Subscription Agent by the Subscription Expiration Date; and

ii.    no later than the Backstop Funding Deadline, pay the applicable Purchase Price in accordance with the Backstop Commitment Agreement.

(c)    With respect to 4(a) and (b) above, each Eligible FLLO Holder must duly complete, execute and return the applicable Subscription Form(s) in accordance with the instructions herein (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), and payment of the applicable Purchase Price, payable for the Rights Offering Shares elected to be purchased by such Eligible FLLO Holder must be made (i) in the case of Eligible FLLO Holders that are not Backstop Parties, on or before the Subscription Payment Deadline and (ii) in the case of Eligible FLLO Holders that are Backstop Parties, on or before the Backstop Funding Deadline.

5. **Exercise of Subscription Rights – *Eligible Second Lien Holders***

In order to exercise an Eligible Second Lien Holder's Subscription Rights, such Eligible Second Lien Holder's Nominee must submit the relevant portion of Second Lien Notes as to which the Subscription Rights pertain into the ATOP system to the account maintained by the Subscription Agent with DTC.

(a)       In order to validly exercise its Subscription Rights, each Eligible Holder that is <u>not</u> a Backstop Party must return a duly completed and executed Second Lien Subscription Form(s) to its Nominee (or otherwise follow the directions of its Nominee), so that such holder's subscription instructions may be effected by the Nominee by delivering the applicable Second Lien Notes via DTC's ATOP system prior to the Subscription Expiration Date. Payment of the aggregate Purchase Price with respect to Eligible Second Lien Holders that are not Backstop Parties **<u>must</u>** be made to the Subscription Agent on or before the Subscription Payment Deadline either by the Eligible Second Lien Holder or its Nominee, in accordance with the directions in the Second Lien Subscription Form.

(b)       In order to validly exercise its Subscription Rights, each Eligible Second Lien Holder that is a Backstop Party must:

i.       return the duly completed and executed Backstop Subscription Form to the Subscription Agent so that such documents are actually received by the Subscription Agent by the Subscription Expiration Date; and

ii.       no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Subscription Agent or to the escrow account established and maintained by a third party satisfactory to the Backstop Parties and the Company (the "<u>Escrow Account</u>") by wire transfer ONLY of immediately available funds in accordance with wire instructions included in the Funding Notice.

(c)       With respect to 5(a) above, each Eligible Holder must duly complete, execute and return the applicable Second Lien Subscription Form(s) to their Nominee (or otherwise follow their Nominee's instructions) in sufficient time to allow its Nominee to process its instructions and deliver the underlying Second Lien Notes through ATOP, and payment of the applicable Purchase Price, payable for the Rights Offering Shares elected to be purchased by such Eligible Holder, must be made on or before the Subscription Payment Deadline. With respect to 5(b) above, each Eligible Holder that is a Backstop Party must duly complete, execute and return the Backstop Subscription Form in accordance with the instructions herein, and payment of the applicable Purchase Price, payable for the Rights Offering Shares elected to be purchased by such Backstop Party, must be made on or before the Backstop Funding Deadline.

6. **Subscription Payments**

(a)       In the event that the funds received from any Eligible Holder do not correspond to the Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder, the number of the Rights Offering Shares deemed to be purchased by such Eligible Holder will be the lesser of (a) the number of the Rights Offering Shares elected to be purchased by such

Eligible Holder as evidenced by the relevant FLLO Subscription Form or Second Lien Notes ATOP submission(s) and (b) a number of the Rights Offering Shares determined by dividing the amount of the funds received by the Purchase Price, in each case up to such Eligible Holder's *pro rata* portion of Rights Offering Shares.

(b)     The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures will be deposited and held by the Subscription Agent in a segregated account until released to the Debtors in connection with the settlement of the Rights Offering on the Effective Date. The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder shall not be deemed part of the Debtors' bankruptcy estates.

### 7.     Transfer Restriction; Revocation

The Subscription Rights are not transferable separate from the FLLO Term Loan Facility Loans and Second Lien Notes. Any FLLO Term Loan Facility Loans or Second Lien Notes traded after the Subscription Expiration Date will not be traded with the Subscription Rights attached.

Once an Eligible Holder has properly exercised its Subscription Rights, subject to the terms and conditions contained in these Rights Offering Procedures and, in the case of any Backstop Party, the Backstop Commitment Agreement, such exercise will be irrevocable.

### 8.     Termination/Return of Payment

Unless the Effective Date has occurred, the Rights Offerings will be deemed automatically terminated without any action of any party upon the earlier of (i) termination of the Plan or rejection of the Plan by all classes entitled to vote, (ii) termination of the Restructuring Support Agreement in accordance with its terms, (iii) termination of the Backstop Commitment Agreement in accordance with its terms and (iv) the Outside Date (as defined in the Backstop Commitment Agreement) (as such date may be extended pursuant to the terms of the Backstop Commitment Agreement). In the event the Rights Offerings are terminated, any payments received pursuant to these Rights Offering Procedures will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in any event, within five (5) Business Days after the date of termination.

### 9.     Settlement of the Rights Offerings and Distribution of the Rights Offering Shares

The settlement of the Rights Offerings is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Rights Offering Procedures, and the simultaneous occurrence of the Effective Date.

The Debtors intend that the Rights Offering Shares will be issued to the Eligible FLLO Holders and/or to any party that an Eligible FLLO Holder so designates in the Subscription Form(s), in book-entry form on the books of the Company's transfer agent. It is also anticipated

that the Rights Offering Shares will be eligible on the DTC system, and that Eligible FLLO Holders or their designees who receive the Rights Offering Shares will be able to transfer such shares to a Nominee through DTC, including by specifying such transfer in the FLLO Subscription Form, unless DTC is unwilling or unable to make the Rights Offering Shares eligible on the DTC system.

The Debtors intend that the Rights Offering Shares will be issued to the Eligible Second Lien Holders to the account that submitted the Second Lien Notes in the Rights Offering, and that DTC, or its nominee, will be the holder of record of such Rights Offering Shares. To the extent DTC is unwilling or unable to make the Rights Offering Shares eligible on the DTC system, the Rights Offering Shares will be issued directly to the Eligible Holder or its designee in book-entry form on the books of the Company's transfer agent.

## 10. Fractional Shares

No fractional rights or Rights Offering Shares will be issued in the Rights Offerings. All share allocations (including each Eligible Holder's Rights Offering Shares) will be calculated and rounded down to the nearest whole share.

## 11. Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors in consultation with the Required Backstop Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtor, with the prior written consent of the Required Backstop Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Forms will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith in consultation with the Required Backstop Parties.

