*SOLICITATION VERSION*

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:    mcavenaugh@jw.com
    jwertz@jw.com
    kpeguero@jw.com
    vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
    marc.kieselstein@kirkland.com
    alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  October 30, 2020

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ................................................................................................................ 1
    A.     Defined Terms. ........................................................................................................... 1
    B.     Rules of Interpretation. .............................................................................................. 16
    C.     Computation of Time. ................................................................................................ 17
    D.     Governing Law. ......................................................................................................... 17
    E.     Reference to Monetary Figures. ................................................................................ 17
    F.     Reference to the Debtors or the Reorganized Debtors. ............................................. 17
    G.     Controlling Document. ............................................................................................... 18
    H.     Consultation, Information, Notice, and Consent Rights. ........................................... 18

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS ..................................... 18
    A.     Administrative Claims. .............................................................................................. 18
    B.     DIP Claims. ............................................................................................................... 20
    C.     Priority Tax Claims. .................................................................................................. 20
    D.     Statutory Fees. ........................................................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................... 21
    A.     Classification of Claims and Interests. ...................................................................... 21
    B.     Treatment of Claims and Interests. ........................................................................... 21
    C.     Special Provision Governing Unimpaired Claims. .................................................... 24
    D.     Elimination of Vacant Classes. .................................................................................. 25
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ............................... 25
    F.     Intercompany Interests. .............................................................................................. 25
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 25
    H.     Controversy Concerning Impairment. ....................................................................... 25
    I.     Subordinated Claims and Interests. ........................................................................... 25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................................... 25
    A.     General Settlement of Claims and Interests. .............................................................. 25
    B.     Restructuring Transactions. ........................................................................................ 26
    C.     Midstream Savings Requirement. .............................................................................. 26
    D.     Reorganized Debtors. ................................................................................................. 27
    E.     Sources of Consideration for Plan Distributions. ...................................................... 27
    F.     General Unsecured Claims Recovery Reserve. ......................................................... 29
    G.     Corporate Existence. .................................................................................................. 29
    H.     Vesting of Assets in the Reorganized Debtors. ......................................................... 30
    I.     Cancellation of Existing Securities and Agreements. ................................................ 30
    J.     Corporate Action. ...................................................................................................... 31
    K.     New Organizational Documents. ............................................................................... 31
    L.     Indemnification Obligations. ..................................................................................... 32
    M.     Directors and Officers of the Reorganized Debtors. ................................................. 32
    N.     Effectuating Documents; Further Transactions. ........................................................ 33
    O.     Section 1146 Exemption. ........................................................................................... 33
    P.     Director and Officer Liability Insurance. .................................................................. 33
    Q.     Management Incentive Plan. ...................................................................................... 34
    R.     Employee Benefits. .................................................................................................... 34
    S.     Preservation of Causes of Action. ............................................................................. 34
    T.     Preservation of Royalty and Working Interests. ........................................................ 35
    U.     Resolution of Pending Litigation. ............................................................................. 35
    V.     Payment of Certain Fees. ........................................................................................... 35

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............................36
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...............................36
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ................................37
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .............................37
    D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........38
    E.    Insurance Policies. .................................................................................................38
    F.    Reservation of Rights. ............................................................................................38
    G.    Nonoccurrence of Effective Date. ..............................................................................38
    H.    Contracts and Leases Entered Into After the Petition Date. .................................................39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................39
    A.    Timing and Calculation of Amounts to Be Distributed. ....................................................39
    B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...............................39
    C.    Manner of Payment. ..............................................................................................40
    D.    Exemption from Securities Laws. ...............................................................................41
    E.    Compliance with Tax Requirements. ...........................................................................41
    F.    Allocations. ........................................................................................................42
    G.    No Postpetition or Default Interest on Claims. ...............................................................42
    H.    Foreign Currency Exchange Rate. ..............................................................................42
    I.    Setoffs and Recoupment. .........................................................................................42
    J.    No Double Payment of Claims. ..................................................................................42
    K.    Claims Paid or Payable by Third Parties. ......................................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
              DISPUTED CLAIMS ...............................................................................................43
    A.    Allowance of Claims. .............................................................................................43
    B.    Claims Administration Responsibilities. .......................................................................43
    C.    Estimation of Claims. ............................................................................................44
    D.    Adjustment to Claims or Interests without Objection. .......................................................44
    E.    Time to File Objections to Claims. .............................................................................44
    F.    Disputed and Contingent Claims Reserve. ....................................................................44
    G.    Disallowance of Claims or Interests. ...........................................................................44
    H.    No Distributions Pending Allowance. ..........................................................................45
    I.    Distributions After Allowance. ..................................................................................45
    J.    No Interest on Disputed Claims. .................................................................................45

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................45
    A.    Discharge of Claims and Termination of Interests. ...........................................................45
    **B.**    **Release of Liens.** .................................................................................................46
    **C.**    **Releases by the Debtors.** .......................................................................................46
    **D.**    **Releases by Holders of Claims and Interests.** ...............................................................47
    **E.**    **Exculpation.** .....................................................................................................48
    **F.**    **Injunction.** ......................................................................................................48
    G.    Protections Against Discriminatory Treatment. ...............................................................49
    H.    Recoupment. .......................................................................................................49
    I.    Document Retention. ..............................................................................................49
    J.    Reimbursement or Contribution. ................................................................................49

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ......................................50
    A.    Conditions Precedent to the Effective Date. ...................................................................50
    B.    Waiver of Conditions. ............................................................................................51
    C.    Effect of Failure of Conditions. .................................................................................51
    D.    Substantial Consummation .......................................................................................52

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .....................................52
    A.    Modification and Amendments. ..................................................................................52

B.      Effect of Confirmation on Modifications. .................................................................52
C.      Revocation or Withdrawal of Plan. ..........................................................................52

