IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 20-33233 (DRJ) |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et. al.*, | § § | Jointly Administered |
| | § | Chapter 11 |
| Debtors. | § § | |

### OBJECTION OF JUSTIN COBB, KRISTINE COBB, AND LINDA MILANOVICH TO CONFIRMATION OF CHAPTER 11 PLAN

TO THE HONORABLE DAVID R. JONES, CHIEF U.S. BANKRUPTCY JUDGE:

COME NOW Justin Cobb, individually and as next friend of M.C. and R.C., minors, Kristine Cobb, individually and as next friend of K.C. and M.C., minors, and Linda Milanovich (collectively, the "Tort Creditors"), creditors in the above styled and numbered jointly administered Chapter 11 case of Chesapeake Energy Corporation and its affiliated debtors and debtors-in-possession (the "Debtors"), and file this their *Objection to Confirmation of Chapter 11 Plan* (the "Objection"), objecting to the confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [docket no. 1599] (the "Plan"), respectfully stating as follows:

### I.   SUMMARY

1.   The Tort Creditors' claims arise from serious personal injuries and wrongful death stemming from a fatal well blowout in January, 2020. Linda Milanovich lost a son; Justin Cobb, 33 at the time, was horrifically burned over most of his body, suffered two cardiac arrests, experienced heart, lung, and renal failure, has had dozens of surgeries to-date, and will have at least twenty (20) more surgeries in the future; while Kristine Cobb now cares for her invalid husband and their four (4) children, all of whom relive the horrors and pains of that day on a daily basis. While there are larger contract creditors with hundreds of millions in claims, those creditors

went into business with the Debtors aware of the risk of default. The Tort Creditors, on the other hand, never anticipated the catastrophic loss and suffering that has permanently and fundamentally altered their lives. The Tort Creditors do not wish to impede the Debtors' reorganization. By the same token, the Tort Creditors expect that the Debtors avoid unnecessarily impeding the progression of their claims.

2.  The Tort Creditors simply request (and expect) that any plan proposed by the Debtors preserve their rights to a full and complete recovery from any available insurer and insurance policy, as well as any claims against the Debtors. The Plan, as currently written, however, selectively jeopardizes the Tort Creditors' claims without providing any corresponding benefit to the Debtors or to other creditors. The Tort Creditors, therefore, object to the Plan because: (i) it improperly and unfairly discriminates against them in violation of 11 U.S.C. § 1123(a)(4); (ii) the Plan provides them with an illusory recovery by requiring them to exhaust rights against insurance policies before they may recover against the Debtors; (iii) the Plan improperly classifies their claims in violation of 11 U.S.C. § 1122, while other general unsecured creditors are able to recover a substantially larger percentage of their claims; (iv) the Plan contains an injunction that potentially prevents the Tort Creditors from proving and liquidating their claims in state court, irrespective of the fact that this Court lacks jurisdiction to do so; (v) the Plan does not satisfy the best interests test of 11 U.S.C. § 1129(a)(7)(A)(ii) and improperly releases valuable avoidance actions; and (vi) the Plan violates the absolutely priority rule by retaining equity without full payment.

## II.  TORT CREDITORS' CLAIMS

3.  Each of the Tort Creditors has filed unliquidated, unsecured proofs of claim against Chesapeake Energy Corporation and against Chesapeake Operating, LLC, both on their own behalf and, where stated, on behalf of their children: (i) Justin Cobb filed proof of claim number

1124 against Chesapeake Energy Corporation and claim number 11250 against; (ii) Kristine Cobb filed claim number 11251 and claim number 11252, respectively; and (iii) Linda Milanovich filed claim number 11247 and claim number 11248, respectively. While each of these claims are filed in unknown amounts, it is fair to estimate the claims, collectively, as seeking hundreds of millions of dollars in actual, compensatory, and other damage, resulting from the death and horrific injuries suffered as a result of the blowout.

