**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |

**REORGANIZED DEBTORS' MOTION FOR
ENTRY OF ORDERS (I) AUTHORIZING AND APPROVING
(A) THE PA AG SETTLEMENT, (B) THE MEC SETTLEMENT, AND
(C) THE NON-MEC SETTLEMENT, AND (II) GRANTING RELATED RELIEF**

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the Court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

The above-captioned reorganized debtors (collectively, the "<u>Reorganized Debtors</u>" or "<u>Chesapeake</u>")[2] respectfully state the following in support of this motion:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer  of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 37] (the "<u>First Day Declaration</u>"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), on June 28, 2020 (the "<u>Petition Date</u>").

**Preliminary Statement**

1.     The PA AG Settlement, the MEC Settlement, and the Non-MEC Settlement represent global resolution of royalty-related litigation and disputes in Pennsylvania.   The Settlement Agreements resolve three interconnected lawsuits— the *Demchak* class action (referred to as the "MEC" Action), the *Brown-Suessenbach* class action (referred to as the "Non-MEC" Action) and the related state-court action initiated by the Commonwealth of Pennsylvania (referred to as the "AG" Action)—concerning alleged royalty underpayments to Pennsylvania oil and gas lessors.   The Settlement Agreements will reset Chesapeake's relationship with its Pennsylvania lessors by providing Chesapeake royalty owners in Pennsylvania the ability (a) to select the method by which their royalties are calculated and (b) to realize an immediate benefit from the settlement payments under the Settlement Agreements.   Of course, the Settlement Agreements will also avoid protracted and costly litigation and position the newly-emerged Reorganized Debtors and Pennsylvania lessors for continued growth and long-term mutual success.

2.     The Reorganized Debtors seek two primary approvals.   *First*, the Reorganized Debtors request final approval of the PA AG Settlement, which addresses the state-court action initiated by the Commonwealth of Pennsylvania.   *Second*, the Reorganized Debtors request that the Court apply Bankruptcy Rule 7023, and, by incorporation, Civil Rule 23, with respect to the MEC Settlement and the Non-MEC Settlement, which address the *Demchak* and *Brown-Suessenbach* class action lawsuits.   The Reorganized Debtors seek to implement the MEC Settlement and the Non-MEC Settlement on a class-wide basis—despite the fact that no class proofs of claim were filed and regardless of whether an individual lessor filed a proof of claim— in order to provide all Pennsylvania lessors with the opportunity to participate in the settlements and, importantly, to choose their go-forward royalty calculation method, thus resolving the root cause of the royalty disputes.   To assure due process, Chesapeake seeks evaluation and final

approval of the MEC Settlement and the Non-MEC Settlement through two stages, consistent with the notice requirements of Civil Rule 23. *Initially*, the Court would preliminarily approve the MEC Settlement and the Non-MEC Settlement and approve the form and manner of notice to be provided to the respective Settlement Class under each agreement (each, a "Settlement Notice"). The Settlement Administrator would in turn serve the Settlement Notice, which would apprise the respective Settlement Class Members of their ability to object to, or opt out of, the terms of the MEC Settlement or the Non-MEC Settlement at the settlement fairness hearing. Chesapeake also requests that the Court schedule a settlement fairness hearing, at which any respective Settlement Class Members who objected to either the MEC Settlement or the Non-MEC Settlement may appear and present any such objections. *Later*, the Court would hold the final settlement fairness hearing and, following such hearing, enter orders finally approving the MEC Settlement and the Non-MEC Settlement and granting other related relief.

3.      Chesapeake believes that the Settlement Agreements are in the best interests of the Reorganized Debtors' estates, the Commonwealth, all respective Settlement Class Members, and all other parties in interest. Accordingly, the Court should finally approve the PA AG Settlement and approve the Preliminary Approval Orders and, following the settlement fairness hearing, the Final Approval Orders granting the relief requested in this motion.

## Relief Requested

4.      The Reorganized Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "PA AG Settlement Order"): (a) authorizing and approving on a final basis, the settlement agreement by and among Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C. and the Commonwealth of Pennsylvania (the "Commonwealth"), through the Pennsylvania Office

of Attorney General (the "PA AG"), attached hereto as **Exhibit 2** (the "PA AG Settlement"), and

(b) granting related relief.

