IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| CHESAPEAKE ENERGY ) | |
| CORPORATION, *et al.*, ) | Case No. 20-33233 (DRJ) |
| ) | |
| Debtors. ) | Jointly Administered |

### MARONE PLP MESHOPPEN LP REQUEST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIMS

Marone PLP Meshoppen LP ("**Claimant**" or "Marone PLP"), by and through their undersigned counsel, by way of Request for Allowance and Payment of Administrative Claims (the "Request"), hereby state:

### BACKGROUND

*A.   The Leases*

1. Marone PLP is a party to an oil and gas lease (the "Lease") with Chesapeake Appalachia LLC. The Lease burdens multiple parcels of real property located in Susquehanna County, Pennsylvania (the "Leased Premises"). A Copy of the Claimant's Lease is attached hereto.

*B.   The Debtors' Chapter 11 Cases and Marone PLP's Claim*

2. On June 28, 2020 (the "Petition Date"), the Debtors, including Chesapeake Appalachia, ("Chesapeake") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code").

3. Pursuant to the terms of the Lease, Claimant is entitled to be paid royalties without deduction of post-production costs.

4. Chesapeake breached the Lease through its underpayment of royalties, including negative royalties, by its unauthorized deduction of post-production costs.

5. Chesapeake's underpayment of royalties by improperly deducting post-production costs started with the Claimants' first royalty check and is ongoing.

6. Claimant also possesses an administrative claim under 11 U.S.C. §507(a)(5) for all unpaid amounts due under the Leases from the Petition Date through the Effective Date of any plan of reorganization confirmed in the Debtors' cases.

7. Further, as a result of Chesapeake's breaches of the Leases, any right, title and interest held by Chesapeake under the Leases of the Leased Premises reverted to Claimant. Claimant reserves the right to seek through arbitration and/or a judgment in a court of appropriate jurisdiction declaring that Chesapeake does not possess any right, title or interest in the Leases or the Leased Premises.

8. Claimant reserves its right to amend and/or supplement this Administrative Claim for all purposes.

### D. The Debtors' Plan

9. On September 11, 2020, the Debtors' filed a proposed plan of reorganization [Docket No. 1150], and the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates [Docket No. 1151], both of which were subsequently amended.

10. On October 8, 2020, the Debtors filed their amended disclosure statement [Docket No. 1331] (the "Disclosure Statement").

11. On October 30, 2020, the Bankruptcy Court entered an Order approving the Disclosure Statement [Docket No. 1633].

12. On January 12, 2021, the Debtors filed their Fifth Amended Joint Chapter 11 Plan of Reorganization (the "Plan"). [Docket No. 2833].

13. The Plan provides for a complete pass-through of the Claimant's rights under the Leases. The Plan states that "all Royalty and Working Interests shall remain in full force and

effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests." Plan, Article IV. T.

14. The Plan further states that "Royalty and Working Interests shall not be modified, affected or impaired in any manner by any provision of the Plan or the Confirmation Order, including but not limited to any injunctive or stay relief, and the legal and equitable rights, interests, defenses, and obligations of holders of Royalty and Working Interests, with respect to such Royalty and Working Interests, shall not be modified, affected or impaired in any manner by the provisions of the Plan or the Confirmation Order." *Id.*

15. On January 16, 2021, the Court entered an Order Confirming the Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization [Docket No. 2915].

16. On February 9, 2021, the Debtors filed and served a Notice of Entry of Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates (the "Notice") [Docket No. 3058].

17. Pursuant to the Notice, the Plan became effective on February 9, 2021 (the "Effective Date").

18. In addition, the Notice provides that requests for payment Royalty and Working Interests Administrative Claims must be filed on or before June 9, 2021.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

20. Venue is proper pursuant to 28 U.S.C. § 1408.

21. The statutory basis for the relief requested herein is Sections 105(a) and 503(b) of title 11 of the United States Code (the "Bankruptcy Code").

## RELIEF REQUESTED

22. Section 503(b)(1) of the Bankruptcy Code provides that there shall be allowed administrative expenses for the "actual, necessary costs and expenses of preserving the estate."

23. In addition, the Disclosure Statement states that "any post-petition, pre-Effective Date right to payment arising from a Royalty and Working Interest, if any, shall be treated by the Plan as an Administrative Claim." Disclosure Statement at 10.

24. Further, the Plan provides that "any postpetition, pre-Effective Date rights to payment arising on account of Royalty and Working Interests" shall constitute administrative claims. Plan, Article I. A. 172.

