# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
|  | § |  |
| Reorganized Debtors. | § | (Jointly Administered) |
|  | § |  |

## REORGANIZED DEBTORS' MOTION TO STRIKE UNAUTHORIZED "CLASS" PROOF OF CLAIM NO. 11083

**This Motion seeks entry of an order that may adversely affect you. If you oppose the Motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the Motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the Motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the Court may consider evidence at the hearing and may decide the Motion at the hearing.**

**Represented parties should act through their attorney.**

**A hearing will be conducted on this matter on July 7, 2021, at 2:00 p.m. prevailing Central Time in Courtroom 400, 515 Rusk Street, Houston, TX 77002. You may participate in the hearing either in person or by audio/video connection. Audio communication will be by use of the court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long-distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures & Schedules," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click Here to Submit Electronic Appearance." Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Reorganized Debtors in these chapter 11 cases may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Reorganized Debtor Chesapeake Energy Corporation's principal place of business and the Reorganized Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

The above-captioned reorganized debtors (before the effective date of their plan of reorganization, the "<u>Debtors</u>," and after the effective date of their plan of reorganization, the "<u>Reorganized Debtors</u>")[2] respectfully state as follows in support of this motion (this "<u>Motion</u>"):

<u>**Preliminary Statement**</u>

1.     Without filing the required motion asking this Court to apply Bankruptcy Rule 7023, John D. Mashburn and Poynter Law Group filed a purported "class" proof of claim number 11083 (the "<u>Claim</u>") against Chesapeake Operating, L.L.C. ("<u>Chesapeake Operating</u>"), on behalf of April Marler and putative class members (together, the "<u>Claimants</u>") in the litigation styled *Lisa Griggs, and April Marler, on behalf of themselves and other Oklahoma citizens similarly situated, v. New Dominion, LLC, et al.*, Case No. CJ-2017-174 (the "<u>Griggs Litigation</u>"),[3] pending in the District Court of Logan County, Oklahoma (the "<u>State Court</u>").

2.     As a threshold matter, Counsel failed to timely file a motion asking this Court to apply the class action rule—Bankruptcy Rule 7023—which is a prerequisite to allowing any proof of claim on a "class" basis.  Further, had a timely motion been filed, the exceptional circumstances that merit application of Bankruptcy Rule 7023 do not exist here, as no class was certified prepetition and appropriate notice of the bar date was provided to all putative class members.[4]

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2833] (the "<u>Plan</u>").

[3]     The Class Action Petition, as defined herein, was filed by co-counsel to the putative class Federman & Sherwood, Weitz & Luxenberg, PC, and Poynter Law Group, (collectively, with John Mashburn, "<u>Counsel</u>").  *See* Class Action Petition, pp. 38–39. Steel, Wright, Gray & Hutchinson, PLLC also represents the plaintiffs in the Griggs Litigation but has not made an appearance in these chapter 11 cases.

[4]     To the extent the Court finds that Bankruptcy Rule 7023 should apply, the Reorganized Debtors reserve the right to submit additional briefing on the issue of whether the requirements under rule 23 of the Federal Rules of Civil Procedure ("<u>Federal Rule 23</u>") for class certification are satisfied.

3.      Accordingly, and for the reasons set forth herein, the Claim should be stricken from the Reorganized Debtors' claims register.

## **Relief Requested**

4.      The Reorganized Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), striking the Claim from the Reorganized Debtors' claims register.

## **Jurisdiction and Venue**

5.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Reorganized Debtors confirm their consent to the entry of a final order by the Court.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105(a) of the Bankruptcy Code, rules 9014 and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## **Background**

### I.      **The Griggs Litigation.**

8.      On July 21, 2017, Claimants filed the *Class Action Petition*, attached hereto as **Exhibit A** (as amended from time to time, the "Class Action Petition"), in the State Court, thereby commencing the Griggs Litigation against twenty-three defendants, including Chesapeake Operating, on behalf of two named plaintiffs and a putative class of plaintiffs.  The Class Action Petition alleges that defendants' underground disposal of saltwater—a byproduct of oil and gas production that is co-produced with hydrocarbons—caused several series of earthquakes that damaged the putative class members' property.  *See* Class Action Petition, ¶¶ 1, 34–55,

Case No. CJ-2017-174.  The Class Action Petition defines the putative class as:  (a) citizens of Oklahoma; (b) owning a home or business in Logan County, Payne County, Lincoln County, Oklahoma County, Canadian County, Kingfisher County, Garfield County, or Noble County (the "Class Area"); (c) during the dates of seismic activity within the Class Area between March 30, 2014 and July 21, 2017 (the "Class Period"); (d) excluding class member properties on lands where there is any federal oversight, such as tribal or Indian lands; and (e) excluding any defendants and their officers and directors, and the State Court judge and his or her immediate family members.  *See id.*, ¶ 70.

9.     Between the dates of September 26, 2018 and October 18, 2018, certain defendants filed motions to strike the class action allegations (the "Motions to Strike Class") on the basis that they failed to meet the class action requirements under Oklahoma law.  The moving defendants argued, among other things, that the "commonality requirement" of 12 O.S. § 2023(A)(2)—which is substantially similar to that of Federal Rule 23(a)(2)—could not be met because (a) a basic element of the class's claim must be proven individually for each plaintiff, (b) the class is so numerous that the plaintiffs could not possibly meet the commonality requirement, and (c) plaintiffs allege such numerous seismic events giving rise to the claims that the putative class could not generate common answers to proposed class question.  *Motion to Strike the Class Allegations Contained in Plaintiffs' Petition*, Case No. CJ-2017-174, October 10, 2018, pp. 10–14.  The moving defendants further argued that individual issues predominated over common issues and Federal Rule 23(b) could not be satisfied.  *See id.*, pp. 14–16.

10.    On November 16, 2018, the State Court granted the Motions to Strike Class on the record and denied the certification of the purported class.  *See* November 16, 2011 Hr'g Tr. at 25, Griggs Litigation, Case No. CJ-2017-174 (the "State Court Transcript"), attached hereto as

**Exhibit B** ("We have [23] defendants in this matter with a whole bunch of different earthquakes and a whole bunch of different clusters.  The Court believes, based upon the petition on its face, that there's no way . . . the plaintiffs can show commonality, as it relates to a class certification.").

11.     On October 8, 2020, the State Court memorialized its decision by entering the *Order on Defendants' Motions to Dismiss Plaintiffs' First Amended Petition, Defendants' Motions to Strike the Class Allegations, and Plaintiffs' Motion for Appropriate Relief*, Case No. CJ-2017-174 (the "Class Action Order"), attached hereto as **Exhibit C**.

12.     On November 6, 2020, Counsel filed the *Petition in Error* (the "Petition in Error") in the Supreme Court of the State of Oklahoma, thereby commencing an interlocutory appeal of the Class Action Order with respect to class allegations.  *See* Petition in Error, *Lisa Griggs and April Marler, on behalf of themselves and other Oklahoma citizens similarly situated vs. New Dominion LLC, et al.*, Case No. IN-119185.

## II.     The Chapter 11 Cases.

13.     On June 28, 2020, the Debtors commenced these chapter 11 cases.

14.     On July 9, 2020, the Debtors filed *Defendants' Notice of Suggestion of Pendency of Bankruptcy for Chesapeake Energy Corporation, et al., and Automatic Stay of These Proceedings* (the "Suggestion of Bankruptcy") in the State Court.

15.     On August 13, 2020, the Court entered the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 787] (the "Bar Date Order"), establishing certain dates and deadlines for filing proofs of claim in these chapter 11 cases.  Among other things, the Bar Date Order established October 30, 2020, at 5:00 p.m., prevailing Central

Time (the "Bar Date"), as the deadline for filing all "claims" (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors that arose before the Petition Date, except for claims specifically exempt from complying with the Bar Date Order.

16.     On August 28, 2020 and September 1, 2020, the Debtors caused *Notice of Deadlines for Filing of Proofs of Claim, Including Requests for Payment Pursuant to Section 503(b)(9) of the Bankruptcy Code* (the "Bar Date Notice") to be served on Counsel.[5]  *See Affidavit of Service of Gregory Winter* [Docket No. 1254]; s*ee also Affidavit of Service of Gregory Winter* [Docket No. 1263].

17.     On October 13, 2020, Counsel filed the Claim related to the Griggs Litigation against Chesapeake Operating on behalf of the Claimants.  The Claim included a copy of the Class Action Petition.

18.     On December 4, 2020, Counsel filed the *Notice of Rule 2004 Requests on Chesapeake Operating, L.L.C.* [Docket No. 2047] (the "2004 Request"), requesting the Debtors to produce all insurance agreement documents under which an insurer may be liable to satisfy all or part of any judgment or to indemnify or reimburse for payments made to satisfy any judgment in the Griggs Litigation.  The Debtors satisfied the 2004 Request by providing Counsel with the requested documents.

19.     On January 16, 2021, the Bankruptcy Court entered the *Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (the "Confirmation Order") [Docket No. 2915] confirming the Plan.

---

[5]     On August 28, 2020, Counsel was served with the Bar Date Notice on behalf of the named plaintiff and the putative class.  On September 1, 2020, Counsel was served the Bar Date Notice on behalf of other individuals listed in the Debtors' creditor matrix.

20.     As of the filing of this Motion, no motion requesting application of Bankruptcy Rule 7023 has been filed.

## Basis for Relief

### I.     Claimants Failed to Timely Move for Application of Bankruptcy Rule 7023.

21.     One "mandatory requirement essential to filing a class proof of claim" is that the claimant must "timely petition the bankruptcy court to apply the provisions of Rule 9014 and 7023." *Reid v. White Motor Corp. (In re White Motor Corp.)*, 886 F.2d 1462, 1471 (6th Cir. 1989); *In re Craft*, 321 B.R. 189, 199 (Bankr. N.D. Tex. 2005) ("Though some courts have held that a claim must be objected to create a contested matter in which to invoke Rule 7023 . . . it is the view of this court that it is the burden of the class representatives to raise the issue of class certification."); *In re Computer Learning Centers, Inc.*, 344 B.R. 79, 85 (Bankr. E.D. Va. 2006) ("The burden is on the claimant to obtain application of Rule 7023 and also to satisfy the requirements of Rule 23 itself."); *id*. at 87 ("*Reid* makes clear that a class proof of claim is not permissible without an order making 7023 applicable and that the proponent of the class proof of claim must timely obtain that order.").  While Bankruptcy Rule 9014 does not provide a deadline for filing a Bankruptcy Rule 7023 motion, it "should be filed as soon as practicable." *Computer Learning Centers, Inc.*, 344 B.R. at 89.

22.     Where the proponent fails to file a motion to apply the class action rule, "[t]hat is dispositive" against applying Bankruptcy Rule 7023. *See Computer Learning Centers*, 344 B.R. at 88–89 ("Logically, the Rule 7023 motion should be granted before a class proof of claim is filed . . . A Rule 7023 motion is not a defense to . . . an objection since the objection is well taken at the moment it is made.  A Rule 7023 motion filed at that time is merely an attempt to remedy an obvious defect that will otherwise certainly result in disallowance of the claim.").

23.     The Claimants never filed a motion seeking authority to file a class proof of claim. That is dispositive and the claim should be stricken from the record.

**II.     Application of Bankruptcy Rule 7023 to this Matter Is Not Appropriate.**

24.     Even if Counsel had filed a Bankruptcy Rule 7023 motion for class certification, application of Bankruptcy Rule 7023 is not appropriate as the State Court has already determined that the putative class does not satisfy the requirements for class certification.

25.     Although the Fifth Circuit has not opined on the propriety of class proofs of claim, it has clearly established a "two-step process" for determining whether a contested motion for class certification should be approved or denied. *Teta v. Chow (In re TWL Corp.)*, 712 F.3d 886, 892 (5th Cir. 2013). ***First***, "the court must exercise its discretion [under [Bankruptcy] Rule 9014] as to whether to apply Rule 23 to the contested proceeding." *Id.* (alteration in original). ***Second***, "if the court decides to apply Rule 23, it then must determine whether the Rule's requirements for class certification have been satisfied." *Id.* at 892–93.

26.     Bankruptcy Rule 9014 affords discretion to the court to apply Bankruptcy Rule 7023 to contested matters. *See* Fed. R. Bankr. P. 9014; *see also TWL Corp.*, 712 F.3d at 892 ("Rule 7023 is not designated as one of these automatically applicable rules, but Rule 9014 does state that '[t]he court ***may*** at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply.'") (emphasis in original).  Thus, whether to apply Bankruptcy Rule 7023 to this matter lies squarely within the Court's discretion.

27.     The Fifth Circuit has established the following three-factor test for determining whether to apply Bankruptcy Rule 7023 to a contested motion for class certification:  "(1) whether the class was certified pre-petition, (2) whether the members of the putative class received notice of the bar date, and (3) whether class certification will adversely affect the administration of the case, especially if the proposed litigation would cause undue delay." *TWL Corp.*, 712 F.3d at 893.

The first two factors—prepetition certification and notice—are the most important.  *See In re Musicland Holding Corp.*, 362 B.R. 644, 655 (Bankr. S.D.N.Y. 2007) ("The first two considerations—pre-petition certification and notice of the bar date—are critical."); *see also In re Bally Total Fitness of Greater New York, Inc.*, 402 B.R. 616, 620 (Bankr. S.D.N.Y.), *aff'd*, 411 B.R. 142 (S.D.N.Y. 2009) ("The filing of a class proof of claim is consistent with the Bankruptcy Code generally in two principal situations:  (i) where a class has been certified pre-petition by a non-bankruptcy court; and (ii) where there has been no actual or constructive notice to the class members of the bankruptcy case and Bar Date.").  A court may also consider the benefits and costs of class litigation to the estate.  *TWL Corp.*, 712 F.3d at 893.

28.     For the reasons outlined below, application of Bankruptcy Rule 7023 is not appropriate in the present circumstances.