*Before exercising any Subscription Rights, Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

All calculations, including, to the extent applicable, the calculation of (a)(i) the value of any Eligible FLLO Holder's Allowed FLLO Term Loan Facility Claims for the purposes of the FLLO Rights Offering and (ii) any Eligible FLLO Holder's FLLO Rights Offering Shares, shall be made in good faith by the Company with the prior written consent of the Required Backstop Parties and (b)(i) the value of any Eligible Second Lien Holder's Allowed Second Lien Notes Claims for the purposes of the Second Lien Rights Offering and (ii) any Eligible Second Lien Holder's Second Lien Rights Offering Shares, shall be made in good faith by the Company with the prior written consent of the Required Backstop Parties and in each case in accordance with any Claim amounts included in the Plan, and such calculations will be conclusive absent manifest error. Any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

### 12.    Modification of Procedures

With the prior written consent of the Required Backstop Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures to effectuate the Rights Offerings and to issue the Rights Offering Shares, provided, however, that the Debtors shall provide prompt written notice to each Eligible Holder of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date, provided further that any amendments or modifications to the terms of the Rights Offerings are subject to the provisions of Section 10.7 of the Backstop Commitment Agreement. In so doing, and subject to the prior written consent of the Required Backstop Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith is necessary and appropriate to effectuate and implement the Rights Offerings and the issuance of the Rights Offering Shares.

The Debtors shall undertake reasonable procedures to confirm that each participant in the Rights Offerings is in fact an Eligible Holder.

### 13.    Inquiries; Subscription Agent

The Rights Offering Instructions for Eligible Holders in the relevant Subscription Form should be carefully read and strictly followed by the Eligible Holders.

Questions relating to the Rights Offerings should be directed to the Subscription Agent via email to [●]@[●].com (please reference "[Chesapeake Rights Offering]" in the subject line) or at the following phone number: [●].

The risk of non-delivery of all documents and payments is borne by the Eligible Holder electing to exercise its Subscription Rights and not the Debtors, the Subscription Agent, or the Backstop Parties.

---

**The Subscription Expiration Date is 4:00 p.m. Central Time on [December 7], 2020.**

**The Subscription Funding Deadline (for Non-Backstop Parties) is 4:00 p.m. Central Time on [December 8], 2020.**

**Backstop Parties must fund by the Backstop Funding Deadline which will be set forth in their Funding Notice.**

---

**Exhibit 13A**

**Second Lien Claims Subscription Forms**

**CHESAPEAKE ENERGY CORPORATION**

**SUBSCRIPTION FORM**
**FOR SECOND LIEN RIGHTS  OFFERING**

**FOR USE BY ELIGIBLE SECOND LIEN HOLDERS**
**THAT ARE <u>NOT</u> BACKSTOP PARTIES**

**IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED [●], 2020**

**Special Note:  Backstop Parties should use the Backstop Party Subscription Form.**
*Backstop Parties will receive the Backstop Party Subscription Form from their counsel.*

---

For use by beneficial owners of Chesapeake Energy Corporation's 11.500% Senior Notes Due 2025 (the "<u>Notes</u>") issued by Chesapeake Energy Corporation pursuant to an indenture dated as of December 19, 2019, by and among Chesapeake Energy Corporation, as Issuer, Deutsche Bank Trust Company Americas, as Trustee, and the guarantors party thereto (as amended from time to time prior to the date hereof).

---

**SUBSCRIPTION EXPIRATION DATE**

**AND**

**SUBSCRIPTION FUNDING DEADLINE**

**The Subscription Expiration Date is 4:00 p.m. Central Time on [December 7], 2020.**

**The Subscription Funding Deadline is 5:00 p.m. Central Time on [December 8], 2020.**

**Please note that your Subscription Form (or other form of instruction required by your Nominee) must be received <u>by your Nominee in sufficient time</u> to allow such Nominee to deliver your underlying Notes through ATOP by the Subscription Expiration Date or your subscription will not be counted and will be deemed forever relinquished and waived; payment of the aggregate Purchase Price with respect to Eligible Holders that are not Backstop Parties must be made to the Subscription Agent by the Subscription Funding Deadline.**

**Please note that by submitting your Subscription Form (or other form of instruction required by your Nominee) to exercise your Subscription Rights, you also agree to vote in favor of the Plan.**

**Please consult the Plan, the Disclosure Statement and the Rights Offering Procedures for additional information with respect to the Rights Offering.  Any terms capitalized but not defined herein shall have the meaning as set forth in the Plan or the Rights Offering**

> **Procedures.**
>
> **Questions may also be directed to the Subscription Agent via email to: [●]@[●] (please reference "[Chesapeake Rights Offering]" in the subject line).**

## Item 1.  Amount of Notes.

The undersigned certifies that it is a beneficial owner (or the Nominee of the beneficial owner) of Notes in the aggregate principal amount as set forth below (insert amount on the lines below).  For purposes of this Subscription Form, do not adjust the principal (face) amount for any accrued or unmatured interest.  Accrued prepetition interest is accounted for in the multiplier set forth in Item 2 and Item 3a below. (If a Nominee holds your Notes on your behalf and you do not know the principal amount, please contact your Nominee immediately).

*Insert aggregate principal amount of 11.500% Senior Notes Due 2025 beneficially owned.*

_____

## Item 2.  Rights Calculation Worksheet

The number of Rights Offering Shares for which the undersigned may subscribe, based on the principal amount shown above, is calculated as follows:

| _____ (Insert aggregate principal amount from Item 1 above) | X | [RATE] | = | _____ (Maximum number of Rights Offering Shares)  (Round down to nearest whole number) |
|---|---|---|---|---|

Each Eligible Holder is entitled to subscribe for [RATE] Rights Offering Shares per $1,000 of principal amount of the Notes, subject to the individual limits included in the calculations in the table above.

IMPORTANT NOTE: You may exercise any portion of principal amount of Notes that you wish, up to the total amount shown for this account.  The exercise of rights will be effected through the submission of the relevant amount of underlying Notes through The Depository Trust Company ("DTC") Automated Tender Offer Program ("ATOP"), which will also block your underlying Notes from trading.  If you do not wish to exercise 100% of your available rights based on the principal amount in Item 1, you should instruct your Nominee to only submit the amount of Notes associated with the number of rights you wish to exercise.  For example, if you only wish to exercise 50% of your rights, you should instruct your Nominee to only submit 50% of your Notes via ATOP.