ARTICLE XI. RETENTION OF JURISDICTION ................................................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS .............................................................................54
A.      Immediate Binding Effect. .......................................................................................54
B.      Additional Documents. .............................................................................................54
C.      Payment of Statutory Fees. ......................................................................................55
D.      Statutory Committee and Cessation of Fee and Expense Payment. .........................55
E.      Reservation of Rights. ..............................................................................................55
F.      Successors and Assigns. ...........................................................................................55
G.      Notices. .....................................................................................................................55
H.      Term of Injunctions or Stays. ...................................................................................56
I.      Entire Agreement. .....................................................................................................56
J.      Plan Supplement. ......................................................................................................56
K.      Nonseverability of Plan Provisions. .........................................................................56
L.      Votes Solicited in Good Faith. .................................................................................57
M.      Closing of Chapter 11 Cases. ...................................................................................57
N.      Waiver or Estoppel. ..................................................................................................57
O.      Creditor Default. ......................................................................................................57

**INTRODUCTION**

Chesapeake Energy Corporation and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters. Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*1145 Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

2.      "*4(a)(2) Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Professional Claims; (c) DIP Claims; (d) Adequate Protection Super-Priority Claims (as defined in the Final DIP Order) (if any); (e) postpetition, pre-Effective Date rights to payment arising on account of Royalty and Working Interests; (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (g) as approved by the Backstop Commitment Agreement Approval Order, including the priority and payment subordination provisions described in paragraph 7 thereof, the Put Option Premium.

4.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

6.      "*Agent*" means any administrative agent, collateral agent, collateral trustee, or similar Entity under the Exit Facilities, the DIP Facility, the Revolving Credit Facility, the Collateral Trust Agreement, and/or the FLLO Term Loan Facility.

7.      "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture,

1

or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Reorganized Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.

8.        "*Alternative Securities Exchange*" means, excluding any National Securities Exchange, any other securities exchange or over-the-counter quotation system, including, without limitation, the NYSE MKT, the Nasdaq Capital Market, any quotation or other listing service provided by the OTC Markets Group or the Financial Industry Regulatory Authority, Inc., any "pink sheet" or other alternative listing service, or any successor or substantially equivalent service to any of the foregoing.

9.        "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

10.        "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11.        "*Backstop*" means the several and not joint backstop in full of the Rights Offering by the Backstop Parties pursuant to the Backstop Commitment Agreement.

12.        "*Backstop Allocations*" has the meaning set forth in Article IV.E.1 of the Plan.

13.        "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of June 28, 2020, by and between Chesapeake and the Backstop Parties, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

14.        "*Backstop Commitment Agreement Approval Order*" means the *Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 21, 2020 at CM/ECF No. 899 in the Chapter 11 Cases.

15.        "*Backstop Parties*" means the members of the FLLO Ad Hoc Group and Franklin that are signatories to the Backstop Commitment Agreement.

16.        "*Backstop Party Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $150 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

17.        "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

18.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

20.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim or Proofs of Interest must be Filed with respect to such Claims or Interests, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim or Proofs of Interest.

21.     "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

22.     "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

23.     "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

24.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

25.     "*Chesapeake*" means Chesapeake Energy Corporation or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

26.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

27.     "*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

28.     "*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

29.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

30.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

31.     "*Collateral Trust Agreement*" means that certain Collateral Trust Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee and revolver agent, and GLAS USA LLC, as original term loan agent, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

32.     "*Conditions Precedent to the Effective Date*" means the conditions precedent to the Effective Date set forth in Article IX.A of the Plan

33.     "*Conditions Precedent to the Exit Facilities*" means the conditions precedent to the closing of the Exit Facilities identified on <u>Exhibit D</u> to the Exit Facilities Term Sheet.

34.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

35.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

36.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

37.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

38.     "*Consenting DIP Lenders*" means those certain DIP Lenders that are or have become parties to the Restructuring Support Agreement.

39.     "*Consenting FLLO Term Loan Facility Lenders*" means those certain FLLO Term Loan Facility Lenders that are or have become parties to the Restructuring Support Agreement.

40.     "*Consenting Revolving Credit Facility Lenders*" means those certain Revolving Credit Facility Lenders that are or have become parties to the Restructuring Support Agreement.

41.     "*Consenting Second Lien Noteholders*" means Second Lien Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Second Lien Noteholders that are or have become parties to the Restructuring Support Agreement.

42.     "*Consenting Stakeholders*" means collectively, the Consenting DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, and the Consenting Second Lien Noteholders.

43.     "*Consenting Unsecured Noteholders*" means Unsecured Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Unsecured Noteholders that are or have become parties to the Restructuring Support Agreement.

44.     "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

45.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

46.     "*D&O Liability Insurance Policies*" means all insurance policies issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

47.     "*Definitive Documents*" means, without limitation, the following documents: (a) the Plan and its exhibits, ballots, and solicitation procedures; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the DIP Order, DIP Credit Agreement, and any and all other DIP Documents and related documentation; (h) the Backstop Commitment Agreement, Backstop Commitment Agreement Approval Order, Rights Offering Procedures, Registration Rights Agreement and any and all documentation required to implement, issue, and distribute the New Common Stock; (i) the New Warrants Agreements; (j) the Exit Facilities Documents and related documentation; (k) the Management Incentive Plan; (l) the New Organizational Documents and all other documents or agreements for the governance of Reorganized Chesapeake, including the list of directors of Reorganized Chesapeake and any certificates of incorporation and shareholders' agreements or supplements as may be reasonably necessary or advisable to implement the Restructuring Transactions; and (m) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by the Plan.

48.     "*DIP Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

49.     "*DIP Agent Fees and Expenses*" has the meaning ascribed to such term in the DIP Order.

50.     "*DIP Claims*" means all Claims derived from, based upon, or secured pursuant to the DIP Credit Agreement or DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, transaction fees, Superpriority Hedge Claims, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Facility; *provided* that any Adequate Protection Super-Priority Claims (as defined in the Final DIP Order), including such Claims granted in respect of the Revolving Credit Facility, FLLO Term Loan Facility, or Second Lien Notes authorized in the DIP Order, shall not be DIP Claims.