4. Prior to the Petition Date, the Tort Creditors filed their *Original Petition and Request for Disclosure* with the 116th Judicial District Court for Dallas County, Texas (the "State Court") on May 18, 2020, thereby initiating Case Number DC-20-06977 (the "State Court Action"). Other plaintiffs with claims arising from the explosion have also filed separate state court actions against the Debtors and others. Some of these plaintiffs filed suit in Duval County, Harris County, and Dallas County. Subsequently, the Harris and Duval County suits were non-suited and refiled in Dallas County, where approximately nine actions remain pending before six judges. In an effort to coordinate and consolidate the various state court cases, minimize expenses and costs, and promote efficiency, the Debtors and other plaintiffs jointly filed a motion with the Supreme Court of Texas Judicial Panel on Multidistrict Litigation, in proceeding No. 20-0286 (the "MDL Proceeding"), seeking to transfer all nine actions, including the State Court Action, to one pretrial court for pretrial proceedings. The foregoing proceedings were automatically stayed upon the petition date.

5. On October 19, 2020, the Tort Creditors filed a motion for relief from the automatic stay in order to permit the State Court Action to proceed to judgment and finality, but not as to any recovery as against the Debtors and their estates. *See* Docket No. 1448. The Tort Creditors believed that the Debtors would not contest this relief, since it is obvious that this Court lacks jurisdiction to liquidate their claims and that some court must liquidate those claims for the benefit

of all involved, meaning that the liquidation of their claims would proceed outside of the bankruptcy process and that the Plan was therefore not of significant concern to them. However, the Debtors have indicated that they will object to a lifting of the automatic stay and will force a contested hearing on that motion. Since the Court may well deny that motion, this means that the Tort Creditors now find themselves forced to object to the Plan because, at least for now, it appears that the liquidation and payment of their claims may be subject to the Plan.

6.   The Plan places all of the Tort Creditors' claims in Class 7. Prior to or concurrently herewith, each of the Tort Creditors has voted to reject the Plan and to opt out of the Plan's releases.

### III.   OBJECTIONS

**A.   THE PLAN VIOLATES 11 U.S.C. § 1123(A)(4)**

7.   Section VI.K.2 of the Plan provides as follows, under the heading "Claims Payable by Third Parties":

> No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction of such Claim, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Plan at p. 43 (VI.K.2).

8.   Under the Bankruptcy Code, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The Tort Creditors are classified as general unsecured creditors in Class 7, yet, unlike contract and other general unsecured creditors also in that class, the Tort Creditors cannot share in any distribution otherwise provided to their class without first "exhaust[ing] all remedies" with respect to the

Debtors' insurance policies. Notwithstanding the issues with a disputed claim reserve, arbitrarily requiring the Tort Creditors to clear these unnecessary hurdles violates section 1123(a)(4). *See, e.g., Computer Task Group Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 185 (B.A.P. 9th Cir. 2003) (holding that plan violated section 1123(a)(4) where it required creditor to await the conclusion of certain litigation while other creditors enjoined immediate payments).

9.  The elements of equitable marshalling are: "(1) the contesting claimants both have secured claims against a common debtor; (2) the assets or funds subject to marshaling belong solely to the common debtor; and (3) one of the lienholders, alone, has the right to resort to more than one fund or asset of the debtor." *In re San Jacinto Glass Industries Inc.*, 93 B.R. 934, 937 (Bankr. S.D. Tex. 1988). *Accord In re Mid-West Motors Inc.*, 82 B.R. 439, 442 (Bankr. N.D. Tex. 1988). The Debtors are likely to rely on this doctrine to support section VI.K.2 of the Plan. First, equitable marshalling, to the extent applicable, cannot override the clear dictate of section 1123(a)(4) of the Plan. And, if equitable marshalling applies, the Tort Creditors have differing legal rights from general unsecured creditors and the Plan cannot be confirmed because it improperly similarly classifies dissimilar claims. *See* 11 U.S.C. § 1122(a). Second, "the equitable doctrine of marshalling rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. United States*, 375 U.S. 233, 236 (1963). Therefore, equitable marshalling cannot apply because the only creditors at issue are unsecured creditors. *See In re San Jacinto Glass Industries Inc.*, 93 B.R. at 938 (denying marshalling when requested by unsecured creditor). Furthermore:

> For the marshaling doctrine to apply, the parties must be creditors of the same debtor and both funds must belong to one debtor. The doctrine cannot be invoked if it delays or inconveniences the paramount creditor in collection of a debt, prejudices him in any manner, or if the properties are insufficient to satisfy the paramount lien. The doctrine can only be invoked where the paramount creditor's

> right to resort to both funds is clear and the remedies available for reaching the funds are reasonably prompt and efficient. The basis of the rule of marshaling is that a person who may by law control application of two or more funds cannot use his legal advantage to exclude the demand of a fellow creditor whose legal recourse is to only one of them. The doctrine of marshaling rests on equitable principles alone and may not be invoked in favor of one whose equities are inferior to those of the other party.

*In re Mid-West Motors Inc.*, 82 B.R. at 442-43.

10. Perhaps most importantly, Texas is not a direct-action state. "In Texas . . . an injured party cannot sue the tortfeasor's insurer directly until the tortfeasor's liability has been finally determined by agreement or judgment." *In re Essex Ins. Co.*, 450 S.W.3d 524, 525 (Tex. 2014). It follows that "a release of the tortfeasor that precludes a final determination of liability by agreement or judgment therefore precludes the releasing party from suing the tortfeasor's insurer." *Angus Chem. Co. v. IMC Fertilizer*, 939 S.W.2d 138, 138 (Tex. 1997). Given that the Tort Creditors have yet to obtain a judgment against Debtors, they are also unable to proceed against their insurers under Texas law. The Tort Creditors have no rights against the insurance policies until a judgment or settlement results.

11. The Plan purports to require the Tort Creditors to "exhaust[] all remedies with respect to such Insurance Policy" before "distributions under the Plan shall be made." But this is an impossible standard as—without a judgment, settlement, or assignment of Debtor's rights and claims—there are no "remedies" to pursue. This could lead to myriad of (presumably unintended) consequences, ostensibly enabling an unscrupulous insurer to abdicate its duties on the grounds that the Debtors' liability to the Tort Creditors is contingent upon the latter having first exhausted their remedies against the insurers. While this may not be the intended effect, it is relevant to note that Debtors have already been forced to file a declaratory judgment action against Starr Insurance due to an alleged coverage dispute. *See* Adversary Proceeding No. 20-03458.

12. Therefore, the violation of 11 U.S.C. § 1123(a)(4) is not trivial, but potentially threatens any recovery to the Tort Creditors by imposing a condition precedent that cannot be satisfied absent a judgment or assignment. More particularly, equitable marshalling cannot apply because (aside from the secured/unsecured creditor issue) the "doctrine cannot be invoked if it delays or inconveniences the paramount creditor in collection of a debt, prejudices him in any manner, or if the properties are insufficient to satisfy the paramount lien." *In re Mid-West Motors Inc.*, 82 B.R. at 442-43. And because the Plan fails to comply with 11 U.S.C. § 1123(a)(4), it fails to comply with 11 U.S.C. § 1129(a)(1). Moreover, because the treatment offered to the Tort Creditors is illusory, the Plan violates 11 U.S.C. § 1129(a)(7)(A)(ii) by not providing the Tort Creditors with at least what they would have in a Chapter 7 liquidation.