5.      The Reorganized Debtors also seek entry of orders, substantially in the forms set forth in the MEC Settlement and the Non-MEC Settlement (collectively, the "Preliminary Approval Orders"):

    a.      authorizing and approving:

- on a preliminary basis, the settlement agreement by and among Chesapeake Appalachia, L.L.C. and the named plaintiffs and plaintiffs-intervenors in *Demchak Partners Limited Partnership, et. al. v. Chesapeake Appalachia, L.L.C.*, No. 3:13-cv-2289 ("*Demchak*"), on behalf of themselves and as putative class representatives, attached hereto as **Exhibit 3** (the "MEC Settlement"); and

- on a preliminary basis, the settlement agreement by and among Chesapeake Energy Corporation and the named plaintiffs in *Brown v. Access Midstream Partners, LP.*, No. 3: l 4-cv-00591-MEM (M.D. Pa.) ("*Brown*") and in *Suessenbach Family Limited Partnership v. Access Midstream Partners, L. P.*, No. 3: 14-cv- 01197 (M.D. Pa.) ("*Suessenbach*," and together with *Demchak* and *Brown*, the "Class Royalty Litigation"), on behalf of themselves and as putative class representatives, attached hereto as **Exhibit 4** (the "Non-MEC Settlement," and together with the PA AG Settlement and the MEC Settlement, the "Settlement Agreements");

    b.      approving the form of Settlement Notice as set forth in each of the MEC Settlement and the Non-MEC Settlement;

    c.      setting the settlement fairness hearing; and

    d.      granting related relief.

6.      Finally, the Reorganized Debtors seek entry of orders, substantially in the forms set forth in the Non-MEC Settlement and the MEC Settlement (the "Final Approval Orders"): (a) authorizing and approving the MEC Settlement and the Non-MEC Settlement on a final basis;

and (b) granting related relief.  The Reorganized Debtors seek entry of the Final Approval Orders after the settlement fairness hearing.[3]

### **Jurisdiction and Venue**

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Reorganized Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 7023, and 9019, and rule 23 of the Federal Rules of Civil Procedure ("Civil Rule 23").

---

[3]    The Reorganized Debtors reserve the right to submit additional briefing in support of the Final Approval Orders.

Chesapeake and plaintiffs' counsel have signed the MEC and Non-MEC Private Settlement agreements.  Counsel expects additional signatures from certain royalty owners will be added to those settlements in the future.

## Background

10.     As the Court knows from prior briefing and oral arguments, private Pennsylvania landowners initiated several lawsuits against Chesapeake alleging that Chesapeake underpaid royalties due to them under various oil and gas leases.  These lawsuits are the MEC and Non-MEC lawsuits.  The Attorney General of Pennsylvania also filed a lawsuit seeking substantially similar relief from Chesapeake for Pennsylvania landowners.  Below is a summary of the actions used previously at oral argument before the Court.



## I.      The Class Royalty Litigation.

11.     As the Court knows from prior briefings and arguments, in 2013 and 2014, private Pennsylvania landowners initiated several lawsuits against Chesapeake alleging that Chesapeake underpaid royalties due to them under various oil and gas leases.

12.     ***Demchak.***  The *Demchak* plaintiffs, as lessors, and Chesapeake Appalachia, L.L.C., as lessee, are parties to oil and gas leases governing leaseholds in Pennsylvania.[4]  On August 30, 2013, the *Demchak* plaintiffs initiated a lawsuit on behalf of a putative class of oil and gas lessors in Pennsylvania, alleging that Chesapeake, among other things, underpaid royalties by improperly deducting post-production costs.  Chesapeake denies those claims and further denies that its royalty payment practices are or were improper.  Chesapeake believes it paid royalties consistent with the leases and Pennsylvania law.

13.     ***Brown-Suessenbach.***     The *Brown-Suessenbach* plaintiffs, as lessors, and Chesapeake Appalachia, L.L.C., as lessee, are parties to oil and gas leases governing leaseholds in Pennsylvania.[5]  On March 28, 2014, the *Brown* plaintiffs initiated a lawsuit on behalf of a putative class of oil and gas lessors in Pennsylvania, and on June 20, 2014, the *Suessenbach* plaintiffs initiated a similar lawsuit.  Both *Brown* and *Suessenbach* allege that Chesapeake, among other things, underpaid royalties by improperly deducting inflated post-production costs and engaged in a purported scheme with Access Midstream Partners, L.P. to charge landowners artificially inflated and supra-competitive rates for certain post-production services.  Chesapeake denies the plaintiffs' claims that the post-production costs are or were inflated and further denies that its royalty payment practices are or were improper.  Chesapeake believes it paid royalties consistent with the leases and Pennsylvania law.