25. Under the Plan, allowed administrative claims are to be paid in full no later than thirty (30) days after the date on which an order allowing the administrative claim becomes a final order, or as soon as reasonably practicable thereafter. Plan, Article II. A. 1.

26. Between the Petition Date and the Effective Date (the "Administrative Claim Period"), the Debtors breached the Leases by underpaying the royalties due and owing to the Marone PLP.

24. As a result, Marone PLP is entitled to an administrative claim for all unpaid or underpaid royalties due under the Leases during the Administrative Claim Period.

25. The estimated total amount due the Marone PLP pursuant to the Leases for unpaid or underpaid royalties during the Administrative Claim Period, exclusive of interest as provided for under the Leases, is not less than $7,474.29.[1]

---

[1] As set forth in the Proofs of Claim, until additional information is provided by Chesapeake, Claimant will be unable to determine the exact amount of the royalty underpayments and other charges due under the Leases.

26. Consequently, Marone PLP request the entry of an order allowing them administrative claims for all amounts due under the Leases during the Administrative Claim Period.

## CONCLUSION

27. For the foregoing reasons, the Marone PLP respectfully request that the Court enter an Order allowing the Marone PLP's administrative claims for all unpaid and underpaid royalties due under the Leases during the Administrative Claims Period, and for such other and further relief as the Court deems just and equitable.

Dated: June 8th, 2021

By: /s/ Aaron D. Hovan
Aaron D. Hovan (admitted *pro hac vice*)
Law Office of Aaron Hovan
154 Warren St.
Tunkhannock, PA 18657
Telephone: (570) 836-3121
aaron@hovanlaw.com

Ira N. Richards (admitted *pro hac vice*)
Richard A. Barkasy (admitted *pro hac vice*)
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
irichards@schnader.com
rbarkasy@schnader.com

*Attorneys for Claimant Marone PLP*

PHDATA 7784273_1



**PAID-UP**

**OIL & GAS LEASE**     Lease No. 1265797-000

SAIS - PA

This Lease made this 18th day of August, 2008 by and between: Phillip Marone, single, whose address is P.O. Box 127, Thorofare, NJ 08086, hereinafter collectively called "Lessor" CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, P.O. Box 6070, Charleston, WV 25362-0070, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, ~~to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas~~; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the Township of Washington in the County of Wyoming in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number: 27-094.0-008-03-00-00-00
and is bounded formerly or currently as follows:
    On the North by lands of: P. Marone (Tax Id No. 27-094.0-008-04-00-00),
    On the East by lands of: Stang Road,
    On the South by lands of: P. Marone (Tax Id No. 27-094.0-008-05-00-00),
    On the West by lands of: P. Marone (Tax Id No 27-083.0-001-00-00-00),

Property Tax Parcel Identification Number: 27-094.0-008-04-00-00
and is bounded formerly or currently as follows:
    On the North by lands of: P. Marone (Tax Id No. 27-094.0-008-07-00-00),
    On the East by lands of: Stang Road,
    On the South by lands of: P. Marone (Tax Id No. 27-094.0-008-03-00-00),
    On the West by lands of: P. Marone (Tax Id No. 27-083.0-001-00-00-00),

Property Tax Parcel Identification Number: 27-094.0-008-05-00-00
and is bounded formerly or currently as follows:
    On the North by lands of: P. Marone (Tax Id No. 27-094.0-008-03-00-00),
    On the East by lands of: Stang Road,
    On the South by lands of: P. Marone (Tax Id No. 27-094.0-008-06-00-00),
    On the West by lands of: P. Marone (Tax Id No. 27-083.0-001-00-00-00),

Property Tax Parcel Identification Number: 27-094.0-008-06-00-00-00
and is bounded formerly or currently as follows:
    On the North by lands of: P. Marone (Tax Id No. 27-094.0-008-05-00-00),
    On the East by lands of: Stang Road,
    On the South by lands of: S. Chesner (Tax Id No.27-083.0-039-00-00-00),
    On the West by lands of: P. Marone (Tax Id No. 27-083.0-001-00-00-00),