### A.     The Putative Class Was Not Certified Prepetition.

29.     The question of whether a court has certified a prepetition class is the key inquiry as to whether to apply Bankruptcy Rule 7023, and is often the dispositive factor.  *See Craft*, 321 B.R. at 190 (analyzing two class proofs of claim and allowing the certified class claim while denying the non-certified class claim).  When a class has not been certified prepetition, the putative class members lack a "reasonable expectation that they need not comply with the Bar Date Order."  *Bailey v. Jamesway Corp. (In re Jamesway Corp.)*, 1997 WL 327105, at *10 (Bankr. S.D.N.Y. June 12, 1997).

30.     Here, the putative class has not been certified.  In fact, the Claimants' request for class certification was expressly denied by the State Court nearly two years before the Claim was filed.  Accordingly, the first prong of the *TWL* test weighs in favor of denying certification.

**B.**     **The Members of the Putative Class Received Notice of the Bar Date.**

31.     A motion to file a class proof of claim should be denied when the putative class members receive notice of the bar date.  *See In re Sacred Heart Hosp. of Norristown*, 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995) ("[I]f the putative unnamed class members have clearly received actual or constructive notice of the bankruptcy case and the bar date, denial of the implementation of the class proof of claim device appears advisable.");  *see also In re Nw. Airlines Corp.*, 2007 WL 2815917, at \*4 (Bankr. S.D.N.Y. Sept. 26, 2007) (published notice combined with actual notice of the bar date provided to relevant parties, including class counsel and the proposed class representatives, was "*prima facie*, reasonable" when the class certification previously had been denied).

32.     Notice is sufficient when it is "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  In other words, "notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance."  *Id.* (internal citation omitted).  The reasonableness of notice depends on the particular circumstances and facts of each case.  *See id.* at 314 (stating that "due regard" is to be had for the "practicalities and peculiarities of the case" in assessing reasonableness of notice); *Greyhound Lines, Inc. v. Rogers (In re Eagle Bus. Mfg.)*, 62 F.3d 730, 735 (5th Cir. 1995) (citing *Oppenheim, Appel, Dixon, & Co. v. Bullock (In re Robintech, Inc.)*, 863 F.2d 393, 396 (5th Cir. 1989)) ("[W]hether a creditor received adequate notice depends on the facts and circumstances of each case.").

33.     The method of notification due to creditors depends on whether they are known or unknown.  *Chemetron Corp. v. Jones*, 72 F.3d 341, 345–46 (3d Cir. 1995) ("For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'") (internal citations

omitted).  A debtor must provide actual notice, as opposed to notice by publication, to all known creditors.  *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953).  Known creditors include those claimants known to the debtor and those claimants whose identities are "reasonably ascertainable."  *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (1988).  A creditor is reasonably ascertainable if it can be discovered through "reasonably diligent efforts."  *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4 (1983).  Reasonably diligent efforts do not require "impracticable and extended searches[.]"  *Mullane*, 339 U.S. at 317.  Rather, reasonably diligent efforts need only include a careful examination of the debtor's own books and records.  *Chemetron*, 72 F.3d at 347; *In re Best Products Co.*, 140 B.R. 353, 358 (Bankr. S.D.N.Y. 1992) (citing *In re Waterman S.S. Corp.*, 59 B.R. 724, 727 (Bankr. S.D.N.Y. 1986)) ("Whereas a debtor must review its own books and records to ascertain the identity of creditors, a debtor is not required to search elsewhere for those who might have been injured.").  Further, it is a creditor's responsibility to provide the debtor with any changes in its mailing address.  *Eagle Bus. Mfg.*, 62 F.3d at 736 ("The creditor is responsible for notifying the debtor, trustee, or the court of any changes in her mailing address to guarantee that she be given reasonable notice.  If the creditor fails to up-date her address and as a consequence does not receive a notice of the bar date that was properly mailed, she cannot later argue that her due process rights were violated.") (internal citation omitted).

34.     Known creditors require actual notice.  *See*, *e.g.*, *Eagle Bus. Mfg.*, 62 F.3d at 736 ("Mailing a notice by First Class U.S. Mail to the last known address of a creditor satisfies due process because it is reasonably calculated to inform the creditor of the bar date for filing proofs of claim.") (internal quotations omitted).  A party receives actual notice when its attorney receives actual notice within the scope of the attorney-client relationship.  *See In re Hutchison*, 187

B.R. 533 (Bankr. S.D. Tex. 1995) ("It is well recognized that an attorney's actual notice of the pendency of a bankruptcy may be imputed to his client if it occurs within the scope of the attorney-client relationship." (citing *Matter of Sam*, 894 F.2d 778, 779 (5th Cir. 1990))).

35.     In contrast, unknown creditors require only publication notice.  *See Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 155 (5th Cir. 2014) ("[T]he debtor need only provide 'unknown creditors' with constructive notice by publication.  Publication in a national newspaper such as the *Wall Street Journal* is sufficient.") (internal citation omitted).

36.     A debtor "need only do what is reasonable under the circumstances to provide notice to ascertainable creditors."  *In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 46 (Bankr. D. Del. 2012) (internal citations omitted).  The Debtors complied with this standard.

37.     April Marler is the sole named plaintiff and is possibly the only known creditor in the putative class.[6]  Due to the broad definition of the class, there may be thousands of unknown members of the putative class.

### 1.     The Debtors' Methods for Compiling Notice Information.

38.     Prior to commencing these chapter 11 cases, the Debtors, with the assistance of their advisors, developed a creditor matrix to provide reasonable and appropriate notice to parties in interest.  Ms. Marler—the only named plaintiff in the action—is included in the Debtors' creditor matrix.  Additionally, certain other individuals on the creditor matrix may fall within the putative class definition (such individuals, together with Ms. Marler, the "Known Creditors").

39.     It is likely that, in light of the scope of the putative class, many putative class members were not included in the matrix, nor would it have been practicable to identify and

---

[6]     Ms. Griggs passed away on April 15, 2020 and her representative chose not to pursue the Griggs Litigation or the claims therein on her estate's behalf.  However, the Griggs Litigation's caption remained unchanged for purposes of consistency.

include them.  If Counsel is aware of specific members of the putative class who are not listed on the creditor matrix, Counsel has not shared such information with the Reorganized Debtors. Therefore, any members of the Putative Class not listed on the Debtors' creditor matrix are unknown creditors (the "Unknown Creditors").

### 2.    The Debtors' Methods for Delivering Notice.

40.    The Debtors served the Bar Date Notice on all parties listed in the creditor matrix, including Ms. Marler and any other Known Creditors.  The Bar Date Notice was enclosed securely in a postage pre-paid envelope and delivered via first class mail.  The Bar Date Notice advised Counsel of the bankruptcy proceedings and provided details regarding the time and manner for filing a proof of claim.[7]  Therefore, all Known Creditors in the Griggs Litigation received actual notice of the Bar Date.

41.    With respect to the Unknown Creditors, the Debtors provided publication notice of the Bar Date Order in accordance therewith.  *See* Bar Date Order, ¶¶ 16–17.  Specifically, the Debtors published the Bar Date Notice on at least one occasion in the *New York Times*, the *Oklahoman*, and six other newspapers.  *See* Docket Nos. 1096–1099, 1125–1127, 1157.  Because constructive notice is appropriate for unknown creditors, the Debtors provided publication notice to all Unknown Creditors, consistent with the requirements of due process.

42.    To the extent Counsel has established an attorney-client relationship with any unknown members of the putative class, such Unknown Creditors received actual notice of the Bar Date by virtue of the Debtors' service of the Bar Date Order on Counsel.

---

[7]    This Court held that the notice provided pursuant to the Bar Date Order "constitutes adequate and sufficient notice of each of the Bars Dates and satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules."  *See* Bar Date Order, ¶ 17.

43.     The Debtors provided sufficient notice—actual or constructive—to every Claimant.  Having provided notice of the Bar Date Order to all putative class members, the second *TWL* factor also weighs in favor of denying class certification.

### C.     Class Certification Will Adversely Affect the Administration of These Cases.

44.     The final *TWL* factor considers whether class certification will adversely affect the administration of the case, with particular attention to whether it would cause undue delay.  *TWL Corp.*, 712 F.3d at 893.  Certification of a class at this late stage would certainly adversely affect the administration of these cases by causing undue delay and complexity in the claims resolution process.

45.     The benefits to the claims process of a class proof of claim are minimized in bankruptcy compared to other contexts because the bankruptcy claim process already provides advantages that make it superior to a class action.  *See FIRSTPLUS Financial, Inc.*, 248 B.R. 60, 71 (Bankr. N.D. Tex. 2000) ("The chief purpose of a class action suit outside of the bankruptcy context—to avoid litigation in a multiplicity of fora—is of little concern in the bankruptcy context since the Bankruptcy Court has jurisdiction over all claims against the Debtor."); *see also Musicland Holding Corp.*, 362 B.R. at 651 n. 8 ("Creditors, even corporate creditors, don't have to hire a lawyer, and can participate in the distribution for the price of a stamp.  They need only fill out and return the proof of claim sent with the Bar Date Notice.  Furthermore, claims are 'deemed allowed' under § 502(a) in the absence of an objection, in which case discovery and fact-finding are avoided altogether."); *see also Mortland v. Aughney*, 2011 WL 2653515, at *2 (N.D. Cal. July 6, 2011) ("[T]he bankruptcy process is already efficient; it consolidates claims just as a class action does.").

46.     On the other hand, the significant costs imposed by a class action can "gum up the works" of the case.  *See In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005) (noting

that class claims have the potential to disrupt administering the estate); *see also Bally Total Fitness*, 402 B.R. at 621 ("[C]lass certification would adversely affect the administration of these cases adding layers of procedural and factual complexity that accompany class-based claims, siphoning the Debtors' resources and interfering with the orderly progression of the reorganization.").

47.     Over 8,300 claims have been filed in these chapter 11 cases.  The members of the putative class had ample opportunity to participate in the claims process like any other creditor—by filing a proof of claim.  To certify a class at this late juncture would effectively add an unknown number of Claimants to these proceedings nearly seven months after the Bar Date. Under these circumstances, certification of the putative class would not serve an efficient and fair claims resolution process.

48.     The Claimants have failed to seek authority to file a class proof of claim.  Even if this defective aspect of the Claim could be remedied, Claimants cannot satisfy any of the *TWL* factors.  The Reorganized Debtors, therefore, respectfully request that the Court strike the Claim from the claims register.

## **Reservation of Rights**

49.     Nothing contained in this Motion or any actions taken by the Reorganized Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Reorganized Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Reorganized Debtors' rights under the Bankruptcy Code or

15

any other applicable law; or (g) a concession by the Reorganized Debtors or any other party in interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Reorganized Debtors and all other parties in interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Reorganized Debtors' or any other party in interest's rights to subsequently dispute such claim law.

## **Notice**

50.     Notice of this Motion has been provided to Counsel in accordance with the Bankruptcy Rules. The Reorganized Debtors submit that such notice is sufficient and proper under the circumstances and that no other or further notice is requested.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Reorganized Debtors respectfully request that the Court enter the Order granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 9, 2021

/s/ Matthew D. Cavenaugh

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Co-Counsel to the Reorganized Debtors*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* )
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                alexandra.schwarzman@kirkland.com

*Co-Counsel to the Reorganized Debtors*

## **Certificate of Service**

I certify that on June 9, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

**Class Action Petition**



**IN THE DISTRICT COURT OF LOGAN COUNTY, OKLAHOMA**

LISA GRIGGS, and APRIL MARLER,
on behalf of themselves and other
Oklahoma citizens similarly situated,

**PLAINTIFFS**

vs.                                              Case No. CJ-2017-174

NEW DOMINION LLC, TNT OPERATING
COMPANY, INC., WHITE OPERATING
COMPANY,RAINBO SERVICE COMPANY,
GASTAR EXPLORATION, INC.,
DRYES CORNER LLC, CHESAPEAKE
OPERATING LLC,
DEVON ENERGY PRODUCTION COMPANY LP,
SPECIAL ENERGY PRODUCTION CO LP,
ORCA OPERATING COMPANY LLC,
WHITE STARPETROLEUM, LLC,
EQUAL ENERGY US INC.,
ELDER CRAIG OIL AND GAS LLC, D&B
OPERATING LLC,M M ENERGY INC.,
DAKOTA EXPLORATION LLC,
WICKLUND PETROLEUM CORPORATION,
KIRKPATRICK OIL COMPANY INC., TOOMEY
OIL COMPANY INC,
CHAPARRAL ENERGY LLC,EASTOK
PIPELINE LLC,
MID-CON ENERGY OPERATING LLC,
MIDSTATES PETROLEUM
COMPANY, AND TERRITORY RESOURCES LLC,
and JOHN DOES 1 through 25,

**DEFENDANTS**

---

### CLASS ACTION PETITION

---

COMES NOW Plaintiffs Lisa Griggs, and April Marler on behalf of themselves and the Class of similarly situated Oklahoma citizens (defined below), and for their class action petition against Defendants state:

### I:    NATURE OF ACTION

1.    By disposing of fracking wastewater deep into the earth, Defendants introduced contaminants into the natural environment that caused an adverse change to it in the form of unnatural seismic activity.  In other words, due to Defendants' pollution of the environment they caused the earthquakes at issue in this case.

2.    This is an action to recover Plaintiffs' and the Class members' damages proximately caused by Defendants' pollution of the environment within and around Logan County, Oklahoma through the disposal of fracking wastewater with injection wells, which are the pollutants.

3.    Plaintiffs and the Class seek damages from the Defendants, in the form of the following:

     a.   Physical damages to real and personal property;

     b.   market value losses to their real property;

     c.   emotional distress; and,

     d.   punitive damages.