## Item 3.  Rights Exercise

To subscribe, fill out all Items in this Subscription Form completely and legibly – *and follow the instructions of your Nominee with respect to the submission of your instructions to the Nominee.*

**3a. Exercise Instruction.  Principal Amount that you wish your Nominee to SUBMIT VIA ATOP for the purpose of exercising rights**. The principal amount of Notes you instruct your Nominee to submit via ATOP and (if calculated correctly) the corresponding number of Rights Offering Shares for which you wish to subscribe are shown below:

| BOX A | | | | | BOX B |
|---|---|---|---|---|---|
| _____ <br> (Insert principal amount you request your Nominee to SUBMIT VIA ATOP in order to exercise the associated Second Lien Rights) (May not be more than the Principal Amount shown in Item 2) | X | [RATE] | = | | _____ <br> (Number of associated Rights Offering Shares)  (Round down to nearest whole number) |

**3b. Calculation of Purchase Price**. By filling in the following blanks, you are indicating that the undersigned Eligible Holder is interested in purchasing the number of Rights Offering Shares associated with the Principal Amount specified in Box A (which, if calculated correctly, will yield the number of Rights Offering Shares shown in Box B at the aggregate Purchase Price shown in Box C), on the terms and subject to the conditions set forth in the Rights Offering Procedures.

| | | | | | BOX C |
|---|---|---|---|---|---|
| _____ <br> (Insert number of Rights Offering Shares from <u>Box B</u> above) | X | $[PRICE] | = | $ | _____ <br> Aggregate Purchase Price (include dollars and cents) |

**For the avoidance of doubt, the exercise of Rights Offering Shares will be based solely upon the PRINCIPAL AMOUNT tendered, and not on the amounts shown in Box B or Box C, which are included for your convenience.**

**Item 4.  Payment Instructions:**

**Insert aggregate Purchase Price as set forth in BOX C:**

$_____

All cash payments with respect to the exercise of Subscription Rights that are being transmitted with respect to the amount set forth above shall be made by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below. Any Eligible Second Lien Holder that is not a Backstop Party and that is submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to ensure such payment is provided to the Subscription Agent by the Subscription Funding Deadline.

**YOUR WIRE MUST BE RECEIVED BY THE SUBSCRIPTION FUNDING DEADLINE, WHICH IS [DECEMBER 8], 2020.  PAYMENTS OF THE AGGREGATE PURCHASE PRICE MUST BE RECEIVED BY THE SUBSCRIPTION FUNDING DEADLINE OR THE SUBSCRIPTIONS REPRESENTED BY THE SUBMISSION OF THE SECOND LIEN NOTES THROUGH ATOP WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.**

| | |
|---|---|
| Account Name: | [Epiq to provide details for subscription account] |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | [Insert VOI Number of ATOP Tender in memo field OR a Nominee acting on behalf of multiple parties may provide a spreadsheet to Epiq] |

**Item 5.  Certification and Subscription Form Delivery Instructions.**

The undersigned hereby certifies that it (i) is the beneficial owner of the Notes set forth in Item 1 above (the "Holder"), or the authorized signatory (the "Authorized Signatory") of such Holder acting on behalf of the Holder, (ii) is entitled to participate in the Second Lien Rights Offering, (iii) it has reviewed a copy of the Plan, the Disclosure Statement and the Rights Offering Procedures and other applicable materials and (iv) understands that the exercise of the rights under the Second Lien Rights Offering is subject to all the terms and conditions set forth in the Plan, and the Rights Offering Procedures.

Please provide your completed Subscription Form (or other required instruction, as applicable) to your Nominee **in sufficient time** to allow such Nominee to deliver the principal amount shown in Box A via ATOP by the Subscription Expiration Date.  By electing to subscribe for the amount of Rights Offering Shares shown in Box B above, the Holder (or the Authorized Signatory on behalf of the Holder) is hereby instructing its Nominee to arrange for the delivery of the Notes shown in Box A via ATOP by the Subscription Expiration Date, and acknowledges that payment of the aggregate Purchase Price shown in Box C associated with that the delivery of such Notes must be made by Subscription Funding Deadline.

**The Holder (or the Authorized Signatory on behalf of such Holder) acknowledges that, by executing this Subscription Form or otherwise providing its subscription instructions to it Nominee, the Eligible Holder has elected to subscribe for the number of Rights Offering Shares associated with the principal amount tendered through ATOP, and will be bound to**

**pay the aggregate Purchase Price for the Rights Offering Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

Authorized signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Email: _____

**PLEASE RETURN THIS SUBSCRIPTION FORM OR OTHER INSTRUCTION (*AS REQUIRED BY THE NOMINEE*) ONLY TO YOUR NOMINEE. <u>DO NOT</u> RETURN THIS FORM DIRECTLY TO THE SUBSCRIPTION AGENT.**

**PLEASE NOTE:  THE SUBSCRIPTION WILL NOT BE VALID UNLESS THE RELEVANT NOTES HAVE BEEN TENDERED THROUGH ATOP BY THE SUBSCRIPTION EXPIRATION DATE.**

**PAYMENT <u>MUST</u> MADE BY THE SUBSCRIPTION FUNDING DEADLINE.**

**Exhibit 13B**

**FLLO Claims Subscription Forms**

**CHESAPEAKE ENERGY CORPORATION**

**SUBSCRIPTION FORM**
**FOR FLLO RIGHTS OFFERING**

**FOR USE BY ELIGIBLE FLLO HOLDERS**
**THAT ARE NOT BACKSTOP PARTIES**

**IN CONNECTION WITH DEBTORS'**
**DISCLOSURE STATEMENT DATED [●], 2020**

**Special Note:  Backstop Parties should use the Backstop Party Subscription Form.**
*Backstop Parties will receive the Backstop Party Subscription Form from their counsel.*

THIS SUBSCRIPTION FORM (WITH ACCOMPANYING TAX FORMS) MUST BE RECEIVED BY THE SUBSCRIPTION AGENT, BY 4:00 P.M. (CENTRAL TIME) ON [DECEMBER 7], 2020, (THE "SUBSCRIPTION EXPIRATION DATE") AND PAYMENTS OF THE AGGREGATE PURCHASE PRICE (SOLELY WITH RESPECT TO NON-BACKSTOP PARTIES) MUST BE RECEIVED BY 4:00 P.M. (CENTRAL TIME) ON [DECEMBER 8], 2020 (THE "SUBSCRIPTION FUNDING DEADLINE") OR THE SUBSCRIPTIONS REPRESENTED BY THIS SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED.  ANY TERMS CAPITALIZED BUT NOT DEFINED HEREIN SHALL HAVE THE MEANING AS SET FORTH IN THE PLAN OR THE RIGHTS OFFERING PROCEDURES.

PLEASE LEAVE SUFFICIENT TIME FOR YOUR SUBSCRIPTION FORM TO REACH THE SUBSCRIPTION AGENT BY THE SUBSCRIPTION EXPIRATION DATE AND TO ARRANGE FOR PAYMENT OF THE AGGREGATE PURCHASE PRICE BY THE SUBSCRIPTION FUNDING DEADLINE.

PLEASE NOTE THAT BY SUBMITTING YOUR SUBSCRIPTION FORM TO EXERCISE YOUR SUBSCRIPTION RIGHTS, YOU ALSO AGREE TO VOTE IN FAVOR OF THE PLAN.