51.     "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated July 1, 2020, between Chesapeake Energy Corporation, as borrower, the Debtor guarantors that are party thereto, the DIP Lenders, and the DIP Agent (as may be amended, supplemented, or otherwise modified from time to time).

52.     "*DIP Documents*" means collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the DIP Credit Agreement.

53.     "*DIP Facility*" means that certain debtor-in-possession financing facility documented pursuant to the DIP Documents and DIP Order.

54.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement.

55.     "*DIP Order*" means collectively, the Interim DIP Order and the Final DIP Order.

56.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

57.     "*Disclosure Statement Order*" means an order of the Bankruptcy Court approving the Disclosure Statement, the Solicitation Materials, and the solicitation of the Plan.

58.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

59.     "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or before the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public Securities, including the Second Lien Notes and the Unsecured Notes.

60.     "*DTC*" means the Depository Trust Company.

61.     "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all Conditions Precedent to the Effective Date have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

62.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

63.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

64.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time, and the rules and regulations promulgated thereunder.

65.     "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the DIP Lenders; (d) the Exit Facilities Lenders; (e) the Consenting Revolving Credit Facility Lenders; (f) the Consenting FLLO Term Loan Facility Lenders; (g) the Consenting Second Lien Noteholders; (h) the Consenting Unsecured Noteholders; (i) the Agents; (j) each Trustee; (k) the Backstop Parties; and (l) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, participants, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

66.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

67.     "*Existing Equity Interest*" means an Interest in Chesapeake Energy Corporation existing as of the Petition Date.

68.     "*Existing RBL Adequate Protection Payments*" has the meaning ascribed to such term in the DIP Order.

69.     "*Exit Facilities*" means collectively, the Exit RBL Facility and Exit FLLO Term Loan Facility.

70.     "*Exit Facilities Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Exit Facilities.

71.     "*Exit Facilities Credit Agreements*" means those certain credit agreements that will govern the Exit Facilities (as each may be amended, supplemented, or otherwise modified from time to time), in each case which shall be consistent with the Exit Facilities Term Sheet.

72.     "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreements, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the form and substance of which shall be consistent with the Exit Facilities Term Sheet.

73.     "*Exit Facilities Lenders*" means the lenders party to the Exit Facilities Credit Agreements.

74.     "*Exit Facilities Loans*" means collectively, the Tranche A RBL Exit Facility Loans, the Tranche B RBL Exit Facility Loans, and the Exit FLLO Term Loans.

75.     "*Exit Facilities Term Sheet*" means the term sheet setting forth the material terms of the Exit Facilities, attached as <u>Exhibit 3</u> to the Restructuring Term Sheet.

76.     "*Exit FLLO Term Loan*" means term loans made under and on the terms set forth under the Exit FLLO Term Loan Facility.

77.     "*Exit FLLO Term Loan Facility*" means the term loan facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

78.     "*Exit RBL Facility*" means the revolving credit facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

79.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

80.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

81.     "*Final DIP Order*" means the *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, And (VI) Granting Related Relief* entered by the Bankruptcy Court on July 31, 2020 at CM/ECF No. 597 in the Chapter 11 Cases.

82.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

83.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

84.     "*FLLO Ad Hoc Group*" means the ad hoc group of FLLO Term Loan Facility Lenders represented by Davis Polk & Wardwell LLP.

85. "*FLLO Professionals*" means the FLLO Term Loan Facility Administrative Agent's professionals (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction) and the FLLO Ad Hoc Group's professionals (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP).

86. "*FLLO Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $382.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

87. "*FLLO Term Loan Facility*" means the facility outstanding under the FLLO Term Loan Facility Credit Agreement.

88. "*FLLO Term Loan Facility Administrative Agent*" means GLAS USA LLC, in its capacity as administrative agent for the FLLO Term Loan Facility.

89. "*FLLO Term Loan Facility Claim*" means any Claim on account of the FLLO Term Loan Facility.

90. "*FLLO Term Loan Facility Credit Agreement*" means that certain Term Loan Agreement, dated as of December 19, 2019 ((i) as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lender parties thereto, and (ii) as further amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lenders party thereto.

91. "*FLLO Term Loan Facility Lenders*" means lenders party to the FLLO Term Loan Facility Credit Agreement.

92. "*Franklin*" means Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts.

93. "*General Unsecured Claim*" means any Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, a Second Lien Notes Claim, an Unsecured Notes Claim, an Intercompany Claim, or a Section 510(b) Claim.

94. "*General Unsecured Claims Recovery Amount*" means cash in the amount of $1,000,000 in the aggregate.

95. "*General Unsecured Claims Recovery Amount Allocation*" means the *Pro Rata* share of the General Unsecured Claims Recovery Amount allocated to each Debtor for payment of General Unsecured Claims asserted against such Debtor, which allocation shall be determined by the unencumbered value (if any) of such Debtor's assets as compared to the unencumbered value of all the Debtors' assets.

96. "*General Unsecured Claims Recovery Reserve*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the General Unsecured Claims Recovery Amount.

97. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

98. "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

99.     "*Insurance Policies*" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

100.     "*Insurer*" means any company or other Entity that issued or entered into an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

101.     "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

102.     "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

103.     "*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of December 19, 2019 by and between MUFG Union Bank, N.A., as Priority Lien Agent, and the Second Lien Notes Trustee, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

104.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

105.     "*Interim DIP Order*" means the *Interim Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on June 29, 2020 at CM/ECF No. 128 in the Chapter 11 Cases.

106.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

107.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

108.     "*Management Incentive Plan*" has the meaning set forth in Article IV.Q of the Plan.

109.     "*Minimum Liquidity Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have minimum liquidity, including unrestricted cash on hand and availability under the Exit RBL Facility, of at least $500 million.

110.     "*National Securities Exchange*" means The New York Stock Exchange, The Nasdaq Global Select Market, or The Nasdaq Global Market.

111.     "*New Board*" means the board of directors of Reorganized Chesapeake that shall be appointed in accordance with the terms of the governance term sheet attached as Exhibit 6 to the Restructuring Term Sheet.  The identities of directors on the New Board shall be set forth in the Plan Supplement, to the extent known.