B.   **IMPERMISSIBLE INJUNCTION**

13. The Plan also provides for a broad injunction which, among other things, prohibits any creditor holding a discharged claim from "(1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests . . . (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests." Plan at pp. 48-49 (VIII.F). Read literally, this would mean that: (i) the Tort Creditors would be enjoined from prosecuting their claims against the Debtors even if to obtain rights against any insurance policies; and (ii) the Tort Creditors would be enjoined from exhausting precisely those rights that section VI.K.2 imposes as a condition precedent, since the insurance policies (but not proceeds) would arguably be property of the estates. The Tort Creditors hold personal injury and wrongful death claims which this Court lacks any jurisdiction to try, *see* 28 U.S.C. § 157(b)(2)(o), meaning that these claims have to be liquidated before some other court, thus directly raising the potential application of this injunction.

14. A different provision of the Plan excepts certain claims from the scope of the above injunction:

> the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable nonbankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim . . .

Plan p. 38 (V.E).

15. The Tort Creditors, however, are neither workers' compensation claimants nor claimants with direct action claims against any of the Debtors' insurers. Thus, the above safety-valve to the broad injunction would not apply to the Tort Creditors.

16. There is yet a different and additional portion of the Plan that may apply to the Tort Creditors, as follows:

> Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; provided that any Claim resulting from a final judgment in any such litigation shall be treated in accordance with the Plan.

Plan at p. 35 (IV.U). But this provision does not expressly state that it overrides the Plan's injunction.

17. Accordingly, the Plan should be clarified, and the Confirmation Order should provide, that the foregoing section IV.U of the Plan shall provide an exception to the section VIII.F injunction and that no injunction, discharge, or release provision of the Plan shall prevent the Tort Creditors from prosecuting their personal injury and wrongful death claims and from recovering

on the same from any applicable insurer or insurance policy. Without this essential clarifying language, the Plan cannot be confirmed because it purports to permanently enjoin the Tort Creditors from prosecuting their claims and from recovering against any insurer or insurance policy, while providing illusory treatment due to the section VI.K.2 condition precedent, in violation of 11 U.S.C. § 524(a), in violation of 11 U.S.C. § 1129(a)(7)(A)(ii), and governing Fifth Circuit case law addressing permanent injunctions and third party releases. *See, e.g., In re Pacific Lumber Co.)*, 584 F.3d 229, 252-53 (5th Cir. 2009).

### C.    IMPROPER CLASSIFICATION / DISCRIMINATION

18. The Plan contains two classes of unsecured creditors: Class 6, which recovers 12% of new common stock (estimated at upwards of 4.4% recovery), and Class 7, which recovers *pro-rata* from a pot of $1 million (estimated at less than a .1% recovery). The Tort Creditors are classified in Class 7, receiving disparate and inferior treatment. The sole ground given for the separate classification of otherwise identical claim rights is that Class 6 claims, while against Debtor Chesapeake, are guaranteed by 25 other Debtors, while Class 7 claims are not. *See* Disclosure Statement at p. 15.

19. This reasoning is insufficient to justify a separate classification. All general unsecured claims against Debtor Chesapeake should be in the same class of general unsecured creditors, receiving the same recovery. As is, what the Debtors are really saying is that it is Debtor Chesapeake that is paying creditors on account of the obligations of its affiliated Debtors, even though the Plan does not provide for substantive consolidation. Specifically, the treatment to Class 6 is a "Pro Rata share of (i) the Unsecured Notes Claims Recovery and (ii) 50 percent of the New Class C Warrants." Plan at p. 23 (III.B.6(b)). "Unsecured Notes Claims Recovery" is defined as "12% of New Common Stock." Plan at p. 16. "New Common Stock" is defined as "the single class of common stock to be issued by Reorganized Chesapeake." Plan at p. 10. "Reorganized

Chesapeake" is defined as a new entity to be incorporated in Delaware and which "will be the successor or assign to Chesapeake." Plan at p. 12.