---

[4]   The leases implicated in the MEC Settlement contain Market Enhancement Clauses and Ready for Sale or Use Clauses.

[5]   The leases implicated in the Non-MEC Settlement do not contain Market Enhancement Clauses or Ready for Sale or Use Clauses.

## II.     The PA AG Litigation.

14.     On December 9, 2015, the Commonwealth, through the PA AG, initiated its own state-court lawsuit styled *Commonwealth of Pennsylvania v. Chesapeake Energy Corporation*, No. 2015IR0069 (the "PA AG Litigation"), in the Bradford County, Pennsylvania Court of Common Pleas against Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C., seeking substantially similar relief for the same Pennsylvania lessors that are plaintiffs in the Class Royalty Litigation. The PA AG filed a Second Amended Complaint on May 3, 2016, alleging that Chesapeake violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law and Pennsylvania antitrust common law through unfair and/or deceptive acts or practices concerning inflated midstream prices, leasing practices at the formation and post-formation stages, improper deductions from royalty payments, and an undisclosed market allocation agreement in the Marcellus Shale.  Chesapeake denies the Commonwealth's allegations as a factual matter and denies that the Commonwealth's allegations are cognizable as a legal matter.

## III.    The Chapter 11 Cases.

15.     On June 28, 2020, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

16.     On December 28, 2020, the PA AG filed Claim Nos. 4672, 4673, 4675, and 4683 related to the PA AG Litigation.

17.     Although no class proofs of claim were filed on behalf of the putative classes involved in the Class Royalty Litigation, approximately 161 proofs of claim were filed by individual Pennsylvania lessors related to the conduct alleged in the Class Royalty Litigation.

18.     On January 13, 2021, the Court confirmed the Debtors' plan of reorganization (the "Plan"), memorializing that decision in an order filed on January 16, 2021 (the "Confirmation

Order"). *Order Confirming Fifth Am. Joint Ch. 11 Plan of Reorganization of Chesapeake Energy Corp. & Its Debtor Affiliates* [Docket No. 2915].

19.     The Debtors substantially consummated the Plan on February 9, 2021 (the "Effective Date"). *Notice of Entry of Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 3058].

20.     On February 9, 2021, after good-faith and arms' length negotiations, the Reorganized Debtors and the PA AG entered into the PA AG Settlement.

21.     On March 4, 2021, after good-faith and arms' length negotiations, the Reorganized Debtors and the *Demchak* plaintiffs finalized the MEC Settlement.

22.     On March 4, 2021, after good-faith and arms' length negotiations the Reorganized Debtors and the *Brown* and *Suessenbach* plaintiffs finalized the Non-MEC Settlement.

23.     All capitalized terms used in this motion but not otherwise defined herein have the meanings ascribed to such terms in the PA AG Settlement, the MEC Settlement, and the Non-MEC Settlement, as applicable.

**The Settlement Agreements**

24.     Collectively, the Settlement Agreements resolve all royalty-related litigation and disputes in Pennsylvania, resulting in a fundamental reset of Chesapeake's relationship with its Pennsylvania lessors.

## IV.     **The PA AG Settlement.**

25.     Under the terms of the PA AG Settlement:[6]

a.      Chesapeake shall not use the Market Enhancement Clause or Ready for Sale or Use Clause in future leases.

b.      Chesapeake shall offer Pennsylvania Landowners with Market Enhancement Clauses or Ready for Sale or Use Clauses the opportunity to have their Gas Royalties paid at the higher of the In-Basin Price without Post-Production Deductions or the Netback Price.

c.      Chesapeake shall offer Pennsylvania Landowners with Non-MEC leases the opportunity to have their Gas Royalties paid at the In-Basin Price without Post-Production Deductions or the Netback Price.