Property Tax Parcel Identification Number: 27-094.0-008-07-00-00
and is bounded formerly or currently as follows:
    On the North by lands of: Small Lots,
    On the East by lands of: Stang Road,
    On the South by lands of: P. Marone (Tax Id No. 27-094.0-008-07-00-00),
    On the West by lands of: Brooks Hill Road,

including lands acquired from James A. Coles and Barbara A. Cole, his wife, Thomas Tesluk and Cynthia Tesluk, his wife and Nancy L. Kinter, unmarried, Thomas Tesluk and Cynthia Tesluk, his wife and Nancy L. Kinter, unmarried, Thomas Tesluk and Cynthia Tesluk, his wife and Nancy L. Kinter, unmarried, Thomas Tesluk and Cynthia Tesluk, his wife and Nancy L. Kinter, unmarried, by virtue of deed dated April 9, 1999, September 13, 1993, September 13, 1993, September 13, 1993, September 13, 1993 and recorded in Book 389, Page 781, Book 304, Page 716 Book 304, Page 722 Book 304, Page 728 Book 304, Page 734 and described for the purposes of this agreement as containing a total of 56.14 Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of _five_ (5) years from 12:00 A.M. August 18, 2008 (effective date) to 11:59 P.M August 18, 2013 (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, ~~or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas~~, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one-additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration

and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal Fifteen Percent (15%) of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor an amount equal to Fifteen Percent (15%) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, and in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether

the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to be in conformity with all laws, rules, regulations and orders and interpreted as such. If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

"Reference Exhibit "A" attached hereto and by this reference made part hereof"

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal,

Witness _____     _____ (Seal)
                                        Phillip Marone

Witness _____     _____ (Seal)

Document prepared by: Chesapeake Appalachia, L.L.C., P.O. Box 6070, Charleston, West Virginia 25362-0070

ACKNOWLEDGMENT

State of Pennsylvania:

County of Wyoming:

On 9/5/08 before me, the undersigned, a Notary Public in and for said State, personally appeared Phillip Marone, single, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

My commission expires 5/20/2009

Signature / Notary Public _____

Name / Notary Public (print) Lynn Madkiff

LYNN MADKIFF
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES
MAY 20, 2009

Recorder: Return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

EXHIBIT "A"

Attached hereto and by this reference made a part hereof that certain Oil and Gas Lease of even date, by and between Phillip Marone, single, Lessor and CHESAPEAKE APPALACHIA, LLC., Lessee.

### Mutual Consent:

Provided that Lessor is the current surface owner of the affected lands at the time of Lessee's surface operations, Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.

### Reclamation Clause:

Lessor and Lessee agree that the leased premises will be restored, as nearly as is reasonably practicable, to the contours which existed prior to commencement of operations as granted in Article one (1) herewith. Said restoration will be conducted in a timely manner, consistent with accepted oil and gas standards and any controlling government agency having jurisdiction there over.

### Hold Harmless Clause:

Lessee agrees it will protect and save and keep Lessor harmless and indemnified against and from any penalty or damage or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, damage or expense, including any injury to any person or property whomsoever or whatsoever arising out of or caused by any negligence of the Lessee or those holding under Lessee.

### Compliance Clause:

Lessee stipulates and agrees that its operations and those operating under the color of Lessee's rights granted herein, including the plugging and abandonment of wells, will be conducted in strict compliance with any and all Governmental Agency's having jurisdiction thereover, including, but not limited to, the Department of Environmental Protection Agency [DEP] of the State of Pennsylvania.

### Ad Valorem (Property) Tax Clause:

Lessee agrees to pay eighty five percent (85%) of any increase in ad valorem taxes attributable to, or resulting from, the assessment of oil and gas due to production from the leased premises.

### Assessment Clause:

Lessee understands that the land leased hereunder may be under and subject to the Pennsylvania Clean and Green program or the Pennsylvania Conservation Reserve Enhancement Program (CREP) program, and Lessee, its successors and assigns accepts responsibility for and agrees to pay any and all roll-back real estate taxes and/or any and all additional assessments (and including, but not limited to, interest and penalties thereon) which are assessed on that portion of the leased lands affected as a result of Lessee's operations hereunder.

### Potable Water Clause:

In the event any activity carried on by Lessee pursuant to the terms of this lease damages, disturbs, or injures Lessor's potable water well or source located on these leased premises, Lessee shall at its sole cost and expense use its best efforts to correct any such damage, disturbance or injury.

### Market Enhancement Clause:

It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

The aforementioned conditions contained in this Oil and Gas Lease and Exhibit "A" constitute the entire agreement between the parties hereto and no other verbal representation has been made and/or agreed to. Any changes, additions or alterations to the printed form of the Oil and Gas Lease or Exhibit "A" require the same degree of formality as the conditions contained herein.

Signed for Identification:

_____    _____
                            Phillip Marone

LYNN MADKIFF
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES
MAY 20, 2009