### II:    PARTIES

4.    Plaintiff Lisa Griggs is a citizen of Oklahoma.  She is also a citizen and resident of Logan County, Oklahoma.

5.    Plaintiff April Marler is a citizen of Oklahoma.  She is also a citizen and resident of Oklahoma County, Oklahoma.

6.      Defendant New Dominion LLC ("New Dominion") is a citizen of Oklahoma.  It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 1307 S. Boulder Ave., Tulsa, Oklahoma 74119.  Its registered agent for service of process is Mr. Fred Buxton at the same address.

7.      Defendant TNT Operating Company ("TNT"), Inc. is a citizen of Oklahoma.  It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 10600 S. Pennsylvania Ave., Ste. 16-601, Oklahoma City, Oklahoma 73170.  Its registered agent for service of process is Mr. Byron R. Neher at 920 South Fairmount Ave., Oklahoma City, Oklahoma 73128.

8.      Defendant White Operating Company ("White") is a citizen of Oklahoma.  It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 1627 SW 96th St., Oklahoma City, Oklahoma 73159.  Its registered agent for service of process is Mr. Lloyd White at the same address.

9.      Defendant Rainbo Service Company ("Rainbo") is a citizen of Oklahoma.  It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 1839 SE 25th St., Oklahoma City, Oklahoma.  Its registered agent for service of process is K.D. Lackey, 6 NE 63rd St., Suite 275, Oklahoma City, Oklahoma 73105.

10.     Defendant Dryes Corner LLC ("Dryes Corner") is a citizen of Oklahoma.  It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 7005 N.

Robinson Ave., Oklahoma City, Oklahoma 73116. Its registered agent for service of process is Len Cason, 201 Robert S. Kerr, Ste. 1600, Oklahoma City, Oklahoma 73102.

11.     Defendant Chesapeake Operating LLC ("Chesapeake") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 6100 North Western Ave., Oklahoma City, Oklahoma 73118. Its registered agent for service of process is The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

12.     Defendant Devon Energy Production Company, L.P. ("Devon") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 333 W. Sheridan Ave., Oklahoma City, Oklahoma 73102. Its registered agent for service of process is The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

13.     Defendant Special Energy Production Co LP ("Special Energy") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 4815 Perkins Road, Stillwater, Oklahoma 74076. Its registered agent for service of process is John. F. Special, 4815 Perkins Road, Stillwater, Oklahoma 74074.

14.     Defendant Orca Operating Company LLC ("Orca") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 427 S. Boston Ave., Suite 929, Tulsa, Oklahoma 74114. Its registered agent for service of process is Orca Resources, LLC at the same address.

15.     Defendant White Star Petroleum LLC, previously named American Energy Woodford LLC, ("White Star") is a citizen of Oklahoma.  It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 301 Nw 63rd St., Suite 600, Oklahoma City, Oklahoma 73116.  Its registered agent for service of process is The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

16.     Defendant Equal Energy US Inc. ("Equal Energy") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is at 15th West 6th Street, Suite 1100, Tulsa, Oklahoma 74119. Its registered agent for service is The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

17.     Defendant Elder Craig Oil and Gas LLC ("Elder Craig") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 1004 NW 139th Street Parkway, Edmond, Oklahoma 73013. Its registered agent is Craig J. Elder, 6632 NW 110th Street. Oklahoma City, Oklahoma 73162.

18.     Defendant D&B Operating LLC ("D&B") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 223 W. Melrose, Ringwood, Oklahoma 73768. Its registered agent is Preston Jones, 46413 Beckham Road, Aline, Oklahoma 73716.

19.     Defendant M M Energy Inc. ("M M") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain

wastewater disposal wells at issue in this case. Its principal place of business is 13927 Quail Pointe Drive, Oklahoma City, Oklahoma 73134. Its registered agent is Mike Murphy, 2601 NW Expressway #904E, Oklahoma City, Oklahoma 73112.

20.    Defendant Dakota Exploration LLC ("Dakota") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 110 W. 7th Street, Suite 210, Tulsa, Oklahoma 74119. Its registered agent is Ezzell and Shepherd, PLLC, 1010 W. Maple, Enid, Oklahoma 73702.

21.    Defendant Wicklund Petroleum Corporation ("Wicklund") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 4521 Executive Drive, Suite 101, P.O. Box 110429, Naples, FL 34108. Its registered agent is Scott M. Rayburn, 211 N. Robinson N1000, Oklahoma City, Oklahoma 73102.

22.    Defendant Kirkpatrick Oil Company, Inc. ("Kirkpatrick") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 1001 W. Wilshire Boulevard, Suite 202, Oklahoma City, Oklahoma 73116. Its registered agent is Crowe & Dunlevy, a Professional Corporation, Attn: Cynda Ottaway, 324 North Robinson Avenue, Suite 100, Oklahoma City, Oklahoma 73102.

23.    Defendant Toomey Oil Company, Inc. ("Toomey") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 1126 S.

Frankfort Avenue, Suite 200, P.O. Box 1090, Tulsa, Oklahoma 74101. Its registered agent is Toomey Oil Co., Inc., 1126 S. Frankfort Ave., Tulsa, Oklahoma 74120.

24.     Defendant Chaparral Energy LLC ("Chaparral") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 701 Cedar Lake Boulevard, Oklahoma City, Oklahoma 73114. Its registered agent is Capitol Document Services, Inc., 101 N. Robinson Avenue, 13th Floor, Oklahoma City, Oklahoma 73102.

25.     Defendant Eastok Pipeline LLC ("Eastok Pipeline") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principle place of business is 601 N. Marienfeld, Suite 400, Midland, Texas 79701. Its registered agent is The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

26.     Defendant Mid-Con Energy Operating LLC ("Mid-Con") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principle place of business is 2431 E. 61st Street, Suite 850, Tulsa, Oklahoma 74136. Its registered agent is Charles L. McLawhorn, 2431 E. 61st Street, Suite 850, Tulsa, Oklahoma 74136.

27.     Defendant Midstates Petroleum Company, LLC ("Midstates") is incorporated in Delaware. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 321 S. Boston Ave., Suite 1000, Tulsa, OK 74103. Its registered agent is The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

28.     Defendant Territory Resources LLC ("Territory Resources") is a citizen of Oklahoma. It owns and conducts oil and gas operations in this State, and more specifically, owns and operates certain wastewater disposal wells at issue in this case. Its principal place of business is 1511 S. Sangre Road, Stillwater, Oklahoma 74074. Its registered agent is Crowe & Dunleavy, a Professional Corporation, Attn: James H. Holloman, Jr., 324 North Robinson Avenue, Suite 100, Oklahoma City, Oklahoma 73102.

29.     John Does 1 – 25 are other Oklahoma oil and gas companies that have engaged in injection well operations in and around Logan County, which have also contributed to the earthquakes and resulting damages to Plaintiffs and the Class members.

30.     Collectively, the Defendants specifically named above and John Does 1-25 are referred to in this petition as "Defendants."

### III:    JURISIDICTION AND VENUE

31.     Jurisdiction in this Court is proper.

32.     This Court also has personal jurisdiction over Defendants as they are citizens of Oklahoma, do substantial business in the State of Oklahoma and Logan County, and further, operate the wastewater disposal wells at issue within and nearby this judicial district.

33.     Venue is proper in this Court as a substantial part of the events giving rise to this claim occurred here, and Plaintiffs are citizens and residents of Logan and Oklahoma Counties.

### IV:    FACTUAL ALLEGATIONS

34.     In recent years, thousands of earthquakes have occurred in Oklahoma.

35.     In fact, Oklahoma is the most seismically active state in the continental United States.

36.     Scientists have tied these earthquakes to the disposal of wastewater from fracking operations, which the oil and gas industry uses to release trapped oil and gas.

37.     Over the years, the oil and gas industry has issued public statements to hide the seismic problems it is creating, and in fact continued a mantra that their operations did not cause earthquakes.

38.     In truth, Oklahoma's earthquakes over the past five or so years have been caused by the oil and gas industry's disposal of fracking related waste.  Some have termed these earthquakes as "induced," "man-made," "human-made," or "frackquakes."

39.     The waste fluids generated from fracking are mostly disposed of by injecting the wastewater fluids back into the earth under extreme pressure in what are usually called wastewater disposal wells or injection wells.

40.     The injection of wastewater into the earth is conducted by Defendants on oil lands. Compared with the overall population of Oklahoma, relatively few persons are engaged in this activity.  The disposal well drilling and injection of pressurized toxic water at high volumes back into the earth is inappropriate in proximity to faults in Logan County and surrounding counties.

41.     Indeed, this process of pollution causes earthquakes, and has caused the earthquakes shaking Oklahoma since at least 2011.

42.     In fact, the number of earthquakes in Oklahoma has increased more than 300 fold, from a maximum of 167 before 2009 to 5,838 in 2015.

43.     As the number of earthquakes has increased, so has their severity.  For example, the number of magnitude 3.5 earthquakes has increased fifty fold from 4 in 2009 to 220 in 2015. See below:



44.    These waste-induced earthquakes have toppled historic towers, caused parts of houses to fall and injure people, cracked walls, foundations, and basements, and shattered nerves, as people fear there could be worse to come.



45.    On March 28, 2016, and revised on June 17, 2016, the United States Geological Survey ("USGS") published a study quantifying these risks.  It found that the earthquake risks in Oklahoma have risen rapidly as a result of deep disposal of production wastes.  Oklahoma

Page 10 of 39

earthquake risks are now the highest in the nation. Maps included in the report show a broad swathe of the State of Oklahoma has a 5 to 12% likelihood of a highly damaging earthquake in the next year. Petersen, M.D., Mueller, C.S., Moschetti, M.P., Hoover, S.M., Llenos, A.L., Ellsworth, W.L., Michael, A.J., Rubinstein, J.L., McGarr, A.F., and Rukstales, K.S., 2016, 2016 One-year seismic hazard forecast for the Central and Eastern United States from induced and natural earthquakes: U.S. Geological Survey Open-File Report 2016–1035, 52 p., http://dx.doi.org/10.3133/ofr20161035.

46.     Plaintiff Griggs has owned the real property in Guthrie, Logan County, Oklahoma on which she makes her home since about 2007.

47.     The area around Ms. Griggs's home has suffered over one hundred earthquakes of greater than 3.0 in magnitude in the past three years. The most significant earthquakes, and damages to Ms. Griggs's home, occurred beginning in February 2014. Multiple quakes of greater than 4.0 magnitude shook her home between February and about August 2014. In 2015, between about April through about June 2015, several more earthquakes of greater than 4.0 magnitude struck nearby, causing further damage to her home.

48.     Upon information and belief, these earthquakes were caused by nearby injection wells owned and operated by Defendants. Moreover, the earthquakes triggered by their wastewater disposal operations continue around Ms. Griggs's home and areas nearby.

49.     As a result of the earthquakes, Plaintiff Griggs has sustained extensive damage to her home, including shifts to the piers of her home's foundation, cracks to the concrete block forming the foundation, separation of the chimney from the home, separation of the cabinets from walls, cracks and separations to exterior brick veneer and mortar joints, cracks to drywall, wracking of doors, damages to door casings, and separations in door and window trim.

50.     The damage to her home is in the thousands of dollars.

51.     Plaintiff Marler has owned the real property in Choctaw, Oklahoma County, Oklahoma, on which she makes her home since about 2012.

52.     The area around Choctaw and Ms. Marler's home has suffered nearly one hundred earthquakes of greater than 3.0 in magnitude in the past three years. The most significant earthquakes, and resulting damages to Ms. Marler's home, occurred in mid-2014, when approximately 17 quakes measuring greater than 3.0 occurred in or around the Choctaw area. The largest, measuring 3.7 magnitude, occurred in Choctaw on May 31, 2014. The following day a 3.6 magnitude earthquake struck nearby; and approximately two weeks later magnitude 3.9 and 3.5 earthquakes hit within a few miles of Ms. Marler's home.

53.     Upon information and belief, these earthquakes were caused by nearby injection wells owned and operated by Defendants.   Moreover, the earthquakes triggered by their wastewater disposal operations continue around Ms. Marler's home and areas nearby.

54.     As a result of all of these earthquakes, Plaintiff Marler has sustained damage to her home, including cracks to the foundation, cracks and separations to exterior brick veneer and mortar joints, cracks to drywall, and separations in door and window trim.

55.     The damage to her home is in the thousands of dollars

### IV:    THE INDUCED EARTHQUAKES AT ISSUE
### AND HOW THEY WERE CAUSED BY DEFENDANTS'
### POLLUTION THROUGH THEIR WASTEWATER DISPOSAL

56.     Plaintiffs bring this action on behalf of themselves and the Class (as defined below) for eight clusters of earthquake swarms caused by nearby wastewater injection operations by Defendants, and which caused them to suffer damages.

57.     This Petition focuses on Defendants' induced earthquakes of magnitude ("M") of 4.0 or greater, because these earthquakes are substantial and have resulted in damage to Class members' homes, businesses, and other real properties, as well as to themselves emotionally.

58.     Further, this Petition also focuses exclusively on wastewater disposal injection into Oklahoma's Arbuckle formation, which is where scientists have confirmed as the problem.