PLEASE CONSULT THE PLAN AND THE RIGHTS OFFERING PROCEDURES FOR ADDITIONAL INFORMATION WITH RESPECT TO THIS SUBSCRIPTION FORM. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE SUBSCRIPTION AGENT VIA EMAIL TO [●]@[●].COM (PLEASE REFERENCE "[CHESAPEAKE RIGHTS OFFERING]" IN THE SUBJECT LINE), OR AT THE FOLLOWING PHONE NUMBER: [●].

**Item 1.  Amount of FFLO Term Loan Facility Loans.**

 The undersigned certifies that it is the holder (or beneficial owner pending settlement, to the extent that both sides of the trade or the FLLO Term Loan Facility Administrative Agent agree that the transferee is the party entitled to the Subscription Rights) as of the Subscription Expiration Date of the aggregate principal amount of FLLO Term Loan Facility Loans (the "FFLO Term Loan") as set forth below (insert amount on the lines below). For purposes of this Subscription Form, do not adjust the principal (face) amount for any accrued or unmatured interest.  Accrued prepetition interest is accounted for in the multiplier set forth in Item 2 below.

*Insert aggregate principal amount of FFLO Term Loans beneficially owned.*

_____

**Item 2.  Rights Calculation Worksheet**

The number of Rights Offering Shares for which the undersigned may subscribe, based on the aggregate principal amount of FLLO Term Loans shown above, is calculated as follows:

| _____<br>(Insert aggregate principal amount from Item 1 above) | X | [RATE] | = | _____<br>(Maximum number of Rights Offering Shares)  (Round down to nearest whole number) |
|---|---|---|---|---|

 Each Eligible Holder is entitled to subscribe for [RATE] Rights Offering Shares per $1,000 of FFLO Term Loans held (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in the table above.

 To subscribe, fill out all Items in this Subscription Form completely and legibly.

**Item 3.  Rights Exercise and Purchase Price**

 Completing this form indicates that the undersigned is committing to purchase the number of Rights Offering Shares specified in Box A for the Purchase Price shown in Box B, on the terms and subject to the conditions set forth in the Rights Offering Procedures.

| BOX A | | | | BOX B |
|---|---|---|---|---|
| _____<br>Insert number of Rights Offering Shares (may not exceed the Maximum Number of Rights Offering Shares shown in Item 2) | X | $[PRICE] | = | $_____<br><br>Aggregate Purchase Price (include dollars and cents) |

Total amount in Box B must be paid by wire transfer ONLY of immediately available funds in accordance with the directions below.

**Item 4.  Payment Instructions:**

**Insert aggregate Purchase Price set forth in Item 3 Box B:**

$$\$\underline{\hspace{3cm}}$$

All cash payments with respect to the exercise of Subscription Rights that are being transmitted with respect to the amount set forth above shall be made by wire transfer ONLY of immediately available funds in accordance with the instructions set forth below. **YOUR WIRE MUST BE RECEIVED BY THE SUBSCRIPTION FUNDING DEADLINE, WHICH IS [DECEMBER 8], 2020**. **PAYMENTS OF THE AGGREGATE PURCHASE PRICE MUST BE RECEIVED BY THE SUBSCRIPTION FUNDING DEADLINE (SOLELY WITH RESPECT TO ELIGIBLE FLLO HOLDERS THAT ARE NOT BACKSTOP PARTIES) OR THE SUBSCRIPTIONS REPRESENTED BY THE SUBMISSION OF THIS SUBSCRIPTION FORM WILL NOT BE COUNTED AND WILL BE DEEMED FOREVER RELINQUISHED AND WAIVED**.

| | |
|---|---|
| Account Name: | [Epiq to provide details for subscription account] |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | [Insert Epiq ID in memo field] |

**Item 5.  Delivery Instructions for Subscription Form**

Please email, mail or deliver your completed Subscription Form (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) to:

[●]
Telephone: [●]

Questions may also be directed to the Subscription Agent via email to: [●]@[●].com (please reference "[Chesapeake Rights Offering]" in the subject line). (Please also see "Note Regarding Email" below.)

**PLEASE NOTE: NO SUBSCRIPTION BY AN ELIGIBLE HOLDER WILL BE VALID UNLESS THIS SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE), IS VALIDLY SUBMITTED ON OR BEFORE THE SUBSCRIPTION EXPIRATION DATE (4:00 P.M. CENTRAL TIME ON [DECEMBER 7], 2020) <u>PROVIDED THAT</u>, PAYMENT IS RECEIVED IN ACCORDANCE WITH ITEM 4 BY THE SUBSCRIPTION FUNDING DEADLINE.**

**<u>NOTE REGARDING EMAIL</u>**

**PROPERLY EXECUTED SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORM) CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT [●]@[●].COM BY THE SUBSCRIPTION EXPIRATION DATE. ONLY SELECT ONE METHOD FOR THE RETURN OF YOUR SUBSCRIPTION FORM.**

**Item 6.  Additional Certification.**

The undersigned hereby certifies that it (i) is the holder, or is the beneficial owner (pending settlement) of, the FLLO Term Loan Facility Loans listed under Item 1, or it is the authorized signatory of such holder or beneficial owner, (ii) is entitled to participate in the FLLO Rights Offering, (iii) has reviewed a copy of the Plan, the Rights Offering Procedures and other applicable materials and (iv) understands that the exercise of the rights under the FLLO Rights Offering is subject to all the terms and conditions set forth in the Plan and the Rights Offering Procedures.

**The undersigned acknowledges that, by executing this Subscription Form, it has irrevocably elected to subscribe for the number of Rights Offering Shares designated under Item 3 Box A above, will be bound to pay the aggregate Purchase Price listed under Item 3 Box B above for the Rights Offering Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Holder: _____

Authorized signature: _____

Name of Signatory: _____

Title: _____

A-4

Address: _____

Telephone Number: _____

Email: _____

**PLEASE COMPLETE <u>EXHIBIT A</u> HERETO TO DESIGNATE DELIVERY INSTRUCTIONS FOR THE RIGHTS OFFERING SHARES.**

<u>**EXHIBIT A**</u>

**Rights Offering Shares Delivery Instructions**

If there is more than one designee, complete a separate form for each designee. You must specify the number of Rights Offering Shares for each designee.