112.     "*New Class A Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan, the New Class B Warrants, and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.0 billion.

113.     "*New Class B Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.5 billion.

114.     "*New Class C Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $5.0 billion.

115.     "*New Common Stock*" means the single class of common stock to be issued by Reorganized Chesapeake on the Effective Date on terms acceptable to the Required Plan Sponsors.

116.     "*New Organizational Documents*" means the amended and restated or new charters, bylaws, operating agreements, or other organizational documents of Reorganized Chesapeake and the other Reorganized Debtors, as applicable and in form and substance satisfactory to the Required Plan Sponsors.

117.     "*New Warrants*" means collectively, the New Class A Warrants, the New Class B Warrants, and the New Class C Warrants.

118.     "*New Warrants Agreements*" means the documents or agreements governing the New Warrants, Filed with the Plan Supplement, which will be consistent in all material respects with the terms of this Plan and shall at all times be in form and substance reasonably acceptable to the Required Plan Sponsors and the Consenting Second Lien Noteholders holding at least 66.67% of the aggregate outstanding principal amount of the Second Lien Notes Claims that are held by the Consenting Second Lien Noteholders.

119.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

120.     "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, or a Second Lien Notes Claim.

121.     "*PDP PV-10 Ratio*" means the ratio of (a) the total present value of the future net revenues expected with respect to the oil and gas properties of the Debtors discounted at 10% per annum, calculated in accordance with the Exit Facilities Term Sheet to (b) consolidated indebtedness under the Exit Credit Facilities and any other secured debt of Chesapeake as of the closing date of the Exit Credit Facilities.

122.     "*PDP PV-10 Test Ratio Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have a PDP PV-10 Ratio no less than 1.5x.

123.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

124.     "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

125.     "*Plan Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

126.     "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior on or before November 23, 2020, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) a summary of the material terms of the Exit Facilities, which may include the Exit Facilities Term Sheet; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) the Registration Rights Agreement.

127.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

128.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

129.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

130.     "*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

131.     "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.A.2(c) of the Plan.

132.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

133.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Administrative Claims Bar Date, as applicable.

134.     "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

135.     "*Put Option Premium*" means a nonrefundable aggregate fee of $60 million, which represents 10 percent of the Rights Offering Amount, payable to the Backstop Parties in accordance with, and subject to the terms of, the Backstop Commitment Agreement based on their respective Backstop commitment percentages at the time such payment is made.

136.     "*Registration Rights Agreement*" means the registration rights agreement pursuant to which each Backstop Party shall be entitled to registration rights with respect to its shares of New Common Stock, its New Warrants, and its shares of New Common Stock underlying its New Warrants to be entered into as of the Effective Date.  The Registration Rights Agreement will provide (among other provisions) that, after the Effective Date, at any time Reorganized Chesapeake is not required to file public reports with the SEC, Reorganized Chesapeake shall continue to file such public reports on EDGAR as a voluntary filer, unless approved by the holders of a majority of the outstanding New Common Stock.

137.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

138.     "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Stakeholders.

139.     "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

140.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

141.     "*Removal Deadline*" means the deadline by which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, as amended by the Removal Extension Order.

142.     "*Removal Extension Order*" means the *Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* entered by the Bankruptcy Court on September 25, 2020 at CM/ECF No. 1231 in the Chapter 11 Cases.

143.     "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

144.     "*Reorganized Chesapeake*" means the new entity which shall be incorporated in the State of Delaware and will be the successor or assign to Chesapeake, by merger, consolidation, or otherwise, on or after the Effective Date.

145. "*Required Consenting DIP Lenders*" means Consenting DIP Lenders holding at least 51% of the aggregate Revolving DIP Loan Commitments under the DIP Facility that are held by Consenting DIP Lenders.

146. "*Required Consenting Revolving Credit Facility Lenders*" means Consenting Revolving Credit Facility Lenders holding at least 51% of the aggregate outstanding principal amount of the Revolving Credit Facility Claims that are held by Consenting Revolving Credit Facility Lenders.

147. "*Required Consenting Stakeholders*" means the Required Consenting DIP Lenders, the Required Consenting Revolving Credit Facility Lenders, and the Required Plan Sponsors.

148. "*Required Plan Sponsors*" means the Backstop Parties holding FLLO Term Loan Facility Claims and commitments to Backstop the Rights Offering such that the Required Plan Sponsors Percentage exceeds 66 2/3 percent.

149. "*Required Plan Sponsors Percentage*" means a fraction, expressed as a percentage, (a) the numerator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by the relevant Backstop Parties and (ii) the percentage of the Backstop ascribed to the relevant Backstop Parties (as set forth in the Backstop Commitment Agreement) multiplied by the Rights Offering Amount; and (b) the denominator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by all of the Backstop Parties and (ii) the Rights Offering Amount.

150. "*Restructuring Expenses*" means any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by the FLLO Professionals and the Second Lien Professionals payable on the Effective Date, subject to the conditions set forth in Article IV.V of the Plan; *provided* that reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

151. "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of June 28, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

152. "*Restructuring Term Sheet*" means the term sheet setting forth the material terms of the Restructuring Transactions, attached as Exhibit B to the Restructuring Support Agreement.

153. "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

154. "*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Stakeholders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions.

155. "*Revolving Credit Facility*" means the facility outstanding under the Revolving Credit Facility Credit Agreement.

156. "*Revolving Credit Facility Administrative Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Revolving Credit Facility.

157. "*Revolving Credit Facility Claim*" means any Claim on account of the Revolving Credit Facility, other than any Claims converted to Roll-Up Loans (as defined in the Final DIP Order).

158. "*Revolving Credit Facility Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the Revolving Credit Facility Administrative Agent, and the other lender, issuer, and agent parties party thereto.

159. "*Revolving Credit Facility Lenders*" means the lenders party to the Revolving Credit Facility Credit Agreement.

160. "*Revolving DIP Loan Commitment*" means a commitment to provide revolving loans under the DIP Facility.