20. Thus, it is clear that Debtor Chesapeake is paying *all* unsecured creditors in Class 6 even when the claim being paid is against a different Debtor. Debtor Chesapeake is paying the debts of its affiliated debtors: the affiliated debtors are not paying their own debts. The creditors of Debtor Chesapeake, like the Tort Creditors, have a right to have *their* debtor use *its* property to pay *their* debts; not the debts of *other* Debtors. The general unsecured creditors of Debtor Chesapeake are all the same and share the same priority. *See, e.g., In re Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir. 1991) ("ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class"). Whether certain of those creditors may have a right against other Debtors does not matter for purposes of Debtor Chesapeake, as there is no substantive consolidation and the Plan must therefore be confirmed or denied confirmation on a debtor-by-debtor basis. *See, e.g., In re Woodbridge Grp. of Cos. LLC*, 592 B.R. 761, 778 (Bankr. D. Del. 2018). *But see In re Transwest Resort Props.*, 881 F.3d 724 (9th Cir. 2018).

21. Indeed, this is no different from the standard situation where a debtor attempts separate classification because some creditors have guarantee claims against others—a ground for separate classification soundly rejected by the majority of the case law. *See, e.g., In re AOV Indus.*, 792 F.2d 1140, 1151 (D.D.C. 1986) ("[t]he existence of a third-party guarantor does not change the nature of a claim vis-a-vis the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are 'substantially similar' for classification purposes"); *In re Loop 76, LLC,* 465 B.R. 525, 540 (9th Cir. B.A.P. 2012); *In re Monticello Realty Invs. LLC*, 562 B.R. 902, 913 (Bankr. M.D. Fla. 2015); *In re Frascella Enters.*, 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) ("[b]ecause it is the nature of the claims being classified, as opposed to the nature of other claims or interests the

creditor may have, that is relevant, the existence of a third party guarantee does not require separate classification. The guarantee does not change the nature of the claim vis a vis the debtor estate and thus does not impact a determination of whether it is similar"). As this Court has noted:

> there is no reason to fragment classifications and uselessly increase their number where there is no substantial differentiation in the nature of the claims and that . . . logistics and fairness dictate consolidation, rather than proliferation of classes, so long as they are internally homogeneous. The key to proper classification would seem to be equality of treatment for similarly situated creditors or equity interest holders.

*In re Mcorp Fin. Inc.*, 137 B.R. 219, 226-27 (Bankr. S.D. Tex. 1992) (internal citations omitted).

22. The situation here is no different. Creditor X has a claim against Debtor Chesapeake that is guaranteed by other, separate entities, while creditor Y has a claim against Debtor Chesapeake that is not guaranteed. The fact that one claim is guaranteed and not the other is not proper grounds to separately classify the claims. Simply because the guarantors are also debtors should not and cannot matter, not without substantive consolidation, since, with respect to rights against Debtor Chesapeake and its property, the two claims share the same rights and priorities. "Unsecured Note" claimants may well have rights against Debtors other than Debtor Chesapeake, but then let those other Debtors pay a larger return to these claimants. In effect, the process is in reverse to what the Debtors think justifies it: the other Debtors, rather than contributing into the pot on account of their guarantees, are paying nothing, and it is Debtor Chesapeake who alone is contributing more to benefit its other Debtors, at the expense of general unsecured creditors.

23. Separately classifying Class 7 from Class 6 is improper under 11 U.S.C. § 1122 and, as such, the Plan cannot be confirmed because it fails 11 U.S.C. § 1129(a)(1). Furthermore, to the extent that Class 7 rejects the Plan, the Plan cannot be confirmed on cramdown under 11 U.S.C. § 1129(b)(1) because it discriminates unfairly between two unsecured creditors having the

same rights against their borrower and its property: one receives less than .1% on its claim while the other receives upwards of 4.5% and the potential for an upside.  *See, e.g., In re Tucson Self-Storage*, 166 B.R. 892, 898 (9th Cir. B.A.P. 1994) (and cases cited therein) (denying confirmation where there is "disparate treatment of classes that have identical legal rights").