d.      Chesapeake has certain leases which expressly prohibit Post-Production Deductions (which are not contained in the MEC or RFSU Lease categories).  Chesapeake believes it is not taking any prohibited Post-Production Deductions from such leases.  If Chesapeake discovers it is taking prohibited Post-Production Deductions from such leases, it will discontinue doing so.

e.      Chesapeake shall pay $5,300,000 to the Commonwealth, which shall be distributed to Pennsylvania Lessors.

f.      Chesapeake shall pay $350,000 to the PA AG towards reimbursement of costs related to the PA AG Litigation.

g.      Chesapeake shall comply with certain reporting requirements as set forth in the PA AG Settlement, including semi-annually publishing the monthly In-Basin Price on its royalty owner website.

h.      Chesapeake shall, jointly with the PA AG, appoint an Ombudsman to assist in resolution of any issues, questions or complaints raised by Pennsylvania Landowners and assist the PA AG with ensuring compliance with the settlement's terms.

i.      The Commonwealth shall release Chesapeake for all claims and actions that were brought or that could have been brought based on the allegations contained in the PA AG Litigation, except for any criminal, tax and environmental claims.

---

[6]   The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the PA AG Settlement.  In the event of any inconsistency between this summary and the PA AG Settlement, the PA AG Settlement controls in all respects.  Further, this summary shall not be used to construe or interpret the terms of the PA AG Settlement or intent of the parties thereto.

j.    Chesapeake and the PA AG agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by the Commonwealth, except for any criminal, tax and environmental claims, shall be deemed satisfied and released and any Settled Claims filed in the Chapter 11 cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

## V.    The MEC Settlement.

26.    Under the terms of the MEC Settlement:[7]

a.    Within fifteen (15) days after the Court's entry of the Preliminary Approval Order or a date otherwise established by the Court, the Settlement Administrator shall provide the Settlement Notice to the Settlement Class in the manner approved by the Court, which Settlement Notice shall include mailing the Settlement Notice by first-class mail, postage pre-paid, to individuals and entities who are in the Settlement Class and for whom Chesapeake has addresses available from its business records. In addition, Chesapeake shall send a timely and proper notice(s) of this Settlement to all appropriate federal and state officials as required by the Class Action Fairness Act of 2005 ("CAFA"), including under 28 U.S.C. §1715, if necessary.

b.    Chesapeake shall pay $5,000,000 in Settlement Funds, to be distributed to the Settlement Class in accordance with the Final Approval Order.

c.    Chesapeake shall pay all Settlement Administrative Costs.

d.    Chesapeake shall have no obligation whatsoever to pay any Attorneys' Fees of Plaintiffs, Class Counsel, or Settlement Class Members, or any Incentive Award Payments to Plaintiffs.

e.    Each Settlement Class Member shall be provided the opportunity to make an election concerning how Chesapeake (and its affiliates, successors, and assigns) will calculate and pay Gas Royalties to such Settlement Class Member and its successors and assigns after the Settlement Effective Date occurs, pursuant to such Settlement Class Member's Pennsylvania Leases in which Chesapeake currently owns an interest.

f.    Each Plaintiff and Settlement Class Member hereby releases the Settled Claims and any and all claims that Chesapeake is obligated to pay them royalties under their Pennsylvania Leases in any manner other than the

---

[7] The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the MEC Settlement. In the event of any inconsistency between this summary and the MEC Settlement, the MEC Settlement controls in all respects. Further, this summary shall not be used to construe or interpret the terms of the MEC Settlement or intent of the parties thereto.

Election under Paragraph 6 of the MEC Settlement (including, but not limited to, the Settled Claims). Plaintiffs and the Settlement Class Members further agree that they fully and forever release and discharge all working interest owners on whose behalf Chesapeake has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Chesapeake's payments of Gas Royalties on behalf of such working interest owners.

g.      Each of the Plaintiffs and the Settlement Class Members agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

## VI.   The Non-MEC Settlement.

27.     Under the terms of the Non-MEC Settlement:[8]

a.      Within fifteen (15) days after the Court's entry of the Preliminary Approval Order or a date otherwise established by the Court, the Settlement Administrator shall provide the Settlement Notice to the Settlement Class in the manner approved by the Court, which Settlement Notice shall include mailing the Settlement Notice by first-class mail, postage pre-paid, to individuals and entities who are in the Settlement Class and for whom Chesapeake has addresses available from its business records. In addition, Chesapeake shall send a timely and proper notice(s) of this Settlement to all appropriate federal and state officials as required by CAFA, including under 28 U.S.C. §1715, if necessary.