59.     The eight wastewater induced earthquake swarms at issue in this Petition are identified as follows:

   a.  **"The Edmond Cluster"** refers to four induced earthquakes hitting near Edmond, Oklahoma as follows:

       i.   4.3M on June 16, 2014;

       ii.  4.3M on December 29, 2015;

       iii. 4.2M on January 1, 2016; and,

       iv.  4.1M on June 18, 2014.

   b.  **"The Guthrie Cluster"** refers to five induced earthquakes hitting near Guthrie, Oklahoma as follows:

       i.   4.4M on August 19, 2014;

       ii.  4.0M on April 10, 2014;

       iii. 4.0M on July 12, 2014;

       iv.  4.0M on April 8, 2015; and,

       v.   4.0M on June 20, 2015.

   c.  **"The Langston Cluster"** refers to four induced earthquakes hitting near Langston, Oklahoma as follows:

       i.   4.2M on April 7, 2014;

Page 13 of 39

      ii.  4.2M on April 19, 2015;

     iii.  4.1M on February 9, 2014; and,

     iv.  4.1M on April 27, 2015.

d.  **"The Crescent Cluster"** refers to three induced earthquakes hitting near Crescent, Oklahoma as follows:

      i.  4.5M on July 27, 2015;

      ii.  4.2M on March 29, 2016; and,

     iii.  4.1M on July 28, 2015.

e.  **"The North Crescent Cluster"** refers to three induced earthquakes hitting north of Crescent, Oklahoma as follows:

      i.  4.2M on March 30, 2014;

      ii.  4.1M on March 30, 2014; and,

     iii.  4.1M on April 4, 2015.

f.  **"The Covington Cluster"** refers to four induced earthquakes hitting near Covington, Oklahoma as follows:

      i.  4.3M on June 17, 2015;

      ii.  4.2M on July 17, 2016;

     iii.  4.0M on September 30, 2014; and,

     iv.  4.0M on June 14, 2015.

g.  **"The Perry Cluster"** refers to an induced earthquake hitting near Perry, Oklahoma of 4.2M on January 25, 2015.

h.  **"The Luther Cluster"** refers to two earthquakes hitting near Luther, Oklahoma as follows:

    i.  4.2M on April 7, 2014; and,

    ii.  4.0M on August 17, 2016.

**A.**    **Responsibility for The Edmond Cluster and Resulting Damages:**

60.    The Edmond Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants New Dominion, TNT, White, and Rainbo.

    a.  Historically, New Dominion injected hundreds of thousands of barrels (one barrel is equal to 42 gallons) of wastewater a month through its disposal wells near Edmond, and more specifically, its Wishon SWD, Chambers, Sweetheart, Deep Throat, Peyton SWD, and Flower Power wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that, collectively, these New Dominion wells polluted the Arbuckle formation with fracking waste of about 200 million barrels or 8.4 billion gallons of waste. New Dominion's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Edmond caused the earthquakes within The Edmond Cluster and resulted in damages to Plaintiffs and the Class.

    b.  Historically, TNT injected hundreds of thousands of barrels of wastewater a month into the Arbuckle through its Baker-Townsend disposal well near Edmond. Publicly available data reveals that the Baker-Townsend well polluted the Arbuckle formation with fracking waste of about 10 million barrels or 420 million gallons of waste. TNT's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Edmond caused the earthquakes within The Edmond Cluster and resulted in damages to Plaintiffs and the Class.

c.  Historically, White injected hundreds of thousands of barrels of wastewater a month through its disposal wells near Edmond, and more specifically, its Walnut Grove and Mary Unsell wastewater disposal wells that dispose of its wastes into the Arbuckle.  Publicly available data reveals that, collectively, these White wells polluted the Arbuckle formation with fracking waste of about 9 million barrels or about 380 million gallons of waste.  White's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Edmond caused the earthquakes within The Edmond Cluster and resulted in damages to Plaintiffs and the Class.

d.  Historically, Rainbo injected tens of thousands of barrels of wastewater a month through its Brady-Teller and Pesthouse disposal wells near Edmond that pollute the Arbuckle. Publicly available data reveals that Rainbo's disposal wells polluted the Arbuckle formation with fracking waste of about 1 million barrels or about 42 million gallons of waste.  Rainbo's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Edmond caused the earthquakes within The Edmond Cluster and resulted in damages to Plaintiffs and the Class.

**B.     Responsibility for The Guthrie Cluster and Resulting Damages**:

61.     The Guthrie Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants New Dominion, Dryes Corner, and Chesapeake.

a.  Historically, New Dominion injected hundreds of thousands of barrels (one barrel is equal to 42 gallons) of wastewater a month through its disposal wells near Guthrie, and more specifically, its Wishon SWD disposal well that disposes of its wastes into the Arbuckle.  Publicly available data reveals that the Wishon SWD

well polluted the Arbuckle formation with fracking waste of about 7 million barrels or 294 million gallons of waste. New Dominion's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Guthrie caused the earthquakes within The Guthrie Cluster and resulted in damages to Plaintiffs and the Class.

b.  Historically, Dryes Corner injected tens of thousands of barrels of wastewater a month through its disposal well near Guthrie, and more specifically, its Safair wastewater disposal well that disposes of its wastes into the Arbuckle. Publicly available data reveals that the Safair well polluted the Arbuckle formation with fracking waste of about 2.6 million barrels or over 109 million gallons of waste. Dryes Corner's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Guthrie caused the earthquakes within The Guthrie Cluster and resulted in damages to Plaintiffs and the Class.

c.  Historically, Chesapeake injected tens of thousands of barrels of wastewater a month through its disposal wells near Guthrie, and more specifically, its West Edmond wastewater disposal well that disposes of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 1.5 million barrels or over 63 million gallons of waste. Chesapeake's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Guthrie caused the earthquakes within The Guthrie Cluster and resulted in damages to Plaintiffs and the Class.

**C.     Responsibility for The Langston Cluster and Resulting Damages**:

62.     The Langston Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants Devon, Special Energy, Orca, White Star, Equal Energy, and Elder Criag.

   a.  Historically, Devon injected millions of barrels of wastewater a month through its disposal wells near Langston, and more specifically, its Cunningham 23-1, Hopkins, Dudek 12-18N-3W, Frank SWD, and Eavenson 24-19N, Woodard, Lenora 29-18N-1W, Winney, Adkisson, and Peach wastewater disposal wells that dispose of its wastes into the Arbuckle.  Publicly available data reveals that, collectively, these Devon wells polluted the Arbuckle formation with fracking waste of about 25 million barrels or about 1 billion gallons of waste.  Devon's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Langson caused the earthquakes within The Langston Cluster and resulted in damages to Plaintiffs and the Class.

   b.  Historically, Special Energy injected hundreds of thousands of barrels of wastewater a month through its disposal wells near Langston, and more specifically, its Ramsey Unit 1-17, Ramsey Unit 1-18, Iconium SWD, and Ramsey Unit 1-19 wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that, collectively, these Special Energy wells polluted the Arbuckle formation with fracking waste of about 13 million barrels or 546 million gallons of waste.  Special Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Langston caused the

earthquakes within The Langston Cluster and resulted in damages to Plaintiffs and the Class.

c.  Historically, Orca injected hundreds of thousands of barrels of wastewater a month through its disposal wells near Langston, and more specifically, its Northcut SWD wastewater disposal well that disposes of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 2.5 million barrels or 105 million gallons of waste. Orca's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Langston caused the earthquakes within The Langston Cluster and resulted in damages to Plaintiffs and the Class.

d.  Historically, White Star injected hundreds of thousands of barrels of wastewater a month through its disposal wells near Langston, and more specifically, its Boyce SWD, Bode SWD, Hopkins SWD, and Katz wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that, collectively, these White Star wells polluted the Arbuckle formation with fracking waste of about 5.8 million barrels or about 250 million gallons of waste. White Star's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Langston caused the earthquakes within The Langston Cluster and resulted in damages to Plaintiffs and the Class.

e.  Historically, Equal Energy injected tens of thousands of barrels of wastewater a month through its disposal wells near Langston, and more specifically, its Goodnight SWD 3, Goodnight SWD 4, and Goodnight SWD 1 wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals

that, collectively, these Equal Energy wells polluted the Arbuckle formation with fracking waste of about 2.6 million barrels or about 109 million gallons of waste. Equal Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Langston caused the earthquakes within The Langston Cluster and resulted in damages to Plaintiffs and the Class.

f.  Historically, Elder Craig injected tens of thousands of barrels of wastewater a month through its disposal wells near Langston, and more specifically, its Meridian wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that, collectively, well polluted the Arbuckle formation with fracking waste of about 834,000 barrels or about 35 million gallons of waste. Elder Craig's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Langston caused the earthquakes within The Langston Cluster and resulted in damages to Plaintiffs and the Class.

**D.    Responsibility for The Crescent Cluster and Resulting Damages:**

63.    The Crescent Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants Dryes Corner, Devon, D & B, and Sundance Energy.

a.  Historically, Dryes Corner injected tens of thousands of barrels of wastewater a month through its disposal well near Crescent, and more specifically, its Safair wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 2.7 million barrels or about 113 million gallons of waste. Dryes Corner's disposal of these substantial amounts of fracking waste into the Arbuckle

formation near Crescent caused the earthquakes within The Crescent Cluster and resulted in damages to Plaintiffs and the Class.

b. Historically, Devon injected hundreds of thousands of barrels of wastewater a month through its disposal wells near Crescent, and more specifically, its Fuxa 25-19N-4W, Eavenson 24-19N, Adkisson, Dudek 12-18N-3W, Cunningham 23-1, Frank SWD, Hopkins, Lena 15-19N-3W, Peach, Lemmons 14-19N-, Wilma SWD, Lenora 29-18N-1W, Winney, Woodard, and Smith wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 33 million barrels or nearly 1.4 billion gallons of waste. Devon's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Crescent caused the earthquakes within The Crescent Cluster and resulted in damages to Plaintiffs and the Class.

c. Historically, D & B injected hundreds of thousands of barrels of wastewater a month through its disposal well near Crescent, and more specifically, Oak Valley SWD wastewater disposal well that disposes of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 2.1 million barrels or nearly 84 million gallons of waste. D & B's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Crescent caused the earthquakes within The Crescent Cluster and resulted in damages to Plaintiffs and the Class.

d. Historically, Sundance Energy injected hundreds of thousands of barrels of wastewater a month through its disposal wells near Crescent, and more specifically,

its Branson 17-4-23, Rother 16-4-11, Brown Trust, and Berg Trust 16-3-2 wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 2.2 million barrels or nearly 84 million gallons of waste. Sundance Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation near Crescent caused the earthquakes within The Crescent Cluster and resulted in damages to Plaintiffs and the Class.

E.      **Responsibility for The North Crescent Cluster and Resulting Damages**:

64.     The North Crescent Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants Devon, Sundance Energy, and M M Energy.

a.   Historically, Devon injected millions of barrels of wastewater a month through its disposal wells in the north Crescent area, and more specifically, its Fuxa 25-19N-4W, Eavenson 24-19N, Adkisson, Cunningham 23-1, Smith, Lena 15-19N-3W, Lemmons 14-19N-1, Hopfer, Limestone SWD, Dudek 12-18N-3W, Frank SWD, Hopkins, , Peach, Williams, Olmstead 21-21N-15WD, Wilma SWD, and Geihsler wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 30 million barrels or nearly 1.3 billion gallons of waste. Devon's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the north Crescent area caused the earthquakes within The North Crescent Cluster and resulted in damages to Plaintiffs and the Class.

b.   Historically, Sundance Energy injected tens of thousands of barrels of wastewater a month through its disposal wells in the north Crescent area, and more specifically, its Brown Trust and Whiteneck Trust wastewater disposal wells that dispose of its wastes into the Arbuckle.  Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 1 million barrels or nearly 42 million gallons of waste.  Devon's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the north Crescent area caused the earthquakes within The North Crescent Cluster and resulted in damages to Plaintiffs and the Class.

c.   Historically, M M Energy injected hundreds of thousands of barrels of wastewater a month through its disposal well in the north Crescent area, and more specifically, its School Land 64 wastewater disposal well that disposed of its wastes into the Arbuckle.  Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 31.5 million barrels or nearly 1.3 billion gallons of waste.  M M Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the north Crescent area caused the earthquakes within The North Crescent Cluster and resulted in damages to Plaintiffs and the Class.

**F.      Responsibility for The Covington Cluster and Resulting Damages:**

65.      The Covington Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants M M Energy, Devon, Chesapeake, Dakota Exploration, Wicklund, Kirkpatrick Oil, and Toomey Oil.

a. Historically, M M Energy injected hundreds of thousands of barrels of wastewater a month through its disposal wells in the Covington area, and more specifically, its School Land 64 and Gregg wastewater disposal wells that disposed of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 34 million barrels or nearly 1.4 billion gallons of waste. M M Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

b. Historically, Devon injected millions of barrels of wastewater a month through its disposal wells in the Covington area, and more specifically, its Fuxa 25-19N-4W, Eavenson 24-19N, Buffington 29-22, Big Iron 4-4-21N-1E, Vargas 3-20N-1E, Olmstead 21-21N-15WD, Janice 7-21N-3W, Williams, Sebranek, Limestone SWD, Smith, Geihsler, Frank SWD, Dudek 12-18N-3W, and Bontrager wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 34.6 million barrels or nearly 1.5 billion gallons of waste. Devon's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

c. Historically, Chesapeake injected nearly a million of barrels of wastewater a month through its disposal wells in the Covington area, and more specifically, its O'Neil, Yost, Gerken, and Sara Yost wastewater disposal wells that dispose of its wastes

into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 30 million barrels or nearly 1.3 billion gallons of waste. Chesapeake's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

d. Historically, Dakota injected tens of thousands of barrels of wastewater a month through its disposal wells in the Covington area, and more specifically, its Oberlender, and PLC wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 1 million barrels or nearly 42 million gallons of waste. Dakota's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

e. Historically, Wicklund injected tens of thousands of barrels of wastewater a month through its disposal well in the Covington area, and more specifically, its SWDW wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 1.9 million barrels or nearly 84 million gallons of waste. Wicklund's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

f.  Historically, Kirkpatrick injected tens of thousands of barrels of wastewater a month through its disposal well in the Covington area, and more specifically, its Little Beaver SWD wastewater disposal well that dispose of its wastes into the Arbuckle.  Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 772,000 barrels or nearly 32 million gallons of waste. Kirkpatrick's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

g.  Historically, Toomey injected tens of thousands of barrels of wastewater a month through its disposal well in the Covington area, and more specifically, its Ruth wastewater disposal well that dispose of its wastes into the Arbuckle.  Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 3 million barrels or nearly 126 million gallons of waste.  Toomey's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Covington area caused the earthquakes within The Covington Cluster and resulted in damages to Plaintiffs and the Class.