Number of Rights Offering Shares:_____

Issue in the following Name: _____

**A. Please indicate on the lines provided below the registration name of the designee in whose name the Rights Offering Shares should be issued, in the event the Rights Offering Shares are not DTC eligible (it is strongly recommended that the below information be typed to ensure that it is legible). If you desire for the Rights Offering Shares to be held in book-entry form by the transfer agent, please only complete this Item A and enter N/A on Item B. If you complete Items A and B and the Rights Offering Shares are DTC eligible, your Rights Offering Shares will be delivered according to Item B.**

Registration Name Line 1 (Maximum 35 Characters):_____

Registration Name Line 2 (Maximum 35 Characters):_____

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email: _____

**B. DTC Participant for the deposit of Rights Offering Shares, in the event the Rights Offering Shares are DTC eligible (if you do not want delivery of Rights Offering Shares through DTC, please enter N/A below):**

DTC Participant Name:_____

DTC Participant Number:_____

A-1

Information regarding your contact at the DTC Participant:

Contact Name:_____

Contact Telephone:_____

Contact Email:_____

**C. Wire information in the event a refund is necessary:**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

## Exhibit 13C

**Backstop Subscription Forms**

**CHESAPEAKE ENERGY CORPORATION**

**BACKSTOP PARTY SUBSCRIPTION FORM**

**FOR FLLO RIGHTS OFFERING AND/OR
SECOND LIEN RIGHTS OFFERING**

**FOR USE <u>ONLY</u> BY BACKSTOP PARTIES**

**IN CONNECTION WITH DEBTORS'
DISCLOSURE STATEMENT DATED [●], 2020**

*This form is to be used by Backstop Parties to exercise FLLO Subscription Rights
and/or Second Lien Notes Subscription Rights.*

---

**BACKSTOP PARTY SUBSCRIPTION EXPIRATION DATE**

**The Subscription Expiration Date is 4:00 p.m. Central Time on [December 7], 2020.**

**Please consult the Plan, the Disclosure Statement and the Rights Offering Procedures for additional information with respect to the Rights Offering. Any terms capitalized but not defined herein shall have the meaning as set forth in the Plan or the Rights Offering Procedures. Pursuant to the Backstop Commitment Agreement, all Backstop Parties are required to fully exercise all subscription rights issued to them in the Rights Offerings.**

**Questions may also be directed to the Subscription Agent via email to: [●]@[●] (please reference "[Chesapeake Rights Offering]" in the subject line).**

---

## I.  BACKSTOP PROCEDURES.

**1.  FLLO Procedures for Backstop Parties**

(a)      In order to validly exercise its FLLO Subscription Rights, each FLLO Eligible Holder that is a Backstop Party must:

i.    return the duly completed and executed Backstop Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent so that such documents are actually received by the Subscription Agent by the Subscription Expiration Date; and

ii.   no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Subscription Agent or to the escrow account established and maintained by a third party satisfactory to the Backstop Parties and the Company (the "<u>Escrow Account</u>") by wire transfer **ONLY** of immediately available funds in accordance with the wire instructions included in the Funding Notice.

**2.  Second Lien Procedures for Backstop Parties**

(a)     In order to validly exercise its Second Lien Subscription Rights, each Eligible Holder that is a Backstop Party must:

  i.    return the duly completed and executed Backstop Subscription Form to the Subscription Agent so that such documents are actually received by the Subscription Agent by the Subscription Expiration Date; and

  ii.   no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Subscription Agent or to the escrow account established and maintained by a third party satisfactory to the Backstop Parties and the Company (the "Escrow Account") by wire transfer **ONLY** of immediately available funds in accordance with the wire instructions included in the Funding Notice.

**3.  Information about the delivery of securities to Backstop Parties**

The delivery of Plan Securities from the Rights Offerings to each Backstop Party will be by DWAC deposit, unless a Backstop Party elects for its securities to be held in book-entry form with the Company's transfer agent. Delivery via DWAC deposit will require the cooperation of each Backstop Party and its custodian. This includes the following items, to the extent applicable, and to be outlined in the Funding Notice:

- Plan Securities from exercise of the FLLO Subscription Rights subscribed through the FLLO Worksheet;

- Plan Securities from exercise of the Second Lien Notes Subscription Rights subscribed through the 2L Worksheet;

- Plan Securities from the exercise of the direct investment rights under the Backstop Commitment Agreement;

- Unsubscribed shares of New Common Stock issued to the Backstop Parties in accordance with the Backstop Commitment Agreement; and

- Plan Securities issuable from the Put Option Premium in accordance with the Backstop Commitment Agreement.

**II.  FLLO BACKSTOP PARTY SUBSCRIPTION WORKSHEET (the "FLLO Worksheet").**

**Item 1.  Amount of FLLO Term Loan Facility Claims.**

The undersigned certifies that it is the holder (or beneficial owner pending settlement, to the extent that both sides of the trade or the FLLO Term Loan Facility Administrative Agent agree that the transferee is the party entitled to the Subscription Rights) as of the Subscription Expiration Date of the aggregate principal amount of FLLO Term Loans set forth below (insert amount on the lines below). For purposes of this Subscription Form, do not adjust the principal

(face) amount for any accrued or unmatured interest.  Accrued prepetition interest is accounted for in the multiplier set forth in Item 2 below.

*Insert aggregate amount of FLLO Term Loans beneficially owned.*

_____

## Item 2.  Rights Calculation Worksheet

The number of Rights Offering Shares eligible for subscription, based on the aggregate principal amount shown in Item 1 above, is calculated as follows:

| _____ (Insert aggregate principal amount of FLLO Term Loans from Item 1 above) | X | [RATE] | = | _____ (Maximum number of Rights Offering Shares)  (Round down to nearest whole number) |
|---|---|---|---|---|

Each Backstop Party is entitled to subscribe for [RATE] Rights Offering Shares per $1,000 of FLLO Term Loans held (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in the table above.

IMPORTANT NOTE: Each Backstop Party is required to exercise subscription rights for the total amount shown.

## Item 3.  Rights Exercise and Purchase Price

Completing this form indicates that the undersigned FLLO Backstop Party has confirmed its commitment to purchase the number of Rights Offering Shares specified in Box A for the Purchase Price shown in Box B, on the terms and subject to the conditions set forth in the Rights Offering Procedures and the Backstop Commitment Agreement.

| BOX A | | | | BOX B |
|---|---|---|---|---|
| _____ Insert number of Rights Offering Shares (should be the **same** as the Maximum Number of Rights Offering Shares shown in Item 2) | X | $[PRICE] | = | $_____ Aggregate Purchase Price (include dollars and cents) |

## III.  SECOND LIEN BACKSTOP PARTY SUBSCRIPTION WORKSHEET (the "2L Worksheet").

## Item 1.  Amount of Notes.

The undersigned certifies that it is the beneficial owner (including for trades pending settlement)

3

as of the Subscription Expiration Date of the following aggregate principal amount of 11.500% Senior Notes Due 2025 (the "Notes") issued by Chesapeake Energy Corporation (insert amount on the lines below) or that the undersigned is the authorized signatory of that beneficial owner. For purposes of this Subscription Form, do not adjust the principal (face) amount for any accrued or unmatured interest.  Accrued prepetition interest is accounted for in the multiplier set forth in Item 2 below.