161. "*Rights*" means collectively, the FLLO Rights, the Second Lien Rights, and the Backstop Party Rights.

162. "*Rights Offering*" means the New Common Stock rights offering for the Rights Offering Amount to be consummated by the Debtors on the Effective Date in accordance with the Rights Offering Procedures.

163. "*Rights Offering Amount*" means a minimum of $600 million in aggregate amount of Rights.

164. "*Rights Offering Participants*" means (a) holders of FLLO Term Loan Facility Claims and Second Lien Notes Claims as of the Rights Offering Record Date and (b) the Backstop Parties.

165. "*Rights Offering Procedures*" means the procedures governing the Rights Offering attached as an exhibit to the Disclosure Statement Order.

166. "*Rights Offering Record Date*" means the record date set by the Rights Offering Procedures, as of which date an Entity must be a record holder of FLLO Term Loan Facility Claims or Second Lien Notes Claims in order to be eligible to be a Rights Offering Participant.

167. "*Royalty and Working Interests*" means the working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests, including but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, unleased mineral interests, and production payments.

168. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

169. "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

170. "*SEC*" means the United States Securities and Exchange Commission.

171. "*Second Lien Noteholders*" means holders of notes issued under the Second Lien Notes Indenture.

172. "*Second Lien Notes*" means the 11.500% senior notes due 2025 issued by Chesapeake pursuant to the Second Lien Notes Indenture.

173. "*Second Lien Notes Claim*" means any Claim on account of the Second Lien Notes.

174. "*Second Lien Notes Indenture*" means that certain indenture dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtors guarantors party thereto, and the Second Lien Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

175. "*Second Lien Notes Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee and collateral trustee for the Second Lien Notes Indenture.

176.     "*Second Lien Professionals*" means the Second Lien Collateral Trustee's professionals (including Morgan, Lewis & Bockius LLP, one local counsel in the relevant jurisdiction, and one financial advisor) and Franklin's professionals (including Akin Gump Strauss Hauer & Feld LLP, Moelis & Company LLC, one local counsel in each other relevant local jurisdiction, and FTI Consulting, Inc.).

177.     "*Second Lien Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $67.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

178.     "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

179.     "*Secured*" means, when referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

180.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

181.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

182.     "*Solicitation Materials*" means the Disclosure Statement and related documentation to be distributed to holders of Claims entitled to vote on the Plan.

183.     "*Superpriority Hedge Claims*" means superpriority claims in respect of the Debtors' Superpriority Hedge Obligations.

184.     "*Superpriority Hedge Obligations*" means all hedging obligations with respect to commodity hedge transactions that are secured under the DIP Facility.

185.     "*Total Leverage*" means the ratio of (a) consolidated indebtedness net of unrestricted Cash and Cash equivalents held in a pledged account in an amount not to exceed $100 million to (b) consolidated EBITDAX calculated in accordance with the terms set forth in the Exit Facilities Term Sheet.

186.     "*Total Leverage Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have Total Leverage no greater than 2.25:1.00.

187.     "*Tranche A RBL Exit Facility Loans*" means fully revolving loans made under and on the terms set forth under the Exit RBL Facility which will be partially funded on the Effective Date, will have a scheduled maturity of 3 years from the Effective Date, and shall at all times be repaid prior to the repayment of Tranche B Exit RBL Facility Loans.

188.     "*Tranche B RBL Exit Facility Loans*" means term loans made under and on the terms set forth under the Exit RBL Facility which will be fully funded on the Effective Date, will have a scheduled maturity of 4 years from the Effective Date, will be repaid or prepaid only after there are no Tranche A RBL Exit Facility Loans outstanding, and once so prepaid or repaid, may not be reborrowed.

189.     "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Second Lien Notes or the Unsecured Notes.

190.     "*Turnover Provisions*" has the meaning set forth in Article IV.A of the Plan.

191. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

192. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

193. "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

194. "*Unsecured Noteholders*" means holders of notes issued under the Unsecured Notes Indentures.

195. "*Unsecured Notes*" means the 6.625% senior notes due 2020, the 6.875% senior notes due 2020, the 6.125% senior notes due 2021, the 5.375% senior notes due 2021, the 4.875% senior notes due 2022, the 5.750% senior notes due 2023, the 7.000% senior notes due 2024, the 8.000% senior notes due 2025, the 8.000% senior notes due 2026, the 7.500% senior notes due 2026, the 8.000% senior notes due 2027, the 5.500% convertible senior notes due 2026, and the 6.875% senior notes due 2025, all issued by certain Debtors pursuant to the Unsecured Notes Indentures.

196. "*Unsecured Notes Claim*" means any Claim on account of the Unsecured Notes.

197. "*Unsecured Notes Claims Recovery*" means 12% of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants).

198. "*Unsecured Notes Indentures*" means those certain indentures dated as of the following dates: August 2, 2010 (6.625% senior notes due 2020); November 8, 2005 (6.875% senior notes due 2020); February 11, 2011 (6.125% senior notes due 2021); April 1, 2013 (5.375% senior notes due 2021); April 24, 2014 (4.875% senior notes due 2022); April 1, 2013 (5.750% senior notes due 2023); September 27, 2018 (7.000% senior notes due 2024); December 20, 2016 (8.000% senior notes due 2025); April 3, 2019 (8.000% senior notes due 2026); September 27, 2018 (7.500% senior notes due 2026); June 6, 2017 (8.000% senior notes due 2027); October 5, 2016 (5.500% convertible senior notes due 2026); and February 1, 2017 (6.875% senior notes due 2025), each by and among certain of the Debtors and the Unsecured Notes Trustees, as may be amended, supplemented, or otherwise modified from time to time.

199. "*Unsecured Notes Trustees*" means the following entities, each in its capacity as trustee for the Unsecured Notes Indentures:  The Bank of New York Trust Company, N.A. (6.625% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.875% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.125% senior notes due 2021); Wilmington Savings Fund Society, FSB (5.375% senior notes due 2021); Wilmington Savings Fund Society, FSB (4.875% senior notes due 2022); Wilmington Savings Fund Society, FSB (5.750% senior notes due 2023); Wilmington Savings Fund Society, FSB (7.000% senior notes due 2024); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2025); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2026); Wilmington Savings Fund Society, FSB (7.500% senior notes due 2026); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2027); Wilmington Savings Fund Society, FSB (5.500% convertible senior notes due 2026); and U.S. Bank National Association (6.875% senior notes due 2025).