24. For the same reasons, the Tort Creditors object to the Plan classifying inter-company claims separately and paying those claims separately and in preference to Class 7.  The Plan defines "Intercompany Claim" as a claim "held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor."  Plan at p. 9.  Thus, Intercompany Claims may be general unsecured claims the same as Class 7.  Yet, the Plan separately classifies Intercompany Claims as Class 8.  Plan at p. 21.  The Plan provides that these claims may be reinstated; *i.e.* paid in full.  Plan at p. 24.  There is no legitimate reason to separately classify a general unsecured claim against a Debtor on the basis that the claim is an insider or intercompany claim, much less pay the same in full in preference to other legitimate creditors.  Indeed, the Debtors' own liquidation analysis demonstrates that Class 8 would recover nothing in a Chapter 7 liquidation.  *See* Disclosure Statement, Exhibit C, at p. 8.  Therefore, the Tort Creditors object to the Plan on the basis of Class 8 and unfair discrimination regarding the same for the same reasons as applicable to Class 6, and pursuant to 11 U.S.C. § 1122, § 1129(a)(1), and § 1129(b)(1).

D. <u>**VIOLATION OF BEST INTERESTS TEST/OBJECTION TO INSIDER RELEASES**</u>

25. Setting aside the issue of improper classification and disparate treatment within the same class, the Plan fails the best interests test because the Plan does not provide general unsecured creditors more than they would receive in a hypothetical Chapter 7 liquidation.  The Tort Creditors have voted to reject the Plan.  That means that the Plan must provide a recovery to them that is at least what they would recover in a hypothetical Chapter 7.  *See* 11 U.S.C. § 1129(a)(7)(A)(ii).  Under the Plan, the Tort Creditors receive less than a .1% recovery.  The Debtors' own liquidation

analysis, however, demonstrates that avoidance actions would yield a recovery of between $392 million and $590 million. *See* Disclosure Statement, Exhibit C at p. 5. This value would be for the benefit of general unsecured creditors in a Chapter 7.

26. That same liquidation analysis demonstrates that a liquidation of the Debtors would yield sufficient funds to pay all secured creditors (with potential claims against avoidance actions) in full, all superpriority administrative claims in full, all Chapter 11 administrative claims in full, and all Chapter 7 administrative claims in full. While that liquidation analysis suggests that there would be no remaining funds for general unsecured creditors, that is wrong.[1] After payment of any claim that may be able to share in a recovery from the avoidance actions, the Debtors' own liquidation analysis demonstrates that hundreds of millions of dollars of avoidance action proceeds would remain, only the Debtor improperly attributes the proceeds to prepetition creditors who, by definition, would have no lien or superpriority right to these proceeds. Rather, between approximately $400 million to $600 million in avoidance action proceeds would remain for the benefit of approximately $9 billion in remaining, unpaid unsecured claims at most, and perhaps as little as approximately $4 billion in legitimate claims. And this is assuming that the various potential avoidance actions the Committee has alleged, worth perhaps billions of dollars, have no merit. *See* Docket No. 1545.

27. Thus, by the Debtors' own analysis, general unsecured creditors like the Tort Creditors would recover between 5% and 10% on their claims in a liquidation—many times what Class 7 is offered under the Plan. As such, the Plan cannot be confirmed because it does not

---

[1] The Debtors' liquidation analysis fails to recognize that prepetition secured creditors could not have any superior right, whether a lien or otherwise, to the proceeds of postpetition avoidance actions. Instead, the liquidation analysis appears to pay all avoidance action proceeds to these creditors, leaving nothing for general unsecured creditors. This is wrong because the fact that a secured creditor may be secured with respect to property of a type "a" does not mean that the creditor is secured by property of type "b." Instead, the proper way to analyze the situation, as mandated by 11 U.S.C. § 506(a) and the UCC, is to deem all of the unpaid creditors as unsecured and then analyze their pro-rata distribution from the avoidance actions.