b.      Chesapeake shall pay $1,250,000 in Settlement Funds, to be distributed to the Settlement Class in accordance with the Final Approval Order.

c.      Chesapeake shall pay all Settlement Administrative Costs.

d.      Chesapeake shall have no obligation whatsoever to pay any Attorneys' Fees of Plaintiffs, Class Counsel, or Settlement Class Members, or any Incentive Award Payments to Plaintiffs.

e.      Each Settlement Class Member shall be provided the opportunity to make an election concerning how Chesapeake (and its affiliates, successors, and assigns) will calculate and pay Gas Royalties to such Settlement Class

---

[8]   The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the Non-MEC Settlement. In the event of any inconsistency between this summary and the Non-MEC Settlement, the Non-MEC Settlement controls in all respects. Further, this summary shall not be used to construe or interpret the terms of the Non-MEC Settlement or intent of the parties thereto.

Member and its successors and assigns after the Settlement Effective Date occurs, pursuant to such Settlement Class Member's Pennsylvania Leases in which Chesapeake currently owns an interest.

f.     Each Plaintiff and Settlement Class Member hereby releases the Settled Claims and any and all claims that Chesapeake is obligated to pay them royalties under their Pennsylvania Leases in any manner other than the Election under Paragraph 6 of the Non-MEC Settlement (including, but not limited to, the Settled Claims). Plaintiffs and the Settlement Class Members further agree that they fully and forever release and discharge all working interest owners on whose behalf Chesapeake has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Chesapeake's payments of Gas Royalties on behalf of such working interest owners.

g.     Each of the Plaintiffs and the Settlement Class Members agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

28.     The Reorganized Debtors believe the Settlement Agreements are in the best interests of the Reorganized Debtors and their estates. Specifically, the Settlement Agreements address the root cause of the PA AG Litigation and the Class Royalty Litigation by allowing all putative class members to elect how their royalties are calculated on a go-forward basis. As a result, the Reorganized Debtors believe the settlements will reduce the likelihood and attendant cost and distraction of future royalty related litigation. In addition, the PA AG Settlement resolves any dispute regarding the dischargeability of the PA AG Litigation—wherein the PA AG sought to require Chesapeake to forfeit its right to engage in certain business activities until the company paid all alleged restitution, costs and civil penalties—thus preserving Chesapeake's ability to continue operating in the Commonwealth. Accordingly, to finally resolve Chesapeake's disputes with the Commonwealth and Pennsylvania lessors, the Reorganized Debtors seek authorization and approval of the Settlement Agreements.

## Basis for Relief

**I.      Settlements Are Favored in Bankruptcy, and the Debtors' Business Judgment Is Given Significant Deference.**

29.      Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

30.      "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).  Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly."  *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

31.      Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court.  *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

32.      Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement.  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Instead, the

court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).[9]

33.     "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) (citation omitted). "As long as [the decision] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision . . . should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation omitted).

## II.     The Settlement Agreements Satisfy the Three-Factor Test Courts in the Fifth Circuit Employ to Analyze Proposed Settlements.

34.     The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors a court must consider in determining whether a compromise is "fair, equitable, and in the best interest of the estate" are: "(1) [t]he probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) [t]he complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) [a]ll other factors bearing on the wisdom of the compromise." *In re Roqumore*, 393 B.R. 474, 479 (Bankr. S.D. Tex. 2008) (citing the factors set forth by the court in *Jackson Brewing*); s*ee also Age Ref. Inc.*, 801 F.3d at 540 (same).