**G.  Responsibility for The Perry Cluster and Resulting Damages**:

66.  The Perry Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants Devon, Chaparral Energy, EastOK, Chesapeake, Special Energy, M M Energy, and Cisco Operating.

a.  Historically, Devon injected millions of barrels of wastewater a month through its disposal wells in the Perry area, and more specifically, its Big Iron 4-4-21N-1E, Vargas 3-20N-1E, Bontrager, H. Voise 14-21N-1E, Buffington 29-22, Rains 5-

Page 26 of 39

20N-2E, Eavenson 24-19N,Thomason 15-20N, Leigh 8-19N-3E, Cunningham 23-1, Hicks, Singleton SWD, Cedar Grove, Vitek, Hopkins, Gilbert, and Frank SWD wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 61.8 million barrels or nearly 2.7 billion gallons of waste. Devon's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Perry area caused the earthquakes within The Perry Cluster and resulted in damages to Plaintiffs and the Class.

b. Historically, Chaparral Energy injected hundreds of thousands of barrels of wastewater a month through its disposal well in the Perry area, and more specifically, its Suplex SWD wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 4.9 million barrels or nearly 205 million gallons of waste. Chaparral Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Perry area caused the earthquakes within The Perry Cluster and resulted in damages to Plaintiffs and the Class.

c. Historically, EastOK injected hundreds of thousands of barrels of wastewater a month through its disposal wells in the Perry area, and more specifically, its EastOK-Steichen, EastOK, EastOK-Ruark, EastOK-Cabernet, and EastOK-Drummond wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 16.8 million barrels or about 705 million gallons of waste.

Page 27 of 39

EastOK's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Perry area caused the earthquakes within The Perry Cluster and resulted in damages to Plaintiffs and the Class.

d.  Historically, Chesapeake injected millions of barrels of wastewater a month through its disposal wells in the Perry area, and more specifically, its Yost, O'Neil, Sara Yost, and Gerken wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 30 million barrels or about 1.2 billion gallons of waste. Chesapeake's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Perry area caused the earthquakes within The Perry Cluster and resulted in damages to Plaintiffs and the Class.

e.  Historically, Special Energy injected hundreds of thousands of barrels of wastewater a month through its disposal well in the Perry area, and more specifically, its Ramsey Unit wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 9.3 million barrels or nearly 390 million gallons of waste. Special Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Perry area caused the earthquakes within The Perry Cluster and resulted in damages to Plaintiffs and the Class.

f.  Historically, M M Energy injected nearly a million barrels of wastewater a month through its disposal well in the Perry area, and more specifically, its School Land 64 wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking

waste of about 31.6 million barrels or nearly 1.3 billion gallons of waste.  M M Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Perry area caused the earthquakes within The Perry Cluster and resulted in damages to Plaintiffs and the Class.

**H.     Responsibility for The Luther Cluster and Resulting Damages**:

67.     The Luther Cluster of human-induced earthquakes were caused by nearby wastewater injection operations conducted by Defendants New Dominion, MidStates, Territory Resources, and Equal Energy.

a.  Historically, New Dominion injected hundreds of thousands of barrels of wastewater a month through its disposal wells in the Luther area, and more specifically, its Peyton SWD and Wishon wastewater disposal wells that dispose of its wastes into the Arbuckle.  Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 20 million barrels or nearly 2.7 billion gallons of waste.  New Dominion's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Luther area caused the earthquakes within The Luther Cluster and resulted in damages to Plaintiffs and the Class.

b.  Historically, MidStates injected hundreds of thousands of barrels of wastewater a month through its disposal wells in the Luther area, and more specifically, its East Wellston, Hazel, Fire, and Chase wastewater disposal wells that dispose of its wastes into the Arbuckle.  Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 28 million barrels or nearly 1.17 billion gallons of waste.  MidStates disposal of these substantial amounts of

fracking waste into the Arbuckle formation in the Luther area caused the earthquakes within The Luther Cluster and resulted in damages to Plaintiffs and the Class.

c. Historically, Territory Resources injected tens of thousands of barrels of wastewater a month through its disposal well in the Luther area, and more specifically, its Octagon wastewater disposal well that dispose of its wastes into the Arbuckle. Publicly available data reveals that this well polluted the Arbuckle formation with fracking waste of about 1.5 million barrels or nearly 63 million gallons of waste. Territory Resources' disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Luther area caused the earthquakes within The Luther Cluster and resulted in damages to Plaintiffs and the Class.

d. Historically, Equal Energy injected millions of barrels of wastewater a month through its disposal wells in the Luther area, and more specifically, its Twin Cities 1, 2, and 3, Twin Cities North 1 and 2, West Carney, and CD wastewater disposal wells that dispose of its wastes into the Arbuckle. Publicly available data reveals that these wells polluted the Arbuckle formation with fracking waste of about 71 million barrels or nearly 3 billion gallons of waste. Equal Energy's disposal of these substantial amounts of fracking waste into the Arbuckle formation in the Luther area caused the earthquakes within The Luther Cluster and resulted in damages to Plaintiffs and the Class.

## V:    CLASS ALLEGATIONS

68.    Plaintiff realleges each of the preceding paragraphs, and by this reference incorporates each such paragraph as though set forth here in full.

69.    Plaintiff brings this action, on behalf of themselves and all others similarly situated, as a class action pursuant to 12 O.S. § 2023.

70.    The Class that Plaintiffs seek to represent (the "Class") is defined as follows:

a)  Citizens of Oklahoma;

b)  owning a home or business in Logan County, Payne County, Lincoln County, Oklahoma County, Canadian County, Kingfisher County, Garfield County, or Noble County (hereafter, the "Class Area");

c)  during the dates of seismic activity within the Class Area between March 30, 2014 to present (the "Class Period");

d)  excluded from the Class are all Class member properties on and lands where there is any federal oversight, such as Tribal or Indian Lands; and,

e)  excluded from the Class are Defendants and their officers and directors, and the judge presiding over this action and his/her immediate family members.

71.    Plaintiffs reserve the right to amend the definition of the Class if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

72.    This action is brought and properly may be maintained as a class action pursuant to 12 O.S. § 2023, and satisfies the requirements of its provisions.

### *Numerosity*

73.     These human-made earthquakes are continuing in the Class Area, and thus, more properties are likely to suffer damages.

74.     The Class Area includes several counties in Oklahoma where thousands of Oklahoma's citizens reside in their homes and operate businesses.

75.     As such, the Class is sufficiently numerous and has members scattered over several counties so as to make joinder of all members of the Class in a single action impracticable, and therefore, the resolution of their claims through the procedure of a class action will be to the benefit of the parties and the Court.

### *Commonality*

76.     Plaintiffs' claims raise issues of fact or law which are common to the members of the putative Class.  These common questions include, but are not limited to:

(a)     whether Defendants' disposal well operations within the Class Area caused earthquakes in the Class Area;

(b)     whether these induced earthquakes caused damage to the personal and real property of Plaintiffs and the members of the Class;

(c)     whether Defendants owed a duty to the Plaintiffs and the members of the putative Class;

(d)     whether Defendants' conduct amounted to a nuisance;

(e)     whether Defendants' conduct is an ultra-hazardous activity;

(f)     whether Defendants' operations were negligently performed;

(g)     whether Defendants caused a trespass;

(h)     whether Plaintiffs and the members of the putative Class have suffered damages proximately caused by Defendants' wastewater disposal operations; and

(i)     whether a judgment including punitive damages is appropriate.

### *Typicality*

77.     Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent because at bottom, all of the claims center upon whether Defendants' wastewater injection operations have caused the seismicity within the Class Area during the Class Period.

### *Adequacy*

78.     Plaintiffs are interested in the outcome of this litigation and understands the importance of adequately representing the Class.

79.     Plaintiffs will fairly and adequately protect the interests of the Class sought to be certified.

80.     Plaintiffs are adequate representatives of the Class because they have no interests that are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel competent and experienced in handling class-action and complex tort litigation, which are also qualified to adequately represent the Class.

### *Predominance*

81.     Questions of law or fact common to the members of the Class predominate over questions affecting only individual members.

### *Superiority*

82.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The predicate issues relate to Defendants' wastewater injection operations, actions and activities, and whether these activities pose a nuisance, are an ultra-hazardous activity, were negligently performed, or caused trespasses.  The focus of this action will

be on the common and uniform conduct of Defendants in conducting their wastewater injection operations during the Class Period and within the Class Area.

83.     Absent class action relief, the putative Class Members would be forced to prosecute hundreds of similar claims in different district court venues.   Such an event would cause tremendous amounts of waste of judicial resources, but the prosecution of these claims as a class action will promote judicial economy.

84.     The prosecution of separate actions by individual members of the Class would create a risk of:

      a.  inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendants; and

      b.  adjudications with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

85.     Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## **CAUSES OF ACTION**

## **COUNT I**

## **STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY**

86.     Plaintiffs and the Class hereby re-allege and incorporate the foregoing Paragraphs as if fully set forth herein, word-for-word.

87.     Defendants' actions described above are ultrahazardous activities that necessarily involve a risk of serious harm to a person that cannot be eliminated by the exercise of the utmost care and is not a matter of common usage.

88.     As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiffs and the Class members have suffered damages, to which Defendants are strictly liable.

89.     As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiffs and Class members have suffered damages to their homes and businesses in the form of physical damages and market losses, and also damages to their personal property.

90.     As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiffs and Class members have suffered and continue to suffer emotional harm for which Defendants should be held strictly liable.

## COUNT II

## <u>NEGLIGENCE</u>

91.     Plaintiffs and the Class hereby re-allege and incorporate the foregoing Paragraphs, as if fully set forth herein, word-for-word.

92.     The Defendants owed a duty to Plaintiffs and the Class to use ordinary care and not to operate or maintain their injection wells in such a way as to cause or contribute to seismic activity. Defendants, experienced in these operations, were well aware of the connection between injection wells and seismic activity, and acted in disregard of these facts.

93.     As a direct and proximate result of these facts, omissions, and fault of the Defendants, the Plaintiffs and the Class have suffered injuries reasonably foreseeable to the Defendants in the form of property damages to their homes and businesses (in the form of physical damages and market losses), damages to their personal property, and emotional harm that is continuing.

## COUNT III

### PRIVATE NUISANCE

94.     Plaintiffs and the Class re-allege and incorporate the foregoing Paragraphs, as if fully set forth herein, word-for-word.

95.     Defendants' conduct constitutes a private nuisance.

96.     Plaintiffs and the Class have property rights and are privileged regarding the use and enjoyment of their home, land and businesses.  Defendants' actions and operations as described above have unlawfully and unreasonably interfered with those rights and privileges.

97.     Plaintiffs and the Class have suffered harm and damages because of Defendants' creation of a nuisance, including:

        a.     Damages to their personal and real property;

        b.     interference with their use and enjoyment of property;

        c.     annoyance, discomfort and inconvenience on their property caused by Defendants' nuisance;

        d.     loss of peace of mind and emotional distress; and

        e.     diminution of property value.

### COUNT IV

### TRESPASS

65.     Plaintiffs and the Class re-allege and incorporate the foregoing Paragraphs, as if set forth herein, word-for-word.

66.     Plaintiffs and the Class are and have been lawfully entitled to possession of their property.

67.     Defendants, without the permission or consent of Plaintiff and the Class and without legal right, intentionally engaged in activities that resulted in concussions or vibrations entering Plaintiffs' and the Class members' property.  Such unauthorized invasion of Plaintiffs' and the Class members' property constitutes a trespass.

68.     Because of Defendants' trespass, Plaintiffs and the Class have suffered damages, including:

     a.     Damages to personal and real property;

     b.     interference with their use and enjoyment of property;

     c.     annoyance, discomfort and inconvenience on their property caused by Defendants' trespass;

     d.     loss of peace of mind and emotional distress; and

     e.     diminution of real estate property value.

## PUNITIVE DAMAGES

69.     The Defendants' actions, in knowingly causing seismic activity as a result of their injection well operations, constitute wanton or reckless disregard for public or private safety, and are thus subject to a claim for punitive damages, for which Plaintiffs and the Class seek in an amount sufficient to punish the Defendants and to deter them from such conduct in the future.

## CONTINUING NATURE OF WRONGDOING AND HARM TO PLAINTIFFS AND THE CLASS

70.     Defendants' injections of fracking waste continue within the Class Area, their wrongdoing is continuing, and moreover, the harm caused by their operations as alleged in this Petition continues to cause Plaintiffs and the Class to suffer the damages alleged in this Petition.

## DEMAND FOR JURY TRIAL

71.   Plaintiffs and the Class respectfully demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully requests the following relief:

    i.    Judgments against each of the Defendants for their individual wrongdoing, and awarding real and personal property damages (for physical damage and market loss), lost use and enjoyment of real property and emotional harm in an amount to be proven at trial;

    ii.    punitive damages;

    iii.    pre-judgment and post-judgment interest; and,

    iv.    all other relief to which Plaintiffs and the Class are entitled or that the Court deems just and proper.