*Insert aggregate principal amount of 11.500% Senior Notes Due 2025 beneficially owned.*

_____

## Item 2.  Rights Calculation Worksheet

The number of Second Lien Rights Offering Shares eligible for subscription, based on the principal amount shown above, is calculated as follows:

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert aggregate principal amount from Item 1 above) | X | [RATE] | = | _____<br>(Maximum number of Second Lien Rights Offering Shares)  (Round down to nearest whole number) |

Each Backstop Party is entitled to subscribe for [RATE] Rights Offering Shares per $1,000 of Second Lien Notes held (the "Maximum Participation Amount"), subject to the individual limits included in the calculations in the table above.

IMPORTANT NOTE: Each Backstop Party is required to exercise subscription rights for the total amount shown.

## Item 3.  Rights Exercise and Calculation of Purchase Price.

By filling in the following blanks, you are indicating that the undersigned Backstop Party has committed to purchasing the number of Rights Offering Shares specified in Box A for the Purchase Price shown in Box B, on the terms and subject to the conditions set forth in the Rights Offering Procedures and the Backstop Commitment Agreement.

| BOX A | | | | BOX B |
|---|---|---|---|---|
| _____<br>Insert number of Rights Offering Shares (should be the **same** as the Maximum Number of Rights Offering Shares shown in Item 2) | X | $[PRICE] | = | $_____<br>Aggregate Purchase Price (include dollars and cents) |

4

**IV.  TOTAL PURCHASE PRICE FOR EXERCISED RIGHTS.**

| CATEGORY | LOCATION | PRICE |
|---|---|---|
| Price for FLLO Rights | II. FLLO Worksheet: Item 3 – Box B. | (i) $_____ |
| Price for Second Lien Rights | III. 2L Worksheet: Item 3 – Box B. | (ii) $_____ |
| **Total Due for Exercised Rights** | **TOTAL of (i) and (ii):** | $_____ |

**PAYMENT IS NOT REQUIRED FROM BACKSTOP PARTIES AT THIS TIME. BACKSTOP PARTIES WILL BE PROVIDED WITH A FUNDING NOTICE IN ACCORDANCE WITH THE BACKSTOP COMMITMENT AGREEMENT.**

**V.  CERTIFICATION.**

**The Backstop Party (or the authorized signatory on behalf of such Backstop Party) acknowledges that, by executing this Backstop Party Subscription Form, the Backstop Party has confirmed its commitment to subscribe for the number of Rights Offering Shares set forth above, and will be bound to pay the aggregate Purchase Price for the Rights Offering Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment, in accordance with the Backstop Commitment Agreement.**

Date: _____

Name of Backstop Party: _____

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Email: _____

## VI.  DELIVERY INSTRUCTIONS FOR BACKSTOP PARTY SUBSCRIPTION FORM.

Please email, mail or deliver your completed Subscription Form (with accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) to:

<div align="center">

[●]
Telephone: [●]

</div>

Questions may also be directed to the Subscription Agent via email to: [●]@[●].com (please reference "[Chesapeake Rights Offering]" in the subject line). (Please also see "Note Regarding Email" below.)

<table>
<tr><td>

**NOTE REGARDING EMAIL**

**PROPERLY EXECUTED SUBSCRIPTION FORMS (WITH ACCOMPANYING TAX FORM) CAN BE E-MAILED TO THE SUBSCRIPTION AGENT AT [●]@[●].COM BY THE SUBSCRIPTION EXPIRATION DATE.**

</td></tr>
</table>

<table>
<tr><td>

**PLEASE NOTE:**

**NO RIGHTS OFFERING SHARES WILL BE VALID UNLESS THE ADMINISTRATIVE AGENT CONFIRMS THE BACKSTOP PARTY'S HOLDINGS AS OF THE SUBSCRIPTION EXPIRATION DATE;**

**ELIGIBLE HOLDERS THAT ARE BACKSTOP PARTIES MUST DELIVER THE APPROPRIATE FUNDING NO LATER THAN THE BACKSTOP FUNDING DEADLINE (EXCEPT TO THE EXTENT OF ANY FUNDING PREVIOUSLY PROVIDED BY ANY SUCH ELIGIBLE HOLDER IN ACCORDANCE WITH THE TERMS OF THE BACKSTOP COMMITMENT AGREEMENT).**

</td></tr>
</table>

## **Exhibit 14**

**Form of Official Committee of Unsecured Creditors Solicitation Letter**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF CHESAPEAKE ENERGY CORPORATION, ET AL.**
c/o Brown Rudnick LLP
7 Times Square New York, New York 10036

October 30, 2020

**To:**    **Holders Of Class 6 Unsecured Notes Claims and Class 7 General Unsecured Claims Under Second Amended Joint Chapter 11 Plan Of Reorganization Of Chesapeake Energy Corporation And Its Debtor Affiliates**

The Official Committee of Unsecured Creditors (the "**Committee**") in the chapter 11 cases of Chesapeake Energy Corporation and certain of its affiliated entities (collectively, "**Chesapeake**") was appointed by the Office of the United States Trustee (an arm of the United States Department of Justice) to represent the interests of all unsecured creditors, including you as a Holder of Unsecured Notes Claim or General Unsecured Claim, in Chesapeake's chapter 11 cases.   Claims relating to the Unsecured Notes are classified as Class 6 Unsecured Notes Claims pursuant to Chesapeake's *Second Amended Joint Chapter 11 Plan Of Reorganization Of Chesapeake Energy Corporation And Its Debtor Affiliates* [Docket No. 1599] (the "**Plan**").   All other general unsecured claims are classified as Class 7 General Unsecured Claims pursuant to the Plan.   We refer to claims classified as Class 6 Unsecured Notes Claims and Class 7 General Unsecured Claims collectively as "**Unsecured Claims**."   The Plan and Ballot to vote to accept or reject the Plan are included among the materials accompanying this

> **OUR RECOMMENDATION TO YOU IS TO VOTE TO <u>REJECT</u> (VOTE AGAINST) THE PLAN AND <u>OPT OUT</u> OF PROVIDING THE THIRD-PARTY RELEASES REQUESTED BY THE PLAN.**
>
> **THE COMMITTEE NEEDS YOUR SUPPORT TO SEEK BETTER TREATMENT FOR ALL UNSECURED CLAIMS.**
>
> **For updates, please visit the Committee's website at www.ChesapeakeOCC.com. Alternatively, follow us on Twitter @ChesapeakeOCC.**
>
> **Please contact the Committee's counsel at Brown Rudnick LLP with any questions regarding our recommendation or the Plan:**
> **Bennett Silverberg (212-209-4924; BSilverberg@brownrudnick.com)**

letter.
**<u>YOUR VOTE IS IMPORTANT.</u>** Without your vote to reject the Plan, the Committee may be unable to advocate for a greater recovery to Holders of Unsecured Claims such as yourself.   Certain holders of Class 6 Unsecured Notes Claims are supporting the Plan, it is believed, because the Plan provides them with more favorable treatment on account of other claims they hold against Chesapeake that is not available to other Holders of Unsecured Claims.   Class 6 would reject the Plan if *more noteholders vote to reject the plan than accept the Plan*.   We are unaware of any Holders of Class 7 General Unsecured Claim which support the Plan.