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as

applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15)  references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; *provided* that nothing in this clause (2) or clause (3) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.

H.    *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as set forth in the Restructuring Support Agreement (including the exhibits thereto), with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent, DIP Lenders, Revolving Credit Facility Administrative Agent, Revolving Credit Facility Lenders, Exit Facilities Agent, and Exit Facilities Lenders as set forth in the DIP Documents, DIP Order, and Exit Facilities Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein. Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

1.    <u>General Administrative Claims</u>.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this <u>Article II.A</u> of the Plan, and except with respect to Administrative Claims that are Professional Claims, or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the Administrative Claims Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Agent under the Collateral Trust Agreement shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments. The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

2.      <u>Professional Compensation</u>.

(a)      Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

(b)      Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(c)      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.      DIP Claims.

For the avoidance of doubt, the DIP Claims are Allowed in full in accordance with the DIP Order.  Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (1) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (2) the proceeds of the Rights Offering; and (3) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Allowed Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims. For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order.  The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with this Article II.B, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.      Statutory Fees.

All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. <u>Class 1 – Other Secured Claims</u>.

    (a)    *Classification*:  Class 1 consists of all Other Secured Claims.

    (b)    *Treatment*: On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders:

        (i)    payment in full in Cash;

        (ii)    the collateral securing its Allowed Other Secured Claim;

        (iii)    Reinstatement of its Allowed Other Secured Claim; or

        (iv)    such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 – Other Priority Claims</u>.

    (a)    *Classification*:  Class 2 consists of all Other Priority Claims.

    (b)    *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

    (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – Revolving Credit Facility Claims</u>.

    (a)    *Classification*:  Class 3 consists of all Revolving Credit Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility.  On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive,  in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash as set forth in Section II.A.1 of the Plan.

    (c)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Revolving Credit Facility Claims are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – FLLO Term Loan Facility Claims</u>.

   (a) *Classification*:  Class 4 consists of all FLLO Term Loan Facility Claims.

   (b) *Treatment*:  On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, the make whole amount, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility.  On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

   (c) *Voting*:  Class 4 is Impaired under the Plan.  Holders of FLLO Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Second Lien Notes Claims</u>.

   (a) *Classification*:  Class 5 consists of all Second Lien Notes Claims.

   (b) *Treatment*:  On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest.  Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

   (c) *Voting*:  Class 5 is Impaired under the Plan.  Holders of Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 6 – Unsecured Notes Claims</u>.

   (a) *Classification*:  Class 6 consists of all Unsecured Notes Claims.

   (b) *Treatment*:  On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of (i) the Unsecured Notes Claims Recovery and (ii) 50 percent of the New Class C Warrants.

   (c) *Voting*:  Class 6 is Impaired under the Plan.  Holders of Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 7 – General Unsecured Claims</u>.

   (a) *Classification*:  Class 7 consists of all General Unsecured Claims.

   (b) *Treatment*:  On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the General Unsecured Claims Recovery Amount allocable to the Debtor against which such Claim is asserted.

(c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Intercompany Claims</u>.

(a)    *Classification*:  Class 11 consists of all Intercompany Claims.

(b)    *Treatment*:  On the Effective Date, unless otherwise provided for under the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall have its Claim:

(i)    Reinstated; or

(ii)    distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distribution shall be made on account of any such Intercompany Claims.

(c)    *Voting*:   Class 8 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 8 is not entitled to vote to accept or reject the Plan.

9.    <u>Class 9 – Intercompany Interests</u>.

(a)    *Classification*:  Class 9 consists of all Intercompany Interests.

(b)    *Treatment*:  On the Effective Date, each holder of Intercompany Interests shall have such Interest:

(i)    Reinstated; or

(ii)    canceled, released, and extinguished without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders.

(c)    *Voting*:   Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10.    <u>Class 10 – Existing Equity Interests</u>.

(a)    *Classification*:  Class 10 consists of all Existing Equity Interests.

(b)    *Treatment*:  On the Effective Date, each holder of Existing Equity Interests shall have such Interest cancelled, released, and extinguished without any distribution.

(c)    *Voting*:   Class 10 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.       *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.       *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.       *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.       *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right, subject to the prior consent of the Required Consenting Stakeholders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.       *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.       *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.       *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving

Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions").  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Midstream Savings Requirement.*

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and

the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

D.     *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

E.     *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D below.

1.     Rights Offering.

The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights; (b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights.  Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount.  Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and

restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order. For the avoidance of doubt, if the Put Option Premium is payable in Cash pursuant to the terms and conditions set forth in the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order, the Put Option Premium shall be a superpriority administrative expense with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code except it shall be unsecured and (i) be subordinated in priority to (a) the DIP Claims and (b) any adequate protection granted on account of the Revolving Credit Facility Claims (and any Claims to which such Claims in (a) or (b) are subordinate); and (ii) payable only after all such Claims set forth in clause (i) have been paid in full in Cash or provided such other treatment as is agreed to by the  requisite parties, as set forth in section 3.1 of the Backstop Commitment Agreement.

All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

2.    Rights and New Common Stock.

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B.  Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents.  Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock.  All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

3.    New Warrants.

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B this Plan.  Issuances of the New Warrants shall be governed by the terms and conditions set

forth in this Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

    4.   <u>Exit Facilities</u>.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents. The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

*F.*   *General Unsecured Claims Recovery Reserve.*

On the Effective Date, the Reorganized Debtors shall establish and fund the General Unsecured Claims Recovery Reserve with Cash in an amount equal to the General Unsecured Claims Recovery Amount. The General Unsecured Claims Recovery Reserve shall be maintained in trust solely for holders of Allowed General Unsecured Claims. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. Allowed General Unsecured Claims shall be paid in accordance with Article V1.A of the Plan.