OBJECTION OF JUSTIN COBB, KRISTINE COBB, AND LINDA MILANOVICH TO CONFIRMATION OF CHAPTER 11 PLAN—Page 13

provide the Tort Creditors with at least what they would receive in a hypothetical Chapter 7 case, especially when one considers the potential insurance recovery issues that the Plan demonstrably creates, instead of solving.

28. Similarly, the Tort Creditors object to the release by the Debtors and their Estates of various potential avoidance actions and other actions against insiders, directors, officers, professionals, transferees, and other potential defendants. *See* Plan (VIII.C and VIII.D). To the extent applicable to prepetition events and claims, the Tort Creditors likewise object to Plan's exculpation provision. The Debtors have failed to demonstrate that the released parties have provided adequate and proper consideration to the Debtors and to the Estates in exchange for a release of potentially valuable estate claims. To be clear, the Tort Creditors do not object to a release of estate claims and to exculpation for decisions made during the Bankruptcy Case and with the negotiation and formulation of the Plan, if the Plan is otherwise confirmed—such releases and exculpations should be the norm where a court has made the predicate finding of good faith under section 1129(a)(3)—but here the proposed releases and exculpation go much further and encompass prepetition actions and claims where it is by no means clear that the released parties are giving adequate return consideration to the Debtors and their estates.

29. That these potential defendants may agree to the Plan, and that this agreement is fair return consideration, is insufficient because it is they who, by far, are the beneficiaries of the Plan and the very releases in question. Class 7 creditors are to be paid $1 million, despite hundreds of millions of dollars in avoidance action claims—by the Debtors' own analysis and without consideration of any of the Committee's claims. Whatever other value is allegedly given does not go to unsecured creditors. So, where does it go? It goes to the very people who are being released. In effect, they are paying themselves to release themselves, at the expense of general unsecured

creditors who do not even obtain the value of the avoidance actions that Congress created expressly for their benefit.

E. <u>**VIOLATION OF ABSOLUTE PRIORITY RULE**</u>

30. The Tort Creditors have filed unsecured claims against both Chesapeake Energy Corporation and against Chesapeake Operating L.L.C. The Tort Creditors have voted to reject the Plan. Assuming that Class 7 rejects the Plan, either *in toto* or with respect to Chesapeake Operating L.L.C. (*see* discussion above regarding confirmation of Plan on per-Debtor basis in absence of substantive consolidation), this means that the Plan can only be confirmed on cramdown of Class 7. The Plan defines "Intercompany Interest" as an interest "in a Debtor held by a Debtor or an Affiliate of a Debtor." Plan at p. 9. The Plan provides for the reinstatement and retention of such interests, unless the interests are cancelled (with no clarity as to which will be reinstated and which may be cancelled, although it appears that most if not all will be retained pursuant to the Disclosure Statement). This means that various if not almost all of the Debtors will not be paying unsecured creditors in full—nowhere close—but equity holders will retain their interests. This is *per se* unlawful and the Plan may not be confirmed on cramdown. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Thus, the Tort Creditors object to the confirmation of the Plan on the basis of 11 U.S.C. § 1129(b)(2)(B)(ii) as well as on the basis of unfair discrimination under 11 U.S.C. § 1129(b)(1).

## IV.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Tort Creditors respectfully request that the Court enter an order: (i) denying confirmation of the Plan; and (ii) granting them such other and further relief to which they may be justly entitled.

RESPECTFULLY SUBMITTED this 3d day of December, 2020.

            **MUNSCH HARDT KOPF & HARR, P.C.**

      By:  /s/ Davor Rukavina
            Davor Rukavina, Esq.
            Texas Bar No. 24030781
            3800 Ross Tower
            500 N. Akard Street
            Dallas, Texas 75201
            Telephone: (214) 855-7500
            Facsimile: (214) 978-5359

            **ATTORNEYS FOR JUSTIN COBB,**
            **KRISTINE COBB, and**
            **LINDA MILANOVICH**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors, and counsel for the United States Trustee.

      By:  /s/ Davor Rukavina
            Davor Rukavina, Esq.