---

[9]     Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Authorizing the Reorganized Debtors to proceed with the Settlement Agreements falls squarely within the spirit of Bankruptcy Rule 9019, if not the letter, as well as the Bankruptcy Code's predilection for compromise. Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

35.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. ***First***, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (Matter of Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d at 540 (noting the *Foster Mortgage* factors).  "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'" *Foster Mortg. Corp.*, 68 F.3d at 917 (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1985)).  ***Second***, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

**A.     The Reorganized Debtors Face Exposure in Excess of the Settlement Payments.**

36.     Although the Reorganized Debtors believe that the claims related to the PA AG Litigation were discharged on the Effective Date pursuant to the Plan and the Confirmation Order, the PA AG Settlement resolves any dispute regarding the dischargeablity of the PA AG Litigation. While the Reorganized Debtors believe there is a high probability of success in litigation related to the discharageabilty, as well as the merits, of the PA AG Litigation, resolution of these matters would rest in a court's discretion.  Moreover, should Chesapeake not succeed in the litigation, the Reorganized Debtors may be required to pay more in restitution, costs, and civil penalties—and jeopardize their ability to conduct business in the Commonwealth—than the approximately $5,650,000 in settlement payments contemplated under the PA AG Settlement.

37.     Similarly, the claims related to Class Royalty Litigation were discharged on the Effective Date pursuant to the Plan and the Confirmation Order.  However, the MEC Settlement

and the Non-MEC Settlement reduce the likelihood of future royalty related litigation by allowing all putative class members to elect how their royalties are calculated on a go-forward basis.  The Reorganized Debtors, in their reasonable business judgment, believe that the approximately $5,000,000 settlement payment contemplated under the MEC Settlement and the approximately $1,250,000 settlement payment contemplated under the Non-MEC Settlement are likely less than the attendant cost and possible liability of potential future royalty related litigation, including potential class action litigation.

> **B.     Ongoing and Potential Future Litigation Would Be Complex and Result in Delay and Distraction.**

38.     With respect to "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay," further claims litigation and potential future royalty related litigation in Pennsylvania likely would be costly and time consuming, involving drafting and filing motions and preparing for trial.  Specifically, absent the PA AG Settlement, the Reorganized Debtors face continued litigation with the PA AG regarding the dischargeability—and, if nondischargebale, the merits—of the PA AG Litigation.  Absent the MEC Settlement and the Non-MEC Settlement, the Reorganized Debtors face claims litigation with individual Pennsylvania lessors, as well as future potential class litigation related to the calculation of royalties.  All such litigation would distract from the Reorganized Debtors' business operations and claims administration process, as well as threaten the relationship between Chesapeake and its Pennsylvania lessors.

> **C.     The Settlement Agreements Are in the Best Interests of Creditors.**

39.     The Settlement Agreements will provide all stakeholders with certainty regarding the resolution of the disputes between Chesapeake and the Commonwealth and the Class Royalty Litigation plaintiffs and putative class members.  The Settlement Agreements constitute a

fundamental reset of Chesapeake's relationship with its Pennsylvania lessors, obviating the need for further claims litigation and future potential class action litigation and preserving the Reorganized Debtors' interests in the Pennsylvania leases. The PA AG Settlement additionally preserves the Reorganized Debtors' ability to continue conducting business in the Commonwealth. Further, the Settlement Agreements arise out of arm's-length bargaining between the Reorganized Debtors and the Commonwealth and the Class Royalty Litigation plaintiffs.

40.     Based on the foregoing considerations, the Settlement Agreements represent fair and reasonable compromises that are in the best interest of the Reorganized Debtors' estates. Accordingly, the Court should authorize and approve the PA AG Settlement on a final basis, and the MEC Settlement and the Non-MEC Settlement (a) on a preliminary basis as set forth in the Preliminary Approval Orders and (b) following the settlement fairness hearing, on a final basis as set forth in the Final Approval Orders.

## III.   The MEC Settlement and the Non-MEC Settlement Satisfy the Requirements of Civil Rule 23.

41.     Civil Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Final approval of a settlement pursuant to Civil Rule 23(e) turns on whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 285–86 (W.D. Tex. 2007). "The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed [settlement of a] class action is that the court must ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *DeHoyos*, 240 F.R.D. at 286 (internal citations omitted) (quoting *Garza v. Sporting*

*Goods Properties, Inc.*, No. CIV. A. SA-93-CA-108, 1996 WL 56247, at *11 (W.D. Tex. Feb. 6, 1996)). "[T]here is a strong presumption in favor of finding the settlement fair." *Id*. Furthermore, "the proposed settlement is not required to achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in a contested matter," but instead the "[c]ourt may rely on the judgement of experienced counsel for the parties." *Id*.