DATED:    July 21, 2017          Respectfully Submitted,

                                        William B. Federman

                                        William B. Federman
                                        **Federman & Sherwood**
                                        10205 N. Pennsylvania Ave.
                                        Oklahoma City, Oklahoma 73120
                                        Tel:  (405) 235-1560
                                        Fax:  (405) 239-2112
                                        Email:  WBF@federmanlaw.com

                                        Robin L. Greenwald
                                        Curt D. Marshall
                                        **Weitz & Luxenberg, PC**
                                        700 Broadway
                                        New York, NY 10003
                                        Tel: (212) 558-5500
                                        Fax: (212) 344-5461
                                        Email:  rgreenwald@weitzlux.com

Email:  cmarshall@weitzlux.com

Scott Poynter,
**Poynter Law Group**
400 W. Capitol Ave., Suite 2910
Little Rock, AR 72201
Ph. (501)251-1587
scott@poynterlawgroup.com

Nate Steel
Alex T. Gray
Jeremy Hutchinson
**Steel, Wright, Gray & Hutchinson, PLLC**
400 W. Capitol Avenue, Suite 2910
Little Rock, Arkansas 72201
Tel:  (501) 251-1587
nate@swghfirm.com
alex@swghfirm.com
jeremy@swghfirm.com

**<u>Exhibit B</u>**

**State Court Transcript**

IN THE DISTRICT COURT OF LOGAN COUNTY
STATE OF OKLAHOMA

LISA GRIGGS and APRIL MARLER, on            )
behalf of themselves and other             )
Oklahoma citizens similarly situated,      )
                                            )
          PLAINTIFFS,                        )
vs.                                         )  CASE NO. CJ-2017-174
                                            )
NEW DOMINION LLC, TNT OPERATING             )
COMPANY INC, WHITE OPERATING                )
COMPANY, RAINBO SERVICE COMPANY,           )
DRYES CORNER LLC, CHESAPEAKE               )
OPERATING LLC, DEVON ENERGY                 )
PRODUCTION CO LP, SPECIAL ENERGY            )
PRODUCTION CO LP, ORCA OPERATING            )
COMPANY LLC, WHITE STAR PETROLEUM           )
LLC, EQUAL ENERGY US INC, ELDER             )
CRAIG OIL & GAS LLC, D&B OPERATING          )
LLC, M M ENERGY INC, DAKOTA                 )
EXPLORATION LLC, WICKLUND                   )
PETROLEUM CORPORATION, KIRKPATRICK          )
OIL COMPANY INC, TOOMEY OIL                 )
COMPANY INC, CHAPARRAL ENERGY LLC,          )
EASTOK PIPELINE LLC, MID-CON                )
ENERGY OPERATING LLC, MIDSTATES             )
PETROLEUM COMPANY LLC, TERRITORY            )
RESOURCES LLC, and JOHN DOES 1-25,          )
                                            )
          DEFENDANTS.                        )

* * * * * * * *

TRANSCRIPT OF PROCEEDINGS

HAD ON THE

16TH DAY OF NOVEMBER, 2018

BEFORE THE

HONORABLE PHILLIP C. CORLEY

* * * * * * * *

Reported by:
Karen L. Martin, CSR
606 South Husband Street, #306
Stillwater, Oklahoma  74074

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

2

```
 1                    A P P E A R A N C E S

 2
      ON BEHALF OF THE PLAINTIFFS:
 3
                  SCOTT E. POYNTER
 4                ATTORNEY AT LAW
                  POYNTER LAW GROUP
 5                400 WEST CAPITOL AVENUE, SUITE 2910
                  LITTLE ROCK, AR  72201
 6
                  CURT D. MARSHALL
 7                ATTORNEY AT LAW
                  WEITZ & LUXENBERG
 8                700 BROADWAY
                  NEW YORK, NY  10003
 9
10    ON BEHALF OF DEFENDANT WHITE STAR PETROLEUM LLC:

11                DALE E. COTTINGHAM
                  ATTORNEY AT LAW
12                GABLE & GOTWALS
                  211 NORTH ROBINSON, 15TH FLOOR
13                OKLAHOMA CITY, OK  73102

14
      ON BEHALF OF DEFENDANT DEVON ENERGY PRODUCTION CO LP:
15
                  KENNETH W. ABRAMS
16                ATTORNEY AT LAW
                  McGUIRE WOODS
17                GATEWAY PLAZA
                  800 EAST CANAL STREET
18                RICHMOND, VA  23219-3916

19
      ON BEHALF OF DEFENDANTS WHITE STAR PETROLEUM LLC, TNT
20    OPERATING COMPANY INC, WHITE OPERATING COMPANY, DRYES CORNER
      LLC, and EQUAL ENERGY US INC:
21
                  E. EDD PRITCHETT JR.
22                ATTORNEY AT LAW
                  DURBIN, LARIMORE & BIALICK
23                920 NORTH HARVEY
                  OKLAHOMA CITY, OK  73102
24

25
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

3

```
 1                A P P E A R A N C E S  (continued)

 2

 3   ON BEHALF OF DEFENDANT SPECIAL ENERGY CORPORATION:

 4           MICHAEL McDANIEL
             ATTORNEY AT LAW
 5           COFFEY, SENGER & McDANIEL
             4725 EAST 91ST STREET, SUITE 100
 6           TULSA, OK  74137

 7   ON BEHALF OF DEFENDANTS D&B OPERATING LLC, MID-CON ENERGY
     OPERATING LLC, ORCA OPERATING COMPANY LLC, and CHESAPEAKE
 8   OPERATING LLC:

 9           PATRICK STEIN
             ATTORNEY AT LAW
10           McAFEE & TAFT
             211 NORTH ROBINSON, 10TH FLOOR
11           OKLAHOMA CITY, OK  73102

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

4

```
1        (The following proceedings transpired in open
         court with all parties present:)
2

3        THE COURT:  I have before the Court CJ-17-174,

4   which is Griggs versus New Dominion and others.  I think

5   just about every defendant has filed a motion to dismiss in

6   this matter.

7        I want to shorten things as the parties know how

8   I've ruled previously on the motions to dismiss.  Unless

9   there's something different to add than what's been

10  previously argued, I'm going to limit argument on those

11  issues.  I have reviewed the briefs.

12       I will state that there's a couple of defendants

13  that filed motions to dismiss based upon bankruptcy issues,

14  and I think those are, in and of itself, explanatory in that

15  if bankruptcy's been filed and they've been discharged for

16  certain dates, they cannot go back on them for those dates.

17  I don't recall specifically who it is, off the top of my

18  head, but if you did have a bankruptcy issue, then I'm

19  sustaining your motion as it relates back to your bankruptcy

20  stay and proceedings.

21       That leaves us with the general motions for

22  failure to state a claim for which relief can be granted,

23  alternative liability, market share liability,

24  ultrahazardous activities, and then the nuisance and the

25  trespass.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

5

```
 1           Mr. Cottingham, you're at the podium, so I'm
 2   assuming you're first up.
 3           MR. COTTINGHAM:  I am, Your Honor.  Dale
 4   Cottingham.  I represent White Star Petroleum for purposes
 5   of our record.
 6           We've attempted to organize ourselves as a
 7   defendant group.  How we propose to move forward is the
 8   motions to dismiss, there are -- there's a specific motion
 9   to dismiss regarding the standard that's applicable in a
10   class action case.
11           THE COURT:  Let me stop you there.  That's the
12   real issue I want to hear today.
13           MR. COTTINGHAM:  Right, right.  That will be
14   argued by Ken Abrams from the McGuire Woods firm.  There
15   are -- As you pointed out, there are additional motions to
16   dismiss; however, many of those you've already looked at
17   both in this case, these pleadings now, as well as in the
18   Reid case earlier this year.
19           Additionally, there are motions to dismiss that
20   apply to specific or certain defendants.  You've mentioned
21   bankruptcy.  So those will be -- I'm sure the presentations
22   will be short.
23           My understanding is there's also a motion to
24   strike class allegations, and we're prepared to argue that
25   as well today.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

6

1          THE COURT:  I thought that's what you mentioned

2    first off.  What was the first one you had mentioned?

3          MR. COTTINGHAM:  Well, the first one is the

4    standard of review under class action.  I believe that

5    you're -- I believe you're correct about that but, at any

6    rate, I would like to yield now and have our defendant

7    group, those that have prepared remarks, to present those.

8    We'll start with Ken Abrams.

9          MR. ABRAMS:  Good afternoon, Your Honor.

10          THE COURT:  Afternoon.

11          MR. ABRAMS:  My name is Ken Abrams.  I'm with the

12    law firm of McGuire Woods, and I represent Devon Energy in

13    this case.

14          I understand from the Court's comments that it

15    wants to limit argument on motions to dismiss for failure to

16    state a claim, based on failure to show causation, and

17    that's what I was here to argue.

18          What we've argued in Devon's motion is that, under

19    12 O.S. 2023, the Legislature has established a different

20    standard, or at least a more express standard on motions to

21    dismiss on the face of the pleadings that incorporates the

22    federal standard under *Iqbal* and *Twombly*, in which the

23    plaintiff in the petition must state a plausible claim for

24    relief based on factual allegations.  Under that federal

25    standard, as explained in *Iqbal*, it's not enough for a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

7

1    plaintiff to make threadbare recitations of the elements of
2    a claim.  So, for example, plain allegations that the
3    defendant harmed me are not enough.
4          Here, what we have are two individual plaintiffs
5    who own property.  They say they experienced certain
6    earthquakes.  Those plaintiffs allege that nine energy
7    producers caused eight different earthquake clusters.
8    What's lacking in the petition is facts connecting the
9    plaintiffs' injuries to those nine clusters.  Specifically,
10   none of -- neither of the plaintiffs allege that they
11   experienced any of the specific clusters at issue.  Instead,
12   at the end of the allegations regarding the clusters, the
13   plaintiffs merely say, this cluster resulted in damages to
14   plaintiff in the class.  That's a classic conclusory
15   allegation that the Court should disregard, under the
16   standards set out in 2023.
17         So what we're left with is plaintiffs who say
18   they've been harmed by earthquakes, defendants who allegedly
19   caused certain earthquakes, but no allegation that the
20   plaintiffs experienced those earthquakes.  For that reason,
21   the causation is lacking to show that these defendants,
22   Devon and the others, actually caused the earthquakes that
23   allegedly harmed the plaintiffs.
24         There's one allegation in particular, Your Honor,
25   that I'll end on to demonstrate the problem.  Plaintiff

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

8

```
1   Marler, the second plaintiff in this case, alleges that her
2   home experienced earthquakes of magnitude 3 to 3.9.  When
3   the petition alleges that the defendants caused certain
4   earthquake clusters, the petition says, it focuses on
5   clusters of 4.0 magnitude and greater.  In fact, there's no
6   fact alleged in the complaint showing that Devon or any of
7   the other defendants caused an earthquake below a 4.0
8   magnitude.  So there's nothing in the petition showing that
9   Plaintiff Marler's experienced earthquakes is connected to
10  any defendant in this case, and so there's no causation,
11  approximate or otherwise.  For that reason, the petition
12  should be dismissed as a matter of law.
13          THE COURT:  Thank you.
14          Do y'all wish to go ahead and respond individually
15  or do it all at one time, after I've heard from everybody,
16  Mr. Poynter?
17          MR. POYNTER:  Mr. Marshall is going to respond to
18  the motion to dismiss arguments, and it seems to me it would
19  probably be easier if we just hit each one of the issues
20  separately, if that's okay.
21          MR. MARSHALL:  So, Your Honor, we can discuss
22  causation first.  I believe your interest was in the federal
23  standard versus the state standard.  Should I address that
24  as well or --
25          THE COURT:  No, I don't think so.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

```
 1              MR. MARSHALL:  We'll do that later?
 2              THE COURT:  I understand the difference on it.
 3              MR. MARSHALL:  Okay.  So causation.  The petition
 4    alleges that disposal operations of each of the defendants
 5    caused specific clusters of earthquakes and that these
 6    clusters caused damages to the plaintiffs in the class.
 7    Indeed, the contributions of the individual defendants are
 8    laid out with specificity in the sections relating to the
 9    various clusters set forth in the petition.  The petition
10    identifies specific wells that were operated by the
11    defendants and that induced the seismicity and the clusters
12    of seismicity and the aggregate amounts of wastewater that
13    were injected into the Arbuckle.  It's by defendant, and
14    that's Paragraphs 60 through 68.  The petition also
15    identifies which defendants are responsible for causing
16    which cluster.  All right?
17              As to the specific allegations that were just
18    referred to by defense counsel about the plaintiffs, one of
19    the things that seems to be forgotten in the mix is that we
20    allege, in the complaint, that the seismicity as well as the
21    injection is ongoing.  So there are continuous earthquakes
22    that are happening that we believe were induced by
23    defendants.
24              We believe that it's too premature for the Court
25    to determine causation, whether it be market share or other
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

```
 1   kinds of causation.  That is generally a question of fact
 2   for the jury, after fact and expert discovery, and I'll be
 3   willing to address any other issues.
 4                THE COURT:  Thank you.
 5                Any other argument on behalf of the defendants?
 6                MR. McDANIEL:  Yes, Your Honor.  Mike McDaniel for
 7   Special Energy.  Thank you.
 8                I just wanted to supplement very briefly the
 9   argument about the standard of review.  It is quite clear
10   from the plaintiffs' omnibus response that the standard
11   relied upon is the notice pleading standard.  As Devon's
12   counsel just hinted at a moment ago, not only is the
13   standard embodied by an act of the Legislature, Oklahoma
14   courts have begun to recognize the application of the
15   Twombly standard of review on motions to dismiss.
16                Attached to Special Energy's brief in chief is an
17   opinion of the Honorable Judge Parrish out of Oklahoma
18   County, in which she recognizes that the standard formally
19   articulated and followed from Conley v. Gibson is no longer
20   the standard and that Twombly has replaced it.  So it is
21   Special Energy's position that the standard plaintiff should
22   be required to satisfy is the plausibility standard of
23   Twombly.
24                Thank you, Your Honor.
25                THE COURT:  Thank you.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1          Any other response?

2          MR. MARSHALL:  So, Your Honor, that is correct.

3  We did argue and rely on the notice pleading standard, which

4  you're well aware of.  We believe that we gave fair notice

5  of what the plaintiffs' claims are and the grounds upon

6  which they rest.

7          As to plausibility, of course that's a federal

8  standard, but apparently the defendants' focus is 2023B.3,

9  which references plausibility.  But the plaintiff -- that

10 the petition must contain factual allegations sufficient to

11 demonstrate a plausible claim for relief.  Through that and

12 perhaps the case that was referenced, that's where *Twombly*

13 and *Iqbal* are brought into play according to the defendants.

14 I would argue that, whether it be notice pleading or the

15 plausibility standard, the plaintiffs here satisfy both.

16         One of the things that we have to show, under the

17 plausibility standard, is that a petition must contain

18 enough allegations of fact taken as true to state a claim to

19 relief that is plausible on its face.  Facial plausibility

20 exists when the plaintiff pleads factual content that allows

21 the Court to draw a reasonable inference that the defendant

22 or defendants are liable for the conduct that's alleged.  A

23 petition must set forth facts that raise a reasonable

24 expectation that discovery will reveal evidence of

25 liability.  We believe that that is the case here, Your

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1   Honor.

2           In terms of distinguishing between notice pleading

3   and the federal plausibility standard, the operative

4   petition passes muster under both tests, we believe.  The

5   petition, first of all, gives fair notice, as I said, of

6   what the plaintiffs' claims are and the grounds upon which

7   they rest.  That includes governmental and agency

8   declarations, also facts linking the damages of the

9   plaintiffs to the clusters and also the injection

10  operations.

11          The petition pleads factual content that allows

12  the Court to draw the reasonable inference that the

13  defendants are liable for the damage caused from the

14  earthquakes induced by defendants' injection operations.  So

15  we believe that that passes muster under the plausibility

16  standard as well.

17          Indeed, the petition sets forth facts that raise a

18  reasonable expectation that discovery will reveal evidence

19  of defendants' liability.  And, of course, how we're going

20  to do that ultimately is through expert evidence.

21          Plaintiffs have identified specific wells operated

22  by the defendants respectively, involved in seismicity, how

23  much volume of wastewater each defendant injected into the

24  Arbuckle formation, and Plaintiffs have identified which

25  defendants caused which clusters of earthquakes.  Plaintiffs

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1  allege plaintiffs' property damage from the earthquakes,

2  when their homes suffered the most, and they continue to

3  suffer damage due to reoccurring and continued induced

4  seismicity by the defendants.  These factual allegations, we

5  believe, pass both tests.

6       THE COURT:  As I've indicated previously, the

7  Court is aware that there is no market share or collective

8  or alternative liability in Oklahoma.  It is an issue for

9  the Court to determine whether or not ultrahazardous

10 activity is occurring.  That's all to be done at a later

11 date on a motion for summary judgment.

12      As I've indicated earlier, the Court believes the

13 petitions are satisfactory to get past the motion to dismiss

14 to allow the plaintiffs discovery and then determine and try

15 to tie up the defendants with the particular earthquakes and

16 particular damage.

17      The real issue I have before the Court at this

18 time -- and it may be premature, but there has been a motion

19 filed -- is the issue of class certification.  So who's

20 prepared to argue that issue on behalf of the defendants?

21      MR. ABRAMS:  That's me again, Your Honor.

22      As the Court indicated, Devon Energy filed a

23 motion to strike the class allegations contained in the

24 plaintiffs' complaint, which has been joined by most, if not

25 all, the defendants.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

14

1    Under Oklahoma Statute 12 Section 2023, the Court

2   is required to as early a possible time as practical to

3   determine class allegation issues.  Although there is no

4   decision under Oklahoma state courts that address that,

5   federal courts across the country agree that that particular

6   section in the federal law, which is the same as Oklahoma

7   law in this case, allows a court to strike class allegations

8   from the face of a petition or a complaint, if those

9   allegations make it clear that the plaintiffs cannot meet

10   their burden to show that a class should be satisfied.

11    Devon here moved to strike the class allegations

12   in this case on the face of the pleadings.  For that

13   purpose, we are assuming that everything the plaintiffs say

14   is true.  There's no dispute of fact, at least for this

15   motion.  That comes later, as the Court indicated on summary

16   judgment.  Even assuming that everything the plaintiffs say

17   in the petition is true, no class can be certified.

18    What plaintiffs seek to do is to certify a class

19   of hundreds of thousands of business and property owners who

20   own real property in nine Oklahoma counties.  Those nine

21   counties, according to plaintiffs, experienced 24

22   earthquakes associated with nine different earthquake

23   clusters caused by 23 different oil and gas producers in

24   their water disposal operations.

25    The standard for satisfying a class is not that a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

15

```
 1     class claim raises common questions.  As the Court -- the
 2     Supreme Court of the United States found in Walmart v. Duke,
 3     any competently crafted petition or complaint can raise
 4     common questions.  The issue is do those common questions
 5     lead to a common resolution of the class's claims.
 6              Now Devon and others made a similar motion to
 7     strike in federal court before Judge Friot in the West v.
 8     Chaparral case, and we've attached that to our motion.  In
 9     that case, Judge Friot found that claims very similar to
10     what the plaintiffs raise here do not raise common questions
11     susceptible to a common single answer.  And that's what we
12     have here.
13              The reason for that is what plaintiffs are
14     claiming is an environmental tort that took place from 2014
15     through today, according to their allegations.  It's
16     different sources of the pollutants that plaintiffs discuss,
17     different producers, different geographic areas, different
18     homes, and different damages.  Those things are all part of
19     plaintiffs' prima facia case to establish liability.
20              For any of plaintiff's claims, whether it's strict
21     liability, negligence, nuisance, or trespass, any class
22     member has to show not only that their property was affected
23     by a given earthquake but that it was damaged by the
24     earthquake.  That's an individual determination that any
25     class member must show and is not susceptible to class
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

16

1    treatment.

2         Judge Friot, in the *West* case, what he found on

3    very similar allegations was given you have multiple

4    earthquakes caused by multiple defendants, or possibly even

5    others who are not part of the case, and not every class

6    member has experienced those earthquakes and not every

7    defendant has caused every earthquake alleged, there's no

8    way to have a class resolution that provides a common

9    answer.

10        Plaintiffs respond that what they're looking to do

11   is to have the Court answer the question, who caused each

12   cluster of earthquakes, but that doesn't resolve the case.

13   Because whether any given class member has a cracked

14   foundation, let's say, the question is is that cracked

15   foundation a result of an earthquake or the result of shoddy

16   workmanship or weather or flooding or some other cause.

17   That's a particular allegation in each case.

18        What we've cited in our briefs, Your Honor, are

19   cases throughout the country where courts have refused to

20   certify or indeed even struck class allegations in

21   environmental cases like this.  In fact, those courts are

22   even striking or denying class certification where there's a

23   single defendant and a single source of alleged pollution.

24        Here, we have 23 defendants and numerous sources

25   across a wide geographic area affecting hundreds of

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1    thousands of class members.  There's no verdict a jury can

2    render that will give a common resolution to the class

3    members' claims in those instances.

4            For that reason, the defendants and Devon are

5    requesting that the Court follow Judge Friot's order and

6    find similarly in this case that, on the face of the

7    petition, the class allegation should be stricken as a

8    matter of law.

9            THE COURT:  Thank you.

10           Defendants wish to be heard?

11           Mr. Poynter?

12           MR. POYNTER:  May it please the Court.  My name is

13   Scott Poynter.  I represent the plaintiffs in this lawsuit,

14   and I also represent the plaintiffs in the Cooper class

15   action.  It's currently before Judge Walkley in Cleveland

16   County, but the case is on file in Lincoln County.  Judge

17   Ashwood in Lincoln County had recused.  Her husband was

18   Director of the Office of Emergency Management at the time

19   of the Prague earthquakes.  So she recused and Judge Walkley

20   was appointed by the Supreme Court.

21           Earlier this year when we had motions to stay and

22   we were present before Your Honor, I pointed out then that

23   there were enormous differences with the way that the *West*

24   case was pled and the way this case was pled.  I'm not a

25   part of the *West* case.  I disagreed with the way that it was

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1  pled.  I even said that maybe the defendants would like me

2  as an expert witness because I didn't believe that case

3  could ever be certified.

4        This case is pled the way that I pled the Cooper

5  case, which has been certified as a class action as to New

6  Dominion by Judge Walkley.  So I thought, back in the early

7  part of this year, that Judge Friot would probably not

8  certify that class.  He didn't get to that point.  What he

9  did is he struck the class allegations, which is what Devon

10  and the other defendants want you to do here.  I thought

11  then that they would be waving that order before Your Honor

12  today, and I said I'd be waving my Walkley order in front of

13  you.  Because I think -- in fact I know, because I pled both

14  cases -- that the Cooper case is way more appropriate for

15  class certification.  That's why it was certified as a

16  class, and this case is pled very similarly.

17        In the Walkley case, there was an evidentiary

18  hearing.  The judge took evidence from us, from our

19  geophysicist, and also Austin Holland, who was the state

20  geophysicist.  New Dominion put on evidence of different

21  engineers that testified primarily as you couldn't determine

22  damages on a uniform basis across the entire class

23  membership.  I admitted that was true.

24        The way that Judge Walkley certified the class,

25  which also involves what we think is potentially 450,000

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1   class members, is she certified it for purposes of an issues

2   trial on common issues.  She did so based on the current law

3   in the State of Oklahoma and particularly the *Gentry* case

4   that we talked about in our briefing before Your Honor.

5              So there is precedent from the Oklahoma appellate

6   courts.  There is a decision from a district court judge

7   that I know, from being in front of her this morning, that

8   she respects Your Honor and I think you respect her.  Her

9   decision is an informed, knowledgeable decision of how this

10  case can proceed on a liability trace -- or I should say

11  track -- and to have common issues certified for the class,

12  under the *Gentry* decision that's in our briefing, before

13  this court and was also before Judge Walkley.

14             What this really comes down to, Your Honor, is

15  class certification orders are conditional by their nature,

16  and that's by the rules.  And they're on purpose because

17  they want the district courts to have the ability to have

18  flexibility.  Even the *Gentry* decision talks about that and

19  says it is okay to certify when there's one prevailing,

20  overarching issue, where the earthquake's caused by the

21  wastewater disposal, and then potentially decertify and

22  bifurcate the case as to specific causation and damages.

23  That's what Judge Walkley has done.

24             I think the reason that we're seeing these motions

25  to strike from Devon and the other companies is because what

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1    they want to do is they want to cut off additional claims by

2    folks.   What I mean by that is the class claims tolled the

3    statute of limitations for class members while that claim is

4    pending.   If the class allegations are struck, as they wish,

5    then the statute is no longer tolled, and what members of

6    the class -- everybody in this nine-county area -- would

7    have to do to protect their claims is file all their

8    earthquake cases in this court, Payne County, and the

9    surrounding counties, and I just don't think that's a wise

10   thing to do.

11         What I think and what I'm proposing to Your Honor

12   is let's see how the Supreme Court deals with Judge

13   Walkley's decision in Cooper because it doesn't hurt anybody

14   and it allows us to see what the precedent from the

15   appellate courts are going to be in Oklahoma.   In other

16   words, I'm basically saying that what they're asking the

17   Court to do is somewhat, for lack of a better phrase, busy

18   work because, at some point, we're going to have precedent.

19         Now New Dominion, I think, filed a reply a couple

20   of days ago and referred to the appeal.   I want to just let

21   the Court know exactly where the appeal stands.   New

22   Dominion filed a petition in error.   We responded to that

23   petition in error.   New Dominion filed its brief, and we

24   have filed our brief.   In New Dominion's recent reply, the

25   second paragraph notes that I moved to stay the appeal,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1    basically saying Mr. Poynter's being hypocritical because he

2    said this was going to be decided soon but then he moved to

3    stay.  What's not revealed in that second paragraph is that

4    the reason that we moved to stay is because both the

5    petition that New Dominion filed and the response that we

6    filed, both of us chose the block that we were willing for

7    the appellate courts to send us into a settlement

8    conference.  So I moved to stay and asked the Court to put

9    us into a settlement conference.

10            Now the settlement conference procedure has been

11   done away with at the Supreme Court and at the Court of

12   Appeals, but that was the purpose of the motion, and it's

13   been denied.  The appeal is going forward.  New Dominion

14   will be filing a refly brief soon.  So that's the true

15   status of the appeal, and I just felt like the second

16   paragraph, in New Dominion's reply, should have revealed why

17   the motion to stay was filed.  It was really because it

18   appeared both parties were willing to try to settle the

19   appeal.

20            Thank you, Your Honor.

21            THE COURT:  Thank you.

22            Just a second.

23            It's probably going to be 3:30 before I get to

24   Leforce, if you want to wait to bring him up until then.  I

25   know it's an hour later, but I've still got to call my

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

```
 1    disposition docket.  It will take about 40 minutes.  So
 2    let's bring him up at 3:30 to address that issue, if you
 3    don't mind, so everybody's on the same page.
 4              Any responses?
 5              MR. ABRAMS:  Yes, Your Honor.
 6              I'd like to respond to the discussion of the
 7    Cooper case.  It is on appeal, and Devon believes there's a
 8    good chance, if not a certainty, that the order certifying
 9    the class gets overturned.  But more importantly, this is
10    not the Cooper case.  In this case -- The Cooper case
11    involved two defendants and a single earthquake event that
12    occurred over a couple of days.  This is four years of
13    earthquakes allegedly caused by numerous defendants, 23 in
14    this case, occurring in different places at different times.
15    This is a multi-source case with different factors applying.
16              Cooper, frankly, is irrelevant unless it gets
17    overturned.  Because if Cooper's overturned, it demonstrates
18    that no class of this nature can be done or can be
19    certified.  But here, looking at just the facts that
20    plaintiffs have pled have shown that no class can be
21    certified.
22              Now plaintiffs' counsel principally argued that
23    plaintiffs are asking the Court to certify an issues class.
24    That's not pled in their complaint.  In fact, it doesn't
25    show up in the complaint at all -- or the petition.  Excuse
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

1    me.  What the petition alleges, and this is Paragraph 100,

2    is that plaintiffs in the class have suffered damages.  The

3    next paragraph, Paragraph 101, plaintiffs and the class

4    members have suffered damages to their homes and business in

5    the form of physical damages, market losses, and damages to

6    their personal property.  Going further, Paragraph 102 says

7    that plaintiffs and the class have suffered and continue to

8    suffer emotional harm for which defendants should be held

9    strictly liable.

10          Those questions, physical injury to real property,

11   injury to personal property, loss of value for real estate

12   or personal property, loss of business opportunities, and

13   emotional harm are all particular to each class member.

14   Plaintiffs are not asking for an issue class in their

15   petition.  They're asking for the Court to certify a class

16   and to make findings as to how these hundreds of thousands

17   of people have been emotionally harmed by earthquakes, in

18   addition to physically and otherwise.  Those claims for

19   every class member require an individualized determination.

20          In order to certify any class under Oklahoma law

21   and indeed federal law, common issues must present

22   themselves in the class proceeding.  Those common issues

23   must predominate.  But for every class member, there are

24   individualized questions as to what earthquakes did that

25   person experience, when did that person own the property.

EXHIBIT 1

```
1    If they only started owning the property in 2016, they have
2    no claim for earthquakes occurring in 2015.  We couldn't
3    know that from a single class proceeding.  That requires an
4    individual determination.  And then how much has that
5    person's emotional wellbeing been harmed?  That's a question
6    that requires every person to testify personally in the
7    proceeding.  Those individualized issues predominate.
8            There's another issue too that the plaintiff
9    raised, which is the objections that Devon and the
10   defendants have raised is to the quantum of damages.  In
11   other words, individualized issues or really just how much
12   each person should get.  But as a prima facie matter, every
13   claim raised must show that damage has occurred as a matter
14   of fact.  Without damage, there's no claim.
15           Here, let's take the nuisance claim, for example.
16   If you have an individual class member who owns a home and
17   was absent when an earthquake occurred and there's no
18   physical damage, that earthquake can't be a nuisance.
19   They're not home to have the earthquake interfere with their
20   use and enjoyment of the property.  But the only way to know
21   that and the only way to know whether that person actually
22   has a claim is to ask them.  That's not what the class
23   action procedure is for.  It's for a single trial where
24   plaintiffs in a representative capacity can resolve the
25   claims of the class, and that's not been presented here.
```

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

EXHIBIT 1

```
1              Finally, I'll note, Your Honor, for issue class
2    certification, plaintiffs still must meet the requirements
3    of a typical class certification under Rule 2023.  As we've
4    demonstrated in our briefs, they cannot do so even on the
5    face of the pleadings.  For that reason, the Court should
6    strike those class claims as a matter of law.
7              THE COURT:  Let me stop you there.
8              The Court has reviewed Judge Friot's decision.
9    The Court has reviewed Judge Walkley's decision.  The
10   Court -- The way Judge Walkley decided, the Court
11   understands her reasoning and understands her argument
12   that -- or her position dealing with whether or not the
13   injection wells caused the earthquake and whether or not
14   that caused individual damages that she would determine at a
15   later date.  I understand that's on appeal.
16             The problem I have in these cases, the way it's
17   pled is that she has New Dominion -- alleged others, but it
18   appears to be just New Dominion.  We have 26 defendants in
19   this matter with a whole bunch of different earthquakes and
20   a whole bunch of different clusters.  The Court believes,
21   based upon the petition on its face, that there's no way
22   this Court believes that the plaintiffs can show
23   commonality, as it relates to a class certification.
24             I'm going to go ahead, at this time, and sustain
25   that motion to strike class certification.  I will certify
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

```
 1    it interlocutory, so we can get that issue before the
 2    Supreme Court or the appellate courts and get that ruled on
 3    to proceed on further.  I think that's the difference that
 4    we have here.  While Judge Walkley's case is similar as it
 5    relates to earthquakes, it's not similar as it relates to
 6    parties.  I think that they're completely different
 7    entities.  So I am sustaining the motion as it relates --
 8    that I do not believe the plaintiffs can get to commonality
 9    of a class, the defendants, and we'll show that stricken.
10          As I indicated, I will enter an interlocutory
11    appeal, so that you can proceed on, Mr. Poynter, if you want
12    to get that before the appellate courts.  I think they'll
13    have to resolve it one way or another in this case, even
14    though this case may get resolved a different way.  I think
15    they've got to address the issues of this case separately.
16          Anything else that we need to address at this time
17    then?
18          MR. COTTINGHAM:  Your Honor, I can think of --
19    There may be more from defendants -- we probably need a
20    timeframe to file answers.  I'm thinking 20 days.
21          THE COURT:  As it relates on the motions to
22    dismiss?
23          MR. COTTINGHAM:  Well, to answer the petition.
24          THE COURT:  Yes.
25          MR. COTTINGHAM:  Yeah.  Even though I know there's
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

```
 1    going to be -- it sounds like there may well be an
 2    interlocutory appeal.
 3              THE COURT:  I would hope so, just so we can get
 4    that issue resolved.
 5              Any objection to 20 days to allow the defendants
 6    to file their answers?  Any problems with that?
 7              (No response)
 8              THE COURT:  The Court will grant 20 days to do so.
 9              MR. STEIN:  Your Honor, Patrick Stein on behalf of
10    Chesapeake, Orca, D&B, and Mid-Con.
11              We had briefed a statute of limitations argument
12    that the Court hasn't heard previously.
13              THE COURT:  Yeah.  I'm going to stay that at this
14    time.  I think that could be a fact question as to each
15    individual.  So I'm going to overrule it at this time to be
16    raised depending on class, of course, and then on summary
17    judgment.  I think it's more appropriate on a summary
18    judgment than a motion to dismiss.  I think there's some
19    facts that would need to be presented on those claims.
20              MR. STEIN:  I understand, Your Honor.  Thank you.
21              THE COURT:  Anything else?
22              (No response)
23              THE COURT:  The parties may be excused in this
24    matter.  Thank you.
25              (End of proceedings)
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

28

```
 1              IN THE DISTRICT COURT OF LOGAN COUNTY
                        STATE OF OKLAHOMA
 2
      LISA GRIGGS and APRIL MARLER, on        )
 3    behalf of themselves and other          )
      Oklahoma citizens similarly situated,   )
 4                                            )
                    PLAINTIFFS,               )
 5    vs.                                     ) CASE NO. CJ-2017-174
                                              )
 6    NEW DOMINION LLC, TNT OPERATING         )
      COMPANY INC, WHITE OPERATING            )
 7    COMPANY, RAINBO SERVICE COMPANY,        )
      DRYES CORNER LLC, CHESAPEAKE            )
 8    OPERATING LLC, DEVON ENERGY             )
      PRODUCTION CO LP, SPECIAL ENERGY        )
 9    PRODUCTION CO LP, ORCA OPERATING        )
      COMPANY LLC, WHITE STAR PETROLEUM       )
10    LLC, EQUAL ENERGY US INC, ELDER         )
      CRAIG OIL & GAS LLC, D&B OPERATING      )
11    LLC, M M ENERGY INC, DAKOTA             )
      EXPLORATION LLC, WICKLUND               )
12    PETROLEUM CORPORATION, KIRKPATRICK      )
      OIL COMPANY INC, TOOMEY OIL             )
13    COMPANY INC, CHAPARRAL ENERGY LLC,      )
      EASTOK PIPELINE LLC, MID-CON            )
14    ENERGY OPERATING LLC, MIDSTATES         )
      PETROLEUM COMPANY LLC, TERRITORY        )
15    RESOURCES LLC, and JOHN DOES 1-25,      )
                                              )
16                  DEFENDANTS.               )

17

18                CERTIFICATE OF THE COURT REPORTER

19         I, Karen L. Martin, Certified Shorthand Reporter
      and Official Court Reporter for Payne and Logan Counties, do
20    hereby certify that the foregoing transcript in the
      above-styled case is a true, correct, and complete
21    transcript of my shorthand notes of the proceedings in said
      cause.
22         Dated this 5th day of December, 2018.

23
      Karen L. Martin, CSR and
24    Official Court Reporter in
      and for the State of Oklahoma
25
```

Karen Martin
State of Oklahoma
Certified Shorthand Reporter
CSR #1557

My Certificate Expires 12-31-2018

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

EXHIBIT 1

**<u>Exhibit B</u>**

**Class Action Order**



**IN THE DISTRICT COURT OF LOGAN COUNTY**
**STATE OF OKLAHOMA**

STATE OF OKLAHOMA
LOGAN COUNTY ss
FILED IN THE OFFICE

2020 OCT -8 AM 9: 36

CHERYL SMITH
COURT CLERK
BY _____ DEPUTY

LISA GRIGGS, et al.,                )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )    Case No. CJ-2017-174
                                    )    Hon. Judge Phillip C. Corley
NEW DOMINION LLC, et al.            )
                                    )
        Defendants.                 )

---

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS**
**PLAINTIFFS' FIRST AMENDED PETITION, DEFENDANTS'**
**MOTIONS TO STRIKE THE CLASS ALLEGATIONS, AND PLAINTIFFS'**
**MOTION FOR APPROPRIATE RELIEF**

---

BEFORE THE COURT are Defendants' Motions to Dismiss Plaintiffs' First Amended

Petition, Defendants' Motions to Strike the Class Allegations of the First Amended Petition, and

Plaintiffs' Motion for Appropriate Relief. The motions were heard in hearings held on November

16, 2018, and September 18, 2020.

This matter came before the Court on the 16th day of November, 2018, on the following

motions:

Defendant MM Energy, Inc.'s Motion to Dismiss and Brief in Support;

Defendant Special Energy Corporation's Notice of Motion to Dismiss;

Motion to Dismiss and Brief in Support of Defendants TNT Operating, Inc. White
Operating Company, Dryes Corner LLC, and Equal Energy US Inc;

Defendant White Star Petroleum LLC's Motion to Dismiss for Failure to State a Claim,
with Brief in Support;

Defendant Rainbo Service Co.'s Notice of Motion to Dismiss;

Chesapeake Operating, L.L.C.'s Notice of Pending Motion to Dismiss;

Renewed Motion to Dismiss of Rainbo Service Company Combined with Brief in Support;

Renewed Motion to Dismiss of Defendants White Star Petroleum LLC and Dakota Exploration, LLC for Failure to State a Claim, With Brief in Support;

Defendant Devon Energy Production Company, L.P.'s Motion to Dismiss Plaintiffs' First Amended Petition and Brief in Support;

Motions to Dismiss and Brief in Support of Defendants TNT Operating, White Operating Company, Dryes Corner LLC and Equal Energy US Inc.;

Defendant Kirkpatrick Oil Company's Renewed Motion to Dismiss Plaintiffs' First Amended Class Action Petition and Brief in Support;

Defendant MM Energy, Inc.'s Renewed Motion to Dismiss and Brief in Support;

Defendant New Dominion, LLC's Motion to Dismiss Plaintiffs' First Amended Class Action Petition, and Brief in Support;

Defendant Special Energy Corporation's Special Appearance, Motion to Dismiss and Brief in Support;

Defendant Chesapeake's Renewed Motion to Dismiss and Supporting Brief;

Defendants D&B's, Mid-Con's, and Orca's Renewed Motion to Dismiss and Supporting Brief;

Defendant Wicklund Petroleum Corporation's Joinder to Codefendants' Motion to Dismiss;

Defendant Toomey Oil Company, Inc.'s Joinder to Codefendants' Motion to Dismiss;

Craig Elder Oil and Gas, L.L.C.'s Joinder in Devon Energy Production Company, L.P.'s Motion to Dismiss Plaintiffs' First Amended Petition;

Devon Energy Production Company, L.P.'s Motion to Strike the Class Allegations Contained in Plaintiff's Petition;

Defendant New Dominion, LLC's Motion to Strike Plaintiffs' Class Allegations;

Defendants Chesapeake's, D&B's, Mid-Con's, and Orca's Joinder in Defendant Devon's Motion to Strike Class Action Allegations from Petition;

Motion to Strike Class Action Allegations by Defendants, TNT Operating Company, Inc., White Operating Company, Dryes Corner, LLC, and Equal Energy US, Inc.;

Defendant MM Energy, Inc.'s Motion to Strike Class Allegations Contained Within Plaintiffs' First Amended Petition; and

Craig Elder Oil & Gas, L.L.C.'s Joinder in Devon Energy Production Company, L.P.'s Motion to Strike Class Action Allegations in Petition.

The Court having reviewed the Parties' briefs and the exhibits submitted therewith, and having heard the arguments of counsel, found, for the reasons stated on the record in open Court on that day (November 16, 2018), that Defendants' motions to dismiss based on bankruptcy should be and hereby are sustained and Defendants' motions to dismiss on other grounds should be and hereby are denied. Defendants were to file their responses to the First Amended Petition within 20 days of the date of the hearing on the pending motions, and it appears that they have done so.

On November 16, 2020, the parties also appeared on the Defendants' Motions to Strike the Class Action Allegations, and the Court reviewed all such matters before it and heard argument from the parties, and then announced its intention to grant the motions, but also to certify the order for an interlocutory appeal. For whatever reasons, no Order was ever presented or entered by the Court.

Thereafter, on July 16, 2020, Plaintiffs filed a Motion for Appropriate Relief requesting entry of an Order regarding the Motions to Strike or to allow Plaintiffs to prepare the matter for a Motion for Class Certification pursuant to 12 O.S. §2023.

The Motion for Appropriate Relief was heard on September 18, 2020. Having considered all matters before the Court on the Motions to Strike, the Motion for Appropriate Relief, and having heard arguments of counsel on November 16, 2018 and September 18, 2020, the Court hereby grants the Motions to Strike and grants that portion of the Motion for Appropriate Relief requesting entry of an Order regarding the Motions to Strike. The Court grants the Motions to Strike because

3

of the number of Defendants named in the Petition, and for the reasons stated at pp. 25-27 of the Transcript of November 16, 208 and the reasons stated during the hearing held September 18, 2020, which will be reflected in the hearing's transcript. The Court enters this Order pursuant to 12 O.S. §2023 C. 1. This Order shall be appealable by Plaintiffs pursuant to 12 O.S. §2023 C. A. and 2.

IT IS SO ORDERED this 24 day of _Sept_____, 2020.

_____

PHILLIP C. CORLEY
JUDGE OF THE DISTRICT COURT

4