1

**YOU WILL RECEIVE A RECOVERY EVEN IF YOU VOTE TO REJECT THE PLAN IF THE PLAN IS NONETHELESS APPROVED.**  You do not need to accept the Plan or grant the third-party releases to receive the treatment offered to you under the Plan if the Plan is confirmed.  If the Plan is ultimately approved by the Bankruptcy Court over the objection of the Committee and consummated by Chesapeake, you will still receive the same treatment as other Holders of Class 6 Unsecured Notes Claims and Class 7 General Unsecured Claims who vote to accept the Plan.  However, if the Plan is not ultimately approved, we cannot provide you with any assurances of your ultimate recovery under any alternative restructuring transaction.

**THE COMMITTEE HAS BEEN ADVISED BY ITS PROFESSIONALS THAT THE PLAN DOES NOT OFFER YOU FAIR VALUE.**  We believe the Plan is the product of a negotiation among a limited number of supporting creditors with their own interests.

The Plan they negotiated offers Holders of Class 6 Unsecured Notes Claims their *pro rata* share of 12% of the New Common Stock that Chesapeake intends to issue upon emergence from bankruptcy and warrants to acquire additional New Common Stock.  This New Common Stock is subject to significant dilution by a Rights Offering backstopped by the aforementioned supporting creditors.  Chesapeake's Disclosure Statement equates this to a recovery of between 2.3% - 4.4%, based upon Chesapeake's valuation of its business and depending on whether warrants issued to Holders of Class 6 Unsecured Notes Claims are exercised.

With respect to Holders of Class 7 General Unsecured Claims, the Plan offers such Holders their *pro rata* share of $1 million in cash.  Chesapeake's Disclosure Statement equates this to a recovery of slightly more than 0%.

The Committee has been advised that Chesapeake's estimated total enterprise valuation range is far greater than the $4.1 billion midpoint value derived by Chesapeake's valuation expert.  The Committee is in the process of finalizing its own valuation with the assistance of its financial advisors and valuation consultants at Opportune LLP and The Michel-Shaked Group.  We anticipate that our experts will conclude that Chesapeake's valuation is greater than the total amount of Chesapeake's secured and administrative claims.  This could entitle you to greater value on account of your Unsecured Claims under a chapter 11 plan. The Bankruptcy Court would likely deny approval of Chesapeake's proposed Plan if the Committee demonstrates that Chesapeake's valuation is improperly low.

In addition, the Committee has identified assets of significant value that are either presently encumbered by liens that can be avoided or are unencumbered.  As a result, a hypothetical liquidation of Chesapeake under Chapter 7 of the Bankruptcy Code may lead to greater recoveries for Holders of Unsecured Claims than under the proposed Plan.  Under such circumstances, the Plan would presumably fail to satisfy the Bankruptcy Code's "best interests test" which should render the Plan unconfirmable.

**WE BELIEVE THE PLAN PROVIDES INAPPROPRIATE RELEASES OF CLAIMS AGAINST CHESAPEAKE'S INSIDERS AND LENDERS THAT MAY OTHERWISE BENEFIT HOLDERS OF UNSECURED CLAIMS.**  The Plan proposes releases of claims and causes of action against Chesapeake's insiders and their secured lenders.  The Committee has conducted an extensive investigation

into the circumstances leading to the commencement of these Chapter 11 cases, including the December 2019 "liability management" transactions and Chesapeake's intentional squandering of avoidance claims against their secured lenders.  The Committee is presently seeking standing to assert certain claims and causes of action against Chesapeake's secured lenders and directors.  The claims are described in a standing motion filed with the Bankruptcy Court on October 26, 2020.  If the Committee obtains standing to assert these claims and if the claims are successful, significantly greater value should be available for distribution to Holders of Unsecured Claims than provided in the current Plan.  Nevertheless, the Plan, if consummated, provides releases of Chesapeake's insiders with respect to the claims identified in the standing motion.  The Plan would also release related claims, including claims for aiding and abetting breaches of fiduciary duties and equitable subordination, against certain of Chesapeake's secured lenders.

**THE PLAN DOES NOT PROVIDE FOR PAYMENT OF INDENTURE TRUSTEE FEES AND EXPENSES PUTTING RECOVERIES FOR HOLDERS OF CLASS 6 UNSECURED NOTES CLAIMS AT RISK OF FURTHER DILUTION.**  The Unsecured Notes Indentures each provide for the payment in cash of the fees and expenses of the Unsecured Notes Indenture Trustees by Chesapeake. However, the Plan does not provide for such payments.  Rather, the Plan expressly preserves the Unsecured Notes Trustees' respective charging liens against distributions to the Class 6 Unsecured Notes Claims.  The Unsecured Notes Trustees have informed Chesapeake that to the extent provision is not made in the Plan for payment of the fees and expenses of the Unsecured Notes Trustees in cash, they intend to exercise their charging liens against some or all of the distributions to the holders of the Unsecured Notes, including the distributions of New Common Stock and New Class C Warrants that would otherwise be distributed to the Class 6 Unsecured Notes Claims, to satisfy any outstanding and unpaid fees and expenses of the Unsecured Notes Trustees, including the fees and expenses of their respective counsel. This mechanic could also cause the Unsecured Notes Indenture Trustees to hold back an indeterminate amount of such securities to liquidate such securities in an uncertain market, thereby potentially materially diluting distributions to the Unsecured Noteholders and delaying such distributions significantly beyond the Effective Date of the Plan, as well as potentially necessitating multiple bifurcated distributions.

**THE PLAN PRESERVES PREFERENCE CLAIMS AGAINST UNSECURED CREDITORS.** Under the proposed Plan, Chesapeake is retaining certain claims and causes of action, including preference claims under Bankruptcy Code section 547, against Holders of Unsecured Claims.  If Chesapeake pursues such claims, the recoveries on account of such claims will inure almost entirely to Chesapeake's secured creditors all while Holders of Class 7 General Unsecured Claims, receive effectively no recovery under the Plan.

**THE PLAN HAS A MANAGEMENT INCENTIVE PLAN THAT WILL BENEFIT MANAGEMENT.**  We believe Chesapeake's executive management team is highly incentivized to pursue this Plan given the contemplated management incentive plan under the Plan.  This management incentive plan would provide members of Chesapeake's senior management team with certain equity-based grants in Reorganized Chesapeake, which we believe incentivizes them to support this Plan.

**WE BELIEVE YOU CAN DO BETTER.** The creditors supporting the Plan are opposing our efforts in Bankruptcy Court to obtain a better recovery for you.  Rejection of the Plan provides us with significant leverage, through litigation or negotiation, to attempt to improve your recovery although such a result

cannot be guaranteed.  We believe there are serious legal defects to the Plan. But, we need your help to prosecute them.

***For these reasons, the Committee urges Holders of Unsecured Claims vote to <u>REJECT</u> the Plan.*** **PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE YOUR BALLOT IN ITS ENTIRETY BEFORE RETURNING IT IN ACCORDANCE WITH THE DIRECTIONS CONTAINED IN THE BALLOT**.

Very truly yours,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
CHESAPEAKE ENERGY CORPORATION, *ET AL*.

63896042 v1-WorkSiteUS-036272/0001

## **Exhibit 15**

**Form of Official Committee of Royalty Owners Solicitation Letter**



**October 30, 2020**

**TO:**       **ROYALTY OWNERS**

**FROM:**     **OFFICIAL COMMITTEE OF ROYALTY OWNERS**

**RE:**       **DISCLOSURE STATEMENT AND PLAN CONFIRMATION ADVISORY**

This letter is being sent to you because you have been identified as a royalty owner by Chesapeake Energy Corporation or its affiliated Debtors (collectively, "Debtors") in the Chapter 11 Bankruptcy pending in the Southern District of Texas Bankruptcy Court (Houston Div.), Case No. 20-33233 (jointly administered).

You should be receiving this letter with a packet of materials mailed to you by Epiq, the Debtors' noticing agent, which is called a Solicitation Package. It includes the Second Amended Disclosure Statement ("Disclosure Statement") which was approved by the Court, the Second Amended Plan of Reorganization ("Plan"), and other documents including the notices of the upcoming deadlines and date for the confirmation hearing.

The approval of the Plan by the Bankruptcy Court is one of the most important parts of a Bankruptcy and is called the confirmation process. The Court holds a hearing to consider approving the Plan, which is the Confirmation Hearing. Anyone with a concern with the Plan has an opportunity to object.  Once the Plan is approved by the Court, it will be binding on everyone who received notice of the bankruptcy.  It is considered a contract between the Debtor and its creditors and other interested parties.

In these very large Chapter 11 cases, the Disclosure Statement and Plan process can seem complicated for most people, even lawyers, who review the documents.  Because of the complexity of the Disclosure Statement and Plan process, a video is being prepared to hopefully help provide royalty owners a better understanding of the plan confirmation process and more specifically the plan in this case discussing the issues royalty owners may have unique to other parties in the case.

**Royalty owners can access the video at www.royaltyownerscommittee.com or you can call the Royalty Committee's counsel if there are general questions 832-569-7330.  If you have**

---

**FORSHEY PROSTOK** LLP

777 Main Street, Suite 1550        1990 Post Oak Blvd., Suite 2400        500 Crescent Court, Suite 240        1
Fort Worth. Texas 76102            Houston. Texas 77056                   Dallas. Texas 75201



**legal questions, you should confer with an attorney as the Royalty Committee cannot provide legal advice.**

There are aspects of the Plan that the Royalty Committee still has concerns with which may give rise to an objection if a resolution cannot be worked out with the Debtors.   One of the biggest concerns relates to any amounts owed for royalty proceeds generated post-petition after the Bankruptcy was filed and making sure sufficient funds are put in a reserve to cover such claims or demands for turnover of funds to the extent not property of the Debtors. Also, the Royalty Committee would like to see a process for handling such claims which is simplified compared to the normal process of filing an application for administrative claim and/or motion to lift the stay to demand turnover of funds.  The Royalty Committee would also like to see a change to the handling of royalty proceeds with Chesapeake adopting financial controls which include more transparency for royalty owners.  Numerous parties have also objected to the releases in the Plan. Ultimately, any objection has to be decided upon by the Bankruptcy Court.

The Royalty Committee does not represent individual royalty owners, but is tasked with trying to generally look out for the common interests or royalty owners. Royalty owners are a diverse constituency:

- Some have no disputes with the Debtors and received their royalties before and after the bankruptcy
- Some were involved in litigation with the Debtors before the bankruptcy and have alleged unsecured claims, secured claims or argued that the proceeds are their property not the Debtors' estates' property.
- Some believe they are owed sums for the period AFTER the Debtors filed bankruptcy. Whether the funds are considered their separate property and not property of the estate or an administrative claim may be a dispute between the royalty owners and Debtors. Administrative claims typically require filing an application to file a claim.
- Some would like their lease terminated and others want to see the Debtors' operations continue on with continuation of their leases

**FORSHEY PROSTOK** LLP

777 Main Street, Suite 1550       1990 Post Oak Blvd., Suite 2400       500 Crescent Court, Suite 240       2
Fort Worth. Texas 76102       Houston. Texas 77056       Dallas. Texas 75201



Many royalty owners filed proof of claims.  Anyone who filed an unsecured proof of claim should review the letter provided from the Official Committee of Unsecured Creditors Committee ("UCC") regarding the UCC's recommendations on voting for the Plan. The only royalty owners who vote on the Plan are those who have an unsecured claim.

If you filed an unsecured claim, please know you should review the documents you are sent because the Debtors may object to your claim before the Plan confirmation. In such case, your vote counts in the amount of $1.00 unless you contact the Debtors and get an agreement on an amount for voting purposes.  There are other ways to make sure your vote is counted in the event it is objected to prior to the confirmation hearing and you should consult with a lawyer to see if it makes sense for you to be concerned about your vote.

If you filed a secured claim, the Debtors have already indicated that they may object to your claim because the Debtors take the position that many, if not all, royalty claims are unsecured.  As such, you will also want to closely monitor the filings and be sure to respond to any objection to your claim.  Secured creditors do not get to vote under the Plan; they are deemed to accept the Plan.

For those who are wondering why they keep getting notice of the Chesapeake Bankruptcy, the Debtors are providing notice to royalty owners who may no longer have a lease with any of the Debtors or any issues with the Debtors.  If a party received a check from the Debtors for a certain lookback period, the party was included in the service list.  Debtors try to err on the side of caution and provide notice to anyone who may have a claim even if the leases were sold or transferred to another party. As such, just because you are getting notice of this bankruptcy does not mean you have to take any action.

[Finally, the Solicitation Package also has a form for *Notice of Non-Voting Status with Respect to Disputed Claims* which includes a provision to opt out of the third party releases in the Plan.]

---

**FORSHEY PROSTOK** LLP

777 Main Street, Suite 1550          1990 Post Oak Blvd., Suite 2400          500 Crescent Court, Suite 240
Fort Worth, Texas 76102               Houston, Texas 77056                      Dallas, Texas 75201