*G.*   *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation,

limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise provided in this Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to this Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, to the extent cancelled pursuant to this Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, this Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification,

contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

Except as provided in this Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable. To the extent cancelled in accordance with this Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to extend any further or future credit or financial accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

J.    *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.    *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state. The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such

provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents. The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.      *Management Incentive Plan.*

On the Plan Effective Date, the Reorganized Debtors shall adopt a management incentive plan (the "<u>Management Incentive Plan</u>").  All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

R.      *Employee Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.  On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee.  Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the

objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

T.      *Preservation of Royalty and Working Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any prepetition or post-petition but pre-Effective Date right to payment arising from a Royalty and Working Interest asserted by a non-Debtor as a prepetition Claim or Administrative Claim, respectively, if any, shall be treated as a Claim under this Plan and shall be subject to any discharge and/or release provided in the Plan without prejudice to any rights to assert a Claim or dispute which may arise post-Effective Date on account of or relating to an unexpired or unterminated Royalty and Working Interest.

U.      *Resolution of Pending Litigation.*

The Debtors may remove to the Bankruptcy Court by the Removal Deadline any litigation pending as of the Petition Date that alleges claims or causes of action that, if successful, would not result in a Claim. Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; *provided* that any Claim resulting from a final judgment in any such litigation shall be treated in accordance with the Plan.

V.      *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in this Article IV.V of the Plan. The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the

Plan, whether incurred before, on, or after the Effective Date. For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens. Notwithstanding anything in the Plan, including Article IV.I hereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right, with the consent of the Required Consenting Stakeholders, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Stakeholders, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Leases Schedule in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, any Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, the Restructuring Term Sheet, any Bar Date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):

(1) on the Effective Date the Reorganized Debtors shall be deemed to have assumed all unexpired Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (2) all unexpired Insurance Policies shall re-vest in the Reorganized Debtors, unaltered, other than that on and after the Effective Date, the Reorganized Debtors shall be liable for all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) under the Insurance Policies, regardless of when such debts, obligations, and liabilities arise, without the need or requirement for any Insurer to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount, and thereafter the Reorganized Debtors may, subject to the terms of the Insurance Policies and applicable non-bankruptcy law, resolve any Claims covered by the Insurance Policies, resolve any Causes of Action, if any, in connection with the Insurance Policies, and collect any and all outstanding deposits, restricted cash, and letters of credit, if any, related thereto; (3) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Policies; and (4) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Interests in the applicable Class.

With respect to holders of Allowed General Unsecured Claims, each such holder shall receive from the General Unsecured Claims Recovery Reserve (1) an initial Cash distribution on the Effective Date or as soon as reasonably practicable thereafter (or if a General Unsecured Claim is not an Allowed General Unsecured Claim on the Effective Date, on the date that such General Unsecured Claim becomes an Allowed General Unsecured Claim or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Cash in the General Unsecured Claims Recovery Reserve allocable to the Debtor against which such General Unsecured Claim is Allowed.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security or FLLO Term Loan Facility Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, with respect to distributions on account of FLLO Term Loan Facility Claims, the Required Plan Sponsors.

3.    <u>Minimum Distributions</u>.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment therefor; *provided, however*, that fractional shares rounding determination with respect to the Rights Offering shall be subject to the Rights Offering Procedures.  The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.    <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

5.    <u>Surrender of Canceled Instruments or Securities</u>.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

6.    <u>Delivery of Distributions on Second Lien Notes Claims and Unsecured Notes Claims</u>.

The Debtors shall make all distributions required under the Plan.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of Second Lien Notes Claims and Unsecured Notes Claims shall be made to or at the direction of each of the Trustees for distribution under the applicable indentures and bond agreements.  The Trustees may transfer or direct the transfer of such distributions directly through the facilities of the applicable securities depository and clearing house and will be entitled to recognize and deal with, for all purposes under the Plan, holders of Second Lien Notes Claims and Unsecured Notes Claims, as applicable, as is consistent with the ordinary practices of the applicable depositories.  Such distributions shall be subject to the right of each of the Trustees under the applicable indenture or bond agreements, including their rights to assert and exercise charging liens against such distributions.

C.    *Manner of Payment.*

Except as otherwise set forth herein, all distributions of Cash, the New Common Stock, the New Warrants, and the Rights, as applicable, to Holders of Allowed Claims under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable.  At the option of the Reorganized Debtors (in consultation with and subject to the reasonable consent of the Required Consenting Stakeholders), any Cash payment to be made under the Plan, if any, may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

D.      *Exemption from Securities Laws*.

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the 1145 Securities are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  Each of the 1145 Securities (1) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (2) is freely tradable and transferable by any initial recipient thereof that at the time of transfer or as a result thereof, is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock (including any shares issuable as part of the Put Option Premium or issuable upon exercise of the Rights other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) or the New Warrants (and any Shares of the New Common Stock issuable upon the exercise of the New Warrants) through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to such treatment under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Each Backstop Party that receives Plan Securities will be entitled to registration rights and sale support rights with respect to all such Securities to be documented in the Registration Rights Agreement in form and substance satisfactory to the Required Plan Sponsors.

E.      *Compliance with Tax Requirements*.

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

F.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

G.      *No Postpetition or Default Interest on Claims.*

Notwithstanding any provision in the Plan, the Confirmation Order, or any documents that govern the Debtors' prepetition funded indebtedness or other Claims to the contrary, except as provided in the DIP Order, DIP Credit Agreement, and Articles II.B, III.B.3 and III.B.4 hereof, (a) postpetition and/or default interest shall not accrue or be paid on any Claims; and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan and the DIP Order, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.  Notwithstanding anything to the contrary herein, the Allowed DIP Claims, the Allowed Revolving Credit Facility Claims, the Allowed FLLO Term Loan Facility Claims, the Allowed Second Lien Notes Claims, or the Allowed Unsecured Notes Claims and the Plan distributions to be made on account of such Claims shall not be subject to set off and/or recoupment by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors and the Reorganized Debtors hereby waive any and all rights of set off or recoupment against such Claims.

J.      *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

K.      *Claims Paid or Payable by Third Parties.*

        1.      <u>Claims Paid by Third Parties</u>.

        The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.      <u>Claims Payable by Third Parties</u>.

        No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction of such Claim, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      <u>Applicability of Insurance Policies</u>.

        Except as otherwise provided in the Plan, payments to holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims.*

        After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities.*

        Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) one-hundred-eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the General Unsecured Claims Recovery Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts set forth in the Plan (in the case of the General Unsecured Claims Recovery Reserve) or as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

G.      *Disallowance of Claims or Interests.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and

all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of the Claim or Interest is Allowed.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

J.      *No Interest on Disputed Claims.*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.      *Release of Liens.*

Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided*, *further*, that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.      *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan

Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

### D.  Releases by Holders of Claims and Interests.

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other

related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or

may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Recoupment.*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

I.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of

the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A. *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1. the Confirmation Order shall have become a Final Order and be in form and substance acceptable to the Required Consenting Stakeholders and shall:

    (a) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    (b) decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

    (c) authorize the Debtors or the Reorganized Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering and Exit Facilities; (b) appoint the directors and officers for the Reorganized Debtors; (c) issue and distribute the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (d) issue and distribute the Rights and subsequently issue and distribute New Common Stock issuable upon exercise of such; (e) execute and deliver the Registration Rights Agreement; (f) execute and deliver the New Warrants Agreements and issue and distribute the New Warrants; (g) enter into the Exit Facilities Documents; (h) take all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (i) approve and adopt the New Organizational Documents; (j) adopt the Management Incentive Plan; (k)  reject, assume, or assume and assign, as applicable, Executory Contracts and Unexpired Leases; and (l) complete all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

    (d) authorize the implementation of the Plan in accordance with its terms;

    (e) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

    (f) contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the Plan and the applicable documents included in the Plan Supplement, including any schedules, documents, and exhibits contained therein, shall have been Filed and shall be in form and substance

reasonably acceptable to the Debtors and the Required Consenting Stakeholders in accordance with the consent rights contained in the Restructuring Support Agreement;

4. the Restructuring Support Agreement shall remain in full force and effect;

5. the Final Order approving the DIP Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

6. the Backstop Commitment Agreement Approval Order and Backstop Commitment Agreement shall have been entered and remain in full force and effect;

7. all Allowed Professional Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Claims by the Bankruptcy Court, all fees and expenses payable pursuant to Article IV.V shall have been paid in full, and all fees and expenses of the DIP Agent, Revolving Credit Facility Administrative Agent, and the Agent under the Collateral Trust Agreement payable pursuant to the DIP Order shall have been paid in full;

8. the payments required to be made pursuant to the terms of Article IV.V of the Plan shall have been paid;

9. the New Organizational Documents with respect to the Reorganized Debtors shall be in full force and effect and be in form and substance reasonably acceptable to the Required Consenting Stakeholders;

10. the Exit Facilities Documents shall be in full force and effect (with the Conditions Precedent to the Exit Facilities having been met, satisfied, or waived) and, subject to any post-closing execution and delivery requirements provided for in the Exit Facilities Documents, be in form and substance acceptable to the Required Consenting Stakeholders (such approval not to be withheld in bad faith; *provided* that the terms set forth in the Exit Facilities Term Sheet shall be deemed acceptable to the Required Consenting Stakeholders); and

11. The Minimum Liquidity Condition, the Total Leverage Condition, and the PDP PV-10 Test Ratio Condition shall have been met, satisfied, or waived.

For the avoidance of doubt, if the Minimum Liquidity Condition, the Total Leverage Condition, and/or the PDP PV-10 Test Ratio Condition would not otherwise be satisfied, the Required Plan Sponsors may agree, in their sole discretion, to increase the Rights Offering amount above $600 million on the same terms, including the Rights Offering Value and with an allocation consistent with the Backstop Allocations, in order to enable such conditions to be satisfied; *provided* that no Backstop Party's Backstop Commitment may be increased without its consent.

*B.      Waiver of Conditions.*

Any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (with the exception of the condition precedent specified in Section IX.A.4, not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

*C.      Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an

51

admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, upon prior notice to and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and with the consent of the Required Consenting Stakeholders, not resolicit votes on such modified Plan.   Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, upon prior notice to and with the consent of the Required Consenting Stakeholders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, and including any settlement, waiver, or release of any rights of the Revolving Credit Facility Lenders under the Intercreditor Agreement or the Collateral Trust Agreement), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any

Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.    enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15.     enter an order concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the obligations or terms of the Rights Offering and the Backstop Commitment Agreement;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

23.     enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Chesapeake Energy Corporation<br>6100 North Western Avenue<br>Oklahoma, Oklahoma 73118<br>Attention:  James R. Webb | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Patrick J. Nash, Jr., P.C., Marc Kieselstein, P.C., and Alexandra Schwarzman<br><br>and<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention:  Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, and Veronica A. Polnick |

| United States Trustee | Counsel to the Consenting DIP Lenders |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard |
| **Counsel to the Consenting Revolving Credit Facility Lenders** | **Counsel to the FLLO Ad Hoc Group** |
| Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention:  Damian S. Schaible, Darren S. Klein, and Aryeh Ethan Falk |
| **Counsel to Franklin** | |
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, New York 10036<br>Attention:  Michael S. Stamer, Meredith A. Lahaie, and Stephen B. Kuhn | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H. *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I. *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/chesapeake or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).

K. *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or

provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Chesapeake, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Chesapeake; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of Chesapeake has been closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Chesapeake in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated:  October 30, 2020                    CHESAPEAKE ENERGY CORPORATION

                                            on behalf of itself and all other Debtors


                                            /s/  Domenic J. Dell'Osso, Jr.
                                            Domenic J. Dell'Osso, Jr.
                                            Executive Vice President and Chief Financial Officer