42.     The Fifth Circuit has held that the following six factors are relevant in determining whether a proposed class settlement is fair, reasonable, and adequate: "(1) the existence of fraud or collusion behind the settlement; (2) the probability of plaintiffs' success on the merits; (3) the range of possible recovery; (4) the complexity, expense and likely duration of the litigation; (5) the stage of the proceedings and the amount of discovery completed; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (citing *Parker v. Anderson*, 667 F.2d 1205, 1209 (5th Cir. 1982)); *In re Katrina Canal Breaches Litigation*, 628 F.3d 185, 194-95 (5th Cir. 2010) (citing *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004)); *cf. In re TD Banknorth*, 938 A.2d 654, 658 (Del. Ch. 2007) ("an evaluation of whether a settlement is fair and reasonable" "requires balancing the strengths of the claims being compromised against the benefits the settlement provides to the class members."). The *Reed* factors strongly support approval of the MEC Settlement and the Non-MEC Settlement.

43.     *First*, as noted herein, both the MEC Settlement and the Non-MEC Settlement arise out of serious, informed, arms'-length bargaining between Chesapeake and the Class Royalty Litigation plaintiffs. There is no evidence that either the MEC Settlement or the Non-MEC Settlement is collusive or fraudulent.

44.     *Second* and *third*, although the claims related to the Class Royalty Litigation were discharged on the Effective Date pursuant to the Plan and the Confirmation Order and no class proofs of claim were filed, the MEC Settlement and the Non-MEC Settlement nevertheless provide the Class Royalty Litigation plaintiffs and putative class members with closure regarding past royalty disputes; the Reorganized Debtors believe this is an important step towards resetting Chesapeake's relationship with its Pennsylvania lessors.  The MEC Settlement and the Non-MEC Settlement provide all Pennsylvania lessors with the opportunity to participate in the settlements and, importantly, to choose their go-forward royalty calculation method.  Absent the MEC Settlement and the Non-MEC Settlement, the Reorganized Debtors face claims litigation with individual Pennsylvania lessors, as well as future potential class action litigation related to the calculation of royalties.  In light of these circumstances, the MEC Settlement and the Non-MEC Settlement are fair and reasonable.

45.     *Fourth* and *fifth*, the complexity, expense and likely duration of related litigation all point in favor of approving the MEC Settlement and the Non-MEC Settlement.  Absent approval of the MEC Settlement and the Non-MEC Settlement, the Reorganized Debtors will have to litigate over 100 claims filed by individual Pennsylvania lessors.  Such litigation would likely entail significant expense and delay for all parties involved.  Further, the MEC Settlement and the Non-MEC Settlement allow all putative class members to elect how their royalties are calculated on a go-forward basis.  As a result, the Reorganized Debtors believe the settlements will reduce the likelihood and attendant cost and delay of future potential royalty related litigation, including potential class action litigation.

46.     *Sixth*, the MEC Settlement and the Non-MEC Settlement enjoy the support of the *Demchak*, *Brown*, and *Suessenbach* plaintiffs and respective Class Counsel, who engaged in

negotiations with Chesapeake throughout these chapter 11 cases to secure each settlement's respective terms.  All respective Settlement Class Members will be afforded the opportunity to opt-out of the applicable settlement agreement and object to any of the respective settlement agreement's terms at the settlement fairness hearing.  At that time, if significant objections manifest, the Court, the Reorganized Debtors, and the Class Royalty Litigation plaintiffs may address them as appropriate.

47.     For all of the foregoing reasons, the Court should enter the PA AG Settlement Order, the Preliminary Approval Orders and, after the settlement fairness hearing, the Final Approval Orders.

## **Reservation of Rights**

48.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Reorganized Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Reorganized Debtors' estates; (g) a waiver or limitation of the Reorganized Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Reorganized Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief

requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

### <u>Notice</u>

49.     The Reorganized Debtors will provide notice of this motion to:  (a) the United States Trustee for the Southern District of Texas; (b) the parties to the Settlement Agreements; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Reorganized Debtors respectfully request that the Court enter the orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
March 5, 2021

*/s/  Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:              mcavenaugh@jw.com
                      kpeguero@jw.com


*Co-Counsel to the Reorganized Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* )
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:              patrick.nash@kirkland.com
                      alexandra.schwarzman@kirkland.com


*Co-Counsel to the Reorganized Debtors*

**<u>Certificate of Service</u>**

I certify that on March 5, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh